No. 16-60670
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT
_____

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; SCOTT PRUITT, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*
_____

ON PETITION FOR REVIEW OF FINAL ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
_____

## CORRECTED BRIEF OF PETITIONERS THE STATE OF TEXAS AND THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
_____

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection
Division

CRAIG J. PRITZLAFF
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC-066)
Austin, Texas  78711-2548
Tel: (512) 475-4138
Fax: (512) 320-0911

COUNSEL FOR PETITIONERS

March 2, 2017

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Petitioners*
State of Texas and Texas Commission on Environmental Quality

### Counsel for Petitioners
Ken Paxton, Attorney General of Texas; Jeffrey C. Mateer, First Assistant Attorney General; Brantley Starr, Deputy First Assistant Attorney General; James E. Davis, Deputy Attorney General for Civil Litigation; Priscilla M. Hubenak, Chief, Environmental Protection Division; and Craig J. Pritzlaff, Assistant Attorney General

*Intervenors*
Big Brown Power Company LLC; La Frontera Holdings, LLC; Luminant Generation Company LLC; Luminant Mining Company LLC; Oak Grove Management Company LLC; and Sandow Power Company LLC

### Counsel for Intervenors
Stephen Gidiere III and David W. Mitchell with Balch & Bingham LLP; Stephanie Z. Moore, Executive Vice President & General Counsel, Vistra Energy Corp. (parent company of Interventors); and Daniel J. Kelly, Vice President & Associate General Counsel, Vistra Energy Corp.

*Respondents*

United States Environmental Protection Agency and Scott Pruitt, in his official capacity as Administrator of the United States Environmental Protection Agency

### *Counsel for Respondents*

Bruce S. Gelber, Deputy Assistant Attorney General U.S. Department of Justice, Environment & Natural Resources Division; Amy J. Dona, U.S. Department of Justice, Environmental Defense Section; Chloe H. Kolman, U.S. Department of Justice, Environmental Defense Section; Stephanie Hogan, United States Environmental Protection Agency; Abi Vijayan, United States Environmental Protection Agency; Lynde Schoellkopf, United States Environmental Protection Agency, Region 6; Ron Curry, United States Environmental Protection Agency (not counsel, but Region 6 Administrator)

*/s/ Craig J. Pritzlaff*
CRAIG J. PRITZLAFF
Attorney of record for the Petitioners

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Fifth Circuit Rule 28.2.3, Petitioner the State of Texas respectfully requests oral argument. In accordance with the Clean Air Act, the State of Texas submitted a plan for approval to the United States Environmental Protection Agency ("EPA") to implement certain provisions of the Act. Without reason, the EPA delayed acting on Texas' plan in contravention of the requirement that the EPA act on the plan within a year. After years of delay, the EPA ultimately disapproved Texas' plan, basing its decision on data and criteria developed well after Texas submitted its plan and not on any statutory requirement. Oral argument will aid the Court in understanding the EPA's procedural failures and the effect those failures have not only on the present petition for review, but also on review of future state plans submitted to the EPA under the Clean Air Act.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**.................................................. ii

**STATEMENT REGARDING ORAL ARGUMENT** ........................................ iv

**TABLE OF CONTENTS** ..................................................................................v

**TABLE OF AUTHORITIES** ........................................................................ ix

**RECORD REFERENCES** .............................................................................xv

**GLOSSARY**...................................................................................................xv

**STATEMENT OF JURISDICTION**.................................................................1

**STATEMENT OF THE ISSUES**.......................................................................2

**STATEMENT OF THE CASE**..........................................................................3

   **I.**   **The Clean Air Act establishes a framework for how the state and federal governments set and comply with air quality standards.**.............3

      A. The Act establishes a system of cooperative federalism between the EPA and the states.....................................................................................3

      B. The EPA sets the NAAQS.............................................................................4

      C. States must prepare plans to attain the NAAQS...........................................5

      D. The EPA must timely approve or disapprove a SIP revision within 12 months of declaring it administratively and technically complete.................6

      E. If the EPA disapproves a SIP, the EPA must prepare a FIP for the state. ......7

  **II.**  **The EPA has made various regulatory attempts to address interstate transport of air pollution**. .............................................................................8

      A. The EPA first promulgated the NO$_x$ SIP Call. ...............................................9

      B. The EPA then promulgated the Clean Air Interstate Rule (CAIR)................9

C. The EPA then promulgated the Cross-State Air Pollution Rule (the "Transport Rule"). ..................................................................10

D. In December 2015, the EPA promulgated an update to the Transport Rule. ................................................................................................11

III. **In 2012, Texas timely submitted its infrastructure SIP revisions to address the 2008 Ozone NAAQS.** ..............................................12

A. The EPA reviewed drafts of Texas' infrastructure SIP prior to submission, and when the TCEQ submitted its SIP revision to the EPA, the agency immediately declared that it was complete. ..................................13

IV. **Texas' infrastructure SIP revision addressed the Good Neighbor Provision.** ........................................................................................14

V. **The EPA disapproved Texas' infrastructure SIP revision.** ....................16

**STANDARD OF REVIEW** ................................................................................19

**SUMMARY OF ARGUMENT** ..........................................................................21

**ARGUMENT** .....................................................................................................23

*Restatement of Issue 1:   Did the EPA act arbitrarily and capriciously by disapproving Texas' infrastructure SIP revisions, not based on any requirement in the Clean Air Act, but based on EPA-created data and criteria not available or revealed to Texas when Texas developed its methodology and approach for determining whether Texas contributed significantly to nonattainment of the 2008 Ozone NAAQS in another state or interfered with another state's maintenance of that NAAQS?*

I. **Texas' methodology and approach in its SIP revision for the 2008 Ozone NAAQS was appropriate based on the data, laws, the record, and EPA interpretations of the Good Neighbor Provision in existence at the time Texas submitted its plan.** ..................................................23

A. The EPA's strained interpretation of the phrase "will ... contribute significantly to nonattainment" in the Good Neighbor Provision is contrary to the plain language of the statute and is contrary to the EPA's prior interpretations.  This application of a new interpretation to Texas' SIP was arbitrary, capricious, and not in accordance with law. ..................................24

1. *The term "nonattainment" is a term of art that cannot be ignored or redefined by the EPA.* ..............................................................................25

2. *The EPA's interpretation of the Good Neighbor Provision renders superfluous the "interfere with maintenance" clause.* ...........................28

3. *Even if the EPA's interpretation were permissible, it was invalidly applied here because the projected nonattainment future year projection was arbitrarily set by the EPA well after Texas submitted its SIP.*..........29

B. The TCEQ correctly concluded that Texas satisfied its obligations under the Good Neighbor Provisions. ........................................................................30

1. *Texas analyzed an appropriate scope and geographic range of data.* ....30

2. *The EPA's reliance on data, modeling, and statutory interpretations published three years after Texas submitted its SIP is arbitrary and capricious.* ...............................................................................................32

C. Texas conducted sufficient analysis to establish that the State does not "interfere with maintenance" in other downwind states. ..............................36

*Restatement of Issue 2: The EPA declared that Texas' state implementation plan revision was administratively and technically complete. The Clean Air Act, 42 U.S.C. § 7410(k)(2), required the EPA to approve or disapprove the plan within 12 months of that declaration. Did the EPA violate the Clean Air Act by delaying its decision for 28 months beyond that and basing its decision on post hoc data and criteria not available when the EPA should have reviewed the plan in 2013?*

**II. The EPA arbitrarily and without statutory authority delayed making a decision on Texas' timely submitted SIP revision in contravention of the EPA's requirement to act under the Clean Air Act.**................................38

A. The Clean Air Act requires the EPA to act to approve or disapprove a SIP within 12 months of determining the plan is administratively and technically complete...................................................................................................38

B. The EPA must review a SIP submission based on information and methodology available during the 12 month statutory review period, not on information or criteria developed years later...................................................39

C.  The EPA did not have to follow the path it did—ignoring the deadlines and then reviewing and disapproving the SIP on new information—because the Act includes several SIP-review safeguard provisions for exactly this situation..........................................................................................................40

D.  The EPA's arbitrary course of conduct has nullified the Act's SIP review scheme. ............................................................................................................42

**CONCLUSION**..................................................................................................44

**CERTIFICATE OF SERVICE** ...........................................................................46

**CERTIFICATE OF COMPLIANCE** ...............................................................46

**ADDENDUM OF STATUTES, RULES, AND REGULATIONS**...................47

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ala. Power Co. v. Costle*,
    636 F.2d 323 (D.C. Cir. 1979)......................................................................42

*Alaska Dep't of Envtl. Conservation v. EPA*,
    540 U.S. 461 (2004)....................................................................................35

*BCCA Appeal Grp. v. EPA*,
    355 F.3d 817 (5th Cir. 2003) ...............................................................3, 5, 6

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
    467 U.S. 837 (1984)....................................................................................20

*EME Homer City Generation, L.P. v. EPA*,
    696 F.3d 7 (D.C. Cir. 2012) ("*EME Homer City I*")......................................10

*EME Homer City Generation, L.P. v. EPA*,
    795 F.3d 118 (D.C. Cir. 2015) ("*EME Homer City II*")...............................11

*EPA v. EME Homer City Generation, L.P.*,
    134 S. Ct. 1584 (2014)..................................................................8, 9, 10, 11

*Fla. Power & Light v. Costle*,
    650 F.2d 579 (5th Cir. 1981) .........................................................................3

*Forest Guardians v. Babbitt*,
    174 F.3d 1178 (10th Cir. 1999) ..................................................................38

*Luminant Generation Co., L.L.C. v. EPA*,
    675 F.3d 917 (5th Cir. 2012) ...............................................................passim

*Luminant Generation Co, L.L.C. v. EPA*,
    714 F.3d 841 (5th Cir. 2013) .......................................................................20

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000)......................................................................9

*Michigan v. EPA,*
     268 F.3d 1075 (D.C. Cir. 2001)......................................................................3

*Nat'l Steel Corp. v. Gorsuch,*
     700 F.2d 314 (6th Cir. 1983) .......................................................35

*North Carolina v. EPA,*
     531 F.3d 896 (D.C. Cir. 2008)........................................10, 29, 36

*North Carolina v. EPA,*
     550 F.3d 1176 (D.C. Cir. 2008)....................................................10

*North Dakota. v. EPA,*
     730 F.3d 750 (8th Cir. 2013) .......................................................40

*Sierra Club v. Johnson,*
     541 F.3d 1257 (11th Cir. 2008) ...................................................38

*Sierra Club v. McCarthy,*
     No. 14-cv-05091-YGR, 2015 WL 3666419,
      at *3 (N.D. Cal. May 7, 2015) ...................................................39

*Sun Towers, Inc. v. Schweiker,*
     694 F.2d 1036 (5th Cir. 1983) ....................................................19

*Texas v. EPA,*
     690 F.3d 670 (5th Cir. 2012) ..................................................6, 19

*Texas v. EPA,*
     829 F.3d 405 (5th Cir. 2016) ....................................6, 7, 8, 17, 44

*Tex. Oil & Gas Ass'n v. EPA,*
     161 F.3d 923 (5th Cir. 1998) ......................................................19

*Union Elec. Co. v. EPA,*
     427 U.S. 246 (1976).......................................................................6

*Whitman v. Am. Trucking Ass'ns,*
     531 U.S. 457 (2001).....................................................................20

*WildEarth Guardians v. Jackson*,
  Case No. 11-cv-5651-YGR, 2012 WL 4953101
  (N.D. Cal. Oct. 17, 2012) ..............................................................................12

## Federal Statutes

ADMINISTRATIVE PROCEDURE ACT

5 U.S.C. § 553(c) ..........................................................................................24

5 U.S.C. § 555(b) ..........................................................................................39

5 U.S.C. § 706(2) ..........................................................................................43

5 U.S.C. § 706(2)(A), (E) .............................................................................19

5 U.S.C. § 706(2)(C) .....................................................................................19

5 U.S.C. § 706(2)(D) ...............................................................................19, 40

CLEAN AIR ACT

42 U.S.C. § 7401(a)(3), (4) ............................................................................3

42 U.S.C. § 7407(a) ........................................................................................5

42 U.S.C. § 7407(d)(1)(A)(i) ........................................................................26

42 U.S.C. § 7407(d)(1)(A)(i)-(ii) ...................................................................4

42 U.S.C. §§ 7408-7409 .................................................................................4

42 U.S.C. §§ 7408-7410 .................................................................................3

42 U.S.C. § 7409 .............................................................................................4

42 U.S.C. § 7409(d) ......................................................................................39

42 U.S.C. § 7409(d)(1) ...................................................................................4

42 U.S.C. § 7410(a) ...................................................................................... 39

42 U.S.C. § 7410(a)(1), (a)(2)(H) ................................................................... 5

42 U.S.C. § 7410(a)(1), (*l*) ............................................................................ 6

42 U.S.C. § 7410(a)(2)(A)-(M) ....................................................................... 6

42 U.S.C. § 7410(a)(2)(C) ............................................................................. 37

42 U.S.C. § 7410(a)(2)(D) ............................................................................... 8

42 U.S.C. § 7410(c)(1) ................................................................................. 7, 8

42 U.S.C. § 7410(c)(1)(A)-(B) ........................................................................ 8

42 U.S.C. § 7410(k)(1)-(2) ............................................................................ 39

42 U.S.C. § 7410(k)(1)(B) ............................................................................... 7

42 U.S.C. § 7410(k)(2) .............................................................................. 7, 38

42 U.S.C. § 7410(k)(3) .............................................................................. 6, 28

42 U.S.C. § 7410(k)(4) ................................................................................. 41

42 U.S.C. §§ 7410(k)(4)-(5) ......................................................................... 34

42 U.S.C. § 7410(k)(5) .............................................................................. 9, 40

42 U.S.C. § 7410(k)(6) ................................................................................. 40

42 U.S.C. § 7410(l) ........................................................................................ 7

42 U.S.C. § 7475 .......................................................................................... 37

42 U.S.C. § 7501(2) .................................................................................. 4, 26

42 U.S.C. § 7511 .......................................................................................... 26

42 U.S.C. §§ 7511-7511a ...........................................................................5

42 U.S.C. § 7602(y) ...................................................................................7

42 U.S.C. § 7607(b)(1) ...............................................................................1

**<u>Federal Regulatory Materials</u>**

40 C.F.R. pt. 50 ..........................................................................................4

40 C.F.R. pt. 50, app. P ........................................................................14, 26

40 C.F.R. § 50.15 ..............................................................................4, 26, 27

40 C.F.R. pt. 51, app. V ..........................................................................7, 32

40 C.F.R. § 51.103 ......................................................................................7

40 C.F.R. § 51.103(b) ...............................................................................13

40 C.F.R. § 51.103(c) ...............................................................................32

40 C.F.R. § 52.02(a) ...................................................................................6

63 Fed. Reg. 57,356 (Oct. 27, 1998)..........................................................9

70 Fed. Reg. 25,162 (May 12, 2005) ..........................................................9

73 Fed. Reg. 16,436 (Mar. 27, 2008)..........................................................4

76 Fed. Reg. 48,208 (Aug. 8, 2011)....................................................10, 11

77 Fed. Reg. 30,088 (May 21, 2012) ....................................................12, 26

80 Fed. Reg. 46,271 (Aug. 4, 2015)..........................................................18

80 Fed. Reg. 75,706 (Dec. 3, 2015) ...............................12, 18, 28, 42, 43

81 Fed. Reg. 296 (Jan. 5, 2016) ...............................................................17

81 Fed. Reg. 6483 (Feb. 8. 2016) ............................................................17

81 Fed. Reg. 20,543 (Apr. 8, 2016) .........................................................15

81 Fed. Reg. 21,290 (Apr. 11, 2016) ...............................................passim

81 Fed. Reg. 40,816 (June 23, 2016) .......................................................15

81 Fed. Reg. 53,284 (Aug. 12, 2016)................................................passim

81 Fed. Reg. 62,375 (Sept. 9, 2016) ........................................................26

81 Fed. Reg. 74,504 (Oct. 26, 2016)........................................................12

81 Fed. Reg. 95,051 (Dec. 27, 2016) .......................................................15

82 Fed. Reg. 8,499 (Jan. 26, 2017) ..........................................................15

# RECORD REFERENCES

This brief cites documents from the Environmental Protection Agency's Second Corrected Certified Index to Administrative Record as "Index #___, App.___, at [page no. and/or document description as appropriate]."  An appendix including these documents will be filed in accordance with Fifth Circuit Rule 30.2(a).  Because certain documents listed in the Certified Index are not relevant to the EPA's disapproval action, Petitioners and Petitioner-Intervenors moved to strike those irrelevant documents from the record.  Doc. 00513863091.  The motion to strike was carried with the case and remains pending.  Doc. 00513866172.

# GLOSSARY

| | |
|---|---|
| CAA or Act | Clean Air Act |
| EPA | United States Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| Good Neighbor Provision | 42 U.S.C. § 7410(a)(2)(D) |
| NAAQS | National Ambient Air Quality Standards |
| 2008 Ozone NAAQS | 8-hour daily average of ozone (0.075 parts per million), set by the EPA on March 27, 2008 at 73 Fed. Reg. 16,436 |
| SIP | State Implementation Plan |
| TCEQ | Texas Commission on Environmental Quality |

## STATEMENT OF JURISDICTION

In December 2012, Texas adopted and submitted to the EPA revisions to Texas' state implementation plan ("SIP") for infrastructure and transport for the 2008 ozone national ambient air quality standard. The United States Environmental Protection Agency disapproved the portion of the SIP pertaining to interstate transport of air pollutants in a final rule published on August 12, 2016, "Approval and Promulgation of Air Quality Implementation Plans; Texas; Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards," 81 Fed. Reg. 53,284 ("Final Disapproval").

The Clean Air Act ("CAA" or the "Act") affords this Court jurisdiction to review the Final Disapproval. *See* 42 U.S.C. § 7607(b)(1) (permitting petitions for review to be filed within sixty days from the date of publication of the rule in the *Federal Register*). On October 11, 2016, Texas timely filed a petition for review of the Final Disapproval. The Final Disapproval adversely affects Texas and the Texas Commission on Environmental Quality ("TCEQ"), which is the agency responsible for administering the Act in Texas. The Final Disapproval pertains only to Texas, and, therefore, this Court is the "appropriate circuit" to review the EPA's action. *Id*.

## STATEMENT OF THE ISSUES

1. Did the EPA act arbitrarily and capriciously by disapproving Texas' infrastructure SIP revisions, not based on any requirement in the Clean Air Act, but based on EPA-created data and criteria not available or revealed to Texas when Texas developed its methodology and approach for determining whether Texas contributed significantly to nonattainment of the 2008 Ozone NAAQS in another state or interfered with another state's maintenance of that NAAQS?

2. The EPA declared that Texas' state implementation plan revision was administratively and technically complete.  The Clean Air Act, 42 U.S.C. § 7410(k)(2), required the EPA to approve or disapprove the plan within 12 months of that declaration.  Did the EPA violate the Clean Air Act by delaying its decision for 28 months beyond that and basing its decision on post hoc data and criteria not available when the EPA should have reviewed the plan in 2013?

## STATEMENT OF THE CASE

**I.    The Clean Air Act establishes a framework for how the state and federal governments set and comply with air quality standards.**

> **A.    The Act establishes a system of cooperative federalism between the EPA and the states.**

The Clean Air Act establishes a comprehensive program for improving air quality through state and federal regulation.  *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-822 (5th Cir. 2003).  The Act provides that air pollution control is the "primary responsibility of States and local governments" and that cooperation between state and federal governments is essential to prevent and control air pollution.  42 U.S.C. § 7401(a)(3), (4).  This spirit of cooperative federalism is embodied throughout the Act.  *See Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001) (the Act is "an experiment in cooperative federalism").  The federal government sets minimum standards, and the states prepare plans to comply with those standards within their borders.  42 U.S.C. §§ 7408-7410.  "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'"  *Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (quoting *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981)).

**B.    The EPA sets the NAAQS.**

Under the Act, the EPA must identify pollutants that endanger the public health and welfare, and it must also establish maximum permissible concentrations of these pollutants in ambient air. *See* 42 U.S.C. §§ 7408-7409. The concentrations are known as the national ambient air quality standards or NAAQS. *Id.* § 7409. Every five years, the EPA must revisit each standard and revise it as may be appropriate. *Id.* § 7409(d)(1).

The EPA has promulgated NAAQS for various pollutants, including ozone. *See* 40 C.F.R. pt. 50. Ground-level ozone is not emitted directly by human activities, but is formed when nitrogen oxides ("$NO_x$") and volatile organic compounds (VOCs) react with sunlight. ($NO_x$ and VOCs are also called ozone 'precursors.') Index #3, App. A, at 2-1 to 2-2 (Texas SIP Submittal for the 2008 Ozone NAAQS; Index #2, App. B, 81 Fed. Reg. 21,290, 21,291 (Apr. 11, 2016)). Relevant here, in March 2008, the EPA revised the NAAQS for ozone. *See* 73 Fed. Reg. 16,436 (Mar. 27, 2008). The EPA made the standard more stringent by lowering it from 0.080 parts per million ("ppm"), to 0.075 ppm, as measured over an 8-hour daily average ("2008 Ozone NAAQS"). 40 C.F.R. § 50.15.

An area that meets a NAAQS is called an "attainment" area; an area "that does not meet" a NAAQS is a "nonattainment" area. 42 U.S.C. § 7407(d)(1)(A)(i)-(ii); *see id.* § 7501(2) ("nonattainment area" incorporates nonattainment as defined in

section 7407(d)).  Ozone nonattainment areas are further classified according to the severity of air pollution.  They include "marginal," "moderate," "serious," "severe," and "extreme" nonattainment areas.  *Id.* §§ 7511-7511a.

### C.   States must prepare plans to attain the NAAQS.

While the EPA determines the level of the NAAQS, the Act leaves with the states "the primary responsibility for ensuring that the ambient air meets the NAAQS for the identified pollutants."   *BCCA Appeal Grp.*, 355 F.3d at 822; 42 U.S.C. § 7407(a).  Within three years of the promulgation of a NAAQS or a revised NAAQS, a state must submit a state implementation plan ("SIP"), or a revision to its existing SIP, to implement, maintain, and enforce the standard. 42 U.S.C. §§ 7410(a)(1), (a)(2)(H).

The type of SIP to be submitted in response to a new or revised NAAQS is known as an "infrastructure" SIP, because the plan includes elements that establish the infrastructure of a state's air-pollution control program.  *See* EPA *Memoran*dum, Guidance on Infrastructure SIP Elements Under Clean Air Act Section 110(a)(1) and 110(a)(2), at 1 (Sept. 13, 2013), referenced in Index #15, App. C, at 1 (EPA Guidance Document from Janet McCabe).[1]   The infrastructure elements include provisions that, among other things, set enforceable emissions limitations and other

---

[1] This document is publicly available at:
https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf (last visited Feb. 10, 2017).

control measures, develop air-quality monitoring and modeling, establish permitting programs, provide for adequate funding and personnel, provide for emissions reporting, and provide for public participation. *See* 42 U.S.C. § 7410(a)(2)(A)-(M).

The Act affords states "'wide discretion in formulating [their] plan[s]'" for achieving the NAAQS. *Luminant Generation Co.*, 675 F.3d at 921 (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)). Consistent with the Act's cooperative federalism, the federal government sets the goals and basic requirements of state plans, but it is the states that retain "broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Grp.*, 355 F.3d at 822.

## D. The EPA must timely approve or disapprove a SIP revision within 12 months of declaring it administratively and technically complete.

After reasonable notice and public hearings, a state submits its SIP or SIP revision to the EPA for review and approval. *See* 42 U.S.C. §§ 7410(a)(1), (*l*). The EPA's reviewing role is primarily "ministerial" to ensure that plans are consistent with the Act. *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016). If a SIP or SIP revision meets the statutory criteria of the Act and related federal regulations, "then the EPA must approve it." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012); 42 U.S.C. § 7410(k)(3); 40 C.F.R. § 52.02(a).

Once the EPA receives a SIP revision, it must promptly (no later than six months from receipt) review and determine whether the plan is technically and administratively complete. 42 U.S.C. § 7410(k)(1)(B); *see* 40 C.F.R. § 51.103 & pt. 51, app. V ("Criteria for Determining the Completeness of Plan Submissions"). If the EPA does not make a completeness finding within six months, the plan is deemed by operation of law to meet the minimum criteria. 42 U.S.C. § 7410(k)(1)(B).

"Within 12 months of a determination by the Administrator ... that a State has submitted a plan or plan revision ... that meets the minimum criteria established pursuant to [§ 7410(k)(1)] ..., the Administrator shall act on the submission ...." *Id.* § 7410(k)(2). "The EPA shall disapprove a SIP revision only if 'the revision would interfere with any applicable requirement concerning attainment' of the NAAQS 'or any other applicable requirement' of the Act." *Luminant Generation Co.*, 675 F.3d at 921-22 (quoting 42 U.S.C. § 7410(l)).

E.    **If the EPA disapproves a SIP, the EPA must prepare a FIP for the state.**

When the EPA disapproves a SIP, it assumes "the role of primary regulator" and must promulgate a federal implementation plan ("FIP") within two years. *Texas*, 829 F.3d at 412; 42 U.S.C. § 7410(c)(1). A FIP is promulgated to "fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan." 42 U.S.C. § 7602(y). The EPA may impose a FIP only if (1) "a State has failed to make a required submission" or if the "plan revision

7

submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A);" or (2) the EPA "disapproves a State implementation plan submission in whole or in part." 42 U.S.C. § 7410(c)(1)(A)-(B). Unless and until the state corrects the deficiency in its SIP, the EPA "steps into the State's shoes" and assumes the state's role with respect to implementation of appropriate control measures in the state. *Texas*, 829 F.3d at 412; 42 U.S.C. § 7410(c)(1).

## II.    The EPA has made various regulatory attempts to address interstate transport of air pollution.

One of the infrastructure items a state must include in its SIP are provisions to address interstate transport of pollutants. 42 U.S.C. § 7410(a)(2)(D). This "transport" provision "has come to be called the Good Neighbor Provision." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1595 (2014). The Good Neighbor Provision is divided into two components. Section 7410(a)(2)(D)(i) addressed interstate transport and section 7410(a)(2)(D)(ii) addresses interstate and international pollution abatement. The first of these components, section 7410(a)(2)(D)(i), is further divided into two subcomponents:

> [Each plan shall]— (D) contain adequate provisions—
> (i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in any amount which will—
>
> > (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard[.]

Only the Texas SIP revision provisions relating to section 7410(a)(2)(D)(i)(I) are at issue in this case.

As the EPA has amended the NAAQS over the years, it has attempted to fashion regulatory programs to implement the Good Neighbor Provision. *See EME Homer City Generation*, 134 S. Ct. at 1595-96. The relevant regulatory history is briefly described in this section for context.

### A.    The EPA first promulgated the NO$_x$ SIP Call.

The EPA's first regulatory effort came in 1998, when the EPA issued a rule known as the "NO$_x$ SIP Call," which called for 22 states and the District of Columbia to revise their SIPs to address interstate transport of emissions of nitrogen oxides. *See* 63 Fed. Reg. 57,356 (Oct. 27, 1998) (addressing the 1979 one-hour and 1997 eight-hour ozone NAAQS). The NO$_x$ SIP Call was issued pursuant to 42 U.S.C. § 7410(k)(5). The rule was challenged and the D.C. Circuit upheld the regulation. *See Michigan v. EPA*, 213 F.3d 663, 669-70 (D.C. Cir. 2000).

### B.    The EPA then promulgated the Clean Air Interstate Rule (CAIR).

In 2005, the EPA issued the Clean Air Interstate Rule ("CAIR"), which generally concerned control of emissions of NO$_x$ and sulfur dioxide ("SO$_2$") in 28 upwind states that the EPA determined contributed to downwind nonattainment of the 1997 NAAQS for particulate matter and eight-hour ozone. *See* 70 Fed. Reg. 25,162 (May 12, 2005). CAIR also used several factors to define the term

"contribute significantly" in the Good Neighbor Provision. The D.C. Circuit first vacated the CAIR, then reinstated the rule on request from the industry petitioners, but remanded to the EPA for revisions. *See North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008) (vacating the CAIR); *North Carolina v. EPA*, 550 F.3d 1176 (D.C. Cir. 2008) (reinstating and remanding the CAIR).

### C.    The EPA then promulgated the Cross-State Air Pollution Rule (the "Transport Rule").

In response to *North Carolina*, in 2011 the EPA promulgated the Cross-State Air Pollution Rule ("Transport Rule"), which concerned control of emissions in 27 upwind states (including Texas) that the EPA contended contributed to downwind nonattainment of the 1997 NAAQS for fine particulate matter and eight-hour ozone and the 2006 NAAQS for fine particulate matter. Index #13, App. D, 76 Fed. Reg. 48,208 (Aug. 8, 2011). The rule replaced CAIR and included, as relevant here, new ozone-season NOx budgets for electric generating units in Texas. However, in 2012, before Texas submitted its infrastructure SIP revision at issue here for the 2008 Ozone NAAQS, the D.C. Circuit vacated the rule. *See EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 12 (D.C. Cir. 2012) ("*EME Homer City I*"). Then, two years later, the Supreme Court reversed *EME Homer City I* and remanded the rule for further consideration. *See EME Homer City Generation*, 134 S. Ct. at 1584.

Of import to this proceeding, the Transport Rule relied on the EPA's interpretation of the term "contribute significantly" as used in

section 7410(a)(2)(D)(i)(I). As the Supreme Court explained: "In short, under the Transport Rule, an upwind State 'contribute[d] significantly' to downwind nonattainment to the extent its exported pollution both (1) produced one percent or more of a NAAQS in at least one downwind State (step one) and (2) could be eliminated cost-effectively, as determined by EPA (step 2). Upwind states would be obligated to eliminate all and only emissions meeting both of these criteria." *EME Homer City Generation,* 134 S. Ct. at 1597 (citation omitted); *see* Index #13, App. D, 76 Fed. Reg. at 48,254.

On remand, the D.C. Circuit considered various as-applied challenges to the Transport Rule pressed by several petitioners, including Texas. *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015) ("*EME Homer City II*"). In general, petitioners challenged the emission allocations promulgated for certain states in the Transport Rule. The D.C. Circuit granted certain of the petitions (including Texas') on the grounds that the EPA's emission budgets for those states were more stringent than necessary, and the court remanded to the EPA for the EPA to revise upward those states' budgets. *See EME Homer City II*, 795 F.3d at 138. Among the remanded budgets was the EPA's ozone-season $NO_x$ budget for Texas.

### D.    In December 2015, the EPA promulgated an update to the Transport Rule.

In December 2015, the EPA proposed revisions to the Transport Rule, which included provisions to address the 2008 Ozone NAAQS and also proposed

imposition of a FIP against 23 upwind states, including Texas. *See* Index #10, App. E, 80 Fed. Reg. 75,706 (Dec. 3, 2015). Over the objections of many parties, including Texas, the EPA finalized the Transport Rule revisions and the FIP ("Transport Rule Update" or "CSAPR Update"). *See* 81 Fed. Reg. 74,504 (Oct. 26, 2016).[2] Among other things, the Transport Rule Update establishes more constrained budgets for $NO_x$ emissions from electric generating units, including units in Texas. *See* 81 Fed. Reg. at 74,506-508.

## III.  In 2012, Texas timely submitted its infrastructure SIP revisions to address the 2008 Ozone NAAQS.

Under section 7410(a)(1), states are required to submit their SIPs within three years of EPA's promulgation of the 2008 Ozone NAAQS (March 2011). In this case, the normal three-year deadline was delayed by litigation challenging the underlying standard. *See generally* 77 Fed. Reg. 30,088, 30,091 (May 21, 2012); *WildEarth Guardians v. Jackson*, No. 11-cv-5651-YGR, 2012 WL 4953101 (N.D. Cal. Oct. 17, 2012) (requiring the EPA to make an initial finding on the SIPs no later than January 4, 2013); Index #3, App. A, at v & pp. 1 to 2 of TCEQ's Interoffice Memorandum.

---

[2] Texas and other petitioners have filed petitions for review of the Transport Rule Update in the D.C. Circuit. *See* D.C. Cir. Case No. 16-1406 (lead).

**A.    The EPA reviewed drafts of Texas' infrastructure SIP prior to submission, and when the TCEQ submitted its SIP revision to the EPA, the agency immediately declared that it was complete.**

The TCEQ has a long history of timely submitting comprehensive revisions to its SIP, and it frequently communicates with the EPA concerning its SIPs. *See* Index #3, App. A, at 1-1 (¶1.1) & pp. 4 to 5 of TCEQ's Interoffice Memorandum.  Here, the TCEQ engaged with the public and the EPA concerning its SIP submission *prior* to submitting the SIP to the EPA.  *See* Index #3, App. A, at Letter from EPA Region 6 to TCEQ regarding Texas' proposed SIP submission (Sept. 28, 2012); *see also* 40 C.F.R. § 51.103(b) (permitting preliminary review of plans upon request by a state).  The EPA provided various comments to the TCEQ, but at that time refused to comment on Texas' SIP revision relating to the Good Neighbor Provision pending its evaluation of the decision in *EME Homer City I*. Index #3, App. A, at cmt. 6 of Letter from EPA Region 6 to TCEQ regarding Texas' proposed SIP submission (Sept. 28, 2012).  The TCEQ addressed the EPA's other comments.  *See* Index #3, App. A at p.11 of TCEQ's response to comments document.  The TCEQ also addressed other comments received during the public comment period. Index #3, App. A, at hearing transcript and TCEQ's response to comments document.  On December 13, 2012, Texas timely submitted its infrastructure SIP revision to the EPA regional office (Region 6) located in Dallas. Index #3, App. A, at Letter from TCEQ to EPA submitting Texas' infrastructure SIP

revision.  Seven days later, the EPA determined that Texas' infrastructure SIP was "administratively and technically complete."  Index #23, App. F, at Letter from EPA Region 6 to TCEQ, regarding EPA's completeness finding (Dec. 20, 2012).  This began the 12-month clock for approval or disapproval by the EPA.

## IV.  Texas' infrastructure SIP revision addressed the Good Neighbor Provision.

The Texas SIP revision addressed certain infrastructure elements of section 7410(a)(2), including, specifically, those required by the Good Neighbor Provisions.  Index #3, App. A, at pp. xi & 1-1 to 2-19.  To address interstate transport, the TCEQ considered Texas' impact on downwind states by analyzing ozone design values,[3] ozone design value trends in Texas and in adjacent states, and the distance between the nonattainment areas in Texas compared to the other nonattainment areas in adjacent states.  Index #3, App. A, at 2-3 to 2-12.  The data and analysis demonstrated steeply declining trends in the levels of ozone detected at the monitors and in all ozone nonattainment areas in general.  Index #3, App. A, at 2-3 to 2-13.  Furthermore, all monitors between Texas and the nearest downwind ozone nonattainment areas (Memphis and Baton Rouge) demonstrated attainment of the 2008 Ozone NAAQS.  Index #3, App. A, at 2-5. Finally, because of the many

---

[3] A design value is a statistic used to describe whether the air quality at a given location is meeting or not meeting the NAAQS.  40 C.F.R. pt. 50, app. P.  The ozone design value data were obtained from analysis of 167 ozone monitors within Texas and adjacent states.  Index #3, App. A, at 2-6.

ozone sources not in Texas, the TCEQ concluded that local emissions, not emissions from Texas, primarily contributed to nonattainment in those areas outside of Texas. *Id.* Indeed, Texas' analysis was ultimately borne out—both Memphis and Baton Rouge are now in attainment for the 2008 Ozone NAAQS. *See* 81 Fed. Reg. 20,543 (Apr. 8, 2016), 81 Fed. Reg. 40,816 (June 23, 2016) (redesignating the Memphis area as in attainment for the 2008 Ozone NAAQS); 81 Fed. Reg. 95,051 (Dec. 27, 2016) (redesignating the Baton Rouge area as in attainment for the 2008 Ozone NAAQS).[4]

The TCEQ also examined ozone-season[5] wind patterns and photochemical modeling completed in 2011 and 2010 for the Dallas-Fort Worth and Houston-Galveston 1997 eight-hour ozone nonattainment areas. Index #3, App. A, at 2-5 & 2-12; TCEQ HGB Attainment Demonstration SIP Revision for the 1997 Eight-Hour Ozone Standard, Appendix C: Photochemical Modeling for the HGB Attainment Demonstration SIP (Mar. 10, 2010); and TCEQ Dallas-Fort Worth Attainment Demonstration State Implementation Plan Revision for the 1997 Eight-Hour Ozone Standard, Appendix D: Conceptual Modeling for the DFW Attainment Demonstration SIP Revisions for the 1997 Eight-Hour Ozone Standard

---

[4] The effective date of the Baton Rouge redesignation was delayed, with many other rules, per Presidential directive dated Jan. 20, 2017. 82 Fed. Reg. 8,499 (Jan. 26, 2017).

[5] The ozone season is the season when ground-level ozone is typically generated from May through September. Index #3, App. A, at 2-5.

15

(Dec. 7, 2011).  This modeling demonstrated that prevailing wind patterns from the main sources of downwind ozone forming pollutants in the State were unlikely to transport ozone to the nearest 2008 Ozone NAAQS nonattainment regions in Memphis and Baton Rouge.  Index #3, App. A, at 2-5.

Because direct attainment monitoring data from those regions adjacent to Texas showed declining trends and no exceedances, further modeling or analysis was not deemed necessary.  Furthermore, the TCEQ analyzed the comprehensive control strategies already in place throughout the State to reduce ozone forming pollutants (detailed at Index #3, App. A, at 2-13 to 2-19) and concluded that the SIP revision adequately demonstrates that "Texas has the appropriate statutory and regulatory authority to develop necessary rules and control measures so that all areas of the state can either maintain the standard or meet and then attain the standard in the future."  Index #3, App. A, at 4 of TCEQ's response to comments document.  Based on the control strategies already in place (and to be developed) and analysis of ozone trends within Texas and bordering downwind states, the TCEQ concluded that it met the requirements of section 7410(a)(2)(D)(i)(I) for the 2008 Ozone NAAQS with existing controls.  Index #3, App. A, at 1-1 and 2-19.

## V.    The EPA disapproved Texas' infrastructure SIP revision.

After declaring Texas' infrastructure SIP technically complete in 2012, the EPA went radio silent until 2016 with respect to the revisions.  Despite a non-

discretionary statutory mandate to act on Texas' infrastructure SIP within 12 months (*i.e.*, by December 20, 2013), the EPA waited nearly 40 months to propose disapproving those portions of Texas' infrastructure SIP addressing the interstate transport provision of section 7410(a)(2)(D)(i)(I). *See* Index #2, App. B, 81 Fed. Reg. 21,290 (Apr. 11, 2016).[6] The EPA finalized its disapproval four months later. Index #1, App. G, 81 Fed. Reg. 53,284 (Aug. 12, 2016).

The EPA concluded that Texas improperly limited its analysis to areas designated nonattainment in states geographically closest to Texas and failed to give "independent significance" to the "interfere with maintenance" clause of section 7410(a)(2)(D)(i)(I) because "its analysis did not attempt to evaluate the potential impact of Texas emissions on areas that are currently measuring clean data, but that *may* have issues maintaining that air quality." Index #1, App. G, 81 Fed. Reg. at 53,284 (emphasis added).

---

[6] Separately, on January 5, 2016, the EPA disapproved the portion of Texas's SIP pertaining to interstate transport and visibility requirements under section 7410(a)(2)(D)(i)(II). 81 Fed. Reg. 296. The final rule was challenged by Texas and other petitioners and is pending as No. 16-60118 (5th Cir.) and No. 16-1078 (D.C. Cir.). Venue was upheld in the Fifth Circuit and the Court stayed the EPA's regional haze rule and SIP disapproval because of the strong likelihood that petitioners would prevail in their claims that the rule was unlawful. *See Texas*, 829 F.3d at 405. Additionally, on February 8, 2016, the EPA proposed to approve portions of Texas' SIP submission relating to other infrastructure elements of section 7410(a)(2). *See* 81 Fed. Reg. 6483. The final rule was challenged by environmental groups, but the case was voluntarily dismissed. *See* Case No. 16-60755.

In support of its conclusions, the EPA cited rules, models, and data it released for the first time in 2015—nearly three years after Texas was required by the Act to submit its infrastructure SIP revisions. *See* Index # 7-9, App. H to J, (H) 80 Fed. Reg. 46,271 (Aug. 4, 2015), (I) EPA Excel Spreadsheet of Supporting Data, and (J) EPA Emissions Data Files Provided with the July, 2015 Ozone Transport Modeling Data NODA; Index #10, App. K, 80 Fed. Reg. 75,706 (Dec. 3, 2015), Index #11, App. L, at EPA Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Cross-State Air Pollution Rule Proposal (Nov. 2015); Index #12, App. M, at EPA Ozone Transport Policy Analysis Proposed Rule TSD (Nov. 2015)).[7]  The EPA asserts that in this action it "[did] not rely upon the proposed CSAPR Update" and that any deficiencies identified in Texas' submission "are completely independent of any analysis conducted to support the CSAPR Update proposal."  Index #1, App. G, 81 Fed. Reg. at 53,286.  Nevertheless, throughout the proposed SIP disapproval and the Final SIP Disapproval, the EPA relied heavily on the record for the Transport Rule Update, which was data released years after Texas submitted its SIP.  Index #2, App. B, 81 Fed. Reg. 21,292-94; Index #1, App. G,

---

[7] Each of these items (#7-12) is the subject of a Joint Motion to Strike, filed on Feb. 3, 2017 (Doc. 00513863091).  As noted in the motion, the EPA concedes that the Transport Rule Update was "irrelevant to the question of whether the Texas SIP should be disapproved."  Index #1, App. G, 81 Fed. Reg. at 53,284 n.2.  The TCEQ provided detailed comments on each of the referenced Federal Register announcements.  In keeping with its statement that the Transport Rule Update is irrelevant, the EPA omitted the TCEQ's comments to each announcement from the Second Corrected Certified Index.

81 Fed. Reg. 53,294-6, 53,288.   Indeed, in its proposed disapproval, the EPA

includes a chart and multiple references from the proposed CSAPR Update to

support its disapproval of Texas' conclusions concerning out-of-state transport.

*See e.g.*, Index #2, App. B, 81 Fed. Reg. at 21,293 (citing charts demonstrating, to

EPA, modeled linkages of Texas emissions to downwind areas based on CSAPR

Update data).

The State timely filed a petition for review of the Final Disapproval.

Luminant Generation Company, LLC and its related entities, timely filed a motion

to intervene in support of the State's petition for review, which the Court granted.

## STANDARD OF REVIEW

This Court may reverse the EPA's action if it was "arbitrary, capricious, an

abuse of discretion, not in accordance with law, or unsupported by substantial

evidence on the record taken as a whole."   *Texas*, 690 F.3d at 676 (quoting *Sun*

*Towers, Inc. v. Schweiker*, 694 F.2d 1036, 1038 (5th Cir. 1983)); 5 U.S.C.

§ 706(2)(A), (E).   The EPA's action also must be set aside if it is in excess of the

EPA's statutory authority.   5 U.S.C. § 706(2)(C).   Furthermore, the Court may

vacate the EPA's action if the EPA failed to observe procedures required by law.   *Id.*

§ 706(2)(D); *see also Luminant Generation Co.*, 675 F.3d at 925 (quoting *Tex. Oil*

*& Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998)).   Post hoc rationalizations

of the EPA's action must be disregarded.  *Luminant Generation Co.*, 675 F.3d at 925.

Finally, agency interpretations of statutes they have responsibility for administering are reviewed under a two-step analysis, set forth in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).  *See Luminant Generation Co., L.L.C. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013).  The Court must determine if Congress has directly spoken on the issue, and if Congress' intent is clear from the statutory language, the Court must give it effect.  *Chevron*, 467 U.S. at 842-43.  If the statute is silent or ambiguous, the Court shall decide whether the agency based its own statutory construction "on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  Critically, the "EPA may not construe the [Clean Air Act] in a way that completely nullifies textually applicable provisions meant to limit its discretion."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001).

## SUMMARY OF ARGUMENT

At issue is Texas' plan to address the interstate transport of ozone forming pollutants from Texas to other downwind states. Texas was one of the few states to submit a plan. Texas was required to submit a plan after the EPA had promulgated new ozone standards in 2008. As required by the Clean Air Act, the plan described how Texas intended to meet the 2008 Ozone NAAQS, including how Texas planned to reduce downwind migration of ozone forming pollutants from Texas into other states. The plan also demonstrated that emissions from Texas would not contribute significantly to nonattainment in, or interfere with maintenance by, any downwind state for the 2008 Ozone NAAQS.

After receiving and immediately declaring that Texas' plan was both administratively and technically complete, the EPA thereafter ignored its statutory obligation to complete review of Texas' plan within a year. The EPA faced no penalty or regulatory repercussion for its failure to meet its statutory requirements. The EPA then compounded its procedural failure by first proposing its own plan for Texas, and then later disapproving of those portions of Texas' plan related to interstate transport of pollutants. At no time before disapproving of Texas' plan did the EPA formally communicate to Texas that Texas' conclusions concerning interstate transport were insufficiently supported. As a result, many states simply opted to not submit a plan and ceded their authority under the Act to the EPA.

Instead of reviewing Texas' plan on time and based on the justification presented by Texas, the EPA went about developing its own separate plan that the EPA would use as justification to strip Texas of its discretion and authority to implement the 2008 Ozone NAAQS. The post hoc rulings and justifications rendered it impossible for Texas to have submitted a compliant SIP. Had the EPA acted on Texas' plan within the statutory deadline, the EPA would have had no basis to disapprove the plan.

The Clean Air Act provides that states have primary responsibility for implementing the Act. In its actions here, the EPA has run roughshod over the "cooperative federalism" contemplated in the Act; it has ignored the discretion afforded to states to implement the Act; and the EPA has ignored its own procedural milestones mandated by the Act. All of this amounts to an agency mired in capricious behavior and acting contrary to the Congressional mandate described in the Act. The Court should vacate the Final Disapproval and remand it to the EPA with instructions for the EPA to reconsider its action on Texas' infrastructure SIP revision based on information and statutory criteria available at the time of submission and to approve the SIP unless the EPA demonstrates that it violates a requirement of the Act.

# ARGUMENT

**Issue I:**    *Did the EPA act arbitrarily and capriciously by disapproving Texas' infrastructure SIP revisions, not based on any requirement in the Clean Air Act, but based on EPA-created data and criteria not available or revealed to Texas when Texas developed its methodology and approach for determining whether Texas contributed significantly to nonattainment of the 2008 Ozone NAAQS in another state or interfered with another state's maintenance of that NAAQS?*

## I.    Texas' methodology and approach in its SIP revision for the 2008 Ozone NAAQS was appropriate based on the data, laws, the record, and EPA interpretations of the Good Neighbor Provision in existence at the time Texas submitted its plan.

Imagine an athlete competing in a race, training for and expecting to run a certain distance.  When the athlete nears the expected finish line, she finds the finish line has moved to some unknown location and the parameters of the race have suddenly changed to include hurdles, swimming, and biking.  The athlete would have no hope of successfully competing in such an event.  This is the scenario created by the EPA for Texas in this case.  Well after the EPA should have made a decision on Texas' SIP revision, it completely changed the parameters for what it expected should be included in the SIP, including new data, models, and statutory interpretations developed well after Texas' SIP was submitted.  That is the very definition of arbitrary and capricious decision-making.

The EPA bases its disapproval on an interpretation of the Good Neighbor Provision not previously articulated and in conflict with the plain language of the statute.  Index #1, App. G, 81 Fed. Reg. at 53,287.  The EPA also erroneously asserts

that the TCEQ's demonstration that Texas does not contribute significantly to nonattainment of the 2008 Ozone NAAQS in other states was flawed because (a) the TCEQ did not examine areas in other states not formally designated as nonattainment, and (b) subsequent modeling data published by the EPA three years after Texas timely submitted its SIP have proven Texas's interstate conclusions were wrong. Index #2, App. B, 81 Fed. Reg. at 21,292; Index #1, App. G, 81 Fed. Reg. at 53,284. Finally, the EPA concludes that Texas did not properly consider whether emissions in the State interfered with maintenance of the 2008 Ozone NAAQS in other downwind states. Index #2, App. B, 81 Fed. Reg. at 21,292; Index #1, App. G, 81 Fed. Reg. at 53,284-5. For the reasons discussed below, none of these bases for denial withstands scrutiny, and thus the EPA's disapproval must be vacated.

> **A.    The EPA's strained interpretation of the phrase "will ... contribute significantly to nonattainment" in the Good Neighbor Provision is contrary to the plain language of the statute and is contrary to the EPA's prior interpretations. This application of a new interpretation to Texas' SIP was arbitrary, capricious, and not in accordance with law.**

In its Final Disapproval, the EPA announced a statutory interpretation of section 7410(a)(2)(D)(i)(I) that is contrary to the plain language of the statute, was not even articulated in the proposed disapproval, and provided Texas no meaningful opportunity to consider and comment on the EPA's interpretation. Index #1, App. G, 81 Fed. Reg. at 53,287; 5 U.S.C. § 553(c) (notice and comment). Section 7410(a)(2)(D)(i)(I) requires that for a new or revised standard, each SIP must contain

"adequate provisions" to prohibit emissions within a state that will "contribute significantly to nonattainment" or "interfere with maintenance" of the applicable NAAQS.    In this proceeding, the EPA interpreted the phrase "contribute significantly to nonattainment" to encompass not just those areas formally designated as nonattainment under the statute, but also any area that is *projected* to exceed the NAAQS at some future year the EPA decides is appropriate.  Index #1, App. G, 81 Fed. Reg. at 53,287.

The EPA bases this on the leading term "will" in the statute.  *Id.* ("The future tense demonstrates that Congress intended this requirement to be forward-looking and apply to areas that will be in nonattainment regardless of formal designation.").  According to the EPA, "[a]n upwind state cannot be relieved of its obligation to address interstate transport of air pollution merely because of a lack of formal designation."    *Id*.    However, the EPA's interpretation ignores that the term "nonattainment" is a defined term in the Act with a specific meaning directly contrary to the EPA's interpretation.  The EPA's interpretation also effectively nullifies the "interfere with maintenance" clause in the Good Neighbor Provision.

   1.    *The term "nonattainment" is a term of art that cannot be ignored or redefined by the EPA.*

The EPA posits that it can redefine the term "nonattainment" in the Good Neighbor Provision because "[n]othing in the CAA limits States' obligations under the good neighbor provision to downwind areas that have been formally designated

nonattainment." Index #1, App. G, 81 Fed. Reg. at 53,287. Yet, Congress very specifically used the term "nonattainment," which is a term of art that has a very specific meaning under the Act—*i.e.*, an area that "does not meet" the NAAQS (present tense). *See* 42 U.S.C. §§ 7407(d)(1)(A)(i), 7501(2). An area becomes designated as a nonattainment area following a complicated demonstration process, which includes years of monitoring and analysis of data. *See* 42 U.S.C. § 7511; 40 C.F.R. § 50.15 and pt. 50, app. P.[8]

When preparing its infrastructure SIP revision, the Act does not require Texas to include the level of analysis and detail attendant to an attainment demonstration, which is what the EPA's interpretation in the disapproval here would require. Instead, these infrastructure SIPs are intended merely to demonstrate that the basic program elements have been addressed for the NAAQS—*i.e.*, the SIP must merely demonstrate how Texas statutes and rules will allow the state to meet its obligations under the Act. *See* 81 Fed. Reg. 62,375, 62,376 (Sept. 9, 2016) (because of the lack of information generally available at the time they are submitted, infrastructure SIPs are considered by the EPA to be "general planning" documents designed to "ensure that the state has adequate resources and authority to implement a NAAQS in general throughout the state."). Here, the EPA has cast away this basic principle and

---

[8] The designations for the 2008 Ozone NAAQS were completed in early 2012. *See* 77 Fed. Reg. 30,088 (May 21, 2012).

required of Texas modeling and data accumulation that it took the EPA itself over three years to assemble.

According to the EPA, for Texas to meet its obligations under the "nonattainment" prong of the Good Neighbor Provision, Texas must analyze not just whether it will contribute significantly to a nonattainment area in another State, but whether it might at some future date contribute to an unknown (an unknowable) area in a downwind state that might one day be *forecasted* by the EPA to not meet the NAAQS:

> An area with air quality that is projected to exceed the NAAQS would be in nonattainment, and thus not meeting public health-based standards, regardless of whether it has been formally designated as a nonattainment area. ... Thus, Texas should have considered possible contributions to downwind areas that are not designated nonattainment but *may* nonetheless measure exceedances of the NAAQS in considering whether Texas emissions significantly contribute to nonattainment in another state.

Index #1, App. G, 81 Fed. Reg. at 53,287 (emphasis added). This is an unachievable, and unlawful, requirement. The EPA's approach does not comport with the definition of nonattainment in the Act or the EPA's long-standing interpretation of the term, which classifies ozone nonattainment based upon "the 3-year average of the annual fourth-highest daily maximum 8-hour average" ambient ozone concentration. 40 C.F.R. § 50.15. This determination is based on actual data, not future year projections. *See* 81 Fed. Reg. at 53,288-89 (the TCEQ provided

comments to the EPA concerning the appropriateness of relying on actual monitoring data rather than uncertain models).

   2.   *The EPA's interpretation of the Good Neighbor Provision renders superfluous the "interfere with maintenance" clause.*

The EPA's interpretation also does not provide any meaningful distinction between nonattainment and maintenance areas.  The EPA itself defines maintenance areas to include those receptors "that have measured ozone concentrations that meet the NAAQS (clean data) based on monitoring data from years 2012-2014 *and are projected* to exceed the NAAQS in 2017 based on a maximum or average design value" (emphasis added).  Index #1, App. G, 81 Fed. Reg. at 53,285.  There is scant difference between this definition and that provided by EPA for nonattainment areas, which EPA now says includes areas "projected to exceed the NAAQS." *Id*. at 53,287.

In the Final Disapproval, the EPA notes that its methodology for developing maintenance analysis is further described in the Transport Rule Update.  *See* Index #1, App. G, 81 Fed. Reg. at 53,285 (citing 80 Fed. Reg. at 75,723-26).  But the EPA cannot disapprove a SIP based on non-statutory standards that did not even exist at the time Texas developed and submitted its infrastructure SIP revision.  42 U.S.C. § 7410(k)(3).  It is not clear how the EPA expected Texas to divine the EPA's methodology and interpretations when the EPA did not publish them until December 2015.

3. *Even if the EPA's interpretation were permissible, it was invalidly applied here because the projected nonattainment future year projection was arbitrarily set by the EPA well after Texas submitted its SIP.*

It was not until the EPA proposed the Transport Rule Update that it formally revealed to Texas that the EPA was setting 2017 as the year that Texas should have used to determine whether air quality in another state is projected to exceed the NAAQS. This came some three years after Texas submitted its SIP revision. Index #2, App. B, 81 Fed. Reg. 21,293; Index #1, App. G, 81 Fed. Reg. at 53,285. At the time Texas submitted its SIP revision, the Transport Rule had been struck down and CAIR was still in effect. Index #3, App. A, TCEQ's Interoffice Memorandum at pg. 2. The future-year projection at the time under CAIR was 2010, which the TCEQ used. Index #3, App. A, at 2-3 to 2-12.

The court in *North Carolina v. EPA* examined whether the EPA's future-year projection (2010) for the CAIR rule was arbitrary. 531 F.3d at 913-14. The court held it was not, because the future-year projection was set as the same year the rule was to go into effect. *Id.* Here, however, the EPA used a year based on a rule that was not in existence at the time Texas submitted its SIP. Furthermore, under the EPA's interpretation of the statute, there is no limitation restricting when the EPA can set the year. The EPA could set the future year at any year it wants (as it did here) simply to justify a conclusion it wants. The EPA acted arbitrarily and

capriciously in setting a future-year projection that was not disclosed to Texas at the time it submitted its SIP.

**B.    The TCEQ correctly concluded that Texas satisfied its obligations under the Good Neighbor Provisions.**

1.    *Texas analyzed an appropriate scope and geographic range of data.*

When Texas prepared its infrastructure SIP revision, it examined Texas' impact on downwind states by analyzing ozone-season wind patterns, in-state nonattainment-area modeling, monitoring data, and ozone design values and trends in a geographic area bordering Texas.  Index #3, App. A, at 2-3 to 2-19.  None of these detailed analyses of air monitors indicated any exceedance of a NAAQS, and trends demonstrated continuing declining levels of ozone at the air monitors in adjacent states.  *Id*. at 2-5.

The EPA is incorrect in accusing Texas of limiting its analysis only to designated nonattainment areas.  Index #1, App. G, 81 Fed. Reg. at 53,288 ("nothing in Texas' SIP submittal indicates that it performed any analysis to support its conclusion as the State limited its discussion of data only to certain areas designated as nonattainment and did not consider whether those or any other areas might have trouble maintaining the standard even if they measured clean data.").  The air-quality monitoring data that Texas examined included 167 monitors in *both* attainment and nonattainment areas located in Texas and neighboring states (Arkansas, Louisiana,

New Mexico, and Oklahoma). Index #3, App. A, at 2-6 to 2-12. Thus, Texas did not limit its analysis to nonattainment areas.

Furthermore, Texas "extensively investigated" ozone season wind patterns as developed for photochemical and conceptual models for the Dallas–Fort Worth and Houston–Galveston 1997 eight-hour ozone nonattainment areas in 2009 and 2010. *Id*. at 2-3 to 2-5 (and related items referenced in ¶ 2.2.1.3). Based on those prevailing ozone-season winds, the TCEQ concluded that ozone forming pollutants generated in Texas are expected to drift toward the downwind ozone nonattainment areas in Memphis and Baton Rouge. *Id*. at 2-5. All of the monitors between Texas and the Memphis and Baton Rouge nonattainment areas demonstrated attainment of the 2008 Ozone NAAQS. *Id*. Therefore, the TCEQ concluded that Texas emissions did not contribute to ozone nonattainment in those areas and also did not interfere with maintenance. *Id*. at        2-19. As previously noted, those areas are now in attainment for the 2008 Ozone NAAQS, thus bearing out Texas' analysis.

The EPA also had no basis to conclude that Texas' SIP was deficient because "Texas limited its discussion of data only to areas designated nonattainment in states that are geographically closest to Texas." Index #1, App. G, 81 Fed. Reg. at 53,284. The record simply does not support such a conclusion. Texas analyzed overall trend data in a broad geographic region including states bordering Texas, as well as in Arizona, Colorado, Illinois, Indiana, Mississippi, Missouri, Tennessee, and

Wisconsin.  Index #3, App. A, at 2-3 to 2-6.  It is correct that Texas did not analyze

monitoring data for every state in the country, but instead reasonably based its

demonstration on the ozone-season wind data available at the time, and the fact that

all ozone-season downwind monitors in areas between Texas and the nearest

nonattainment areas demonstrated compliance with the 2008 Ozone NAAQS.  *Id*. at

2-5 to 2-12, 2-19.

> 2.    *The EPA's reliance on data, modeling, and statutory interpretations published three years after Texas submitted its SIP is arbitrary and capricious.*

In December 2012, the EPA reviewed the SIP submission and determined it

was "technically complete."  Index #23, App. F.  "Technically complete" means

what it says—that the plan identifies and includes all of the modeling required to

support the proposed revision.  *See* 40 C.F.R. pt. 51, app. V at ¶ 2.2.  The EPA never

requested follow-up information from Texas or otherwise communicated with the

State that there were serious deficiencies in its submission.  *See* 40 C.F.R.

§ 51.103(c) (contemplating consultation between the State and the EPA during the

SIP process).  Instead, the EPA proceeded to develop new information and derived

new protocols for how transport SIPs would be reviewed—all completed years after

it should have already reviewed Texas' infrastructure SIP revision.  *See* Index #2,

App. B, 81 Fed. Reg. at 21,292-94 (incorporating data used to support the CSAPR

Update, which was first made available in late 2015).

The EPA applied this new information and its new interpretations to the Texas infrastructure SIP revision, knowing there was no way Texas could have incorporated data and standards not in existence in 2012. Based on this new data, and the Transport Rule Update, the EPA disapproved Texas' infrastructure SIP revision. *Id.* at 21,294 ("A final rule making the revised CSAPR implementation schedule permanent was issued on March 14, 2016 ... Thus, it is no longer appropriate for states to rely on CAIR to satisfy emission reduction obligations."), 21,295 ("Moreover, the EPA's most recent modeling indicates that emissions from Texas are projected to significantly contribute to downwind nonattainment and maintenance receptors in other states.").

Recognizing that it was impossible for Texas to have submitted a SIP revision that could comply with non-statutory requirements not in existence, the EPA nevertheless asserts "that states have the ability at any time, including before or after the imposition of a FIP, to submit an approvable SIP, which corrects any deficiency." Index #1, App. G, 81 Fed. Reg. at 53,286. This converts the EPA into the primary leader in implementing this Act, contrary to 42 U.S.C. § 7410. But Congress said that states have that role. The EPA must act on a SIP revision as written and based on information and rules in effect at the time of submission. This accords with the statutory structure that permits the EPA, after it approves a SIP revision, to later

require revision of that submission upon development of new information. 42 U.S.C. §§ 7410(k)(4)-(5).

But nothing in the statute permits the EPA to adopt a "wait-and-see" approach to review of interstate transport SIPs—deferring decisions until it can derive data and criteria to support whatever pre-determined outcome the EPA desires. As aptly described in its SIP submission, Texas was not at leisure under the Act to forestall submitting a SIP in accordance with the law pending new data or guidance from the EPA:

> The EPA has not yet proposed infrastructure or transport guidance for the 2008 [O]zone NAAQS, but in order to meet statutory deadlines for submittal of infrastructure SIPs, states do not have the option of waiting for EPA to provide additional guidance before proceeding with infrastructure and transport SIP development, review, and submittal. The TCEQ is proceeding with publication of this proposed SIP revision to ensure that there were adequate opportunities for public notice and comment as required by state and federal statutes.

Index #3, App. A, at vi. The EPA was similarly not at leisure under the Act to avoid its obligation to timely review the SIP revision. Texas had substantial discretion to fashion its SIP to comply with the then-existing requirements pertaining to interstate transport. Texas complied with the standards and law at the time of submission and submitted a compliant SIP revision. The Texas infrastructure SIP revision should have been approved (or disapproved) sometime in 2013.

If the EPA had approved the SIP revision and new data later showed that the revision was not in compliance with the Act, the EPA could have issued a recall of

the SIP revision under 42 U.S.C. § 7410(k)(5).  That is the EPA's recourse under the Act.  But delaying approval for no good reason, as the EPA has done here, upsets the SIP process and obliterates the leeway States are guaranteed in developing and making decisions to devise control measures to comply with the NAAQS.  *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 490 (2004) (the EPA may not question a State's decision that is based on a reasoned analysis); *Nat'l Steel Corp. v. Gorsuch*, 700 F.2d 314, 322 (6th Cir. 1983) ("The states are given wide discretion in formulating and revising their individual implementation plans. ... The role of the EPA in this scheme is purely a secondary one.").  But that was the path chosen by the EPA here—the EPA waited to develop data and brand-new criteria Texas had no hope of anticipating when it submitted its infrastructure SIP revision.

Nothing in the record demonstrates that Texas failed to meet its obligations under the Good Neighbor Provision based on information available at the time it was required to submit its SIP revision.  The only justifications for the EPA's decision to disapprove that submission are based on information developed well after the infrastructure SIP revision was submitted.  Reliance on that post hoc data was arbitrary, capricious, and not in accordance with the Clean Air Act.

**C.    Texas conducted sufficient analysis to establish that the State does not "interfere with maintenance" in other downwind states.**

As noted, Texas conducted a comprehensive analysis of wind, ozone-trending data, and monitoring data *in both attainment and nonattainment areas* to conclude that "[o]verall, monitoring data do not suggest that emissions from Texas contribute significantly to nonattainment *or interfere with maintenance* of the [2008 Ozone NAAQS] for areas in any other state." Index #3, App. A, at 2-19 (emphasis added). The then-existing downwind monitoring data between Texas and the nearest out-of-state nonattainment areas all showed attainment, and overall trend data showed steeply declining ozone levels over time. *Id*. at 2-3 to 2-6. The EPA does not dispute this data. The TCEQ properly concluded that this undisputed data demonstrated *both* no effect on out-of-state nonattainment *and* no effect on out-of-state maintenance. *Id*. at 2-19.

The EPA citing *North Carolina* says that Texas should have done more. Index #1, App. G, 81 Fed. Reg. at 53,287 ("Texas should have considered the potential impact of its emissions on areas that are currently measuring clean data, but may have issues maintaining that air quality."); *North Carolina*, 531 F.3d at 910. By "potential impact" the EPA would require detailed, multi-state modeling and projections, which the EPA now says must be done for both nonattainment and attainment areas—basically every area of the country. However, Texas' rigorous part of the Good Neighbor Provision analysis demonstrated that Texas did not

contribute significantly to the most serious areas of air quality concern in downwind states and that additional controls were not needed within the State. Because maintenance areas were subsumed within that analysis and because the SIP revision already contained adequate provisions to prevent contributions to downwind nonattainment, further analysis for maintenance areas was not necessary.

Furthermore, the Act includes provisions that specifically prohibit new sources of air pollution in an attainment area from contributing to nonattainment. *See* 42 U.S.C. §§ 7475, 7410(a)(2)(C). So, in addition to the controls Texas has in place (described in Index #3, App. A, at 2-13 to 2-19), downwind states have their own controls for any new sources that might contribute to air quality concerns in an attainment/maintenance area. The air quality trend data demonstrated the effect of these controls—the nearest downwind ozone nonattainment areas were trending toward attainment, and the areas in between Texas and those areas showed similar trends (and no nonattainment). The analysis conducted by Texas was sufficient to demonstrate at the time that Texas did not contribute to nonattainment or interfere with maintenance of the 2008 Ozone NAAQS at any downwind area.

**Issue 2:** *The EPA declared that Texas' state implementation plan revision was administratively and technically complete. The Clean Air Act, 42 U.S.C. § 7410(k)(2), required the EPA to approve or disapprove the plan within 12 months of that declaration. Did the EPA violate the Clean Air Act by delaying its decision for 28 months beyond that and basing its decision on post hoc data and criteria not available when the EPA should have reviewed the plan in 2013?*

## II.    The EPA arbitrarily and without statutory authority delayed making a decision on Texas' timely submitted SIP revision in contravention of the EPA's requirement to act under the Clean Air Act.

The EPA does not view its statutory duty to review a SIP within the deadlines set forth in 42 U.S.C. § 7410(k)(2) as mandatory. But the duty is mandatory and nondiscretionary. The Court should not allow the EPA to ignore its deadline for acting on a SIP.

### A.    The Clean Air Act requires the EPA to act to approve or disapprove a SIP within 12 months of determining the plan is administratively and technically complete.

Once a SIP revision is declared technically and administratively complete, the EPA "shall act on the submission" within 12 months. 42 U.S.C. § 7410(k)(2) (under section header "Deadline for action"). Congress' use of the word "shall" in this context plainly and unambiguously "creates a nondiscretionary duty for the Administrator" to act and to act timely on a SIP submission. *Sierra Club v. Johnson*, 541 F.3d 1257, 1265 (11th Cir. 2008); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) ("'shall' means shall" and imposes "a mandatory duty upon the subject of the command"). This comports with the Administrative Procedure

Act, which requires that agencies proceed to reach a decision on a matter presented to it "within a reasonable time." 5 U.S.C. § 555(b). Here, even after being compelled in a citizens suit to act timely, *see Sierra Club v. McCarthy*, No. 14-cv-05091-YGR, 2015 WL 3666419, at *3 (N.D. Cal. May 7, 2015), the EPA continued to choose to ignore its nondiscretionary, statutory mandate to act within 12 months.

B.    **The EPA must review a SIP submission based on information and methodology available during the 12 month statutory review period, not on information or criteria developed years later.**

Nothing in the Act suggests the EPA is free to ignore SIP review deadlines until it can develop information sufficient to justify a particular conclusion. Indeed, everything points to the opposite conclusion—that the EPA must review a SIP revision and make a decision based on the information available at the time of submission and during the 12-month statutory review period set forth in 42 U.S.C. § 7410(k)(2). Congress created a careful scheme and established deadlines. First, the EPA must review NAAQS every five years, then, once set or revised, a state must prepare and submit a SIP within 3 years. 42 U.S.C. §§ 7409(d), 7410(a). Thereafter, the EPA must review the SIP revision for completeness within six months (or the SIP will be deemed complete), and then make a final decision to approve or disapprove the SIP revision within 12 months of its finding that the State followed the proper procedures and included the appropriate technical information in the SIP. *Id.* § 7410(k)(1)-(2).

Each milestone in this careful and deliberate schedule is mandatory and evidences Congress' express desire for quick federal action so that States can implement their control measures expeditiously. *See North Dakota v. EPA*, 730 F.3d 750, 762 (8th Cir. 2013) ("EPA may approve the submission as a whole or in part, but whatever action it takes *must* be done within twelve months of the completed SIP submission." (emphasis added)).  There is nothing in the Act authorizing the EPA  to delay indefinitely until it develops more information or creates new rules and interpretations.  Just the opposite—the Act plainly states the EPA must act and make a decision on a SIP within a proscribed time period, not later.  The EPA's actions warrant vacatur of the Final Disapproval under 5 U.S.C. § 706(2)(D).

C.    **The EPA did not have to follow the path it did—ignoring the deadlines and then reviewing and disapproving the SIP on new information—because the Act includes several SIP-review safeguard provisions for exactly this situation.**

The Act affords the EPA a series of procedural provisions that allow it to revisit SIPs at a later time.  If information is later developed to suggest a previously approved SIP submission provides for controls that are "inadequate to attain or maintain" a NAAQS, the EPA may call for the SIP to be revised.  42 U.S.C. § 7410(k)(5) (also called a "SIP Call"). A state may have up to 18 months to revise its plan following a SIP Call.  *Id*.  Additionally, the Act permits the EPA to later correct its decision on a SIP if the decision was in error.  *Id*. § 7410(k)(6).  Finally,

the EPA may conditionally approve a SIP, upon commitment by a State to develop and adopt a specific enforceable SIP element. *Id*. § 7410(k)(4).

These safeguard provisions confirm that Congress expected the EPA to act swiftly on SIPs and later, if new information warrants, the EPA is to require a state to amend a SIP. Congress would not have included such safeguards and procedural deadlines if the EPA had authority to simply ignore mandatory deadlines pending development of new criteria and information. Nevertheless, the EPA persists on its course of conduct without statutory authority to act as it has. In this case, the EPA declined to follow the statutory procedure set forth in the Act and opted to instead craft its own timeline and post hoc methodology to ensure the imposition of a federal plan in Texas.

The EPA did not avail itself of any of the procedural safeguards and can offer no legitimate excuse for ignoring the statutory deadline. Here, the EPA opted to ignore its statutory review deadline and all of the procedural SIP-review safeguards in 42 U.S.C. § 7410(k). The EPA has no legitimate excuse for ignoring its statutory deadline in this case. Some courts have permitted an agency to avoid statutorily imposed deadlines if it can meet certain strict criteria, such as extraordinary resource demands that exceed an agency's capacity, or by demonstrating that the agency needs more time to evaluate a difficult technical problem. *See Ala. Power Co. v.*

*Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979).  None of these factors has been established here.

Indeed, when pressed on why it did not act sooner, the EPA cites no reason other than its own ends to justify and overshadow its procedural failures. *See* Index #1, App. G, 81 Fed. Reg. at 53,285 (relying on Texas' purported failure to provide "independent significance" to the "interfere with maintenance clause" of the Good Neighbor Provision as justifying the EPA's admitted delays in reaching a decision).  If Texas' SIP revision was deficient from the start as the EPA alleges, the EPA should have immediately disapproved it.  *See Luminant Generation Co.*, 675 F.3d at 925 (post hoc rationalizations must be disregarded).  But the EPA's conclusion that the SIP was ultimately disapproved is not a justification for ignoring a deadline to act some 40 months earlier.

## D. The EPA's arbitrary course of conduct has nullified the Act's SIP review scheme.

The EPA's delays and the manner in which it orchestrated the timing of its Final Disapproval made it impossible for Texas to correct any deficiency before the FIP came into effect.  The EPA timed the proposed FIP such that comments on the proposal were due some two months before the EPA announced its disapproval of Texas' infrastructure SIP revision.  *See* Index #10, App. K, 80 Fed. Reg. at 75,706. Thus, Texas was deprived of an opportunity to adequately understand and comment on the proposed FIP because the reasons for the disapproval were not known until

April 2016, and in the interim the EPA did not otherwise specifically communicate with the TCEQ concerning the Good Neighbor Provision portion of the SIP revision—even though the EPA suggested it would when it conducted a preliminary review of Texas' SIP submission. *See* Index #3, App. A, at cmt. 6 of Letter from EPA Region 6 to TCEQ, regarding Texas' proposed SIP submission.

In this case, no later than December 2013, the EPA should have (1) approved the Texas infrastructure SIP submission, and if subsequent information demonstrated that the SIP revision did not substantially comply with the statute, the EPA could have requested a later amendment; or (2) disapproved the SIP and promulgated a FIP within two years. The EPA did neither. Accordingly, Texas requests that the Final Disapproval be vacated and that the EPA, on remand, be instructed to reconsider its decision based on the information and statutory criteria available at the time of the original SIP submission. 5 U.S.C. § 706(2).

Many states have opted to give up, not submit a transport SIP for the 2008 Ozone NAAQS, cede their authority under the Act to the EPA, and avoid the extensive SIP-preparation costs and time. *See* Index #10, App. K, 80 Fed. Reg. at 75,708. Texas did not give up. Yet Texas, which went through the time and expense to prepare a timely SIP, is now in the same FIP boat as those states that chose not to. Congress set up a system whereby states could choose whether to file a SIP or not. But here the EPA has converted this into a Hobson's Choice—there was no real

choice at all because both alternatives led to a federal plan.  When a state ends up under a federal plan no matter what it chooses to do, something is amiss in a way Congress could not have intended, and constitutes an "institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act." *Texas*, 829 F.3d at 434.

## CONCLUSION

For the foregoing reasons, the State of Texas and the TCEQ respectfully ask the Court to vacate the Final Disapproval and remand the matter to the EPA for reconsideration.  On remand, the EPA should be instructed to reconsider its action on the Texas SIP based on information and statutory criteria available at the time of submission and to approve the SIP unless the EPA demonstrates that it violates a requirement of the Act.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division
State Bar No. 10144690
priscilla.hubenak@oag.texas.gov

*/s/ Craig J. Pritzlaff*
CRAIG J. PRITZLAFF
Assistant Attorney General
State Bar No. 24046658
craig.pritzlaff@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC 066
Austin, Texas  78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

**Counsel for Petitioners the State of Texas and Texas Commission on Environmental Quality**

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2017, this document was served electronically through the Court's CM/ECF system on all registered counsel. All parties in this case are represented by counsel consenting to electronic service.

*/s/ Craig J. Pritzlaff*
CRAIG J. PRITZLAFF

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,542 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point type face Times New Roman.

Dated: March 2, 2017

*/s/ Craig J. Pritzlaff*
CRAIG J. PRITZLAFF

Counsel for Petitioners the State of Texas and Texas Commission on Environmental Quality

# ADDENDUM OF STATUTES, RULES, AND REGULATIONS
## TO PRINCIPAL BRIEF OF PETITIONERS
## STATE OF TEXAS AND TEXAS COMMISSION ON
## ENVIRONMENTAL QUALITY

Pursuant to Fed. R. App. P. 28(f) and for the Court's ease of reference, this Addendum reproduces the following regulatory materials.  Please note that this Addendum (Add.) has been bates page numbered (Add. nos. 1-14).  The items included are excerpts from Westlaw, excluding those paragraphs not pertinent.

• Federal Statutes
  ○ 42 U.S.C. § 7407(a), (d)(1)(A)........................................................1
  ○ 42 U.S.C. § 7410(a)(1)-(2).............................................................3
  ○ 42 U.S.C. § 7410(c)(1).....................................................................6
  ○ 42 U.S.C. § 7410(k) .......................................................................7

• Federal Regulations
  ○ 40 C.F.R. § 50.15 ..........................................................................10
  ○ 40 C.F.R. § 51.103 ........................................................................11
  ○ 40 C.F.R. pt. 51, app. V ...............................................................12

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter I. Programs and Activities
                Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7407

§ 7407. Air quality control regions

Effective: January 23, 2004

Currentness

**(a) Responsibility of each State for air quality; submission of implementation plan**

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

**(b) Designated regions**

For purposes of developing and carrying out implementation plans under section 7410 of this title--

    **(1)** an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c) of this section, shall be an air quality control region; and

    **(2)** the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

**(c) Authority of Administrator to designate regions; notification of Governors of affected States**

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

**(d) Designations**

    **(1) Designations generally**

        **(A) Submission by Governors of initial designations following promulgation of new or revised standards**

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as--

**(i)** nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

**(ii)** attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

**(iii)** unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

**(B) Promulgation by EPA of designations**

**(i)** Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

**(ii)** In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

**(iii)** If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

**(iv)** A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

United States Code Annotated
 Title 42. The Public Health and Welfare
  Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
   Subchapter I. Programs and Activities
    Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7410

§ 7410. State implementation plans for national primary and secondary ambient air quality standards

Currentness

**(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems**

**(1)** Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

**(2)** Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall--

**(A)** include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

**(B)** provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to--

**(i)** monitor, compile, and analyze data on ambient air quality, and

**(ii)** upon request, make such data available to the Administrator;

**(C)** include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter;

**(D)** contain adequate provisions--

**(i)** prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will--

**(I)** contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

**(II)** interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility,

**(ii)** insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

**(E)** provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

**(F)** require, as may be prescribed by the Administrator--

**(i)** the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

**(ii)** periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

**(iii)** correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

**(G)** provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

**(H)** provide for revision of such plan--

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D of this subchapter (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C of this subchapter (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for--

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover--

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V of this chapter; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub.L. 101-549, Title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C.A. § 791 et seq.], review each State's applicable implementation

App. 000005

**(D)** For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations--

**(i)** exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

**(ii)** preventing maintenance of any such standard after such date.

**(E)** For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

**(6)** No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d) of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

**(1)** The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator--

**(A)** finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or

**(B)** disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

**(2)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409

**(3)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title as in effect before August 7, 1977, or under section 7413(d) of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

**(1)** Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

**(2)** The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) of this section (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) of this title (relating to compliance orders), a plan promulgation under subsection (c) of this section, or a plan revision under subsection (a)(3) of this section, no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The

criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant

transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D of this subchapter, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
        Subchapter C. Air Programs
            Part 50. National Primary and Secondary Ambient Air Quality Standards (Refs & Annos)

40 C.F.R. § 50.15

§ 50.15 National primary and secondary ambient air quality standards for ozone.

Effective: May 27, 2008

Currentness

(a) The level of the national 8–hour primary and secondary ambient air quality standards for ozone ($O_3$) is 0.075 parts per million (ppm), daily maximum 8–hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(b) The 8–hour primary and secondary $O_3$ ambient air quality standards are met at an ambient air quality monitoring site when the 3–year average of the annual fourth-highest daily maximum 8–hour average $O_3$ concentration is less than or equal to 0.075 ppm, as determined in accordance with appendix P to this part.

**Credits**

[73 FR 16511, March 27, 2008]

SOURCE: 36 FR 22384, Nov. 25, 1971; 50 FR 25544, June 19, 1985; 63 FR 7274, Feb. 12, 1998 unless otherwise noted., unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401, et seq.

Notes of Decisions (1)

Current through February 9, 2017; 82 FR 9977.

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
        Subchapter C. Air Programs
            Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)
                Subpart F. Procedural Requirements (Refs & Annos)

40 C.F.R. § 51.103

§ 51.103 Submission of plans, preliminary review of plans.

Effective: March 16, 2015
Currentness

(a) The State makes an official plan submission to EPA only when the submission conforms to the requirements of appendix V to this part and the State delivers the submission to EPA through one of the three following methods: An electronic submission through EPA's eSIP submission system; one paper submission to the appropriate Regional Office with an exact duplicate electronic version, preferably in a word searchable format; or three paper submissions. Any State submission under this part, whether through the eSIP submission system or in paper copy form, will serve as the official submission.

(b) Upon request by a State, the Administrator will work with the State to provide preliminary review of a plan or portion thereof submitted in advance of the date such plan is due. Such requests must be made to the appropriate Regional Office, and must indicate changes (such as redline/strikethrough) to the existing approved plan where applicable, and be submitted using a format agreed upon by the State and Regional Office. Requests for preliminary review do not relieve a State of the responsibility of adopting and submitting plans in accordance with prescribed due dates.

(c) In addition to conforming to the requirements of appendix V to this part for complete SIP submissions, the EPA requests that the state consult with the appropriate Regional Office regarding any additional guidance for submitting a plan to EPA.

**Credits**

[55 FR 5830, Feb. 16, 1990; 63 FR 9151, Feb. 24, 1998; 72 FR 38792, July 16, 2007; 80 FR 7340, Feb. 10, 2015]

SOURCE: 36 FR 22398, Nov. 25, 1971; 51 FR 40661, Nov. 7, 1986; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR 40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Notes of Decisions (1)

---

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
        Subchapter C. Air Programs
            Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)

40 C.F.R. Pt. 51, App. V

Appendix V to Part 51—Criteria for Determining the Completeness of Plan Submissions

Effective: March 16, 2015
Currentness

1.0. Purpose

This appendix V sets forth the minimum criteria for determining whether a State implementation plan submitted for consideration by EPA is an official submission for purposes of review under § 51.103.

1.1 The EPA shall return to the submitting official any plan or revision thereof which fails to meet the criteria set forth in this appendix V, and request corrective action, identifying the component(s) absent or insufficient to perform a review of the submitted plan.

1.2 The EPA shall inform the submitting official whether or not a plan submission meets the requirements of this appendix V within 60 days of EPA's receipt of the submittal, but no later than 6 months after the date by which the State was required to submit the plan or revision. If a completeness determination is not made by 6 months from receipt of a submittal, the submittal shall be deemed complete by operation of law on the date 6 months from receipt. A determination of completeness under this paragraph means that the submission is an official submission for purposes of § 51.103.

2.0. Criteria

The following shall be included in plan submissions for review by EPA:

2.1. Administrative Materials

(a) A formal signed, stamped, and dated letter of submittal from the Governor or his designee, requesting EPA approval of the plan or revision thereof (hereafter "the plan"). If electing to submit a paper submission with a copy in electronic version, the submittal letter must verify that the electronic copy provided is an exact duplicate of the paper submission.

(b) Evidence that the State has adopted the plan in the State code or body of regulations; or issued the permit, order, consent agreement (hereafter "document") in final form. That evidence shall include the date of adoption or final issuance as well as the effective date of the plan, if different from the adoption/issuance date.

(c) Evidence that the State has the necessary legal authority under State law to adopt and implement the plan.

(d) A copy of the actual regulation, or document submitted for approval and incorporation by reference into the plan, including indication of the changes made (such as redline/strikethrough) to the existing approved plan, where applicable. The submission shall include a copy of the official State regulation/document, signed, stamped, and dated

by the appropriate State official indicating that it is fully enforceable by the State. The effective date of any regulation/document contained in the submission shall, whenever possible, be indicated in the regulation/document itself; otherwise the State should include a letter signed, stamped, and dated by the appropriate State official indicating the effective date. If the regulation/document provided by the State for approval and incorporation by reference into the plan is a copy of an existing publication, the State submission should, whenever possible, include a copy of the publication cover page and table of contents.

(e) Evidence that the State followed all of the procedural requirements of the State's laws and constitution in conducting and completing the adoption/issuance of the plan.

(f) Evidence that public notice was given of the proposed change consistent with procedures approved by EPA, including the date of publication of such notice.

(g) Certification that public hearing(s) were held in accordance with the information provided in the public notice and the State's laws and constitution, if applicable and consistent with the public hearing requirements in 40 CFR 51.102.

(h) Compilation of public comments and the State's response thereto.

2.2. Technical Support

(a) Identification of all regulated pollutants affected by the plan.

(b) Identification of the locations of affected sources including the EPA attainment/nonattainment designation of the locations and the status of the attainment plan for the affected areas(s).

(c) Quantification of the changes in plan allowable emissions from the affected sources; estimates of changes in current actual emissions from affected sources or, where appropriate, quantification of changes in actual emissions from affected sources through calculations of the differences between certain baseline levels and allowable emissions anticipated as a result of the revision.

(d) The State's demonstration that the national ambient air quality standards, prevention of significant deterioration increments, reasonable further progress demonstration, and visibility, as applicable, are protected if the plan is approved and implemented. For all requests to redesignate an area to attainment for a national primary ambient air quality standard, under section 107 of the Act, a revision must be submitted to provide for the maintenance of the national primary ambient air quality standards for at least 10 years as required by section 175A of the Act.

(e) Modeling information required to support the proposed revision, including input data, output data, models used, justification of model selections, ambient monitoring data used, meteorological data used, justification for use of offsite data (where used), modes of models used, assumptions, and other information relevant to the determination of adequacy of the modeling analysis.

(f) Evidence, where necessary, that emission limitations are based on continuous emission reduction technology.

(g) Evidence that the plan contains emission limitations, work practice standards and recordkeeping/reporting requirements, where necessary, to ensure emission levels.

(h) Compliance/enforcement strategies, including how compliance will be determined in practice.

(i) Special economic and technological justifications required by any applicable EPA policies, or an explanation of why such justifications are not necessary.

2.3. Exceptions

2.3.1. The EPA, for the purposes of expediting the review of the plan, has adopted a procedure referred to as "parallel processing." Parallel processing allows a State to submit the plan prior to actual adoption by the State and provides an opportunity for the State to consider EPA comments prior to submission of a final plan for final review and action. Under these circumstances, the plan submitted will not be able to meet all of the requirements of paragraph 2.1 (all requirements of paragraph 2.2 will apply). As a result, the following exceptions apply to plans submitted explicitly for parallel processing:

(a) The letter required by paragraph 2.1(a) shall request that EPA propose approval of the proposed plan by parallel processing.

(b) In lieu of paragraph 2.1(b) the State shall submit a schedule for final adoption or issuance of the plan.

(c) In lieu of paragraph 2.1(d) the plan shall include a copy of the proposed/draft regulation or document, including indication of the proposed changes to be made to the existing approved plan, where applicable.

(d) The requirements of paragraphs 2.1(e)–2.1(h) shall not apply to plans submitted for parallel processing.

2.3.2. The exceptions granted in paragraph 2.3.1 shall apply only to EPA's determination of proposed action and all requirements of paragraph 2.1 shall be met prior to publication of EPA's final determination of plan approvability.

3.0. GUIDELINES

The EPA requests that the State adhere to the following voluntary guidelines when making plan submissions.

3.1 All Submissions

(a) The State should identify any copyrighted material in its submission, as EPA does not place such material on the web when creating the E–Docket for loading into the Federal Document Management System (FDMS).

(b) The State is advised not to include any material considered Confidential Business Information (CBI) in their SIP submissions. In rare instances where such information is necessary to justify the control requirements and emissions limitations established in the plan, the State should confer with its Regional Offices prior to submission and must clearly identify such material as CBI in the submission itself. EPA does not place such material in any paper or web-based docket. However, where any such material is considered emissions data within the meaning of Section 114 of the CAA, it cannot be withheld as CBI and must be made publicly available.

3.2 Paper Plan Submissions

(a) The EPA requires that the submission option of submitting one paper plan must be accompanied by an electronic duplicate of the entire paper submission, preferably as a word searchable portable document format (PDF), at the same time the paper copy is submitted. The electronic duplicate should be made available through email, from a File Transfer Protocol (FTP) site, from the State Web site, on a Universal Serial Bus (USB) flash drive, on a compact disk, or using another format agreed upon by the State and Regional Office.