NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 16-60670

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

STATE OF TEXAS; TEXAS COMMISION ON ENVIRONMENTAL
QUALITY,
*Petitioners*,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL
S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
*Respondents*.

_____

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency
81 Fed. Reg. 53284 (Aug. 12, 2016)

_____

**BRIEF FOR RESPONDENTS**

_____

Of Counsel:

ROSEMARY H. KABAN
DANIEL P. SCHRAMM
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

JACOB GALLEGOS
U.S. Environmental Protection Agency
Office of Regional Counsel, Region 6
Dallas, Texas

TODD KIM
*Assistant Attorney General*

SARAH IZFAR
JIN HYUNG LEE
U.S. Department of Justice
Environment and Natural Resources Division
150 M Street, N.E.
Washington, D.C. 20002

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| STATE OF TEXAS, et al., | |
| Petitioners, | |
| v. | No. 16-60670 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Respondents. | |

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Respondents, as governmental parties, need not furnish a certificate of interested persons.

Date: August 30, 2024

 */s/ Jin Hyung Lee*
Jin Hyung Lee
Sarah Izfar

U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044

*Counsel for Respondents*

i

## STATEMENT REGARDING ORAL ARGUMENT

Respondents United States Environmental Protection Agency and its Administrator, Michael S. Regan (collectively, "EPA"), believe the petition for review would benefit from oral argument and should be considered by the same panel that heard oral argument in *Texas v. EPA*, No. 23-60069 (5th Cir.) ("2023 case") to ensure consistent resolution of overlapping issues.

While this case and the 2023 case concern two separate actions with two separate administrative records, both cases address the same Clean Air Act provision and raise some similar legal and factual issues. Oral argument in this case would be useful to further explain some of the legal and record-based context for the challenged action.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... vii

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 4

STATEMENT OF THE ISSUES ................................................................. 4

STATEMENT OF THE CASE .................................................................... 5

    A.    Legal background ........................................................................ 5

           1.    The Clean Air Act ............................................................. 5

           2.    Ozone National Ambient Air Quality Standards ................ 5

           3.    Nonattainment Areas ......................................................... 7

           4.    State Implementation Plans ............................................... 7

           5.    The Good Neighbor Provision ........................................... 10

    B.    Factual background ...................................................................... 14

           1.    EPA's rulemakings addressing states' Good
                  Neighbor obligations for the ozone NAAQS ...................... 14

           2.    Texas's 2008 ozone NAAQS SIP Submission .................... 18

           3.    Intervening events between Submission and
                  Disapproval ....................................................................... 20

           4.    EPA's Proposal ................................................................. 23

           5.    EPA's Disapproval ............................................................ 25

           6.    EPA's FIP: The CSAPR Update ........................................ 27

    C.    Procedural background .................................................................. 29

SUMMARY OF ARGUMENT ................................................................30

STANDARD OF REVIEW ...................................................................36

ARGUMENT .......................................................................................38

I.    The Act delegates to EPA the authority to review SIP
      submissions to determine if they meet all applicable
      requirements, including the Good Neighbor Provision. ................38

      A.    The Act obligates EPA to determine whether SIP
            submissions meet applicable requirements. .......................40

      B.    A state's primary responsibility to develop a SIP
            submission for EPA's review does not limit EPA's
            substantive SIP review authority. .....................................45

      C.    EPA retains authority to substantively evaluate and
            disapprove an inadequate SIP submission that has been
            deemed "complete." ..........................................................49

II.   EPA reasonably disapproved the Submission for failing to
      comply with the Good Neighbor Provision. ................................52

      A.    Texas's reliance on the invalidated CAIR could not
            satisfy Texas's Good Neighbor obligations. ......................54

      B.    The Submission failed to comply with the Good
            Neighbor Provision's requirement that states
            independently evaluate whether their emissions will
            "interfere with maintenance." ...........................................56

      C.    The Submission took an impermissibly narrow approach
            to evaluating whether Texas's emissions contributed to
            nonattainment. ..................................................................58

      D.    Texas's and Intervenors' forfeited arguments regarding
            Texas's nonattainment analysis lack merit. .......................62

1. The Act requires the regulating authority to evaluate a state's Good Neighbor obligations beyond nonattainment areas.......................................62

2. Texas's impermissibly narrow nonattainment analysis did not support its conclusion that Texas will not contribute significantly to nonattainment downwind.................................................................65

3. The Act does not require EPA to disprove Texas's Submission with EPA's own technical analysis. .....................68

III. EPA's untimeliness in issuing the Disapproval does not limit its substantive SIP review authority or render the Disapproval arbitrary and capricious. ........................................................68

A. EPA retains its substantive SIP review authority even if it misses the statutory deadline for that review. .....................69

B. EPA's timeliness in issuing the Disapproval has been appropriately adjudicated and is not before this Court. .....................72

C. EPA explained its reasons for delay.....................................73

D. EPA may lawfully consider relevant data available at the time it takes action on a Good Neighbor SIP submission, even if those data were not available to the state at the time of its submission...........................................................74

E. The updated emissions data and the state-of-the-science modeling support the Disapproval. ......................................78

F. The Act does not require EPA to issue a SIP call or error correction in lieu of disapproving the Submission...............................79

G. Texas and Intervenors were not prejudiced by EPA's delay. ...............................................................................81

IV. The Disapproval was procedurally proper. ....................................82

V.    If the Court determines to remand, it should decline to vacate
      the Disapproval. ............................................................................84

CONCLUSION ......................................................................................91

CERTIFICATE OF COMPLIANCE........................................................92

CERTIFICATE OF SERVICE ...............................................................93

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004) ..................................................................36

*Alaska Unemployment Comp. Comm'n v. Aragan,*
329 U.S. 143 (1946) ..................................................................50

*Am. Great Lakes Ports Ass'n v. Schultz,*
962 F.3d 510 (D.C. Cir. 2020) ..................................................91

*Arizona ex rel. Darwin v. EPA,*
815 F.3d 519 (9th Cir. 2016) ........................................ 43, 44, 51

*Barnhart v. Peabody Coal Co.,*
537 U.S. 149 (2003) ..................................................................70

*BCCA Appeal Grp. v. EPA,*
355 F.3d 817 (5th Cir. 2003) ..................... 36, 49, 56, 61,74

*BCCA Appeal Grp. v. EPA,*
476 F. App'x 579 (5th Cir. 2012) .............................. 10, 72

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,*
72 F.4th 284 (D.C. Cir. 2023) ..................................................74

*Biden v. Texas,*
597 U.S. 785 (2022) ..................................................................74

*Calcutt v. FDIC,*
598 U.S. 623 (2023) ..................................................................85

*Califano v. Sanders,*
430 U.S. 99 (1977) ....................................................................36

*Cent. & S. W. Servs., Inc. v. EPA,*
220 F.3d 683 (5th Cir. 2000) ............................... 85, 86, 90

*Chevron v. NRDC,*
467 U.S. 837 (1984) ..................................................................36

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ....................................................................................36

*City of Arlington v. FCC*,
    668 F.3d 229 (5th Cir. 2012) ......................................................................38

*Ctr. for Biological Diversity v. EPA*,
    937 F.3d 533 (5th Cir. 2019) ................................................................ 53, 56

*Defs. of Wildlife v. Everson*,
    984 F.3d 918 (10th Cir. 2020) ....................................................................62

*EME Homer City Generation, L.P. v. EPA* ("*EME Homer I*"),
    696 F.3d 7 (D.C. Cir. 2012) .................................................................. 17, 47

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014)..... 1, 9, 10, 13, 14, 17, 18, 20, 27, 31, 42, 45, 46, 47, 61, 65,
    68, 77, 79

*EME Homer City Generation, L.P. v. EPA* ("*EME Homer II*"),
    795 F.3d 118 (D.C. Cir. 2015) .................................................. 18, 32, 55, 82, 88

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) .......................................................................53

*Galveston-Houston Ass'n for Smog Prevention (GHASP) v. EPA*,
    289 F. App'x 745 (5th Cir. 2008) ...............................................................49

*Gen. Motors Corp. v. United States*,
    496 U.S. 530 (1990) ............................................................................ 5, 70, 72

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ........................................................ 36, 37, 38, 42, 53, 64

*Luminant Generation Co. v. EPA*,
    714 F.3d 841 (5th Cir. 2013) ................................................................ 43, 44

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ............................................................ 12, 69

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000) .................................................. 8, 13, 14, 43, 80

*Midwest Ozone Grp. v. EPA*,
    61 F.4th 187 (D.C. Cir. 2023) ................................................................29

*Miss. Comm'n on Env't Quality v. EPA* ("*MCEQ*"),
    790 F.3d 138 (D.C. Cir. 2015) ................................................. 6, 11, 66

*Miss. River Basin All. v. Westphal*,
    230 F.3d 170 (5th Cir. 2000) .................................................... 38, 53

*Mont. Sulphur & Chem. Co. v. EPA*,
    666 F.3d 1174 (9th Cir. 2012) .................................................. 10, 72

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...............................................................................76

*New Jersey v. Wheeler*,
    475 F. Supp. 3d 308 (S.D.N.Y. 2020) .................................................71

*New York v. EPA*,
    781 F. App'x 4 (D.C. Cir. 2019) .........................................................28

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ................................ 11, 12, 16, 27, 54, 57, 79, 83

*North Carolina v. EPA*,
    550 F.3d 1176 (D.C. Cir. 2008) ..........................................................16

*North Dakota v. EPA*,
    730 F.3d 750 (8th Cir. 2013) .................................................... 43, 44

*NRDC v. Browner*,
    57 F.3d 1122 (D.C. Cir. 1995) .............................................................51

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) .............................................................. 8, 44, 48

*Oklahoma v. EPA*,
    723 F.3d 1201 (10th Cir. 2013) ................................................ 10, 71

*Russello v. United States*,
    464 U.S. 16 (1983) ...............................................................................63

ix

*Sierra Club v. EPA*,
   294 F.3d 155 (D.C. Cir. 2002) ................................................................75

*Sierra Club v. EPA*,
   671 F.3d 955 (9th Cir. 2012) ................................................................76

*Sierra Club v. EPA*,
   939 F.3d 649 (5th Cir. 2019) ................................................................38

*Sierra Club v. EPA*,
   972 F.3d 290 (3d Cir. 2020) ................................................................41

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................... 37, 64

*Solar Energy Indus. Ass'n v. FERC*,
   80 F.4th 956 (9th Cir. 2023) ................................................................90

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
   989 F.3d 368 (5th Cir. 2021) ................................................................87

*Texas v. EPA*,
   No. 23-60069, 2023 WL 7204840 (5th Cir. May 1, 2023) ................................44

*Train v. NRDC*,
   421 U.S. 60 (1975) ............................................................... 5, 6, 8, 41, 71

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ................................................................52

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976) ............................................................... 5, 8, 41

*United States v. Castillo-Rubio*,
   34 F.4th 404 (5th Cir. 2022) ................................................................66

*Virginia v. EPA*,
   108 F.3d 1397 (D.C. Cir. 1997) ................................................................46

*Westar Energy, Inc. v. EPA*,
   608 F. App'x 1 (D.C. Cir. 2015) ................................................................43

*Williams v. Taylor*,
     529 U.S. 362 (2000) ........................................................................62

*Wisconsin v. EPA*,
     938 F.3d 303 (D.C. Cir. 2019) ...................................... 12, 28, 65, 69, 71

*XO Energy MA, LP v. FERC*,
     77 F.4th 710 (D.C. Cir. 2023) ........................................................91

*Ysleta Del Sur Pueblo v. Texas*,
     596 U.S. 685 (2022) ........................................................................52

**Statutes**

5 U.S.C. § 706 ............................................................................ 36, 81

5 U.S.C. § 706(2)(A) ........................................................................36

42 U.S.C. §§ 7401-7671q ...................................................................5

42 U.S.C. § 7401(b)(1) .......................................................................5

42 U.S.C. § 7407(d)(1) ................................................................. 7, 64

42 U.S.C. § 7407(d)(1)(A)(i) ......................................................... 7, 63

42 U.S.C. § 7407(d)(3) .......................................................................7

42 U.S.C. §§ 7408-09 ........................................................................5

42 U.S.C. § 7410(a) ................................................................ 7, 41, 64

42 U.S.C. § 7410(a)(1) ............................................................... 18, 45

42 U.S.C. § 7410(a)(2) ......................................................................45

42 U.S.C. § 7410(a)(2)(A) ..................................................................46

42 U.S.C. § 7410(a)(2)(B) ..................................................................48

42 U.S.C. § 7410(a)(2)(D)(i) ...............................................................58

42 U.S.C. § 7410(a)(2)(D)(i)(I) .......................... 1, 2, 10, 11, 33, 39, 41, 56, 63, 66

42 U.S.C. § 7410(c) ..................................................................... 3, 41

42 U.S.C. § 7410(c)(1) ................................................................... 9, 10

42 U.S.C. § 7410(c)(1)(B) ....................................................................27

42 U.S.C. § 7410(i) ...............................................................................9

42 U.S.C. § 7410(k) .......................................................... 9, 41, 50, 69

42 U.S.C. § 7410(k)(1)(A) ...................................................................50

42 U.S.C. § 7410(k)(1)(B) ........................................ 8, 9, 49, 50, 72

42 U.S.C. § 7410(k)(2) ........................................... 9, 26, 51, 72

42 U.S.C. § 7410(k)(2)-(3) ............................................... 2, 80

42 U.S.C. § 7410(k)(3) ................................ 9, 10, 38, 40, 41, 49, 51

42 U.S.C. § 7410(k)(5) ......................................................... 9, 13, 80

42 U.S.C. § 7410(k)(6) ......................................................... 9, 80, 82

42 U.S.C. § 7410(l) ........................................................... 9, 51

42 U.S.C. § 7413 ...............................................................................9

42 U.S.C. §§ 7501-15 ........................................................................7

42 U.S.C. § 7501(2) .........................................................................63

42 U.S.C. § 7502 ...............................................................................8

42 U.S.C. § 7502(a)(2)(A) ..................................................................5

42 U.S.C. § 7511 .............................................................................12

42 U.S.C. § 7511-7511a ....................................................................8

42 U.S.C. § 7511(a) .................................................................. 7, 45

42 U.S.C. § 7511(a)(1) .......................................................................6

42 U.S.C. § 7511(b)(2)(A) ................................................................63

42 U.S.C. § 7545(k)(10)(D) ..............................................................63

42 U.S.C. § 7604(a)(2)...................................................... 10, 72

42 U.S.C. § 7607(b)(1)...........................................................4,

42 U.S.C. § 7607(d)(9)..........................................................36

**Regulations**

40 C.F.R. pt. 50 ......................................................................5

40 C.F.R. pt. 51, App. V. ................................................. 8, 50

40 C.F.R. pt. 58 ....................................................................48

40 C.F.R. § 51.308(e)(4) ......................................................89

62 Fed. Reg. 60318 (Nov. 7, 1997)......................................46

63 Fed. Reg. 57356 (Oct. 27, 1998) ................... 13, 14, 63, 64

70 Fed. Reg. 25162 (May 12, 2005) ("CAIR") ...................15

73 Fed. Reg. 16436 (Mar. 27, 2008)................................ 6, 18

76 Fed. Reg. 48208 (Aug. 8, 2011) ("CSAPR") ............. 16, 18

79 Fed. Reg. 74818 (Dec. 16, 2014) ...................................47

80 Fed. Reg. 39961 (July 13, 2015) ....................................83

80 Fed. Reg. 46271 (Aug. 4, 2015) ("Modeling Notice")......22

80 Fed. Reg. 65292 (Oct. 26, 2015)......................................6

80 Fed. Reg. 75706 (Dec. 3, 2015) ("Proposed CSAPR Update") .........................23

81 Fed. Reg. 21290 (Apr. 11, 2016) ("Proposal"). 18, 23, 24, 25, 54, 55, 56, 57, 58, 59, 60, 77, 78, 79,

81 Fed. Reg. 53284 (Aug. 12, 2016) ("Disapproval")... 1, 26, 27, 53, 54, 56, 58, 59, 61, 65, 69, 73, 79, 83, 84

81 Fed. Reg. 74504 (Oct. 26, 2016) ("CSAPR Update") ......... 27, 28, 78, 81, 84, 90

83 Fed. Reg. 65878 (Dec. 21, 2018) ....................................27

86 Fed. Reg. 23054 (Apr. 30, 2021) .................................................. 29, 87

87 Fed. Reg. 9798 (Feb. 22, 2022) ...........................................................65

**INTRODUCTION**

In this case, the State of Texas and Texas Commission on Environmental Quality (collectively, "Texas"), supported by Industry Intervenors, challenge the Environmental Protection Agency's ("EPA") 2016 disapproval of a 2012 Texas State Implementation Plan submission ("Submission").  81 Fed. Reg. 53284 (Aug. 12, 2016) ("Disapproval").  The Submission was intended to comply with the "Good Neighbor Provision" of the Clean Air Act ("Act" or "CAA"), 42 U.S.C. § 7410(a)(2)(D)(i)(I), as to the 2008 federal ozone air quality standards.  But Texas's challenge has long grown stale.  The case has been in abeyance for years, yet Texas still seeks to limit EPA's review to flawed data available in 2012.  In any event, EPA lawfully exercised its statutory authority in evaluating the Submission and reasonably explained its bases for the Disapproval.

In mandating clean air to protect public health and welfare, the Act directs EPA to set federal air quality standards for specific pollutants, including ozone.  Congress included the Good Neighbor Provision to tackle the "complex problem" of interstate air pollution and ensure that upwind states do not impede the efforts of downwind states to attain these federal air quality standards.  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).  States must submit plans to EPA that contain adequate provisions to prohibit in-state emissions that will "contribute significantly to nonattainment" or "interfere with maintenance" of federal air

quality standards in "any other State."  42 U.S.C. § 7410(a)(2)(D)(i)(I).  Then EPA

must ensure that those plans meet these requirements—and, if not, disapprove

them.  *Id.* § 7410(k)(2)-(3).  The Act does not excuse any state from fulfilling its

Good Neighbor obligations because of "practical difficulties."  572 U.S. at 509-10.

EPA lawfully disapproved the Submission for failing to meet the

requirements of the Good Neighbor Provision.  Texas conducted only a cursory

analysis of prior ozone trends in the states closest to it before concluding that, with

existing pollution control measures in place, Texas would not contribute

significantly to nonattainment or interfere with maintenance of the 2008 ozone

standards in any other state.  Texas ignored the projected impacts of its emissions

in areas that would struggle to attain or maintain the 2008 ozone standards.  It

evaluated an insupportably narrow selection of downwind states and conducted no

analysis regarding whether its emissions will "interfere with maintenance" of the

2008 ozone standards of any downwind state.  Further, Texas improperly relied on

an invalidated federal emission control program to demonstrate that it sufficiently

reduced emissions to satisfy its Good Neighbor obligations for the 2008 ozone

standards.  Texas's flawed analysis did not comply with the plain text of the Good

Neighbor Provision's requirements.

Texas and Intervenors barely engage with EPA's rationale for the

Disapproval.  Instead, they seek to diminish EPA's statutory obligation under the

Act to independently evaluate state plans' compliance with the Good Neighbor Provision. And Texas and Intervenors lodge groundless attacks on issues—updated modeling and delay in taking final action—that this Court need not address because they did not affect EPA's bases for the Disapproval.

Not only are Texas's and Intervenors' arguments unavailing, but their requested relief of vacatur is ill-conceived due in part to the case's lengthy abeyance. Accordingly, even if the Court were to find fault with the Disapproval, the Court should reject Texas's requested instruction to limit EPA's review on remand to data available in 2012 and should not vacate the Disapproval. The Disapproval required EPA to issue a federal plan, 42 U.S.C. § 7410(c), and that plan has been upheld by the D.C. Circuit and in effect for eight years. Texas has successfully implemented that plan and is currently using it to meet not only its Good Neighbor obligations as to the 2008 ozone standards but also other requirements of the Act. Vacatur would severely disrupt this status quo and require EPA to end implementation of a longstanding federal plan for Texas, thus jeopardizing important emissions reductions that Texas has made. Moreover, vacating the Disapproval and instructing EPA to limit its review of the 2012 Submission to stale data would cause extreme delay, subvert the Act's cooperative-federalism framework, and contravene a cornerstone of the Act—timely attainment of federal air quality standards.

## STATEMENT OF JURISDICTION

The challenged EPA action, the Disapproval, constitutes final, reviewable agency action pursuant to 42 U.S.C. § 7607(b)(1).  Texas timely filed its petition for judicial review.

## STATEMENT OF THE ISSUES

1.    Whether EPA's Disapproval of the Submission—a submission that asserted without adequate foundation that Texas's emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2008 ozone standards in downwind states—was reasonable.

2.    Whether, if the Court determines that remand of the Disapproval is appropriate, vacatur is improper because (i) the record reflects that on remand, EPA likely could correct any of the Disapproval's defects that the Court may find; and (ii) vacating the Disapproval would have disruptive consequences, for states' compliance with Good Neighbor obligations, for broader progress to attain the 2008 ozone standards, and for Texas's ability to comply with other requirements of the Act.

## STATEMENT OF THE CASE

### A.    Legal background

#### 1.    The Clean Air Act

The Act, 42 U.S.C. §§ 7401-7671q, seeks "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," *id.* § 7401(b)(1), and to control air pollution through a system of shared federal and state responsibility, *see Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).  The Act, as amended in 1970, "reflect[s] congressional dissatisfaction with the progress of existing air pollution programs and a determination to take a stick to the states in order to guarantee the prompt attainment and maintenance of specified air quality standards." *Union Elec. Co. v. EPA*, 427 U.S. 246, 249 (1976) (cleaned up).  Congress's amendments to the Act thus "sharply increased federal authority and responsibility in the continuing effort to combat air pollution." *Train v. NRDC*, 421 U.S. 60, 64 (1975).

#### 2.    Ozone National Ambient Air Quality Standards

A central feature of the Act is the National Ambient Air Quality Standards ("NAAQS"), which are nationally applicable standards that Congress directed EPA to set for specific pollutants at levels required to protect public health and welfare. 42 U.S.C. §§ 7408-09; 40 C.F.R. pt. 50.  At the "heart" of the Act is the

requirement that each state meet the NAAQS "as expeditiously as practicable."

*Train*, 421 U.S. at 66 (first quote); 42 U.S.C. § 7502(a)(2)(A) (second quote).[1]

Ozone is one pollutant for which EPA establishes a NAAQS. *See Miss.*
*Comm'n on Env't Quality v. EPA* ("*MCEQ*"), 790 F.3d 138, 146-47 (D.C. Cir.
2015). Ozone at ground level (commonly known as smog) is harmful because it
can cause "lung dysfunction, coughing, wheezing, shortness of breath, nausea,
[and] respiratory infection," and it widely affects "trees, vegetation, and crops."
*Id.* at 147.

To sufficiently protect public health and welfare, EPA has strengthened the
ozone NAAQS multiple times. This case concerns Texas's submission to meet the
2008 ozone NAAQS, set at 75 parts per billion ("ppb"). 73 Fed. Reg. 16436 (Mar.
27, 2008). EPA later strengthened the ozone NAAQS to 70 ppb in 2015, which
triggered a separate obligation for Texas to submit a plan addressing that more
protective standard. 80 Fed. Reg. 65292 (Oct. 26, 2015).[2]

---

[1] The 1990 Amendments to the Act likewise emphasize that attainment of the
ozone NAAQS must be accomplished "as expeditiously as practicable[.]" 42
U.S.C. § 7511(a)(1).

[2] Texas and some of the Intervenors have challenged, as to Texas, EPA's
disapproval of multiple states' submissions addressing Good Neighbor obligations
for the 2015 ozone NAAQS in the 2023 case.

### 3.    Nonattainment Areas

Each time EPA sets or revises a NAAQS, EPA then, within three years, formally designates areas as being in "attainment," "nonattainment," or "unclassifiable" with regard to compliance with that NAAQS.  42 U.S.C. § 7407(d)(1).  A nonattainment area is "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the [NAAQS]."  *Id.* § 7407(d)(1)(A)(i).  Nonattainment areas are classified based on how long nonattainment has persisted and on severity; they are subject to attainment deadlines specific to those classifications.  *Id.* § 7511(a).  Failure to meet attainment deadlines leads to areas being reclassified to higher classifications and subjected to increasingly stringent emissions-reduction requirements.  *Id.* §§ 7501-15.  Nonattainment areas that later attain the NAAQS are not automatically redesignated as attainment areas unless the state meets the statutory requirements for redesignation and EPA approves the submission.  *Id.* § 7407(d)(3).

### 4.    State Implementation Plans

When EPA sets or revises a NAAQS, all states, regardless of whether they have nonattainment areas, bear the initial responsibility to develop state implementation plans ("SIPs") that are adequate to implement, maintain, and enforce the NAAQS.  *Id.* § 7410(a).  States must submit SIPs for EPA's review no

later than three years from the promulgation or revision of a NAAQS.  *Id.*  States

with nonattainment areas must develop separate, additional plans to bring these

areas into attainment by the relevant attainment date.  *Id.* §§ 7502, 7511-7511a.

The Act places "primary responsibility for formulating pollution control

strategies" on states, *Union Elec.*, 427 U.S. at 256, meaning that states have

latitude in their "choices about the mix of emissions limitations," *Train*, 421 U.S.

at 87; *see also Ohio v. EPA*, 144 S. Ct. 2040, 2048 (2024).  However, the Act

requires EPA to ensure that states satisfy "strict minimum compliance

requirements" to attain the NAAQS.  *Union Elec.*, 427 U.S. at 257.  In other

words, states retain authority in the first instance to determine *how* they will

control emissions to attain and maintain the NAAQS by setting the "specific,

source-by-source emissions limits."  *Michigan v. EPA*, 213 F.3d 663, 686 (D.C.

Cir. 2000).  But EPA retains authority to determine *what amount* must be

controlled to comply with the Act's requirements and attain the NAAQS.  *Id.* at

687.

Once a state submits a SIP, EPA conducts a completeness review to ensure

that the submission contains the minimum criteria specified in EPA's regulations.

42 U.S.C. § 7410(k)(1)(B); 40 C.F.R. pt. 51, App. V.  If EPA is satisfied that the

SIP submission contains all the requisite parts, EPA considers the submission

complete,[3] and then, within one year of that date, EPA must review the submission for substantive compliance with the Act. 42 U.S.C. § 7410(k)(2). If EPA determines that a SIP submission meets "all of the applicable requirements" of the Act, EPA "shall" approve it. *Id.* § 7410(k)(3). But if EPA determines that a submission does not meet all the Act's applicable requirements, it cannot approve the submission and must issue a partial or full disapproval. *See id.*

If the SIP is approved, the provisions of state law that a state has submitted for adoption into its SIP become enforceable as a matter of federal law and cannot be modified except by EPA's approval of a SIP revision.[4] *Id.* §§ 7410(i), (*l*), 7413. If EPA finds that a state either failed to submit a complete SIP under Section 7410(k)(1) or disapproves a SIP because it does not meet the Act's applicable requirements under Section 7410(k)(3), EPA must promulgate a federal implementation plan ("FIP"). *Id.* § 7410(c)(1). Unless the Act otherwise specifies, there is generally no requirement for EPA to provide guidance or specifically define the Act's applicable requirements for states before acting on SIP submissions. *EME Homer*, 572 U.S. at 510. Nor is EPA required to provide states

---

[3] A SIP may also be treated as complete "by operation of law." 42 U.S.C. § 7410(k)(1)(B).

[4] The Act authorizes EPA to issue a "SIP call" and require states to submit SIP revisions if it finds a SIP to be "substantially inadequate." 42 U.S.C. § 7410(k)(5). The Act also authorizes EPA to issue an "error correction" if it "determines" that EPA's action on a SIP submission was "in error." *Id.* § 7410(k)(6).

9

with opportunities to correct a deficient state plan before issuing a FIP. *Id*. at 509.

EPA may promulgate a FIP at any time within two years of a disapproval or

finding of failure to submit and need not "postpone its action even a single day."

*Id.* However, if EPA determines that a SIP revision submitted to replace a FIP

meets the applicable requirements of the Act, EPA must approve the SIP

submission and withdraw its FIP. 42 U.S.C. § 7410(c)(1), (k)(3).

The specific procedural deadlines in Section 7410 that EPA must meet may

be enforced against EPA through civil district-court lawsuits under 42 U.S.C.

§ 7604(a)(2). The only remedy for EPA's failure to meet a nondiscretionary

deadline is a court-ordered deadline requiring EPA to address the relevant

obligation. *See BCCA Appeal Grp. v. EPA*, 476 F. App'x 579, 582 (5th Cir. 2012)

(per curiam); *Oklahoma v. EPA*, 723 F.3d 1201, 1223-24 (10th Cir. 2013); *Mont.*

*Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1190-91 (9th Cir. 2012).

### 5.    The Good Neighbor Provision

Congress enacted the Good Neighbor Provision, 42 U.S.C.

§ 7410(a)(2)(D)(i)(I), to address the "complex problem" of interstate air pollution

and hold upwind states accountable for their fair share of emissions reductions so

that downwind states do not bear the regulatory compliance burden of attaining the

NAAQS alone. *EME Homer*, 572 U.S. at 495-98. This provision is especially

relevant for ozone, which travels great distances and is subject to "the vagaries of

the wind." *Id.* at 497.  Additionally, ozone is not directly emitted into the atmosphere; rather, ozone forms through a photochemical reaction where emissions of ozone precursors—primarily nitrogen oxides ($NO_X$) and volatile organic compounds—react in the atmosphere in the presence of sunlight.  *MCEQ*, 790 F.3d at 147.  Ozone and its precursors "travel easily through the atmosphere, which can result in NAAQS violations hundreds of miles away from the source of the ozone precursors." *Id.*

Once EPA promulgates or revises a NAAQS, states must submit Good Neighbor SIP submissions that contain "adequate provisions" to "prohibit[]" those "amounts" of emissions that "will" "contribute significantly to nonattainment" or "interfere with maintenance" of the NAAQS in "any other State."  42 U.S.C. § 7410(a)(2)(D)(i)(I).  The Supreme Court and D.C. Circuit have addressed the meaning of these key terms in challenges to EPA's rulemakings defining states' Good Neighbor obligations and have clarified what plans must contain to comply with the Good Neighbor Provision.  Relevant here, these courts have established two foundational requirements.

First, the Good Neighbor Provision contains two prongs—"contribute significantly to nonattainment" and "interfere with maintenance"—and each must be given independent effect.  *North Carolina v. EPA*, 531 F.3d 896, 909-10 (D.C. Cir. 2008).  This is because the Good Neighbor Provision is plainly written in the

11

disjunctive "or," which requires terms to "be given separate meanings." *Id.* at 910 (quotation omitted). Accordingly, the regulating authority (either the state when submitting a SIP or EPA when issuing a FIP) analyzing a state's Good Neighbor obligation may not apply both prongs "in conjunction." *Id.* Rather, the regulating authority must separately identify those downwind locations that will not attain the NAAQS and those that will struggle to maintain the NAAQS. *Id.* at 908-10.

Second, the regulating authority must address a state's Good Neighbor obligations as expeditiously as practicable and no later than the next applicable nonattainment deadline. *Id.* at 911-12, 930; *see also Wisconsin v. EPA*, 938 F.3d 303, 316 (D.C. Cir. 2019); *Maryland v. EPA*, 958 F.3d 1185, 1203-04 (D.C. Cir. 2020) (per curiam). This is because the Good Neighbor Provision must be implemented "consistent with the provisions of [Title I of the Act]," which includes the attainment schedule, 42 U.S.C. § 7511. *North Carolina*, 531 F.3d at 911-12. A SIP submission does not comply with the Good Neighbor Provision "if it fails to 'eliminate upwind States' significant contributions to downwind pollution by the statutory deadline for downwind States to meet the NAAQS.'" *Maryland*, 958 F.3d at 1203-04 (quoting *Wisconsin*, 938 F.3d at 314). Relatedly, EPA has consistently applied the term "will" in the Good Neighbor Provision to conduct a forward-looking analysis, which includes considering projected future air pollution emissions. *See Wisconsin*, 938 F.3d at 322 (explaining that given the

12

"use of the future tense ['will'], it would be anomalous for EPA to subject upwind States to good neighbor obligations in 2017 by considering which downwind States were once in nonattainment in 2011").

Courts have concluded that EPA may (although it is not required to) inform states of their Good Neighbor obligations before states submit SIPs. *EME Homer*, 572 U.S. at 509; *Michigan*, 213 F.3d at 687. In 1998, EPA issued its first ozone-transport rulemaking, the $NO_X$ SIP Call, under 42 U.S.C. § 7410(k)(5) of the Act. 63 Fed. Reg. 57356 (Oct. 27, 1998). EPA analyzed states' interstate ozone emissions; determined that Good Neighbor SIPs addressing the ozone NAAQS of 22 states and the District of Columbia were substantially inadequate; quantified the amounts of emissions that were significantly contributing to or interfering with maintenance downwind; and directed states to submit SIPs that establish control measures that eliminate those significant emissions. *Id*. at 57358-59. State petitioners challenging the $NO_X$ SIP Call relied on *Train* to argue that EPA *could not* "prospectively inform the states of EPA's . . . determinations" regarding each state's Good Neighbor obligations before states submit their Good Neighbor SIPs for EPA review. *Michigan*, 213 F.3d at 687. The D.C. Circuit rejected that argument, holding that the Act requires EPA "to ensure that submitted SIPs adequately prohibit significantly contributing emissions" and thus EPA may inform states through rulemaking under its SIP call authority in 42 U.S.C.

§ 7410(k)(5) regarding what amounts of emissions must be prohibited to satisfy the Good Neighbor Provision. *Id.*

Later litigants essentially argued the opposite, i.e., that EPA *must* provide states with guidance and quantify the amount of emissions that must be prohibited to satisfy the Good Neighbor Provision before states submit SIPs and EPA acts on them. *EME Homer*, 572 U.S. at 509-10. The Supreme Court rejected that argument, holding that "nothing in the [Act] places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." *Id.* at 510. "When Congress elected to make EPA's input a prerequisite to state action under the Act, it did so expressly." *Id.* at 509. For the Good Neighbor Provision, Congress did not include such a requirement and so the ordinary rule that a state must submit a SIP for review after EPA sets or revises the NAAQS applies. *Id.* at 510. In short, EPA may inform states what amounts of their emissions must be prohibited to comply with the Good Neighbor Provision, but it need not do so before lawfully disapproving their SIP submissions.

**B.    Factual background**

**1.    EPA's rulemakings addressing states' Good Neighbor obligations for the ozone NAAQS**

Since 1998, for each ozone NAAQS revision, EPA has approved adequate Good Neighbor SIP submissions, disapproved inadequate ones, and promulgated national rules specifically defining and directly implementing Good Neighbor

requirements for certain states when necessary.  EPA's framework for assessing a

state's Good Neighbor obligations has evolved over time but has always included

several key features based on EPA's knowledge and experience regarding

interstate transport of ozone.  Since the 1998 NO$_X$ SIP Call, EPA has used

photochemical grid modeling to identify locations that are projected to be in

nonattainment in the future analytic year, regardless of whether they were in a

formally designated nonattainment area, and has used source apportionment

modeling to quantify contributions to those air quality problems from upwind

states and other sources.  *See, e.g.*, 63 Fed. Reg. at 57375.  For ozone, EPA has

generally examined upwind states' collective contribution to downwind states' air

quality problems because addressing downwind ozone problems requires

controlling small amounts of ozone and its precursor emissions from many sources

across a broad area.  *Id.*

In 2005, EPA promulgated the Clean Air Interstate Rule ("CAIR"), which

assessed states' Good Neighbor obligations for the 1997 fine particulate matter

("PM$_{2.5}$") and 1997 ozone NAAQS.  70 Fed. Reg. 25162, 25165 (May 12, 2005).

EPA determined that Texas contributed significantly to nonattainment of only the

PM$_{2.5}$ NAAQS in downwind states and included Texas in the annual NO$_X$ and

sulfur dioxide emissions trading programs to address its PM$_{2.5}$ contributions

downwind.  *Id.* at 25167, 25226.  The D.C. Circuit initially vacated CAIR but on

rehearing agreed to leave it in place as an interim measure while EPA was tasked to quickly remedy "CAIR's fundamental flaws."  *North Carolina*, 531 F.3d at 929-30; *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008).

In 2011, EPA replaced CAIR with the Cross-State Air Pollution Rule ("CSAPR"), which simultaneously disapproved any SIP that had relied on CAIR and promulgated federal plans addressing 27 states' emissions, including Texas's, that EPA determined contributed significantly to nonattainment or interfered with maintenance of the 1997 ozone NAAQS, 1997 $PM_{2.5}$ NAAQS, or the 2006 $PM_{2.5}$ NAAQS.  76 Fed. Reg. 48208 (Aug. 8, 2011) ("CSAPR").  EPA applied a similar framework used in the 1998 $NO_X$ SIP Call to assess states' Good Neighbor obligations, corrected to address the flaws in CAIR identified in *North Carolina*.

EPA used the latest emissions data and photochemical grid modeling to identify those air quality monitoring sites, regardless of whether they were in a designated nonattainment area, that were projected to exceed the NAAQS (i.e., nonattainment receptors) or were projected to have difficulty maintaining the NAAQS (i.e., maintenance receptors), consistent with *North Carolina*.  *Id.* at 48211.  EPA then used source apportionment modeling to identify each state's contribution to pollution levels at those identified nonattainment and maintenance receptors.  *Id.*  Those states that were projected to contribute at or above a threshold level of 1% of the NAAQS were deemed "linked" and then analyzed

16

further to determine whether they significantly contribute to nonattainment or interfere with maintenance of a relevant NAAQS. *Id.* at 48211, 48236-37. EPA selected a low contribution threshold value because elevated levels of ozone and $PM_{2.5}$ pollution were understood to present a "collective contribution" problem, which requires capturing a high percentage of the emissions that contribute to the problem to ensure an appropriate identification of those amounts of emissions that "significantly" contribute to nonattainment or interfere with maintenance. *Id.* at 48237. The contribution threshold effectively excludes states with *de minimis* contribution from further analysis. *Id.* at 48236-37.

In 2012, the D.C. Circuit vacated and remanded CSAPR to EPA and required EPA to administer CAIR pending promulgation of a valid replacement. *EME Homer City Generation, L.P. v. EPA* ("*EME Homer I*"), 696 F.3d 7, 38 (D.C. Cir. 2012), *rev'd and remanded* 572 U.S. 489 (2014). The D.C. Circuit held, inter alia, that EPA could not disapprove a Good Neighbor SIP submission "for failing to implement the good neighbor obligation until after EPA has defined the State's good neighbor obligation." *Id.* at 31. In 2014, the Supreme Court reversed the D.C. Circuit's holding and concluded that, based on the plain text of the statute, EPA need not provide states with guidance regarding their Good Neighbor obligations before disapproving a SIP and promulgating a FIP. *EME Homer*, 572 U.S. at 509-10. Along with that holding, the Supreme Court also upheld EPA's

framework for assessing Good Neighbor obligations, including EPA's approach

for identifying which contributing emissions are "significant." *Id.* at 524. On

remand, the D.C. Circuit largely upheld CSAPR over remaining challenges,

including challenges to the SIP disapprovals included in CSAPR, but remanded the

rule without vacatur for EPA to consider whether certain states' emissions

budgets,[5] including Texas's ozone season $NO_X$ emissions budget for the 1997

ozone NAAQS, constituted impermissible "overcontrol." *EME Homer City*

*Generation, L.P. v. EPA* ("*EME Homer II*"), 795 F.3d 118, 130, 138 (D.C. Cir.

2015).

## 2.    Texas's 2008 ozone NAAQS SIP Submission

EPA revised the ozone NAAQS on March 27, 2008, 73 Fed. Reg. at 16436,

which in turn required states to submit Good Neighbor SIPs to address the revised

NAAQS within three years, 42 U.S.C. § 7410(a)(1).

On December 13, 2012, before the Supreme Court reversed *EME Homer I*,

Texas submitted its Good Neighbor SIP to address the 2008 ozone NAAQS. Tex.

Submission, C.I. Doc. 3;[6] *see also* 81 Fed. Reg. 21290, 21291 (Apr. 11, 2016)

---

[5] The emissions budget is the quantity of emissions that will remain (and which a state's sources may emit) after elimination of those emissions that are "significant." CSAPR at 48212.

[6] Documents in the record that are not published in the Federal Register are identified in this brief by the EPA Document Number listed in the corrected certified index ("C.I."), Dkt. No. 38-2.

("Proposal"). Texas concluded that it need not consider potential emissions reductions because its emissions did not contribute significantly to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in any downwind state. Tex. Submission at 2-19.

Texas supported its conclusion based on several sources of data and the emissions control measures it already had in place. *Id.* Texas considered ozone trends, wind patterns, and 2010 measured ozone levels from downwind areas closest to it. *Id.* at 2-3–2-12. Specifically, Texas considered the ozone trends from "Texas and the closest nonattainment areas [for the 2008 ozone NAAQS] in other states (Arizona, Arkansas, Colorado, Illinois, Indiana, Louisiana, Mississippi, Missouri, Tennessee, and Wisconsin)" from 2000 through 2010. *Id.* at 2-3. Texas noted that generally, ozone concentrations had been declining in these nonattainment areas since 2000. *Id.* Similarly, Texas focused on wind patterns and the distance between in-state ozone nonattainment areas (Dallas-Fort Worth and Houston-Galveston-Brazoria) and the nearest out-of-state designated nonattainment areas (Baton Rouge, Louisiana, and Memphis, Tennessee). *Id.* at 2-5. Texas did not calculate the amount of ozone coming from Texas to other nonattainment areas because that was "difficult to determine." *Id.* However, Texas noted that "very few winds are observed from the west and northwest, the directions which would be anticipated to transport ozone to Memphis and Baton

19

Rouge." *Id.* Lastly, Texas provided the 2010 ozone data for monitoring sites within EPA Region 6—Arkansas, Louisiana, New Mexico, and Oklahoma—but did not analyze that data. *Id.* at 2-6–2-12.

As for existing control measures, Texas summarized $NO_X$ emission trends for Texas power plants from 1995 to 2011 and discussed how federal rules, such as CAIR and CSAPR, affected power plant emissions. *Id.* at 2-12–2-15. Texas also described non-power plant control measures and existing SIP requirements that reduced ozone precursor emissions within its borders. *Id.* at 2-15–2-19. Texas did not conduct any analysis of any potential additional control measures.

### 3. Intervening events between Submission and Disapproval

EPA made a completeness determination on December 20, 2012. C.I. Doc. 23. But intervening developments affected EPA's ability to timely review Texas's Submission for compliance with the Act's requirements. Most significantly, EPA appealed the D.C. Circuit's vacatur of CSAPR, including the D.C. Circuit's holding limiting EPA's authority to disapprove a Good Neighbor SIP submission without first defining the state's Good Neighbor obligations, which the Supreme Court reversed in 2014. *EME Homer*, 572 U.S. at 509-10. While appealing *EME Homer I*, EPA worked to provide data to aid states in defining their Good Neighbor obligations for the 2008 ozone NAAQS so that EPA and states could move forward to address Good Neighbor obligations as soon as possible. *See* Mem. from

Stephen D. Page, Dir., Off. of Air Quality Planning & Standards to Regional Air Division Directors, Regions 1-10, "Information on the Interstate Transport 'Good Neighbor" Provision for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) under Clean Air Act (CAA) Section 110(a)(2)(D)i)(I)," at 1, C.I. Doc. 16 ("Modeling Memo").

Once the Supreme Court affirmed EPA's approach to assessing Good Neighbor obligations, EPA proceeded to act on Texas's and other states' Good Neighbor obligations for the 2008 ozone NAAQS.  Indeed, EPA was on a court-ordered deadline to do so.  Soon after the Supreme Court's holding in *EME Homer*, two environmental organizations sued EPA in federal district court, alleging that EPA failed to undertake its nondiscretionary duty to timely determine that certain states did not submit SIP submissions or to take timely final action on certain states' Good Neighbor SIPs for the 2008 ozone NAAQS, including Texas's.  *See, e.g.*, *Sierra Club v. EPA*, No. 14-cv-5091 (N.D. Cal. Nov. 18, 2014). EPA agreed to take final action on Texas's Submission by August 1, 2016, and entered into a consent decree to resolve this litigation.  *Id.*, Dkt. Nos. 41, 51.  Texas was not a party to this litigation.

In January 2015, EPA issued a Modeling Memo, which released preliminary air quality modeling results relevant to interstate transport for the 2008 ozone NAAQS to assist states with their Good Neighbor SIP submissions, including,

where appropriate, efforts to supplement pending SIP submissions.  Modeling

Memo at 1.  Despite the preliminary analysis showing that Texas contributed to

downwind ozone pollution problems in Maryland, Michigan, Missouri, New

Jersey, New York, Pennsylvania, and Wisconsin, Texas did not resubmit or

supplement its Submission to address this new data.  *See id.* at 10, 12.

In August 2015, EPA published a Modeling Notice, which provided updated

air quality modeling results for the 2008 ozone NAAQS from the Modeling Memo.

80 Fed. Reg. 46271, 46273 (Aug. 4, 2015) ("Modeling Notice").  Like the

Modeling Memo, the Modeling Notice informed states of their potential Good

Neighbor linkages for the 2008 ozone NAAQS and of forthcoming proposed FIPs

that would address states' Good Neighbor obligations should their SIP submissions

not be submitted or approved.  *Id.*  The updated modeling results showed that

Texas was linked to, and therefore would contribute to downwind ozone pollution

problems in, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania,

and Wisconsin.  *See id.* at 46277 (referring to EPA-HQ-OAR-2015-0500).  Again,

Texas did not resubmit or supplement its Submission to address this new data.

In December 2015, EPA proposed 23 FIPs in the CSAPR Update, to address

those states' Good Neighbor obligations for the 2008 ozone NAAQS based on the

latest emissions data and the state-of-the-science modeling, which showed that

those states contributed significantly to nonattainment or interfered with

maintenance of the 2008 ozone NAAQS in downwind states.  80 Fed. Reg. 75706, 75710 (Dec. 3, 2015) ("Proposed CSAPR Update").[7]  While Texas was included in the Proposed CSAPR Update, EPA made clear that it would only finalize a FIP for a state that it finds "has failed to submit a complete good neighbor SIP" or for which it "issue[s] a final rule disapproving [a state's] good neighbor SIP."  *Id.* at 75708.

### 4.    EPA's Proposal

Concurrent with these scientific and regulatory developments, EPA substantively reviewed Texas's Submission and found it technically flawed in three key respects.

First, EPA explained that Texas's reliance on emissions reductions from CAIR to meet its Good Neighbor obligations was inappropriate because CAIR was invalidated and implementation ended in 2014.  Proposal at 21294.  EPA also explained that Texas had not demonstrated why emissions reductions from CAIR would satisfy its Good Neighbor obligations for the 2008 ozone NAAQS because CAIR addressed the less stringent 1997 ozone NAAQS for other states and only addressed Texas's interstate transport obligations for the 1997 $PM_{2.5}$ NAAQS.  *Id.*

---

[7] The Proposed CSAPR Update also addressed *EME Homer II*'s limited remand of CSAPR for the 1997 ozone NAAQS.  Proposed CSAPR Update at 75706.

Second, EPA explained that, contrary to the Act's requirements and the guidance provided by the D.C. Circuit's holding in *North Carolina*, Texas failed to give "independent significance" to the "interfere with maintenance" prong of the Good Neighbor Provision. *Id.* at 21292. Specifically, Texas did not evaluate the potential impact of its emissions in areas meeting the 2008 ozone NAAQS but that may have issues maintaining that air quality. *Id.*

Third, as to the nonattainment prong of the Good Neighbor Provision, EPA explained that Texas's monitoring data analysis could not technically support its conclusion that it will not contribute significantly to nonattainment. Texas improperly limited its analysis to the designated nonattainment areas that were geographically close to it, ignoring potential ozone exceedances in other areas, including those not currently designated nonattainment. *Id.*

In addition to these technical flaws, EPA explained that its recently circulated "most up-to-date" information used to inform the Proposed CSAPR Update contradicted Texas's conclusion—that its emissions will not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in a downwind state. *Id.* at 21292-93. That information was based on photochemical grid modeling that "[brought] together emissions data, atmospheric chemistry and meteorological information [to] simulate the transport and fate of pollutants and estimate concentrations of pollutants (including ozone)" across the contiguous

United States. *Id.* at 21294. In other words, the modeling fully accounted for the limited monitored ozone data and wind patterns that Texas assessed and the emissions reductions from the control measures Texas identified in its Submission. *See id.*

In projecting ozone concentrations and contribution levels, EPA selected 2017 as the relevant analytic year, because 2017 was the last year that emissions reductions could be implemented for a full ozone season (May 1 through September 30) before the next attainment deadline, and thus could assist downwind states in reaching attainment by that deadline. Proposal at 21293; *see supra* Background A.5 (explaining that the Good Neighbor Provision must be implemented "consistent with the provisions" of Title I of the Act, which includes the attainment schedule). In evaluating the modeling data, EPA applied its longstanding framework to assess the impact of Texas's emissions on other states. Proposal at 21292; *see supra* Background A.5, B.1. That modeling showed that Texas, despite its existing emissions control measures, did contribute to nonattainment and maintenance problems in Maryland, Michigan, New Jersey, New York, Ohio, and Pennsylvania. Proposal at 21293.

### 5.    EPA's Disapproval

EPA received three sets of comments—one in support, and two in opposition (the latter from Texas and Luminant, an Intervenor in this case). *See*

Comment in Support, C.I. Doc. 6; Tex. Comment, C.I. Doc. 4; Luminant

Comment, C.I. Doc. 5.  Rather than grapple with the three proposed bases for

disapproval, Texas and Intervenor-Luminant focused their comments on the

alleged impropriety of EPA's confirmatory modeling data, the timing of EPA's

Proposal in relation to the proposed CSAPR Update, and whether EPA should have

provided Texas with guidance on how to submit a statutorily compliant SIP before

its Submission.

On August 1, 2016, in accordance with its court-ordered deadline, EPA took

final action on Texas's Submission and issued the Disapproval.  EPA identified the

same three reasons it cited in the Proposal for finding Texas's Submission

noncompliant with the Good Neighbor Provision, as no comment suggested EPA's

reasons were incorrect.  Disapproval at 53286.  EPA then fully addressed

comments.  Regarding the modeling data, EPA explained that the Disapproval was

"based on the inadequacies in the analysis provided in Texas's [Submission]" and

"d[id] not rely upon the proposed CSAPR Update." *Id.* at 53285-86.  Rather, the

modeling data was "addition[al]" relevant information that confirmed that

Disapproval was appropriate. *Id.* at 53286.  Regarding timing, EPA explained that

while 42 U.S.C. § 7410(k)(2) requires EPA to act on SIP submissions within one

year after a submission is deemed complete, states also have a substantive

obligation to ensure their Good Neighbor SIP submissions comport with *North*

*Carolina* and give independent effect to the "interfere with maintenance" prong. *Id.* at 53285.  Texas's failure to do so meant that EPA could not approve the Submission.  *Id.*  EPA explained that the Disapproval was not predetermined based on the Proposed CSAPR Update, as EPA had "distinct bases for the proposed disapproval," and Texas had the opportunity to submit "any information that could have changed [EPA's] proposed views" but did not do so.  *Id.* at 53286.  Lastly, EPA explained that it was not required to provide guidance as to Texas's specific Good Neighbor obligations.  *Id.* at 53285 (citing *EME Homer*, 572 U.S. at 510).

### 6.    EPA's FIP: The CSAPR Update

Because EPA disapproved Texas's Submission, it was then obligated to promulgate a FIP "at any time" within two years.  42 U.S.C. § 7410(c)(1)(B); *EME Homer*, 572 U.S. at 509.  Under *North Carolina*, EPA was obligated to align the implementation of Good Neighbor obligations with downwind areas' statutory attainment schedule.  531 F.3d at 911-12; *supra* Background A.5.  Accordingly, although EPA did not consider it a complete remedy to Good Neighbor obligations for the 2008 ozone NAAQS, EPA finalized the CSAPR Update in the fall of 2016.  81 Fed. Reg. 74504 (Oct. 26, 2016) ("CSAPR Update").[8]  The CSAPR Update included FIPs for Texas and 21 other states establishing an emissions trading

---

[8] In a later rule, the CSAPR Close-Out, EPA concluded that the CSAPR Update was a complete remedy for Texas's 2008 ozone NAAQS Good Neighbor obligations.  83 Fed. Reg. 65878 (Dec. 21, 2018).

program for power plants to obtain immediately available emissions reductions, primarily from better operation of already-installed pollution control equipment, starting in 2017. *Id*. at 74506.[9] EPA made clear that a state subject to the CSAPR Update "can submit a good neighbor SIP at any time that, if approved by the EPA, could replace the FIP for that state." *Id.* Texas has not done so, and the CSAPR Update remains in effect in Texas. Specifically, Texas power plants currently remain subject to the same $NO_X$ ozone season allowance trading program established in CSAPR Update. Declaration of Scott Mathias ¶ 12, Att. A ("Mathias Decl.").

Texas and other parties challenged the CSAPR Update in the D.C. Circuit. *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019). That court largely upheld the rule, but remanded without vacatur on the grounds that the CSAPR Update was insufficiently aligned with downwind states' attainment dates because it was only a partial remedy that had not fully addressed "significant contribution" from all sources, including any industrial facilities other than power plants, by the relevant attainment deadline. *Id.* at 312-20, 336.[10] On remand, EPA issued the Revised

---

[9] EPA did not finalize the CSAPR Update as to North Carolina because the modeling data showed that North Carolina did not contribute significantly to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in downwind states. CSAPR Update at 74506.

[10] The CSAPR Close-Out was vacated on the same grounds. *New York v. EPA*, 781 F. App'x 4 (D.C. Cir. 2019).

CSAPR Update, which found that 12 states had additional Good Neighbor obligations that could be addressed through further regulation of power plant emissions, and found that nine states, including Texas, had no further Good Neighbor obligations beyond the CSAPR Update for the 2008 ozone NAAQS. 86 Fed. Reg. 23054 (Apr. 30, 2021); *see also Midwest Ozone Grp. v. EPA*, 61 F.4th 187 (D.C. Cir. 2023) (upholding rule).

### C.    Procedural background

On October 11, 2016, Texas petitioned for review of the Disapproval. Dkt. No. 00513712257 (Oct. 11, 2016). On January 23, 2017, Intervenors intervened on behalf of Texas. Dkt. No. 32-2 (Jan. 23, 2017).

Texas and Intervenors moved to strike certain record documents in the certified index. Dkt. No. 40. That motion, which has been fully briefed, was carried with the case and remains pending. Dkt. No. 00513866172.

Texas and Intervenors filed their opening briefs. Tex. Br., Dkt. No. 44 (Feb. 17, 2017); Indus. Br., Dkt. No. 513900666 (Feb. 24, 2017). Before EPA filed its response brief, the parties jointly moved to place the case into abeyance. Dkt. No. 77 (May 15, 2017). This case remained in abeyance as Texas submitted a SIP submission to address its Good Neighbor obligations for the more protective 2015 ozone NAAQS. *See, e.g.*, Dkt. No. 108 (Sept. 19, 2018); Dkt. No. 133 (July 23, 2019).

EPA disapproved Texas's Good Neighbor SIP submission for the 2015 ozone NAAQS, along with 20 other states' submissions.  Subsequently, several petitioners, including Texas and Intervenors, challenged EPA's disapproval of Texas's Good Neighbor SIP for the 2015 ozone NAAQS in the 2023 case, *Texas v. EPA*, No. 23-60069 (5th Cir.).  This Court heard oral argument on December 4, 2023, and has not yet issued an opinion.  2023 case, Dkt. No. 476.

In this case, EPA continued to file status reports explaining that the 2023 case "may obviate the need for any further judicial proceedings on this petition for review."  Dkt. No. 167 (Jan. 29, 2024).  The Court, however, lifted the abeyance and resumed briefing on June 21, 2024.  Dkt. No. 180 (June 21, 2024).  Pursuant to the Court's order, Texas filed its supplemental brief on July 22, 2024.  Tex. Supp., Dkt. No. 207 (July 22, 2024).

## SUMMARY OF ARGUMENT

1.    The Disapproval is consistent with the Act's cooperative-federalism framework.

a.    While states have primary responsibility for initially developing SIPs to attain the NAAQS and meet all the Act's applicable requirements, including the Good Neighbor Provision, EPA ultimately has the responsibility to determine whether the SIP submissions meet the Act's requirements.  The cornerstone of Congress's framework, which both EPA and the states work toward, is attainment

of the NAAQS, including through addressing states' emissions that unduly impact other states' abilities to attain and maintain the NAAQS.  Texas conflates a state's discretion to choose *which* controls it will adopt to meet the Act's applicable requirements with EPA's duty to determine *whether* a state's submission meets the applicable requirements.  Congress delegated to EPA, not the states, authority to review state submissions for conformity with the Act.

b.  EPA was not obligated to provide Texas with guidance and data in advance of Texas's Submission.  Under Texas's flawed view of "cooperative federalism," EPA could not disapprove the Submission without first providing additional guidance to describe what Texas emissions need to be eliminated to address downwind air quality problems.  But the Supreme Court squarely rejected Texas's reading of the Act in *EME Homer*, 572 U.S. at 510.

c.  EPA's authority to disapprove Texas's Submission was not circumscribed by EPA's predicate determination that the Submission was administratively and technically "complete" under Section 7410(k)(1).  A completeness finding simply confirms that EPA has the information necessary to determine whether the Submission complies with the Act.

2.    EPA reasonably disapproved Texas's Submission for three independent deficiencies.

a.  First, EPA properly rejected Texas's attempt to rely on emissions reductions from CAIR, which had already been invalidated at the time of the Submission, to satisfy Texas's Good Neighbor obligations.  As held in *EME Homer II*, 795 F.3d at 134-35, Texas could not rely on an invalidated trading program for different NAAQS that ended implementation in 2014 to show that Texas was adequately controlling its emissions for the 2008 ozone NAAQS. Neither Texas nor Intervenors commented on this rationale for the Disapproval, and neither contests it in their opening brief.  The Court should uphold EPA's Disapproval on this independent basis and end its analysis here.

b.  Second, EPA correctly concluded that the Submission did not satisfy the "maintenance" prong of the Good Neighbor Provision because Texas failed to give that prong separate meaning from the "nonattainment" prong despite the Act's text and the judicial guidance provided by the 2008 holding in *North Carolina*. The Submission provided *no* explanation for Texas's conclusory assertion that its emissions would not interfere with maintenance in other states.  Accordingly, EPA acted within its CAA authority to disapprove the Submission on this ground, and the Court could also end its analysis here.

c.  Third, EPA correctly concluded that Texas's nonattainment analysis was unjustifiably narrow because it considered only the then-current and past ozone concentrations of formally designated nonattainment areas.  The Good

Neighbor Provision encompasses forward-looking air quality concerns too, and Texas may contribute to a downwind location's exceeding the NAAQS in the future regardless of whether that location is inside a designated nonattainment area.

Even under Texas's flawed interpretation of what the Good Neighbor Provision requires, Texas's nonattainment analysis could not support the conclusion that Texas did not contribute significantly to nonattainment because Texas did not quantify its emissions impact to determine what "amounts" of its emissions, if any, "contribute significantly to nonattainment." 42 U.S.C. § 7410(a)(2)(D)(i)(I). Texas simply considered past ozone data and general wind patterns to reach technically unsubstantiated conclusions regarding interstate transport of air pollutants. Texas did not take on the "difficult" but essential task of quantifying the amount of ozone coming from Texas into other states' nonattainment areas. Tex. Submission at 2-5.

3.    The Disapproval was not undermined by its timing or dependent upon the updated modeling data, so Texas's and Intervenors' arguments on those issues are irrelevant. They also lack merit.

a.    Nothing in the Act supports Texas's and Intervenors' view that missing a statutory deadline limits EPA's statutory review authority when acting on a SIP submission. Congress speaks clearly when it means to impose that sort of consequence for a missed deadline, and it did not do so here.

33

b.     EPA's timeliness in acting on the Submission is not before this Court and has already been appropriately adjudicated in district court.  Other litigants, not party to this litigation, already obtained the only remedy available when EPA misses a statutory deadline to take final action on a SIP submission—a court-ordered deadline from a district court.

c.     EPA's delay in acting on the Submission was reasonable, as considerable uncertainty existed regarding Good Neighbor obligations after *EME Homer I*.  Once courts rendered decisions clarifying key issues and resolving that uncertainty, EPA promptly proposed and took final action on the Submission.

d.     While EPA did not base its Disapproval on the updated modeling data, EPA may lawfully consider relevant data at the time it acts, particularly where doing so is needed to evaluate the technical claims advanced in a state's submission.

e.     Further, while not a basis for the Disapproval, the updated data confirmed that EPA's Disapproval was scientifically sound.

f.     EPA appropriately did not issue a SIP call or an error correction.  But even if EPA had pursued either option, doing so would not have relieved EPA of its judicially enforceable duty to act on Texas's Submission.

g.     If the Court finds some fault in EPA's limited consideration of its own modeling in the Disapproval, this would be, at most, non-prejudicial error.

Over the last eight years, Texas could have submitted a new SIP submission to replace the CSAPR Update FIP.  However, Texas never sought to do so.

4.      EPA's evaluation of Texas's Submission was procedurally proper. The Proposal was subject to public notice, and both Texas and an Intervenor commented on it.  The record contradicts Intervenors' claim that EPA pre-judged the outcome of the Disapproval based on the proposed FIP in the CSAPR Update. As the Supreme Court has already held, EPA may *propose* a FIP for a state before taking final action on a SIP submission.  Texas and Intervenors fail to identify any unmet procedural requirement or other barrier against doing so.

5.      If the Court concludes that it should grant any part of the petition, it should remand the Disapproval to EPA without vacatur.  Any flaw could be remedied on remand easily, and vacating the Disapproval would severely disrupt the status quo.  The Disapproval and the CSAPR Update FIP for Texas have been in place for eight years.  Vacatur would deprive EPA of its authority to maintain the FIP, at least while it acts on remand, leaving Texas's Good Neighbor obligations for the 2008 ozone NAAQS unaddressed, disrupting the emissions trading program, and impeding Texas's ability to comply with several other CAA obligations using the CSAPR Update FIP.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") standard of review applies here because Texas challenges EPA's Disapproval of its SIP Submission.[11]  *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2003) (citing 5 U.S.C. § 706), *as amended on denial of reh'g and reh'g en banc* (Jan. 8, 2004).  This standard of review is "narrow."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  EPA's final action must be upheld so long as it is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* (quoting 5 U.S.C. § 706(2)(A)).

When reviewing agency action under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (overruling *Chevron v. NRDC*, 467 U.S. 837 (1984)).  To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best."  *Id.* at 2266.

---

[11] The Act's standard of review, 42 U.S.C. § 7607(d)(9), does not apply to SIP disapprovals.  *See Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496 & n.18 (2004) (noting that the Act's standard of review applies to only certain actions, and otherwise the default APA standard of review applies).  Regardless, the standards of review under the Act and the APA track each other in the respects relevant here.  *Compare* 42 U.S.C. § 7607(d)(9) *with* 5 U.S.C. § 706.

"Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 2273. The Supreme Court just held in *Loper Bright* that the APA and historical judicial practice "specifies that courts, not agencies, will decide '*all* relevant *questions of law*' arising on review of agency action." *Id.* at 2261 (emphasis in original and added).

*Loper* also recognizes the agency's power to persuade, if not to control, in the context of statutory interpretation. *Id*. at 2259, 2262. *Loper* notes that the "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions." *Id.* at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)). "'The weight of such a judgment in a particular case,' . . . 'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.* (quoting *Skidmore*, 323 U.S. at 140).

*Loper* does not overturn or modify the myriad decisions of this Court and others that have long applied deference to technically-based *factual* determinations made by expert agencies. To the contrary, *Loper* stated that "Section 706 [of the

APA] *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Id.* at 2261 (emphasis in original).

This Court "defer[s] to the informed discretion of the responsible federal agencies" when the "analysis of the relevant documents requires a high level of technical expertise," *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000) (quotation omitted), including when there are "conflicting technical contentions" among Petitioners, state agencies, and federal agencies, *Sierra Club v. EPA*, 939 F.3d 649, 686 (5th Cir. 2019). "An agency's failure to comply with the APA is harmless when the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.'" *City of Arlington v. FCC*, 668 F.3d 229, 243-44 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013).

## ARGUMENT

### I.    The Act delegates to EPA the authority to review SIP submissions to determine if they meet all applicable requirements, including the Good Neighbor Provision.

Under the Act, states have the duty in the first instance to develop plans containing measures and controls to meet the NAAQS. But the Act expressly charges EPA with the duty to independently evaluate SIP submissions to ensure they meet "*all* of the [Act's] applicable requirements." 42 U.S.C. § 7410(k)(3) (emphasis added). One such requirement, the Good Neighbor Provision, requires states to include in their SIPs "adequate provisions" to "prohibit[]" those

"amounts" of emissions that "contribute significantly to nonattainment[] or interfere with maintenance" of the NAAQS in "any other State." *Id.* § 7410(a)(2)(D)(i)(I). Thus, evaluating whether an upwind state has correctly assessed if its emissions significantly contribute to nonattainment or interfere with maintenance of the NAAQS in a downwind state is directly in EPA's wheelhouse.

The sole issue in this case is whether EPA reasonably disapproved the Submission for failing to include adequate provisions to comply with the Good Neighbor Provision. The Submission asserted that Texas was not contributing significantly to nonattainment or interfering with maintenance in downwind states, meaning that Texas did not have to adopt *any* additional emissions-control measures to meet this requirement. Tex. Submission at ES-1.

Consistent with its statutory duty, EPA could not simply accept Texas's assertion but was required to review the Submission for substantive compliance with the Act. Contrary to Texas's argument otherwise (Tex. Br. at 23-30), EPA reasonably concluded, consistent with longstanding agency practice, that the Submission was deficient on multiple fronts, did not heed key terms in the Good Neighbor Provision, and did not technically support Texas's conclusion that it was complying with the Good Neighbor Provision. *See infra* Arg. II. Rather than substantively engage with EPA's careful reasoning, Texas instead invents limitations on EPA's statutorily prescribed role that are found nowhere in the Act,

cannot be reconciled with the plain language of several of the Act's provisions, and

conflict with precedent affirming EPA's authority and responsibility to ensure that

SIP submissions comply with the Act's requirements.

### A.    The Act obligates EPA to determine whether SIP submissions meet applicable requirements.

The Act clearly defines EPA's role for reviewing SIP submissions.  Section

7410(k)(3) of the Act is a delegation of authority to EPA to determine whether SIP

submissions meet "all of the applicable requirements" for compliance with the Act.

42 U.S.C. § 7410(k)(3).  Section 7410(k)(3) requires EPA to approve a SIP only if

it complies with *all* the Act's applicable requirements.  *Id.*  That section also

authorizes EPA to partially approve and partially disapprove a SIP if EPA

determines that only parts of the SIP meet all applicable requirements.  It would

make no sense for Congress to authorize EPA to parse the approvability of a state's

submission if Congress were not conferring discretion on EPA to determine

compliance.

Section 7410(k)(3) also states that the "plan revision shall not be treated as

meeting the requirements of this Chapter until the Administrator approves the

entire plan revision as complying with the applicable requirements." *Id.*  Here

again, Congress clearly and explicitly delegates to EPA final review over

compliance with the Act's requirements.  Moreover, if a SIP submission is

deficient, Section 7410(c) requires EPA to so find and then promulgate a FIP to address the relevant requirements.  *Id.* § 7410(c).

The Act thus requires EPA to evaluate SIP submissions for substantive compliance with the Act's requirements and to assess whether the control measures that states adopt are adequate to attain the NAAQS or achieve other real-world results required by the Act.  *Id.* § 7410(k)(3); *Union Elec.*, 427 U.S. at 249 (citing *Train*, 421 U.S. at 64).  And because EPA's evaluation of a SIP is subject to APA review, EPA's failure to do a thorough review would be unlawful action.  *See, e.g., Sierra Club v. EPA*, 972 F.3d 290, 301-03 (3d Cir. 2020) (faulting EPA for approving SIP submission that lacked technical justification).

This conclusion does not, as Texas erroneously contends, depend upon the overruled *Chevron* interpretive methodology.  Tex. Supp. at 15-17.  In the context of the Good Neighbor Provision, the Act explicitly requires EPA to ensure that SIPs contain "adequate provisions" to provide for attainment and maintenance of the NAAQS, and to meet "all" of the Act's "applicable requirements," including the Good Neighbor Provision.  42 U.S.C. § 7410(a), (k).  And the Good Neighbor Provision requires SIPs to "prohibit[]" emissions that "contribute significantly" to downwind nonattainment or "interfere with" maintenance.  *Id*. § 7410(a)(2)(D)(i)(I).  In conjunction with the APA standard of review, Congress has delegated "policymaking and factfinding" of Good Neighbor implementation

41

to EPA. *See EME Homer*, 572 U.S. at 514-15; *Loper Bright*, 144 S. Ct. at 2261-62, 2263 (holding that some statutes "empower an agency to prescribe rules to fill up the details" or to regulate within "limits . . . that leave[ ] agencies with flexibility") (quotations omitted).[12]  Here, Congress delegated to EPA the authority to determine whether SIP provisions are "adequate" to prohibit harmful interstate emissions.  42 U.S.C. § 7410(k)(3), (a)(2)(D)(i)(I).  And EPA acts within Congress's specific delegation of authority when it disapproves a SIP submission for failing to comply with the Good Neighbor Provision's requirements.

This common-sense view of EPA's SIP review authority accords with the Supreme Court's holding in *EME Homer* that the Act delegates to EPA the authority to quantify and allocate responsibility for an upwind state's excess downwind pollution, 572 U.S. at 510, 515-16, 520—a holding consistent with *Loper Bright*.  While *EME Homer* was decided in the context of a FIP, the holdings in that case were issued without reference to whether EPA was acting on a SIP submission or promulgating a FIP and were based on the plain text of the Act.  *See* 572 U.S. at 509-10.

---

[12] This response and Texas's Supplemental Brief both cite to *EME Homer* and *BCCA Appeal* at length.  Even though these cases "relied on the *Chevron* framework" that governed at the time, *Loper Bright* did not disturb their statutory holdings.  144 S. Ct. at 2273.

Likewise, *Michigan* supports EPA's substantive SIP review authority. There, based on the plain text of the Act, the D.C. Circuit held that EPA may prospectively define a state's Good Neighbor obligations even before states submit SIPs. *Michigan*, 213 F.3d at 685-87. Thus, EPA does not intrude upon states' authority to develop SIP submissions when it substantively evaluates whether a SIP submission's conclusions regarding a state's Good Neighbor obligations complies with the Act's requirements. *Contra* Indus. Br. at 19; *accord Westar Energy, Inc. v. EPA*, 608 F. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted well within the bounds of its delegated authority when it disapproved of Kansas's proposed [Good Neighbor] SIP.").

This Court has characterized EPA's SIP approval authority under Section 7410(k)(3) as a "ministerial" function, but only insofar as EPA *must* approve a SIP submission *once* EPA has determined it complies with the Act. *Luminant Generation Co. v. EPA*, 714 F.3d 841, 846 (5th Cir. 2013).[13] This describes the final step in EPA's review process as ministerial, not the analytical basis for EPA's

---

[13] As other circuits have observed, EPA's SIP review role is not "ministerial" in the sense that Texas and Intervenors claim. *North Dakota v. EPA*, 730 F.3d 750, 760-61 (8th Cir. 2013) ("Although the [Act] grants states the primary role of determining the appropriate pollution controls within their borders, EPA is left with more than the ministerial task of routinely approving SIP submissions."); *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519, 531 (9th Cir. 2016) ("EPA is not limited to the 'ministerial' role of verifying whether a determination was made; it must 'review the substantive content of the . . . determination.'" (quotation omitted)).

review or its substantive determination of compliance or noncompliance. *Luminant* recognized that EPA has the authority to evaluate whether a SIP submission in fact meets applicable requirements specified by the Act. *Id.* at 856-57 (upholding EPA's partial SIP disapproval even while describing EPA's role as "ministerial"). "Congress intended that EPA, not the states alone, ultimately ensure that state determinations . . . comply with the Act, and so authorized EPA to disapprove [a] state['s] 'analysis that is neither reasoned nor moored to the [Act's] provisions.'" *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519, 532 (9th Cir. 2016) (quoting *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013), and rejecting argument that EPA bears the burden of proving a state's determinations are unreasonable).

Texas relies on the Court's non-precedential order in the 2023 case staying a different, challenged SIP disapproval action, but that order has no relevance here. Tex. Supp. at 11 (citing 2023 WL 7204840 (5th Cir. May 1, 2023)). That order was not a finding on the merits and expressly did not bind the merits panel, and the 2023 case remains pending. *See supra* Background C. No challenge to the SIP disapproval action has been decided, and as Justice Barrett noted in her *Ohio* dissent, "EPA's SIP disapprovals [at issue in the 2023 case] may, in fact, be valid." 144 S. Ct. at 2058. Further, as EPA explained in merits briefing in the 2023 case, the stay order was incorrect. EPA's SIP review authority requires EPA to evaluate

44

SIPs for substantive compliance with the Act, including the Good Neighbor Provision. *See* EPA Resp. Br. at 80-81, 89-90, 95-96, 2023 case, Dkt. No. 397. EPA's determination in the 2023 case that Texas's SIP submission did not comply with the requirements of the Good Neighbor Provision fell squarely within EPA's SIP review authority under 42 U.S.C. § 7410(k)(3). *See id.*

**B.     A state's primary responsibility to develop a SIP submission for EPA's review does not limit EPA's substantive SIP review authority.**

Under the Act, the state's role in developing SIP submissions is likewise clearly defined. Congress required states to "adopt and submit" SIPs that provide for the "implementation, maintenance, and enforcement" of the NAAQS. 42 U.S.C. § 7410(a)(1). The Act sets forth basic SIP requirements that "[e]ach such plan shall" satisfy. *Id.* § 7410(a)(2); *see also EME Homer*, 572 U.S. at 509. By using the mandatory "shall," Congress established a framework of mandatory requirements within which states may exercise their discretion to design SIPs to provide for attainment and maintenance of the NAAQS and to meet other requirements of the Act, including the Good Neighbor Provision.[14]

The Supreme Court has expressly affirmed that EPA is not obligated to provide Texas with guidance and data in advance of its Submission. *EME Homer*,

---

[14] In other sections of the Act, Congress imposed more specific SIP requirements (e.g., requirements that states must meet in designated ozone nonattainment areas, depending on the level of classification under 42 U.S.C. § 7511(a)).

572 U.S. at 510.  The Act provides "without reservation" that states "shall" submit a SIP; that the SIP "shall" address the state's Good Neighbor obligations; and that "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations" to submit an adequate SIP.  *Id.* at 509-10 (quoting 42 U.S.C. § 7410(a)(1), (a)(2)).

Texas's claim that states are "guaranteed" some "leeway" is atextual and misunderstands states' obligations to develop their SIP submissions.  *See* Tex. Br. at 35.  EPA has never disputed that states enjoy wide discretion in *formulating regulatory controls* to include in their SIPs, 42 U.S.C. § 7410(a)(2)(A), meaning that they can adopt their preferred mix of enforceable control measures that will address Good Neighbor obligations, so long as they meet applicable requirements.  And, in general, EPA may not dictate specific control measures for a state to adopt in a SIP.  *See Virginia v. EPA*, 108 F.3d 1397, 1415 (D.C. Cir. 1997).

But that discretion does not excuse states from developing SIP submissions that fully address their Good Neighbor obligations, even if doing so requires complicated analysis or there are "practical difficulties" in doing so.  *EME Homer*, 572 U.S. at 509.  Citing a different SIP action addressing other, intra-state, SIP requirements for the 2008 ozone NAAQS, Texas asserts that EPA imposed improper requirements by considering complicated modeling and extensive data.  Tex. Br. at 26.  But the Good Neighbor Provision requires addressing the "complex

problem" that results from the emissions of many states that affect many other states' ozone problems. *EME Homer*, 572 U.S. at 495. Assessing whether in-state emissions adversely affect ozone levels out of state *is* complicated, but it is not infeasible. EPA and states have been conducting such analyses for nearly 30 years. *See, e.g.*, 62 Fed. Reg. 60318, 60376-79 (Nov. 7, 1997) (publishing state recommendations to EPA concerning how to analyze interstate ozone transport, including through use of photochemical modeling); *supra* Background B.1. (describing EPA's technical analysis for the 1998 NO$_X$ SIP Call); *EME Homer I*, 696 F.3d at 49 (Rogers, J., dissenting) (noting that states routinely undertake technically complex air quality determinations, "are fully capable of measuring interstate transport of emissions by conducting modeling," and "have done so before and continue to do so"). Texas has in fact used photochemical modeling for other applications under the Act. *See, e.g.*, 79 Fed. Reg. 74818, 74848 (Dec. 16, 2014). A technical interstate emissions analysis is therefore entirely consistent with what the Act requires and is feasible.

If states are unable or unwilling to complete an adequate analysis, the Act plainly directs EPA to do so, to ensure the end result—here the elimination of significant interstate ozone pollution—is achieved. Moreover, Texas had (and still has) the opportunity to identify appropriate emissions limitations and control measures to address its Good Neighbor obligations. *See infra* Arg. IV. But Texas

instead ignored and continues to ignore its impacts on downwind states' air quality. *See infra* Arg. II.

Texas incorrectly asserts that the Supreme Court in *Ohio* shed new light on the well-established role of states in developing SIP submissions. Tex. Supp. at 11. The Supreme Court simply reiterated its prior holding in *Train* that states have "primary responsibility" to "pick emissions limitations" to meet the Act's requirements, including adequate measures to protect their neighbors' air quality, as required by the Good Neighbor Provision. *Ohio*, 144 S. Ct. at 2048. But that does not mean, as Texas suggests, that states may determine—or, as in this case, excuse—their own compliance with the Good Neighbor Provision, without EPA oversight. Tex. Supp. at 11. On the contrary, as explained, the Act requires EPA to review whether states' submissions meet the requirements of the Good Neighbor Provision. *See supra* Arg. I.A. EPA cannot approve a state's submission unless it is "legally compliant," meaning that it "satisfies the 'applicable requirements' of the Act, including the Good Neighbor Provision." *Ohio*, 144 S. Ct. at 2048.

Texas also misconstrues the Act and *Ohio*, asserting that Congress provided that states "decide how to measure ambient air quality" within their own borders under a separate CAA provision. Tex. Supp. at 11 (quoting *Ohio*, 144 S. Ct. at 2048 (citing 42 U.S.C. § 7410(a)(2)(B))). While the Act requires states to monitor air quality, such monitoring is also subject to federal oversight. *See* 42 U.S.C.

§ 7410(a)(2)(B)(ii); 40 C.F.R. pt. 58.  Thus, the mere fact that monitoring air

quality is among states' responsibilities does not alter the basic statutory scheme,

under which states develop SIP submissions, and EPA assesses the adequacy of

those submissions.

### C.    EPA retains authority to substantively evaluate and disapprove an inadequate SIP submission that has been deemed "complete."

EPA's separate determination that the Submission was "complete" under 42

U.S.C. § 7410(k)(1)(B) did not alter EPA's substantive SIP review authority under

42 U.S.C. § 7410(k)(3).  Texas and Intervenors contend that EPA may not

subsequently disapprove the Submission following EPA's "completeness"

determination.  Tex. Br. at 32; Indus. Br. at 20-23.  This argument is contrary to

the statutory text and EPA's regulations, which require EPA to review SIP

submissions first for completeness and only then for substantive compliance with

the Act.

As an initial matter, no commenter raised this argument in their comments

on the Proposal, so this argument is forfeited.  *See generally* Tex. Comment;

Luminant Comment.  "Generally, in considering a petition for review from a final

agency order, this court will not consider questions of law which were neither

presented to nor passed on by the agency."  *BCCA Appeal*, 355 F.3d at 828; *see

also Galveston-Houston Ass'n for Smog Prevention (GHASP) v. EPA*, 289 F.

49

App'x 745, 752 (5th Cir. 2008).  To do otherwise would "usurp[ ] the agency's function" and would "deprive[ ] the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Alaska Unemployment Comp. Comm'n v. Aragan*, 329 U.S. 143, 155 (1946).

Even if not forfeited, Texas's and Intervenors' narrow view of EPA's SIP review authority is contrary to the plain text of the Act, which sets forth a two-step process for EPA's SIP submission review.  *See* 42 U.S.C. § 7410(k).  Under Section 7410(k)(1), EPA first must make a threshold "completeness determination" within 6 months whether the submission contains certain "minimum criteria" designated by EPA as "the information necessary to . . . determine whether the plan submission complies with the provisions of [the Act]." *Id.* § 7410(k)(1)(A), (B).  These minimum criteria are listed in Appendix V to 40 C.F.R. pt. 51 and include a relatively short list of eight "Administrative Materials" and nine "Technical Support" requirements, such as evidence that the state properly adopted and included relevant technical materials.  EPA's completeness check simply ensures that a submission contains the materials necessary to allow EPA to later evaluate compliance with the substantive requirements of the Act; it does not actually determine compliance with the Act.  *See* 40 C.F.R. pt. 51, App. V.  If EPA fails to make the completeness determination within six months, the

SIP submission is deemed complete by operation of law.  *See* 42 U.S.C.

§ 7410(k)(1)(B).

By contrast, under Section 7410(k)(3), EPA evaluates SIP submissions for

compliance with the substantive requirements in the second step of EPA's review,

which EPA must complete within one year after the submission is determined to be

complete.  *See id.* § 7410(k)(2), (3), & (*l*); *see also Arizona*, 815 F.3d at 527 n.5

(noting that EPA's finding of completeness under § 7410(k)(1) "[does] not mean

that [the submission was] complete in the sense that [it] contained the provisions

necessary to satisfy the requirements of [the Act]."); *NRDC v. Browner*, 57 F.3d

1122, 1126 (D.C. Cir. 1995) ("Under the two-stage procedure established in

[section] [7410](k), EPA first makes an essentially *ministerial finding* of

completeness, a process taking at most six months.  By contrast, the plan approval

process may take up to twelve months due to the more extensive technical analyses

necessary to ensure that the SIP meets the Act's *substantive requirements*."

(emphasis added)).

Accordingly, a completeness determination does not deprive EPA of

authority to disapprove a SIP submission for failure to comply with substantive

requirements of the Act.  A completeness determination merely triggers EPA's

duty to evaluate the substance of a SIP submission in the first instance and either

approve or disapprove the SIP submission as necessary within one year.

Texas and Intervenors collapse these two separate statutory obligations into one. *See* Tex. Br. at 32; Indus. Br. at 20-22. This interpretation incorrectly reads EPA's substantive review responsibility under Section 7410(k)(3) out of the Act, making it tantamount to a mere completeness review under Section 7410(k)(1)(B). Such a result contravenes the "usual presumption that differences in language . . . convey differences in meaning," *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (quotation omitted), and that statutory provisions are read to avoid rendering any part "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). The Court should reject Texas's and Intervenors' "completeness" arguments, either as forfeited or as entirely without merit.

## II. EPA reasonably disapproved the Submission for failing to comply with the Good Neighbor Provision.

EPA reasonably determined on three independent grounds that Texas's technical analyses in its Submission failed to support its conclusion that Texas did not contribute significantly to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in any downwind state. First, Texas wrongly sought to rely on emissions reductions for different NAAQS from the already-invalidated and now-defunct CAIR. *See infra* Arg. II.A. Second, Texas completely ignored the "interference with maintenance" prong of the Good Neighbor Provision, which under *North Carolina* must be given independent meaning. *See infra* Arg. II.B. Third, Texas undertook an impermissibly narrow approach to reviewing its

emissions' effects on other states' nonattainment of the NAAQS.  *See infra* Arg.

II.C.

Any one of these bases is sufficient for this Court to uphold the Disapproval.

Indeed, Texas does not contest the first basis, and this Court should uphold the

Disapproval based on that concession alone.  *See Feds for Med. Freedom v. Biden*,

63 F.4th 366, 377 (5th Cir. 2023) (holding that a party "effectively concedes" a

reasoned decision by not contesting it), *vacated as moot*, 144 S. Ct. 480 (2023)

(mem.); *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir.

2019) (holding that arguments not included in an opening brief are forfeited).

Regardless, EPA's bases for the Disapproval were all reasonable and withstand the

APA's deferential standard of review.  *Miss. River Basin*, 230 F.3d at 175

(deferring to agencies' technical expertise when reviewing agency actions); *Loper

Bright*, 144 S. Ct. at 2261 ("Section 706 *does* mandate that judicial review of

agency policymaking and factfinding be deferential.").

Thus, contrary to Texas's and Intervenors' position—that EPA's "only

justifications" for the Disapproval were the updated data and modeling, Tex. Br. at

32-35; Indus. Br. at 18, 20-24—EPA made abundantly clear that it disapproved the

Submission based solely on its own deficiencies, Disapproval at 53285 ("EPA's

disapproval is based on the inadequacies in the analysis provided in Texas's SIP

submittal.").[15]  Because the Disapproval was not contingent on the updated

modeling data or delay, there is no need to address those collateral issues raised by

Texas and Intervenors.

Further, because EPA did not rely on Texas's and Intervenors' challenged

record documents, the pending motion to strike certain record documents should be

denied as moot.

### A.  Texas's reliance on the invalidated CAIR could not satisfy Texas's Good Neighbor obligations.

Texas's reliance on emissions reductions stemming from compliance with

CAIR to conclude that it had sufficient emissions control measures to satisfy its

Good Neighbor obligations was inappropriate in three key respects.  Proposal at

21294.

First, as Texas acknowledged in its Submission, the D.C. Circuit had

invalidated CAIR in 2008.  *See* Tex. Submission at 2-13 (mentioning that

decision); *North Carolina*, 531 F.3d at 929.  The court found CAIR was

"fundamentally flawed" and instructed EPA to build a replacement for CAIR

"from the ground up."  *North Carolina*, 531 F.3d at 929.  EPA did so by

promulgating CSAPR, which started implementation in 2015.  Proposal at 21294.

---

[15] *See also, e.g.*, Disapproval at 53286 ("The bases for the disapproval . . .  do not rely upon the proposed CSAPR Update.); *id.* ("These deficiencies are completely independent of any analysis conducted to support the CSAPR Update proposal.").

Accordingly, "CAIR implementation ended in 2014" and Texas could not rely on the defunct CAIR to reduce its emissions to satisfy its Good Neighbor obligations. *Id.* Indeed, the D.C. Circuit has squarely held that, in light of *North Carolina*, not only was EPA correct to disapprove SIPs that had relied on CAIR, it had no choice but to do so. *See EME Homer II*, 795 F.3d at 132-35.

Second, even if CAIR remained in place, Texas failed to demonstrate that CAIR could satisfy Texas's Good Neighbor obligations for the *ozone* NAAQS because, as Texas acknowledged, it was not part of the CAIR emissions trading program that addressed ozone pollution. Tex. Submission at 2-13; Proposal at 21294. CAIR had three emissions trading programs, of which two addressed $PM_{2.5}$ pollution and one addressed ozone pollution, and Texas's sources were participants in only the CAIR emissions trading programs addressing $PM_{2.5}$. *See* Proposal at 21294. Texas provided no explanation how those programs would satisfy obligations associated with reducing summertime ozone highs. *Id.*

Third, even if CAIR remained in place and Texas *had* participated in CAIR's emissions trading program for ozone pollution, Texas did not explain how CAIR could satisfy Texas's Good Neighbor obligations for the 2008 ozone NAAQS because CAIR established a trading program to satisfy the less stringent 1997 ozone NAAQS. *Id.* In other words, CAIR at most would reduce emissions relevant to Good Neighbor obligations for the 1997 ozone NAAQS (80 ppb), and

Texas provided no explanation why compliance with those obligations for a less stringent ozone standard would be sufficient to satisfy Good Neighbor obligations for the more protective 2008 ozone NAAQS (75 ppb).

EPA reasonably determined that Texas could not meet its Good Neighbor obligation for the 2008 ozone NAAQS by relying on CAIR for each of these three reasons. *Id.* EPA received no comments regarding this determination, and relatedly, Texas and Intervenors do not dispute this CAIR-based rationale. This Court does not entertain arguments against EPA's SIP action that were not raised to EPA during the agency proceedings. *BCCA Appeal*, 355 F.3d at 828-29. Nor does it entertain arguments raised for the first time in a reply brief. *See Ctr. for Biological Diversity*, 937 F.3d at 542. Texas and Intervenors have thus forfeited any argument against EPA's CAIR-based rationale, and EPA's CAIR-based rationale provides this Court a straightforward path for upholding the Disapproval.

**B.    The Submission failed to comply with the Good Neighbor Provision's requirement that states independently evaluate whether their emissions will "interfere with maintenance."**

EPA also reasonably disapproved the Submission for failing to make any independent evaluation of whether Texas's emissions will "interfere with maintenance" of the 2008 ozone NAAQS in any other state, as required by the Good Neighbor Provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I); Disapproval at 53285, 53287-88; Proposal at 21292. Texas and Intervenors wrongly argue that Texas

appropriately "subsumed" its maintenance prong analysis with its nonattainment analysis of monitoring sites.  Tex. Br. at 37; *see also* Tex. Supp. at 17-18; Indus. Br. at 23-24.

As the D.C. Circuit held in 2008 (years before Texas's Submission), and as EPA reiterated, the regulating authority must give the "interfere with maintenance" clause in the Good Neighbor Provision "'independent significance.'"  Proposal at 21292 (quoting *North Carolina*, 531 F.3d at 910).  In *North Carolina*, EPA applied the interfere with maintenance prong "in conjunction with" the significant contribution to nonattainment prong and "did not use the maintenance prong to separately identify upwind States subject to CAIR."  531 F.3d at 910.  The D.C. Circuit rejected that approach, explaining that "[a]ll the policy reasons in the world cannot justify reading a substantive provision out of a statute."  *Id.*  Because the Good Neighbor Provision is written in the "disjunctive," the regulating authority (here, Texas) must "give independent effect" to the maintenance prong and cannot subsume its maintenance analysis within its nonattainment analysis, as Texas purports to have done.  *Id.*  The regulating authority must afford "protection for downwind areas that . . . still find themselves struggling to meet NAAQS due to upwind interference." *Id.* at 911.

EPA reasonably disapproved the Submission for failing to do *any* analysis to identify its effects on locations that may struggle to maintain the NAAQS.

Proposal at 21292; Disapproval at 53285, 53287-88.  Texas's contention that it did

conduct a maintenance analysis by "examin[ing] . . . 167 monitors in both

attainment and nonattainment areas in Texas and neighboring states," Tex. Supp. at

18; *see also* Tex. Br. at 30-32, goes far beyond what Texas actually did.  Texas did

not examine anything; it simply listed the 2010 measured ozone levels of those 167

monitors but provided no analysis of what those values mean.  *See* Tex.

Submission at 2-6–2-12.  So, EPA reasonably determined that Texas did not

conduct the necessary maintenance prong analysis.  Proposal at 21292;

Disapproval at 53285, 53287-88.

Accordingly, Texas's contention that EPA disapproved its Submission for

not following EPA's maintenance methodology is belied by the record.  *See* Tex.

Br. at 28.  Likewise, EPA did not disapprove the Submission for failing to adhere

to EPA's methodology, *see id.*, but, instead, for failing to follow *any* methodology

that would reasonably demonstrate compliance with the Act.

C.     **The Submission took an impermissibly narrow approach to
       evaluating whether Texas's emissions contributed to
       nonattainment.**

As for the nonattainment prong, EPA reasonably disapproved the

Submission because Texas considered an impermissibly narrow scope of its

emissions' impact on downwind states by evaluating only designated

nonattainment areas in states that were geographically close to Texas.  Proposal at

21292.  As EPA explained, the plain text of the Good Neighbor Provision supports, if not requires, a broader approach, consistent with longstanding agency practice. Disapproval at 53287; *see supra* Background B.1.  The future tense "will" in the Good Neighbor Provision, 42 U.S.C. § 7410(a)(2)(D)(i), demonstrates Congress's intent that the provision be "forward-looking and apply to areas that will be in nonattainment regardless of formal designation."  Disapproval at 53287.  An area that is not formally a nonattainment area may well, currently or in the future, exceed the NAAQS and not meet public health-based standards, due in part to significant contribution from another state.  *Id.*; Proposal at 21292.  Accordingly, "[a]n upwind state cannot be relieved of its obligation to address interstate transport of air pollution merely because of a lack of formal designation," as Texas did.  Disapproval at 53287.  EPA thus reasonably disapproved Texas's Submission on the basis of Texas's flawed nonattainment analysis.

Even aside from these statutory concerns with Texas's unjustifiably narrow nonattainment analysis, EPA also reasonably concluded it was technically flawed because it "d[id] not quantify the magnitude of impact from Texas emissions to downwind states."  Proposal at 21294.  Wind patterns provide only an indication of "the *possibility* of transport" and do not demonstrate whether a state contributes significantly to nonattainment in a downwind state.  *Id.* (emphasis added).  Indeed, Texas acknowledged that Memphis's and Baton Rouge's ozone pollution problem

could be caused by transport of ozone or ozone-precursors from sources within Texas, but Texas did not calculate the amount of ozone coming or transported from each state because "it [wa]s difficult to determine."  Tex. Submission at 2-5. Further, EPA's own analysis showed that wind does in fact transport pollutants eastward from Texas, including to Baton Rouge.  Proposal at 21294.

Likewise, while downward trends in emissions and observed ozone levels may "indicate progress towards reducing impact," they do not provide information on "the magnitude of the remaining impact," (i.e., whether the remaining impact is "significant").  *Id.*  Such downward trends do not conclusively demonstrate that downwind nonattainment areas will come into attainment in the future, nor do they provide any estimate of the extent to which continued downwind nonattainment is due to the upwind state's contribution.  *See id.*  In other words, Texas's evaluation of ozone concentration trends was insufficient to suggest that emissions from Texas did not, do not, and will not contribute significantly to nonattainment in those downwind nonattainment areas.  Thus, EPA provided another distinct reasoned explanation for the Disapproval.

Texas and Intervenors lodge several arguments against both bases for the Disapproval—the statutory requirement and technical inadequacies.  However, all but one of the arguments are forfeited, as no commenter raised those issues with EPA during the rulemaking process.  *See generally* Tex. Comment; Luminant

Comment.  The only comment EPA received regarding the nonattainment prong came from Texas, which objected that EPA did not provide "guidance on how to develop its [Good Neighbor] SIP" and "did not explain what type of transport analysis would be considered satisfactory."  Tex. Comment at 3; *see also* Tex. Br. at 24-25, 27 (erroneously arguing that EPA's requirement for the nonattainment prong is new).  But the Act does not excuse any state from fulfilling its Good Neighbor obligations due to the absence of EPA guidance or because of "practical difficulties."  *EME Homer*, 572 U.S. at 509-10; *see also supra* Arg. I.B.

Further, EPA thoroughly explained that (consistent with the statutory requirements discussed above) it has long evaluated the nonattainment prong by considering those locations that may exceed the NAAQS regardless of whether those locations are formally designated nonattainment areas.  Disapproval at 53287 & n.6 (citing EPA actions); *see also supra* Background B.1 (explaining that EPA has taken this approach since it began addressing Good Neighbor obligations for the ozone NAAQS).  Texas's contention that EPA newly required states to consider locations beyond designated nonattainment areas is thus factually wrong.

Texas and Intervenors forfeited their other nonattainment arguments, as no commenter raised them to EPA, and EPA did not have an opportunity to address them in the administrative record.  *BCCA Appeal*, 355 F.3d at 828-29.

D.    **Texas's and Intervenors' forfeited arguments regarding Texas's nonattainment analysis lack merit.**

Nonetheless, if the Court considers Texas's and Intervenors' improper attacks on EPA's rationales, those arguments should be rejected because they are meritless and contravene the plain text of the Good Neighbor Provision.[16]

1.    **The Act requires the regulating authority to evaluate a state's Good Neighbor obligations beyond nonattainment areas.**

As explained *supra* Argument II.C., Texas's and Intervenors' overly narrow interpretation of the Good Neighbor Provision as considering contributions only to areas already designated as nonattainment areas turns a blind eye to the word "will" in the Good Neighbor Provision.  *See* Tex. Br. at 25-27; Tex. Supp. at 14-15; Indus. Br. at 22-23.  Thus, it defies the cardinal rule of statutory interpretation that courts must "give effect" to every "word" of a statute.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000).

---

[16] Because EPA had no opportunity to develop record-based responses to Texas's and Intervenors' arguments first raised in litigation, this Court should reject any post-hoc rationalization arguments that Texas and Intervenors make in their reply regarding these responses.  *See Defs. of Wildlife v. Everson*, 984 F.3d 918, 941 & n.10 (10th Cir. 2020) (rejecting argument that agency engaged in "impermissible post-hoc rationalization" by responding to arguments made in litigation on issues irrelevant to the substance of the agency's action); *see also id.* at 941 n.10 ("The Court can only assume the plaintiff is not suggesting that it would be entitled to fully brief this issue with all of the sources it could muster, while the [agency] would be limited to those materials 'cited' in the original Decision.") (quotation omitted)).

Texas's and Intervenors' narrow reading of the Good Neighbor Provision is inconsistent with the plain text of the Act for an additional reason—Texas and Intervenors inappropriately focus on the term "nonattainment area," which is nonexistent in the Good Neighbor Provision. *See* Tex. Br. at 25-27 (citing 42 U.S.C. §§ 7407(d)(1)(A)(i), 7501(2)); Tex. Supp. at 14-15; Indus. Br. at 22-23. Unlike other CAA provisions that expressly use that term of art, *see, e.g.*, 42 U.S.C. §§ 7511(b)(2)(A), 7545(k)(10)(D), the Good Neighbor Provision omits the word "area" referring instead to only those emissions that will contribute significantly to "*nonattainment*" in "any other State," *id.* § 7410(a)(2)(D)(i)(I) (emphasis added); *see also* 63 Fed. Reg. at 57375 (explaining in the $NO_X$ SIP Call that the Good Neighbor Provision does not refer to "nonattainment areas"). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotations and citations omitted). Thus, there is no textual support for Texas's and Intervenors' interpretation of the Good Neighbor Provision.

Not only is EPA's interpretation consistent with the plain text of the Good Neighbor Provision, but it is the best understanding when considering the procedural timeframes set forth in the Act. Once EPA revises a NAAQS, the Act

requires states to submit SIP submissions to address their Good Neighbor

obligations within three years (or faster), 42 U.S.C. § 7410(a), and requires EPA to

formally designate areas in nonattainment of those revised NAAQS within two

years (with the availability of extension up to three years), *id.* § 7407(d)(1).  In

other words, the nonattainment designation process is intended to occur during the

same timeframe as (or longer than) the Good Neighbor SIP development process.

It makes no sense to limit Good Neighbor analyses to formally designated

nonattainment areas when such designations may not yet exist during the states'

Good Neighbor SIP development timeframe.

Further, EPA's interpretation of the Good Neighbor Provision's

nonattainment prong as extending beyond already designated nonattainment areas

is entitled to respect under *Skidmore*.  *See Loper Bright*, 144 S. Ct. at 2259, 2262.

Among the factors which give the agency power to persuade include "the validity

of [the agency's] reasoning" and the agency's "consistency with earlier and later

pronouncements."  *Id.* at 2259 (quoting *Skidmore*, 323 U.S. at 140).  Here, EPA's

interpretation ensures harmony with the Act's procedural structure, and it has

always been how EPA has evaluated the nonattainment prong.  *See, e.g.*, 63 Fed.

Reg. at 57375.

Texas's appeal to practicability—arguing that requiring Texas to project its

emissions impact on locations beyond nonattainment areas is "unachievable," Tex.

Br. at 27—is unavailing.  Texas provides no support for this argument.  Indeed,

Texas could and did conduct its own modeling to forecast ozone concentrations in

downwind areas for its SIP submission to address its Good Neighbor obligation for

the 2015 ozone NAAQS.  *See* 87 Fed. Reg. 9798, 9824-25 (Feb. 22, 2022).  Even

if Texas found forecasting ozone pollution problems difficult for the 2008 ozone

NAAQS, that did "not absolve" Texas from meeting its Good Neighbor obligation.

Disapproval at 53287; *see also supra* Arg. I.B.  Interstate air pollution is a

"complex problem."  *EME Homer*, 572 U.S. at 495.  If Texas wants to bear the

"primary responsibility" for developing a plan to satisfy its Good Neighbor

obligation, Tex. Br. at 3 (quotation omitted), it "cannot shirk its duties by reason of

mere difficulty," *Wisconsin*, 938 F.3d at 319 (cleaned up); *see also EME Homer*,

572 U.S. at 509 (holding that "practical difficulties" are no excuse for departing

from the plain text requirements of the Act).

> ## 2.    Texas's impermissibly narrow nonattainment analysis did not support its conclusion that Texas will not contribute significantly to nonattainment downwind.

In litigation, Texas makes three forfeited arguments for why its

nonattainment analysis supported its conclusion that Texas will not contribute

significantly to nonattainment of the 2008 ozone NAAQS.  Each lacks merit for

the reasons provided *supra* Argument II.C, and for the additional reasons discussed

below.

First, Texas contends that it evaluated a reasonable geographic region.  Tex.

Br. at 31-32.  This argument is "conclusory" and "waived as inadequately briefed."

*United States v. Castillo-Rubio*, 34 F.4th 404, 411 (5th Cir. 2022).  Indeed, Texas's

Submission provided no explanation, much less a reasonable one, for why it

evaluated ozone concentration trends from 1990 to 2010 in only nonattainment

areas "closest" to it—those in Arizona, Arkansas, Colorado, Illinois, Indiana,

Louisiana, Mississippi, Missouri, Tennessee, and Wisconsin.[17]  Tex. Submission at

2-3.  Nor did the Submission provide an explanation for why Texas separately

evaluated the 2010 ozone concentrations of a different, narrow segment of the

United States—Arkansas, Louisiana, Oklahoma, and New Mexico.  *Id.* at 2-6.

Nothing in the Act permits states to select a subset of states when evaluating their

Good Neighbor obligations.  Rather, the Act expressly requires states to prohibit

those emissions that contribute significantly in "*any* other State."  42 U.S.C.

§ 7410(a)(2)(D)(i)(I) (emphasis added).  Further, the expansive dispersion of ozone

and ozone precursors, "which can result in NAAQS violations hundreds of miles

away from the source of the ozone precursors," make Texas's limited review

especially unwarranted.  *MCEQ*, 790 F.3d at 147.

---

[17] In fact, it is not even clear that those nonattainment areas are "closest" to Texas.
For example, the Atlanta, Georgia nonattainment area is arguably closer to Texas
than the Sheboygan, Wisconsin nonattainment area.  *See* Tex. Submission at 2-3,
Fig. 2-1.

Second, Texas makes another conclusory argument that it performed "detailed analyses" of monitors in both attainment and nonattainment areas to contend that it did not limit its analysis to only designated nonattainment areas. Tex. Br. at 30-31. Texas provides no explanation of what that those "analyses" entailed, as it submitted none to EPA. As explained *supra* Argument II.B., all Texas did was list the 2010 measured ozone levels of those monitors. Texas did not provide EPA with any analysis of those ozone levels.

Third, Texas wrongly argues that its wind pattern analysis of Memphis and Baton Rouge supported its conclusion that "Texas emissions did not contribute to ozone nonattainment in those areas" because "ozone forming pollutants generated in Texas are expected to drift toward the downwind ozone nonattainment areas in Memphis and Baton Rouge" and all monitors between Texas and those nonattainment areas demonstrated attainment of the 2008 ozone NAAQS. Tex. Br. at 31. As an initial matter, Texas's post hoc argument is irreconcilable with its Submission, which made the exact *opposite* wind pattern finding and stated that "very few winds are observed from the west and northwest, the directions which would be anticipated to transport ozone to Memphis and Baton Rouge." Tex. Submission at 2-5. Beyond misrepresenting its own record (which is itself unsupported in any case), Texas's wind pattern analysis does not support its conclusion for the reasons explained above, which Texas did not contest during the

comment period and does not challenge here. *See supra* Arg. II.C (explaining that Texas failed to quantify the magnitude of its emissions' impact downwind and that EPA's wind pattern analysis refuted Texas's).

> ### 3. The Act does not require EPA to disprove Texas's Submission with EPA's own technical analysis.

Lastly, Intervenors' contradictory and forfeited argument that EPA must disprove Texas's Submission with EPA's own "data or technical demonstration," is unavailing. Indus. Br. at 24. The Supreme Court has squarely addressed and rejected that argument, holding that EPA need not quantify a state's Good Neighbor obligation before disapproving a SIP and promulgating a FIP. *EME Homer*, 572 U.S. at 509. Further, Intervenors' argument here contradicts their other meritless argument—that EPA cannot consider its updated modeling results at the time of its action. Indus. Br. at 18-20; *see also* Tex. Br. at 32-35. So even if EPA had conducted its own analysis with its own data (as Intervenors argue that EPA should have done), Texas and Intervenors presumably would have challenged EPA's reliance on that new analysis. This Court should reject Intervenors' attempt to impose a double bind on EPA.

## III.  EPA's untimeliness in issuing the Disapproval does not limit its substantive SIP review authority or render the Disapproval arbitrary and capricious.

As Argument II makes clear, EPA reasonably disapproved Texas's Submission based on inherent deficiencies and flaws that compelled EPA to

disapprove the Submission irrespective of when EPA acted. Texas's and Intervenors' numerous arguments regarding delay and EPA's modeling are entirely irrelevant and need not be considered. Nonetheless, they fail.

The mere fact that EPA missed procedural deadlines does not permit this Court to invalidate the Disapproval or limit what EPA could consider at the time it acted. Granting such relief would elevate procedural deadlines over substantive ones and force substantive noncompliance with the Act. EPA did not intentionally delay action to disapprove the Submission, and there is no reason to think that EPA would have approved the Submission had it acted any faster. In any event, Texas and Intervenors have shown no prejudice from EPA's delay, unlike downwind states, which were lawfully entitled to reductions in Texas's emissions by 2015, the first attainment date for the 2008 ozone NAAQS. *Wisconsin*, 938 F.3d at 313; *Maryland*, 958 F.3d at 1203-04.

## A.      EPA retains its substantive SIP review authority even if it misses the statutory deadline for that review.

Contrary to Texas's argument, Tex. Br. at 38-40, the Act's procedural deadlines do not alter EPA's substantive SIP review authority, Disapproval at 53286 (explaining that the "State's ability to submit a sufficient SIP that meets the applicable requirements is unrelated to the EPA's timeline for review"). While the Act mandates that EPA "shall" take actions on SIPs within a specific timeframe, 42 U.S.C. § 7410(k), the Supreme Court has consistently declined to treat a

statutory requirement that an agency "'shall' act within a specified time, without more, as a jurisdictional limit precluding action later," *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003). The Supreme Court has reasoned that it "would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." *Gen. Motors*, 496 U.S. at 542 (quotation omitted). Accordingly, when "there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Id.* (quotation omitted).

*General Motors* is instructive. In that case, the Supreme Court held that EPA could not be barred from enforcing an existing federally enforceable SIP even if EPA had unreasonably delayed action on a proposed SIP revision. *Id.* at 540-42. The Court reasoned that the existing SIP remains the applicable implementation plan even after the state submits a proposed revision. *Id.* at 540. Further, the Court determined that nothing in the Act suggests that Congress intended to limit EPA's authority to enforce the currently applicable SIP, even if it was unreasonably delayed in acting on a proposed SIP revision. *Id*. at 541. The same reasoning applies here. Nothing in the Act suggests that EPA loses its authority to disapprove the Submission or must limit its understanding of "important public rights," because it missed the statutory deadline for final action. *See id.* at 542.

Texas's reading also runs counter to the purpose of the Act. Texas places undue weight on the procedural deadlines by which plans are to be submitted and reviewed, which do not supersede the substantive requirements of the Act, including the Good Neighbor Provision. Tex. Br. at 38-40. Constraining EPA's SIP review authority to considering only the data available to Texas at the time of its Submission would contravene the Act's cooperative-federalism framework, which is fundamentally geared toward expeditious attainment of the NAAQS. In *Wisconsin*, the D.C. Circuit explained that SIP submission deadlines, unlike attainment deadlines, are "procedural" and therefore not "central to the regulatory scheme." 938 F.3d at 322 (quotation omitted); *cf. id.* at 316 (describing the NAAQS's attainment deadlines as the "heart" of the Act (quoting *Train*, 421 U.S. at 66)). The court rejected arguments that sought to elevate the general procedural deadlines of 42 U.S.C. § 7410 over the substantive requirements of the Good Neighbor Provision and the rest of Title I of the Act. *Id.* at 322; *see also id.* at 318.

The Act's procedural deadlines were intended to be action-forcing, by establishing enforceable, mandatory duties on EPA to implement the substantive goals of the Act. *See Oklahoma*, 723 F.3d at 1223-24; *New Jersey v. Wheeler*, 475 F. Supp. 3d 308, 323-24 (S.D.N.Y. 2020). With the Good Neighbor Provision, specifically, Congress mandated that states or EPA timely prohibit emissions that contribute significantly to nonattainment or interfere with maintenance of the

NAAQS in other states. It would be anomalous to conclude that Congress

intended to allow EPA to nullify that requirement through delay.

Had Congress wanted to impose a substantive limitation or change in EPA's

SIP-review authority due to delay, it could have done so in 42 U.S.C. § 7410(k)(2),

the statutory provision establishing the deadline to act. Or Congress could have

deemed SIP submissions "approved" after a certain time the same way that it

provided that SIP submissions would be deemed complete if EPA did not make a

completeness determination in time. 42 U.S.C. § 7410(k)(1)(B). But no similar

provision exists for SIP approvals if EPA fails to act within the statutory deadline.

*See id*. at § 7410(k)(2) (establishing deadline for action).

### B.    EPA's timeliness in issuing the Disapproval has been appropriately adjudicated and is not before this Court.

EPA's timeliness under the Act is not for this Court to review and has been

appropriately adjudicated in district court. *See supra* Background B.3. The Act

provides only one judicial recourse when there is an alleged failure by EPA to

perform a nondiscretionary duty—for EPA to be placed on a court-ordered

deadline to address the relevant obligations. 42 U.S.C. § 7604(a)(2); *Gen. Motors*,

496 U.S. at 541 & n.4; *BCCA Appeal*, 476 F. App'x at 582 ("[T]he remedy for an

Administrator's failure to perform an act or duty under this chapter is a civil action

in district court to compel agency action"); *Mont. Sulphur*, 666 F.3d at 1190-91

(holding same). The Act's provision of this singular remedy clarifies that

notwithstanding EPA's delay in acting on a SIP submission, EPA retains authority to subsequently act. If EPA's SIP review authority were to erode when it missed statutory deadlines, the availability of a remedy to compel EPA's action would be meaningless.

Notably, others (but not Texas) sought such relief in the Northern District of California, which entered judgment establishing deadlines for EPA to act on the state submissions (or lack of submissions). *See supra* Background B.3. In taking final action on the Submission, EPA complied with the deadline established by that court. Therefore, the district court already ordered a remedy for EPA's missed deadline, with which EPA has complied. There are no further issues concerning EPA's missed deadline for this Court to consider, nor would such an issue be appropriately before this Court.

### C.    EPA explained its reasons for delay.

EPA does not dispute that the Act required it to take final action on the Submission by a specific deadline under 42 U.S.C. § 7410(k) or that it missed that deadline. Disapproval at 53285. However, Texas's claim that EPA adopted a "wait-and-see" approach, Tex. Br. at 34, is false as the Disapproval was based purely on the inadequacies of the Submission, *see supra* Arg. II. Likewise, Texas's claim that EPA acted in bad faith are forfeited and, in any event, meritless. Tex. Br. at 42. Texas did not "press[] on why [EPA] did not act sooner" on its

Submission. *Id.*; *see generally* Tex. Comment; Luminant Comment. Therefore,

EPA did not provide a response, and Texas's argument is forfeited. *BCCA Appeal*,

355 F.3d at 828.

Regardless, EPA's delay was driven in part by the uncertainty regarding

Good Neighbor obligations while *EME Homer* was pending. *See supra*

Background B.1, B.3. Indeed, one Intervenor commented that EPA could not

decide the Submission until it resolved earlier remand obligations under *EME*

*Homer* for the 1997 ozone NAAQS. Luminant Comment at 2-3 (commenting that

EPA must first revise CSAPR $NO_X$ budgets in accordance with *EME Homer II*).

The Court therefore has no basis to read improper motive into the Disapproval, and

there is no evidence to support the claim. *See Biden v. Texas*, 597 U.S. 785, 811

(2022) (holding that a presumption of regularity attends agency action absent a

"strong showing of bad faith or improper behavior" (quotation omitted)).

> **D.    EPA may lawfully consider relevant data available at the time it takes action on a Good Neighbor SIP submission, even if those data were not available to the state at the time of its submission.**

While EPA did not base the Disapproval on the relevant, updated data and

modeling, EPA unquestionably could have done so. Nothing in the Act requires

EPA to make substantive errors in its own Good Neighbor analysis and reject more

up-to-date modeling and monitoring data because those data were not available to

the state at the time of its submission. *See Bd. of Cnty. Comm'rs of Weld Cnty. v.*

*EPA*, 72 F.4th 284, 290 (D.C. Cir. 2023) (recognizing that EPA generally must base its decisions on the most relevant and appropriate data). Indeed, EPA's ability to consider a broader range of information than states may have considered or submitted is foundational to the oversight role Congress assigned to EPA. *See supra* Arg. I.A.

To begin with, Texas's own theory that EPA cannot consider information that comes to light after a state submits a Good Neighbor SIP, Tex. Br. at 33, is inconsistent with its later assertion that "EPA must review a SIP submission based on information and methodology available *during the 12 month statutory review period*"—i.e., *after* a SIP submission—because of the procedural deadlines Congress created. *Id.* at 39 (emphasis added). In any event, regardless of which position Texas ultimately presses, both theories do not withstand scrutiny. Cabining EPA's consideration to only information available within a procedural deadline elevates that deadline above the substantive requirements of the Act that are "central to the regulatory scheme" and to protecting public health. *See supra* Arg. III.A, *see also Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (invalidating EPA's extension of the attainment deadline notwithstanding missed procedural deadlines).

EPA must be able to review the data that is relevant *at the time it acts*. Any other outcome would compel EPA to ignore material data and information that

bears on whether Texas's emissions are actually contributing to downwind air quality problems.  EPA would have to approve a SIP submission even in the face of incontrovertible evidence that the submission relied on invalidated data or did not adequately prohibit emissions with impacts on downwind states—merely because that data came to light more than 18 months after the state's submission.  This outcome would both conflict with basic principles of administrative law, *see Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data."), and undermine the purpose of the Good Neighbor Provision—to help states attain and maintain the NAAQS.

Texas's view would also eviscerate the Act's public notice provisions by barring EPA from considering duly submitted public comments identifying deficiencies in a state's SIP submission.  Were EPA to ignore a commenter raising such defects on the basis that the timing of its proposed action had tied the agency's hands, the resulting final action may not withstand judicial scrutiny.  *See Sierra Club v. EPA*, 671 F.3d 955, 967-68 (9th Cir. 2012) (holding that EPA acted arbitrarily and capriciously for disregarding newly available and relevant data when evaluating SIP submissions).  Unsurprisingly, Texas identifies no court that has imposed this illogical and improper limitation on EPA's ability to review relevant data.

Texas's contention that EPA was required to base its evaluation on the data available at the time of the Submission, rather than use up-to-date data and modeling, likewise misreads the Act.  Tex. Br. at 23, 32-37, 39.  Texas is again at odds with the Supreme Court's explanation of the statutory scheme in *EME Homer*.  If EPA had no obligation to define Texas's significant contribution before disapproving its Submission (and issuing a FIP through the CSAPR Update), then the determination of whether a SIP submission contains "adequate provisions" to address the Good Neighbor Provision should not be cabined by the data available to states when formulating their plans.  *See EME Homer*, 572 U.S. at 509 ("[T]he Act does not require EPA to furnish upwind States with information of any kind about their good neighbor obligations before a FIP issues.").

Finally, Texas's argument that EPA's consideration of updated air quality modeling left the state no option but to succumb to a federal plan is meritless.  *See* Tex. Br. at 43.  Texas commented on the data that EPA considered in the Proposed CSAPR Update.  *See* Proposal at 21295 n.15.  EPA considered all comments on the updated data, including Texas's, *see id.*, and applied the updated data in a neutral fashion, approving numerous states' SIP submissions, finalizing the CSAPR Update FIP for certain states, and determining that a CSAPR Update FIP is not necessary for a state based on EPA's updated analysis.  *See* Idsal Decl. ¶ 55 n.7, *New Jersey*, No. 1:20-cv-01425 (S.D.N.Y.), Dkt. No. 36-3 (explaining that

EPA approved 14 states' Good Neighbor SIPs for the 2008 ozone NAAQS);

CSAPR Update at 74504-05 (finalizing CSAPR Update FIPs for 22 states based on

the updated data); *id.* at 74506 (concluding that a FIP was not necessary for North

Carolina despite proposing one). There was no "Hobson's Choice" as Texas

alleges. Tex. Br. at 43.

### E. The updated emissions data and the state-of-the-science modeling support the Disapproval.

Although not a reason for the Disapproval, it is worth noting that the data

and modeling available to EPA at the time it acted countered Texas's conclusion

that Texas did not contribute significantly to nonattainment or interfere with

maintenance of the 2008 ozone NAAQS in any downwind state. Texas and

Intervenors do not dispute these results.

Applying state-of-the-science photochemical modeling, EPA considered

factors that impact ozone formation and transport—emissions data, existing

emissions control measures, atmospheric chemistry, and meteorological

information—and calculated the amount of ozone coming from one state to

another, *see* Proposal at 21294, an analysis which Texas recognized was important

in assessing its Good Neighbor obligations but did not do because it was "difficult

to determine," Tex. Submission at 2-5. EPA conducted this analysis and evaluated

the results applying the same general framework it has used since 1998. *See supra*

Background B.1, B.4; *contra* Tex. Br. at 32 (erroneously arguing that EPA

"derived new protocols"). The modeling results showed that Texas's emissions would contribute to nonattainment and maintenance problems in several downwind areas in 2017, contrary to Texas's conclusion in its Submission.[18] *See* Proposal at 21292-94; Disapproval at 53285.

### F.    The Act does not require EPA to issue a SIP call or error correction in lieu of disapproving the Submission.

Even if EPA needed to consider the up-to-date modeling data to disapprove the Submission (which it did not), EPA was not required to first issue a SIP call or exercise its error correction authority before disapproving the Submission as inadequate and issuing the CSAPR Update. *Contra* Tex. Br. at 40-42. *EME Homer* addressed these arguments and unequivocally rejected them, holding that EPA was not required to give states a second chance or to issue guidance or instructions before disapproving a Good Neighbor SIP submission. 572 U.S. at 508-09. The Supreme Court explained that this principle flowed from the general structure of the SIP review process under 42 U.S.C. § 7410. *See id.* at 510 (holding that the D.C. Circuit erred by "altering the schedule Congress provided

---

[18] When Texas submitted its SIP submission, the D.C. Circuit had already held that states and EPA must align their analysis of Good Neighbor obligations with the attainment deadlines faced by downwind states. *North Carolina*, 531 F.3d at 911-12. Thus, there is no merit to Texas's argument that "EPA could set the future year at any year it wants." Tex. Br. at 29.

for SIPs and FIPs," "allow[ing] a delay Congress did not order and plac[ing] an information submission obligation on EPA Congress did not impose").

Nor would issuing a SIP call or exercising its error correction authority relieve EPA of its statutory deadline to act on the Submission.  EPA issued the Disapproval as it was required to under 42 U.S.C. § 7410(k)(2)-(3).  Indeed, EPA was subject to a court-ordered deadline to act and lacked authority to decline acting on the Submission.  *See supra* Background B.3.

Neither EPA's SIP call authority nor its error correction authority suggests that Congress intended EPA to ignore data available at the time of decision-making.  *See* 42 U.S.C. § 7410(k)(5), (6).  The provisions instead point to the opposite conclusion, as they provide that EPA may issue a SIP call "[w]henever the Administrator finds [a SIP] is substantially inadequate" to maintain the NAAQS, *id.* § 7410(k)(5); and may error-correct "[w]henever the Administrator determines" that its action approving or disapproving a SIP "was in error," *id.* § 7410(k)(6).  These provisions indicate that, above all, Congress was concerned with ensuring that SIPs conformed to EPA's determinations concerning the most relevant information about states' CAA obligations.  While these provisions provide EPA with tools that it may use where prior measures prove deficient or in need of correction, they do not import any limitation on EPA's substantive evaluation of the Submission at issue here.  *Cf. Michigan*, 213 F.3d at 672-73

80

(rejecting arguments that "hodgepodge" of other provisions functioned to bar EPA's exercise of SIP-call authority).

Texas readily notes, and EPA agrees, that states bear primary responsibility for formulating SIP submissions. Tex. Br. at 3. Over the last eight years, Texas has had ample opportunity to revise its deficient Submission here and replace its CSAPR Update FIP with an approvable SIP. CSAPR Update at 74569. It has declined to do so. In the meantime, EPA should not be compelled to approve the Submission by ignoring pertinent available data, only to immediately issue a SIP call or correct that decision based on the best available data. Texas's suggestion should be viewed for what it is—an attempt at further delay in meeting its statutory obligations, subverting Congress's intent in the Good Neighbor Provision and the larger structure of the Act.

### G.    Texas and Intervenors were not prejudiced by EPA's delay.

Texas has no grounds to contend that the Court invalidate the Disapproval because EPA acted untimely. *See* Tex. Br. at 43. Neither Texas nor Intervenors suffered any prejudice from delay, and "the rule of prejudicial error" precludes this Court from "hold[ing] unlawful" EPA's Disapproval on the basis of its delay. 5 U.S.C. § 706. The belated Disapproval *deferred* implementation of the Good Neighbor Provision—with the effect of affording upwind states a period of

reprieve from prohibiting emissions that should have been prohibited earlier. So any delay was harmless to them.

Had EPA acted earlier, such action would not have resulted in approval of the Submission because, as explained *supra* Argument II, it did not meet the Good Neighbor Provision's requirements.

And even if EPA *had* approved the Submission based on information later shown to be incorrect, as Texas acknowledged was possible, nothing would have barred EPA from correcting that approval based on later information indicating that its earlier approval was erroneous. *See* Tex. Br. at 40-41; *see also* 42 U.S.C. § 7410(k)(6) (providing EPA the authority to correct SIP actions that later prove to be in error). Thus, an earlier approval based on modeling later shown to be flawed would not have insulated Texas from a later disapproval. *See EME Homer II*, 795 F.3d at 132-36, 138 (upholding error correction of 22 Good Neighbor SIP approvals to disapprovals).

## IV.    The Disapproval was procedurally proper.

EPA issued the Proposal with an open mind and did not pre-determine the Disapproval. As detailed in Argument II, EPA carefully considered the Submission and reasonably disapproved it solely based on the inherent deficiencies within Texas's analysis. Procedurally, EPA adhered to the requisite requirements, including notice and comment, and carefully considered and addressed those

comments before issuing the Disapproval. Disapproval at 53286. Thus, the record disproves Intervenors' contention that EPA predetermined the Disapproval based on the Proposed CSAPR Update. Indus. Br. at 25-27.

Intervenors also overstate the relevance of the timing of the Proposed CSAPR Update. *See id.* at 17-19. It was well within EPA's authority to *propose* the CSAPR Update before EPA disapproved Texas's Submission. *See* Disapproval at 53286; *EME Homer*, 572 U.S. at 509. If EPA is authorized by the Act to promulgate a FIP "at any time" within two years after disapproving a SIP submission and need not "postpone its action even a single day," then it necessarily follows that EPA may *propose* a FIP before taking action on a SIP submission. *EME Homer*, 572 U.S. at 509. Nothing in the Act bars EPA from proposing a FIP as a backstop that EPA would finalize only if it ultimately disapproved the Submission. *Id.*; Disapproval at 53286.

Intervenors assume that, because EPA was developing the CSAPR Update, a separate federal action that EPA was required to issue for multiple states before the next attainment date, *North Carolina*, 531 F.3d at 911-12, EPA had predetermined that the CSAPR Update would apply to Texas, Indus. Br. at 25-26. But the Proposed CSAPR Update did not include only Texas; EPA was subject to statutory deadlines requiring EPA to issue FIPs for numerous states, regardless of whether Texas was included. *See, e.g.*, 80 Fed. Reg. 39961 (July 13, 2015) (finding that 24

states failed to submit SIPs and triggering EPA's two-year deadline to issue FIPs). So, proposing the CSAPR Update, which contained technical data that Texas could have reviewed, in advance of the Proposal did not demonstrate that the Disapproval was predetermined. EPA did not issue the CSAPR Update FIP for Texas until after issuing the Disapproval. Further, the Disapproval was not a foregone conclusion. For example, EPA did not finalize a CSAPR Update FIP for North Carolina, which invalidates Intervenors' argument that the Proposed CSAPR Update predetermined EPA's action. *See* CSAPR Update at 74506.

In any event, EPA emphasized that Texas could, at any time, develop a revised SIP submission to submit to EPA for approval. Disapproval at 53286. This remains true, even after the Disapproval and the CSAPR Update. *Id*.; CSAPR Update at 74506. Yet Texas has never done so.

## V.    If the Court determines to remand, it should decline to vacate the Disapproval.

EPA's Disapproval is lawful and should be upheld. But even if the Court finds some flaw, it should not vacate the Disapproval, which has been in effect for eight years. Instead, the Court should allow the Disapproval to remain in place pending prompt completion of remand proceedings.

As an initial matter, if the Court were to remand the Disapproval, it should decline to provide the instruction Texas has requested. In its opening brief, Texas asks the Court to vacate the Disapproval and remand to EPA with instructions for

EPA to reconsider the Submission "based on information and statutory criteria available at the time of submission and to approve the SIP unless the EPA demonstrates that it violates a requirement of the Act." Tex. Br. at 22, 44. Texas reiterates its request in its supplemental brief without acknowledging its impracticability and cascading consequences to all parties, including Texas. Tex. Supp. at 19.

EPA should be entitled the normal discretion afforded agencies to determine for themselves the appropriate course of action on remand within statutory and regulatory constraints. *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023). Texas's sources have complied with the CSAPR Update for eight years without incident and under the FIP, Texas is meeting its Good Neighbor obligations for the 2008 ozone NAAQS. Mathias Decl. ¶¶ 8-11. Yet in its skewed view of cooperative federalism, Texas would have the Court vacate the Disapproval, force EPA to remove Texas from the CSAPR Update, and remand for EPA to re-evaluate a long-disapproved SIP submission based on analysis EPA already found flawed when it first acted. *See supra* Arg. II. The Act and broader principles of administrative law do not countenance such a convoluted and unproductive result.

Remand without vacatur "is generally appropriate when there is at least a serious possibility that the [agency] will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive." *Cent. & S. W.*

*Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (quotation omitted).  In

deciding whether to vacate unlawful agency action, this Court considers (1) the

likelihood that the agency's action could be sustained on remand, and (2) the

disruptive consequences that might flow from vacatur of the action.  *Id.*  Here, both

prongs show that remand without vacatur would be proper.

On the first prong, if remanded, EPA could very likely disapprove the

Submission again.  The legal and technical flaws in the Submission that led to the

Disapproval are inherent in the Submission itself and do not depend on the

consideration of information outside what Texas provided in its Submission.  *See*

*supra* Arg. II.  Even if EPA were limited to consider data available at the time

Texas submitted its SIP, that data also indicated that Texas was linked and

contributed to downwind ozone problems in Baton Rouge, Louisiana, and Allegan,

Michigan, for the 2008 ozone NAAQS.  *See* Air Quality Modeling Final Rule

Technical Support Document (June 2011) at D-4, D-6, *available at*

https://www.regulations.gov/document/EPA-HQ-OAR-2009-0491-4140.[19]

Therefore, vacatur is not warranted.  *Cent. & S. W. Servs.*, 220 F.3d at 692; *see*

---

[19] This Technical Support Document included ozone contributions to receptors
identified as such for the 1997 ozone NAAQS; however, the ozone levels indicate
that both Baton Rouge and Allegan, Michigan would be identified as receptors for
the 2008 ozone NAAQS.  *See* Air Quality Modeling Final Rule Technical Support
Document at B-14 (Baton Rouge), B-16 (Allegan).

*also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).

On the second prong, this is the paradigmatic case in which vacatur of a longstanding federal regulation would be extremely disruptive and unworkable, for EPA, for Texas, and for the regulated community (not to mention all of those, including Texans, who are the beneficiaries of air quality protection under the Act). The Disapproval was issued in 2016 and authorized EPA to promulgate the CSAPR Update FIP for Texas, which has operated since 2017 to hold ozone-season $NO_X$ pollution from power plants in check. Mathias Decl. ¶¶ 3-8. Through its power plants' participation in the CSAPR Update "Group 2" ozone season $NO_X$ allowance trading program since the 2017 ozone season, Texas is meeting its Good Neighbor obligations for the 2008 ozone NAAQS. 86 Fed. Reg. at 23054. Vacatur would compel EPA to stop implementing the CSAPR Update as to Texas, at least temporarily, while it addresses the remanded Disapproval, leaving no enforceable control measures in place to address Texas's Good Neighbor obligations for the 2008 ozone NAAQS. Mathais Decl. ¶ 12 & n.1. This temporary removal would jeopardize downwind states' ozone air quality, as several states rely on emissions reductions from the CSAPR Update, including from Texas sources, to meet the 2008 ozone NAAQS. *Id.* ¶¶ 19-22.

Further, suspension of the CSAPR Update in Texas would needlessly disrupt the emissions trading market that has developed. *See EME Homer II*, 795 F.3d at 132 (noting "disruption to the trading markets that have developed" as a reason not to vacate CSAPR). Texas's CSAPR Update budget comprises roughly more than a third of the total allowances allocated for each ozone season, and suspension of the FIP would necessitate the removal of these allowances. Mathias Decl. ¶¶ 14-15. While states are authorized to leave these trading programs—and EPA does adjust trading program membership in response to new regulatory developments (like new Good Neighbor rulemakings)—those membership transitions are carried out with the benefit of planning by EPA to avoid disruptions of the allowance market. *See id.* ¶¶ 15-17. Here, EPA has already recorded allowances for the 2024 and 2025 ozone seasons into sources' compliance accounts, and trading activity with those allowances has already occurred. *Id.* ¶ 15. Vacatur (i.e., removing Texas from the trading program) would require EPA to recall already-recorded allowances allocated to Texas sources from the market and would require Texas sources that have already sold their allowances to acquire replacement allowances to surrender for the recall. *Id.* ¶¶ 15-17. This sudden removal is disruptive for the sources and can create uncertainty in the allowance market, *id.* ¶ 17, and this disruption is unwarranted here because, as noted above, EPA's action on remand would very likely return Texas to the same trading program in short order.

Moreover, Texas has relied on and continues to rely on the enforceable $NO_X$ emissions controls from the CSAPR Update to meet requirements under the Act beyond the Good Neighbor Provision. *Id*. ¶¶ 23-34. That reliance has come to take two forms.

First, numerous Texas power plants that would otherwise be subject to the "best available retrofit technology" ("BART") requirements of the Act's "regional haze" visibility-improvement program currently are not subject to those requirements for $NO_X$ BART because of a regulation that excuses sources from implementing BART if they are subject to a CSAPR trading program for the relevant pollutant. *Id*. ¶¶ 28-31 (referring to 40 C.F.R. § 51.308(e)(4)). Without the CSAPR Update to function as a "BART alternative," BART requirements for these Texas sources would need to be addressed. *Id.* ¶¶ 30, 33. Relatedly, Texas has used reductions from the CSAPR Update in its SIP submission to address regional haze obligations for the "second planning period." *Id*. ¶ 34. EPA is currently reviewing that SIP submission. *Id*. If the CSAPR Update is no longer in effect in Texas, those reductions can no longer be assumed and will likely impact EPA's substantive analysis of Texas's regional haze SIP submission. *Id*.

Second, Texas has also relied on emissions reductions achieved from the CSAPR Update in its SIP submissions addressing intra-state ozone nonattainment, which are currently undergoing EPA review. *Id*. ¶¶ 24-26. If the CSAPR Update

is no longer in effect in Texas, then Texas's underlying assumptions about its

emissions reductions due to pollution control programs, such as the CSAPR

Update, may no longer be supportable. *Id*. ¶ 26.

In short, removing Texas from the CSAPR Update would have cascading

impacts on Texas's compliance with other CAA programs, necessitating further

rulemaking work on the part of the state or EPA, and potentially leading to

increased regulatory requirements on Texas's sources where necessary to make up

for the loss in emissions-control stringency resulting from a suspension of the

CSAPR Update in Texas. *Id*. ¶¶ 23-34.

Neither Texas or Intervenors would suffer undue prejudice from keeping the

Disapproval (and the CSAPR Update) in place were EPA required to complete a

remand proceeding. Texas has not rushed to adjudicate this case. The CSAPR

Update has been the status quo for eight years, has been upheld by the D.C.

Circuit, and is designed to incentivize power plants to continue running their

existing emissions controls during the summertime ozone season. *Id.* ¶ 4; CSAPR

Update at 74552; *see supra* Background B.6. Under such circumstances, vacatur

would cause undue disruption. *See Cent. & S. W. Servs.*, 220 F.3d at 692

(declining to vacate rule that applied to regulated community); *see also Solar*

*Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 998 (9th Cir. 2023) (holding vacatur

of an order in place for many years and which regulated parties were implementing

would be disruptive); *XO Energy MA, LP v. FERC*, 77 F.4th 710, 719 (D.C. Cir. 2023) (same); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) ("[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome.").

If the Court finds that remand is proper, it should keep the Disapproval in place and allow EPA to continue implementing the CSAPR Update as to Texas.

## CONCLUSION

For these reasons, the petition for review should be denied and the motion to strike certain record documents should be denied as moot.

Dated:  August 30, 2024

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

OF COUNSEL:

ROSEMARY H. KABAN             */s/ Jin Hyung Lee*
DANIEL P. SCHRAMM             SARAH IZFAR
JACOB GALLEGOS                JIN HYUNG LEE

U.S. Environmental Protection Agency    U.S. Department of Justice
                                        Environment and Natural Resources Division

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word-count limit of the Court's July 12, 2024, order, Dkt. No. 206-2, because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 20,852 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Jin Hyung Lee*
Jin Hyung Lee

Counsel for Respondents

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing EPA's response brief on all registered counsel through the Court's electronic filing system (CM/ECF).

Dated: August 30, 2024

*/s/ Jin Hyung Lee*
Jin Hyung Lee