IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STATE OF TEXAS, et al.,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Respondents. | No. 16-60670 |

### DECLARATION OF SCOTT MATHIAS

1.   I, Scott Mathias, affirm and declare that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge, or on information contained in the records of the United States Environmental Protection Agency ("EPA" or the "Agency"), or on information supplied to me by EPA employees.

2.   I am the Director of the Air Quality Policy Division ("AQPD") within the Office of Air and Radiation ("OAR") at the EPA, a position I have held since May 2020. AQPD is the division at EPA Headquarters that has primary responsibility for developing national programs, technical policies, regulations, and guidance to implement the national ambient air quality standards ("NAAQS") under the Clean Air Act ("CAA" or the "Act").

3.   The purpose of this declaration is to explain the consequences of vacatur of EPA's disapproval of Texas's good neighbor state implementation plan ("SIP") submission for the 2008 ozone NAAQS. That disapproval is the predicate authority for the federal implementation plan for Texas for the 2008 ozone NAAQS included in the Cross-State Air Pollution Rule ("CSAPR") Update. 81 Fed. Reg. 74504 (October 26, 2016). The CSAPR Update established the CSAPR nitrogen oxides ("$NO_X$") Ozone Season Group 2 Trading Program ("Group 2 trading program") to address the obligations of Texas and other states under CAA section 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i)(I), known as the "good neighbor" provision, to prohibit emissions that significantly contribute to

1

nonattainment, or interfere with maintenance, of the 2008 ozone NAAQS in other states beginning in the 2017 ozone season (May through September).

4. The trading program requires reductions in emissions of $NO_X$, an ozone precursor. It is designed to incentivize electric generating units ("EGUs") to optimize operation of their existing emissions controls during the summertime ozone season. As initially established in the CSAPR Update, the Group 2 trading program covered EGUs in 22 states, including Texas. Today, after changes in geographic coverage made in subsequent rules, EGUs from nine states are participating in the trading group within the Group 2 trading program that includes Texas EGUs. (The other states are Alabama, Arkansas, Iowa, Kansas, Mississippi, Missouri, Oklahoma, and Tennessee.)

5. The Group 2 trading program is an allowance trading program, which means that instead of establishing source-specific limits on the tonnages or rates of emissions for each affected source, the EPA identifies a total budget of emissions that groups of affected sources may collectively emit in a given "control period." In the case of the Group 2 trading program, the control period is the ozone season in each year. Because the Group 2 trading program is addressing the obligations of states under the good neighbor provision, each state's budget reflects the emissions that remain following the elimination of the emissions determined to significantly contribute to nonattainment or interfere with maintenance.

6. To implement the Group 2 trading program's state emissions budgets, the EPA or the state allocates "allowances" equal to the amount of the emissions budget for each control period among the state's affected sources, where each allowance is a limited authorization to emit up to one ton of $NO_X$. Each affected source is subject to two principal requirements under the trading program: first, a requirement to monitor and report its emissions of $NO_X$ during each control period, and second, a requirement after the end of the control period to surrender allowances sufficient to cover the reported emissions, typically at a 1-for-1 ratio but sometimes at a higher ratio depending on other trading program provisions.

7. Sources are free to trade allowances, providing flexibility and opportunities to reduce the costs of achieving the collective emissions reductions needed to meet the emissions budgets. Under the Group 2 trading program, any allowances issued for a given control period that are not needed to cover emissions in that control period can be carried forward (or "banked") and used to supplement the allowances issued for future control periods. If the collective emissions of a state's EGUs in a given control period exceed the state's emissions budget for the control period, the EGUs are free to meet their allowance surrender requirements

using allowances acquired from sources in other states or allowances banked from earlier control periods. However, to ensure that each state addresses its own good neighbor obligations, the Group 2 trading program includes "assurance provisions" designed to provide strong incentives discouraging a state's sources from relying excessively on the efforts made by sources in other states to reduce emissions beyond what is needed to address the other states' good neighbor obligations. Specifically, the Group 2 trading program's assurance provisions require allowances to be surrendered at a 3-for-1 ratio instead of the normal 1-for-1 ratio for those emissions of the state's affected sources that exceed the state's "assurance level" for the control period, which is defined as 121 percent of the state's emissions budget for the control period.

## Operation of Group 2 Trading Program from the 2017 ozone season to the present day

8.  The Group 2 program has been effective and well-functioning from the 2017 ozone season to the present.

9.  A comparison of Texas's statewide EGU emissions versus the budget and assurance level from 2017 to present shows that Texas's ozone season emissions have been below the state's emissions budget of 52,301 tons in each year from 2018 through 2023. Texas's ozone season emissions in 2017 were above the state's emissions budget but were below the state's assurance level of 63,284 tons (52,301 x 121 percent = 63,284), so no allowance surrenders were required beyond the normal 1-for-1 surrender ratio.

|      | Texas Ozone Season NO$_X$ Budget | Texas Ozone Season NO$_X$ Emissions |
|------|------|------|
| 2017 | 52,301 | 54,413 |
| 2018 | 52,301 | 51,693 |
| 2019 | 52,301 | 47,589 |
| 2020 | 52,301 | 40,611 |
| 2021 | 52,301 | 42,761 |
| 2022 | 52,301 | 44,877 |
| 2023 | 52,301 | 46,917 |

10. Under the Group 2 trading program, Texas EGUs have the opportunity to purchase additional allowances from EGUs in other states in the same trading group, to use allowances banked from previous control periods, or to sell their extra allowances to EGUs in other states. After the 2023 control period,

the total quantity of banked Group 2 allowances of the type used by the trading group that includes Texas EGUs was 182,690 allowances across the Group 2 trading program.

11.     Trading within the Group 2 program has been relatively robust in each year of its operation. The following chart shows, across all states in the Group 2 trading program, the approximate number of transactions and Group 2 allowances transferred among unrelated entities.

| Year | # of Distinct Transactions* | # of Allowances Transacted* |
|------|------------------------------|------------------------------|
| 2017 | 263 | 51,124 |
| 2018 | 351 | 54,472 |
| 2019 | 572 | 112,762 |
| 2020 | 434 | 78,705 |
| 2021 | 436 | 77,685 |
| 2022 | 213 | 41,968 |
| 2023 | 179 | 23,785 |
| | | *approximately |

**Consequences of vacatur to CSAPR Update allowance trading program**

12.     For the more protective 2015 ozone NAAQS, the Good Neighbor Plan had moved Texas EGUs from the Group 2 trading program to the "Group 3" $NO_X$ ozone season allowance trading program. 88 Fed. Reg. 36654 (June 5, 2023). However, the EPA was required to administratively stay implementation of the Good Neighbor Plan in Texas following this Court's stay of the EPA's 2015 ozone NAAQS good neighbor SIP Disapproval as to Texas, and the EPA moved Texas EGUs back into the Group 2 trading program to preserve the status quo. 88 Fed. Reg. 49295 (July 31, 2023). Therefore, under the current circumstances, vacatur of the disapproval of Texas's good neighbor SIP submission for the 2008 ozone NAAQS would require the EPA to at least temporarily (pending further action on Texas's SIP submission on remand), and potentially permanently, remove Texas EGUs from the Group 2 trading program. If so, there would be no emissions control program in place in Texas to address good neighbor obligations for the 2008 ozone NAAQS or for any other NAAQS.[1] Without this program, there would

---

[1] The EPA determined in the CSAPR Update that Texas had no further good neighbor obligations for the 1997 ozone NAAQS, 81 Fed. Reg. at 74525-74526. Thus, removal from the Group 2 program would not result in Texas EGUs reverting to participation in the "Group 1" $NO_X$ ozone season allowance trading program established in CSAPR. 76 Fed. Reg. 48208 (August 8, 2011).

be no guarantee that emissions from Texas's EGUs would remain at or below the state's budget. In other words, emissions reductions achieved with the Group 2 program in place cannot be assumed to continue in the absence of the program.

13.     While other state or federal requirements may partially help keep emissions in check, if Texas is removed from the Group 2 trading program, there will be no $NO_X$ limitations on Texas EGUs in place to address obligations under 42 U.S.C. § 7410(a)(2)(D)(i)(I) for the 2008 ozone NAAQS. This will have several repercussions, not only for Texas's fulfillment of its good neighbor obligations and the near-term operation of the Group 2 program, but also for Texas's ability to comply with several other requirements under the Act.

14.     Texas is the largest state in terms of emissions in its trading group within the Group 2 trading program. For the 2023 ozone season, the state emissions budget for Texas under the Group 2 trading program was 52,301 tons, approximately 39 percent of the sum of the 2023 state emissions budgets of all nine states in the same trading group for the 2023 ozone season, which is 135,493 tons. Similarly, for the 2023 ozone season, Texas EGUs participating in the Group 2 trading program reported total $NO_X$ emissions of 46,917 tons, approximately 43 percent of the 108,788 tons of total $NO_X$ emissions reported by the EGUs in all nine states in the same trading group.

15.     While interstate trading is merely a compliance flexibility and not necessary to the implementation of the CSAPR Update, which defines each state's good neighbor obligations through a budget that each state's sources can meet, if the compliance obligations of Texas EGUs under the Group 2 trading program were ended abruptly, without an opportunity for the EPA to manage the transition in an orderly manner, the result would be a major shift in the balance of supply and demand for allowances for the trading group within the Group 2 trading program that includes Texas EGUs. Allowances have already been issued to Texas EGUs and other EGUs participating in the Group 2 trading program for the 2024 and 2025 ozone seasons. If Texas EGUs were suddenly no longer required to surrender any allowances to cover their emissions in these ozone seasons–absent corrective action by the Agency–the allowances already issued to Texas EGUs and being traded in the allowance market would immediately become surplus because they would no longer be needed to address compliance requirements of Texas EGUs.

16.     The result, if left unaddressed, would undermine the purpose of the Group 2 trading program by creating a glut of allowances far in excess of the allowance budgets – and thus the emissions reductions obligations – that would otherwise apply for the EGUs remaining in the trading program. With this glut of

excess allowances, allowance prices could be expected to fall, and some sources could choose to purchase cheap surplus allowances instead of reducing their emissions through continuing to operate their emissions controls.

17. To remedy this situation and ensure the trading program continues to accurately reflect the remaining EGUs' good neighbor emissions reduction obligations, the EPA would need to remove the allowances already issued to Texas EGUs from the Group 2 trading program allowance market. However, participants in the trading program have already begun buying and selling these allowances. The EPA would be unable to accomplish the removal of these already issued allowances without requiring sources that have already sold the allowances allocated to them to acquire replacement allowances to surrender for compliance with the recall. While justifiable, these requirements are disruptive for the sources concerned and administratively challenging for the EPA, and they can create uncertainty in the allowance market. Such disruption is entirely unnecessary in the current circumstance where the EPA is likely, on remand, to disapprove Texas's 2008 ozone NAAQS good neighbor SIP submission again and so return the Texas EGUs to the Group 2 trading program.

**Consequences of vacatur related to downwind receptors' attainment planning and Texas's SIP submissions addressing *intra*-state ozone nonattainment obligations**

18. States with ozone nonattainment areas are required to submit attainment plans, with requirements specified by the classification of the nonattainment area. 42 U.S.C. §§ 7502, 7511-7511a. The EPA's interstate transport rules, such as the CSAPR Update, are typically relied on by states with nonattainment areas as part of their strategies for reaching and maintaining the NAAQS. *See, e.g.,* Redesignation Request and Maintenance Plan for the Ohio Portion of the Cincinnati, OH-KY-IN 8-Hour Ozone Nonattainment Area, at 41-42 (April 2016).[2] *See also* 42 U.S.C. § 7607(d)(3)(E)(i) and (iii) (requiring that redesignation of areas to attainment be based on "improvement in air quality [that] is due to permanent and enforceable reductions in emissions . . . .").

19. In the CSAPR Update, Texas was found to contribute significantly to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in five downwind locations: Allegan, Michigan; Hamilton, Ohio; Harford, Maryland;

---

[2] Available at *https://dam.assets.ohio.gov/image/upload/epa.ohio.gov/Portals/27/sip/Cin_2008Ozone_Redesig_Final.pdf*.

Philadelphia, Pennsylvania; and Sheboygan, Wisconsin. *See* U.S. EPA, Air Quality Modeling TSD for the Final CSAPR Update, Appendix C-3 (August 2016).[3]

20. The states responsible for managing air quality for these downwind areas are relying on the emissions reductions from the CSAPR Update (including from Texas's EGUs) as part of their planning strategies for attaining and maintaining ozone levels below the 2008 ozone NAAQS.

21. For example, in Wisconsin's "State Implementation Plan Submittal for Sheboygan County 2008 Ozone NAAQS Moderate Area Attainment Plan" (September 25, 2017), at 29, the Wisconsin Department of Natural Resources relies on the CSAPR Update in its modeling to support a demonstration that it will attain the 2008 ozone NAAQS.[4]

22. Similar modeling efforts incorporating emissions reductions from the CSAPR Update and other ozone transport rulemakings to demonstrate attainment or progress toward attainment are routinely included in downwind states' planning submissions. *See, e.g.,* Baltimore Moderate Nonattainment Area 0.070 ppm 8-Hour Ozone State Implementation Plan Attainment Demonstration (March 7, 2023), at 127[5]; Pennsylvania Department of Environmental Protection, State Implementation Plan Revision Attainment Demonstration and Base Year Inventory, Philadelphia Five-County Portion of the Philadelphia-Wilmington-Atlantic City, PA-NJ-MD-DE Nonattainment Area for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard (September 2023), at 57-59, 71-73.[6]

23. Removal of Texas EGUs from the CSAPR Update will also impact Texas's own ozone NAAQS attainment planning efforts, which also expressly rely on the reductions from the CSAPR Update. Texas had several receptor locations identified in the CSAPR Update that benefit from the emissions reductions of other states in the CSAPR Update as well as from the reductions achieved from Texas's own sources.

---

[3] Available at *https://www.regulations.gov/document/EPA-HQ-OAR-2015-0500-0575*.
[4] Available at *https://dnr.wisconsin.gov/sites/default/files/topic/AirQuality/ SheboyganAttainmentPlan.pdf*.
[5] Available at *https://mde.maryland.gov/programs/air/AirQualityPlanning/ Documents/Baltimore%20Ozone%20NAA%2070ppm/Baltimore%20Moderate%20Nonattainmen t%20Area%20%200.070%20ppm%208- Hour%20Ozone%20State%20Implementation%20Plan%20Attainment%20Demonstration.pdf*.
[6] Available at *https://www.regulations.gov/document/EPA-HQ-OAR-2023-0442-0017*.

24. Texas has two "Severe" nonattainment areas for the 2008 ozone NAAQS—Dallas-Fort Worth and Houston-Galveston-Brazoria—and submitted attainment demonstration SIP submissions for those nonattainment areas for EPA's review.

25. In each attainment demonstration SIP submission, Texas relies on the enforceable $NO_X$ emission reductions from CSAPR trading programs. *See* DFW 2008 8-Hour Ozone Severe Area AD SIP Revision for the for the 2008 Eight-Hour NAAQS," Response to Comments at 42, 58; Appendix A to DFW Modeling Technical Support Document at A-27, A-28, A-30[7]; HGB 2008 Eight-Hour Ozone Severe Area AD SIP Revision for the 2008 Eight-Hour Ozone NAAQS, Response to Comments at 44-45, HGB Modeling Appendix A at A-27, A-28, A-30.[8]

26. The EPA is currently reviewing the SIP submissions referenced in paragraph 25. If Texas EGUs are no longer participating in the CSAPR Group 2 trading program, Texas's underlying assumptions about emissions reductions from EGUs due to participating in the Group 2 trading program may not be supportable.

**Consequences of vacatur related to Texas's regional haze obligations**

27. The regional haze program is a distinct CAA program that seeks to restore natural visibility conditions in mandatory "Class I" federal areas of the United States, specifically certain national parks and wilderness areas. 42 U.S.C. §§ 7491-7492; 40 C.F.R. Part 81, subpart D. It is an iterative program broken up into multiple planning periods. The requirements under each planning period are governed by EPA's implementing regulations, known as the Regional Haze Rule.

28. The Regional Haze Rule required that in the first planning period, states must submit SIPs that address, among other things, the statutory requirement on certain sources to install Best Available Retrofit Technology ("BART") requirements, as well as address the separate statutory requirement of making reasonable progress toward natural visibility conditions. 40 C.F.R. § 51.308(d), (e).

29. Only certain emissions units are considered BART-eligible, depending on when they were constructed and their industrial category and size. Within this group, sources are further analyzed to determine if they should be

---

[7] Both DFW attainment demonstration SIP submission documents available at *https://www.tceq.texas.gov/airquality/sip/dfw/dfw-latest-ozone*.
[8] Both HGB attainment demonstration SIP submission documents available at *https://www.tceq.texas.gov/airquality/sip/hgb/hgb-latest-ozone*.

subject to BART requirements. In Texas, the following are the non-retired BART-eligible EGUs which therefore may be subject to BART requirements:

- Newman Power Station **4
- Newman Power Station **5
- Newman Power Station 2
- Newman Power Station 3
- O W Sommers 1
- O W Sommers 2
- Wilkes Power Plant 1
- Wilkes Power Plant 2
- Wilkes Power Plant 3
- Graham 2
- Stryker Creek 2
- Coleto Creek
- Harrington Station 061B
- Harrington Station 062B
- Martin Lake 1
- Martin Lake 2
- Martin Lake 3
- Sam Seymour 1
- Sam Seymour 2
- W A Parish WAP4
- W A Parish WAP5
- W A Parish WAP6
- Welsh Power Plant 1

82 Fed. Reg. 48324, 48328-29 (Oct. 17, 2017); *see also* 88 Fed. Reg. 28918, 28938 (May 4, 2023) (identifying retired units).

30. While BART requirements are generally implemented through a source-specific five-factor analysis resulting in numerical emissions limitations assigned to each covered unit at the source, *see* 42 U.S.C. § 7491(g)(2); 40 C.F.R. § 51.308(e)(1), the Regional Haze Rule allows for alternatives to BART to satisfy BART requirements so long as the BART alternative achieves greater reasonable progress than would be achieved through the installation and operation of BART. 40 C.F.R. § 51.308(e)(2).

31. The Regional Haze Rule at 40 C.F.R. § 51.308(e)(4) provides that for those states whose sources participate in one of the CSAPR trading programs established under 40 C.F.R. §§ 52.38-52.39 and Part 97, those sources may rely on

9

that participation to satisfy BART for the pollutant covered by the particular trading program. EPA's determination that participation in CSAPR trading programs can satisfy BART is referred to as "CSAPR Better than BART." 82 Fed. Reg. 45481 (September 29, 2017).

32. Texas's first planning period regional haze SIP submission sought to address its BART requirements for EGUs by relying on the Clean Air Interstate Rule ("CAIR"), 70 Fed. Reg. 25162 (May 12, 2005), a predecessor to CSAPR. Because CAIR was invalidated and replaced with CSAPR, the EPA issued a limited disapproval of the portion of Texas's first planning period regional haze SIP submission that addressed BART requirements for Texas EGUs and issued a FIP that relied on the Group 2 trading program for Texas EGUs to meet their regional haze $NO_X$ BART requirements. 77 Fed. Reg. 33642, 33653 (June 7, 2012); 82 Fed. Reg. 48324, 48361 (October 17, 2017). Thus, Texas EGUs rely on those sources' participation in the Group 2 trading program to meet their regional haze $NO_X$ BART requirements. *Id.*

33. If Texas's BART-eligible EGUs were no longer in any CSAPR-related $NO_X$ trading program (which would be the case with suspension of the Group 2 program in Texas), those EGUs could no longer rely on such participation to satisfy their $NO_X$ BART requirements. Consequently, the EPA would likely need to revise its FIP (or the state could submit a SIP revision for EPA's review) to ensure that $NO_X$ BART requirements for those BART-eligible Texas EGUs are adequately addressed through other means. Such means could include a five-factor BART analysis on a source-by-source basis for those BART-eligible EGUs found to be subject to BART. 40 C.F.R. § 51.308(e)(1).

34. The removal of Texas EGUs from the Group 2 trading program will also impact the analysis of Texas's separate "reasonable progress" obligations under the Regional Haze Rule. For the second planning period, Texas has submitted a regional haze SIP revision that explicitly relies on its EGUs' Group 2 $NO_X$ budgets in its future case modeling for 2028 to support its technical determinations. That regional haze SIP submission is currently pending before the EPA for review. If Texas EGUs are no longer participating in the Group 2 trading program, Texas's underlying assumptions about emissions reductions due to ongoing air pollution control programs in the submission may not be supportable. *See* 2021 Regional Haze State Implementation Plan (SIP) Revision for the Second Planning Period, at 7-17, 8-26.[9]

---

[9] Available at *https://www.tceq.texas.gov/downloads/air-quality/sip/haze/ revisions/2021rhsip_ado.pdf*.

SO DECLARED:

_____
Scott Mathias, Director
Air Quality Policy Division

DATED: August 28, 2024