**No. 16-60670**

# In the
# United States Court of Appeals
# For the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY,

*PETITIONERS,*

V.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, IN HIS
OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*RESPONDENTS.*

## REPLY BRIEF OF PETITIONERS STATE OF TEXAS AND THE
## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney
General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division


September 20, 2024

JOHN R. HULME
Special Counsel
john.hulme@oag.texas.gov

ERIN K. SNODY
Assistant Attorney General
erin.snody@oag.texas.gov

JAKE MARX
Assistant Attorney General
jake.marx@oag.texas.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax (512) 320-0911

Counsel for State of Texas and Texas
Commission on Environmental Quality

# TABLE OF CONTENTS

Table of Authorities ................................................................... iv

Introduction and Summary of the Argument .............................................1

Argument...................................................................................6

    I.      EPA unlawfully disapproved Texas's SIP, which met all applicable statutory requirements. ..................................6

          A.     EPA unlawfully disapproved Texas's SIP based upon its "reliance" on CAIR. ......................................6

          B.     EPA unlawfully disapproved Texas's SIP for failing to consider areas that were in attainment. ...............................................................8

          C.     EPA unlawfully disapproved Texas's SIP as taking an allegedly "impermissible narrow approach" to areas in nonattainment........................10

               1.     The statutory language only refers to nonattainment. ............................................11

               2.     "Will" significantly contribute to nonattainment cannot reasonably require States to predict future conditions, future EPA determinations, and future control measures by other States.................................12

    II.     Based on these pretexts, EPA unlawfully disapproved Texas's SIP to allow it to impose its FIP upon Texas—contrary to the Act's "cooperative federalism" framework. ......................................................15

    III.    EPA must review SIP submissions by the 12-month statutory deadline, using the available data, and cannot pre-determine whether the SIP is compliant based on its own policy objectives.....................................18

A.    The SIP review should have occurred in 2013. ........................18

B.    EPA acted arbitrarily and capriciously, in excess of its statutory authority, and did not give fair notice of the post hoc data and modeling on which it relied............................................................................18

C.    EPA may use a SIP Call to require States to consider new information. ........................................................21

D.    The citizen suit remedy has no relevance here. ........................22

E.    EPA predetermined the SIP disapproval. ..................................22

IV.    The APA requires vacatur. ................................................................24

Conclusion and Prayer ........................................................................26

Certificate of Service ..........................................................................28

Certificate of Compliance ...................................................................28

Certificate of Electronic Compliance..................................................28

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ................................................................................3

*BCCA Appeal Grp. v. EPA*,
355 F.3d 817 (5th Cir. 2003) ...............................................................15

*BCCA Appeal Grp. v. EPA*,
476 F. App'x 579 (5th Cir. 2012) ........................................................22

*Cent. & S. W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ...............................................................24

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ..............................................................................19

*Data Mktg. P'Ship, LP v. DOL*,
45 F.4th 846 (5th Cir. 2022) ................................................................24

*EME Homer City Generation, L.P. v. EPA*,
696 F.3d 7 (D.C. Cir. 2012), *rev'd and remanded*, 572 U.S. 489
(2014) .......................................................................................................6

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) .................................................... 1, 10, 17, 21

*Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*,
790 F.2d 154 (D.C. Cir. 1986) .............................................................19

*Gen. Motors Corp. v. United States*,
496 U.S. 530 (1990) ..................................................................... 19, 22

*Inhance Techs. LLC v. EPA*,
96 F.4th 888 (5th Cir. 2024) ................................................................19

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ..........................................................................14

*Luminant Generation Co. v. EPA,*
675 F.3d 917 (5th Cir. 2012) ........................................................3, 15

*Mont. Sulphur & Chem. Co. v. EPA,*
666 F.3d 1174 (9th Cir. 2012) ..............................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)................................................................................20

*Nat'l Ass'n of Clean Air Agencies v. EPA,*
489 F.3d 1221 (D.C. Cir. 2007)............................................................11

*North Carolina v. EPA,*
531 F.3d 896 (D.C. Cir. 2008), *on reh'g in part,* 550 F.3d 1176
(D.C. Cir. 2008) ........................................................................... 12, 14

*Sierra Club v. EPA,*
No. 14-cv-5091 (N.D. Cal. Nov. 18, 2014) .........................................22

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944)..............................................................................15

*State of Texas v. EPA,*
690 F.3d 670 (5th Cir. 2012) ...........................................................9, 20

*State of Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016) ...........................................................3, 15

*State of Texas v. EPA,*
91 F.4th 280 (5th Cir. 2024) ................................................................11

*Train v. Nat. Res. Def. Council,*
421 U.S. 60 (1975).................................................................................9

*United States v. Lauderdale Cty.*
914 F.3d 960 (5th Cir. 2019) ...............................................................12

*Virginia v. EPA,*
108 F.3d 1397 (D.C. Cir. 1997).............................................................9

*Wages & White Lion Invs., LLC,*
    90 F.4th 357 (5th Cir. 2024) ................................................................19

**Statutes**

42 U.S.C. § 7410(a)(1) ...........................................................................13

42 U.S.C. § 7410(a)(2)(D)(i)(I) ...................................................... 11, 12

42 U.S.C. § 7410(c)(1) ...........................................................................15

42 U.S.C. § 7410(k) ......................................................................... 20, 21

42 U.S.C. § 7410(k)(1)(A) ......................................................................20

42 U.S.C. § 7410(k)(1)(B) ......................................................................20

42 U.S.C. § 7410(k)(2) ...........................................................................18

42 U.S.C. § 7410(k)(3) ...........................................................................18

42 U.S.C. § 7410(k)(5) ................................................................ 16, 21, 25

42 U.S.C. § 7604(a)(2) ...........................................................................22

5 U.S.C. § 706(2)(A) ..............................................................................19

5 U.S.C. § 706(2)(C) ..............................................................................19

**Rules & Regulations**

40 C.F.R. § 51.103(c) .............................................................................20

40 C.F.R. pt. 51, app. V § 2.0 ................................................................20

**Other Authorities**

Memorandum from William T. Harnett, Director of EPA Air Quality
    Policy Division, to EPA Air Division Directors, re EPA Guidance
    on SIP Elements Required Under Sections 110(a)(1) and (2) for
    the 1997 8-hour ozone and $PM_{2.5}$ National Ambient Air Quality
    Standards        (Oct.        2,        2007),

https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20071 002_harnett_110(a)_sip_guidance.pdf (last visited Sept. 19, 2024) .................................................................................................................7

Far from being "stale," EPA Br. 1, the EPA overreach presented in this case—its co-option of "cooperative federalism" under the federal Clean Air Act (the "Act") providing for state choice and implementation of air quality controls, and its unlawful disapproval of Texas's implementation plan—is just as important now as it was when Texas filed its initial brief in 2017.

In disapproving Texas's State Implementation Plan ("SIP") for the 2008 National Ambient Air Quality Standard ("NAAQS") for ozone, EPA has turned the Act's "cooperative federalism" approach on its head: delaying its decision on Texas's SIP until years past EPA's statutory deadline for its approval or disapproval determination under the Act and only proposing its SIP disapproval *after* EPA had prematurely, and unlawfully, *see EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 507-09 (2014), proposed its own FIP.

Unsurprisingly, EPA eventually disapproved Texas's SIP. It did so for extra-statutory, arbitrary and capricious, and (indeed) pretextual reasons. It faulted Texas for failing to do an exhaustive nationwide analysis that is well beyond the Act's "applicable requirements" that States must meet. EPA Br. 38, 40. It arbitrarily and capriciously ignored Texas's evidence regarding impacts on areas in attainment. And it arbitrarily and capriciously faulted Texas for failing to address *later*, post 2012 data and *later*-developed EPA methodologies—information that was, self-evidently,

*not* available to Texas when it was required to submit its SIP in 2012. This deprived Texas of fair notice of the standards that would be applied to its SIP, in violation of a fundamental tenet of administrative law.

To be clear, the problem here was not only EPA's delayed action on the SIP, in and of itself. The delay was exacerbated by how EPA used the delay—it developed its own Federal Implementation Plan ("FIP") that included Texas, and later disapproved Texas's SIP because it did not comport with EPA's FIP. EPA is indifferent to the burden created by its waste of Texas's time and resources spent developing its SIP. Instead of timely evaluating Texas's SIP for its consistency with statutory requirements, EPA ignored the Act's deadline, developed and proposed a FIP, and only then proposed to deny Texas's SIP. If Texas's SIP were as deficient as EPA claims, it should have immediately disapproved it. Instead, it waited years, until after it had developed modeling that promoted its own policy objectives, to propose a FIP and then propose disapproval of Texas's SIP because it did not comply with the FIP. The administrative record EPA submitted to the Court included numerous documents relating to that FIP post-dating Texas's SIP submittal in 2012.[1] That later-developed FIP is extensively discussed in EPA's 2016 final disapproval of Texas's SIP. *E.g.*, Texas Br. 32; Luminant Br. 18, 26-27.

---

[1] Texas and Intervenors moved to strike these materials. The motion was carried.

What EPA did here was plainly contrary to the Act. Under well-established precedent in this Circuit, EPA's role regarding SIPs is limited. Consistent with the preference for *state* implementation and enforcement, the Act "confines EPA's role in implementing air quality standards 'to the ministerial function of reviewing SIPs for consistency with the Act's requirements.'" *State of Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012)). EPA's review is more than just a box-checking exercise, but its "ministerial" review still affords States "considerable leeway." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 490 (2004). EPA must "accord appropriate deference to States' . . . designations" and refrain from "second guess[ing] state decisions." *Id.* (internal quotation omitted). EPA's statutory authority to review SIPs for their consistency with the Act's "applicable requirements" most certainly does *not* include the right to override States' implementation authority in order to mandate its preferred implementation approach years later. But that is precisely what EPA has done here.

To justify usurping Texas's implementation function for the Act's Good Neighbor requirements—and assume that core State function for itself—EPA offers what amounts to three pretextual reasons for its disapproval. EPA Br. 52-58. None were lawful.

*First*, EPA claims Texas was wrong to rely upon reductions for "different NAAQS" under the Clean Air Interstate Rule ("CAIR"). *Id.* at 52. On this, EPA is wrong on the law and facts. Although the D.C. Circuit had found issues with CAIR and the rule had been remanded to the agency, CAIR remained in place while EPA addressed those issues. This is even apparent from EPA's own brief. *See id.* at 15-17. Thus, Texas appropriately relied upon it.

*Second*, EPA claims that Texas completely ignored the "interference with maintenance" prong of the Good Neighbor Provision. *Id.* at 52. This, again, is wrong: Texas's SIP discussed the information available at the time, including data as to wind patterns, in assessing which areas may be affected by Texas emissions. Texas reviewed extensive, actual monitoring data from areas in attainment in other states in determining no additional control measures, outside the extensive measures already in place, were necessary. Texas Br. 30-32; Texas Suppl. Br. 17-18. Texas also reviewed photochemical modeling for the Dallas and Houston nonattainment areas. Texas Br. 15, 31-32. Though EPA complains this analysis is "conclusory" and "cursory," EPA Br. 2, 66-67, EPA does not say what more Texas could have done, short of highly resource and time-intensive comprehensive modeling. Such a requirement is found nowhere in the Act. Disapproving the SIP on this basis, EPA exceeded its statutory authority.

And, *third*, EPA claims its disapproval was justified based on Texas's failure to consider emissions' impact on areas other than those that designated as nonattainment. *Id.* at 52-53. EPA disapproved Texas's SIP based on the premise that Texas did not consider areas in attainment. Again, this is wrong, and disapproval on this basis was arbitrary and capricious. Texas's SIP *did* consider areas in attainment. EPA cannot simply ignore Texas's efforts to consider attainment areas in other states. Texas Br. 14-16, 30-32, 36-37. But Texas is not required to predict EPA's future *non*attainment determinations. Requiring this was in excess of its statutory authority. EPA's argument rests upon a fundamental misinterpretation of the Act's language and conflates the two prongs of the Act. The first prong of the Good Neighbor Provision (requiring the assessment of impacts on *non*attainment areas) does not require the comprehensive assessment of impacts upon areas that are currently *in attainment*. EPA Br. 62-64.[2]

None of these pretexts justify EPA's unlawful disapproval of Texas's SIP. Thus, EPA's final rule should be vacated and remanded.

---

[2] EPA oddly complains about Texas's "inappropriate[] focus" on "nonattainment *areas*," noting that the Good Neighbor Provision does not refer to nonattainment areas. EPA Br. 63. But EPA designates specific geographic areas as not attaining NAAQS based on monitoring and other information.

## I. EPA unlawfully disapproved Texas's SIP, which met all applicable statutory requirements.

Texas timely submitted a compliant SIP to EPA. After several years of inexplicable delay—during which EPA developed new data and criteria, and its own FIP—EPA unreasonably and unlawfully disapproved Texas's SIP citing extra-statutory factors. EPA exceeded its authority by disapproving a SIP compliant with the "applicable requirements," deprived Texas of fair notice of the standards used to judge its SIP, and arbitrarily and capriciously ignored key evidence and analysis supporting Texas's SIP. None of the disapproval justifications proffered by EPA can overcome its legal errors. EPA Br. 52-68.

### A. EPA unlawfully disapproved Texas's SIP based upon its "reliance" on CAIR.

EPA claims Texas wrongly relied upon reductions for "different NAAQS" from the "*already*-invalidated" CAIR. EPA Br. 52 (emphasis added), 54-56. But EPA's allegation that CAIR was "defunct" by 2012 is false. *Id.* at 55. Although the D.C. Circuit found issues with CAIR and had remanded the rule, CAIR remained in place pending its replacement. *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 38 (D.C. Cir. 2012), *rev'd and remanded*, 572 U.S. 489 (2014). Thus, CAIR was in effect when Texas submitted its SIP in 2012. EPA even acknowledged this in its response brief. *E.g.*, EPA Br. 15-16, 17 ("In *2012*, the D.C. Circuit vacated and

remanded CSAPR to EPA and required EPA to administer CAIR pending promulgation of a valid replacement.") (emphasis added). EPA's brief further acknowledges that CAIR implementation ended *in 2014*—two years after Texas submitted its SIP. EPA Br. 17.

Although Texas was not included in CAIR trading program for ozone, only for $PM_{2.5}$, the pollutants controlled under the emission budgets for $PM_{2.5}$ were $NO_X$, which is the same precursor pollutant controlled for ozone, and $SO_2$. Thus, $NO_X$ controls would also benefit ozone reduction. And the fact that CAIR involved an earlier ozone NAAQS does not mean these controls would not contribute to attainment of a more stringent one. EPA issued guidance prior to Texas's SIP submission directing a state can determine an existing SIP is adequate to meet new requirements.[3]

Texas did not waive this issue. EPA Br. 56. Texas discussed CAIR in its opening brief, where it explained that CAIR was still in effect when it submitted its SIP, and thus Texas properly relied upon it. Texas Br. 29.

---

[3] Memorandum from William T. Harnett, Director of EPA Air Quality Policy Division, to EPA Air Division Directors, re EPA Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 1997 8-hour ozone and $PM_{2.5}$ National Ambient Air Quality Standards (Oct. 2, 2007), https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20071002_harnett_110(a)_sip_guidanc e.pdf (last visited Sept. 19, 2024).

**B.     EPA unlawfully disapproved Texas's SIP for failing to consider areas that were in attainment.**

EPA claims Texas failed to independently assess whether its emissions interfere with the maintenance prong of the Good Neighbor Provision. EPA Br. 56-57. This is incorrect. The Texas Commission on Environmental Quality ("TCEQ") assessed, through review and analysis of the actual monitoring data available in 2012, impacts on neighboring areas in attainment and areas in nonattainment. Texas Br. 30-32. TCEQ fulfilled its obligations to separately evaluate Texas's contributions to nonattainment and interference with maintenance in downwind states. Thus, disapproval because it did not was arbitrary and capricious.

It is true Texas did not conduct its own modeling for its SIP. But nothing in the Act's Good Neighbor Provision requires this. Contrary to EPA's complaint, *e.g.*, EPA Br. 32, 56, Texas's analysis of actual monitoring data for areas that were in attainment in its SIP was not "conclusory." The available monitoring data as of 2012 showed declining trends in ozone both inside and outside the state and, thus, that Texas's transported emissions did not "interfere with maintenance" for attainment areas. Texas Br. 30-32, 36-37. It is unclear what further explanation Texas could have provided. EPA offers no specific explanation of what more Texas could have done.

Texas's SIP cited its robust existing controls. Index # 3, Texas SIP Submission at 2-1 – 2-19. It pointed to its mix of controls promulgated into law, including Title 30, Texas Administrative Code Chapters 101 (air quality rules,

including emissions banking and trading), 115 (control of volatile organic compounds ("VOCs")), 116 (control of air pollution from new sources), 117 (control of nitrogen compounds), and 122 (federal operating permits). *See generally id.* Texas *should be* free to adopt its own compliant mix of controls that it determines right for itself and its citizens. *See Train v. Nat. Res. Def. Council*, 421 U.S. 60, 79 (1975); *see also State of Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) (so long as the standards are met, a state may select its own controls). Importantly, ozone is a secondary pollutant created through a photochemical reaction between oxygen, $NO_X$, and VOCs. Index # 3, Texas SIP Submission at 2-1. Thus, in addition to ozone controls, *id.* at 2-17 – 2-19, Texas also addressed ozone precursor emissions, *id.* at 2-1 – 2-17. It also pointed to controls targeting specific industries and sectors. *Id.* at 2-13 – 2-19. EPA admits it may not dictate specific control measures for a state to adopt in a SIP, EPA Br. 46 (citing *Virginia v. EPA*, 108 F.3d 1397, 1415 (D.C. Cir. 1997)), yet it ignored the breadth of Texas's specific, targeted controls to address ozone.

Here again, EPA's complaints only underscore that its *real* issue is that Texas did not conduct comprehensive nationwide modeling—or more precisely, that Texas did not undertake the very sort of modeling that EPA subsequently developed for its FIP, and that Texas did not consider later information that (self-evidently) did not exist in 2012. This modeling would be an extraordinary burden on States—an issue

that EPA implicitly acknowledges but summarily dismisses as a necessary task for States to undertake to satisfy Good Neighbor obligations. *See* EPA Br. 46-47. Contrary to EPA's suggestion, EPA Br. 65, the Supreme Court's opinion in *EME Homer* did not require states to undertake such an onerous burden. While *EME Homer* acknowledges that practical difficulties in compliance with the Act's requirements "do not justify departure from the *Act's plain text*," 572 U.S. at 509 (emphasis added), there is nothing in the Court's opinion to suggest that EPA may impose on states burdensome extra-statutory requirements or impossible tasks.

### C. EPA unlawfully disapproved Texas's SIP as taking an allegedly "impermissible narrow approach" to areas in nonattainment.

Another EPA basis for the SIP disapproval is also unlawful. EPA wrongly asserts that Texas was required, under the first prong of the Good Neighbor Provision, to consider areas not yet designated as nonattainment. *See*, *e.g.*, EPA Br. 58. But EPA's expansive reading of the first statutory prong to include areas that might be designated as nonattainment in the future goes well beyond the Act's text and renders the second prong (addressing maintenance of attainment areas) superfluous.[4]

---

[4] EPA claims Texas waived numerous objections to EPA's disapproval. EPA does not specify which "nonattainment" arguments were allegedly waived, only generally that statutory and technical ones were. But TCEQ submitted robust comments on "nonattainment," telling EPA this was an area of concern. Index # 4, Texas Comment at 3-5. Texas's comments were "prominent and clear enough to place the agency 'on notice'" of Texas's arguments. *State of Texas v. EPA*, 91

1.    <u>The statutory language only refers to nonattainment.</u>

As discussed in Texas's opening brief, Texas Br. 24-28, the plain language of the first prong of the Act's Good Neighbor Provision requires states to assess whether their emissions "will . . . contribute significantly to *nonattainment*." 42 U.S.C. § 7410(a)(2)(D)(i)(I) (emphasis added). This is exactly what Texas did—it assessed areas designated as *nonattainment*.[5] Texas looked at actual monitoring data from nonattainment areas in states around the country (Arizona, Arkansas, Colorado, Illinois, Indiana, Louisiana, Mississippi, Missouri, Tennessee, and Wisconsin) and discussed the declining trend in ozone design values. Texas Br. 30-32.

EPA argues that Texas was required, under this first prong, to do much more. It says Texas must assess impacts on areas that are currently in attainment but may fall into nonattainment in the future. But this impermissibly exceeds the scope of the first prong and renders the second "interfere with maintenance" prong redundant. As EPA acknowledges, the D.C. Circuit interprets these two prongs to have separate meanings and require separate obligations. EPA Br. 11-12 (quoting *North Carolina v. EPA*, 531 F.3d 896, 909-10 (D.C. Cir. 2008), *on reh'g in part*, 550 F.3d 1176 (D.C.

---

F.4th 280, 299 (5th Cir. 2024) (quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007)). There was no waiver.

[5] Indeed, the statutory scheme itself plainly could not require consideration of future nonattainment areas because "Good Neighbor" SIPs are due before any nonattainment designations for revised NAAQS. Nor are they required to be re-submitted after any future designations.

Cir. 2008)). Yet, EPA interprets both prongs to require consideration of current attainment areas under both, making the two prongs redundant of each other. *See, e.g., United States v. Lauderdale Cty*. 914 F.3d 960, 966 (5th Cir. 2019) (cardinal rule that statutes construed so no words rendered superfluous).

### 2. "Will" significantly contribute to nonattainment cannot reasonably require States to predict future conditions, future EPA determinations, and future control measures by other States.

EPA's extra-statutory interpretation of the first prong in the Good Neighbor Provision is premised on the inclusion of the word "will." The text requires that a SIP "contain adequate provisions" prohibiting emissions that "*will* . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I) (emphasis added). As EPA reads it, the text requires consideration of areas that EPA *might* determine are in nonattainment *in the future. See* Index # 1, 81 Fed. Reg. 53,284, 53,287 (Aug. 12, 2016) ("Texas should have considered *possible* contributions to downwind *areas that are not designated nonattainment* but *may* nonetheless measure exceedances of the NAAQS in considering whether Texas emissions significantly contribute to nonattainment in another State.") (emphasis added).

The Act does not require this. Indeed, this would be an impossible task. It would require that States possess "a crystal ball" and predict the nonattainment determinations that *EPA will make in the future*, applying data *not yet in existence*,

that individual States do not have access to, on a nationwide basis. *E.g.*, Texas Br. 25-28 (explaining Texas not required to include level of analysis and detail involved with attainment designations in the SIP). EPA's complaint that Texas's SIP ignored projected impacts on "areas that would struggle to attain or maintain the 2008 ozone standards," EPA Br. 2, amounts to demanding that Texas do a full attainment analysis for areas around the country. Every state must predict the nonattainment designations EPA will make in <u>any</u> future, subsequent year. EPA seemingly acknowledges this quandary but curiously dismisses it without explaining how States might comply practically with such lofty expectations. EPA Br. 64 ("It makes no sense to limit Good Neighbor analyses to formally designated nonattainment areas when such designations may not yet exist during the states' Good Neighbor SIP development timeframe.").

Perhaps even more significantly, States must submit their Good Neighbor SIPs *before* other states have submitted their nonattainment plans outlining the controls they will implement to achieve the NAAQS. 42 U.S.C. § 7410(a)(1) (SIPs must be submitted within three years of the promulgation of a NAAQS). EPA's reading requires states to undertake exhaustive analysis of areas in attainment at the time of SIP submission before it is even known what controls will be implemented by other states in areas that EPA *might* eventually designate as nonattainment for a

NAAQS. Modeling here would be extraordinarily difficult or impossible, as it depends on the future actions of EPA and other States.

Rather than imposing such an impossible requirement, the statutory term "will" reflects a straightforward cause-and-effect relationship that underlies the Good Neighbor Provision. Texas must evaluate emissions that "will" travel to areas in other states (depending on prevailing winds) and thus "will" potentially contribute significantly to nonattainment in those states. This reading is consistent with the statutory text; EPA's expansive reading is not.[6]

To the extent EPA is asking for it, respect for its statutory interpretation is not appropriate. EPA's interpretation of the word "will" in this provision cannot survive post-*Loper Bright*.[7] "Will" in this context cannot reasonably be read to require predictions of future conditions. Post-*Chevron*, under *Loper Bright*, the Court must conduct its own statutory analysis, applying standard rules of statutory construction. The text at issue here—particularly the phrase "will . . . contribute significantly"— cannot be read to require States to predict *possible* future changes in attainment

---

[6] Texas recognizes that in *North Carolina* the D.C. Circuit found it appropriate for EPA to interpret the statute's use of the term "will" to "mean either certainty or indicate the future tense." *North Carolina v. EPA*, 531 F.3d 896, 914 (D.C. Cir. 2008), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008). But it did so in the context of areas that *are currently in nonattainment* and are projected to remain in nonattainment in the future. *Id.* at 913-14. Here, EPA takes it a step too far. It tries to expand the future tense meaning of "will" to encompass not only current nonattainment areas that are projected to remain in nonattainment, but to extend to areas currently monitoring *attainment* but that may, at some point in the future, fall into nonattainment.

[7] *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

status. To do so would be wholly inconsistent with the statutory scheme for SIP submission and review and would fail to give independent meaning to the second prong requiring review of maintenance in areas of attainment). Thus, respect for the agency's interpretation under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), is not warranted here. EPA Br. 64.

## II. Based on these pretexts, EPA unlawfully disapproved Texas's SIP to allow it to impose its FIP upon Texas—contrary to the Act's "cooperative federalism" framework.

EPA's role in reviewing a SIP is limited to determining whether the State satisfies the applicable requirements under the Act. EPA sets the NAAQS, and the States develop plans to implement them. These principles are well-established in this Court's case law. Although the Act requires EPA to set the NAAQS, it assigns the States "primary responsibility *for ensuring that the ambient air meets the NAAQS*." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003) (emphasis added). "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Texas v. EPA*, 829 F.3d at 411 (quoting *Luminant Generation Co.*, 675 F.3d at 921). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id*. "Only if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator" by drafting a FIP. *Id.* at 412; *see* 42 U.S.C. § 7410(c)(1).

The Act's requirements here do not include, as EPA urges, applying post hoc data unavailable to Texas in 2012, and employing the specific methodology that EPA employed in its own FIP *before* disapproving Texas's SIP. This violates a basic principle of administrative law: fair notice of the standards to be applied.

Examination of EPA's disapproval rule makes clear this pretext for disapproving Texas's SIP is really about requiring Texas, and all other states, to apply the same methodology as EPA employed in its later FIP. Texas Br. 18-19; *see also* Luminant Br. 17-20. EPA faults Texas for not doing a more comprehensive analysis. Yet, at the same time, EPA claims such analysis is in its "wheelhouse," EPA Br. 39, betraying the federal agency's true intent that it, *not the States*, must always make these determinations in the first instance. The net effect of EPA's disapproval decision here is that states will *never* be able to propose a compliant SIP, and EPA is *always* to step in and issue a FIP. EPA could always use later information to justify a disapproval. This is not to say that later information can never be considered. But the appropriate mechanism to do that is a SIP Call, 42 U.S.C. § 7410(k)(5), not disapproval of a SIP after years of delay.

EPA cites numerous cases involving challenges to EPA's own Good Neighbor rules and *FIPs*, not SIPs: for example, *EME Homer* (a challenge to EPA's transport rule); *Wisconsin* (a challenge to EPA's CSAPR update); *North Carolina* (a challenge to CAIR); and *Ohio*, (a challenge to a FIP). This is a very important distinction.

These cases address the scope of EPA's authority in promulgating Good Neighbor rules and developing a FIP *after* a State has failed to submit a compliant SIP. But that is not the situation here. This case involves the scope of EPA's authority to disapprove a SIP for alleged noncompliance with the Act's "applicable requirements." EPA conflates the scope of EPA's FIP authority with its authority to disapprove a SIP, but they are not the same. *See EME Homer*, 572 U.S. at 514 n.15.

Texas does not dispute that EPA can prospectively define States' Good Neighbor obligations in the FIP context. But when Texas's SIP was due in 2012, EPA had not successfully done so. Texas Br. 8-12 (describing EPA's unsuccessful Good Neighbor efforts through 2012); EPA Br. 14-18. Thus, Texas appropriately analyzed actual monitoring data and modeling for the two nonattainment areas in Texas (Dallas and Houston) available at the time. The information EPA uses to justify its disapproval, in contrast, was not issued until *2015*, years later—and, importantly, only in the context of proposing a nationwide FIP.

Design of a SIP necessarily involves assessment of whether additional control measures are necessary at all. The Act mandates that EPA determine the ambient standard that must be met. Everything else (*i.e.*, implementation of a plan to meet that standard) is left to the States. If existing control measures are sufficient, the States need not do more. It does not matter if control measures were put in place to meet another standard—if such controls limit ozone precursors, then those controls

17

may reasonably be said to also limit the potential for transported emissions' impacts on other States. The analysis in Texas's SIP supports its conclusion that no additional control measures were necessary.

**III.    EPA must review SIP submissions by the 12-month statutory deadline, using the available data, and cannot pre-determine whether the SIP is compliant based on its own policy objectives.**

**A.    The SIP review should have occurred in 2013.**

Under the cooperative federalism framework, EPA was required to review the Texas SIP in 2013. There is no dispute there. *See* EPA Br. 73. EPA hazards the result may not have been different had it acted faster, EPA Br. 69, but this speculation completely misses the point. EPA *must* act on a SIP submission within 12 months of a completeness finding—not 44 months. 42 U.S.C. § 7410(k)(2), (3); *see* Index # 1, 81 Fed. Reg. at 53,284. While EPA attempts to downplay its significance, this delay was not harmless—EPA used the interim to develop new data and prepare its own FIP, which it then used as the basis for disapproving Texas's SIP.

**B.    EPA acted arbitrarily and capriciously, in excess of its statutory authority, and did not give fair notice of the post hoc data and modeling on which it relied.**

The majority of the supporting documents and memoranda that EPA relied on in disapproving Texas's SIP are dated long *after* December 13, 2012, when Texas submitted its SIP to EPA. *See* Index # 7-12, 15-18, 21-22. Many were created in connection with the FIP. Texas Br. 18-19. EPA cannot use data and modeling created

years after the statutory deadline that Texas had no access to when it timely submitted its SIP. EPA claims it did not rely on new information to support its disapproval, *see, e.g.*, EPA Br. 53-54, 74, 78, 82, but the final disapproval itself belies this. In using new data and modeling created *after* the Texas SIP submission, EPA acted arbitrarily and capriciously, in excess of statutory limitations, and failed to give Texas fair notice of the standards it would apply in reviewing its SIP. 5 U.S.C. § 706(2)(A), (C). "[W]hile [parties] are required to stay apprised of laws and regulations, they are not required to predict an agency's actions with 'extraordinary intuition or with the aid of a psychic.'" *Inhance Techs. LLC v. EPA*, 96 F.4th 888, 894 (5th Cir. 2024) (quoting *Wages & White Lion Invs., LLC*, 90 F.4th 357, 381 (5th Cir. 2024)). Here, EPA cites *General Motors Corporation v. United States*, 496 U.S. 530, 541 (1990), arguing it should not be powerless to act even though it missed its deadline. EPA Br. 70. But this argument misses the point: Texas is not contending EPA wholly loses its ability to act. But relying on post hoc information developed during its lengthy delay is arbitrary and capricious. *See* Texas Br. 23, 32-35.

EPA must give Texas "fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (alterations in original) (quoting *Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986)). This is a basic equity principle central to cooperative federalism. States are owed a fair chance to submit SIPs that

satisfy their obligations and fulfill their implementation role. Changing the standards by which the Texas SIP would be judged deprived Texas of fair notice. In so doing, EPA held Texas to previously unannounced, ever-evolving standards that are, of course, impossible to meet.

Using data or modeling created after every applicable 42 U.S.C. § 7410(k) deadline here is in excess of statutory limitations and arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *State of Texas v. EPA*, 690 F.3d at 676 (EPA considered irrelevant factors Congress did not intend and had clear error in judgment). A sound interpretation exists that the completeness criteria established via 42 U.S.C. § 7410(k)(1)(A) limits EPA to "the information necessary to enable [it] to determine whether the plan submission complies with the provisions of this chapter." 42 U.S.C. § 7410(k)(1)(A); *see* 40 C.F.R. pt. 51, app. V § 2.0 (criteria for administrative and technical completeness). When EPA then makes a completeness determination under 42 U.S.C. § 7410(k)(1)(B), it decides whether it possesses the limited information necessary, pursuant to 42 U.S.C. § 7410(k)(1)(A), for it to make a substantive decision. The Act necessarily limits EPA to the information available at the time of its completeness finding. 42 U.S.C. § 7410(k)(1)(A), (B). At most, given the opportunity for consultation, *see* 40 C.F.R. § 51.103(c); Texas Br. 32, it may be reasonable to utilize limited information found within the 12-month review window.

What is not reasonable, though, and in excess of all statutory limitations, is EPA using information created after all applicable 42 U.S.C. § 7410(k) deadlines to support its disapproval.

### C. EPA may use a SIP Call to require States to consider new information.

EPA notes that Texas may submit a revised SIP, EPA Br. 84, but this ignores the fact that Texas submitted a compliant SIP in 2012 that EPA declined to review for years. Importantly, EPA cites no authority requiring States to update SIPs with new information while they sit shelved and unreviewed, particularly after the approval deadline. This could extend the SIP review process indefinitely—States would be expected to continually update pending SIP submissions whenever new information comes to light, inevitably restarting the approval process all over again. Instead, the Act mandates EPA must timely act on the submission with the information available. EPA may then issue a "SIP Call" allowing States to consider new information. *See* 42 U.S.C. § 7410(k)(5). Here, EPA disregards the Act's procedural framework, which includes a provision for SIP Call when appropriate.[8]

---

[8] EPA's reliance on *EME Homer* here is misplaced. *See* EPA Br. 79 (citing *EME Homer*, 572 U.S. at 508-09. *EME Homer* did not unequivocally reject use of a SIP call in these circumstances. In that case, the Supreme Court rejected the D.C. Circuit position that, once EPA issued emissions budgets for the States, it must give States a reasonable period of time to issue SIPs implementing their budgets. This "second chance" was found inconsistent with statutory deadlines for States to submit their SIPs following EPA's issuance of a new NAAQS. *EME Homer*, 572 U.S. at 508.

## D.     The citizen suit remedy has no relevance here.

States need not rely upon a citizen-suit provision to ensure EPA timely approves their compliant SIPs. States are primary actors in the Act's regulatory framework. Suggesting the Act provides state sovereigns a "singular" citizen suit remedy via 42 U.S.C. § 7604(a)(2) further reflects EPA's disregard for the Act's cooperative federalism. *See* EPA Br. 72.

Tellingly, EPA cites only to matters where corporate entities or NGOs, not a State, filed suit to compel EPA action. *See id.* at 21, 72 (citing *BCCA Appeal Grp. v. EPA*, 476 F. App'x 579, 582 (5th Cir. 2012) (suit by NGO); *General Motors*, 496 U.S. at 541 & n.4 (suit by corporation); *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1190-91 (9th Cir. 2012) (suit by company) and *Sierra Club v. EPA*, No. 14-cv-5091 (N.D. Cal. Nov. 18, 2014) (suit by NGO). These private entities are not governmental actors in the Act's regulatory framework; States are. Under EPA's illogical view, Texas must race to secure a court order forcing EPA to act on a SIP before EPA releases new information it claims justifies SIP disapproval. Such a scheme is untenable. EPA controls when it releases new information and when it reviews SIPs, and thus, inevitably, it will win.

## E.     EPA predetermined the SIP disapproval.

EPA proposed its FIP over four months before it proposed disapproval of the Texas SIP. EPA dedicated considerable time, expense, and staff resources to prepare

its FIP before even proposing to disapprove Texas's SIP. When EPA finally raised the curtain after years of inaction, it revealed that "[t]o the extent that the EPA has not finalized action on [States'] submitted SIPs, these states can evaluate their submissions in light of this proposal and the actions we are taking . . . ." Index # 10, 80 Fed. Reg. 75,706, 75,719 (Dec. 3, 2015). This means Texas must reevaluate its SIP since it will be judged in comparison with the FIP. EPA may not shy away from this assertion—it referenced its FIP ten times in the proposed disapproval of Texas's SIP, *see* Index # 2, 81 Fed. Reg. 21,290, 21,292-94 (Apr. 11, 2016), and several more times in the final SIP disapproval, *see* Index # 1, 81 Fed. Reg. 53,284, 53,284 n.2. (Aug. 12, 2016). When pressed on the pre-determined outcome issue, EPA responded that because "[a] proposed rulemaking does not constitute a promulgation of a rule . . . [it] does not constitute a 'predetermined outcome' of EPA's review of Texas's SIP." Index # 1, 81 Fed. Reg. at 53,286. That response flies past the target.

It remains clear that EPA always needed Texas as part of its FIP, a trading program, for it to be successful: Texas is the largest state within its trading market— with approximately 39 percent of the total 2023 ozone season state emissions budgets of all nine states. EPA Br., Mathias Decl. ¶ 14. Texas's outsized influence only supports the notion that EPA predetermined that Texas needed to be part of the regional block. Even now, EPA has shown its desire and intent: "EPA is likely, on

remand, to disapprove Texas's 2008 ozone NAAQS good neighbor SIP submission again . . . ." *Id.* ¶ 17.

After Texas pressed EPA on why it did not act sooner, EPA now claims Texas forfeited the argument of "bad faith." EPA Br. 73-74. This is incorrect. TCEQ commented: "[d]espite the EPA's claims of not pre-judging submitted SIPs, the EPA took unwarranted action by proposing [a] FIP for states that had SIPs awaiting EPA action" well "before even notifying Texas of what [SIP] corrections it deemed necessary for approval" and "took no action on Texas' transport submittal until … four months after proposing this FIP." Index # 4 at 2-3. Texas waived no argument here.

## IV. The APA requires vacatur.

Courts *shall* "hold unlawful and set aside agency action" found to be arbitrary, capricious, or in excess of statutory authority. 5 U.S.C. § 706(2). The default rule is vacatur. *Data Mktg. P'Ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022). That default rule should be applied here.

In support of remand without vacatur, EPA cites to *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000), stating remand may occur "when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" (citations

omitted). This is a rare exception to the default rule and the APA. It does not apply here.

First, EPA's utter disregard of cooperative federalism, the Act's timetable, and its pretextual reasons for disapproval are too great to overcome—its SIP disapproval decision could not be substantiated on remand.

Second, the disruption that vacatur will cause is overstated in EPA's extra-record declaration. Much is made about disruption to the trading program, especially to Group 2, EPA Br., Mathias Decl. ¶ 16, but EPA already finalized a rule to move Texas to a new Group 3—an action now stayed—so the extent of disruption to the trading market is questionable. *See id.* ¶ 12. For NO$_X$ BART, as EPA concedes, Texas has other alternatives for compliance, such as a SIP revision. *See id.* ¶ 33. A SIP revision is, after all, how to reconcile new information under the Act. 42 U.S.C. § 7410(k)(5). Finally, EPA wrongly assumes the Texas SIP will not achieve the same ends as application of the existing FIP within the Regional Haze, Dallas-Fort Worth, and Houston-Galveston-Brazoria SIPs. *See* EPA Br., Mathias Decl. ¶¶ 25, 33 (again, a pre-determined outcome, based on EPA's illegal interpretation of the Act). If Texas is no longer included in the FIP trading program, Texas will evaluate any necessary changes to correct the *presumed* potential deficiencies identified in the declaration.

As such, this Court should order vacatur, following the default rule and the APA.

## CONCLUSION AND PRAYER

The SIP disapproval should be vacated and the matter remanded to the EPA.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

 */s/ John R. Hulme*
JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

ERIN K. SNODY
Assistant Attorney General
State Bar No. 24093056
Erin.Snody@oag.texas.gov

JAKE MARX
Assistant Attorney General
State Bar No. 24087989
Jake.Marx@oag.texas.gov

Environmental Protection Division
Office of the Attorney General

P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Phone: (512) 463-2012
Fax: (512) 320-0911

**Attorneys for Petitioners State of Texas and Texas Commission on Environmental Quality**

**CERTIFICATE OF SERVICE**

I certify that on September 20, 2024, the foregoing document was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon all registered CM/ECF users associated with this case.

    */s/ John R. Hulme*
JOHN R. HULME


**CERTIFICATE OF COMPLIANCE**

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,238 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in the Times New Roman font 14-point type face.

    */s/ John R. Hulme*
JOHN R. HULME


**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I certify that, in the foregoing brief using the Fifth Circuit CM/ECF document filing system, 1) required privacy redactions have been made, 5TH CIR. R. 25.2.13; 2) the electronic submission is an exact copy of the paper document, 5TH CIR. R. 25.2.1; and 3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

    */s/ John R. Hulme*
JOHN R. HULME

Dated: September 20, 2024