**No. 16-60670**

In the
United States Court of Appeals
For the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY,
*PETITIONERS,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,
ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*RESPONDENTS.*

## RULE 30.2(a) APPENDIX
### VOLUME 2: TABS 7–23

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division

September 20, 2024

JOHN R. HULME
Assistant Attorney General
john.hulme@oag.texas.gov

ERIN K. SNODY
Assistant Attorney General
erin.snody@oag.texas.gov

JAKE MARX
Assistant Attorney General
jake.marx@oag.texas.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel.: (512) 463-2012
Fax: (512) 320-0911

Counsel for State of Texas and Texas
Commission on Environmental Quality

## INDEX TO RULE 30.2(a) APPENDIX

1. Approval and Promulgation of Air Quality Implementation Plans; Texas; Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards; Final Rule; 81 FR 53284 (August 12, 2016) ................................................................. **Tab 1**

2. Approval and Promulgation of Air Quality Implementation Plans; Texas; Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Qua1ity Standards; Proposal Rule; 81 FR 21290 (April 11, 2016) ......................................................... **Tab 2**

3. Texas Infrastructure and Transport SIP Submittal for the 2008 Ozone National Ambient Air Quality Standard (NAAQS), Texas Project No. 2012-004-SIP-NR, submitted to EPA December 13, 2012 .................... **Tab 3**

4. TCEQ cover letter and comment letter to EPA–EPA Docket Center, Air and Radiation Docket; Re: Docket ID No. EPA-R06-0AR-2012-0985 (May 11,2016); Comments by the TCEQ Regarding Disapproval of Air Quality Implementation Plans: Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards ............................................................. **Tab 4**

5. Luminant comment letter to Ron Curry, EPA Region Regional Administrator; Re: Comments of Luminant on the Disapproval of Texas's SIP Regarding Implementation of the 2008 Ozone NAAQS-Docket ID No. EPA-R06-OAR-2012-0985; 81 Fed. Reg. 21290 (April 2016) ......................................................... **Tab 5**

6. Comment letter from public citizen Nicholas Porter; Comment: EPA-R06-OAR-2012-0985-0001; Re: Air Quality State Implementation Plans; Approval and Promulgation; Texas; Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards Proposed Rule ......................................................... **Tab 6**

7.  Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS); 80 FR 46271 (August 4, 2015) ................................................................... **Tab 7**

8.  Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS); 2017 Ozone Contributions (Excel Spreadsheet); Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS; 80 FR 46271 (August 4, 2015) ................................................................... **Tab 8**

9.  Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS); Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS); Notice of Data Availability (NODA): Details about Provided Emissions Data Files; 80 FR 46271 (August 4, 2015) ................................................................... **Tab 9**

10. Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS; 80 FR 75706 (December 3, 2015) ....................................................... **Tab 10**

11. Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS; Air Quality Modeling Technical Support Document (TSD) for the 2008 Ozone NAAQS; 80 FR 75706 (December 3, 2015) .................... **Tab 11**

12. Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS; Ozone Transport Policy Analysis TSD; 80 FR 75706 (December 3, 2015) .............................................................. **Tab 12**

13. Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals; Final Rule; 76 FR 48208, 48238 (August 8, 2011) ................................................. **Tab 13**

14. Memorandum from Janet G. McCabe, Acting Assistant Administrator for the Office of Air and Radiation to Regional Administrators, Regions 1-10, "Implementing the 2015 Ozone National Ambient Air Quality Standards" ............................................................................................ **Tab 15**

15. Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards to Regional Air Division Directors, Regions 1-10, "Information on the Interstate Transport 'Good Neighbor' Provision for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act (CAA) Section 110(a)(2)(D)(i)(I)" ...... **Tab 16**

16. EPA letter of December 20, 2012 pertaining to administrative completeness of the Texas SIP revision "Infrastructure Demonstration and Transport Plan for Ozone" ........................................................... **Tab 23**

# Tab 7

Notice of Availability of the Environmental Protection Agency′s
Updated Ozone Transport Modeling Data for the 2008 Ozone National
Ambient Air Quality Standard (NAAQS)
80 FR 46271 (August 4, 2015)

the potential for serious delivery problems on the pipeline's own system or the pipeline grid.

Filings (in accordance with the provisions of section 4(d) of the NGA) [2] must contain information necessary to advise the Commission when a change in service has occurred. Section 7(d) of the NGA [3] authorizes the Commission to issue a temporary certificate in cases of emergency to assure maintenance of adequate service or to serve particular customers, without notice or hearing.

Respondents to the FERC–576 are encouraged to submit the reports by email to *pipelineoutage@ferc.gov* but also have the option of faxing the reports to the Director of the Division of Pipeline Certificates. 18 CFR 260.9(b) requires that a report of service interruption or damage to natural gas facilities state: (1) The location of the service interruption or damage to natural gas pipeline or storage facilities; (2) The nature of any damage to pipeline or storage facilities; (3) Specific

identification of the facilities damaged; (4) The time the service interruption or damage to the facilities occurred; (5) The customers affected by the service interruption or damage to the facilities; (6) Emergency actions taken to maintain service; and (7) Company contact and telephone number. The Commission may contact pipelines reporting damage or other pipelines to determine availability of supply, and if necessary, authorize transportation or construction of facilities to alleviate constraints in response to these reports.

A report required by 18 CFR 260.9(a)(1)(i) of damage to natural gas facilities resulting in loss of pipeline throughput or storage deliverability shall be reported to the Director of the Commission's Division of Pipeline Certificates at the earliest feasible time when pipeline throughput or storage deliverability has been restored.

In any instance in which an incident or damage report involving jurisdictional natural gas facilities is

required by Department of Transportation (DOT) reporting requirements under the Natural Gas Pipeline Safety Act of 1968, a copy of such report shall be submitted to the Director of the Commission's Division of Pipeline Certificates, within 30 days of the reportable incident.[4]

If the Commission failed to collect these data, it would lose the ability to monitor and evaluate transactions, operations, and reliability of interstate pipelines and perform its regulatory functions. These reports are kept by the Commission Staff as non-public information and are not made part of the public record.

*Type of Respondents:* Natural gas companies.

*Estimate of Annual Burden* [5]: The Commission estimates the annual public reporting burden for the information collection as:

FERC–576—REPORT OF SERVICE INTERRUPTIONS

|  | Number of respondents | Annual number of responses per respondent | Total number of responses | Average burden & cost per response [6] | Total annual burden hours & total annual cost | Cost per respondent ($) |
|---|---|---|---|---|---|---|
|  | (1) | (2) | (1) * (2) = (3) | (4) | (3) * (4) = (5) | (5) ÷ (1) |
| Submittal of Original Email/Fax ............... | 22 | 2 | 44 | 1 $72 | 44 $3,168 | 72 |
| Submittal of Damage Report ................... | 22 | 2 | 44 | 0.25 $18 | 11 $198 | 18 |
| Submittal of DOT Incident Report ........... | 22 | 1 | 22 | 0.25 $18 | 5.5 $99 | 18 |
| Total ................................................. | ...................... | ...................... | ...................... | ...................... | 60.5 $3,465 | 108 |

*Comments:* Comments are invited on: (1) Whether the collection of information is necessary for the proper performance of the functions of the Commission, including whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden and cost of the collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility and clarity of the information collection; and (4) ways to minimize the burden of the collection of information on those who are to respond, including the use

of automated collection techniques or other forms of information technology.

Dated: July 29, 2015.

**Kimberly D. Bose,**

*Secretary.*

[FR Doc. 2015–19058 Filed 8–3–15; 8:45 am]

**BILLING CODE 6717–01–P**

**ENVIRONMENTAL PROTECTION AGENCY**

[EPA–HQ–OAR–2015–0500; FRL–9931–68–OAR]

**Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of data availability (NODA); request for public comment.

[2] (15 U.S.C. 717c).

[3] (15 U.S.C. 717f).

[4] 18 CFR 260.9(d).

[5] The Commission defines burden as the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or

provide information to or for a Federal agency. For further explanation of what is included in the information collection burden, reference 5 Code of Federal Regulations 1320.3.

[6] The estimates for cost per response are derived using the following formula: Average Burden Hours

per Response * $72.00 per Hour = Average Cost per Response. The hourly cost figure comes from the FERC average salary ($149,489/year). Commission staff believes the FERC average salary to be representative wage for industry respondents.

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice that interstate ozone transport modeling and associated data and methods are available for public review and comment. These data and methods will be used to inform a rulemaking proposal that the EPA is developing and expects to release later this year to address interstate ozone transport for the 2008 ozone national ambient air quality standards (NAAQS). This notice also meets the EPA's expressed intent to update the air quality modeling data that were released on January 22, 2015, and to share the updated data with states and other stakeholders. The information available includes: (1) Emission inventories for 2011 and 2017, supporting data used to develop those emission inventories, methods and data used to process emission inventories into a form that can be used for air quality modeling; and (2) base year 2011 and projected 2017 ozone concentrations and projected 2017 ozone state contribution data at individual ozone monitoring sites based on air quality modeling, supporting data including 2009–2013 base period and 2017 projected ozone design values, and methods used to process air quality model outputs to calculate 2017 ozone concentrations and contributions at individual monitoring sites. A docket has been established to facilitate public review of the data and to track comments.

**DATES:** Comments must be received on or before September 23, 2015.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2015–0500, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments.

• *Fax:* (202)566–9744. Attention Docket ID No. EPA–HQ–OAR–2015–0500.

• *Mail:* EPA Docket Center, WJC West Building, Attention Docket ID No. EPA–HQ–OAR–2015–0500, U.S. Environmental Protection Agency, Mailcode: 28221T, 1200 Pennsylvania Ave. NW., Washington, DC 20460. Please include a total of 2 copies.

• *Hand Delivery:* U.S. Environmental Protection Agency, WJC West Building, 1301 Constitution Avenue NW., Room 3334, Washington, DC 20004, Attention Docket ID No. EPA–HQ–OAR–2015–0500. Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.

*Instructions:* Direct your comments to Docket ID No. EPA–HQ–OAR–2015–0500. The EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. Clearly mark the part or all of the information that you claim to be CBI. For CBI information on a disk or CD–ROM that you mail to the EPA docket office, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket.

The *www.regulations.gov* Web site is an "anonymous access" system, which means the EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to the EPA without going through *www.regulations.gov,* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, the EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If the EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, the EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses.

When submitting comments, remember to:

1. Identify the notification by docket number and other identifying information (subject heading, **Federal Register** date and page number).

2. Explain your comments, why you agree or disagree; suggest alternatives and substitute data that reflect your requested changes.

3. Describe any assumptions and provide any technical information and/or data that you used.

4. Provide specific examples to illustrate your concerns, and suggest alternatives.

5. Explain your views as clearly as possible, avoiding the use of profanity or personal threats.

6. Make sure to submit your comments by the comment period deadline identified.

For additional information about the EPA's public docket, visit the EPA Docket Center homepage at *http://www.epa.gov/epahome/dockets.htm.*

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, WJC West Building, Room 3334, 1301 Constitution Ave. NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions on the emissions data and on how to submit comments on the emissions data and related methodologies, contact Alison Eyth, Air Quality Assessment Division, Environmental Protection Agency, C339–02, 109 T.W. Alexander Drive, Research Triangle Park, NC 27709; telephone number: (919)541–2478; fax number: (919)541–1903; email: *eyth.alison@epa.gov.* For questions on the air quality modeling and ozone contributions and how to submit comments on the air quality modeling data and related methodologies, contact Norm Possiel, Air Quality Assessment Division, Environmental Protection Agency, C439–01, 109 T.W. Alexander Drive, Research Triangle Park, NC 27709; telephone number: (919)541–5692; fax number: (919)541–0044; email: *possiel.norm@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

On January 22, 2015, the EPA issued a memo and preliminary air quality modeling data that would help states as

they develop State Implementation Plans to address cross-state transport of air pollution under the "Good Neighbor" Provision of the Clean Air Act (CAA), section 110(a)(2)(D)(i)(I), as it pertains to the 2008 ozone NAAQS.[1] That information included the EPA's preliminary air quality modeling data that applies the Cross-State Air Pollution Rule (CSAPR—76 FR 48208) approach to contribution projections for the year 2018 for the 2008 8-hour ozone NAAQS. Specifically, the EPA provided data identifying ozone monitoring sites that are projected to be nonattainment or have maintenance problems for the 2008 ozone NAAQS in 2018. The EPA also provided the projected contribution estimates from 2018 anthropogenic oxides of nitrogen ($NO_X$) and volatile organic compound (VOC) emissions in each state to ozone concentrations at each of these sites. The year 2018 was used as the analytic year for the preliminary modeling because at the onset of the modeling assessment, that year aligned with the December 2018 attainment date for Moderate ozone nonattainment areas. However, subsequent to the completion of the 2018 modeling, the EPA issued the final 2008 Ozone NAAQS SIP Requirements Rule,[2] which revised the attainment deadline for ozone nonattainment areas currently designated as Moderate for the 2008 ozone NAAQS to July 2018. The EPA established this deadline in the 2015 Ozone SIP Requirements Rule after previously establishing a deadline of December 31, 2018, that was vacated by the DC Circuit in *Natural Resources Defense Council* v. *EPA*. In order to demonstrate attainment by the revised attainment deadline, the demonstration would have to be based on design values calculated using 2015 through 2017 ozone season data, since the July 2018 deadline does not afford a full ozone season of measured data. Therefore, the EPA has adopted 2017 as the analytic year for the updated ozone transport modeling information being released as part of this NODA.

The 2011 and 2018 emissions inventory data used for the preliminary air quality modeling were released for public review on November 27, 2013 (78 FR 70935), and January 14, 2014 (79 FR 2437), respectively. Based in part on comments received from the public

review process, the EPA updated the 2011 emissions inventory data, developed emissions inventory data for 2017, and used these data in air quality modeling to develop updated projections of future year ozone concentrations and contributions.

In the January 22, 2015 memo, the EPA expressed its intent to update the preliminary air quality modeling data and to share the updated data with states and other stakeholders. This notice meets this intent. Additionally, the EPA, together with its state partners, is assessing the next steps to address interstate air pollution transport for the 2008 ozone NAAQS under the CAA. The EPA recognizes its backstop role to develop and promulgate federal implementation plans, as appropriate. We are planning to take this action, if necessary, by issuing a proposal for a federal rule later this year. This notice provides an opportunity to review and comment on the agency's ozone transport modeling data that EPA intends to use in this forthcoming proposal.

## II. Air Quality Modeling Data and Methodologies

Using the updated emissions inventories, the EPA performed photochemical air quality modeling to project ozone concentrations at air quality monitoring sites to 2017, and to estimate state-by-state contributions to those 2017 concentrations. We then used the air quality modeling results to identify nonattainment or maintenance sites for the 2008 ozone NAAQS in 2017, consistent with the CSAPR approach to identify such sites. We used the contribution information to quantify projected interstate contributions from emissions in each upwind state to ozone concentrations at each of the projected 2017 nonattainment and maintenance sites in downwind states.

The EPA's air quality modeling used the updated version of the 2011-based air quality modeling platform. This platform includes emissions for the 2011 base year and a 2017 future base case as well as meteorology for 2011. The 2011 meteorology was used in air quality model simulations for both 2011 and 2017. The 2011 and 2017 emissions data are described in more detail in Section III.

The EPA used the Comprehensive Air Quality Model with Extensions (CAMx version 6.11) for modeling the 2011 base year and 2017 future base case emissions scenarios to identify sites with projected nonattainment and maintenance problems in 2017. The air quality model runs were performed for a modeling domain that covers the 48

states in the contiguous U.S. along with adjacent portions of Canada and Mexico. The spatial resolution (*i.e.*, grid size) for this modeling domain is 12 km x 12 km. The 2011 and 2017 scenarios were both modeled for the full year with 2011 meteorology. The meteorological data used as input to the air quality modeling was obtained from an annual simulation of version 3.4 of the Weather Research Forecast Model (WRF) for 2011. The initial and boundary concentration inputs to the air quality modeling were derived from an annual simulation of the Goddard Earth Observing System global chemical transport model (GEOS-Chem). The CAMx predictions for 2011 were compared to corresponding measurements as part of a model performance evaluation. Information on the development of the 2011 meteorological and initial and boundary concentration inputs to the CAMx simulations and the model performance evaluation methodologies and results are described in the "Updated Air Quality Modeling Technical Support Document" (AQM TSD) for the 2008 Ozone NAAQS Interstate Transport Assessment, which is available in the docket for this notice. Also in this docket is a report on the performance evaluation for the annual 2011 WRF meteorological model simulation.

### A. Identification of Projected 2017 Nonattainment and Maintenance Sites

The ozone predictions from the 2011 and 2017 CAMx model runs were used to project measured ozone design values to 2017 following the approach described in the EPA's draft guidance for attainment demonstration modeling.[3] We selected 2011 as the base year to reflect the most recent National Emissions Inventory (NEI). In addition, the meteorological conditions during the summer of 2011 were generally conducive for ozone formation across much of the U.S., particularly the eastern U.S. We selected 2017 as the projected analysis year to coincide with the attainment date for Moderate nonattainment areas under the 2008 ozone NAAQS. The draft attainment modeling guidance recommends using 5-year weighted average ambient design values[4] centered on the base year as the starting point for projecting design values to the future. Because 2011 is the

[1] Memorandum from Stephen D. Page, Information on the Interstate Transport "Good Neighbor" Provision for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) under CAA section 110(a)(2)(D)(i)(I), January 22, 2015, *available at http://www.epa.gov/airtransport/Good NeighborProvision2008NAAQS.pdf*.

[2] 80 FR 12264, 12268 (Mar. 6, 2015); 40 CFR 51.1103.

[3] The December 3, 2014, draft ozone, fine particulate matter and regional haze SIP modeling guidance is available at *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3–PM–RH_Modeling_Guidance-2014.pdf*.

[4] The air quality design value for a site is the 3-year average annual fourth-highest daily maximum 8-hour average ozone concentration.

**46274**    **Federal Register** / Vol. 80, No. 149 / Tuesday, August 4, 2015 / Notices

base year of emissions, we started with the average ambient 8-hour ozone design values for the period 2009 through 2013 (*i.e.*, the average of design values for 2009–2011, 2010–2012, and 2011–2013). The 5-year weighted average ambient design value at each site was projected to 2017 using model-predicted Relative Response Factors (RRFs) [5] that were calculated based on procedures described in the draft attainment demonstration modeling guidance. The 2017 projected average ozone design values were evaluated to identify those sites with design values that exceed the 2008 ozone NAAQS.[6] Consistent with the approach used in CSAPR, those sites with 2017 average design values that exceed the NAAQS

are projected to be in nonattainment in 2017.

As noted above, we followed the CSAPR approach to identify sites with projected maintenance problems in 2017. As part of the approach for identifying sites with projected future maintenance problems, the highest (*i.e.*, maximum) ambient design value from the 2011-centered 5-year period (*i.e.*, the maximum of design values from 2009–2011, 2010–2012, and 2011–2013) was projected to 2017 for each site using the site-specific RRFs. Following the CSAPR approach, monitoring sites with a maximum design value that exceeds the NAAQS, even if the average design value is below the NAAQS, are projected to have a maintenance problem in 2017. In this regard,

nonattainment sites are also maintenance sites because the maximum design value at nonattainment sites is always greater than or equal to the 5-year weighted average. Monitoring sites with a 2017 average design value below the NAAQS, but with a maximum design value that exceeds the NAAQS, are considered maintenance-only sites. These sites are projected to have a maintenance problem, but not a nonattainment problem in 2017.

The base period ambient and projected 2017 average and maximum design values at individual nonattainment sites and maintenance-only sites are provided in Tables 1 and 2, respectively.

TABLE 1—2009–2013 AND 2017 AVERAGE AND MAXIMUM DESIGN VALUES AT PROJECTED NONATTAINMENT SITES IN THE EAST (TOP) AND WEST (BOTTOM)

[Units are ppb]

| Monitor ID | State | County | 2009–2013 average design value | 2009–2013 maximum design value | 2017 average design value | 2017 maximum design value |
|---|---|---|---|---|---|---|
| 90013007 ........... | Connecticut ....................... | Fairfield ............................. | 84.3 | 89.0 | 77.1 | 81.4 |
| 90019003 ........... | Connecticut ....................... | Fairfield ............................. | 83.7 | 87.0 | 78.0 | 81.1 |
| 90099002 ........... | Connecticut ....................... | New Haven ........................ | 85.7 | 89.0 | 77.2 | 80.2 |
| 240251001 ......... | Maryland ........................... | Harford .............................. | 90.0 | 93.0 | 81.3 | 84.0 |
| 360850067 ......... | New York ........................... | Richmond .......................... | 81.3 | 83.0 | 76.3 | 77.8 |
| 361030002 ......... | New York ........................... | Suffolk .............................. | 83.3 | 85.0 | 79.2 | 80.8 |
| 390610006 ......... | Ohio .................................. | Hamilton ............................ | 82.0 | 85.0 | 76.3 | 79.1 |
| 480391004 ......... | Texas ................................ | Brazoria ............................ | 88.0 | 89.0 | 81.4 | 82.3 |
| 481210034 ......... | Texas ................................ | Denton .............................. | 84.3 | 87.0 | 76.9 | 79.4 |
| 482011034 ......... | Texas ................................ | Harris ................................ | 81.0 | 82.0 | 76.8 | 77.8 |
| 482011039 ......... | Texas ................................ | Harris ................................ | 82.0 | 84.0 | 78.2 | 80.2 |
| 484392003 ......... | Texas ................................ | Tarrant .............................. | 87.3 | 90.0 | 79.6 | 82.1 |
| 484393009 ......... | Texas ................................ | Tarrant .............................. | 86.0 | 86.0 | 78.6 | 78.6 |
| 551170006 ......... | Wisconsin .......................... | Sheboygan ........................ | 84.3 | 87.0 | 77.0 | 79.4 |
| 60190007 ........... | California ........................... | Fresno ............................... | 94.7 | 95.0 | 89.0 | 89.3 |
| 60190011 ........... | California ........................... | Fresno ............................... | 93.0 | 96.0 | 87.6 | 90.4 |
| 60190242 ........... | California ........................... | Fresno ............................... | 91.7 | 95.0 | 87.1 | 90.3 |
| 60194001 ........... | California ........................... | Fresno ............................... | 90.7 | 92.0 | 84.2 | 85.4 |
| 60195001 ........... | California ........................... | Fresno ............................... | 97.0 | 99.0 | 90.6 | 92.5 |
| 60251003 ........... | California ........................... | Imperial ............................. | 81.0 | 82.0 | 79.3 | 80.3 |
| 60290007 ........... | California ........................... | Kern .................................. | 91.7 | 96.0 | 86.2 | 90.2 |
| 60290008 ........... | California ........................... | Kern .................................. | 86.3 | 88.0 | 80.6 | 82.2 |
| 60290011 ........... | California ........................... | Kern .................................. | 80.0 | 81.0 | 76.2 | 77.1 |
| 60290014 ........... | California ........................... | Kern .................................. | 87.7 | 89.0 | 82.8 | 84.0 |
| 60290232 ........... | California ........................... | Kern .................................. | 87.3 | 89.0 | 82.2 | 83.8 |
| 60295002 ........... | California ........................... | Kern .................................. | 90.0 | 91.0 | 84.5 | 85.5 |
| 60296001 ........... | California ........................... | Kern .................................. | 84.3 | 86.0 | 79.7 | 81.3 |
| 60311004 ........... | California ........................... | Kings ................................ | 87.0 | 90.0 | 81.1 | 83.9 |
| 60370002 ........... | California ........................... | Los Angeles ...................... | 80.0 | 82.0 | 79.0 | 81.0 |
| 60370016 ........... | California ........................... | Los Angeles ...................... | 94.0 | 97.0 | 92.8 | 95.8 |
| 60371002 ........... | California ........................... | Los Angeles ...................... | 80.0 | 81.0 | 77.1 | 78.1 |
| 60371201 ........... | California ........................... | Los Angeles ...................... | 90.0 | 90.0 | 87.9 | 87.9 |
| 60371701 ........... | California ........................... | Los Angeles ...................... | 84.0 | 85.0 | 82.2 | 83.2 |
| 60372005 ........... | California ........................... | Los Angeles ...................... | 79.5 | 82.0 | 78.1 | 80.6 |
| 60376012 ........... | California ........................... | Los Angeles ...................... | 97.3 | 99.0 | 94.5 | 96.2 |
| 60379033 ........... | California ........................... | Los Angeles ...................... | 90.0 | 91.0 | 86.0 | 86.9 |
| 60392010 ........... | California ........................... | Madera .............................. | 85.0 | 86.0 | 79.8 | 80.8 |
| 60470003 ........... | California ........................... | Merced .............................. | 82.7 | 84.0 | 78.1 | 79.3 |
| 60610006 ........... | California ........................... | Placer ............................... | 84.0 | 86.0 | 78.2 | 80.0 |

[5] In brief, the RRF for a particular location is the ratio of the 2017 ozone model prediction to the 2011 ozone model prediction. The RRFs were calculated using model outputs for the May through September period.

[6] In determining compliance with the NAAQS, ozone design values are truncated to integer values. For example, a design value of 75.9 ppb is truncated to 75 ppb which is attainment. In this manner, design values at or above 76.0 ppb are considered nonattainment.

TABLE 1—2009–2013 AND 2017 AVERAGE AND MAXIMUM DESIGN VALUES AT PROJECTED NONATTAINMENT SITES IN THE EAST (TOP) AND WEST (BOTTOM)—Continued

[Units are ppb]

| Monitor ID | State | County | 2009–2013 average design value | 2009–2013 maximum design value | 2017 average design value | 2017 maximum design value |
|---|---|---|---|---|---|---|
| 60650004 | California | Riverside | 85.0 | 85.0 | 82.3 | 82.3 |
| 60650012 | California | Riverside | 97.3 | 99.0 | 93.5 | 95.1 |
| 60651016 | California | Riverside | 100.7 | 101.0 | 95.7 | 96.0 |
| 60652002 | California | Riverside | 84.3 | 85.0 | 79.8 | 80.5 |
| 60655001 | California | Riverside | 92.3 | 93.0 | 87.6 | 88.2 |
| 60656001 | California | Riverside | 94.0 | 98.0 | 88.1 | 91.9 |
| 60658001 | California | Riverside | 97.0 | 98.0 | 93.3 | 94.3 |
| 60658005 | California | Riverside | 92.7 | 94.0 | 89.2 | 90.4 |
| 60659001 | California | Riverside | 88.3 | 91.0 | 82.7 | 85.2 |
| 60670012 | California | Sacramento | 93.3 | 95.0 | 85.7 | 87.3 |
| 60675003 | California | Sacramento | 86.3 | 88.0 | 80.5 | 82.0 |
| 60710005 | California | San Bernardino | 105.0 | 107.0 | 103.6 | 105.6 |
| 60710012 | California | San Bernardino | 95.0 | 97.0 | 91.8 | 93.8 |
| 60710306 | California | San Bernardino | 83.7 | 85.0 | 81.2 | 82.4 |
| 60711004 | California | San Bernardino | 96.7 | 98.0 | 94.3 | 95.6 |
| 60712002 | California | San Bernardino | 101.0 | 103.0 | 99.5 | 101.5 |
| 60714001 | California | San Bernardino | 94.3 | 97.0 | 92.3 | 95.0 |
| 60714003 | California | San Bernardino | 105.0 | 107.0 | 101.8 | 103.8 |
| 60719002 | California | San Bernardino | 92.3 | 94.0 | 88.0 | 89.6 |
| 60719004 | California | San Bernardino | 98.7 | 99.0 | 95.7 | 96.0 |
| 60731006 | California | San Diego | 81.0 | 82.0 | 76.6 | 77.6 |
| 60990006 | California | Stanislaus | 87.0 | 88.0 | 83.0 | 83.9 |
| 61070006 | California | Tulare | 81.7 | 85.0 | 77.0 | 80.1 |
| 61070009 | California | Tulare | 94.7 | 96.0 | 87.3 | 88.5 |
| 61072002 | California | Tulare | 85.0 | 88.0 | 78.6 | 81.4 |
| 61072010 | California | Tulare | 89.0 | 90.0 | 82.7 | 83.6 |
| 61112002 | California | Ventura | 81.0 | 83.0 | 78.3 | 80.2 |
| 80350004 | Colorado | Douglas | 80.7 | 83.0 | 76.0 | 78.1 |
| 80590006 | Colorado | Jefferson | 80.3 | 83.0 | 76.3 | 78.8 |

TABLE 2—2009–2013 AND 2017 AVERAGE AND MAXIMUM DESIGN VALUES AT PROJECTED MAINTENANCE-ONLY SITES IN THE EAST (TOP) AND WEST (BOTTOM)

[Units are ppb]

| Monitor ID | State | County | 2009–2013 average design value | 2009–2013 maximum design value | 2017 average design value | 2017 maximum design value |
|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 80.3 | 83.0 | 75.8 | 78.4 |
| 211110067 | Kentucky | Jefferson | 82.0 | 85.0 | 75.8 | 78.6 |
| 211850004 | Kentucky | Oldham | 82.0 | 86.0 | 73.7 | 77.3 |
| 240053001 | Maryland | Baltimore | 80.7 | 84.0 | 73.2 | 76.2 |
| 260050003 | Michigan | Allegan | 82.7 | 86.0 | 75.5 | 78.5 |
| 261630019 | Michigan | Wayne | 78.7 | 81.0 | 74.0 | 76.2 |
| 340071001 | New Jersey | Camden | 82.7 | 87.0 | 74.2 | 78.1 |
| 340150002 | New Jersey | Gloucester | 84.3 | 87.0 | 75.1 | 77.5 |
| 340230011 | New Jersey | Middlesex | 81.3 | 85.0 | 73.0 | 76.3 |
| 340290006 | New Jersey | Ocean | 82.0 | 85.0 | 73.9 | 76.6 |
| 360810124 | New York | Queens | 78.0 | 80.0 | 75.7 | 77.6 |
| 420031005 | Pennsylvania | Allegheny | 80.7 | 82.0 | 75.3 | 76.5 |
| 421010024 | Pennsylvania | Philadelphia | 83.3 | 87.0 | 75.1 | 78.4 |
| 480850005 | Texas | Collin | 82.7 | 84.0 | 74.9 | 76.0 |
| 481130069 | Texas | Dallas | 79.7 | 84.0 | 74.0 | 78.0 |
| 481130075 | Texas | Dallas | 82.0 | 83.0 | 75.8 | 76.7 |
| 481211032 | Texas | Denton | 82.7 | 84.0 | 75.1 | 76.3 |
| 482010024 | Texas | Harris | 80.3 | 83.0 | 75.9 | 78.5 |
| 482010026 | Texas | Harris | 77.3 | 80.0 | 73.5 | 76.1 |
| 482010055 | Texas | Harris | 81.3 | 83.0 | 75.4 | 77.0 |
| 482011050 | Texas | Harris | 78.3 | 80.0 | 74.6 | 76.2 |
| 484390075 | Texas | Tarrant | 82.0 | 83.0 | 75.5 | 76.4 |
| 484393011 | Texas | Tarrant | 80.7 | 83.0 | 74.5 | 76.6 |
| 40131004 | Arizona | Maricopa | 79.7 | 81.0 | 75.0 | 76.2 |
| 60170020 | California | El Dorado | 82.7 | 84.0 | 75.1 | 76.3 |
| 60390004 | California | Madera | 79.3 | 81.0 | 75.3 | 76.9 |
| 60610003 | California | Placer | 83.0 | 85.0 | 75.4 | 77.2 |

TABLE 2—2009–2013 AND 2017 AVERAGE AND MAXIMUM DESIGN VALUES AT PROJECTED MAINTENANCE-ONLY SITES IN THE EAST (TOP) AND WEST (BOTTOM)—Continued

[Units are ppb]

| Monitor ID | State | County | 2009–2013 average design value | 2009–2013 maximum design value | 2017 average design value | 2017 maximum design value |
|---|---|---|---|---|---|---|
| 60670006 .......... | California ............................ | Sacramento ........................ | 78.7 | 81.0 | 74.0 | 76.1 |
| 60773005 .......... | California ............................ | San Joaquin ....................... | 79.0 | 80.0 | 75.9 | 76.8 |
| 80050002 .......... | Colorado ............................. | Arapahoe ............................ | 76.7 | 79.0 | 74.4 | 76.6 |
| 80590011 .......... | Colorado ............................. | Jefferson ............................ | 78.7 | 82.0 | 75.8 | 78.9 |

## B. Quantification of Interstate Ozone Contributions

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/ Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[7] to quantify the contribution of 2017 base case $NO_X$ and VOC emissions from all sources in each state to projected 2017 ozone concentrations at each air quality monitoring site. In the source apportionment model run, we tracked the ozone formed from each of the following contribution categories (i.e., "tags"):

• States—anthropogenic $NO_X$ and VOC emissions from each state tracked individually (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic $NO_X$ and VOC emissions domain-wide (i.e., not by state);

• Boundary Concentrations— concentrations transported into the modeling domain;

• Tribes—the emissions from those tribal lands for which we have point

source inventory data in the 2011 NEI (we did not model the contributions from individual tribes);

• Canada and Mexico— anthropogenic emissions from sources in the portions of Canada and Mexico included in the modeling domain (we did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires; and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms.

The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the 2017 future base case emissions and 2011 meteorology for this time period. The hourly contributions[8] from each tag were processed to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2017 model simulation. This step was performed for those model grid cells containing monitoring sites in order to obtain 8-hour average contributions for each day at the location of each site. The model-predicted contributions were then

applied in a relative sense to quantify the contributions to the 2017 average design value at each site. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD.

The average contribution metric is intended to provide a reasonable representation of the contribution from individual states to the projected 2017 design value, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations in the vicinity of the monitoring site. An average contribution metric constructed in this manner is beneficial since the magnitude of the contributions is directly related to the magnitude of the design value at each site.

The resulting 2017 contributions from each tag to each monitoring site are provided in the AQM TSD. The largest contributions from each state to projected 2017 downwind nonattainment sites and to projected downwind maintenance-only sites are provided in Table 3.

TABLE 3—LARGEST OZONE CONTRIBUTIONS FROM EACH STATE TO DOWNWIND 2017 PROJECTED NONATTAINMENT AND TO 2017 PROJECTED MAINTENANCE-ONLY SITES

[Units are ppb]

| Upwind state | Largest contribution to a 2017 nonattainment site in downwind states | Largest contribution to a 2017 maintenance-only site in downwind states |
|---|---|---|
| Alabama ................................................................................................................. | 0.79 | 1.28 |
| Arizona .................................................................................................................. | 1.78 | 0.41 |
| Arkansas ............................................................................................................... | 1.24 | 2.15 |
| California ............................................................................................................... | 1.75 | 3.44 |
| Colorado ............................................................................................................... | 0.36 | 0.34 |
| Connecticut ........................................................................................................... | 0.46 | 0.41 |
| Delaware ............................................................................................................... | 0.68 | 2.23 |
| District of Columbia .............................................................................................. | 0.73 | 0.64 |
| Florida ................................................................................................................... | 0.57 | 0.72 |
| Georgia ................................................................................................................. | 0.58 | 0.56 |
| Idaho ..................................................................................................................... | 0.23 | 0.35 |

---

[7] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

[8] Contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net

contribution from $NO_X$ and VOC anthropogenic emissions in each state.

TABLE 3—LARGEST OZONE CONTRIBUTIONS FROM EACH STATE TO DOWNWIND 2017 PROJECTED NONATTAINMENT AND TO 2017 PROJECTED MAINTENANCE-ONLY SITES—Continued

[Units are ppb]

| Upwind state | Largest contribution to a 2017 nonattainment site in downwind states | Largest contribution to a 2017 maintenance-only site in downwind states |
|---|---|---|
| Illinois | 17.48 | 23.17 |
| Indiana | 7.15 | 14.95 |
| Iowa | 0.61 | 0.85 |
| Kansas | 0.80 | 1.03 |
| Kentucky | 11.17 | 2.14 |
| Louisiana | 3.81 | 4.23 |
| Maine | 0.00 | 0.08 |
| Maryland | 2.39 | 7.11 |
| Massachusetts | 0.10 | 0.37 |
| Michigan | 2.69 | 1.79 |
| Minnesota | 0.40 | 0.47 |
| Mississippi | 0.78 | 1.48 |
| Missouri | 1.63 | 3.69 |
| Montana | 0.15 | 0.17 |
| Nebraska | 0.51 | 0.36 |
| Nevada | 0.84 | 0.73 |
| New Hampshire | 0.02 | 0.07 |
| New Jersey | 12.38 | 11.48 |
| New Mexico | 1.05 | 0.54 |
| New York | 16.96 | 17.21 |
| North Carolina | 0.55 | 0.93 |
| North Dakota | 0.14 | 0.28 |
| Ohio | 3.99 | 7.92 |
| Oklahoma | 1.70 | 2.46 |
| Oregon | 0.65 | 0.65 |
| Pennsylvania | 13.51 | 15.93 |
| Rhode Island | 0.02 | 0.08 |
| South Carolina | 0.19 | 0.21 |
| South Dakota | 0.08 | 0.12 |
| Tennessee | 1.67 | 0.90 |
| Texas | 2.44 | 2.95 |
| Utah | 1.59 | 1.66 |
| Vermont | 0.01 | 0.05 |
| Virginia | 5.29 | 4.70 |
| Washington | 0.22 | 0.09 |
| West Virginia | 2.99 | 3.11 |
| Wisconsin | 0.56 | 2.59 |
| Wyoming | 1.22 | 1.22 |

In CSAPR, the EPA used a contribution screening threshold of 1 percent of the NAAQS to identify upwind states in the eastern U.S. that may significantly contribute to downwind nonattainment and/or maintenance problems and which warrant further analysis. The EPA will take comment on the appropriate threshold to be applied for purposes of the 2008 ozone NAAQS in the upcoming rulemaking proposal to address interstate ozone transport for that standard. The EPA is not proposing or taking comment on this threshold as part of this NODA.

*C. Air Quality Modeling Information Available for Public Comment*

The EPA is requesting comment on the components of the 2011 air quality modeling platform, the air quality model applications and model performance evaluation, and the projected 2017 ozone design value concentrations and contribution data. The EPA is also seeking comment on the methodology for calculating contributions at individual monitoring sites. The EPA encourages all states and sources to review and comment on the information provided in this NODA.

The EPA has placed key information related to the air quality modeling into the electronic docket for this notice (EPA–HQ–OAR–2015–0500) which is available at *www.regulations.gov*. This includes the AQM TSD, an Excel file which contains the 2009–2013 base period and 2017 projected average and maximum ozone design values at individual monitoring sites, and an Excel file with the ozone contributions from each state and all other source tags

to each monitoring site. However, the air quality modeling input and output data files are too large to be directly uploaded into the electronic docket and/or are not in formats accepted by that docket. These air quality modeling files have been placed on a data drive in the docket office. Electronic copies of the non-emissions air quality modeling input files and the air quality modeling output files can also be obtained prior to the end of the comment period by contacting Norm Possiel at *possiel.norm@epa.gov*. A detailed description of the 2011 and 2017 emissions data and procedures for accessing and commenting on these data are provided below.

**III. Emissions Data and Methodologies**

The EPA is requesting comment on the updated 2011 and 2017 emission

inventories; supporting ancillary files used to allocate emissions temporally, spatially, and by emissions species; and on the emissions modeling methods used to develop the emission inventories, including but not restricted to, the activity data, model input databases, and the projection, control, and closure data used to develop projected 2017 emissions. Summaries of the emission inventories are provided to aid in the review of the data, but comments are sought on the actual inventories, model inputs, data, and methods used to develop the projected emissions.

*A. Instructions for Submitting Emissions Comments and Alternative Emissions Data*

The EPA can most effectively use comments on emissions data that provide specific alternative values to those in the EPA data sets, and for which accompanying documentation supports the alternative values. Commenters should provide the alternative data at a level of detail appropriate to the data set into which it will be incorporated, thereby including all key fields needed to substitute the old data with the new. For example, any data provided as an alternative to the EPA's point source emissions data should include all key fields used to identify point source data such as facility, unit, release point, process, and pollutant, along with alternative emissions values. If a commenter were to provide a new set of county total emissions as an alternative to detailed point source emissions data, the EPA would not be able to use that new data. Commenters should also include documentation that describes methods for development of any alternative values and relevant references supporting the alternative approach.

Any alternative emission inventory or ancillary data provided should be compatible with the formats used by the Sparse Matrix Operator Kernel Emissions (SMOKE) modeling system version 3.6.5, which is used by the EPA to process emission inventories into a format that can be used for air quality modeling. Formats are defined in the SMOKE Version 3.6.5 User's Manual available from *http://www.cmascenter.org/smoke/*. Only the rows of data that have changed from those provided by the EPA should be included in the alternative data sets. Alternative data that are not an input to SMOKE, such as model input databases for mobile source models, should be provided in a format in which it could be directly input to the model.

Commenters wishing to comment on inventory projection methods should submit to the docket comments that describe an alternative approach to the existing methods, along with documentation describing why that method is an improvement over the existing method.

*B. Emissions Information Available for Public Comment*

The released data include emission inventories that represent projected emissions into the atmosphere of criteria and some hazardous air pollutants in the years 2011 and 2017, additional ancillary data files that are used to convert the NEI emissions into a form that can be used for air quality modeling, and methods used to prepare the air quality model inputs and to develop projections of emissions for the year 2017. The platform includes emission inventories for sources at specific locations called point sources; emissions from fire events; and county-level emissions of onroad mobile sources, nonroad mobile sources, and nonpoint stationary sources.

The provided emission inventories are split into categories called modeling sectors. For example, facility-specific point emission sources are split into electric generating units (EGUs), oil and gas point sources, and other point sources. Nonpoint emission sources are split into agricultural ammonia sources, area fugitive dust sources, non-Category 3 commercial marine and locomotive sources, residential wood sources, oil and gas nonpoint sources, agricultural burning sources, and other nonpoint sources. Additional modeling sectors are onroad and nonroad mobile sources, Category 3 commercial marine sources, and emissions from wild and prescribed fires.

The emission inventories for the future year of 2017 have been developed using projection methods that are specific to the type of emission source. Future emissions are projected from the 2011 base case either by running models to estimate future year emissions from specific types of emission sources (*i.e.,* EGUs, and onroad and nonroad mobile sources), or for other types of sources by adjusting the base year emissions according to the best estimate of changes expected to occur in the intervening years (*i.e.,* non-EGU point and nonpoint sources).

For some sectors, the same emissions are used in the base and future years, such as biogenic emissions, wild and prescribed fire emissions, and Canadian emissions. For all other sectors, rules and specific legal obligations that go into effect in the intervening years,

along with changes in activity for the sector, are considered when possible. Documentation of the methods used for each sector is provided in the TSD *Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform,* which can be found in the docket for this notice.

Emission projections for EGUs for 2017 were developed using the Integrated Planning Model (IPM). The National Electric Energy Data System (NEEDS) database contains the generation unit records used for the model plants that represent existing and planned/committed units in EPA modeling applications of IPM. The NEEDS database includes basic geographic, operating, air emissions, and other data on these generating units and is updated for the EPA's version 5.14 power sector modeling platform. The EGU emission projections included in this data release are reported in an air quality modeling-ready flat file taken from the EPA Base Case v.5.14, developed using IPM. The 2017 EGU emission projections in the flat file format, the corresponding NEEDS database, and user guides and documentation are available in the docket for this notice, and at *http://www.epa.gov/powersectormodeling.*

To project future emissions from onroad and nonroad mobile sources, the EPA uses the Motor Vehicle Emissions Simulator (MOVES) and the National Mobile Inventory Model (NMIM), respectively. Development of the future year onroad and nonroad emissions requires a substantial amount of lead time and resources. The EPA had already prepared the emissions projections for 2018 when the attainment deadline for Moderate nonattainment areas was revised to July 2018 in the 2008 Ozone SIP Requirements Rule, as discussed above, effectively requiring the agency to adjust its projection year to 2017. Thus, for purposes of this NODA, the EPA calculated the 2017 emissions from mobile sources using post-modeling adjustments to 2018 emissions, but the agency anticipates that it will directly generate the mobile source emissions for 2017 that will be used in the air quality modeling for the final rule to address interstate transport for the 2008 ozone standard. The EPA obtained 2018 projections by running the MOVES and NMIM models using year-specific information about fuel mixtures, activity data, and the impacts of national and state-level rules and control programs. The input databases and future year activity data for onroad mobile sources are provided with the 2011v6.2 platform available at *http://www.epa.gov/ttn/*

chief/emch/index.html#2011. The 2018 onroad and nonroad mobile source emissions were adjusted for 2017 using factors derived from national scale runs of MOVES and NMIM, respectively.

For non-EGU point and nonpoint sources, projections of 2017 emissions were developed by starting with the 2011 emissions inventories and applying adjustments that represent the impact of national, state, and local rules coming into effect in the years 2012 through 2017, along with the impacts of planned shutdowns, the construction of new plants, specific information provided by states, and specific legal obligations resolving alleged environmental violations, such as consent decrees. Changes in activity are considered for sectors such as oil and gas, residential wood combustion, cement kilns, livestock, aircraft, commercial marine vessels and locomotives. Data files that include factors that represent the changes are provided, along with summaries that quantify the emission changes resulting from the projections at a state and national level.

The provided data include relevant emissions inventories for neighboring countries used in our modeling, specifically the 2010 emissions inventories for Canada and the 2008 and 2018 emissions inventories for Mexico. Canadian emissions for a future year were not available.

Ancillary data files used to allocate annual emissions to the hourly, gridded emissions of chemical species used by the air quality model are also provided. The types of ancillary data files include temporal profiles that allocate annual and monthly emissions down to days and hours, spatial surrogates that allocate county-level emissions onto the grid cells used by the AQM, and speciation profiles that allocate the pollutants in the NEI to the chemical species used by the air quality model. In addition, there are temporal, spatial, and speciation cross-reference files that map the emission sources in the emission inventories to the appropriate profiles based on their location, emissions source classification code (SCC), and, in some cases, the specific facility or unit. With the exception of some speciation profiles and temporal profiles for EGUs and mobile sources, the same ancillary data files are used to prepare the 2011 and 2017 emissions inventories for air quality modeling.

Information related to this section is located in the docket. However, as mentioned above, some of the emissions data files are too large to be directly uploaded into the electronic docket and/or are not in formats accepted by

that docket. Therefore, the information placed in the electronic docket, associated detailed data, and summaries to help with interpretation of the data are available for public review with the 2011v6.2 platform available on the Emissions Modeling Clearinghouse on the EPA's Web site at *http:// www.epa.gov/ttn/chief/emch/ index.html#2011.* Requests for electronic copies of pre-merged, intermediate and air quality model-ready emissions files for input to air quality modeling can be obtained by contacting Alison Eyth at *eyth.alison@ epa.gov.*

The emissions inventories, along with many of the ancillary files, are provided in the form of flat files that can be input to SMOKE. Flat files are comma-separated values-style text files with columns and rows that can be loaded into spreadsheet or database software. The columns of interest in the emission inventory files are specified in each subsection below. The EPA specifically requests comment on the following components of the provided emissions modeling inventories and ancillary files:

• *Emissions values and supporting data for EGUs.* The EPA requests comment on the IPM version 5.14 input assumptions, NEEDS database, 2018 unit-level parsed files because 2017 parsed files are not available, 2017 flat file inputs and outputs (including modifications to the IPM 2018 Base Case to inform 2017 $NO_X$ emissions), temporal profiles use to allocate seasonal emissions to hours, and cross references and matching between IPM and NEI.

• *Emission values for non-EGU sources.* The EPA requests comment on the criteria air pollutant projected 2017 emissions in the modeling inventories, such as $NO_X$, VOC, sulfur dioxide, particulate matter less than 2.5 micrometers, particulate matter less than 10 micrometers, and ammonia, with a focus on the ozone precursors $NO_X$ and VOC. The EPA will also accept comments on 2017 projections of hazardous air pollutants (HAPs), as they are included in the outputs of models used to develop 2017 emission projections. However, HAPs are not the focus of this effort. The annual emissions values are located in the ANN_VALUE column of emission inventory files in the Flat File 2010 (FF10) format. Some emission inventories (*e.g.,* nonroad) may also have values filled in to the monthly value columns (*e.g.,* JAN_VALUE, FEB_ VALUE, . . ., DEC_VALUE). The EPA requests comment on both the annual and monthly emissions values, where applicable. Summaries of emissions by

state and county are provided to aid in the review of emissions values.

• *Model inputs and activity data used to develop mobile source emission inventories.* The EPA requests comment on the mobile source model input data used to develop the projected future mobile source emission inventories. These include both the databases used to create emission factors and the vehicle miles traveled and vehicle population activity data used to compute the emissions. Of particular interest are county total vehicle miles traveled, the mixture of vehicle types in 2017, hoteling hours of combination long-haul trucks, and changes to the inspection and maintenance programs. Alternative activity data should be provided in the SMOKE FF10 activity data format.

• *Projection data and methods.* The EPA seeks comment on the data used to project point and nonpoint source emissions from 2011 to 2017, and on the methods and assumptions used to implement the projections. In this context, nonpoint source emissions are inclusive of commercial marine vessel, railroad, oil and gas, and other nonpoint emissions. In particular, the EPA seeks comment on its assumptions regarding the manner in which specific consent decrees and state- or locality-specific control programs will be implemented.

• *Existing control techniques.* The emission inventories include information on emissions control techniques listed in terms of control codes submitted to the EIS. These are listed in the CONTROL_IDS and CONTROL_MEASURES columns in the emission inventory flat files, with levels of reduction in the ANN_PCT_RED column. Projection of non-EGU point source emissions to future years is dependent on this information. The EPA seeks comment on whether data on existing controls given in the inventory flat files are incomplete or erroneous. The flat files must be consulted for details of control techniques by pollutant.

• *Emissions modeling methods.* The EPA is using SMOKE version 3.6.5 to prepare data for air quality modeling. The EPA requests comment on the methods by which SMOKE is used to develop air quality model-ready emissions, as illustrated in the scripts provided with the modeling platform and as described in the TSD *Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform,* available with the 2011v6.2 platform at *http://www.epa.gov/ttn/chief/emch/ index.html#2011.*

• *Temporal allocation.* Annual emission inventories must be allocated

to hourly values prior to air quality modeling. This may be done with temporal profiles in several steps, such as annual-to-month, month-to-day, and day-to-hour. The exact method used depends on the type of emissions being processed. The EPA seeks comment on the allocation of the emission inventories to month, day, and hour for all types of emission processes. In particular, the EPA seeks information that could help improve the temporal allocation in 2017 of emissions from EGUs, nonroad mobile sources, residential wood combustion sources, and the temporal allocation of vehicle miles traveled needed to model onroad mobile sources. The EPA seeks local- and region-specific data that can be used to improve the temporal allocation of emissions data.

• *Spatial surrogates.* Spatial surrogates are used to allocate county-level emissions to the grid cells used for air quality modeling. The EPA requests comment on the spatial surrogates used to spatially allocate the 2011 and 2017 emissions. The same spatial surrogates are used in the base and future years.

• *Chemical speciation.* Prior to air quality modeling, the pollutants in the emission inventories must be converted into the chemical species used by the air quality model using speciation profiles. The speciation profiles provided are consistent with version 4.4 of the SPECIATE database. The EPA requests comment on the provided speciation profiles, as well as any information that could help improve the speciation of oil and gas emissions in both the eastern and western U.S. in 2017. Oil and gas speciation information, along with VOC to TOG adjustment factors that are used to compute methane emissions, would be of the most use at the county or oil/gas basin level of detail and also for each distinct process at oil and gas drilling/production facilities (*e.g.,* glycol dehydrators).

To aid in the interpretation of the provided data files and how they relate to the aspects of the data on which the EPA is requesting comment, the EPA has provided a summary document in the docket that describes in more detail the provided data and summary files.

Dated: July 23, 2015.

**Stephen D. Page,**
*Director, Office of Air Quality Planning and Standards.*

[FR Doc. 2015–18878 Filed 8–3–15; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

[EPA–HQ–OW–2014–0170; FRL—9931–67–OW]

**RIN 2040–ZA24**

**Final 2014 Effluent Guidelines Program Plan and 2014 Annual Effluent Guidelines Review Report**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability.

---

**SUMMARY:** This notice announces the availability of the Environmental Protection Agency's (EPA) Final 2014 Effluent Guidelines Program Plan and EPA's 2014 Annual Effluent Guidelines Review Report. Section 304(m) of the Clean Water Act requires EPA to biennially publish a plan for new and revised effluent guidelines, after public notice and comment. The Plan identifies any new or existing industrial categories selected for effluent guidelines and provides a schedule. EPA typically publishes a preliminary plan upon which the public is invited to comment, and then publishes a final plan thereafter. EPA published the Preliminary 2014 Plan on September 16, 2014, and received public comment on it.

**FOR FURTHER INFORMATION CONTACT:** Mr. William F. Swietlik, Engineering and Analysis Division, Office of Water, 4303T, U.S. Environmental Protection Agency, 1200 Pennsylvania Avenue NW., Washington, DC., 20460; telephone number: (202) 566–1129; fax number: (202) 566–1053; email address: *swietlik.william@epa.gov*

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Supporting Documents*—Key documents providing additional information about EPA's 2014 annual review and the Final 2014 Plan include the 2014 Effluent Guidelines Review Report and the Final 2014 Effluent Guidelines Program Plan.

*B. How can I get copies of these documents and other related information?*

1. *Docket.* EPA has established official public dockets for these actions under Docket ID No. EPA–HQ–OW–2014–0170. The official public docket is the collection of materials that is available for public viewing at the Water Docket in the EPA Docket Center, (EPA/DC) EPA West, Room 3334, 1301Constitution Ave. NW., Washington, DC 20460.

2. *Electronic Access.* You can access this **Federal Register** document

electronically through the United States government online source for Federal regulations at *http:// www.regulations.gov.*

3. *Internet access.* Copies of the supporting documents are available at *http://water.epa.gov/lawsregs/ lawsguidance/cwa/304m/index.cfm*

**II. How Is This Document Organized?**

The outline of this notice follows.

*A. Legal Authority*
*B. Summary of the Final 2014 Effluent Guidelines Program Plan*

*A. Legal Authority*

This notice is published under the authority of the CWA, 33 U.S.C. 1251, *et seq.,* and in particular sections 301(d), 304(b), 304(g), 304(m), 306, 307(b) and 308 of the Act, 33 U.S.C. 1311(d), 1314(b), 1314(g), 1314(m), 1316, 1317(b), and 1318.

*B. Summary of the Final 2014 Effluent Guidelines Program Plan*

EPA prepared the *Final 2014 Effluent Guidelines Program Plan* (the Plan) pursuant to Clean Water Act section 304(m). The Plan provides a summary of EPA's review of effluent guidelines and pretreatment standards, consistent with CWA sections 301(d), 304(b), 304(g), 304(m), and 307(b). It includes EPA's evaluation of indirect discharge categories that do not have categorical pretreatment standards for the purpose of identifying potential new categories for which pretreatment standards under CWA section 307(b) might be warranted. From these reviews, the Plan identifies any new or existing industrial categories selected for effluent guidelines, and provides a schedule. In addition, the Plan presents any new or existing categories of industry selected for further review and analysis. The Final 2014 Plan and the 2014 Annual Review Report can be found at *http:// water.epa.gov/lawsregs/lawsguidance/ cwa/304m/index.cfm*

Dated: July 24, 2015.

**Kenneth J. Kopocis,**
*Deputy Assistant Administrator for Water.*

[FR Doc. 2015–18877 Filed 8–3–15; 8:45 am]

**BILLING CODE 6560–50–P**

# Tab 8

Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS); 2017 Ozone Contributions (Excel Spreadsheet); Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS; 80 FR 46271 (August 4, 2015)

This file contains projected 2017 design values and 2017 ozone contributions at individual monitoring sites based upon EPA's updated air quality modeling released in the July 2015 Notice of Data Availibility.

The following data are provided for individual monitoring sites:
    Projected 2017 average and maximum design values.
    Projected 2017 ozone contributions from each state and the District of Columbia, individually.
    Projected 2017 ozone contributions from the Tribal, Canada & Mexico, Offshore, Initial & Boundary Concentration, and Biogenics categories.

Data in this file are provided for those monitoring sites that meet the following criteria which were used for calculating contributions:
    Contributions in this file are calculated based on data for all model-predicted 8-hour ozone exceedance days (i.e., >=76 ppb) in the 2017 modeling.
    For those sites with fewer than 5 modeled exceedance days in 2017,  the contributions were calculated based on the top 5 concentration days.
    Monitoring sites were eliminated from this analysis if there were fewer than 5 days with 2017 modeled-predicted ozone greater than or equal to 60 ppb.
    Thus, this file does not include contributions for all monitoring sites in the U.S.

Note that the concentrations and contributions are in units of parts per billion (ppb).

| Monitor ID | State | County | 2017 Projected Average Design Value | 2017 Projected Maximum Design Value | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT | NE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10030010 | Alabama | Baldwin | 59.8 | 61.5 | 14.17 | 0.03 | 0.31 | 0.05 | 0.09 | 0.00 | 0.00 | 0.00 | 0.82 | 0.76 | 0.01 | 0.78 | 1.34 | 0.26 | 0.15 | 1.15 | 8.60 | 0.00 | 0.01 | 0.00 | 0.23 | 0.10 | 3.55 | 0.22 | 0.03 | 0.08 |
| 10331002 | Alabama | Colbert | 50.9 | 52.5 | 10.89 | 0.05 | 0.34 | 0.06 | 0.12 | 0.00 | 0.00 | 0.00 | 0.16 | 0.52 | 0.02 | 0.22 | 0.63 | 0.06 | 0.11 | 2.19 | 0.44 | 0.00 | 0.01 | 0.00 | 0.27 | 0.08 | 0.34 | 0.19 | 0.06 | 0.08 |
| 10499991 | Alabama | DeKalb | 56.7 | 56.7 | 5.37 | 0.03 | 0.13 | 0.08 | 0.19 | 0.00 | 0.00 | 0.00 | 0.03 | 3.58 | 0.04 | 0.15 | 0.40 | 0.08 | 0.11 | 2.27 | 0.10 | 0.00 | 0.02 | 0.00 | 0.34 | 0.13 | 0.09 | 0.15 | 0.09 | 0.14 |
| 10510001 | Alabama | Elmore | 55.8 | 57.3 | 11.79 | 0.05 | 0.11 | 0.08 | 0.09 | 0.00 | 0.00 | 0.00 | 0.09 | 7.52 | 0.03 | 0.30 | 0.80 | 0.18 | 0.09 | 1.20 | 0.38 | 0.00 | 0.05 | 0.00 | 0.33 | 0.13 | 0.40 | 0.19 | 0.06 | 0.07 |
| 10550011 | Alabama | Etowah | 52.4 | 52.6 | 13.46 | 0.07 | 0.05 | 0.10 | 0.22 | 0.00 | 0.00 | 0.00 | 0.06 | 4.62 | 0.03 | 0.07 | 0.19 | 0.04 | 0.13 | 1.10 | 0.09 | 0.00 | 0.03 | 0.00 | 0.16 | 0.05 | 0.07 | 0.07 | 0.05 | 0.10 |
| 10690004 | Alabama | Houston | 55.1 | 56.2 | 6.16 | 0.05 | 0.29 | 0.05 | 0.09 | 0.00 | 0.00 | 0.00 | 0.70 | 8.62 | 0.02 | 0.55 | 0.66 | 0.15 | 0.15 | 0.83 | 1.20 | 0.00 | 0.05 | 0.00 | 0.41 | 0.08 | 0.89 | 0.31 | 0.05 | 0.11 |
| 10730023 | Alabama | Jefferson | 61.6 | 63.9 | 23.86 | 0.06 | 0.30 | 0.06 | 0.10 | 0.00 | 0.00 | 0.00 | 0.09 | 3.60 | 0.02 | 0.22 | 0.45 | 0.07 | 0.10 | 1.17 | 0.22 | 0.00 | 0.05 | 0.00 | 0.25 | 0.09 | 0.13 | 0.33 | 0.04 | 0.06 |
| 10731003 | Alabama | Jefferson | 62.0 | 64.5 | 21.99 | 0.10 | 0.09 | 0.11 | 0.09 | 0.00 | 0.00 | 0.00 | 0.27 | 4.31 | 0.02 | 0.08 | 0.20 | 0.06 | 0.05 | 0.80 | 0.13 | 0.00 | 0.12 | 0.00 | 0.23 | 0.08 | 0.15 | 0.07 | 0.06 | 0.08 |
| 10731005 | Alabama | Jefferson | 63.6 | 65.1 | 20.87 | 0.15 | 0.35 | 0.14 | 0.20 | 0.00 | 0.01 | 0.01 | 0.23 | 3.45 | 0.02 | 0.11 | 0.21 | 0.04 | 0.11 | 0.94 | 0.28 | 0.00 | 0.13 | 0.00 | 0.07 | 0.03 | 0.30 | 0.18 | 0.03 | 0.07 |
| 10731009 | Alabama | Jefferson | 60.6 | 62.2 | 19.20 | 0.06 | 0.11 | 0.10 | 0.11 | 0.00 | 0.00 | 0.00 | 0.20 | 2.93 | 0.03 | 0.20 | 0.48 | 0.08 | 0.10 | 1.29 | 0.15 | 0.00 | 0.08 | 0.00 | 0.27 | 0.10 | 0.18 | 0.14 | 0.10 | 0.12 |
| 10731010 | Alabama | Jefferson | 62.2 | 64.1 | 25.29 | 0.06 | 0.38 | 0.09 | 0.13 | 0.00 | 0.00 | 0.00 | 0.20 | 3.11 | 0.02 | 0.27 | 0.49 | 0.09 | 0.15 | 1.01 | 0.29 | 0.00 | 0.04 | 0.00 | 0.28 | 0.11 | 0.78 | 0.36 | 0.06 | 0.08 |
| 10732006 | Alabama | Jefferson | 63.1 | 64.8 | 25.92 | 0.09 | 0.34 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | 0.17 | 3.01 | 0.02 | 0.20 | 0.37 | 0.06 | 0.13 | 0.87 | 0.33 | 0.00 | 0.07 | 0.00 | 0.18 | 0.07 | 0.31 | 0.32 | 0.03 | 0.06 |
| 10735002 | Alabama | Jefferson | 60.6 | 62.3 | 24.29 | 0.12 | 0.13 | 0.16 | 0.26 | 0.00 | 0.00 | 0.00 | 0.41 | 3.04 | 0.03 | 0.10 | 0.18 | 0.06 | 0.13 | 0.51 | 0.93 | 0.00 | 0.04 | 0.00 | 0.14 | 0.07 | 0.47 | 0.10 | 0.05 | 0.09 |
| 10735003 | Alabama | Jefferson | 60.4 | 62.1 | 22.83 | 0.08 | 0.15 | 0.13 | 0.21 | 0.00 | 0.00 | 0.00 | 0.98 | 2.92 | 0.02 | 0.17 | 0.30 | 0.06 | 0.14 | 0.70 | 0.24 | 0.00 | 0.03 | 0.00 | 0.23 | 0.08 | 0.34 | 0.12 | 0.05 | 0.08 |
| 10736002 | Alabama | Jefferson | 65.4 | 68.2 | 27.04 | 0.10 | 0.11 | 0.11 | 0.17 | 0.00 | 0.00 | 0.00 | 0.43 | 3.05 | 0.02 | 0.14 | 0.28 | 0.07 | 0.09 | 0.67 | 1.00 | 0.00 | 0.05 | 0.00 | 0.29 | 0.10 | 0.43 | 0.10 | 0.05 | 0.08 |
| 10890014 | Alabama | Madison | 60.3 | 62.3 | 15.60 | 0.04 | 0.06 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 0.09 | 1.51 | 0.02 | 0.11 | 0.33 | 0.05 | 0.08 | 2.33 | 0.07 | 0.00 | 0.03 | 0.00 | 0.51 | 0.08 | 0.05 | 0.09 | 0.06 | 0.08 |
| 10970003 | Alabama | Mobile | 58.8 | 60.5 | 18.11 | 0.02 | 0.19 | 0.07 | 0.17 | 0.00 | 0.00 | 0.00 | 2.78 | 1.89 | 0.02 | 0.32 | 0.40 | 0.16 | 0.18 | 0.35 | 2.55 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 2.16 | 0.25 | 0.06 | 0.12 |
| 10972005 | Alabama | Mobile | 62.5 | 62.5 | 29.56 | 0.03 | 0.23 | 0.06 | 0.09 | 0.00 | 0.00 | 0.00 | 1.77 | 1.18 | 0.01 | 0.50 | 0.75 | 0.18 | 0.09 | 0.67 | 2.35 | 0.00 | 0.01 | 0.00 | 0.42 | 0.10 | 2.26 | 0.22 | 0.03 | 0.07 |
| 11011002 | Alabama | Montgomery | 56.8 | 58.3 | 15.84 | 0.02 | 0.12 | 0.06 | 0.09 | 0.00 | 0.00 | 0.00 | 0.33 | 5.79 | 0.02 | 0.29 | 0.82 | 0.17 | 0.09 | 1.25 | 0.13 | 0.00 | 0.02 | 0.00 | 0.33 | 0.13 | 0.09 | 0.21 | 0.05 | 0.08 |
| 11030011 | Alabama | Morgan | 59.8 | 61.8 | 11.47 | 0.07 | 0.10 | 0.09 | 0.16 | 0.00 | 0.00 | 0.00 | 0.74 | 0.78 | 0.02 | 0.06 | 0.21 | 0.03 | 0.09 | 1.46 | 0.13 | 0.00 | 0.03 | 0.00 | 0.13 | 0.02 | 0.65 | 0.06 | 0.03 | 0.08 |
| 11130002 | Alabama | Russell | 56.0 | 56.8 | 5.59 | 0.07 | 0.16 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | 0.44 | 10.29 | 0.03 | 0.16 | 0.27 | 0.11 | 0.09 | 0.59 | 0.29 | 0.00 | 0.06 | 0.00 | 0.05 | 0.06 | 0.26 | 0.18 | 0.03 | 0.09 |
| 11170004 | Alabama | Shelby | 61.7 | 63.2 | 24.77 | 0.10 | 0.34 | 0.10 | 0.20 | 0.00 | 0.00 | 0.00 | 0.19 | 2.41 | 0.02 | 0.21 | 0.53 | 0.07 | 0.17 | 0.97 | 0.34 | 0.00 | 0.07 | 0.00 | 0.08 | 0.07 | 0.32 | 0.32 | 0.03 | 0.07 |
| 11190002 | Alabama | Sumter | 52.3 | 52.3 | 10.12 | 0.03 | 0.46 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | 0.87 | 1.96 | 0.02 | 0.21 | 0.27 | 0.13 | 0.11 | 0.68 | 2.18 | 0.00 | 0.01 | 0.00 | 0.09 | 0.13 | 1.31 | 0.28 | 0.03 | 0.09 |
| 11250010 | Alabama | Tuscaloosa | 50.8 | 51.1 | 16.76 | 0.08 | 0.23 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | 0.11 | 2.65 | 0.02 | 0.11 | 0.21 | 0.06 | 0.08 | 0.93 | 0.18 | 0.00 | 0.06 | 0.00 | 0.14 | 0.07 | 0.17 | 0.15 | 0.05 | 0.07 |
| 40038001 | Arizona | Cochise | 70.4 | 71.3 | 0.00 | 7.67 | 0.00 | 0.85 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 40051008 | Arizona | Coconino | 65.9 | 66.5 | 0.02 | 6.15 | 0.00 | 1.48 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 |
| 40058001 | Arizona | Coconino | 68.7 | 69.7 | 0.00 | 2.35 | 0.00 | 7.86 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40070010 | Arizona | Gila | 68.8 | 70.0 | 0.01 | 20.49 | 0.00 | 2.06 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 |
| 40128000 | Arizona | La Paz | 68.3 | 69.0 | 0.00 | 6.49 | 0.00 | 8.39 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40130019 | Arizona | Maricopa | 72.9 | 75.0 | 0.00 | 29.29 | 0.01 | 2.76 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131004 | Arizona | Maricopa | 75.0 | 76.2 | 0.00 | 31.57 | 0.00 | 3.44 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131010 | Arizona | Maricopa | 64.7 | 66.8 | 0.01 | 24.60 | 0.01 | 2.24 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 40132001 | Arizona | Maricopa | 70.8 | 72.1 | 0.00 | 30.75 | 0.00 | 2.70 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40132005 | Arizona | Maricopa | 71.1 | 72.0 | 0.00 | 27.32 | 0.00 | 4.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40133002 | Arizona | Maricopa | 69.9 | 71.5 | 0.00 | 28.46 | 0.00 | 3.36 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40133003 | Arizona | Maricopa | 71.2 | 72.4 | 0.01 | 29.43 | 0.00 | 2.54 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40134003 | Arizona | Maricopa | 71.9 | 73.1 | 0.00 | 26.88 | 0.01 | 2.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40134004 | Arizona | Maricopa | 68.3 | 69.5 | 0.02 | 23.35 | 0.01 | 1.65 | 0.07 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 |
| 40134005 | Arizona | Maricopa | 65.6 | 66.8 | 0.00 | 26.23 | 0.00 | 2.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40134008 | Arizona | Maricopa | 70.7 | 71.3 | 0.00 | 27.15 | 0.00 | 4.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40134010 | Arizona | Maricopa | 66.1 | 67.0 | 0.00 | 29.82 | 0.00 | 1.86 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 |
| 40134011 | Arizona | Maricopa | 61.5 | 62.5 | 0.00 | 19.18 | 0.00 | 2.78 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 40137003 | Arizona | Maricopa | 66.4 | 67.6 | 0.01 | 17.42 | 0.00 | 2.98 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.12 | 0.01 | 0.00 | 0.01 | 0.05 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.08 | 0.04 |
| 40137020 | Arizona | Maricopa | 69.3 | 70.5 | 0.01 | 28.64 | 0.00 | 2.47 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40137021 | Arizona | Maricopa | 71.4 | 71.7 | 0.00 | 29.70 | 0.00 | 2.20 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40137022 | Arizona | Maricopa | 68.2 | 69.8 | 0.00 | 28.37 | 0.00 | 2.10 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40137024 | Arizona | Maricopa | 68.9 | 69.6 | 0.01 | 28.48 | 0.00 | 2.46 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40139508 | Arizona | Maricopa | 68.3 | 70.1 | 0.00 | 19.72 | 0.00 | 3.55 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40139702 | Arizona | Maricopa | 69.5 | 71.7 | 0.01 | 27.96 | 0.01 | 2.35 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 40139704 | Arizona | Maricopa | 69.5 | 70.9 | 0.00 | 27.13 | 0.00 | 3.34 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40139706 | Arizona | Maricopa | 69.0 | 69.9 | 0.00 | 26.45 | 0.00 | 3.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40139997 | Arizona | Maricopa | 72.5 | 73.4 | 0.00 | 29.52 | 0.00 | 3.48 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40170119 | Arizona | Navajo | 66.1 | 67.3 | 0.00 | 8.59 | 0.00 | 1.46 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40190021 | Arizona | Pima | 66.5 | 68.1 | 0.01 | 18.02 | 0.01 | 0.54 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01 |
| 40191011 | Arizona | Pima | 62.4 | 63.3 | 0.00 | 16.00 | 0.00 | 1.19 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40191018 | Arizona | Pima | 64.1 | 64.7 | 0.02 | 12.37 | 0.01 | 1.25 | 0.18 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.01 | 0.02 |
| 40191020 | Arizona | Pima | 64.9 | 66.1 | 0.01 | 15.10 | 0.01 | 0.62 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01 |
| 40191028 | Arizona | Pima | 62.2 | 63.1 | 0.02 | 13.47 | 0.01 | 1.19 | 0.16 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40191030 | Arizona | Pima | 64.1 | 65.3 | 0.06 | 9.43 | 0.02 | 0.37 | 0.17 | 0.00 | 0.00 | 0.00 | 0.04 | 0.05 | 0.02 | 0.00 | 0.01 | 0.00 | 0.08 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.02 | 0.05 |
| 40191032 | Arizona | Pima | 61.8 | 62.5 | 0.02 | 14.00 | 0.01 | 1.08 | 0.16 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40191034 | Arizona | Pima | 60.4 | 61.3 | 0.01 | 14.94 | 0.00 | 0.78 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01 |
| 40213001 | Arizona | Pinal | 67.7 | 68.6 | 0.02 | 23.40 | 0.01 | 1.88 | 0.12 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40213003 | Arizona | Pinal | 63.7 | 64.4 | 0.00 | 11.71 | 0.00 | 2.83 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.01 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.05 | 0.02 |
| 40213007 | Arizona | Pinal | 65.2 | 65.9 | 0.00 | 10.12 | 0.00 | 0.91 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 40217001 | Arizona | Pinal | 65.9 | 67.5 | 0.00 | 13.35 | 0.00 | 2.90 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 40218001 | Arizona | Pinal | 70.1 | 71.0 | 0.00 | 19.93 | 0.00 | 1.86 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40258033 | Arizona | Yavapai | 65.7 | 66.6 | 0.00 | 7.25 | 0.00 | 3.49 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40278011 | Arizona | Yuma | 70.7 | 72.3 | 0.00 | 4.32 | 0.00 | 13.81 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 50350005 | Arkansas | Crittenden | 67.6 | 69.0 | 0.21 | 0.06 | 7.22 | 0.12 | 0.20 | 0.00 | 0.00 | 0.00 | 0.21 | 0.09 | 0.01 | 0.79 | 0.60 | 0.11 | 0.24 | 1.52 | 0.52 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 3.82 | 1.05 | 0.04 | 0.07 |
| 51130003 | Arkansas | Polk | 66.4 | 67.1 | 0.29 | 0.09 | 4.97 | 0.10 | 0.12 | 0.00 | 0.00 | 0.00 | 0.21 | 0.28 | 0.01 | 0.07 | 0.04 | 0.05 | 0.19 | 0.08 | 2.45 | 0.00 | 0.02 | 0.00 | 0.02 | 0.05 | 0.66 | 0.28 | 0.01 | 0.07 |
| 51190007 | Arkansas | Pulaski | 60.6 | 61.2 | 0.21 | 0.06 | 25.34 | 0.12 | 0.23 | 0.00 | 0.00 | 0.00 | 0.29 | 0.19 | 0.02 | 0.25 | 0.11 | 0.07 | 0.21 | 0.15 | 0.87 | 0.00 | 0.01 | 0.00 | 0.01 | 0.04 | 1.25 | 0.60 | 0.03 | 0.08 |
| 51191002 | Arkansas | Pulaski | 63.6 | 64.7 | 0.79 | 0.07 | 26.06 | 0.13 | 0.36 | 0.00 | 0.00 | 0.00 | 0.35 | 0.56 | 0.02 | 0.11 | 0.16 | 0.03 | 0.16 | 0.23 | 1.56 | 0.00 | 0.02 | 0.00 | 0.07 | 0.02 | 2.39 | 0.18 | 0.04 | 0.09 |
| 51191008 | Arkansas | Pulaski | 63.1 | 64.8 | 0.22 | 0.05 | 22.65 | 0.11 | 0.23 | 0.00 | 0.00 | 0.00 | 0.17 | 0.16 | 0.03 | 0.21 | 0.12 | 0.06 | 0.25 | 0.16 | 1.01 | 0.00 | 0.01 | 0.00 | 0.01 | 0.04 | 0.80 | 0.61 | 0.03 | 0.08 |
| 51430005 | Arkansas | Washington | 63.9 | 65.7 | 0.05 | 0.06 | 9.66 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | 0.11 | 0.03 | 0.01 | 0.10 | 0.04 | 0.11 | 1.11 | 0.05 | 0.76 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.23 | 1.20 | 0.02 | 0.22 |
| 60010007 | California | Alameda | 71.4 | 74.0 | 0.00 | 0.01 | 0.00 | 37.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60050002 | California | Amador | 66.7 | 68.6 | 0.00 | 0.06 | 0.00 | 32.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60070007 | California | Butte | 68.3 | 68.9 | 0.00 | 0.00 | 0.00 | 30.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60070008 | California | Butte | 59.1 | 60.0 | 0.00 | 0.01 | 0.00 | 24.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60090001 | California | Calaveras | 69.4 | 71.3 | 0.00 | 0.06 | 0.00 | 33.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60111002 | California | Colusa | 57.2 | 58.1 | 0.00 | 0.01 | 0.00 | 21.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60130002 | California | Contra Costa | 69.2 | 71.4 | 0.00 | 0.00 | 0.00 | 36.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60131002 | California | Contra Costa | 68.5 | 70.7 | 0.00 | 0.01 | 0.00 | 35.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60170010 | California | El Dorado | 74.2 | 75.1 | 0.00 | 0.01 | 0.00 | 39.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60170020 | California | El Dorado | 75.1 | 76.3 | 0.00 | 0.02 | 0.00 | 39.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190007 | California | Fresno | 89.0 | 89.3 | 0.00 | 0.04 | 0.00 | 42.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190011 | California | Fresno | 87.6 | 90.4 | 0.00 | 0.05 | 0.00 | 41.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190242 | California | Fresno | 87.1 | 90.3 | 0.00 | 0.17 | 0.00 | 37.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60192009 | California | Fresno | 72.2 | 72.2 | 0.00 | 0.08 | 0.00 | 28.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60194001 | California | Fresno | 84.2 | 85.4 | 0.00 | 0.08 | 0.00 | 41.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60195001 | California | Fresno | 90.6 | 92.5 | 0.00 | 0.08 | 0.00 | 44.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60250005 | California | Imperial | 72.9 | 74.1 | 0.00 | 1.15 | 0.00 | 16.72 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60251003 | California | Imperial | 79.3 | 80.3 | 0.01 | 1.78 | 0.00 | 20.02 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01 |
| 60254003 | California | Imperial | 69.2 | 70.2 | 0.00 | 0.82 | 0.00 | 17.15 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60254004 | California | Imperial | 67.8 | 69.4 | 0.00 | 0.82 | 0.00 | 19.25 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60270101 | California | Inyo | 69.8 | 70.1 | 0.01 | 0.12 | 0.00 | 7.59 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 |
| 60290007 | California | Kern | 86.2 | 90.2 | 0.00 | 0.08 | 0.00 | 39.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290008 | California | Kern | 80.6 | 82.2 | 0.00 | 0.35 | 0.00 | 32.63 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290011 | California | Kern | 76.2 | 77.1 | 0.00 | 0.56 | 0.00 | 22.62 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290014 | California | Kern | 82.8 | 84.0 | 0.00 | 0.02 | 0.00 | 39.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | California | Kern | 82.2 | 83.8 | 0.00 | 0.04 | 0.00 | 38.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295002 | California | Kern | 84.5 | 85.5 | 0.00 | 0.14 | 0.00 | 38.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60296001 | California | Kern | 79.7 | 81.3 | 0.00 | 0.11 | 0.00 | 36.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60311004 | California | Kings | 81.1 | 83.9 | 0.00 | 0.24 | 0.00 | 36.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370002 | California | Los Angeles | 79.0 | 81.0 | 0.00 | 0.47 | 0.00 | 42.47 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370016 | California | Los Angeles | 92.8 | 95.8 | 0.00 | 0.56 | 0.00 | 49.89 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370113 | California | Los Angeles | 64.3 | 67.2 | 0.00 | 0.20 | 0.00 | 32.56 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371002 | California | Los Angeles | 77.1 | 78.1 | 0.00 | 0.21 | 0.00 | 43.28 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371103 | California | Los Angeles | 62.9 | 64.2 | 0.00 | 0.23 | 0.00 | 33.65 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371201 | California | Los Angeles | 87.9 | 87.9 | 0.00 | 0.42 | 0.00 | 45.64 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371302 | California | Los Angeles | 57.7 | 57.7 | 0.00 | 0.37 | 0.00 | 25.44 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371602 | California | Los Angeles | 62.9 | 63.4 | 0.00 | 0.43 | 0.00 | 29.25 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371701 | California | Los Angeles | 82.2 | 83.2 | 0.00 | 0.43 | 0.00 | 44.50 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60372005 | California | Los Angeles | 78.1 | 80.6 | 0.00 | 0.42 | 0.00 | 41.87 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60374002 | California | Los Angeles | 57.8 | 58.3 | 0.00 | 0.61 | 0.00 | 22.32 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60376012 | California | Los Angeles | 94.5 | 96.2 | 0.00 | 0.55 | 0.00 | 47.48 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60379033 | California | Los Angeles | 86.0 | 86.9 | 0.00 | 0.86 | 0.00 | 36.18 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60390004 | California | Madera | 75.3 | 76.9 | 0.00 | 0.15 | 0.00 | 32.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60392010 | California | Madera | 79.8 | 80.8 | 0.00 | 0.14 | 0.00 | 33.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60430003 | California | Mariposa | 73.4 | 74.1 | 0.00 | 0.00 | 0.00 | 17.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60430006 | California | Mariposa | 71.6 | 72.5 | 0.00 | 0.03 | 0.00 | 26.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60470003 | California | Merced | 78.1 | 79.3 | 0.00 | 0.08 | 0.00 | 36.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60530002 | California | Monterey | 53.9 | 54.8 | 0.00 | 0.00 | 0.00 | 19.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60530008 | California | Monterey | 54.3 | 56.2 | 0.00 | 0.02 | 0.00 | 19.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60550003 | California | Napa | 58.0 | 60.5 | 0.00 | 0.00 | 0.00 | 26.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60570005 | California | Nevada | 70.6 | 71.8 | 0.00 | 0.01 | 0.00 | 33.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60570007 | California | Nevada | 68.7 | 70.5 | 0.00 | 0.01 | 0.00 | 32.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60590007 | California | Orange | 63.2 | 63.5 | 0.00 | 0.47 | 0.00 | 31.25 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60591003 | California | Orange | 60.5 | 61.2 | 0.00 | 0.40 | 0.00 | 28.74 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60592022 | California | Orange | 67.9 | 69.8 | 0.00 | 0.28 | 0.00 | 37.13 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60595001 | California | Orange | 69.2 | 70.5 | 0.00 | 0.41 | 0.00 | 36.38 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60610003 | California | Placer | 75.4 | 77.2 | 0.00 | 0.02 | 0.00 | 39.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60610004 | California | Placer | 67.3 | 68.2 | 0.00 | 0.01 | 0.00 | 34.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60610006 | California | Placer | 78.2 | 80.0 | 0.00 | 0.01 | 0.00 | 42.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650004 | California | Riverside | 82.3 | 82.3 | 0.00 | 0.47 | 0.00 | 44.40 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650012 | California | Riverside | 93.5 | 95.1 | 0.00 | 0.35 | 0.00 | 47.30 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650016 | California | Riverside | 71.6 | 71.6 | 0.00 | 0.12 | 0.00 | 37.68 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60651016 | California | Riverside | 95.7 | 96.0 | 0.00 | 0.40 | 0.00 | 46.77 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60652002 | California | Riverside | 79.8 | 80.5 | 0.01 | 0.74 | 0.00 | 30.50 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60655001 | California | Riverside | 87.6 | 88.2 | 0.01 | 0.46 | 0.01 | 33.10 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.01 |
| 60656001 | California | Riverside | 88.1 | 91.9 | 0.00 | 0.38 | 0.00 | 47.41 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658001 | California | Riverside | 93.3 | 94.3 | 0.00 | 0.45 | 0.00 | 50.64 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658005 | California | Riverside | 89.2 | 90.4 | 0.00 | 0.43 | 0.00 | 48.41 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659001 | California | Riverside | 82.7 | 85.2 | 0.00 | 0.30 | 0.00 | 44.36 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659003 | California | Riverside | 64.1 | 65.1 | 0.00 | 2.04 | 0.00 | 13.64 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670002 | California | Sacramento | 72.2 | 72.5 | 0.00 | 0.02 | 0.00 | 35.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60670006 | California | Sacramento | 74.0 | 76.1 | 0.00 | 0.00 | 0.00 | 41.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670010 | California | Sacramento | 66.9 | 67.6 | 0.00 | 0.01 | 0.00 | 33.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60670011 | California | Sacramento | 68.2 | 69.6 | 0.00 | 0.00 | 0.00 | 36.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670012 | California | Sacramento | 85.7 | 87.3 | 0.00 | 0.01 | 0.00 | 47.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670014 | California | Sacramento | 65.6 | 66.3 | 0.00 | 0.01 | 0.00 | 31.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60675003 | California | Sacramento | 80.5 | 82.0 | 0.00 | 0.01 | 0.00 | 44.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60690002 | California | San Benito | 58.5 | 62.3 | 0.00 | 0.02 | 0.00 | 25.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60690003 | California | San Benito | 66.2 | 66.2 | 0.00 | 0.02 | 0.00 | 24.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710001 | California | San Bernardino | 73.8 | 74.8 | 0.00 | 0.07 | 0.00 | 22.13 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710005 | California | San Bernardino | 103.6 | 105.6 | 0.00 | 0.65 | 0.00 | 52.27 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710012 | California | San Bernardino | 91.8 | 93.8 | 0.00 | 0.73 | 0.00 | 33.10 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710306 | California | San Bernardino | 81.2 | 82.4 | 0.00 | 0.27 | 0.00 | 37.84 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60711004 | California | San Bernardino | 94.3 | 95.6 | 0.00 | 0.62 | 0.00 | 48.53 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60711234 | California | San Bernardino | 66.8 | 66.8 | 0.00 | 0.14 | 0.00 | 11.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60712002 | California | San Bernardino | 99.5 | 101.5 | 0.00 | 0.50 | 0.00 | 52.75 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | California | San Bernardino | 92.3 | 95.0 | 0.00 | 0.47 | 0.00 | 44.68 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60714003 | California | San Bernardino | 101.8 | 103.8 | 0.00 | 0.49 | 0.00 | 55.33 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719002 | California | San Bernardino | 88.0 | 89.6 | 0.01 | 0.51 | 0.00 | 35.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60719004 | California | San Bernardino | 95.7 | 96.0 | 0.00 | 0.46 | 0.00 | 52.01 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60730001 | California | San Diego | 60.7 | 62.4 | 0.00 | 0.75 | 0.00 | 21.86 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60730003 | California | San Diego | 66.7 | 68.0 | 0.00 | 0.65 | 0.00 | 27.11 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60730006 | California | San Diego | 66.8 | 66.8 | 0.00 | 0.75 | 0.00 | 26.03 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60731001 | California | San Diego | 61.5 | 62.5 | 0.00 | 0.55 | 0.00 | 20.64 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60731002 | California | San Diego | 64.9 | 66.5 | 0.00 | 0.78 | 0.00 | 30.71 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 |
| 60731006 | California | San Diego | 76.6 | 77.6 | 0.00 | 0.42 | 0.00 | 30.56 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60731008 | California | San Diego | 61.6 | 63.8 | 0.00 | 0.31 | 0.00 | 29.85 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| Monitor ID | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | Tribal | Canada & Mexico | Offshore | Fires | Initial & Boundary | Biogenics |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10030010 | 0.01 | 0.00 | 0.00 | 0.05 | 0.01 | 0.13 | 0.03 | 0.36 | 0.29 | 0.01 | 0.04 | 0.00 | 0.12 | 0.02 | 0.95 | 0.91 | 0.03 | 0.00 | 0.06 | 0.01 | 0.04 | 0.19 | 0.09 | 0.01 | 0.21 | 4.13 | 0.72 | 14.73 | 3.66 |
| 10331002 | 0.01 | 0.00 | 0.00 | 0.11 | 0.00 | 0.16 | 0.04 | 0.95 | 0.17 | 0.01 | 0.20 | 0.00 | 0.09 | 0.03 | 6.93 | 0.85 | 0.04 | 0.00 | 0.20 | 0.02 | 0.84 | 0.14 | 0.13 | 0.02 | 0.29 | 0.31 | 0.29 | 16.65 | 5.36 |
| 10499991 | 0.02 | 0.00 | 0.00 | 0.06 | 0.00 | 0.85 | 0.05 | 1.33 | 0.11 | 0.02 | 0.17 | 0.00 | 0.82 | 0.05 | 7.61 | 0.36 | 0.06 | 0.00 | 0.66 | 0.04 | 1.12 | 0.13 | 0.24 | 0.02 | 0.23 | 0.10 | 0.32 | 23.47 | 5.10 |
| 10510001 | 0.02 | 0.00 | 0.00 | 0.09 | 0.02 | 1.15 | 0.07 | 0.82 | 0.13 | 0.02 | 0.32 | 0.00 | 0.83 | 0.04 | 2.27 | 0.50 | 0.04 | 0.00 | 0.47 | 0.04 | 0.31 | 0.10 | 0.12 | 0.02 | 0.35 | 0.20 | 0.25 | 18.49 | 4.92 |
| 10550011 | 0.03 | 0.00 | 0.00 | 0.11 | 0.01 | 0.66 | 0.02 | 0.72 | 0.12 | 0.01 | 0.13 | 0.00 | 0.50 | 0.02 | 4.55 | 0.48 | 0.08 | 0.00 | 0.51 | 0.02 | 0.65 | 0.05 | 0.18 | 0.03 | 0.25 | 0.13 | 0.37 | 17.09 | 4.68 |
| 10690004 | 0.01 | 0.00 | 0.00 | 0.09 | 0.04 | 1.15 | 0.05 | 0.44 | 0.25 | 0.01 | 0.18 | 0.00 | 1.11 | 0.04 | 1.62 | 1.01 | 0.02 | 0.00 | 0.42 | 0.02 | 0.30 | 0.15 | 0.08 | 0.01 | 0.49 | 0.37 | 0.61 | 19.49 | 5.48 |
| 10730023 | 0.01 | 0.00 | 0.00 | 0.11 | 0.03 | 0.60 | 0.04 | 0.66 | 0.31 | 0.01 | 0.20 | 0.00 | 0.50 | 0.03 | 3.40 | 0.93 | 0.03 | 0.00 | 0.38 | 0.02 | 0.41 | 0.07 | 0.11 | 0.02 | 0.38 | 0.21 | 0.69 | 17.14 | 3.83 |
| 10731003 | 0.02 | 0.00 | 0.01 | 0.15 | 0.07 | 1.27 | 0.04 | 0.73 | 0.08 | 0.01 | 0.36 | 0.00 | 1.00 | 0.03 | 2.62 | 0.69 | 0.04 | 0.00 | 0.69 | 0.03 | 0.69 | 0.06 | 0.12 | 0.02 | 0.63 | 0.27 | 0.65 | 18.41 | 3.97 |
| 10731005 | 0.03 | 0.00 | 0.01 | 0.23 | 0.03 | 0.70 | 0.01 | 0.47 | 0.14 | 0.01 | 0.23 | 0.00 | 0.68 | 0.01 | 3.22 | 1.10 | 0.07 | 0.00 | 0.51 | 0.01 | 0.41 | 0.03 | 0.11 | 0.05 | 0.59 | 0.27 | 1.30 | 20.91 | 4.32 |
| 10731009 | 0.02 | 0.00 | 0.01 | 0.09 | 0.06 | 0.93 | 0.07 | 1.24 | 0.13 | 0.02 | 0.27 | 0.00 | 0.80 | 0.05 | 3.55 | 0.50 | 0.05 | 0.00 | 0.49 | 0.04 | 0.77 | 0.09 | 0.17 | 0.02 | 0.46 | 0.24 | 0.62 | 19.14 | 4.50 |
| 10731010 | 0.02 | 0.00 | 0.00 | 0.12 | 0.03 | 0.49 | 0.05 | 0.57 | 0.39 | 0.01 | 0.20 | 0.00 | 0.41 | 0.04 | 2.30 | 1.04 | 0.06 | 0.00 | 0.29 | 0.03 | 0.32 | 0.08 | 0.17 | 0.02 | 0.40 | 0.24 | 0.48 | 16.41 | 4.48 |
| 10732006 | 0.02 | 0.00 | 0.01 | 0.15 | 0.03 | 0.56 | 0.03 | 0.49 | 0.36 | 0.01 | 0.20 | 0.00 | 0.50 | 0.02 | 2.47 | 1.09 | 0.05 | 0.00 | 0.36 | 0.01 | 0.33 | 0.06 | 0.11 | 0.02 | 0.42 | 0.27 | 0.58 | 18.07 | 3.91 |
| 10735002 | 0.05 | 0.00 | 0.00 | 0.24 | 0.01 | 0.55 | 0.03 | 0.29 | 0.21 | 0.02 | 0.17 | 0.00 | 0.45 | 0.03 | 1.55 | 0.85 | 0.13 | 0.00 | 0.34 | 0.02 | 0.36 | 0.04 | 0.22 | 0.05 | 0.44 | 0.71 | 0.69 | 17.57 | 4.04 |
| 10735003 | 0.03 | 0.00 | 0.00 | 0.16 | 0.02 | 0.45 | 0.04 | 0.37 | 0.23 | 0.01 | 0.19 | 0.00 | 0.34 | 0.03 | 2.32 | 0.94 | 0.10 | 0.00 | 0.32 | 0.02 | 0.46 | 0.06 | 0.19 | 0.03 | 0.44 | 0.46 | 0.72 | 17.50 | 4.82 |
| 10736002 | 0.03 | 0.00 | 0.00 | 0.21 | 0.03 | 0.54 | 0.05 | 0.56 | 0.20 | 0.01 | 0.24 | 0.00 | 0.44 | 0.04 | 1.83 | 0.82 | 0.08 | 0.00 | 0.35 | 0.02 | 0.39 | 0.07 | 0.16 | 0.03 | 0.56 | 0.76 | 0.63 | 19.03 | 3.68 |
| 10890014 | 0.01 | 0.00 | 0.00 | 0.07 | 0.05 | 0.30 | 0.04 | 1.53 | 0.07 | 0.01 | 0.32 | 0.00 | 0.16 | 0.03 | 8.97 | 0.33 | 0.04 | 0.00 | 0.44 | 0.02 | 1.06 | 0.12 | 0.14 | 0.01 | 0.50 | 0.13 | 0.18 | 19.24 | 4.92 |
| 10970003 | 0.02 | 0.00 | 0.00 | 0.04 | 0.00 | 0.36 | 0.06 | 0.18 | 0.24 | 0.01 | 0.03 | 0.00 | 0.45 | 0.04 | 0.72 | 0.81 | 0.05 | 0.00 | 0.10 | 0.02 | 0.08 | 0.09 | 0.17 | 0.01 | 0.19 | 1.39 | 0.76 | 18.96 | 3.75 |
| 10972005 | 0.01 | 0.00 | 0.00 | 0.05 | 0.01 | 0.13 | 0.04 | 0.32 | 0.15 | 0.01 | 0.04 | 0.00 | 0.15 | 0.03 | 1.13 | 0.60 | 0.03 | 0.00 | 0.06 | 0.01 | 0.05 | 0.21 | 0.08 | 0.01 | 0.26 | 1.63 | 0.74 | 12.57 | 3.39 |
| 11011002 | 0.01 | 0.00 | 0.00 | 0.05 | 0.02 | 0.61 | 0.06 | 0.76 | 0.14 | 0.01 | 0.12 | 0.00 | 0.71 | 0.04 | 2.33 | 0.39 | 0.04 | 0.00 | 0.20 | 0.04 | 0.19 | 0.09 | 0.12 | 0.01 | 0.30 | 0.22 | 0.26 | 19.58 | 4.31 |
| 11030011 | 0.02 | 0.00 | 0.00 | 0.11 | 0.00 | 0.25 | 0.01 | 0.84 | 0.07 | 0.01 | 0.08 | 0.00 | 0.22 | 0.01 | 4.54 | 0.38 | 0.07 | 0.00 | 0.21 | 0.01 | 0.37 | 0.06 | 0.12 | 0.03 | 0.23 | 0.53 | 0.56 | 30.18 | 4.21 |
| 11130002 | 0.03 | 0.00 | 0.00 | 0.12 | 0.01 | 1.59 | 0.03 | 0.18 | 0.16 | 0.01 | 0.25 | 0.00 | 1.24 | 0.03 | 1.57 | 0.61 | 0.07 | 0.00 | 0.56 | 0.02 | 0.30 | 0.03 | 0.18 | 0.04 | 0.23 | 0.48 | 0.32 | 24.27 | 4.33 |
| 11170004 | 0.02 | 0.00 | 0.01 | 0.17 | 0.02 | 0.46 | 0.04 | 0.45 | 0.36 | 0.01 | 0.15 | 0.00 | 0.46 | 0.02 | 2.53 | 1.13 | 0.07 | 0.00 | 0.32 | 0.02 | 0.23 | 0.06 | 0.11 | 0.04 | 0.36 | 0.27 | 0.53 | 18.06 | 4.16 |
| 11190002 | 0.01 | 0.00 | 0.00 | 0.07 | 0.00 | 0.23 | 0.03 | 0.26 | 0.26 | 0.01 | 0.03 | 0.00 | 0.26 | 0.02 | 2.01 | 1.46 | 0.06 | 0.00 | 0.11 | 0.02 | 0.13 | 0.11 | 0.12 | 0.02 | 0.20 | 1.01 | 0.92 | 21.47 | 4.05 |
| 11250010 | 0.02 | 0.00 | 0.00 | 0.13 | 0.01 | 0.43 | 0.03 | 0.49 | 0.12 | 0.01 | 0.16 | 0.00 | 0.40 | 0.02 | 2.70 | 0.68 | 0.05 | 0.00 | 0.31 | 0.02 | 0.47 | 0.05 | 0.13 | 0.03 | 0.35 | 0.15 | 0.85 | 17.17 | 3.41 |
| 40038001 | 0.17 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.34 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 | 0.16 | 1.58 | 0.08 | 0.62 | 55.92 | 2.13 |
| 40051008 | 0.10 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.01 | 1.18 | 0.16 | 0.15 | 54.25 | 1.28 |
| 40058001 | 0.35 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.12 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.04 | 2.05 | 0.42 | 0.35 | 52.99 | 1.69 |
| 40070010 | 0.51 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.29 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.06 | 0.15 | 1.49 | 0.18 | 0.18 | 39.65 | 2.52 |
| 40128000 | 0.32 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.10 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 | 0.03 | 1.71 | 0.36 | 0.11 | 47.56 | 2.61 |
| 40130019 | 0.18 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.04 | 1.89 | 0.29 | 0.12 | 34.98 | 2.70 |
| 40131004 | 0.27 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.11 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.09 | 1.95 | 0.27 | 0.19 | 33.90 | 2.68 |
| 40131010 | 0.16 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.36 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.06 | 1.88 | 0.34 | 0.16 | 32.03 | 2.28 |
| 40132001 | 0.21 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.07 | 1.63 | 0.24 | 0.17 | 31.76 | 2.64 |
| 40132005 | 0.27 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.11 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.08 | 1.39 | 0.27 | 0.12 | 34.85 | 2.30 |
| 40133002 | 0.08 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.05 | 2.37 | 0.31 | 0.21 | 31.68 | 2.72 |
| 40133003 | 0.23 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.09 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.07 | 2.13 | 0.31 | 0.19 | 32.94 | 2.54 |
| 40134003 | 0.17 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.04 | 1.54 | 0.27 | 0.12 | 37.62 | 2.32 |
| 40134004 | 0.28 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.01 | 0.00 | 0.07 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.95 | 0.08 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.08 | 1.67 | 0.25 | 0.14 | 35.80 | 3.01 |
| 40134005 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.03 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.05 | 1.80 | 0.31 | 0.12 | 31.73 | 2.30 |
| 40134008 | 0.13 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.12 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.12 | 2.05 | 0.31 | 0.14 | 33.44 | 2.66 |
| 40134010 | 0.18 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.12 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.08 | 1.76 | 0.22 | 0.25 | 27.58 | 3.13 |
| 40134011 | 0.19 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.14 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.11 | 0.83 | 0.15 | 0.26 | 34.78 | 2.33 |
| 40137003 | 0.22 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.04 | 0.00 | 0.07 | 0.07 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.68 | 0.16 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.09 | 0.05 | 1.66 | 0.22 | 0.22 | 38.15 | 3.21 |
| 40137020 | 0.22 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.09 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.07 | 2.08 | 0.31 | 0.19 | 32.06 | 2.47 |
| 40137021 | 0.20 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.08 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.07 | 1.98 | 0.29 | 0.43 | 33.23 | 2.54 |
| 40137022 | 0.19 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.08 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.07 | 1.89 | 0.28 | 0.41 | 31.74 | 2.43 |
| 40137024 | 0.22 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.09 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.07 | 2.06 | 0.30 | 0.19 | 31.87 | 2.46 |
| 40139508 | 0.17 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.09 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.03 | 1.39 | 0.20 | 0.11 | 40.99 | 1.75 |
| 40139702 | 0.29 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.13 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.13 | 2.21 | 0.31 | 0.17 | 32.02 | 2.95 |
| 40139704 | 0.21 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.10 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.10 | 1.99 | 0.31 | 0.16 | 32.86 | 2.56 |
| 40139706 | 0.26 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.09 | 1.34 | 0.25 | 0.11 | 34.09 | 2.24 |
| 40139997 | 0.09 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.05 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.05 | 2.46 | 0.32 | 0.22 | 32.86 | 2.82 |
| 40170119 | 0.14 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.04 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.30 | 1.14 | 0.15 | 4.22 | 47.31 | 2.00 |
| 40190021 | 0.40 | 0.00 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.93 | 0.24 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.08 | 0.10 | 1.92 | 0.11 | 0.26 | 39.94 | 2.85 |
| 40191011 | 0.32 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.12 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.06 | 1.84 | 0.12 | 0.15 | 40.04 | 1.95 |
| 40191018 | 0.13 | 0.00 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.71 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.12 | 0.07 | 2.52 | 0.19 | 0.16 | 41.01 | 2.83 |
| 40191020 | 0.39 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.65 | 0.22 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.07 | 0.10 | 2.14 | 0.13 | 0.28 | 41.61 | 2.66 |
| 40191028 | 0.12 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.52 | 0.13 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.09 | 0.06 | 2.11 | 0.23 | 0.15 | 39.23 | 2.49 |
| 40191030 | 0.11 | 0.00 | 0.00 | 0.52 | 0.00 | 0.01 | 0.01 | 0.00 | 0.20 | 0.04 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 | 2.05 | 0.11 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.09 | 0.07 | 3.14 | 0.26 | 0.25 | 42.69 | 3.67 |
| 40191032 | 0.11 | 0.00 | 0.00 | 0.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.57 | 0.12 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.09 | 0.05 | 2.11 | 0.23 | 0.15 | 38.40 | 2.46 |
| 40191034 | 0.17 | 0.00 | 0.00 | 0.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.87 | 0.17 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.05 | 0.16 | 1.59 | 0.16 | 0.22 | 37.53 | 2.64 |
| 40213001 | 0.34 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.82 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.06 | 0.05 | 1.90 | 0.33 | 0.17 | 34.96 | 2.73 |
| 40213003 | 0.19 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.02 | 0.00 | 0.04 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.22 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.07 | 0.14 | 1.36 | 0.28 | 0.25 | 42.73 | 2.77 |
| 40213007 | 0.08 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.16 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.06 | 0.14 | 2.10 | 0.20 | 0.16 | 47.68 | 2.39 |
| 40217001 | 0.21 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 | 0.04 | 1.53 | 0.34 | 0.09 | 43.56 | 2.80 |
| 40218001 | 0.38 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.10 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 | 0.11 | 0.93 | 0.23 | 0.13 | 43.38 | 2.20 |
| 40258033 | 0.27 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.02 | 1.13 | 0.18 | 0.11 | 51.53 | 1.31 |
| 40278011 | 0.12 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.00 | 5.08 | 0.75 | 0.19 | 43.36 | 2.69 |
| 50350005 | 0.02 | 0.00 | 0.00 | 0.10 | 0.00 | 0.03 | 0.04 | 0.09 | 0.70 | 0.01 | 0.01 | 0.00 | 0.02 | 0.02 | 20.72 | 1.86 | 0.06 | 0.00 | 0.01 | 0.02 | 0.01 | 0.04 | 0.10 | 0.04 | 0.25 | 0.40 | 0.33 | 19.02 | 6.52 |
| 51130003 | 0.02 | 0.00 | 0.00 | 0.23 | 0.01 | 0.13 | 0.01 | 0.03 | 2.33 | 0.00 | 0.06 | 0.00 | 0.08 | 0.01 | 0.33 | 16.71 | 0.04 | 0.00 | 0.07 | 0.00 | 0.05 | 0.03 | 0.08 | 0.02 | 1.23 | 0.73 | 1.21 | 25.29 | 7.40 |
| 51190007 | 0.03 | 0.00 | 0.00 | 0.14 | 0.00 | 0.07 | 0.01 | 0.04 | 0.97 | 0.01 | 0.03 | 0.00 | 0.04 | 0.01 | 0.60 | 3.70 | 0.08 | 0.00 | 0.04 | 0.01 | 0.03 | 0.02 | 0.13 | 0.03 | 0.26 | 0.41 | 0.81 | 16.73 | 6.05 |
| 51191002 | 0.03 | 0.00 | 0.00 | 0.13 | 0.01 | 0.11 | 0.01 | 0.10 | 0.41 | 0.01 | 0.03 | 0.00 | 0.08 | 0.01 | 0.84 | 1.09 | 0.08 | 0.00 | 0.05 | 0.01 | 0.05 | 0.02 | 0.14 | 0.04 | 0.26 | 0.43 | 1.14 | 19.19 | 5.67 |
| 51191008 | 0.03 | 0.00 | 0.00 | 0.11 | 0.00 | 0.06 | 0.01 | 0.04 | 1.48 | 0.01 | 0.02 | 0.00 | 0.04 | 0.01 | 0.59 | 7.96 | 0.09 | 0.00 | 0.03 | 0.01 | 0.02 | 0.02 | 0.15 | 0.02 | 0.22 | 0.46 | 0.65 | 17.06 | 6.76 |
| 51430005 | 0.03 | 0.00 | 0.00 | 0.12 | 0.00 | 0.01 | 0.02 | 0.01 | 11.47 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.09 | 8.13 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.12 | 0.02 | 0.59 | 0.57 | 1.23 | 19.92 | 7.19 |
| 60010007 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.09 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.02 | 0.00 | 0.22 | 2.56 | 1.68 | 23.04 | 4.27 |
| 60050002 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.62 | 1.06 | 25.08 | 6.29 |
| 60070007 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.79 | 0.31 | 26.29 | 9.39 |
| 60070008 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.26 | 0.20 | 25.66 | 7.71 |
| 60090001 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.93 | 1.68 | 26.24 | 6.63 |
| 60111002 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.41 | 0.86 | 26.04 | 7.92 |
| 60130002 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.01 | 0.00 | 0.17 | 2.50 | 2.41 | 21.88 | 4.13 |
| 60131002 | 0.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.02 | 0.00 | 0.08 | 1.33 | 1.74 | 22.40 | 5.96 |
| 60170010 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.94 | 0.37 | 25.88 | 6.11 |
| 60170020 | 0.12 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 1.00 | 0.36 | 26.27 | 6.82 |
| 60190007 | 0.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.28 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.09 | 0.98 | 1.02 | 30.52 | 12.51 |
| 60190011 | 0.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.30 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.09 | 0.88 | 0.99 | 30.02 | 12.08 |
| 60190242 | 0.84 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.33 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 | 0.01 | 0.16 | 0.97 | 1.75 | 31.05 | 13.80 |
| 60192009 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.95 | 1.43 | 30.33 | 10.00 |
| 60194001 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 1.20 | 0.97 | 24.84 | 14.77 |
| 60195001 | 0.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.88 | 0.88 | 29.45 | 13.56 |
| 60250005 | 0.15 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.09 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.05 | 0.04 | 11.08 | 0.77 | 0.49 | 38.46 | 2.99 |
| 60251003 | 0.22 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.15 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.08 | 0.07 | 9.32 | 0.87 | 0.30 | 41.65 | 3.60 |
| 60254003 | 0.48 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.02 | 7.31 | 0.73 | 0.12 | 39.32 | 2.79 |
| 60254004 | 0.45 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.02 | 5.31 | 0.77 | 0.12 | 37.48 | 3.14 |
| 60270101 | 0.03 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.01 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.01 | 0.77 | 0.31 | 1.03 | 56.93 | 2.18 |
| 60290007 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 1.03 | 1.82 | 29.36 | 12.65 |
| 60290008 | 0.48 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.02 | 0.63 | 1.35 | 1.46 | 31.52 | 11.70 |
| 60290011 | 0.35 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.28 | 1.19 | 0.28 | 44.91 | 4.30 |
| 60290014 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 1.36 | 1.08 | 27.21 | 13.26 |
| 60290232 | 0.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 1.24 | 1.49 | 27.31 | 12.43 |
| 60295002 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.68 | 1.46 | 28.38 | 14.11 |
| 60296001 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 1.18 | 0.84 | 25.10 | 14.95 |
| 60311004 | 0.53 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 1.05 | 1.13 | 27.30 | 13.71 |
| 60370002 | 0.12 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.02 | 1.50 | 3.10 | 0.75 | 27.14 | 2.65 |
| 60370016 | 0.14 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.07 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 | 0.02 | 1.76 | 3.64 | 0.88 | 31.88 | 3.11 |
| 60370113 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.01 | 0.47 | 5.50 | 0.93 | 21.08 | 2.99 |
| 60371002 | 0.11 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.01 | 0.78 | 3.79 | 0.83 | 24.22 | 3.22 |
| 60371103 | 0.14 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.01 | 0.59 | 4.15 | 0.79 | 20.25 | 2.67 |
| 60371201 | 0.20 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.09 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.15 | 4.82 | 1.22 | 29.37 | 4.28 |
| 60371302 | 0.12 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.09 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 0.89 | 5.79 | 0.76 | 21.48 | 2.31 |
| 60371602 | 0.15 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.03 | 0.95 | 4.95 | 0.49 | 23.75 | 2.44 |
| 60371701 | 0.12 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.50 | 3.49 | 0.77 | 27.88 | 2.69 |
| 60372005 | 0.16 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.09 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.02 | 1.03 | 3.65 | 0.99 | 26.31 | 3.00 |
| 60374002 | 0.10 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.13 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 | 0.03 | 1.53 | 6.36 | 0.79 | 23.18 | 2.24 |
| 60376012 | 0.26 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 | 0.03 | 1.57 | 3.94 | 1.06 | 33.83 | 4.81 |
| 60379033 | 0.30 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.04 | 0.03 | 1.91 | 2.50 | 0.45 | 38.07 | 4.73 |
| 60390004 | 0.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.28 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.14 | 0.83 | 1.51 | 26.85 | 11.93 |
| 60392010 | 0.76 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.87 | 1.49 | 29.74 | 12.23 |
| 60430003 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.92 | 3.74 | 45.68 | 5.39 |
| 60430006 | 0.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 1.59 | 0.77 | 33.33 | 8.04 |
| 60470003 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 1.69 | 1.62 | 28.83 | 8.52 |
| 60530002 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 3.40 | 1.26 | 26.30 | 2.84 |
| 60530008 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 1.86 | 0.47 | 26.67 | 4.77 |
| 60550003 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 1.37 | 0.44 | 24.31 | 4.77 |
| 60570005 | 0.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 1.50 | 0.66 | 27.26 | 6.55 |
| 60570007 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 1.66 | 0.71 | 26.79 | 5.82 |
| 60590007 | 0.13 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.13 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.03 | 1.37 | 4.31 | 0.76 | 22.19 | 2.06 |
| 60591003 | 0.09 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.11 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.03 | 1.13 | 4.98 | 1.01 | 21.14 | 2.35 |
| 60592022 | 0.12 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 | 0.01 | 1.19 | 4.55 | 0.65 | 21.10 | 2.29 |
| 60595001 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.10 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.03 | 1.18 | 3.87 | 0.95 | 23.06 | 2.59 |
| 60610003 | 0.12 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 1.01 | 0.36 | 26.37 | 6.85 |
| 60610004 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 1.76 | 0.53 | 23.12 | 6.42 |
| 60610006 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.90 | 0.84 | 25.25 | 7.10 |
| 60650004 | 0.19 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 | 0.02 | 1.73 | 3.78 | 0.81 | 27.29 | 2.78 |
| 60650012 | 0.26 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.02 | 1.43 | 2.66 | 0.52 | 36.58 | 3.70 |
| 60650016 | 0.10 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.02 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 1.63 | 3.76 | 0.95 | 24.03 | 2.88 |
| 60651016 | 0.33 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 | 0.01 | 1.70 | 2.81 | 0.40 | 39.00 | 3.60 |
| 60652002 | 0.44 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.08 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 | 0.02 | 2.02 | 1.40 | 0.72 | 39.12 | 3.80 |
| 60655001 | 0.28 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 0.07 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.05 | 0.02 | 1.94 | 1.99 | 0.65 | 44.61 | 3.31 |
| 60656001 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.06 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 | 0.01 | 1.39 | 4.14 | 0.75 | 30.18 | 3.13 |
| 60658001 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.02 | 1.77 | 4.08 | 0.82 | 31.54 | 3.01 |
| 60658005 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.69 | 3.90 | 0.78 | 30.16 | 2.88 |
| 60659001 | 0.10 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 | 0.01 | 1.17 | 4.36 | 0.56 | 28.73 | 2.65 |
| 60659003 | 0.13 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 | 0.02 | 2.57 | 0.60 | 0.28 | 41.54 | 2.66 |
| 60670002 | 0.54 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.15 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.05 | 0.00 | 0.13 | 0.74 | 0.96 | 25.23 | 7.45 |
| 60670006 | 0.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.70 | 0.39 | 23.30 | 7.37 |
| 60670010 | 0.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 | 0.00 | 0.05 | 0.45 | 0.97 | 22.21 | 7.67 |
| 60670011 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.77 | 1.12 | 21.50 | 7.05 |
| 60670012 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.87 | 1.04 | 27.77 | 7.34 |
| 60670014 | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.05 | 0.00 | 0.07 | 0.62 | 0.95 | 23.78 | 7.22 |
| 60675003 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.41 | 1.28 | 25.88 | 7.38 |
| 60690002 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 2.42 | 0.60 | 24.68 | 4.04 |
| 60690003 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 2.41 | 0.60 | 31.50 | 5.19 |
| 60710001 | 0.20 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.00 | 0.86 | 1.28 | 0.60 | 45.55 | 2.47 |
| 60710005 | 0.25 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.04 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.56 | 2.69 | 0.59 | 40.98 | 3.75 |
| 60710012 | 0.17 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.03 | 0.70 | 1.01 | 0.33 | 52.48 | 2.67 |
| 60710306 | 0.10 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.02 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.96 | 1.79 | 0.34 | 35.93 | 3.26 |
| 60711004 | 0.16 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.07 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 | 0.03 | 1.86 | 3.43 | 0.80 | 34.85 | 3.10 |
| 60711234 | 0.10 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.34 | 0.66 | 50.69 | 2.40 |
| 60712002 | 0.20 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.01 | 1.71 | 3.64 | 0.81 | 35.77 | 3.29 |
| 60714001 | 0.26 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.01 | 1.50 | 2.19 | 0.49 | 38.42 | 3.42 |
| 60714003 | 0.19 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.09 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 | 0.02 | 1.76 | 3.65 | 0.94 | 34.87 | 3.66 |
| 60719002 | 0.12 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.04 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.04 | 0.02 | 1.99 | 2.20 | 0.43 | 43.14 | 3.45 |
| 60719004 | 0.18 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.09 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 | 0.02 | 1.66 | 3.43 | 0.88 | 32.78 | 3.44 |
| 60730001 | 0.08 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.04 | 0.04 | 5.96 | 6.38 | 0.66 | 22.12 | 2.00 |
| 60730003 | 0.08 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.08 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 | 0.03 | 7.33 | 4.69 | 0.48 | 23.67 | 1.92 |
| 60730006 | 0.05 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.05 | 0.04 | 4.56 | 6.60 | 0.71 | 24.97 | 2.18 |
| 60731001 | 0.07 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.03 | 0.03 | 2.48 | 10.02 | 0.91 | 23.73 | 2.31 |
| 60731002 | 0.12 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.12 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.05 | 0.04 | 2.16 | 4.54 | 0.59 | 22.61 | 2.49 |
| 60731006 | 0.09 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.05 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.02 | 10.95 | 4.45 | 0.45 | 26.93 | 2.05 |
| 60731008 | 0.12 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.07 | 6.31 | 0.73 | 20.07 | 2.50 |







| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60731010 | California | San Diego | 55.7 | 58.4 | 0.00 | 0.68 | 0.00 | 20.06 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.10 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.04 | 0.03 | 5.47 | 5.86 | 0.60 | 20.29 | 1.83 |
| 60731016 | California | San Diego | 63.9 | 63.9 | 0.00 | 0.72 | 0.00 | 24.90 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.04 | 0.04 | 4.36 | 6.31 | 0.68 | 23.89 | 2.09 |
| 60731201 | California | San Diego | 65.9 | 66.6 | 0.00 | 0.39 | 0.00 | 33.73 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.07 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.02 | 2.52 | 4.85 | 0.64 | 20.13 | 2.85 |
| 60732007 | California | San Diego | 56.1 | 56.3 | 0.00 | 0.46 | 0.00 | 20.80 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 | 0.03 | 8.71 | 3.94 | 0.54 | 19.02 | 1.80 |
| 60771002 | California | San Joaquin | 64.2 | 65.1 | 0.00 | 0.01 | 0.00 | 34.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.06 | 1.09 | 1.76 | 19.93 | 5.99 |
| 60773005 | California | San Joaquin | 75.9 | 76.8 | 0.00 | 0.01 | 0.00 | 38.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 1.40 | 1.03 | 29.22 | 5.09 |
| 60790005 | California | San Luis Obispo | 60.4 | 62.0 | 0.00 | 0.08 | 0.00 | 21.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 1.82 | 0.35 | 28.60 | 7.12 |
| 60798001 | California | San Luis Obispo | 58.3 | 59.0 | 0.00 | 0.09 | 0.00 | 20.94 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 2.40 | 0.41 | 26.83 | 6.54 |
| 60798005 | California | San Luis Obispo | 73.1 | 74.1 | 0.00 | 0.20 | 0.00 | 25.85 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 | 0.01 | 0.35 | 1.76 | 1.42 | 34.03 | 8.56 |
| 60798006 | California | San Luis Obispo | 70.4 | 71.3 | 0.00 | 0.27 | 0.00 | 25.28 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.02 | 0.50 | 1.80 | 1.73 | 32.14 | 7.79 |
| 60830008 | California | Santa Barbara | 55.3 | 56.5 | 0.00 | 0.29 | 0.00 | 19.33 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 | 0.02 | 0.56 | 6.15 | 0.68 | 24.19 | 3.44 |
| 60830011 | California | Santa Barbara | 53.5 | 54.5 | 0.00 | 0.32 | 0.00 | 20.17 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.02 | 0.68 | 7.02 | 0.70 | 20.63 | 3.35 |
| 60831014 | California | Santa Barbara | 63.4 | 65.3 | 0.00 | 0.42 | 0.00 | 22.43 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.02 | 0.92 | 5.09 | 0.65 | 28.24 | 4.91 |
| 60831018 | California | Santa Barbara | 52.7 | 53.6 | 0.00 | 0.25 | 0.00 | 17.59 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.07 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.01 | 0.78 | 7.51 | 0.55 | 22.30 | 3.07 |
| 60831021 | California | Santa Barbara | 63.6 | 67.7 | 0.00 | 0.45 | 0.00 | 22.77 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 0.96 | 8.68 | 0.89 | 25.33 | 3.73 |
| 60831025 | California | Santa Barbara | 65.4 | 69.9 | 0.00 | 0.35 | 0.00 | 22.86 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 | 0.02 | 0.66 | 7.27 | 0.81 | 28.61 | 4.06 |
| 60832011 | California | Santa Barbara | 53.3 | 54.5 | 0.00 | 0.32 | 0.00 | 18.70 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.02 | 1.03 | 6.65 | 0.57 | 22.61 | 2.76 |
| 60833001 | California | Santa Barbara | 56.6 | 58.8 | 0.00 | 0.29 | 0.00 | 20.76 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.02 | 0.54 | 3.79 | 0.55 | 25.73 | 4.28 |
| 60850002 | California | Santa Clara | 64.8 | 67.4 | 0.00 | 0.01 | 0.00 | 30.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 2.87 | 0.92 | 24.58 | 4.34 |
| 60850005 | California | Santa Clara | 60.5 | 62.8 | 0.00 | 0.00 | 0.00 | 28.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.24 | 1.82 | 25.52 | 2.36 |
| 60851001 | California | Santa Clara | 65.8 | 68.2 | 0.00 | 0.00 | 0.00 | 28.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 2.85 | 0.67 | 30.88 | 2.30 |
| 60852006 | California | Santa Clara | 68.2 | 70.7 | 0.00 | 0.01 | 0.00 | 33.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 2.40 | 0.99 | 25.67 | 3.76 |
| 60852009 | California | Santa Clara | 61.2 | 61.2 | 0.00 | 0.00 | 0.00 | 28.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.78 | 1.94 | 25.97 | 2.26 |
| 60870007 | California | Santa Cruz | 51.2 | 53.1 | 0.00 | 0.00 | 0.00 | 21.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.23 | 1.41 | 22.85 | 2.28 |
| 60890004 | California | Shasta | 55.9 | 59.6 | 0.00 | 0.01 | 0.00 | 24.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.63 | 0.28 | 23.41 | 5.31 |
| 60890007 | California | Shasta | 62.8 | 64.7 | 0.00 | 0.03 | 0.00 | 25.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.29 | 0.42 | 28.51 | 6.12 |
| 60890009 | California | Shasta | 64.2 | 65.2 | 0.00 | 0.01 | 0.00 | 26.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.69 | 0.31 | 28.69 | 5.97 |
| 60950005 | California | Solano | 62.7 | 64.3 | 0.00 | 0.00 | 0.00 | 31.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 1.24 | 0.55 | 22.95 | 5.64 |
| 60953003 | California | Solano | 64.0 | 64.9 | 0.00 | 0.00 | 0.00 | 28.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 1.19 | 0.36 | 27.08 | 5.75 |
| 60990005 | California | Stanislaus | 72.0 | 72.0 | 0.00 | 0.02 | 0.00 | 37.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 | 0.00 | 0.10 | 0.78 | 1.95 | 23.29 | 7.17 |
| 60990006 | California | Stanislaus | 83.0 | 83.9 | 0.00 | 0.06 | 0.00 | 44.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.38 | 1.95 | 2.00 | 25.58 | 8.13 |
| 61010003 | California | Sutter | 60.0 | 61.0 | 0.00 | 0.01 | 0.00 | 27.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.79 | 0.24 | 23.09 | 6.87 |
| 61030004 | California | Tehama | 70.3 | 71.0 | 0.00 | 0.04 | 0.00 | 26.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.63 | 0.53 | 31.59 | 9.26 |
| 61030005 | California | Tehama | 67.6 | 68.1 | 0.00 | 0.03 | 0.00 | 27.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.61 | 0.59 | 28.85 | 8.82 |
| 61070006 | California | Tulare | 77.0 | 80.1 | 0.00 | 0.06 | 0.00 | 19.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.64 | 4.65 | 42.60 | 8.50 |
| 61070009 | California | Tulare | 87.3 | 88.5 | 0.00 | 0.06 | 0.00 | 33.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.93 | 2.69 | 35.19 | 14.50 |
| 61072002 | California | Tulare | 78.6 | 81.4 | 0.00 | 0.03 | 0.00 | 39.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 1.21 | 1.08 | 21.40 | 14.53 |
| 61072010 | California | Tulare | 82.7 | 83.6 | 0.00 | 0.04 | 0.00 | 38.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 1.23 | 1.19 | 24.73 | 16.22 |
| 61090005 | California | Tuolumne | 67.8 | 68.4 | 0.00 | 0.01 | 0.00 | 29.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 1.71 | 1.55 | 27.84 | 6.41 |
| 61110007 | California | Ventura | 69.3 | 73.4 | 0.00 | 0.46 | 0.00 | 33.92 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.03 | 1.10 | 2.51 | 1.43 | 25.70 | 3.31 |
| 61110009 | California | Ventura | 70.7 | 73.6 | 0.00 | 0.72 | 0.00 | 29.53 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.11 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 | 0.04 | 1.64 | 3.53 | 1.35 | 28.94 | 4.03 |
| 61111004 | California | Ventura | 72.8 | 73.1 | 0.00 | 0.66 | 0.00 | 26.13 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.09 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.03 | 1.42 | 6.15 | 0.98 | 32.42 | 4.05 |
| 61112002 | California | Ventura | 78.3 | 80.2 | 0.00 | 0.63 | 0.00 | 37.54 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.12 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.03 | 1.43 | 3.74 | 1.24 | 28.80 | 3.97 |
| 61113001 | California | Ventura | 58.6 | 60.8 | 0.00 | 0.44 | 0.00 | 22.98 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.09 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 | 0.02 | 1.46 | 6.85 | 1.03 | 22.09 | 3.07 |
| 61130004 | California | Yolo | 64.1 | 65.3 | 0.00 | 0.01 | 0.00 | 28.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.09 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.04 | 0.00 | 0.05 | 0.98 | 1.40 | 23.91 | 7.95 |
| 61131003 | California | Yolo | 65.3 | 65.3 | 0.00 | 0.02 | 0.00 | 27.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.05 | 0.00 | 0.09 | 0.50 | 0.87 | 26.49 | 8.25 |
| 80013001 | Colorado | Adams | 72.7 | 72.7 | 0.02 | 0.26 | 0.05 | 0.64 | 26.13 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.08 | 0.00 | 0.00 | 0.01 | 0.22 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.01 | 0.33 | 0.21 | 0.00 | 0.00 | 0.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 1.78 | 0.79 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.76 | 0.20 | 0.55 | 0.12 | 0.40 | 32.71 | 5.97 |
| 80050002 | Colorado | Arapahoe | 74.4 | 76.6 | 0.00 | 0.32 | 0.00 | 1.16 | 25.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.32 | 0.46 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.17 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.16 | 1.66 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 1.22 | 0.24 | 0.23 | 0.07 | 0.32 | 37.16 | 4.06 |
| 80050006 | Colorado | Arapahoe | 68.3 | 68.7 | 0.00 | 0.29 | 0.00 | 1.24 | 13.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.41 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 1.90 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.34 | 0.23 | 0.24 | 0.08 | 0.11 | 45.01 | 3.73 |
| 80130011 | Colorado | Boulder | 69.8 | 71.9 | 0.01 | 1.06 | 0.00 | 0.56 | 21.46 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.24 | 0.18 | 0.00 | 0.00 | 1.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.51 | 0.64 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.64 | 0.55 | 0.66 | 0.12 | 1.47 | 35.57 | 4.57 |
| 80310014 | Colorado | Denver | 67.9 | 69.8 | 0.02 | 0.24 | 0.05 | 0.60 | 24.40 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.07 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.01 | 0.31 | 0.20 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 1.67 | 0.73 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.71 | 0.19 | 0.51 | 0.11 | 0.37 | 30.55 | 5.58 |
| 80310025 | Colorado | Denver | 63.9 | 63.9 | 0.00 | 0.29 | 0.04 | 0.54 | 24.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.00 | 0.28 | 0.23 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 1.03 | 1.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.84 | 0.19 | 0.31 | 0.06 | 0.27 | 29.48 | 3.93 |
| 80350004 | Colorado | Douglas | 76.0 | 78.1 | 0.00 | 0.39 | 0.00 | 1.23 | 26.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.51 | 0.49 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.05 | 0.00 | 0.15 | 0.12 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.35 | 1.59 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.22 | 0.22 | 0.34 | 0.07 | 0.55 | 36.46 | 4.62 |
| 80410013 | Colorado | El Paso | 66.9 | 69.7 | 0.00 | 0.58 | 0.00 | 0.32 | 3.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.07 | 0.13 | 0.00 | 0.00 | 0.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.22 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.34 | 0.30 | 0.52 | 0.09 | 1.13 | 55.95 | 2.47 |
| 80410016 | Colorado | El Paso | 68.2 | 69.5 | 0.00 | 0.58 | 0.00 | 0.33 | 3.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.13 | 0.00 | 0.00 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.22 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.31 | 0.29 | 0.54 | 0.09 | 1.10 | 57.59 | 2.31 |
| 80450012 | Colorado | Garfield | 62.8 | 63.8 | 0.00 | 0.20 | 0.00 | 1.73 | 5.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.43 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 2.16 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.13 | 0.35 | 0.20 | 0.09 | 0.28 | 49.68 | 1.53 |
| 80590002 | Colorado | Jefferson | 71.2 | 71.2 | 0.01 | 0.38 | 0.03 | 1.81 | 26.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.01 | 0.22 | 0.47 | 0.00 | 0.00 | 0.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 1.08 | 1.25 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.69 | 0.30 | 0.47 | 0.13 | 0.39 | 31.74 | 4.79 |
| 80590005 | Colorado | Jefferson | 72.0 | 74.2 | 0.01 | 0.35 | 0.02 | 1.00 | 25.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.19 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.03 | 0.46 | 0.37 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.05 | 0.00 | 0.19 | 0.09 | 0.00 | 0.00 | 0.00 | 0.05 | 0.01 | 0.98 | 1.20 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.99 | 0.22 | 0.46 | 0.09 | 0.51 | 33.06 | 4.82 |
| 80590006 | Colorado | Jefferson | 76.3 | 78.8 | 0.02 | 0.48 | 0.03 | 1.75 | 26.97 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.04 | 0.21 | 0.38 | 0.00 | 0.00 | 1.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 1.58 | 0.87 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.67 | 0.33 | 0.78 | 0.17 | 0.74 | 34.04 | 5.55 |
| 80590011 | Colorado | Jefferson | 75.8 | 78.9 | 0.01 | 0.41 | 0.03 | 1.93 | 27.77 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.01 | 0.23 | 0.50 | 0.00 | 0.00 | 0.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 1.15 | 1.34 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.73 | 0.32 | 0.51 | 0.14 | 0.41 | 33.79 | 5.09 |
| 80590013 | Colorado | Jefferson | 69.9 | 70.4 | 0.00 | 0.44 | 0.01 | 1.26 | 25.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.32 | 0.45 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.37 | 1.42 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 1.06 | 0.23 | 0.42 | 0.09 | 0.32 | 33.06 | 4.14 |
| 80671004 | Colorado | La Plata | 70.1 | 71.1 | 0.01 | 0.91 | 0.00 | 1.89 | 2.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.01 | 0.00 | 0.46 | 0.00 | 0.00 | 4.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.66 | 0.48 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.04 | 3.35 | 0.73 | 0.11 | 0.66 | 50.93 | 2.47 |
| 80677001 | Colorado | La Plata | 65.9 | 66.2 | 0.01 | 0.96 | 0.00 | 1.80 | 2.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.01 | 0.00 | 0.44 | 0.00 | 0.00 | 4.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.65 | 0.52 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.04 | 3.63 | 0.73 | 0.11 | 0.54 | 46.54 | 2.42 |
| 80690007 | Colorado | Larimer | 70.2 | 71.4 | 0.00 | 0.54 | 0.00 | 0.80 | 13.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.22 | 0.31 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.14 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.08 | 0.89 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.88 | 0.27 | 0.32 | 0.07 | 1.19 | 47.21 | 2.86 |
| 80690011 | Colorado | Larimer | 72.5 | 74.4 | 0.01 | 0.50 | 0.03 | 0.77 | 23.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.22 | 0.48 | 0.22 | 0.00 | 0.00 | 0.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.10 | 0.00 | 0.00 | 0.00 | 0.09 | 0.01 | 1.43 | 0.50 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 1.79 | 0.40 | 0.68 | 0.13 | 2.34 | 29.89 | 8.25 |
| 80690012 | Colorado | Larimer | 65.9 | 65.9 | 0.01 | 0.52 | 0.00 | 1.62 | 18.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.14 | 0.50 | 0.47 | 0.00 | 0.00 | 0.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.08 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.69 | 0.88 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 1.07 | 0.49 | 0.56 | 0.12 | 1.78 | 30.62 | 7.07 |
| 80691004 | Colorado | Larimer | 64.1 | 67.2 | 0.02 | 0.43 | 0.03 | 0.59 | 21.11 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.14 | 0.59 | 0.13 | 0.00 | 0.00 | 0.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.06 | 0.00 | 0.00 | 0.00 | 0.08 | 0.01 | 1.52 | 0.28 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 1.05 | 0.39 | 0.69 | 0.12 | 2.05 | 25.42 | 7.78 |
| 80770020 | Colorado | Mesa | 64.3 | 65.3 | 0.00 | 0.60 | 0.00 | 2.47 | 5.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.48 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 1.63 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.20 | 0.60 | 0.52 | 0.11 | 0.25 | 48.18 | 2.43 |
| 80830006 | Colorado | Montezuma | 63.8 | 64.5 | 0.01 | 1.42 | 0.01 | 2.05 | 1.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 | 0.31 | 0.00 | 0.00 | 5.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.52 | 0.43 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.03 | 3.13 | 1.02 | 0.13 | 0.85 | 43.60 | 2.99 |
| 80830101 | Colorado | Montezuma | 64.1 | 64.7 | 0.00 | 0.91 | 0.00 | 1.15 | 2.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 7.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 0.52 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 | 4.89 | 0.50 | 0.13 | 0.89 | 41.91 | 3.05 |
| 81030005 | Colorado | Rio Blanco | 61.4 | 61.8 | 0.00 | 0.65 | 0.00 | 1.33 | 3.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 1.84 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.06 | 0.81 | 0.20 | 0.07 | 0.68 | 50.01 | 1.43 |
| 81230009 | Colorado | Weld | 70.1 | 71.4 | 0.02 | 0.44 | 0.03 | 0.91 | 25.17 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.04 | 0.14 | 0.00 | 0.00 | 0.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 1.42 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.48 | 0.49 | 0.61 | 0.12 | 1.32 | 31.09 | 6.06 |
| 90010017 | Connecticut | Fairfield | 75.8 | 78.4 | 0.10 | 0.04 | 0.11 | 0.05 | 0.10 | 9.04 | 0.22 | 0.04 | 0.03 | 0.11 | 0.03 | 0.50 | 0.62 | 0.21 | 0.18 | 0.35 | 0.07 | 0.01 | 1.34 | 0.06 | 0.98 | 0.25 | 0.07 | 0.34 | 0.06 | 0.13 | 0.01 | 0.01 | 7.98 | 0.05 | 17.21 | 0.33 | 0.13 | 1.57 | 0.30 | 0.01 | 7.14 | 0.01 | 0.07 | 0.06 | 0.17 | 0.47 | 0.06 | 0.01 | 1.51 | 0.02 | 0.67 | 0.35 | 0.16 | 0.02 | 1.66 | 0.61 | 0.18 | 15.66 | 4.08 |
| 90011123 | Connecticut | Fairfield | 71.9 | 73.5 | 0.33 | 0.06 | 0.22 | 0.05 | 0.11 | 2.85 | 0.49 | 0.11 | 0.09 | 0.33 | 0.01 | 0.56 | 0.96 | 0.10 | 0.12 | 0.76 | 0.15 | 0.01 | 2.72 | 0.13 | 0.71 | 0.13 | 0.18 | 0.27 | 0.03 | 0.06 | 0.01 | 0.02 | 8.94 | 0.11 | 12.63 | 0.31 | 0.05 | 1.99 | 0.21 | 0.00 | 9.08 | 0.03 | 0.10 | 0.02 | 0.48 | 0.59 | 0.03 | 0.01 | 2.13 | 0.01 | 1.08 | 0.19 | 0.07 | 0.02 | 1.10 | 1.45 | 0.29 | 14.88 | 4.29 |
| 90013007 | Connecticut | Fairfield | 77.1 | 81.4 | 0.15 | 0.04 | 0.16 | 0.04 | 0.11 | 5.22 | 0.34 | 0.06 | 0.02 | 0.20 | 0.01 | 0.49 | 0.76 | 0.10 | 0.16 | 0.48 | 0.06 | 0.00 | 2.07 | 0.05 | 0.89 | 0.11 | 0.09 | 0.27 | 0.03 | 0.08 | 0.01 | 0.01 | 8.45 | 0.08 | 15.98 | 0.55 | 0.04 | 1.89 | 0.24 | 0.00 | 9.29 | 0.01 | 0.16 | 0.02 | 0.31 | 0.46 | 0.05 | 0.00 | 1.87 | 0.01 | 0.92 | 0.17 | 0.12 | 0.02 | 1.61 | 1.30 | 0.20 | 16.90 | 4.17 |
| 90019003 | Connecticut | Fairfield | 78.0 | 81.1 | 0.14 | 0.06 | 0.15 | 0.06 | 0.14 | 4.75 | 0.30 | 0.06 | 0.04 | 0.19 | 0.02 | 0.70 | 0.89 | 0.17 | 0.20 | 0.57 | 0.08 | 0.00 | 1.83 | 0.03 | 0.89 | 0.13 | 0.09 | 0.38 | 0.04 | 0.12 | 0.02 | 0.00 | 8.84 | 0.08 | 16.16 | 0.47 | 0.06 | 2.18 | 0.34 | 0.01 | 9.39 | 0.00 | 0.14 | 0.03 | 0.28 | 0.59 | 0.07 | 0.00 | 1.75 | 0.01 | 0.95 | 0.22 | 0.20 | 0.03 | 1.48 | 1.00 | 0.22 | 16.73 | 4.49 |
| 90031003 | Connecticut | Hartford | 66.5 | 67.7 | 0.21 | 0.04 | 0.25 | 0.04 | 0.11 | 7.36 | 0.35 | 0.05 | 0.05 | 0.21 | 0.01 | 0.74 | 1.16 | 0.17 | 0.17 | 1.09 | 0.13 | 0.02 | 1.68 | 0.23 | 0.71 | 0.14 | 0.12 | 0.49 | 0.02 | 0.09 | 0.01 | 0.03 | 5.63 | 0.10 | 10.32 | 0.30 | 0.06 | 2.26 | 0.24 | 0.00 | 5.90 | 0.05 | 0.10 | 0.03 | 0.46 | 0.51 | 0.03 | 0.02 | 1.40 | 0.00 | 0.94 | 0.22 | 0.07 | 0.02 | 0.90 | 1.90 | 0.34 | 14.75 | 3.99 |
| 90050005 | Connecticut | Litchfield | 62.5 | 63.1 | 0.19 | 0.05 | 0.08 | 0.06 | 0.09 | 2.53 | 0.39 | 0.07 | 0.14 | 0.21 | 0.01 | 0.38 | 0.63 | 0.08 | 0.11 | 0.51 | 0.14 | 0.03 | 2.22 | 0.21 | 0.63 | 0.06 | 0.07 | 0.17 | 0.03 | 0.06 | 0.01 | 0.05 | 6.98 | 0.10 | 9.69 | 0.64 | 0.03 | 1.85 | 0.22 | 0.00 | 7.82 | 0.04 | 0.07 | 0.02 | 0.23 | 0.59 | 0.04 | 0.02 | 2.05 | 0.01 | 0.79 | 0.14 | 0.07 | 0.02 | 0.83 | 1.70 | 0.20 | 15.57 | 3.31 |
| 90070007 | Connecticut | Middlesex | 70.7 | 72.2 | 0.13 | 0.03 | 0.20 | 0.02 | 0.08 | 6.86 | 0.36 | 0.07 | 0.03 | 0.18 | 0.01 | 0.69 | 1.08 | 0.16 | 0.15 | 0.94 | 0.06 | 0.00 | 2.13 | 0.04 | 0.64 | 0.17 | 0.09 | 0.43 | 0.03 | 0.08 | 0.00 | 0.00 | 5.75 | 0.06 | 13.73 | 0.55 | 0.07 | 1.61 | 0.21 | 0.00 | 6.57 | 0.01 | 0.17 | 0.03 | 0.32 | 0.39 | 0.02 | 0.00 | 2.05 | 0.01 | 0.90 | 0.22 | 0.07 | 0.01 | 1.44 | 1.92 | 0.27 | 15.39 | 4.03 |
| 90090027 | Connecticut | New Haven | 68.1 | 71.5 | 0.12 | 0.04 | 0.14 | 0.03 | 0.10 | 6.11 | 0.29 | 0.05 | 0.02 | 0.17 | 0.01 | 0.43 | 0.64 | 0.08 | 0.14 | 0.41 | 0.05 | 0.00 | 1.80 | 0.06 | 0.77 | 0.09 | 0.08 | 0.24 | 0.02 | 0.07 | 0.01 | 0.01 | 6.53 | 0.06 | 14.18 | 0.50 | 0.04 | 1.63 | 0.21 | 0.00 | 7.73 | 0.01 | 0.15 | 0.02 | 0.26 | 0.40 | 0.04 | 0.00 | 1.52 | 0.00 | 0.74 | 0.15 | 0.10 | 0.01 | 1.42 | 1.39 | 0.17 | 14.94 | 3.63 |
| 90099002 | Connecticut | New Haven | 77.2 | 80.2 | 0.09 | 0.05 | 0.12 | 0.06 | 0.11 | 8.29 | 0.37 | 0.04 | 0.04 | 0.10 | 0.04 | 0.57 | 0.68 | 0.21 | 0.20 | 0.43 | 0.09 | 0.00 | 1.55 | 0.10 | 0.91 | 0.15 | 0.06 | 0.39 | 0.05 | 0.13 | 0.02 | 0.02 | 7.04 | 0.06 | 16.96 | 0.38 | 0.11 | 1.68 | 0.36 | 0.01 | 7.16 | 0.02 | 0.07 | 0.05 | 0.18 | 0.56 | 0.07 | 0.01 | 1.22 | 0.02 | 0.66 | 0.21 | 0.19 | 0.02 | 1.67 | 2.33 | 0.21 | 16.52 | 4.33 |
| 90110124 | Connecticut | New London | 71.5 | 74.8 | 0.06 | 0.02 | 0.09 | 0.03 | 0.06 | 10.19 | 0.40 | 0.04 | 0.03 | 0.08 | 0.02 | 0.42 | 0.54 | 0.15 | 0.13 | 0.30 | 0.07 | 0.01 | 1.42 | 0.24 | 0.59 | 0.11 | 0.04 | 0.26 | 0.04 | 0.08 | 0.01 | 0.04 | 5.63 | 0.04 | 18.90 | 0.42 | 0.09 | 1.18 | 0.23 | 0.01 | 4.97 | 0.22 | 0.07 | 0.04 | 0.12 | 0.39 | 0.03 | 0.03 | 1.39 | 0.03 | 0.48 | 0.14 | 0.09 | 0.01 | 1.25 | 3.14 | 0.15 | 13.31 | 3.40 |
| 90131001 | Connecticut | Tolland | 67.2 | 68.7 | 0.21 | 0.05 | 0.24 | 0.05 | 0.12 | 8.52 | 0.40 | 0.05 | 0.06 | 0.21 | 0.01 | 0.52 | 0.94 | 0.08 | 0.14 | 0.58 | 0.13 | 0.02 | 2.08 | 0.28 | 0.73 | 0.08 | 0.12 | 0.31 | 0.02 | 0.06 | 0.01 | 0.04 | 4.76 | 0.11 | 9.37 | 0.29 | 0.03 | 2.20 | 0.27 | 0.00 | 6.73 | 0.05 | 0.08 | 0.01 | 0.44 | 0.63 | 0.04 | 0.02 | 1.29 | 0.00 | 0.53 | 0.17 | 0.07 | 0.02 | 1.09 | 2.50 | 0.25 | 15.97 | 3.97 |
| 100010002 | Delaware | Kent | 65.3 | 68.5 | 0.43 | 0.09 | 0.34 | 0.10 | 0.17 | 0.00 | 1.34 | 0.55 | 0.08 | 0.27 | 0.02 | 0.81 | 2.47 | 0.23 | 0.32 | 2.63 | 0.56 | 0.00 | 11.63 | 0.00 | 0.44 | 0.07 | 0.26 | 0.81 | 0.04 | 0.16 | 0.02 | 0.00 | 1.55 | 0.22 | 0.19 | 0.52 | 0.05 | 4.52 | 0.52 | 0.01 | 4.68 | 0.00 | 0.13 | 0.05 | 0.75 | 1.25 | 0.08 | 0.00 | 3.36 | 0.01 | 2.44 | 0.12 | 0.17 | 0.04 | 0.53 | 1.08 | 0.38 | 12.31 | 6.24 |
| 100031007 | Delaware | New Castle | 65.9 | 69.2 | 0.39 | 0.09 | 0.29 | 0.08 | 0.18 | 0.00 | 0.42 | 0.54 | 0.11 | 0.37 | 0.03 | 0.92 | 2.24 | 0.23 | 0.39 | 2.02 | 0.24 | 0.00 | 14.36 | 0.00 | 0.58 | 0.09 | 0.15 | 0.72 | 0.06 | 0.22 | 0.02 | 0.00 | 0.10 | 0.14 | 0.16 | 0.30 | 0.08 | 3.23 | 0.56 | 0.02 | 6.04 | 0.00 | 0.10 | 0.07 | 0.70 | 1.03 | 0.09 | 0.00 | 4.13 | 0.02 | 2.64 | 0.15 | 0.22 | 0.04 | 0.50 | 0.38 | 0.30 | 13.93 | 5.97 |
| 100031010 | Delaware | New Castle | 68.8 | 68.8 | 0.39 | 0.12 | 0.22 | 0.12 | 0.18 | 0.02 | 1.69 | 0.27 | 0.16 | 0.33 | 0.04 | 0.83 | 1.52 | 0.25 | 0.34 | 1.24 | 0.32 | 0.00 | 7.03 | 0.01 | 1.09 | 0.08 | 0.17 | 0.75 | 0.06 | 0.24 | 0.03 | 0.00 | 0.81 | 0.21 | 0.80 | 0.21 | 0.08 | 3.64 | 0.57 | 0.01 | 14.92 | 0.00 | 0.06 | 0.11 | 0.40 | 1.35 | 0.10 | 0.00 | 2.63 | 0.02 | 2.15 | 0.18 | 0.22 | 0.04 | 0.79 | 0.50 | 0.33 | 14.68 | 6.21 |
| 100031013 | Delaware | New Castle | 68.3 | 70.3 | 0.19 | 0.08 | 0.16 | 0.09 | 0.14 | 0.02 | 2.71 | 0.46 | 0.12 | 0.29 | 0.04 | 0.69 | 1.17 | 0.23 | 0.32 | 1.01 | 0.20 | 0.00 | 11.75 | 0.02 | 0.88 | 0.10 | 0.08 | 0.66 | 0.06 | 0.21 | 0.02 | 0.00 | 0.19 | 0.13 | 0.23 | 0.60 | 0.09 | 3.01 | 0.48 | 0.02 | 9.51 | 0.00 | 0.10 | 0.09 | 0.25 | 0.99 | 0.09 | 0.00 | 4.47 | 0.03 | 2.73 | 0.17 | 0.22 | 0.03 | 0.65 | 0.50 | 0.27 | 15.91 | 5.57 |
| 100032004 | Delaware | New Castle | 65.9 | 65.9 | 0.18 | 0.08 | 0.16 | 0.09 | 0.14 | 0.02 | 2.62 | 0.45 | 0.11 | 0.28 | 0.04 | 0.67 | 1.13 | 0.22 | 0.30 | 0.98 | 0.19 | 0.00 | 11.34 | 0.02 | 0.84 | 0.09 | 0.08 | 0.64 | 0.06 | 0.20 | 0.02 | 0.00 | 0.19 | 0.13 | 0.23 | 0.58 | 0.09 | 2.90 | 0.46 | 0.02 | 9.18 | 0.00 | 0.10 | 0.08 | 0.24 | 0.95 | 0.08 | 0.00 | 4.31 | 0.03 | 2.64 | 0.17 | 0.21 | 0.03 | 0.62 | 0.48 | 0.26 | 15.36 | 5.38 |
| 100051002 | Delaware | Sussex | 67.3 | 70.6 | 0.37 | 0.09 | 0.26 | 0.11 | 0.20 | 0.00 | 0.48 | 1.12 | 0.09 | 0.31 | 0.03 | 0.68 | 2.01 | 0.18 | 0.24 | 3.12 | 0.45 | 0.00 | 13.68 | 0.00 | 0.38 | 0.08 | 0.18 | 0.56 | 0.04 | 0.14 | 0.03 | 0.00 | 0.00 | 0.23 | 0.01 | 0.99 | 0.05 | 3.26 | 0.50 | 0.02 | 2.52 | 0.00 | 0.19 | 0.05 | 0.87 | 1.32 | 0.10 | 0.00 | 7.79 | 0.01 | 3.27 | 0.19 | 0.22 | 0.04 | 0.27 | 0.42 | 0.36 | 13.24 | 6.32 |
| 100051003 | Delaware | Sussex | 69.7 | 72.6 | 0.37 | 0.09 | 0.13 | 0.10 | 0.19 | 0.00 | 6.29 | 0.37 | 0.11 | 0.32 | 0.03 | 0.62 | 1.12 | 0.14 | 0.26 | 1.42 | 0.49 | 0.00 | 9.15 | 0.00 | 0.36 | 0.06 | 0.19 | 0.40 | 0.04 | 0.15 | 0.02 | 0.00 | 1.69 | 0.21 | 0.10 | 2.28 | 0.04 | 3.06 | 0.41 | 0.01 | 5.50 | 0.00 | 0.37 | 0.05 | 0.29 | 1.01 | 0.09 | 0.00 | 4.65 | 0.02 | 2.23 | 0.10 | 0.21 | 0.04 | 0.40 | 2.93 | 0.33 | 15.08 | 5.91 |
| 110010041 | District Of Colu | District of Columbi | 65.4 | 68.9 | 0.39 | 0.06 | 0.13 | 0.05 | 0.13 | 0.00 | 0.03 | 4.07 | 0.07 | 0.22 | 0.02 | 0.49 | 1.29 | 0.13 | 0.23 | 1.24 | 0.14 | 0.00 | 9.46 | 0.01 | 0.59 | 0.07 | 0.09 | 0.48 | 0.04 | 0.12 | 0.01 | 0.00 | 0.07 | 0.11 | 0.21 | 1.05 | 0.04 | 3.27 | 0.36 | 0.01 | 4.74 | 0.00 | 0.19 | 0.03 | 0.40 | 0.69 | 0.06 | 0.00 | 11.53 | 0.01 | 2.33 | 0.14 | 0.14 | 0.02 | 0.93 | 0.38 | 0.24 | 14.33 | 4.27 |
| 110010043 | District Of Colu | District of Columbi | 69.5 | 72.3 | 0.42 | 0.06 | 0.14 | 0.06 | 0.14 | 0.00 | 0.03 | 4.32 | 0.08 | 0.23 | 0.02 | 0.52 | 1.37 | 0.14 | 0.25 | 1.32 | 0.15 | 0.00 | 10.05 | 0.01 | 0.63 | 0.08 | 0.10 | 0.51 | 0.04 | 0.13 | 0.01 | 0.00 | 0.08 | 0.12 | 0.22 | 1.12 | 0.04 | 3.48 | 0.38 | 0.01 | 5.04 | 0.00 | 0.20 | 0.04 | 0.42 | 0.74 | 0.06 | 0.00 | 12.26 | 0.01 | 2.47 | 0.15 | 0.15 | 0.03 | 0.98 | 0.41 | 0.26 | 15.23 | 4.54 |
| 120013011 | Florida | Alachua | 57.1 | 58.2 | 1.56 | 0.04 | 0.16 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | 13.98 | 2.85 | 0.02 | 0.43 | 0.54 | 0.23 | 0.16 | 0.41 | 0.33 | 0.00 | 0.07 | 0.00 | 0.19 | 0.14 | 0.46 | 0.24 | 0.05 | 0.12 | 0.01 | 0.00 | 0.01 | 0.08 | 0.03 | 0.62 | 0.08 | 0.14 | 0.18 | 0.01 | 0.16 | 0.00 | 0.62 | 0.05 | 0.61 | 0.45 | 0.05 | 0.00 | 0.30 | 0.03 | 0.15 | 0.20 | 0.11 | 0.02 | 0.32 | 1.25 | 3.81 | 21.39 | 4.03 |
| 120030002 | Florida | Baker | 56.0 | 57.2 | 0.69 | 0.03 | 0.15 | 0.05 | 0.09 | 0.04 | 0.05 | 0.01 | 12.38 | 2.84 | 0.02 | 0.22 | 0.31 | 0.12 | 0.10 | 0.46 | 0.26 | 0.00 | 0.24 | 0.09 | 0.23 | 0.06 | 0.15 | 0.20 | 0.04 | 0.06 | 0.01 | 0.02 | 0.22 | 0.06 | 0.26 | 1.99 | 0.05 | 0.39 | 0.19 | 0.01 | 0.48 | 0.01 | 1.15 | 0.03 | 0.51 | 0.61 | 0.04 | 0.01 | 1.09 | 0.02 | 0.40 | 0.08 | 0.10 | 0.01 | 0.38 | 2.24 | 3.38 | 19.65 | 3.43 |
| 120050006 | Florida | Bay | 57.9 | 58.8 | 5.63 | 0.00 | 0.26 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 14.16 | 2.79 | 0.01 | 0.65 | 1.25 | 0.26 | 0.14 | 1.10 | 3.19 | 0.00 | 0.00 | 0.00 | 0.73 | 0.21 | 1.31 | 0.24 | 0.03 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.06 | 0.70 | 0.17 | 0.01 | 0.04 | 0.00 | 0.09 | 0.04 | 1.55 | 0.55 | 0.01 | 0.00 | 0.05 | 0.01 | 0.09 | 0.40 | 0.05 | 0.00 | 0.32 | 2.08 | 0.72 | 14.53 | 3.96 |
| 120090007 | Florida | Brevard | 57.9 | 57.9 | 0.92 | 0.05 | 0.14 | 0.04 | 0.15 | 0.00 | 0.00 | 0.00 | 20.94 | 0.96 | 0.01 | 0.11 | 0.13 | 0.05 | 0.07 | 0.16 | 1.43 | 0.00 | 0.01 | 0.00 | 0.03 | 0.02 | 0.49 | 0.14 | 0.02 | 0.04 | 0.01 | 0.00 | 0.00 | 0.15 | 0.00 | 0.26 | 0.01 | 0.07 | 0.15 | 0.00 | 0.04 | 0.00 | 0.21 | 0.01 | 0.34 | 0.76 | 0.04 | 0.00 | 0.13 | 0.01 | 0.08 | 0.03 | 0.09 | 0.02 | 0.29 | 5.86 | 1.84 | 17.23 | 4.10 |
| 120094001 | Florida | Brevard | 58.4 | 59.3 | 0.47 | 0.03 | 0.09 | 0.05 | 0.11 | 0.00 | 0.00 | 0.00 | 27.45 | 0.56 | 0.02 | 0.06 | 0.07 | 0.04 | 0.07 | 0.11 | 0.50 | 0.00 | 0.03 | 0.00 | 0.03 | 0.02 | 0.20 | 0.11 | 0.02 | 0.05 | 0.01 | 0.00 | 0.01 | 0.09 | 0.01 | 0.31 | 0.01 | 0.07 | 0.14 | 0.01 | 0.07 | 0.00 | 0.26 | 0.01 | 0.24 | 0.57 | 0.04 | 0.00 | 0.18 | 0.01 | 0.10 | 0.02 | 0.07 | 0.01 | 0.18 | 5.33 | 2.16 | 14.24 | 3.93 |
| 120110033 | Florida | Broward | 55.1 | 56.0 | 0.55 | 0.07 | 0.13 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 18.71 | 1.00 | 0.01 | 0.09 | 0.08 | 0.05 | 0.07 | 0.12 | 0.59 | 0.00 | 0.01 | 0.00 | 0.04 | 0.04 | 0.25 | 0.11 | 0.01 | 0.05 | 0.01 | 0.00 | 0.01 | 0.17 | 0.02 | 0.36 | 0.01 | 0.06 | 0.12 | 0.00 | 0.07 | 0.00 | 0.35 | 0.01 | 0.33 | 0.60 | 0.04 | 0.00 | 0.13 | 0.01 | 0.09 | 0.03 | 0.07 | 0.02 | 0.31 | 4.70 | 1.29 | 21.73 | 2.20 |
| 120112003 | Florida | Broward | 54.4 | 55.0 | 0.53 | 0.03 | 0.10 | 0.04 | 0.10 | 0.00 | 0.00 | 0.00 | 19.02 | 0.57 | 0.00 | 0.07 | 0.06 | 0.03 | 0.05 | 0.07 | 0.54 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.27 | 0.08 | 0.01 | 0.03 | 0.01 | 0.00 | 0.00 | 0.08 | 0.01 | 0.12 | 0.00 | 0.03 | 0.12 | 0.00 | 0.03 | 0.00 | 0.14 | 0.00 | 0.20 | 0.45 | 0.04 | 0.00 | 0.03 | 0.00 | 0.02 | 0.02 | 0.05 | 0.01 | 0.16 | 8.60 | 1.63 | 18.84 | 1.93 |
| 120210004 | Florida | Collier | 54.0 | 54.4 | 0.66 | 0.10 | 0.24 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | 16.98 | 1.77 | 0.01 | 0.12 | 0.08 | 0.08 | 0.10 | 0.11 | 0.72 | 0.00 | 0.01 | 0.00 | 0.05 | 0.09 | 0.31 | 0.16 | 0.01 | 0.06 | 0.02 | 0.00 | 0.00 | 0.20 | 0.02 | 0.34 | 0.01 | 0.05 | 0.21 | 0.00 | 0.06 | 0.00 | 0.53 | 0.02 | 0.40 | 0.69 | 0.05 | 0.00 | 0.07 | 0.00 | 0.04 | 0.05 | 0.07 | 0.03 | 0.39 | 4.14 | 3.52 | 17.19 | 3.80 |
| 120230002 | Florida | Columbia | 56.5 | 57.7 | 0.91 | 0.01 | 0.10 | 0.04 | 0.07 | 0.04 | 0.05 | 0.01 | 12.95 | 2.36 | 0.02 | 0.44 | 0.54 | 0.23 | 0.10 | 0.43 | 0.17 | 0.00 | 0.24 | 0.08 | 0.26 | 0.12 | 0.15 | 0.19 | 0.06 | 0.09 | 0.01 | 0.02 | 0.22 | 0.03 | 0.26 | 1.89 | 0.10 | 0.30 | 0.09 | 0.02 | 0.48 | 0.01 | 1.06 | 0.06 | 0.44 | 0.26 | 0.03 | 0.01 | 1.07 | 0.04 | 0.35 | 0.17 | 0.08 | 0.01 | 0.33 | 2.08 | 0.67 | 22.96 | 3.52 |
| 120310077 | Florida | Duval | 57.4 | 59.8 | 1.35 | 0.06 | 0.14 | 0.07 | 0.14 | 0.00 | 0.00 | 0.00 | 16.55 | 4.91 | 0.03 | 0.38 | 0.54 | 0.21 | 0.13 | 0.59 | 0.74 | 0.00 | 0.05 | 0.00 | 0.15 | 0.09 | 0.32 | 0.22 | 0.06 | 0.11 | 0.02 | 0.00 | 0.01 | 0.12 | 0.01 | 0.80 | 0.06 | 0.22 | 0.23 | 0.02 | 0.12 | 0.00 | 1.13 | 0.05 | 0.81 | 0.82 | 0.06 | 0.00 | 0.30 | 0.03 | 0.22 | 0.15 | 0.16 | 0.03 | 0.33 | 2.16 | 1.94 | 16.56 | 3.96 |
| 120310100 | Florida | Duval | 58.3 | 60.7 | 1.52 | 0.05 | 0.14 | 0.07 | 0.16 | 0.00 | 0.00 | 0.00 | 15.51 | 4.85 | 0.03 | 0.38 | 0.57 | 0.19 | 0.15 | 0.67 | 0.50 | 0.00 | 0.00 | 0.00 | 0.14 | 0.08 | 0.31 | 0.22 | 0.05 | 0.10 | 0.02 | 0.00 | 0.00 | 0.11 | 0.00 | 0.49 | 0.06 | 0.21 | 0.23 | 0.01 | 0.03 | 0.00 | 0.72 | 0.05 | 1.23 | 0.68 | 0.07 | 0.00 | 0.10 | 0.02 | 0.09 | 0.14 | 0.17 | 0.02 | 0.26 | 2.48 | 4.73 | 16.56 | 3.90 |
| 120310106 | Florida | Duval | 56.9 | 57.8 | 0.50 | 0.05 | 0.08 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 19.62 | 1.88 | 0.01 | 0.10 | 0.12 | 0.06 | 0.05 | 0.19 | 0.30 | 0.00 | 0.11 | 0.00 | 0.14 | 0.06 | 0.19 | 0.09 | 0.02 | 0.04 | 0.02 | 0.00 | 0.00 | 0.13 | 0.03 | 1.18 | 0.03 | 0.29 | 0.10 | 0.00 | 0.26 | 0.00 | 1.01 | 0.02 | 0.24 | 0.41 | 0.05 | 0.00 | 0.60 | 0.01 | 0.27 | 0.06 | 0.07 | 0.02 | 0.29 | 2.34 | 3.25 | 19.46 | 2.77 |
| 120330004 | Florida | Escambia | 61.3 | 62.4 | 8.26 | 0.03 | 0.27 | 0.07 | 0.10 | 0.00 | 0.00 | 0.00 | 15.68 | 2.70 | 0.02 | 0.31 | 0.42 | 0.10 | 0.10 | 0.75 | 3.38 | 0.00 | 0.01 | 0.00 | 0.24 | 0.07 | 2.53 | 0.26 | 0.05 | 0.08 | 0.02 | 0.00 | 0.00 | 0.06 | 0.02 | 0.21 | 0.04 | 0.34 | 0.23 | 0.01 | 0.04 | 0.00 | 0.18 | 0.02 | 1.42 | 0.82 | 0.05 | 0.00 | 0.10 | 0.02 | 0.11 | 0.09 | 0.14 | 0.01 | 0.32 | 1.33 | 0.75 | 15.32 | 3.96 |
| 120330018 | Florida | Escambia | 64.4 | 65.3 | 9.41 | 0.02 | 0.35 | 0.06 | 0.09 | 0.00 | 0.00 | 0.00 | 21.03 | 1.35 | 0.01 | 0.43 | 0.78 | 0.16 | 0.06 | 1.05 | 1.74 | 0.00 | 0.01 | 0.00 | 0.32 | 0.10 | 2.71 | 0.25 | 0.02 | 0.05 | 0.01 | 0.00 | 0.00 | 0.05 | 0.01 | 0.09 | 0.03 | 0.55 | 0.27 | 0.01 | 0.04 | 0.00 | 0.08 | 0.02 | 1.16 | 1.12 | 0.04 | 0.00 | 0.06 | 0.01 | 0.06 | 0.18 | 0.08 | 0.01 | 0.28 | 1.21 | 0.94 | 14.31 | 3.57 |
| 120570081 | Florida | Hillsborough | 65.3 | 66.5 | 0.88 | 0.05 | 0.13 | 0.04 | 0.09 | 0.00 | 0.00 | 0.00 | 30.20 | 1.44 | 0.00 | 0.15 | 0.07 | 0.05 | 0.04 | 0.05 | 0.52 | 0.00 | 0.01 | 0.00 | 0.07 | 0.06 | 0.32 | 0.12 | 0.01 | 0.03 | 0.01 | 0.00 | 0.00 | 0.10 | 0.02 | 0.04 | 0.01 | 0.02 | 0.07 | 0.00 | 0.03 | 0.00 | 0.04 | 0.01 | 0.24 | 0.38 | 0.03 | 0.00 | 0.02 | 0.00 | 0.01 | 0.06 | 0.04 | 0.02 | 0.25 | 2.57 | 1.76 | 22.49 | 2.51 |
| 120571035 | Florida | Hillsborough | 62.0 | 62.7 | 0.69 | 0.11 | 0.15 | 0.08 | 0.16 | 0.00 | 0.00 | 0.00 | 23.54 | 0.83 | 0.01 | 0.07 | 0.03 | 0.04 | 0.05 | 0.03 | 0.82 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.28 | 0.08 | 0.01 | 0.04 | 0.03 | 0.00 | 0.00 | 0.24 | 0.00 | 0.05 | 0.01 | 0.01 | 0.12 | 0.00 | 0.02 | 0.00 | 0.07 | 0.01 | 0.16 | 0.78 | 0.07 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.06 | 0.03 | 0.40 | 3.05 | 3.16 | 23.80 | 2.56 |
| 120571065 | Florida | Hillsborough | 65.5 | 66.7 | 1.04 | 0.03 | 0.06 | 0.03 | 0.11 | 0.00 | 0.00 | 0.00 | 30.67 | 0.76 | 0.01 | 0.11 | 0.08 | 0.06 | 0.05 | 0.07 | 0.57 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.48 | 0.13 | 0.01 | 0.03 | 0.01 | 0.00 | 0.00 | 0.11 | 0.01 | 0.03 | 0.01 | 0.02 | 0.07 | 0.00 | 0.02 | 0.00 | 0.06 | 0.01 | 0.21 | 0.38 | 0.03 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.05 | 0.01 | 0.26 | 3.35 | 1.56 | 22.24 | 2.43 |
| 120573002 | Florida | Hillsborough | 63.1 | 63.6 | 1.01 | 0.02 | 0.14 | 0.01 | 0.08 | 0.00 | 0.00 | 0.00 | 28.58 | 0.98 | 0.00 | 0.13 | 0.08 | 0.08 | 0.06 | 0.07 | 0.75 | 0.00 | 0.01 | 0.00 | 0.05 | 0.07 | 0.47 | 0.13 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 | 0.08 | 0.02 | 0.08 | 0.01 | 0.02 | 0.10 | 0.00 | 0.04 | 0.00 | 0.12 | 0.01 | 0.24 | 0.43 | 0.02 | 0.00 | 0.03 | 0.00 | 0.02 | 0.06 | 0.03 | 0.01 | 0.19 | 3.12 | 1.06 | 22.12 | 2.29 |
| 120619991 | Florida | Indian River | 58.6 | 58.6 | 0.59 | 0.05 | 0.08 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 | 15.94 | 0.74 | 0.01 | 0.09 | 0.08 | 0.06 | 0.06 | 0.10 | 0.56 | 0.00 | 0.01 | 0.00 | 0.02 | 0.03 | 0.27 | 0.11 | 0.02 | 0.05 | 0.01 | 0.00 | 0.01 | 0.15 | 0.00 | 0.26 | 0.02 | 0.05 | 0.10 | 0.00 | 0.05 | 0.00 | 0.20 | 0.01 | 0.22 | 0.53 | 0.04 | 0.00 | 0.15 | 0.01 | 0.09 | 0.03 | 0.08 | 0.02 | 0.29 | 7.32 | 1.51 | 24.52 | 3.65 |
| 120690002 | Florida | Lake | 58.7 | 59.0 | 0.89 | 0.14 | 0.07 | 0.10 | 0.25 | 0.00 | 0.00 | 0.00 | 17.53 | 1.34 | 0.02 | 0.05 | 0.03 | 0.04 | 0.05 | 0.05 | 0.57 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.29 | 0.09 | 0.01 | 0.04 | 0.04 | 0.00 | 0.00 | 0.30 | 0.00 | 0.12 | 0.01 | 0.01 | 0.06 | 0.01 | 0.01 | 0.00 | 0.11 | 0.01 | 0.17 | 0.76 | 0.10 | 0.00 | 0.03 | 0.01 | 0.01 | 0.02 | 0.10 | 0.04 | 0.54 | 2.44 | 3.64 | 25.34 | 2.98 |
| 120712002 | Florida | Lee | 57.8 | 58.0 | 0.74 | 0.14 | 0.17 | 0.10 | 0.20 | 0.00 | 0.00 | 0.00 | 17.41 | 1.33 | 0.01 | 0.08 | 0.07 | 0.05 | 0.07 | 0.10 | 0.85 | 0.00 | 0.01 | 0.00 | 0.03 | 0.04 | 0.32 | 0.13 | 0.01 | 0.05 | 0.04 | 0.00 | 0.00 | 0.29 | 0.01 | 0.25 | 0.01 | 0.04 | 0.15 | 0.01 | 0.04 | 0.00 | 0.30 | 0.01 | 0.32 | 0.89 | 0.07 | 0.00 | 0.07 | 0.00 | 0.03 | 0.03 | 0.08 | 0.04 | 0.50 | 4.46 | 4.56 | 19.77 | 3.69 |
| 120713002 | Florida | Lee | 54.9 | 55.5 | 0.62 | 0.09 | 0.17 | 0.07 | 0.17 | 0.00 | 0.00 | 0.00 | 21.16 | 1.02 | 0.01 | 0.07 | 0.05 | 0.04 | 0.08 | 0.07 | 0.75 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.29 | 0.14 | 0.01 | 0.04 | 0.02 | 0.00 | 0.00 | 0.20 | 0.00 | 0.15 | 0.01 | 0.02 | 0.18 | 0.01 | 0.02 | 0.00 | 0.18 | 0.01 | 0.27 | 0.79 | 0.06 | 0.00 | 0.03 | 0.01 | 0.02 | 0.02 | 0.08 | 0.03 | 0.32 | 4.94 | 2.89 | 16.37 | 3.09 |
| 120730012 | Florida | Leon | 54.5 | 55.9 | 2.54 | 0.03 | 0.40 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | 8.55 | 6.47 | 0.01 | 0.49 | 0.72 | 0.21 | 0.17 | 0.92 | 0.69 | 0.00 | 0.00 | 0.00 | 0.36 | 0.09 | 0.60 | 0.30 | 0.04 | 0.12 | 0.01 | 0.00 | 0.00 | 0.06 | 0.01 | 0.42 | 0.06 | 0.42 | 0.29 | 0.01 | 0.04 | 0.00 | 0.73 | 0.04 | 1.31 | 0.93 | 0.03 | 0.00 | 0.12 | 0.02 | 0.12 | 0.18 | 0.10 | 0.02 | 0.33 | 0.92 | 0.86 | 19.29 | 5.07 |
| 120730013 | Florida | Leon | 54.4 | 55.2 | 2.89 | 0.02 | 0.51 | 0.04 | 0.11 | 0.00 | 0.00 | 0.00 | 7.08 | 5.53 | 0.01 | 0.47 | 0.76 | 0.17 | 0.19 | 0.74 | 0.71 | 0.00 | 0.02 | 0.00 | 0.36 | 0.10 | 0.65 | 0.27 | 0.03 | 0.12 | 0.01 | 0.00 | 0.01 | 0.05 | 0.03 | 0.23 | 0.04 | 0.56 | 0.33 | 0.01 | 0.11 | 0.00 | 0.23 | 0.03 | 1.36 | 0.89 | 0.03 | 0.00 | 0.08 | 0.01 | 0.08 | 0.20 | 0.09 | 0.01 | 0.33 | 0.71 | 0.63 | 22.90 | 4.39 |
| 120813002 | Florida | Manatee | 58.0 | 58.9 | 0.58 | 0.02 | 0.13 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 27.36 | 2.04 | 0.00 | 0.15 | 0.09 | 0.05 | 0.04 | 0.07 | 0.17 | 0.00 | 0.03 | 0.00 | 0.09 | 0.06 | 0.14 | 0.11 | 0.00 | 0.03 | 0.00 | 0.00 | 0.02 | 0.04 | 0.04 | 0.21 | 0.01 | 0.05 | 0.09 | 0.00 | 0.11 | 0.00 | 0.30 | 0.01 | 0.31 | 0.17 | 0.02 | 0.00 | 0.16 | 0.00 | 0.07 | 0.07 | 0.03 | 0.01 | 0.22 | 2.63 | 0.69 | 19.00 | 2.26 |
| 120814012 | Florida | Manatee | 60.1 | 60.1 | 0.91 | 0.08 | 0.18 | 0.05 | 0.15 | 0.00 | 0.00 | 0.00 | 22.30 | 2.99 | 0.01 | 0.21 | 0.11 | 0.07 | 0.07 | 0.10 | 0.35 | 0.00 | 0.04 | 0.00 | 0.11 | 0.09 | 0.21 | 0.16 | 0.01 | 0.06 | 0.02 | 0.00 | 0.02 | 0.19 | 0.05 | 0.32 | 0.01 | 0.07 | 0.14 | 0.00 | 0.15 | 0.00 | 0.42 | 0.01 | 0.44 | 0.50 | 0.07 | 0.00 | 0.24 | 0.01 | 0.11 | 0.09 | 0.07 | 0.03 | 0.49 | 3.81 | 2.57 | 18.62 | 3.15 |
| 120830003 | Florida | Marion | 57.7 | 58.6 | 0.83 | 0.12 | 0.05 | 0.08 | 0.23 | 0.00 | 0.00 | 0.00 | 15.66 | 1.35 | 0.01 | 0.08 | 0.06 | 0.05 | 0.05 | 0.06 | 0.44 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.30 | 0.09 | 0.01 | 0.04 | 0.03 | 0.00 | 0.00 | 0.31 | 0.01 | 0.07 | 0.01 | 0.02 | 0.06 | 0.01 | 0.01 | 0.00 | 0.03 | 0.01 | 0.14 | 0.73 | 0.08 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 | 0.07 | 0.04 | 0.53 | 1.98 | 2.88 | 28.12 | 2.70 |
| 120830004 | Florida | Marion | 55.1 | 56.0 | 1.02 | 0.10 | 0.10 | 0.08 | 0.24 | 0.00 | 0.00 | 0.00 | 13.91 | 1.88 | 0.02 | 0.23 | 0.22 | 0.15 | 0.10 | 0.17 | 0.39 | 0.00 | 0.00 | 0.00 | 0.05 | 0.09 | 0.36 | 0.18 | 0.05 | 0.08 | 0.03 | 0.00 | 0.00 | 0.25 | 0.00 | 0.07 | 0.07 | 0.02 | 0.07 | 0.02 | 0.00 | 0.00 | 0.03 | 0.04 | 0.32 | 0.60 | 0.08 | 0.00 | 0.01 | 0.02 | 0.00 | 0.11 | 0.10 | 0.04 | 0.46 | 1.49 | 2.51 | 25.85 | 3.25 |
| 120860027 | Florida | Miami-Dade | 61.2 | 62.2 | 0.45 | 0.04 | 0.14 | 0.02 | 0.07 | 0.00 | 0.00 | 0.00 | 26.38 | 0.82 | 0.00 | 0.11 | 0.08 | 0.05 | 0.07 | 0.09 | 0.40 | 0.00 | 0.01 | 0.00 | 0.05 | 0.05 | 0.20 | 0.10 | 0.01 | 0.04 | 0.00 | 0.00 | 0.01 | 0.10 | 0.02 | 0.24 | 0.01 | 0.05 | 0.15 | 0.00 | 0.07 | 0.00 | 0.29 | 0.01 | 0.26 | 0.37 | 0.02 | 0.00 | 0.05 | 0.00 | 0.03 | 0.03 | 0.04 | 0.01 | 0.22 | 7.25 | 1.86 | 18.69 | 1.98 |
| 120860029 | Florida | Miami-Dade | 59.6 | 60.3 | 0.41 | 0.05 | 0.11 | 0.03 | 0.09 | 0.00 | 0.00 | 0.00 | 24.35 | 0.67 | 0.00 | 0.07 | 0.06 | 0.03 | 0.05 | 0.08 | 0.38 | 0.00 | 0.01 | 0.00 | 0.03 | 0.03 | 0.19 | 0.08 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.12 | 0.01 | 0.21 | 0.00 | 0.03 | 0.10 | 0.00 | 0.03 | 0.00 | 0.23 | 0.00 | 0.22 | 0.37 | 0.02 | 0.00 | 0.04 | 0.00 | 0.02 | 0.02 | 0.04 | 0.02 | 0.22 | 5.44 | 1.63 | 21.91 | 1.93 |
| 120910002 | Florida | Okaloosa | 57.8 | 58.6 | 7.87 | 0.04 | 0.12 | 0.07 | 0.09 | 0.00 | 0.00 | 0.00 | 9.86 | 3.23 | 0.01 | 0.10 | 0.30 | 0.06 | 0.07 | 0.59 | 3.77 | 0.00 | 0.03 | 0.00 | 0.26 | 0.06 | 3.10 | 0.09 | 0.03 | 0.05 | 0.01 | 0.00 | 0.01 | 0.05 | 0.04 | 0.36 | 0.03 | 0.37 | 0.13 | 0.01 | 0.11 | 0.00 | 0.30 | 0.02 | 1.29 | 0.41 | 0.04 | 0.00 | 0.18 | 0.02 | 0.15 | 0.07 | 0.10 | 0.02 | 0.33 | 2.70 | 1.28 | 16.12 | 3.60 |
| 120950008 | Florida | Orange | 63.5 | 64.4 | 0.90 | 0.05 | 0.09 | 0.04 | 0.13 | 0.00 | 0.00 | 0.00 | 28.99 | 1.65 | 0.01 | 0.09 | 0.11 | 0.05 | 0.06 | 0.17 | 0.67 | 0.00 | 0.05 | 0.00 | 0.07 | 0.05 | 0.36 | 0.11 | 0.02 | 0.04 | 0.01 | 0.00 | 0.00 | 0.13 | 0.01 | 0.49 | 0.02 | 0.11 | 0.11 | 0.00 | 0.10 | 0.00 | 0.71 | 0.01 | 0.34 | 0.55 | 0.04 | 0.00 | 0.21 | 0.01 | 0.11 | 0.05 | 0.09 | 0.02 | 0.28 | 3.11 | 2.24 | 17.83 | 2.96 |
| 120952002 | Florida | Orange | 65.1 | 66.3 | 0.64 | 0.07 | 0.08 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 27.70 | 1.16 | 0.02 | 0.07 | 0.09 | 0.03 | 0.05 | 0.15 | 0.55 | 0.00 | 0.06 | 0.00 | 0.07 | 0.03 | 0.25 | 0.08 | 0.02 | 0.04 | 0.02 | 0.00 | 0.00 | 0.15 | 0.01 | 0.48 | 0.02 | 0.11 | 0.10 | 0.01 | 0.11 | 0.00 | 0.64 | 0.01 | 0.29 | 0.53 | 0.06 | 0.00 | 0.22 | 0.01 | 0.12 | 0.04 | 0.08 | 0.02 | 0.30 | 2.44 | 2.06 | 22.98 | 2.66 |
| 120972002 | Florida | Osceola | 58.1 | 58.1 | 1.20 | 0.13 | 0.11 | 0.10 | 0.22 | 0.00 | 0.00 | 0.00 | 18.78 | 1.78 | 0.02 | 0.08 | 0.08 | 0.05 | 0.06 | 0.12 | 1.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.45 | 0.13 | 0.02 | 0.05 | 0.04 | 0.00 | 0.00 | 0.28 | 0.00 | 0.24 | 0.01 | 0.05 | 0.11 | 0.01 | 0.02 | 0.00 | 0.33 | 0.01 | 0.30 | 0.92 | 0.09 | 0.00 | 0.06 | 0.01 | 0.03 | 0.03 | 0.11 | 0.04 | 0.51 | 3.22 | 4.13 | 19.20 | 3.69 |
| 120990009 | Florida | Palm Beach | 58.8 | 59.1 | 0.66 | 0.07 | 0.09 | 0.03 | 0.12 | 0.00 | 0.00 | 0.00 | 15.16 | 0.83 | 0.01 | 0.06 | 0.07 | 0.03 | 0.05 | 0.10 | 0.70 | 0.00 | 0.01 | 0.00 | 0.02 | 0.02 | 0.30 | 0.10 | 0.01 | 0.04 | 0.01 | 0.00 | 0.00 | 0.19 | 0.01 | 0.22 | 0.01 | 0.05 | 0.10 | 0.00 | 0.04 | 0.00 | 0.23 | 0.01 | 0.25 | 0.64 | 0.04 | 0.00 | 0.10 | 0.01 | 0.07 | 0.02 | 0.07 | 0.02 | 0.31 | 5.07 | 1.24 | 28.95 | 2.42 |
| 120990020 | Florida | Palm Beach | 57.7 | 58.0 | 0.67 | 0.08 | 0.10 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 | 15.98 | 0.85 | 0.01 | 0.09 | 0.08 | 0.05 | 0.06 | 0.11 | 0.75 | 0.00 | 0.01 | 0.00 | 0.02 | 0.03 | 0.31 | 0.11 | 0.02 | 0.04 | 0.01 | 0.00 | 0.01 | 0.23 | 0.01 | 0.24 | 0.02 | 0.06 | 0.11 | 0.00 | 0.06 | 0.00 | 0.21 | 0.01 | 0.27 | 0.70 | 0.04 | 0.00 | 0.12 | 0.01 | 0.09 | 0.02 | 0.08 | 0.03 | 0.39 | 6.66 | 1.27 | 24.76 | 2.50 |
| 121010005 | Florida | Pasco | 58.7 | 59.0 | 0.35 | 0.12 | 0.07 | 0.09 | 0.16 | 0.00 | 0.00 | 0.00 | 20.92 | 0.35 | 0.00 | 0.04 | 0.05 | 0.01 | 0.04 | 0.05 | 0.37 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.17 | 0.06 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.25 | 0.01 | 0.06 | 0.00 | 0.02 | 0.10 | 0.00 | 0.01 | 0.00 | 0.06 | 0.00 | 0.11 | 0.78 | 0.06 | 0.00 | 0.02 | 0.00 | 0.01 | 0.01 | 0.05 | 0.04 | 0.38 | 2.68 | 2.76 | 25.48 | 2.65 |
| 121012001 | Florida | Pasco | 59.2 | 60.8 | 0.30 | 0.10 | 0.03 | 0.08 | 0.19 | 0.00 | 0.00 | 0.00 | 19.48 | 0.35 | 0.01 | 0.04 | 0.04 | 0.01 | 0.03 | 0.04 | 0.28 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.14 | 0.05 | 0.01 | 0.02 | 0.03 | 0.00 | 0.00 | 0.23 | 0.01 | 0.11 | 0.01 | 0.02 | 0.05 | 0.01 | 0.01 | 0.00 | 0.06 | 0.00 | 0.09 | 0.50 | 0.08 | 0.00 | 0.03 | 0.00 | 0.01 | 0.01 | 0.06 | 0.03 | 0.36 | 3.13 | 2.04 | 28.91 | 1.94 |
| 121030004 | Florida | Pinellas | 60.9 | 61.2 | 0.32 | 0.09 | 0.03 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | 19.77 | 0.37 | 0.01 | 0.04 | 0.04 | 0.01 | 0.02 | 0.03 | 0.30 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.15 | 0.04 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.20 | 0.01 | 0.06 | 0.00 | 0.02 | 0.04 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.08 | 0.49 | 0.05 | 0.00 | 0.02 | 0.00 | 0.01 | 0.01 | 0.04 | 0.03 | 0.34 | 3.29 | 2.16 | 30.41 | 1.87 |
| 121030018 | Florida | Pinellas | 59.5 | 60.1 | 0.60 | 0.03 | 0.18 | 0.04 | 0.09 | 0.00 | 0.00 | 0.00 | 22.30 | 1.47 | 0.00 | 0.07 | 0.04 | 0.05 | 0.06 | 0.04 | 0.34 | 0.00 | 0.00 | 0.00 | 0.04 | 0.06 | 0.20 | 0.10 | 0.01 | 0.04 | 0.01 | 0.00 | 0.00 | 0.09 | 0.01 | 0.07 | 0.01 | 0.02 | 0.14 | 0.00 | 0.03 | 0.00 | 0.28 | 0.01 | 0.23 | 0.36 | 0.04 | 0.00 | 0.02 | 0.00 | 0.01 | 0.04 | 0.04 | 0.01 | 0.21 | 2.38 | 1.47 | 25.83 | 2.22 |
| 121035002 | Florida | Pinellas | 58.6 | 59.2 | 0.30 | 0.11 | 0.03 | 0.08 | 0.19 | 0.00 | 0.00 | 0.00 | 19.26 | 0.35 | 0.01 | 0.04 | 0.04 | 0.01 | 0.03 | 0.04 | 0.29 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.14 | 0.05 | 0.01 | 0.02 | 0.03 | 0.00 | 0.00 | 0.23 | 0.01 | 0.10 | 0.00 | 0.01 | 0.04 | 0.01 | 0.01 | 0.00 | 0.06 | 0.00 | 0.09 | 0.49 | 0.08 | 0.00 | 0.03 | 0.00 | 0.01 | 0.01 | 0.05 | 0.03 | 0.35 | 3.13 | 2.04 | 28.62 | 1.91 |
| 121056005 | Florida | Polk | 59.6 | 60.2 | 0.39 | 0.14 | 0.09 | 0.09 | 0.21 | 0.00 | 0.00 | 0.00 | 21.75 | 0.54 | 0.02 | 0.04 | 0.04 | 0.02 | 0.06 | 0.08 | 0.45 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.17 | 0.09 | 0.01 | 0.05 | 0.03 | 0.00 | 0.00 | 0.28 | 0.00 | 0.21 | 0.00 | 0.03 | 0.12 | 0.01 | 0.02 | 0.00 | 0.15 | 0.00 | 0.19 | 0.90 | 0.08 | 0.00 | 0.08 | 0.01 | 0.04 | 0.00 | 0.10 | 0.04 | 0.42 | 2.71 | 4.08 | 22.69 | 2.91 |
| 121056006 | Florida | Polk | 60.7 | 61.3 | 0.69 | 0.09 | 0.13 | 0.07 | 0.17 | 0.00 | 0.00 | 0.00 | 24.15 | 0.70 | 0.01 | 0.06 | 0.07 | 0.03 | 0.07 | 0.12 | 0.96 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.34 | 0.11 | 0.01 | 0.04 | 0.02 | 0.00 | 0.00 | 0.20 | 0.00 | 0.22 | 0.00 | 0.04 | 0.16 | 0.01 | 0.02 | 0.00 | 0.19 | 0.00 | 0.25 | 0.92 | 0.06 | 0.00 | 0.09 | 0.01 | 0.05 | 0.01 | 0.08 | 0.03 | 0.32 | 3.35 | 2.69 | 20.58 | 3.34 |
| 121130015 | Florida | Santa Rosa | 62.7 | 64.8 | 8.80 | 0.02 | 0.26 | 0.06 | 0.08 | 0.00 | 0.00 | 0.00 | 18.41 | 1.32 | 0.02 | 0.30 | 0.64 | 0.15 | 0.10 | 0.94 | 3.01 | 0.00 | 0.01 | 0.00 | 0.20 | 0.09 | 3.41 | 0.22 | 0.04 | 0.07 | 0.01 | 0.00 | 0.00 | 0.05 | 0.01 | 0.11 | 0.05 | 0.47 | 0.23 | 0.01 | 0.03 | 0.00 | 0.12 | 0.03 | 1.11 | 0.92 | 0.03 | 0.00 | 0.05 | 0.02 | 0.07 | 0.12 | 0.09 | 0.01 | 0.22 | 2.11 | 0.71 | 13.98 | 3.72 |
| 121151005 | Florida | Sarasota | 63.7 | 64.3 | 1.30 | 0.09 | 0.14 | 0.06 | 0.19 | 0.00 | 0.00 | 0.00 | 22.14 | 2.00 | 0.01 | 0.19 | 0.13 | 0.07 | 0.08 | 0.13 | 0.81 | 0.00 | 0.05 | 0.00 | 0.08 | 0.06 | 0.49 | 0.18 | 0.02 | 0.06 | 0.02 | 0.00 | 0.02 | 0.19 | 0.04 | 0.32 | 0.01 | 0.07 | 0.13 | 0.00 | 0.15 | 0.00 | 0.18 | 0.01 | 0.38 | 0.73 | 0.07 | 0.00 | 0.28 | 0.01 | 0.13 | 0.07 | 0.09 | 0.04 | 0.46 | 5.31 | 2.42 | 21.07 | 2.99 |
| 121151006 | Florida | Sarasota | 60.4 | 60.6 | 1.23 | 0.09 | 0.14 | 0.06 | 0.18 | 0.00 | 0.00 | 0.00 | 21.38 | 1.93 | 0.01 | 0.17 | 0.12 | 0.06 | 0.08 | 0.12 | 0.75 | 0.00 | 0.04 | 0.00 | 0.07 | 0.06 | 0.46 | 0.17 | 0.02 | 0.05 | 0.02 | 0.00 | 0.02 | 0.19 | 0.03 | 0.29 | 0.01 | 0.07 | 0.12 | 0.00 | 0.13 | 0.00 | 0.17 | 0.01 | 0.36 | 0.70 | 0.06 | 0.00 | 0.25 | 0.01 | 0.11 | 0.06 | 0.09 | 0.04 | 0.43 | 4.70 | 2.32 | 19.91 | 2.84 |
| 121152002 | Florida | Sarasota | 59.1 | 60.0 | 0.81 | 0.09 | 0.08 | 0.05 | 0.15 | 0.00 | 0.00 | 0.00 | 17.98 | 1.46 | 0.01 | 0.14 | 0.09 | 0.05 | 0.06 | 0.08 | 0.40 | 0.00 | 0.04 | 0.00 | 0.06 | 0.05 | 0.27 | 0.13 | 0.01 | 0.05 | 0.02 | 0.00 | 0.01 | 0.16 | 0.03 | 0.29 | 0.01 | 0.05 | 0.07 | 0.00 | 0.13 | 0.00 | 0.16 | 0.01 | 0.26 | 0.49 | 0.06 | 0.00 | 0.27 | 0.01 | 0.12 | 0.05 | 0.08 | 0.03 | 0.39 | 3.22 | 3.25 | 24.83 | 2.79 |
| 121171002 | Florida | Seminole | 60.4 | 61.9 | 0.70 | 0.03 | 0.17 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 27.58 | 1.65 | 0.00 | 0.10 | 0.10 | 0.06 | 0.07 | 0.15 | 0.66 | 0.00 | 0.05 | 0.00 | 0.08 | 0.06 | 0.30 | 0.11 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 0.08 | 0.01 | 0.48 | 0.02 | 0.10 | 0.15 | 0.00 | 0.11 | 0.00 | 0.73 | 0.01 | 0.37 | 0.51 | 0.02 | 0.00 | 0.18 | 0.00 | 0.10 | 0.05 | 0.06 | 0.01 | 0.20 | 2.15 | 1.61 | 18.43 | 2.75 |
| 121272001 | Florida | Volusia | 52.5 | 52.8 | 1.04 | 0.06 | 0.18 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | 15.12 | 2.98 | 0.04 | 0.16 | 0.19 | 0.13 | 0.13 | 0.33 | 0.87 | 0.00 | 0.00 | 0.00 | 0.04 | 0.09 | 0.44 | 0.26 | 0.08 | 0.08 | 0.03 | 0.00 | 0.00 | 0.16 | 0.00 | 0.18 | 0.07 | 0.07 | 0.21 | 0.03 | 0.01 | 0.00 | 0.21 | 0.03 | 0.67 | 0.81 | 0.06 | 0.00 | 0.04 | 0.05 | 0.05 | 0.05 | 0.14 | 0.02 | 0.33 | 1.96 | 2.89 | 17.93 | 3.85 |
| 121275002 | Florida | Volusia | 56.5 | 57.1 | 1.29 | 0.08 | 0.20 | 0.08 | 0.21 | 0.00 | 0.00 | 0.00 | 13.07 | 3.39 | 0.04 | 0.31 | 0.44 | 0.15 | 0.16 | 0.58 | 1.28 | 0.00 | 0.02 | 0.00 | 0.13 | 0.06 | 0.66 | 0.31 | 0.07 | 0.11 | 0.03 | 0.00 | 0.00 | 0.19 | 0.00 | 0.60 | 0.07 | 0.21 | 0.28 | 0.02 | 0.06 | 0.00 | 0.92 | 0.04 | 0.99 | 1.01 | 0.09 | 0.00 | 0.18 | 0.03 | 0.13 | 0.10 | 0.21 | 0.03 | 0.43 | 2.60 | 4.41 | 16.57 | 4.46 |
| 130210012 | Georgia | Bibb | 59.4 | 60.0 | 0.97 | 0.08 | 0.38 | 0.17 | 0.20 | 0.00 | 0.00 | 0.00 | 0.13 | 20.45 | 0.07 | 0.41 | 0.93 | 0.20 | 0.23 | 2.26 | 0.21 | 0.00 | 0.05 | 0.01 | 0.15 | 0.17 | 0.17 | 0.48 | 0.13 | 0.13 | 0.05 | 0.00 | 0.02 | 0.15 | 0.04 | 0.64 | 0.04 | 0.57 | 0.52 | 0.05 | 0.11 | 0.00 | 0.48 | 0.04 | 3.51 | 1.36 | 0.11 | 0.00 | 0.26 | 0.08 | 0.26 | 0.08 | 0.27 | 0.03 | 0.45 | 0.34 | 0.31 | 15.45 | 5.93 |
| 130510021 | Georgia | Chatham | 55.8 | 56.4 | 1.33 | 0.01 | 0.25 | 0.08 | 0.12 | 0.00 | 0.00 | 0.00 | 1.86 | 13.78 | 0.05 | 0.18 | 0.33 | 0.11 | 0.17 | 1.00 | 0.22 | 0.00 | 0.10 | 0.00 | 0.30 | 0.10 | 0.28 | 0.17 | 0.10 | 0.11 | 0.02 | 0.00 | 0.00 | 0.04 | 0.02 | 1.65 | 0.04 | 1.33 | 0.24 | 0.03 | 0.69 | 0.00 | 3.49 | 0.03 | 1.03 | 0.59 | 0.06 | 0.00 | 0.60 | 0.06 | 0.80 | 0.09 | 0.18 | 0.01 | 0.35 | 2.44 | 0.50 | 16.73 | 3.90 |
| 130550001 | Georgia | Chattooga | 56.8 | 57.4 | 1.50 | 0.05 | 0.16 | 0.08 | 0.20 | 0.00 | 0.00 | 0.00 | 0.11 | 9.52 | 0.02 | 0.19 | 0.39 | 0.03 | 0.11 | 2.04 | 0.15 | 0.00 | 0.03 | 0.00 | 0.18 | 0.03 | 0.11 | 0.14 | 0.05 | 0.10 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.89 | 0.03 | 1.15 | 0.11 | 0.02 | 0.11 | 0.00 | 0.93 | 0.02 | 10.13 | 0.42 | 0.06 | 0.00 | 0.63 | 0.02 | 0.95 | 0.07 | 0.16 | 0.02 | 0.23 | 0.17 | 0.30 | 20.13 | 4.71 |
| 130590002 | Georgia | Clarke | 58.5 | 60.4 | 4.08 | 0.08 | 0.25 | 0.07 | 0.11 | 0.01 | 0.02 | 0.00 | 0.26 | 22.74 | 0.02 | 0.10 | 0.19 | 0.05 | 0.07 | 0.37 | 1.01 | 0.00 | 0.13 | 0.03 | 0.15 | 0.06 | 0.82 | 0.09 | 0.05 | 0.05 | 0.02 | 0.00 | 0.05 | 0.18 | 0.11 | 0.63 | 0.03 | 0.33 | 0.22 | 0.01 | 0.37 | 0.00 | 1.15 | 0.03 | 1.21 | 1.02 | 0.05 | 0.00 | 0.41 | 0.02 | 0.36 | 0.04 | 0.12 | 0.03 | 0.38 | 0.92 | 0.39 | 14.83 | 4.50 |
| 130670003 | Georgia | Cobb | 63.9 | 65.6 | 0.61 | 0.05 | 0.16 | 0.11 | 0.25 | 0.00 | 0.01 | 0.00 | 0.32 | 27.35 | 0.04 | 0.18 | 0.31 | 0.09 | 0.15 | 0.72 | 0.23 | 0.00 | 0.15 | 0.00 | 0.45 | 0.08 | 0.17 | 0.19 | 0.06 | 0.12 | 0.03 | 0.00 | 0.01 | 0.10 | 0.02 | 1.81 | 0.05 | 0.83 | 0.18 | 0.03 | 0.54 | 0.00 | 1.90 | 0.04 | 1.57 | 0.68 | 0.09 | 0.00 | 0.78 | 0.03 | 0.56 | 0.09 | 0.28 | 0.03 | 0.35 | 0.86 | 0.33 | 16.35 | 4.34 |
| 130730001 | Georgia | Columbia | 58.2 | 59.3 | 1.57 | 0.03 | 0.09 | 0.08 | 0.14 | 0.01 | 0.01 | 0.00 | 0.23 | 12.70 | 0.04 | 0.14 | 0.22 | 0.09 | 0.09 | 0.57 | 0.13 | 0.00 | 0.17 | 0.00 | 0.50 | 0.11 | 0.10 | 0.16 | 0.08 | 0.10 | 0.02 | 0.00 | 0.06 | 0.04 | 0.16 | 3.02 | 0.07 | 1.17 | 0.12 | 0.03 | 0.93 | 0.00 | 5.82 | 0.04 | 1.35 | 0.40 | 0.06 | 0.00 | 1.20 | 0.04 | 0.96 | 0.12 | 0.24 | 0.02 | 0.48 | 0.58 | 0.31 | 18.34 | 4.99 |
| 130770002 | Georgia | Coweta | 53.1 | 54.7 | 1.18 | 0.08 | 0.15 | 0.06 | 0.12 | 0.00 | 0.00 | 0.00 | 0.16 | 20.09 | 0.01 | 0.20 | 0.34 | 0.03 | 0.09 | 0.83 | 0.44 | 0.00 | 0.04 | 0.00 | 0.05 | 0.02 | 0.31 | 0.15 | 0.01 | 0.05 | 0.01 | 0.00 | 0.00 | 0.21 | 0.00 | 2.36 | 0.01 | 0.30 | 0.21 | 0.01 | 0.18 | 0.00 | 1.38 | 0.01 | 1.56 | 0.89 | 0.04 | 0.00 | 0.74 | 0.01 | 0.47 | 0.02 | 0.06 | 0.02 | 0.43 | 0.51 | 0.27 | 14.99 | 3.78 |
| 130850001 | Georgia | Dawson | 55.1 | 56.5 | 1.57 | 0.08 | 0.13 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | 0.73 | 15.54 | 0.03 | 0.12 | 0.33 | 0.06 | 0.07 | 0.55 | 0.31 | 0.00 | 0.05 | 0.00 | 0.06 | 0.04 | 0.25 | 0.13 | 0.04 | 0.05 | 0.03 | 0.00 | 0.01 | 0.17 | 0.03 | 2.20 | 0.04 | 0.19 | 0.11 | 0.02 | 0.15 | 0.00 | 1.54 | 0.02 | 1.32 | 0.49 | 0.08 | 0.00 | 0.51 | 0.01 | 0.27 | 0.03 | 0.11 | 0.03 | 0.27 | 1.29 | 0.56 | 21.13 | 3.83 |
| 130890002 | Georgia | DeKalb | 65.3 | 67.6 | 1.99 | 0.05 | 0.22 | 0.13 | 0.19 | 0.00 | 0.01 | 0.00 | 0.43 | 29.58 | 0.03 | 0.32 | 0.49 | 0.12 | 0.14 | 0.87 | 0.26 | 0.00 | 0.07 | 0.00 | 0.18 | 0.08 | 0.30 | 0.25 | 0.06 | 0.09 | 0.04 | 0.00 | 0.02 | 0.11 | 0.04 | 1.27 | 0.04 | 0.42 | 0.24 | 0.02 | 0.19 | 0.00 | 1.41 | 0.03 | 2.26 | 0.79 | 0.08 | 0.00 | 0.49 | 0.03 | 0.31 | 0.08 | 0.20 | 0.02 | 0.32 | 0.52 | 0.40 | 15.28 | 4.58 |
| 130970004 | Georgia | Douglas | 60.6 | 62.0 | 0.92 | 0.06 | 0.29 | 0.06 | 0.17 | 0.00 | 0.00 | 0.00 | 0.15 | 20.91 | 0.02 | 0.30 | 0.55 | 0.06 | 0.15 | 1.49 | 0.37 | 0.00 | 0.03 | 0.00 | 0.26 | 0.04 | 0.28 | 0.22 | 0.02 | 0.09 | 0.01 | 0.00 | 0.00 | 0.12 | 0.01 | 1.92 | 0.01 | 0.83 | 0.31 | 0.01 | 0.10 | 0.00 | 1.58 | 0.02 | 3.15 | 0.94 | 0.05 | 0.00 | 0.67 | 0.01 | 0.64 | 0.06 | 0.11 | 0.02 | 0.34 | 0.29 | 0.38 | 17.59 | 4.73 |
| 131210055 | Georgia | Fulton | 68.1 | 69.8 | 1.78 | 0.06 | 0.22 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.26 | 31.70 | 0.03 | 0.26 | 0.35 | 0.12 | 0.10 | 0.86 | 0.49 | 0.00 | 0.04 | 0.00 | 0.19 | 0.08 | 0.35 | 0.23 | 0.05 | 0.09 | 0.03 | 0.00 | 0.01 | 0.14 | 0.01 | 1.91 | 0.03 | 0.44 | 0.17 | 0.02 | 0.12 | 0.00 | 1.46 | 0.03 | 2.42 | 0.91 | 0.07 | 0.00 | 0.60 | 0.03 | 0.38 | 0.07 | 0.16 | 0.02 | 0.38 | 0.74 | 0.36 | 15.37 | 4.43 |
| 131270006 | Georgia | Glynn | 53.4 | 54.3 | 1.48 | 0.03 | 0.28 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 2.12 | 9.97 | 0.03 | 0.48 | 0.63 | 0.29 | 0.24 | 0.82 | 0.39 | 0.00 | 0.01 | 0.00 | 0.18 | 0.13 | 0.43 | 0.34 | 0.08 | 0.16 | 0.02 | 0.00 | 0.00 | 0.07 | 0.00 | 1.09 | 0.09 | 0.42 | 0.29 | 0.02 | 0.07 | 0.00 | 3.05 | 0.08 | 1.03 | 0.75 | 0.06 | 0.00 | 0.18 | 0.04 | 0.17 | 0.16 | 0.19 | 0.02 | 0.29 | 3.21 | 1.18 | 17.99 | 4.40 |
| 131350002 | Georgia | Gwinnett | 64.5 | 65.6 | 1.93 | 0.05 | 0.13 | 0.08 | 0.14 | 0.00 | 0.00 | 0.00 | 0.70 | 29.13 | 0.03 | 0.35 | 0.54 | 0.09 | 0.09 | 0.59 | 0.21 | 0.00 | 0.04 | 0.00 | 0.19 | 0.07 | 0.25 | 0.17 | 0.04 | 0.06 | 0.03 | 0.00 | 0.01 | 0.12 | 0.01 | 1.56 | 0.03 | 0.40 | 0.12 | 0.02 | 0.11 | 0.00 | 1.74 | 0.02 | 1.50 | 0.45 | 0.07 | 0.00 | 0.34 | 0.02 | 0.33 | 0.09 | 0.11 | 0.02 | 0.26 | 0.84 | 0.67 | 16.14 | 4.35 |
| 131510002 | Georgia | Henry | 67.6 | 69.2 | 0.96 | 0.07 | 0.38 | 0.13 | 0.18 | 0.00 | 0.00 | 0.00 | 0.21 | 28.59 | 0.05 | 0.35 | 0.83 | 0.19 | 0.15 | 1.95 | 0.23 | 0.00 | 0.05 | 0.00 | 0.06 | 0.19 | 0.15 | 0.36 | 0.10 | 0.11 | 0.03 | 0.00 | 0.01 | 0.15 | 0.02 | 1.24 | 0.05 | 0.32 | 0.40 | 0.04 | 0.16 | 0.00 | 0.98 | 0.05 | 4.01 | 1.15 | 0.08 | 0.00 | 0.39 | 0.07 | 0.28 | 0.06 | 0.21 | 0.03 | 0.34 | 0.32 | 0.29 | 15.97 | 5.41 |
| 132130003 | Georgia | Murray | 59.3 | 60.7 | 1.96 | 0.04 | 0.21 | 0.08 | 0.19 | 0.00 | 0.00 | 0.00 | 0.10 | 5.43 | 0.04 | 0.20 | 0.44 | 0.09 | 0.11 | 2.02 | 0.12 | 0.00 | 0.05 | 0.00 | 0.32 | 0.13 | 0.47 | 0.19 | 0.10 | 0.13 | 0.02 | 0.00 | 0.00 | 0.08 | 0.01 | 1.14 | 0.07 | 0.94 | 0.16 | 0.02 | 0.39 | 0.00 | 0.77 | 0.05 | 13.35 | 0.45 | 0.07 | 0.00 | 0.99 | 0.05 | 1.47 | 0.12 | 0.24 | 0.02 | 0.32 | 0.15 | 0.33 | 20.01 | 5.41 |
| 132150008 | Georgia | Muscogee | 56.2 | 57.0 | 4.18 | 0.07 | 0.20 | 0.10 | 0.14 | 0.00 | 0.00 | 0.00 | 1.27 | 10.39 | 0.02 | 0.21 | 0.33 | 0.09 | 0.07 | 0.57 | 0.30 | 0.00 | 0.05 | 0.00 | 0.08 | 0.05 | 0.31 | 0.19 | 0.03 | 0.08 | 0.02 | 0.00 | 0.00 | 0.14 | 0.02 | 1.53 | 0.02 | 0.18 | 0.15 | 0.01 | 0.23 | 0.00 | 1.24 | 0.02 | 1.31 | 0.73 | 0.06 | 0.00 | 0.53 | 0.01 | 0.29 | 0.03 | 0.14 | 0.03 | 0.31 | 0.61 | 0.48 | 24.89 | 4.25 |
| 132230003 | Georgia | Paulding | 59.0 | 60.1 | 1.10 | 0.07 | 0.22 | 0.09 | 0.21 | 0.00 | 0.00 | 0.00 | 0.14 | 17.22 | 0.02 | 0.18 | 0.39 | 0.05 | 0.17 | 1.23 | 0.19 | 0.00 | 0.05 | 0.00 | 0.14 | 0.03 | 0.14 | 0.20 | 0.05 | 0.09 | 0.02 | 0.00 | 0.00 | 0.19 | 0.01 | 1.61 | 0.04 | 0.71 | 0.35 | 0.01 | 0.17 | 0.00 | 1.57 | 0.02 | 5.58 | 0.95 | 0.07 | 0.00 | 0.58 | 0.02 | 0.66 | 0.06 | 0.13 | 0.03 | 0.29 | 0.23 | 0.35 | 18.00 | 5.13 |
| 132450091 | Georgia | Richmond | 59.2 | 60.9 | 1.44 | 0.05 | 0.40 | 0.11 | 0.09 | 0.02 | 0.02 | 0.00 | 0.23 | 14.95 | 0.05 | 0.28 | 0.29 | 0.22 | 0.12 | 0.87 | 0.27 | 0.00 | 0.13 | 0.04 | 0.21 | 0.21 | 0.21 | 0.33 | 0.12 | 0.12 | 0.03 | 0.00 | 0.07 | 0.09 | 0.14 | 2.99 | 0.06 | 0.45 | 0.23 | 0.04 | 0.40 | 0.01 | 5.74 | 0.05 | 1.93 | 0.61 | 0.05 | 0.00 | 0.82 | 0.07 | 0.54 | 0.14 | 0.16 | 0.02 | 0.33 | 0.66 | 0.31 | 17.10 | 5.13 |
| 132470001 | Georgia | Rockdale | 64.2 | 65.9 | 3.82 | 0.05 | 0.59 | 0.07 | 0.13 | 0.00 | 0.00 | 0.00 | 0.21 | 27.82 | 0.02 | 0.51 | 0.45 | 0.08 | 0.16 | 0.62 | 0.71 | 0.00 | 0.02 | 0.00 | 0.16 | 0.06 | 0.84 | 0.35 | 0.04 | 0.06 | 0.02 | 0.00 | 0.01 | 0.15 | 0.03 | 0.34 | 0.02 | 0.16 | 0.49 | 0.01 | 0.13 | 0.00 | 0.29 | 0.02 | 2.87 | 1.52 | 0.06 | 0.00 | 0.14 | 0.02 | 0.16 | 0.10 | 0.12 | 0.02 | 0.30 | 0.40 | 0.52 | 14.42 | 4.81 |
| 160010019 | Idaho | Ada | 57.7 | 57.7 | 0.00 | 0.04 | 0.00 | 0.70 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.20 | 0.02 | 0.21 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.31 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.16 | 0.00 | 0.00 | 0.65 | 0.00 | 0.00 | 0.67 | 0.04 | 0.16 | 0.07 | 3.18 | 29.30 | 5.57 |
| 170010007 | Illinois | Adams | 60.1 | 61.8 | 0.24 | 0.08 | 0.74 | 0.07 | 0.13 | 0.00 | 0.00 | 0.00 | 0.30 | 0.19 | 0.03 | 3.76 | 0.35 | 0.28 | 1.55 | 0.17 | 0.93 | 0.00 | 0.02 | 0.00 | 0.00 | 0.11 | 0.14 | 10.55 | 0.07 | 0.18 | 0.02 | 0.00 | 0.00 | 0.23 | 0.01 | 0.09 | 0.12 | 0.02 | 2.49 | 0.01 | 0.04 | 0.00 | 0.06 | 0.04 | 0.07 | 4.29 | 0.06 | 0.00 | 0.05 | 0.07 | 0.04 | 0.00 | 0.08 | 0.03 | 0.44 | 0.47 | 0.47 | 22.18 | 8.59 |
| 170190007 | Illinois | Champaign | 63.4 | 63.4 | 0.19 | 0.07 | 1.40 | 0.07 | 0.14 | 0.00 | 0.00 | 0.00 | 0.25 | 0.21 | 0.02 | 13.35 | 2.92 | 0.10 | 0.72 | 1.96 | 0.44 | 0.00 | 0.02 | 0.00 | 0.04 | 0.09 | 0.15 | 3.14 | 0.04 | 0.08 | 0.02 | 0.00 | 0.00 | 0.18 | 0.00 | 0.09 | 0.06 | 0.53 | 1.89 | 0.01 | 0.04 | 0.00 | 0.06 | 0.02 | 0.52 | 2.62 | 0.05 | 0.00 | 0.06 | 0.04 | 0.05 | 0.16 | 0.10 | 0.03 | 0.42 | 0.34 | 0.42 | 21.57 | 8.50 |
| 170230001 | Illinois | Clark | 60.8 | 60.8 | 0.02 | 0.01 | 0.09 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 6.34 | 16.09 | 0.33 | 0.14 | 6.35 | 0.04 | 0.00 | 0.00 | 0.00 | 0.97 | 0.24 | 0.02 | 0.30 | 0.15 | 0.10 | 0.02 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.20 | 3.16 | 0.19 | 0.02 | 0.00 | 0.00 | 0.00 | 0.06 | 0.12 | 0.42 | 0.06 | 0.00 | 0.00 | 0.07 | 0.03 | 0.65 | 0.13 | 0.01 | 0.34 | 0.03 | 0.40 | 14.14 | 9.08 |
| 170310001 | Illinois | Cook | 67.5 | 69.4 | 0.18 | 0.06 | 0.17 | 0.15 | 0.09 | 0.00 | 0.00 | 0.00 | 0.11 | 0.15 | 0.12 | 22.51 | 1.33 | 1.08 | 0.96 | 0.02 | 0.46 | 0.00 | 0.00 | 0.00 | 0.19 | 1.29 | 0.19 | 0.87 | 0.20 | 0.27 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.05 | 0.57 | 0.01 | 1.68 | 0.09 | 0.01 | 0.00 | 0.05 | 0.23 | 0.05 | 1.51 | 0.11 | 0.00 | 0.02 | 0.12 | 0.01 | 4.26 | 0.32 | 0.02 | 0.61 | 0.23 | 0.31 | 19.41 | 7.12 |
| 170310032 | Illinois | Cook | 63.7 | 66.4 | 0.26 | 0.06 | 0.50 | 0.10 | 0.09 | 0.00 | 0.00 | 0.00 | 0.16 | 0.22 | 0.06 | 21.13 | 1.24 | 2.03 | 0.91 | 0.04 | 0.58 | 0.00 | 0.01 | 0.00 | 0.07 | 0.44 | 0.23 | 1.25 | 0.20 | 0.25 | 0.02 | 0.00 | 0.00 | 0.09 | 0.00 | 0.07 | 0.41 | 0.02 | 2.05 | 0.03 | 0.03 | 0.00 | 0.07 | 0.16 | 0.09 | 2.19 | 0.06 | 0.00 | 0.04 | 0.10 | 0.02 | 2.28 | 0.20 | 0.02 | 0.43 | 0.27 | 0.45 | 17.51 | 7.03 |
| 170310064 | Illinois | Cook | 58.4 | 61.5 | 0.23 | 0.05 | 0.46 | 0.09 | 0.08 | 0.00 | 0.00 | 0.00 | 0.15 | 0.20 | 0.06 | 19.37 | 1.14 | 1.86 | 0.83 | 0.04 | 0.53 | 0.00 | 0.01 | 0.00 | 0.06 | 0.41 | 0.21 | 1.15 | 0.18 | 0.23 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.07 | 0.37 | 0.02 | 1.88 | 0.03 | 0.02 | 0.00 | 0.06 | 0.14 | 0.08 | 2.00 | 0.05 | 0.00 | 0.04 | 0.10 | 0.02 | 2.09 | 0.19 | 0.02 | 0.40 | 0.25 | 0.41 | 16.06 | 6.44 |
| 170310076 | Illinois | Cook | 67.0 | 69.2 | 0.40 | 0.07 | 0.85 | 0.11 | 0.10 | 0.00 | 0.00 | 0.00 | 0.18 | 0.25 | 0.06 | 22.43 | 0.54 | 1.03 | 1.05 | 0.09 | 1.10 | 0.00 | 0.01 | 0.00 | 0.07 | 0.30 | 0.41 | 1.57 | 0.15 | 0.27 | 0.02 | 0.00 | 0.00 | 0.10 | 0.00 | 0.09 | 0.34 | 0.04 | 2.47 | 0.03 | 0.03 | 0.00 | 0.08 | 0.16 | 0.17 | 3.11 | 0.06 | 0.00 | 0.05 | 0.08 | 0.03 | 1.65 | 0.18 | 0.02 | 0.44 | 0.41 | 0.70 | 17.99 | 7.46 |
| 170311003 | Illinois | Cook | 55.9 | 57.7 | 0.20 | 0.05 | 0.66 | 0.06 | 0.14 | 0.00 | 0.00 | 0.00 | 0.07 | 0.10 | 0.02 | 18.30 | 4.71 | 0.51 | 0.74 | 0.60 | 0.65 | 0.00 | 0.01 | 0.00 | 0.85 | 0.21 | 0.31 | 1.94 | 0.03 | 0.18 | 0.02 | 0.00 | 0.00 | 0.15 | 0.01 | 0.05 | 0.07 | 0.65 | 1.60 | 0.01 | 0.10 | 0.00 | 0.04 | 0.05 | 0.40 | 2.70 | 0.06 | 0.00 | 0.04 | 0.02 | 0.17 | 0.81 | 0.12 | 0.02 | 0.39 | 0.26 | 0.48 | 10.88 | 6.25 |
| 170311601 | Illinois | Cook | 66.4 | 68.9 | 0.04 | 0.05 | 0.31 | 0.12 | 0.19 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.08 | 20.51 | 2.63 | 0.39 | 0.59 | 0.63 | 0.11 | 0.00 | 0.00 | 0.00 | 0.38 | 0.52 | 0.06 | 2.21 | 0.13 | 0.33 | 0.03 | 0.00 | 0.00 | 0.11 | 0.01 | 0.02 | 0.25 | 0.59 | 0.95 | 0.08 | 0.12 | 0.00 | 0.01 | 0.10 | 0.21 | 1.64 | 0.12 | 0.00 | 0.03 | 0.08 | 0.22 | 3.70 | 0.34 | 0.03 | 0.60 | 0.12 | 0.20 | 20.00 | 7.29 |
| 170314002 | Illinois | Cook | 57.9 | 59.8 | 0.30 | 0.05 | 0.80 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 0.14 | 0.19 | 0.02 | 19.84 | 0.89 | 0.49 | 0.71 | 0.28 | 0.79 | 0.00 | 0.01 | 0.00 | 0.07 | 0.23 | 0.32 | 1.84 | 0.07 | 0.15 | 0.01 | 0.00 | 0.00 | 0.13 | 0.00 | 0.07 | 0.12 | 0.07 | 2.17 | 0.01 | 0.03 | 0.00 | 0.06 | 0.05 | 0.33 | 3.14 | 0.04 | 0.00 | 0.04 | 0.03 | 0.03 | 1.46 | 0.11 | 0.02 | 0.39 | 0.31 | 0.54 | 15.01 | 6.15 |
| 170314007 | Illinois | Cook | 54.1 | 56.0 | 0.12 | 0.05 | 0.68 | 0.08 | 0.22 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.02 | 19.18 | 3.81 | 0.29 | 0.58 | 0.54 | 0.47 | 0.00 | 0.00 | 0.00 | 0.92 | 0.08 | 0.22 | 1.83 | 0.03 | 0.19 | 0.02 | 0.00 | 0.00 | 0.19 | 0.01 | 0.02 | 0.05 | 0.64 | 1.39 | 0.01 | 0.09 | 0.00 | 0.01 | 0.02 | 0.37 | 2.81 | 0.09 | 0.00 | 0.03 | 0.01 | 0.16 | 0.34 | 0.16 | 0.03 | 0.44 | 0.23 | 0.45 | 10.82 | 6.09 |
| 170314201 | Illinois | Cook | 62.3 | 64.2 | 0.14 | 0.06 | 0.79 | 0.09 | 0.25 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.02 | 22.09 | 4.39 | 0.34 | 0.67 | 0.62 | 0.54 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 0.27 | 0.51 | 12.46 | 7.01 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 170317002 | Illinois | Cook | 61.2 | 64.5 | 0.14 | 0.04 | 0.69 | 0.07 | 0.17 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170436001 | Illinois | DuPage | 61.8 | 63.4 | 0.04 | 0.06 | 0.46 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170491001 | Illinois | Effingham | 62.0 | 63.5 | 0.02 | 0.02 | 0.21 | 0.05 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170650002 | Illinois | Hamilton | 68.4 | 71.8 | 0.05 | 0.03 | 0.30 | 0.13 | 0.25 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170831001 | Illinois | Jersey | 64.6 | 67.1 | 0.02 | 0.03 | 0.71 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170859991 | Illinois | Jo Daviess | 61.7 | 61.7 | 0.22 | 0.06 | 0.50 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170890005 | Illinois | Kane | 66.5 | 67.8 | 0.01 | 0.02 | 0.34 | 0.12 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 170971007 | Illinois | Lake | 65.0 | 67.2 | 0.14 | 0.05 | 0.64 | 0.07 | 0.18 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171110001 | Illinois | McHenry | 65.2 | 66.5 | 0.16 | 0.02 | 0.51 | 0.05 | 0.09 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171132003 | Illinois | McLean | 62.6 | 64.1 | 0.44 | 0.06 | 0.26 | 0.10 | 0.17 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171150013 | Illinois | Macon | 62.8 | 64.3 | 0.79 | 0.08 | 2.12 | 0.10 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171170002 | Illinois | Macoupin | 60.2 | 61.7 | 0.69 | 0.08 | 3.38 | 0.09 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171190008 | Illinois | Madison | 65.6 | 68.2 | 0.38 | 0.09 | 2.39 | 0.11 | 0.21 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171191009 | Illinois | Madison | 67.5 | 69.0 | 0.26 | 0.07 | 3.21 | 0.10 | 0.23 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171193007 | Illinois | Madison | 65.4 | 67.3 | 0.37 | 0.09 | 2.38 | 0.11 | 0.21 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171199991 | Illinois | Madison | 64.4 | 64.4 | 0.34 | 0.07 | 3.51 | 0.07 | 0.24 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171430024 | Illinois | Peoria | 56.3 | 57.4 | 0.16 | 0.05 | 0.21 | 0.10 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171431001 | Illinois | Peoria | 64.5 | 65.7 | 0.18 | 0.05 | 0.24 | 0.11 | 0.19 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171570001 | Illinois | Randolph | 61.3 | 63.3 | 0.07 | 0.04 | 0.83 | 0.16 | 0.31 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171613002 | Illinois | Rock Island | 53.1 | 54.6 | 0.23 | 0.05 | 0.12 | 0.07 | 0.08 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171630010 | Illinois | Saint Clair | 65.1 | 67.1 | 0.43 | 0.06 | 1.55 | 0.06 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171670014 | Illinois | Sangamon | 62.3 | 62.3 | 0.40 | 0.08 | 2.41 | 0.10 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 171971011 | Illinois | Will | 58.9 | 59.8 | 0.05 | 0.05 | 0.14 | 0.07 | 0.17 | 0.00 | 0.00 | 0.00 | [illegible] |
| 172012001 | Illinois | Winnebago | 62.1 | 62.7 | 0.08 | 0.05 | 0.43 | 0.04 | 0.20 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180030002 | Indiana | Allen | 61.6 | 63.2 | 0.07 | 0.02 | 0.25 | 0.03 | 0.08 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180030004 | Indiana | Allen | 62.6 | 64.2 | 0.07 | 0.02 | 0.31 | 0.03 | 0.07 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180110001 | Indiana | Boone | 65.4 | 66.9 | 0.62 | 0.03 | 0.49 | 0.05 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180150002 | Indiana | Carroll | 62.3 | 64.1 | 0.08 | 0.03 | 0.47 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180190008 | Indiana | Clark | 70.6 | 73.3 | 0.19 | 0.04 | 0.14 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180350010 | Indiana | Delaware | 61.5 | 62.6 | 0.75 | 0.05 | 0.67 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180390007 | Indiana | Elkhart | 60.7 | 62.8 | 0.41 | 0.09 | 0.74 | 0.10 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180431004 | Indiana | Floyd | 69.4 | 72.1 | 0.14 | 0.02 | 0.31 | 0.08 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180550001 | Indiana | Greene | 72.6 | 73.5 | 0.09 | 0.03 | 1.40 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180570006 | Indiana | Hamilton | 64.0 | 64.9 | 0.71 | 0.05 | 0.59 | 0.05 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180590003 | Indiana | Hancock | 60.0 | 62.1 | 0.69 | 0.04 | 0.78 | 0.04 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180630004 | Indiana | Hendricks | 61.0 | 61.9 | 0.60 | 0.03 | 0.38 | 0.05 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180690002 | Indiana | Huntington | 58.9 | 59.8 | 0.17 | 0.05 | 0.54 | 0.06 | 0.09 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180710001 | Indiana | Jackson | 61.4 | 62.4 | 0.26 | 0.03 | 0.18 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180810002 | Indiana | Johnson | 62.2 | 63.1 | 0.08 | 0.02 | 0.35 | 0.07 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180839991 | Indiana | Knox | 68.8 | 68.8 | 0.04 | 0.03 | 0.24 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180890022 | Indiana | Lake | 60.2 | 62.3 | 0.25 | 0.05 | 0.47 | 0.08 | 0.08 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180890030 | Indiana | Lake | 61.3 | 64.2 | 0.26 | 0.06 | 0.50 | 0.09 | 0.09 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180892008 | Indiana | Lake | 59.8 | 59.8 | 0.26 | 0.06 | 0.49 | 0.09 | 0.08 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180910005 | Indiana | LaPorte | 71.4 | 74.7 | 0.25 | 0.06 | 0.80 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180910010 | Indiana | LaPorte | 63.9 | 66.0 | 0.17 | 0.06 | 0.61 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180950010 | Indiana | Madison | 60.6 | 62.1 | 0.70 | 0.04 | 0.77 | 0.04 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180970050 | Indiana | Marion | 65.4 | 66.6 | 0.01 | 0.03 | 0.39 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180970057 | Indiana | Marion | 63.4 | 65.2 | 0.69 | 0.04 | 0.44 | 0.03 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180970073 | Indiana | Marion | 65.3 | 67.1 | 0.01 | 0.04 | 0.34 | 0.09 | 0.21 | 0.00 | 0.00 | 0.00 | [illegible] |
| 180970078 | Indiana | Marion | 64.0 | 66.2 | 0.70 | 0.04 | 0.45 | 0.03 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181090005 | Indiana | Morgan | 60.7 | 61.6 | 0.65 | 0.03 | 0.26 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181230009 | Indiana | Perry | 68.5 | 70.7 | 0.34 | 0.03 | 0.59 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181270024 | Indiana | Porter | 62.5 | 64.0 | 0.26 | 0.07 | 0.80 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181270026 | Indiana | Porter | 58.4 | 59.4 | 0.26 | 0.07 | 0.34 | 0.17 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181290003 | Indiana | Posey | 65.5 | 66.2 | 0.04 | 0.01 | 0.09 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181410010 | Indiana | St. Joseph | 56.4 | 57.6 | 0.36 | 0.06 | 0.59 | 0.08 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181410015 | Indiana | St. Joseph | 62.5 | 65.8 | 0.39 | 0.09 | 0.75 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181411007 | Indiana | St. Joseph | 57.7 | 57.7 | 0.36 | 0.08 | 0.69 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181450001 | Indiana | Shelby | 66.8 | 67.7 | 0.01 | 0.05 | 0.36 | 0.10 | 0.24 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181630013 | Indiana | Vanderburgh | 67.4 | 68.6 | 0.06 | 0.02 | 0.33 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181630021 | Indiana | Vanderburgh | 69.4 | 69.4 | 0.04 | 0.01 | 0.09 | 0.05 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181670018 | Indiana | Vigo | 58.5 | 60.5 | 0.01 | 0.01 | 0.17 | 0.07 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181670024 | Indiana | Vigo | 57.2 | 57.2 | 0.01 | 0.01 | 0.15 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181730008 | Indiana | Warrick | 66.5 | 68.4 | 0.29 | 0.02 | 0.26 | 0.07 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181730009 | Indiana | Warrick | 65.8 | 68.0 | 0.03 | 0.02 | 0.29 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 181730011 | Indiana | Warrick | 67.0 | 69.8 | 0.38 | 0.03 | 0.73 | 0.08 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 190450021 | Iowa | Clinton | 60.6 | 61.8 | 0.11 | 0.04 | 0.31 | 0.06 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 190850007 | Iowa | Harrison | 59.4 | 60.6 | 0.03 | 0.05 | 0.43 | 0.16 | 0.34 | 0.00 | 0.00 | 0.00 | [illegible] |
| 190851101 | Iowa | Harrison | 60.3 | 61.5 | 0.03 | 0.05 | 0.44 | 0.16 | 0.35 | 0.00 | 0.00 | 0.00 | [illegible] |
| 191130028 | Iowa | Linn | 58.4 | 60.0 | 0.28 | 0.04 | 0.29 | 0.11 | 0.20 | 0.00 | 0.00 | 0.00 | [illegible] |
| 191130040 | Iowa | Linn | 56.7 | 57.9 | 0.26 | 0.04 | 0.26 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | [illegible] |
| 191530030 | Iowa | Polk | 53.1 | 54.2 | 0.42 | 0.05 | 0.34 | 0.06 | 0.05 | 0.00 | 0.00 | 0.00 | [illegible] |
| 191630014 | Iowa | Scott | 57.1 | 57.1 | 0.12 | 0.04 | 0.31 | 0.07 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 191630015 | Iowa | Scott | 60.1 | 61.0 | 0.26 | 0.06 | 0.14 | 0.08 | 0.09 | 0.00 | 0.00 | 0.00 | [illegible] |
| 200910010 | Kansas | Johnson | 66.0 | 69.0 | 0.02 | 0.07 | 0.46 | 0.18 | 0.36 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201030003 | Kansas | Leavenworth | 63.4 | 65.2 | 0.10 | 0.04 | 0.89 | 0.12 | 0.19 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201070002 | Kansas | Linn | 62.2 | 63.9 | 0.58 | 0.11 | 0.87 | 0.15 | 0.24 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201730010 | Kansas | Sedgwick | 67.8 | 69.3 | 0.42 | 0.05 | 0.97 | 0.14 | 0.30 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201730018 | Kansas | Sedgwick | 67.8 | 69.0 | 0.39 | 0.03 | 1.03 | 0.09 | 0.20 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201770013 | Kansas | Shawnee | 63.6 | 65.6 | 0.09 | 0.06 | 0.97 | 0.12 | 0.27 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201910002 | Kansas | Sumner | 68.8 | 69.7 | 0.43 | 0.11 | 1.23 | 0.27 | 0.71 | 0.00 | 0.00 | 0.00 | [illegible] |
| 201950001 | Kansas | Trego | 67.6 | 69.2 | 0.06 | 0.36 | 0.51 | 0.16 | 0.57 | 0.00 | 0.00 | 0.00 | [illegible] |
| 202090021 | Kansas | Wyandotte | 59.1 | 62.9 | 0.08 | 0.06 | 0.47 | 0.21 | 0.45 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210130002 | Kentucky | Bell | 55.3 | 56.8 | 0.71 | 0.06 | 0.17 | 0.12 | 0.39 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210150003 | Kentucky | Boone | 62.6 | 64.5 | 0.22 | 0.04 | 0.72 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210190017 | Kentucky | Boyd | 62.8 | 64.6 | 0.33 | 0.02 | 0.18 | 0.06 | 0.08 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210290006 | Kentucky | Bullitt | 66.4 | 68.9 | 0.00 | 0.01 | 0.04 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210373002 | Kentucky | Campbell | 71.4 | 73.6 | 0.18 | 0.04 | 0.65 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210430500 | Kentucky | Carter | 59.6 | 61.4 | 0.37 | 0.01 | 0.19 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210470006 | Kentucky | Christian | 65.1 | 67.2 | 0.01 | 0.02 | 0.06 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210590005 | Kentucky | Daviess | 72.5 | 75.0 | 0.23 | 0.03 | 0.98 | 0.05 | 0.09 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210610501 | Kentucky | Edmonson | 63.1 | 65.8 | 0.11 | 0.04 | 0.55 | 0.08 | 0.25 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210670012 | Kentucky | Fayette | 63.1 | 65.5 | 0.05 | 0.03 | 0.17 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210890007 | Kentucky | Greenup | 63.0 | 65.1 | 0.33 | 0.02 | 0.23 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210910012 | Kentucky | Hancock | 68.9 | 71.1 | 0.62 | 0.03 | 0.28 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 210930006 | Kentucky | Hardin | 64.1 | 66.5 | 0.06 | 0.02 | 0.29 | 0.07 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211010014 | Kentucky | Henderson | 72.0 | 74.5 | 0.30 | 0.02 | 0.16 | 0.08 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211110027 | Kentucky | Jefferson | 70.7 | 73.4 | 0.02 | 0.01 | 0.48 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211110051 | Kentucky | Jefferson | 72.6 | 74.2 | 0.09 | 0.01 | 0.10 | 0.07 | 0.10 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211110067 | Kentucky | Jefferson | 75.8 | 78.6 | 0.04 | 0.03 | 0.06 | 0.07 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211130001 | Kentucky | Jessamine | 59.5 | 61.3 | 0.06 | 0.03 | 0.46 | 0.10 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211390003 | Kentucky | Livingston | 65.8 | 68.2 | 0.37 | 0.02 | 0.75 | 0.09 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211451024 | Kentucky | McCracken | 67.8 | 70.8 | 0.62 | 0.03 | 0.96 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211850004 | Kentucky | Oldham | 73.7 | 77.3 | 0.06 | 0.03 | 0.85 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211930003 | Kentucky | Perry | 59.9 | 62.3 | 0.20 | 0.02 | 0.15 | 0.09 | 0.26 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211950002 | Kentucky | Pike | 59.8 | 61.8 | 0.20 | 0.04 | 0.19 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 211990003 | Kentucky | Pulaski | 55.9 | 57.8 | 0.07 | 0.03 | 0.22 | 0.09 | 0.23 | 0.00 | 0.00 | 0.00 | [illegible] |
| 212130004 | Kentucky | Simpson | 60.0 | 61.4 | 0.40 | 0.06 | 0.29 | 0.08 | 0.24 | 0.00 | 0.00 | 0.00 | [illegible] |
| 212218001 | Kentucky | Trigg | 61.8 | 61.8 | 0.18 | 0.04 | 0.77 | 0.07 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 212270008 | Kentucky | Warren | 56.1 | 56.1 | 0.04 | 0.03 | 0.16 | 0.08 | 0.21 | 0.00 | 0.00 | 0.00 | [illegible] |
| 212299991 | Kentucky | Washington | 61.7 | 61.7 | 0.06 | 0.04 | 0.26 | 0.19 | 0.25 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220050004 | Louisiana | Ascension | 67.1 | 69.2 | 1.03 | 0.03 | 0.21 | 0.09 | 0.20 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220150008 | Louisiana | Bossier | 69.3 | 71.7 | 0.33 | 0.05 | 0.60 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220170001 | Louisiana | Caddo | 67.1 | 68.3 | 0.26 | 0.06 | 1.22 | 0.13 | 0.25 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220190002 | Louisiana | Calcasieu | 69.0 | 71.6 | 0.23 | 0.01 | 0.25 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220190008 | Louisiana | Calcasieu | 63.1 | 64.3 | 0.30 | 0.01 | 0.16 | 0.04 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220190009 | Louisiana | Calcasieu | 66.5 | 68.4 | 0.26 | 0.02 | 0.51 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220330003 | Louisiana | East Baton Rouge | 71.2 | 74.2 | 1.67 | 0.04 | 0.24 | 0.19 | 0.33 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220330009 | Louisiana | East Baton Rouge | 67.8 | 69.6 | 1.91 | 0.03 | 0.16 | 0.14 | 0.25 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220330013 | Louisiana | East Baton Rouge | 63.2 | 64.1 | 0.87 | 0.04 | 0.50 | 0.06 | 0.16 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220470009 | Louisiana | Iberville | 65.8 | 67.4 | 2.65 | 0.05 | 0.20 | 0.16 | 0.20 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220470012 | Louisiana | Iberville | 68.9 | 69.8 | 1.50 | 0.04 | 0.29 | 0.14 | 0.29 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220511001 | Louisiana | Jefferson | 68.6 | 70.7 | 3.17 | 0.04 | 0.27 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220550007 | Louisiana | Lafayette | 63.9 | 64.8 | 3.58 | 0.05 | 0.12 | 0.09 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220570004 | Louisiana | Lafourche | 66.2 | 67.7 | 1.93 | 0.04 | 0.37 | 0.10 | 0.17 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220630002 | Louisiana | Livingston | 66.8 | 68.6 | 1.32 | 0.02 | 0.47 | 0.03 | 0.07 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220710012 | Louisiana | Orleans | 64.1 | 64.7 | 3.33 | 0.03 | 0.27 | 0.08 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220730004 | Louisiana | Ouachita | 57.6 | 60.1 | 0.72 | 0.08 | 0.96 | 0.19 | 0.45 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220770001 | Louisiana | Pointe Coupee | 66.4 | 67.9 | 0.98 | 0.04 | 0.36 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220870004 | Louisiana | St. Bernard | 63.8 | 63.8 | 2.04 | 0.06 | 0.25 | 0.08 | 0.22 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220890003 | Louisiana | St. Charles | 64.9 | 66.7 | 2.29 | 0.02 | 0.28 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220930002 | Louisiana | St. James | 62.4 | 63.3 | 2.02 | 0.01 | 0.20 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | [illegible] |
| 220950002 | Louisiana | St. John the Baptis | 67.7 | 68.6 | 1.55 | 0.03 | 0.24 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | [illegible] |
| 221030002 | Louisiana | St. Tammany | 67.3 | 68.0 | 1.88 | 0.02 | 0.43 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | [illegible] |
| 221210001 | Louisiana | West Baton Rouge | 63.5 | 65.1 | 1.79 | 0.03 | 0.15 | 0.13 | 0.23 | 0.00 | 0.00 | 0.00 | [illegible] |
| 230010014 | Maine | Androscoggin | 54.5 | 55.4 | 0.08 | 0.03 | 0.34 | 0.02 | 0.06 | 1.06 | 0.22 | 0.01 | [illegible] |
| 230052003 | Maine | Cumberland | 61.8 | 62.5 | 0.10 | 0.04 | 0.39 | 0.03 | 0.10 | 1.33 | 0.31 | 0.01 | [illegible] |
| 230130004 | Maine | Knox | 60.3 | 61.4 | 0.07 | 0.03 | 0.32 | 0.02 | 0.08 | 1.21 | 0.24 | 0.02 | [illegible] |
| 230230006 | Maine | Sagadahoc | 53.8 | 53.8 | 0.07 | 0.03 | 0.31 | 0.02 | 0.07 | 1.13 | 0.17 | 0.00 | [illegible] |
| 230290019 | Maine | Washington | 53.3 | 53.9 | 0.03 | 0.02 | 0.09 | 0.03 | 0.06 | 0.82 | 0.21 | 0.02 | [illegible] |
| 230312002 | Maine | York | 65.3 | 66.4 | 0.12 | 0.05 | 0.42 | 0.03 | 0.12 | 1.42 | 0.35 | 0.02 | [illegible] |
| 240030014 | Maryland | Anne Arundel | 71.7 | 75.1 | 0.47 | 0.07 | 0.21 | 0.07 | 0.15 | 0.01 | 0.26 | 1.36 | [illegible] |
| 240051007 | Maryland | Baltimore | 70.9 | 73.6 | 0.15 | 0.08 | 0.18 | 0.07 | 0.17 | 0.00 | 0.18 | 0.46 | [illegible] |
| 240053001 | Maryland | Baltimore | 73.2 | 76.2 | 0.34 | 0.07 | 0.20 | 0.08 | 0.14 | 0.01 | 0.12 | 0.64 | [illegible] |
| 240090011 | Maryland | Calvert | 70.7 | 73.7 | 0.61 | 0.11 | 0.24 | 0.10 | 0.19 | 0.00 | 0.15 | 0.53 | [illegible] |
| 240130001 | Maryland | Carroll | 67.4 | 69.8 | 0.19 | 0.07 | 0.22 | 0.06 | 0.14 | 0.05 | 0.27 | 0.68 | [illegible] |
| 240150003 | Maryland | Cecil | 72.2 | 74.9 | 0.26 | 0.10 | 0.28 | 0.10 | 0.18 | 0.00 | 0.09 | 0.52 | [illegible] |
| 240170010 | Maryland | Charles | 67.5 | 71.0 | 0.56 | 0.09 | 0.20 | 0.11 | 0.14 | 0.00 | 0.14 | 0.64 | [illegible] |
| 240199991 | Maryland | Dorchester | 67.0 | 67.0 | 0.30 | 0.08 | 0.23 | 0.09 | 0.18 | 0.00 | 0.00 | 0.66 | [illegible] |
| 240210037 | Maryland | Frederick | 67.8 | 70.2 | 0.08 | 0.08 | 0.29 | 0.08 | 0.18 | 0.00 | 0.01 | 0.01 | [illegible] |
| 240230002 | Maryland | Garrett | 62.1 | 64.7 | 0.08 | 0.08 | 0.36 | 0.07 | 0.23 | 0.00 | 0.00 | 0.00 | [illegible] |
| 240251001 | Maryland | Harford | 81.3 | 84.0 | 0.40 | 0.09 | 0.22 | 0.11 | 0.19 | 0.01 | 0.15 | 0.73 | [illegible] |
| 240259001 | Maryland | Harford | 69.5 | 71.8 | 0.06 | 0.04 | 0.12 | 0.04 | 0.10 | 0.00 | 0.02 | 0.56 | [illegible] |
| 240290002 | Maryland | Kent | 68.2 | 71.1 | 0.40 | 0.08 | 0.21 | 0.08 | 0.15 | 0.01 | 0.11 | 0.73 | [illegible] |
| 240313001 | Maryland | Montgomery | 66.9 | 68.0 | 0.10 | 0.04 | 0.17 | 0.04 | 0.11 | 0.04 | 0.34 | 1.36 | [illegible] |
| 240330030 | Maryland | Prince George's | 68.9 | 71.5 | 0.31 | 0.07 | 0.18 | 0.07 | 0.15 | 0.00 | 0.06 | 1.68 | [illegible] |
| 240338003 | Maryland | Prince George's | 70.4 | 74.4 | 0.48 | 0.07 | 0.19 | 0.07 | 0.14 | 0.01 | 0.29 | 2.32 | [illegible] |
| 240339991 | Maryland | Prince George's | 69.5 | 69.5 | 0.23 | 0.06 | 0.16 | 0.07 | 0.13 | 0.00 | 0.07 | 1.57 | [illegible] |
| 240430009 | Maryland | Washington | 64.8 | 66.8 | 0.83 | 0.06 | 0.11 | 0.08 | 0.17 | 0.00 | 0.00 | 0.03 | [illegible] |
| 245100054 | Maryland | Baltimore (City) | 67.9 | 69.1 | 0.19 | 0.05 | 0.08 | 0.05 | 0.10 | 0.01 | 0.07 | 0.56 | [illegible] |
| 250010002 | Massachusetts | Barnstable | 65.0 | 66.8 | 0.01 | 0.01 | 0.03 | 0.02 | 0.04 | 1.82 | 0.28 | 0.05 | [illegible] |
| 250034002 | Massachusetts | Berkshire | 62.0 | 63.8 | 0.04 | 0.04 | 0.08 | 0.06 | 0.11 | 1.44 | 0.15 | 0.04 | [illegible] |
| 250051002 | Massachusetts | Bristol | 66.9 | 66.9 | 0.17 | 0.04 | 0.18 | 0.04 | 0.10 | 4.48 | 0.33 | 0.05 | [illegible] |
| 250070001 | Massachusetts | Dukes | 70.2 | 72.9 | 0.11 | 0.03 | 0.15 | 0.04 | 0.09 | 2.86 | 0.56 | 0.04 | [illegible] |
| 250092006 | Massachusetts | Essex | 62.8 | 62.8 | 0.17 | 0.05 | 0.42 | 0.04 | 0.12 | 2.43 | 0.28 | 0.02 | [illegible] |
| 250094005 | Massachusetts | Essex | 62.2 | 62.2 | 0.18 | 0.05 | 0.42 | 0.04 | 0.12 | 1.62 | 0.27 | 0.02 | [illegible] |
| 250095005 | Massachusetts | Essex | 61.5 | 62.1 | 0.17 | 0.05 | 0.42 | 0.04 | 0.13 | 2.48 | 0.23 | 0.02 | [illegible] |
| 250130008 | Massachusetts | Hampden | 65.1 | 65.4 | 0.24 | 0.06 | 0.28 | 0.05 | 0.13 | 7.01 | 0.31 | 0.04 | [illegible] |
| 250150103 | Massachusetts | Hampshire | 57.3 | 58.5 | 0.28 | 0.05 | 0.30 | 0.04 | 0.12 | 3.93 | 0.26 | 0.03 | [illegible] |
| 250154002 | Massachusetts | Hampshire | 62.7 | 63.4 | 0.26 | 0.07 | 0.30 | 0.07 | 0.15 | 5.34 | 0.23 | 0.02 | [illegible] |
| 250170009 | Massachusetts | Middlesex | 59.7 | 60.3 | 0.26 | 0.07 | 0.43 | 0.06 | 0.14 | 3.34 | 0.20 | 0.02 | [illegible] |
| 250171102 | Massachusetts | Middlesex | 59.0 | 59.0 | 0.19 | 0.05 | 0.36 | 0.05 | 0.14 | 3.22 | 0.19 | 0.03 | [illegible] |
| 250213003 | Massachusetts | Norfolk | 64.3 | 65.0 | 0.17 | 0.05 | 0.42 | 0.04 | 0.13 | 2.79 | 0.26 | 0.05 | [illegible] |
| 250250041 | Massachusetts | Suffolk | 60.8 | 62.3 | 0.02 | 0.03 | 0.05 | 0.05 | 0.07 | 1.09 | 0.13 | 0.01 | [illegible] |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250250042 | Massachusetts | Suffolk | 53.6 | 53.8 | 0.15 | 0.05 | 0.35 | 0.04 | 0.11 | 1.87 | 0.16 | 0.02 | 0.04 | 0.13 | 0.01 | 0.85 | 1.10 | 0.12 | 0.18 | 0.39 | 0.11 | 0.09 | 0.75 | 8.87 | 1.13 | 0.11 | 0.11 | 0.41 | 0.03 | 0.08 | 0.01 | 0.54 | 1.32 | 0.08 | 3.62 | 0.21 | 0.05 | 1.89 | 0.36 | 0.01 | 2.81 | 0.80 | 0.08 | 0.03 | 0.33 | 0.61 | 0.04 | 0.20 | 0.59 | 0.01 | 0.18 | 0.23 | 0.11 | 0.02 | 1.96 | 1.21 | 0.24 | 14.75 | 3.81 |
| 250270015 | Massachusetts | Worcester | 60.1 | 61.6 | 0.24 | 0.06 | 0.32 | 0.06 | 0.14 | 4.73 | 0.25 | 0.03 | 0.08 | 0.22 | 0.02 | 1.01 | 1.30 | 0.16 | 0.20 | 0.61 | 0.16 | 0.02 | 1.10 | 3.04 | 1.11 | 0.14 | 0.15 | 0.47 | 0.03 | 0.10 | 0.01 | 0.03 | 3.14 | 0.11 | 6.76 | 0.21 | 0.06 | 2.55 | 0.41 | 0.01 | 4.40 | 0.05 | 0.08 | 0.03 | 0.45 | 0.75 | 0.06 | 0.03 | 0.80 | 0.01 | 0.38 | 0.27 | 0.15 | 0.03 | 1.51 | 1.74 | 0.26 | 15.29 | 4.48 |
| 250270024 | Massachusetts | Worcester | 60.5 | 61.4 | 0.04 | 0.03 | 0.08 | 0.04 | 0.08 | 5.01 | 0.29 | 0.05 | 0.04 | 0.09 | 0.02 | 0.93 | 1.05 | 0.23 | 0.20 | 0.68 | 0.05 | 0.00 | 1.53 | 2.25 | 0.87 | 0.24 | 0.02 | 0.50 | 0.05 | 0.11 | 0.01 | 0.00 | 3.05 | 0.04 | 7.75 | 0.40 | 0.10 | 1.86 | 0.32 | 0.01 | 4.60 | 0.19 | 0.12 | 0.05 | 0.09 | 0.43 | 0.05 | 0.01 | 1.47 | 0.01 | 0.73 | 0.33 | 0.14 | 0.01 | 1.82 | 1.87 | 0.16 | 15.98 | 4.15 |
| 260050003 | Michigan | Allegan | 75.5 | 78.5 | 0.33 | 0.08 | 2.15 | 0.06 | 0.23 | 0.00 | 0.00 | 0.00 | 0.13 | 0.20 | 0.01 | 23.17 | 8.02 | 0.85 | 1.03 | 0.53 | 0.57 | 0.00 | 0.01 | 0.00 | 2.74 | 0.06 | 0.42 | 3.69 | 0.01 | 0.17 | 0.01 | 0.00 | 0.00 | 0.21 | 0.00 | 0.05 | 0.01 | 0.10 | 1.78 | 0.00 | 0.02 | 0.00 | 0.05 | 0.02 | 0.68 | 2.95 | 0.06 | 0.00 | 0.03 | 0.00 | 0.03 | 2.59 | 0.12 | 0.04 | 0.28 | 0.34 | 0.73 | 11.71 | 9.01 |
| 260190003 | Michigan | Benzie | 66.4 | 68.2 | 0.22 | 0.05 | 0.85 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.11 | 0.16 | 0.02 | 14.25 | 4.21 | 1.47 | 0.88 | 1.15 | 0.59 | 0.00 | 0.01 | 0.00 | 2.27 | 0.23 | 0.25 | 1.44 | 0.08 | 0.10 | 0.01 | 0.00 | 0.00 | 0.11 | 0.01 | 0.05 | 0.14 | 0.83 | 1.51 | 0.01 | 0.05 | 0.00 | 0.04 | 0.03 | 0.20 | 2.19 | 0.03 | 0.00 | 0.03 | 0.03 | 0.03 | 8.89 | 0.11 | 0.02 | 0.47 | 0.18 | 0.41 | 14.83 | 7.48 |
| 260210014 | Michigan | Berrien | 73.7 | 75.8 | 0.26 | 0.08 | 1.10 | 0.09 | 0.20 | 0.00 | 0.00 | 0.00 | 0.18 | 0.20 | 0.02 | 21.49 | 6.30 | 0.90 | 1.14 | 0.47 | 0.77 | 0.00 | 0.01 | 0.00 | 1.74 | 0.24 | 0.36 | 3.58 | 0.05 | 0.21 | 0.02 | 0.00 | 0.00 | 0.18 | 0.00 | 0.07 | 0.26 | 0.08 | 2.62 | 0.01 | 0.03 | 0.00 | 0.06 | 0.06 | 0.46 | 3.72 | 0.07 | 0.00 | 0.04 | 0.04 | 0.03 | 3.26 | 0.10 | 0.04 | 0.30 | 0.37 | 0.83 | 13.19 | 8.24 |
| 260270003 | Michigan | Cass | 68.6 | 69.7 | 0.48 | 0.07 | 0.91 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | 0.20 | 0.26 | 0.03 | 13.63 | 9.31 | 0.87 | 1.45 | 0.46 | 1.03 | 0.00 | 0.01 | 0.00 | 1.59 | 0.24 | 0.53 | 3.19 | 0.07 | 0.30 | 0.02 | 0.00 | 0.00 | 0.16 | 0.01 | 0.11 | 0.21 | 0.10 | 2.91 | 0.02 | 0.04 | 0.00 | 0.09 | 0.11 | 0.48 | 3.89 | 0.07 | 0.00 | 0.06 | 0.04 | 0.06 | 0.91 | 0.13 | 0.03 | 0.33 | 0.42 | 0.77 | 13.81 | 8.73 |
| 260370001 | Michigan | Clinton | 61.4 | 62.9 | 0.19 | 0.05 | 0.30 | 0.06 | 0.09 | 0.00 | 0.00 | 0.00 | 0.12 | 0.14 | 0.02 | 3.72 | 3.12 | 0.70 | 0.68 | 1.04 | 0.32 | 0.00 | 0.08 | 0.00 | 11.87 | 0.24 | 0.18 | 1.32 | 0.06 | 0.21 | 0.01 | 0.00 | 0.00 | 0.05 | 0.12 | 0.27 | 0.04 | 2.62 | 0.87 | 0.01 | 0.92 | 0.00 | 0.06 | 0.08 | 0.43 | 1.37 | 0.05 | 0.00 | 0.37 | 0.02 | 0.62 | 1.18 | 0.15 | 0.01 | 0.59 | 0.17 | 0.30 | 19.73 | 6.58 |
| 260490021 | Michigan | Genesee | 66.1 | 68.8 | 0.13 | 0.05 | 0.23 | 0.09 | 0.15 | 0.04 | 0.01 | 0.00 | 0.17 | 0.14 | 0.04 | 1.46 | 1.90 | 0.28 | 0.39 | 0.92 | 0.23 | 0.00 | 0.15 | 0.06 | 15.91 | 0.34 | 0.15 | 0.73 | 0.07 | 0.12 | 0.02 | 0.01 | 0.08 | 0.10 | 0.42 | 0.33 | 0.14 | 4.75 | 0.46 | 0.04 | 1.21 | 0.01 | 0.07 | 0.05 | 0.25 | 0.86 | 0.07 | 0.00 | 0.46 | 0.05 | 0.64 | 0.57 | 0.20 | 0.02 | 3.49 | 0.33 | 0.37 | 21.65 | 5.46 |
| 260492001 | Michigan | Genesee | 65.2 | 66.8 | 0.08 | 0.04 | 0.35 | 0.08 | 0.12 | 0.00 | 0.00 | 0.00 | 0.06 | 0.05 | 0.04 | 1.72 | 1.91 | 0.29 | 0.38 | 1.04 | 0.35 | 0.00 | 0.12 | 0.00 | 17.13 | 0.28 | 0.16 | 0.84 | 0.06 | 0.11 | 0.02 | 0.00 | 0.01 | 0.08 | 0.23 | 0.25 | 0.12 | 5.43 | 0.42 | 0.04 | 1.14 | 0.00 | 0.02 | 0.04 | 0.28 | 0.99 | 0.06 | 0.00 | 0.42 | 0.05 | 0.69 | 0.47 | 0.18 | 0.02 | 2.86 | 0.16 | 0.23 | 19.55 | 5.98 |
| 260630007 | Michigan | Huron | 65.5 | 67.9 | 0.37 | 0.07 | 0.20 | 0.09 | 0.07 | 0.00 | 0.01 | 0.00 | 0.13 | 0.23 | 0.02 | 1.22 | 2.63 | 0.09 | 0.13 | 1.34 | 0.39 | 0.00 | 0.20 | 0.01 | 13.56 | 0.04 | 0.27 | 0.44 | 0.02 | 0.06 | 0.02 | 0.00 | 0.03 | 0.13 | 0.45 | 0.41 | 0.02 | 6.50 | 0.35 | 0.01 | 1.64 | 0.00 | 0.13 | 0.02 | 0.72 | 0.85 | 0.04 | 0.00 | 0.67 | 0.01 | 1.19 | 0.26 | 0.10 | 0.01 | 7.94 | 0.40 | 0.39 | 14.37 | 7.01 |
| 260650012 | Michigan | Ingham | 62.5 | 64.0 | 0.20 | 0.04 | 0.31 | 0.06 | 0.08 | 0.00 | 0.00 | 0.00 | 0.13 | 0.15 | 0.02 | 4.22 | 3.24 | 0.73 | 0.70 | 1.02 | 0.33 | 0.00 | 0.08 | 0.00 | 12.10 | 0.27 | 0.19 | 1.37 | 0.06 | 0.21 | 0.01 | 0.00 | 0.00 | 0.05 | 0.12 | 0.25 | 0.04 | 2.63 | 0.91 | 0.01 | 0.93 | 0.00 | 0.06 | 0.08 | 0.44 | 1.44 | 0.05 | 0.00 | 0.36 | 0.02 | 0.61 | 1.30 | 0.14 | 0.01 | 0.62 | 0.17 | 0.32 | 19.69 | 6.50 |
| 260770008 | Michigan | Kalamazoo | 66.0 | 67.1 | 0.29 | 0.08 | 1.07 | 0.10 | 0.18 | 0.00 | 0.00 | 0.00 | 0.20 | 0.21 | 0.03 | 9.45 | 6.61 | 1.05 | 1.58 | 0.41 | 0.88 | 0.00 | 0.01 | 0.00 | 4.36 | 0.35 | 0.35 | 3.56 | 0.07 | 0.32 | 0.02 | 0.00 | 0.00 | 0.14 | 0.00 | 0.08 | 0.32 | 0.08 | 2.56 | 0.02 | 0.03 | 0.00 | 0.07 | 0.14 | 0.32 | 3.72 | 0.07 | 0.00 | 0.04 | 0.04 | 0.04 | 1.55 | 0.12 | 0.04 | 0.29 | 0.49 | 0.67 | 13.54 | 10.20 |
| 260810020 | Michigan | Kent | 65.4 | 67.2 | 0.23 | 0.06 | 1.94 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | 0.11 | 0.14 | 0.02 | 9.69 | 3.88 | 0.44 | 0.66 | 0.82 | 0.59 | 0.00 | 0.05 | 0.00 | 8.87 | 0.04 | 0.39 | 2.20 | 0.05 | 0.16 | 0.02 | 0.00 | 0.00 | 0.10 | 0.19 | 0.09 | 0.02 | 2.85 | 1.25 | 0.01 | 1.05 | 0.00 | 0.04 | 0.06 | 0.61 | 2.34 | 0.04 | 0.00 | 0.16 | 0.02 | 0.41 | 1.58 | 0.11 | 0.02 | 0.73 | 0.20 | 0.80 | 14.99 | 6.89 |
| 260810022 | Michigan | Kent | 64.2 | 65.4 | 0.24 | 0.07 | 1.85 | 0.05 | 0.17 | 0.00 | 0.00 | 0.00 | 0.13 | 0.16 | 0.00 | 11.05 | 3.73 | 0.87 | 1.06 | 0.34 | 0.60 | 0.00 | 0.04 | 0.00 | 6.97 | 0.05 | 0.37 | 2.46 | 0.00 | 0.13 | 0.01 | 0.00 | 0.00 | 0.17 | 0.17 | 0.08 | 0.00 | 2.32 | 1.55 | 0.00 | 0.88 | 0.00 | 0.04 | 0.01 | 0.43 | 2.56 | 0.04 | 0.00 | 0.10 | 0.00 | 0.20 | 1.11 | 0.07 | 0.03 | 0.69 | 0.23 | 0.70 | 14.86 | 7.39 |
| 260910007 | Michigan | Lenawee | 67.3 | 67.7 | 0.15 | 0.08 | 0.45 | 0.11 | 0.19 | 0.03 | 0.00 | 0.00 | 0.16 | 0.15 | 0.05 | 2.95 | 3.16 | 0.85 | 0.96 | 0.30 | 0.37 | 0.01 | 0.04 | 0.05 | 13.39 | 0.32 | 0.18 | 1.55 | 0.10 | 0.55 | 0.03 | 0.01 | 0.06 | 0.14 | 0.25 | 0.08 | 0.19 | 6.10 | 1.17 | 0.03 | 0.32 | 0.00 | 0.06 | 0.17 | 0.18 | 1.82 | 0.10 | 0.00 | 0.06 | 0.05 | 0.06 | 0.98 | 0.24 | 0.04 | 2.81 | 0.39 | 0.43 | 16.26 | 8.81 |
| 260990009 | Michigan | Macomb | 71.3 | 72.6 | 0.41 | 0.09 | 0.36 | 0.14 | 0.21 | 0.00 | 0.00 | 0.00 | 0.16 | 0.20 | 0.05 | 2.20 | 3.83 | 0.39 | 0.58 | 1.93 | 0.58 | 0.00 | 0.05 | 0.00 | 19.85 | 0.09 | 0.45 | 1.14 | 0.10 | 0.27 | 0.04 | 0.00 | 0.02 | 0.17 | 0.06 | 0.38 | 0.04 | 4.46 | 0.79 | 0.03 | 0.21 | 0.00 | 0.09 | 0.10 | 0.80 | 1.38 | 0.11 | 0.00 | 0.30 | 0.03 | 0.43 | 0.64 | 0.30 | 0.03 | 1.99 | 0.51 | 0.51 | 17.63 | 6.93 |
| 260991003 | Michigan | Macomb | 72.7 | 74.2 | 0.12 | 0.04 | 0.24 | 0.13 | 0.15 | 0.00 | 0.00 | 0.00 | 0.04 | 0.11 | 0.07 | 1.66 | 3.98 | 0.31 | 0.36 | 1.17 | 0.15 | 0.00 | 0.04 | 0.00 | 19.03 | 0.32 | 0.11 | 0.47 | 0.19 | 0.19 | 0.04 | 0.00 | 0.01 | 0.04 | 0.10 | 0.36 | 0.27 | 6.95 | 0.31 | 0.07 | 0.29 | 0.00 | 0.08 | 0.09 | 0.41 | 0.66 | 0.08 | 0.00 | 0.28 | 0.10 | 0.34 | 0.72 | 0.27 | 0.01 | 3.90 | 0.10 | 0.38 | 21.59 | 6.12 |
| 261010922 | Michigan | Manistee | 65.7 | 67.3 | 0.22 | 0.05 | 0.84 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.12 | 0.16 | 0.02 | 15.43 | 4.51 | 1.45 | 0.89 | 1.13 | 0.59 | 0.00 | 0.01 | 0.00 | 2.01 | 0.24 | 0.26 | 1.42 | 0.07 | 0.10 | 0.01 | 0.00 | 0.00 | 0.10 | 0.01 | 0.05 | 0.14 | 0.82 | 1.45 | 0.01 | 0.05 | 0.00 | 0.04 | 0.03 | 0.21 | 2.29 | 0.03 | 0.00 | 0.03 | 0.03 | 0.03 | 7.61 | 0.10 | 0.02 | 0.46 | 0.19 | 0.43 | 14.36 | 7.30 |
| 261050007 | Michigan | Mason | 66.3 | 67.9 | 0.22 | 0.05 | 0.98 | 0.04 | 0.10 | 0.00 | 0.00 | 0.00 | 0.12 | 0.16 | 0.02 | 19.76 | 3.15 | 1.49 | 0.87 | 0.06 | 0.56 | 0.00 | 0.01 | 0.00 | 1.63 | 0.31 | 0.27 | 1.35 | 0.12 | 0.11 | 0.01 | 0.00 | 0.00 | 0.12 | 0.00 | 0.05 | 0.21 | 0.02 | 1.38 | 0.01 | 0.02 | 0.00 | 0.04 | 0.04 | 0.17 | 2.20 | 0.03 | 0.00 | 0.03 | 0.06 | 0.02 | 8.22 | 0.10 | 0.02 | 0.45 | 0.18 | 0.48 | 13.67 | 7.16 |
| 261210039 | Michigan | Muskegon | 72.2 | 74.3 | 0.23 | 0.06 | 1.34 | 0.06 | 0.16 | 0.00 | 0.00 | 0.00 | 0.09 | 0.14 | 0.03 | 22.07 | 6.66 | 0.68 | 0.75 | 0.51 | 0.44 | 0.00 | 0.01 | 0.00 | 4.83 | 0.27 | 0.30 | 2.22 | 0.10 | 0.21 | 0.02 | 0.00 | 0.00 | 0.12 | 0.00 | 0.04 | 0.17 | 0.21 | 1.27 | 0.01 | 0.05 | 0.00 | 0.03 | 0.05 | 0.47 | 1.97 | 0.06 | 0.00 | 0.04 | 0.05 | 0.11 | 4.90 | 0.15 | 0.02 | 0.42 | 0.22 | 0.52 | 12.26 | 7.63 |
| 261250001 | Michigan | Oakland | 70.1 | 71.7 | 0.13 | 0.04 | 0.24 | 0.13 | 0.16 | 0.00 | 0.00 | 0.00 | 0.04 | 0.11 | 0.07 | 1.77 | 4.15 | 0.32 | 0.39 | 1.18 | 0.16 | 0.00 | 0.03 | 0.00 | 17.83 | 0.32 | 0.12 | 0.49 | 0.17 | 0.18 | 0.04 | 0.00 | 0.01 | 0.06 | 0.09 | 0.33 | 0.21 | 7.14 | 0.36 | 0.06 | 0.26 | 0.00 | 0.08 | 0.08 | 0.41 | 0.75 | 0.08 | 0.00 | 0.25 | 0.09 | 0.31 | 0.73 | 0.28 | 0.02 | 2.71 | 0.10 | 0.38 | 20.81 | 6.18 |
| 261390005 | Michigan | Ottawa | 68.3 | 70.1 | 0.27 | 0.08 | 2.32 | 0.06 | 0.22 | 0.00 | 0.00 | 0.00 | 0.14 | 0.18 | 0.00 | 17.45 | 5.66 | 0.93 | 1.14 | 0.35 | 0.72 | 0.00 | 0.01 | 0.00 | 3.82 | 0.08 | 0.44 | 2.94 | 0.01 | 0.16 | 0.01 | 0.00 | 0.00 | 0.20 | 0.00 | 0.06 | 0.01 | 0.06 | 1.82 | 0.00 | 0.02 | 0.00 | 0.05 | 0.02 | 0.49 | 2.99 | 0.05 | 0.00 | 0.03 | 0.00 | 0.02 | 2.21 | 0.09 | 0.04 | 0.29 | 0.35 | 0.79 | 12.89 | 8.60 |
| 261470005 | Michigan | St. Clair | 69.3 | 70.8 | 0.55 | 0.11 | 0.21 | 0.13 | 0.18 | 0.00 | 0.00 | 0.00 | 0.38 | 0.24 | 0.03 | 1.49 | 4.55 | 0.19 | 0.21 | 2.17 | 0.53 | 0.00 | 0.03 | 0.00 | 16.81 | 0.06 | 0.54 | 0.62 | 0.04 | 0.10 | 0.03 | 0.00 | 0.01 | 0.21 | 0.07 | 0.31 | 0.04 | 5.45 | 0.56 | 0.01 | 0.26 | 0.00 | 0.06 | 0.02 | 0.84 | 1.30 | 0.11 | 0.00 | 0.25 | 0.01 | 0.42 | 0.34 | 0.22 | 0.04 | 3.20 | 0.81 | 0.43 | 18.33 | 6.53 |
| 261610008 | Michigan | Washtenaw | 66.9 | 69.4 | 0.06 | 0.04 | 0.24 | 0.09 | 0.12 | 0.00 | 0.01 | 0.00 | 0.04 | 0.04 | 0.04 | 1.83 | 1.47 | 0.54 | 0.36 | 0.49 | 0.15 | 0.00 | 0.12 | 0.00 | 19.77 | 0.42 | 0.07 | 0.70 | 0.10 | 0.16 | 0.02 | 0.00 | 0.04 | 0.08 | 0.23 | 0.56 | 0.18 | 5.55 | 0.46 | 0.05 | 0.58 | 0.00 | 0.04 | 0.05 | 0.17 | 0.87 | 0.06 | 0.00 | 0.66 | 0.07 | 0.90 | 1.11 | 0.18 | 0.02 | 3.59 | 0.13 | 0.24 | 18.14 | 5.76 |
| 261630001 | Michigan | Wayne | 65.4 | 67.5 | 0.02 | 0.03 | 0.08 | 0.09 | 0.09 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.04 | 0.82 | 2.21 | 0.28 | 0.21 | 0.61 | 0.09 | 0.00 | 0.03 | 0.00 | 16.74 | 0.40 | 0.03 | 0.26 | 0.11 | 0.10 | 0.02 | 0.00 | 0.01 | 0.04 | 0.10 | 0.27 | 0.19 | 9.32 | 0.21 | 0.05 | 0.26 | 0.00 | 0.04 | 0.04 | 0.11 | 0.49 | 0.06 | 0.00 | 0.20 | 0.07 | 0.25 | 0.86 | 0.20 | 0.01 | 3.16 | 0.08 | 0.15 | 21.48 | 5.21 |
| 261630019 | Michigan | Wayne | 74.0 | 76.2 | 0.02 | 0.03 | 0.09 | 0.10 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 | 0.05 | 0.90 | 2.64 | 0.30 | 0.23 | 0.67 | 0.11 | 0.00 | 0.03 | 0.00 | 20.77 | 0.47 | 0.04 | 0.28 | 0.13 | 0.09 | 0.03 | 0.00 | 0.01 | 0.04 | 0.10 | 0.32 | 0.28 | 7.92 | 0.22 | 0.06 | 0.27 | 0.00 | 0.04 | 0.04 | 0.12 | 0.52 | 0.07 | 0.00 | 0.24 | 0.09 | 0.27 | 1.00 | 0.20 | 0.01 | 4.89 | 0.08 | 0.17 | 24.10 | 5.57 |
| 270031001 | Minnesota | Anoka | 60.3 | 60.3 | 0.06 | 0.14 | 0.47 | 0.07 | 0.31 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.01 | 0.30 | 0.30 | 1.77 | 1.74 | 0.38 | 0.22 | 0.00 | 0.00 | 0.00 | 0.04 | 23.44 | 0.08 | 1.60 | 0.04 | 1.14 | 0.01 | 0.00 | 0.00 | 0.23 | 0.00 | 0.02 | 0.20 | 0.16 | 1.70 | 0.01 | 0.01 | 0.00 | 0.01 | 0.58 | 0.18 | 2.35 | 0.09 | 0.00 | 0.01 | 0.01 | 0.02 | 0.46 | 0.20 | 0.05 | 0.45 | 0.19 | 0.32 | 10.46 | 10.13 |
| 270031002 | Minnesota | Anoka | 61.4 | 62.0 | 0.07 | 0.16 | 0.16 | 0.12 | 0.38 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.12 | 0.13 | 0.06 | 1.74 | 1.56 | 0.03 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 22.44 | 0.06 | 0.42 | 0.17 | 1.45 | 0.04 | 0.00 | 0.00 | 0.24 | 0.00 | 0.02 | 0.15 | 0.01 | 1.42 | 0.07 | 0.00 | 0.00 | 0.01 | 0.71 | 0.05 | 1.81 | 0.16 | 0.00 | 0.01 | 0.10 | 0.00 | 0.46 | 0.40 | 0.06 | 0.41 | 0.16 | 0.41 | 15.08 | 10.04 |
| 271377550 | Minnesota | Saint Louis | 45.5 | 45.7 | 0.00 | 0.04 | 0.11 | 0.03 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.28 | 0.24 | 0.64 | 0.28 | 0.19 | 0.03 | 0.00 | 0.00 | 0.00 | 0.04 | 15.50 | 0.01 | 0.74 | 0.23 | 0.25 | 0.01 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.95 | 0.12 | 0.36 | 0.04 | 0.00 | 0.00 | 0.00 | 0.31 | 0.03 | 0.56 | 0.03 | 0.00 | 0.00 | 0.14 | 0.00 | 6.30 | 0.09 | 0.01 | 0.46 | 0.03 | 0.07 | 11.09 | 5.85 |
| 271713201 | Minnesota | Wright | 58.9 | 59.4 | 0.07 | 0.14 | 0.29 | 0.14 | 0.33 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 0.14 | 0.98 | 0.42 | 1.59 | 1.41 | 0.05 | 0.22 | 0.00 | 0.00 | 0.00 | 0.38 | 19.01 | 0.08 | 0.57 | 0.19 | 1.13 | 0.04 | 0.00 | 0.00 | 0.19 | 0.00 | 0.02 | 0.35 | 0.08 | 1.33 | 0.09 | 0.02 | 0.00 | 0.01 | 0.69 | 0.07 | 1.75 | 0.18 | 0.00 | 0.01 | 0.10 | 0.01 | 1.00 | 0.46 | 0.05 | 0.47 | 0.17 | 0.31 | 13.55 | 10.43 |
| 280330002 | Mississippi | DeSoto | 62.5 | 64.0 | 0.24 | 0.06 | 5.58 | 0.09 | 0.13 | 0.00 | 0.00 | 0.00 | 0.64 | 0.25 | 0.02 | 0.35 | 0.04 | 0.12 | 0.18 | 0.12 | 1.67 | 0.00 | 0.03 | 0.00 | 0.01 | 0.02 | 7.31 | 1.09 | 0.03 | 0.08 | 0.02 | 0.00 | 0.00 | 0.14 | 0.01 | 0.11 | 0.01 | 0.03 | 0.40 | 0.01 | 0.05 | 0.00 | 0.10 | 0.02 | 14.65 | 2.35 | 0.06 | 0.00 | 0.07 | 0.01 | 0.04 | 0.02 | 0.10 | 0.02 | 0.32 | 1.05 | 0.86 | 16.66 | 7.04 |
| 280450003 | Mississippi | Hancock | 58.3 | 58.9 | 3.58 | 0.04 | 0.30 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | 1.07 | 1.07 | 0.01 | 0.25 | 0.22 | 0.08 | 0.10 | 0.26 | 17.30 | 0.00 | 0.02 | 0.00 | 0.16 | 0.07 | 10.61 | 0.24 | 0.02 | 0.06 | 0.01 | 0.00 | 0.00 | 0.08 | 0.01 | 0.24 | 0.02 | 0.12 | 0.22 | 0.00 | 0.06 | 0.00 | 0.24 | 0.02 | 0.60 | 0.83 | 0.03 | 0.00 | 0.09 | 0.01 | 0.06 | 0.10 | 0.09 | 0.01 | 0.24 | 3.05 | 0.78 | 12.70 | 2.79 |
| 280470008 | Mississippi | Harrison | 62.0 | 64.3 | 5.44 | 0.03 | 0.27 | 0.08 | 0.12 | 0.00 | 0.00 | 0.00 | 0.99 | 0.82 | 0.02 | 0.42 | 0.41 | 0.12 | 0.14 | 0.46 | 8.10 | 0.00 | 0.02 | 0.00 | 0.40 | 0.09 | 19.63 | 0.32 | 0.04 | 0.09 | 0.02 | 0.00 | 0.00 | 0.05 | 0.02 | 0.17 | 0.03 | 0.22 | 0.25 | 0.01 | 0.05 | 0.00 | 0.17 | 0.02 | 0.92 | 0.69 | 0.05 | 0.00 | 0.07 | 0.01 | 0.05 | 0.20 | 0.14 | 0.01 | 0.28 | 2.04 | 0.60 | 14.45 | 3.22 |
| 280490010 | Mississippi | Hinds | 56.7 | 57.6 | 1.86 | 0.06 | 1.11 | 0.07 | 0.14 | 0.00 | 0.01 | 0.00 | 1.06 | 0.78 | 0.02 | 0.11 | 0.14 | 0.16 | 0.43 | 0.18 | 5.06 | 0.00 | 0.08 | 0.00 | 0.20 | 0.12 | 13.57 | 0.39 | 0.05 | 0.25 | 0.02 | 0.00 | 0.02 | 0.11 | 0.07 | 0.35 | 0.04 | 0.23 | 0.29 | 0.01 | 0.24 | 0.00 | 0.29 | 0.06 | 0.27 | 1.08 | 0.05 | 0.00 | 0.20 | 0.02 | 0.13 | 0.07 | 0.13 | 0.02 | 0.49 | 1.45 | 1.09 | 20.30 | 3.54 |
| 280590006 | Mississippi | Jackson | 64.5 | 65.6 | 8.63 | 0.01 | 0.24 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | 1.68 | 1.61 | 0.03 | 0.36 | 0.48 | 0.15 | 0.17 | 0.59 | 6.46 | 0.00 | 0.00 | 0.00 | 0.39 | 0.12 | 18.51 | 0.26 | 0.07 | 0.12 | 0.02 | 0.00 | 0.00 | 0.03 | 0.01 | 0.10 | 0.05 | 0.36 | 0.25 | 0.01 | 0.04 | 0.00 | 0.10 | 0.04 | 0.91 | 0.81 | 0.05 | 0.00 | 0.05 | 0.02 | 0.04 | 0.16 | 0.18 | 0.00 | 0.25 | 2.76 | 0.55 | 13.75 | 3.64 |
| 280750003 | Mississippi | Lauderdale | 54.6 | 54.9 | 4.71 | 0.04 | 0.43 | 0.07 | 0.16 | 0.00 | 0.00 | 0.00 | 0.24 | 1.56 | 0.01 | 0.22 | 0.29 | 0.14 | 0.19 | 0.46 | 4.55 | 0.00 | 0.06 | 0.00 | 0.08 | 0.14 | 6.20 | 0.29 | 0.04 | 0.11 | 0.01 | 0.00 | 0.01 | 0.08 | 0.02 | 0.41 | 0.05 | 0.21 | 0.48 | 0.00 | 0.15 | 0.00 | 0.34 | 0.03 | 1.71 | 2.78 | 0.04 | 0.00 | 0.27 | 0.02 | 0.14 | 0.10 | 0.10 | 0.02 | 0.28 | 1.01 | 0.73 | 21.22 | 4.15 |
| 280810005 | Mississippi | Lee | 55.9 | 56.8 | 3.01 | 0.08 | 0.25 | 0.11 | 0.14 | 0.00 | 0.00 | 0.00 | 0.24 | 1.16 | 0.03 | 0.48 | 1.41 | 0.14 | 0.12 | 2.21 | 0.25 | 0.00 | 0.05 | 0.00 | 0.15 | 0.15 | 6.87 | 0.22 | 0.08 | 0.09 | 0.02 | 0.00 | 0.00 | 0.13 | 0.01 | 0.32 | 0.11 | 0.61 | 0.20 | 0.02 | 0.12 | 0.00 | 0.25 | 0.04 | 5.10 | 0.70 | 0.05 | 0.00 | 0.20 | 0.06 | 0.18 | 0.11 | 0.15 | 0.03 | 0.40 | 0.29 | 0.56 | 22.50 | 6.24 |
| 281619991 | Mississippi | Yalobusha | 55.4 | 55.4 | 1.58 | 0.06 | 1.01 | 0.05 | 0.13 | 0.00 | 0.00 | 0.00 | 0.15 | 0.91 | 0.01 | 1.74 | 0.75 | 0.49 | 0.18 | 0.59 | 3.16 | 0.00 | 0.01 | 0.00 | 0.12 | 0.31 | 5.80 | 0.57 | 0.02 | 0.17 | 0.01 | 0.00 | 0.00 | 0.14 | 0.00 | 0.21 | 0.08 | 0.03 | 0.29 | 0.01 | 0.03 | 0.00 | 0.12 | 0.05 | 1.72 | 2.45 | 0.04 | 0.00 | 0.08 | 0.01 | 0.04 | 0.47 | 0.08 | 0.02 | 0.45 | 0.67 | 1.08 | 22.06 | 7.20 |
| 290030001 | Missouri | Andrew | 64.8 | 66.3 | 0.13 | 0.05 | 0.50 | 0.14 | 0.26 | 0.00 | 0.00 | 0.00 | 0.09 | 0.17 | 0.03 | 0.16 | 0.12 | 0.17 | 8.81 | 0.10 | 0.66 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.16 | 16.60 | 0.05 | 0.13 | 0.05 | 0.00 | 0.00 | 0.12 | 0.00 | 0.03 | 0.01 | 0.01 | 4.02 | 0.01 | 0.00 | 0.00 | 0.03 | 0.02 | 0.14 | 5.69 | 0.13 | 0.00 | 0.01 | 0.01 | 0.00 | 0.03 | 0.22 | 0.03 | 0.27 | 0.39 | 0.59 | 14.33 | 10.01 |
| 290190011 | Missouri | Boone | 62.0 | 64.7 | 0.12 | 0.06 | 0.63 | 0.07 | 0.20 | 0.00 | 0.00 | 0.00 | 0.21 | 0.11 | 0.01 | 1.39 | 0.13 | 0.17 | 3.26 | 0.06 | 0.59 | 0.00 | 0.01 | 0.00 | 0.01 | 0.06 | 0.14 | 16.34 | 0.02 | 0.18 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 0.07 | 0.05 | 0.02 | 4.31 | 0.01 | 0.03 | 0.00 | 0.03 | 0.04 | 0.10 | 5.26 | 0.06 | 0.00 | 0.04 | 0.01 | 0.03 | 0.16 | 0.08 | 0.03 | 0.23 | 0.54 | 0.47 | 16.19 | 10.05 |
| 290270002 | Missouri | Callaway | 60.0 | 62.0 | 0.25 | 0.06 | 0.67 | 0.09 | 0.17 | 0.00 | 0.00 | 0.00 | 0.32 | 0.23 | 0.02 | 2.65 | 0.14 | 0.45 | 1.29 | 0.05 | 0.91 | 0.00 | 0.02 | 0.00 | 0.24 | 0.07 | 0.19 | 13.73 | 0.04 | 0.18 | 0.02 | 0.00 | 0.01 | 0.12 | 0.01 | 0.12 | 0.03 | 0.04 | 3.47 | 0.01 | 0.05 | 0.00 | 0.06 | 0.04 | 0.10 | 4.29 | 0.07 | 0.00 | 0.07 | 0.01 | 0.05 | 0.59 | 0.12 | 0.03 | 0.29 | 0.59 | 0.51 | 18.03 | 9.28 |
| 290370003 | Missouri | Cass | 62.8 | 64.6 | 0.21 | 0.11 | 0.24 | 0.17 | 0.30 | 0.00 | 0.00 | 0.00 | 0.15 | 0.11 | 0.02 | 0.05 | 0.01 | 0.52 | 14.61 | 0.02 | 0.67 | 0.00 | 0.01 | 0.00 | 0.00 | 0.07 | 0.17 | 8.29 | 0.03 | 0.73 | 0.03 | 0.00 | 0.00 | 0.29 | 0.00 | 0.04 | 0.10 | 0.01 | 4.08 | 0.01 | 0.02 | 0.00 | 0.03 | 0.12 | 0.05 | 5.74 | 0.11 | 0.00 | 0.03 | 0.03 | 0.01 | 0.00 | 0.14 | 0.04 | 0.47 | 0.40 | 0.53 | 14.63 | 9.17 |
| 290390001 | Missouri | Cedar | 64.4 | 66.5 | 0.28 | 0.10 | 1.79 | 0.19 | 0.41 | 0.00 | 0.00 | 0.00 | 0.22 | 0.21 | 0.04 | 0.11 | 0.08 | 0.05 | 3.20 | 0.07 | 2.60 | 0.00 | 0.02 | 0.00 | 0.03 | 0.02 | 0.43 | 2.41 | 0.05 | 0.11 | 0.05 | 0.00 | 0.00 | 0.22 | 0.01 | 0.10 | 0.01 | 0.03 | 7.05 | 0.01 | 0.04 | 0.00 | 0.06 | 0.01 | 0.16 | 9.93 | 0.15 | 0.00 | 0.05 | 0.01 | 0.03 | 0.02 | 0.24 | 0.04 | 0.49 | 0.98 | 0.83 | 22.76 | 8.44 |
| 290470003 | Missouri | Clay | 69.0 | 70.8 | 0.05 | 0.06 | 0.47 | 0.16 | 0.42 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.03 | 0.08 | 0.07 | 0.06 | 11.06 | 0.06 | 0.58 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.17 | 20.17 | 0.04 | 0.15 | 0.05 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.01 | 0.01 | 3.73 | 0.01 | 0.00 | 0.00 | 0.01 | 0.01 | 0.07 | 5.58 | 0.18 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.25 | 0.04 | 0.26 | 0.29 | 0.56 | 14.56 | 9.21 |
| 290470005 | Missouri | Clay | 67.7 | 69.2 | 0.05 | 0.06 | 0.39 | 0.16 | 0.41 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.03 | 0.08 | 0.06 | 0.06 | 13.58 | 0.05 | 0.54 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.16 | 16.82 | 0.04 | 0.12 | 0.05 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.01 | 0.01 | 3.71 | 0.01 | 0.00 | 0.00 | 0.01 | 0.02 | 0.06 | 5.63 | 0.18 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.27 | 0.04 | 0.27 | 0.28 | 0.62 | 15.11 | 8.26 |
| 290470006 | Missouri | Clay | 69.7 | 71.8 | 0.04 | 0.06 | 0.39 | 0.19 | 0.47 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.04 | 0.10 | 0.08 | 0.08 | 15.50 | 0.06 | 0.60 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 | 0.17 | 15.71 | 0.05 | 0.15 | 0.06 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.02 | 0.01 | 3.86 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.08 | 5.15 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.33 | 0.04 | 0.25 | 0.27 | 0.61 | 15.77 | 8.81 |
| 290490001 | Missouri | Clinton | 69.7 | 71.4 | 0.04 | 0.06 | 0.41 | 0.20 | 0.48 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.03 | 0.11 | 0.08 | 0.10 | 14.03 | 0.06 | 0.61 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 | 0.17 | 16.56 | 0.05 | 0.19 | 0.06 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.02 | 0.01 | 4.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.08 | 5.14 | 0.22 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.33 | 0.05 | 0.24 | 0.27 | 0.60 | 15.50 | 9.47 |
| 290770036 | Missouri | Greene | 61.9 | 63.4 | 0.26 | 0.08 | 1.95 | 0.24 | 0.15 | 0.00 | 0.00 | 0.00 | 0.30 | 0.23 | 0.04 | 0.09 | 0.06 | 0.05 | 0.61 | 0.07 | 0.98 | 0.00 | 0.02 | 0.00 | 0.02 | 0.02 | 0.20 | 11.59 | 0.05 | 0.09 | 0.06 | 0.00 | 0.01 | 0.12 | 0.01 | 0.11 | 0.02 | 0.04 | 3.34 | 0.02 | 0.05 | 0.00 | 0.07 | 0.05 | 0.15 | 6.38 | 0.15 | 0.00 | 0.06 | 0.02 | 0.04 | 0.02 | 0.33 | 0.03 | 0.28 | 0.70 | 0.66 | 25.74 | 6.09 |
| 290770042 | Missouri | Greene | 64.0 | 66.1 | 0.27 | 0.08 | 2.02 | 0.24 | 0.15 | 0.00 | 0.00 | 0.00 | 0.31 | 0.23 | 0.05 | 0.10 | 0.06 | 0.06 | 0.64 | 0.08 | 1.01 | 0.00 | 0.02 | 0.00 | 0.02 | 0.02 | 0.21 | 11.99 | 0.05 | 0.09 | 0.06 | 0.00 | 0.01 | 0.13 | 0.01 | 0.11 | 0.02 | 0.04 | 3.46 | 0.02 | 0.05 | 0.00 | 0.07 | 0.05 | 0.16 | 6.60 | 0.16 | 0.00 | 0.06 | 0.02 | 0.04 | 0.02 | 0.35 | 0.03 | 0.29 | 0.72 | 0.68 | 26.61 | 6.30 |
| 290970004 | Missouri | Jasper | 68.9 | 70.0 | 0.33 | 0.10 | 0.57 | 0.14 | 0.31 | 0.00 | 0.00 | 0.00 | 0.46 | 0.25 | 0.01 | 0.03 | 0.04 | 0.01 | 1.38 | 0.06 | 1.73 | 0.00 | 0.03 | 0.00 | 0.01 | 0.01 | 0.29 | 2.40 | 0.01 | 0.05 | 0.04 | 0.00 | 0.01 | 0.20 | 0.01 | 0.14 | 0.00 | 0.05 | 14.49 | 0.01 | 0.07 | 0.00 | 0.07 | 0.00 | 0.10 | 10.84 | 0.11 | 0.00 | 0.08 | 0.00 | 0.06 | 0.00 | 0.14 | 0.05 | 0.33 | 1.22 | 0.81 | 23.93 | 7.65 |
| 290990019 | Missouri | Jefferson | 67.1 | 69.4 | 0.04 | 0.04 | 0.91 | 0.11 | 0.19 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.03 | 6.54 | 0.95 | 0.41 | 0.53 | 0.50 | 0.20 | 0.00 | 0.00 | 0.00 | 0.19 | 0.11 | 0.12 | 27.99 | 0.07 | 0.12 | 0.03 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.08 | 0.15 | 1.76 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.37 | 2.28 | 0.11 | 0.00 | 0.00 | 0.03 | 0.00 | 0.16 | 0.23 | 0.03 | 0.23 | 0.22 | 0.24 | 14.58 | 7.15 |
| 291130003 | Missouri | Lincoln | 66.3 | 68.8 | 0.02 | 0.02 | 0.18 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 6.86 | 4.58 | 0.36 | 0.27 | 1.15 | 0.08 | 0.00 | 0.00 | 0.00 | 0.42 | 0.28 | 0.03 | 18.41 | 0.18 | 0.11 | 0.02 | 0.00 | 0.00 | 0.04 | 0.02 | 0.00 | 0.23 | 1.12 | 0.48 | 0.04 | 0.17 | 0.00 | 0.00 | 0.08 | 0.14 | 0.64 | 0.05 | 0.00 | 0.01 | 0.11 | 0.44 | 0.37 | 0.21 | 0.01 | 0.57 | 0.06 | 0.11 | 20.21 | 7.73 |
| 291370001 | Missouri | Monroe | 61.9 | 64.0 | 0.14 | 0.06 | 0.49 | 0.08 | 0.19 | 0.00 | 0.00 | 0.00 | 0.17 | 0.11 | 0.02 | 2.06 | 3.06 | 0.34 | 2.10 | 2.01 | 0.48 | 0.00 | 0.01 | 0.00 | 0.35 | 0.12 | 0.10 | 11.52 | 0.02 | 0.19 | 0.02 | 0.00 | 0.00 | 0.21 | 0.01 | 0.05 | 0.04 | 1.63 | 3.20 | 0.01 | 0.18 | 0.00 | 0.03 | 0.06 | 0.06 | 3.85 | 0.06 | 0.00 | 0.04 | 0.01 | 0.44 | 0.05 | 0.08 | 0.04 | 0.57 | 0.33 | 0.40 | 16.83 | 9.84 |
| 291570001 | Missouri | Perry | 66.7 | 69.1 | 0.48 | 0.02 | 0.65 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 0.09 | 0.21 | 0.05 | 5.21 | 5.53 | 0.22 | 0.12 | 11.74 | 0.18 | 0.00 | 0.01 | 0.00 | 0.40 | 0.18 | 0.09 | 6.24 | 0.12 | 0.15 | 0.02 | 0.00 | 0.00 | 0.04 | 0.02 | 0.04 | 0.13 | 1.95 | 0.26 | 0.03 | 0.30 | 0.00 | 0.03 | 0.06 | 2.11 | 0.49 | 0.07 | 0.00 | 0.06 | 0.07 | 0.90 | 0.20 | 0.21 | 0.01 | 0.44 | 0.20 | 0.41 | 17.91 | 8.64 |
| 291831002 | Missouri | Saint Charles | 70.1 | 73.3 | 0.20 | 0.05 | 1.64 | 0.13 | 0.22 | 0.00 | 0.00 | 0.00 | 0.16 | 0.25 | 0.05 | 9.70 | 1.36 | 0.47 | 0.31 | 1.64 | 0.49 | 0.00 | 0.00 | 0.00 | 0.22 | 0.22 | 0.10 | 20.90 | 0.19 | 0.15 | 0.04 | 0.00 | 0.00 | 0.13 | 0.00 | 0.05 | 0.15 | 0.38 | 0.90 | 0.03 | 0.02 | 0.00 | 0.05 | 0.08 | 0.50 | 2.41 | 0.13 | 0.00 | 0.01 | 0.07 | 0.05 | 0.18 | 0.31 | 0.04 | 0.30 | 0.47 | 0.54 | 17.11 | 7.45 |
| 291831004 | Missouri | Saint Charles | 68.0 | 70.0 | 0.02 | 0.04 | 1.01 | 0.19 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 8.09 | 0.81 | 0.56 | 0.36 | 0.95 | 0.13 | 0.00 | 0.00 | 0.00 | 0.10 | 0.28 | 0.08 | 25.37 | 0.20 | 0.15 | 0.05 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.21 | 0.11 | 0.87 | 0.03 | 0.00 | 0.00 | 0.00 | 0.10 | 0.34 | 1.39 | 0.17 | 0.00 | 0.00 | 0.11 | 0.00 | 0.14 | 0.34 | 0.03 | 0.35 | 0.10 | 0.31 | 16.77 | 7.60 |
| 291860005 | Missouri | Sainte Genevieve | 63.9 | 66.3 | 0.16 | 0.04 | 0.21 | 0.09 | 0.15 | 0.00 | 0.00 | 0.00 | 0.12 | 0.13 | 0.03 | 4.57 | 5.81 | 0.43 | 0.64 | 4.56 | 0.53 | 0.00 | 0.02 | 0.00 | 0.45 | 0.11 | 0.14 | 11.82 | 0.07 | 0.11 | 0.03 | 0.00 | 0.00 | 0.09 | 0.02 | 0.07 | 0.06 | 1.12 | 1.54 | 0.02 | 0.19 | 0.00 | 0.04 | 0.03 | 0.48 | 2.05 | 0.08 | 0.00 | 0.08 | 0.02 | 0.57 | 0.17 | 0.16 | 0.02 | 0.48 | 0.32 | 0.21 | 18.21 | 7.43 |
| 291890005 | Missouri | Saint Louis | 62.0 | 63.7 | 0.03 | 0.03 | 0.46 | 0.11 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 6.69 | 2.43 | 0.39 | 0.37 | 1.45 | 0.12 | 0.00 | 0.00 | 0.00 | 0.25 | 0.09 | 0.07 | 21.17 | 0.08 | 0.27 | 0.04 | 0.00 | 0.00 | 0.07 | 0.01 | 0.01 | 0.05 | 1.25 | 0.74 | 0.03 | 0.18 | 0.00 | 0.00 | 0.03 | 0.24 | 1.17 | 0.16 | 0.00 | 0.02 | 0.04 | 0.45 | 0.14 | 0.24 | 0.03 | 0.46 | 0.11 | 0.15 | 15.76 | 6.13 |
| 291890014 | Missouri | Saint Louis | 67.9 | 70.5 | 0.01 | 0.03 | 0.45 | 0.14 | 0.20 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.07 | 8.60 | 2.19 | 0.41 | 0.33 | 0.88 | 0.10 | 0.00 | 0.00 | 0.00 | 0.19 | 0.16 | 0.05 | 23.19 | 0.16 | 0.34 | 0.05 | 0.00 | 0.00 | 0.07 | 0.01 | 0.00 | 0.14 | 1.15 | 0.97 | 0.04 | 0.16 | 0.00 | 0.00 | 0.05 | 0.07 | 1.22 | 0.19 | 0.00 | 0.02 | 0.08 | 0.35 | 0.22 | 0.29 | 0.02 | 0.49 | 0.12 | 0.22 | 17.81 | 6.42 |
| 292130004 | Missouri | Taney | 62.4 | 63.3 | 0.10 | 0.06 | 3.01 | 0.14 | 0.25 | 0.00 | 0.00 | 0.00 | 0.23 | 0.11 | 0.01 | 0.10 | 0.05 | 0.13 | 0.98 | 0.06 | 1.50 | 0.00 | 0.01 | 0.00 | 0.02 | 0.05 | 0.28 | 7.99 | 0.01 | 0.26 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.08 | 0.01 | 0.03 | 6.06 | 0.01 | 0.03 | 0.00 | 0.03 | 0.02 | 0.10 | 8.95 | 0.10 | 0.00 | 0.04 | 0.00 | 0.02 | 0.02 | 0.17 | 0.04 | 0.28 | 0.75 | 0.94 | 20.69 | 8.22 |
| 295100085 | Missouri | St. Louis City | 66.7 | 69.6 | 0.20 | 0.05 | 0.81 | 0.11 | 0.21 | 0.00 | 0.00 | 0.00 | 0.20 | 0.27 | 0.04 | 8.55 | 1.05 | 0.55 | 0.44 | 0.58 | 0.55 | 0.00 | 0.00 | 0.00 | 0.25 | 0.14 | 0.12 | 23.75 | 0.15 | 0.16 | 0.03 | 0.00 | 0.00 | 0.13 | 0.00 | 0.05 | 0.10 | 0.20 | 1.16 | 0.02 | 0.01 | 0.00 | 0.06 | 0.06 | 0.49 | 2.68 | 0.13 | 0.00 | 0.01 | 0.03 | 0.01 | 0.15 | 0.24 | 0.03 | 0.26 | 0.58 | 0.48 | 14.75 | 6.63 |
| 300750001 | Montana | Powder River | 53.4 | 53.4 | 0.00 | 0.14 | 0.00 | 0.99 | 0.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.73 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.04 | 0.40 | 0.35 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.12 | 0.00 | 0.04 | 0.22 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.10 | 0.60 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 5.03 | 0.04 | 0.30 | 0.07 | 6.08 | 24.83 | 8.16 |
| 310550019 | Nebraska | Douglas | 61.1 | 61.1 | 0.10 | 0.07 | 1.03 | 0.15 | 0.35 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.01 | 0.22 | 0.25 | 4.92 | 4.22 | 0.17 | 0.26 | 0.00 | 0.00 | 0.00 | 0.02 | 0.31 | 0.12 | 4.56 | 0.02 | 10.66 | 0.03 | 0.00 | 0.00 | 0.15 | 0.00 | 0.01 | 0.05 | 0.01 | 4.28 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.15 | 3.54 | 0.14 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.18 | 0.05 | 0.33 | 0.21 | 0.53 | 12.23 | 11.33 |
| 310550028 | Nebraska | Douglas | 53.5 | 54.7 | 0.09 | 0.06 | 0.90 | 0.13 | 0.30 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.01 | 0.19 | 0.21 | 4.31 | 3.70 | 0.14 | 0.23 | 0.00 | 0.00 | 0.00 | 0.02 | 0.27 | 0.11 | 3.99 | 0.02 | 9.33 | 0.03 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.04 | 0.01 | 3.74 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.13 | 3.10 | 0.12 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.15 | 0.05 | 0.29 | 0.19 | 0.46 | 10.70 | 9.92 |
| 310550035 | Nebraska | Douglas | 57.9 | 59.7 | 0.08 | 0.08 | 0.72 | 0.22 | 0.39 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.03 | 0.28 | 0.24 | 5.99 | 2.64 | 0.15 | 0.23 | 0.00 | 0.00 | 0.00 | 0.02 | 0.38 | 0.10 | 2.07 | 0.05 | 13.66 | 0.06 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.01 | 2.82 | 0.02 | 0.00 | 0.00 | 0.01 | 0.10 | 0.13 | 2.49 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.09 | 0.28 | 0.06 | 0.32 | 0.17 | 0.44 | 13.12 | 9.74 |
| 311090016 | Nebraska | Lancaster | 48.6 | 50.1 | 0.18 | 0.08 | 0.53 | 0.15 | 0.26 | 0.00 | 0.00 | 0.00 | 0.11 | 0.13 | 0.03 | 0.28 | 0.18 | 0.81 | 2.88 | 0.10 | 0.61 | 0.00 | 0.01 | 0.00 | 0.03 | 0.07 | 0.21 | 1.26 | 0.05 | 9.68 | 0.05 | 0.00 | 0.00 | 0.13 | 0.00 | 0.05 | 0.03 | 0.01 | 2.12 | 0.02 | 0.02 | 0.00 | 0.04 | 0.04 | 0.14 | 3.28 | 0.16 | 0.00 | 0.03 | 0.02 | 0.02 | 0.06 | 0.23 | 0.03 | 0.55 | 0.25 | 0.63 | 14.02 | 8.79 |
| 320010002 | Nevada | Churchill | 54.2 | 55.4 | 0.00 | 0.00 | 0.00 | 3.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.25 | 0.21 | 45.14 | 1.20 |
| 320030043 | Nevada | Clark | 71.9 | 73.2 | 0.00 | 0.88 | 0.00 | 8.46 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.20 | 0.00 | 0.00 | 0.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.35 | 0.32 | 47.37 | 2.50 |
| 320030071 | Nevada | Clark | 72.1 | 72.8 | 0.01 | 1.01 | 0.00 | 8.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 9.87 | 0.00 | 0.00 | 0.09 | 0.02 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 1.02 | 0.40 | 0.45 | 47.02 | 2.73 |
| 320030073 | Nevada | Clark | 71.6 | 72.8 | 0.01 | 1.00 | 0.00 | 8.63 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 9.80 | 0.00 | 0.00 | 0.09 | 0.02 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 1.01 | 0.40 | 0.45 | 46.69 | 2.71 |
| 320030075 | Nevada | Clark | 71.5 | 72.4 | 0.01 | 1.02 | 0.00 | 7.86 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 12.20 | 0.00 | 0.00 | 0.10 | 0.01 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 1.06 | 0.38 | 0.45 | 45.06 | 2.57 |
| 320030538 | Nevada | Clark | 66.8 | 67.8 | 0.01 | 0.49 | 0.01 | 6.47 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 12.90 | 0.00 | 0.00 | 0.13 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 | 0.02 | 0.93 | 0.29 | 0.39 | 41.75 | 2.45 |
| 320030540 | Nevada | Clark | 66.8 | 66.8 | 0.01 | 0.49 | 0.01 | 6.47 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 12.90 | 0.00 | 0.00 | 0.13 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 | 0.02 | 0.93 | 0.29 | 0.39 | 41.75 | 2.45 |
| 320030601 | Nevada | Clark | 68.6 | 68.6 | 0.01 | 0.95 | 0.01 | 8.04 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 2.86 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.48 | 0.06 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.03 | 1.12 | 0.40 | 0.24 | 51.25 | 2.47 |
| 320031019 | Nevada | Clark | 70.8 | 71.4 | 0.01 | 0.31 | 0.01 | 11.75 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.49 | 0.00 | 0.00 | 0.11 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.03 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.02 | 1.15 | 0.58 | 0.29 | 52.44 | 2.69 |
| 320032002 | Nevada | Clark | 67.1 | 68.3 | 0.01 | 1.03 | 0.01 | 7.24 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 13.58 | 0.00 | 0.00 | 0.12 | 0.01 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 1.18 | 0.37 | 0.33 | 39.70 | 2.58 |
| 320190006 | Nevada | Lyon | 64.6 | 65.1 | 0.00 | 0.00 | 0.00 | 4.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.22 | 0.23 | 52.84 | 1.35 |
| 320310016 | Nevada | Washoe | 62.3 | 63.3 | 0.00 | 0.00 | 0.00 | 6.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.30 | 0.13 | 51.07 | 1.50 |
| 320310020 | Nevada | Washoe | 63.3 | 64.2 | 0.00 | 0.00 | 0.00 | 6.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.30 | 0.13 | 51.89 | 1.52 |
| 320310025 | Nevada | Washoe | 62.5 | 63.2 | 0.00 | 0.00 | 0.00 | 3.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.20 | 0.20 | 53.83 | 0.89 |
| 320311005 | Nevada | Washoe | 63.1 | 63.8 | 0.00 | 0.00 | 0.00 | 4.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.23 | 0.18 | 52.07 | 1.25 |
| 320312002 | Nevada | Washoe | 57.2 | 57.5 | 0.00 | 0.00 | 0.00 | 10.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.36 | 0.19 | 41.53 | 1.39 |
| 320312009 | Nevada | Washoe | 63.3 | 64.2 | 0.00 | 0.00 | 0.00 | 5.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.26 | 0.15 | 53.09 | 1.40 |
| 320330101 | Nevada | White Pine | 69.1 | 71.0 | 0.01 | 0.15 | 0.00 | 7.47 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 1.37 | 0.00 | 0.00 | 0.05 | 0.01 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.36 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 | 0.00 | 0.66 | 0.44 | 0.56 | 55.18 | 2.36 |
| 325100002 | Nevada | Carson City | 62.7 | 62.7 | 0.00 | 0.00 | 0.00 | 6.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.36 | 0.19 | 52.25 | 1.41 |
| 330111011 | New Hampshire | Hillsborough | 58.8 | 59.4 | 0.29 | 0.07 | 0.43 | 0.06 | 0.15 | 2.81 | 0.20 | 0.02 | 0.10 | 0.24 | 0.02 | 1.10 | 1.51 | 0.17 | 0.24 | 0.62 | 0.19 | 0.03 | 0.84 | 2.83 | 1.52 | 0.14 | 0.19 | 0.48 | 0.03 | 0.11 | 0.01 | 1.42 | 2.62 | 0.13 | 5.65 | 0.15 | 0.07 | 2.84 | 0.44 | 0.01 | 4.03 | 0.05 | 0.06 | 0.04 | 0.50 | 0.84 | 0.06 | 0.18 | 0.62 | 0.01 | 0.31 | 0.27 | 0.15 | 0.03 | 1.72 | 1.34 | 0.31 | 15.52 | 4.75 |
| 330115001 | New Hampshire | Hillsborough | 61.7 | 62.6 | 0.38 | 0.08 | 0.44 | 0.07 | 0.18 | 1.85 | 0.20 | 0.02 | 0.15 | 0.33 | 0.02 | 1.35 | 1.84 | 0.22 | 0.29 | 0.79 | 0.23 | 0.02 | 0.82 | 1.66 | 1.49 | 0.16 | 0.22 | 0.54 | 0.04 | 0.13 | 0.02 | 0.47 | 2.91 | 0.15 | 6.32 | 0.18 | 0.08 | 3.25 | 0.51 | 0.01 | 4.83 | 0.03 | 0.07 | 0.04 | 0.57 | 0.98 | 0.07 | 0.29 | 0.78 | 0.01 | 0.44 | 0.30 | 0.18 | 0.03 | 1.83 | 1.17 | 0.36 | 16.63 | 5.43 |
| 330131007 | New Hampshire | Merrimack | 57.1 | 57.4 | 0.31 | 0.08 | 0.48 | 0.07 | 0.17 | 1.67 | 0.13 | 0.00 | 0.14 | 0.25 | 0.02 | 1.22 | 1.51 | 0.21 | 0.29 | 0.63 | 0.23 | 0.04 | 0.36 | 3.33 | 1.64 | 0.13 | 0.18 | 0.53 | 0.03 | 0.12 | 0.01 | 2.87 | 1.75 | 0.14 | 4.93 | 0.09 | 0.06 | 2.83 | 0.49 | 0.01 | 3.01 | 0.19 | 0.04 | 0.04 | 0.50 | 0.93 | 0.06 | 0.42 | 0.16 | 0.01 | 0.17 | 0.26 | 0.16 | 0.03 | 1.96 | 1.12 | 0.34 | 15.74 | 4.76 |
| 330150014 | New Hampshire | Rockingham | 58.5 | 58.5 | 0.12 | 0.04 | 0.40 | 0.03 | 0.11 | 1.51 | 0.28 | 0.02 | 0.03 | 0.10 | 0.01 | 0.71 | 0.82 | 0.11 | 0.21 | 0.29 | 0.13 | 0.46 | 0.96 | 6.92 | 1.37 | 0.06 | 0.11 | 0.36 | 0.01 | 0.08 | 0.01 | 4.21 | 2.25 | 0.08 | 4.18 | 0.20 | 0.03 | 1.84 | 0.36 | 0.00 | 4.18 | 0.35 | 0.05 | 0.02 | 0.29 | 0.62 | 0.03 | 0.12 | 0.71 | 0.00 | 0.27 | 0.18 | 0.08 | 0.02 | 1.51 | 2.83 | 0.27 | 14.78 | 3.51 |
| 330150016 | New Hampshire | Rockingham | 58.8 | 59.4 | 0.12 | 0.04 | 0.40 | 0.03 | 0.11 | 1.51 | 0.28 | 0.02 | 0.03 | 0.10 | 0.01 | 0.71 | 0.82 | 0.11 | 0.21 | 0.29 | 0.13 | 0.46 | 0.96 | 6.95 | 1.37 | 0.06 | 0.11 | 0.36 | 0.02 | 0.08 | 0.01 | 4.23 | 2.27 | 0.08 | 4.20 | 0.21 | 0.03 | 1.85 | 0.37 | 0.00 | 4.20 | 0.35 | 0.05 | 0.02 | 0.29 | 0.62 | 0.03 | 0.12 | 0.71 | 0.00 | 0.28 | 0.18 | 0.08 | 0.02 | 1.52 | 2.84 | 0.27 | 14.85 | 3.53 |
| 330150018 | New Hampshire | Rockingham | 60.4 | 60.4 | 0.26 | 0.05 | 0.45 | 0.04 | 0.12 | 3.56 | 0.26 | 0.02 | 0.07 | 0.22 | 0.01 | 0.61 | 0.98 | 0.10 | 0.17 | 0.52 | 0.17 | 0.03 | 1.01 | 4.75 | 1.47 | 0.09 | 0.18 | 0.31 | 0.01 | 0.07 | 0.01 | 1.34 | 3.30 | 0.11 | 6.83 | 0.18 | 0.03 | 2.31 | 0.27 | 0.00 | 4.66 | 0.42 | 0.07 | 0.02 | 0.49 | 0.61 | 0.03 | 0.08 | 0.72 | 0.00 | 0.32 | 0.18 | 0.06 | 0.02 | 1.36 | 1.76 | 0.29 | 15.07 | 4.03 |
| 340010006 | New Jersey | Atlantic | 66.0 | 67.5 | 0.41 | 0.10 | 0.26 | 0.09 | 0.18 | 0.07 | 2.60 | 0.07 | 0.07 | 0.24 | 0.02 | 0.83 | 1.45 | 0.27 | 0.36 | 1.20 | 0.51 | 0.00 | 2.75 | 0.00 | 0.87 | 0.07 | 0.24 | 0.72 | 0.03 | 0.21 | 0.02 | 0.00 | 10.02 | 0.20 | 1.84 | 0.32 | 0.03 | 4.00 | 0.58 | 0.01 | 10.91 | 0.00 | 0.10 | 0.06 | 0.29 | 1.23 | 0.09 | 0.00 | 1.09 | 0.00 | 1.49 | 0.23 | 0.21 | 0.04 | 0.76 | 1.42 | 0.42 | 11.10 | 5.67 |
| 340030006 | New Jersey | Bergen | 70.1 | 71.0 | 0.46 | 0.09 | 0.25 | 0.09 | 0.17 | 0.07 | 0.47 | 0.07 | 0.15 | 0.47 | 0.03 | 0.87 | 1.45 | 0.21 | 0.22 | 1.37 | 0.19 | 0.00 | 2.06 | 0.05 | 0.60 | 0.11 | 0.21 | 0.53 | 0.04 | 0.13 | 0.02 | 0.00 | 14.10 | 0.15 | 1.90 | 0.34 | 0.05 | 3.02 | 0.41 | 0.01 | 11.98 | 0.01 | 0.13 | 0.03 | 0.67 | 0.93 | 0.08 | 0.00 | 1.55 | 0.01 | 1.59 | 0.21 | 0.19 | 0.04 | 0.72 | 0.90 | 0.36 | 15.05 | 4.99 |
| 340071001 | New Jersey | Camden | 74.2 | 78.1 | 0.32 | 0.11 | 0.37 | 0.11 | 0.20 | 0.17 | 1.36 | 0.00 | 0.07 | 0.15 | 0.04 | 1.33 | 1.71 | 0.37 | 0.42 | 0.93 | 0.58 | 0.02 | 0.57 | 0.17 | 1.43 | 0.15 | 0.26 | 0.76 | 0.07 | 0.23 | 0.02 | 0.04 | 10.93 | 0.22 | 2.70 | 0.07 | 0.10 | 4.16 | 0.69 | 0.02 | 15.93 | 0.03 | 0.04 | 0.09 | 0.25 | 1.52 | 0.10 | 0.04 | 0.32 | 0.03 | 1.07 | 0.44 | 0.24 | 0.04 | 1.73 | 0.55 | 0.46 | 14.07 | 6.14 |
| 340110007 | New Jersey | Cumberland | 64.2 | 66.8 | 0.24 | 0.07 | 0.31 | 0.07 | 0.15 | 0.17 | 3.50 | 0.04 | 0.06 | 0.12 | 0.03 | 0.94 | 1.35 | 0.30 | 0.33 | 0.91 | 0.32 | 0.01 | 3.32 | 0.15 | 1.09 | 0.11 | 0.19 | 0.76 | 0.05 | 0.19 | 0.02 | 0.03 | 8.32 | 0.14 | 2.11 | 0.14 | 0.07 | 3.89 | 0.55 | 0.01 | 10.13 | 0.03 | 0.04 | 0.06 | 0.26 | 1.23 | 0.07 | 0.03 | 0.77 | 0.02 | 1.35 | 0.30 | 0.20 | 0.03 | 1.50 | 0.53 | 0.45 | 11.11 | 5.73 |
| 340130003 | New Jersey | Essex | 70.8 | 74.5 | 0.47 | 0.11 | 0.17 | 0.10 | 0.18 | 0.07 | 0.47 | 0.05 | 0.15 | 0.50 | 0.03 | 0.80 | 1.35 | 0.20 | 0.24 | 1.49 | 0.19 | 0.00 | 1.64 | 0.05 | 0.57 | 0.08 | 0.19 | 0.48 | 0.03 | 0.14 | 0.02 | 0.01 | 10.53 | 0.16 | 0.60 | 0.46 | 0.02 | 3.45 | 0.42 | 0.00 | 16.15 | 0.01 | 0.16 | 0.03 | 0.68 | 0.94 | 0.10 | 0.00 | 1.36 | 0.00 | 2.19 | 0.18 | 0.23 | 0.04 | 0.55 | 0.53 | 0.35 | 16.52 | 5.10 |
| 340150002 | New Jersey | Gloucester | 75.1 | 77.5 | 0.34 | 0.10 | 0.15 | 0.11 | 0.16 | 0.10 | 2.23 | 0.30 | 0.14 | 0.33 | 0.03 | 0.87 | 1.02 | 0.27 | 0.17 | 1.23 | 0.26 | 0.00 | 7.11 | 0.09 | 1.01 | 0.15 | 0.13 | 0.48 | 0.06 | 0.11 | 0.02 | 0.01 | 4.41 | 0.19 | 1.22 | 0.33 | 0.07 | 3.85 | 0.35 | 0.01 | 15.73 | 0.02 | 0.07 | 0.04 | 0.38 | 1.07 | 0.08 | 0.02 | 3.33 | 0.02 | 2.35 | 0.44 | 0.19 | 0.03 | 1.05 | 0.62 | 0.30 | 15.90 | 5.75 |
| 340170006 | New Jersey | Hudson | 70.5 | 71.4 | 0.44 | 0.09 | 0.16 | 0.08 | 0.15 | 0.08 | 0.62 | 0.06 | 0.14 | 0.48 | 0.03 | 0.79 | 1.22 | 0.18 | 0.20 | 1.37 | 0.18 | 0.00 | 2.02 | 0.05 | 0.50 | 0.09 | 0.17 | 0.46 | 0.04 | 0.12 | 0.02 | 0.00 | 11.69 | 0.15 | 1.63 | 0.32 | 0.04 | 2.85 | 0.40 | 0.01 | 14.45 | 0.01 | 0.14 | 0.03 | 0.65 | 0.90 | 0.08 | 0.00 | 1.37 | 0.01 | 1.69 | 0.18 | 0.18 | 0.03 | 1.20 | 0.60 | 0.32 | 16.60 | 4.94 |
| 340190001 | New Jersey | Hunterdon | 69.5 | 71.3 | 0.37 | 0.07 | 0.13 | 0.06 | 0.15 | 0.15 | 0.21 | 0.05 | 0.08 | 0.35 | 0.03 | 0.70 | 1.20 | 0.20 | 0.22 | 1.39 | 0.11 | 0.00 | 1.58 | 0.02 | 0.69 | 0.10 | 0.14 | 0.47 | 0.04 | 0.12 | 0.02 | 0.00 | 4.69 | 0.11 | 1.93 | 0.65 | 0.04 | 4.04 | 0.38 | 0.01 | 19.40 | 0.00 | 0.19 | 0.03 | 0.55 | 0.74 | 0.08 | 0.00 | 1.89 | 0.01 | 2.96 | 0.24 | 0.20 | 0.03 | 0.50 | 0.43 | 0.28 | 15.95 | 5.27 |
| 340210005 | New Jersey | Mercer | 70.6 | 73.0 | 0.42 | 0.10 | 0.14 | 0.09 | 0.17 | 0.08 | 0.82 | 0.08 | 0.12 | 0.45 | 0.02 | 0.68 | 1.12 | 0.23 | 0.25 | 1.53 | 0.16 | 0.00 | 2.88 | 0.04 | 0.49 | 0.09 | 0.13 | 0.52 | 0.03 | 0.13 | 0.02 | 0.00 | 5.79 | 0.16 | 1.46 | 0.53 | 0.03 | 3.08 | 0.43 | 0.00 | 18.41 | 0.00 | 0.16 | 0.03 | 0.60 | 0.94 | 0.09 | 0.00 | 1.71 | 0.00 | 2.62 | 0.38 | 0.19 | 0.04 | 1.61 | 0.56 | 0.30 | 15.03 | 5.36 |
| 340219991 | New Jersey | Mercer | 68.4 | 68.4 | 0.40 | 0.06 | 0.12 | 0.05 | 0.14 | 0.11 | 0.49 | 0.07 | 0.09 | 0.37 | 0.02 | 0.60 | 1.12 | 0.18 | 0.21 | 1.39 | 0.11 | 0.00 | 2.45 | 0.02 | 0.52 | 0.08 | 0.13 | 0.45 | 0.03 | 0.11 | 0.01 | 0.00 | 3.50 | 0.10 | 1.41 | 0.76 | 0.03 | 3.53 | 0.35 | 0.00 | 21.24 | 0.00 | 0.22 | 0.03 | 0.54 | 0.71 | 0.07 | 0.00 | 2.17 | 0.01 | 2.83 | 0.20 | 0.17 | 0.03 | 0.44 | 0.39 | 0.28 | 14.78 | 5.00 |
| 340230011 | New Jersey | Middlesex | 73.0 | 76.3 | 0.28 | 0.08 | 0.12 | 0.08 | 0.14 | 0.33 | 0.73 | 0.07 | 0.09 | 0.31 | 0.03 | 0.58 | 0.85 | 0.18 | 0.17 | 1.08 | 0.14 | 0.08 | 2.35 | 0.33 | 0.62 | 0.12 | 0.10 | 0.38 | 0.04 | 0.10 | 0.02 | 0.07 | 10.78 | 0.12 | 3.71 | 0.50 | 0.05 | 2.42 | 0.32 | 0.01 | 15.16 | 0.07 | 0.12 | 0.03 | 0.48 | 0.73 | 0.08 | 0.05 | 2.10 | 0.01 | 1.91 | 0.30 | 0.17 | 0.03 | 1.95 | 0.64 | 0.25 | 16.30 | 5.01 |
| 340250005 | New Jersey | Monmouth | 73.1 | 75.8 | 0.15 | 0.05 | 0.17 | 0.06 | 0.11 | 0.70 | 0.50 | 0.04 | 0.04 | 0.15 | 0.03 | 0.73 | 0.86 | 0.29 | 0.21 | 0.68 | 0.13 | 0.01 | 1.39 | 0.14 | 1.26 | 0.15 | 0.08 | 0.42 | 0.06 | 0.13 | 0.01 | 0.01 | 14.25 | 0.07 | 7.92 | 0.42 | 0.10 | 2.23 | 0.37 | 0.01 | 10.25 | 0.01 | 0.09 | 0.06 | 0.30 | 0.72 | 0.06 | 0.04 | 1.45 | 0.02 | 0.94 | 0.42 | 0.17 | 0.02 | 2.07 | 1.67 | 0.27 | 15.81 | 4.53 |
| 340273001 | New Jersey | Morris | 69.1 | 70.6 | 0.42 | 0.06 | 0.22 | 0.07 | 0.15 | 0.36 | 0.13 | 0.04 | 0.06 | 0.35 | 0.03 | 0.63 | 1.21 | 0.18 | 0.16 | 1.00 | 0.18 | 0.05 | 1.30 | 0.19 | 0.73 | 0.14 | 0.23 | 0.29 | 0.04 | 0.11 | 0.02 | 0.05 | 12.36 | 0.13 | 5.47 | 0.41 | 0.05 | 2.62 | 0.30 | 0.01 | 10.38 | 0.03 | 0.16 | 0.03 | 0.71 | 0.78 | 0.06 | 0.08 | 1.46 | 0.02 | 1.78 | 0.32 | 0.14 | 0.03 | 1.56 | 0.47 | 0.29 | 15.94 | 4.83 |
| 340290006 | New Jersey | Ocean | 73.9 | 76.6 | 0.21 | 0.06 | 0.23 | 0.08 | 0.15 | 0.36 | 0.76 | 0.06 | 0.05 | 0.17 | 0.04 | 0.80 | 1.06 | 0.34 | 0.26 | 0.88 | 0.19 | 0.07 | 2.01 | 0.37 | 1.31 | 0.17 | 0.12 | 0.52 | 0.07 | 0.17 | 0.02 | 0.07 | 11.44 | 0.10 | 5.10 | 0.33 | 0.11 | 2.54 | 0.44 | 0.02 | 13.30 | 0.08 | 0.09 | 0.07 | 0.40 | 0.95 | 0.08 | 0.05 | 1.07 | 0.03 | 1.08 | 0.47 | 0.22 | 0.03 | 2.28 | 0.75 | 0.31 | 16.60 | 5.04 |
| 340315001 | New Jersey | Passaic | 67.8 | 69.4 | 0.04 | 0.03 | 0.07 | 0.04 | 0.09 | 2.15 | 0.25 | 0.05 | 0.10 | 0.08 | 0.02 | 0.41 | 0.33 | 0.15 | 0.10 | 0.16 | 0.05 | 0.01 | 1.45 | 0.94 | 0.70 | 0.11 | 0.03 | 0.16 | 0.04 | 0.07 | 0.01 | 0.06 | 14.94 | 0.04 | 10.10 | 0.48 | 0.05 | 1.54 | 0.16 | 0.01 | 6.18 | 0.29 | 0.10 | 0.02 | 0.08 | 0.30 | 0.05 | 0.10 | 1.43 | 0.01 | 1.07 | 0.27 | 0.11 | 0.01 | 1.30 | 1.56 | 0.10 | 16.50 | 3.04 |
| 340410007 | New Jersey | Warren | 57.6 | 57.6 | 0.38 | 0.05 | 0.13 | 0.04 | 0.11 | 0.38 | 0.49 | 0.03 | 0.49 | 0.69 | 0.01 | 0.46 | 0.85 | 0.12 | 0.13 | 0.70 | 0.10 | 0.00 | 1.13 | 0.11 | 0.42 | 0.09 | 0.17 | 0.21 | 0.03 | 0.08 | 0.01 | 0.00 | 4.89 | 0.08 | 1.86 | 0.88 | 0.04 | 1.68 | 0.19 | 0.00 | 14.74 | 0.07 | 0.39 | 0.02 | 0.42 | 0.47 | 0.05 | 0.02 | 1.94 | 0.00 | 1.58 | 0.19 | 0.11 | 0.02 | 0.94 | 0.87 | 0.28 | 13.87 | 4.29 |
| 350010023 | New Mexico | Bernalillo | 62.8 | 64.6 | 0.00 | 2.34 | 0.00 | 1.03 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 8.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.69 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.85 | 0.74 | 0.11 | 2.46 | 42.19 | 2.35 |
| 350010024 | New Mexico | Bernalillo | 64.0 | 64.6 | 0.00 | 2.38 | 0.00 | 1.05 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 8.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.38 | 0.71 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.04 | 0.87 | 0.76 | 0.12 | 2.50 | 43.00 | 2.40 |
| 350010027 | New Mexico | Bernalillo | 65.9 | 66.8 | 0.01 | 2.85 | 0.01 | 1.68 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.01 | 0.18 | 0.00 | 0.00 | 9.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.18 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.66 | 1.58 | 0.14 | 3.18 | 40.32 | 3.61 |
| 350010029 | New Mexico | Bernalillo | 63.9 | 65.1 | 0.01 | 1.53 | 0.01 | 0.59 | 0.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.01 | 0.16 | 0.00 | 0.00 | 11.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.89 | 0.75 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.06 | 1.45 | 0.87 | 0.14 | 1.34 | 40.53 | 3.18 |
| 350010032 | New Mexico | Bernalillo | 64.7 | 64.7 | 0.00 | 2.40 | 0.01 | 1.24 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.01 | 0.21 | 0.00 | 0.00 | 8.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.70 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.80 | 1.02 | 0.13 | 2.65 | 42.51 | 3.15 |
| 350011012 | New Mexico | Bernalillo | 67.1 | 69.0 | 0.03 | 1.95 | 0.01 | 1.68 | 0.33 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 7.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 1.31 | 0.75 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.04 | 0.48 | 0.73 | 0.12 | 1.32 | 48.04 | 2.39 |
| 350011013 | New Mexico | Bernalillo | 64.1 | 64.4 | 0.05 | 2.22 | 0.02 | 0.89 | 0.30 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.02 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.01 | 0.01 | 0.02 | 0.17 | 0.00 | 0.00 | 8.15 | 0.00 | 0.01 | 0.00 | 0.00 | 0.14 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.01 | 2.32 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.74 | 1.20 | 0.17 | 1.63 | 41.55 | 3.44 |
| 350130008 | New Mexico | Dona Ana | 60.4 | 62.5 | 0.08 | 1.16 | 0.03 | 0.29 | 0.32 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.03 | 0.02 | 0.02 | 0.01 | 0.09 | 0.02 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.02 | 0.02 | 0.06 | 0.07 | 0.00 | 0.00 | 1.65 | 0.00 | 0.01 | 0.02 | 0.00 | 0.19 | 0.02 | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 8.54 | 0.19 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.12 | 0.08 | 4.95 | 0.31 | 0.40 | 37.75 | 3.17 |
| 350130017 | New Mexico | Dona Ana | 62.0 | 63.2 | 0.10 | 0.21 | 0.04 | 0.24 | 0.41 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.06 | 0.03 | 0.03 | 0.02 | 0.12 | 0.02 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.04 | 0.08 | 0.07 | 0.00 | 0.00 | 2.23 | 0.00 | 0.01 | 0.02 | 0.01 | 0.25 | 0.04 | 0.00 | 0.00 | 0.02 | 0.01 | 0.03 | 10.67 | 0.31 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.19 | 0.17 | 5.99 | 0.36 | 0.44 | 35.37 | 3.55 |
| 350130020 | New Mexico | Dona Ana | 62.9 | 64.1 | 0.11 | 1.80 | 0.03 | 0.64 | 0.13 | 0.00 | 0.00 | 0.00 | 0.03 | 0.07 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.02 | 0.01 | 0.02 | 0.15 | 0.00 | 0.00 | 2.59 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.03 | 3.37 | 0.26 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 | 0.35 | 3.46 | 0.29 | 0.49 | 45.23 | 2.77 |
| 350130021 | New Mexico | Dona Ana | 66.0 | 67.0 | 0.11 | 0.23 | 0.04 | 0.26 | 0.44 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.06 | 0.03 | 0.03 | 0.02 | 0.12 | 0.03 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.04 | 0.04 | 0.09 | 0.07 | 0.00 | 0.00 | 2.37 | 0.00 | 0.01 | 0.02 | 0.01 | 0.27 | 0.04 | 0.00 | 0.00 | 0.02 | 0.01 | 0.03 | 11.36 | 0.33 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.20 | 0.18 | 6.38 | 0.38 | 0.47 | 37.65 | 3.78 |
| 350130022 | New Mexico | Dona Ana | 65.5 | 69.9 | 0.10 | 0.23 | 0.04 | 0.26 | 0.44 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.06 | 0.03 | 0.03 | 0.02 | 0.13 | 0.02 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.04 | 0.09 | 0.07 | 0.00 | 0.00 | 2.53 | 0.00 | 0.01 | 0.02 | 0.01 | 0.27 | 0.04 | 0.00 | 0.00 | 0.02 | 0.01 | 0.03 | 10.29 | 0.32 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.20 | 0.17 | 7.33 | 0.37 | 0.45 | 37.13 | 3.85 |
| 350130023 | New Mexico | Dona Ana | 60.4 | 61.0 | 0.12 | 0.82 | 0.04 | 0.24 | 0.34 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.05 | 0.02 | 0.02 | 0.02 | 0.12 | 0.02 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.05 | 0.08 | 0.07 | 0.00 | 0.00 | 5.44 | 0.00 | 0.01 | 0.02 | 0.00 | 0.32 | 0.03 | 0.00 | 0.00 | 0.01 | 0.01 | 0.03 | 6.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.20 | 0.06 | 3.28 | 0.36 | 0.54 | 37.42 | 3.55 |
| 350151005 | New Mexico | Eddy | 69.6 | 70.3 | 0.11 | 0.48 | 0.15 | 0.21 | 0.35 | 0.00 | 0.00 | 0.00 | 0.05 | 0.03 | 0.02 | 0.08 | 0.05 | 0.06 | 0.39 | 0.03 | 0.34 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.06 | 0.16 | 0.03 | 0.14 | 0.06 | 0.00 | 0.00 | 5.76 | 0.00 | 0.00 | 0.01 | 0.01 | 1.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 9.58 | 0.17 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.14 | 0.24 | 2.60 | 0.51 | 0.73 | 40.89 | 4.74 |
| 350171003 | New Mexico | Grant | 63.1 | 65.0 | 0.00 | 3.05 | 0.00 | 0.59 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.11 | 0.00 | 0.00 | 0.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.31 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.18 | 0.10 | 1.20 | 0.11 | 2.06 | 52.49 | 1.35 |
| 350250008 | New Mexico | Lea | 62.7 | 66.0 | 0.22 | 0.08 | 0.07 | 0.13 | 0.24 | 0.00 | 0.00 | 0.00 | 0.16 | 0.09 | 0.03 | 0.04 | 0.06 | 0.02 | 0.13 | 0.05 | 0.57 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.13 | 0.06 | 0.03 | 0.06 | 0.05 | 0.00 | 0.00 | 1.15 | 0.00 | 0.02 | 0.00 | 0.02 | 0.46 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.06 | 10.98 | 0.13 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.16 | 0.04 | 1.97 | 0.84 | 0.30 | 40.93 | 3.13 |
| 350290003 | New Mexico | Luna | 60.0 | 63.9 | 0.05 | 3.64 | 0.01 | 0.81 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 1.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 1.15 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.07 | 1.24 | 0.23 | 1.68 | 46.87 | 1.59 |
| 350431001 | New Mexico | Sandoval | 58.2 | 59.4 | 0.03 | 2.37 | 0.01 | 0.86 | 0.24 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 6.97 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.01 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 1.62 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.19 | 1.18 | 0.16 | 5.60 | 34.93 | 3.23 |
| 350439004 | New Mexico | Sandoval | 60.6 | 60.6 | 0.03 | 0.80 | 0.01 | 1.02 | 0.26 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 3.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.16 | 0.19 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.23 | 0.79 | 0.09 | 7.13 | 42.40 | 2.28 |
| 350450009 | New Mexico | San Juan | 62.3 | 64.9 | 0.02 | 0.97 | 0.01 | 1.44 | 1.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 12.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.75 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 4.52 | 0.78 | 0.15 | 0.76 | 34.66 | 3.21 |
| 350450018 | New Mexico | San Juan | 67.7 | 67.7 | 0.02 | 1.05 | 0.01 | 1.81 | 1.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 8.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.69 | 0.25 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 | 3.88 | 0.82 | 0.16 | 0.52 | 45.49 | 2.73 |
| 350451005 | New Mexico | San Juan | 62.1 | 64.0 | 0.01 | 0.87 | 0.01 | 0.98 | 1.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 11.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.64 | 0.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 8.25 | 0.63 | 0.11 | 1.95 | 30.32 | 3.44 |
| 350490021 | New Mexico | Santa Fe | 61.7 | 63.3 | 0.04 | 0.72 | 0.02 | 0.33 | 0.38 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.01 | 0.07 | 0.00 | 0.00 | 4.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 1.95 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.31 | 1.11 | 0.14 | 11.57 | 35.99 | 3.41 |
| 350610008 | New Mexico | Valencia | 63.8 | 65.1 | 0.00 | 1.58 | 0.00 | 0.96 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 7.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.75 | 0.88 | 0.13 | 4.10 | 44.47 | 2.38 |
| 360010012 | New York | Albany | 61.4 | 63.2 | 0.15 | 0.05 | 0.15 | 0.06 | 0.11 | 0.84 | 0.11 | 0.01 | 0.34 | 0.30 | 0.02 | 0.52 | 0.42 | 0.16 | 0.17 | 0.19 | 0.16 | 0.00 | 0.65 | 0.13 | 1.20 | 0.14 | 0.07 | 0.23 | 0.03 | 0.08 | 0.01 | 0.01 | 3.03 | 0.11 | 14.28 | 0.83 | 0.06 | 1.71 | 0.25 | 0.01 | 5.50 | 0.02 | 0.24 | 0.03 | 0.18 | 0.61 | 0.05 | 0.12 | 0.95 | 0.02 | 0.44 | 0.25 | 0.09 | 0.02 | 2.15 | 1.28 | 0.15 | 18.07 | 4.35 |
| 360050133 | New York | Bronx | 71.5 | 73.4 | 0.29 | 0.06 | 0.17 | 0.06 | 0.14 | 0.02 | 0.29 | 0.06 | 0.05 | 0.27 | 0.03 | 0.81 | 1.16 | 0.19 | 0.20 | 0.87 | 0.10 | 0.00 | 1.85 | 0.00 | 0.70 | 0.15 | 0.17 | 0.43 | 0.05 | 0.13 | 0.02 | 0.00 | 12.66 | 0.09 | 4.92 | 0.26 | 0.07 | 2.37 | 0.37 | 0.01 | 12.44 | 0.00 | 0.10 | 0.04 | 0.43 | 0.67 | 0.07 | 0.00 | 2.02 | 0.01 | 1.34 | 0.26 | 0.19 | 0.03 | 1.60 | 0.26 | 0.27 | 17.58 | 4.90 |
| 360130006 | New York | Chautauqua | 66.0 | 68.4 | 0.14 | 0.07 | 0.63 | 0.06 | 0.18 | 0.00 | 0.00 | 0.00 | 0.09 | 0.12 | 0.02 | 2.54 | 3.00 | 0.52 | 0.49 | 1.49 | 0.27 | 0.00 | 0.00 | 0.00 | 3.92 | 0.16 | 0.14 | 1.86 | 0.04 | 0.21 | 0.01 | 0.00 | 0.00 | 0.14 | 1.25 | 0.04 | 0.06 | 14.87 | 0.87 | 0.01 | 3.34 | 0.00 | 0.03 | 0.04 | 0.68 | 1.21 | 0.06 | 0.00 | 0.02 | 0.01 | 0.25 | 0.63 | 0.18 | 0.03 | 2.87 | 0.18 | 0.31 | 15.22 | 7.51 |
| 360130011 | New York | Chautauqua | 66.5 | 68.3 | 0.30 | 0.07 | 0.78 | 0.05 | 0.16 | 0.00 | 0.00 | 0.00 | 0.10 | 0.19 | 0.02 | 2.88 | 3.41 | 0.44 | 0.25 | 2.99 | 0.47 | 0.00 | 0.01 | 0.00 | 4.12 | 0.15 | 0.32 | 1.19 | 0.05 | 0.10 | 0.01 | 0.00 | 0.00 | 0.17 | 0.40 | 0.13 | 0.08 | 13.15 | 0.64 | 0.01 | 2.75 | 0.00 | 0.05 | 0.04 | 0.96 | 1.88 | 0.04 | 0.00 | 0.14 | 0.02 | 0.90 | 0.61 | 0.16 | 0.02 | 1.77 | 0.16 | 0.49 | 16.39 | 7.24 |
| 360150003 | New York | Chemung | 61.1 | 61.6 | 0.26 | 0.08 | 0.12 | 0.11 | 0.14 | 0.01 | 0.01 | 0.00 | 0.08 | 0.05 | 0.05 | 0.50 | 1.40 | 0.21 | 0.23 | 0.50 | 0.28 | 0.00 | 0.13 | 0.00 | 2.03 | 0.24 | 0.23 | 0.41 | 0.08 | 0.16 | 0.02 | 0.00 | 0.05 | 0.15 | 5.82 | 0.19 | 0.28 | 6.08 | 0.37 | 0.03 | 5.14 | 0.00 | 0.01 | 0.07 | 0.20 | 0.80 | 0.08 | 0.00 | 0.47 | 0.05 | 1.30 | 0.25 | 0.20 | 0.03 | 2.48 | 0.41 | 0.24 | 22.94 | 5.86 |
| 360270007 | New York | Dutchess | 63.7 | 65.4 | 0.02 | 0.02 | 0.08 | 0.04 | 0.08 | 1.90 | 0.31 | 0.09 | 0.05 | 0.03 | 0.02 | 0.39 | 0.44 | 0.13 | 0.11 | 0.24 | 0.03 | 0.00 | 2.49 | 0.34 | 0.84 | 0.12 | 0.02 | 0.18 | 0.04 | 0.07 | 0.01 | 0.02 | 7.33 | 0.04 | 13.58 | 0.47 | 0.06 | 1.70 | 0.16 | 0.00 | 7.04 | 0.10 | 0.05 | 0.03 | 0.07 | 0.28 | 0.04 | 0.04 | 1.98 | 0.01 | 0.83 | 0.22 | 0.09 | 0.01 | 1.23 | 1.24 | 0.10 | 15.27 | 3.34 |
| 360290002 | New York | Erie | 64.9 | 66.5 | 0.27 | 0.11 | 0.81 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | 0.09 | 0.13 | 0.01 | 2.12 | 3.25 | 0.37 | 0.45 | 1.59 | 0.49 | 0.00 | 0.01 | 0.00 | 2.76 | 0.08 | 0.26 | 1.79 | 0.01 | 0.18 | 0.01 | 0.00 | 0.00 | 0.24 | 7.11 | 0.04 | 0.02 | 8.58 | 0.92 | 0.00 | 1.78 | 0.00 | 0.03 | 0.03 | 0.84 | 1.65 | 0.05 | 0.00 | 0.03 | 0.00 | 0.31 | 0.15 | 0.13 | 0.04 | 6.25 | 0.29 | 0.47 | 13.66 | 6.94 |
| 360310002 | New York | Essex | 64.6 | 67.1 | 0.28 | 0.09 | 1.15 | 0.06 | 0.25 | 0.00 | 0.00 | 0.00 | 0.11 | 0.22 | 0.02 | 2.88 | 2.69 | 0.62 | 0.51 | 0.70 | 0.41 | 0.00 | 0.06 | 0.00 | 3.70 | 0.16 | 0.28 | 1.44 | 0.02 | 0.20 | 0.01 | 0.00 | 0.03 | 0.19 | 3.46 | 0.27 | 0.04 | 5.05 | 1.06 | 0.01 | 1.04 | 0.00 | 0.06 | 0.05 | 0.69 | 1.80 | 0.07 | 0.00 | 0.33 | 0.01 | 0.56 | 0.38 | 0.23 | 0.04 | 9.36 | 0.21 | 0.55 | 15.69 | 7.33 |
| 360310003 | New York | Essex | 61.9 | 63.4 | 0.27 | 0.09 | 1.10 | 0.06 | 0.24 | 0.00 | 0.00 | 0.00 | 0.10 | 0.21 | 0.01 | 2.76 | 2.58 | 0.59 | 0.49 | 0.67 | 0.39 | 0.00 | 0.06 | 0.00 | 3.54 | 0.16 | 0.27 | 1.38 | 0.02 | 0.19 | 0.01 | 0.00 | 0.02 | 0.18 | 3.32 | 0.26 | 0.04 | 4.84 | 1.02 | 0.01 | 1.00 | 0.00 | 0.06 | 0.04 | 0.66 | 1.72 | 0.06 | 0.00 | 0.32 | 0.01 | 0.54 | 0.36 | 0.22 | 0.04 | 8.96 | 0.20 | 0.52 | 15.03 | 7.02 |
| 360410005 | New York | Hamilton | 60.0 | 60.9 | 0.29 | 0.07 | 0.59 | 0.06 | 0.17 | 0.00 | 0.00 | 0.00 | 0.10 | 0.24 | 0.02 | 2.37 | 3.11 | 0.65 | 0.45 | 0.81 | 0.31 | 0.00 | 0.06 | 0.00 | 3.59 | 0.14 | 0.27 | 1.13 | 0.02 | 0.21 | 0.01 | 0.00 | 0.03 | 0.14 | 4.62 | 0.28 | 0.05 | 6.13 | 1.02 | 0.01 | 1.31 | 0.00 | 0.06 | 0.05 | 0.40 | 1.55 | 0.07 | 0.00 | 0.34 | 0.01 | 0.70 | 0.39 | 0.23 | 0.03 | 6.31 | 0.21 | 0.41 | 13.96 | 6.75 |
| 360430005 | New York | Herkimer | 57.1 | 58.0 | 0.25 | 0.06 | 0.55 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 0.09 | 0.20 | 0.02 | 2.42 | 2.98 | 0.58 | 0.44 | 0.71 | 0.27 | 0.00 | 0.06 | 0.00 | 3.23 | 0.13 | 0.23 | 0.98 | 0.02 | 0.15 | 0.01 | 0.00 | 0.03 | 0.14 | 4.92 | 0.26 | 0.04 | 5.72 | 0.88 | 0.01 | 1.31 | 0.00 | 0.05 | 0.04 | 0.35 | 1.36 | 0.06 | 0.00 | 0.34 | 0.01 | 0.69 | 0.45 | 0.19 | 0.03 | 6.21 | 0.18 | 0.37 | 13.34 | 6.28 |
| 360450002 | New York | Jefferson | 65.9 | 68.0 | 0.24 | 0.06 | 0.66 | 0.06 | 0.12 | 0.00 | 0.01 | 0.00 | 0.07 | 0.20 | 0.02 | 1.94 | 2.19 | 0.47 | 0.42 | 0.61 | 0.24 | 0.00 | 0.08 | 0.00 | 3.91 | 0.17 | 0.20 | 1.02 | 0.06 | 0.14 | 0.01 | 0.00 | 0.04 | 0.11 | 7.12 | 0.27 | 0.12 | 5.19 | 0.76 | 0.01 | 1.42 | 0.00 | 0.05 | 0.03 | 0.54 | 1.19 | 0.05 | 0.00 | 0.41 | 0.04 | 0.70 | 0.70 | 0.13 | 0.02 | 11.64 | 0.16 | 0.40 | 14.54 | 7.13 |
| 360610135 | New York | New York | 69.3 | 71.9 | 0.06 | 0.07 | 0.13 | 0.09 | 0.14 | 0.00 | 0.46 | 0.07 | 0.04 | 0.08 | 0.06 | 0.84 | 0.74 | 0.35 | 0.32 | 0.37 | 0.12 | 0.00 | 2.05 | 0.00 | 1.64 | 0.22 | 0.05 | 0.65 | 0.09 | 0.23 | 0.03 | 0.00 | 11.65 | 0.07 | 3.85 | 0.33 | 0.19 | 2.23 | 0.54 | 0.02 | 11.34 | 0.00 | 0.08 | 0.10 | 0.06 | 0.78 | 0.11 | 0.00 | 2.33 | 0.03 | 1.10 | 0.35 | 0.27 | 0.03 | 1.74 | 0.52 | 0.18 | 16.81 | 5.44 |
| 360631006 | New York | Niagara | 67.8 | 70.3 | 0.57 | 0.09 | 0.71 | 0.09 | 0.20 | 0.00 | 0.00 | 0.00 | 0.20 | 0.19 | 0.02 | 2.07 | 2.79 | 0.65 | 0.39 | 1.14 | 0.60 | 0.00 | 0.00 | 0.00 | 3.26 | 0.13 | 0.45 | 1.14 | 0.02 | 0.22 | 0.02 | 0.00 | 0.00 | 0.19 | 6.45 | 0.04 | 0.03 | 6.15 | 0.89 | 0.01 | 0.88 | 0.00 | 0.03 | 0.05 | 0.52 | 1.73 | 0.09 | 0.00 | 0.02 | 0.01 | 0.21 | 0.61 | 0.20 | 0.04 | 13.07 | 0.50 | 0.53 | 12.67 | 7.70 |
| 360650004 | New York | Oneida | 56.2 | 58.5 | 0.25 | 0.05 | 0.45 | 0.05 | 0.08 | 0.00 | 0.00 | 0.00 | 0.08 | 0.20 | 0.02 | 1.70 | 2.31 | 0.21 | 0.22 | 0.55 | 0.22 | 0.00 | 0.18 | 0.00 | 2.88 | 0.13 | 0.21 | 0.64 | 0.03 | 0.08 | 0.01 | 0.00 | 0.04 | 0.08 | 6.19 | 0.25 | 0.06 | 4.81 | 0.53 | 0.01 | 4.32 | 0.00 | 0.05 | 0.03 | 0.34 | 1.01 | 0.04 | 0.00 | 0.55 | 0.01 | 1.15 | 0.45 | 0.14 | 0.02 | 4.29 | 0.13 | 0.35 | 15.17 | 5.37 |
| 360671015 | New York | Onondaga | 63.3 | 65.8 | 0.37 | 0.09 | 0.73 | 0.10 | 0.16 | 0.00 | 0.01 | 0.00 | 0.11 | 0.22 | 0.03 | 2.21 | 2.32 | 0.27 | 0.34 | 0.57 | 0.44 | 0.00 | 0.11 | 0.00 | 2.28 | 0.12 | 0.37 | 0.88 | 0.03 | 0.12 | 0.02 | 0.00 | 0.04 | 0.19 | 10.34 | 0.25 | 0.05 | 3.80 | 0.66 | 0.02 | 1.79 | 0.00 | 0.05 | 0.04 | 0.51 | 1.62 | 0.07 | 0.00 | 0.44 | 0.01 | 0.78 | 0.36 | 0.20 | 0.03 | 3.74 | 0.29 | 0.50 | 18.66 | 6.71 |
| 360715001 | New York | Orange | 60.8 | 62.7 | 0.14 | 0.03 | 0.07 | 0.04 | 0.07 | 0.92 | 0.21 | 0.02 | 0.61 | 0.48 | 0.01 | 0.23 | 0.19 | 0.09 | 0.09 | 0.13 | 0.08 | 0.00 | 0.83 | 0.25 | 0.47 | 0.06 | 0.05 | 0.13 | 0.02 | 0.05 | 0.01 | 0.01 | 12.13 | 0.06 | 10.64 | 1.22 | 0.02 | 1.03 | 0.14 | 0.00 | 5.10 | 0.09 | 0.67 | 0.01 | 0.11 | 0.36 | 0.04 | 0.03 | 1.07 | 0.00 | 0.66 | 0.15 | 0.07 | 0.01 | 0.84 | 1.92 | 0.20 | 15.86 | 2.82 |
| 360750003 | New York | Oswego | 62.4 | 64.2 | 0.23 | 0.05 | 0.69 | 0.06 | 0.10 | 0.00 | 0.01 | 0.00 | 0.09 | 0.18 | 0.02 | 2.07 | 2.08 | 0.22 | 0.28 | 0.44 | 0.28 | 0.00 | 0.14 | 0.00 | 2.70 | 0.15 | 0.23 | 0.83 | 0.04 | 0.09 | 0.01 | 0.00 | 0.04 | 0.09 | 6.80 | 0.31 | 0.07 | 5.44 | 0.63 | 0.01 | 4.24 | 0.00 | 0.05 | 0.03 | 0.39 | 1.22 | 0.05 | 0.00 | 0.66 | 0.02 | 1.61 | 0.52 | 0.16 | 0.02 | 4.96 | 0.16 | 0.43 | 17.16 | 6.07 |
| 360790005 | New York | Putnam | 62.7 | 63.6 | 0.02 | 0.02 | 0.07 | 0.03 | 0.06 | 3.13 | 0.29 | 0.07 | 0.07 | 0.03 | 0.01 | 0.30 | 0.28 | 0.10 | 0.08 | 0.18 | 0.03 | 0.01 | 1.80 | 0.99 | 0.83 | 0.13 | 0.02 | 0.17 | 0.03 | 0.05 | 0.01 | 0.10 | 6.41 | 0.03 | 16.04 | 0.36 | 0.06 | 1.14 | 0.13 | 0.00 | 5.25 | 0.26 | 0.05 | 0.02 | 0.06 | 0.23 | 0.03 | 0.11 | 1.34 | 0.00 | 0.76 | 0.24 | 0.07 | 0.01 | 1.68 | 1.55 | 0.09 | 14.81 | 2.80 |
| 360810124 | New York | Queens | 75.7 | 77.6 | 0.13 | 0.07 | 0.12 | 0.09 | 0.13 | 0.41 | 0.60 | 0.07 | 0.08 | 0.20 | 0.05 | 0.84 | 0.80 | 0.34 | 0.24 | 0.49 | 0.14 | 0.00 | 2.15 | 0.06 | 1.79 | 0.21 | 0.06 | 0.49 | 0.09 | 0.18 | 0.02 | 0.01 | 11.48 | 0.09 | 10.61 | 0.39 | 0.17 | 2.36 | 0.43 | 0.02 | 8.83 | 0.01 | 0.11 | 0.08 | 0.16 | 0.76 | 0.09 | 0.00 | 2.10 | 0.03 | 0.92 | 0.49 | 0.24 | 0.02 | 2.00 | 1.54 | 0.21 | 17.29 | 5.14 |
| 360830004 | New York | Rensselaer | 60.3 | 60.3 | 0.24 | 0.06 | 0.36 | 0.06 | 0.15 | 0.43 | 0.10 | 0.01 | 0.07 | 0.19 | 0.03 | 1.36 | 1.37 | 0.27 | 0.32 | 0.56 | 0.16 | 0.00 | 0.54 | 0.05 | 1.35 | 0.09 | 0.19 | 0.51 | 0.03 | 0.12 | 0.02 | 0.00 | 1.98 | 0.11 | 11.15 | 0.22 | 0.03 | 3.17 | 0.50 | 0.00 | 4.83 | 0.00 | 0.05 | 0.03 | 0.40 | 0.87 | 0.06 | 0.00 | 0.81 | 0.00 | 0.66 | 0.26 | 0.16 | 0.03 | 2.31 | 0.56 | 0.29 | 17.43 | 5.44 |
| 360850067 | New York | Richmond | 76.3 | 77.8 | 0.25 | 0.08 | 0.16 | 0.09 | 0.15 | 0.30 | 0.68 | 0.08 | 0.09 | 0.30 | 0.04 | 0.74 | 1.02 | 0.27 | 0.27 | 0.96 | 0.15 | 0.00 | 2.39 | 0.04 | 1.20 | 0.16 | 0.11 | 0.54 | 0.06 | 0.18 | 0.02 | 0.00 | 12.38 | 0.12 | 4.57 | 0.55 | 0.11 | 2.70 | 0.44 | 0.01 | 13.51 | 0.00 | 0.14 | 0.07 | 0.42 | 0.83 | 0.10 | 0.00 | 2.27 | 0.02 | 1.64 | 0.33 | 0.22 | 0.03 | 1.74 | 1.21 | 0.29 | 16.47 | 5.51 |
| 360870005 | New York | Rockland | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 360910004 | New York | Saratoga | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361010003 | New York | Steuben | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361030002 | New York | Suffolk | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361030004 | New York | Suffolk | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361030009 | New York | Suffolk | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361111005 | New York | Ulster | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361173001 | New York | Wayne | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 361192004 | New York | Westchester | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370030004 | North Carolina | Alexander | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370110002 | North Carolina | Avery | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370119991 | North Carolina | Avery | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370210030 | North Carolina | Buncombe | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370270003 | North Carolina | Caldwell | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370330001 | North Carolina | Caswell | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370370004 | North Carolina | Chatham | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370510008 | North Carolina | Cumberland | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370511003 | North Carolina | Cumberland | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370590003 | North Carolina | Davie | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370630015 | North Carolina | Durham | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 370650099 | North Carolina | Edgecombe | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 370670022 | North Carolina | Forsyth | 64.1 | 66.4 | 0.41 | 0.06 | 0.21 | 0.06 | 0.16 | 0.00 | 0.00 | 0.00 | 0.24 | 0.78 | 0.02 | 0.25 | 0.43 |
| 370670028 | North Carolina | Forsyth | 59.5 | 61.4 | 0.33 | 0.06 | 0.14 | 0.06 | 0.14 | 0.02 | 0.03 | 0.01 | 0.14 | 0.57 | 0.02 | 0.22 | 0.42 |
| 370670030 | North Carolina | Forsyth | 61.5 | 64.3 | 0.59 | 0.06 | 0.16 | 0.05 | 0.18 | 0.00 | 0.00 | 0.00 | 0.31 | 0.95 | 0.02 | 0.26 | 0.44 |
| 370671008 | North Carolina | Forsyth | 61.2 | 63.5 | 0.35 | 0.06 | 0.14 | 0.05 | 0.17 | 0.00 | 0.00 | 0.00 | 0.27 | 0.89 | 0.02 | 0.31 | 0.44 |
| 370690001 | North Carolina | Franklin | 57.9 | 59.3 | 0.17 | 0.07 | 0.23 | 0.08 | 0.19 | 0.00 | 0.00 | 0.00 | 0.09 | 0.56 | 0.02 | 0.66 | 0.69 |
| 370750001 | North Carolina | Graham | 61.2 | 62.7 | 0.11 | 0.10 | 0.26 | 0.14 | 0.32 | 0.00 | 0.00 | 0.00 | 0.10 | 0.21 | 0.04 | 0.40 | 0.94 |
| 370770001 | North Carolina | Granville | 61.1 | 62.2 | 0.60 | 0.06 | 0.20 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 0.11 | 0.58 | 0.01 | 0.75 | 1.10 |
| 370810013 | North Carolina | Guilford | 63.0 | 64.7 | 0.20 | 0.09 | 0.10 | 0.09 | 0.25 | 0.00 | 0.00 | 0.01 | 0.13 | 0.54 | 0.03 | 0.40 | 0.41 |
| 370870008 | North Carolina | Haywood | 53.6 | 53.6 | 0.10 | 0.05 | 0.10 | 0.09 | 0.29 | 0.00 | 0.00 | 0.00 | 0.08 | 1.94 | 0.03 | 0.19 | 0.36 |
| 370870036 | North Carolina | Haywood | 59.5 | 60.7 | 0.31 | 0.09 | 0.18 | 0.11 | 0.25 | 0.00 | 0.00 | 0.00 | 0.18 | 2.39 | 0.03 | 0.32 | 0.70 |
| 370990005 | North Carolina | Jackson | 58.9 | 58.9 | 0.24 | 0.07 | 0.10 | 0.09 | 0.25 | 0.00 | 0.00 | 0.00 | 0.15 | 2.65 | 0.03 | 0.25 | 0.50 |
| 371010002 | North Carolina | Johnston | 60.7 | 62.6 | 0.13 | 0.08 | 0.11 | 0.12 | 0.28 | 0.05 | 0.13 | 0.03 | 0.07 | 0.08 | 0.05 | 0.58 | 0.75 |
| 371070004 | North Carolina | Lenoir | 58.4 | 59.5 | 0.18 | 0.05 | 0.09 | 0.08 | 0.18 | 0.00 | 0.02 | 0.06 | 0.14 | 0.21 | 0.04 | 0.52 | 0.60 |
| 371090004 | North Carolina | Lincoln | 61.2 | 63.2 | 0.56 | 0.07 | 0.10 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 0.08 | 0.66 | 0.02 | 0.08 | 0.07 |
| 371170001 | North Carolina | Martin | 55.5 | 56.1 | 0.44 | 0.06 | 0.38 | 0.09 | 0.14 | 0.00 | 0.02 | 0.04 | 0.22 | 0.61 | 0.03 | 0.60 | 0.92 |
| 371190041 | North Carolina | Mecklenburg | 70.0 | 72.6 | 0.48 | 0.06 | 0.09 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | 0.23 | 2.23 | 0.02 | 0.28 | 0.41 |
| 371191005 | North Carolina | Mecklenburg | 65.1 | 66.8 | 0.39 | 0.06 | 0.07 | 0.07 | 0.14 | 0.00 | 0.00 | 0.00 | 0.20 | 1.07 | 0.03 | 0.19 | 0.39 |
| 371191009 | North Carolina | Mecklenburg | 67.1 | 69.9 | 0.27 | 0.03 | 0.16 | 0.05 | 0.14 | 0.00 | 0.01 | 0.00 | 0.19 | 1.50 | 0.03 | 0.34 | 0.55 |
| 371239991 | North Carolina | Montgomery | 55.0 | 55.0 | 0.14 | 0.05 | 0.19 | 0.08 | 0.17 | 0.00 | 0.00 | 0.00 | 0.10 | 1.89 | 0.03 | 0.20 | 0.36 |
| 371290002 | North Carolina | New Hanover | 53.9 | 54.7 | 0.24 | 0.01 | 0.15 | 0.04 | 0.08 | 0.00 | 0.02 | 0.03 | 0.24 | 1.04 | 0.02 | 0.39 | 0.47 |
| 371450003 | North Carolina | Person | 67.5 | 70.3 | 0.44 | 0.04 | 0.32 | 0.06 | 0.14 | 0.00 | 0.00 | 0.00 | 0.07 | 0.48 | 0.02 | 0.94 | 1.80 |
| 371470006 | North Carolina | Pitt | 60.3 | 61.4 | 0.31 | 0.06 | 0.30 | 0.08 | 0.19 | 0.00 | 0.02 | 0.07 | 0.28 | 0.43 | 0.03 | 0.43 | 0.77 |
| 371570099 | North Carolina | Rockingham | 62.0 | 63.7 | 0.40 | 0.08 | 0.15 | 0.06 | 0.18 | 0.00 | 0.00 | 0.00 | 0.11 | 0.59 | 0.02 | 0.36 | 0.42 |
| 371590021 | North Carolina | Rowan | 62.1 | 64.4 | 0.19 | 0.07 | 0.08 | 0.08 | 0.18 | 0.00 | 0.00 | 0.00 | 0.13 | 0.59 | 0.03 | 0.40 | 0.68 |
| 371590022 | North Carolina | Rowan | 62.5 | 64.2 | 0.40 | 0.05 | 0.24 | 0.05 | 0.13 | 0.01 | 0.00 | 0.00 | 0.32 | 1.71 | 0.02 | 0.35 | 0.42 |
| 371730002 | North Carolina | Swain | 53.3 | 54.4 | 0.17 | 0.09 | 0.29 | 0.10 | 0.23 | 0.00 | 0.00 | 0.00 | 0.10 | 2.52 | 0.03 | 0.65 | 0.83 |
| 371790003 | North Carolina | Union | 59.7 | 61.4 | 0.18 | 0.07 | 0.10 | 0.10 | 0.30 | 0.00 | 0.00 | 0.00 | 0.20 | 0.93 | 0.05 | 0.45 | 1.20 |
| 371830014 | North Carolina | Wake | 59.5 | 60.9 | 0.18 | 0.08 | 0.09 | 0.07 | 0.16 | 0.02 | 0.04 | 0.02 | 0.09 | 0.35 | 0.02 | 0.49 | 0.46 |
| 371830016 | North Carolina | Wake | 62.9 | 64.6 | 0.17 | 0.07 | 0.31 | 0.10 | 0.30 | 0.11 | 0.15 | 0.03 | 0.04 | 0.08 | 0.04 | 0.71 | 1.19 |
| 371990004 | North Carolina | Yancey | 59.7 | 60.8 | 0.03 | 0.06 | 0.09 | 0.11 | 0.20 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.06 | 0.45 | 1.55 |
| 390030009 | Ohio | Allen | 65.8 | 66.7 | 0.66 | 0.06 | 0.32 | 0.06 | 0.17 | 0.00 | 0.00 | 0.00 | 0.04 | 0.67 | 0.02 | 1.41 | 6.94 |
| 390071001 | Ohio | Ashtabula | 67.8 | 69.3 | 0.14 | 0.06 | 0.46 | 0.07 | 0.16 | 0.00 | 0.00 | 0.00 | 0.09 | 0.11 | 0.03 | 3.49 | 2.81 |
| 390090004 | Ohio | Athens | 62.6 | 62.6 | 0.55 | 0.05 | 0.46 | 0.10 | 0.21 | 0.00 | 0.00 | 0.00 | 0.07 | 0.54 | 0.04 | 1.44 | 3.88 |
| 390170004 | Ohio | Butler | 71.5 | 73.3 | 1.08 | 0.06 | 0.59 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 0.09 | 0.85 | 0.03 | 0.84 | 5.45 |
| 390170018 | Ohio | Butler | 73.0 | 75.1 | 1.27 | 0.07 | 0.85 | 0.10 | 0.20 | 0.00 | 0.00 | 0.00 | 0.15 | 0.98 | 0.04 | 0.95 | 4.85 |
| 390179991 | Ohio | Butler | 70.1 | 70.1 | 0.07 | 0.03 | 0.08 | 0.09 | 0.13 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.05 | 1.60 | 10.14 |
| 390230001 | Ohio | Clark | 67.3 | 68.2 | 0.97 | 0.08 | 0.63 | 0.08 | 0.22 | 0.00 | 0.00 | 0.00 | 0.08 | 0.74 | 0.03 | 0.61 | 3.92 |
| 390230003 | Ohio | Clark | 66.6 | 67.5 | 0.79 | 0.06 | 0.53 | 0.08 | 0.20 | 0.00 | 0.00 | 0.00 | 0.07 | 0.71 | 0.04 | 1.26 | 4.97 |
| 390250022 | Ohio | Clermont | 71.0 | 74.0 | 0.18 | 0.05 | 0.47 | 0.08 | 0.20 | 0.00 | 0.00 | 0.00 | 0.06 | 0.13 | 0.04 | 1.84 | 7.88 |
| 390271002 | Ohio | Clinton | 69.7 | 72.7 | 0.91 | 0.06 | 0.56 | 0.07 | 0.19 | 0.00 | 0.00 | 0.00 | 0.12 | 0.83 | 0.02 | 1.59 | 8.07 |
| 390350034 | Ohio | Cuyahoga | 64.4 | 66.3 | 0.09 | 0.05 | 0.52 | 0.06 | 0.15 | 0.00 | 0.00 | 0.00 | 0.06 | 0.07 | 0.02 | 2.12 | 2.90 |
| 390350060 | Ohio | Cuyahoga | 57.4 | 58.7 | 0.15 | 0.04 | 0.35 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | 0.02 | 0.09 | 0.02 | 1.54 | 1.80 |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 450830009 | South Carolina | Spartanburg | 62.9 | 64.0 | 0.02 | 0.03 | 0.05 | 0.06 | 0.22 | 0.00 | 0.00 | 0.00 | 0.02 | 0.23 | 0.02 | 0.16 | 0.22 | 0.08 | 0.14 | 0.33 | 0.02 | 0.00 | 0.20 | 0.00 | 0.58 | 0.10 | 0.01 | 0.13 | 0.04 | 0.12 | 0.02 | 0.00 | 0.00 | 0.05 | 0.01 | 10.80 | 0.02 | 1.35 | 0.14 | 0.02 | 0.99 | 0.00 | 10.48 | 0.02 | 0.49 | 0.24 | 0.09 | 0.00 | 1.83 | 0.02 | 1.69 | 0.19 | 0.17 | 0.02 | 0.33 | 0.08 | 0.17 | 26.43 | 4.22 |
| 450910006 | South Carolina | York | 54.3 | 55.2 | 0.23 | 0.07 | 0.10 | 0.08 | 0.16 | 0.00 | 0.00 | 0.00 | 0.12 | 0.26 | 0.02 | 0.23 | 0.50 | 0.09 | 0.10 | 1.16 | 0.19 | 0.00 | 0.13 | 0.00 | 0.43 | 0.03 | 0.08 | 0.20 | 0.05 | 0.09 | 0.02 | 0.00 | 0.01 | 0.13 | 0.03 | 16.83 | 0.08 | 1.46 | 0.14 | 0.01 | 0.63 | 0.00 | 4.14 | 0.03 | 0.45 | 0.56 | 0.06 | 0.00 | 2.41 | 0.02 | 1.74 | 0.06 | 0.18 | 0.02 | 0.35 | 0.25 | 0.23 | 15.66 | 4.21 |
| 460330132 | South Dakota | Custer | 59.6 | 60.8 | 0.00 | 0.26 | 0.02 | 0.84 | 2.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.01 | 0.62 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.21 | 0.69 | 0.32 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.32 | 0.13 | 0.00 | 0.00 | 0.00 | 1.19 | 0.00 | 0.36 | 1.05 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 4.37 | 0.27 | 0.21 | 0.06 | 6.57 | 31.19 | 7.78 |
| 460930001 | South Dakota | Meade | 54.3 | 55.7 | 0.00 | 0.15 | 0.00 | 1.34 | 0.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.90 | 0.73 | 0.43 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.07 | 0.18 | 0.00 | 0.00 | 0.00 | 6.25 | 0.00 | 0.15 | 1.20 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 4.14 | 0.09 | 0.29 | 0.09 | 4.59 | 23.67 | 8.10 |
| 470010101 | Tennessee | Anderson | 61.7 | 63.7 | 0.40 | 0.05 | 0.10 | 0.10 | 0.25 | 0.00 | 0.00 | 0.00 | 0.15 | 0.40 | 0.05 | 0.48 | 0.89 | 0.22 | 0.20 | 1.78 | 0.11 | 0.00 | 0.01 | 0.00 | 0.55 | 0.19 | 0.15 | 0.35 | 0.13 | 0.21 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.28 | 0.09 | 1.69 | 0.18 | 0.02 | 0.18 | 0.00 | 0.11 | 0.09 | 21.24 | 0.31 | 0.10 | 0.00 | 1.15 | 0.05 | 1.73 | 0.22 | 0.32 | 0.03 | 0.25 | 0.16 | 0.38 | 21.28 | 4.73 |
| 470090101 | Tennessee | Blount | 66.4 | 68.4 | 0.24 | 0.09 | 0.24 | 0.11 | 0.30 | 0.00 | 0.00 | 0.00 | 0.40 | 2.14 | 0.03 | 0.25 | 0.57 | 0.05 | 0.14 | 2.39 | 0.24 | 0.00 | 0.02 | 0.00 | 0.15 | 0.04 | 0.09 | 0.25 | 0.04 | 0.12 | 0.03 | 0.00 | 0.00 | 0.18 | 0.00 | 1.27 | 0.02 | 0.92 | 0.20 | 0.02 | 0.13 | 0.00 | 0.70 | 0.01 | 22.19 | 0.75 | 0.10 | 0.00 | 1.29 | 0.03 | 1.10 | 0.07 | 0.20 | 0.04 | 0.42 | 0.46 | 0.53 | 22.66 | 4.97 |
| 470090102 | Tennessee | Blount | 56.9 | 58.4 | 0.24 | 0.07 | 0.21 | 0.09 | 0.25 | 0.00 | 0.00 | 0.00 | 0.35 | 1.71 | 0.04 | 0.37 | 0.71 | 0.09 | 0.12 | 2.03 | 0.25 | 0.00 | 0.02 | 0.00 | 0.15 | 0.04 | 0.19 | 0.30 | 0.05 | 0.11 | 0.03 | 0.00 | 0.00 | 0.13 | 0.00 | 0.99 | 0.02 | 0.73 | 0.26 | 0.02 | 0.11 | 0.00 | 0.57 | 0.02 | 14.76 | 0.68 | 0.11 | 0.00 | 0.65 | 0.03 | 0.60 | 0.11 | 0.25 | 0.03 | 0.32 | 0.44 | 0.32 | 23.60 | 4.51 |
| 470259991 | Tennessee | Claiborne | 53.7 | 53.7 | 1.56 | 0.05 | 0.16 | 0.09 | 0.22 | 0.00 | 0.00 | 0.00 | 0.16 | 5.08 | 0.03 | 0.47 | 0.72 | 0.17 | 0.14 | 1.63 | 0.21 | 0.00 | 0.04 | 0.00 | 0.28 | 0.06 | 0.15 | 0.30 | 0.05 | 0.13 | 0.02 | 0.00 | 0.00 | 0.12 | 0.04 | 0.66 | 0.06 | 1.13 | 0.21 | 0.02 | 0.29 | 0.00 | 0.88 | 0.04 | 12.74 | 0.63 | 0.08 | 0.00 | 0.45 | 0.03 | 0.31 | 0.10 | 0.21 | 0.03 | 0.36 | 0.34 | 0.24 | 17.80 | 4.96 |
| 470370011 | Tennessee | Davidson | 58.5 | 61.4 | 0.98 | 0.08 | 0.11 | 0.11 | 0.20 | 0.00 | 0.00 | 0.00 | 0.19 | 1.61 | 0.05 | 0.28 | 0.73 | 0.13 | 0.31 | 3.57 | 0.09 | 0.00 | 0.01 | 0.00 | 0.29 | 0.12 | 0.04 | 0.20 | 0.08 | 0.13 | 0.03 | 0.00 | 0.00 | 0.19 | 0.01 | 0.27 | 0.07 | 0.99 | 0.48 | 0.02 | 0.25 | 0.00 | 0.33 | 0.06 | 21.18 | 1.03 | 0.08 | 0.00 | 0.20 | 0.03 | 0.65 | 0.18 | 0.21 | 0.04 | 0.34 | 0.24 | 0.45 | 16.67 | 4.98 |
| 470370026 | Tennessee | Davidson | 62.2 | 65.4 | 0.19 | 0.08 | 0.40 | 0.15 | 0.27 | 0.00 | 0.00 | 0.00 | 0.17 | 0.19 | 0.04 | 0.37 | 1.03 | 0.13 | 0.30 | 4.39 | 0.26 | 0.00 | 0.01 | 0.00 | 0.30 | 0.11 | 0.57 | 0.51 | 0.09 | 0.14 | 0.04 | 0.00 | 0.00 | 0.17 | 0.01 | 0.07 | 0.07 | 1.01 | 0.52 | 0.02 | 0.27 | 0.00 | 0.05 | 0.06 | 21.13 | 1.00 | 0.12 | 0.00 | 0.18 | 0.03 | 0.68 | 0.18 | 0.29 | 0.04 | 0.32 | 0.24 | 0.39 | 19.84 | 5.54 |
| 470651011 | Tennessee | Hamilton | 62.4 | 64.7 | 2.15 | 0.06 | 0.26 | 0.09 | 0.22 | 0.00 | 0.00 | 0.00 | 0.60 | 5.94 | 0.02 | 0.47 | 0.34 | 0.15 | 0.15 | 0.98 | 0.25 | 0.00 | 0.06 | 0.00 | 0.44 | 0.06 | 0.69 | 0.29 | 0.02 | 0.12 | 0.02 | 0.00 | 0.01 | 0.10 | 0.04 | 0.46 | 0.02 | 0.82 | 0.20 | 0.01 | 0.40 | 0.00 | 0.96 | 0.02 | 13.40 | 0.62 | 0.06 | 0.00 | 0.58 | 0.01 | 0.80 | 0.15 | 0.19 | 0.03 | 0.34 | 0.53 | 0.55 | 23.77 | 4.66 |
| 470654003 | Tennessee | Hamilton | 63.3 | 65.7 | 1.00 | 0.03 | 0.33 | 0.08 | 0.26 | 0.00 | 0.00 | 0.00 | 0.02 | 1.63 | 0.03 | 0.20 | 0.43 | 0.07 | 0.23 | 2.45 | 0.22 | 0.00 | 0.02 | 0.00 | 0.40 | 0.07 | 0.22 | 0.20 | 0.09 | 0.14 | 0.02 | 0.00 | 0.00 | 0.06 | 0.01 | 0.47 | 0.06 | 1.35 | 0.29 | 0.02 | 0.28 | 0.00 | 0.20 | 0.04 | 23.47 | 0.71 | 0.08 | 0.00 | 1.03 | 0.03 | 1.44 | 0.12 | 0.22 | 0.03 | 0.20 | 0.14 | 0.30 | 18.98 | 5.41 |
| 470890002 | Tennessee | Jefferson | 64.5 | 67.4 | 0.83 | 0.09 | 0.23 | 0.11 | 0.26 | 0.00 | 0.00 | 0.00 | 0.27 | 2.57 | 0.04 | 0.30 | 0.67 | 0.18 | 0.19 | 1.65 | 0.24 | 0.00 | 0.06 | 0.00 | 0.25 | 0.11 | 0.37 | 0.26 | 0.08 | 0.18 | 0.03 | 0.00 | 0.00 | 0.16 | 0.01 | 0.82 | 0.07 | 1.07 | 0.27 | 0.02 | 0.43 | 0.00 | 1.15 | 0.06 | 19.52 | 0.71 | 0.10 | 0.00 | 0.85 | 0.04 | 0.58 | 0.09 | 0.33 | 0.04 | 0.35 | 0.37 | 0.40 | 22.43 | 5.43 |
| 470930021 | Tennessee | Knox | 60.0 | 61.7 | 0.73 | 0.07 | 0.24 | 0.11 | 0.23 | 0.00 | 0.00 | 0.00 | 0.18 | 2.48 | 0.04 | 0.39 | 0.79 | 0.20 | 0.21 | 1.53 | 0.16 | 0.00 | 0.05 | 0.00 | 0.36 | 0.14 | 0.35 | 0.25 | 0.08 | 0.17 | 0.03 | 0.00 | 0.00 | 0.13 | 0.01 | 0.80 | 0.06 | 0.74 | 0.28 | 0.03 | 0.40 | 0.00 | 1.07 | 0.07 | 19.94 | 0.59 | 0.09 | 0.00 | 0.67 | 0.04 | 0.65 | 0.16 | 0.30 | 0.04 | 0.29 | 0.28 | 0.39 | 18.55 | 5.41 |
| 470931020 | Tennessee | Knox | 62.0 | 64.0 | 0.40 | 0.07 | 0.28 | 0.11 | 0.22 | 0.00 | 0.00 | 0.00 | 0.15 | 2.20 | 0.04 | 0.55 | 1.12 | 0.21 | 0.23 | 1.77 | 0.25 | 0.00 | 0.03 | 0.00 | 0.25 | 0.12 | 0.25 | 0.49 | 0.05 | 0.16 | 0.03 | 0.00 | 0.00 | 0.11 | 0.01 | 0.94 | 0.05 | 0.53 | 0.34 | 0.02 | 0.19 | 0.00 | 0.37 | 0.04 | 23.46 | 0.71 | 0.11 | 0.00 | 0.46 | 0.02 | 0.34 | 0.19 | 0.23 | 0.04 | 0.22 | 0.28 | 0.27 | 18.84 | 5.02 |
| 471050109 | Tennessee | Loudon | 63.1 | 65.5 | 0.38 | 0.04 | 0.06 | 0.08 | 0.28 | 0.00 | 0.00 | 0.00 | 0.16 | 0.38 | 0.05 | 0.25 | 0.58 | 0.13 | 0.15 | 1.79 | 0.13 | 0.00 | 0.02 | 0.00 | 0.51 | 0.13 | 0.16 | 0.11 | 0.12 | 0.19 | 0.02 | 0.00 | 0.00 | 0.06 | 0.00 | 0.60 | 0.08 | 1.70 | 0.13 | 0.03 | 0.21 | 0.00 | 0.27 | 0.07 | 23.29 | 0.29 | 0.09 | 0.00 | 1.33 | 0.06 | 1.98 | 0.15 | 0.30 | 0.03 | 0.25 | 0.14 | 0.40 | 21.27 | 4.43 |
| 471210104 | Tennessee | Meigs | 61.5 | 63.8 | 0.79 | 0.02 | 0.30 | 0.07 | 0.20 | 0.00 | 0.00 | 0.00 | 0.11 | 1.15 | 0.02 | 0.16 | 0.38 | 0.04 | 0.15 | 1.84 | 0.27 | 0.00 | 0.00 | 0.00 | 0.37 | 0.03 | 0.38 | 0.17 | 0.05 | 0.11 | 0.02 | 0.00 | 0.00 | 0.04 | 0.00 | 0.31 | 0.03 | 1.62 | 0.21 | 0.01 | 0.02 | 0.00 | 0.21 | 0.02 | 16.54 | 0.55 | 0.06 | 0.00 | 0.79 | 0.02 | 1.40 | 0.10 | 0.16 | 0.02 | 0.12 | 0.21 | 0.26 | 27.07 | 4.91 |
| 471490101 | Tennessee | Rutherford | 59.7 | 61.0 | 0.44 | 0.08 | 0.86 | 0.08 | 0.11 | 0.00 | 0.00 | 0.00 | 0.59 | 0.26 | 0.01 | 0.61 | 1.03 | 0.04 | 0.06 | 4.55 | 0.64 | 0.00 | 0.02 | 0.00 | 0.13 | 0.01 | 0.32 | 0.83 | 0.02 | 0.05 | 0.01 | 0.00 | 0.00 | 0.15 | 0.00 | 0.09 | 0.00 | 0.96 | 0.18 | 0.01 | 0.03 | 0.00 | 0.07 | 0.00 | 18.08 | 1.14 | 0.04 | 0.00 | 0.15 | 0.01 | 0.35 | 0.05 | 0.08 | 0.02 | 0.34 | 0.59 | 0.34 | 21.21 | 4.83 |
| 471550101 | Tennessee | Sevier | 64.5 | 65.9 | 0.25 | 0.08 | 0.10 | 0.13 | 0.26 | 0.00 | 0.00 | 0.00 | 0.16 | 0.35 | 0.03 | 0.27 | 0.66 | 0.12 | 0.16 | 1.37 | 0.16 | 0.00 | 0.01 | 0.00 | 0.30 | 0.09 | 0.18 | 0.21 | 0.05 | 0.15 | 0.04 | 0.00 | 0.00 | 0.11 | 0.00 | 0.78 | 0.03 | 1.39 | 0.16 | 0.01 | 0.04 | 0.00 | 0.31 | 0.03 | 14.10 | 0.43 | 0.11 | 0.00 | 1.19 | 0.02 | 0.93 | 0.17 | 0.22 | 0.04 | 0.26 | 0.20 | 0.22 | 33.90 | 4.53 |
| 471570021 | Tennessee | Shelby | 66.5 | 68.5 | 0.28 | 0.06 | 3.30 | 0.13 | 0.28 | 0.00 | 0.00 | 0.00 | 0.14 | 0.07 | 0.03 | 0.61 | 0.64 | 0.10 | 0.27 | 1.59 | 0.34 | 0.00 | 0.00 | 0.00 | 0.09 | 0.08 | 3.50 | 0.84 | 0.06 | 0.12 | 0.03 | 0.00 | 0.00 | 0.11 | 0.00 | 0.02 | 0.05 | 0.33 | 0.54 | 0.01 | 0.07 | 0.00 | 0.02 | 0.03 | 24.71 | 1.37 | 0.09 | 0.00 | 0.02 | 0.03 | 0.23 | 0.06 | 0.17 | 0.04 | 0.24 | 0.27 | 0.34 | 18.92 | 6.04 |
| 471570075 | Tennessee | Shelby | 67.7 | 67.7 | 0.55 | 0.05 | 4.17 | 0.11 | 0.24 | 0.00 | 0.00 | 0.00 | 0.24 | 0.38 | 0.03 | 0.59 | 0.50 | 0.13 | 0.26 | 1.07 | 1.47 | 0.00 | 0.02 | 0.00 | 0.09 | 0.08 | 3.89 | 0.69 | 0.06 | 0.12 | 0.04 | 0.00 | 0.00 | 0.11 | 0.01 | 0.12 | 0.04 | 0.28 | 0.59 | 0.02 | 0.11 | 0.00 | 0.12 | 0.03 | 23.36 | 2.38 | 0.11 | 0.00 | 0.08 | 0.02 | 0.27 | 0.07 | 0.20 | 0.03 | 0.23 | 0.58 | 0.67 | 15.63 | 7.63 |
| 471571004 | Tennessee | Shelby | 64.5 | 67.1 | 0.84 | 0.05 | 4.26 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | 0.29 | 0.78 | 0.02 | 0.59 | 0.52 | 0.14 | 0.17 | 1.39 | 2.07 | 0.00 | 0.05 | 0.00 | 0.16 | 0.08 | 3.62 | 0.45 | 0.07 | 0.08 | 0.02 | 0.00 | 0.00 | 0.11 | 0.01 | 0.26 | 0.06 | 0.44 | 0.40 | 0.01 | 0.23 | 0.00 | 0.26 | 0.04 | 17.19 | 2.61 | 0.07 | 0.00 | 0.17 | 0.02 | 0.50 | 0.07 | 0.16 | 0.02 | 0.29 | 0.99 | 0.86 | 14.86 | 8.74 |
| 471632002 | Tennessee | Sullivan | 63.8 | 65.8 | 0.36 | 0.09 | 0.16 | 0.09 | 0.24 | 0.00 | 0.00 | 0.00 | 0.12 | 1.48 | 0.03 | 0.51 | 0.90 | 0.20 | 0.31 | 1.77 | 0.16 | 0.00 | 0.02 | 0.00 | 0.21 | 0.13 | 0.13 | 0.44 | 0.05 | 0.18 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 1.42 | 0.07 | 0.78 | 0.43 | 0.01 | 0.14 | 0.00 | 0.93 | 0.06 | 25.53 | 0.85 | 0.09 | 0.00 | 1.72 | 0.01 | 0.40 | 0.23 | 0.22 | 0.04 | 0.27 | 0.20 | 0.35 | 16.35 | 5.72 |
| 471632003 | Tennessee | Sullivan | 63.1 | 64.7 | 0.59 | 0.05 | 0.37 | 0.06 | 0.17 | 0.00 | 0.00 | 0.00 | 0.09 | 0.67 | 0.03 | 0.80 | 1.73 | 0.28 | 0.30 | 2.74 | 0.11 | 0.00 | 0.01 | 0.00 | 0.47 | 0.24 | 0.18 | 0.57 | 0.11 | 0.17 | 0.02 | 0.00 | 0.01 | 0.10 | 0.02 | 0.54 | 0.14 | 2.65 | 0.41 | 0.01 | 0.25 | 0.00 | 0.32 | 0.09 | 19.50 | 0.46 | 0.07 | 0.00 | 3.17 | 0.03 | 0.52 | 0.28 | 0.22 | 0.03 | 0.35 | 0.17 | 0.39 | 17.26 | 6.12 |
| 471650007 | Tennessee | Sumner | 67.4 | 69.5 | 1.11 | 0.07 | 0.09 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | 0.25 | 1.82 | 0.06 | 0.81 | 1.19 | 0.23 | 0.31 | 4.35 | 0.18 | 0.00 | 0.02 | 0.00 | 0.45 | 0.24 | 0.08 | 0.19 | 0.09 | 0.19 | 0.03 | 0.00 | 0.00 | 0.15 | 0.01 | 0.31 | 0.09 | 1.07 | 0.47 | 0.02 | 0.26 | 0.00 | 0.38 | 0.09 | 23.08 | 1.11 | 0.07 | 0.00 | 0.22 | 0.04 | 0.69 | 0.30 | 0.26 | 0.03 | 0.42 | 0.29 | 0.42 | 19.37 | 5.97 |
| 471650101 | Tennessee | Sumner | 63.4 | 65.1 | 1.26 | 0.05 | 0.22 | 0.10 | 0.17 | 0.00 | 0.00 | 0.00 | 0.39 | 1.85 | 0.06 | 0.45 | 0.73 | 0.15 | 0.19 | 1.57 | 0.39 | 0.00 | 0.02 | 0.00 | 0.24 | 0.15 | 0.59 | 0.33 | 0.11 | 0.14 | 0.03 | 0.00 | 0.00 | 0.09 | 0.01 | 0.34 | 0.11 | 0.36 | 0.31 | 0.02 | 0.24 | 0.00 | 0.41 | 0.07 | 20.59 | 0.70 | 0.07 | 0.00 | 0.22 | 0.04 | 0.43 | 0.18 | 0.24 | 0.02 | 0.28 | 0.46 | 0.43 | 22.77 | 5.57 |
| 471870106 | Tennessee | Williamson | 61.3 | 63.7 | 0.06 | 0.03 | 0.09 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.02 | 0.93 | 2.53 | 0.14 | 0.21 | 4.19 | 0.13 | 0.00 | 0.00 | 0.00 | 0.50 | 0.14 | 0.06 | 0.21 | 0.06 | 0.11 | 0.01 | 0.00 | 0.00 | 0.09 | 0.00 | 0.02 | 0.08 | 1.99 | 0.34 | 0.01 | 0.38 | 0.00 | 0.02 | 0.04 | 18.45 | 0.82 | 0.04 | 0.00 | 0.07 | 0.02 | 1.51 | 0.31 | 0.12 | 0.01 | 0.32 | 0.09 | 0.13 | 21.05 | 5.49 |
| 471890103 | Tennessee | Wilson | 63.1 | 65.1 | 0.90 | 0.12 | 1.05 | 0.13 | 0.21 | 0.00 | 0.00 | 0.00 | 0.59 | 0.50 | 0.03 | 0.35 | 0.33 | 0.22 | 0.25 | 1.76 | 0.62 | 0.00 | 0.02 | 0.00 | 0.04 | 0.01 | 0.98 | 1.04 | 0.06 | 0.22 | 0.03 | 0.00 | 0.00 | 0.23 | 0.00 | 0.15 | 0.01 | 0.19 | 0.37 | 0.04 | 0.06 | 0.00 | 0.12 | 0.05 | 17.98 | 1.10 | 0.09 | 0.00 | 0.12 | 0.05 | 0.17 | 0.04 | 0.15 | 0.05 | 0.37 | 0.63 | 0.53 | 24.87 | 6.03 |
| 480271047 | Texas | Bell | 68.6 | 69.1 | 1.15 | 0.08 | 0.97 | 0.09 | 0.20 | 0.00 | 0.00 | 0.00 | 0.33 | 0.76 | 0.03 | 0.51 | 0.16 | 0.06 | 0.11 | 0.13 | 3.44 | 0.00 | 0.03 | 0.00 | 0.03 | 0.03 | 0.74 | 0.44 | 0.03 | 0.06 | 0.03 | 0.00 | 0.00 | 0.13 | 0.01 | 0.22 | 0.01 | 0.05 | 0.77 | 0.02 | 0.07 | 0.00 | 0.18 | 0.01 | 0.38 | 20.11 | 0.07 | 0.00 | 0.11 | 0.02 | 0.06 | 0.10 | 0.17 | 0.02 | 1.25 | 0.75 | 2.35 | 26.32 | 5.78 |
| 480290032 | Texas | Bexar | 71.5 | 72.7 | 0.64 | 0.04 | 0.31 | 0.08 | 0.13 | 0.00 | 0.00 | 0.00 | 0.33 | 0.43 | 0.02 | 0.19 | 0.13 | 0.07 | 0.30 | 0.14 | 1.11 | 0.00 | 0.01 | 0.00 | 0.04 | 0.05 | 0.45 | 0.30 | 0.04 | 0.19 | 0.02 | 0.00 | 0.00 | 0.06 | 0.00 | 0.19 | 0.11 | 0.07 | 0.65 | 0.01 | 0.03 | 0.00 | 0.23 | 0.03 | 0.32 | 25.56 | 0.05 | 0.00 | 0.07 | 0.01 | 0.05 | 0.07 | 0.12 | 0.01 | 0.32 | 1.62 | 1.84 | 30.85 | 3.99 |
| 480290052 | Texas | Bexar | 72.7 | 74.9 | 0.60 | 0.07 | 0.53 | 0.18 | 0.26 | 0.00 | 0.00 | 0.00 | 0.20 | 0.27 | 0.09 | 0.31 | 0.15 | 0.10 | 0.33 | 0.14 | 1.38 | 0.00 | 0.01 | 0.00 | 0.03 | 0.05 | 0.47 | 0.50 | 0.13 | 0.15 | 0.06 | 0.00 | 0.00 | 0.09 | 0.00 | 0.07 | 0.02 | 0.05 | 0.71 | 0.05 | 0.02 | 0.00 | 0.06 | 0.03 | 0.32 | 26.04 | 0.13 | 0.00 | 0.04 | 0.05 | 0.02 | 0.09 | 0.29 | 0.03 | 0.30 | 1.53 | 2.23 | 29.50 | 4.73 |
| 480290059 | Texas | Bexar | 63.9 | 65.5 | 0.04 | 0.04 | 0.66 | 0.09 | 0.33 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.05 | 0.28 | 0.04 | 0.21 | 0.45 | 0.01 | 0.60 | 0.00 | 0.00 | 0.00 | 0.05 | 0.19 | 0.04 | 0.58 | 0.11 | 0.22 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 1.44 | 0.04 | 0.00 | 0.00 | 0.00 | 0.04 | 0.02 | 24.34 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.16 | 0.27 | 0.02 | 0.53 | 0.44 | 3.42 | 23.65 | 5.07 |
| 480391004 | Texas | Brazoria | 81.4 | 82.3 | 0.56 | 0.08 | 0.98 | 0.23 | 0.25 | 0.00 | 0.00 | 0.00 | 0.19 | 0.30 | 0.09 | 0.86 | 0.24 | 0.42 | 0.46 | 0.18 | 3.09 | 0.00 | 0.01 | 0.00 | 0.05 | 0.40 | 0.78 | 1.00 | 0.15 | 0.24 | 0.07 | 0.00 | 0.00 | 0.11 | 0.00 | 0.08 | 0.06 | 0.04 | 0.72 | 0.05 | 0.03 | 0.00 | 0.08 | 0.08 | 0.37 | 38.93 | 0.14 | 0.00 | 0.04 | 0.05 | 0.03 | 0.34 | 0.30 | 0.03 | 0.35 | 0.99 | 1.62 | 19.53 | 6.57 |
| 480391016 | Texas | Brazoria | 66.5 | 67.7 | 0.10 | 0.03 | 1.90 | 0.09 | 0.12 | 0.00 | 0.00 | 0.00 | 0.04 | 0.06 | 0.01 | 1.43 | 0.38 | 0.20 | 0.24 | 0.08 | 2.68 | 0.00 | 0.00 | 0.00 | 0.50 | 0.18 | 0.46 | 0.98 | 0.04 | 0.13 | 0.02 | 0.00 | 0.00 | 0.05 | 0.01 | 0.01 | 0.03 | 0.04 | 0.63 | 0.01 | 0.00 | 0.00 | 0.02 | 0.03 | 0.11 | 23.10 | 0.03 | 0.00 | 0.00 | 0.01 | 0.00 | 0.31 | 0.10 | 0.01 | 0.30 | 2.65 | 2.17 | 22.32 | 4.61 |
| 480430101 | Texas | Brewster | 69.0 | 70.0 | 0.08 | 0.02 | 0.09 | 0.06 | 0.48 | 0.00 | 0.00 | 0.00 | 0.08 | 0.02 | 0.07 | 0.04 | 0.04 | 0.06 | 0.06 | 0.03 | 0.30 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.05 | 0.08 | 0.04 | 0.04 | 0.02 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.01 | 0.01 | 0.34 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 4.67 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.02 | 0.17 | 0.05 | 6.90 | 0.77 | 1.31 | 49.10 | 3.28 |
| 480610006 | Texas | Cameron | 59.3 | 60.5 | 0.03 | 0.00 | 1.30 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.12 | 0.21 | 0.31 | 0.15 | 0.03 | 2.73 | 0.00 | 0.00 | 0.00 | 0.37 | 0.15 | 0.37 | 0.99 | 0.04 | 0.11 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 | 0.05 | 0.02 | 0.54 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.09 | 8.66 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.26 | 0.07 | 0.00 | 1.23 | 5.01 | 3.88 | 28.06 | 3.13 |
| 480850005 | Texas | Collin | 74.9 | 76.0 | 0.41 | 0.07 | 0.35 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | 0.61 | 0.24 | 0.02 | 0.03 | 0.03 | 0.02 | 0.20 | 0.05 | 1.40 | 0.00 | 0.02 | 0.00 | 0.01 | 0.00 | 0.24 | 0.12 | 0.03 | 0.05 | 0.03 | 0.00 | 0.00 | 0.13 | 0.01 | 0.14 | 0.00 | 0.04 | 0.73 | 0.01 | 0.04 | 0.00 | 0.11 | 0.01 | 0.10 | 40.58 | 0.08 | 0.00 | 0.07 | 0.01 | 0.04 | 0.00 | 0.16 | 0.02 | 0.25 | 2.23 | 0.90 | 19.19 | 5.62 |
| 481130069 | Texas | Dallas | 74.0 | 78.0 | 0.41 | 0.05 | 0.83 | 0.09 | 0.15 | 0.00 | 0.00 | 0.00 | 0.72 | 0.33 | 0.02 | 0.13 | 0.06 | 0.04 | 0.19 | 0.10 | 1.44 | 0.00 | 0.02 | 0.00 | 0.01 | 0.04 | 0.23 | 0.19 | 0.03 | 0.05 | 0.03 | 0.00 | 0.00 | 0.08 | 0.01 | 0.22 | 0.01 | 0.05 | 0.77 | 0.01 | 0.05 | 0.00 | 0.21 | 0.01 | 0.12 | 35.26 | 0.07 | 0.00 | 0.09 | 0.01 | 0.06 | 0.01 | 0.14 | 0.02 | 0.20 | 1.93 | 1.20 | 22.27 | 5.78 |
| 481130075 | Texas | Dallas | 75.8 | 76.7 | 0.34 | 0.05 | 0.92 | 0.08 | 0.18 | 0.00 | 0.00 | 0.00 | 0.65 | 0.24 | 0.02 | 0.14 | 0.06 | 0.04 | 0.23 | 0.09 | 1.22 | 0.00 | 0.02 | 0.00 | 0.01 | 0.04 | 0.18 | 0.21 | 0.03 | 0.06 | 0.03 | 0.00 | 0.00 | 0.09 | 0.01 | 0.16 | 0.01 | 0.04 | 0.86 | 0.01 | 0.04 | 0.00 | 0.12 | 0.01 | 0.10 | 37.23 | 0.08 | 0.00 | 0.07 | 0.01 | 0.05 | 0.01 | 0.16 | 0.02 | 0.30 | 1.76 | 1.14 | 22.41 | 6.02 |
| 481130087 | Texas | Dallas | 73.7 | 74.6 | 0.17 | 0.07 | 0.84 | 0.12 | 0.24 | 0.00 | 0.00 | 0.00 | 0.14 | 0.17 | 0.06 | 0.18 | 0.08 | 0.18 | 0.78 | 0.09 | 1.02 | 0.00 | 0.01 | 0.00 | 0.17 | 0.12 | 0.14 | 0.30 | 0.12 | 0.33 | 0.04 | 0.00 | 0.00 | 0.11 | 0.02 | 0.11 | 0.04 | 0.10 | 2.53 | 0.03 | 0.09 | 0.00 | 0.12 | 0.08 | 0.10 | 31.43 | 0.13 | 0.00 | 0.06 | 0.03 | 0.07 | 0.11 | 0.27 | 0.02 | 0.61 | 0.81 | 1.39 | 23.93 | 5.93 |
| 481210034 | Texas | Denton | 76.9 | 79.4 | 0.67 | 0.10 | 0.51 | 0.14 | 0.25 | 0.00 | 0.00 | 0.00 | 0.30 | 0.39 | 0.06 | 0.11 | 0.12 | 0.08 | 0.43 | 0.14 | 1.99 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.51 | 0.23 | 0.09 | 0.17 | 0.06 | 0.00 | 0.00 | 0.13 | 0.01 | 0.08 | 0.02 | 0.10 | 1.33 | 0.02 | 0.03 | 0.00 | 0.09 | 0.03 | 0.19 | 33.85 | 0.15 | 0.00 | 0.03 | 0.02 | 0.04 | 0.06 | 0.28 | 0.03 | 0.40 | 1.57 | 0.95 | 24.23 | 6.50 |
| 481211032 | Texas | Denton | 75.1 | 76.3 | 0.29 | 0.07 | 0.68 | 0.11 | 0.29 | 0.00 | 0.00 | 0.00 | 0.27 | 0.21 | 0.07 | 0.05 | 0.04 | 0.05 | 0.39 | 0.05 | 1.77 | 0.00 | 0.02 | 0.00 | 0.06 | 0.03 | 0.47 | 0.15 | 0.12 | 0.16 | 0.04 | 0.00 | 0.00 | 0.11 | 0.01 | 0.11 | 0.02 | 0.06 | 1.61 | 0.02 | 0.06 | 0.00 | 0.11 | 0.03 | 0.15 | 34.09 | 0.11 | 0.00 | 0.07 | 0.04 | 0.05 | 0.03 | 0.33 | 0.02 | 0.35 | 0.87 | 0.93 | 23.75 | 6.52 |
| 481390016 | Texas | Ellis | 70.0 | 71.2 | 0.07 | 0.09 | 1.27 | 0.09 | 0.20 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.05 | 0.45 | 0.06 | 0.10 | 0.22 | 0.03 | 1.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.04 | 0.06 | 0.48 | 0.08 | 0.11 | 0.03 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.01 | 0.01 | 1.47 | 0.02 | 0.01 | 0.00 | 0.00 | 0.02 | 0.02 | 30.72 | 0.11 | 0.00 | 0.00 | 0.02 | 0.00 | 0.17 | 0.21 | 0.03 | 0.82 | 0.43 | 1.70 | 23.62 | 5.66 |
| 481391044 | Texas | Ellis | 64.7 | 66.5 | 0.41 | 0.08 | 1.16 | 0.11 | 0.19 | 0.00 | 0.00 | 0.00 | 0.20 | 0.26 | 0.05 | 0.43 | 0.07 | 0.14 | 0.33 | 0.04 | 1.46 | 0.00 | 0.01 | 0.00 | 0.08 | 0.11 | 0.27 | 0.40 | 0.08 | 0.17 | 0.03 | 0.00 | 0.00 | 0.14 | 0.01 | 0.08 | 0.02 | 0.02 | 1.23 | 0.02 | 0.04 | 0.00 | 0.07 | 0.04 | 0.08 | 22.17 | 0.10 | 0.00 | 0.04 | 0.02 | 0.03 | 0.15 | 0.20 | 0.02 | 1.22 | 0.74 | 1.66 | 23.52 | 6.75 |
| 481410029 | Texas | El Paso | 60.4 | 60.4 | 0.07 | 2.25 | 0.02 | 0.55 | 0.09 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.01 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 2.60 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 7.57 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.34 | 3.00 | 0.24 | 0.55 | 39.37 | 2.57 |
| 481410037 | Texas | El Paso | 66.3 | 67.2 | 0.11 | 1.10 | 0.04 | 0.44 | 0.18 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.02 | 0.03 | 0.03 | 0.01 | 0.07 | 0.03 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.04 | 0.03 | 0.04 | 0.12 | 0.00 | 0.00 | 1.50 | 0.00 | 0.01 | 0.00 | 0.01 | 0.19 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.03 | 7.24 | 0.26 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.11 | 0.34 | 5.33 | 0.44 | 0.52 | 44.08 | 3.07 |
| 481410044 | Texas | El Paso | 64.4 | 65.3 | 0.10 | 1.07 | 0.04 | 0.43 | 0.18 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.02 | 0.03 | 0.03 | 0.01 | 0.07 | 0.02 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.02 | 0.04 | 0.11 | 0.00 | 0.00 | 1.46 | 0.00 | 0.01 | 0.00 | 0.01 | 0.18 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.03 | 7.03 | 0.25 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.10 | 0.33 | 5.18 | 0.42 | 0.51 | 42.82 | 2.99 |
| 481410055 | Texas | El Paso | 61.9 | 63.5 | 0.10 | 1.03 | 0.04 | 0.41 | 0.17 | 0.00 | 0.00 | 0.00 | 0.03 | 0.06 | 0.02 | 0.03 | 0.03 | 0.01 | 0.06 | 0.02 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.02 | 0.03 | 0.11 | 0.00 | 0.00 | 1.40 | 0.00 | 0.01 | 0.00 | 0.01 | 0.17 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.03 | 6.76 | 0.24 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.10 | 0.32 | 4.98 | 0.41 | 0.49 | 41.16 | 2.87 |
| 481410057 | Texas | El Paso | 61.3 | 61.3 | 0.07 | 2.25 | 0.02 | 0.54 | 0.09 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.01 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.01 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 2.31 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 6.39 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.33 | 5.42 | 0.25 | 0.53 | 39.30 | 2.60 |
| 481410058 | Texas | El Paso | 64.9 | 66.4 | 0.06 | 1.71 | 0.01 | 0.52 | 0.16 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.01 | 0.01 | 0.13 | 0.00 | 0.00 | 2.47 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 7.55 | 0.39 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.06 | 0.47 | 4.63 | 0.22 | 0.53 | 42.27 | 2.89 |
| 481671034 | Texas | Galveston | 72.9 | 75.5 | 0.58 | 0.04 | 1.21 | 0.08 | 0.10 | 0.00 | 0.00 | 0.00 | 0.71 | 0.27 | 0.02 | 1.34 | 0.30 | 0.28 | 0.27 | 0.18 | 5.07 | 0.00 | 0.01 | 0.00 | 0.12 | 0.11 | 0.97 | 1.21 | 0.06 | 0.11 | 0.02 | 0.00 | 0.00 | 0.06 | 0.01 | 0.10 | 0.04 | 0.04 | 0.24 | 0.02 | 0.03 | 0.00 | 0.08 | 0.03 | 0.29 | 26.56 | 0.04 | 0.00 | 0.04 | 0.02 | 0.03 | 0.27 | 0.12 | 0.01 | 0.27 | 6.27 | 1.76 | 18.47 | 4.81 |
| 481830001 | Texas | Gregg | 72.1 | 73.3 | 1.31 | 0.08 | 1.98 | 0.11 | 0.10 | 0.00 | 0.00 | 0.00 | 0.53 | 0.80 | 0.03 | 0.35 | 0.17 | 0.20 | 0.37 | 0.18 | 6.07 | 0.00 | 0.04 | 0.00 | 0.11 | 0.08 | 1.13 | 1.14 | 0.05 | 0.12 | 0.03 | 0.00 | 0.01 | 0.11 | 0.02 | 0.18 | 0.04 | 0.15 | 0.44 | 0.02 | 0.08 | 0.00 | 0.14 | 0.03 | 0.34 | 23.41 | 0.05 | 0.00 | 0.11 | 0.02 | 0.07 | 0.05 | 0.13 | 0.02 | 0.41 | 1.13 | 1.42 | 23.94 | 4.57 |
| 482010024 | Texas | Harris | 75.9 | 78.5 | 0.54 | 0.04 | 0.28 | 0.09 | 0.16 | 0.00 | 0.00 | 0.00 | 0.62 | 0.36 | 0.03 | 0.16 | 0.06 | 0.09 | 0.13 | 0.09 | 2.82 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.56 | 0.31 | 0.05 | 0.07 | 0.03 | 0.00 | 0.00 | 0.08 | 0.00 | 0.14 | 0.02 | 0.03 | 0.24 | 0.01 | 0.02 | 0.00 | 0.17 | 0.02 | 0.19 | 32.55 | 0.07 | 0.00 | 0.05 | 0.01 | 0.04 | 0.02 | 0.14 | 0.02 | 0.18 | 4.14 | 0.73 | 27.62 | 2.68 |
| 482010026 | Texas | Harris | 73.5 | 76.1 | 0.09 | 0.02 | 1.21 | 0.08 | 0.23 | 0.00 | 0.00 | 0.00 | 0.07 | 0.05 | 0.05 | 0.76 | 0.11 | 0.35 | 0.42 | 0.05 | 3.66 | 0.00 | 0.00 | 0.00 | 0.24 | 0.26 | 0.49 | 1.13 | 0.11 | 0.26 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.06 | 0.02 | 1.05 | 0.02 | 0.00 | 0.00 | 0.01 | 0.06 | 0.12 | 30.45 | 0.07 | 0.00 | 0.00 | 0.03 | 0.00 | 0.28 | 0.23 | 0.01 | 0.24 | 2.95 | 2.36 | 21.17 | 4.44 |
| 482010029 | Texas | Harris | 74.9 | 75.8 | 0.77 | 0.06 | 0.31 | 0.14 | 0.13 | 0.00 | 0.00 | 0.00 | 1.15 | 0.47 | 0.06 | 0.38 | 0.19 | 0.16 | 0.25 | 0.14 | 4.02 | 0.00 | 0.03 | 0.00 | 0.07 | 0.08 | 0.88 | 0.44 | 0.09 | 0.11 | 0.05 | 0.00 | 0.01 | 0.08 | 0.02 | 0.27 | 0.03 | 0.08 | 0.28 | 0.03 | 0.08 | 0.00 | 0.28 | 0.03 | 0.23 | 28.85 | 0.09 | 0.00 | 0.12 | 0.02 | 0.07 | 0.08 | 0.19 | 0.02 | 0.22 | 4.21 | 1.32 | 24.22 | 3.84 |
| 482010046 | Texas | Harris | 71.6 | 72.8 | 0.51 | 0.04 | 0.26 | 0.08 | 0.15 | 0.00 | 0.00 | 0.00 | 0.59 | 0.34 | 0.03 | 0.15 | 0.06 | 0.08 | 0.12 | 0.08 | 2.66 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.52 | 0.30 | 0.05 | 0.06 | 0.02 | 0.00 | 0.00 | 0.07 | 0.00 | 0.14 | 0.02 | 0.03 | 0.22 | 0.01 | 0.02 | 0.00 | 0.16 | 0.01 | 0.18 | 30.70 | 0.06 | 0.00 | 0.04 | 0.01 | 0.03 | 0.01 | 0.14 | 0.02 | 0.17 | 3.91 | 0.69 | 26.05 | 2.53 |
| 482010047 | Texas | Harris | 72.3 | 73.0 | 0.54 | 0.04 | 0.28 | 0.11 | 0.17 | 0.00 | 0.00 | 0.00 | 0.60 | 0.34 | 0.04 | 0.25 | 0.11 | 0.12 | 0.17 | 0.11 | 3.27 | 0.00 | 0.00 | 0.00 | 0.04 | 0.05 | 0.66 | 0.34 | 0.06 | 0.09 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.14 | 0.03 | 0.04 | 0.26 | 0.02 | 0.02 | 0.00 | 0.17 | 0.02 | 0.22 | 30.65 | 0.08 | 0.00 | 0.05 | 0.02 | 0.03 | 0.05 | 0.17 | 0.02 | 0.18 | 3.91 | 0.77 | 24.86 | 2.89 |
| 482010051 | Texas | Harris | 74.5 | 75.2 | 1.26 | 0.07 | 0.78 | 0.22 | 0.19 | 0.00 | 0.00 | 0.00 | 0.63 | 0.56 | 0.08 | 0.60 | 0.21 | 0.18 | 0.33 | 0.18 | 4.18 | 0.00 | 0.02 | 0.00 | 0.02 | 0.07 | 1.46 | 0.77 | 0.13 | 0.13 | 0.07 | 0.00 | 0.00 | 0.11 | 0.00 | 0.16 | 0.04 | 0.06 | 0.20 | 0.04 | 0.03 | 0.00 | 0.15 | 0.04 | 0.41 | 34.17 | 0.12 | 0.00 | 0.06 | 0.04 | 0.05 | 0.08 | 0.28 | 0.02 | 0.31 | 1.44 | 1.53 | 18.05 | 4.76 |
| 482010055 | Texas | Harris | 75.4 | 77.0 | 1.28 | 0.07 | 0.79 | 0.22 | 0.20 | 0.00 | 0.00 | 0.00 | 0.64 | 0.56 | 0.08 | 0.60 | 0.21 | 0.18 | 0.33 | 0.19 | 4.23 | 0.00 | 0.02 | 0.00 | 0.02 | 0.07 | 1.48 | 0.78 | 0.14 | 0.13 | 0.07 | 0.00 | 0.00 | 0.11 | 0.00 | 0.16 | 0.04 | 0.06 | 0.20 | 0.04 | 0.03 | 0.00 | 0.15 | 0.04 | 0.41 | 34.58 | 0.12 | 0.00 | 0.06 | 0.04 | 0.05 | 0.08 | 0.28 | 0.02 | 0.31 | 1.46 | 1.55 | 18.26 | 4.81 |
| 482010062 | Texas | Harris | 72.0 | 73.2 | 0.44 | 0.04 | 1.14 | 0.12 | 0.17 | 0.00 | 0.00 | 0.00 | 0.15 | 0.23 | 0.06 | 0.70 | 0.12 | 0.31 | 0.37 | 0.09 | 2.68 | 0.00 | 0.01 | 0.00 | 0.20 | 0.19 | 0.70 | 1.07 | 0.13 | 0.20 | 0.04 | 0.00 | 0.00 | 0.06 | 0.00 | 0.06 | 0.05 | 0.03 | 0.80 | 0.03 | 0.02 | 0.00 | 0.06 | 0.05 | 0.32 | 31.59 | 0.08 | 0.00 | 0.03 | 0.03 | 0.02 | 0.24 | 0.23 | 0.01 | 0.25 | 1.28 | 2.60 | 19.71 | 5.05 |
| 482010066 | Texas | Harris | 71.7 | 73.6 | 0.85 | 0.04 | 0.30 | 0.18 | 0.19 | 0.00 | 0.00 | 0.00 | 0.74 | 0.42 | 0.06 | 0.25 | 0.07 | 0.12 | 0.19 | 0.08 | 3.41 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.83 | 0.44 | 0.09 | 0.09 | 0.05 | 0.00 | 0.00 | 0.07 | 0.00 | 0.20 | 0.03 | 0.05 | 0.21 | 0.02 | 0.02 | 0.00 | 0.25 | 0.02 | 0.15 | 32.94 | 0.12 | 0.00 | 0.06 | 0.02 | 0.05 | 0.03 | 0.22 | 0.02 | 0.18 | 3.43 | 0.94 | 20.90 | 3.09 |
| 482010070 | Texas | Harris | 72.5 | 72.5 | 0.63 | 0.04 | 0.34 | 0.15 | 0.15 | 0.00 | 0.00 | 0.00 | 0.87 | 0.37 | 0.05 | 0.28 | 0.07 | 0.14 | 0.15 | 0.07 | 3.55 | 0.00 | 0.01 | 0.00 | 0.03 | 0.06 | 0.61 | 0.50 | 0.09 | 0.08 | 0.05 | 0.00 | 0.00 | 0.06 | 0.00 | 0.21 | 0.03 | 0.05 | 0.19 | 0.03 | 0.02 | 0.00 | 0.26 | 0.02 | 0.10 | 32.18 | 0.10 | 0.00 | 0.06 | 0.02 | 0.05 | 0.03 | 0.18 | 0.02 | 0.17 | 4.22 | 1.09 | 22.01 | 2.90 |
| 482010075 | Texas | Harris | 72.8 | 73.5 | 0.63 | 0.04 | 0.34 | 0.15 | 0.15 | 0.00 | 0.00 | 0.00 | 0.87 | 0.37 | 0.05 | 0.29 | 0.07 | 0.14 | 0.15 | 0.07 | 3.56 | 0.00 | 0.01 | 0.00 | 0.03 | 0.06 | 0.61 | 0.51 | 0.09 | 0.08 | 0.05 | 0.00 | 0.00 | 0.06 | 0.00 | 0.21 | 0.03 | 0.05 | 0.19 | 0.03 | 0.02 | 0.00 | 0.26 | 0.02 | 0.11 | 32.32 | 0.10 | 0.00 | 0.07 | 0.02 | 0.05 | 0.03 | 0.18 | 0.02 | 0.17 | 4.24 | 1.09 | 22.10 | 2.92 |
| 482010416 | Texas | Harris | 74.1 | 75.3 | 1.31 | 0.07 | 0.84 | 0.22 | 0.20 | 0.00 | 0.00 | 0.00 | 0.63 | 0.57 | 0.08 | 0.67 | 0.22 | 0.20 | 0.36 | 0.19 | 4.42 | 0.00 | 0.02 | 0.00 | 0.02 | 0.08 | 1.54 | 0.84 | 0.14 | 0.13 | 0.07 | 0.00 | 0.00 | 0.11 | 0.00 | 0.16 | 0.05 | 0.06 | 0.20 | 0.04 | 0.03 | 0.00 | 0.15 | 0.04 | 0.42 | 32.78 | 0.12 | 0.00 | 0.06 | 0.04 | 0.05 | 0.09 | 0.28 | 0.02 | 0.31 | 1.45 | 1.68 | 18.04 | 4.89 |
| 482011015 | Texas | Harris | 70.7 | 73.3 | 0.09 | 0.02 | 1.16 | 0.08 | 0.22 | 0.00 | 0.00 | 0.00 | 0.06 | 0.04 | 0.04 | 0.73 | 0.11 | 0.33 | 0.40 | 0.05 | 3.52 | 0.00 | 0.00 | 0.00 | 0.23 | 0.25 | 0.48 | 1.08 | 0.11 | 0.25 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.06 | 0.01 | 1.01 | 0.02 | 0.00 | 0.00 | 0.01 | 0.06 | 0.11 | 29.29 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.27 | 0.22 | 0.01 | 0.23 | 2.83 | 2.27 | 20.37 | 4.27 |
| 482011034 | Texas | Harris | 76.8 | 77.8 | 0.46 | 0.04 | 0.52 | 0.12 | 0.18 | 0.00 | 0.00 | 0.00 | 0.57 | 0.27 | 0.05 | 0.40 | 0.07 | 0.30 | 0.39 | 0.06 | 3.81 | 0.00 | 0.00 | 0.00 | 0.10 | 0.27 | 0.65 | 0.69 | 0.10 | 0.21 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.16 | 0.05 | 0.04 | 0.94 | 0.02 | 0.02 | 0.00 | 0.19 | 0.05 | 0.10 | 32.18 | 0.09 | 0.00 | 0.05 | 0.02 | 0.04 | 0.18 | 0.21 | 0.01 | 0.22 | 4.08 | 1.58 | 22.78 | 4.22 |
| 482011035 | Texas | Harris | 74.2 | 75.9 | 0.44 | 0.04 | 0.50 | 0.11 | 0.17 | 0.00 | 0.00 | 0.00 | 0.55 | 0.26 | 0.05 | 0.39 | 0.07 | 0.29 | 0.38 | 0.05 | 3.68 | 0.00 | 0.00 | 0.00 | 0.10 | 0.26 | 0.62 | 0.67 | 0.10 | 0.21 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.15 | 0.05 | 0.04 | 0.91 | 0.02 | 0.02 | 0.00 | 0.18 | 0.05 | 0.09 | 31.09 | 0.08 | 0.00 | 0.05 | 0.02 | 0.04 | 0.17 | 0.20 | 0.01 | 0.21 | 3.94 | 1.52 | 22.01 | 4.08 |
| 482011039 | Texas | Harris | 78.2 | 80.2 | 0.41 | 0.03 | 1.24 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | 0.15 | 0.21 | 0.05 | 0.87 | 0.15 | 0.33 | 0.38 | 0.09 | 3.33 | 0.00 | 0.01 | 0.00 | 0.28 | 0.23 | 0.77 | 1.15 | 0.11 | 0.21 | 0.04 | 0.00 | 0.00 | 0.05 | 0.01 | 0.06 | 0.05 | 0.03 | 0.83 | 0.02 | 0.02 | 0.00 | 0.05 | 0.05 | 0.31 | 33.69 | 0.07 | 0.00 | 0.03 | 0.03 | 0.02 | 0.28 | 0.21 | 0.01 | 0.29 | 2.50 | 2.70 | 21.03 | 5.31 |
| 482011050 | Texas | Harris | 74.6 | 76.2 | 0.32 | 0.03 | 0.92 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 0.18 | 0.17 | 0.01 | 0.74 | 0.14 | 0.24 | 0.21 | 0.06 | 2.76 | 0.00 | 0.00 | 0.00 | 0.34 | 0.26 | 0.61 | 0.75 | 0.03 | 0.15 | 0.01 | 0.00 | 0.00 | 0.05 | 0.01 | 0.05 | 0.03 | 0.03 | 0.67 | 0.00 | 0.02 | 0.00 | 0.05 | 0.04 | 0.21 | 36.47 | 0.03 | 0.00 | 0.02 | 0.01 | 0.01 | 0.35 | 0.09 | 0.01 | 0.31 | 3.95 | 1.84 | 17.62 | 4.39 |
| 482030002 | Texas | Harrison | 65.6 | 66.7 | 0.28 | 0.08 | 0.91 | 0.14 | 0.28 | 0.00 | 0.00 | 0.00 | 0.30 | 0.11 | 0.04 | 0.06 | 0.04 | 0.09 | 0.27 | 0.03 | 13.79 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 1.07 | 0.28 | 0.05 | 0.11 | 0.04 | 0.00 | 0.00 | 0.16 | 0.00 | 0.03 | 0.03 | 0.02 | 0.70 | 0.02 | 0.01 | 0.00 | 0.02 | 0.03 | 0.06 | 18.40 | 0.10 | 0.00 | 0.02 | 0.02 | 0.02 | 0.03 | 0.23 | 0.02 | 0.27 | 0.92 | 1.06 | 20.35 | 4.85 |
| 482150043 | Texas | Hidalgo | 57.9 | 58.8 | 0.04 | 0.10 | 0.87 | 0.03 | 0.13 | 0.00 | 0.00 | 0.00 | 0.11 | 0.01 | 0.01 | 0.64 | 0.13 | 0.09 | 0.21 | 0.01 | 1.69 | 0.00 | 0.00 | 0.00 | 0.24 | 0.02 | 0.14 | 0.65 | 0.03 | 0.12 | 0.01 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.01 | 0.01 | 0.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 10.98 | 0.03 | 0.00 | 0.00 | 0.01 | 0.00 | 0.16 | 0.09 | 0.02 | 1.95 | 1.77 | 1.78 | 31.18 | 3.68 |
| 482210001 | Texas | Hood | 70.1 | 70.4 | 0.47 | 0.13 | 1.26 | 0.09 | 0.33 | 0.00 | 0.00 | 0.00 | 0.19 | 0.34 | 0.05 | 0.35 | 0.13 | 0.19 | 0.58 | 0.08 | 2.01 | 0.00 | 0.02 | 0.00 | 0.13 | 0.11 | 0.35 | 0.43 | 0.08 | 0.27 | 0.03 | 0.00 | 0.00 | 0.23 | 0.02 | 0.11 | 0.04 | 0.07 | 2.18 | 0.03 | 0.09 | 0.00 | 0.09 | 0.06 | 0.12 | 25.89 | 0.13 | 0.00 | 0.07 | 0.03 | 0.06 | 0.16 | 0.32 | 0.04 | 1.20 | 0.44 | 1.38 | 22.15 | 7.35 |
| 482311006 | Texas | Hunt | 65.3 | 67.4 | 0.17 | 0.06 | 0.29 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | 0.26 | 0.18 | 0.02 | 0.04 | 0.03 | 0.05 | 0.24 | 0.03 | 1.09 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.16 | 0.12 | 0.02 | 0.09 | 0.03 | 0.00 | 0.00 | 0.12 | 0.00 | 0.09 | 0.01 | 0.03 | 0.74 | 0.01 | 0.01 | 0.00 | 0.12 | 0.01 | 0.06 | 30.48 | 0.08 | 0.00 | 0.02 | 0.00 | 0.02 | 0.02 | 0.15 | 0.02 | 1.10 | 1.52 | 0.49 | 20.67 | 6.06 |
| 482450009 | Texas | Jefferson | 67.7 | 69.3 | 0.77 | 0.05 | 0.81 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.16 | 0.37 | 0.05 | 1.03 | 0.46 | 0.32 | 0.27 | 0.35 | 11.93 | 0.00 | 0.01 | 0.00 | 0.12 | 0.28 | 1.84 | 0.64 | 0.11 | 0.19 | 0.04 | 0.00 | 0.00 | 0.08 | 0.01 | 0.08 | 0.07 | 0.13 | 0.46 | 0.02 | 0.03 | 0.00 | 0.07 | 0.05 | 0.65 | 19.22 | 0.08 | 0.00 | 0.04 | 0.03 | 0.03 | 0.32 | 0.23 | 0.01 | 0.32 | 2.12 | 2.30 | 16.09 | 4.93 |
| 482450011 | Texas | Jefferson | 71.0 | 71.0 | 1.08 | 0.04 | 0.95 | 0.13 | 0.15 | 0.00 | 0.00 | 0.00 | 0.42 | 0.33 | 0.05 | 1.26 | 0.26 | 0.36 | 0.22 | 0.15 | 9.21 | 0.00 | 0.00 | 0.00 | 0.33 | 0.23 | 2.42 | 1.02 | 0.11 | 0.17 | 0.04 | 0.00 | 0.00 | 0.06 | 0.01 | 0.07 | 0.06 | 0.03 | 0.38 | 0.02 | 0.01 | 0.00 | 0.07 | 0.05 | 0.36 | 21.26 | 0.08 | 0.00 | 0.03 | 0.03 | 0.02 | 0.32 | 0.22 | 0.01 | 0.31 | 2.63 | 1.93 | 18.87 | 5.02 |
| 482450022 | Texas | Jefferson | 65.8 | 66.4 | 0.39 | 0.03 | 1.33 | 0.08 | 0.10 | 0.00 | 0.00 | 0.00 | 0.13 | 0.24 | 0.04 | 1.12 | 0.20 | 0.35 | 0.24 | 0.13 | 4.86 | 0.00 | 0.01 | 0.00 | 0.36 | 0.23 | 1.10 | 1.18 | 0.12 | 0.17 | 0.03 | 0.00 | 0.00 | 0.04 | 0.01 | 0.07 | 0.05 | 0.03 | 0.60 | 0.02 | 0.02 | 0.00 | 0.06 | 0.05 | 0.41 | 21.94 | 0.05 | 0.00 | 0.03 | 0.02 | 0.02 | 0.35 | 0.17 | 0.01 | 0.31 | 2.38 | 2.30 | 19.07 | 5.12 |
| 482450101 | Texas | Jefferson | 73.1 | 75.0 | 0.70 | 0.05 | 1.46 | 0.13 | 0.16 | 0.00 | 0.00 | 0.00 | 0.31 | 0.27 | 0.05 | 1.68 | 0.33 | 0.56 | 0.37 | 0.24 | 11.41 | 0.00 | 0.02 | 0.00 | 0.14 | 0.26 | 1.71 | 1.62 | 0.12 | 0.21 | 0.04 | 0.00 | 0.00 | 0.06 | 0.01 | 0.10 | 0.09 | 0.04 | 0.35 | 0.03 | 0.04 | 0.00 | 0.09 | 0.06 | 0.64 | 16.21 | 0.08 | 0.00 | 0.05 | 0.04 | 0.03 | 0.34 | 0.23 | 0.01 | 0.33 | 4.51 | 2.65 | 18.94 | 6.11 |
| 482450102 | Texas | Jefferson | 65.0 | 66.2 | 0.71 | 0.04 | 1.04 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | 0.18 | 0.36 | 0.04 | 1.13 | 0.25 | 0.33 | 0.23 | 0.19 | 10.25 | 0.00 | 0.01 | 0.00 | 0.28 | 0.22 | 1.37 | 0.90 | 0.10 | 0.17 | 0.04 | 0.00 | 0.00 | 0.06 | 0.01 | 0.08 | 0.05 | 0.03 | 0.41 | 0.02 | 0.02 | 0.00 | 0.06 | 0.04 | 0.54 | 17.54 | 0.07 | 0.00 | 0.03 | 0.02 | 0.02 | 0.30 | 0.21 | 0.01 | 0.31 | 2.77 | 1.73 | 17.69 | 4.64 |
| 482450628 | Texas | Jefferson | 66.0 | 68.2 | 1.00 | 0.04 | 0.89 | 0.12 | 0.14 | 0.00 | 0.00 | 0.00 | 0.39 | 0.31 | 0.04 | 1.17 | 0.24 | 0.34 | 0.21 | 0.14 | 8.56 | 0.00 | 0.00 | 0.00 | 0.31 | 0.21 | 2.25 | 0.95 | 0.10 | 0.16 | 0.04 | 0.00 | 0.00 | 0.05 | 0.01 | 0.06 | 0.06 | 0.03 | 0.35 | 0.02 | 0.01 | 0.00 | 0.06 | 0.04 | 0.33 | 19.76 | 0.07 | 0.00 | 0.02 | 0.02 | 0.02 | 0.30 | 0.20 | 0.01 | 0.29 | 2.45 | 1.79 | 17.54 | 4.67 |
| 482451035 | Texas | Jefferson | 66.2 | 67.1 | 0.72 | 0.04 | 1.06 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | 0.19 | 0.37 | 0.04 | 1.15 | 0.26 | 0.34 | 0.23 | 0.19 | 10.44 | 0.00 | 0.01 | 0.00 | 0.29 | 0.22 | 1.39 | 0.91 | 0.10 | 0.18 | 0.04 | 0.00 | 0.00 | 0.06 | 0.01 | 0.08 | 0.05 | 0.03 | 0.41 | 0.02 | 0.02 | 0.00 | 0.07 | 0.04 | 0.55 | 17.86 | 0.07 | 0.00 | 0.03 | 0.02 | 0.02 | 0.30 | 0.21 | 0.01 | 0.31 | 2.82 | 1.76 | 18.01 | 4.72 |
| 482510003 | Texas | Johnson | 72.8 | 72.8 | 0.06 | 0.10 | 1.22 | 0.07 | 0.22 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.04 | 0.46 | 0.05 | 0.19 | 0.30 | 0.02 | 0.88 | 0.00 | 0.00 | 0.00 | 0.06 | 0.11 | 0.06 | 1.02 | 0.06 | 0.10 | 0.03 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.02 | 0.01 | 1.83 | 0.02 | 0.01 | 0.00 | 0.00 | 0.02 | 0.02 | 29.49 | 0.11 | 0.00 | 0.00 | 0.02 | 0.00 | 0.25 | 0.22 | 0.03 | 0.85 | 0.25 | 2.50 | 25.51 | 6.16 |
| 482570005 | Texas | Kaufman | 65.4 | 68.5 | 1.47 | 0.06 | 1.33 | 0.09 | 0.13 | 0.00 | 0.00 | 0.00 | 0.65 | 0.84 | 0.02 | 0.33 | 0.21 | 0.08 | 0.17 | 0.30 | 3.44 | 0.00 | 0.03 | 0.00 | 0.10 | 0.09 | 1.11 | 0.32 | 0.04 | 0.08 | 0.02 | 0.00 | 0.01 | 0.11 | 0.02 | 0.20 | 0.02 | 0.14 | 0.49 | 0.02 | 0.06 | 0.00 | 0.15 | 0.01 | 0.47 | 19.49 | 0.05 | 0.00 | 0.10 | 0.02 | 0.07 | 0.06 | 0.12 | 0.02 | 0.37 | 1.42 | 1.17 | 22.56 | 7.09 |
| 483091037 | Texas | McLennan | 68.2 | 69.4 | 1.01 | 0.14 | 0.94 | 0.12 | 0.19 | 0.00 | 0.00 | 0.00 | 0.62 | 0.61 | 0.04 | 0.33 | 0.23 | 0.04 | 0.17 | 0.16 | 3.64 | 0.00 | 0.06 | 0.00 | 0.03 | 0.03 | 0.95 | 0.29 | 0.06 | 0.08 | 0.03 | 0.00 | 0.01 | 0.20 | 0.02 | 0.25 | 0.01 | 0.08 | 0.44 | 0.02 | 0.12 | 0.00 | 0.19 | 0.02 | 0.36 | 21.82 | 0.10 | 0.00 | 0.15 | 0.02 | 0.08 | 0.05 | 0.19 | 0.04 | 0.65 | 1.18 | 1.53 | 24.25 | 6.38 |
| 483390078 | Texas | Montgomery | 70.8 | 72.4 | 0.47 | 0.05 | 0.25 | 0.04 | 0.19 | 0.00 | 0.00 | 0.00 | 0.63 | 0.34 | 0.01 | 0.09 | 0.04 | 0.08 | 0.16 | 0.08 | 2.22 | 0.00 | 0.02 | 0.00 | 0.03 | 0.02 | 0.42 | 0.23 | 0.03 | 0.12 | 0.01 | 0.00 | 0.00 | 0.11 | 0.02 | 0.17 | 0.06 | 0.04 | 0.40 | 0.00 | 0.07 | 0.00 | 0.14 | 0.02 | 0.23 | 27.50 | 0.04 | 0.00 | 0.09 | 0.01 | 0.04 | 0.02 | 0.14 | 0.02 | 0.46 | 2.86 | 0.76 | 29.13 | 2.69 |
| 483491051 | Texas | Navarro | 66.7 | 67.6 | 0.53 | 0.08 | 0.80 | 0.13 | 0.19 | 0.00 | 0.00 | 0.00 | 0.26 | 0.30 | 0.06 | 0.15 | 0.06 | 0.11 | 0.36 | 0.11 | 2.35 | 0.00 | 0.01 | 0.00 | 0.03 | 0.12 | 0.41 | 0.24 | 0.10 | 0.18 | 0.04 | 0.00 | 0.00 | 0.12 | 0.00 | 0.08 | 0.02 | 0.03 | 0.83 | 0.02 | 0.03 | 0.00 | 0.06 | 0.04 | 0.27 | 26.38 | 0.10 | 0.00 | 0.04 | 0.02 | 0.03 | 0.05 | 0.21 | 0.02 | 0.92 | 0.98 | 1.11 | 21.32 | 7.15 |
| 483550025 | Texas | Nueces | 67.2 | 68.1 | 0.02 | 0.01 | 1.35 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 | 1.00 | 0.18 | 0.32 | 0.36 | 0.02 | 1.84 | 0.00 | 0.00 | 0.00 | 0.36 | 0.18 | 0.24 | 1.30 | 0.05 | 0.18 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.09 | 0.01 | 1.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 18.48 | 0.04 | 0.00 | 0.00 | 0.01 | 0.00 | 0.31 | 0.14 | 0.00 | 0.19 | 2.54 | 8.52 | 23.06 | 4.74 |
| 483550026 | Texas | Nueces | 66.8 | 68.1 | 0.01 | 0.01 | 1.24 | 0.02 | 0.18 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 | 0.87 | 0.15 | 0.38 | 0.51 | 0.01 | 1.41 | 0.00 | 0.00 | 0.00 | 0.30 | 0.23 | 0.17 | 1.29 | 0.06 | 0.23 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.10 | 0.01 | 1.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.05 | 18.96 | 0.04 | 0.00 | 0.00 | 0.01 | 0.00 | 0.32 | 0.16 | 0.00 | 0.19 | 1.66 | 7.98 | 23.22 | 5.21 |
| 483611001 | Texas | Orange | 67.9 | 70.0 | 0.07 | 0.00 | 0.97 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.56 | 0.13 | 0.00 | 0.81 | 0.12 | 0.16 | 0.12 | 0.05 | 5.54 | 0.00 | 0.00 | 0.00 | 0.41 | 0.14 | 0.46 | 0.89 | 0.03 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.02 | 0.04 | 0.41 | 0.00 | 0.02 | 0.00 | 0.15 | 0.02 | 0.15 | 20.54 | 0.01 | 0.00 | 0.04 | 0.00 | 0.03 | 0.29 | 0.06 | 0.00 | 0.23 | 4.79 | 4.63 | 22.73 | 2.72 |
| 483611100 | Texas | Orange | 63.8 | 64.1 | 0.45 | 0.03 | 0.54 | 0.06 | 0.14 | 0.00 | 0.00 | 0.00 | 0.61 | 0.10 | 0.03 | 0.69 | 0.25 | 0.29 | 0.32 | 0.15 | 7.24 | 0.00 | 0.01 | 0.00 | 0.26 | 0.21 | 0.99 | 0.63 | 0.08 | 0.19 | 0.02 | 0.00 | 0.01 | 0.05 | 0.02 | 0.11 | 0.06 | 0.05 | 0.60 | 0.01 | 0.04 | 0.00 | 0.05 | 0.05 | 0.29 | 17.32 | 0.04 | 0.00 | 0.05 | 0.02 | 0.03 | 0.30 | 0.17 | 0.01 | 0.47 | 3.53 | 1.54 | 21.79 | 3.66 |
| 483670081 | Texas | Parker | 72.6 | 72.9 | 0.70 | 0.05 | 0.76 | 0.17 | 0.37 | 0.00 | 0.00 | 0.00 | 0.20 | 0.35 | 0.07 | 0.25 | 0.18 | 0.17 | 0.67 | 0.17 | 2.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.10 | 0.45 | 0.33 | 0.12 | 0.30 | 0.06 | 0.00 | 0.00 | 0.11 | 0.01 | 0.04 | 0.04 | 0.11 | 2.42 | 0.05 | 0.04 | 0.00 | 0.04 | 0.06 | 0.18 | 26.12 | 0.14 | 0.00 | 0.02 | 0.05 | 0.03 | 0.11 | 0.38 | 0.02 | 0.36 | 1.26 | 1.76 | 22.93 | 8.44 |
| 483970001 | Texas | Rockwall | 70.1 | 70.1 | 0.30 | 0.06 | 0.27 | 0.09 | 0.14 | 0.00 | 0.00 | 0.00 | 0.60 | 0.27 | 0.01 | 0.05 | 0.04 | 0.05 | 0.23 | 0.06 | 0.91 | 0.00 | 0.02 | 0.00 | 0.02 | 0.04 | 0.20 | 0.12 | 0.02 | 0.08 | 0.02 | 0.00 | 0.00 | 0.11 | 0.01 | 0.19 | 0.01 | 0.04 | 0.61 | 0.00 | 0.05 | 0.00 | 0.18 | 0.01 | 0.10 | 32.07 | 0.06 | 0.00 | 0.08 | 0.00 | 0.05 | 0.02 | 0.11 | 0.02 | 1.09 | 1.64 | 0.98 | 22.99 | 5.83 |
| 484230007 | Texas | Smith | 68.1 | 68.1 | 1.43 | 0.12 | 0.98 | 0.17 | 0.21 | 0.00 | 0.00 | 0.00 | 0.52 | 0.85 | 0.03 | 0.11 | 0.16 | 0.08 | 0.16 | 0.18 | 4.46 | 0.00 | 0.05 | 0.00 | 0.12 | 0.07 | 1.29 | 0.10 | 0.03 | 0.10 | 0.04 | 0.00 | 0.01 | 0.26 | 0.02 | 0.19 | 0.02 | 0.15 | 0.41 | 0.03 | 0.09 | 0.00 | 0.16 | 0.02 | 0.36 | 19.63 | 0.10 | 0.00 | 0.12 | 0.01 | 0.08 | 0.08 | 0.13 | 0.04 | 0.53 | 1.30 | 1.73 | 26.35 | 4.79 |
| 484390075 | Texas | Tarrant | 75.5 | 76.4 | 0.66 | 0.09 | 0.88 | 0.13 | 0.34 | 0.00 | 0.00 | 0.00 | 0.17 | 0.35 | 0.07 | 0.36 | 0.26 | 0.21 | 0.81 | 0.21 | 2.20 | 0.00 | 0.00 | 0.00 | 0.21 | 0.13 | 0.46 | 0.42 | 0.12 | 0.36 | 0.05 | 0.00 | 0.00 | 0.15 | 0.02 | 0.05 | 0.05 | 0.15 | 2.46 | 0.04 | 0.07 | 0.00 | 0.04 | 0.07 | 0.20 | 29.82 | 0.16 | 0.00 | 0.03 | 0.04 | 0.05 | 0.15 | 0.36 | 0.03 | 0.58 | 0.99 | 2.06 | 22.71 | 6.49 |
| 484391002 | Texas | Tarrant | 74.4 | 75.4 | 0.23 | 0.09 | 0.72 | 0.13 | 0.33 | 0.00 | 0.00 | 0.00 | 0.17 | 0.17 | 0.07 | 0.17 | 0.07 | 0.19 | 0.81 | 0.08 | 1.17 | 0.00 | 0.01 | 0.00 | 0.16 | 0.11 | 0.22 | 0.31 | 0.11 | 0.34 | 0.05 | 0.00 | 0.00 | 0.15 | 0.02 | 0.09 | 0.04 | 0.09 | 2.68 | 0.03 | 0.08 | 0.00 | 0.10 | 0.08 | 0.09 | 32.73 | 0.17 | 0.00 | 0.04 | 0.03 | 0.06 | 0.12 | 0.35 | 0.03 | 0.52 | 1.12 | 1.71 | 21.79 | 6.34 |
| 484392003 | Texas | Tarrant | 79.6 | 82.1 | 0.79 | 0.10 | 0.87 | 0.14 | 0.36 | 0.00 | 0.00 | 0.00 | 0.34 | 0.47 | 0.07 | 0.35 | 0.27 | 0.09 | 0.37 | 0.22 | 2.64 | 0.00 | 0.00 | 0.00 | 0.12 | 0.07 | 0.54 | 0.34 | 0.10 | 0.18 | 0.06 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.03 | 0.12 | 1.23 | 0.03 | 0.03 | 0.00 | 0.10 | 0.03 | 0.21 | 34.52 | 0.18 | 0.00 | 0.03 | 0.03 | 0.04 | 0.09 | 0.36 | 0.03 | 0.44 | 1.62 | 1.33 | 23.94 | 6.28 |
| 484393009 | Texas | Tarrant | 78.6 | 78.6 | 0.73 | 0.08 | 0.80 | 0.14 | 0.24 | 0.00 | 0.00 | 0.00 | 0.54 | 0.43 | 0.06 | 0.29 | 0.22 | 0.07 | 0.33 | 0.18 | 2.21 | 0.00 | 0.01 | 0.00 | 0.09 | 0.05 | 0.47 | 0.30 | 0.08 | 0.14 | 0.05 | 0.00 | 0.00 | 0.11 | 0.01 | 0.13 | 0.02 | 0.11 | 1.03 | 0.02 | 0.05 | 0.00 | 0.11 | 0.03 | 0.20 | 35.64 | 0.13 | 0.00 | 0.06 | 0.02 | 0.05 | 0.07 | 0.26 | 0.02 | 0.34 | 1.62 | 1.40 | 23.61 | 5.78 |
| 484393011 | Texas | Tarrant | 74.5 | 76.6 | 0.15 | 0.08 | 1.19 | 0.11 | 0.26 | 0.00 | 0.00 | 0.00 | 0.13 | 0.16 | 0.07 | 0.32 | 0.10 | 0.21 | 0.77 | 0.09 | 1.47 | 0.00 | 0.01 | 0.00 | 0.18 | 0.13 | 0.17 | 0.44 | 0.13 | 0.34 | 0.04 | 0.00 | 0.00 | 0.15 | 0.02 | 0.10 | 0.04 | 0.10 | 2.41 | 0.03 | 0.09 | 0.00 | 0.12 | 0.08 | 0.10 | 32.06 | 0.14 | 0.00 | 0.05 | 0.04 | 0.07 | 0.17 | 0.30 | 0.03 | 0.69 | 0.65 | 1.54 | 22.51 | 6.25 |
| 484530014 | Texas | Travis | 67.8 | 69.0 | 0.65 | 0.06 | 0.68 | 0.15 | 0.23 | 0.00 | 0.00 | 0.00 | 0.22 | 0.24 | 0.08 | 0.44 | 0.19 | 0.10 | 0.30 | 0.14 | 2.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.04 | 0.44 | 0.50 | 0.12 | 0.15 | 0.05 | 0.00 | 0.00 | 0.09 | 0.00 | 0.06 | 0.02 | 0.06 | 0.68 | 0.05 | 0.03 | 0.00 | 0.05 | 0.03 | 0.28 | 22.11 | 0.11 | 0.00 | 0.04 | 0.05 | 0.02 | 0.11 | 0.26 | 0.02 | 0.27 | 1.63 | 2.74 | 27.35 | 4.65 |
| 484530020 | Texas | Travis | 65.5 | 66.4 | 0.41 | 0.03 | 0.51 | 0.13 | 0.21 | 0.00 | 0.00 | 0.00 | 0.40 | 0.25 | 0.06 | 0.41 | 0.17 | 0.10 | 0.29 | 0.12 | 1.90 | 0.00 | 0.00 | 0.00 | 0.06 | 0.04 | 0.18 | 0.47 | 0.08 | 0.11 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.12 | 0.02 | 0.07 | 0.57 | 0.03 | 0.01 | 0.00 | 0.15 | 0.02 | 0.12 | 20.56 | 0.11 | 0.00 | 0.04 | 0.03 | 0.01 | 0.11 | 0.25 | 0.01 | 0.18 | 2.65 | 2.35 | 27.39 | 4.41 |
| 484690003 | Texas | Victoria | 64.9 | 66.1 | 0.00 | 0.00 | 1.60 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.11 | 0.19 | 0.33 | 0.54 | 0.01 | 1.87 | 0.00 | 0.00 | 0.00 | 0.32 | 0.26 | 0.13 | 1.16 | 0.06 | 0.25 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 1.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.03 | 20.55 | 0.01 | 0.00 | 0.00 | 0.01 | 0.00 | 0.41 | 0.12 | 0.00 | 0.13 | 1.33 | 3.44 | 23.56 | 5.70 |
| 490030003 | Utah | Box Elder | 64.6 | 65.8 | 0.00 | 0.95 | 0.00 | 4.27 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.71 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 8.84 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.16 | 0.15 | 0.72 | 0.27 | 0.41 | 43.67 | 2.74 |
| 490050004 | Utah | Cache | 61.5 | 64.1 | 0.00 | 1.24 | 0.00 | 3.31 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.23 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 6.39 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.28 | 0.13 | 0.74 | 0.24 | 0.25 | 44.96 | 2.16 |
| 490071003 | Utah | Carbon | 66.8 | 66.8 | 0.00 | 0.25 | 0.00 | 4.13 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.23 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 7.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.01 | 0.18 | 0.27 | 0.17 | 0.36 | 50.83 | 1.91 |
| 490110004 | Utah | Davis | 66.1 | 67.7 | 0.00 | 0.86 | 0.00 | 2.98 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.90 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 15.94 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.10 | 0.46 | 0.16 | 0.17 | 40.25 | 2.79 |
| 490131001 | Utah | Duchesne | 65.9 | 65.9 | 0.00 | 0.69 | 0.00 | 4.63 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.97 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 4.35 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.05 | 0.34 | 0.18 | 0.29 | 52.47 | 1.58 |
| 490352004 | Utah | Salt Lake | 70.5 | 72.4 | 0.00 | 0.81 | 0.00 | 2.76 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.71 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 21.79 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 | 0.07 | 0.56 | 0.17 | 0.29 | 38.17 | 3.48 |
| 490353006 | Utah | Salt Lake | 71.7 | 71.7 | 0.00 | 0.78 | 0.00 | 3.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.21 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 14.51 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.15 | 0.26 | 46.81 | 2.39 |
| 490370101 | Utah | San Juan | 66.6 | 66.9 | 0.00 | 0.98 | 0.00 | 4.96 | 0.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.56 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 1.35 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 | 1.36 | 0.87 | 0.23 | 0.17 | 52.51 | 2.26 |
| 490450003 | Utah | Tooele | 68.7 | 69.6 | 0.01 | 0.92 | 0.00 | 4.42 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 9.92 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.01 | 1.05 | 0.30 | 0.40 | 45.48 | 3.34 |
| 490490002 | Utah | Utah | 67.6 | 70.5 | 0.00 | 0.99 | 0.00 | 4.14 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.03 | 1.69 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 8.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.64 | 0.04 | 0.41 | 0.14 | 0.68 | 47.27 | 2.58 |
| 490495010 | Utah | Utah | 67.2 | 67.9 | 0.00 | 1.01 | 0.00 | 5.26 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.63 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 6.07 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.47 | 0.21 | 0.36 | 49.60 | 2.17 |
| 490530006 | Utah | Washington | 64.1 | 64.1 | 0.01 | 1.33 | 0.01 | 9.29 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 1.75 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 1.52 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.03 | 1.69 | 0.64 | 0.31 | 42.99 | 3.16 |
| 490530130 | Utah | Washington | 68.9 | 70.1 | 0.01 | 1.26 | 0.01 | 7.94 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 1.67 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 1.22 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.03 | 1.47 | 0.49 | 0.23 | 50.63 | 2.79 |
| 490570002 | Utah | Weber | 68.7 | 69.0 | 0.00 | 1.08 | 0.00 | 1.94 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.48 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 17.51 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.10 | 0.23 | 0.51 | 0.13 | 0.13 | 42.32 | 2.78 |
| 490571003 | Utah | Weber | 69.4 | 70.7 | 0.00 | 1.01 | 0.00 | 3.61 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.54 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 11.51 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.15 | 0.17 | 0.82 | 0.27 | 0.34 | 46.19 | 2.91 |
| 500030004 | Vermont | Bennington | 57.1 | 58.3 | 0.23 | 0.06 | 0.34 | 0.05 | 0.14 | 0.57 | 0.07 | 0.01 | 0.06 | 0.18 | 0.02 | 1.37 | 1.40 | 0.27 | 0.33 | 0.57 | 0.14 | 0.00 | 0.45 | 0.17 | 1.33 | 0.10 | 0.18 | 0.52 | 0.03 | 0.12 | 0.01 | 0.00 | 1.71 | 0.11 | 9.76 | 0.17 | 0.03 | 3.24 | 0.50 | 0.00 | 4.42 | 0.00 | 0.04 | 0.03 | 0.40 | 0.83 | 0.06 | 0.06 | 0.71 | 0.00 | 0.58 | 0.26 | 0.15 | 0.02 | 2.46 | 0.45 | 0.28 | 16.37 | 5.42 |
| 510030001 | Virginia | Albemarle | 59.5 | 60.7 | 0.06 | 0.05 | 0.19 | 0.04 | 0.15 | 0.00 | 0.00 | 0.00 | 0.05 | 0.06 | 0.02 | 0.71 | 2.49 | 0.16 | 0.36 | 1.95 | 0.14 | 0.00 | 0.56 | 0.00 | 1.07 | 0.12 | 0.06 | 0.71 | 0.05 | 0.17 | 0.01 | 0.00 | 0.00 | 0.10 | 0.03 | 0.14 | 0.06 | 5.96 | 0.62 | 0.01 | 3.26 | 0.00 | 0.03 | 0.04 | 0.21 | 0.93 | 0.05 | 0.00 | 9.54 | 0.02 | 4.78 | 0.20 | 0.16 | 0.02 | 0.61 | 0.12 | 0.16 | 17.15 | 5.87 |
| 510130020 | Virginia | Arlington | 71.1 | 74.9 | 0.34 | 0.06 | 0.17 | 0.06 | 0.13 | 0.00 | 0.04 | 3.34 | 0.08 | 0.15 | 0.02 | 0.63 | 1.63 | 0.15 | 0.26 | 1.17 | 0.20 | 0.00 | 9.44 | 0.00 | 0.74 | 0.08 | 0.12 | 0.59 | 0.04 | 0.13 | 0.01 | 0.00 | 0.04 | 0.12 | 0.19 | 1.03 | 0.04 | 4.09 | 0.40 | 0.01 | 5.59 | 0.00 | 0.16 | 0.04 | 0.30 | 0.81 | 0.06 | 0.00 | 14.72 | 0.01 | 2.17 | 0.18 | 0.14 | 0.02 | 0.99 | 0.43 | 0.23 | 14.60 | 4.89 |
| 510330001 | Virginia | Caroline | 62.8 | 64.8 | 0.55 | 0.05 | 0.13 | 0.05 | 0.08 | 0.00 | 0.11 | 0.39 | 0.10 | 0.17 | 0.01 | 0.38 | 0.39 | 0.14 | 0.08 | 0.27 | 0.29 | 0.00 | 4.57 | 0.00 | 1.18 | 0.08 | 0.17 | 0.27 | 0.04 | 0.03 | 0.01 | 0.00 | 0.24 | 0.14 | 0.46 | 0.24 | 0.07 | 3.49 | 0.14 | 0.02 | 7.13 | 0.00 | 0.04 | 0.01 | 0.25 | 0.90 | 0.03 | 0.00 | 15.88 | 0.03 | 1.69 | 0.12 | 0.07 | 0.01 | 1.40 | 0.36 | 0.29 | 16.00 | 4.00 |
| 510360002 | Virginia | Charles | 67.3 | 70.3 | 0.38 | 0.07 | 0.17 | 0.08 | 0.16 | 0.00 | 0.00 | 0.10 | 0.11 | 0.18 | 0.02 | 0.50 | 0.86 | 0.16 | 0.19 | 1.45 | 0.26 | 0.00 | 1.48 | 0.00 | 0.36 | 0.07 | 0.14 | 0.40 | 0.03 | 0.11 | 0.02 | 0.00 | 0.01 | 0.16 | 0.03 | 1.57 | 0.03 | 2.04 | 0.31 | 0.01 | 2.68 | 0.00 | 0.13 | 0.03 | 0.58 | 0.78 | 0.07 | 0.00 | 26.50 | 0.01 | 2.31 | 0.12 | 0.14 | 0.03 | 0.39 | 0.29 | 0.44 | 16.38 | 4.71 |
| 510410004 | Virginia | Chesterfield | 64.2 | 66.9 | 0.50 | 0.05 | 0.20 | 0.07 | 0.14 | 0.08 | 0.32 | 0.30 | 0.08 | 0.14 | 0.02 | 0.58 | 1.01 | 0.12 | 0.13 | 1.10 | 0.20 | 0.00 | 4.37 | 0.11 | 0.38 | 0.07 | 0.15 | 0.43 | 0.05 | 0.07 | 0.02 | 0.02 | 0.84 | 0.12 | 0.90 | 0.06 | 0.06 | 2.69 | 0.20 | 0.02 | 7.15 | 0.02 | 0.01 | 0.02 | 0.56 | 0.57 | 0.05 | 0.01 | 17.43 | 0.03 | 1.94 | 0.10 | 0.13 | 0.02 | 0.96 | 0.44 | 0.17 | 13.89 | 4.83 |
| 510590030 | Virginia | Fairfax | 70.5 | 73.7 | 0.30 | 0.06 | 0.15 | 0.05 | 0.13 | 0.00 | 0.02 | 1.54 | 0.07 | 0.13 | 0.02 | 0.56 | 1.51 | 0.14 | 0.25 | 1.15 | 0.15 | 0.00 | 6.76 | 0.01 | 0.67 | 0.08 | 0.09 | 0.56 | 0.04 | 0.12 | 0.01 | 0.00 | 0.04 | 0.11 | 0.20 | 1.17 | 0.04 | 4.01 | 0.39 | 0.01 | 5.47 | 0.00 | 0.17 | 0.03 | 0.28 | 0.70 | 0.05 | 0.00 | 18.30 | 0.01 | 2.69 | 0.16 | 0.13 | 0.02 | 1.00 | 0.43 | 0.20 | 15.28 | 4.75 |
| 510610002 | Virginia | Fauquier | 55.5 | 56.6 | 0.44 | 0.07 | 0.22 | 0.06 | 0.16 | 0.00 | 0.12 | 0.17 | 0.11 | 0.15 | 0.02 | 0.70 | 2.30 | 0.19 | 0.35 | 2.00 | 0.21 | 0.00 | 2.57 | 0.00 | 0.76 | 0.12 | 0.12 | 0.78 | 0.06 | 0.18 | 0.01 | 0.00 | 0.21 | 0.16 | 0.02 | 0.03 | 0.06 | 5.30 | 0.57 | 0.01 | 5.45 | 0.00 | 0.02 | 0.05 | 0.40 | 1.03 | 0.06 | 0.00 | 6.81 | 0.02 | 3.06 | 0.16 | 0.17 | 0.03 | 0.41 | 0.38 | 0.24 | 12.83 | 5.88 |
| 510690010 | Virginia | Frederick | 59.5 | 61.5 | 0.85 | 0.06 | 0.07 | 0.07 | 0.16 | 0.00 | 0.00 | 0.01 | 0.11 | 0.55 | 0.02 | 0.53 | 2.09 | 0.12 | 0.14 | 2.31 | 0.11 | 0.00 | 2.34 | 0.00 | 0.98 | 0.13 | 0.14 | 0.19 | 0.07 | 0.09 | 0.02 | 0.00 | 0.00 | 0.11 | 0.03 | 0.06 | 0.08 | 6.43 | 0.17 | 0.02 | 5.58 | 0.00 | 0.05 | 0.04 | 0.83 | 0.47 | 0.05 | 0.00 | 2.66 | 0.02 | 6.65 | 0.27 | 0.13 | 0.02 | 0.73 | 0.28 | 0.32 | 17.59 | 5.52 |
| 510719991 | Virginia | Giles | 51.9 | 51.9 | 0.00 | 0.04 | 0.02 | 0.10 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.44 | 0.96 | 0.11 | 0.20 | 0.34 | 0.02 | 0.00 | 0.02 | 0.00 | 1.42 | 0.18 | 0.00 | 0.15 | 0.12 | 0.22 | 0.03 | 0.00 | 0.00 | 0.06 | 0.01 | 0.02 | 0.11 | 5.13 | 0.15 | 0.06 | 0.96 | 0.00 | 0.00 | 0.05 | 0.01 | 0.29 | 0.13 | 0.00 | 3.06 | 0.07 | 4.63 | 0.33 | 0.42 | 0.03 | 0.41 | 0.04 | 0.09 | 26.94 | 3.87 |
| 510850003 | Virginia | Hanover | 65.5 | 67.5 | 0.39 | 0.09 | 0.19 | 0.09 | 0.21 | 0.00 | 0.02 | 0.22 | 0.09 | 0.16 | 0.02 | 0.65 | 1.16 | 0.24 | 0.29 | 2.15 | 0.20 | 0.00 | 2.72 | 0.00 | 0.21 | 0.09 | 0.10 | 0.58 | 0.04 | 0.16 | 0.02 | 0.00 | 0.03 | 0.20 | 0.02 | 1.41 | 0.04 | 2.86 | 0.49 | 0.01 | 2.62 | 0.00 | 0.08 | 0.05 | 0.59 | 0.97 | 0.08 | 0.00 | 21.34 | 0.01 | 2.41 | 0.16 | 0.17 | 0.04 | 0.28 | 0.28 | 0.49 | 15.19 | 5.34 |
| 510870014 | Virginia | Henrico | 66.9 | 69.6 | 0.42 | 0.07 | 0.15 | 0.06 | 0.17 | 0.00 | 0.06 | 0.24 | 0.09 | 0.13 | 0.01 | 0.44 | 0.98 | 0.13 | 0.23 | 1.30 | 0.21 | 0.00 | 2.91 | 0.00 | 0.49 | 0.09 | 0.13 | 0.43 | 0.02 | 0.11 | 0.01 | 0.00 | 0.04 | 0.16 | 0.26 | 0.94 | 0.04 | 2.69 | 0.38 | 0.01 | 5.07 | 0.00 | 0.05 | 0.02 | 0.33 | 0.78 | 0.06 | 0.00 | 22.99 | 0.01 | 2.00 | 0.13 | 0.14 | 0.03 | 0.71 | 0.29 | 0.42 | 15.27 | 4.99 |
| 511071005 | Virginia | Loudoun | 65.1 | 66.9 | 0.50 | 0.08 | 0.13 | 0.08 | 0.16 | 0.00 | 0.17 | 0.20 | 0.11 | 0.14 | 0.03 | 0.71 | 1.80 | 0.15 | 0.17 | 1.80 | 0.15 | 0.00 | 6.25 | 0.01 | 0.90 | 0.15 | 0.10 | 0.49 | 0.07 | 0.10 | 0.02 | 0.00 | 0.38 | 0.15 | 0.16 | 0.03 | 0.07 | 4.96 | 0.33 | 0.01 | 8.25 | 0.00 | 0.01 | 0.04 | 0.40 | 0.80 | 0.07 | 0.00 | 11.48 | 0.02 | 2.78 | 0.30 | 0.18 | 0.03 | 0.82 | 0.39 | 0.22 | 12.98 | 5.51 |
| 511130003 | Virginia | Madison | 64.2 | 65.4 | 0.10 | 0.07 | 0.28 | 0.05 | 0.20 | 0.00 | 0.00 | 0.00 | 0.06 | 0.09 | 0.03 | 1.29 | 3.86 | 0.24 | 0.54 | 1.99 | 0.19 | 0.00 | 0.81 | 0.00 | 1.38 | 0.15 | 0.09 | 1.08 | 0.07 | 0.27 | 0.01 | 0.00 | 0.00 | 0.15 | 0.05 | 0.03 | 0.08 | 6.65 | 0.85 | 0.01 | 4.73 | 0.00 | 0.03 | 0.07 | 0.30 | 1.27 | 0.08 | 0.00 | 4.18 | 0.02 | 5.31 | 0.35 | 0.22 | 0.03 | 0.82 | 0.17 | 0.22 | 17.93 | 7.54 |
| 511390004 | Virginia | Page | 60.1 | 61.7 | 0.09 | 0.07 | 0.25 | 0.05 | 0.19 | 0.00 | 0.00 | 0.00 | 0.06 | 0.08 | 0.02 | 1.16 | 3.64 | 0.22 | 0.49 | 1.83 | 0.18 | 0.00 | 0.89 | 0.00 | 1.29 | 0.14 | 0.08 | 0.94 | 0.06 | 0.25 | 0.01 | 0.00 | 0.00 | 0.14 | 0.06 | 0.03 | 0.07 | 6.17 | 0.77 | 0.01 | 4.46 | 0.00 | 0.02 | 0.07 | 0.28 | 1.17 | 0.07 | 0.00 | 4.34 | 0.02 | 5.04 | 0.33 | 0.21 | 0.03 | 0.82 | 0.15 | 0.20 | 16.44 | 6.96 |
| 511479991 | Virginia | Prince Edward | 57.1 | 57.1 | 0.11 | 0.02 | 0.20 | 0.03 | 0.10 | 0.00 | 0.01 | 0.05 | 0.10 | 0.16 | 0.02 | 0.73 | 0.83 | 0.17 | 0.16 | 0.88 | 0.12 | 0.00 | 0.82 | 0.00 | 1.40 | 0.07 | 0.07 | 0.44 | 0.04 | 0.10 | 0.01 | 0.00 | 0.02 | 0.05 | 0.02 | 3.81 | 0.03 | 3.57 | 0.28 | 0.01 | 3.15 | 0.00 | 0.56 | 0.03 | 0.40 | 0.48 | 0.04 | 0.00 | 10.61 | 0.01 | 1.92 | 0.23 | 0.12 | 0.01 | 0.43 | 0.22 | 0.23 | 18.95 | 5.04 |
| 511530009 | Virginia | Prince William | 63.1 | 64.9 | 0.46 | 0.06 | 0.07 | 0.07 | 0.14 | 0.00 | 0.16 | 0.49 | 0.08 | 0.12 | 0.03 | 0.59 | 1.02 | 0.13 | 0.12 | 0.73 | 0.11 | 0.00 | 7.71 | 0.01 | 1.28 | 0.14 | 0.09 | 0.26 | 0.07 | 0.08 | 0.02 | 0.00 | 0.33 | 0.12 | 0.16 | 0.04 | 0.07 | 4.80 | 0.19 | 0.01 | 9.19 | 0.00 | 0.00 | 0.04 | 0.25 | 0.52 | 0.06 | 0.00 | 10.14 | 0.02 | 2.21 | 0.32 | 0.16 | 0.02 | 0.93 | 0.38 | 0.15 | 13.56 | 5.12 |
| 511611004 | Virginia | Roanoke | 59.8 | 62.2 | 0.13 | 0.05 | 0.15 | 0.05 | 0.27 | 0.01 | 0.03 | 0.00 | 0.05 | 0.27 | 0.02 | 0.65 | 1.32 | 0.19 | 0.37 | 1.79 | 0.06 | 0.00 | 0.18 | 0.00 | 0.79 | 0.10 | 0.05 | 0.47 | 0.04 | 0.22 | 0.02 | 0.00 | 0.17 | 0.11 | 0.17 | 1.41 | 0.02 | 3.41 | 0.42 | 0.01 | 0.75 | 0.00 | 0.16 | 0.02 | 0.57 | 0.56 | 0.10 | 0.00 | 12.86 | 0.02 | 3.03 | 0.25 | 0.20 | 0.03 | 0.50 | 0.15 | 0.18 | 22.25 | 4.90 |
| 511630003 | Virginia | Rockbridge | 56.0 | 57.5 | 0.02 | 0.04 | 0.14 | 0.07 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 1.06 | 1.71 | 0.23 | 0.29 | 1.24 | 0.03 | 0.00 | 0.15 | 0.00 | 1.62 | 0.12 | 0.01 | 0.46 | 0.06 | 0.20 | 0.03 | 0.00 | 0.00 | 0.08 | 0.01 | 0.02 | 0.04 | 5.08 | 0.34 | 0.02 | 0.92 | 0.00 | 0.00 | 0.05 | 0.11 | 0.53 | 0.11 | 0.00 | 7.59 | 0.03 | 4.34 | 0.38 | 0.23 | 0.03 | 0.55 | 0.04 | 0.15 | 22.49 | 4.88 |
| 511650003 | Virginia | Rockingham | 59.5 | 61.3 | 0.03 | 0.04 | 0.14 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.02 | 0.65 | 2.57 | 0.15 | 0.35 | 0.59 | 0.11 | 0.00 | 0.50 | 0.00 | 1.80 | 0.13 | 0.05 | 0.47 | 0.06 | 0.22 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.01 | 0.07 | 6.86 | 0.45 | 0.01 | 2.97 | 0.00 | 0.00 | 0.05 | 0.02 | 0.63 | 0.06 | 0.00 | 3.52 | 0.03 | 5.18 | 0.27 | 0.17 | 0.02 | 0.71 | 0.08 | 0.10 | 24.88 | 4.99 |
| 511790001 | Virginia | Stafford | 61.7 | 64.3 | 0.43 | 0.05 | 0.07 | 0.05 | 0.09 | 0.00 | 0.01 | 0.25 | 0.09 | 0.12 | 0.01 | 0.29 | 1.18 | 0.05 | 0.08 | 1.21 | 0.13 | 0.00 | 3.87 | 0.00 | 0.69 | 0.08 | 0.09 | 0.25 | 0.03 | 0.04 | 0.01 | 0.00 | 0.01 | 0.11 | 0.13 | 0.46 | 0.04 | 4.15 | 0.19 | 0.01 | 6.53 | 0.00 | 0.07 | 0.02 | 0.28 | 0.56 | 0.03 | 0.00 | 16.80 | 0.01 | 2.48 | 0.11 | 0.08 | 0.01 | 0.82 | 0.35 | 0.17 | 14.71 | 4.12 |
| 511970002 | Virginia | Wythe | 57.4 | 58.9 | 0.36 | 0.10 | 0.24 | 0.17 | 0.64 | 0.00 | 0.00 | 0.00 | 0.07 | 0.21 | 0.09 | 1.17 | 1.09 | 0.25 | 0.40 | 1.19 | 0.34 | 0.00 | 0.01 | 0.00 | 0.40 | 0.21 | 0.22 | 0.53 | 0.11 | 0.37 | 0.07 | 0.00 | 0.00 | 0.15 | 0.00 | 0.06 | 0.09 | 1.87 | 0.62 | 0.07 | 0.62 | 0.00 | 0.04 | 0.08 | 0.32 | 1.29 | 0.26 | 0.00 | 3.13 | 0.08 | 3.04 | 0.41 | 0.66 | 0.07 | 0.42 | 0.18 | 0.42 | 29.82 | 5.24 |
| 515100009 | Virginia | Alexandria City | 69.0 | 71.6 | 0.52 | 0.07 | 0.14 | 0.08 | 0.15 | 0.00 | 0.09 | 2.19 | 0.09 | 0.33 | 0.02 | 0.51 | 1.58 | 0.14 | 0.22 | 2.09 | 0.27 | 0.00 | 9.42 | 0.00 | 0.52 | 0.08 | 0.14 | 0.47 | 0.04 | 0.12 | 0.02 | 0.00 | 0.12 | 0.17 | 0.22 | 0.88 | 0.04 | 3.30 | 0.35 | 0.01 | 4.74 | 0.00 | 0.17 | 0.04 | 0.70 | 0.82 | 0.06 | 0.00 | 12.54 | 0.01 | 2.51 | 0.14 | 0.14 | 0.03 | 0.91 | 0.40 | 0.25 | 16.06 | 4.83 |
| 516500008 | Virginia | Hampton City | 66.1 | 67.9 | 0.25 | 0.10 | 0.14 | 0.11 | 0.17 | 0.17 | 0.27 | 0.07 | 0.08 | 0.22 | 0.02 | 0.34 | 0.67 | 0.14 | 0.12 | 1.02 | 0.34 | 0.01 | 1.73 | 0.17 | 0.34 | 0.09 | 0.14 | 0.22 | 0.03 | 0.10 | 0.02 | 0.04 | 0.66 | 0.22 | 0.73 | 5.92 | 0.04 | 1.56 | 0.23 | 0.01 | 2.31 | 0.03 | 0.74 | 0.04 | 0.32 | 0.83 | 0.06 | 0.01 | 19.75 | 0.01 | 1.53 | 0.12 | 0.15 | 0.04 | 0.45 | 2.06 | 0.26 | 15.33 | 5.27 |
| 518000004 | Virginia | Suffolk City | 65.0 | 66.6 | 0.04 | 0.02 | 0.13 | 0.10 | 0.18 | 0.04 | 0.40 | 0.07 | 0.02 | 0.06 | 0.02 | 0.75 | 0.84 | 0.24 | 0.09 | 1.03 | 0.11 | 0.00 | 2.45 | 0.02 | 0.40 | 0.14 | 0.07 | 0.28 | 0.06 | 0.09 | 0.03 | 0.00 | 0.54 | 0.03 | 0.69 | 1.74 | 0.08 | 2.03 | 0.10 | 0.01 | 3.32 | 0.00 | 0.14 | 0.04 | 0.24 | 0.30 | 0.09 | 0.00 | 18.17 | 0.02 | 1.78 | 0.30 | 0.18 | 0.01 | 1.23 | 1.58 | 0.16 | 19.35 | 4.95 |
| 518000005 | Virginia | Suffolk City | 61.0 | 62.1 | 0.21 | 0.09 | 0.13 | 0.12 | 0.22 | 0.00 | 0.04 | 0.05 | 0.09 | 0.24 | 0.05 | 0.82 | 0.78 | 0.25 | 0.22 | 0.66 | 0.20 | 0.00 | 1.05 | 0.00 | 0.65 | 0.20 | 0.08 | 0.40 | 0.06 | 0.17 | 0.04 | 0.00 | 0.06 | 0.20 | 0.04 | 4.50 | 0.05 | 2.74 | 0.34 | 0.03 | 2.87 | 0.00 | 0.35 | 0.05 | 0.24 | 0.85 | 0.12 | 0.00 | 8.38 | 0.03 | 1.32 | 0.69 | 0.27 | 0.04 | 0.41 | 0.33 | 0.20 | 24.03 | 5.77 |
| 530330017 | Washington | King | 54.1 | 56.0 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 23.37 | 0.00 | 0.00 | 0.01 | 0.00 | 2.00 | 0.31 | 1.93 | 24.17 | 1.44 |
| 530330023 | Washington | King | 60.8 | 62.7 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28.25 | 0.00 | 0.00 | 0.02 | 0.00 | 2.41 | 0.09 | 1.46 | 25.96 | 1.83 |
| 540030003 | West Virginia | Berkeley | 60.8 | 62.6 | 0.82 | 0.06 | 0.09 | 0.07 | 0.15 | 0.00 | 0.00 | 0.03 | 0.10 | 0.42 | 0.02 | 0.61 | 1.98 | 0.15 | 0.12 | 2.20 | 0.12 | 0.00 | 2.89 | 0.00 | 0.94 | 0.13 | 0.18 | 0.21 | 0.07 | 0.09 | 0.02 | 0.00 | 0.00 | 0.12 | 0.08 | 0.05 | 0.08 | 5.95 | 0.16 | 0.01 | 6.42 | 0.00 | 0.04 | 0.04 | 0.77 | 0.47 | 0.05 | 0.00 | 0.94 | 0.02 | 8.86 | 0.30 | 0.13 | 0.02 | 0.92 | 0.30 | 0.19 | 17.64 | 5.53 |
| 540110006 | West Virginia | Cabell | 61.2 | 63.6 | 0.22 | 0.01 | 0.12 | 0.05 | 0.11 | 0.00 | 0.00 | 0.00 | 0.03 | 0.15 | 0.03 | 1.04 | 1.77 | 0.19 | 0.11 | 9.19 | 0.17 | 0.00 | 0.00 | 0.00 | 0.94 | 0.37 | 0.17 | 0.20 | 0.12 | 0.08 | 0.01 | 0.00 | 0.00 | 0.03 | 0.01 | 0.02 | 0.16 | 10.93 | 0.17 | 0.02 | 0.42 | 0.00 | 0.03 | 0.05 | 0.30 | 0.47 | 0.04 | 0.00 | 0.04 | 0.05 | 11.40 | 0.52 | 0.14 | 0.01 | 0.47 | 0.06 | 0.22 | 15.16 | 5.15 |
| 540219991 | West Virginia | Gilmer | 55.8 | 55.8 | 0.69 | 0.02 | 0.23 | 0.05 | 0.11 | 0.00 | 0.00 | 0.00 | 0.03 | 0.70 | 0.02 | 1.10 | 3.05 | 0.13 | 0.27 | 3.21 | 0.33 | 0.00 | 0.00 | 0.00 | 0.89 | 0.11 | 0.20 | 0.49 | 0.06 | 0.11 | 0.01 | 0.00 | 0.00 | 0.06 | 0.00 | 0.10 | 0.05 | 8.18 | 0.44 | 0.01 | 0.16 | 0.00 | 0.08 | 0.03 | 0.96 | 0.85 | 0.04 | 0.00 | 0.13 | 0.03 | 12.64 | 0.34 | 0.11 | 0.01 | 0.34 | 0.13 | 0.24 | 13.36 | 5.48 |
| 540250003 | West Virginia | Greenbrier | 58.1 | 59.3 | 0.00 | 0.01 | 0.00 | 0.04 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.53 | 1.75 | 0.08 | 0.13 | 0.89 | 0.00 | 0.00 | 0.00 | 0.00 | 1.06 | 0.12 | 0.00 | 0.04 | 0.07 | 0.11 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.05 | 6.69 | 0.11 | 0.02 | 1.84 | 0.00 | 0.00 | 0.02 | 0.00 | 0.17 | 0.06 | 0.00 | 0.01 | 0.04 | 6.27 | 0.36 | 0.14 | 0.01 | 0.63 | 0.01 | 0.04 | 33.11 | 3.28 |
| 540291004 | West Virginia | Hancock | 67.4 | 69.2 | 0.12 | 0.01 | 0.16 | 0.06 | 0.11 | 0.00 | 0.06 | 0.04 | 0.01 | 0.07 | 0.05 | 1.75 | 2.22 | 0.33 | 0.18 | 0.49 | 0.22 | 0.00 | 0.83 | 0.00 | 3.14 | 0.26 | 0.20 | 0.43 | 0.12 | 0.12 | 0.03 | 0.00 | 0.10 | 0.03 | 0.30 | 0.04 | 0.13 | 13.56 | 0.31 | 0.03 | 6.96 | 0.00 | 0.02 | 0.06 | 0.18 | 0.67 | 0.05 | 0.00 | 1.12 | 0.05 | 6.44 | 0.69 | 0.21 | 0.01 | 1.73 | 0.13 | 0.29 | 17.60 | 5.44 |
| 540390010 | West Virginia | Kanawha | 68.7 | 70.3 | 0.26 | 0.02 | 0.20 | 0.06 | 0.12 | 0.00 | 0.00 | 0.00 | 0.03 | 0.12 | 0.04 | 1.20 | 2.25 | 0.15 | 0.14 | 3.31 | 0.32 | 0.00 | 0.01 | 0.00 | 1.05 | 0.34 | 0.22 | 0.36 | 0.12 | 0.07 | 0.02 | 0.00 | 0.00 | 0.04 | 0.02 | 0.03 | 0.16 | 10.24 | 0.34 | 0.02 | 0.76 | 0.00 | 0.02 | 0.05 | 0.18 | 0.86 | 0.05 | 0.00 | 0.16 | 0.05 | 21.16 | 0.53 | 0.15 | 0.01 | 0.56 | 0.10 | 0.40 | 16.88 | 5.30 |
| 540610003 | West Virginia | Monongalia | 65.7 | 67.8 | 0.07 | 0.05 | 0.29 | 0.05 | 0.18 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.02 | 1.50 | 3.01 | 0.30 | 0.51 | 2.07 | 0.13 | 0.00 | 0.01 | 0.00 | 1.85 | 0.15 | 0.07 | 0.76 | 0.04 | 0.25 | 0.01 | 0.00 | 0.00 | 0.12 | 0.03 | 0.02 | 0.05 | 6.30 | 0.59 | 0.01 | 3.01 | 0.00 | 0.02 | 0.05 | 0.11 | 0.81 | 0.06 | 0.00 | 0.05 | 0.01 | 20.19 | 0.39 | 0.14 | 0.03 | 0.69 | 0.10 | 0.16 | 15.66 | 5.44 |
| 540690010 | West Virginia | Ohio | 64.6 | 66.1 | 0.04 | 0.03 | 0.29 | 0.06 | 0.15 | 0.00 | 0.04 | 0.03 | 0.02 | 0.03 | 0.04 | 1.93 | 3.61 | 0.25 | 0.35 | 1.31 | 0.16 | 0.00 | 0.57 | 0.00 | 1.90 | 0.17 | 0.09 | 0.76 | 0.08 | 0.20 | 0.02 | 0.00 | 0.05 | 0.05 | 0.37 | 0.04 | 0.11 | 12.10 | 0.41 | 0.02 | 4.78 | 0.00 | 0.01 | 0.07 | 0.17 | 0.57 | 0.07 | 0.00 | 0.84 | 0.05 | 6.97 | 0.52 | 0.19 | 0.02 | 1.34 | 0.12 | 0.16 | 17.26 | 5.92 |
| 541071002 | West Virginia | Wood | 61.3 | 63.7 | 0.23 | 0.06 | 0.31 | 0.11 | 0.23 | 0.00 | 0.01 | 0.01 | 0.06 | 0.30 | 0.04 | 0.77 | 1.52 | 0.17 | 0.23 | 2.97 | 0.25 | 0.00 | 0.20 | 0.00 | 0.62 | 0.15 | 0.21 | 0.51 | 0.06 | 0.15 | 0.03 | 0.00 | 0.01 | 0.12 | 0.02 | 0.28 | 0.07 | 10.20 | 0.39 | 0.03 | 1.26 | 0.00 | 0.12 | 0.05 | 1.25 | 1.01 | 0.11 | 0.00 | 1.05 | 0.04 | 12.92 | 0.18 | 0.33 | 0.03 | 0.55 | 0.14 | 0.46 | 15.98 | 5.25 |
| 550090026 | Wisconsin | Brown | 61.1 | 62.7 | 0.27 | 0.09 | 0.42 | 0.14 | 0.16 | 0.00 | 0.00 | 0.00 | 0.19 | 0.18 | 0.02 | 5.90 | 1.50 | 1.23 | 1.42 | 0.09 | 1.15 | 0.00 | 0.01 | 0.00 | 0.61 | 0.23 | 0.42 | 1.23 | 0.03 | 0.26 | 0.03 | 0.00 | 0.00 | 0.22 | 0.00 | 0.08 | 0.10 | 0.02 | 2.66 | 0.02 | 0.03 | 0.00 | 0.05 | 0.02 | 0.23 | 3.61 | 0.12 | 0.00 | 0.04 | 0.02 | 0.03 | 10.34 | 0.14 | 0.03 | 0.41 | 0.64 | 0.52 | 17.60 | 8.33 |
| 550250041 | Wisconsin | Dane | 60.6 | 63.1 | 0.24 | 0.04 | 0.42 | 0.08 | 0.11 | 0.00 | 0.00 | 0.00 | 0.18 | 0.16 | 0.05 | 6.63 | 0.90 | 3.33 | 0.78 | 0.29 | 0.54 | 0.00 | 0.02 | 0.00 | 0.22 | 0.55 | 0.19 | 1.53 | 0.14 | 0.31 | 0.02 | 0.00 | 0.00 | 0.09 | 0.01 | 0.07 | 0.19 | 0.20 | 2.54 | 0.04 | 0.06 | 0.00 | 0.04 | 0.10 | 0.22 | 2.89 | 0.05 | 0.00 | 0.05 | 0.07 | 0.09 | 8.37 | 0.22 | 0.01 | 0.41 | 0.34 | 0.50 | 18.41 | 8.66 |
| 550270001 | Wisconsin | Dodge | 66.1 | 66.6 | 0.35 | 0.06 | 0.81 | 0.07 | 0.07 | 0.00 | 0.00 | 0.00 | 0.22 | 0.24 | 0.02 | 7.86 | 2.06 | 1.87 | 1.25 | 0.50 | 1.04 | 0.00 | 0.03 | 0.00 | 0.39 | 0.02 | 0.37 | 2.08 | 0.03 | 0.06 | 0.01 | 0.00 | 0.00 | 0.11 | 0.02 | 0.10 | 0.01 | 0.44 | 3.41 | 0.01 | 0.13 | 0.00 | 0.07 | 0.01 | 0.35 | 4.78 | 0.03 | 0.00 | 0.09 | 0.01 | 0.20 | 7.39 | 0.08 | 0.01 | 0.54 | 0.42 | 0.72 | 19.12 | 8.44 |
| 550290004 | Wisconsin | Door | 68.8 | 70.9 | 0.20 | 0.06 | 0.73 | 0.07 | 0.16 | 0.00 | 0.00 | 0.00 | 0.08 | 0.10 | 0.03 | 12.88 | 6.91 | 0.84 | 1.03 | 2.47 | 0.37 | 0.00 | 0.01 | 0.00 | 4.21 | 0.12 | 0.19 | 1.77 | 0.07 | 0.13 | 0.02 | 0.00 | 0.00 | 0.12 | 0.01 | 0.04 | 0.06 | 1.13 | 1.39 | 0.01 | 0.10 | 0.00 | 0.03 | 0.04 | 0.39 | 1.84 | 0.06 | 0.00 | 0.05 | 0.03 | 0.14 | 7.48 | 0.15 | 0.02 | 0.39 | 0.20 | 0.67 | 13.94 | 7.83 |
| 550390006 | Wisconsin | Fond du Lac | 64.8 | 66.7 | 0.21 | 0.04 | 0.86 | 0.07 | 0.09 | 0.00 | 0.00 | 0.00 | 0.22 | 0.15 | 0.03 | 8.96 | 4.26 | 0.89 | 1.03 | 1.34 | 0.63 | 0.00 | 0.02 | 0.00 | 1.02 | 0.08 | 0.21 | 1.95 | 0.05 | 0.09 | 0.02 | 0.00 | 0.00 | 0.09 | 0.02 | 0.07 | 0.03 | 1.22 | 2.30 | 0.02 | 0.15 | 0.00 | 0.04 | 0.03 | 0.32 | 2.83 | 0.04 | 0.00 | 0.07 | 0.02 | 0.19 | 6.95 | 0.13 | 0.01 | 0.49 | 0.38 | 0.54 | 18.84 | 7.57 |
| 550550002 | Wisconsin | Jefferson | 62.7 | 64.1 | 0.23 | 0.04 | 0.50 | 0.07 | 0.15 | 0.00 | 0.00 | 0.00 | 0.19 | 0.16 | 0.04 | 8.30 | 2.25 | 1.15 | 0.76 | 0.46 | 0.53 | 0.00 | 0.02 | 0.00 | 1.28 | 0.32 | 0.20 | 1.47 | 0.09 | 0.15 | 0.02 | 0.00 | 0.00 | 0.09 | 0.02 | 0.07 | 0.23 | 0.61 | 2.44 | 0.05 | 0.10 | 0.00 | 0.05 | 0.09 | 0.28 | 2.83 | 0.09 | 0.00 | 0.07 | 0.07 | 0.16 | 7.84 | 0.25 | 0.02 | 0.55 | 0.33 | 0.50 | 19.91 | 7.43 |
| 550590019 | Wisconsin | Kenosha | 66.7 | 69.2 | 0.14 | 0.03 | 0.61 | 0.05 | 0.12 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.02 | 23.63 | 4.88 | 0.20 | 0.28 | 0.49 | 0.39 | 0.00 | 0.00 | 0.00 | 2.68 | 0.36 | 0.21 | 1.47 | 0.05 | 0.11 | 0.01 | 0.00 | 0.00 | 0.09 | 0.00 | 0.03 | 0.09 | 0.20 | 0.94 | 0.01 | 0.02 | 0.00 | 0.02 | 0.02 | 0.44 | 1.97 | 0.04 | 0.00 | 0.03 | 0.03 | 0.06 | 7.65 | 0.09 | 0.01 | 0.55 | 0.19 | 0.42 | 12.04 | 5.73 |
| 550610002 | Wisconsin | Kewaunee | 67.9 | 70.6 | 0.19 | 0.08 | 0.68 | 0.09 | 0.09 | 0.00 | 0.00 | 0.00 | 0.08 | 0.07 | 0.02 | 14.73 | 7.69 | 0.44 | 0.40 | 1.57 | 0.98 | 0.00 | 0.01 | 0.00 | 3.46 | 0.05 | 0.53 | 1.30 | 0.05 | 0.06 | 0.03 | 0.00 | 0.00 | 0.18 | 0.01 | 0.03 | 0.04 | 0.99 | 0.88 | 0.01 | 0.10 | 0.00 | 0.02 | 0.03 | 0.51 | 1.75 | 0.05 | 0.00 | 0.05 | 0.01 | 0.16 | 7.71 | 0.09 | 0.02 | 0.34 | 0.63 | 0.74 | 13.84 | 6.85 |
| 550630012 | Wisconsin | La Crosse | 57.2 | 58.7 | 0.30 | 0.10 | 0.79 | 0.04 | 0.23 | 0.00 | 0.00 | 0.00 | 0.18 | 0.20 | 0.00 | 0.07 | 0.12 | 4.66 | 2.49 | 0.13 | 0.56 | 0.00 | 0.01 | 0.00 | 0.01 | 2.77 | 0.28 | 1.00 | 0.00 | 0.85 | 0.01 | 0.00 | 0.00 | 0.18 | 0.00 | 0.06 | 0.01 | 0.04 | 4.16 | 0.00 | 0.03 | 0.00 | 0.05 | 0.11 | 0.21 | 3.57 | 0.09 | 0.00 | 0.04 | 0.00 | 0.03 | 6.00 | 0.16 | 0.04 | 0.33 | 0.41 | 0.44 | 14.59 | 11.60 |
| 550710007 | Wisconsin | Manitowoc | 71.5 | 72.7 | 0.21 | 0.05 | 0.35 | 0.07 | 0.11 | 0.00 | 0.00 | 0.00 | 0.09 | 0.08 | 0.02 | 15.14 | 9.06 | 0.43 | 0.47 | 1.71 | 0.79 | 0.00 | 0.02 | 0.00 | 4.12 | 0.06 | 0.52 | 1.13 | 0.05 | 0.06 | 0.02 | 0.00 | 0.00 | 0.14 | 0.03 | 0.05 | 0.04 | 1.69 | 0.98 | 0.01 | 0.25 | 0.00 | 0.02 | 0.02 | 0.52 | 1.63 | 0.05 | 0.00 | 0.07 | 0.02 | 0.29 | 8.74 | 0.11 | 0.02 | 0.49 | 0.52 | 0.47 | 13.97 | 6.59 |
| 550790010 | Wisconsin | Milwaukee | 61.5 | 63.5 | 0.21 | 0.04 | 0.74 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 0.08 | 0.10 | 0.02 | 14.36 | 4.58 | 0.41 | 0.55 | 0.56 | 0.41 | 0.00 | 0.01 | 0.00 | 2.21 | 0.22 | 0.22 | 1.30 | 0.06 | 0.07 | 0.02 | 0.00 | 0.00 | 0.11 | 0.01 | 0.05 | 0.06 | 0.60 | 1.44 | 0.01 | 0.13 | 0.00 | 0.03 | 0.03 | 0.36 | 1.87 | 0.05 | 0.00 | 0.05 | 0.02 | 0.20 | 6.88 | 0.12 | 0.01 | 0.48 | 0.16 | 0.45 | 16.26 | 5.54 |
| 550790026 | Wisconsin | Milwaukee | 66.2 | 69.1 | 0.14 | 0.06 | 0.62 | 0.06 | 0.13 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.02 | 19.73 | 6.75 | 0.14 | 0.30 | 0.52 | 1.06 | 0.00 | 0.01 | 0.00 | 3.37 | 0.22 | 0.47 | 1.40 | 0.04 | 0.06 | 0.02 | 0.00 | 0.00 | 0.16 | 0.01 | 0.03 | 0.05 | 0.69 | 0.74 | 0.01 | 0.14 | 0.00 | 0.02 | 0.02 | 0.37 | 1.41 | 0.05 | 0.00 | 0.05 | 0.01 | 0.21 | 5.44 | 0.11 | 0.02 | 0.46 | 0.59 | 0.41 | 13.70 | 6.05 |
| 550790085 | Wisconsin | Milwaukee | 71.3 | 73.1 | 0.14 | 0.02 | 0.59 | 0.04 | 0.06 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.02 | 17.06 | 8.70 | 0.09 | 0.19 | 1.53 | 0.41 | 0.00 | 0.04 | 0.00 | 4.36 | 0.47 | 0.19 | 1.16 | 0.09 | 0.05 | 0.01 | 0.00 | 0.00 | 0.03 | 0.02 | 0.04 | 0.25 | 1.21 | 0.55 | 0.01 | 0.34 | 0.00 | 0.02 | 0.03 | 0.46 | 0.93 | 0.03 | 0.00 | 0.20 | 0.05 | 0.83 | 9.64 | 0.10 | 0.01 | 0.73 | 0.20 | 0.33 | 13.77 | 5.98 |
| 550870009 | Wisconsin | Outagamie | 64.0 | 66.5 | 0.18 | 0.06 | 0.18 | 0.17 | 0.20 | 0.00 | 0.00 | 0.00 | 0.16 | 0.13 | 0.03 | 5.94 | 1.48 | 1.39 | 1.44 | 0.06 | 0.36 | 0.00 | 0.01 | 0.00 | 0.48 | 0.13 | 0.10 | 1.75 | 0.04 | 0.20 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.06 | 0.07 | 0.12 | 2.17 | 0.01 | 0.04 | 0.00 | 0.04 | 0.03 | 0.07 | 2.93 | 0.16 | 0.00 | 0.03 | 0.04 | 0.03 | 12.57 | 0.16 | 0.03 | 0.60 | 0.36 | 0.39 | 20.88 | 8.32 |
| 550890008 | Wisconsin | Ozaukee | 70.4 | 73.8 | 0.24 | 0.07 | 0.72 | 0.08 | 0.12 | 0.00 | 0.00 | 0.00 | 0.11 | 0.13 | 0.01 | 15.14 | 6.05 | 0.45 | 0.68 | 1.62 | 1.25 | 0.00 | 0.04 | 0.00 | 1.29 | 0.04 | 0.50 | 1.60 | 0.03 | 0.06 | 0.02 | 0.00 | 0.00 | 0.16 | 0.03 | 0.06 | 0.02 | 1.40 | 1.71 | 0.01 | 0.42 | 0.00 | 0.04 | 0.02 | 0.56 | 2.34 | 0.05 | 0.00 | 0.17 | 0.01 | 0.81 | 7.54 | 0.09 | 0.02 | 0.51 | 0.68 | 0.58 | 15.82 | 6.86 |
| 550890009 | Wisconsin | Ozaukee | 67.4 | 69.5 | 0.23 | 0.06 | 0.60 | 0.07 | 0.13 | 0.00 | 0.00 | 0.00 | 0.10 | 0.11 | 0.01 | 17.63 | 6.07 | 0.42 | 0.62 | 1.60 | 1.00 | 0.00 | 0.01 | 0.00 | 2.19 | 0.05 | 0.51 | 1.50 | 0.02 | 0.06 | 0.02 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 551010017 | Wisconsin | Racine | 64.6 | 67.4 | 0.12 | 0.02 | 0.36 | 0.04 | 0.09 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.02 | 18.57 | 4.94 | 0.14 | 0.16 | 0.47 | 0.24 | 0.00 | 0.00 | 0.00 | 3.40 | 0.56 | 0.17 | 1.09 | 0.07 | 0.10 | 0.01 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 12.37 | 5.09 |
| 551050024 | Wisconsin | Rock | 63.9 | 66.2 | 0.21 | 0.07 | 0.55 | 0.06 | 0.22 | 0.00 | 0.00 | 0.00 | 0.20 | 0.17 | 0.04 | 12.59 | 1.73 | 1.35 | 0.79 | 0.09 | 0.41 | 0.00 | 0.00 | 0.00 | 0.49 | 0.46 | 0.15 | 1.91 | 0.07 | 0.46 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 19.86 | 8.97 |
| 551170006 | Wisconsin | Sheboygan | 77.0 | 79.4 | 0.25 | 0.08 | 0.57 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.11 | 0.12 | 0.02 | 17.48 | 6.24 | 0.61 | 0.80 | 0.75 | 1.11 | 0.00 | 0.02 | 0.00 | 2.69 | 0.07 | 0.56 | 1.63 | 0.03 | 0.09 | 0.02 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 14.91 | 7.79 |
| 551270005 | Wisconsin | Walworth | 64.4 | 66.0 | 0.26 | 0.04 | 0.53 | 0.05 | 0.06 | 0.00 | 0.00 | 0.00 | 0.18 | 0.17 | 0.02 | 15.01 | 3.05 | 0.74 | 0.57 | 0.37 | 0.54 | 0.00 | 0.00 | 0.00 | 1.19 | 0.20 | 0.21 | 1.36 | 0.08 | 0.10 | 0.01 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 20.45 | 6.69 |
| 551330027 | Wisconsin | Waukesha | 62.0 | 64.2 | 0.20 | 0.03 | 0.75 | 0.04 | 0.05 | 0.00 | 0.00 | 0.00 | 0.16 | 0.14 | 0.01 | 13.71 | 4.95 | 0.59 | 0.80 | 0.73 | 0.73 | 0.00 | 0.00 | 0.00 | 0.69 | 0.02 | 0.32 | 1.75 | 0.02 | 0.03 | 0.01 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 16.63 | 6.64 |
| 560050123 | Wyoming | Campbell | 61.8 | 63.0 | 0.00 | 0.27 | 0.00 | 1.16 | 0.89 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 8.33 | 26.37 | 8.14 |

Case: 16-60670 Document: 227-2 Page: 23 Date Filed: 09/20/2024

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 560050456 | Wyoming | Campbell | 61.2 | 62.1 | 0.00 | 0.14 | 0.00 | 1.61 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.43 |
| 560070100 | Wyoming | Carbon | 60.8 | 61.7 | 0.00 | 0.59 | 0.00 | 3.67 | 1.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 560130232 | Wyoming | Fremont | 62.7 | 63.7 | 0.00 | 0.52 | 0.00 | 2.56 | 0.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 |
| 560210100 | Wyoming | Laramie | 64.6 | 64.6 | 0.01 | 0.48 | 0.01 | 1.44 | 10.20 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.05 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 |
| 560370200 | Wyoming | Sweetwater | 60.2 | 60.4 | 0.00 | 0.27 | 0.00 | 3.35 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 560370300 | Wyoming | Sweetwater | 62.9 | 62.9 | 0.01 | 0.90 | 0.00 | 2.82 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 560410101 | Wyoming | Uinta | 61.6 | 62.2 | 0.01 | 1.04 | 0.00 | 2.53 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 560050456 | Wyoming | Campbell | 0.28 | 0.42 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.36 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.24 | 0.66 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 7.49 | 0.09 | 0.38 | 0.13 | 2.18 | 39.35 | 5.76 |
| 560070100 | Wyoming | Carbon | 0.00 | 0.72 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 2.85 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.26 | 0.65 | 0.53 | 0.18 | 0.22 | 47.80 | 1.80 |
| 560130232 | Wyoming | Fremont | 0.00 | 0.71 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 2.04 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 1.90 | 0.42 | 0.48 | 0.18 | 0.31 | 49.94 | 2.12 |
| 560210100 | Wyoming | Laramie | 0.18 | 0.27 | 0.00 | 0.00 | 0.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.72 | 0.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.27 | 0.52 | 0.55 | 0.13 | 0.97 | 37.56 | 6.39 |
| 560370200 | Wyoming | Sweetwater | 0.00 | 0.92 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 3.32 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 3.10 | 0.24 | 0.30 | 0.16 | 0.29 | 45.19 | 2.05 |
| 560370300 | Wyoming | Sweetwater | 0.00 | 0.92 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 3.66 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.90 | 0.19 | 0.70 | 0.23 | 0.33 | 48.29 | 1.98 |
| 560410101 | Wyoming | Uinta | 0.00 | 1.05 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 5.72 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.20 | 0.04 | 0.90 | 0.24 | 0.33 | 46.41 | 2.07 |

# Tab 9

Notice of Availability of the Environmental Protection Agency′s
Updated Ozone Transport Modeling Data for the 2008 Ozone National
Ambient Air Quality Standard (NAAQS); Notice of Availability of the
Environmental Protection Agency′s Updated Ozone Transport Modeling
Data for the 2008 Ozone National Ambient Air Quality Standard
(NAAQS); Notice of Data Availability (NODA): Details about
Provided Emissions Data Files; 80 FR 46271 (August 4, 2015)

**Emissions Data Files Provided with the July, 2015 Ozone Transport Modeling Data NODA**

The EPA has released a NODA that includes emission inventories for 2011 and 2017 along with supporting data and methods.  The docket that contains the information is #EPA-HQ-OAR-2015-0500.  The emission inventories and associated data and documentation are also available electronically from the 2011v6.2 section of EPA's Emissions Modeling Clearinghouse (EMCH) at http://www.epa.gov/ttn/chief/emch/index.html#2011. Data files needed to run the Sparse Matrix Operator Kernel Emissions (SMOKE) modeling system version 3.6.5 (https://www.cmascenter.org/smoke/) to prepare emissions input data for air quality modeling of the years of 2011 and 2017 are included.  These files include emission inventories, data to spatially allocate the emissions to model grid cells, data to temporally allocate the emissions to hours, and data to speciate the inventory pollutants into the chemical species used by the air quality model, along with summaries of the data. Documentation of the emissions modeling platform used in support of this analysis can be found in the Technical Support Document "Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform", also known as the Emissions Modeling TSD for the 2011v6.2 platform.

Some data files are too large to place directly on the Emissions Modeling Clearinghouse or in the electronic docket.  To obtain the following types of data, please send an email requesting the data to eyth.alison@epa.gov and possiel.norm@epa.gov:

- Emission Factors output from MOVES
- Sector-specific emissions output from SMOKE
- Air quality model-ready emissions data files
- Non-emissions inputs for air quality models

Details about provided data are given below. For more information on the emissions files provided with the data release, please contact Alison Eyth at eyth.alison@epa.gov, or (919) 541-2478.

## Organization of 2011v6.2 Platform Files on the Emissions Modeling Clearinghouse

The emissions modeling-related files for the 2011v6.2 platform posted the Emissions Modeling Clearinghouse are organized into several directories:

- 2011emissions contains emissions inventories and other SMOKE input files specific to 2011, along with subdirectories that contain state-specific extractions of inventories along with input databases used to create 2011 onroad emissions data (see below for more details);
- 2017emissions contains emissions inventories and other SMOKE input files specific to 2017, along with subdirectories that contain state-specific extractions of inventories along with input databases used to create 2017 onroad emissions data (see below for more details);
- ancillary_data contains non-emissions input data files for SMOKE, like temporal factors, speciation factors, and cross references;

- <u>reports</u> contains summaries for both 2011 and 2017, including some that include the v1platform values for 2011 and 2018 that were released in the 2013 NODA for the 2011 Emissions Modeling Platform and the 2014 NODA for the 2018 Emissions Modeling Platform;
- <u>smoke_scripts_utils</u> contains scripts for running SMOKE and other related utility programs for both 2011 and 2017; and
- <u>spatial_surrogates</u> contains data for spatially allocating county-based emission to grid cells and associated documentation.

The emissions modeling-related files for the 2011v6.0 platform were posted previously under the FTP folder: <u>ftp://ftp.epa.gov/EmisInventory/2011v6/v1platform/</u>.

**<u>Emissions Modeling Sectors</u>**

    To aid in the review of the emissions data, they have been summarized and reorganized into a series of reports with the goal of making the data easier to understand. The summaries and reports can be found in the <u>reports</u> subdirectory of the data release described above. Some of the summaries have data in terms of emissions modeling sectors, which represent emissions for specific categories of sources. The modeling sectors are defined as follows:

- afdust/afdust_adj - area fugitive dust emissions; afdust_adj are the emissions after meteorological and land use adjustments
- ag - agricultural ammonia emissions
- agfire - emissions from agricultural fires
- beis - emissions from natural sources
- c1c2rail - C1 and C2 commerical marine vessel emissions plus locomotive emissions
- c3marine - C3 marine (ocean going vessel ) emissions
- nonpt - nonpoint (county-level) not included in other sectors
- nonroad - mobile source emissions from off-road equipment
- onroad - mobile source emissions from vehicles on roads
- othafdust - Non-US area fugitive dust emissions
- othar - Non-US area source emissions
- othon - Non-US onroad source emissions
- onhpt - Non-US point source emissions, including off shore oil platforms
- ptprescfire - Point source prescribed fire emissions
- ptwildfire - Point source wildfire emissions
- ptegu - Emissions from EGUs not specifically designated as peaking
- ptnonipm - Point source emissions not included in ptegu or pt_oilgas
- pt_oilgas - oil and gas emissions from point sources
- np_oilgas - oil and gas emissions from nonpoint sources
- rwc - residential wood combustion emissions

Note: for some reports, some sectors are combined to allow easier comparison with the v1 platform. These situations are described in the README tab for the report.

**Modeling Case Abbreviations**

The EPA uses unique abbreviations for each modeling case. The updated 2011 case for which data are provided is known as 2011eh_cb6v2_v6_11g and many of the files provided reference this abbreviation or the first portion of it. The parts of the abbreviation can be interpreted as follows: 2011 is the year being modeled, "e" stands for evaluation case meaning it uses year-specific data for EGUs and fires, "h" means it is the fourth instance of the modeling platform, cb6v2 means it used version 2 of the CB6 air quality model speciation, "v6" corresponds to the 2011 modeling platform, and "11g" denotes that the meteorological data are for 2011, while g corresponds to the meteorological model version and configuration. Future model runs of 2011 or 2017 will have different abbreviations. The 2017 case that is comparable to this 2011 case is 2017eh_cb6v2_v6_11g. Thus, the 2011v6.2 platform includes the cases 2011eh_cb6v2_v6_11g and 2017eh_cb6v2_v6_11g. The 2011v6.0 preliminary modeling platform included the cases 2011ed_cb6v2_v6_11g and 2018ed_cb6v2_v6_11g.

**Items for which EPA requested Comment**

The EPA has requested comments on various aspects of the emissions modeling platform. These aspects are described below, along with suggestions regarding which files to use to support the review of the specific aspects of the emissions platform.

**Emissions Modeling Methods:** EPA used the Sparse Matrix Operator Kernel Emissions (SMOKE) modeling system version 3.6.5 to prepare data for air quality modeling for the 2018ed_v6_11f case. More information about SMOKE including descriptions of input data formats is available from http://cmascenter.org/smoke/. The specific methods and settings for SMOKE are embodied in the scripts used to run each sector. The scripts to run smoke for the cases can be found in the directory ftp://ftp.epa.gov/EmisInventory/2011v6/v2platform/smoke_scripts_utils/. Emissions modeling methods are also documented in the 2011v6.2 Emissions Modeling TSD.

**2011 and 2017 Emission Values:** The EPA requests comment on the criteria air pollutant (CAP) 2011 emissions and projected 2017 emissions in the modeling inventories, with a focus on ozone precursors such as $NO_x$ and VOC. The EPA will accept comments on other CAPs and on hazardous air pollutants (HAPs), as they are included in the inventories, but these are not the focus of this effort. National inventory files can be found in the following compressed zip files:

- Point source emissions: 2011eh_v6_11g_inputs_point.zip, 2017eh_v6_11g_inputs_point.zip, with state-specific zips in the directory point_by_state;
- Continuous Emissions Monitoring System data: 2011eh_v6_11g_inputs_cem.zip, 2017eh_v6_11g_inputs_cem.zip;

- <u>Nonpoint source emissions</u>: 2011eh_v6_11g_inputs_nonpoint.zip, 2017eh_v6_11g_inputs_nonpoint.zip with state-specific zips in <u>nonpoint_by_state</u>;
- <u>Nonroad source emissions</u>: (Note: for 2011, only Delaware has changed since the v1platform) 2011eh_v6_11g_inputs_nonroad_part1.zip; 2011eh_v6_11g_inputs_nonroad_part2.zip, 2017eh_v6_11g_inputs_nonroad.zip
- <u>Onroad activity data</u>: 2011eh_v6_11g_inputs_onroad.zip, 2017eh_v6_11g_inputs_onroad.zip;
- <u>Onroad mobile source emissions</u>: the onroad subdirectories contain national files of CAPs and speciated PM, along with state-specific zip files; and
- <u>Non-US emissions</u>: (including inventories for Canada, Mexico, and offshore sources) 2011eh_v6_11g_inputs_oth.zip, 2017eh_v6_11g_inputs_oth.zip.

In the Flat File 2010 (FF10) format files, the annual emissions values are located in the ANN_VALUE column. Some emission inventories (e.g., nonroad) may also have values filled in to the monthly value columns (e.g., JAN_VALUE, FEB_VALUE, …, DEC_VALUE). Note that all of the emission values in the flat files are in units of tons. The EPA requests comment on both the annual and monthly emissions values, where applicable. The Flat File 2010 (FF10) formats are defined for nonpoint (including nonroad) and point sources at these locations:

https://www.cmascenter.org/smoke/documentation/3.6.5/html/ch08s02s08.html#d0e40196
https://www.cmascenter.org/smoke/documentation/3.6.5/html/ch08s02s04.html#d0e37959

Summaries of emissions by state and county are provided to aid in the review of emissions values.  State total emissions for each modeling sector, including speciated emissions, can be found in the summary reports 2011eh_cb6v2_v6_11g_state_sector_totals.xlsx and 2017eh_cb6v2_v6_11g_state_sector_totals.xlsx.

County total annual and monthly emissions for all modeling sectors can be found the summary reports 2011eh_county_monthly_report.xlsx and 2017eh_county_monthly_report.xlsx.  A county by sector level comparison of the 2011v6.0 platform released in the 2013 and 2014 Emissions Modeling Platform NODAs with the 2011v6.2 platform cases are provided in 2011ed_2018ed_2011eh_2017eh_county_annual_totals.xlsx.

State, sector, and SCC level emission summaries and onroad mobile source activity data that include SCC descriptions are also available in the <u>reports</u> directory: 2011eh_state_fullSCC_summary.xlsx, 2011v6.0_v6.2_onroad_emis_activity_state_SCC_summary.xlsx, and 2011v6.0_v6.2_point_nonpoint_nonroad_state_SCC_summary.xlsx.

State and sector-specific daily $NO_x$ and VOC emissions are available in 2011eh_2017eh_state_sector_daily_nox_voc.xlsx and total $NO_x$ and VOC emissions are available in 2011eh_2017eh_state_sector_daily_nox_voc.xlsx.  A complete list of the provided summaries is at the end of this document.

**Emission Values for EGUs:**  The EPA requests comment on the IPM version 5.14 input assumptions, the associated NEEDS database, 2018 unit-level parsed files, flat file inputs, the 2017 flat file, and cross references for matching between IPM and the NEI. The following files related to this part of the request for comment are provided at http://www.epa.gov/powersectormodeling/psmodel514.html:

- needs_v514.xlsx: National Electric Energy Data System (NEEDS) database input to IPM version 5.14 that contains the generation unit records used to construct the "model" plants that represent existing and planned/committed units in EPA modeling applications of IPM, along with basic geographic, operating, air emissions, and other data on these generating units;
- EPA_Base_Case_v514_Incremental_Documentation.pdf: Incremental documentation for NEEDS v5.14;
- Web-Ready_Parsed_File_EPA5-13_Base_Case_2018.xlsx: A file showing the IPM results approximated down to the generating unit level;
- Adjusted2017.pdf: Documentation of what was adjusted in the 2018 result to create 2017 emissions;
- FlatFile_Inputs.xlsx: A spreadsheet of lookup table data used by IPM v5.14 to convert the state level power estimates to the detailed flat file information needed by SMOKE;
- FlatFile_Methodology.pdf: Documentation of how the SMOKE flat file is created by IPM v5.14; and
- Flatfile_2017_20150319_23mar2015_v2.csv: The emission inventory flat file based on output by IPM v5.14 that can be input to SMOKE for air quality modeling.

These additional files are provided in the docket for this notice:

- ipm_to_flat_file_xref_2011NEIv2_IPM5.14_20150113.xlsx: The version of the IPM to NEI flat file cross reference that was used with IPM v5.14.
- ipm_to_flat_file_xref_2011NEIv2_Updated_20150710.xlsx: An updated version of the IPM to flat file cross reference that will be used for scenarios that will be created with IPM in the future. This version should be used as the starting point for comments.

**Inputs and activity data used to develop mobile source emission inventories:** The EPA requests comment on the mobile source model input data used to develop the projected future mobile source emission inventories. These include both the databases used to create emission factors and the vehicle miles traveled and vehicle population activity data used to compute the emissions. Of particular interest are county total vehicle miles traveled, the mixture of vehicle types in 2017, and changes to the inspection and maintenance programs. The national onroad activity datasets can be found in the files 2011eh_v6_11g_inputs_onroad.zip and 2017eh_v6_11g_inputs_onroad.zip. Alternative activity data should be provided in SMOKE FF10 activity data format, but can be uploaded to the docket in .csv or .xlsx format. MOVES input databases for representative counties are available

in the onroad subdirectory or 2011emissions and 2017emissions, respectively. Alternative MOVES input data other than activity data should be provided as MOVES databases for each affected county. Contact Alison Eyth at eyth.alison@epa.gov for instructions if you would like to submit MOVES databases. Additional information on data and methods used for mobile sources is available the 2011 NEI version 2 TSD and in the Emissions Modeling TSD.

**Projection data and methods**. The EPA seeks comment on the data used to project point and nonpoint source emissions from 2011 to 2017, and on the methods and assumptions used to implement the projections. In this context, nonpoint source emissions are inclusive of commercial marine vessel, railroad, and other nonpoint emissions. In particular, EPA seeks comment on its assumptions regarding the manner in which specific consent decrees and state- or locality-specific control programs will be implemented. Projection methods are described in the Emissions Modeling TSD. Summaries are provided in the report 2017eh_CoST_Summaries_state.xlsx. The detailed data used to project emissions of various sectors with the Control Strategy Tool can be found in the file 2017eh_CoST_Projection_packets.zip.

**Existing 2011 Control Techniques**: Control techniques for a unit independent of pollutants can be found in the point source inventory flat files in 2011eh_v6_11g_inputs_point.zip, 2017eh_v6_11g_inputs_point.zip, and in the state-specific extractions of these data. The point source flat files specify the control techniques specific to each pollutant in the CONTROL_IDS and CONTROL_MEASURES columns with levels of reduction in the ANN_PCT_RED column.

**Temporal allocation:** The annual emissions in the modeling inventories are allocated into hourly values for air quality modeling. Except for electric generating units, factors for the temporal allocation of emissions to hours are the same in 2011 as in 2017. Day-specific EGU totals for units without CEMS are available in the 2011 SMOKE input file ptipm_ff10_noncem_2011eg_Nov19_2014_29jan2015_v2, and for 2017 in the SMOKE input file ptipm_ff10_noncem_2017eh_final_adj_29apr2015_v0. Emission totals by county, sector, and month can be found in the county-month-sector reports 2011eh_county_monthly_report.xlsx and 2017eh_county_monthly_report.xlsx. Temporal profiles are available in ancillary_data/ge_dat_for_2011v2_temporal.zip. Summaries of the main temporal profiles used by sector are available in the Emissions Modeling TSD. Alternative temporal profile and temporal cross reference data should be provided in a format compatible with SMOKE as specified in https://www.cmascenter.org/smoke/documentation/3.6.5/html/ch08s03.html.

The file 2017eh_v6_11g_inputs_cem.zip contains hourly CEMS-style emissions for the ptegu sector. These data are based on the hourly temporal patterns derived from the 2011 hourly CEMS data available on EPA's Clean Air Markets Program Data website (ampd.epa.gov) that are adjusted to match the 2017 emissions projected by IPM 5.14. Seasonal (winter/summer) to hour temporal factors based on 2011 CEM sources were applied to the seasonal 2018 IPM source emissions for sources that could

be matched to ORIS Facility and Boiler IDs.  The state-specific onroad inventories and the nonroad inventories discussed above include monthly emissions for those sectors.

**Spatial Surrogates:** County-level emissions in the modeling inventories are allocated onto air quality model grid cells with spatial surrogates.  The same spatial surrogate data are used for both 2011 and 2017. The spatial surrogates and documentation for these can be found in the directory ftp://ftp.epa.gov/EmisInventory/2011v6/v2platform/spatial_surrogates/.  The formats for the spatial surrogate files are in the SMOKE User's Manual on this page: http://www.cmascenter.org/smoke/documentation/3.6.5/html/ch08s04s02.html.  Please provide any alternative spatial surrogates or cross-reference data in a format compatible with SMOKE.

**Chemical Speciation:** Prior to air quality modeling, the inventory pollutants such as $NO_x$, $PM_{2.5}$, and VOC need to be allocated into the chemical species used by the air quality model through the application of speciation profiles. The speciation profiles for the platform are consistent with version 4.4 of the SPECIATE database. Some updates to speciation data are made for the 2017 case as compared to 2011 for mobile sources.  The EPA requests comment on the speciation profiles used in the 2011v6.2 modeling platform, as well as any information that could help improve the speciation of oil and gas emissions in both the eastern and western United States in 2017. Oil and gas speciation information, along with VOC to TOG adjustment factors that are used to compute methane emissions, would be of the most use at the county or oil/gas basin level of detail and also for each distinct process at oil and gas drilling/production facilities (e.g., glycol dehydrators).

Speciated emissions by state and sector are shown in the reports 2011eh_cb6v2_v6_11g_state_sector_totals.xlsx and 2017eh_cb6v2_v6_11g_state_sector_totals.xlsx. Speciation profiles for CB6 can be found in ge_dat_for_2011v2_speciation_cb6.zip under ancillary_data.  Speciation profile summaries are included in the Emissions Modeling TSD. The formats for speciation data are provided in the SMOKE User's Manual on this page: http://www.cmascenter.org/smoke/documentation/3.6.5/html/ch08s05.html. Please provide any alternative speciation data in a format compatible with SMOKE.

**Alphabetic list and contents of provided summary reports:**

1. 2011v6.0_v6.2_onroad_emis_activity_state_SCC_summary.xlsx: Onroad emissions and activity data by comparison SCC for the 2011v6.0 and 2011v6.2 platforms

2. 2011v6.0_v6.2_point_nonpoint_nonroad_state_SCC_summary.xlsx: Point, nonpoint, and nonroad source emissions by state and SCC with descriptions for the 2011v6.0 and 2011v6.2 platforms

3. 2011ed_2018ed_2011eh_2017eh_county_annual_totals.xlsx: County total annual emissions by sector for the 2011v6.0 and 2011v6.2 platforms

4. 2011eh_2017eh_state_sector_daily_nox_voc.xlsx: Daily NOx and VOC emissions by state and sector for the 2011v6.2 platform

5. <u>2011eh_2017eh_state_total_daily_nox_voc.xlsx</u>: Daily total NOx and VOC emissions for the 2011v6.2 platform

6. <u>2011eh_cb6v2_v6_11g_state_sector_totals.xlsx</u>: Inventory and speciated emissions by state and sector for 2011eh CB6 case

7. <u>2011eh_county_monthly_report.xlsx</u>: Emissions by county, month, and sector for 2011eh case

8. <u>2011eh_county_SCC7_sector_CAP_PM.xlsx</u>: CAP and speciated PM emissions by county, sector, and truncated SCC

9. <u>2011eh_state_fullSCC_summary.xlsx</u>: A state+SCC summary for CAPs for all sectors in the 2011eh case, including biogenics, agricultural fires, prescribed fires and wild fires.  Also has ptnonipm separated from pt_oilgas.

10. <u>2017eh_cb6v2_v6_11g_state_sector_totals.xlsx</u>: Inventory and speciated emissions by state and sector for 201yeh CB6 case

11. <u>2017eh_CoST_Summaries_state.xlsx</u>: Summaries of impacts of projection packets by state

12. <u>2017eh_county_monthly_report.xlsx</u>: Emissions by county, month, and sector for 2017eh case

# Tab 10

Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS;
80 FR 75706 (December 3, 2015)



# FEDERAL REGISTER

Vol. 80          Thursday,

No. 232          December 3, 2015

---

Part II

Environmental Protection Agency

40 CFR Parts 52, 78, and 97
Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS;
Proposed Rules

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 52, 78, and 97

**[EPA–HQ–OAR–2015–0500; FRL–9935–25–OAR]**

**RIN 2060–AS05**

## Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The primary purpose of this proposal is to address interstate air quality impacts with respect to the 2008 ozone National Ambient Air Quality Standards (NAAQS). The EPA promulgated the Cross-State Air Pollution Rule (CSAPR) on July 6, 2011, to address interstate transport of ozone pollution under the 1997 ozone NAAQS and fine particulate matter ($PM_{2.5}$) under the 1997 and 2006 $PM_{2.5}$ NAAQS. The EPA is proposing to update CSAPR to address interstate emission transport with respect to the 2008 ozone NAAQS. This proposal also responds to the July 28, 2015 remand by the Court of Appeals for the District of Columbia Circuit of certain states' ozone-season nitrogen oxides ($NO_X$) emissions budgets established by CSAPR. This proposal also updates the status of certain states' outstanding interstate ozone transport obligations with respect to the 1997 ozone NAAQS, for which CSAPR provided a partial remedy.

This proposal finds that ozone season emissions of $NO_X$ in 23 eastern states affect the ability of downwind states to attain and maintain the 2008 ozone NAAQS. These emissions can be transported downwind as $NO_X$ or, after transformation in the atmosphere, as ozone. For these 23 eastern states, the EPA proposes to issue Federal Implementation Plans (FIPs) that generally update the existing CSAPR $NO_X$ ozone-season emissions budgets for electricity generating units (EGUs) and implement these budgets via the CSAPR $NO_X$ ozone-season allowance trading program. The EPA would finalize a FIP for any state that does not have an approved SIP addressing its contribution by the date this rule is finalized. The EPA is proposing implementation starting with the 2017 ozone season. In conjunction with other federal and state actions, these requirements would assist downwind states in the eastern United States in attaining and maintaining the 2008 ozone standard.

**DATES:** Comments must be received on or before January 19, 2016. Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before January 4, 2016.

*Public hearing.* The EPA will be holding one public hearing on the proposed Cross-State Air Pollution Rule Update for the 2008 Ozone National Ambient Air Quality Standards. The hearing will be held to accept oral comments on the proposal. The hearing will be held on December 17, 2015 in Washington, DC. The hearing will begin at 9 a.m. EST and will conclude at 8 p.m. EST. Additional information for this public hearing is available in a separate **Federal Register** notice and at *http://www2.epa.gov/airmarkets/proposed-cross-state-air-pollution-update-rule.*

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2015–0500, to the *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or withdrawn. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Mr. David Risley, Clean Air Markets Division, Office of Atmospheric Programs (Mail Code 6204M), Environmental Protection Agency, 1200 Pennsylvania Avenue NW., Washington, DC 20460; telephone number: (202) 343–9177; email address: *Risley.David@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Preamble Glossary of Terms and Abbreviations

The following are abbreviations of terms used in the preamble.

CAA or Act   Clean Air Act
CAIR   Clean Air Interstate Rule
CAMx   Comprehensive Air Quality Model with Extensions
CBI   Confidential Business Information
CEMS   Continuous Emission Monitoring Systems
CFR   Code of Federal Regulations
CSAPR   Cross-State Air Pollution Rule
EGU   Electric Generating Unit
EPA   U.S. Environmental Protection Agency
FIP   Federal Implementation Plan
FR   Federal Register
GWh   Gigawatt hours
ICR   Information Collection Request
IPM   Integrated Planning Model
Km   Kilometer
lb/mmBtu   Pounds per Million British Thermal Unit
LNB   Low-$NO_X$ Burners
mmBtu   Pounds per Million British Thermal Unit
MOVES   Motor Vehicle Emission Simulator
NAAQS   National Ambient Air Quality Standard
NBP   $NO_X$ Budget Trading Program
NEI   National Emission Inventory
$NO_X$   Nitrogen Oxides
NODA   Notice of Data Availability
NSPS   New Source Performance Standard
OFA   Overfire Air
$PM_{2.5}$   Fine Particulate Matter
PPB   Parts Per Billion
RIA   Regulatory Impact Analysis
SC–$CO_2$   Social Cost of Carbon
SCR   Selective Catalytic Reduction
SIP   State Implementation Plan
SMOKE   Sparse Matrix Operator Kernel Emissions
SNCR   Selective Non-catalytic Reduction
$SO_2$   Sulfur Dioxide
TSD   Technical Support Document

## Table of Contents

I. Executive Summary
  A. Purpose of Regulatory Action
  B. Major Provisions
  C. Benefits and Costs
II. General Information
  A. To Whom Does the Proposed Action Apply
III. Air Quality Issues Addressed and Overall Approach for the Proposed Rule
  A. The Interstate Transport Challenge Under the 2008 Ozone Standard
    1. Background on the Overall Nature of the Interstate Ozone Transport Problem
    2. Events Affecting Application of the Good Neighbor Provision for the 2008 Ozone NAAQS
  B. Proposed Approach To Address Ozone Transport Under the 2008 Ozone NAAQS via FIPS
    1. The CSAPR Framework
    2. Partial Versus Full Resolution of Transport Obligation
    3. Why We Focus on Eastern States
    4. Short-Term $NO_X$ Emissions
  C. Responding to the Remand of CSAPR $NO_X$ Ozone-Season Emissions Budgets

D. Addressing the Status of Outstanding Transport Obligations for the 1997 Ozone NAAQS
IV. Legal Authority
A. EPA's Authority for the Proposed Rule
1. Statutory Authority
2. FIP Authority for Each State Covered by the Proposed Rule
V. Analyzing Downwind Air Quality and Upwind-State Contributions
A. Overview of Air Quality Modeling Platform
B. Emission Inventories
1. Foundation Emission Inventory Data Sets
2. Development of Emission Inventories for EGUs
3. Development of Emission Inventories for Non-EGU Point Sources
4. Development of Emission Inventories for Onroad Mobile Sources
5. Development of Emission Inventories for Commercial Marine Category 3 (Vessel)
6. Development of Emission Inventories for Other Nonroad Mobile Sources
7. Development of Emission Inventories for Nonpoint Sources
C. Air Quality Modeling to Identify Nonattainment and Maintenance Receptors
D. Pollutant Transport From Upwind States
1. Air Quality Modeling To Quantify Upwind State Contributions
2. Application of Screening Threshold
VI. Quantifying Upwind-State EGU NOₓ Reduction Potential to Reduce Interstate Ozone Transport for the 2008 NAAQS
A. Introduction
B. NOₓ Mitigation Strategies
1. EGU NOₓ Mitigation Strategies
2. Non-EGU NOₓ Mitigation Strategies
C. Uniform EGU Cost Thresholds for Assessment
D. Assessing Cost, EGU NOₓ Reductions, and Air Quality
E. Quantifying State Emissions Budgets
VII. Implementation Using the Existing CSAPR Ozone-Season Allowance Trading Program and Relationship to Other Rules
A. Background
B. FIP Requirements and Key Elements of the CSAPR Trading Programs
1. Applicability
2. State Budgets
3. Allocations of Emission Allowances
4. Variability Limits, Assurance Levels, and Penalties
5. Implementation Approaches for Transitioning the Existing CSAPR NOₓ Ozone-Season Program to Address Transport for a Newer NAAQS
6. Compliance Deadlines
7. Monitoring and Reporting and the Allowance Management System
8. Recordation of Allowances
C. Submitting a SIP
1. 2018 SIP Option
2. 2019 and Beyond SIP Option
3. SIP Revisions That Do Not Use the CSAPR Trading Program
4. Submitting a SIP to Participate in CSAPR for States Not Included in This Proposal
D. Title V Permitting
E. Relationship to Other Emission Trading and Ozone Transport Programs
1. Interactions With Existing CSAPR Annual Programs, Title IV Acid Rain Program, NOₓ SIP Call, 176A Petition, and Other State Implementation Plans
2. Other Federal Rulemakings
VIII. Costs, Benefits, and Other Impacts of the Proposed Rule
IX. Description of Proposed Changes to the Regulatory Text for the CSAPR FIPs and CSAPR Trading Program
X. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Determinations Under Section 307(b)(1) and (d)

# I. Executive Summary

The EPA promulgated the original Cross-State Air Pollution Rule (CSAPR) on July 6, 2011, to address interstate ozone transport under the 1997 ozone National Ambient Air Quality Standards (NAAQS). The EPA is proposing to update CSAPR to address interstate emission transport with respect to the 2008 ozone NAAQS. The 2008 ozone NAAQS is an 8-hour standard that was set at 75 parts per billion (ppb). *See* 73 FR 16436 (March 27, 2008).

## A. Purpose of Regulatory Action

The purpose of this rulemaking is to reduce interstate emission transport that significantly contributes to nonattainment, or interferes with maintenance, of the 2008 ozone NAAQS in the eastern U.S. To achieve this goal, this proposal would further limit ozone season (May 1 through September 30) NOₓ emissions from electric generating units (EGUs) in 23 eastern states.

Ozone causes a variety of negative effects on human health, vegetation, and ecosystems. In humans, acute and chronic exposure to ozone is associated with premature mortality and a number of morbidity effects, such as asthma exacerbation. Ozone exposure can also negatively impact ecosystems.

Studies have established that ozone occurs on a regional scale (*i.e.*, thousands of kilometers) over much of the eastern U.S., with elevated concentrations occurring in rural as well as metropolitan areas. To reduce this regional-scale ozone transport, assessments of ozone control approaches have concluded that NOₓ control strategies are most effective. Further, studies have found that EGU NOₓ emission reductions can be effective in reducing individual 8-hour peak ozone concentrations and in reducing 8-hour peak ozone concentrations averaged across the ozone season.[1] Specifically, studies indicate that EGUs' emissions, which are generally released higher in the air column through tall stacks and are significant in quantity, may disproportionately contribute to long-range transport of ozone pollution on a per-ton basis.[2]

Clean Air Act (CAA or the Act) section 110(a)(2)(D)(i)(I), sometimes called the "good neighbor provision," requires states[3] to prohibit emissions that will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any primary or secondary NAAQS.

The EPA originally finalized CSAPR on July 6, 2011. *See* 76 FR 48208 (August 8, 2011). CSAPR addresses the 1997 ozone NAAQS and the 1997 and 2006 fine particulate matter (PM₂.₅) NAAQS.[4] (See section IV for a discussion of CSAPR litigation and implementation.)

CSAPR provides a 4-step process to address the requirements of the good neighbor provision for ozone or PM₂.₅ standards: (1) Identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (*i.e.*, NAAQS); (2) determining which upwind states contribute to these identified problems in amounts sufficient to "link" them to the downwind air quality problems; (3)

---

[1] Summertime Zero-Out Contributions of regional NOₓ and VOC emissions to modeled 8-hour ozone concentrations in the Washington, DC; Philadelphia, PA, and New York City MSAs. "Contributions of regional air pollutant emissions to ozone and fine particulate matter-related mortalities in eastern U.S. urban areas".

[2] Butler, et al., "Response of Ozone and Nitrate to Stationary Source Reductions in the Eastern USA."

[3] The term "state" has the same meaning as provided in CAA section 302(d) which specifically includes the District of Columbia.

[4] CSAPR did not evaluate the 2008 ozone standard because the 2008 ozone NAAQS was under reconsideration during the analytic work for the rule.

for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to downwind nonattainment or interfere with downwind maintenance of a standard by quantifying available upwind emission reductions and apportioning upwind responsibility among linked states; and (4) for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, reducing the identified upwind emissions via regional emissions allowance trading programs. Each time the ozone or $PM_{2.5}$ NAAQS are revised, this process can be applied for the new NAAQS. In this action, the EPA proposes to apply this 4-step process to update CSAPR with respect to the 2008 ozone NAAQS.

Application of this process with respect to the 2008 ozone NAAQS provides the analytic basis for proposing to further limit ozone season EGU $NO_X$ emissions in 23 eastern states. However, the EPA seeks comment on this proposal from all states and stakeholders.

The requirements of this proposal are in addition to existing, on-the-books EPA and state environmental regulations, including the Clean Power Plan (CPP), which is included in the base case for this proposal. On August 3, 2015, President Obama and EPA announced the Clean Power Plan—a historic and important action on emissions that contribute to climate change. The CPP reduces carbon pollution from the power sector. Due to the compliance timeframes of the CPP, the EPA does not anticipate significant interactions with the CPP and the near-term ozone season EGU $NO_X$ emission reduction requirements under this proposal. However, states and utilities will be able to make their compliance plans with both programs in mind. Further discussion of the CPP is provided later in this proposal.

In addition to reducing interstate ozone transport with respect to the 2008 ozone NAAQS, this proposal also addresses the status of outstanding interstate ozone transport obligations with respect to the 1997 ozone NAAQS. Under CSAPR, the EPA promulgated FIPs for 25 states to address ozone transport under the 1997 NAAQS. For 11 of these states,[5] in the 2011 final rule, CSAPR quantified ozone season $NO_X$ emission reductions that were not

necessarily sufficient to eliminate all significant contribution to downwind nonattainment or interference with downwind maintenance of the 1997 ozone NAAQS downwind. Relying on base case modeling completed for this proposed rulemaking, this action proposes to find that the reductions required by those 11 FIPs were in fact sufficient to eliminate such significant contributions to downwind air quality problems for that standard.

This action also responds to the July 28, 2015 opinion of the Court of Appeals for the District of Columbia (D.C. Circuit) remanding without vacatur 11 states' CSAPR phase 2 $NO_X$ ozone-season emissions budgets. *EME Homer City Generation, L.P.* v. *EPA,* No. 795 F.3d 118, 129–30, 138 (*EME Homer City II*). This action proposes to respond to that remand by replacing the budgets invalidated by the D.C. Circuit for nine states and by removing two states from the CSAPR $NO_X$ ozone-season trading program.[6]

On October 1, 2015, the EPA strengthened the ground-level ozone NAAQS, based on extensive scientific evidence about ozone's effects on public health and welfare. This proposal to reduce interstate emission transport with respect to the 2008 ozone NAAQS is a separate and distinct regulatory action and is not meant to address the CAA's good neighbor provision with respect to the 2015 ozone NAAQS final rule.

The Clean Air Act gives states the responsibility to address interstate pollution transport through good neighbor State Implementation Plans (SIPs). The EPA supports state efforts to submit good neighbor SIPs for the 2008 ozone NAAQS and has shared information with states to facilitate such SIP submittals. However, in the event that good neighbor SIPs are not submitted or cannot be approved, this rulemaking proposes Federal Implementation Plans (FIPs), as required under section 110(c)(1) of the CAA, to establish and implement EGU $NO_X$ reductions identified in this rule.

On July 13, 2015, the EPA published a rule finding that 24 states[7] failed to make complete submissions that

address the requirements of section 110(a)(2)(D)(i)(I) related to the interstate transport of pollution as to the 2008 ozone NAAQS. See 80 FR 39961 (July 13, 2015) (effective August 12, 2015). The finding action triggered a 2-year deadline for the EPA to issue FIPs to address the good neighbor provision for these states by August 12, 2017.

The EPA would finalize a FIP for a state that we find has failed to submit a complete good neighbor SIP or for which we issue a final rule disapproving its good neighbor SIP.

The EPA proposes to align implementation of this proposed rule with relevant attainment dates for the 2008 ozone NAAQS, as required by the D.C. Circuit's decision *North Carolina* v. *EPA.*[8] The EPA's final 2008 Ozone NAAQS SIP Requirements Rule[9] revised the attainment deadline for ozone nonattainment areas currently designated as moderate from December 2018 to July 2018 in accordance with the D.C. Circuit's decision in *NRDC* v. *EPA.*[10] Because July 2018 falls during the 2018 ozone season, the 2017 ozone season will be the last full season from which data can be used to determine attainment of the NAAQS by the July 2018 attainment date. We believe that *North Carolina* compels the EPA to identify upwind reductions and implementation programs to achieve these reductions, to the extent possible, for the 2017 ozone season.

In order to apply the first and second steps of the CSAPR 4-step process to interstate transport for the 2008 ozone NAAQS, the EPA used air quality modeling to project ozone concentrations at air quality monitoring sites to 2017. The EPA evaluated these modeling projections for the air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2008 ozone NAAQS. The EPA then used air quality modeling to evaluate contributions from upwind states to these downwind receptors.

CSAPR and previous federal transport rules, such as the $NO_X$ SIP Call and the Clean Air Interstate Rule (CAIR)—discussed in detail below—addressed collective contributions of ozone pollution from states in the eastern U.S. These rules did not address contributions in the 11 western

---

[5] Alabama, Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Tennessee, and Texas. (See CSAPR Final Rule, 76 FR at 48220, and the CSAPR Supplemental Rule, 76 FR at 80760, December 27, 2011).

[6] The EPA proposes to replace emissions budgets for Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia, and West Virginia. The EPA proposes to remove Florida and South Carolina from the CSAPR ozone-season $NO_X$ trading program.

[7] The states included in this finding of failure to submit are: Alabama, Arkansas, California, Florida, Georgia, Iowa, Illinois, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Vermont, Virginia, and West Virginia.

[8] 531 F.3d 896, 911–12 (D.C. Cir. 2008) (holding that EPA must coordinate interstate transport compliance deadlines with downwind attainment deadlines).

[9] 80 FR 12264, 12268; 40 CFR 51.1103.

[10] 777 F.3d 456, 469 (D.C. Cir. 2014).

contiguous United States.[11] There may be additional criteria to evaluate regarding collective contribution of transported air pollution in the West, such as those raised in EPA-state meetings to discuss approaches for determining how emissions in upwind states impact air quality in downwind states.[12] Given that the near-term 2017 implementation timeframe constrains the opportunity to conduct evaluations of additional criteria, the EPA proposes to focus this rulemaking on eastern states. This focus would not relieve western states of obligations to address interstate transport under the Act. The EPA and western states, working together, would continue to evaluate interstate transport on a case-by-case basis. While the EPA proposes to focus this rulemaking on eastern states, we seek comment on whether to include western states in this rule.

To apply the third step of the 4-step process, the EPA assessed ozone season $NO_X$ reductions that are achievable for the 2017 ozone season. This assessment reveals that there is significant EGU $NO_X$ reduction potential that can be achieved for 2017 at reasonable cost, which would make meaningful and timely improvements in ozone air quality. The EPA applied a multi-factor test to evaluate EGU $NO_X$ reduction potential for 2017 and proposes to quantify EGU $NO_X$ ozone-season emissions budgets reflecting emission reductions from cost-effective pollution control measures achievable for the 2017 ozone season (estimated to obtain $NO_X$ reductions at a uniform cost of approximately $1,300 per ton).

The EPA is not proposing to quantify non-EGU emission reductions to reduce interstate ozone transport for the 2008 ozone NAAQS at this time because we are uncertain that significant $NO_X$ mitigation is achievable from non-EGUs for the 2017 ozone season. The EPA will continue to evaluate whether non-EGU emission reductions can be achieved on a longer time-frame at a future date. However, as explained later in this document, this proposal seeks comment on a preliminary evaluation of stationary non-EGU $NO_X$ mitigation potential and on allowing a state to include legacy $NO_X$ SIP Call non-EGUs in the CSAPR trading program by adopting a SIP revision that the EPA would approve as modifying the CSAPR

trading program provisions with regard to that state.

To evaluate full elimination of a state's significant contribution to nonattainment and interference with maintenance, EGU and non-EGU ozone season $NO_X$ reductions should both be evaluated. To the extent the air quality impacts persist after implementation of the $NO_X$ reductions identified in this rulemaking, a final judgment on whether the proposed EGU $NO_X$ reductions represent a full or partial elimination of a state's good neighbor obligation for the 2008 NAAQS is therefore subject to an evaluation of the contribution to interstate transport from additional non-EGU emission sectors.

However, the EPA believes that it is beneficial to implement, without further delay, EGU $NO_X$ reductions since they are achievable in the near term. Generally, notwithstanding that additional reductions may be required to fully address the states' interstate transport obligations, the proposed $NO_X$ emission reductions are needed for these states to eliminate their significant contribution to nonattainment and interference with maintenance of the 2008 ozone NAAQS and needed for downwind states with ozone nonattainment areas that are required to attain the standard by 2018.[13]

At the same time, the EPA also notes that section 110(a)(2)(D)(i)(I) of the CAA only requires upwind states to prohibit emissions that will significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. It does not shift to upwind states the full responsibility for ensuring that all areas in other states attain and maintain the NAAQS. Downwind states also have control responsibilities because, among other things, the Act requires each state to adopt enforceable plans to attain and maintain air quality standards. The requirements established for upwind states through this proposed rule will supplement downwind states' local emission control strategies that, in conjunction with the certainty on maximum allowable upwind state EGU emissions that this proposed rule would provide, promote attainment and maintenance of the 2008 ozone NAAQS.

To meet the fourth step of the 4-step process (i.e., implementation) the proposed FIPs contain enforceable measures necessary to achieve the emission reductions in each state. The proposed FIPs would require power plants in affected states (i.e., states that

significantly contribute to ozone transport in the east) to participate in the CSAPR $NO_X$ ozone-season allowance trading program (as modified by the proposed changes described elsewhere in this notice). CSAPR's trading programs and EPA's prior emissions trading programs provide a proven implementation framework for achieving emission reductions. In addition to providing environmental certainty (i.e., a cap on emissions), these programs also provide regulated sources with flexibility in choosing compliance strategies. By using the existing CSAPR $NO_X$ ozone-season allowance trading program, the EPA is proposing to use an implementation framework that was shaped by notice and comment in previous rulemakings and reflects the evolution of these programs in response to court decisions. Further, this program is familiar to the EGUs that will be regulated under this rule, which means that monitoring, reporting, and compliance will be done as it already is under CSAPR's current ozone-season and annual programs.[14]

These FIP requirements, if finalized, would begin with the 2017 ozone season and would continue for subsequent ozone seasons to ensure that upwind states included in this proposed rule meet their Clean Air Act obligation to address interstate emissions transport with respect to the 2008 ozone NAAQS for 2017 and future years. To the extent that emissions in an included state would otherwise exceed the promulgated emission level, these good neighbor EGU emissions limits will ensure that future emissions are consistent with states' ongoing good neighbor obligations. To the extent that emissions in an included state would be reduced for other reasons, for example planned lower-$NO_X$ emitting generation coming online, then those actions will help the state comply with its good neighbor requirements.

Generally, for states that would be affected by one of the FIPs proposed in this action and that are already included in the CSAPR $NO_X$ ozone-season trading program to address interstate ozone transport for the 1997 NAAQS, this action proposes to revise the existing part 97 regulations that define that program to incorporate lower EGU $NO_X$ ozone-season emissions budgets for each of the affected states in order to reduce ozone transport for the 2008

---

[11] For the purpose of this action, the western U.S. (or the West) consists of the 11 western contiguous states of Arizona, California, Colorado, Idaho, Montana, New Mexico, Nevada, Oregon, Utah, Washington, and Wyoming.

[12] For example, EPA-State meetings held in Research Triangle Park, NC on April 8, 2013 and Denver, Colorado on April 17, 2013.

[13] The proposed requirements for one state, North Carolina, would fully eliminate that state's significant contribution to downwind air quality problems.

[14] One state, Kansas, would have a new CSAPR ozone season source requirement under this proposal. Kansas currently participates in the CSAPR $NO_X$ and $SO_2$ annual programs. The remaining 22 states were included in the original CSAPR ozone-season program as to the 1997 ozone NAAQS.

ozone NAAQS.[15] If finalized, compliance with these lower emissions budgets for the 2008 ozone NAAQS would also satisfy compliance with the existing higher emissions budgets for the 1997 ozone NAAQS. Therefore, the EPA proposes to replace the existing CSAPR emissions budgets (*i.e.* for the 1997 ozone NAAQS) for the affected states with the lower emissions budgets proposed to reduce ozone transport for the 2008 ozone NAAQS. Compliance with the final lower emissions budgets for the 2008 ozone NAAQS would supersede compliance with the CSAPR NO$_X$ ozone-season budgets for the 1997 ozone NAAQS. This action would therefore respond to the remand of *EME Homer City II* with respect to the NO$_X$ ozone-season emissions budgets for nine states[16] by replacing the budgets declared invalid by the court with revised budgets designed to address the 2008 ozone NAAQS.

The proposed FIPs, if finalized, would not limit states' flexibility in meeting their CAA requirements, as any state included in this proposed rule can submit a good neighbor SIP at any time that, if approved by the EPA, could replace the FIP for that state. Additionally, CSAPR already provides states with the option to submit abbreviated SIPs to customize the methodology for allocating NO$_X$ ozone-season allowances while participating in the ozone-season trading program and we propose to continue that approach in this rule.

The EPA therefore proposes revisions to the Code of Federal Regulations, specifically 40 CFR part 97, subpart BBBBB (federal CSAPR NO$_X$ ozone-season trading program); 40 CFR 52.38(b) (rules on replacing or modifying the federal CSAPR NO$_X$ ozone-season trading program with a SIP); 40 CFR 52.540, 52.882, and 52.2140 (adding or limiting requirements for EGUs in certain individual states to participate in the CSAPR NO$_X$ ozone-season trading program); and 40 CFR 78.1 (modifying the list of decisions subject to administrative appeal procedures under part 78) to address interstate transport for the 2008 ozone NAAQS. In addition, various minor corrections are proposed to these CFR and other sections of parts 52, 78, and 97 relating to the CSAPR

ozone-season and annual trading programs.

The 23 eastern states for which the EPA proposes to promulgate FIPs to reduce interstate ozone transport as to the 2008 ozone NAAQS are listed in Table I–1.

TABLE I–A–1—PROPOSED LIST OF COVERED STATES FOR THE 2008 8-HOUR OZONE NAAQS

| State name |
| --- |
| Alabama |
| Arkansas |
| Illinois |
| Indiana |
| Iowa |
| Kansas |
| Kentucky |
| Louisiana |
| Maryland |
| Michigan |
| Mississippi |
| Missouri |
| New Jersey |
| New York |
| North Carolina |
| Ohio |
| Oklahoma |
| Pennsylvania |
| Tennessee |
| Texas |
| Virginia |
| West Virginia |
| Wisconsin |

For eastern states for which the EPA is not proposing FIPs in this action, the EPA notes that updates to the modeling for the final rule, made based on comments received on the proposal, could change the analysis as to which states significantly contribute to nonattainment or interfere with maintenance. In this regard, the final modeling could result in additional states being included in the final rule. Therefore, the EPA provides all data and methods necessary for all eastern states to comment on all aspects of this proposal in the Ozone Transport Policy Analysis TSD. This information includes EGU NO$_X$ ozone-season emissions budgets for all eastern states, in the event that final rule modeling demonstrates that additional states significantly contribute to downwind air quality problems.

The EPA notes that the annual PM$_{2.5}$ NAAQS was updated after CSAPR was promulgated (78 FR 306, January 15, 2013). However, this rulemaking does not address the 2012 PM$_{2.5}$ standard. The EPA acknowledges that, in *EME Homer City II,* the D.C. Circuit also remanded without vacatur the CSAPR phase 2 SO$_2$ emissions budgets as to four states. 795 F.3d at 129, 138. This proposal does not address the remand of

these CSAPR phase 2 SO$_2$ annual emissions budgets. The EPA intends to address the remand of the phase 2 SO$_2$ annual emissions budgets separately. The existing CSAPR emissions budgets and implementation programs (CSAPR SO$_2$ annual and NO$_X$ annual requirements), which address interstate transport for the 1997 and 2006 PM$_{2.5}$ NAAQS, continue to apply at this time.

*B. Major Provisions*

The major provision of this action are described in the remainder of this preamble and organized as follows: Section III describes the human health and environmental context, the EPA's overall approach for addressing interstate transport, and the EPA's response to the remand of certain CSAPR NO$_X$ ozone-season emissions budgets; section IV describes the EPA's legal authority for this action; section V describes the air quality modeling platform and emission inventories that the EPA used to identify downwind receptors of concern and upwind state ozone contributions to those receptors; section VI describes the EPA's proposed approach to quantify upwind state obligations in the form of EGU NO$_X$ emissions budgets; section VII details the implementation requirements including key elements of the CSAPR allowance trading program and deadlines for compliance; section VIII describes the expected costs, benefits, and other impacts of this proposed rule; section IX discusses proposed changes to the existing regulatory text for the CSAPR FIPs and the CSAPR trading programs; and section X discusses the statutes and executive orders affecting this rulemaking. The EPA invites comment on this proposed rulemaking.

*C. Benefits and Costs*

The proposed rule would achieve near-term emission reductions from the power sector, lowering ozone season NO$_X$ in 2017 by 85,000 tons, compared to baseline 2017 projections without the rule.

Consistent with Executive Order 13563, ''Improving Regulation and Regulatory Review,'' we have estimated the costs and benefits of the proposed rule. Estimates here are subject to uncertainties discussed further in the Regulatory Impact Analysis (RIA) in the docket. The estimated net benefits of the proposed rule at a 3 percent discount rate are $700 million to $1.2 billion (2011$). The non-monetized benefits include reduced ecosystem effects and reduced visibility impairment. Discussion of the costs and benefits of the proposal is provided in preamble section VIII, below, and in the RIA,

---

[15] One state, Kansas, would have a new CSAPR ozone season requirement under this proposal. The remaining 22 states were included in the original CSAPR ozone-season program as to the 1997 ozone NAAQS.

[16] The EPA proposes to replace emissions budgets for Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia, and West Virginia.

which is found in the docket for this proposed rulemaking. The EPA's estimate of the proposed rule's costs and quantified benefits is summarized in Table I.C–1, below.

#### TABLE I.C–1—SUMMARY OF COMPLIANCE COSTS, MONETIZED BENEFITS, AND MONETIZED NET BENEFITS OF THE PROPOSED RULE FOR 2017 (2011$)

| Description | Impacts at 3 percent discount rate ($ millions) |
|---|---|
| Annualized Compliance Costs [a] | $93. |
| Monetized benefits [b] | 700 to 1,200. |
| Net benefits (benefits-costs) | 620 to 1,200. |

[a] Total annualized social costs are estimated at a 3 percent discount rate. The social costs presented here reflect the EGU ozone season costs of complying with the proposed FIPs.

[b] Total monetized benefits are estimated at a 3 percent discount rate. The total monetized benefits reflect the human health benefits associated with reducing exposure to ozone and $PM_{2.5}$. It is important to note that the monetized benefits and co-benefits include many but not all health effects associated with pollution exposure. Benefits are shown as a range reflecting studies from Krewski *et al.* (2009) with Smith *et al.* (2009) to Lepeule *et al.* (2012) with Zanobetti and Schwartz (2008).

## II. General Information

### A. To whom does this action apply?

This proposed rule affects EGUs, and regulates the following groups:

| Industry group | NAICS [*] |
|---|---|
| Fossil fuel-fired electric power generation | 221112 |

[*] North American Industry Classification System.

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this action. This table lists the types of entities that the EPA is now aware could potentially be regulated by this action. Other types of entities not listed in the table could also be regulated. To determine whether your entity is regulated by this action, you should carefully examine the applicability criteria found in 40 CFR 97.504. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

## III. Air Quality Issues Addressed and Overall Approach for the Proposed Rule

### A. The Interstate Transport Challenge Under the 2008 Ozone Standard

1. Background on the Overall Nature of the Interstate Ozone Transport Problem

Interstate transport of $NO_X$ emissions poses significant challenges with respect to the 2008 ozone NAAQS in the eastern U.S. and thus presents a threat to public health and welfare.

a. Nature of Ozone and the Ozone NAAQS

Ground-level ozone is not emitted directly into the air, but is created by chemical reactions between $NO_X$ and volatile organic compounds (VOC) in the presence of sunlight. Emissions from electric utilities and industrial facilities, motor vehicles, gasoline vapors, and chemical solvents are some of the major sources of $NO_X$ and VOC.

Because ground-level ozone formation increases with temperature and sunlight, ozone levels are generally higher during the summer. Increased temperature also increases emissions of volatile man-made and biogenic organics and can indirectly increase $NO_X$ emissions as well (*e.g.,* increased electricity generation for air conditioning).

The 2008 primary and secondary ozone standards are both 75 parts per billion (ppb) as an 8-hour level. Specifically, the standards require that the 3-year average of the fourth highest 24-hour maximum 8-hour average ozone concentration may not exceed 75 ppb.

b. Ozone Transport

Studies have established that ozone formation, atmospheric residence, and transport occurs on a regional scale (*i.e.,* thousands of kilometers) over much of the eastern U.S., with elevated concentrations occurring in rural as well as metropolitan areas. While substantial progress has been made in reducing ozone in many urban areas, regional-scale ozone transport is still an important component of peak ozone concentrations during the summer ozone season.

The EPA has previously concluded in the $NO_X$ SIP Call, CAIR, and CSAPR that, for reducing regional-scale ozone transport, a $NO_X$ control strategy would be most effective. $NO_X$ emissions can be transported downwind as $NO_X$ or, after transformation in the atmosphere, as ozone. As a result of ozone transport, in any given location, ozone pollution levels are impacted by a combination of local emissions and emissions from upwind sources. The transport of ozone pollution across state borders compounds the difficulty for downwind states in meeting health-based air quality standards (*i.e.,* NAAQS).

Recent assessments of ozone, for example those conducted for the October 2015 Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (EPA–452/R–15–007) continue to show the importance of $NO_X$ emissions on ozone transport. This analysis is in the docket for this proposal and can be also found at the EPA's Web site at: *http://www3.epa.gov/ozonepollution/pdfs/20151001ria.pdf.*

There are five general categories of $NO_X$ emission sources: EGUs, non-EGU point, onroad mobile, non-road mobile, and area. Studies have found that EGU $NO_X$ emission reductions can be

effective in reducing individual 8-hour peak ozone concentrations and in reducing 8-hour peak ozone concentrations averaged across the ozone season. For example, a study that evaluates the effectiveness on ozone concentrations of EGU NOₓ reductions achieved under the NOₓ Budget Trading Program shows that regulating NOₓ emissions has been highly effective in reducing both ozone and dry-NO₃ concentrations during the ozone season. Further, this study indicates that EGU emissions, which are generally released higher in the air column through tall stacks and are significant in quantity, may disproportionately contribute to long-range transport of ozone pollution on a per-ton basis.[17] Another study shows that EGU NOₓ emissions can contribute between 5 ppb and 25 ppb to average 8-hour peak ozone concentrations in mid-Atlantic metropolitan statistical areas.[18]

Previous regional ozone transport efforts, including the NOₓ SIP Call, CAIR, and CSAPR, required ozone season NOₓ reductions from EGUs to address interstate transport of ozone. The EPA has taken comment on regulating EGU NOₓ emissions to address interstate ozone transport in the notice-and-comment process for these rulemakings. The EPA received no significant adverse comments in any of these proposals regarding the rules' focus on ozone season EGU NOₓ reductions to address interstate ozone transport.

As described later in this notice, the EPA's analysis finds that the power sector continues to be capable of making NOₓ reductions at reasonable cost that reduce interstate transport with respect to ground-level ozone. EGU NOₓ emission reductions can be made in the near-term under this proposal by fully operating existing EGU NOₓ post-combustion controls (*i.e.,* Selective Catalytic Reduction and Selective Non-Catalytic Reduction)—including optimizing NOₓ removal by existing, operational controls and turning on and optimizing existing idled controls; installation of (or upgrading to) state-of-the-art NOₓ combustion controls; and shifting generation to units with lower NOₓ emission rates. Further, additional assessment reveals that these available

EGU NOₓ reductions would make meaningful and timely improvements in ozone air quality.

The Clean Air Act's good neighbor provision requires states and the EPA to address interstate transport of air pollution that affects downwind states' ability to attain and maintain NAAQS. Other provisions of the CAA, namely sections 179B and 319(b), are available to deal with NAAQS exceedances not attributable to the interstate transport of pollution covered by the good neighbor provisions but caused by emission sources outside the control of a downwind state. These provisions address international transport and exceptional events, respectively.[19 20]

c. Health and Environmental Effects

Exposure to ambient ozone causes a variety of negative effects on human health, vegetation, and ecosystems. In humans, acute and chronic exposure to ozone is associated with premature mortality and a number of morbidity effects, such as asthma exacerbation. In ecosystems, ozone exposure causes visible foliar injury, decreases plant growth, and affects ecosystem community composition. See the EPA's November 2014 Regulatory Impact Analysis of the Proposed Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (EPA–452/P–14–006), in the docket for this proposal and available on the EPA's Web site at: *http://www.epa.gov/ttn/ecas/regdata/RIAs/20141125ria.pdf,* for more information on the human health

and welfare and ecosystem effects associated with ambient ozone exposure.

2. Events Affecting Application of the Good Neighbor Provision for the 2008 Ozone NAAQS

The 2008 revisions to the ozone NAAQS were promulgated on March 12, 2008. *See* National Ambient Air Quality Standards for Ozone, Final Rule, 73 FR 16436 (March 27, 2008). The revision of the NAAQS, in turn, triggered a 3-year deadline of March 12, 2011, for states to submit SIP revisions addressing infrastructure requirements under CAA sections 110(a)(1) and 110(a)(2), including the good neighbor provision. During this 3-year SIP development period, on September 16, 2009, the EPA announced[21] that it would reconsider the 2008 ozone NAAQS. To reduce the workload for states during the interim period of reconsideration, the EPA also announced its intention to propose staying implementation of the 2008 standards for a number of the requirements. On January 6, 2010, the EPA proposed to revise the 2008 NAAQS for ozone from 75 ppb to a level within the range of 60 to 70 ppb. *See* 75 FR 2938 (January 19, 2010). The EPA indicated its intent to issue final standards based upon the reconsideration by summer 2011.

On July 6, 2011, the EPA finalized CSAPR, in response to the DC Circuit's remand of the EPA's prior federal transport rule, CAIR. *See* 76 FR 48208 (August 8, 2011). CSAPR addresses ozone transport under the 1997 ozone NAAQS, but does not address the 2008 ozone standard, because the 2008 ozone NAAQS was under reconsideration during the analytic work for the rule.

On September 2, 2011, consistent with the direction of the President, the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget returned the draft final 2008 ozone rule EPA had developed upon reconsideration to the Agency for further consideration.[22] In view of this direction and the timing of the agency's ongoing periodic review of the ozone NAAQS required under CAA section 109 (as announced on September 29, 2008), the EPA decided to coordinate further proceedings on its voluntary reconsideration rulemaking of the 2008

---

[19] The EPA recognizes that both in-state and upwind wildfires may contribute to monitored ozone concentrations. The EPA encourages all states to consider how the appropriate use of prescribed fire may benefit of public safety and health by resulting in fewer ozone exceedances for both the affected state and their neighboring states.

[20] The CAA and the EPA's implementing regulations, specifically the Exceptional Events Rule at 40 CFR 50.14, allow for the exclusion of air quality monitoring data from regulatory determinations when events, including wildland fires, contribute to NAAQS exceedances or violations if they meet certain requirements, including the criterion that the event be not reasonably controllable or preventable. Wildland fires can be of two types: Wildfire (unplanned) and prescribed fire (planned). Under the Exceptional Events Rule, wildfires are considered, by their nature, to be not reasonably controllable or preventable. Because prescribed fires on wildland are intentionally ignited for resource management purposes, to meet the not reasonably controllable or preventable criterion, they must be conducted under a certified Smoke Management Program or employ basic smoke management practices. Both types of wildland fire must also satisfy the other rule criteria. The EPA will soon propose revisions to the Exceptional Events Rule and release a draft guidance document, which applies the proposed rule revisions to wildfire events that could influence ozone concentrations. These actions, which the EPA intends to finalize in the summer of 2016, further clarify the treatment of wildland fires under the Exceptional Events Rule.

[17] Butler, *et al.,* "Response of Ozone and Nitrate to Stationary Source Reductions in the Eastern USA".

[18] Summertime Zero-Out Contributions of regional NOₓ and VOC emissions to modeled 8-hour ozone concentrations in the Washington, DC; Philadelphia, PA, and New York City MSAs. "Contributions of regional air pollutant emissions to ozone and fine particulate matter-related mortalities in eastern U.S. urban areas".

[21] Fact Sheet. The EPA to reconsider Ozone Pollution Standards. *http://www.epa.gov/groundlevelozone/pdfs/O3_Reconsideration_FACT%20SHEET_091609.pdf.*

[22] *See* Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards, August 2014, *http://www.epa.gov/ttn/naaqs/standards/ozone/data/20140829pa.pdf,* at 1–9.

ozone standard with that of its ongoing periodic review of the ozone NAAQS.[23] Implementation for the original 2008 ozone standard was renewed. However, during this time period, a number of legal developments pertaining to the EPA's promulgation of CSAPR created uncertainty surrounding the EPA's statutory interpretation and implementation of the good neighbor provision.

On August 21, 2012, the D.C. Circuit issued a decision in *EME Homer City Generation, L.P.* v. *EPA* addressing several legal challenges to CSAPR and holding, among other things, that states had no obligation to submit good neighbor SIPs until the EPA had first quantified each state's good neighbor obligation.[24] According to that decision, the submission deadline for good neighbor SIPs under the CAA would not necessarily be tied to the promulgation of a new or revised NAAQS. While the EPA disagreed with this interpretation of the statute and sought review of the decision in the D.C. Circuit and the U.S. Supreme Court, the EPA complied with the D.C. Circuit's ruling during the pendency of its appeal. In particular, the EPA indicated that, consistent with the D.C. Circuit's opinion, it would not at that time issue findings that states had failed to submit SIPs addressing the good neighbor provision.[25]

On January 23, 2013, the Supreme Court granted the EPA's petition for certiorari.[26] During 2013 and early 2014, as the EPA awaited a decision from the Supreme Court, the EPA initiated efforts and technical analyses aimed at identifying and quantifying state good neighbor obligations for the 2008 ozone NAAQS. As part of this effort, the EPA solicited stakeholder input and also provided states with, and requested input on, emissions inventories for 2011 (78 FR 70935, November 27, 2013) and

inventory projections for 2018 (79 FR 2437, January 14, 2014).

On April 29, 2014, the Supreme Court reversed the D.C. Circuit's *EME Homer City* opinion on CSAPR and held, among other things, that under the plain language of the CAA, states must submit SIPs addressing the good neighbor provision within 3 years of promulgation of a new or revised NAAQS, regardless of whether the EPA first provides guidance, technical data, or rulemaking to quantify the state's obligation.[27] Thus, the Supreme Court affirmed that states have an obligation in the first instance to address the good neighbor provision after promulgation of a new or revised NAAQS, a holding that also applies to states' obligation to address transport for the 2008 ozone NAAQS.

The Supreme Court holding affirmed that states were required to submit SIPs addressing the good neighbor provision with respect to the 2008 ozone NAAQS by March 12, 2011. To the extent that states have failed to submit SIPs to meet this statutory obligation, then the EPA has not only the authority, but the obligation, to promulgate FIPs to address the CAA requirement.

Following the remand of the case to the D.C. Circuit, the EPA requested that the court lift the CSAPR stay and toll the CSAPR compliance deadlines by three years. On October 23, 2014, the D.C. Circuit granted the EPA's request. The EPA issued an interim final rule to revise the regulatory deadlines in CSAPR to reflect the three-year delay in implementation. Accordingly, CSAPR phase 1 implementation began in 2015 and phase 2 will begin in 2017.[28]

On March 6, 2015, the EPA's final 2008 Ozone NAAQS SIP Requirements Rule[29] revised the attainment deadline for ozone nonattainment areas currently designated as moderate to July 2018. In order to demonstrate attainment by the deadline, the demonstration would have to be based on design values calculated using 2015 through 2017 ozone season data, since the July 2018 deadline does not afford a full ozone season of measured data. The EPA established this deadline in the 2015 Ozone SIP Requirements Rule after previously establishing a deadline of December 31, 2018, that was vacated by the D.C. Circuit Court in *Natural Resources Defense Council* v. *EPA*.[30]

On July 28, 2015, the D.C. Circuit issued its opinion regarding CSAPR on

remand from the Supreme Court, *EME Homer City II*, 795 F.3d 118. The court largely upheld CSAPR, but remanded to EPA without vacatur certain states' emissions budgets for reconsideration. This proposal responds to the remand of certain CSAPR $NO_X$ ozone-season emissions budgets to the EPA for reconsideration; see section C below. Regarding the remand of CSAPR phase 2 $SO_2$ annual emissions budgets as to four states, this proposal does not address that particular aspect of the D.C. Circuit opinion. The EPA intends to address the remand of the phase 2 $SO_2$ annual emissions budgets separately.

*B. Proposed Approach To Address Ozone Transport Under the 2008 Ozone NAAQS via FIPs*

1. The CSAPR Framework

CSAPR establishes a 4-step process to address the requirements of the good neighbor provision.[31] The EPA proposes to follow the same steps for this rulemaking with respect to the 2008 ozone NAAQS. These steps are: (1) Identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (*i.e.,* NAAQS); (2) determining which upwind states contribute to these identified problems in amounts sufficient to ''link'' them to the downwind air quality problems; (3) for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of a standard by quantifying available upwind emission reductions and apportioning upwind responsibility among linked states; and (4) for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, reducing the identified upwind emissions via regional emissions allowance trading programs.

Step 1—In the original CSAPR, downwind air quality problems were assessed using modeled future air quality concentrations for a year aligned with attainment deadlines for the NAAQS considered in that rulemaking. The assessment of future air quality conditions generally accounts for on-the-books emission reductions[32] and the most up-to-date forecast of future emissions in the absence of the transport policy being evaluated (*i.e.,* base case conditions). The locations of

---

[23] *Id.*

[24] *EME Homer City Generation, L.P.* v. *EPA,* 696 F.3d 7, 31 (D.C. Cir. 2012).

[25] *See, e.g.,* Memorandum from the Office of Air and Radiation former Assistant Administrator Gina McCarthy to the EPA Regions, ''Next Steps for Pending Redesignation Requests and State Implementation Plan Actions Affected by the Recent Court Decision Vacating the 2011 Cross-State Air Pollution Rule,'' November 19, 2012; 78 FR 65559 (November 1, 2013) (final action on Florida infrastructure SIP submission for 2008 8-hour ozone NAAQS); 78 FR 14450 (March 6, 2013) (final action on Tennessee infrastructure SIP submissions for 2008 8-hour ozone NAAQS); Final Rule, Findings of Failure To Submit a Complete State Implementation Plan for Section 110(a) Pertaining to the 2008 Ozone National Ambient Air Quality Standard, 78 FR 2884 (January 15, 2013).

[26] *EPA* v. *EME Homer City Generation, L.P.,* 133 S. Ct. 2857 (2013) (granting the EPA's and other parties' petitions for certiorari).

[27] *EPA* v. *EME Homer City Generation, L.P.,* 134 S. Ct. 1584, 1600–01 (2014).

[28] 79 FR 71663 (December 3, 2014).

[29] 80 FR 12264, 12268 (Mar. 6, 2015); 40 CFR 51.1103.

[30] 777 F.3d 456 (D.C. Cir. 2014).

[31] *See* CSAPR, Final Rule, 76 FR 48208 (August 8, 2011).

[32] Since CSAPR was designed to replace CAIR, CAIR emissions reductions were not considered ''on-the-books.''

downwind air quality problems are identified as those with receptors that are projected to be unable to attain (*i.e.*, nonattainment receptor) or maintain (*i.e.*, maintenance receptor) the standard. This proposal follows this same general approach. However, the EPA also proposes to consider current monitored air quality data to further inform the projected identification of downwind air quality problems for this proposal. Further details and application of step one for this proposal are described in section V of this notice.

Step 2—The original CSAPR used a screening threshold of one percent of the NAAQS to identify upwind states that were ''linked'' to downwind air pollution problems. States were identified as needing further evaluation for actions to address transport if their air quality impact [33] was greater than or equal to the threshold for at least one downwind problem receptor (*i.e.*, nonattainment or maintenance receptor identified in step 1). We evaluated a given state's contribution based on the average relative downwind impact calculated over multiple days. States whose air quality impacts to all downwind problem receptors were below this threshold did not require further evaluation for actions to address transport—that is, these states were determined to make insignificant contributions to downwind air quality problems and therefore have no emission reduction obligations under the good neighbor provision. The EPA used this threshold because much of the ozone nonattainment problem in the eastern half of the United States results from relatively small contributions from a number of upwind states. Use of the one percent threshold for CSAPR is discussed in the preambles to the proposed and final CSAPR rules. *See* 75 FR 45237 (Aug. 2, 2010); 76 FR 48238, (Aug. 8, 2011). The EPA proposes to use this same approach for this rule. Application of step two for this proposal is described in section V of this notice.

Step 3—For states that are linked in step 2 to downwind air quality problems, the original CSAPR used a multi-factor test to evaluate emission reductions available in upwind states by application of uniform cost thresholds. The EPA evaluated $NO_X$ reductions that were available in upwind states by applying a marginal cost of $NO_X$ emissions to entities in these states. This approach, in essence, simulated placing an economic value on $NO_X$ emissions and evaluated emission

reduction potential that was cost-effective under this constraint. The EPA evaluated $NO_X$ reduction potential, cost, and downwind air quality improvements available at several cost thresholds in the multi-factor test. This evaluation quantified the magnitude of emissions that significantly contribute to nonattainment or interfere with maintenance of a NAAQS downwind and apportioned upwind responsibility among linked states, an approach upheld by the U.S. Supreme Court in *EPA* v. *EME Homer City*.[34] The EPA proposes to apply this approach to identify $NO_X$ emission reductions necessary to reduce interstate transport for the 2008 ozone NAAQS, updated to also explicitly consider over-control. For this proposal, the multi-factor test is also used to evaluate possible over-control by evaluating if an upwind state is linked solely to downwind air quality problems that are resolved at a given cost threshold, or if upwind states would reduce their emissions at a given cost threshold to the extent that they would no longer meet or exceed the 1% air quality contribution threshold. This evaluation of cost, $NO_X$ reductions, and air quality improvements, including its consideration of potential over-control, results in the EPA's determination of upwind emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind. Next, emissions budgets are determined. Emissions budgets are remaining allowable emissions after the elimination of emissions identified as significantly contributing to nonattainment or interfering with maintenance of the standard downwind. The EPA's assessment of significant contribution to nonattainment and interference with maintenance and development of EGU $NO_X$ ozone-season emissions budgets is described in section VI of this notice.

Step 4—Finally, the original CSAPR used allowance trading programs to implement the necessary emission reductions. Specifically, the emissions budgets identified in step 3 were implemented via a tradable allowance program. Emissions allowances were issued to units covered by the trading program and the allowances can be turned in at the close of each compliance period to account for a specified amount of ozone season EGU $NO_X$ emissions. Additionally, the original CSAPR included variability limits, which define the amount by which collective emissions within a state may exceed the level of the

budgets in a given year to account for variability in EGU operations. CSAPR set assurance levels equal to the sum of each state's emissions budget plus its variability limit. The original CSAPR included assurance provisions that help to assure that state emissions remain below the assurance levels in each state by requiring additional allowance surrenders in the instance that emissions in the state exceed the state's assurance level. This limited interstate trading approach is responsive to previous court decisions (see discussion in section IV of this preamble) and has been upheld in subsequent litigation regarding CSAPR. The EPA proposes to apply this approach to reduce interstate transport for the 2008 ozone NAAQS. Implementation using the CSAPR allowance trading program is described in section VII of this notice.

2. Partial Versus Full Resolution of Transport Obligation

Given the unique circumstances surrounding the implementation of the 2008 ozone standard that have delayed state and EPA efforts to address interstate transport, at this time the EPA is focusing its efforts on the immediately available and cost-effective emission reductions that are achievable by the 2017 ozone season.

a. Partial Remedy Under Proposed FIPs

This rulemaking proposes to establish (or revise currently established) FIPs for 23 eastern states under the good neighbor provision of the CAA. These FIPs contain requirements for EGUs in these states to reduce ozone season $NO_X$ emissions for the 2017 ozone season. As noted in section VI, the EPA has identified important EGU emission reductions that are achievable starting for the 2017 ozone season in each of the covered states through actions such as turning on and operating existing pollution controls. These readily available emission reductions will assist downwind states to attain and maintain the 2008 ozone NAAQS and will provide human health and welfare benefits through reduced exposure to ozone pollution.

While these reductions are necessary to assist downwind states attain and maintain the 2008 ozone NAAQS and are necessary to address good neighbor obligations for these states, the EPA acknowledges that they may not be sufficient to fully address these states' good neighbor obligations.[35] With respect to the 2008 ozone standard, the

---

[33] For ozone the impacts would include those from volatile organic compounds (VOC) and $NO_X$, and from all sectors.

[34] *EPA* v. *EME Homer City Generation, L.P.,* 134 S. Ct. 1584, 1606–07 (2014).

[35] The proposed requirements for one state, North Carolina, would fully eliminate that state's significant contribution to downwind air quality problems.

EPA has generally not attempted to quantify the ozone season $NO_X$ reductions that may be necessary to eliminate all significant contribution to nonattainment and interference with maintenance in other states. Given the time constraints for implementing $NO_X$ reduction strategies, the EPA believes that implementation of a full remedy may not be achievable for 2017, even though a partial remedy is achievable.

To evaluate full elimination of a state's significant contribution to nonattainment and interference with maintenance, EGU and non-EGU ozone season $NO_X$ reductions should both be evaluated. However, the EPA is not proposing to quantify non-EGU emissions reductions to address interstate ozone transport for the 2008 ozone NAAQS at this time because: (1) There is greater uncertainty in the non-EGU emission inventory estimates than for EGUs; and (2) there appear to be few non-EGU reductions that could be accomplished by the beginning of the 2017 ozone season. This is discussed further in section VI of this proposal and in the Non-EGU $NO_X$ Mitigation Strategies TSD. We intend to continue to collect information and undertake analysis for potential future emissions reductions at non-EGUs that may be necessary to fully quantify states' significant contributions in a future action.

Because the reductions proposed in this action are EGU-only and because EPA has focused the policy analysis for this proposal on reductions available by 2017, for most states they represent a first, partial step to addressing a given upwind state's significant contribution to downwind air quality impacts for the 2008 ozone NAAQS. Generally, a final determination of whether the proposed EGU $NO_X$ reductions represent a full or partial elimination of a state's good neighbor obligation for the 2008 NAAQS is subject to an evaluation of the contribution to interstate transport from additional emission sectors, such as non-EGUs. However, the EPA believes that it is beneficial to implement, without further delay, EGU $NO_X$ reductions that are achievable in the near term. The proposed $NO_X$ emission reductions are needed (although they may not be all that is needed) for these states to eliminate their significant contribution to nonattainment and interference with maintenance of the 2008 ozone NAAQS. The EPA's current statutory deadlines to promulgate FIPs extend until 2017 for most states, and the EPA will remain mindful of those deadlines as it evaluates what further steps may be necessary to address interstate transport

for the 2008 ozone NAAQS. The EPA seeks comment on possible future steps that may be necessary to resolve the remainder of the good neighbor obligation for the 2008 ozone standard.

The EPA has shared information with states to facilitate the development of the ozone transport SIPs.[36] The EPA encourages state SIP development and will continue to assist states in developing transport SIPs regardless of whether they are covered by this proposed FIP. Where a state would be covered by this proposed FIP, the EPA may be able to partially approve SIPs that include controls on EGU emissions that achieve ozone season $NO_X$ emission reductions and/or that establish EGU $NO_X$ ozone emissions budgets approximately equivalent to those identified in this proposal as achievable by 2017. (This is discussed in more detail in Section VII.) In these SIPS, states could also demonstrate that they are achieving the same level of emissions reductions through non-EGU source measures as they would achieve under the EGU budgets established in the FIP. For example, a SIP could set EGU budgets, but allow emission reductions from non-EGU sources as a compliance option. EPA also seeks comment on methods it can use to ensure that any non-EGU reductions are incremental to the base case, permanent, and enforceable.

**b. Potential for Full Remedy Under SIPs**

The EPA also notes that many states have already submitted, or are currently developing, SIP submittals to address the good neighbor provision of the CAA for the 2008 ozone standard, and expects that some may assert that the state plan fully addresses the state's good neighbor obligation.

The EPA anticipates that those SIPs intending to fully address the state's good neighbor obligations and for which the state is seeking approval may fall into one of two categories:

(1) The SIP concludes that the state is meeting its good neighbor obligation without need for additional $NO_X$ reductions. This SIP could include an adequate demonstration, using EPA or state-generated analytical results, which supports the state's conclusion that the state contributes insignificant amounts to downwind nonattainment or

maintenance problems in other states. The EPA would generally expect to propose full approval of these SIPs.

(2) The SIP demonstrates that the state will timely achieve reductions that fully address its significant contribution to nonattainment or interference with maintenance in downwind states. This demonstration could include an assessment of how all emissions source sectors contribute to the state's contribution and how these sectors are controlled in that state. States wishing to seek full approval of good neighbor SIPs should contact their appropriate regional office. Guidance on developing such SIPs is outside the scope of this action, but the EPA intends to work closely with any state that is interested in pursuing this option.

**3. Why We Focus on Eastern States**

CSAPR and previous federal transport rules, such as the $NO_X$ SIP Call and CAIR, were designed to address collective contributions of ozone pollution from states in the eastern U.S. These rules did not address contributions in the 11 western contiguous United States.[37] The EPA's air quality modeling that supports this proposed rule includes data for the western states. This assessment shows that there are problem receptors in the West to which western states contribute amounts greater than or equal to the screening threshold used to evaluate transport across eastern states (*i.e.*, 1 percent of the NAAQS). However, there may be additional criteria to evaluate regarding transported air pollution in the West when evaluating upwind states' contributions to downwind air quality impacts, such as those discussed in EPA-state meetings to discuss approaches for determining how emissions in upwind states impact air quality in downwind states.[38] Given that the near-term 2017 implementation timeframe constrains the opportunity to conduct a further evaluation of western states, the EPA proposes to focus this rulemaking on eastern states. This focus would not relieve western states of obligations to address interstate transport under the Act. The EPA and states working together would continue to evaluate interstate transport in the western states on a case-by-case basis. The EPA would also continue to engage

---

[36] On January 22, 2015, the EPA issued a memo with preliminary air quality modeling data that characterized interstate ozone transport projected to 2018. On April 8, 2015, the EPA held a workshop that continued a discussion with states on the path forward for addressing interstate transport for the 2008 8-hour ozone NAAQS. On August 4, 2015, we published a NODA with updated modeling that states could use to support development of transport SIPs.

[37] For the purpose of this action, the western U.S. (or the West) consists of the 11 western contiguous states of Arizona, California, Colorado, Idaho, Montana, New Mexico, Nevada, Oregon, Utah, Washington, and Wyoming, and the eastern U.S. (or East) consists of the remaining states in the contiguous U.S.

[38] For example, EPA-State meetings held in Research Triangle Park, NC on April 8, 2013 and Denver, Colorado on April 17, 2013.

with western states on air quality modeling analyses and the implications of those analyses for interstate transport.

While the EPA proposes to focus this rulemaking on eastern states, we seek comment on whether to include western states in this rule. The EPA notes that analyses developed to support this proposal, including air quality modeling and the EPA's assessment of EGU NO$_X$ mitigation potential, contain data that could be useful for states in developing SIPs or could be used to develop FIPs, where necessary.

The EPA seeks comment on the data provided for western states, including emissions inventories, ozone concentration modeling, contribution modeling, and EPA's assessment of EGU NO$_X$ reduction potential.[39] These data are available in the docket for this proposal. The EPA also solicits comment on whether to promulgate FIPs to address interstate ozone transport for the 2008 ozone NAAQS for western states, either in this rulemaking or in a subsequent rulemaking.

4. Short-Term NO$_X$ Emissions

In eastern states, the highest measured ozone days tend to occur within the hottest days, weeks, or months of the summer. On many high ozone days, there is higher demand for electricity (for instance, to run air conditioners). In general and technical discussions with representatives and officials of eastern states in April 2013 and April 2015, and in several letters to the EPA, officials from the Ozone Transport Region (OTR)[40] states suggested that EGU emissions transported from upwind states may disproportionally affect downwind ozone concentrations on peak ozone days in the eastern U.S. These representatives asked that the EPA consider additional "peak day" limits on EGU NO$_X$ emissions.

Some states have also asked the EPA to consider whether existing emission controls are being turned off for short periods (e.g., multiple days) within the

ozone season, for example during hot weeks. These states assert that emissions from short-term idling of controls may contribute to downwind ozone NAAQS exceedances in the eastern U.S. These states suggest that sub-seasonal limits on EGU NO$_X$ emissions would reduce ozone formation that might be attributable to short-term idling of NO$_X$ controls.

The EPA seeks comment on whether or not short-term (e.g., peak-day) EGU NO$_X$ emissions disproportionally impact downwind ozone concentrations, and if they do, then what EGU emission limits (e.g., daily or monthly emission rates or differential allowance surrender ratios on high ozone days) would be reasonable complements to the proposed seasonal CSAPR requirement to mitigate this impact.

C. Responding to the Remand of CSAPR NO$_X$ Ozone-Season Emissions Budgets

As noted above, in EME Homer City II, the D.C. Circuit declared invalid the CSAPR phase 2 NO$_X$ ozone-season emissions budgets of 11 states, holding that those budgets over-control with respect to the downwind air quality problems to which those states were linked for the 1997 ozone NAAQS. 795 F.3d at 129–30, 138. As to ten of these states, the court held that EPA's 2014 modeling conducted to support the RIA for CSAPR demonstrated that air quality problems at the downwind locations to which those states were linked would resolve by phase 2 of the CSAPR program without further transport regulation (either CAIR or CSAPR). Id. at 129–30. With respect to Texas, the court held that the record reflected that the ozone air quality problems to which the state was linked could be resolved at a lower cost threshold. Id. The court therefore remanded those budgets to EPA for reconsideration consistent with the court's opinion. Id. at 138. The court instructed the EPA to act "promptly" in addressing these issues on remand. Id. at 132.

The court's decision explicitly applies to 11 state budgets involved in that litigation: Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and West Virginia. Id. at 129–30, 138. EPA is proposing in this rulemaking to promulgate FIPs for nine of those states to address interstate transport with respect to the 2008 ozone NAAQS: Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia, and West Virginia. The proposed FIPs incorporate revised emissions budgets that would supplant and replace the budgets

promulgated in the CSAPR rule to address the 1997 ozone NAAQS, the same budgets remanded by the D.C. Circuit for reconsideration. Further, as proposed in this rule, these proposed budgets would be effective for the 2017 ozone season, the same period in which the phase 2 budgets that were invalidated by the court are currently scheduled to become effective. Therefore, this proposed action provides an appropriate and timely response to the court's remand by replacing the budgets promulgated in the CSAPR to address the 1997 ozone NAAQS, which were declared invalid by the D.C. Circuit, with budgets developed to address the revised and more stringent 2008 ozone NAAQS.[41]

The EPA notes that it is able to propose addressing the D.C. Circuit's remand of CSAPR NO$_X$ ozone-season emissions budgets because the agency was already performing analysis and policy development for this proposal, which is directly applicable to this aspect of the D.C. Circuit opinion.

Separately, various petitioners filed legal challenges in the D.C. Circuit to a supplemental rule that added five states to the CSAPR ozone-season trading program, 76 FR 80760 (Dec. 27, 2011). See Public Service Company of Oklahoma v. EPA, No. 12–1023 (D.C. Cir., filed Jan. 13, 2012). The case was held in abeyance during the pendency of the litigation in EME Homer City. The case remains pending in the D.C. Circuit as of the date of signature of this proposed rule.[42] The EPA notes that this rulemaking also proposes to promulgate FIPs for all five states added to CSAPR in the supplemental rule: Iowa, Michigan, Missouri, Oklahoma, and Wisconsin. The proposed FIPs incorporate revised emissions budgets that would supplant and replace the budgets promulgated in the supplemental CSAPR rule to address the 1997 ozone NAAQS for these five states

---

[39] On August 4, 2015, the EPA published a Notice of Data Availability (80 FR 46271) requesting comment on the air quality modeling platform and air quality modeling results that are being used for this proposed rule. Specifically, in the NODA, the EPA requested comment on the data and methodologies related to the 2011 and 2017 emissions and the air quality modeling to project 2017 concentrations and contributions. Comments received on that data via the NODA will be considered for the final rule.

[40] The OTR was established by the CAA amendments of 1990 to facilitate addressing the ozone problem on a regional basis and consists of the following states: Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, the District of Columbia and northern Virginia. 42 U.S.C. 7511c, CAA section 184.

[41] The methodology for developing the proposed budgets to address the 2008 ozone NAAQS is described in more detail in Sections VI and VII below. Section VI also includes an evaluation, as instructed by the court in EME Homer City II, to affirm that the proposed budgets do not over-control with respect to downwind air quality problems identified in this rule. 795 F.3d at 127–28.

[42] In 2012, the EPA also finalized two rules making certain revisions to CSAPR. 77 FR 10324 (Feb. 21, 2012); 77 FR 34830 (June 12, 2012). Various petitioners filed legal challenges to these rules in the D.C. Circuit, and the cases were also held in abeyance pending the litigation in EME Homer City. See Wisconsin Public Service Corp. v. EPA, No. 12–1163 (D.C. Cir., filed Apr. 6, 2012); Utility Air Regulatory Group v. EPA, No. 12–1346 (D.C. Cir., filed Aug. 9, 2012). The cases currently remain pending in the D.C. Circuit.

and would be effective for the 2017 ozone season.

For the two remaining ozone-season states affected by this portion of the *EME Homer City II* decision, Florida and South Carolina, the EPA is not proposing in this action to promulgate FIPs because the air quality modeling performed to support the proposal does not indicate that these states are linked to any identified downwind nonattainment or maintenance receptors with respect to the 2008 ozone standard. Inherently then, because the 2008 ozone NAAQS is more stringent than the 1997 ozone NAAQS, this modeling also does not indicate that Florida or South Carolina are linked to any remaining air quality concerns with respect to the 1997 ozone standard for which the states were regulated in CSAPR.

Accordingly, in order to address the Court's remand with respect to these two states' interstate transport responsibility under the 1997 ozone standard, the EPA proposes to remove these states from the CSAPR ozone-season trading program beginning in 2017 when the phase 2 ozone-season emissions budgets were scheduled to be implemented.

The EPA notes that because the proposed rule modeling was performed prior to the D.C. Circuit's issuance of *EME Homer City II*, that modeling assumed in its baseline for all states the emission reductions associated with the CSAPR phase 2 ozone-season budgets. In the final rule modeling, the EPA will make any additional changes to the emissions inventories or modeling platform as may be justified based on comments received on the modeling performed for the proposed rule. In the event that air quality modeling conducted for the final rule demonstrates that either Florida or South Carolina are projected to significantly (*e.g.*, greater than or equal to 1% of the NAAQS) contribute to an air quality problem with respect to the 2008 ozone standard in the absence of a CSAPR-related emissions budget in place for those states, the EPA instead proposes to finalize revised budgets (presented with this rulemaking for comment) for whichever of those states may be identified as linked to such air quality problems rather than remove those states from the CSAPR ozone-season trading program. The EPA has calculated emissions budgets for Florida and South Carolina that we are proposing to apply to those states if, and only if, the final rule air quality modeling identifies a linkage as just described. These proposed budgets are developed using the same methods applied to the 23 states that the EPA

proposed to regulate in this action. These methods are described in section VI of this proposal and the methods and resulting emissions budgets are provided in the Ozone Transport Policy Analysis TSD.

The EPA seeks comment on this approach with respect to addressing the remand as to Florida and South Carolina, including the proposed budgets that would apply to those states if a linkage is identified, which are available in the docket.

Additionally, the EPA notes Florida and South Carolina may be relying upon emissions reductions that result from now-remanded emissions budgets in Florida and South Carolina to satisfy statutory obligations other than the interstate transport requirements. However, Florida and South Carolina may have an interest in submitting SIPs to continue their participation in the CSAPR $NO_X$ ozone-season trading program in order to meet other Clean Air Act requirements. Likewise, to the extent that the final modeling indicates that other states included in the remand of the CSAPR phase 2 $NO_X$ ozone-season emissions budgets are not linked to any identified downwind nonattainment or maintenance receptors with respect to the 2008 ozone standard, they would not be included in the final FIPs but they may be interested in continuing to participate in the CSAPR $NO_X$ ozone-season trading program in order to meet other Clean Air Act requirements. The EPA seeks comment on whether to allow Florida, South Carolina, and other similarly situated states (if any) to continue their participation in the CSAPR $NO_X$ ozone-season program through voluntary SIPs that would retain the CSAPR $NO_X$ ozone-season emissions budgets, contingent upon review and approval by the EPA.

The D.C. Circuit also remanded without vacatur the CSAPR $SO_2$ annual emissions budgets for four states (Alabama, Georgia, South Carolina, and Texas) for reconsideration. 795 F.3d at 129, 138. This proposal does not address the remand of these CSAPR phase 2 $SO_2$ annual emissions budgets. The EPA intends to address the remand of the phase 2 $SO_2$ annual emissions budgets separately. The existing CSAPR annual emissions budgets and implementation programs (CSAPR $SO_2$ annual and $NO_X$ annual requirements), which address interstate transport for the 1997 and 2006 $PM_{2.5}$ NAAQS, continue to apply at this time.

*D. Addressing Outstanding Transport Obligations for the 1997 Ozone NAAQS*

In the original CSAPR, the EPA noted that the reductions for 11 states may not be sufficient to fully eliminate all significant contribution to nonattainment or interference with maintenance for certain downwind areas with respect to the 1997 ozone NAAQS.[43] The 11 states are: Alabama, Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Tennessee, and Texas.[44] In the original CSAPR, the EPA's analysis projected continued nonattainment and maintenance problems at downwind receptors to which these upwind states were linked after implementation of the CSAPR trading programs. Specifically, the persistent ozone problems were expected in Baton Rouge, Louisiana; Houston, Texas; and Allegan, Michigan according to the remedy case modeling conducted for the final rule. At that time the EPA did not address whether additional ozone season $NO_X$ emission reductions would be needed in these states to fully resolve the good neighbor obligation under the CAA with respect to the 1997 ozone NAAQS beyond the EGU requirements promulgated in CSAPR.

To evaluate whether additional emission reductions would be needed in these 11 states to address the states' full good neighbor obligation for the 1997 ozone NAAQS, the EPA reviewed the 2017 baseline air quality modeling conducted for this proposal, which includes emission reductions associated with the CSAPR phase 2 ozone-season budgets.

The updated 2017 air quality modeling shows that the predicted average DVs and maximum DVs for 2017 are below the level of the 1997 ozone NAAQS for the downwind receptors of concern that the 11 states were linked to in the original CSAPR for the 1997 ozone NAAQS. Further, the 2017 air quality modeling shows that there are no other nonattainment or

[43] *See* CSAPR Final Rule, 76 FR at 48220, and the CSAPR Supplemental Rule, 76 FR at 80760, December 27, 2011.

[44] The EPA acknowledges that, despite its conclusion in CSAPR that the air quality problems to which Texas was linked in the original CSAPR were not fully resolved, the court concluded in *EME Homer City II* that the $NO_X$ ozone-season emissions budget finalized for Texas resulted in over-control as to the ozone air quality problems to which the state was linked. 795 F.3d at 129–30. As discussed below in section V, this rule proposes to respond to the remand of Texas's $NO_X$ ozone-season emissions budget by promulgating a new budget to address the 2008 ozone NAAQS. The EPA has also evaluated Texas's contribution to any remaining air quality problems with respect to the 1997 ozone NAAQS. [Text may be revised to reflect ongoing litigation.]

maintenance receptors to which these areas would be linked with respect to the 1997 ozone NAAQS. This conclusion demonstrates that no further emission reductions are required to address the interstate transport obligations of these states with respect to the 1997 ozone NAAQS, and therefore EPA finds that the original CSAPR emissions budgets satisfy these states' full obligation to address interstate ozone transport under the good neighbor provision of the CAA as to that NAAQS. Therefore, we propose to find that the original CSAPR FIPs fully satisfy those 11 states' good neighbor CAA obligations regarding the emissions that contribute significantly to nonattainment or interfere with maintenance of the 1997 ozone NAAQS in other states.

## IV. Legal Authority

### A. EPA's Authority for the Proposed Rule

#### 1. Statutory Authority

The statutory authority for this proposed action is provided by the CAA as amended (42 U.S.C. 7401 *et seq.*). Specifically, sections 110 and 301 of the CAA provide the primary statutory bases for this proposal. The most relevant portions of section 110 are subsections 110(a)(1), 110(a)(2), and 110(a)(2)(D)(i)(I), and 110(c)(1).

Section 110(a)(1) provides that states must make SIP submissions "within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof)," and that these SIP submissions are to provide for the "implementation, maintenance, and enforcement" of such NAAQS.[45] The statute directly imposes on states the duty to make these SIP submissions, and the requirement to make the submissions is not conditioned upon the EPA taking any action other than promulgating a new or revised NAAQS.[46]

The EPA has historically referred to SIP submissions made for the purpose of satisfying the applicable requirements of CAA sections 110(a)(1) and 110(a)(2) as "infrastructure SIP" submissions. Section 110(a)(1) addresses the timing and general requirements for infrastructure SIP submissions, and section 110(a)(2) provides more details concerning the required content of these submissions. It includes a list of specific elements that "[e]ach such plan"

submission must address.[47] All states, regardless of whether the state includes areas designated as nonattainment for the relevant NAAQS, must have SIPs that meet the applicable requirements of section 110(a)(2), including provisions of section 110(a)(2)(D)(i)(I) described further below and which are the focus of this proposal.

Section 110(c)(1) requires the Administrator to promulgate a FIP at any time within 2 years after the Administrator: (1) Finds that a state has failed to make a required SIP submission, (2) finds a SIP submission to be incomplete pursuant to CAA section 110(k)(1)(C), or (3) disapproves a SIP submission, unless the state corrects the deficiency through a SIP revision that the Administrator approves before the FIP is promulgated.[48]

Section 110(a)(2)(D)(i)(I), also known as the "good neighbor provision," provides the basis for this proposed action. It requires that each state SIP shall include provisions sufficient to "prohibit[] . . . any source or other type of emissions activity within the State from emitting any air pollutants in amounts which will—(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]."[49]

The EPA has previously issued three rules interpreting and clarifying the requirements of section 110(a)(2)(D)(i)(I) for states in the eastern half of the United States. These rules, and the associated court decisions addressing these rules, provide important guidance regarding the requirements of section 110(a)(2)(D)(i)(I).

The NO$_X$ SIP Call, promulgated in 1998, addressed the good neighbor provision for the 1979 1-hour ozone NAAQS and the 1997 8-hour ozone NAAQS.[50] The rule required 22 states and the District of Columbia to amend their SIPs and limit NO$_X$ emissions that contribute to ozone nonattainment. The EPA set a NO$_X$ ozone-season budget for each affected state, essentially a cap on ozone season NO$_X$ emissions in the state. Sources in the affected states were given the option to participate in a regional cap-and-trade program, known

as the NO$_X$ Budget Trading Program (NBP). The NO$_X$ SIP Call was largely upheld by the D.C. Circuit in *Michigan* v. *EPA,* 213 F.3d 663 (D.C. Cir. 2000), *cert. denied,* 532 U.S. 904 (2001).

The Clean Air Interstate Rule (CAIR), promulgated in 2005, addressed both the 1997 PM$_{2.5}$ and ozone standards under the good neighbor provision.[51] CAIR required SIP revisions in 28 states and the District of Columbia to ensure that certain emissions of sulfur dioxide (SO$_2$) and/or NO$_X$—important precursors of regionally transported PM$_{2.5}$ (SO$_2$ and NO$_X$) and ozone (NO$_X$)—were prohibited. Like the NO$_X$ SIP Call, states were given the option to participate in a regional cap-and-trade program to satisfy their SIP obligations. When the EPA promulgated the final CAIR in May 2005, the EPA also issued a national rule finding that states had failed to submit SIPs to address the requirements of CAA section 110(a)(2)(D)(i) with respect to the 1997 ozone and PM$_{2.5}$ NAAQS, given that states were required by the CAA to have submitted section 110(a)(2)(D)(i)(I) SIPs for those standards by July 2000.[52] This finding of failure to submit triggered a 2-year clock for the EPA to issue FIPs to address interstate transport, and on March 15, 2006, the EPA promulgated FIPs to ensure that the emission reductions required by CAIR would be achieved on schedule.[53] CAIR was remanded to EPA by the D.C. Circuit in *North Carolina,* 531 F.3d 896 (D.C. Cir. 2008), *modified on reh'g,* 550 F.3d 1176. For more information on the legal considerations of CAIR and the D.C. Circuit holding in *North Carolina,* refer to the preamble of the final CSAPR rule.[54]

In 2011, the EPA promulgated CSAPR to address the issues raised by the remand of CAIR and additionally to address the good neighbor provision for the 2006 PM$_{2.5}$ NAAQS.[55] CSAPR requires 28 states to reduce SO$_2$ emissions, annual NO$_X$ emissions, and/or ozone season NO$_X$ emissions that significantly contribute to other states' nonattainment or interfere with other states' abilities to maintain these air quality standards. To accomplish implementation aligned with the applicable attainment deadlines, the EPA promulgated FIPs for each of the 28 states covered by CSAPR. The FIPs implement regional cap-and-trade programs to achieve the necessary reductions. States can submit good

---

[45] 42 U.S.C. 7410(a)(1).

[46] *See EPA* v. *EME Homer City Generation, L.P.,* 134 S. Ct. 1584, 1601 (2014).

[47] EPA's general approach to infrastructure SIP submissions is explained in greater detail in individual notices acting or proposing to act on state infrastructure SIP submissions and in guidance. *See, e.g.,* Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2) (Sept. 2013).

[48] 42 U.S.C. 7410(c)(1).

[49] 42 U.S.C. 7410(a)(2)(D)(i)(I).

[50] 63 FR 57356 (Oct. 27, 1998).

[51] 70 FR 25162 (May 12, 2005).

[52] 70 FR 21147 (May 12, 2005).

[53] 71 FR 25328 (April 28, 2006).

[54] 76 FR 48208, 48217 (Aug. 8, 2011).

[55] 76 FR 48208.

neighbor SIPs at any time that, if approved by the EPA, would replace the CSAPR FIP for that state. As discussed below, CSAPR was the subject of decisions by both the D.C. Circuit and the Supreme Court, which largely upheld the rule.

On August 21, 2012, the D.C. Circuit issued a decision in *EME Homer City Generation, L.P.* v. *EPA*, 696 F.3d 7 (D.C. Cir. 2012), vacating CSAPR and holding, among other things, that states had no obligation to submit good neighbor SIPs until the EPA had first quantified each state's good neighbor obligation.[56] The implication of this decision was that the EPA did not have authority to promulgate FIPs as a result of states' failure to submit or EPA's disapproval of such SIPs. The EPA sought review, first with the D.C. Circuit *en banc* and then with the Supreme Court. While the D.C. Circuit declined to consider the EPA's appeal *en banc*,[57] on January 23, 2013, the Supreme Court granted the EPA's petition for certiorari.[58]

On April 29, 2014, the Supreme Court issued a decision reversing the D.C. Circuit's *EME Homer City* opinion on CSAPR and held, among other things, that under the plain language of the CAA, states must submit SIPs addressing the good neighbor provision within 3 years of promulgation of a new or revised NAAQS, regardless of whether the EPA first provides guidance, technical data or rulemaking to quantify the state's obligation.[59] Thus, the Supreme Court affirmed that states have an obligation in the first instance to address the good neighbor provision after promulgation of a new or revised NAAQS, a holding that also applies to states' obligation to address interstate transport for the 2008 ozone NAAQS. The Supreme Court remanded the litigation to the D.C. Circuit for further proceedings.

Finally, on July 28, 2015, the D.C. Circuit issued its opinion on CSAPR regarding the remaining legal issues raised by the Petitioners on remand from the Supreme Court, *EME Homer City II*, 795 F.3d 118. This decision largely upheld EPA's approach to addressing interstate transport in CSAPR, leaving the rule in place and affirming EPA's interpretation of various statutory provisions and EPA's technical decisions. The decision also remands the rule without vacatur for reconsideration of EPA's emissions budgets for certain states. In particular and as discussed in more detail in section III, the court declared invalid the CSAPR phase 2 $NO_X$ ozone-season emissions budgets of 11 states, holding that those budgets over-control with respect to the downwind air quality problems to which those states were linked for the 1997 ozone NAAQS. The court's decision explicitly applies to 11 states: Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and West Virginia. *Id.* at 129–30, 138. The court also remanded without vacatur the $SO_2$ annual emissions budgets for four states (Alabama, Georgia, South Carolina, and Texas) for reconsideration. *Id.* at 129, 138. The court instructed the EPA to act ''promptly'' in addressing these issues on remand. *Id.* at 132.

Section 301(a)(1) of the CAA also gives the Administrator of the EPA general authority to prescribe such regulations as are necessary to carry out her functions under the Act.[60] Pursuant to this section, the EPA has authority to clarify the applicability of CAA requirements. In this action, among other things, the EPA is clarifying the applicability of section 110(a)(2)(D)(i)(I) by identifying $NO_X$ emissions in certain states that must be prohibited pursuant to this section with respect to the 8-hour ozone NAAQS promulgated in 2008.

In particular, the EPA is proposing to use its authority under sections 110 and 301 to promulgate FIPs that establish or revise EGU $NO_X$ ozone-season emissions budgets for 23 eastern states to mitigate their significant contribution to nonattainment or interference with maintenance in another state. As described in more detail later in this notice, generally the EPA is proposing to update each affected state's FIP, including revising the existing CSAPR budgets.[61] The EPA is also proposing to respond to the court's remand in *EME Homer City II* with respect to the remanded $NO_X$ ozone-season emissions budgets.

2. FIP Authority for Each State Covered by the Proposed Rule

a. Status of State Good Neighbor SIPs for the 2008 Ozone NAAQS

As discussed above, all states have an obligation to submit SIPs that address the requirements of CAA section 110(a)(2) within 3 years of promulgation of a new or revised NAAQS. With respect to the 2008 ozone NAAQS, states were required to submit SIPs addressing the good neighbor provision by March 12, 2011. If the EPA finds that a state has failed to submit a SIP to meet its statutory obligation to address section 110(a)(2)(D)(i)(I) or if EPA disapproves a good neighbor SIP, then the EPA has not only the authority but the obligation, pursuant to section 110(c)(1), to promulgate a FIP to address the CAA requirement within 2 years of the finding or disapproval.

On July 13, 2015, the EPA published a rule finding that 24 states failed to make complete submissions that address the requirements of section 110(a)(2)(D)(i)(I) related to the interstate transport of pollution as to the 2008 ozone NAAQS. See 80 FR 39961 (July 13, 2015) (effective August 12, 2015). The finding action triggered a 2-year deadline for the EPA to issue FIPs to address the good neighbor provision for these states by August 12, 2017. The states included in this finding of failure to submit are: Alabama, Arkansas, California, Florida, Georgia, Iowa, Illinois, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Vermont, Virginia, and West Virginia.

Since the EPA issued the findings notice, EPA has received a SIP submission addressing the good neighbor provision for the 2008 ozone NAAQS from the state of Maine on which the EPA has not yet proposed action.

Several additional states— Connecticut, Nebraska, North Dakota, Rhode Island, South Dakota, New York, Delaware, Maryland, Indiana, Kentucky, Louisiana, New Jersey, Ohio, Texas, Wisconsin, and the District of Columbia—have previously submitted SIPs to address the requirements of section 110(a)(2)(D)(i)(I) for the 2008 ozone NAAQS. To the extent that the EPA has not finalized action on these submitted SIPs, these states can evaluate their submissions in light of this proposal and the actions we are taking to reduce interstate ozone transport for the 2008 ozone NAAQS. Pursuant to a judgment issued on May 15, 2015, the

---

[56] *EME Homer City Generation, L.P.* v. *EPA*, 696 F.3d 7, 31 (D.C. Cir. 2012).

[57] *EME Homer City Generation, L.P.* v. *EPA*, No. 11–1302 (D.C. Cir. January 24, 2013), ECF No. 1417012 (denying the EPA's motion for rehearing en banc).

[58] *EPA* v. *EME Homer City Generation, L.P.*, 133 S. Ct. 2857 (2013) (granting the EPA's and other parties' petitions for certiorari).

[59] *EPA* v. *EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1600–01 (2014).

[60] 42 U.S.C. 7601(a)(1).

[61] One state, Kansas, would have a new CSAPR ozone season requirement under this proposal. The remaining 22 states were included in the original CSAPR ozone-season program as to the 1997 ozone NAAQS.

EPA is required to take final action on the interstate transport SIPs for Nebraska and North Dakota by January 29, 2016, and for Maryland, Texas, Ohio and Indiana by June 7, 2016.[62] In the event that the EPA finalizes disapproval or partial disapproval of any of these SIPs, that action would trigger the EPA's FIP authority to implement the requirements of the good neighbor provision for those states. Alternatively, if any of these states withdraws its 2008 ozone interstate transport SIP submittal, the EPA plans to issue a separate notice of finding of failure to submit for these states and will finalize FIPs as appropriate.

On March 7, 2013, the EPA finalized action on the State of Kentucky's SIP submission addressing, among other things, the good neighbor provision requirements for the 2008 ozone NAAQS.[63] The EPA disapproved the submission as to the good neighbor requirements. In the notice, the EPA explained that the disapproval of the good neighbor portion of the state's infrastructure SIP submission did not trigger a mandatory duty for the EPA to promulgate a FIP to address these requirements.[64] Citing the D.C. Circuit's decision *EME Homer City Generation* v. *EPA*, 696 F.3d 7 (2012), the EPA explained that the court concluded states have no obligation to make a SIP submission to address the good neighbor provision for a new or revised NAAQS until the EPA first defines a state's obligations pursuant to that section.[65] Therefore, because a good neighbor SIP addressing the 2008 ozone standard was not at that time required, the EPA indicated that its disapproval action would not trigger an obligation for the EPA to promulgate a FIP to address the interstate transport requirements.[66]

On April 30, 2013, the Sierra Club filed a petition for review of the EPA's action based on the Agency's conclusion that the FIP clock was not triggered by the disapproval of Kentucky's good neighbor SIP.[67] As described above, on April 29, 2014, the Supreme Court issued a decision reversing and vacating the D.C. Circuit's decision in *EME Homer City*. Following the Supreme Court decision, the EPA requested, and the court granted, vacatur and remand of the portion of the EPA's final action

that determined that the FIP obligation was not triggered by the disapproval.[68]

In this notice, the EPA is proposing to correct the portion of the disapproval notice indicating that the FIP clock would not be triggered by the SIP disapproval. The EPA believes that the EPA's obligation to develop a FIP was triggered on the date of the judgment issued by the Supreme Court in *EPA* v. *EME Homer City*, June 2, 2014, and the EPA is obligated to issue a FIP at any time within two years of that date. The EPA does not believe that the FIP obligation was triggered as of the date of the SIP disapproval because the controlling law as of that date was the D.C. Circuit decision in *EME Homer City*, which held that states had no obligation to submit a SIP and the EPA had no authority to issue a FIP until the EPA first quantified each state's emission reduction obligation under the good neighbor provision. Accordingly, the most reasonable conclusion is that the EPA's FIP obligation was triggered when the Supreme Court clarified the state and federal obligations with respect to the good neighbor provision. Thus, the EPA proposes to find that the FIP obligation was triggered as of June 2, 2014, and that the EPA is obligated to promulgate a FIP that corrects the deficiency by June 2, 2016.

b. States Submitting Transport SIPs Before FIP Is Finalized

The EPA recognizes that some states are currently developing SIP submissions or revising their submitted SIPs to address the good neighbor provision of the CAA for the 2008 ozone standard. The EPA encourages SIP development and will continue to assist states in developing transport SIPs. As noted above, the EPA is subject to a court order requiring final action on certain state SIPs by January 29, and June 7, 2016.

The fact that the EPA is proposing a FIP for any state does not suggest that the EPA has determined that the state's submittal is not approvable. If EPA finalizes approval of a state's good neighbor SIP before the FIP is applied, the FIP that is now being proposed for that state would no longer be necessary.

Further, the EPA notes that the remedy being proposed in this notice are not the only means a state has to mitigate interstate ozone transport under the good neighbor provision. States could submit measures that strengthen their current SIPs and achieve reductions that are similar to, or more efficacious in eliminating

significant transport than, those that would be achieved by the FIPs proposed in this action. The EPA strongly encourages such strengthening actions. If a state submits a SIP that is approved (in whole or in part) by the EPA via notice-and-comment rulemaking and that achieves ozone season $NO_X$ emission reductions and/or establishes EGU $NO_X$ ozone emissions budgets approximately equivalent to those identified by EPA as achievable by 2017, the EPA does not anticipate subjecting the state to the EPA's partial remedy in this FIP action.

## V. Analyzing Downwind Air Quality and Upwind-State Contributions

In this section, we describe the air quality modeling performed to (1) identify locations where we expect there to be nonattainment or maintenance problems for 8-hour ozone for the 2017 analytic year chosen for this proposal, and (2) quantify the contributions from anthropogenic emissions from upwind states to downwind ozone concentrations at monitoring sites projected to be in nonattainment or have maintenance problems in 2017 for the 2008 ozone NAAQS. Air quality modeling to assess the health and welfare benefits of the emissions reductions expected to result from this proposal is described in section VIII.

This section includes information on the air quality modeling platform used in support of the proposed rule with a focus on the base year and future base case emission inventories. We also provide the projection of 2017 ozone concentrations and the interstate contributions for 8-hour ozone. The Air Quality Modeling Technical Support Document (AQM TSD) in the docket for this proposed rule contains more detailed information on the air quality modeling aspects of this rulemaking.

On August 4, 2015, the EPA published a Notice of Data Availability (80 FR 46271) requesting comment on the air quality modeling platform and air quality modeling results that are being used for this proposed rule. Specifically, in the NODA, the EPA requested comment on the data and methodologies related to the 2011 and 2017 emissions and the air quality modeling to project 2017 concentrations and contributions. Comments received on that data via the NODA will be considered for the final rule.

### A. Overview of Air Quality Modeling Platform

The EPA performed air quality modeling for three emissions scenarios: A 2011 base year, a 2017 baseline, and a 2017 illustrative control case that

---

[62] *See* Judgment, *Sierra Club* v. *McCarthy*, Case 4:14–cv–05091–YGR (N.D. Cal. May 15, 2015).

[63] 78 FR 14681 (March 7, 2013).

[64] *Id.* at 14683.

[65] *Id.*

[66] *Id.*

[67] *Sierra Club* v. *EPA*, Case No. 13–3546 (6th Cir., filed Apr. 30, 2013).

[68] Order, *Sierra Club* v. *EPA*, Case No. 13–3546, Document No. 74–1 (Mar. 13, 2015).

reflects the emission reductions expected from the proposed rule.[69] We selected 2011 as the base year to reflect the most recent National Emissions Inventory (NEI). In addition, the meteorological conditions during the summer of 2011 were generally conducive for ozone formation across much of the U.S., particularly the eastern U.S. For example, as described in the AQM TSD, an analysis of meteorological-adjusted trends in seasonal mean ozone for the period 2000 through 2012 indicates that, on a regional basis, the summer of 2011 was typical, in terms of the presence of conditions conducive to ozone formation, of high ozone years in the eastern U.S. Additional analyses of meteorological conditions during the summer of 2011 in comparison to conditions during several other recent years can be found in the AQM TSD. The use of meteorological data representing conditions that are conducive for ozone formation is consistent with the EPA's modeling guidance for attainment demonstrations.[70] As noted above, we selected 2017 as the projected analysis year to coincide with the attainment date for moderate areas under the 2008 ozone NAAQS. We used the 2017 baseline emissions in our air quality modeling to identify future nonattainment and maintenance locations and to quantify the contributions of emissions from upwind states to 8-hour ozone concentrations at downwind locations. We used the air quality modeling of the 2017 baseline and 2017 illustrative control case emissions to estimate the air quality impacts and health benefits of this proposal.

The EPA used the Comprehensive Air Quality Model with Extensions (CAMx) version 6.11[71] to simulate pollutant concentrations for the 2011 base year and the 2017 future year scenarios. CAMx is a grid cell-based, multi-pollutant photochemical model that simulates the formation and fate of ozone and fine particles in the atmosphere. The CAMx model contains certain probing tools including source apportionment techniques that are designed to quantify the contribution of emissions from various sources and areas to ozone in other downwind locations. The CAMx model applications were performed for a modeling region (*i.e.*, modeling domain) that covers the contiguous 48 states, the District of Columbia, and adjacent portions of Canada and Mexico using a horizontal resolution of 12 x 12 km. A map of the air quality modeling domain is provided in the AQM TSD.

The 2011-based air quality modeling platform includes 2011 base year emissions and future year projections of these emissions and 2011 meteorology for air quality modeling with CAMx. In the remainder of this section, we provide an overview of (1) the 2011 and 2017 emissions inventories, (2) the methods for projecting future nonattainment and maintenance along with a list of 2017 baseline nonattainment and maintenance receptors in the eastern U.S., (3) the approach to developing metrics to measure interstate contributions to 8-hour ozone, and (4) the predicted interstate contributions to downwind nonattainment and maintenance in the eastern U.S. We also identify which predicted interstate contributions are at or above the CSAPR screening threshold, which we are proposing to apply for regulation of interstate transport of ozone for purposes of the 2008 ozone standard.

*B. Emission Inventories*

The EPA developed emission inventories for this proposal including emission estimates for EGUs, non-EGU point sources, stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, wild fires, prescribed fires, and for biogenic emissions that are not the result of human activities. The EPA's air quality modeling relies on this comprehensive set of emission inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

To prepare the emission inventories for air quality modeling, the EPA processed the emission inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 3.6.5 to produce the gridded, hourly, speciated, model-ready emissions for input to the CAMx air quality model. Additional information on the development of the emission inventories and on data sets used during the emissions modeling process are provided in the TSD "Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform," hereafter known as the "Emissions Modeling TSD." This TSD is available in the docket for this proposed rule and at *http://www.epa.gov/ttn/chief/emch/index.html#2011.*

The EPA published **Federal Register** notices on November 27, 2013 (78 FR 70935), and January 14, 2014 (79 FR 2437), to take comment on the 2011 and 2018[72] emission modeling platforms, including data and documentation on the methods used to prepare the emission inventories for air quality modeling. Comments were collected for the 2011 and 2018 emissions modeling platforms under the dockets EPA–HQ–OAR–2013–0743 and EPA–HQ–OAR–2013–0809, respectively. Comments from those notices that were accepted by the EPA have been incorporated into the emission modeling data and procedures for this proposal as documented in the Emissions Modeling TSD. As indicated above, the updated emission inventories, methodologies, and data were provided in a Notice of Data Availability published in the **Federal Register** on August 4, 2015 (80 FR 46271). Comments received on the proposal data will be considered for the final rule.

1. Foundation Emission Inventory Data Sets

The EPA developed emission data representing the year 2011 to support air quality modeling of a base year from which future air quality could be forecasted. The EPA used the 2011 National Emission Inventory (NEI) version 2 (2011NEIv2), released in March 2015, as the primary basis for the U.S. inventories supporting the 2011 air quality modeling. Documentation on the 2011NEIv2 is available in the 2011 National Emissions Inventory, version 2 TSD available in the docket for this proposed rule and at *http://www.epa.gov/ttn/chief/net/2011inventory.html#inventorydoc.* The future base case scenario modeled for

---

[69] The 2017 illustrative control case is relevant to the EPA's policy analysis discussed in section VI and to the benefits and costs assessment discussed in section VIII of this preamble. It is not used to identify nonattainment or maintenance receptors or quantify the contributions from upwind states to these receptors.

[70] "Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze" U.S. Environmental Protection Agency, Research Triangle Park, NC. December 2014. *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf.*

[71] Comprehensive Air Quality Model with Extensions Version 6.11 User's Guide. Environ International Corporation. Novato, CA. December, 2014.

[72] During the 2013 and 2014 pre-proposal comment periods for the modeling platforms, the attainment deadline for the downwind areas was established by regulation as December 2018. The 2008 Ozone NAAQS SIP Requirements Rule revised the attainment deadline for ozone nonattainment areas currently designated as Moderate from December 2018 to July 2018, which means attainment determinations have to be based on design values calculated using 2015 through 2017 ozone season data. Therefore, in its July 2015 NODA and in this proposal, the EPA has adjusted the future year modeling to be for the year 2017 rather than 2018.

2017 includes a representation of changes in activity data and of predicted emission reductions from on-the-books actions, including planned emission control installations and promulgated federal measures that affect anthropogenic emissions.[73]

2. Development of Emission Inventories for EGUs

Annual $NO_X$ and $SO_2$ emissions for EGUs in the 2011NEIv2 are based primarily on data from continuous emission monitoring systems (CEMS), with other EGU pollutants estimated using emission factors and annual heat input data reported to the EPA. For EGUs without CEMS, the EPA used data submitted to the NEI by the states. For more information on the details of how the 2011 EGU emissions were developed and prepared for air quality modeling, see the Emissions Modeling TSD.

The EPA projected future 2017 baseline EGU emissions using version 5.14 of the Integrated Planning Model (IPM) (*http://www.epa.gov/powersector modeling*). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emission control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. EPA has used IPM for over two decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emission impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[74]

The IPM version 5.14 base case accounts for comments received as a result of the NODAs released in 2013 and 2014 (including control configuration) as well as updated environmental regulations. This projected base case accounts for the effects of the finalized MATS[75] and CSAPR rules, New Source Review settlements, and on-the-books state rules through 2014[76] impacting $SO_2$, $NO_X$, directly emitted particulate matter, and $CO_2$, and final actions the EPA has taken to implement the Regional Haze Rule. The EPA's IPM base case also includes two federal non-air rules affecting EGUs: The Cooling Water Intake Structure (Clean Water Act section 316(b)) rule and the Coal Combustion Residuals (CCR) rule. Documentation of IPM version 5.14 is in the docket and available online at *www.epa.gov/powersectormodeling*.

After the receptor and contribution analyses for this proposal were underway, the EPA released an updated IPM base case, version 5.15, and the final Clean Power Plan (CPP).[77] In order to reflect all on-the-books policies as well as the most current power sector modeling data, the EPA performed an assessment, described in section V–D below, to reflect inclusion of IPM 5.15 with the CPP in the base case for this proposal. The EPA plans to use this base case, including the final CPP, for its modeling analysis for the final rule. However, EPA's analysis for the final rule may include updated or different assumptions about the inclusion of the CPP and the CSAPR phase 2 $NO_X$ ozone-season or $SO_2$ annual emissions budgets for those states with budgets that were declared invalid and remanded to the EPA by the D.C. Circuit's decision in *EME Homer City II.*

In projecting future 2017 baseline EGU emissions, the EPA adjusted the 2018 IPM version 5.14 base case results to account for three categories of differences between 2017 and 2018. The categories are: (1) Adjusting $NO_X$ emissions for units with SCRs in 2018 but that are assumed not to operate or be installed in 2017; (2) adding $NO_X$

emissions for units that are retiring in 2018 but are projected to operate in 2017; and (3) adjusting $NO_X$ emissions for coal-fired units that are projected to convert to natural gas (*i.e.,* "coal-to-gas") in 2018, but are still projected to burn coal in 2017. These adjustments were only made to the air quality flat file outputs of IPM and are discussed in greater detail in the IPM documentation found in the docket for this proposed rule.

3. Development of Emission Inventories for Non-EGU Point Sources

The 2011 non-EGU point sources in the 2011 base case inventory match those in the 2011NEIv2. Details on the development of the 2011 emission inventories can be found in the 2011NEIv2 TSD. Prior to air quality modeling, the emission inventories must be processed into a format that is appropriate for the air quality model to use. Details on the processing of the emissions for 2011 and on the development of the 2017 non-EGU emission inventories are available in the Emissions Modeling TSD. Projection factors and percent reductions in this proposal reflect comments received as a result of the NODAs in 2013 and 2014, along with emission reductions due to national and local rules, control programs, plant closures, consent decrees and settlements. Reductions from several Maximum Achievable Control Technology (MACT) and National Emission Standards for Hazardous Air Pollutants (NESHAP) standards are included. Projection approaches for corn ethanol and biodiesel plants, refineries and upstream impacts represent requirements pursuant to the Energy Independence and Security Act of 2007 (EISA).

For aircraft emissions at airports, the EPA developed projection factors based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast (TAF) system, published in March 2013.

Point source and nonpoint oil and gas emissions are projected to 2018 using regional projection factors by product type using Annual Energy Outlook (AEO) 2014 projections to year 2017. $NO_X$ and VOC reductions that are co-benefits to the NESHAP and New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected for select source categories. In addition, Natural Gas Turbines and Process Heaters NSPS $NO_X$ controls and NSPS Oil and Gas VOC controls are reflected for select source categories.

---

[73] Biogenic emissions and emissions from wild fires and prescribed fires were held constant between 2011 and 2017 since (1) these emissions are tied to the 2011 meteorological conditions and (2) the focus of this rule is on the contribution from anthropogenic emissions to projected ozone nonattainment and maintenance.

[74] Detailed information and documentation of EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on EPA's Web site at: *www.epa.gov/airmarkets/powersectormodeling.*

[75] In *Michigan* v. *EPA*, the Supreme Court reversed on narrow grounds a portion of the D.C. Circuit decision upholding the MATS rule, finding that EPA erred by not considering cost when determining that regulation of EGUs was "appropriate" pursuant to CAA section 112(n)(1). 135 S.Ct. 192 (2015). The case was remanded to the D.C. Circuit for further proceedings, and the MATS rule currently remains in place.

[76] For any specific version of IPM there is a cutoff date after which it is no longer possible to incorporate updates into the input databases. For version 5.14, that cutoff date was November 2014.

[77] Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 FR 64662 (Oct. 23, 2015).

### 4. Development of Emission Inventories for Onroad Mobile Sources

The EPA developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES) 2014. We computed the emissions within SMOKE by multiplying emission factors developed using MOVES with the appropriate activity data. We also used MOVES emission factors to estimate emissions from refueling. The 2011 onroad mobile source emissions used in the inventory for this rule are similar but not identical to the 2011NEIv2 emissions due to a more detailed treatment of E–85 emissions in the 2011 emission modeling platform used for this rule. Additional information on the approach for generating the onroad mobile source emissions is available in the Emissions Modeling TSD. Onroad mobile source emissions for California are consistent with the emissions submitted by the state as reflected in the 2011NEIv2.

In the future-year modeling for mobile sources, we included all national measures known at the time of modeling. The future scenarios for mobile sources reflect projected changes to fuel usage and onroad mobile control programs finalized as of the date of the model run. Finalized rules that are incorporated into the mobile source emissions include: Tier 3 Standards (March 2014), the Light-Duty Greenhouse Gas Rule (March 2013), Heavy (and Medium)-Duty Greenhouse Gas Rule (August 2011), the Renewable Fuel Standard (February 2010), the Light Duty Greenhouse Gas Rule (April 2010), the Corporate-Average Fuel Economy standards for 2008–2011 (April 2010), the 2007 Onroad Heavy-Duty Rule (February 2009), and the Final Mobile Source Air Toxics Rule (MSAT2) (February 2007). Impacts of rules that were in effect in 2011 are reflected in the 2011 base year emissions at a level that corresponds to the extent to which each rule had penetrated into the fleet and fuel supply by the year 2011. Local control programs such as the California LEV III program are included in the onroad mobile source emissions. Activity data for onroad mobile sources was projected using AEO 2014. Because EPA changed the model year from 2018 to 2017 between its pre-proposal modeling and the modeling conducted for this proposal (see footnote 64), and due to the substantial amount of lead time required to generate emission factors with MOVES, the EPA was unable to directly generate emission factors for 2017 prior to the modeling used to

support this proposed rule. Therefore, for this proposal, future year onroad mobile source emissions were computed for 2018 and adjusted to 2017 levels using adjustment factors derived from national MOVES runs for 2017 and 2018. Emission factors will be generated directly for 2017 prior to air quality modeling for the final rule.

### 5. Development of Emission Inventories for Commercial Marine Category 3 (Vessel)

The commercial marine category 3 vessel ("C3 marine") emissions in the 2011 base case emission inventory for this proposed rule are consistent with those in the 2011NEIv2. These emissions reflect reductions associated with the Emissions Control Area proposal to the International Maritime Organization control strategy (EPA–420–F–10–041, August 2010); reductions of $NO_X$, VOC, and CO emissions for new C3 engines that went into effect in 2011; and fuel sulfur limits that went into effect as early as 2010. The cumulative impacts of these rules through 2017 are incorporated in the 2017 projected emissions for C3 marine sources.

### 6. Development of Emission Inventories for Other Nonroad Mobile Sources

To develop the nonroad mobile source emission inventories other than C3 marine for the modeling platform, the EPA used monthly, county, and process level emissions output from the National Mobile Inventory Model (NMIM) (see *http://www.epa.gov/otaq/nmim.htm*). State-submitted emissions data for nonroad sources were used for Texas and California. These emissions are consistent with those in the 2011NEIv2.

The EPA also used NMIM to project nonroad mobile emissions for future years. Development of the future year nonroad emissions require a substantial amount of lead time and the emissions were prepared for the year 2018 before the model year was changed to 2017 when the attainment date was revised in the 2008 Ozone NAAQS SIP Requirements Rule. To develop a 2017 nonroad emissions inventory for this proposal that accounted for the difference between 2017 and 2018 emissions levels, we calculated the nonroad emissions for 2018, and then adjusted those emissions to 2017 levels using national adjustment factors derived from national NMIM runs for 2017 and 2018. Emissions specific to 2017 will be developed for the modeling that will support the final rule. The nonroad mobile emission control programs include reductions to

locomotives, diesel engines and marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of control programs included for mobile sources is available in the Emissions Modeling TSD.

### 7. Development of Emission Inventories for Nonpoint Sources

The emissions for stationary nonpoint sources in our 2011 base case emission inventory are largely consistent with those in the 2011NEIv2. For more information on the nonpoint sources in the 2011 base case inventory, see the Emissions Modeling TSD and the 2011NEIv2 TSD.

Where states provided EPA with information about projected control measures or changes in nonpoint source emissions, the EPA incorporated those inputs in its projections. We included adjustments for state fuel sulfur content rules for fuel oil in the Northeast. Projected emissions for portable fuel containers reflect the impact of projection factors required by the final Mobile Source Air Toxics (MSAT2) rule and the EISA, including updates to cellulosic ethanol plants, ethanol transport working losses, and ethanol distribution vapor losses.

The EPA developed regional projection factors for nonpoint oil and gas sources by product type based on Annual Energy Outlook (AEO) 2014 projections to year 2018. We reflected criteria air pollutant (CAP) co-benefit reductions resulting from the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Reciprocating Internal Combustion Engines (RICE) and NSPS rules and Oil and Gas NSPS VOC controls for select source categories. Additional details on the projections are available in the Emissions Modeling TSD.

### C. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors

In this section, we describe the air quality modeling performed to identify locations where we expect there to be nonattainment or maintenance problems for the 2008 8-hour ozone NAAQS in the 2017 analytic future year chosen for this proposal. We then describe how we factored current monitored data into the identification of sites as having either nonattainment or maintenance concerns for the purposes of this rulemaking. These sites are used as the "receptors" for quantifying the contributions of emissions in upwind states to nonattainment and maintenance concerns in downwind locations.

In this proposed rule, the EPA is relying on CSAPR's approach to identify separate nonattainment and maintenance receptors in order to give independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*.[78] In its decision on remand from the Supreme Court, the D.C. Circuit confirmed that EPA's approach to identifying maintenance receptors in CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision. *EME Homer City II*, 795 F.3d at 136.

In CSAPR, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The CSAPR approach for identifying nonattainment and maintenance receptors relied only upon air quality model projections of measured design values. In CSAPR, if the average design value in the analysis year was projected to exceed the NAAQS, then the monitoring site is identified as a nonattainment receptor without consideration of whether the monitoring site is currently measuring "clean data" (*i.e.*, design values below the NAAQS based on the most recent three years of measured data). In prior transport rulemakings, such as the NO$_X$ SIP Call and CAIR, the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.[79] We explained that we had the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. In CSAPR, we were compelled to deviate from this practice of incorporating monitored data into EPA's evaluation of projected nonattainment receptors because the most recent monitoring data then available reflected large emission

reductions from CAIR, which CSAPR was designed to replace. As recently affirmed by the D.C. Circuit, it was therefore reasonable for the EPA to decide not to compare monitored data reflecting CAIR emissions reductions to its modeling projections that instead excluded CAIR from its baseline.[80]

As the EPA is not replacing an existing transport program in this rulemaking proposal, we are proposing to consider current monitored data as part of the process for identifying projected nonattainment receptors for this rulemaking. Accordingly, in this rulemaking, the EPA is proposing to return to our prior practice of comparing our modeled nonattainment projections to current monitored air quality. For the purposes of this rulemaking, the EPA proposes to identify as nonattainment receptors those monitors that both currently measure nonattainment and that the EPA projects will be in nonattainment in 2017.

As noted above, in CSAPR the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor. The EPA also recognizes that previously experienced meteorological conditions (*e.g.*, dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS. Therefore, the EPA assesses the magnitude of the maximum projected design value for 2017 at each receptor in relation to the 2008 ozone NAAQS and, where such a value exceeds the NAAQS, EPA determines

that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance in this proposal, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[81] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have a maintenance problem in 2017.

Consistent with the CSAPR methodology, monitoring sites with a projected maximum design value that exceeds the NAAQS, but with a projected average design value that is below the NAAQS, are identified as maintenance-only receptors. In addition, those sites that are currently measuring clean data, but are projected to be nonattainment based on the average design value and that, by definition, are projected to have a maximum design value above the standard are also identified as maintenance-only receptors. We are not proposing that monitored data have any effect on the EPA's determination of maintenance receptors using the CSAPR method since even those receptor sites that are not currently monitoring violations are still subject to conditions that may allow violations to reoccur and therefore have future maintenance concerns.

The following is a brief summary of the procedures for projecting future-year 8-hour ozone average and maximum design values to 2017. Consistent with the EPA's modeling guidance we use the air quality modeling results in a "relative" sense to project future concentrations. That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values[82] up or down depending on the relative (percent) change in model predictions for each location. The modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under "average" conditions. Because the base year for this proposal is 2011, we are using the base period 2009–2013 ambient ozone design value data in order to project

[78] 531 F.3d at 910–911 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[79] 63 FR at 57375, 57377 (Oct. 27, 1998); 70 FR at 25241 (May 12, 2005). *See also North Carolina*, 531 F.3d at 913–914 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

[80] *EME Homer City II*, 795 F.3d at 135–36; *see also* 76 FR 48208 at 48230–31 (August 8, 2011).

[81] *See* 795 F.3d at 136.

[82] The ozone design value at a particular monitoring site is the 3-year average of the annual 4th highest daily maximum 8-hour ozone concentration at that site.

2017 average design values in a manner consistent with the modeling guidance.

The approach for projecting future ozone design values involved the projection of an average of up to 3 design value periods, which include the years 2009–2013 (design values for 2009–2011, 2010–2012, and 2011–2013). The 2009–2011, 2010–2012, and 2011–2013 design values are accessible at *www.epa.gov/airtrends/values.html.* The average of the 3 design values creates a "5-year weighted average" value. The 5-year weighted average values were then projected to 2017. To project 8-hour ozone design values we used the 2011 base year and 2017 future base-case model-predicted ozone concentrations to calculate relative reduction factors (RRFs) for the location of each monitoring site. The RRFs were applied to the 2009–2013 average ozone design values and the individual design values for 2009–2011, 2010–2012, and 2011–2013 through the following steps:

*Step 1:* For each monitoring site, we calculate the average concentration across the 10 days with the 10 highest 8-hour daily maximum ozone predictions in the 2017 baseline[83] using the predictions in the nine grid cells that include or surround the location of the monitoring site. The RRF for a site is the ratio of the mean prediction in the future year to the mean prediction in the 2011 base year. The RRFs were calculated on a site-by-site basis.[84]

*Step 2:* The RRF for each site is then multiplied by the 2009–2013 5-year weighted average ambient design value for that site, yielding an estimate of the

future average design value at that particular monitoring location.

*Step 3:* We calculate the maximum future design value by multiplying the RRF for each site by the three base periods (2009–2011, 2010–2012, and 2011–2013) separately. The highest of the three future values is the projected maximum design value. Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are truncated to integers in units of ppb.[85]

Projected design values that are greater than or equal to 76 ppb are considered to be violating the NAAQS in 2017. For those sites that are projected to be violating the NAAQS based on the average design values in 2017, we examined measured design values for the period 2012–2014, which is the most recent available measured design values at the time of this proposal. As noted above, we are proposing to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality and also have projected average design values of 76 ppb or greater. Maintenance-only receptors therefore include both (1) those sites with projected average design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 76 ppb or greater. In addition to the maintenance-only receptors, the 2017 ozone nonattainment receptors are also maintenance receptors because the

maximum design values for each of these sites is always greater than or equal to the average design value. The monitoring sites that we project to be nonattainment and maintenance receptors for the ozone NAAQS in the 2017 baseline are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of ozone NAAQS as part of this proposal.

Table V.C–1 contains the 2009–2013 base period average and maximum 8-hour ozone design values, the 2017 baseline average and maximum design values, and the 2012–2014 design values for the 8 sites in the eastern U.S. projected to be 2017 nonattainment receptors. Table V.C–2 contains this same information for the 6 maintenance-only sites in the eastern U.S. that are projected nonattainment but currently measuring clean data. Table V.C–3 contains this same information for the 23 maintenance-only sites in the eastern U.S. that are projected to have average design values below the NAAQS, but maximum design values above the NAAQS. The design values for all monitoring sites in the U.S. are provided in docket item EPA–HQ–OAR–2015–0500–0006. Additional details on the approach for projecting average and maximum design values are provided in the modeling guidance, Model Attainment Test Software[86] documentation, and the AQM TSD. The EPA is seeking comment on the proposed methods for determining projected nonattainment and maintenance receptors.

TABLE V.C–1—AVERAGE AND MAXIMUM 2009–2013 AND 2017 BASELINE 8-HOUR OZONE DESIGN VALUES AND 2012–2014 DESIGN VALUES (ppb) AT PROJECTED NONATTAINMENT SITES IN THE EASTERN U.S.

[Nonattainment receptors]

| Monitor ID | State | County | Average design value 2009–2013 | Maximum design value 2009–2013 | Average design value 2017 | Maximum design value 2017 | 2012–2014 design value |
|---|---|---|---|---|---|---|---|
| 90013007 ............ | Connecticut ........ | Fairfield ................ | 84.3 | 89.0 | 77.1 | 81.4 | 84.0 |
| 90019003 ............ | Connecticut ........ | Fairfield ................ | 83.7 | 87.0 | 78.0 | 81.1 | 85.0 |
| 90099002 ............ | Connecticut ........ | New Haven ........... | 85.7 | 89.0 | 77.2 | 80.2 | 81.0 |
| 480391004 ......... | Texas ................. | Brazoria ............... | 88.0 | 89.0 | 81.4 | 82.3 | 80.0 |
| 481210034 ......... | Texas ................. | Denton ................. | 84.3 | 87.0 | 76.9 | 79.4 | 81.0 |
| 484392003 ......... | Texas ................. | Tarrant ................. | 87.3 | 90.0 | 79.6 | 82.1 | 77.0 |
| 484393009 ......... | Texas ................. | Tarrant ................. | 86.0 | 86.0 | 78.6 | 78.6 | 80.0 |
| 551170006 ......... | Wisconsin ........... | Sheboygan .......... | 84.3 | 87.0 | 77.0 | 79.4 | 81.0 |

---

[83] As specified in the attainment demonstration modeling guidance, if there are fewer than 10 modeled days greater than or equal to (>=) 70 ppb, then the threshold is lowered in 1 ppb increments (to as low as 60 ppb) until there are 10 days. If there

are fewer than 5 days >= 60 ppb, then an RRF calculation is not completed for that site.

[84] Sites with insufficient valid design values were not included in the calculation. In addition, sites with fewer than 5 days with predicted 8-hour ozone >= 60 ppb in 2018 were dropped from the analysis.

[85] 40 CFR part 50, Appendix P to Part 50— Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone.

[86] Abt Associates, 2014. User's Guide: Modeled Attainment Test Software. *http://www.epa.gov/ scram001/modelingapps_mats.htm.*

TABLE V.C–2—AVERAGE AND MAXIMUM 2009–2013 AND 2017 BASELINE 8-HOUR OZONE DESIGN VALUES AND 2012–2014 DESIGN VALUES (ppb) AT SITES IN THE EASTERN U.S. THAT ARE PROJECTED NONATTAINMENT BUT CURRENTLY MEASURING CLEAN DATA

[Maintenance-only receptors]

| Monitor ID | State | County | Average design value 2009–2013 | Maximum design value 2009–2013 | Average design value 2017 | Maximum design value 2017 | 2012–2014 design value |
|---|---|---|---|---|---|---|---|
| 240251001 | Maryland | Harford | 90.0 | 93.0 | 81.3 | 84.0 | 75.0 |
| 360850067 | New York | Richmond | 81.3 | 83.0 | 76.3 | 77.8 | 73.0 |
| 361030002 | New York | Suffolk | 83.3 | 85.0 | 79.2 | 80.8 | 73.0 |
| 390610006 | Ohio | Hamilton | 82.0 | 85.0 | 76.3 | 79.1 | 75.0 |
| 482011034 | Texas | Harris | 81.0 | 82.0 | 76.8 | 77.8 | 72.0 |
| 482011039 | Texas | Harris | 82.0 | 84.0 | 78.2 | 80.2 | 72.0 |

TABLE V.C–3—AVERAGE AND MAXIMUM 2009–2013 AND 2017 BASELINE 8-HOUR OZONE DESIGN VALUES AND 2012–2014 DESIGN VALUES (ppb) AT PROJECTED MAINTENANCE SITES IN THE EASTERN U.S. BASED ON THE CSAPR METHODOLOGY

[Maintenance-only receptors]

| Monitor ID | State | County | Average design value 2009–2013 | Maximum design value 2009–2013 | Average design value 2017 | Maximum design value 2017 | 2012–2014 design value |
|---|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 80.3 | 83.0 | 75.8 | 78.4 | 82.0 |
| 211110067 | Kentucky | Jefferson | 82.0 | 85.0 | 75.8 | 78.6 | Incomplete Data |
| 211850004 | Kentucky | Oldham | 82.0 | 86.0 | 73.7 | 77.3 | 74.0 |
| 240053001 | Maryland | Baltimore | 80.7 | 84.0 | 73.2 | 76.2 | 72.0 |
| 260050003 | Michigan | Allegan | 82.7 | 86.0 | 75.5 | 78.5 | 83.0 |
| 261630019 | Michigan | Wayne | 78.7 | 81.0 | 74.0 | 76.2 | 74.0 |
| 340071001 | New Jersey | Camden | 82.7 | 87.0 | 74.2 | 78.1 | 76.0 |
| 340150002 | New Jersey | Gloucester | 84.3 | 87.0 | 75.1 | 77.5 | 76.0 |
| 340230011 | New Jersey | Middlesex | 81.3 | 85.0 | 73.0 | 76.3 | 74.0 |
| 340290006 | New Jersey | Ocean | 82.0 | 85.0 | 73.9 | 76.6 | 75.0 |
| 360810124 | New York | Queens | 78.0 | 80.0 | 75.7 | 77.6 | 72.0 |
| 420031005 | Pennsylvania | Allegheny | 80.7 | 82.0 | 75.3 | 76.5 | 77.0 |
| 421010024 | Pennsylvania | Philadelphia | 83.3 | 87.0 | 75.1 | 78.4 | 75.0 |
| 480850005 | Texas | Collin | 82.7 | 84.0 | 74.9 | 76.0 | 78.0 |
| 481130069 | Texas | Dallas | 79.7 | 84.0 | 74.0 | 78.0 | 78.0 |
| 481130075 | Texas | Dallas | 82.0 | 83.0 | 75.8 | 76.7 | 77.0 |
| 481211032 | Texas | Denton | 82.7 | 84.0 | 75.1 | 76.3 | 79.0 |
| 482010024 | Texas | Harris | 80.3 | 83.0 | 75.9 | 78.5 | 72.0 |
| 482010026 | Texas | Harris | 77.3 | 80.0 | 73.5 | 76.1 | 67.0 |
| 482010055 | Texas | Harris | 81.3 | 83.0 | 75.4 | 77.0 | 75.0 |
| 482011050 | Texas | Harris | 78.3 | 80.0 | 74.6 | 76.2 | 74.0 |
| 484390075 | Texas | Tarrant | 82.0 | 83.0 | 75.5 | 76.4 | 79.0 |
| 484393011 | Texas | Tarrant | 80.7 | 83.0 | 74.5 | 76.6 | 75.0 |

*D. Pollutant Transport From Upwind States*

1. Air Quality Modeling To Quantify Upwind State Contributions

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on 2017 8-hour design values for identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone. CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The strength of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique [87] to quantify the contribution of 2017 baseline $NO_X$ and VOC emissions from all sources in each state to projected 2017 ozone concentrations at air quality monitoring sites. In the source apportionment model run, we tracked the ozone formed from each of the following contribution categories (*i.e.*, "tags"):

• States—anthropogenic $NO_X$ and VOC emissions from each state tracked individually (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic $NO_X$ and VOC emissions domain-wide (*i.e.*, not by state);

• Boundary Concentrations—concentrations transported into the modeling domain;

[87] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

- Tribes—the emissions from those tribal lands for which we have point source inventory data in the 2011 NEI (we did not model the contributions from individual tribes);
- Canada and Mexico—anthropogenic emissions from sources in the portions of Canada and Mexico included in the modeling domain (we did not model the contributions from Canada and Mexico separately);
- Fires—combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and
- Offshore—combined emissions from offshore marine vessels and offshore drilling platforms.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the ''biogenic'' category. The contributions from wild fire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the

''fires'' category. That is, the contributions from the ''biogenic'' and ''fires'' categories are not assigned to individual states nor are they included in the state contributions.

The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected 2017 baseline emissions and 2011 meteorology for this time period. The hourly contributions [88] from each tag were processed to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2017 model simulation. This step was performed for those model grid cells containing monitoring sites in order to obtain 8-hour average contributions for each day at the location of each site. The model-predicted contributions were then applied in a relative sense to quantify the contributions to the 2017 average design value at each site. The resulting 2017 contributions from each tag to each monitoring site in the eastern and western U.S. along with additional

details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD. The EPA is seeking comment on the methodologies for calculating ozone contributions.

The average contribution metric is intended to provide a reasonable representation of the contribution from individual states to the projected 2017 design value, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner is beneficial since the magnitude of the contributions is directly related to the magnitude of the design value at each site.

The largest contribution from each state in the East to 8-hour ozone nonattainment receptors in downwind states is provided in Table V.D–1. The largest contribution from each state in the East to 8-hour ozone maintenance-only receptors in downwind states is also provided in Table V.D–1.

TABLE V.D–1—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS FOR EACH STATE IN THE EASTERN U.S.

| Upwind state | Largest downwind contribution to nonattainment receptors for ozone (ppb) | Largest downwind contribution to maintenance receptors for ozone (ppb) |
|---|---|---|
| AL | 0.79 | 1.28 |
| AR | 0.98 | 2.15 |
| CT | 0.00 | 0.46 |
| DE | 0.37 | 2.23 |
| DC | 0.06 | 0.73 |
| FL | 0.54 | 0.72 |
| GA | 0.47 | 0.58 |
| IL | 17.48 | 23.17 |
| IN | 6.24 | 14.95 |
| IA | 0.61 | 0.85 |
| KS | 0.80 | 1.03 |
| KY | 0.75 | 11.17 |
| LA | 3.09 | 4.23 |
| ME | 0.00 | 0.08 |
| MD | 2.07 | 7.11 |
| MA | 0.10 | 0.37 |
| MI | 2.69 | 1.79 |
| MN | 0.40 | 0.47 |
| MS | 0.78 | 1.48 |
| MO | 1.63 | 3.69 |
| NE | 0.24 | 0.36 |
| NH | 0.02 | 0.07 |
| NJ | 8.84 | 12.38 |
| NY | 16.96 | 17.21 |
| NC | 0.55 | 0.93 |
| ND | 0.11 | 0.28 |
| OH | 2.18 | 7.92 |
| OK | 1.70 | 2.46 |
| PA | 9.39 | 15.93 |
| RI | 0.02 | 0.08 |
| SC | 0.16 | 0.21 |

[88] Contributions from anthropogenic emissions under ''$NO_X$-limited'' and ''VOC-limited'' chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.

TABLE V.D–1—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS FOR EACH STATE IN THE EASTERN U.S.—Continued

| Upwind state | Largest downwind contribution to nonattainment receptors for ozone (ppb) | Largest downwind contribution to maintenance receptors for ozone (ppb) |
|---|---|---|
| SD | 0.08 | 0.12 |
| TN | 0.51 | 1.67 |
| TX | 2.44 | 2.95 |
| VT | 0.01 | 0.05 |
| VA | 1.87 | 5.29 |
| WV | 0.95 | 3.11 |
| WI | 0.34 | 2.59 |

2. Application of Screening Threshold

The EPA then evaluated the magnitude of the contributions from each upwind state to downwind nonattainment and maintenance receptors. In this proposal, the EPA uses an air quality screening threshold to identify upwind states that contribute to downwind ozone concentrations in amounts sufficient to ''link'' them to these to downwind nonattainment and maintenance receptors.

As discussed above in section III, the EPA is proposing to establish the air quality screening threshold calculated as one percent of the NAAQS. Specifically for this rule, we propose calculating an 8-hour ozone value for this air quality threshold of 0.75 ppb as the quantification of one percent of the 2008 ozone NAAQS.

States in the East[89] whose contributions to a specific receptor meet or exceed the screening threshold are considered linked to that receptor; those states' ozone contributions and emissions (and available emission reductions) are analyzed further, as described in section VI, to determine

whether and what emissions reductions might be required from each state.

States in the East whose contributions are below the threshold are not included in the proposed rule and are considered to make insignificant contributions to projected downwind air quality problems. However, for eastern states for which the EPA is not proposing FIPs in this action, the EPA notes that updates to the modeling for the final rule could change the analysis as to which states have contributions that meet or exceed the screening threshold. In the event that air quality modeling conducted for the final rule demonstrates that states that contribute amounts below the threshold in the proposal are projected to contribute amounts greater than or equal to the threshold in the final rule modeling, the EPA instead proposes to finalize revised budgets (presented with this rulemaking for comment) for whichever of those states may be identified as linked to such air quality problems. The EPA has calculated emissions budgets for all eastern states that we are proposing to apply to those states if, and only if, the final rule air quality modeling identifies

a linkage as just described. These budgets are available in the Ozone Transport Policy Analysis TSD.

Based on the maximum downwind contributions in Table V.D–1, the following states contribute at or above the 0.75 ppb threshold to downwind nonattainment receptors: Alabama, Arkansas, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, and West Virginia. Based on the maximum downwind contributions in Table V.D–1, the following states contribute at or above the 0.75 ppb threshold to downwind maintenance-only receptors: Alabama, Arkansas, Delaware, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. The linkages between each upwind state and downwind nonattainment receptors and maintenance-only receptors in the eastern U.S. are provided in Table V.D–2 and Table V.D–3, respectively.

TABLE V.D–2—LINKAGES BETWEEN EACH UPWIND STATE AND DOWNWIND NONATTAINMENT RECEPTORS IN THE EASTERN U.S.

| Upwind state | Downwind nonattainment receptors |
|---|---|
| AL | Tarrant Co., TX (484392003). |
| AR | Brazoria Co., TX (480391004); Tarrant Co., TX (484392003); Tarrant Co., TX (484393009). |
| IL | Brazoria Co., TX (480391004); Sheboygan Co., WI (551170006). |
| IN | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); Sheboygan Co., WI (551170006). |
| KS | Sheboygan Co., WI (551170006). |
| KY | Sheboygan Co., WI (551170006). |
| LA | Brazoria Co., TX (480391004); Denton Co., TX (481210034); Tarrant Co., TX (484392003); Tarrant Co., TX (484393009); Sheboygan Co., WI (551170006). |
| MD | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002). |
| MI | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002); Sheboygan Co., WI (551170006). |
| MS | Brazoria Co., TX (480391004). |

[89] As discussed in section III this assessment shows that there are problem receptors in the West where western states contribute amounts greater than or equal to the screening threshold used to

evaluate eastern states (*i.e.,* 1 percent of the NAAQS). However, there may be additional criteria to evaluate regarding transported air pollution in the West and upwind state obligations. The EPA

proposes to focus this rulemaking on eastern states, but seeks comment on whether to include western states in this rule.

TABLE V.D–2—LINKAGES BETWEEN EACH UPWIND STATE AND DOWNWIND NONATTAINMENT RECEPTORS IN THE EASTERN U.S.—Continued

| Upwind state | Downwind nonattainment receptors |
|---|---|
| MO | Brazoria Co., TX (480391004); Sheboygan Co., WI (551170006). |
| NJ | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002). |
| NY | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002). |
| OH | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002); Sheboygan Co., WI (551170006). |
| OK | Denton Co., TX (481210034); Tarrant Co., TX (484392003); Tarrant Co., TX (484393009); Sheboygan Co., WI (551170006). |
| PA | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002). |
| TX | Sheboygan Co., WI (551170006). |
| VA | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003); New Haven Co., CT (90099002). |
| WV | Fairfield Co., CT (90013007); Fairfield Co., CT (90019003). |

TABLE V.D–3—LINKAGES BETWEEN EACH UPWIND STATES AND DOWNWIND MAINTENANCE-ONLY RECEPTORS IN THE EASTERN U.S.

| Upwind state | Downwind maintenance receptors |
|---|---|
| AL | Hamilton Co., OH (390610006); Harris Co., TX (482010055). |
| AR | Oldham Co., KY (211850004); Allegan Co., MI (260050003); Dallas Co., TX (481130069); Dallas Co., TX (481130075); Harris Co., TX (482010026); Harris Co., TX (482010055); Harris Co., TX (482011039); Harris Co., TX (482011050); Tarrant Co., TX (484390075); Tarrant Co., TX (484393011). |
| DE | Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Ocean Co., NJ (340290006); Philadelphia Co., PA (421010024). |
| IL | Jefferson Co., KY (211110067); Oldham Co., KY (211850004); Allegan Co., MI (260050003); Wayne Co., MI (261630019); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Suffolk Co., NY (361030002); Hamilton Co., OH (390610006); Allegheny Co., PA (420031005); Harris Co., TX (482010026); Harris Co., TX (482011039). |
| IN | Jefferson Co., KY (211110067); Oldham Co., KY (211850004); Baltimore Co., MD (240053001); Harford Co., MD (240251001); Allegan Co., MI (260050003); Wayne Co., MI (261630019); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Hamilton Co., OH (390610006); Allegheny Co., PA (420031005); Philadelphia Co., PA (421010024). |
| IA | Allegan Co., MI (260050003). |
| KS | Allegan Co., MI (260050003); Tarrant Co., TX (484390075); Tarrant Co., TX (484393011). |
| KY | Baltimore Co., MD (240053001); Harford Co., MD (240251001); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Richmond Co., NY (360850067); Hamilton Co., OH (390610006); Allegheny Co., PA (420031005); Philadelphia Co., PA (421010024). |
| LA | Collin Co., TX (480850005); Dallas Co., TX (481130069); Dallas Co., TX (481130075); Denton Co., TX (481211032); Harris Co., TX (482010034); Harris Co., TX (482010026); Harris Co., TX (482010055); Harris Co., TX (482011034); Harris Co., TX (482011039); Harris Co., TX (482011050); Tarrant Co., TX (484390075); Tarrant Co., TX (484393011). |
| MD | Fairfield Co., CT (90010017); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Philadelphia Co., PA (421010024). |
| MI | Fairfield Co., CT (90010017); Jefferson Co., KY (211110067); Oldham Co., KY (211850004); Harford Co., MD (240251001); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Hamilton Co., OH (390610006); Allegheny Co., PA (420031005). |
| MS | Harris Co., TX (482010055); Harris Co., TX (482011039). |
| MO | Oldham Co., KY (211850004); Allegan Co., MI (260050003); Camden Co., NJ (340071001); Hamilton Co., OH (390610006); Harris Co., TX (482010026); Harris Co., TX (482010055); Harris Co., TX (482011039); Harris Co., TX (482011050). |
| NJ | Fairfield Co., CT (90010017); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Philadelphia Co., PA (421010024). |
| NY | Fairfield Co., CT (90010017); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006). |
| NC | Baltimore Co., MD (240053001). |
| OH | Fairfield Co., CT (90010017); Jefferson Co., KY (211110067); Oldham Co., KY (211850004); Baltimore Co., MD (240053001); Harford Co., MD (240251001); Wayne Co., MI (261630019); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Allegheny Co., PA (420031005); Philadelphia Co., PA (421010024). |
| OK | Allegan Co., MI (260050003); Hamilton Co., OH (390610006); Dallas Co., TX (481130069); Dallas Co., TX (481130075); Denton Co., TX (481211032); Harris Co., TX (482010026); Harris Co., TX (482011034); Harris Co., TX (482011039); Tarrant Co., TX (484390075); Tarrant Co., TX (484393011). |
| PA | Fairfield Co., CT (90010017); Baltimore Co., MD (240053001); Harford Co., MD (240251001); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002). |
| TN | Hamilton Co., OH (390610006); Philadelphia Co., PA (421010024). |

TABLE V.D–3—LINKAGES BETWEEN EACH UPWIND STATES AND DOWNWIND MAINTENANCE-ONLY RECEPTORS IN THE EASTERN U.S.—Continued

| Upwind state | Downwind maintenance receptors |
|---|---|
| TX | Baltimore Co., MD (240053001); Harford Co., MD (240251001); Allegan Co., MI (260050003); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Hamilton Co., OH (390610006); Allegheny Co., PA (420031005); Philadelphia Co., PA (421010024). |
| VA | Fairfield Co., CT (90010017); Baltimore Co., MD (240053001); Harford Co., MD (240251001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Philadelphia Co., PA (421010024). |
| WV | Baltimore Co., MD (240053001); Harford Co., MD (240251001); Camden Co., NJ (340071001); Gloucester Co., NJ (340150002); Middlesex Co., NJ (340230011); Ocean Co., NJ (340290006); Queens Co., NY (360810124); Richmond Co., NY (360850067); Suffolk Co., NY (361030002); Hamilton Co., OH (390610006); Allegheny Co., PA (420031005); Philadelphia Co., PA (421010024). |
| WI | Allegan Co., MI (260050003); Wayne Co., MI (261630019). |

As discussed previously, after the receptor and contribution analyses for this proposal were underway, the EPA released an updated IPM base case, version 5.15, and the final CPP. In order to reflect all on-the-books policies as well as the most current power sector modeling data, the EPA performed an assessment to reflect inclusion of IPM 5.15 with the CPP in an "adjusted" base case for this proposal. All references below to the "adjusted base case" refer to the 2017 air quality modeling base case which has been adjusted to account for the revised IPM 5.15 with CPP emissions. This assessment method relied on the EPA's air quality modeling contribution data as well as projected ozone concentrations from an illustrative EGU NOₓ mitigation scenario. For more information about these methods, refer to the Ozone Transport Policy Analysis Technical Support Document.

This assessment shows that two receptors—Hamilton County Ohio (390610006) and Richmond County New York (360850067)—that were projected to have average design values exceeding the NAAQS in the modeled 2017 baseline, are expected to have average design values below the NAAQS with the adjusted base case. However, these receptors are still expected to have maximum design values exceeding the NAAQS with the adjusted base case. Because both of these receptors are also considered maintenance receptors for the purposes of this proposal, their status as identified air quality concerns and the status of states linked to these receptors is unchanged by the adjusted base case.

This assessment also shows that four receptors—Allegheny County Pennsylvania (420031005), Collin County Texas (480850005), Wayne County Michigan (261630019), and Middlesex County New Jersey (340230011)—that were projected to

have maximum design values exceeding the NAAQS in the modeled base case, are expected to have maximum design values below the NAAQS with the adjusted base case. With the adjusted base case, these sites would not be considered nonattainment or maintenance receptors for the purposes of this proposal. However, because no state is linked solely to any one of these sites, changing the status of these receptors does not impact the scope of states linked to downwind nonattainment or maintenance receptors for this proposal.

In addition to evaluating the status of downwind receptors identified for this proposal, the EPA evaluated whether the adjusted base case would reduce ozone contributions from upwind states to the extent that a previously linked state would have a maximum contribution less than the 1% threshold. This assessment shows that in the adjusted base case, all states are expected to remain linked (i.e., contribute greater than or equal to 1% of the NAAQS) to at least one downwind nonattainment or maintenance receptor. Therefore, using the adjusted base case for this proposal does not impact the scope of states linked to downwind nonattainment or maintenance receptors relative to the modeled base case.

The analyses that EPA uses in section VI to quantify EGU NOₓ ozone-season emissions budgets for this proposal also rely on the adjusted base case.

The EPA seeks comment on its assessment of the impacts of relying on the adjusted base case for these purposes, and on EPA's intention to rely on full air quality and IPM modeling of the adjusted base case to identify nonattainment and maintenance receptors and to inform the analysis of interstate ozone transport for the 2008 ozone NAAQS.

## VI. Quantifying Upwind-State EGU NOₓ Reduction Potential To Reduce Interstate Ozone Transport for the 2008 NAAQS

### A. Introduction

This section describes the EPA's proposed quantification of near-term EGU NOₓ reductions that are necessary to fulfill (at least in part) the Clean Air Act requirement to address interstate ozone transport for the 2008 NAAQS. This section also describes the EPA's proposal to translate these reductions into EGU NOₓ ozone-season emissions budgets. Section VII describes the EPA's proposal to implement these proposed emissions budgets via updates to the existing CSAPR NOₓ ozone-season trading program.

As described in section V, the EPA separately identified nonattainment receptors and maintenance receptors. The EPA proposes to apply a single approach for quantifying an upwind state's ozone transport obligation to both nonattainment and maintenance receptors. It is reasonable to apply the same approach to quantify upwind-state reduction requirements with respect to both nonattainment and maintenance because the structure of the problems is the same—emissions from sources in upwind states contributing to downwind ozone concentrations that put the downwind receptor at risk of nonattainment with respect to the EPA's clean air standards. Moreover, as all nonattainment receptors are also maintenance receptors because the maximum design value will always be equal to or exceed the average design value, it is reasonable to control all sites consistent with the level of control necessary to reduce maintenance concerns.

As described in section III of this preamble, due to the impending July 2018 moderate area attainment date, the EPA is proposing, as a first step, to

quantify near-term EGU NO$_X$ ozone-season emission reductions to reduce interstate ozone transport for the 2008 ozone NAAQS. For this section, this means that the EPA is proposing to quantify ozone season EGU NO$_X$ reductions achievable for the 2017 ozone season (*i.e.,* the last full ozone season prior to the July 2018 attainment date).

The EPA's assessment of upwind state obligations in this proposal reflects application of a multi-factor test that considers cost, available emission reductions, and air quality. This is the same multi-factor test used in the original CSAPR. This multi-factor test considers increasing levels of uniform control stringency, where each level is represented by cost, to determine the appropriate magnitude of pollution reduction that would reduce the impacts of interstate transport on downwind states and to apportion that reduction responsibility among collectively-contributing upwind states. This approach to quantifying upwind state emission reduction obligations was reviewed by the Supreme Court in *EPA* v. *EME Homer City Generation,* which held that using such an approach to apportion reduction responsibilities among upwind states that are collectively responsible for downwind air quality impacts ''is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address.'' 134 S.Ct. at 1607.

There are three steps in developing and applying the multi-factor test to quantify upwind state emission reductions as to the 2008 ozone NAAQS: (1) Identify NO$_X$ mitigation strategies, focusing on those that can be in place for the 2017 ozone season; (2) develop uniform EGU NO$_X$ cost thresholds based on these NO$_X$ mitigation strategies; (3) assess EGU NO$_X$ mitigation potential that is achievable for 2017 and assess corresponding air quality improvements resulting from the application of each uniform cost threshold, including to check for over-control. This multi-factor evaluation informs the EPA's determination of appropriate ozone season EGU NO$_X$ reductions necessary to reduce significant contribution to nonattainment and interference with maintenance of the 2008 ozone NAAQS for the proposed 2017 compliance year. These steps are discussed in further detail in the following sections.

This proposal evaluates a range of uniform EGU NO$_X$ costs from $500 per ton to $10,000 per ton. This range, and the intermediate uniform NO$_X$ cost thresholds evaluated within that range,

were selected based on the cost thresholds at which various EGU NO$_X$ control technologies are widely available, the use of certain EGU NO$_X$ cost thresholds in previous rules to address ozone transport, and EGU NO$_X$ cost thresholds incorporated into state requirements to address ozone nonattainment.

In this proposal, the EPA evaluated the emission reduction potential in each upwind state at each uniform NO$_X$ cost threshold using the adjusted IPM base case 5.15. In this case, the EPA limited IPM's evaluation of NO$_X$ mitigation strategies to those that can be implemented for the 2017 ozone season, which is the proposed compliance timing for this rulemaking, as described in section VI.B below.

*B. NO$_X$ Mitigation Strategies*

The following sub-sections describe the EPA's assessment of EGU and non-EGU point source NO$_X$ mitigation strategies. For more details on these assessments, refer to the EGU NO$_X$ Mitigation Strategies TSD and the Update to Non-EGU Emission Reductions Cost and Potential for States with Potentially Significant Contributions under the 2008 Ozone Standard TSD in the docket for this proposed rule.

1. EGU NO$_X$ Mitigation Strategies

In developing this proposed rule, the EPA considered all widely used EGU NO$_X$ control strategies: Fully operating existing Selective Catalytic Reduction (SCR) and Selective Non-Catalytic Reduction (SNCR)—including optimizing NO$_X$ removal by existing, operational SCRs and SNCRs and turning on and optimizing existing idled SCRs and SNCRs; installation of (or upgrading to) state-of-the-art NO$_X$ combustion controls; shifting generation to units with lower NO$_X$ emission rates within the same state; and installing new SCRs and SNCRs. Although this proposal does not require or impose any specific technology standards to demonstrate compliance, EPA determined that certain technologies would be available by the 2017 timeframe when assessing potential reductions in the region.

For the reasons explained below, the EPA determined that the power sector could implement all of these NO$_X$ mitigation strategies, except installation of new SCRs or SNCRs, between finalization of this proposal in summer of 2016 and the 2017 ozone season. As to the installation of new SCRs or SNCRs, the amount of time from contract award through commissioning for retrofit with new SCR or SNCR

exceeds 18 and 12 months, respectively. For both technologies, conceptual design, permitting, financing, and bid review require additional time. It would therefore not be feasible to retrofit new SCR or SNCR to achieve EGU NO$_X$ reductions in the 2017 ozone season. *See* EGU NO$_X$ Mitigation Strategies TSD for discussion of feasibility of EGU NO$_X$ controls for the 2017 ozone season. Therefore, the EPA analyzed the remaining strategies for purposes of quantifying upwind state obligations in this rule. Exclusion of new SCR and SNCR installation from this analysis reflects a determination only that these strategies are infeasible by 2017, not a determination that they are infeasible or inappropriate for consideration of cost-effective NO$_X$ reduction potential over a longer timeframe. The EPA requests comment on what EGU NO$_X$ mitigation strategies are feasible for the 2017 ozone season.

a. Fully Operating Existing SCRs and SNCRs

Fully operating existing SCR and SNCRs can significantly reduce EGU NO$_X$ emissions quickly, using investments that have already been made. SCRs can achieve up to 90 percent reduction in EGU NO$_X$ (with sufficient installed catalyst), while SNCRs can achieve 20–30 percent reduction in EGU NO$_X$, beyond the reductions from combustion controls. These controls are in widespread use across the U.S. power sector. In the east, approximately 64 percent of coal-fired EGU capacity and 75 percent of natural gas combined cycle (NGCC) EGU capacity is equipped with SCR or SNCR. Recent power sector data reveal that some SCR and SNCR controls are being underused.[90] In some cases, controls are not fully operating (*i.e.,* the controls could be operated at a higher NO$_X$ removal rate). In other cases, controls have been idled for years. Fully operating existing SCR and SNCR would be a cost-effective and readily available approach for EGUs to reduce NO$_X$ emissions and the EPA evaluated this NO$_X$ mitigation strategy in quantifying EGU NO$_X$ obligations for this proposal.

For existing SCRs and SNCRs that are operating to some extent, but not at their full pollution control capability, the EPA's analysis determined that $500 per ton represents the costs reflective of fully operating these systems. Because the SCR or SNCR is already installed and is at least to some extent operating and the EPA assumes that additional reagent (*i.e.,* ammonia or urea) is the only

significant cost required for full operation. We observe that urea can cost on the order of $300 per metric ton. The cost for anhydrous ammonia is around $750 per ton.[91] In our assessment, we assume that a 50 percent solution is used in removing an equivalent amount of $NO_X$. Thus, we estimate that sufficient reagent could be purchased at a cost of $500 per ton of $NO_X$ removed to achieve full operation for most SCRs and SNCRs. For more details on this assessment, refer to the EGU $NO_X$ Mitigation Strategies TSD in the docket for this proposed rule. The proposal seeks comment on this assessment.

The operational difference between not fully operating and fully operating existing SCRs and SNCRs is increasing reagent (i.e., ammonia or urea) flow rate and ensuring sufficient reagent exists to sustain higher flow operations. Therefore, increasing $NO_X$ removal from these controls can be implemented by procuring more reagent. Stocking-up additional reagent for sustaining increased $NO_X$ removal could be done in a one or two weeks.[92]

For existing SCRs and SNCRs that have been idled for years, unit operators may need to restart payment of some fixed and variable costs associated with that control. Fixed and variable costs include labor, maintenance and repair, reagent, parasitic load, and ammonia or urea. As further detailed in the EGU $NO_X$ Mitigation Strategies TSD, which is found in the docket for this proposed rule, the EPA performed an in-depth cost assessment for all coal-fired units with SCRs, finding that 90 percent of the units had total SCR operation costs of $1,300 per ton of $NO_X$ removed, or less.

Based on this assessment, the EPA proposes that turning on and fully operating idled SCRs is widely available at a uniform cost of $1,300 per ton of $NO_X$ removed. For more details on this assessment, refer to the EGU $NO_X$ Mitigation Strategies TSD in the docket for this proposed rule. The proposal seeks comment on this assessment.

The EPA performed a similar assessment for fully operating existing idled SNCR systems, finding that the majority of the total fixed and variable operating cost for SNCR is related to the cost of the reagent used (e.g., ammonia

or urea) and that the resulting cost per ton of $NO_X$ reduction is sensitive to the $NO_X$ rate of the unit prior to SNCR operation. Based on the results of this analysis, and in order to represent a broad range of unit-level $NO_X$ rates before SNCR operation, the EPA proposes that turning on and fully operating idled SNCRs is widely available at a uniform cost of $3,400 per ton of $NO_X$ removed. For more details on this assessment, refer to the EGU $NO_X$ Mitigation Strategies TSD in the docket for this proposed rule. The proposal seeks comment on this assessment and on higher cost thresholds that would require some installation of new SCRs/SNCRs and the appropriate timetable or phase-in needed to accommodate those technologies.

The EPA also evaluated the feasibility of turning on idled SCR and SNCR for the 2017 ozone season. Based on past practice and the possible effort to restart the controls (e.g., stockpiling reagent, bringing the system out of protective lay-up, performing inspections, etc.), returning these idled controls to operation should be available in equal to or less than 3 months.[93] The proposal seeks comment on this assessment.

b. State-of-the-Art $NO_X$ Combustion Controls

State-of-the-art combustion controls such as low-$NO_X$ burners (LNB) and/or over-fire air (OFA) are cost-effective, can be installed quickly, and can significantly reduce EGU $NO_X$ emissions. Ninety-nine percent of coal-fired EGU capacity in the East is equipped with some form of combustion control. Combustion controls alone can achieve $NO_X$ emission rates of 0.15 to 0.50 lb/mmBtu. Once installed, combustion controls reduce $NO_X$ emissions at all times of EGU operation. State-of-the-art combustion controls would be a cost-effective, timely, and readily available approach for EGUs to reduce $NO_X$ emissions and the EPA included this $NO_X$ mitigation strategy in quantifying EGU $NO_X$ reductions for this proposal.

The cost of state-of-the-art combustion controls per ton of $NO_X$ reduced is dependent on the combustion control type and unit type. We estimate the cost per ton of state-of-the-art combustion controls to be $500 per ton to $1,200 per ton of $NO_X$ removed. To be conservative, the EPA proposes that installation of (or upgrading to) state-of-the-art $NO_X$ combustion controls is

widely available at $1,300 per ton of $NO_X$ removed.

As described in CSAPR the EPA has observed that upgrade, replacement, or installation of combustion controls has been demonstrated to be achievable within the timeframe provided for by this rulemaking and its compliance dates.[94] The EPA revisited this analysis with data specific to this proposal and proposes that a 2017 compliance timeframe is feasible for this EGU $NO_X$ mitigation strategy. These controls are fully proven, widely used, and with a reasonable effort can be procured, designed, installed, tested and be in operation on any coal-steam EGU consistent with the compliance timeframe provided for this rulemaking. The EPA proposes that this will be feasible for the 2017 ozone season. The proposal seeks comment on additional EGU NOx mitigation strategies that may be feasible for the 2017 ozone season.

For more details on this assessment, refer to the EGU $NO_X$ Mitigation Strategies TSD in the docket for this proposed rule. The proposal seeks comment on this assessment.

c. Shifting Generation to Lower $NO_X$-Emitting EGUs

Shifting generation to lower $NO_X$-emitting EGUs, similar to operating existing post-combustion controls, uses investments that have already been made, can be done quickly, and can significantly reduce EGU $NO_X$ emissions.

Since CSAPR was promulgated, electricity generation has trended toward lower $NO_X$-emitting generation due to market conditions (e.g., low natural gas prices) and state and federal environmental policies. For example, new NGCC facilities, which represented 45% of new 2014 capacity, can achieve $NO_X$ emission rates of 0.0095 lb/mmBtu, compared to existing coal steam facilities, which emitted at an average rate across the 23 states included in this proposal of 0.18 lbs/mmBtu of $NO_X$ in 2014. This substantial difference in $NO_X$ emission performance between existing coal steam and new NGCC generation is due both to higher nitrogen content in coal compared to natural gas, as well as to the substantially lower generating efficiency of steam combustion technology compared to combined cycle combustion technology. Shifting generation to lower $NO_X$-emitting EGUs would be a cost-effective, timely, and readily available approach for EGUs to reduce $NO_X$ emissions and the EPA

---

[91] Schnitkey, G. "Nitrogen Fertilizer Prices and 2015 Planting Decisions." *farmdoc daily* (4):195, Department of Agricultural and Consumer Economics, University of Illinois at Urbana-Champaign, October 9, 2014.

Permalink URL *http://farmdocdaily.illinois.edu/2014/10/nitrogen-fertilizer-prices-and-2015-planting-decisions.html.*

[92] This assessment is available in the EGU $NO_X$ Mitigation Strategies TSD.

[93] This assessment is available in the EGU $NO_X$ Mitigation Strategies TSD.

[94] "Installation Timing for Low $NO_X$ Burners (LNB)", Docket ID No. EPA–HQ–OAR–2009–0491–0051.

included this $NO_X$ mitigation strategy in quantifying EGU $NO_X$ obligations for this proposal.

Shifting generation to lower $NO_X$-emitting EGUs occurs on a continuum in response to economic factors such as fuel costs and uniform $NO_X$ cost thresholds, including those evaluated for this proposal (*i.e.*, relatively lower uniform $NO_X$ cost thresholds incentivize relatively fewer EGU $NO_X$ reductions resulting from shifting generation, while relatively higher uniform $NO_X$ cost thresholds encourage more EGU $NO_X$ reductions driven by shifting generation). As a result, the EPA quantified reduction potential from this EGU $NO_X$ mitigation strategy at each cost level identified that represents the availability of other pollution control measures evaluated in our assessment of uniform $NO_X$ cost thresholds described in section VI.C.

In this analysis, the EPA assumed shifting generation to units with lower $NO_X$ emission rates could occur within the same state by the near-term 2017 implementation timing for this proposed rule when assessing state emission reduction potential for emissions budget purposes. This conservative approach does not capture emission reductions that would occur if generation was shifted more broadly among units in different states, which the EPA believes is feasible over time but which may be subject to out-of-merit order dispatch constraints in the near term. Limiting generation shifting potential to units within each state is not a reflection of how generation shifting works in practice (given that the grid crosses state boundaries); instead, it is an analytic proxy designed to respect the feasibility of near-term generation shifting in light of these potential near-term out-of-merit order dispatch constraints. The EPA seeks comment on this assessment and on this limitation in quantifying EGU $NO_X$ reduction potential for the 2017 ozone season.

### 2. Non-EGU $NO_X$ Mitigation Strategies

The EPA is not proposing to address non-EGU emission reductions in its efforts to reduce interstate ozone transport for the 2008 ozone NAAQS at this time. Compared to EGUs, there are relatively more non-EGU point sources and these sources on average are smaller than EGUs. The implication of these fleet characteristics is that there are more individual sources to control and there are relatively fewer emission reductions available from each source. Given the proposed 2017 implementation timing for this rulemaking, we are uncertain that significant aggregate $NO_X$ mitigation is achievable from non-EGU point sources for 2017. Moreover, there is greater uncertainty in the EPA's assessment of non-EGU point-source $NO_X$ mitigation potential (see below). The EPA requests comment on these issues, including how non-EGU reductions should be addressed and considered in fulfilling upwind states' good neighbor obligations under the 2008 ozone standard in the future, as the control of non-EGUs may be a necessary part of addressing states' full transport obligation. States can always choose to reduce non-EGU emissions via good neighbor SIPs.

The EPA has evaluated the potential for ozone season $NO_X$ reductions from non-EGU sources. A detailed discussion of this assessment is provided in the Non-EGU $NO_X$ Mitigation Potential TSD, located in the docket for this proposed rule. This TSD discusses non-EGU source category emissions, EPA tools for estimating emission reductions from non-EGU categories, and efforts, to date, to review and refine our estimates for certain states. In addition, the TSD contains brief discussions of available controls, costs, and potential emission reductions for a few specific source categories. The EPA views this non-EGU assessment as an initial step in future efforts to evaluate non-EGU categories that may be necessary to fully quantify upwind states' significant contribution to nonattainment and interference with maintenance. The EPA seeks comment on its assessment that non-EGU controls are not feasible by the 2017 ozone-season. It also seeks comment on its broader non-EGU $NO_X$ mitigation assessment and the availability of non-EGU $NO_X$ emission reductions to mitigate interstate ozone transport in years following 2017.

Although EPA did not find non-EGU reductions feasible by 2017 in this proposal, it is taking comment on that assessment. Future EPA rulemakings or guidance could revisit the potential for reductions from non-EGU sources. Under such a scenario, EPA could use a similar approach of identifying appropriate cost thresholds for non-EGUs and EGUs alike, and then identify potential emission reductions and corresponding emission budgets. Under this scenario, an emission budget could be established for all covered sources (*e.g.*, EGUs and non-EGUs alike) with fungible allowances. EPA is taking comment on the potential to combine EGUs and non-EGUs into a single trading program to resolve the remaining non-attainment and maintenance issues at a later date.

### C. Uniform EGU Cost Thresholds for Assessment

As discussed above, the multi-factor test used here considers increasing levels of uniform control stringency, where each level is represented by cost, in combination with consideration of $NO_X$ reduction potential and corresponding air quality improvements. To determine which cost thresholds to use to assess upwind state $NO_X$ mitigation potential, the EPA evaluated EGU $NO_X$ control costs that represent the thresholds at which various control technologies are widely available (described previously in section VI.B), the use of certain cost thresholds in previous rules to address ozone transport, and cost thresholds incorporated into state requirements to address ozone nonattainment.

The EPA began by determining the appropriate range of costs to evaluate. The lower end of the range is informed by a confluence of considerations. In CSAPR, $500 per ton was the EGU $NO_X$ cost threshold relied upon to partially address ozone transport for the less stringent 1997 standard. It is also the lowest marginal cost where EPA expects $NO_X$ reduction to be cost effective, based on our assessment of EGU $NO_X$ mitigation strategies (see section B). Specifically, the cost of this approach to $NO_X$ reduction is the marginal cost of running currently operating SCR and SNCR systems at higher levels of $NO_X$ removal than they are currently achieving. The EPA has not identified a discrete $NO_X$ pollution control measure that would achieve sufficient emission reductions to address relevant air quality impacts at an estimated cost of less than $500 per ton; as a result, the EPA has not included a representation of such a cost level in this proposal's analyses.[95]

The EPA then evaluated EGU $NO_X$ cost thresholds to determine an appropriate upper bound for our assessment. The EPA identified $10,000 per ton as an upper bound, exceeding the costs of operating existing or installing new EGU $NO_X$ controls.

The EPA seeks comment on whether $500 per ton is an appropriate minimum and $10,000 per ton is an appropriate maximum uniform cost threshold to evaluate for the purpose of quantifying EGU $NO_X$ reductions to reduce interstate ozone transport for the 2008 ozone NAAQS.

---

[95] Additionally, the EPA notes that, as discussed in more detail below, no identified air quality problems were resolved at the $500 per ton cost threshold. Accordingly, it would not be practical for the EPA to evaluate emission reductions achieved at cost thresholds below $500 per ton.

The EPA then determined appropriate EGU $NO_X$ cost thresholds to evaluate within the range of $500 per ton to $10,000 per ton. As described above, these cost thresholds are informed by our assessment of the costs at which EGU $NO_X$ control strategies are widely available. While the EPA could evaluate additional cost thresholds in between those selected, this would not yield meaningful insights as to $NO_X$ reduction potential. The EPA has identified cost thresholds where control technologies are widely available and thereby where the most significant incremental emission reduction potential is expected. Analyzing costs between these cost thresholds is not expected to reveal significant incremental emission reduction potential that isn't already anticipated at the analyzed cost thresholds. Table VI.C–1 lists the EGU $NO_X$ cost thresholds evaluated and the $NO_X$ reduction strategy or policy used to identify each cost threshold.

TABLE VI.C–1

| EGU $NO_X$ cost threshold | |
|---|---|
| $500/ton | CSAPR ozone season $NO_X$ cost threshold; fully operating post-combustion controls that are already running. |
| $1,300/ton | Widespread availability of restarting idled SCRs and state of the art combustion controls. |
| $3,400/ton | $NO_X$ SIP Call ozone season $NO_X$ cost threshold, adjusted to 2014$; Widespread availability of restarting idled SNCRs. |
| $5,000/ton | Widespread availability of new SCRs.[96] |
| $6,400/ton | Widespread availability of new SNCRs.[97] |
| $10,000/ton | Upper bound. |

The EPA proposes that this range and selection of interim uniform cost thresholds are appropriate to evaluate potential EGU $NO_X$ reduction obligations to address interstate ozone transport for the 2008 ozone NAAQS. Because these cost thresholds are linked to costs at which EGU $NO_X$ mitigation strategies become widely available in each state, the cost thresholds represent the break points at which the most significant step-changes in EGU $NO_X$ mitigation are expected. The EPA seeks comment on the appropriateness of evaluating these uniform cost thresholds for the purpose of quantifying EGU $NO_X$ reductions to reduce interstate ozone transport for the 2008 ozone NAAQS.

*D. Assessing Cost, EGU $NO_X$ Reductions, and Air Quality*

The EPA analyzed ozone season $NO_X$ emission reductions available from the power sector in each state using IPM.[98] The agency analyzed levels of uniform control stringency, where each level is represented by uniform EGU $NO_X$ cost thresholds listed in Table VI.C–1 above and repeated here: $500 per ton; $1,300 per ton; $3,400 per ton; $5,000 per ton; $6,400 per ton; and $10,000 per ton. The EPA limited IPM's $NO_X$ mitigation strategies to those that could be implemented for 2017, as described in section VI.B.

The analysis applied these uniform EGU $NO_X$ cost thresholds to EGUs in the 48 contiguous United States and the District of Columbia, starting in 2017. The analysis covered EGUs with a capacity (electrical output) greater than 25 MW to make the analysis similar to previous analyses done for interstate transport purposes. The EGU Emission Reduction Cost Analysis TSD, which is in the docket for this proposed rule, provides further details of EPA's analysis of ozone season $NO_X$ emission reductions occurring at the representative EGU $NO_X$ cost thresholds analyzed for the 2017 ozone season.

Table VI.D–1 shows the 2017 baseline EGU emissions and ozone season $NO_X$ reduction potential in each state corresponding to the uniform cost levels.

TABLE VI.D–1—EGU OZONE SEASON $NO_X$ EMISSION REDUCTIONS (TONS)

| State | 2017 emissions (short tons) | Reduction potential (short tons) at various representative marginal costs per ton (in 2011$) | | |
|---|---|---|---|---|
| | Base case | $500/ton | $1,300/ton | $3,400/ton |
| Alabama | 13,289 | 1,729 | 3,582 | 3,670 |
| Arkansas | 6,224 | 13 | 104 | 859 |
| Illinois | 10,021 | 395 | 472 | 546 |
| Indiana | 41,748 | 6,611 | 12,173 | 12,989 |
| Iowa | 7,911 | 186 | 423 | 717 |
| Kansas | 11,332 | 428 | 438 | 465 |
| Kentucky | 27,141 | 3,608 | 11,896 | 12,382 |
| Louisiana | 10,897 | 64 | 117 | 400 |
| Maryland | 6,470 | 1,028 | 1,026 | 1,164 |
| Michigan | 20,049 | 403 | 3,033 | 3,528 |
| Mississippi | 7,871 | 82 | 297 | 893 |
| Missouri | 17,050 | 934 | 996 | 1,152 |
| New Jersey | 3,302 | 370 | 372 | 378 |
| New York | 4,948 | 115 | 284 | 359 |
| North Carolina | 14,435 | 1,922 | 1,922 | 3,526 |

[96] The cost assessment for new SCR is available in the EGU $NO_X$ Mitigation Strategies TSD. While chosen to define a cost-threshold, new SCRs were not considered a feasible control on the compliance timeframe being proposed for this rule.

[97] The cost assessment for new SNCR is available in the EGU $NO_X$ Mitigation Strategies TSD. While chosen to define a cost-threshold, new SNCRs were not considered a feasible control on the compliance timeframe being proposed for this rule.

[98] IPM version 5.14 is discussed in preamble section IV.B, and as noted in preamble section V, for purposes of this quantification analysis EPA used an adjusted base case reflecting IPM version 5.15, including the Clean Power Plan. IPM documentation is in the docket and available at *www.epa.gov/powersectormodeling*.

TABLE VI.D–1—EGU OZONE SEASON NO$_X$ EMISSION REDUCTIONS (TONS)—Continued

| State | 2017 emissions (short tons) Base case | Reduction potential (short tons) at various representative marginal costs per ton (in 2011$) | | |
|---|---|---|---|---|
| | | $500/ton | $1,300/ton | $3,400/ton |
| Ohio | 27,795 | 5,746 | 9,646 | 9,666 |
| Oklahoma | 19,593 | 703 | 2,170 | 3,169 |
| Pennsylvania | 41,533 | 2,210 | 26,759 | 26,791 |
| Tennessee | 5,554 | 74 | 113 | 146 |
| Texas | 58,199 | 685 | 3,610 | 5,810 |
| Virginia | 7,196 | 423 | 539 | 1,587 |
| West Virginia | 25,384 | 592 | 10,908 | 12,014 |
| Wisconsin | 5,257 | 5 | 36 | 107 |
| Total | 393,198 | 28,325 | 90,916 | 102,318 |

TABLE VI.D–1 (CONTINUED)—EGU OZONE SEASON NO$_X$ EMISSION REDUCTIONS (TONS)

| State | Reduction potential (short tons) at various representative marginal costs per ton (in 2011$) | | |
|---|---|---|---|
| | $5,000/ton | $6,400/ton | $10,000/ton |
| Alabama | 4,780 | 5,418 | 5,840 |
| Arkansas | 1,147 | 1,242 | 1,935 |
| Illinois | 622 | 640 | 761 |
| Indiana | 13,770 | 13,437 | 17,109 |
| Iowa | 717 | 717 | 1,317 |
| Kansas | 677 | 838 | 1,150 |
| Kentucky | 12,473 | 13,456 | 14,503 |
| Louisiana | 461 | 467 | 706 |
| Maryland | 1,176 | 1,369 | 1,369 |
| Michigan | 3,756 | 3,889 | 4,411 |
| Mississippi | 1,165 | 1,479 | 2,208 |
| Missouri | 1,298 | 1,930 | 2,775 |
| New Jersey | 381 | 384 | 465 |
| New York | 370 | 661 | 906 |
| North Carolina | 3,626 | 4,415 | 4,643 |
| Ohio | 9,773 | 10,078 | 10,231 |
| Oklahoma | 3,821 | 5,702 | 6,609 |
| Pennsylvania | 26,913 | 26,932 | 27,091 |
| Tennessee | 224 | 241 | 285 |
| Texas | 6,940 | 7,772 | 8,380 |
| Virginia | 3,104 | 3,560 | 3,610 |
| West Virginia | 12,211 | 12,243 | 12,243 |
| Wisconsin | 131 | 276 | 618 |
| Total | 109,535 | 117,145 | 129,166 |

Next, the EPA performed a combined multi-factor assessment of costs (*i.e.,* the uniform cost thresholds evaluated), EGU NO$_X$ emissions and corresponding ozone reductions (*i.e.,* the reductions in Table VI.D–1), and corresponding improvements in downwind ozone concentrations. For this assessment, the EPA used simplifying assumptions regarding the relationship between EGU NO$_X$ emissions and corresponding ozone concentrations at nonattainment and maintenance receptors of concern. For more information about how this assessment was performed, refer to the Ozone Transport Policy Analysis Technical Support Document.

For each nonattainment or maintenance receptor identified for this proposal, the EPA evaluated the air quality improvement at that receptor that is expected from progressively more stringent upwind EGU NO$_X$ reductions in states that are linked to that receptor. For example, the EPA evaluated the Harford County Maryland receptor with all linked states controlling their emissions at $500 per ton. This assessment showed a 0.35 ppb reduction in expected ozone design values at $500 per ton. The residual design values at this site are still expected to exceed the 2008 ozone NAAQS with an average design value of 81.2 ppb and a maximum design value of 83.9 ppb. Next, the EPA evaluated this receptor with all linked states controlling their emissions at $1,300 per ton. This assessment showed a 0.94 ppb reduction in expected ozone design values. At a cost threshold of $1,300 per ton, the residual design values at this site are expected to continue to exceed the 2008 ozone NAAQS with an average design value of 80.6 ppb and a maximum design value of 83.3 ppb. With respect to this receptor, the EPA then evaluated each progressively more stringent uniform control stringency (*i.e.* $3,400 per ton; $5,000 per ton; $6,400 per ton; and $10,000 per ton). Generally, the EPA evaluated the air quality improvements at each monitoring site for each progressively more stringent uniform EGU NO$_X$ control level. This information is available in the Ozone Transport Policy Analysis TSD.

This approach evaluates interstate ozone transport for each receptor independently. Also, by evaluating the downwind ozone impact of upwind

reductions that are made in all linked states at the same uniform control stringency, this approach provides equitable treatment of all upwind states as to their contribution to each downwind receptor to which they are linked.

The EPA aggregates the relevant data (*i.e.,* cost of control, EGU NO$_X$ reduction potential, and downwind ozone reduction metrics) in a multi-factor test that allows the EPA to evaluate the cost-effectiveness of various levels of emission reductions and the resulting improvements in downwind ozone concentrations.

This evaluation shows that meaningful EGU NO$_X$ reductions are available at reasonable cost and that these reductions can provide meaningful improvements in downwind ozone concentrations at the identified nonattainment and maintenance receptors for this proposal. For example, the combined downwind ozone improvement across nonattainment and maintenance receptors is approximately 19 ppb at the $1,300 per ton level. See Figure VI.1.



Figure VI.1. EGU Ozone season NO$_X$ Reduction Potential in 24 linked states and Corresponding Total Reduction in Downwind Ozone Concentrations at Nonattainment and Maintenance Receptors for each Uniform NO$_X$ Cost Evaluated

Combining costs, EGU NO$_X$ reductions, and corresponding improvements in downwind ozone concentrations results in a "knee in the curve" at $1,300 per ton. This uniform cost of reduction represents the threshold at which EGU NO$_X$ reduction potential and corresponding downwind ozone air quality improvements are maximized with respect to marginal cost. That is, the ratio of emission reductions to marginal cost and the ratio of ozone improvements to marginal cost are maximized relative to the other uniform cost thresholds evaluated. Further, at higher cost thresholds, as a result of this analysis we do not anticipate significant additional reductions that would justify these higher costs.

As part of this analysis, the EPA evaluates potential over-control with respect to whether (1) the expected ozone improvements would be sufficient or greater than necessary to resolve the downwind ozone pollution problem (*i.e.,* resolving nonattainment or maintenance problems) or (2) the expected ozone improvements would reduce upwind state ozone contributions to below the screening threshold (*i.e.,* 1% of the NAAQS).

In *EME Homer City,* the Supreme Court held that EPA cannot "require[] an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked." 134 S.Ct. at 1608. On remand from the Supreme Court, the D.C. Circuit held that this means that EPA might overstep its authority "when those downwind locations would achieve attainment even if less stringent emissions limits were imposed on the upwind States linked to those locations." *EME Homer City II,* 795 F.3d at 127. The D.C. Circuit qualified this statement by noting that this "does not mean that every such upwind State would then be entitled to less stringent emission limits. Some of those upwind States may still be subject to the more stringent emissions limits so as not to cause *other* downwind locations to which those States are linked to fall into nonattainment." *Id.* at 14–15.

Consistent with these instructions from the Supreme Court and the D.C. Circuit, the EPA evaluated whether reductions quantified under the evaluated cost thresholds can be anticipated to resolve any downwind nonattainment or maintenance problems (as defined in section V) and by how much.

The EPA's assessment shows that the uniform control stringency represented by $500 per ton would resolve the maintenance problem at two downwind maintenance receptors—Ocean County, New Jersey (maximum design value of 75.9 ppb) and Oldham County, Kentucky (maximum design value of 75.8 ppb). Because no state is linked solely to one of these maintenance receptors, resolving this downwind air quality impact does not fully address any individual upwind state's good neighbor obligation.

This assessment shows that the uniform control stringency represented by $1,300 per ton would resolve maintenance problems at three additional downwind maintenance receptors—Baltimore County, Maryland (maximum design value of 75.6 ppb), Hamilton County, Ohio (maximum design value of 75.1 ppb), and Gloucester County, New Jersey (maximum design value of 75.8 ppb). The EPA's assessment shows that this control level does resolve the only identified nonattainment or maintenance problem to which North Carolina is linked for this proposal—the Baltimore County, Maryland maintenance receptor. The EPA therefore proposes that this EGU control level would fully address North Carolina's good neighbor obligation

with respect to the 2008 ozone NAAQS. The EPA seeks comment on this determination.

The EPA also proposes that, based on the information supporting this proposal, this level of EGU NO$_X$ control for North Carolina would not constitute over-control as to the Baltimore County receptor. The level of the 2008 ozone standard NAAQS is 75 ppb. At the uniform $1,300 per ton cost threshold, EPA's assessment demonstrates that the receptor would just be maintaining the standard, with a maximum design value of 75.6 ppb. Therefore, the emissions reductions that would be achieved at the $1,300 per ton cost threshold would not result in air quality improvements at the Baltimore County receptor significantly better than the standard such the emission reductions might constitute over-control as to that receptor. On the contrary, the emission reductions achieved in upwind states at the $1,300 per ton cost threshold are necessary to bring the maximum design value at the Baltimore County receptor into alignment with the standard. The EPA also seeks comment on this determination.

For the remainder of the states for which the EPA is proposing FIPs in this action, none of these states are linked solely to one of these maintenance receptors with air quality resolved at the $1,300 per ton cost threshold. Therefore, resolving these downwind air quality impacts does not fully address any other individual upwind state's good neighbor obligation.

As noted above the EPA is proposing that the $1,300 per ton EGU control level would fully address North Carolina's good neighbor obligation

with respect to the 2008 ozone NAAQS. As such, based on the data supporting this proposal, North Carolina was excluded from assessment of air quality improvements at more stringent uniform EGU NO$_X$ control levels.

The EPA's assessment shows that the uniform control stringency represented by $3,400 per ton would resolve the maintenance problem at two additional downwind maintenance receptors— Denton County, Texas (481211032) (maximum design value of 75.9 ppb) and Harris County, Texas (482011050) (maximum design value of 75.9 ppb). Because no state is linked solely to one of these maintenance receptors, resolving these downwind air quality impacts does not fully address any individual upwind state's good neighbor obligation.

The EPA provides this summary of the evaluation for the $500 per ton; $1,300 per ton; and $3,400 per ton uniform cost thresholds because, as described below, the EPA is proposing to use the $1,300 per ton level and is taking comment on using the $500 per ton level or $3,400 per ton level to quantify ozone season EGU NO$_X$ requirements to reduce interstate ozone transport for the 2008 ozone NAAQS. Further information on the EPA's evaluation of these cost thresholds as well as additional cost thresholds ($5,000 per ton; $6,400 per ton; and $10,000 per ton) are provided in the Ozone Transport Policy Analysis Technical Support Document. Additionally, Table VI.D–2 provides a summary of the expected number of nonattainment and maintenance-only receptors at the adjusted base case and cost thresholds.

TABLE VI.D–2—NUMBER OF NONATTAINMENT OR MAINTENANCE RECEPTORS AFTER EGU NO$_X$ MITIGATION

| Cost threshold | Nonattainment receptors | Maintenance-only receptors |
|---|---|---|
| Base Case (IPM 5.15 w/CPP) | 12 | 21 |
| $500 per ton | 12 | 19 |
| $1,300 per ton | 12 | 14 |
| $3,400 per ton | 12 | 13 |
| $5,000 per ton | 12 | 13 |
| $6,400 per ton | 12 | 13 |
| $10,000 per ton | 12 | 12 |

In *EME Homer City,* the Supreme Court also held that "EPA cannot require a State to reduce its output of pollution . . . at odds with the one-percent threshold the Agency has set." 134 S.Ct. at 1608. The Court explained that "EPA cannot demand reductions that would drive an upwind State's contribution to every downwind State to which it is linked below one percent of

the relevant NAAQS." *Id.* Accordingly, the EPA also evaluated the potential for over-control with respect to the 1% threshold proposed to be applied in this rulemaking at each relevant cost threshold. Specifically, the EPA evaluated whether the uniform cost thresholds would reduce upwind EGU emissions to a level where the contribution from each upwind state

would be below the 1% threshold that linked the upwind state to the downwind receptors. If the EPA found that any state's reduction obligation at the applied cost threshold decreased its contribution to every downwind receptor to which it is linked below the 1% threshold, we would need to adjust the state's reduction obligation accordingly. The EPA's assessment

reveals that there is not over-control with respect to the 1% threshold at any of the evaluated uniform costs in any upwind state; in fact, even at the highest uniform cost threshold evaluated (*e.g.*, $10,000 per ton), all upwind states that contributed greater than or equal to the 1% threshold in the base case continued to contribute greater than or equal to 1% of the NAAQS to at least one downwind nonattainment or maintenance receptor.[99] Therefore, the EPA does not expect any of the uniform cost thresholds evaluated to result in over-control relative to the 1% threshold. For more information about this assessment, refer to the Ozone Transport Policy Analysis Technical Support Document.

The EPA proposes to determine ozone season EGU $NO_X$ control requirements for upwind states to reduce interstate ozone transport for the 2008 ozone NAAQS based on the reduction potential quantified from pollution control measures that are cost-effective at the $1,300 per ton level. The EPA seeks comment on potentially basing these ozone season $NO_X$ control requirements on uniform cost levels that are less stringent ($500 per ton) or more stringent ($3,400 per ton), including comments on the proposed approach to addressing a state like North Carolina in such a situation, which is explained below.

The EPA notes that the evaluation of cost, $NO_X$ reductions, and ozone improvements for the final rule could show different results for different states. For example, one or more states could fully address their good neighbor obligation based on ozone season $NO_X$ control requirements represented by one cost level while one or more other states would not fully address their good neighbor obligation at that level and would have ozone season $NO_X$ control requirements based on a more stringent cost level in order to fully address or make further progress toward partially addressing their good neighbor obligation. In this situation, the EPA proposes that it would quantify requirements for these different groups of states based on different uniform control stringencies. This could be similar to EPA's establishing two different $SO_2$ groups under the original CSAPR as to addressing $PM_{2.5}$ transport. The EPA seeks comment on this

proposed approach for quantifying requirements.

The EPA also seeks comment on implementation of the resulting emissions budgets. The EPA proposes that if there are groups of states with ozone season $NO_X$ control requirements based on different cost levels, we would nevertheless finalize FIPs for the states in these groups of states that incorporate participation in a trading program that allows them to trade allowances with each other subject to limitations described in section VII of this proposal.

By way of example and as noted above, the EPA is also seeking comment on potentially basing ozone season $NO_X$ control requirements on the $3,400 per ton uniform cost levels. If the EPA were to finalize ozone season $NO_X$ control requirements based on this level, given the specific data informing this proposal, then the EPA would set North Carolina's requirements based on the less stringent $1,300 per ton level because, as discussed above, the sole receptor to which North Carolina is linked for this proposal is resolved at the $1,300 per ton level with a maximum design value of 75.6 ppb. Therefore, because the $1,300 per ton level fully addresses North Carolina's good neighbor obligation, if EPA were to determine ozone season $NO_X$ control requirements based on the $3,400 per ton level for the remainder of states, the EPA would finalize good neighbor requirements for these two groups of states using different uniform control stringencies. The EPA proposes that it would finalize FIPs for the states that incorporate participation in a trading program that allows them to trade allowances with each other subject to limitations described in section VII of this proposal.

The EPA's selection of reductions for this proposed rule is specific to, and appropriate for, defining near-term achievable upwind obligations with respect to the 2008 ozone NAAQS in states where a FIP is necessary. We do not intend—nor do we believe we would be justified in doing so in any event—that the cost-level-based determinations in this proposed rule impose a constraint for selection of cost levels in addressing transported pollution with respect to future NAAQS and/or any revisions to these FIPs for any other future transport rules that the EPA may develop to address any potential remaining obligation as to the current NAAQS, for which different cost levels may be appropriate.

As described above, the EPA is proposing that the $NO_X$ emission reductions associated with uniform control stringency represented by

$1,300 per ton would not result in over-control at any of the identified non-attainment or maintenance receptors and it is reasonable to require such reductions from upwind states.

The EPA requests comment on its proposal to quantify ozone season EGU $NO_X$ reductions to reduce interstate transport with respect to the 2008 ozone NAAQS using the $1,300 per ton uniform cost threshold.

Note that our assessment of EGU $NO_X$ reduction potential shows zero reductions available in Delaware in 2017 at any evaluated cost threshold. At this time, because the assessment shows no EGU $NO_X$ reduction potential within Delaware up to $10,000 per ton and because Delaware does not currently participate in the original CSAPR $NO_X$ ozone-season allowance trading program, the EPA is not proposing to promulgate a FIP for Delaware to be included in this rule. However, as this assessment has only considered reductions available at EGUs by 2017, the EPA cannot at this time conclude that Delaware does not have reductions available on a longer timeframe or from other emission sectors. Accordingly, the EPA cannot conclude at this time that Delaware does not significantly contribute to nonattainment or interfere with maintenance at downwind receptors to which it is linked. The EPA will evaluate additional reduction potential from Delaware in a future rulemaking to address the 2008 ozone standard. The EPA seeks comment on not including Delaware in the proposed FIPs.

The EPA's EGU $NO_X$ reduction assessment also shows nearly zero reductions available in Wisconsin in 2017 at the proposed $1,300 per ton cost threshold. However, Wisconsin currently participates in the original CSAPR $NO_X$ ozone-season emissions trading program and Wisconsin's original CSAPR $NO_X$ ozone emissions budget is greater than its projected base case emissions. The EPA proposes to update Wisconsin's emissions budgets because not doing so would mean that Wisconsin, which is found to contribute above 1% to downwind ozone problems, could increase emissions above its base case level. The EPA proposes to determine ozone season $NO_X$ control requirements for Wisconsin to reduce interstate ozone transport for the 2008 ozone NAAQS based on the reduction potential quantified from pollution control measures that are cost-effective at the $1,300 per ton level. For Wisconsin, based on modeling for this proposal, this level is similar to its projected base-case level. The EPA seeks

---

[99] As discussed above, North Carolina would not be regulated at any level higher than $1300/ton and at that level, there's no over-control as to the 1% threshold. In fact, while the receptor to which North Carolina is linked resolves its maintenance problem at the $1,300/ton level, North Carolina would continue to contribute equal to or greater than 1% to that air quality monitor.

comment on the proposed FIP for Wisconsin.

The EPA also requests comment as to whether the EPA should treat Delaware and Wisconsin in the same manner with respect to their inclusion or exclusion from the ozone-season trading program with respect to the 2008 ozone NAAQS. For example, the EPA requests comment as to whether both Delaware and Wisconsin should be included in the ozone-season trading program with budgets on the reduction potential quantified from pollution control measures that are cost-effective at $1,300 per ton,. EPA also requests comment as to whether both states should instead be excluded from the ozone-season trading program.

*E. Quantifying State Emissions Budgets*

The proposed emissions budgets reflect remaining EGU emissions after upwind states achieve the emission reduction obligations defined in section VI of this proposal.

In the original CSAPR proposal, the EPA set proposed emissions budgets by using an approach that considered monitored state-level heat input and modeled state-level emissions rates.

However, for the CSAPR final rule, the EPA set budgets using only the modeling results from CSAPR's uniform cost assessment. For this rule, the EPA proposes to set emissions budgets by considering monitored heat input and modeled emissions rates, similar to the original CSAPR proposal. The EPA seeks comment on all aspects of quantifying state emissions budgets reflecting upwind obligations, including alternative metrics to heat input, such as generation.

The EPA proposes to quantify state emissions budgets using the minimum of calculated EGU emissions budgets using the state-level EGU $NO_X$ emission rates that correspond to the upwind state reductions identified above using a uniform cost threshold of $1,300 per ton or 2014 monitored historic emissions.

The proposed approach for translating this EGU $NO_X$ reduction potential into emissions budgets is a four step process. First, the EPA would use the resulting 2018 state-level modeled EGU $NO_X$ emissions rate (lbs/mmBtu) from the IPM $1,300 per ton uniform cost assessment. The state-level rate is calculated as the total emissions from affected sources within the state,

divided by the total heat input from these sources. Second, the EPA proposes to multiply this modeled state-level emissions rate by 2014 monitored historic state-level heat input. Multiplying the projected state-level emissions rate by historical heat input yields state-specific ozone season EGU $NO_X$ emissions for 2018. Third, the EPA proposes to add an adjustment to account for differences in unit availability between the IPM 2018 run year and 2017, yielding state-specific ozone season EGU $NO_X$ emissions for 2017. Finally, the EPA then proposes EGU emissions budgets as the minimum of this calculated 2017 emission level or 2014 historic monitored emissions.

This proposed approach reflects the EGU $NO_X$ reduction potential described above and grounds the EPA's quantification of emissions budgets in historical data. The proposed EGU NOx ozone-season emissions budgets calculated using this approach can be found in Table VI.E–1. Tables VI.E–2 and VI.E–3 provide the EGU $NO_X$ ozone-season emissions budgets reflecting EGU $NO_X$ mitigation available for 2017 at $500 per ton and $3,400 per ton, respectively.

TABLE VI.E–1—PROPOSED EGU $NO_X$ OZONE-SEASON EMISSIONS BUDGETS, REFLECTING EGU $NO_X$ MITIGATION AVAILABLE FOR 2017 AT $1,300 PER TON

| State | 2014 emissions (tons) | 2018 $1,300/ton emission rate (lbs/MMBtu) | 2014 Heat Input (MMBtu) | 2017 adjustment (tons) [100] | 2017 EGU $NO_X$ Ozone-season emissions budget (tons) |
|---|---|---|---|---|---|
| Alabama | 21,075 | 0.049 | 410,477,094 | 0 | 9,979 |
| Arkansas | 18,135 | 0.074 | 185,511,093 | 51 | 6,949 |
| Illinois | 17,520 | 0.062 | 388,382,456 | 9 | 12,078 |
| Indiana | 40,247 | 0.126 | 447,417,615 | 0 | 28,284 |
| Iowa | 13,857 | 0.11 | 151,989,571 | 0 | 8,351 |
| Kansas | 12,297 | 0.12 | 154,921,650 | 0 | 9,272 |
| Kentucky | 33,896 | 0.102 | 380,694,315 | 2,169 | 21,519 |
| Louisiana | 18,278 | 0.097 | 326,662,000 | 17 | 15,807 |
| Maryland | 4,026 | 0.05 | 86,239,563 | 2,669 | 4,026 |
| Michigan | 25,065 | 0.112 | 307,723,171 | 1,836 | 19,115 |
| Mississippi | 10,229 | 0.069 | 172,406,970 | 0 | 5,910 |
| Missouri | 31,235 | 0.086 | 330,006,788 | 1,210 | 15,323 |
| New Jersey | 2,746 | 0.036 | 112,887,439 | 0 | 2,015 |
| New York | 5,547 | 0.038 | 235,619,397 | 0 | 4,450 |
| North Carolina | 16,759 | 0.078 | 315,255,877 | 0 | 12,275 |
| Ohio | 32,181 | 0.073 | 457,251,027 | 0 | 16,660 |
| Oklahoma | 16,215 | 0.144 | 236,715,186 | 154 | 16,215 |
| Pennsylvania | 44,551 | 0.057 | 508,608,673 | 0 | 14,387 |
| Tennessee | 8,057 | 0.056 | 196,132,311 | 0 | 5,481 |
| Texas | 58,492 | 0.079 | 1,474,773,212 | 33 | 58,002 |
| Virginia | 9,695 | 0.076 | 179,324,728 | 0 | 6,818 |
| West Virginia | 29,420 | 0.084 | 317,087,558 | 0 | 13,390 |
| Wisconsin | 9,087 | 0.054 | 205,305,933 | 0 | 5,561 |
| 23 State Region | 478,610 | .................... | 7,581,393,627 | .................... | 311,867 |

TABLE VI.E–2—PROPOSED EGU NO$_X$ OZONE-SEASON EMISSIONS BUDGETS, REFLECTING EGU NO$_X$ MITIGATION AVAILABLE FOR 2017 AT $500 PER TON

| State | 2014 emissions (tons) | 2018 $500/ton emission rate (lbs/MMBtu) | 2014 heat input (MMBtu) | 2017 adjustment (tons) [101] | 2017 EGU NO$_X$ ozone-season emissions budget (tons) |
|---|---|---|---|---|---|
| Alabama | 21,075 | 0.058 | 410,477,094 | 0 | 11,886 |
| Arkansas | 18,135 | 0.075 | 185,511,093 | 51 | 7,038 |
| Illinois | 17,520 | 0.062 | 388,382,456 | 23 | 12,144 |
| Indiana | 40,247 | 0.15 | 447,417,615 | 0 | 33,483 |
| Iowa | 13,857 | 0.113 | 151,989,571 | 0 | 8,614 |
| Kansas | 12,297 | 0.12 | 154,921,650 | 0 | 9,278 |
| Kentucky | 33,896 | 0.149 | 380,694,315 | 4,463 | 32,783 |
| Louisiana | 18,278 | 0.097 | 326,662,000 | 17 | 15,861 |
| Maryland | 4,026 | 0.05 | 86,239,563 | 2,672 | 4,026 |
| Michigan | 25,065 | 0.131 | 307,723,171 | 1,836 | 22,022 |
| Mississippi | 10,229 | 0.071 | 172,406,970 | 0 | 6,083 |
| Missouri | 31,235 | 0.086 | 330,006,788 | 1,123 | 15,380 |
| New Jersey | 2,746 | 0.036 | 112,887,439 | 0 | 2,016 |
| New York | 5,547 | 0.039 | 235,619,397 | 0 | 4,607 |
| North Carolina | 16,759 | 0.078 | 315,255,877 | 0 | 12,278 |
| Ohio | 32,181 | 0.088 | 457,251,027 | 0 | 20,194 |
| Oklahoma | 16,215 | 0.156 | 236,715,186 | 154 | 16,215 |
| Pennsylvania | 44,551 | 0.15 | 508,608,673 | 0 | 38,270 |
| Tennessee | 8,057 | 0.056 | 196,132,311 | 0 | 5,520 |
| Texas | 58,492 | 0.083 | 1,474,773,212 | 0 | 58,492 |
| Virginia | 9,695 | 0.078 | 179,324,728 | 0 | 6,955 |
| West Virginia | 29,420 | 0.145 | 317,087,558 | 0 | 22,932 |
| Wisconsin | 9,087 | 0.054 | 205,305,933 | 0 | 5,588 |
| 23 State Region | 478,610 | | 7,581,393,627 | | 371,665 |

TABLE VI.E–3—PROPOSED EGU NO$_X$ OZONE-SEASON EMISSIONS BUDGETS, REFLECTING EGU NO$_X$ MITIGATION AVAILABLE FOR 2017 AT $3,400 PER TON

| State | 2014 emissions (tons) | 2018 $3,400/ton emission rate (lbs/MMBtu) | 2014 heat input (MMBtu) | 2017 adjustment (tons) [102] | 2017 EGU NO$_X$ ozone-season emissions budget (tons) |
|---|---|---|---|---|---|
| Alabama | 21,075 | 0.048 | 410,477,094 | 0 | 9,931 |
| Arkansas | 18,135 | 0.065 | 185,511,093 | 51 | 6,101 |
| Illinois | 17,520 | 0.062 | 388,382,456 | 0 | 11,992 |
| Indiana | 40,247 | 0.123 | 447,417,615 | 0 | 27,585 |
| Iowa | 13,857 | 0.107 | 151,989,571 | 0 | 8,118 |
| Kansas | 12,297 | 0.12 | 154,921,650 | 0 | 9,259 |
| Kentucky | 33,896 | 0.099 | 380,694,315 | 2,169 | 20,945 |
| Louisiana | 18,278 | 0.094 | 326,662,000 | 17 | 15,378 |
| Maryland | 4,026 | 0.05 | 86,239,563 | 2,523 | 4,026 |
| Michigan | 25,065 | 0.108 | 307,723,171 | 1,978 | 18,624 |
| Mississippi | 10,229 | 0.064 | 172,406,970 | 0 | 5,487 |
| Missouri | 31,235 | 0.083 | 330,006,788 | 1,500 | 15,240 |
| New Jersey | 2,746 | 0.036 | 112,887,439 | 0 | 2,011 |
| New York | 5,547 | 0.037 | 235,619,397 | 0 | 4,391 |
| North Carolina | 16,759 | 0.068 | 315,255,877 | 0 | 10,705 |
| Ohio | 32,181 | 0.073 | 457,251,027 | 0 | 16,637 |
| Oklahoma | 16,215 | 0.137 | 236,715,186 | 146 | 16,215 |
| Pennsylvania | 44,551 | 0.056 | 508,608,673 | 0 | 14,358 |
| Tennessee | 8,057 | 0.056 | 196,132,311 | 0 | 5,449 |
| Texas | 58,492 | 0.076 | 1,474,773,212 | 100 | 55,864 |
| Virginia | 9,695 | 0.065 | 179,324,728 | 0 | 5,834 |
| West Virginia | 29,420 | 0.078 | 317,087,558 | 0 | 12,367 |
| Wisconsin | 9,087 | 0.054 | 205,305,933 | 0 | 5,511 |
| 23 State Region | 478,610 | | 7,581,393,627 | | 302,028 |

## VII. Implementation Using the Existing CSAPR NO$_X$ Ozone-Season Allowance Trading Program and Relationship to Other Rules

### A. Background

This section describes implementing and enforcing the budgets quantified in section VI. In the 4-step CSAPR methodology previously described, once emission reduction potential is quantified into emissions budgets, the remaining step is to identify an approach for ensuring that such reductions occur and are enforceable. As discussed previously, EPA is proposing implement the budgets to address the 2008 ozone NAAQS using the existing CSAPR trading program that allows limited interstate trading among states participating in the ozone-season trading program. The EPA proposes to revise the existing budgets, developed to address transport as to the 1997 ozone NAAQS, where necessary to reflect the additional reductions that the EPA identified as necessary to address transport as to the 2008 NAAQS. The EPA will implement the trading program in each affected state through the issuance of a FIP.

In electing to propose to implement these near-term EGU reductions for the 2008 ozone standard using the existing CSAPR trading infrastructure, the EPA considered the many significant advantages of continuing to use the existing CSAPR program, including the ease of transition to the new budgets, the economic and administrative efficiency of trading approaches, and the flexibility afforded to sources regarding compliance.

The EPA also considered views expressed by some stakeholders that a complementary short-term (*e.g.*, 30-day) rate-based limit would ensure that control measures adopted to meet the revised budgets continue to operate over time. Some stakeholders have observed, for example, that some existing SCR and SNCR units may not have operated in recent years because CAIR allowance prices are below the operating costs of the controls. The EPA notes that in such cases, the CAIR emissions budgets that states were required to meet to address significant contribution for the 1997

NAAQS were in fact still being met. The EPA will also evaluate power sector behavior for 2015, the first year of CSAPR implementation, and provide that assessment for the final rule. The EPA expects that certain aspects of this proposal will alleviate some of these concerns. In particular, this proposal is aimed at establishing new, lower emissions budgets that are calculated based on a uniform cost that is reflective of, among other things, operating those controls. Furthermore, as described later in this notice, we are proposing adjustments to the CSAPR regulations that, if adopted, would address the role that the banked allowances may play in allowance prices. For these reasons, the EPA does not believe that including a short-term complementary rate-based limit in the proposed FIPs is necessary. Nevertheless, we invite comment on the need for such an approach and, from commenters arguing that it is needed, we invite suggestions for calculating it.

As explained in greater detail in section IV, under CAA sections 110(a)(1) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance, and enforcement of each primary or secondary NAAQS. According to section 110(a)(2)(D)(i)(I), the SIP for each state, regardless of a state's designation status for the relevant NAAQS, must prohibit sources or other types of emissions activity from emitting any air pollutant in amounts that will ''contribute significantly to nonattainment'' of the standard in a downwind state or ''interfere with maintenance'' of the standard in a downwind state. Section IV also explains in detail that the EPA is obligated to promulgate FIPs when we find that a state fails to submit a complete SIP or the EPA disapproves a SIP submittal.

The EPA recognizes that several states included in this proposal have submitted transport SIPs to address the 2008 ozone standard that the EPA is reviewing, and it is possible that additional states may submit SIPs in the future. As explained in section IV above, the EPA may only finalize FIPs for states where FIP authority exists; that is, for states where either the EPA found that the state failed to submit a complete transport SIP or where the EPA has disapproved a transport SIP submittal for that state. The EPA intends to finalize these proposed FIPs together in a single action and, to the greatest extent possible, the EPA intends to take final action on SIP submittals currently before the agency prior to finalizing this proposal. In the event that a state plans to revise its SIP or submit a SIP prior to

any final rule, contact your regional office to alert the EPA.

By this action, the EPA is proposing federal implementation plans with respect to the 2008 ozone NAAQS for each state potentially covered by this rule. Section VI above describes the EPA's approach to defining state-level EGU emissions budgets that represent the EGU emissions remaining after reducing that state's significant contribution to downwind nonattainment and/or interference with maintenance. The EPA is proposing to implement these EGU emissions budgets in the FIPs through the CSAPR EGU NO$_X$ ozone-season trading program.

When the EPA finalized CSAPR in 2011 under the good neighbor provision of the CAA to reduce emissions of SO$_2$ and NO$_X$ from power plants in eastern states, the rule put in place regional trading programs to quickly and cost-effectively address pollution that affects air quality in downwind states. The EPA envisioned that the methodology could be used to address transport concerns under other existing NAAQS and future NAAQS revisions. See 76 FR 48211 and 48246, August 8, 2011. Accordingly, the EPA proposes to use the CSAPR ozone-season trading program and related provisions as codified under 40 CFR part 97, subpart BBBBB and section 52.38, as amended in this proposal, to implement the proposed EGU NO$_X$ ozone-season emissions budgets for the 2008 ozone NAAQS. This program will be initially implemented in each state through a FIP.

In this notice, the EPA proposes that the first control period for the requirements is the 2017 ozone season. A covered state would be required to demonstrate compliance with FIP requirements for each subsequent ozone season until it submits, and the EPA approves, a SIP or the EPA promulgates another federal rule replacing the FIP.

The EPA notes that the compliance flexibility provided by the CSAPR NO$_X$ ozone-season trading program allows sources to demonstrate compliance by holding allowances and does not prescribe unit-specific and technology-specific NO$_X$ mitigation. In other words, while the EPA quantified EGU NO$_X$ reductions resulting from mitigation strategies such as operating or installing (or upgrading to) state-of-the-art combustion controls, no particular reduction strategy is required for any specific unit because the Act only requires that an upwind state's aggregate emissions neither significantly contribute to nonattainment nor interfere with maintenance of the NAAQS in a downwind state.

---

[100] The entire 2017 Adjustment listed is not used in calculating for Maryland and Oklahoma because it would push their budget above their 2014 emissions.

[101] The entire 2017 Adjustment listed is not used in calculating for Maryland, Oklahoma, and Texas because it would push their budget above their 2014 emissions.

[102] The entire 2017 Adjustment listed is not used in calculating for Maryland and Oklahoma because it would push their budget above their 2014 emissions.

In practice, the EGU emissions budgets that the EPA is proposing in this action are achievable for each of the 23 states through operating existing SCR and SNCR controls, installing or upgrading to state-of-the-art combustion controls, or shifting generation to low-NOX emitting units. The EPA believes that this proposed rule provides sufficient lead time to implement these control strategies by the 2017 ozone season. For the EPA's assessment of the feasibility of controls for 2017, refer to section VI above and the EGU NOX Reduction TSD in the docket for this proposal.[103]

In this section of the preamble, the following topics are addressed: FIP requirements and key elements of the CSAPR trading programs; participation in the CSAPR NOX ozone-season trading program with a new budget; source monitoring and reporting; replacing the FIP with a SIP; title V permitting; and the relationship of this proposed rule to existing programs (NOX SIP Call, CSAPR trading programs, Clean Power Plan (CPP), and other ozone transport programs).

## B. FIP Requirements and Key Elements of the CSAPR Trading Programs

The original CSAPR establishes an NOX ozone-season allowance trading program that allows covered sources within each state to trade allowances with other sources within the same trading group. Pursuant to the CSAPR NOX ozone-season trading program, sources are required to hold one allowance for each ton of NOX emitted during the ozone season. We propose to use that same regional trading program, with adjusted budgets and certain additional revisions described below, as the compliance remedy for the proposed FIPs to address the 2008 ozone NAAQS. The first control period for this updated CSAPR NOX ozone-season trading program is proposed to begin with the 2017 ozone season, on May 1, 2017.

In this section, the EPA is proposing to use the existing NOX ozone-season allowance trading system that was established under CSAPR in 40 CFR part 97, subpart BBBBB, to implement the emission reductions identified and quantified in the FIPs for this action.

### 1. Applicability

In this proposed rule, the EPA would maintain the applicability provisions in the final CSAPR rule for the NOX ozone-season trading program (see 40 CFR 97.504).

Under the general applicability provisions of the CSAPR final rule, a covered unit is any stationary fossil-fuel-fired boiler or combustion turbine serving at any time on or after January 1, 2005, a generator with nameplate capacity exceeding 25 MW producing electricity for sale, with the exception of certain cogeneration units and solid waste incineration units (see 76 FR 48273, August 8, 2011, for a discussion on applicability in the final CSAPR rule). The EPA is not proposing any changes to this provision.

### 2. State Budgets

This proposal includes revisions to 40 CFR 97.510 to reflect new budgets for states covered under this proposal as delineated in section VI above. This includes the NOX ozone-season trading budgets, new unit set-asides, and Indian country new unit set-asides for 2017 and beyond, described in further detail below.

For states already covered by the original CSAPR ozone-season program, the EPA proposes to update CSAPR EGU NOX ozone-season budgets to reflect obligations to reduce interstate transport to address the 2008 ozone standard. For states that are newly brought into the CSAPR ozone-season program because emissions from the states significantly contribute to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in a downwind state (i.e., Kansas based on information used to develop this proposal), the proposal includes an EGU NOX ozone-season emissions budget. For states currently in the CSAPR ozone-season trading program, but not identified as contributing to interstate ozone transport for the 2008 NAAQS (i.e., Georgia based on information used to develop this proposal), participation in CSAPR would continue unchanged pursuant to their previously-defined obligation (budget) with respect to the 1997 ozone NAAQS.

The EPA proposes to establish reduced or new ozone-season emissions budgets for the 23 eastern states affected by the transport rule for the 2008 ozone NAAQS. The EPA proposes to implement these emissions budgets by allocating allowances to sources in those states equal to the proposed budgets for compliance starting in 2017. The EPA will establish allowance allocations for the existing units in each state through this rulemaking. Portions of the state budgets will be set aside for new units, and the EPA will use the existing processes set forth in the CSAPR regulations to annually allocate allowances to the new units in each state from the new unit set-asides. For

states that are currently in the CSAPR ozone-season program, but are not affected under this proposed transport rule for the 2008 ozone NAAQS (i.e., Georgia based on information used to develop this proposal), the EPA will maintain the state's budget as finalized in the original CSAPR rulemakings.

### 3. Allocations of Emission Allowances

Pursuant to the CSAPR trading program regulations, a covered source is required to hold sufficient allowances to cover the emissions from all covered units at the source during the control period for the NOX ozone season. The EPA assesses compliance with these allowance-holding requirements at the source (i.e., facility) level.

This section explains that the EPA proposes to allocate a state's budget to existing units and new units in that state by applying the same allocation approach as finalized in CSAPR, based on a unit's historical heat input and its maximum historical emissions (see 76 FR 48284, August 8, 2011). This section also describes allocation for Tribes, the new unit set-asides and Indian country new unit set-asides in each state, allocations to units that are not operating; and the recordation of allowance allocations in source compliance accounts.

### A. Allocations for Existing Units

The EPA proposes to implement each state's EGU NOX ozone-season emissions budget in the trading program by allocating the number of emission allowances to sources within that state, equivalent to the tonnage of that specific state budget, as shown in section VI. For these 23 states, the EPA would allocate allowances under each state's budget to covered units in that state. The portion of a state budget allocated to existing units in that state is the state budget minus the new unit set-aside and minus the Indian country new unit set-aside. The new unit set-asides are portions of each budget reserved for new units that might locate in each state or in Indian country in the future. For the existing source level allocations, see the TSD called, "Existing Source Level Allocations for the 2008 NOX Ozone-season Rule FIPs," in the docket for this rulemaking. The methodology used to allocate allowances to individual units in a particular state has no impact on that state's budget.

For the purpose of allocations, an "existing unit" in CSAPR is one that commenced commercial operation prior to January 1, 2010. For the 23 states included in this proposed rulemaking for the 2008 ozone NAAQS, the EPA proposes to identify an "existing unit"

---

[103] The EPA notes that a state can instead require non-EGU NOX emission reductions through a SIP, if they choose to do so.

as one that commenced commercial operation prior to January 1, 2015. EPA has updated information on affected units that have commenced commercial operation prior to January 1, 2015 (currently defined either as existing units or as new units pursuant to the current CSAPR regulations) that would allow these units to be considered existing units for purposes of allocations and would allow new unit set-asides to be fully reserved for any future new units in affected states or Indian country. The EPA is not proposing to change the January 1, 2010 date for states that remain in the original CSAPR and are not affected by the changes proposed here (*i.e.,* Georgia with respect to the CSAPR $NO_X$ ozone-season allowances and all states with respect to CSAPR $SO_2$ or $NO_X$ annual allowances); thus, the only allowance allocations that are proposed to be changed in this rulemaking for any units under any of the CSAPR trading programs are allocations of $NO_X$ ozone-season allowances from budgets that are proposed to be revised in this proposed rule.

The EPA proposes to follow the original CSAPR methodology for distributing, or allocating, emission allowances to existing units based on the unit's share of the state's heat input, limited by the unit's maximum historical emissions. This approach uses the highest three of the last five years to establish the heat input baseline for each unit, and constrains the unit-level allocations so as not to exceed the maximum historical baseline emissions during 2007–2014. As discussed in the original CSAPR final rule (*see* 76 FR 48288–9, August 8, 2011), the EPA finds no advantage or disadvantage in this approach that would penalize those units that have already invested in cleaner fuels or other pollution reduction measures. The EPA considers this allocation approach to be fuel-neutral, control-neutral, transparent, based on reliable data, and similar to allocation methodologies previously used in the $NO_X$ SIP Call and Acid Rain Program. The EPA requests comments on following the CSAPR approach for existing unit allocations in states covered by this proposed rule as to the 2008 ozone NAAQS.

For states that have EPA-approved abbreviated SIP revisions adopting a different allocation methodology for sources located within the state for CSAPR for the 2017 ozone season and beyond, those provisions would address the allocation of revised $NO_X$ ozone-season emissions budgets established under this proposed rule, provided that the SIP revision includes not only specific allocations given the total state budget expected at the time of the SIP revision, but also a methodology for determining allocations from any given total state budget. For states that have EPA-approved full SIP revisions, the EPA proposes to use the EPA-approved allocation provisions of the state's SIP revision to allocate allowances to sources in that particular state using the revised emissions budget proposed to address interstate ozone transport for the 2008 NAAQS, provided that the SIP includes not only specific allocations but a methodology for determining allocations from any given total state budget.

Further, where the state regulation approved as a full or abbreviated SIP revision does not contain an allocation methodology but the materials submitted by the state to support EPA's approval of that regulation as a SIP revision contain the state's allocation method, described in an unambiguous manner, the EPA seeks comment on using that state-approved methodology to determine the allocations of allowances to sources in the state under the FIPs established in this proposed rule. These possible approaches could prevent a state from needing to submit another SIP revision to implement the same allocation provisions under this proposed rule that the state has already implemented under CSAPR before adoption of this proposed rule.

For all other states, the EPA proposes to use the allocation method previously finalized in the final CSAPR rulemaking as discussed in this section. These provisions would not prevent any state (one with an EPA-approved SIP revision or without) from submitting an alternative allocation methodology under this proposed rule for later compliance years. EPA requests comment on this modified allocation approach for states with EPA-approved SIP revisions under the current rule.

b. Allocations for New Units

For the purpose of allocations, CSAPR identifies a "new unit" as one that commenced commercial operation on or after January 1, 2010, and provides a methodology for allocating emission allowances to new units from new unit set-asides in each state and to new units that locate in Indian country. See 76 FR 48290–48294 (Aug. 8, 2011), for more

information. The FIPs that EPA is proposing will incorporate a trading program in which EPA is proposing to define a covered unit as a "new unit" if it commences commercial operation on or after January 1, 2015; if it becomes covered by meeting applicability criteria subsequent to January 1, 2015; if it relocates into a different state covered by this FIP; or if it was an "existing" covered unit that stopped operating for 2 consecutive years but resumes commercial operation at some point thereafter. To the extent that states seek approval of SIPs with different allocation provisions than EPA, these SIPs may seek to define new units differently.

The EPA further proposes that its trading program will make allocations to each state for new units (the new unit set-aside) equal to a basic minimum 2 percent of the total state budget, plus the projected amount of emissions from planned units in that state (for instance, if planned units in state A are projected to emit 3 percent of the state's $NO_X$ ozone-season emissions budget, then the new unit set-aside for the state would be set at 5 percent, consisting of the basic minimum 2 percent plus an additional 3 percent for planned units). See 76 FR 48292. New units may receive allocations starting with the first year they are subject to the allowance-holding requirements of the rule. If unallocated to new units, set-asides are redistributed to unretired existing units before the compliance deadline. The EPA requests comments on following the CSAPR approach for new unit allocations under this proposal. (For more detail on the CSAPR new unit set-aside provisions, see 40 CFR 97.511(b) and 97.512.)

The EPA notes that applying the CSAPR approach using the data for this proposal results in a new-unit set-aside for New Jersey that is greater than 50% of the total proposed EGU $NO_X$ ozone-season emissions budget for the state. This result is influenced by the EPA's projected emissions rates for new units that are anticipated to come online within states. The EPA seeks comment on these data, which are available in the IPM documentation in the docket for this proposal. Further, the EPA seeks comment on whether additional data should be considered—for example, reported $NO_X$ emission rates of recently constructed new NGCC units in each state.

Table VII.B–1—Proposed EGU NO$_X$ Ozone-Season New-Unit Set-Aside Amounts, Reflecting Proposed EGU Emissions Budgets (Tons)

| State | Proposed EGU NO$_X$ emissions budgets (tons) | New-unit set-aside amount (percent) | New-unit set-aside amount (tons) | Indian country set-aside amount (tons) |
|---|---|---|---|---|
| Alabama | 9,979 | 2 | 205 | |
| Arkansas | 6,949 | 2 | 141 | |
| Illinois | 12,078 | 5 | 591 | |
| Indiana | 28,284 | 2 | 565 | |
| Iowa | 8,351 | 5 | 419 | 8 |
| Kansas | 9,272 | 3 | 281 | 9 |
| Kentucky | 21,519 | 3 | 647 | |
| Louisiana | 15,807 | 4 | 628 | 16 |
| Maryland | 4,026 | 12 | 485 | |
| Michigan | 19,115 | 2 | 382 | 19 |
| Mississippi | 5,910 | 10 | 590 | 6 |
| Missouri | 15,323 | 2 | 314 | |
| New Jersey | 2,015 | 57 | 1,151 | |
| New York | 4,450 | 2 | 93 | 4 |
| North Carolina | 12,275 | 2 | 248 | 12 |
| Ohio | 16,660 | 2 | 337 | |
| Oklahoma | 16,215 | 2 | 325 | 16 |
| Pennsylvania | 14,387 | 7 | 1,017 | |
| Tennessee | 5,481 | 2 | 109 | |
| Texas | 58,002 | 5 | 2,910 | 58 |
| Virginia | 6,818 | 27 | 1,844 | |
| West Virginia | 13,390 | 2 | 268 | |
| Wisconsin | 5,561 | 2 | 121 | 6 |
| 23 State Region | 311,867 | | 13,671 | 154 |

c. Allocations for Tribes and New Units in Indian Country

Tribes are not required to submit tribal implementation plans. However, as explained in the EPA's regulations outlining Tribal Clean Air Act authority, the EPA is authorized to promulgate FIPs for Indian country as necessary or appropriate to protect air quality if a tribe does not submit and get EPA approval of a tribal implementation plan. *See* 40 CFR 49.11(a); see also 42 U.S.C. 7601(d)(4). For this proposed ozone rule, there are no existing affected units in Indian country in the states affected by this rule.

Under the current rule, allowances to possible future new units locating in Indian country are allocated by the EPA from an Indian country new unit set-aside established for each state with Indian country. (See 40 CFR 97.511(b)(2) and 97.512(b).) Because states generally have no SIP authority in reservation areas of Indian country and other areas of Indian country over which a tribe or EPA has demonstrated that a tribe has jurisdiction, the EPA continues to allocate such allowances to sources locating in such areas of Indian country within a state even if the state submits a SIP to replace the FIP. (40 CFR 52.38(b)(5)(v) and (vi) and 52.38(b)(6).) The EPA reserves 0.1 percent of the total state budget for new

units in Indian country within that state (5 percent of the basic 2 percent new unit set-aside prior to any increase in a state's new unit set-aside amount for planned units). Unallocated allowances from a state's Indian country new unit set-aside are returned to the state's new unit set-aside and allocated according to the methodology described above. The EPA requests comment on following the CSAPR approach for new unit allocations in such areas of Indian country under the transport rule for the 2008 ozone NAAQS.

d. Units That Do Not Operate and the New Unit Set-Aside

The EPA proposes to continue to apply for purposes of this proposed rule the existing CSAPR provision under which a covered unit that does not operate for a period of two consecutive years will receive allowance allocations for a total of up to five years of non-operation. 40 CFR 97.511(a)(2). Starting in the fifth year after the first year of non-operation, allowances allocated to such units will instead be allocated to the new unit set-aside for the state in which the non-operating unit is located. This approach allows the new unit set-asides to grow over time. The EPA requests comment on retaining this timeline for allowance allocation for non-operating units or changing the

allowance allocation for non-operating units to, for instance, two years or three years, in which case allowances would revert to the new unit set-aside in the second or third year after the first of two consecutive years of non-operation of a unit.

4. Variability Limits, Assurance Levels, and Penalties

In the original CSAPR, the EPA developed assurance provisions, including variability limits and assurance levels (with associated compliance penalties), to assure that each state will meet its pollution control obligations and to accommodate inherent year-to-year variability in state-level EGU operations.

The original CSAPR budgets, and the updated CSAPR emissions budgets proposed in this notice, reflect EGU operations in an "average year." However, year-to-year variability in EGU operations occurs due to the interconnected nature of the power sector and from changing weather patterns, demand growth, or disruptions in electricity supply from other units or from the transmission grid. Recognizing this, the FIP includes variability limits, which define the amount by which state emissions may exceed the level of the budgets in a given year to account for this variability in EGU operations. A

state's budget plus its variability limit equals a state's assurance level, which acts as a cap on each state's $NO_X$ emissions during a control period (that is, during the May–September ozone season in the case of this rule).

To establish the variability limits in the original CSAPR, the EPA analyzed historical state-level heat input variability as a proxy for emissions variability, assuming constant emission rates. (See 76 FR 48265, August 8, 2011.) The variability limits for ozone-season $NO_X$ in the original CSAPR were calculated as 21 percent of each state's budget, and these variability limits were then codified in 40 CFR 97.510 along with the state budgets. Applying the CSAPR approach, the EPA proposes to set new variability limits applying the same 21 percent figure as determined in the original CSAPR to this proposed

rule's budgets. The EPA proposes that the same 21% figure is appropriate to use because variability in state-level heat input across a multi-year period is expected to be relatively consistent around long-term trends. The EPA seeks comment on this approach. Table VII.B–2 shows the proposed EGU $NO_X$ ozone-season emissions budgets, variability limits, and assurance levels for each state.

TABLE VII.B–2—PROPOSED EGU $NO_X$ OZONE-SEASON EMISSIONS BUDGETS REFLECTING EGU $NO_X$ MITIGATION AVAILABLE FOR 2017 AT $1,300 PER TON, VARIABILITY LIMITS, AND ASSURANCE LEVELS (TONS)

| State | EGU $NO_X$ ozone-season emissions budgets | Variability limits | EGU $NO_X$ ozone-season assurance levels |
|---|---|---|---|
| Alabama | 9,979 | 2,096 | 12,075 |
| Arkansas | 6,949 | 1,459 | 8,408 |
| Illinois | 12,078 | 2,536 | 14,614 |
| Indiana | 28,284 | 5,940 | 34,224 |
| Iowa | 8,351 | 1,754 | 10,105 |
| Kansas | 9,272 | 1,947 | 11,219 |
| Kentucky | 21,519 | 4,519 | 26,038 |
| Louisiana | 15,807 | 3,319 | 19,126 |
| Maryland | 4,026 | 845 | 4,871 |
| Michigan | 19,115 | 4,014 | 23,129 |
| Mississippi | 5,910 | 1,241 | 7,151 |
| Missouri | 15,323 | 3,218 | 18,541 |
| New Jersey | 2,015 | 423 | 2,438 |
| New York | 4,450 | 935 | 5,385 |
| North Carolina | 12,275 | 2,578 | 14,853 |
| Ohio | 16,660 | 3,499 | 20,159 |
| Oklahoma | 16,215 | 3,405 | 19,620 |
| Pennsylvania | 14,387 | 3,021 | 17,408 |
| Tennessee | 5,481 | 1,151 | 6,632 |
| Texas | 58,002 | 12,180 | 70,182 |
| Virginia | 6,818 | 1,432 | 8,250 |
| West Virginia | 13,390 | 2,812 | 16,202 |
| Wisconsin | 5,561 | 1,168 | 6,729 |
| Region cap | 311,867 | 65,493 | .......................... |

The assurance provisions include penalties that are triggered when the state emissions as a whole exceed its assurance level. The original CSAPR provided that a state that exceeds its assurance level in a given year is assessed a total of 3-to-1 allowance surrender on the excess tons. Each excess ton above the assurance level must be met with one allowance for normal compliance plus two additional allowances to satisfy the penalty. The penalty is designed to deter state-level emissions from exceeding assurance levels. This was referred to in the original CSAPR as air quality-assured trading that accounts for variability in the electricity sector but also ensures that the necessary emission reductions occur within each covered state. If a state does not exceed its assurance level, no penalties are incurred by any source. Establishing assurance levels with compliance penalties therefore responds

to the court's holding in *North Carolina* requiring the EPA to assure that sources in each state were required to eliminate emissions that significantly contribute to nonattainment and interfere with maintenance of the NAAQS in another state.[104]

To assess the penalty under the assurance provisions, the EPA evaluates whether any state's total EGU emissions in a control period exceeded the state's assurance level, and if so, the EPA then determines which owners and operators of units in the state will be subject to an allowance surrender requirement based on each source's emissions as compared to its unit-level assurance level. Since a single designated representative (DR) often represents multiple sources, the EPA evaluates which groups of units at the common DR level had emissions exceeding the respective common DR's

share of the state assurance level, regardless of whether the individual source had enough allowances to cover its emissions during the control period. This provision is triggered only if two criteria are met: (1) The group of sources and units with a common DR are located in a state where the total state EGU emissions for a control period exceed the state assurance level; and (2) that group with the common DR had emissions exceeding the respective DR's share of the state assurance level.

For more information on the CSAPR assurance provisions see 76 FR 48294 (August 8, 2011).

5. Implementation Approaches for Transitioning the Existing CSAPR $NO_X$ Ozone-Season Program To Address Transport for a Newer NAAQS

Consistent with the original CSAPR approach, EPA proposes that in this updated rulemaking, EGUs would be

---

[104] 531 F.3d at 908.

able to trade $NO_X$ ozone-season emission allowances among units within the state and across state boundaries, with emissions and use of allowances limited by the assurance provisions. The following sections describe approaches to transition the existing CSAPR program designed for the 1997 ozone NAAQS to address interstate ozone transport for the 2008 ozone NAAQS.

A primary focus of this section is the extent to which allowances created to address interstate transport with respect to the 1997 ozone NAAQS, reflecting emissions budgets at $500 per ton, are fungible with allowances created under this proposal to address interstate transport for the 2008 ozone NAAQS, reflecting emissions budgets at $1,300 per ton. The EPA proposes that these implementation tools are not presumptively equivalent, given that they were developed to address ozone transport under different NAAQS and using different cost thresholds. However, as further discussed below, the EPA is proposing approaches under which allowances allocated under budgets established to address the 1997 NAAQS could be used for compliance for addressing interstate transport for the 2008 NAAQS, subject to specific limitations. The EPA is also taking comment on several other approaches for addressing the transition from a program in which all budgets were established based on an integrated analysis using a single control cost threshold to address the 1997 NAAQS to a program with a mix of budgets established in independent analyses using different control cost thresholds, in some cases to address the 1997 NAAQS and in other cases to address the 2008 NAAQS.

a. Use of CSAPR Ozone-season Trading Program Bank in the Transport Rule for the 2008 Ozone NAAQS Trading Program

Since CSAPR was promulgated in 2011, the U.S. electric sector has undergone considerable transformation primarily due to economic and market forces precipitated by the natural gas boom. For example, Henry Hub natural gas prices reached below $2.00 per million BTU in 2012 and were in the $2.00–$3.00 range for most of 2012. These prices are below the level initially anticipated when establishing the phase 1 and 2 budgets, and have made the operation of lower emitting units more competitive, putting more downward pressure on emissions. There has also been turnover in the power generation fleet as newer, lower emitting sources replace older, higher emitting sources,

putting further downward pressure on emissions. Approximately 28.5 GW of coal units retired from the fleet between 2012 and June of 2015. In addition, demand growth has slowed; a majority of U.S. states have implemented renewable portfolio standards and other energy efficiency programs; and high-efficiency building designs, residential energy conservation, roof-top solar, and other forms of distributed generation have grown. In combination, these factors have significantly reduced EGU $NO_X$ emissions between 2012 and 2015.

As a result of protracted litigation, CSAPR implementation was delayed by three years, from 2012 to 2015. Due to this delay, combined with the market forces and changes that took place during that timeframe, expectations are that total banked allowances for the CSAPR ozone-season trading program could be in excess of 210,000 tons by the start of the 2017 ozone-season compliance period, which is more than twice the emission reduction potential estimated at the $1,300 per ton control level described in section VI above. This number was estimated by comparing recent measured emission levels to the original CSAPR $NO_X$ ozone-season phase 1 emissions budgets, assuming EGU emissions in CSAPR $NO_X$ ozone-season states for 2015 and 2016 would continue at 2014 levels.[105]

The use of allowance banks generally provide a glide path for sources required to meet more stringent emission limits in later years and accommodate year-to-year variability in operation. However, allowing unrestricted use of the large number of banked allowances for compliance with this proposed rule could result in regional 2017 ozone season $NO_X$ emissions that exceed the collective state budgets quantified in this rulemaking to address transported air pollution with respect to the 2008 ozone standard. While the assurance provisions included in CSAPR do limit the ultimate amount of pollution that may occur in these states in 2017 (i.e., no matter how large an allowance bank may exist, only a portion of that bank may be used in a state in any given year without exceeding the assurance levels and incurring penalties), unrestricted use of the bank in this situation could allow emissions to exceed the state budgets, up to the assurance level, year after year.

As described in CSAPR, the flexibility provided by the assurance provisions is not designed to be used repeatedly, year

after year. Rather, the use of banked allowances is intended to be limited by binding emissions budgets such that drawing down the bank in one year is only possible because of actions taken to build up the bank in a previous year. Moreover, a relatively large allowance bank that enables emissions budgets to be exceeded year after year may encourage sources to postpone emission reductions that would be more timely in the 2017 timeframe in order to align reductions with the downwind area attainment dates for the 2008 ozone NAAQS.

The EPA is proposing and taking comment on a range of options for how to treat the use of banked 2015 and 2016 CSAPR $NO_X$ ozone-season allowances by units in the 23 states with new or updated budgets in this proposal. The use of banked allowances by states that are not included in the proposed FIPs to address ozone transport under the 2008 NAAQS (i.e., Georgia for CSAPR $NO_X$ ozone-season program and all states for CSAPR $SO_2$ and $NO_X$ annual programs) would not be affected by these options.

The EPA is proposing that allowances issued for compliance in 2015 and 2016 under CSAPR may be used for compliance under the updated CSAPR from 2017 forward in order to smooth implementation in the first few years under the new budgets. However, the EPA is proposing to impose certain limits on the use of these banked allowances starting in 2017. Specifically, the EPA is proposing that sources in the 23 states with new or updated budgets in this proposal may use all of their banked allowances, but at a tonnage authorization level significantly lower than one ton per allowance. This would be realized through a surrender ratio greater than one pre-2017 allowances (vintage 2015 or 2016) to cover one ton of $NO_X$ emitted in 2017 and each year thereafter. The surrender ratio, such as four-for-one or two-for-one, would require more than one pre-2017 banked allowance to be used for each ton of ozone season $NO_X$ emitted in 2017 and beyond. This would have the dual effect of carrying over the banked allowances into the new program to promote program continuity, while also recognizing the environmental objectives of the updated ozone NAAQS for 2008 and the corresponding new state emission budgets designed to help move air quality towards compliance with that NAAQS standard. A surrender ratio would respect the flexibility of sources to operate at their assurance levels in the program's early years, but would reduce the ability for the collective EGU fleet to repeatedly

---

[105] This data analysis relies on 40 CFR part 75 emissions reporting data as available in EPA Air Markets Program Data available at *http://ampd.epa.gov/ampd/*.

exceed the emissions budget year after year.

Finally, EPA believes a surrender ratio is appropriate as it reflects the fact that tighter budgets will put upward pressure on allowance value in the future. Therefore, fewer allowances will be needed to reach the same value of a current allowance holding, making a surrender ratio a natural complement to carrying over the value of the banked allowances in a program where more stringent emission budgets are replacing less stringent emission budgets.

EPA is proposing a surrender ratio greater than one-for-one, such as two-for-one or four-for-one. For analytic purposes in this rulemaking, it reflects the four-for-one surrender ratio to illustrate one potential surrender ratio. However, in the final rule, EPA would update this assumption to reflect the surrender ratio finalized.

This ratio of four or two banked allowances to one ton of emissions is derived from the ratio of the anticipated allowance bank in 2017 (approximately 210,000 allowances) to the ozone season variability limit (i.e., the difference between the sum of the emissions budgets for all 23 states and the sum of the assurance levels for all 23 states; approximately 60,000 tons) or the ozone season variability limit multiplied by two (120,000 tons), rounded to the nearest whole number. The EPA identified this approach to limit the emissions impact of using banked allowances to the magnitude of all states emitting up to their assurance levels for one or two years. The variability limit respects the upper bound variation in emissions and load EPA would expect in any given year. Thus, the carryover of banked allowances equal to one or two years' worth of variability limits provides the affected fleet with the ability to accommodate potential variation from the mean in its load and emission patterns in the first years of the program, while balancing the need to ensure that emissions are reduced, on average, to the level of the budgets and within the assurance levels in subsequent years.

The EPA believes that a surrender ratio approach provides a means for the existing CSAPR EGU $NO_X$ ozone-season allowances to retain some value, while appropriately mitigating the potential adverse impact of the allowance bank on the emission-reducing actions needed from affected units in states with obligations to address interstate transport for the 2008 ozone NAAQS. The EPA seeks comment on a surrender ratio approach and on the use of a ratio, such as two-for-one or four-for-one, and

whether an alternative ratio would be appropriate.

The EPA is also soliciting comment on another approach that we believe could achieve these same goals (i.e., valuing the anticipated CSAPR allowance bank while promoting near-term emission reductions). Under this alternative approach, the EPA would issue fewer allowances than the tons quantified in state budgets for the 23 states affected by this rulemaking in the first three years of program implementation (i.e. 2017, 2018, and 2019). This approach recognizes that 2015 and 2016 allowances are available to sources for compliance and would allow use of those banked CSAPR $NO_X$ ozone allowances at a one-to-one turn-in ratio (i.e., one allowance is surrendered for one ton of emissions). By reducing overall allocations for a period of time, the impact of states using those banked allowances on emission levels would be mitigated.

The EPA seeks comment on what percentage (below 100 percent) of allowances to issue, and over what number of years, under this alternative approach. As a specific example, the EPA seeks comment on implementing this approach in a manner such that the EPA would issue allowances to sources within each of the 23 states with updated budgets under this proposal at a level of 85 percent of the proposed emissions budgets for the first three years that the new budgets are effective. Using the proposed EGU $NO_X$ ozone-season emissions budget of 9,979 tons for Alabama as an example, this would mean issuing approximately 8,482 allowances for each of the 2017 through 2019 (inclusive) control periods (and the full budget for each subsequent control period). Applying this approach to all 23 states with updated budgets under this proposal (which sum to 312,824 allowances) would mean that EPA would issue approximately 266,900 allowances across those states in each of the 2017, 2018, and 2019 control periods. EGUs in those states would be able to use allowances from the anticipated 210,000 allowance bank in addition to allowances issued for these years in order to comply with the updated CSAPR emission requirements. Allocating approximately 266,900 allowances for the first three years of the updated requirements would, based on current estimates, result in approximately 47,000 banked allowances used for compliance each year. This would leave approximately 70,000 banked allowances, which is roughly equivalent to the regional variability limit (i.e., the difference between the states' collective emissions

budgets and their collective assurance levels). As under the illustrative four-for-one surrender ratio option, the remaining amount of banked allowances that would remain after using this initial reduced allocation is approximately the amount of banked allowances that would allow all states to emit up to their assurance levels for one year.

The EPA also seeks comment on what other percentages of the budget and time-frames could be appropriately used to implement this alternative approach. As in the specific example above, the EPA would seek a combination of time and recordation percentage such that the ultimate influence of the anticipated allowance bank is limited to approximately the regional variability limit (i.e., the difference between the collective emissions budgets and the collective assurance levels).

Under either approach, the EPA would conduct unit-level allowance allocations in the same manner as described above, such that each unit's share of its state's total allowances issued is determined by that allocation approach whether the EPA issues allowances in the full amount of the state budget with a surrender ratio for banked allowances or in a lesser amount to address the potential effect of the allowance bank (as entertained in this alternative on which we are inviting comment). In other words, the effect of this alternative approach would be to reduce unit-level allowance allocations in those years in a proportional manner (e.g., all unit-level allowance allocations would decrease by the same percentage as the reduction in total allowances issued below that state's budget).

Additionally, the EPA is soliciting comment on less and more restrictive approaches to address use of the CSAPR EGU $NO_X$ ozone allowance bank. Specifically, the EPA seeks comment on: (1) Allowing banked 2015 and 2016 CSAPR $NO_X$ ozone allowances to be used for compliance with the proposed budgets for the 2008 ozone NAAQS starting in 2017 at a 1-to-1 ratio, or (2) completely disallowing the use of banked 2015 and 2016 CSAPR $NO_X$ ozone allowances for compliance with the proposed budgets for the 2008 ozone NAAQS starting in 2017. The EPA is also soliciting comment on whether and how the assurance provision penalty might be increased, in conjunction with any of the above approaches, to address the relationship of the allowance bank to emissions occurring under this revised program from 2017 onward.

B. Use of CSAPR NO$_X$ Ozone-Season Allowances From States Addressing the 1997 Ozone NAAQS for Compliance in States Addressing the 2008 Ozone NAAQS

Consistent with the original CSAPR, EGUs covered by the seasonal NO$_X$ budget trading program that will be incorporated into these proposed FIPs are able to trade NO$_X$ ozone-season emission allowances among units within the state and across state boundaries, with emissions and the use of allowances limited by the assurance provisions.

The EPA is considering how to transition allowance trading between the group of states that are in the CSAPR NO$_X$ ozone-season program with respect to the 1997 ozone NAAQS but will not have updated emissions budgets proposed in this action (e.g., Georgia based on this proposal) and the group of states for which the EPA is proposing to establish new or lower budgets to address the 2008 ozone NAAQS in this action.

The EPA believes that, where appropriate and feasible, continuity of programs is important, particularly for market-based and other power sector regulations, as this sector makes long-term investment and operational decisions. However, CSAPR allowances issued under budgets established to address the 1997 ozone NAAQS using a $500 per ton cost threshold in one state may not be appropriately valued to reduce interstate ozone transport in another state for the 2008 NAAQS under this proposal where budgets are being established using a $1,300 per ton cost threshold. In the original CSAPR rulemaking, the EPA discussed the concern that allowing unrestricted trading between groups of states whose budgets were established using different cost thresholds would impact whether the necessary emission reductions would be achieved within each state.[106] The assurance provisions used in CSAPR provide some assurance that emission reductions will occur within each state, but in the CSAPR rulemaking the EPA acknowledged concerns that the assurance provisions alone may not be sufficient. Consistent with those previously acknowledged concerns, the EPA is proposing in this rulemaking not to allow these two groups of states to trade without some additional assurances that the emission reductions will be appropriately achieved within each state.

However, because of the relatively small size of the group of states with

budgets set using the $500 per ton cost threshold, the EPA is not proposing to prohibit altogether trading between the two groups in this instance. The EPA does not expect that a single state (i.e., Georgia) would drastically influence emission reductions in the other 23 states covered by this proposed rule. EPA is instead proposing to permit trading between the two groups of ozone states subject to certain restrictions on trading. In particular, the EPA is proposing to require that sources in states addressing the 2008 ozone NAAQS under this proposal may use allowances issued in states only addressing the 1997 ozone NAAQS via the CSAPR trading programs (e.g., Georgia) at a rate of 2.5 allowances for each ton of NO$_X$ emitted. The EPA proposes a ratio of 2.5-to-1 in order to align with the ratio of the cost of ozone season EGU NO$_X$ reduction promulgated in the original CSAPR (i.e., $500 per ton) to the cost proposed for this rulemaking (i.e., $1,300 per ton). The EPA proposes this restriction as sufficient, in conjunction with the assurance provisions, to protect the needed reductions in the 23 states addressing interstate transport for the 2008 ozone NAAQS. The EPA requests comments on this approach. The EPA also seeks comment on using a different ratio than 2.5-to-1, and on using the same ratio as the ratio for the use of banked allowances, whether that ratio is 4-to-1 as proposed or a different ratio.

The EPA is also seeking comment on allowing trading without distinction between the particular NAAQS (1997 ozone NAAQS or 2008 ozone NAAQS) for which an upwind state has obligations to reduce transported pollution, and subject only to the constraints of the CSAPR assurance provisions with no additional restrictions. The EPA is soliciting comment on whether and how the assurance provision penalty might be increased in conjunction with this approach.

Alternatively, the EPA is seeking comment on separating compliance between groups of upwind states under each NAAQS, whereby the use of NO$_X$ ozone-season emission allowances from one group (e.g., sources in states only covered for the 1997 ozone NAAQS) would be disallowed for compliance use by units in the other group (e.g., sources in states covered for the 2008 ozone NAAQS), similar to the existing separation between the CSAPR SO$_2$ Group 1 and CSAPR SO$_2$ Group 2 programs.

C. Use of CSAPR NO$_X$ Ozone-season Allowances Between States With Different Control Stringencies Addressing the 2008 Ozone NAAQS

As discussed in Section VI of this proposal, the EPA notes that the evaluation of EGU NO$_X$ requirements for the final rule could show one or more states fully addressing their good neighbor obligation based on ozone season NO$_X$ control requirements represented by one cost level while one or more other states have ozone season NO$_X$ control requirements based on a more stringent cost level. In this situation, the EPA proposes that it would quantify requirements for these different groups of states based on different uniform control stringencies. However, CSAPR allowances issued under budgets established using a one cost threshold (e.g., $1,300 per ton) in one state may not be appropriately valued to reduce interstate ozone transport in another state where budgets might be established using different cost threshold (e.g., $3,400 per ton). Consistent with the previous discussion (regarding allowances issued in states continuing to address the 1997 ozone NAAQS under budgets established using $500 per ton threshold), the EPA is proposing to permit trading between these groups of states subject to certain restrictions on trading. In particular, the EPA is proposing to require that sources in states with emissions budgets established using the more stringent cost thresholds (e.g., $3,400 per ton) may use allowances issued in states with emissions budgets established using the less stringent cost thresholds (e.g., $1,300 per ton) at a rate of allowances for each ton of NO$_X$ emitted based on the ratio of these cost thresholds. For example, states with emissions budgets established using $3,400 per ton could use allowances at a rate of approximately 2.5-to-1 in order to align with the ratio of the relevant cost thresholds. The EPA requests comments on allowing the states to trade with the proposed restrictions on the use of allowances by sources in states controlled using the more stringent cost threshold.

The EPA is also seeking comment on allowing trading without distinction between the particular cost thresholds for which an upwind state has obligations to reduce transported pollution, and subject only to the constraints of the CSAPR assurance provisions with no additional restrictions. The EPA is also soliciting comment on whether and how the assurance provision penalty might be

[106] 76 FR at 48263–64.

increased in conjunction with this approach.

Alternatively, the EPA is seeking comment on separating compliance between groups of upwind states under each cost threshold, whereby the use of $NO_X$ ozone-season emission allowances from one group (*e.g.*, sources in states with allowances issued using the more stringent cost threshold) would be disallowed for compliance use by units in the other group, similar to the existing separation between the CSAPR $SO_2$ Group 1 and CSAPR $SO_2$ Group 2 programs.

### D. Summary of Proposed Allowance Surrender Ratios

As discussed in sections a. and b. above, the EPA proposes that in this updated rulemaking, EGUs would be able to trade $NO_X$ ozone-season emission allowances among units within the state and across state boundaries, with emissions and use of allowances limited by the assurance provisions. However, the EPA is proposing to impose certain additional limits on the use of allowances starting in 2017 for EGUs in the 23 states with updated budgets in this proposal. Table VII–2 summarizes the limits on the proposed use for CSAPR $NO_X$ ozone-season allowances.[107]

Table VII.B-2. Proposed Use of CSAPR $NO_X$ Ozone-Season Allowances for 2015, 2016, 2017, and Later Allowance Vintages (Tons)

| | | Compliance Period and Unit Location of Allowance Use | | |
|---|---|---|---|---|
| | | Used for 2015 or 2016 Compliance – any state | Used for 2017 or later compliance – unit in states with updated budget for 2008 ozone NAAQS | Used for 2017 or later compliance – states with original CSAPR emissions budget |
| Vintage Year and State of Allowance Issuance | 2015 or 2016 vintage – any state | 1 for 1 | 4 for 1 | 1 for 1 |
| | 2017 or later vintage – states with updated budget for 2008 ozone NAAQS | Not Applicable | 1 for 1 | 1 for 1 |
| | 2017 or later vintage – states with original CSAPR emissions budget | Not Applicable | 2.5 for 1 | 1 for 1 |

### 6. Compliance Deadlines

As discussed in sections II.A., III.B., and IV.A., the proposed rule would require $NO_X$ reductions from sources starting May 1, 2017, to ensure that reductions are made as expeditiously as practicable to assist downwind states' attainment and maintenance of the 2008 ozone NAAQS. The compliance deadline is coordinated with the attainment deadline for the relevant NAAQS and the proposed rule includes provisions to assure that all necessary reductions occur at sources within each individual state.

In section VI above, the EPA explains that this is an adequate and reasonable time for sources to plan for compliance and operate necessary controls.

For states for which EPA has already established a FIP requiring their units to participate in the CSAPR $NO_X$ ozone-season trading program because of transport obligations under the 1997 ozone NAAQS, no CFR changes are necessary to accommodate this

---

[107] In the regulatory text revisions for this proposal, the proposed limits discussed here are described in terms of the "tonnage equivalent" of an allowance. In the case of 2015 or 2016 vintage allowances used for compliance in a control period in 2017 or later, where 4 allowances would be needed for each ton of emissions, each such allowance would have a tonnage equivalent of 0.25 tons per allowance ($\frac{1}{4} = 0.25$). In the case of 2017 or later allowances from a state with an original CSAPR budget used for compliance by a unit in a state with an updated budget based on the 2008 ozone NAAQS, where 2.5 allowances would be needed for each ton of emissions, each such allowance would have a tonnage equivalent of 0.40 tons per allowance ($\frac{1}{2.5} = 0.40$). In a case where one allowance is needed for each ton of emissions, such allowances would have a tonnage equivalent of one ton per allowance. See proposed 40 CFR 97.524(f) in the regulatory text for this proposal.

compliance deadline. The EPA proposes to amend the regulatory text in 40 CFR 97.506(c)(3) to reflect the 2017 start of compliance obligations for units in states that were not previously subject to the CSAPR $NO_X$ ozone-season trading program (e.g., Kansas). The EPA also proposes to amend various FIP provisions in 40 CFR part 52 to indicate the start and end of compliance obligations under the FIPs for sources in states added to the trading program under this proposed rule (e.g., Kansas) or removed from the trading program in response to the D.C. Circuit's remand of certain $NO_X$ ozone-season emissions budgets (e.g., Florida and South Carolina).

7. Monitoring and Reporting and the Allowance Management System

Monitoring and reporting in accordance with the provisions of 40 CFR part 75 are required for all units subject to the CSAPR $NO_X$ ozone-season trading programs and would also be required for all units covered under the proposed transport rule for the 2008 ozone NAAQS requirements. The EPA proposes that the monitoring certification deadline by which monitors are installed and certified for compliance use generally would be May 1, 2017, the beginning of the first compliance period proposed in this rule, with potentially later deadlines for units that commence commercial operation after July 1, 2016. Similarly, the EPA proposes that the first calendar quarter in which quarterly emission reporting is required would generally be the quarter including May 1, 2017. These deadlines are analogous to the current deadlines under CSAPR but are delayed by two years to reflect the fact that this rule's initial implementation year would be two years later than the existing CSAPR programs' initial implementation year.

Under part 75, a unit has several options for monitoring and reporting, namely the use of a CEMS; an excepted monitoring methodology based in part on fuel flow metering for certain gas- or oil-fired peaking units; low-mass emissions monitoring for certain non-coal-fired, low emitting units; or an alternative monitoring system approved by the Administrator through a petition process. In addition, sources can submit petitions to the Administrator for alternatives to specific CSAPR and part 75 monitoring, recordkeeping, and reporting requirements. Each CEMS must undergo rigorous initial certification testing and periodic quality assurance testing thereafter, including the use of relative accuracy test audits (RATAs) and 24-hour calibrations. In addition, when a monitoring system is not operating properly, standard substitute data procedures are applied and result in a conservative estimate of emissions for the period involved.

Further, part 75 requires electronic submission of a quarterly emissions report to the Administrator, and in a format prescribed by the Administrator. The report would contain all of the data required concerning ozone season $NO_X$ emissions.

Units currently subject to CSAPR $NO_X$ ozone-season or CSAPR $NO_X$ annual trading program requirements monitor and report $NO_X$ emissions in accordance with part 75, so most sources would not have to make any changes to monitoring and reporting practices. In fact, only units in Kansas currently subject to the CSAPR $NO_X$ annual trading program but not the CSAPR $NO_X$ ozone-season trading program would need to start newly reporting ozone season $NO_X$ mass emissions. These emissions are already measured under the annual program, so the change would be a minor reporting modification. Units in the following states monitor and report $NO_X$ emissions under the CSAPR $NO_X$ ozone-season trading program and would continue to do so without change under the CSAPR ozone update for the 2008 NAAQS: Alabama, Arkansas, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.

8. Recordation of Allowances

The EPA proposes to update the deadlines by which EPA would record allowances for the CSAPR $NO_X$ ozone-season trading program for the compliance periods in the years from 2017 through 2022. The proposed new dates would amend the recordation deadlines in 40 CFR 97.521 as shown in the proposed regulatory text amendments at the end of this proposal. The existing recordation provisions require EPA to record either FIP-based (i.e., governed by part 97) or SIP-based allocations for 2017 and 2018 by July 1, 2016. The EPA proposes to delay this deadline to December 1, 2016. The extension would allow EPA to finalize any changes to the state budgets for the 2017 compliance period before recording 2017 allowances. This would prevent the need to take back allowances that were recorded under existing budgets in cases where state budgets are reduced. The extended deadline would still allow allocations to be recorded five months prior to the start of the 2017 compliance period, giving affected units time to make compliance plans. Compliance true-up for the 2017 ozone season occurs after December 1, 2017, so affected sources would have more than a year from the extended recordation deadline to ensure they hold enough allowances for 2017 ozone season compliance. The EPA is taking comment on this new deadline for 2017 and 2018 allowance allocation recordation. The EPA is also taking comment on whether the provision to delay 2017 and 2018 allocation recordation should be finalized ahead of final action on this full proposal if this proposal is not finalized before July 1, 2016.

The EPA is also proposing to extend the existing deadlines for recording CSAPR $NO_X$ ozone-season allowances for the 2019 and 2020 compliance periods and for the 2021 and 2022 compliance periods each by one year, to July 1, 2018, and July 1, 2019, respectively. The purpose of these proposed deadline extensions is to provide time for states to submit SIP revisions to modify or replace the FIPs proposed in this rulemaking on schedules comparable to the schedules for the SIP revision options that the states have under the current CSAPR regulations. The EPA seeks comment on extending these recordation deadlines as discussed.

C. Submitting a SIP

As noted earlier in this section VIII, states may replace the FIP with a SIP at any time if approved by the EPA. "Abbreviated" and "full" SIP options continue to be available. An "abbreviated SIP" allows a state to submit a SIP that would modify allocation provisions in the $NO_X$ budget trading program that is incorporated into FIP to allow the state to substitute its own allocation provisions. A second approach, referred to as a full SIP, allows a state to adopt a trading program meeting certain requirements that would allow sources in the state to continue to use the EPA-administered trading program through an approved SIP, rather than a FIP. In addition, as under CSAPR, EPA proposes to provide states with an opportunity to adopt state-determined allowance allocations for existing units for the second compliance period under this proposed rule—in this case, the 2018 compliance period—through streamlined SIP revisions. See 76 FR 48208 at 48326–48332 (August 8, 2011) for additional discussion on full and abbreviated SIP options and 40 CFR 52.38(b).

### 1. 2018 SIP Option

As under CSAPR, the EPA proposes to allow a state to submit a SIP revision establishing allowance allocations for existing units for the second year of the new requirements, 2018, to replace the FIP-based allocations. The process would be the same as under the current rule with deadlines shifted roughly 2 years—*i.e.*, a state would submit a letter to EPA by November 15, 2016 indicating its intent to submit a complete SIP revision by April 1, 2017. The SIP would provide in an EPA-prescribed format a list of existing units and their allocations for the 2018 control period. If a state does not submit a letter of intent to submit a SIP revision, FIP allocations would be recorded by December 1, 2016. If a state submits a timely letter of intent but fails to submit a SIP revision, FIP allocations would be recorded by April 1, 2017. If a state submits a timely letter of intent followed by a timely SIP revision that is approved, the approved SIP allocations would be recorded by October 1, 2017.

### 2. 2019 and Beyond SIP Option

For the 2019 control period and later, EPA proposes that the SIP submittal deadline be delayed one year, until December 1, 2017, from the current deadline. The deadline to then submit state allocations for 2019 and 2020 would be June 1, 2018 and the deadline to record those allocations would be July 1, 2018. Under the proposed new deadlines, a state could submit a SIP revision for 2021 and beyond control periods by December 1, 2018, with state allocations due June 1, 2019, and allocation recordation by July 1, 2019. For 2019 control period and later, SIPs can be full or abbreviated SIPs. An allocation methodology approved in an abbreviated SIP submitted for 2017 under the existing CSAPR regulations could also apply under the proposed new rule in 2017 and 2018. See section III of this preamble and 76 FR 48208 at 48326–48332 (August 8, 2011) for additional discussion on full and abbreviated SIP options and 40 CFR 52.38(b).

### 3. SIP Revisions That Do Not Use the CSAPR Trading Program

For a transport SIP revision that does not use the CSAPR $NO_X$ ozone-season trading program, EPA would evaluate the transport SIP based on the particular control strategies selected and whether the strategies as a whole provide adequate and enforceable provisions ensuring that the emission reductions will be achieved. The SIP revision at a minimum should include the following

general elements: (1) A comprehensive baseline 2017 statewide $NO_X$ emission inventory (which includes growth and existing control requirements), which should be consistent with the 2017 emission inventory the EPA would use when finalizing this rulemaking to calculate the required state budget; (2) a list and description of control measures to satisfy the state emission reduction obligation and a demonstration showing when each measure would be in place to meet the 2017 compliance date; (3) fully-adopted state rules providing for such $NO_X$ controls during the ozone season; (4) for EGUs greater than 25 MWe and large boilers and combustion turbines with a rated heat input capacity of 250 mmBtu per hour or greater, Part 75 monitoring, and for other units, monitoring and reporting procedures sufficient to demonstrate that sources are complying with the SIP; and (5) a projected inventory demonstrating that state measures along with federal measures will achieve the necessary emission reductions in time to meet the 2017 compliance deadline.[108] The SIPs must meet the requirements for public hearing, be adopted by the appropriate board or authority, and establish by a practically enforceable regulation or permit a schedule and date for each affected source or source category to achieve compliance. Once the state has made a SIP submission, the EPA will evaluate the submission(s) for completeness. The EPA's criteria for determining completeness of a SIP submission are codified at 40 CFR part 51, appendix V.

For further information on replacing a FIP with a SIP, see the discussion in the final CSAPR rulemaking (76 FR 48326, August 8, 2011). The EPA requests comment on what types of additional information and guidance would be helpful and stands ready to assist states in SIP development.

### 4. Submitting a SIP To Participate in CSAPR for States Not Included in This Proposal

The EPA believes that there could be circumstances where a state that is not obligated to reduce $NO_X$ emissions in order to eliminate significant contribution to nonattainment or interference with maintenance of ozone standards in another state (such as Florida or South Carolina for purposes of this proposal) may wish to participate in the $NO_X$ ozone-season trading program in order to serve a different regulatory purpose. For example, the state may have a pending request for

redesignation of an area to attainment that relies on participation in the trading program as part of the state's demonstration that emissions will not exceed certain levels, or the state may wish to rely on participation in the trading program for purposes of a SIP revision to satisfy certain obligations under the Regional Haze Rule. The EPA seeks comment on whether the EPA should revise the CSAPR regulations to allow the EPA to approve a SIP revision in which a state seeks to participate in the $NO_X$ ozone-season trading program for a purpose other than addressing ozone transport obligations.

Further, the EPA seeks comment on the conditions that should apply to any such approval in order to ensure that the state's participation is consistent with the trading program's ability to achieve the program's objectives with respect to interstate transport of ozone pollution. The EPA believes that the primary conditions for consideration in this circumstance would be the level of the state emissions budget and what, if any, limitations would be placed on the use of allowances issued to the sources in that state by sources in other states.

The EPA specifically seeks comment on whether a presumption of approvability of such a SIP revision should arise, without limitations on the use of corresponding allowances for compliance by sources within that state or in other states, if the state would adopt as part of the SIP revision a $NO_X$ ozone-season emissions budget no higher than the emissions budgets that the EPA finalizes under this rule. For example, based on this proposal, an emissions budget that reflects EGU $NO_X$ mitigation strategies represented by a uniform cost of $1,300 per ton. The EPA notes that such emissions budgets could be developed using the data and analysis used to establish the emissions budgets for this rule.

EPA also specifically seeks comment on whether a presumption of approvability of such a SIP revision should arise, with limitations on the use of allowances issued to the state's sources analogous to the limitations proposed for allowances issued to Georgia's units in this proposed rule, if the state would adopt as part of the SIP revision a $NO_X$ ozone-season emissions budget no higher than the base case ozone season $NO_X$ emissions that EPA projected for the state in the analysis used to establish the emissions budgets for this proposed rule.

The EPA also specifically seeks comment on whether, in the case of a state previously subject to the CSAPR $NO_X$ ozone-season trading program (*e.g.*, Florida or South Carolina), a

---

[108] The EPA notes that the SIP is not required to include modeling.

presumption of approvability of such a SIP revision should arise at an emissions level higher than the state's base case emissions in the analysis used to establish the emissions budgets for this proposed rule—for example, an emissions level equal to the state's previously promulgated CSAPR budget—subject to the imposition of trading limitations on allowances issued to the state's units analogous to the limitations proposed for allowances issued to Georgia's units in this proposal.

Finally, the EPA also seeks comment on whether a state whose allowances would otherwise be subject to limitations on use analogous to the limitations proposed for allowances issued to Georgia's units in this proposed rule could avoid those limitations by adopting in a SIP revision a more stringent budget reflecting emission levels at higher dollar per ton emission reduction costs comparable to the dollar per ton emission reduction costs used to establish the budgets for other states in this proposed rule.

*D. Title V Permitting*

This proposed rule, like CSAPR, does not establish any permitting requirements independent of those under title V of the CAA and the regulations implementing title V, 40 CFR parts 70 and 71.[109] All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emission limitations and other conditions as necessary to assure compliance with the applicable requirements of the CAA, including the requirements of the applicable State Implementation Plan. CAA sections 502(a) and 504(a), 42 U.S.C. 7661a(a) and 7661c(a). The "applicable requirements" that must be addressed in title V permits are defined in the title V regulations (40 CFR 70.2 and 71.2 (definition of "applicable requirement")).

The EPA anticipates that, given the nature of the units subject to this transport rule and given that many of the units covered here are already subject to CSAPR, most of the sources at which the units are located are already subject to title V permitting requirements. For sources subject to title V, the interstate transport requirements for the 2008 ozone NAAQS that would be applicable to them under the final FIPs will be "applicable requirements" under title V and therefore will need to

be addressed in the title V permits. For example, requirements concerning designated representatives, monitoring, reporting, and recordkeeping, the requirement to hold allowances covering emissions, the assurance provisions, and liability will be "applicable requirements" to be addressed in the permits.

Title V of the CAA establishes the basic requirements for state title V permitting programs, including, among other things, provisions governing permit applications, permit content, and permit revisions that address applicable requirements under final FIPs in a manner that provides the flexibility necessary to implement market-based programs such as the trading programs established by CSAPR and updated by this proposed ozone interstate transport rule. 42 U.S.C. 7661a(b).

In CSAPR, EPA established standard requirements governing how sources covered by the rule would comply with title V and its regulations.[110] 40 CFR 97.506(d). Under this proposed rule, EPA proposes that those same requirements would continue to apply to sources already in the CSAPR NOx Ozone-season Trading Program and to any newly covered sources that have been added to address interstate transport of the 2008 ozone NAAQS. For example, the title V regulations provide that a permit issued under title V must include "[a] provision stating that no permit revision shall be required under any approved . . . emissions trading and other similar programs or processes for changes that are provided for in the permit." 40 CFR 70.6(a)(8) and 71.6(a)(8). Consistent with these provisions in the title V regulations, in CSAPR, EPA included a provision stating that no permit revision is necessary for the allocation, holding, deduction, or transfer of allowances. 40 CFR 97.506(d)(1). This provision is also included in each title V permit for a covered source. The EPA proposes to maintain its approach under CSAPR that allowances can be traded (or allocated, held, or deducted) without a revision to the title V permit of any of the sources involved.

Similarly, the EPA is also proposing to maintain that sources in the CSAPR NOx Ozone-season Trading Program can continue to use the title V minor modification procedure to change their approach for monitoring and reporting emissions, in certain circumstances.

Specifically, sources may use the minor modification procedure so long as the new monitoring and reporting approach is one of the prior-approved approaches under CSAPR (*i.e.,* approaches using a continuous emission monitoring system, an excepted monitoring system under appendices D and E to part 75, a low mass emissions excepted monitoring methodology under 40 CFR 75.19, or an alternative monitoring system under subpart E of part 75), and the permit already includes a description of the new monitoring and reporting approach to be used. *See* 40 CFR 75.506(d)(2); 40 CFR 70.7(e)(2)(i)(B) and 40 CFR 71.7(e)(1)(i)(B). As described in our 2015 guidance, we suggest in our template that sources may comply with this requirement by including a table of all of the approved monitoring and reporting approaches under the rule, and the applicable requirements governing each of those approaches. Inclusion of the table in a source's title V permit therefore allows a covered unit that seeks to change or add to their chosen monitoring and recordkeeping approach to easily comply with the regulations governing the use of the title V minor modification procedure.

Under CSAPR, in order to employ a monitoring or reporting approach different from the prior-approved approaches discussed above, unit owners and operators must submit monitoring system certification applications to the EPA establishing the monitoring and reporting approach actually to be used by the unit, or, if the owners and operators choose to employ an alternative monitoring system, to submit petitions for that alternative to the EPA. These applications and petitions are subject to EPA review and approval to ensure consistency in monitoring and reporting among all trading program participants. The EPA's responses to any petitions for alternative monitoring systems or for alternatives to specific monitoring or reporting requirements are posted on the EPA's Web site.[111] EPA proposes to maintain the same approach in this proposed rule.

Consistent with the EPA's approach under CSAPR, the applicable requirements resulting from this proposed FIP would be incorporated into covered sources' existing title V permits either pursuant to the provisions for reopening for cause (40 CFR 70.7(f) and 40 CFR 71.7(f)) or the standard permit renewal provisions (40

---

[109] Part 70 addresses requirements for state title V programs, and part 71 governs the federal title V program.

[110] EPA also issued a guidance document and template that includes instructions describing how to incorporate the CSAPR applicable requirements into a source's title V permit. *http://www.epa.gov/airtransport/CSAPR/pdfs/CSAPR_Title_V_Permit_Guidance.pdf.*

[111] *http://www2.epa.gov/airmarkets/part-75-petition-responses.*

CFR 70.7(c) and 71.7(c)).[112] For sources newly subject to title V that will also be covered sources under the final FIPs, the initial title V permit issued pursuant to 40 CFR 70.7(a) should address the final FIP requirements.

As in CSAPR, the approach to title V permitting under the proposed FIPs imposes no independent permitting requirements and should reduce the burden on sources already required to be permitted under title V and on permitting authorities.

*E. Relationship to Other Emission Trading and Ozone Transport Programs*

1. Interactions With Existing CSAPR [113] Annual Programs, Title IV Acid Rain Program, $NO_X$ SIP Call, Section 176A Petition, and Other State Implementation Plans

a. CSAPR Annual Programs

Nothing in this proposal affects any CSAPR $NO_X$ annual or CSAPR $SO_2$ Group 1 or CSAPR $SO_2$ Group 2 requirements. The CSAPR annual requirements were premised on the 1997 and 2006 $PM_{2.5}$ NAAQS that are not being addressed in this rulemaking. The CSAPR $NO_X$ annual trading program and the CSAPR $SO_2$ Group 1 and Group 2 trading programs remain in place and will continue to be administered by the EPA.

The EPA acknowledges that, in addition to the ozone budgets discussed above, the D.C. Circuit has remanded for reconsideration the CSAPR $SO_2$ budgets for Alabama, Georgia, South Carolina, and Texas. *EME Homer City II,* 795 F.3d at 138. This proposal does not address the remand of these CSAPR phase 2 $SO_2$ emissions budgets. The EPA intends to address the remand of the phase 2 $SO_2$ annual emissions budgets separately.

b. Title IV Interactions

This proposed rule if adopted would not affect any Acid Rain Program requirements. Any Title IV sources that are subject to provisions of this proposed rule would still need to continue to comply with all Acid Rain provisions. Acid Rain Program $SO_2$ and $NO_X$ requirements are established independently in Title IV of the Clean Air Act, and will continue to apply independently of this proposed rule's provisions. Acid Rain sources will still be required to comply with Title IV requirements, including the requirement to hold Title IV allowances to cover $SO_2$ emissions at the end of a compliance year.

c. $NO_X$ SIP Call Interactions

States affected by both the $NO_X$ SIP Call and any final CSAPR ozone update for the 2008 NAAQS will be required to comply with the requirements of both rules. This proposed rule requires $NO_X$ ozone season emission reductions from EGUs greater than 25 MW in nearly all $NO_X$ SIP Call states and at levels greater than required by the $NO_X$ SIP Call. Therefore, this proposed rule would satisfy the requirements of the $NO_X$ SIP Call for these large EGU units.

The $NO_X$ SIP Call states used the $NO_X$ Budget Trading Program to comply with the $NO_X$ SIP Call requirements for EGUs serving a generator with a nameplate capacity greater than 25 MW and large non-EGUs with a maximum rated heat input capacity greater than 250 MMBTU/hr. (In some states, EGUs smaller than 25 MW were also part of the NBP as a carryover from the Ozone Transport Commission $NO_X$ Budget Trading Program.) When the EPA promulgated CAIR, it allowed states to modify that program and include all $NO_X$ Budget Trading Program units in the CAIR $NO_X$ Ozone-season Trading Program as a way to continue to meet the requirements of the $NO_X$ SIP Call for these sources.

In CSAPR, however, the EPA allowed states to expand applicability of the trading program to EGUs smaller than 25 MW but did not allow the expansion of applicability to include large non-EGU sources. The reason for excluding large non-EGU sources was largely that emissions from these sources were generally much lower than the budget amount and there was concern that surplus allowances created as a result of an overestimation of baseline emissions and subsequent shutdowns (since 1999 when the $NO_X$ SIP Call was promulgated) would prevent needed reductions by the EGUs to address significant contribution to downwind air quality impacts.

Since then, states have had to find appropriate ways to continue to show compliance with the $NO_X$ SIP Call, particularly for large non-EGUs.[114] Most states that included such sources in CAIR are still working to find suitable solutions.[115]

Therefore, the EPA is taking comment on whether to allow any $NO_X$ SIP Call state affected by this proposed rule to voluntarily submit a SIP revision at a budget level that is environmentally neutral to address the state's $NO_X$ SIP Call requirement for ozone season $NO_X$ reductions. The SIP revision could include a rule to expand the applicability of the CSAPR $NO_X$ ozone-season trading program to include all $NO_X$ Budget Trading Program units. Analysis shows that these units (mainly large non-EGU boilers, combustion turbines, and combined cycle units with a maximum rated heat input capacity greater than 250 mmBtu/hr) continue to emit well below their portion of the $NO_X$ SIP Call budget. In order to ensure that the necessary amount of EGU emission reductions occur for this proposed rule, the corresponding state ozone-season emissions budget amount could be increased by the lesser of the highest ozone season $NO_X$ emissions (in the last 3–5 years) [116] from those units or the relevant non-EGU budget under the $NO_X$ SIP Call, and this small group of non-EGUs could participate in the CSAPR ozone-season trading program. The environmental impact would be neutral using this approach, and hourly reporting of emissions under part 75 would continue. This approach would address requests by states for help in determining an appropriate way to address the continuing $NO_X$ SIP Call requirement as to non-EGU sources. EPA proposes that if this option is finalized that the variability limits established for EGUs be unchanged as a result of including these non-EGUs. The assurance provisions would apply to EGUs, and emissions from non-EGUs would not affect the assurance levels.

The $NO_X$ SIP Call generally requires that states choosing to rely on large EGUs and large non-EGUs for meeting $NO_X$ SIP Call emission reduction requirements must establish a $NO_X$ mass emissions cap on each source and require part 75, subpart H monitoring. As an alternative to source-by-source $NO_X$ mass emission caps, a state may impose $NO_X$ emission rate limits on each source and use maximum operating capacity for estimating $NO_X$ mass emissions or may rely on other requirements that the state demonstrates to be equivalent to either the $NO_X$ mass

---

[112] A permit is reopened for cause if any new applicable requirements (such as those under a FIP) become applicable to a covered source with a remaining permit term of 3 or more years. If the remaining permit term is less than 3 years, such new applicable requirements will be added to the permit during permit renewal. See 40 CFR 70.7(f)(1)(I) and 71.7(f)(1)(I).

[113] The CSAPR Annual Programs are referred to in regulations as the Transport Rule $NO_X$ Annual Trading Program (40 CFR 97.401–97.435), the Transport Rule $SO_2$ Group 1 Trading Program (40 CFR 97.601–97.635) and the Transport Rule $SO_2$ Group 2 Trading Program (40 CFR 97.701–97.735).

[114] CSAPR generally satisfies $NO_X$ SIP Call requirements for EGUs in most affected states because the CSAPR cap is lower than the EGU portion of the $NO_X$ SIP Call emission levels.

[115] Affected sources continue to report ozone season emissions using part 75 as required by the $NO_X$ SIP Call and emissions in most states cannot (or are not likely to) exceed $NO_X$ SIP Call non-EGU budget levels.

[116] EPA requests comment on the appropriate time period for this determination.

emission caps or the $NO_X$ emission rate limits that assume maximum operating capacity. Collectively, the caps or their alternatives cannot exceed the portion of the state budget for those sources. *See* 40 CFR 51.121(f)(2) and (i)(4). If the EPA were to allow a state to expand the applicability of this proposed rule to include all the $NO_X$ Budget Trading Program units in the CSAPR $NO_X$ ozone-season trading program, the cap requirement would be met through the new budget and the monitoring requirement would be met through the trading program provisions, which require part 75 monitoring. Whether this option is finalized or not, the EPA will work with states to ensure that $NO_X$ SIP Call obligations continue to be met. The EPA requests comment on the voluntary inclusion of $NO_X$ SIP Call non-EGUs in this 2008 ozone-season proposed rule.

### d. CAA Section 176A Petition To Expand the OTR

On December 9, 2013, the EPA received a CAA section 176A petition from the states of Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont. The petition was amended on December 12, 2013 to add the state of Pennsylvania as a petitioning state. The petition requests that the EPA add 8 states and the remainder of the Commonwealth of Virginia to the current Ozone Transport Region that was established under CAA section 184.[117] The EPA will address this petition at a future date.

### e. Other State Implementation Plans

In this proposal, the EPA has not conducted any technical analysis to determine whether compliance with the proposed rule would satisfy other requirements for EGUs in any attainment or nonattainment areas (*e.g.*, RACT or BART). For that reason, the EPA is not now making determinations nor establishing any presumptions that compliance with the proposed rule satisfies any other requirements for EGUs. Based on analyses that states conduct on a case-by-case basis, states may be able to conclude that compliance with the proposed rule for certain EGUs fulfills other SIP requirements.

### 2. Other Federal Rulemakings

#### a. Clean Power Plan

On August 3, 2015, President Obama and EPA announced the Clean Power Plan—a historic and important action on emissions that contribute to climate change. The CPP reduces carbon pollution from the power sector. With strong but achievable standards for power plants, and customized goals for states to cut the carbon pollution ($CO_2$) that is driving climate change, the Clean Power Plan (CPP) provides national consistency, accountability and a level playing field while reflecting each state's energy mix.

The Clean Air Act—under section 111(d)—creates a partnership between EPA, states, tribes and U.S. territories—with EPA setting a goal and states and tribes choosing how they will meet it. The CPP follows that approach. The CPP establishes interim and final $CO_2$ emission performance rates and statewide goals. States then develop and implement plans that ensure that the power plants in their state—either individually, together or in combination with other measures—achieve these rates or goals. States will be required to submit a state plan, or an initial submittal with an extension request, by September 6, 2016. Complete state plans must be submitted no later than September 6, 2018. The interim rates and goals are assessed over the years 2022 to 2029 and the final $CO_2$ emission performance rates, rate-based goals, or mass-based goals are assessed for 2030 and after.

Because the final deadline for states to submit complete plans under the CPP is September 2018 and because mandatory CPP reductions do not begin until the interim period (*i.e.*, starting in 2022), the EPA does not anticipate significant interactions with the CPP and the near-term (*i.e.*, starting in 2017) ozone season EGU $NO_X$ emission reduction requirements under this proposal.

However the EPA notes that actions taken to reduce $CO_2$ emissions (*e.g.*, deployment of zero-emitting generation) may also reduce ozone season $NO_X$ emissions. To the extent that states or electric utilities consider emission reduction strategies to meet these two separate requirements—CPP and interstate ozone transport—in a coordinated manner, they may find efficiency gains in that actions to meet the CPP goals may also help meet interstate ozone transport requirements.

The EPA believes that timing flexibility provided in the CPP offers significant benefits that allow states to develop plans that will help achieve a number of goals, including, but not limited to: Reducing cost, addressing reliability concerns, addressing concerns about stranded assets, and facilitating the integration of meeting the emission guidelines and compliance by affected EGUs with other air quality and pollution control obligations on the part of both states and affected EGUs.

The EPA is also cognizant of the potential influence of addressing interstate ozone transport on the CPP. As states and utilities undertake the near- and longer-term planning that will be needed for the CPP, they will have the opportunity to consider how compliance with this proposed rule can anticipate, or be consistent with, expected compliance strategies for the CPP. While some EGU $NO_X$ mitigation strategies, most notably shifting generation from higher-$NO_X$ emitting coal-fired units to lower $NO_X$ emitting NGCC units, can potentially also reduce $CO_2$ emissions, the EGU emissions analysis performed for this interstate transport action does not results in a notable difference in $CO_2$ emissions. However, EPA's results do not preclude states and utilities from considering these programs together. And, as the EPA has structured the interstate transport obligations that would be established by this proposal as requirements to limit aggregate affected EGU emissions and the EPA is not proposing to enforce source-specific emission reduction requirements, EGU owners have the flexibility to plan for compliance with the interstate ozone transport requirements in ways that are consistent with state and EGU strategies to reduce $CO_2$ emissions for the Clean Power Plan.

With respect to concerns about potentially stranded investments[118] in $NO_X$ control equipment, the EPA's budget-setting approach quantifies $NO_X$ reductions from upgrading combustion controls at coal-fired units. However, CSAPR's flexible compliance does not require that specific $NO_X$ controls be installed at any specific facilities, and we would not expect such controls to be installed on units that may not be economic to operate in the future.

#### b. 2015 Ozone Standard

On October 1, 2015, the EPA strengthened the ground-level ozone NAAQS to 70 ppb, based on extensive scientific evidence about ozone's effects on public health and welfare. This proposed rule to update CSAPR to address interstate emissions transport

---

[117] The named 8 states are: Illinois, Indiana, Kentucky, Michigan, North Carolina, Ohio, Tennessee, and West Virginia. Currently, the portion of the Commonwealth of Virginia in the OTR is in the consolidated metropolitan statistical area that includes the District of Columbia and northern Virginia.

[118] A potential stranded investment is an investment in an EGU $NO_X$ reduction strategy (*e.g.*, combustion controls) for which the affected EGU retires before the investment is fully depreciated.

with respect to the 2008 ozone NAAQS is a separate and distinct regulatory action and is not meant to address the CAA's good neighbor provision with respect to the strengthened 2015 ozone NAAQS.

The EPA is mindful of the need to address ozone transport for the 2015 ozone NAAQS. The statutory deadline for the EPA to finalize area designations is October 1, 2017. Further, good neighbor SIPs from states are due on October 1, 2018. The steps taken under this proposal to reduce interstate ozone transport, when finalized, will help states attain and maintain the 2015 ozone NAAQS. Moreover, to facilitate the implementation of the CAA good neighbor provision the EPA intends to provide information regarding steps 1 and 2 of the CSAPR framework in the fall of 2016. In particular, the EPA expects to conduct modeling necessary to identify projected nonattainment and maintenance receptors and identify the upwind states that contribute significantly to these receptors.

## VIII. Costs, Benefits, and Other Impacts of the Proposed Rule

The EPA evaluated the costs, benefits, and impacts of compliance with the proposed EGU $NO_X$ ozone-season emissions budgets that reflect uniform $NO_X$ costs of $1,300 per ton (see proposed emissions budgets in table VI.1). In addition, the EPA also assessed compliance with other more and less stringent alternative EGU $NO_X$ ozone-season emissions budgets, reflecting uniform $NO_X$ costs of $3,400 per ton and $500 per ton, respectively (see alternative emissions budgets in tables VI.2 and VI.3). The EPA evaluated the impact of implementing these emissions budgets to reduce interstate transport for the 2008 ozone NAAQS in 2017. More details for this assessment can be found in the Regulatory Impact Analysis in the docket for this proposed rule.

The EPA notes that its analysis of the regulatory control scenarios (i.e., the proposal and more and less stringent alternatives) is illustrative in nature, in part because the EPA proposes to implement the proposed EGU $NO_X$ emissions budgets via a regional $NO_X$ ozone-season allowance trading program. This implementation approach provides utilities with the flexibility to determine their own compliance path. The EPA's assessment develops and analyzes one possible scenario for implementing the $NO_X$ budgets proposed by this action and one possible scenario for implementing the more and less stringent alternatives.

Table VIII.1 provides the projected 2017 EGU emissions reductions for the evaluated regulatory control scenarios.

### TABLE VIII.1—PROJECTED 2017 EMISSIONS REDUCTIONS OF $NO_X$, $SO_2$, AND $CO_2$ WITH THE PROPOSED $NO_X$ EMISSIONS BUDGETS AND MORE OR LESS STRINGENT ALTERNATIVES

[TONS] [1]

|  | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|
| $NO_X$ (annual) | 89,969 | 92,582 | 23,686 |
| $NO_X$ (ozone season) | 84,856 | 83,680 | 25,051 |
| $SO_2$ (annual) | 383 | 425 | 301 |
| $CO_2$ (annual) | 610,092 | 614,385 | 719,760 |

[1] $NO_X$ and $SO_2$ emissions are reported in English (short) tons; $CO_2$ is reported in metric tons.

The EPA estimates the costs associated with compliance with the illustrative proposed regulatory control alternative to be approximately $93 million annually. These costs represent the private compliance cost of reducing $NO_X$ emissions to comply with the proposal and include monitoring, recordkeeping, and reporting costs. Table VIII.2 provides the estimated costs for the evaluated regulatory control scenarios, including the proposal and more and less stringent alternatives. Estimates are in 2011 dollars.

### TABLE VIII.2—COST ESTIMATES FOR COMPLIANCE WITH THE PROPOSED $NO_X$ EMISSIONS BUDGETS AND MORE AND LESS STRINGENT ALTERNATIVES

[2011]$ [1]

|  | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|
| Costs | $93 | $96 | $4.7 |

[1] Levelized annualized costs over the period 2016 through 2040, discounted using the 4.77 discount rate used in IPM's objective function of minimizing the net present value of the stream of total costs of electricity generation.

In this analysis, the EPA monetized the estimated benefits associated with reducing population exposure to ozone and $PM_{2.5}$ and co-benefits of decreased emissions of $CO_2$, but was unable to monetize the co-benefits associated with reducing exposure to mercury, carbon monoxide, and $NO_2$, as well as ecosystem effects and visibility impairment. In addition, the EPA expects positive health and welfare impacts associated with reduced levels of hydrogen chloride, but could not quantify these impacts. Among the benefits it could quantify, the EPA estimated combinations of health benefits at discount rates of 3 percent and 7 percent (as recommended by the EPA's Guidelines for Preparing Economic Analyses [U.S. EPA, 2014] and OMB's Circular A–4 [OMB, 2003]) and climate co-benefits at discount rates of 5 percent, 3 percent, 2.5 percent, and 3 percent (95th percentile) (as recommended by the interagency working group). The EPA estimates the monetized ozone-related benefits [119] of the proposal to be $490 million to $790 million (2011$) in 2017 and the

[119] The ozone-related health benefits range is based on applying different adult mortality functions (i.e., Smith et al. (2009) and Zanobetti and Schwartz (2008)).

$PM_{2.5}$-related co-benefits [120] of the proposal to be $190 million to $430 million (2011$) using a 3% discount rate and $170 million to $380 million (2011$) using a 7% discount rate. Further, the EPA estimates $CO_2$-related co-benefits of $6.5 to $66 million

(2011$). Additional details on this analysis are provided in the RIA for this proposal. Tables VIII.3 and VIII.5 summarize the quantified monetized human health and climate benefits of the proposal and the more and less stringent control alternatives. Table

VIII.4 summarizes the estimated avoided ozone- and $PM_{2.5}$-related health incidences for the proposal and the more and less stringent control alternatives.

TABLE VIII.3—ESTIMATED HEALTH BENEFITS OF PROJECTED 2017 EMISSIONS REDUCTIONS FOR THE PROPOSAL AND MORE OR LESS STRINGENT ALTERNATIVES

[Millions of 2011$] [1]

|  | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|
| $NO_X$ (as ozone) | $490 to $790 | $500 to $820 | $140 to $220 |
| $NO_X$ (as $PM_{2.5}$): |  |  |  |
| 3% Discount Rate | 190 to 430 | 190 to 440 | 49 to 110 |
| 7% Discount Rate | 170 to 380 | 170 to 390 | 45 to 100 |
| Total: |  |  |  |
| 3% Discount Rate | 670 to 1,200 | 690 to 1,300 | 190 to 340 |
| 7% Discount Rate | 650 to 1,200 | 670 to 1,200 | 180 to 330 |

[1] The health benefits range is based on adult mortality functions (*e.g.*, from Krewski *et al.* (2009) with Smith *et al.* (2009) to Lepeule *et al.* (2012) with Zanobetti and Schwartz (2008)).

TABLE VIII.4—SUMMARY OF ESTIMATED AVOIDED OZONE-RELATED AND $PM_{2.5}$-RELATED HEALTH INCIDENCES FROM PROJECTED 2017 EMISSIONS REDUCTIONS FOR THE PROPOSAL AND MORE OR LESS STRINGENT ALTERNATIVES[1]

|  | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|
| **Ozone-Related Health Effects** | | | |
| Avoided Premature Mortality: |  |  |  |
| Smith *et al.* (2009) (all ages) | 48 | 50 | 14 |
| Zanobetti and Schwartz (2008) (all ages) | 81 | 83 | 23 |
| Avoided Morbidity: |  |  |  |
| Hospital admissions—respiratory causes (ages > 65) | 79 | 81 | 22 |
| Emergency room visits for asthma (all ages) | 320 | 330 | 90 |
| Asthma exacerbation (ages 6–18) | 93,000 | 95,000 | 26,000 |
| Minor restricted-activity days (ages 18–65) | 240,000 | 240,000 | 67,000 |
| School loss days (ages 5–17) | 77,000 | 79,000 | 22,000 |
| **$PM_{2.5}$-Rrelated Health Effects** | | | |
| Avoided Premature Mortality: |  |  |  |
| Krewski *et al.* (2009) (adult) | 21 | 22 | 6 |
| Lepeule *et al.* (2012) (adult) | 48 | 50 | 13 |
| Woodruff *et al.* (1997) (infant) | <1 | <1 | <1 |
| Avoided Morbidity: |  |  |  |
| Emergency department visits for asthma (all ages) | 12 | 12 | 3 |
| Acute bronchitis (age 8–12) | 31 | 32 | 8 |
| Lower respiratory symptoms (age 7–14) | 390 | 400 | 100 |
| Upper respiratory symptoms (asthmatics age 9–11) | 560 | 570 | 150 |
| Minor restricted-activity days (age 18–65) | 16,000 | 16,000 | 4,200 |
| Lost work days (age 18–65) | 2,700 | 2,700 | 700 |
| Asthma exacerbation (age 6–18) | 580 | 600 | 150 |
| Hospital admissions—respiratory (all ages) | 6 | 7 | 2 |
| Hospital admissions—cardiovascular (age > 18) | 8 | 8 | 2 |
| *Non-Fatal Heart Attacks (age >18)* |  |  |  |
| Peters *et al.* (2001) | 25 | 26 | 7 |
| Pooled estimate of 4 studies | 3 | 3 | 1 |

[1] All estimates are rounded to whole numbers with two significant figures.

---

[120] The $PM_{2.5}$-related health co-benefits range is based on applying different adult mortality functions (*i.e.*, Krewski *et al.* (2009) and Lepeule *et al.* (2012)).

TABLE VIII.5—ESTIMATED GLOBAL CLIMATE CO-BENEFITS OF $CO_2$ REDUCTIONS FOR THE PROPOSAL AND MORE OR LESS STRINGENT ALTERNATIVES

[Millions of 2011$] [1]

| Discount rate and statistic | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|
| 5% (average) | $6.5 | $6.5 | $7.6 |
| 3 (average) | 23 | 23 | 27 |
| 2.5 (average) | 35 | 35 | 41 |
| 3 (95th percentile) | 66 | 66 | 78 |

[1] The social cost of carbon (SC–$CO_2$) values are dollar-year and emissions-year specific. SC–$CO_2$ values represent only a partial accounting of climate impacts.

The EPA combined this information to perform a benefit-cost analysis for this proposal (shown in table VIII.6 and for the more and less stringent alternatives—shown in the RIA in the docket for this proposed rule).

TABLE VIII.6—TOTAL COSTS, TOTAL MONETIZED BENEFITS, AND NET BENEFITS OF THE PROPOSAL IN 2017 FOR U.S.

[Millions of 2011$]

| | |
|---|---|
| Climate Co-Benefits | $23. |
| Air Quality Health | 670 to 1200. |
| Total Benefits | 700 to 1200. |
| Annualized | 93. |
| Net Benefits | 600 to 1100. |
| Non-Monetized | Non-monetized climate benefits. |
| | Reductions in exposure to ambient $NO_2$ and $SO_2$. |
| | Reductions in mercury deposition. |
| | Ecosystem benefits assoc. with reductions in Visibility impairment. |

There are additional important benefits that the EPA could not monetize. Due to current data and modeling limitations, our estimates of the co-benefits from reducing $CO_2$ emissions do not include important impacts like ocean acidification or potential tipping points in natural or managed ecosystems. Unquantified benefits also include climate co-benefits from reducing emissions of non-$CO_2$ GHGs (e.g., nitrous oxide and methane) and co-benefits from reducing direct exposure to $SO_2$, $NO_X$, and hazardous air pollution (e.g., mercury), as well as from reducing ecosystem effects and visibility impairment. Based upon the foregoing discussion, it remains clear that the benefits of this proposed action are substantial, and far exceed the costs. Additional details on benefits, costs, and net benefits estimates are provided in the RIA for this proposal.

For this proposed rule, the EPA analyzed the costs to the electric power sector using IPM. The IPM is a dynamic linear programming model that can be used to examine the economic impacts of air pollution control policies for $SO_2$ and $NO_X$ throughout the contiguous United States for the entire power system. Documentation for IPM can be found in the docket for this rulemaking or at www.epa.gov/powersectormodeling.

The EPA provides a qualitative assessment of economic impacts associated with electricity price changes to consumers that may result from this proposed rule. This assessment can be found in the RIA for this proposed rule.

Executive Order 13563 directs federal agencies to consider the effect of regulations on job creation and employment. According to the Executive Order, ''our regulatory system must protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation. It must be based on the best available science'' (Executive Order 13563, 2011). Although standard benefit-cost analyses have not typically included a separate analysis of regulation-induced employment impacts, employment impacts are of particular concern and questions may arise about their existence and magnitude.

States have the responsibility and flexibility to implement policies and practices as part of developing SIPs for compliance with the emissions budgets found in this proposed rule. Given the wide range of approaches that may be used and industries that could be affected, quantifying the associated employment impacts is difficult.

## IX. Summary of Proposed Changes to the Regulatory Text for the CSAPR FIPs and CSAPR Trading Programs

This section describes proposed amendments to the regulatory text in the CFR for the CSAPR FIPs and the CSAPR $NO_X$ Ozone-Season Trading Program related to the findings and remedy discussed throughout this preamble. This section also describes other minor proposed corrections to the existing CFR text for the CSAPR FIPs and the CSAPR trading programs more generally.

The proposed regulatory text amendments related to the CSAPR FIPs and the CSAPR $NO_X$ Ozone-Season Trading Program would be made in parts 52, 78, and 97 of title 40 of the CFR. Proposed changes to update the list of states that would be subject to FIPs to address obligations related to transported ozone pollution are in §§ 52.38(b)(2) (summarizing all states subject to FIPs), 52.540 (ending FIP for Florida), 52.882 (establishing FIP for Kansas), and 52.2140 (ending FIP for South Carolina). Section 97.510 contains the proposed changes establishing or revising the amounts of $NO_X$ Ozone-Season trading budgets, new unit set-asides (NUSAs), Indian country NUSAs, and variability limits for states whose sources participate in the CSAPR $NO_X$ Ozone-Season Trading Program. Additional proposed changes to accommodate trading program participation by sources whose coverage

starts in different years are in §§ 97.506(c)(3) (compliance deadlines), 97.512 (NUSA allowance allocation procedures), 97.530(b) (monitor certification deadlines), and 97.534(d) (reporting deadlines).

Proposed changes to § 52.38(b)(3) through (5) would update states' options to submit SIP revisions which, upon approval by the EPA, would modify certain CSAPR trading program provisions as applied to those states or replace the states' FIPs with SIPs—options that correspond closely to states' SIP revision options under CSAPR as initially promulgated. Proposed changes in § 97.521 (allowance recordation) delay the deadlines for recording CSAPR $NO_X$ Ozone-Season allowances for the control periods in 2018 through 2022 in order to coordinate with the proposed updated submission deadlines for the optional SIP revisions. A similar proposed delay in the deadline for recording allowances for the control period in 2017 would provide time to finalize this rulemaking and would thereby allow the EPA to record allocations of 2017 allowances based on the final revised budgets instead of recording allocations based on existing budgets that are proposed to be superseded.

The proposed limitations on the use of emission allowances issued for a compliance period before 2017 or from the state $NO_X$ Ozone-Season trading budget for Georgia are implemented by redefining sources' obligations under the trading program in terms of "tonnage equivalents" of allowances rather than in terms of nominal quantities of allowances. Section 97.502 contains a proposed new definition of "tonnage equivalent" and related proposed modifications to the definitions of "CSAPR $NO_X$ Ozone-Season allowance" and "CSAPR $NO_X$ Ozone-Season emissions limitation." A new § 97.524(f) sets out the proposed procedures for determining the tonnage equivalent of an allowance. Additional proposed changes to reflect the use of allowances based on their tonnage equivalents (rather than their nominal numbers) to meet various obligations are contained in §§ 97.506(c) (standard requirements relating to $NO_X$ emissions), 97.511(c) (corrections of incorrect allowance allocations), 97.524 (compliance with emissions limitations and excess emissions provisions), and 97.525 (compliance with assurance provisions). A proposed change to § 78.1 would make EPA's determinations of the tonnage equivalents of particular allowance holdings subject to the administrative appeal procedures set forth in part 78.

In addition to the proposed CFR changes described above, this proposal also includes other minor amendments throughout the sections of parts 52, 78, and 97 implementing CSAPR, including sections implementing CSAPR's other three emissions trading programs. The most common category of these minor changes consists of proposed corrections to cross-references. Some cross-references would change as a result of this proposal and corrections of those cross-references are therefore related to the changes described above, while other cross-references as originally published indicated incorrect locations because of typographical errors or indicated correct locations but did not use the correct CFR format. In virtually all cases, the intended correct cross-reference can be determined from context, but the corrections clarify the regulations.

Besides the proposed corrections to cross-references, most of the remaining proposed corrections address other typographical errors. However, a small number of the proposed CFR changes correct errors that are not cross-references or obviously typographical errors. While the EPA views all of these proposed corrections as noncontroversial, a few merit a short explanation.

First, the phrase "with regard to the State" or "the State and" would be added in a number of locations in §§ 52.38 and 52.39 where it was inadvertently omitted. The added phrase clarifies that when the EPA approves a state's SIP revision as modifying or replacing provisions in a CSAPR trading program, the modification or replacement is effective only with regard to that particular state. Correcting the omissions of these phrases would make the language concerning SIP revisions consistent for all the types of SIP revisions under all the CSAPR trading programs.

Second, the phrase "in part" would be removed from the existing FIP language in various sections of part 52 for certain states with Indian country to clarify that in order to replace a CSAPR FIP affecting the sources in these states, a SIP revision must fully, not "in part," correct the SIP deficiency identified by the EPA as the basis for the FIP. The intended purpose of the words "in part"—specifically, to indicate that approval of a state's SIP revision would not relieve any sources in Indian country within the borders of the state from obligations under the FIP—is already served by other language in those FIPs. The proposed corrections would make the language in these CSAPR FIPs consistent with the FIP language for the remaining CSAPR FIPs that address states with Indian country. Analogous proposed changes to the general CSAPR FIP language in §§ 52.38(a)(5) and (6) and (b)(5) and (6) and 52.39(f), (i), and (j) would remove the phrase "in whole or in part" (referencing states without Indian country and states with Indian country, respectively) while adding language distinguishing the effect that the EPA's approval of a SIP revision would have on sources in the state from the lack of effect on any sources in Indian country within the borders of the state.

Third, language would be added to § 78.1 clarifying that determinations by the EPA Administrator under the CSAPR trading programs that are subject to the part 78 administrative appeal procedures are subject to those procedures whether the source in question participates in a CSAPR trading program under a FIP or under an approved SIP revision. This approach is consistent with the approach taken under CAIR FIPs and SIPs and with the EPA's intent in CSAPR, as evidenced by the lack of any proposal or discussion in the CSAPR rulemaking regarding deviation from the historical approach. This approach is also consistent with provisions in §§ 52.38 and 52.39 prohibiting approvable SIP revisions from altering certain provisions of the CSAPR trading programs, including the provisions specifying that administrative appeal procedures for determinations of the EPA Administrator under the trading programs are set forth in part 78.

Fourth, the phrase "steam turbine generator" would be changed to "generator" in the list of required equipment in the definition of a "cogeneration system" in §§ 97.402, 97.502, 97.602, and 97.702. Absent this correction, a combustion turbine in a facility that uses the combustion turbine in combination with an electricity generator and heat recovery steam generator, but no steam turbine, to produce electricity and useful thermal energy would not meet the definition of a "cogeneration unit." The proposed correction would clarify that a combustion turbine in such a facility should be able to qualify as a "cogeneration unit" (assuming it meets other relevant criteria) under the CSAPR trading programs, as it could under the CAIR trading programs. The consistency of this approach with the EPA's intent in the CSAPR rulemaking is evidenced by the lack of any proposal or discussion in that rulemaking regarding the concept of narrowing the set of

facilities qualifying for an applicability exemption as cogeneration units. To the contrary, as discussed in the preamble to the CSAPR proposal (75 FR 45307, August 2, 2010), the definition of "cogeneration system" was created in CSAPR to potentially broaden the set of facilities qualifying for the exemption, specifically by facilitating qualification as "cogeneration units" for certain units that might not meet the required levels of efficiency on an individual basis but that operate as components of multi-unit "cogeneration systems" that do meet the required levels of efficiency.

Fifth, the deadline for recording certain allowance allocations under §§ 97.421(j), 97.521(j), 97.621(j), and 97.721(j) would be changed from the "date on which" the EPA receives the necessary allocation information to the date "15 days after the date on which" the EPA receives the information. The EPA's lack of intention in the CSAPR rulemaking to establish the deadline as defined prior to the correction is evidenced by the impracticability of complying with such a deadline.

Sixth, a proposed change to a description of a required notice under the assurance provisions in §§ 97.425(b)(2)(iii)(B), 97.525(b)(2)(iii)(B), 97.625(b)(2)(iii)(B), and 97.725(b)(2)(iii)(B) would modify the phrase "any adjustments" to the phrase "calculations incorporating any adjustments" in order to clarify that the required notice will identify not only any adjustments made to previously noticed calculations, but also the complete calculations with (or without) such adjustments. The intended meaning is clear from the subsequent provisions that use this notice as the point of reference for the complete calculations used in the succeeding administrative procedures.

Finally, the EPA notes that the proposed amendments include updating the nomenclature in the CFR from its name as initially proposed—"Transport Rule" or "TR"—to its name as finalized—"Cross-State Air Pollution Rule" or "CSAPR." This update is intended to reduce confusion and simplify communications regarding the regulations by allowing a single name to be used in all contexts.

The EPA invites comment on the proposed regulatory text amendments described above and shown at the end of this notice.

## X. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www2.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is an economically significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to OMB recommendations have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, which is contained in the "Regulatory Impact Analysis for the Proposed Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS" [EPA–452/R–15–009], is available in the docket and is briefly summarized in section VIII of this preamble.

Consistent with Executive Orders 12866 and 13563, the EPA estimated the costs and benefits for three regulatory control alternatives: The proposed EGU $NO_X$ ozone-season emissions budgets and more and less stringent alternatives. This proposed action would reduce ozone season $NO_X$ emissions from EGUs in 23 eastern states. Actions taken to comply with the proposed EGU $NO_X$ ozone-season emissions budgets would also reduce emissions of other criteria air pollution and hazardous air pollution emissions, including annual $NO_X$, and $CO_2$. The benefits associated with these co-pollutant reductions are referred to as co-benefits, as these reductions are not the primary objective of this proposed rule.

The RIA for this proposal analyzed illustrative compliance approaches for implementing the proposed FIPs. This proposal would establish EGU $NO_X$ ozone-season emissions budgets for 23 states and implement these budgets via the existing CSAPR $NO_X$ ozone-season allowance trading program.

The EPA evaluated the costs, benefits, and impacts of implementing the proposed EGU $NO_X$ ozone-season emissions budgets that reflect uniform $NO_X$ costs of $1,300 per ton (see proposed emissions budgets in table VI.1). In addition, the EPA also assessed implementation of other more and less stringent alternative EGU $NO_X$ ozone-season emissions budgets, reflecting uniform $NO_X$ costs of $3,400 per ton and $500 per ton, respectively (see alternative emissions budgets in tables VI.2 and VI.3). The EPA evaluated the impact of implementing these emissions budgets to reduce interstate transport for the 2008 ozone NAAQS in 2017. More details for this assessment can be found in the Regulatory Impact Analysis in the docket for this proposed rule.

The EPA notes that its analysis of the regulatory control scenarios (*i.e.,* the proposal and more and less stringent alternatives) is illustrative in nature, in part because the EPA proposes to implement the proposed EGU $NO_X$ emissions budgets via a regional $NO_X$ ozone-season allowance trading program. This implementation approach provides utilities with the flexibility to determine their own compliance path. The EPA's assessment develops and analyzes one possible scenario for implementing the $NO_X$ budgets proposed by this action and one possible scenario for implementing the more and less stringent alternatives.

The EPA estimates the costs associated with compliance with the illustrative proposed regulatory control alternative to be approximately $93 million (2011$) annually. These costs represent the private compliance cost of reducing $NO_X$ emissions to comply with the proposal.

In this analysis, the EPA monetized the estimated benefits associated with the reduced exposure to ozone and $PM_{2.5}$ and co-benefits of decreased emissions of $CO_2$, but was unable to monetize the co-benefits associated with reducing exposure to mercury, carbon monoxide, and $NO_2$, as well as ecosystem effects and visibility impairment. In addition, there are expected to be unquantified health and welfare impacts associated with changes in hydrogen chloride. Specifically, the EPA estimated combinations of health benefits at discount rates of 3 percent and 7 percent (as recommended by the EPA's *Guidelines for Preparing Economic Analyses* [U.S. EPA, 2014] and OMB's *Circular A–4* [OMB, 2003]) and climate co-benefits at discount rates of 5 percent, 3 percent, 2.5 percent, and 3 percent (95th percentile) (as recommended by the interagency working group). The EPA estimates the monetized ozone-related benefits [121] of the proposal to be $490 million to $790 million (2011$) in 2017 and the $PM_{2.5}$-related co-benefits [122] of the proposal to be $190 million to $430 million (2011$) using a 3% discount rate and $170 million to $380 million (2011$) using a 7% discount rate. Further, the EPA estimates $CO_2$-related co-benefits of $6.5 to $66 million (2011$). Additional details on this analysis are provided in the RIA for this proposal. Tables X.A–

---

[121] The ozone-related health benefits range is based on applying different adult mortality functions (*i.e.,* Smith et al. (2009) and Zanobetti and Schwartz (2008)).

[122] The $PM_{2.5}$-related health co-benefits range is based on applying different adult mortality functions (*i.e.,* Krewski et al. (2009) and Lepeule et al. (2012)).

1, X.A–2, and X.A–3 summarize the quantified human health and climate benefits and the costs of the proposal and the more and less stringent control alternatives.

TABLE X.A–1—ESTIMATED HEALTH BENEFITS OF PROJECTED 2017 EMISSIONS REDUCTIONS FOR THE PROPOSAL AND MORE OR LESS STRINGENT ALTERNATIVES

[Millions of 2011$] [1]

|  | Proposal | More stringent | Less stringent |
|---|---|---|---|
| NO$_X$ (as ozone) .................................................. | $490 to $790 ......................... | $500 to $820 ......................... | $140 to $220 |
| NO$_X$ (as PM$_{2.5}$) |  |  |  |
|    3% Discount Rate ....................................... | $190 to $430 ......................... | $190 to $440 ......................... | $49 to $110. |
|    7% Discount Rate ....................................... | $170 to $380 ......................... | $170 to $390 ......................... | $45 to $100. |
| Total |  |  |  |
|    3% Discount Rate ....................................... | $670 to $1,200 ...................... | $690 to $1,300 ..................... | $190 to $340. |
|    7% Discount Rate ....................................... | $650 to $1,200 ...................... | $670 to $1,200 ..................... | $180 to $330. |

[1] The health benefits range is based on adult mortality functions (*e.g.,* from Krewski et al. (2009) with Smith *et al.* (2009) to Lepeule *et al.* (2012) with Zanobetti and Schwartz (2008)).

TABLE X.A–2—ESTIMATED GLOBAL CLIMATE CO-BENEFITS OF CO$_2$ REDUCTIONS FOR THE PROPOSAL AND MORE OR LESS STRINGENT ALTERNATIVES

[Millions of 2011$] [1]

| Discount rate and statistic | Proposal | More stringent | Less stringent |
|---|---|---|---|
| 5% (average) ............................................................... | $6.5 | $6.5 | $7.6 |
| 3% (average) ............................................................... | 23 | 23 | 27 |
| 2.5% (average) ............................................................ | 35 | 35 | 41 |
| 3% (95th percentile) .................................................... | 66 | 66 | 78 |

[1] The social cost of carbon (SC–CO$_2$) values are dollar-year and emissions-year specific. SC–CO$_2$ values represent only a partial accounting of climate impacts.

The EPA combined this information to perform a benefit-cost analysis for this proposal (shown in table VIII.6 and for the more and less stringent alternatives—shown in the RIA in the docket for this proposed rule).

TABLE X.A–3—TOTAL COSTS, TOTAL MONETIZED BENEFITS, AND NET BENEFITS OF THE PROPOSAL IN 2017 FOR U.S.

[Millions of 2011$]

| | |
|---|---|
| Climate Co-Benefits ........................................................ | $23. |
| Air Quality Health Benefits ............................................. | $670 to $1200. |
| Total Benefits ................................................................. | $700 to $1200. |
| Annualized Costs ........................................................... | $93. |
| Compliance Costs ........................................................... | $10. |
| Net Benefits .................................................................... | $600 to $1100. |
| Non-Monetized Benefits ................................................. | Non-monetized climate benefits. |
| | Reductions in exposure to ambient NO$_2$ and SO$_2$. |
| | Reductions in mercury deposition. |
| | Ecosystem benefits assoc. with reductions in emissions of NO$_X$, SO$_2$, and PM. |
| | Visibility impairment. |

There are additional important benefits that the EPA could not monetize. Due to current data and modeling limitations, our estimates of the co-benefits from reducing CO$_2$ emissions do not include important impacts like ocean acidification or potential tipping points in natural or managed ecosystems. Unquantified benefits also include climate co-benefits from reducing emissions of non-CO$_2$ GHGs (*e.g.,* nitrous oxide and methane) and co-benefits from reducing direct exposure to SO$_2$, NO$_X$, and hazardous air pollution (*e.g.,* mercury), as well as

from reducing ecosystem effects and visibility impairment. Based upon the foregoing discussion, it remains clear that the benefits of this proposed action are substantial, and far exceed the costs. Additional details on benefits, costs, and net benefits estimates are provided in the RIA for this proposal.

*B. Paperwork Reduction Act (PRA)*

The information collection activities in this proposed rule have been submitted for approval to the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA), 44

U.S.C. 3501 *et seq.* The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2391.04. You can find a copy of the ICR in the docket for this proposed rule, and it is briefly summarized here.

The information generated by information collection activities under CSAPR is used by the EPA to ensure that affected facilities comply with the emission limits and other requirements. Records and reports are necessary to enable EPA or states to identify affected facilities that may not be in compliance

with the requirements. The recordkeeping requirements require only the specific information needed to determine compliance. These recordkeeping and reporting requirements are established pursuant to CAA sections 110(a)(2)(D) and (c) and 301(a) (42 U.S.C. 7410(a)(2)(D) and (c) and 7601(a)) and are specifically authorized by CAA section 114 (42 U.S.C. 7414). Reported data may also be used for other regulatory and programmatic purposes. All information submitted to the EPA for which a claim of confidentiality is made will be safeguarded according to EPA policies in 40 CFR part 2, subpart B, Confidentiality of Business Information.

All of the EGUs that would be subject to changed information collection requirements under this proposed rule are already subject to information collection requirements under CSAPR. Most of these EGUs also are already subject to information collection requirements under the Acid Rain Program (ARP) established under Title IV of the 1990 Clean Air Act Amendments. Both CSAPR and the ARP have existing approved ICRs: EPA ICR Number 2391.03/OMB Control Number 2060–0667 (CSAPR) and EPA ICR Number 1633.16/OMB Control Number 2060–0258 (ARP). The burden and costs of the information collection requirements covered under the CSAPR ICR are estimated as incremental to the information collection requirements covered under the ARP ICR. Most of the information used to estimate burden and costs in this ICR was developed for the existing CSAPR and ARP ICRs.

This proposed rule would change the universe of sources subject to certain information collection requirements under CSAPR but would not change the substance of any CSAPR information collection requirements. The burden and costs associated with the proposed changes in the reporting universe are estimated as reductions from the burden and costs under the existing CSAPR ICR. (This proposed rule would not change any source's information collection requirements with respect to the ARP.) The EPA intends to incorporate the burden and costs associated with the proposed changes in the reporting universe under this rulemaking into the next renewal of the CSAPR ICR.

*Respondents/affected entities:* Entities potentially affected by this proposed action are EGUs in the states of Florida, Kansas, and South Carolina that meet the applicability criteria for the CSAPR NOₓ Ozone-Season Trading Program in 40 CFR 97.404.

*Respondent's obligation to respond:* Mandatory (sections 110(a) and 301(a) of the Clean Air Act).

*Estimated number of respondents:* 116 sources in Florida, Kansas, and South Carolina with one or more EGUs.

*Frequency of response:* Quarterly, occasionally.

*Total estimated burden:* Reduction of 14,064 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* Reduction of $1,472,047 (per year), includes reduction of $450,951 operation and maintenance costs.

The burden and cost estimates above reflect the reduction in burden and cost for Florida sources with EGUs that would no longer be required to report NOₓ mass emissions and heat input data for the ozone season to the EPA under the proposed rule and that are not subject to similar information collection requirements under the Acid Rain Program. Because these EGUs would no longer need to collect NOₓ emissions or heat input data under 40 CFR part 75, the estimates above also reflect the reduction in burden and cost to collect and quality assure these data and to maintain the associated monitoring equipment.

The EPA estimates that the proposed rule would cause no change in information collection burden or cost for EGUs in Kansas that would be required to report NOₓ mass emissions and heat input data for the ozone season to the EPA or for EGUs in South Carolina that would no longer be required to report NOₓ emissions and heat input data for the ozone season to the EPA. The EGUs in both Kansas and South Carolina already are and would remain subject to requirements to report NOₓ mass emissions and heat input data for the entire year to the EPA under the CSAPR NOₓ Annual Trading Program, and the requirements related to ozone season reporting are a subset of the requirements related to annual reporting. Similarly, the EPA estimates that the proposed rule would cause no change in information collection burden or cost for EGUs in Florida that are subject to the Acid Rain Program because of the close similarity between the information collection requirements under CSAPR and under the Acid Rain Program.

More information on the ICR analysis is included in the docket for this rule.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this proposed rule. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs via email to *oria_submissions@ omb.eop.gov,* Attention: Desk Officer for the EPA. Because OMB is required to make a decision concerning the ICR between 30 and 60 days after receipt, OMB must receive comments no later than January 4, 2016. The EPA will respond to any ICR-related comments in the final rule. The information collection requirements in the proposed rule have been submitted for approval to OMB under the PRA. The information collection requirements are not enforceable until OMB approves them. The information collection activities in this proposed rule include monitoring and the maintenance of records.

*E. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. The small entities subject to the requirements of this action are small businesses, small organizations, and small governmental jurisdictions.

The EPA has lessened the impacts for small entities by excluding all units smaller than 25 MWe. This exclusion, in addition to the exemptions for cogeneration units and solid waste incineration units, eliminates the burden of higher costs for a substantial number of small entities located in the 23 states for which the EPA is proposing FIPs.

Within these states, the EPA identified a total of 318 potentially affected EGUs (*i.e.,* greater than 25 MWe) warranting examination in its RFA analysis. Of these, EPA identified 16 potentially affected EGUs that are owned by 7 entities that met the Small Business Administration's criteria for identifying small entities. The EPA estimated the annualized net compliance cost to these 7 small entities to be approximately −$38.3 million in 2017, or savings of $38.3 million. The fact that the net compliance costs for all entities are actually net savings does not mean that each small entity would benefit from the proposal to update CSAPR. The net savings are driven by entities that are able to increase their revenues by increasing generation. Of the 7 small entities considered in this analysis, 1 entity may experience

compliance costs greater than 1 or 3 percent of generation revenues in 2017. Since this entity is not projected to operate in the base case, we are unable to compare the estimated compliance costs to base case generation revenues. However, we note that this entity is located in a cost of service market, where typically we expect entities should be able to recover all of their costs of complying with the proposal.

EPA has concluded that there is no significant economic impact on a substantial number of small entities (No SISNOSE) for this rule. Details of this analysis are presented in the RIA, which is in the public docket.

*F. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. However, the EPA analyzed the economic impacts of the proposal on government entities. According to EPA's analysis, the total net economic impact on government owned entities (state- and municipality-owned utilities and subdivisions) is expected to be negative (*i.e.,* cost savings) in 2014. Note that we expect the action to potentially have an impact on only one category of government-owned entities (municipality-owned entities). This analysis does not examine potential indirect economic impacts associated with the proposal, such as employment effects in industries providing fuel and pollution control equipment, or the potential effects of electricity price increases on government entities. For more information on the estimated impact on government entities, refer to the RIA, which is in the public docket.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action has tribal implications. However, it will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law.

This action proposes to implement EGU NO$_X$ ozone season emissions reductions in 23 eastern states.

However, at this time, none of the existing or planned EGUs affected by this proposed rule are owned by tribes or located in Indian country. This action may have tribal implications if a new affected EGU is built in Indian country. Additionally, tribes have a vested interest in how this proposed rule would affect air quality.

In developing CSAPR, which was promulgated on July 6, 2011 to address interstate transport of ozone pollution under the 1997 ozone NAAQS,[123] the EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing that regulation to permit them to have meaningful and timely input into its development. A summary of that consultation is provided in 76 FR 48346 (August 8, 2011).

EPA received comments from several tribal commenters regarding the availability of CSAPR allowance allocations to new units in Indian country. EPA responded to these comments by instituting Indian country new unit set-asides in the final CSAPR. In order to protect tribal sovereignty, these set-asides are managed and distributed by the federal government regardless of whether CSAPR in the adjoining or surrounding state is implemented through a FIP or SIP. While there are no existing affected EGUs in Indian country covered by this proposal, the Indian country set-asides will ensure that any future new units built in Indian country will be able to obtain the necessary allowances. This proposal maintains the Indian country new unit set-aside and adjusts the amounts of allowances in each set-aside according to the same methodology of the original CSAPR rule.

The EPA has informed tribes of our development of this proposal through a National Tribal Air Association—EPA air policy conference call (January 29, 2015). The EPA plans to further consult with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. The EPA will facilitate this consultation before finalizing this proposed rule.

As required by section 7(a), the EPA's Tribal Consultation Official has certified that the requirements of the executive order have been met in a meaningful and timely manner. A copy of the

[123] CSAPR also addressed interstate transport of fine particulate matter (PM$_{2.5}$) under the 1997 and 2006 PM$_{2.5}$ NAAQS.

certification is included in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 (62 FR 19885, April 23, 1997) as applying to those regulatory actions that concern health or safety risks, such that the analysis required under section 5–501 of the Order has the potential to influence the regulation. This action is not subject to Executive Order 13045 because it does not involve decisions on environmental health or safety risks that may disproportionately affect children. The EPA believes that the ozone-related benefits, PM$_{2.5}$-related co-benefits, and CO$_2$-related co-benefits would further improve children's health.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

This action, which is a significant regulatory action under Executive Order 12866, is likely to have a significant effect on the supply, distribution, or use of energy. The EPA notes that one aspect of this proposal that may affect energy supply, disposition or use is the EPA's proposing and taking comment on a range of options with respect to use of 2015 vintage and 2016 vintage CSAPR NO$_X$ ozone-season allowances for compliance with 2017 and later ozone season requirements. The EPA has prepared a Statement of Energy Effects for the proposed regulatory control alternative as follows. We estimate a much less than 1 percent change in retail electricity prices on average across the contiguous U.S. in 2017, and a much less than 1 percent reduction in coal-fired electricity generation in 2017 as a result of this rule. The EPA projects that utility power sector delivered natural gas prices will change by less than 1 percent in 2017. For more information on the estimated energy effects, refer to the RIA, which is in the public docket.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects

on minority, low-income or indigenous populations.

The EPA notes that this action proposes to update CSAPR to reduce interstate ozone transport with respect to the 2008 ozone NAAQS. This proposed rule uses EPA's authority in CAA section 110(a)(2)(d) to reduce (nitrogen oxides) $NO_X$ pollution that significantly contributes to downwind ozone nonattainment or maintenance areas. As a result, the proposed rule will reduce exposures to ozone in the most-contaminated areas (*i.e.,* areas that are not meeting the 2008 ozone National Ambient Air Quality Standards (NAAQS)). In addition, this proposed rule separately identifies both nonattainment areas and maintenance areas. This requirement reduces the likelihood that areas close to the level of the standard will exceed the current health-based standards in the future. The EPA proposes to implement these emission reductions using the CSAPR EGU $NO_X$ ozone-season emissions trading program with assurance provisions.

EPA recognizes that many environmental justice communities have voiced concerns in the past about emission trading and the potential for any emission increases in any location. The EPA believes that CSAPR mitigated these concerns and that this proposal, which applies the CSAPR framework to reduce interstate ozone pollution and implement these reductions, will also minimize community concerns. The EPA seeks comment from communities on this proposal.

Ozone pollution from power plants have both local and regional components: Part of the pollution in a given location—even in locations near emission sources—is due to emissions from nearby sources and part is due to emissions that travel hundreds of miles and mix with emissions from other sources.

It is important to note that the section of the Clean Air Act providing authority for this proposed rule, section 110(a)(2)(D), unlike some other provisions, does not dictate levels of control for particular facilities. CSAPR allows sources to trade allowances with other sources in the same or different states while firmly constraining any emissions shifting that may occur by requiring a strict emission ceiling in each state (the assurance level). In addition, assurance provisions in the existing CSAPR regulations that will remain in place under this proposal outline the allowance surrender penalties for failing to meet the assurance level; there are additional allowance penalties as well as financial penalties for failing to hold an adequate number of allowances to cover emissions.

This approach reduces EGU emissions in each state that significantly contribute to downwind nonattainment or maintenance areas, while allowing power companies to adjust generation as needed and ensure that the country's electricity needs will continue to be met. EPA maintains that the existence of these assurance provisions, including the penalties imposed when triggered, will ensure that state emissions will stay below the level of the budget plus variability limit.

In addition, all sources must hold enough allowances to cover their emissions. Therefore, if a source emits more than its allocation in a given year, either another source must have used less than its allocation and be willing to sell some of its excess allowances, or the source itself had emitted less than its allocation in one or more previous years (*i.e.,* banked allowances for future use).

In summary, the CSAPR minimizes community concerns about localized hot spots and reduces ambient concentrations of pollution where they are most needed by sensitive and vulnerable populations by: Considering the science of ozone transport to set strict state emissions budgets to reduce significant contributions to ozone nonattainment and maintenance (*i.e.,* the most polluted) areas; implementing air quality-assured trading; requiring any emissions above the level of the allocations to be offset by emission decreases; and imposing strict penalties for sources that contribute to a state's exceedance of its budget plus variability limit. In addition, it is important to note that nothing in this proposed rule allows sources to violate their title V permit or any other federal, state, or local emissions or air quality requirements.

In addition, it is important to note that CAA section 110(a)(2)(d), which addresses transport of criteria pollutants between states, is only one of many provisions of the CAA that provide EPA, states, and local governments with authorities to reduce exposure to ozone in communities. These legal authorities work together to reduce exposure to these pollutants in communities, including for minority, low-income, and tribal populations, and provide substantial health benefits to both the general public and sensitive sub-populations.

The EPA has informed communities of our development of this proposal through an Environmental Justice community call (January 28, 2015) and a National Tribal Air Association—EPA air policy conference call (January 29, 2015). The EPA plans to further consult with communities early in the process of developing this regulation to permit them to have meaningful and timely input into its development. The EPA will facilitate this engagement before finalizing this proposed rule.

*K. Determinations Under Section 307(b)(1) and (d)*

Section 307(b)(1) of the CAA indicates which Federal Courts of Appeal have venue for petitions of review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit if (i) the agency action consists of "nationally applicable regulations promulgated, or final action taken, by the Administrator," or (ii) such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination."

The EPA proposes to find that any final action related to this rulemaking is "nationally applicable" or of "nationwide scope and effect" within the meaning of section 307(b)(1). Through this rulemaking action, the EPA interprets section 110 of the CAA, a provision which has nationwide applicability. In addition, the proposed rule would apply to 23 States. The proposed rule is also based on a common core of factual findings and analyses concerning the transport of pollutants between the different states subject to it. For these reasons, the Administrator proposes to determine that any final action related to the proposed rule is of nationwide scope and effect for purposes of section 307(b)(1). Thus, pursuant to section 307(b) any petitions for review of any final actions regarding the rulemaking would be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date any final action is published in the **Federal Register**.

In addition, pursuant to sections 307(d)(1)(C) and 307(d)(1)(V) of the CAA, the Administrator proposes to determine that this action is subject to the provisions of section 307(d). CAA section 307(d)(1)(B) provides that section 307(d) applies to, among other things, to "the promulgation or revision of an implementation plan by the Administrator under CAA section 110(c)." 42 U.S.C. 7407(d)(1)(B). Under section 307(d)(1)(V), the provisions of section 307(d) also apply to "such other actions as the Administrator may

determine.'' 42 U.S.C. 7407(d)(1)(V). The Agency has complied with procedural requirements of CAA section 307(d) during the course of this rulemaking.

**List of Subjects in 40 CFR Parts 52, 78, and 97.**

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Incorporation by reference, Nitrogen oxides, Reporting and recordkeeping requirements.

Dated: November 16, 2015.

**Gina McCarthy,**

*Administrator.*

For the reasons stated in the preamble, parts 52, 78, and 97 of chapter I of title 40 of the *Code of Federal Regulations* are proposed to be amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**§§ 52.38, 52.39, 52.54, 52.55, 52.184, 52.540, 52.584, 52.585, 52.731, 52.732, 52.789, 52.790, 52.840, 52.841, 52.882, 52.883, 52.940, 52.941, 52.984, 52.1084, 52.1085, 52.1186, 52.1187, 52.1240, 52.1241, 52.1284, 52.1326, 52.1327, 52.1428, 52.1429, 52.1584, 52.1585, 52.1684, 52.1685, 52.1784, 52.1785, 52.1882, 52.1883, 52.1930, 52.2040, 52.2041, 52.2140, 52.2141, 52.2240, 52.2241, 52.2283, 52.2284, 52.2440, 52.2441, 52.2540, 52.2541, 52.2587, and 52.2588 [Amended]**

■ 2. Sections 52.38, 52.39, 52.54, 52.55, 52.184, 52.540, 52.584, 52.585, 52.731, 52.732, 52.789, 52.790, 52.840, 52.841, 52.882, 52.883, 52.940, 52.941, 52.984, 52.1084, 52.1085, 52.1186, 52.1187, 52.1240, 52.1241, 52.1284, 52.1326, 52.1327, 52.1428, 52.1429, 52.1584, 52.1585, 52.1684, 52.1685, 52.1784, 52.1785, 52.1882, 52.1883, 52.1930, 52.2040, 52.2041, 52.2140, 52.2141, 52.2240, 52.2241, 52.2283, 52.2284, 52.2440, 52.2441, 52.2540, 52.2541, 52.2587, and 52.2588 are amended by removing ''TR Federal Implementation Plan'' wherever it appears and adding in its place ''CSAPR Federal Implementation Plan'', by removing ''TR NO$_X$'' wherever it appears and adding in its place ''CSAPR NO$_X$'', and by removing ''TR SO$_2$'' wherever it appears and adding in its place ''CSAPR SO$_2$''.

**§§ 52.540, 52.840, 52.841, 52.882, 52.883, 52.984, 52.1186, 52.1187, 52.1240, 52.1241, 52.1284, 52.1428, 52.1429, 52.1684, 52.1685, 52.1784, 52.1785, 52.2140, 52.2141, 52.2283, 52.2284, 52.2587, and 52.2588 [Amended]**

■ 3. Sections 52.540, 52.840, 52.841, 52.882, 52.883, 52.984, 52.1186, 52.1187, 52.1240, 52.1241, 52.1284, 52.1428, 52.1429, 52.1684, 52.1685, 52.1784, 52.1785, 52.2140, 52.2141, 52.2283, 52.2284, 52.2587, and 52.2588 are amended by removing ''correcting in part the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan'' wherever it appears and adding in its place ''correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan''.

## Subpart A—General Provisions

### § 52.36 [Amended]

■ 4. Section 52.36 is amended in paragraph (e)(1)(i) by removing ''paragraphs (a) through (e)'' and adding in its place ''paragraphs (a) through (c)''.

■ 5. Section 52.38 is amended by:
■ a. Revising the section heading;
■ b. In paragraph (a)(2), by removing ''the sources in the following States'' and adding in its place ''sources in each of the following States'';
■ c. In paragraph (a)(3)(ii), by adding ''the'' before ''CSAPR NO$_X$ Annual trading budget'';
■ d. In paragraph (a)(3)(v)(A), by removing ''paragraph'' and adding in its place ''paragraphs'';
■ e. In the table in paragraph (a)(4)(i)(B), by removing ''annual'' and adding in its place ''Annual'', and by removing ''administrator'' and adding in its place ''the Administrator'';
■ f. In paragraph (a)(4)(ii), by removing ''for the first control period'' and adding in its place ''applicable to the first control period'';
■ g. In paragraph (a)(5) introductory text, by removing ''in whole or in part, as appropriate,'', and by removing ''paragraphs (a)(1) through (4) of this section'' and adding in its place ''paragraphs (a)(1) through (4) of this section with regard to sources in the State but not sources in any Indian country within the borders of the State'';
■ h. In the table in paragraph (a)(5)(i)(B), by removing ''annual'' and adding in its place ''Annual'', and by removing ''administrator'' and adding in its place ''the Administrator'';
■ i. In paragraph (a)(5)(iv), by adding after ''97.412(b)'' the words ''of this chapter'';
■ j. In paragraph (a)(5)(v), by removing ''97.425, and'' and adding in its place ''and 97.425 of this chapter and'', and by adding after ''other provisions'' the words ''of subpart AAAAA of part 97 of this chapter'';

■ k. In paragraph (a)(5)(vi), by removing ''paragraphs (a)(5)(i) and (ii)'' and adding in its place ''paragraph (a)(5)(i)'';
■ l. In paragraph (a)(6), by removing ''in whole or in part, as appropriate,'', by removing ''described in paragraphs (a)(1) through (5)'' and adding in its place ''set forth in paragraphs (a)(1) through (4)'', and by removing ''the sources'' and adding in its place ''sources'';
■ m. In paragraph (a)(7), by removing ''a State'' and adding in its place ''the State'';
■ n. In paragraph (b)(1), by adding ''subpart BBBBB of'' before ''part 97'';
■ o. Revising paragraph (b)(2);
■ p. Redesignating paragraph (b)(3) as paragraph (b)(3)(i): in redesignated paragraph (b)(3)(i), by further redesignating paragraphs (i) through (v) as paragraphs (A) through (E); and in redesignated paragraph (b)(3)(i)(E), by further redesignating paragraphs (A) and (B) as paragraphs (*1*) and (*2*);
■ q. In newly redesignated paragraph (b)(3)(i) introductory text, by removing ''paragraph (b)(2)'' and adding in its place ''paragraph (b)(2)(i) or (ii)'';
■ r. In newly redesignated paragraph (b)(3)(i)(B), by adding ''the'' before ''CSAPR NO$_X$ Ozone Season trading budget'';
■ s. In newly redesignated paragraph (b)(3)(i)(E)(*1*), by removing ''paragraph (b)(3)(i) through (iv)'' and adding in its place ''paragraphs (b)(3)(i)(A) through (D)'';
■ t. In newly redesignated paragraph (b)(3)(i)(E)(*2*), by removing ''paragraph (b)(3)(v)(A)'' and adding in its place ''paragraph (b)(3)(i)(E)(*1*)'';
■ u. Adding a new paragraph (b)(3)(ii);
■ v. In paragraph (b)(4) introductory text, by removing ''paragraph (b)(2)'' and adding in its place ''paragraph (b)(2)(ii) or (iii)'';
■ w. In paragraph (b)(4)(i), by removing ''§§ '' and adding in its place ''§ '', by adding after ''chapter'' the words ''with regard to the State'', and by removing ''whenever'' and adding in its place ''wherever'';
■ x. Revising paragraph (b)(4)(ii) introductory text;
■ y. In paragraph (b)(4)(ii)(B), by revising the table;
■ z. In paragraph (b)(5) introductory text, by removing ''paragraph (b)(2)'' and adding in its place ''paragraph (b)(2)(ii) or (iii)'', by removing ''in whole or in part, as appropriate,'', and by removing ''paragraphs (b)(1) through (4) of this section'' and adding in its place ''paragraphs (b)(1) through (4) of this section with regard to sources in the State but not sources in any Indian country within the borders of the State'';
■ aa. In paragraph (b)(5)(i), by removing ''§§ '' and adding in its place ''§ '', by

adding after "chapter" the words "with regard to the State", and by removing "whenever" and adding in its place "wherever";

■ bb. Revising paragraph (b)(5)(ii) introductory text;

■ cc. In paragraph (b)(5)(ii)(B), by removing "auction of CSAPR" and adding in its place "auctions of CSAPR", and by revising the table;

■ dd. In paragraph (b)(5)(ii)(C), by removing "any control period" and adding in its place "any such control period";

■ ee. In paragraph (b)(5)(iii), by adding a comma after "May adopt";

■ ff. In paragraph (b)(5)(v), by adding after "97.512(b)" the words "of this chapter";

■ gg. In paragraph (b)(5)(vi), by removing "97.525, and" and adding in its place "and 97.525 of this chapter and", and by adding after "other provisions" the words "of subpart BBBBB of part 97 of this chapter";

■ hh. In paragraph (b)(5)(vii), by removing "paragraph (b)(5)(i) through (v)" and adding in its place "paragraph (b)(5)(i) or (ii) of this section and paragraphs (b)(5)(iii) through (v)", by removing "paragraphs (5)(ii)(B) and (C)" and adding in its place "paragraphs (b)(5)(ii)(B) and (C)", and by removing "paragraphs (b)(5)(ii) and (iii)" and adding in its place "paragraph (b)(5)(i) or (ii)";

■ ii. In paragraph (b)(6), by removing "in whole or in part, as appropriate,", and by removing "paragraphs (b)(1) through (5)" and adding in its place "paragraphs (b)(1) through (4)"; and

■ jj. In paragraph (b)(7), by removing "a State" and adding in its place "the State".

The additions and revisions read as follows:

### § 52.38  What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(b) \* \* \*

(2) The provisions of subpart BBBBB of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions in the following years:

(i) With regard to emissions in 2015 and 2016 only, Florida and South Carolina;

(ii) With regard to emissions in 2015 and each subsequent year, Alabama, Arkansas, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin; and

(iii) With regard to emissions in 2017 and each subsequent year, Kansas.

(3) \* \* \*

(ii) Notwithstanding the provisions of paragraph (b)(1) of this section, a State other than Georgia listed in paragraph (b)(2)(ii) or (iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as CSAPR NO$_X$ Ozone Season allowance allocation provisions replacing the provisions in § 97.511(a) of this chapter with regard to the State and the control period in 2018, a list of CSAPR NO$_X$ Ozone Season units and the amount of CSAPR NO$_X$ Ozone Season allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(A) All of the units on the list must be units that are in the State and commenced commercial operation before January 1, 2015;

(B) The total amount of CSAPR NO$_X$ Ozone Season allowance allocations on the list must not exceed the amount, under § 97.510(a) of this chapter for the State and the control period in 2018, of the CSAPR NO$_X$ Ozone Season trading budget minus the sum of the new unit

set-aside and Indian country new unit set-aside;

(C) The list must be submitted electronically in a format specified by the Administrator; and

(D) The SIP revision must not provide for any change in the units and allocations on the list after approval of the SIP revision by the Administrator and must not provide for any change in any allocation determined and recorded by the Administrator under subpart BBBBB of part 97 of this chapter;

(E) Provided that:

(1) By November 15, 2016, the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraphs (b)(3)(ii)(A) through (D) of this section by April 1, 2017; and

(2) The State must submit to the Administrator a complete SIP revision described in paragraph (b)(3)(ii)(E)(1) of this section by April 1, 2017.

(4) \* \* \*

(ii) The State may adopt, as CSAPR NO$_X$ Ozone Season allowance allocation or auction provisions replacing the provisions in §§ 97.511(a) and (b)(1) and 97.512(a) of this chapter with regard to the State and the control period in 2017 or any subsequent year or, for Kansas, 2019 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions CSAPR NO$_X$ Ozone Season allowances and may adopt, in addition to the definitions in § 97.502 of this chapter, one or more definitions that shall apply only to terms as used in the adopted CSAPR NO$_X$ Ozone Season allowance allocation or auction provisions, if such methodology—

\*    \*    \*    \*    \*

(B) \* \* \*

| Year of the control period for which CSAPR NO$_X$ Ozone Season allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| 2017 | November 1, 2016. |
| 2018 | November 1, 2016. |
| 2019 | June 1, 2018. |
| 2020 | June 1, 2018. |
| 2021 | June 1, 2019. |
| 2022 | June 1, 2019. |
| 2023 and any year thereafter | June 1 of the fourth year before the year of the control period. |

\*    \*    \*    \*    \*

(5) \* \* \*

(ii) May adopt, as CSAPR NO$_X$ Ozone Season allowance allocation provisions replacing the provisions in §§ 97.511(a)

and (b)(1) and 97.512(a) of this chapter with regard to the State and the control period in 2019 or any subsequent year or, for Georgia, 2017 or any subsequent year, any methodology under which the

State or the permitting authority allocates or auctions CSAPR NO$_X$ Ozone Season allowances and that—

\*    \*    \*    \*    \*

(B) \* \* \*

| Year of the control period for which CSAPR NO$_X$ Ozone Season allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| 2017 | November 1, 2016. |
| 2018 | November 1, 2016. |
| 2019 | June 1, 2018. |
| 2020 | June 1, 2018. |
| 2021 | June 1, 2019. |
| 2022 | June 1, 2019. |
| 2023 and any year thereafter | June 1 of the fourth year before the year of the control period. |

\*　　\*　　\*　　\*　　\*

### §52.39　What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of sulfur dioxide?

■ 6. Section 52.39 is amended by:

■ a. Revising the section heading as set forth above;

■ b. In paragraph (d)(2), by adding "the" before "CSAPR SO$_2$ Group 1 trading budget";

■ c. In paragraph (d)(5)(i), by removing "paragraph (d)(1) through (4)" and adding in its place "paragraphs (d)(1) through (4)";

■ d. In paragraph (e)(1) introductory text, by adding after "with regard to" the words "the State and";

■ e. In paragraph (e)(1)(ii), by removing "auction of CSAPR" and adding in its place "auctions of CSAPR", and by removing in the table "administrator" and adding in its place "the Administrator";

■ f. In paragraph (f) introductory text, by removing "in whole or in part, as appropriate,", and by removing "paragraphs (a), (b), (d), and (e) of this section" and adding in its place "paragraphs (a), (b), (d), and (e) of this section with regard to sources in the State but not sources in any Indian country within the borders of the State";

■ g. In paragraph (f)(1) introductory text, by adding after "with regard to" the words "the State and", and by removing "and any subsequent year" and adding in its place "or any subsequent year";

■ h. In paragraph (f)(1)(i), by removing "for such control period" and adding in its place "for any such control period";

■ i. In paragraph (f)(1)(ii), by removing "auction of CSAPR" and adding in its place "auctions of CSAPR", and by removing in the table "administrator" and adding in its place "the Administrator";

■ j. In paragraph (f)(1)(iv), by removing "paragraphs (f)(2)(ii) and (iii)" and adding in its place "paragraphs (f)(1)(ii) and (iii)";

■ k. In paragraph (f)(4), by adding after "97.612(b)" the words "of this chapter";

■ l. In paragraph (f)(5), by removing "97.625, and" and adding in its place "and 97.625 of this chapter and", and by adding after "other provisions" the

words "of subpart CCCCC of part 97 of this chapter";

■ m. In paragraph (f)(6), by removing "hold an auction under paragraph (f)(1)(ii) and (iii)" and adding in its place "hold an auction under paragraph (f)(1)";

■ n. In paragraph (g) introductory text, by adding after "with regard to" the words "the State and";

■ o. In paragraph (g)(2), by adding "the" before "CSAPR SO$_2$ Group 2 trading budget";

■ p. In paragraph (g)(5)(i), by removing "paragraph (g)(1) through (4)" and adding in its place "paragraphs (g)(1) through (4)";

■ q. In paragraph (h)(1) introductory text, by adding after "with regard to" the words "the State and", and by removing "and any subsequent year" and adding in its place "or any subsequent year";

■ r. In paragraph (h)(1)(ii), by removing "auction of CSAPR" and adding in its place "auctions of CSAPR", and by removing in the table "administrator" and adding in its place "the Administrator";

■ s. In paragraph (h)(2), by removing "hold an auction under paragraph (h)(1)(ii) and (iii)" and adding in its place "hold an auction under paragraph (h)(1)";

■ t. In paragraph (i) introductory text, by removing "in whole or in part, as appropriate,", and by removing "paragraphs (a), (c), (g), and (h) of this section" and adding in its place "paragraphs (a), (c), (g), and (h) of this section with regard to sources in the State but not sources in any Indian country within the borders of the State";

■ u. In paragraph (i)(1) introductory text, by adding after "with regard to" the words "the State and", and by removing "and any subsequent year" and adding in its place "or any subsequent year";

■ v. In paragraph (i)(1)(ii), by removing "auction of CSAPR" and adding in its place "auctions of CSAPR", and by removing in the table "administrator" and adding in its place "the Administrator";

■ w. In paragraph (i)(4), by adding after "97.712(b)" the words "of this chapter";

■ x. In paragraph (i)(5), by removing "97.725, and" and adding in its place "and 97.725 of this chapter and", and by adding after "other provisions" the words "of subpart DDDDD of part 97 of this chapter";

■ y. In paragraph (i)(6), by removing "hold an auction under paragraphs (i)(1)(ii) and (iii)" and adding in its place "hold an auction under paragraph (i)(1)";

■ z. In paragraph (j), by removing "in whole or in part, as appropriate,", by adding after "CSAPR Federal Implementation Plan" the words "set forth in paragraphs (a), (b), (d), and (e) of this section or paragraphs (a), (c), (g), and (h) of this section, as applicable", and by removing "paragraph (b) and (c)" and adding in its place "paragraph (b) or (c)"; and

■ aa. In paragraph (k), by removing "a State" and adding in its place "the State".

### Subpart B—Alabama

#### §52.54　[Amended]

■ 7. Section 52.54 is amended in paragraph (b)(2) by removing "the" before "Alabama's SIP revision".

### Subpart K—Florida

■ 8. Section 52.540 is amended by adding paragraph (c) to read as follows:

#### §52.540　Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*　　\*　　\*　　\*　　\*

(c) Notwithstanding paragraph (a) of this section, no source or unit located in the State of Florida or Indian country within the borders of the State shall be required under paragraph (a) of this section to comply with the requirements set forth under the CSAPR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter with regard to emissions after 2016.

### Subpart R—Kansas

■ 9. Section 52.882 is amended by revising paragraph (b) to read as follows:

**§ 52.882  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

* * * * *

(b)(1) The owner and operator of each source and each unit located in the State of Kansas and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' SIP.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Kansas' SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart X—Michigan**

**§ 52.1187  [Amended]**

■ 10. Section 52.1187 is amended in paragraph (c)(2) by removing "Maryland's SIP revision" and adding in its place "Michigan's SIP revision".

**Subpart PP—South Carolina**

■ 11. Section 52.2140 is amended by adding paragraph (b)(3) to read as follows:

**§ 52.2140  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

* * * * *

(b) * * *

(3) Notwithstanding paragraph (b)(1) of this section, no source or unit located in the State of South Carolina or Indian country within the borders of the State shall be required under paragraph (b)(1) of this section to comply with the requirements set forth under the CSAPR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter with regard to emissions after 2016.

**PART 78—APPEAL PROCEDURES**

■ 12. The authority citation for part 78 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7411, 7426, 7601, and 7651, *et seq.*

**§§ 78.1 and 78.4  [Amended]**

■ 13. Sections 78.1 and 78.4 are amended by removing "TR NO$_X$" wherever it appears and adding in its place "CSAPR NO$_X$", and by removing "TR SO$_2$" wherever it appears and adding in its place "CSAPR SO$_2$".

■ 14. Section 78.1 is amended by:

a. In paragraph (a)(1), by adding after "part 97 of this chapter" the words "or State regulations approved under § 52.38(a)(4) or (5) or (b)(4) or (5) of this chapter or § 52.39(e), (f), (h), or (i) of this chapter", and by adding a new third sentence at the end of the paragraph;

■ b. Adding paragraph (b)(14)(viii); and

■ c. In paragraphs (b)(16)(ii), (iii), and (v), by removing "SO$_2$ Group 1" and adding in its place "SO$_2$ Group 2".

The additions read as follows:

**§ 78.1  Purpose and scope.**

(a)(1) * * * All references in paragraph (b) of this section and in § 78.3 to subpart AAAAA of part 97 of this chapter, subpart BBBBB of part 97 of this chapter, subpart CCCCC of part 97 of this chapter, and subpart DDDDD of part 97 of this chapter shall be read to include the comparable provisions in State regulations approved under § 52.38(a)(4) or (5) of this chapter, § 52.38(b)(4) or (5) of this chapter, § 52.39(e) or (f) of this chapter, and § 52.39(h) or (i) of this chapter, respectively.

* * * * *

(b) * * *

(14) * * *

(viii) The determination of the tonnage equivalent of a CSAPR NO$_X$ Ozone Season allowance under § 97.524(f) of this chapter.

* * * * *

**§ 78.4  [Amended]**

■ 15. Section 78.4 is amended in paragraph (a)(1)(i) by removing "a affected" and adding in its place "an affected", by adding "or" before "CSAPR SO$_2$ Group 2 unit", and by removing ", or a unit for which a TR opt-in application is submitted and not withdrawn".

**PART 97—FEDERAL NO$_X$ BUDGET TRADING PROGRAM, CAIR NO$_X$ AND SO$_2$ TRADING PROGRAMS, AND CSAPR NO$_X$ AND SO$_2$ TRADING PROGRAMS**

■ 16. The heading of part 97 is revised to read as set forth above.

■ 17. The authority citation for part 97 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7426, 7601, and 7651, *et seq.*

**§§ 97.401 through 97.735  [Amended]**

■ 18. Sections 97.401 through 97.735 are amended by removing "Transport Rule (TR)" wherever it appears and adding in its place "Cross-State Air Pollution Rule (CSAPR)", by removing "TR NO$_X$" wherever it appears and adding in its place "CSAPR NO$_X$", and by removing "TR SO$_2$" wherever it appears and adding in its place "CSAPR SO$_2$".

**Subpart AAAAA—CSAPR NO$_X$ Annual Trading Program**

■ 19. The heading of subpart AAAAA of part 97 is revised to read as set forth above.

**§ 97.402  [Amended]**

■ 20. Section 97.402 is amended by:

a. Relocating all definitions beginning with "*CSAPR*" to their alphabetical locations in the list of definitions;

■ b. In the definition of "*Cogeneration system*", by removing "steam turbine generator" and adding in its place "generator";

■ c. In the definition of "*Commence commercial operation*", in paragraph (2) introductory text, by adding after "defined in" the word "the";

■ d. In the definition of "*CSAPR NO$_X$ Annual allowances held* or *hold TR NO$_4$ Annual allowances*", by removing "*TR NO$_4$*" and adding in its place "*CSAPR NO$_X$*";

■ e. In the definition of "*CSAPR SO$_2$ Group 2 Trading Program*", by removing "52.39(a)" and adding in its place "§ 52.39(a)";

■ f. In the definition of "*Fossil fuel*", by removing "§§ " and adding in its place "§ ";

■ g. In the definition of "*Owner*", by removing the paragraph designator "3)" and adding in its place the paragraph designator "(3)"; and

■ h. In the definition of *Sequential use of energy*'', in paragraph (2), by adding after ''from'' the word ''a''.

### § 97.404   [Amended]

■ 21. Section 97.404 is amended by:
■ a. In paragraph (b)(2)(ii), by removing ''paragraph (b)(1)(i)'' and adding in its place ''paragraph (b)(2)(i)''; and
■ b. Italicizing the headings of paragraphs (c)(1) and (2).

### § 97.406   [Amended]

■ 22. Section 97.406 is amended by:
■ a. Italicizing the headings of paragraphs (c)(1) and (2) and (c)(4) through (7); and
■ b. In the heading of paragraph (c)(4), by adding ''CSAPR NO$_X$ Annual'' before ''allowances.''

### § 97.410   State NO$_X$ Annual trading budgets, new unit set-asides, Indian country new unit set-asides, and variability limits.

■ 23. Section 97.410 is amended by:
■ a. Revising the heading as set forth above;
■ b. Removing ''NO$_X$ annual trading budget'' wherever it appears and adding in its place ''NO$_X$ Annual trading budget'';
■ c. Removing ''NO$_X$ annual new unit set-aside'' wherever it appears and adding in its place ''new unit set-aside'';
■ d. Removing ''NO$_X$ annual Indian country new unit set-aside'' wherever it appears and adding in its place ''Indian country new unit set-aside'';
■ e. Removing ''NO$_X$ annual variability limit'' wherever it appears and adding in its place ''variability limit'';
■ f. In paragraph (a) introductory text, by removing ''new unit-set aside'' and adding in its place ''new unit set-aside'';
■ g. Adding and reserving paragraphs (a)(11)(vi) and (a)(16)(vi); and
■ h. In paragraph (c), by adding after ''Each'' the word ''State'', by removing ''identified'', and by removing ''set aside'' wherever it appears and adding in its place ''set-aside''.

### § 97.411   [Amended]

■ 24. Section 97.411 is amended by:
■ a. Italicizing the headings of paragraphs (b)(1) and (2);
■ b. In paragraphs (b)(1)(iii) and (b)(2)(iii), by adding after ''November 30 of'' the word ''the'';
■ c. In paragraph (c)(1)(ii), by removing ''§ 52.38(a)(3), (4), or (5)'' and adding in its place ''§ 52.38(a)(4) or (5)'';
■ d. In paragraph (c)(5)(i)(B), by adding after ''§ 52.38(a)(4) or (5)'' the words ''of this chapter''; and
■ e. In paragraph (c)(5)(ii) introductory text, by removing ''of this paragraph'' and adding in its place ''of this section''; and

■ f. In paragraph (c)(5)(ii)(B), by adding after ''§ 52.38(a)(4) or (5)'' the words ''of this chapter''; and
■ g. In paragraph (c)(5)(iii), by removing ''of this paragraph'' and adding in its place ''of this section''.

### § 97.412   [Amended]

■ 25. Section 97.412 is amended by:
■ a. In paragraph (a)(2), by removing ''§§'' and adding in its place ''§ '';
■ b. In paragraph (a)(4)(i), by removing ''paragraph (a)(1)(i) through (iii)'' and adding in its place ''paragraphs (a)(1)(i) through (iii)'';
■ c. In paragraph (a)(4)(ii), by adding after ''paragraph (a)(4)(i)'' the words ''of this section'';
■ d. In paragraph (a)(9)(i), by adding after ''November 30 of'' the word ''the'';
■ e. In paragraph (b)(4)(i), by adding after ''paragraph (b)(4)(i)'' the words ''of this section'';
■ f. In paragraph (b)(9)(i), by adding after ''November 30 of'' the word ''the''; and
■ g. In paragraph (b)(10)(ii), by adding after ''§ 52.38(a)(4) or (5)'' the words ''of this chapter''.

### § 97.421   [Amended]

■ 26. Section 97.421 is amended by:
■ a. In paragraphs (c), (d), and (e), by removing ''period'' and adding in its place ''periods''; and
■ b. In paragraph (j), by removing ''the date'' and adding in its place ''the date 15 days after the date''.

### § 97.425   [Amended]

■ 27. Section 97.425 is amended by:
■ a. In paragraph (b)(2)(iii) introductory text, by removing ''paragraph (b)(1)(i)'' and adding in its place ''paragraph (b)(1)(ii)'';
■ b. In paragraph (b)(2)(iii)(B), by adding ''the calculations incorporating'' before ''any adjustments'';
■ c. In paragraph (b)(4)(i), by removing ''the'' before ''them''; and
■ d. In paragraph (b)(6)(iii)(B), by removing after ''appropriate'' the word ''at''.

### § 97.426   [Amended]

■ 28. Section 97.426 is amended in paragraph (b) by removing ''97.427, or 97.428'' and adding in its place ''§ 97.427, or § 97.428''.

### § 97.428   [Amended]

■ 29. Section 97.428 is amended in paragraph (b) by removing ''paragraph (a)(1)'' and adding in its place ''paragraph (a)''.

### § 97.430   [Amended]

■ 30. Section 97.430 is amended by:
■ a. In paragraph (b) introductory text, by adding after ''operator'' the words ''of

a CSAPR NO$_X$ Annual unit'', by adding ''the later of'' before ''the following dates'' each time it appears, and by removing the final period and adding in its place a colon;
■ b. Removing paragraphs (b)(1) and (b)(2) introductory text;
■ c. Redesignating paragraphs (b)(2)(i) and (ii) as paragraphs (b)(1) and (2);
■ d. In newly redesignated paragraph (b)(2), by removing the final semicolon and adding in its place a period;
■ e. In paragraph (b)(3) introductory text, by removing ''§§'' and adding in its place ''§ ''; and
■ f. In paragraph (b)(3)(iii), by adding after ''§ 75.66'' the words ''of this chapter''.

### § 97.431   [Amended]

■ 31. Section 97.431 is amended by:
■ a. Italicizing the headings of paragraphs (d)(1) through (3), (d)(3)(i) through (iv), (d)(3)(iv)(A) through (D), and (d)(3)(v); and
■ b. In paragraph (d)(3) introductory text, by removing ''§§'' and adding in its place ''§ ''.

### § 97.434   [Amended]

■ 32. Section 97.434 is amended by:
■ a. In paragraph (b), by adding ''the'' before ''requirements'';
■ b. In paragraph (d)(1) introductory text, by removing ''the CSAPR'' and adding in its place ''a CSAPR'', and by adding ''the later of'' before the final colon;
■ c. In paragraph (d)(1)(i), by removing ''For a unit that commences commercial operation before July 1, 2014, the'' and adding in its place ''The''; and
■ d. In paragraph (d)(1)(ii), by removing ''For a unit that commences commercial operation on or after July 1, 2014, the'' and adding in its place ''The'', and by removing '', unless that quarter is the third or fourth quarter of 2014, in which case reporting shall commence in the quarter covering January 1, 2015 through March 31, 2015''.

### Subpart BBBBB—CSAPR NO$_X$ Ozone Season Trading Program

■ 33. The heading of subpart BBBBB of part 97 is revised to read as set forth above.
■ 34. Section 97.502 is amended by:
■ a. Relocating all definitions beginning with ''*CSAPR*'' to their alphabetical locations in the list of definitions;
■ b. In the definition of ''*Cogeneration system*'', by removing ''steam turbine generator'' and adding in its place ''generator'';
■ c. In the definition of ''*Commence commercial operation*'', in paragraph (2) introductory text, by adding after ''defined in'' the word ''the'';

■ d. Revising the definitions of "*CSAPR NO$_X$ Ozone Season allowance*" and "*CSAPR NO$_X$ Ozone Season emissions limitation*";

■ e. In the definitions of "*CSAPR SO$_2$ Group 1 Trading Program*" and "*CSAPR SO$_2$ Group 2 Trading Program*", by removing "52.39(a)" and adding in in its place "§ 52.39(a)";

■ f. In the definition of "*Fossil fuel*", by removing "§§" and adding in its place §";

■ g. In the definition of "*Sequential use of energy*", in paragraph (2), by adding after "from" the word "a"; and

■ h. Adding, in alphabetical order, a definition of "*Tonnage equivalent.*"

The additions and revisions read as follows:

### § 97.502   Definitions.

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season allowance* means a limited authorization under the CSAPR NO$_X$ Ozone Season Trading Program issued and allocated or auctioned to a CSAPR NO$_X$ Ozone Season unit in a State (or Indian country within the borders of such State) by the Administrator under this subpart, or by the State or permitting authority under a SIP revision approved by the Administrator under § 52.38(b)(3), (4), or (5) of this chapter, to emit either:

(1) One ton of NO$_X$ in the State (or Indian country located within the borders of such State) during a control period of the specified calendar year for which the authorization is allocated or auctioned; or

(2) As determined under § 97.524(f), up to one ton of NO$_X$ in another State (or Indian country located within the borders of another State) or during a control period after the specified calendar year for which the authorization is allocated or auctioned.

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season emissions limitation* means, for a CSAPR NO$_X$ Ozone Season source, the tonnage of NO$_X$ emissions authorized in a control period in a given year by the tonnage equivalent of CSAPR NO$_X$ Ozone Season allowances available for deduction for the source under § 97.524(a) for such control period.

\*    \*    \*    \*    \*

*Tonnage equivalent* means, with regard to a specific individual CSAPR NO$_X$ Ozone Season allowance held or deducted for an identified purpose, the portion of one ton represented by the CSAPR NO$_X$ Ozone Season allowance as determined under § 97.524(f) or, with regard to a specific group of CSAPR NO$_X$ Ozone Season allowances held or deducted for a common identified

purpose, the unrounded sum of the tonnage equivalents of the individual CSAPR NO$_X$ Ozone Season allowances comprising the group.

\*    \*    \*    \*    \*

### § 97.504   [Amended]

■ 35. Section 97.504 is amended by:

■ a. In paragraph (b)(2)(ii), by removing "paragraph (b)(1)(i)" and adding in its place "paragraph (b)(2)(i)", and by removing "TR NO$_X$" and adding in its place "CSAPR NO$_X$"; and

■ b. Italicizing the headings of paragraphs (c)(1) and (2).

■ 36. Section 97.506 is amended by:

■ a. Italicizing the headings of paragraphs (c), (c)(1) and (2), and (c)(4) through (7);

■ b. Revising paragraphs (c)(1)(i), (c)(2)(i) introductory text, and (c)(2)(v)(B);

■ c. Redesignating paragraph (c)(3)(i) as paragraph (c)(3)(i)(A), and revising it;

■ d. Adding paragraph (c)(3)(i)(B);

■ e. In the heading of paragraph (c)(4), by adding "CSAPR NO$_X$ Ozone Season" before "allowances"; and

■ f. Revising paragraph (c)(6) introductory text.

The revisions and additions read as follows:

### § 97.506   Standard requirements.

\*    \*    \*    \*    \*

(c) \*  \*  \*

(1) \*  \*  \*

(i) As of the allowance transfer deadline for a control period in a given year, the owners and operators of each CSAPR NO$_X$ Ozone Season source and each CSAPR NO$_X$ Ozone Season unit at the source shall hold, in the source's compliance account, CSAPR NO$_X$ Ozone Season allowances available for deduction for such control period under § 97.524(a) with a tonnage equivalent not less than the tons of total NO$_X$ emissions for such control period from all CSAPR NO$_X$ Ozone Season units at the source.

\*    \*    \*    \*    \*

(2) \*  \*  \*

(i) If total NO$_X$ emissions during a control period in a given year from all CSAPR NO$_X$ Ozone Season units at CSAPR NO$_X$ Ozone Season sources in a State (and Indian country within the borders of such State) exceed the State assurance level, then the owners and operators of such sources and units in each group of one or more sources and units having a common designated representative for such control period, where the common designated representative's share of such NO$_X$ emissions during such control period exceeds the common designated representative's assurance level for the

State and such control period, shall hold (in the assurance account established for the owners and operators of such group) CSAPR NO$_X$ Ozone Season allowances available for deduction for such control period under § 97.525(a) with a tonnage equivalent not less than two times the product (rounded to the nearest whole number), as determined by the Administrator in accordance with § 97.525(b), of multiplying—

\*    \*    \*    \*    \*

(v) \*  \*  \*

(B) Each ton of the tonnage equivalent of CSAPR NO$_X$ Ozone Season allowances that the owners and operators fail to hold for such control period in accordance with paragraphs (c)(2)(i) through (iii) of this section and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(3) \*  \*  \*

(i)(A) Except as provided in paragraph (c)(3)(i)(B) of this section, a CSAPR NO$_X$ Ozone Season unit shall be subject to the requirements under paragraph (c)(1) of this section for the control period starting on the later of May 1, 2015 or the deadline for meeting the unit's monitor certification requirements under § 97.530(b) and for each control period thereafter.

(B) A CSAPR NO$_X$ Ozone Season unit in the State of Kansas (or Indian country within the borders of the State) that is not a CSAPR NO$_X$ Ozone Season unit in another State (or Indian country within the borders of another State) during any portion of a control period in 2015 or 2016 shall be subject to the requirements under paragraph (c)(1) of this section for the control period starting on the later of May 1, 2017 or the deadline for meeting the unit's monitor certification requirements under § 97.530(b) and for each control period thereafter.

\*    \*    \*    \*    \*

(6) *Limited authorization.* A CSAPR NO$_X$; Ozone Season allowance is a limited authorization to emit up to one ton of NO$_X$; during the control period in one year as determined under § 97.524(f). Such authorization is limited in its use and duration as follows:

\*    \*    \*    \*    \*

■ 37. Section 97.510 is revised to read as follows:

### § 97.510   State NO$_X$ Ozone Season trading budgets, new unit set-asides, Indian country new unit set-asides, and variability limits.

(a) The State NO$_X$ Ozone Season trading budgets, new unit set-asides, and Indian country new unit set-asides

for allocations of CSAPR NO$_X$ Ozone Season allowances for the control periods in 2015 and thereafter are as follows:

(1) *Alabama.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 31,746 tons.

(ii) The new unit set-aside for 2015 and 2016 is 635 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 9,979 tons.

(v) The new unit set-aside for 2017 and thereafter is 205 tons.

(vi) [Reserved]

(2) *Arkansas.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 15,110 tons.

(ii) The new unit set-aside for 2015 and 2016 is 756 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 6,949 tons.

(v) The new unit set-aside for 2017 and thereafter is 141 tons.

(vi) [Reserved]

(3) *Florida.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 28,644 tons.

(ii) The new unit set-aside for 2015 and 2016 is 544 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 29 tons.

(iv) [Reserved]

(v) [Reserved]

(vi) [Reserved]

(4) *Georgia.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 27,944 tons.

(ii) The new unit set-aside for 2015 and 2016 is 559 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 24,041 tons.

(v) The new unit set-aside for 2017 and thereafter is 481 tons.

(vi) [Reserved]

(5) *Illinois.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 21,208 tons.

(ii) The new unit set-aside for 2015 and 2016 is 1,697 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 12,078 tons.

(v) The new unit set-aside for 2017 and thereafter is 591 tons.

(vi) [Reserved]

(6) *Indiana.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 46,876 tons.

(ii) The new unit set-aside for 2015 and 2016 is 1,406 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 28,284 tons.

(v) The new unit set-aside for 2017 and thereafter is 565 tons.

(vi) [Reserved]

(7) *Iowa.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 16,532 tons.

(ii) The new unit set-aside for 2015 and 2016 is 314 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 17 tons.

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 8,351 tons.

(v) The new unit set-aside for 2017 and thereafter is 411 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 8 tons.

(8) *Kansas.* (i) [Reserved]

(ii) [Reserved]

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 9,272 tons.

(v) The new unit set-aside for 2017 and thereafter is 272 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 9 tons.

(9) *Kentucky.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 36,167 tons.

(ii) The new unit set-aside for 2015 and 2016 is 1,447 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 21,519 tons.

(v) The new unit set-aside for 2017 and thereafter is 647 tons.

(vi) [Reserved]

(10) *Louisiana.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 18,115 tons.

(ii) The new unit set-aside for 2015 and 2016 is 344 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 18 tons.

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 15,807 tons.

(v) The new unit set-aside for 2017 and thereafter is 612 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 16 tons.

(11) *Maryland.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 7,179 tons.

(ii) The new unit set-aside for 2015 and 2016 is 144 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 4,026 tons.

(v) The new unit set-aside for 2017 and thereafter is 485 tons.

(vi) [Reserved]

(12) *Michigan.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 28,041 tons.

(ii) The new unit set-aside for 2015 and 2016 is 533 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 28 tons.

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 19,115 tons.

(v) The new unit set-aside for 2017 and thereafter is 363 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 19 tons.

(13) *Mississippi.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 12,429 tons.

(ii) The new unit set-aside for 2015 and 2016 is 237 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 12 tons.

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 5,910 tons.

(v) The new unit set-aside for 2017 and thereafter is 584 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 6 tons.

(14) *Missouri.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 22,788 tons.

(ii) The new unit set-aside for 2015 is 684 tons and for 2016 is 1,367 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 15,323 tons.

(v) The new unit set-aside for 2017 and thereafter is 314 tons.

(vi) [Reserved]

(15) *New Jersey.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 4,128 tons.

(ii) The new unit set-aside for 2015 and 2016 is 83 tons.

(iii) [Reserved]

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 2,015 tons.

(v) The new unit set-aside for 2017 and thereafter is 1,151 tons.

(vi) [Reserved]

(16) *New York.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 10,369 tons.

(ii) The new unit set-aside for 2015 and 2016 is 197 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 10 tons.

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 4,450 tons.

(v) The new unit set-aside for 2017 and thereafter is 89 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 4 tons.

(17) *North Carolina.* (i) The NO$_X$ Ozone Season trading budget for 2015 and 2016 is 22,168 tons.

(ii) The new unit set-aside for 2015 and 2016 is 1,308 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 22 tons.

(iv) The NO$_X$ Ozone Season trading budget for 2017 and thereafter is 12,275 tons.

(v) The new unit set-aside for 2017 and thereafter is 236 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 12 tons.

(18) *Ohio.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 41,284 tons.

(ii) The new unit set-aside for 2015 and 2016 is 826 tons.

(iii) [Reserved]

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 16,660 tons.

(v) The new unit set-aside for 2017 and thereafter is 337 tons.

(vi) [Reserved]

(19) *Oklahoma.* (i) The $NO_X$ Ozone Season trading budget for 2015 is 36,567 tons and for 2016 is 22,694 tons.

(ii) The new unit set-aside for 2015 is 731 tons and for 2016 is 454 tons.

(iii) [Reserved]

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 16,215 tons.

(v) The new unit set-aside for 2017 and thereafter is 309 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 16 tons.

(20) *Pennsylvania.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 52,201 tons.

(ii) The new unit set-aside for 2015 and 2016 is 1,044 tons.

(iii) [Reserved]

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 14,387 tons.

(v) The new unit set-aside for 2017 and thereafter is 1,017 tons.

(vi) [Reserved]

(21) *South Carolina.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 13,909 tons.

(ii) The new unit set-aside for 2015 and 2016 is 264 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 14 tons.

(iv) [Reserved]

(v) [Reserved]

(vi) [Reserved]

(22) *Tennessee.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 14,908 tons.

(ii) The new unit set-aside for 2015 and 2016 is 298 tons.

(iii) [Reserved]

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 5,481 tons.

(v) The new unit set-aside for 2017 and thereafter is 109 tons.

(23) *Texas.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 65,560 tons.

(ii) The new unit set-aside for 2015 and 2016 is 2,556 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 66 tons.

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 58,002 tons.

(v) The new unit set-aside for 2017 and thereafter is 2,852 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 58 tons.

(24) *Virginia.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 14,452 tons.

(ii) The new unit set-aside for 2015 and 2016 is 723 tons.

(iii) [Reserved]

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 6,818 tons.

(v) The new unit set-aside for 2017 and thereafter is 1,844 tons.

(vi) [Reserved]

(25) *West Virginia.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 25,283 tons.

(ii) The new unit set-aside for 2015 and 2016 is 1,264 tons.

(iii) [Reserved]

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 13,390 tons.

(v) The new unit set-aside for 2017 and thereafter is 268 tons.

(vi) [Reserved]

(26) *Wisconsin.* (i) The $NO_X$ Ozone Season trading budget for 2015 and 2016 is 14,784 tons.

(ii) The new unit set-aside for 2015 and 2016 is 872 tons.

(iii) The Indian country new unit set-aside for 2015 and 2016 is 15 tons.

(iv) The $NO_X$ Ozone Season trading budget for 2017 and thereafter is 5,561 tons.

(v) The new unit set-aside for 2017 and thereafter is 115 tons.

(vi) The Indian country new unit set-aside for 2017 and thereafter is 6 tons.

(b) The States' variability limits for the State $NO_X$ Ozone Season trading budgets for the control periods in 2017 and thereafter are as follows:

(1) The variability limit for Alabama is 2,096 tons.

(2) The variability limit for Arkansas is 1,459 tons.

(3) [Reserved]

(4) The variability limit for Georgia is 5,049 tons.

(5) The variability limit for Illinois is 2,536 tons.

(6) The variability limit for Indiana is 5,940 tons.

(7) The variability limit for Iowa is 1,754 tons.

(8) The variability limit for Kansas is 1,947 tons.

(9) The variability limit for Kentucky is 4,519 tons.

(10) The variability limit for Louisiana is 3,319 tons.

(11) The variability limit for Maryland is 845 tons.

(12) The variability limit for Michigan is 4,014 tons.

(13) The variability limit for Mississippi is 1,241 tons.

(14) The variability limit for Missouri is 3,218 tons.

(15) The variability limit for New Jersey is 423 tons.

(16) The variability limit for New York is 935 tons.

(17) The variability limit for North Carolina is 2,578 tons.

(18) The variability limit for Ohio is 3,499 tons.

(19) The variability limit for Oklahoma is 3,405 tons.

(20) The variability limit for Pennsylvania is 3,021 tons.

(21) [Reserved]

(22) The variability limit for Tennessee is 1,151 tons.

(23) The variability limit for Texas is 12,180 tons.

(24) The variability limit for Virginia is 1,432 tons.

(25) The variability limit for West Virginia is 2,812 tons.

(26) The variability limit for Wisconsin is 1,168 tons.

(c) Each State $NO_X$ Ozone Season trading budget in this section includes any tons in a new unit set-aside or Indian country new unit set-aside, but does not include any tons in a variability limit.

■ 38. Section 97.511 is amended by:

■ a. Italicizing the headings of paragraphs (b)(1) and (2);

■ b. In paragraphs (b)(1)(iii) and (b)(2)(iii), by adding after "August 31 of" the word "the";

■ c. In paragraph (b)(2)(iv)(B), by adding a paragraph break after the end of the second sentence and before the paragraph designator "(v)" for the following paragraph (b)(2)(v);

■ d. In paragraph (c)(1)(ii), by removing "§ 52.38(b)(3), (4), or (5)" and adding in its place "§ 52.38(b)(4) or (5)", and by removing "January 1" and adding in its place "May 1";

■ e. Revising paragraph (c)(3);

■ f. In paragraph (c)(5)(i)(B), by adding after "§ 52.38(b)(4) or (5)" the words "of this chapter";

■ g. In paragraph (c)(5)(ii) introductory text, by removing "of this paragraph" and adding in its place "of this section";

■ h. In paragraph (c)(5)(ii)(B), by adding after "§ 52.38(b)(4) or (5)" the words "of this chapter"; and

■ i. In paragraph (c)(5)(iii), by removing "of this paragraph" and adding in its place "of this section".

The revisions read as follows:

**§ 97.511 Timing requirements for CSAPR $NO_X$ Ozone Season allowance allocations.**

* * * * *

**75772** **Federal Register** / Vol. 80, No. 232 / Thursday, December 3, 2015 / Proposed Rules

(c) * * *

(3) If the Administrator already recorded such CSAPR NO$_X$ Ozone Season allowances under § 97.521 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.524(b) for such control period, then the Administrator will deduct from the account in which such CSAPR NO$_X$ Ozone Season allowances were recorded CSAPR NO$_X$ Ozone Season allowances allocated for the same or a prior control period until the tonnage equivalent of the CSAPR NO$_X$ Ozone Season allowances deducted under this paragraph equals or exceeds the tonnage equivalent of such already recorded CSAPR NO$_X$ Ozone Season allowances, making all such deductions in whole CSAPR NO$_X$ Ozone Season allowances. The authorized account representative shall ensure that there are CSAPR NO$_X$ Ozone Season allowances in such account with a tonnage equivalent sufficient for completion of the deduction.

* * * * *

■ 39. Section 97.512 is amended by:
■ a. Revising paragraph (a) introductory text;
■ b. In paragraph (a)(4)(i), by removing "paragraph (a)(1)(i) through (iii)" and adding in its place "paragraphs (a)(1)(i) through (iii)";
■ c. In paragraph (a)(2), by removing "§§" and adding in its place "§";
■ d. In paragraph (a)(4)(ii), by adding after "paragraph (a)(4)(i)" the words "of this section";
■ e. In paragraph (a)(9)(i), by adding after "August 31 of" the word "the";
■ f. Revising paragraph (b) introductory text;
■ g. In paragraph (b)(4)(ii), by adding after "paragraph (b)(4)(i)" the words "of this section";
■ h. In paragraph (b)(9)(i), by adding after "August 31 of" the word "the"; and
■ i. In paragraph (b)(10)(ii), by adding after "§ 52.38(b)(4) or (5)" the words "of this chapter".

The revisions read as follows:

**§ 97.512   CSAPR NO$_X$ Ozone Season allowance allocations to new units.**

(a) For each control period in 2015 and thereafter and for the CSAPR NO$_X$ Ozone Season units in each State for which a new unit set-aside is set forth in § 97.510 for that control period, the Administrator will allocate CSAPR NO$_X$ Ozone Season allowances to the CSAPR NO$_X$ Ozone Season units as follows:

* * * * *

(b) For each control period in 2015 and thereafter and for the CSAPR NO$_X$ Ozone Season units located in Indian country within the borders of each State for which an Indian country new unit set-aside is set forth in § 97.510 for that control period, the Administrator will allocate CSAPR NO$_X$ Ozone Season allowances to the CSAPR NO$_X$ Ozone Season units as follows:

* * * * *

■ 40. Section 97.521 is amended by:
■ a. In paragraph (b) introductory text, by removing "§ 52.38(b)(3)(i) through (iv)" and adding in its place "§ 52.38(b)(3)(i)(A) through (D)";
■ b. Redesignating paragraph (c) as paragraph (c)(1), and revising it;
■ c. Adding paragraph (c)(2);
■ d. Revising paragraphs (d) and (e); and
■ e. In paragraph (j), by removing "the date" and adding in its place "the date 15 days after the date".

The revisions read as follows:

**§ 97.521   Recordation of CSAPR NO$_X$ Ozone Season allowance allocations and auction results.**

* * * * *

(c)(1) By December 1, 2016, the Administrator will record in each CSAPR NO$_X$ Ozone Season source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the CSAPR NO$_X$ Ozone Season allowances auctioned to CSAPR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control period in 2017 or, for such sources in Georgia, the control periods in 2017 and 2018.

(2) For the CSAPR NO$_X$ Ozone Season sources not in Georgia, by December 1, 2016, the Administrator will record in each such source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source in accordance with § 97.511(a) for the control period in 2018, unless the State in which the source is located notifies the Administrator in writing by November 15, 2016 of the State's intent to submit to the Administrator a complete SIP revision by April 1, 2017 meeting the requirements of § 52.38(b)(3)(ii)(A) through (D) of this chapter.

(A) If the State does not submit to the Administrator by April 1, 2017 such complete SIP revision, the Administrator will record by April 15, 2017 in each CSAPR NO$_X$ Ozone Season source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source in accordance with

§ 97.511(a) for the control period in 2018.

(B) If the State submits to the Administrator by April 1, 2017 and the Administrator approves by October 1, 2017 such complete SIP revision, the Administrator will record by October 1, 2017 in each CSAPR NO$_X$ Ozone Season source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source as provided in such approved, complete SIP revision for the control period in 2018.

(C) If the State submits to the Administrator by April 1, 2017 and the Administrator does not approve by October 1, 2017 such complete SIP revision, the Administrator will record by October 1, 2017 in each CSAPR NO$_X$ Ozone Season source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source in accordance with § 97.511(a) for the control period in 2018.

(d) By July 1, 2018, the Administrator will record in each CSAPR NO$_X$ Ozone Season source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the CSAPR NO$_X$ Ozone Season allowances auctioned to CSAPR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control periods in 2019 and 2020.

(e) By July 1, 2019, the Administrator will record in each CSAPR NO$_X$ Ozone Season source's compliance account the CSAPR NO$_X$ Ozone Season allowances allocated to the CSAPR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the CSAPR NO$_X$ Ozone Season allowances auctioned to CSAPR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control periods in 2021 and 2022.

* * * * *

■ 41. Section 97.524 is amended by:
■ a. Revising paragraphs (b) introductory text, (b)(1), (c)(2) introductory text, and (c)(2)(i) and (ii);
■ b. Adding paragraphs (c)(2)(iii) through (v);
■ c. Revising paragraph (d); and
■ d. Adding paragraph (f).

The revisions and additions read as follows:

**§ 97.524   Compliance with CSAPR NO$_X$ Ozone Season emissions limitation.**

* * * * *

(b) *Deductions for compliance.* After the recordation, in accordance with § 97.523, of CSAPR NO<sub>X</sub> Ozone Season allowance transfers submitted by the allowance transfer deadline for a control period in a given year, the Administrator will deduct from each source's compliance account CSAPR NO<sub>X</sub> Ozone Season allowances available under paragraph (a) of this section in order to determine whether the source meets the CSAPR NO<sub>X</sub> Ozone Season emissions limitation for such control period, making all such deductions in whole CSAPR NO<sub>X</sub> Ozone Season allowances, as follows:

(1) Until the tonnage equivalent of the CSAPR NO<sub>X</sub> Ozone Season allowances deducted equals or exceeds the number of tons of total NO<sub>X</sub> emissions from all CSAPR NO<sub>X</sub> Ozone Season units at the source for such control period; or

\*    \*    \*    \*    \*

(c) \* \* \*

(2) *Default order of deductions.* The Administrator will deduct CSAPR NO<sub>X</sub> Ozone Season allowances under paragraph (b) or (d) of this section from the source's compliance account in accordance with a complete request under paragraph (c)(1) of this section or, in the absence of such request or in the case of identification an insufficient amount of CSAPR NO<sub>X</sub> Ozone Season allowances in such request, in the following order:

(i) Any CSAPR NO<sub>X</sub> Ozone Season allowances determined under paragraph (f)(1) of this section to have a tonnage equivalent of one ton per allowance that were allocated or auctioned from the NO<sub>X</sub> Ozone Season trading budget for the State within whose borders the source is located to the units at the source and were not transferred out of the compliance account, in the order of recordation;

(ii) Any CSAPR NO<sub>X</sub> Ozone Season allowances determine under paragraph (f)(1) of this section to have a tonnage equivalent of one ton per allowance that were not allocated or auctioned from the NO<sub>X</sub> Ozone Season trading budget for the State within whose borders the source is located to any unit at the source and were transferred to and recorded in the compliance account pursuant to this subpart, in the order of recordation;

(iii) Any CSAPR NO<sub>X</sub> Ozone Season allowances determined under paragraph (f)(2) of this section to have a tonnage equivalent of four tenths of one ton per allowance, in the order of recordation;

(iv) Any CSAPR NO<sub>X</sub> Ozone Season allowances determined under paragraph (f)(3) of this section to have a tonnage equivalent of one fourth of one ton per allowance that were allocated or auctioned from the NO<sub>X</sub> Ozone Season trading budget for the State within whose borders the source is located to the units at the source and were not transferred out of the compliance account, in the order of recordation; and

(v) Any CSAPR NO<sub>X</sub> Ozone Season allowances determined under paragraph (f)(3) of this section to have a tonnage equivalent of one fourth of one ton per allowance that were not allocated or auctioned from the NO<sub>X</sub> Ozone Season trading budget for the State within whose borders the source is located to any unit at the source and were transferred to and recorded in the compliance account pursuant to this subpart, in the order of recordation.

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the CSAPR NO<sub>X</sub> Ozone Season source has excess emissions, the Administrator will deduct from the source's compliance account CSAPR NO<sub>X</sub> Ozone Season allowances allocated for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, making all such deductions in whole CSAPR NO<sub>X</sub> Ozone Season allowances, until the tonnage equivalent of the CSAPR NO<sub>X</sub> Ozone Season allowances deducted under this paragraph equals or exceeds two times the number of tons of the source's excess emissions.

\*    \*    \*    \*    \*

(f) *Tonnage equivalents of CSAPR NO<sub>X</sub> Ozone Season allowances.* Where a determination is needed of the tonnage equivalent of a CSAPR NO<sub>X</sub> Ozone Season allowance held or deducted under any provision of § 97.506(c), § 97.511(c), § 97.524, § 97.525, § 97.527, or § 97.528 relating to the holding or deduction of CSAPR NO<sub>X</sub> Ozone Season allowances, the Administrator will make the determination as follows, provided that notwithstanding any such determination the CSAPR NO<sub>X</sub> Ozone Season allowance remains subject to the limitations in § 97.506(c)(6):

(1) Except as provided under paragraph (f)(2) or (f)(3) of this section, the tonnage equivalent of each CSAPR NO<sub>X</sub> Ozone Season allowance shall be one ton per allowance.

(2) Where a CSAPR NO<sub>X</sub> Ozone Season allowance has been allocated or auctioned for a control period in 2017 or a subsequent year from the NO<sub>X</sub> Ozone Season trading budget for Georgia, and where the CSAPR NO<sub>X</sub> Ozone Season allowance is held or deducted for any purpose related to emissions from a CSAPR NO<sub>X</sub> Ozone Season unit in another State (or Indian country within the borders of another State) or for the purpose of correcting an allocation or recordation error affecting a CSAPR NO<sub>X</sub> Ozone Season unit in another State (or Indian country within the borders of another State), the tonnage equivalent of the CSAPR NO<sub>X</sub> Ozone Season allowance shall be four tenths of one ton per allowance.

(3) Where a CSAPR NO<sub>X</sub> Ozone Season allowance has been allocated or auctioned for a control period in 2015 or 2016, and where the CSAPR NO<sub>X</sub> Ozone Season allowance is held or deducted for any purpose related to emissions from a CSAPR NO<sub>X</sub> Ozone Season unit in any State except Georgia (or Indian country within the borders of such a State) in a control period in 2017 or a subsequent year or for the purpose of correcting an allocation or recordation error affecting a CSAPR NO<sub>X</sub> Ozone Season unit in any State except Georgia (or Indian country within the borders of such a State) for a control period in 2017 or a subsequent year, the tonnage equivalent of the CSAPR NO<sub>X</sub> Ozone Season allowance shall be one fourth of one ton per allowance.

(4) The Administrator will determine the year of the compliance period for which a CSAPR NO<sub>X</sub> Ozone Season allowance was allocated or auctioned and the State from whose NO<sub>X</sub> Ozone Season trading budget the CSAPR NO<sub>X</sub> Ozone Season allowance was allocated or auctioned based on the records maintained in the Allowance Management System.

■ 42. Section 97.525 is amended by:
■ a. Revising paragraphs (b) introductory text and (b)(2)(ii);
■ b. In paragraph (b)(2)(iii) introductory text, by removing ''paragraph (b)(1)(i)'' and adding in its place ''paragraph (b)(1)(ii)'';
■ c. In paragraph (b)(2)(iii)(B), by adding ''the calculations incorporating'' before ''any adjustments''; and
■ d. Revising paragraphs (b)(4)(i), (b)(5), (b)(6) introductory text, (b)(6)(i) and (ii), (b)(6)(iii) introductory text, and (b)(6)(iii)(A) and (B).

The revisions read as follows:

### § 97.525 Compliance with CSAPR NO<sub>X</sub> Ozone Season assurance provisions.

\*    \*    \*    \*    \*

(b) *Deductions for compliance.* The Administrator will deduct CSAPR NO<sub>X</sub> Ozone Season allowances available under paragraph (a) of this section for compliance with the CSAPR NO<sub>X</sub> Ozone Season assurance provisions for a State for a control period in a given year in accordance with the following

procedures, making all such deductions in whole CSAPR $NO_X$ Ozone Season allowances:

\* \* \* \* \*

(2) \* \* \*

(ii) By August 1 immediately after the promulgation of such notice, the Administrator will calculate, for each such State (and Indian country within the borders of such State) and such control period and each common designated representative for such control period for a group of one or more CSAPR $NO_X$ Ozone Season sources and units in the State (and Indian country within the borders of such State), the common designated representative's share of the total $NO_X$ emissions from all CSAPR $NO_X$ Ozone Season units at CSAPR $NO_X$ Ozone Season sources in the State (and Indian country within the borders of such State), the common designated representative's assurance level, and the tonnage equivalent (if any) of CSAPR $NO_X$ Ozone Season allowances that the owners and operators of such group of sources and units must hold in accordance with the calculation formula in § 97.506(c)(2)(i) and will promulgate a notice of data availability of the results of these calculations.

\* \* \* \* \*

(4) \* \* \*

(i) As of midnight of November 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section, the owners and operators described in paragraph (b)(3) of this section shall hold in the assurance account established for them and for the appropriate CSAPR $NO_X$ Ozone Season sources, CSAPR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section CSAPR $NO_X$ Ozone Season allowances, available for deduction under paragraph (a) of this section, with a total tonnage equivalent not less than the tonnage equivalent such owners and operators are required to hold with regard to such sources, units and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in such notice.

\* \* \* \* \*

(5) After November 1 (or the date described in paragraph (b)(4)(ii) of this section) immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section and after the recordation, in accordance with § 97.523, of CSAPR $NO_X$ Ozone Season allowance transfers submitted by

midnight of such date, the Administrator will determine whether the owners and operators described in paragraph (b)(3) of this section hold, in the assurance account for the appropriate CSAPR $NO_X$ Ozone Season sources, CSAPR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) established under paragraph (b)(3) of this section, CSAPR $NO_X$ Ozone Season allowances available under paragraph (a) of this section with the tonnage equivalent that the owners and operators are required to hold with regard to such sources, units, and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in the notice required in paragraph (b)(2)(iii)(B) of this section.

(6) Notwithstanding any other provision of this subpart and any revision, made by or submitted to the Administrator after the promulgation of the notice of data availability required in paragraph (b)(2)(iii)(B) of this section for a control period in a given year, of any data used in making the calculations referenced in such notice, the tonnage equivalents of CSAPR $NO_X$ Ozone Season allowances that the owners and operators are required to hold in accordance with § 97.506(c)(2)(i) for such control period shall continue to be such tonnage equivalents as calculated by the Administrator and referenced in such notice required in paragraph (b)(2)(iii)(B) of this section, except as follows:

(i) If any such data are revised by the Administrator as a result of a decision in or settlement of litigation concerning such data on appeal under part 78 of this chapter of such notice, or on appeal under section 307 of the Clean Air Act of a decision rendered under part 78 of this chapter on appeal of such notice, then the Administrator will use the data as so revised to recalculate the tonnage equivalents of CSAPR $NO_X$ Ozone Season allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.506(c)(2)(i) for such control period with regard to the CSAPR $NO_X$ Ozone Season sources, CSAPR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) involved, provided that such litigation under part 78 of this chapter, or the proceeding under part 78 of this chapter that resulted in the decision appealed in such litigation under section 307 of the Clean Air Act, was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(ii) If any such data are revised by the owners and operators of a CSAPR $NO_X$ Ozone Season source and CSAPR $NO_X$ Ozone Season unit whose designated representative submitted such data under paragraph (b)(2)(i) of this section, as a result of a decision in or settlement of litigation concerning such submission, then the Administrator will use the data as so revised to recalculate the tonnage equivalents of CSAPR $NO_X$ Ozone Season allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.506(c)(2)(i) for such control period with regard to the CSAPR $NO_X$ Ozone Season sources, CSAPR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) involved, provided that such litigation was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(iii) If the revised data are used to recalculate, in accordance with paragraphs (b)(6)(i) and (ii) of this section, the tonnage equivalent of CSAPR $NO_X$ Ozone Season allowances that the owners and operators are required to hold for such control period with regard to the CSAPR $NO_X$ Ozone Season sources, CSAPR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) involved—

(A) Where the tonnage equivalent of CSAPR $NO_X$ Ozone Season allowances that the owners and operators are required to hold increases as a result of the use of all such revised data, the Administrator will establish a new, reasonable deadline on which the owners and operators shall hold CSAPR $NO_X$ Ozone Season allowances with the additional tonnage equivalent in the assurance account established by the Administrator for the appropriate CSAPR $NO_X$ Ozone Season sources, CSAPR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section. The owners' and operators' failure to hold such additional tonnage equivalent, as required, before the new deadline shall not be a violation of the Clean Air Act. The owners' and operators' failure to hold such additional tonnage equivalent, as required, as of the new deadline shall be a violation of the Clean Air Act. Each ton of the tonnage equivalent of CSAPR $NO_X$ Ozone Season allowances that the owners and operators fail to hold as required as of the new deadline, and each day in such control period, shall be a separate violation of the Clean Air Act.

(B) For the owners and operators for which the tonnage equivalent of CSAPR NO$_X$ Ozone Season allowances required to be held decreases as a result of the use of all such revised data, the Administrator will record, in all accounts from which CSAPR NO$_X$ Ozone Season allowances were transferred by such owners and operators for such control period to the assurance account established by the Administrator for the appropriate CSAPR NO$_X$ Ozone Season sources, CSAPR NO$_X$ Ozone Season units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, a total amount of the CSAPR NO$_X$ Ozone Season allowances held in such assurance account that the Administrator determines may be transferred from such assurance account without causing the tonnage equivalent of the CSAPR NO$_X$ Ozone Season allowances held by such owners and operators in such assurance account to fall below the tonnage equivalent required to be held by such owners and operators in such assurance account, making any transfers in whole CSAPR NO$_X$ Ozone Season allowances. If CSAPR NO$_X$ Ozone Season allowances were transferred to such assurance account from more than one account, the tonnage equivalent of CSAPR NO$_X$ Ozone Season allowances recorded in each such transferor account will be in proportion to the percentage of the total tonnage equivalent of CSAPR NO$_X$ Ozone Season allowances transferred to such assurance account for such control period from such transferor account.

\*    \*    \*    \*    \*

## § 97.528    [Amended]

■ 43. Section 97.528 is amended in paragraph (b) by removing "paragraph (a)(1)" and adding in its place "paragraph (a)".
■ 44. Section 97.530 is amended by:
■ a. Revising paragraphs (b) introductory text and (b)(1) through (3);
■ b. In paragraph (b)(4) introductory text, by removing "§§" and adding in its place "§"; and
■ c. In paragraph (b)(4)(iii), by adding after "§ 75.66" the words "of this chapter".

The revisions read as follows:

## § 97.530    General monitoring, recordkeeping, and reporting requirements.

\*    \*    \*    \*    \*

(b) *Compliance deadlines.* Except as provided in paragraph (e) of this section, the owner or operator of a CSAPR NO$_X$ Ozone Season unit shall meet the monitoring system certification and other requirements of paragraphs

(a)(1) and (2) of this section on or before the latest of the following dates and shall record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section on and after the latest of the following dates:

(1)(i) For a unit other than a unit described in paragraph (b)(1)(ii) of this section, May 1, 2015; or

(ii) For a unit in the State of Kansas (or Indian country within the borders of the State) that is not a CSAPR NO$_X$ Ozone Season unit in another State (or Indian country within the borders of another State) during any portion of a control period in 2015 or 2016, May 1, 2017;

(2) 180 calendar days after the date on which the unit commences commercial operation; or

(3) Where data for the unit is reported on a control period basis under § 97.534(d)(2)(ii)(B), and where the compliance date under paragraph (b)(2) of this section is not in a month from May through September, May 1 immediately after the compliance date under paragraph (b)(2) of this section.

\*    \*    \*    \*    \*

## § 97.531    [Amended]

■ 45. Section 97.531 is amended by:
■ a. Italicizing the headings of paragraphs (d)(1) through (3), (d)(3)(i) through (iv), (d)(3)(iv)(A) through (D), and (d)(3)(v);
■ b. In paragraph (d)(3) introductory text, by removing "§§" and adding in its place "§"; and
■ c. Redesignating paragraphs (d)(3)(v)(A)(1) through (5) as paragraphs (d)(3)(v)(A)(*1*) through (*5*).
■ 46. Section 97.534 is amended by:
■ a. In paragraph (b), by adding "the" before "requirements";
■ b. Revising paragraphs (d)(1) and (2);
■ c. Redesignating paragraph (d)(6) as paragraph (d)(5)(ii); and
■ d. In paragraph (e)(3), by removing "paragraph (d)(2)(ii)" and adding in its place "paragraph (d)(2)(ii)(B)".

The revisions read as follows:

## § 97.534    Recordkeeping and reporting.

\*    \*    \*    \*    \*

(d) \*    \*    \*

(1) The designated representative shall report the NO$_X$ mass emissions data and heat input data for a CSAPR NO$_X$ Ozone Season unit, in an electronic quarterly report in a format prescribed by the Administrator, for each calendar quarter indicated under paragraph (d)(2) of this section beginning with the latest of:

(i)(A) For a unit other than a unit described in paragraph (d)(1)(i)(B) of this section, the calendar quarter

covering May 1, 2015 through June 30, 2015; or

(B) For a unit in the State of Kansas (or Indian country within the borders of the State) that is not a CSAPR NO$_X$ Ozone Season unit in another State (or Indian country within the borders of another State) during any portion of a control period in 2015 or 2016, the calendar quarter covering May 1, 2017 through June 30, 2017;

(ii) The calendar quarter corresponding to the earlier of the date of provisional certification or the applicable deadline for initial certification under § 97.530(b); or

(iii) For a unit that reports on a control period basis under paragraph (d)(2)(ii)(B) of this section, if the calendar quarter under paragraph (d)(1)(ii) of this section does not include a month from May through September, the calendar quarter covering May 1 through June 30 immediately after the calendar quarter under paragraph (d)(1)(ii) of this section.

(2)(i) If a CSAPR NO$_X$ Ozone Season unit is subject to the Acid Rain Program or a CSAPR NO$_X$ Annual emissions limitation or if the owner or operator of such unit chooses to report on an annual basis under this subpart, then the designated representative shall meet the requirements of subpart H of part 75 of this chapter (concerning monitoring of NO$_X$ mass emissions) for such unit for the entire year and report the NO$_X$ mass emissions data and heat input data for such unit for the entire year.

(ii) If a CSAPR NO$_X$ Ozone Season unit is not subject to the Acid Rain Program or a CSAPR NO$_X$ Annual emissions limitation, then the designated representative shall either:

(A) Meet the requirements of subpart H of part 75 of this chapter for such unit for the entire year and report the NO$_X$ mass emissions data and heat input data for such unit for the entire year in accordance with paragraph (d)(2)(i) of this section; or

(B) Meet the requirements of subpart H of part 75 of this chapter (including the requirements in § 75.74(c) of this chapter) for such unit for the control period and report the NO$_X$ mass emissions data and heat input data (including the data described in § 75.74(c)(6) of this chapter) for such unit only for the control period of each year.

\*    \*    \*    \*    \*

## Subpart CCCCC—CSAPR SO$_2$ Group 1 Trading Program

■ 47. The heading of subpart CCCCC of part 97 is revised to read as set forth above.

### § 97.602  [Amended]

■ 48. Section 97.602 is amended by:
■ a. Relocating all definitions beginning with "*CSAPR*" to their alphabetical locations in the list of definitions;
■ b. In the definition of "*Cogeneration system*", by removing "steam turbine generator" and adding in its place "generator";
■ c. In the definition of "*Commence commercial operation*", in paragraph (2) introductory text, by adding after "defined in" the word "the";
■ d. In the definition of "*Fossil fuel*," by removing "§§ " and adding in its place "§ "; and
■ e. In the definition of "*Sequential use of energy*", in paragraph (2), by adding after "from" the word "a".

### § 97.604  [Amended]

■ 49. Section 97.604 is amended by:
■ a. In paragraph (b)(2)(ii), by removing "paragraph (b)(1)(i)" and adding in its place "paragraph (b)(2)(i)"; and
■ b. Italicizing the headings of paragraphs (c)(1) and (2).

### § 97.606  [Amended]

■ 50. Section 97.606 is amended by:
■ a. Italicizing the headings of paragraphs (c)(1) and (2) and (c)(4) through (7);
■ b. In the heading of paragraph (c)(4), by adding "CSAPR SO₂ Group 1" before "allowances"; and
■ c. In paragraph (d)(2), by removing "subpart H" and adding in its place "subpart B".

### § 97.610  State SO₂ Group 1 trading budgets, new unit set-asides, Indian country new unit set-asides, and variability limits.

■ 51. Section 97.610 is amended by:
■ a. Revising the heading as set forth above;
■ b. Removing "SO₂ trading budget" wherever it appears and adding in its place "SO₂ Group 1 trading budget";
■ c. Removing "SO₂ new unit set-aside" wherever it appears and adding in its place "new unit set-aside";
■ d. Removing "SO₂ Indian country new unit set-aside" wherever it appears and adding in its place "Indian country new unit set-aside";
■ e. Removing "SO₂ variability limit" wherever it appears and adding in its place "variability limit";
■ f. In paragraph (a) introductory text, by adding "Group 1" before "trading budgets", and by removing "new unit-set aside" and adding in its place "new unit set-aside";
■ g. Adding and reserving paragraphs (a)(2)(vi) and (a)(11)(vi); and
■ h. In paragraph (c), by adding after "Each" the word "State", and by removing "set aside" wherever it appears and adding in its place "set-aside".

### § 97.611  [Amended]

■ 52. Section 97.611 is amended by:
■ a. Italicizing the headings of paragraphs (b)(1) and (2);
■ b. In paragraphs (b)(1)(iii) and (b)(2)(iii), by adding after "November 30 of" the word "the";
■ c. In paragraph (c)(1)(ii), by removing "§ 52.39(d), (e), or (f)" and adding in its place "§ 52.39(e) or (f)";
■ d. In paragraph (c)(5)(i)(B), by adding after "§ 52.39(e) or (f)" the words "of this chapter";
■ e. In paragraph (c)(5)(ii) introductory text, by removing "of this paragraph" and adding in its place "of this section";
■ f. In paragraph (c)(5)(ii)(B), by adding after "§ 52.39(e) or (f)" the words "of this chapter"; and
■ g. In paragraph (c)(5)(iii), by removing "of this paragraph" and adding in its place "of this section".

### § 97.612  [Amended]

■ 53. Section 97.612 is amended by:
■ a. In paragraph (a)(2), by removing "§§ " and adding in its place "§ ";
■ b. In paragraph (a)(4)(i), by removing "paragraph (a)(1)(i) through (iii)" and adding in its place "paragraphs (a)(1)(i) through (iii)";
■ c. In paragraph (a)(4)(ii), by adding after "paragraph (a)(4)(i)" the words "of this section";
■ d. In paragraph (a)(9)(i), by adding after "November 30 of" the word "the";
■ e. In paragraph (b)(4)(ii), by adding after "paragraph (b)(4)(i)" the words "of this section";
■ f. In paragraph (b)(9)(i), by adding after "November 30 of" the word "the";
■ g. In paragraph (b)(10)(ii), by removing "§ 52.39(d), (e), or (f)" and by adding in its place "§ 52.39(e) or (f)"; and
■ h. In paragraph (b)(11), by adding after "paragraphs (b)(9), (10) and (12)" the words "of this section".

### § 97.621  [Amended]

■ 54. Section 97.621 is amended by:
■ a. In paragraphs (c), (d), and (e), by removing "period" and adding in its place "periods";
■ b. In paragraphs (f) and (g), by removing "§ 52.39(e) and (f)" and adding in its place "§ 52.39(e) or (f)"; and
■ c. In paragraph (j), by removing "the date" and adding in its place "the date 15 days after the date".

### § 97.625  [Amended]

■ 55. Section 97.625 is amended by:
■ a. In paragraph (b)(2)(iii) introductory text, by removing "paragraph (b)(1)(i)"

and adding in its place "paragraph (b)(1)(ii)"; and
■ b. In paragraph (b)(2)(iii)(B), by adding "the calculations incorporating" before "any adjustments".

### § 97.628  [Amended]

■ 56. Section 97.628 is amended in paragraph (b) by removing "paragraph (a)(1)" and adding in its place "paragraph (a)".

### § 97.630  [Amended]

■ 57. Section 97.630 is amended by:
■ a. In paragraph (b) introductory text, by adding after "operator" the words "of a CSAPR SO₂ Group 1 unit", by adding "the later of" before "the following dates" each time it appears, and by removing the final period and adding in its place a colon;
■ b. Removing paragraphs (b)(1) and (b)(2) introductory text;
■ c. Redesignating paragraphs (b)(2)(i) and (ii) as paragraphs (b)(1) and (2);
■ d. In newly redesignated paragraph (b)(2), by removing the final semicolon and adding in its place a period;
■ e. In paragraph (b)(3) introductory text, by removing "§§ " and adding in its place "§ "; and
■ f. In paragraph (b)(3)(iii), by adding after "§ 75.66" the words "of this chapter".

### § 97.631  [Amended]

■ 58. Section 97.631 is amended by:
■ a. Italicizing the headings of paragraphs (d)(1) through (3), (d)(3)(i) through (iv), (d)(3)(iv)(A) through (D), and (d)(3)(v);
■ b. In paragraph (d)(3) introductory text, by removing "§§ " and adding in its place "§ "; and
■ c. Redesignating paragraphs (d)(3)(v)(A)(1) through (3) as paragraphs (d)(3)(v)(A)(*1*) through (*3*).

### § 97.634  [Amended]

■ 59. Section 97.634 is amended by:
■ a. In paragraph (b) by adding "the" before "requirements";
■ b. In paragraph (d)(1) introductory text, by removing "the CSAPR" and adding in its place "a CSAPR", and by adding "the later of" before the final colon;
■ c. In paragraph (d)(1)(i), by removing "For a unit that commences commercial operation before July 1, 2014, the" and adding in its place "The"; and
■ d. In paragraph (d)(1)(ii), by removing "For a unit that commences commercial operation on or after July 1, 2014, the" and adding in its place "The", and by removing ", unless that quarter is the third or fourth quarter of 2014, in which case reporting shall commence in the quarter covering January 1, 2015 through March 31, 2015".

## Subpart DDDDD—CSAPR SO$_2$ Group 2 Trading Program

■ 60. The heading of subpart DDDDD of part 97 is revised to read as set forth above.

### § 97.702    [Amended]

■ 61. Section 97.702 is amended by:
■ a. Relocating all definitions beginning with "*CSAPR*" to their alphabetical locations in the list of definitions;
■ b. In the definition of "*Cogeneration system*", by removing "steam turbine generator" and adding in its place "generator";
■ c. In the definition of "*Commence commercial operation*", in paragraph (2) introductory text, by adding after "defined in" the word "the";
■ d. In the definition of "*Fossil fuel*", by removing "§§ " and adding in its place "§ "; and
■ e. In the definition of "*Sequential use of energy*", in paragraph (2), by adding after "from" the word "a".

### § 97.704    [Amended]

■ 62. Section 97.704 is amended by:
■ a. In paragraph (b)(2)(ii), by removing "paragraph (b)(1)(i)" and adding in its place "paragraph (b)(2)(i)"; and
■ b. Italicizing the headings of paragraphs (c)(1) and (2).

### § 97.706    [Amended]

■ 63. Section 97.706 is amended by:
■ a. Italicizing the headings of paragraphs (c)(1) and (2) and (c)(4) through (7);
■ b. In the heading of paragraph (c)(4), by adding "CSAPR SO$_2$ Group 2" before "allowances"; and
■ c. In paragraph (d)(2), by removing "subpart H" and adding in its place "subpart B".

### § 97.710    State SO$_2$ Group 2 trading budgets, new unit set-asides, Indian country new unit set-asides, and variability limits.

■ 64. Section 97.710 is amended by:
■ a. Revising the heading as set forth above;
■ b. Removing "SO$_2$ trading budget" wherever it appears and adding in its place "SO$_2$ Group 2 trading budget";
■ c. Removing "SO$_2$ new unit set-aside" wherever it appears and adding in its place "new unit set-aside";
■ d. Removing "SO$_2$ Indian country new unit set-aside" wherever it appears and adding in its place "Indian country new unit set-aside";
■ e. Removing "SO$_2$ variability limit" wherever it appears and adding in its place "variability limit";
■ f. In paragraph (a) introductory text, by adding "Group 2" before "trading budgets", and by removing "new unit-

set aside" and adding in its place "new unit set-aside"; and
■ g. In paragraph (c), by adding after "Each" the word "State", by removing "identified under" and adding in its place "in", by removing "excludes" and adding in its place "does not include", and by removing "set aside" wherever it appears and adding in its place "set-aside".

### § 97.711    [Amended]

■ 65. Section 97.711 is amended by:
■ a. Italicizing the headings of paragraphs (b)(1) and (2);
■ b. In paragraphs (b)(1)(iii) and (b)(2)(iii), by adding after "November 30 of" the word "the";
■ c. In paragraph (c)(1) introductory text, by adding after "approved" each time it appears the word "under";
■ d. In paragraph (c)(1)(ii), by removing "§ 52.39(g), (h), or (i)" and adding in its place "§ 52.39(h) or (i)";
■ e. In paragraph (c)(5)(i)(B), by adding after "§ 52.39(h) or (i)" the words "of this chapter";
■ f. In paragraph (c)(5)(ii) introductory text, by removing "of this paragraph" and adding in its place "of this section";
■ g. In paragraph (c)(5)(ii)(B), by adding after "§ 52.39(h) or (i)" the words "of this chapter"; and
■ h. In paragraph (c)(5)(iii), by removing "of this paragraph" and adding in its place "of this section".

### § 97.712    [Amended]

■ 66. Section 97.712 is amended by:
■ a. In paragraph (a)(2), by removing "§§ " and adding in its place "§ ";
■ b. In paragraph (a)(4)(i), by removing "paragraph (a)(1)(i) through (iii)" and adding in its place "paragraphs (a)(1)(i) through (iii)";
■ c. In paragraph (a)(4)(ii), by adding after "paragraph (a)(4)(i)" the words "of this section";
■ d. In paragraph (a)(9)(i), by adding after "November 30 of" the word "the";
■ e. In paragraph (b)(4)(ii), by adding after "paragraph (b)(4)(i)" the words "of this section";
■ f. In paragraph (b)(9)(i), by adding after "November 30 of" the word "the"; and
■ g. In paragraph (b)(10)(ii), by removing "§ 52.39(g), (h), or (i)" and adding in its place "§ 52.39(h) or (i)".

### § 97.721    [Amended]

■ 67. Section 97.721 is amended by:
■ a. In paragraphs (c), (d), and (e), by removing "period" and adding in its place "periods";
■ b. In paragraphs (f) and (g), by removing "§ 52.39(h) and (i)" and adding in its place "§ 52.39(h) or (i)"; and

■ c. In paragraph (j), by removing "the date" and adding in its place "the date 15 days after the date", and by removing the comma before "described".

### § 97.725    [Amended]

■ 68. Section 97.725 is amended by:
■ a. In paragraph (b)(2)(iii) introductory text, by removing "paragraph (b)(1)(i)" and adding in its place "paragraph (b)(1)(ii)";
■ b. In paragraph (b)(2)(iii)(B), by adding "the calculations incorporating" before "any adjustments"; and
■ c. In paragraph (b)(6)(iii)(B), by removing after "appropriate" the word "at".

### § 97.728    [Amended]

■ 69. Section 97.728 is amended in paragraph (b) by removing "paragraph (a)(1)" and adding in its place "paragraph (a)".

### § 97.730    [Amended]

■ 70. Section 97.730 is amended by:
■ a. Italicizing the heading of paragraph (a);
■ b. In paragraph (b) introductory text, by adding after "operator" the words "of a CSAPR SO$_2$ Group 2 unit", by adding "the later of" before "the following dates" each time it appears, and by removing the final period and adding in its place a colon;
■ c. Removing paragraphs (b)(1) and (b)(2) introductory text;
■ d. Redesignating paragraphs (b)(2)(i) and (ii) as paragraphs (b)(1) and (2);
■ e. In newly redesignated paragraph (b)(2), by removing the final semicolon and adding in its place a period;
■ f. In paragraph (b)(3) introductory text, by removing "§§ " and adding in its place "§ "; and
■ g. In paragraph (b)(3)(iii), by adding after "§ 75.66" the words "of this chapter".

### § 97.731    [Amended]

■ 71. Section 97.731 is amended by:
■ a. Italicizing the headings of paragraphs (d)(1) through (3), (d)(3)(i) through (iv), (d)(3)(iv)(A) through (D), and (d)(3)(v);
■ b. In paragraph (d)(3) introductory text, by removing "§§ " and adding in its place "§ "; and
■ c. Redesignating paragraphs (d)(3)(v)(A)(1) through (3) as paragraphs (d)(3)(v)(A)(*1*) through (*3*).

### § 97.734    [Amended]

■ 72. Section 97.734 is amended by:
■ a. In paragraph (b) by adding "the" before "requirements";
■ b. In paragraph (d)(1) introductory text, by removing "the CSAPR" and adding in its place "a CSAPR", and by adding "the later of" before the final colon;

■ c. In paragraph (d)(1)(i), by removing ''For a unit that commences commercial operation before July 1, 2014, the'' and adding in its place ''The''; and

■ d. In paragraph (d)(1)(ii), by removing ''For a unit that commences commercial operation on or after July 1, 2014, the'' and adding in its place ''The'', and by removing '', unless that quarter is the third or fourth quarter of 2014, in which case reporting shall commence in the quarter covering January 1, 2015 through March 31, 2015''.

[FR Doc. 2015–29796 Filed 12–2–15; 8:45 am]

**BILLING CODE 6560–50–P**

# Tab 11

Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS;
Air Quality Modeling Technical Support Document (TSD) for the
2008 Ozone NAAQS; 80 FR 75706 (December 3, 2015)



# Air Quality Modeling Technical Support Document for the
# 2008 Ozone NAAQS Cross-State Air Pollution Rule Proposal

Office of Air Quality Planning and Standards
United States Environmental Protection Agency
November 2015

## 1.  Introduction

In this technical support document (TSD) we describe the air quality modeling performed to support the proposed Cross-State Air Pollution Rule for the 2008 ozone National Ambient Air Quality Standards (NAAQS)[1]. In this document, air quality modeling is used to project ozone concentrations at individual monitoring sites to 2017[2] and to estimate state-by-state contributions to those 2017 concentrations. The projected 2017 ozone concentrations are used to identify ozone monitoring sites that are projected to be nonattainment or have maintenance problems for the 2008 ozone NAAQS in 2017.  Ozone contribution information is then used to quantify projected interstate contributions from emissions in each upwind state to ozone concentrations at projected 2017 nonattainment and maintenance sites in other states (i.e., in downwind states).

The remaining sections of this TSD are as follows. Section 2 describes the air quality modeling platform and the evaluation of model predictions using measured concentrations. Section 3 defines the procedures for projecting ozone design value concentrations to 2017 and the approach for identifying monitoring sites with projected nonattainment and/or maintenance problems.  Section 4 describes (1) the source contribution (i.e., apportionment) modeling and (2) the procedures for quantifying contributions to individual monitoring sites including nonattainment and/or maintenance sites. For questions about the information in this TSD please contact Norm Possiel at possiel.norm@epa.gov or (919) 541-5692. An electronic copy of the 2009 – 2013 base period and projected 2017 ozone design values and 2017 ozone contributions based on the proposal modeling can be obtained from docket EPA-HQ-OAR-2015-0500.  The ozone design values for individual monitoring sites are in docket item EPA-HQ-OAR-2015-0500-0006 and the ozone contributions are in docket item EPA-HQ-OAR-2015-0500-0007. Electronic copies of the ozone design values and contributions can also be obtained at www.epa.gov/airtransport.[3]

---

[1] The EPA revised the levels of the primary and secondary 8-hour ozone standards to 0.075 parts per million (ppm). 40 CFR 50.15. 73 FR 16436 (March 27, 2008).

[2] 2017 was selected as the future year analytic base case because 2017 corresponds to the attainment date for ozone nonattainment areas classified as Moderate.

[3] Note that the air quality modeling used for the proposed rule was made available for public review as part of the August 4, 2015 Notice of Data Availability (80 FR 46271).

## 2. Air Quality Modeling Platform

EPA has developed a 2011-based air quality modeling platform which includes emissions, meteorology and other inputs for 2011. The 2011 base year emissions were projected to a future year base case scenario, 2017. The 2011 modeling platform and projected 2017 emissions were used to drive the 2011 base year and 2017 base case air quality model simulations.[4] The base year 2011 platform was chosen in part because it represents the most recent, complete set of base year emissions information currently available for national-scale air quality modeling. In addition, the meteorological conditions during the summer of 2011 were generally conducive for ozone formation across much of the U.S., particularly the eastern U.S.

### 2.1 Air Quality Model Configuration

The photochemical model simulations performed for this ozone transport assessment used the Comprehensive Air Quality Model with Extensions (CAMx version 6.11) (Environ, 2014). CAMx is a three-dimensional grid-based Eulerian air quality model designed to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales (e.g., the contiguous U.S.). Consideration of the different processes (e.g., transport and deposition) that affect primary (directly emitted) and secondary (formed by atmospheric processes) pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. CAMx was applied with the carbon-bond 6 revision 2 (CB6r2) gas-phase chemistry mechanism[5] (Ruiz and Yarwood, 2013) and the Zhang dry deposition scheme (Zhang, et al., 2003).

Figure 2-1 shows the geographic extent of the modeling domain that was used for air quality modeling in this analysis. The domain covers the 48 contiguous states along with the southern portions of Canada and the northern portions of Mexico. This modeling domain contains 25 vertical layers with a top at about 17,550 meters, or 50 millibars (mb), and horizontal

---

[4] EPA also used the 2011-based air quality modeling platform to perform a 2017 "illustrative" control case air quality model simulation to inform (1) the analysis to quantify upwind state emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states and (2) the analysis of the costs and benefits of this proposed rule. The 2017 illustrative control case emissions and air quality modeling results are described in the Ozone Transport Policy Analysis Proposed Rule TSD and in the Regulatory Impact Assessment for the proposed rule.

[5] The "chemparam.2_CF" chemical parameter file was used in the CAMx model simulations.

2

grid resolution of 12 km x 12 km. The model simulations produce hourly air quality concentrations for each 12 km grid cell across the modeling domain.

CAMx requires a variety of input files that contain information pertaining to the modeling domain and simulation period. These include gridded, hourly emissions estimates and meteorological data, and initial and boundary concentrations. Separate emissions inventories were prepared for the 2011 base year and the 2017 base case. All other inputs (i.e. meteorological fields, initial concentrations, and boundary concentrations) were specified for the 2011 base year model application and remained unchanged for the future-year model simulations[6].



Figure 2-1. Map of the CAMx modeling domain used for transport modeling.

*2.2 Characterization of 2011 Summer Meteorology*

Meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations.  Ozone is more readily formed on warm, sunny days when the air is stagnant. Conversely, ozone production is more limited on days that are cloudy, cool, rainy, and windy

---

[6] The CAMx annual simulations for 2011 and 2017 were each performed using two time segments (January 1 through April 30, 2011 with a 10-day ramp-up period at the end of December 2010 and May 1 through December 31, 2011 with a 10-day ramp-up period at the end of April 2011). The CAMx 2017 contribution modeling was performed for the period May 1 through September 30, 2011 with a 10-day ramp-up period at the end of April 2011.

(http://www.epa.gov/airtrends/weather.html).  Statistical modeling analyses have shown that temperature and certain other meteorological variables are highly correlated with the magnitude of ozone concentrations (Camalier, et al., 2007).

In selecting a year for air quality modeling it is important to simulate a variety of meteorological conditions that are generally associated with elevated air quality (US EPA, 2014a). Specifically for ozone, modeled time periods should reflect meteorological conditions that frequently correspond with observed 8-hour daily maximum concentrations greater than the NAAQS at monitoring sites in nonattainment areas (US EPA, 2014a). However, because of inter-annual variability in weather patterns it is not possible to identify a single year that will be representative of "typical" meteorological conditions within each region of the U.S.

As part of the development of the 2011 modeling platform we have examined the temperature and precipitation regimes across the U.S. in 2011 compared to long-term, climatological normal (i.e., average) conditions.  Table 2-1 describes the observed 2011 surface temperature anomalies (i.e., departure from normal) for individual months from May through September relative to the period 1895-2011 for each of the nine National Oceanic and Atmospheric Administration (NOAA) climate regions shown in Figure 2-2. The aggregate temperature and precipitation anomalies by state for the core summer months, June through August, are shown in Figures 2-3 and 2-4, respectively. Overall, temperatures were warmer than normal during the summer of 2011 in nearly all regions, except for the West and Northwest. Record warmth occurred in portions of the South and Southwest regions. The summer months experienced below average precipitation for much of the southern and southeastern US, whereas wetter conditions than average were experienced in California and in several northern tier states. Extensive drought conditions occurred in portions of the southern Great Plains states. The warmer and dryer conditions were associated with a strong upper air ridge over the central U.S during the summer of 2011. While warmer than the long-term normal, 2011 summer temperatures in the U.S. were comparable to those in several other recent years. For example, 2006, 2007, 2010, 2012 were also all among the ten warmest on record. Analysis of meteorological-adjusted trends in seasonal mean ozone for the period 2000 through 2012 indicates that, on a regional basis, the summer of 2011 was typical of high ozone years in the Eastern U.S. in terms of being conducive to the formation of ozone.  In Figure 2-5, those years with downward adjustments (compared to the "unadjusted for weather" line) were generally

4

more conducive to ozone formation than years that were adjusted upward.  For example, in the Northeast region, the years 2002, 2005, 2007, 2010, 2011, and 2012 were more conducive to ozone formation than 2000, 2003, 2004, 2006, and 2009. In 2011, the South and Southeast regions had the largest adjustment (most ozone conducive), whereas the Northeast and Central regions were slightly above normal. The Western regions experienced generally near normal ozone, with the Northwest somewhat below normal.

Table 2-1. Surface temperature anomalies in 2011 by month and geographic region.*

| 2011 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| **Northeast** | W | W | WW | N | WW |
| **Southeast** | N | WW | WW | WW | N |
| **Ohio Valley** | N | W | WW | W | C |
| **Upper Midwest** | N | N | WW | W | N |
| **South** | N | WW | WWW | WWW | N |
| **Northern Rockies** | C | N | W | W | W |
| **Southwest** | C | W | WW | WWW | W |
| **Northwest** | CC | C | C | W | WW |
| **West** | C | C | N | W | WW |

*Unshaded boxes with the "N" marker represent near-normal temperatures that fall within the interquartile range.  Blue colors indicate cooler than normal conditions, with the number of "C"s indicating the degree of the anomaly.  CCC = coolest on record, CC = coolest 10th percentile, C = coolest 25th percentile. Red colors indicate warmer than normal conditions, with the number of "W"s indicating the degree of the anomaly.  WWW = warmest on record, WW = warmest 10th percentile, W = warmest 25th percentile.



Figure 2-2. U.S. climate regions.
(http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php)



Figure 2-3. Statewide rank of temperatures in 2011 relative to 1895-2011 period. (http://www.ncdc.noaa.gov/temp-and-precip/maps.php)



Figure 2-4. Statewide rank of precipitation in 2011 relative to 1895-2011 period. (http://www.ncdc.noaa.gov/temp-and-precip/maps.php)



Figure 2-5a. Meteorological-adjusted ozone trends by climate region:
Northeast, Central (Ohio Valley), East North Central (Upper Midwest), Southeast, South,
and Southwest. (http://www.epa.gov/airtrends/weather.html)



Figure 2-5b. Meteorological-adjusted ozone trends by climate region:
West North Central (Northern Rockies and Plains), West, and Northwest.
(http://www.epa.gov/airtrends/weather.html)

*2.3 Meteorological Data for 2011*

The meteorological data for air quality modeling of 2011 were derived from running

Version 3.4 of the Weather Research Forecasting Model (WRF) (Skamarock, et al., 2008). The

meteorological outputs from WRF include hourly-varying horizontal wind components (i.e.,

speed and direction), temperature, moisture, vertical diffusion rates, and rainfall rates for each

grid cell in each vertical layer. Selected physics options used in the WRF simulation include

Pleim-Xiu land surface model (Xiu and Pleim, 2001; Pleim and Xiu, 2003), Asymmetric

Convective Model version 2 planetary boundary layer scheme (Pleim 2007a,b), Kain-Fritsch

cumulus parameterization (Kain, 2004) utilizing the moisture-advection trigger (Ma and Tan,

2009), Morrison double moment microphysics (Morrison, et al., 2005; Morrison and Gettelman,

2008), and RRTMG longwave and shortwave radiation schemes (Iacono, et.al., 2008).

The WRF model simulation was initialized using the 12km North American Model (12NAM) analysis product provided by the National Climatic Data Center (NCDC). Where 12NAM data were unavailable, the 40km Eta Data Assimilation System (EDAS) analysis (ds609.2) from the National Center for Atmospheric Research (NCAR) was used. Analysis nudging for temperature, wind, and moisture was applied above the boundary layer only. The model simulations were conducted in 5.5 day blocks with soil moisture and temperature carried from one block to the next via the "ipxwrf" program (Gilliam and Pleim, 2010). Landuse and land cover data were based on the 2006 National Land Cover Database (NLCD2006) data.[7] Sea surface temperatures at 1 km resolution were obtained from the Group for High Resolution Sea Surface Temperatures (GHRSST) (Stammer, et al., 2003). As shown in Table 2-2, the WRF simulations were performed with 35 vertical layers up to 50 mb, with the thinnest layers being nearest the surface to better resolve the planetary boundary layer (PBL).  The WRF 35-layer structure was collapsed to 25 layers for the CAMx air quality model simulations, as shown in Table 2-2.

Table 2-2. WRF and CAMx layers and their approximate height above ground level.

| CAMx Layers | WRF Layers | Sigma P | Pressure (mb) | Approximate Height (m AGL) |
|---|---|---|---|---|
| 25 | 35 | 0.00 | 50.00 | 17,556 |
|  | 34 | 0.05 | 97.50 | 14,780 |
| 24 | 33 | 0.10 | 145.00 | 12,822 |
|  | 32 | 0.15 | 192.50 | 11,282 |
| 23 | 31 | 0.20 | 240.00 | 10,002 |
|  | 30 | 0.25 | 287.50 | 8,901 |
| 22 | 29 | 0.30 | 335.00 | 7,932 |
|  | 28 | 0.35 | 382.50 | 7,064 |
| 21 | 27 | 0.40 | 430.00 | 6,275 |
|  | 26 | 0.45 | 477.50 | 5,553 |
| 20 | 25 | 0.50 | 525.00 | 4,885 |
|  | 24 | 0.55 | 572.50 | 4,264 |
| 19 | 23 | 0.60 | 620.00 | 3,683 |
| 18 | 22 | 0.65 | 667.50 | 3,136 |
| 17 | 21 | 0.70 | 715.00 | 2,619 |

[7] The 2006 NLCD data are available at http://www.mrlc.gov/nlcd06_data.php

| CAMx Layers | WRF Layers | Sigma P | Pressure (mb) | Approximate Height (m AGL) |
|---|---|---|---|---|
| 16 | 20 | 0.74 | 753.00 | 2,226 |
| 15 | 19 | 0.77 | 781.50 | 1,941 |
| 14 | 18 | 0.80 | 810.00 | 1,665 |
| 13 | 17 | 0.82 | 829.00 | 1,485 |
| 12 | 16 | 0.84 | 848.00 | 1,308 |
| 11 | 15 | 0.86 | 867.00 | 1,134 |
| 10 | 14 | 0.88 | 886.00 | 964 |
| 9 | 13 | 0.90 | 905.00 | 797 |
|  | 12 | 0.91 | 914.50 | 714 |
| 8 | 11 | 0.92 | 924.00 | 632 |
|  | 10 | 0.93 | 933.50 | 551 |
| 7 | 9 | 0.94 | 943.00 | 470 |
|  | 8 | 0.95 | 952.50 | 390 |
| 6 | 7 | 0.96 | 962.00 | 311 |
| 5 | 6 | 0.97 | 971.50 | 232 |
| 4 | 5 | 0.98 | 981.00 | 154 |
|  | 4 | 0.99 | 985.75 | 115 |
| 3 | 3 | 0.99 | 990.50 | 77 |
| 2 | 2 | 1.00 | 995.25 | 38 |
| 1 | 1 | 1.00 | 997.63 | 19 |

Details of the annual 2011 meteorological model simulation and evaluation are provided in a separate technical support document (US EPA, 2014b) which can be obtained at http://www.epa.gov/ttn/scram/reports/MET_TSD_2011_final_11-26-14.pdf

The meteorological data generated by the WRF simulations were processed using a modified version of the wrfcamx v4.0 (Environ, 2013) meteorological data processing program to create model-ready meteorological inputs to CAMx. The modification to wrfcamx included reactivating the wrfcamx option to analyze sub-grid stratiform clouds from the WRF output in order to more fully account for the effects of clouds on photolysis rates. In running wrfcamx, vertical eddy diffusivities (Kv) were calculated using the Yonsei University (YSU) (Hong and Dudhia, 2006) mixing scheme. We used a minimum Kv of 0.1 $m^2$/sec except for urban grid cells

10

where the minimum Kv was reset to 1.0 $m^2$/sec within the lowest 200 m of the surface in order to enhance mixing associated with the nighttime "urban heat island" effect.

### 2.4 Initial and Boundary Concentrations

The lateral boundary and initial species concentrations are provided by a three-dimensional global atmospheric chemistry model, GEOS-Chem (Yantosca, 2004) standard version 8-03-02 with 8-02-01 chemistry. The global GEOS-Chem model simulates atmospheric chemical and physical processes driven by assimilated meteorological observations from the NASA's Goddard Earth Observing System (GEOS-5; additional information available at: http://gmao.gsfc.nasa.gov/GEOS/ and http://wiki.seas.harvard.edu/geos-chem/index.php/GEOS-5). This model was run for 2011 with a grid resolution of 2.0 degrees x 2.5 degrees (latitude-longitude). The predictions were used to provide one-way dynamic boundary concentrations at one-hour intervals and an initial concentration field for the CAMx simulations. The 2011 boundary concentrations from GEOS-Chem were used for the 2011 and 2017 model simulations. The procedures for translating GEOS-Chem predictions to initial and boundary concentrations are described elsewhere (Henderson, 2014). More information about the GEOS-Chem model and other applications using this tool is available at: http://www-as.harvard.edu/chemistry/trop/geos.

### 2.5 Emissions Inventories

CAMx requires detailed emissions inventories containing temporally allocated (i.e., hourly) emissions for each grid-cell in the modeling domain for a large number of chemical species that act as primary pollutants and precursors to secondary pollutants. Annual emission inventories for 2011 and 2017 were preprocessed into CAMx-ready inputs using the Sparse Matrix Operator Kernel Emissions (SMOKE) modeling system (Houyoux et al., 2000).[8] Information on the emissions inventories used as input to the CAMx model simulations can be found in the following emissions inventory technical support documents: Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform (US EPA, 2015a) and 2011 National Emissions Inventory, version 2 (US EPA, 2015b).

---

[8] The SMOKE output emissions case name for the 2011 base year is "2011eh_cb6v2_v6_11g" and the emissions case name for the 2017 base case is "2017eh_cb6v2_v6_11g".

*2.6 Air Quality Model Evaluation*

An operational model performance evaluation for ozone was conducted to examine the ability of the CAMx v6.11 modeling system to replicate 2011 measured concentrations. This evaluation focused on statistical assessments of model predictions versus observations paired in time and space depending on the sampling period of measured data. Details on the evaluation methodology and the calculation of performance statistics are provided in Appendix A. Overall, the ozone model performance statistics for the CAMx 2011 simulation are within or close to the ranges found in other recent peer-reviewed applications (Simon et al, 2012). The model performance results, as described in Appendix A, demonstrate that the predictions from the 2011 modeling platform closely replicate the corresponding observed concentrations in terms of the magnitude, temporal fluctuations, and geographic differences for 8-hour daily maximum ozone. These results provide confidence that our application of CAMx using this 2011 modeling platform provides a scientifically credible approach for assessing ozone concentrations relevant for the transport assessment described in this TSD.

## 3.   Identification of Future Nonattainment and Maintenance Receptors

*3.1 Definition of Nonattainment and Maintenance Receptors*

The approach in the propose rule for identifying the 2017 nonattainment and maintenance receptors is described in Section V.C of the preamble. In brief, we are proposing to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality (i.e., 2012-2014 design values) and that also have projected 2017 average design values that exceed the NAAQS (i.e., 2017 average design values of 76 ppb or greater).[9] We followed the approach in the CSAPR to identify sites that would have difficulty maintaining the 2008 ozone NAAQS in a scenario that takes into account historic variability in air quality at the monitoring site.  In the CSAPR approach, monitoring sites with a 2017 maximum design value that exceeds the NAAQS, even if the 2017 average design value is below the NAAQS, are projected to have a maintenance problem in 2017. Monitoring sites with a 2017 average design value below the NAAQS, but with a maximum design value that exceeds the

---

[9] In determining compliance with the NAAQS, ozone design values are truncated to integer values. For example, a design value of 75.9 ppb is truncated to 75 ppb which is attainment. In this manner, design values at or above 76.0 ppb are considered to be violations of the NAAQS.

NAAQS, are considered maintenance-only sites. In addition, those sites that have projected 2017 average design values that exceed the NAAQS, but are currently measuring clean data based on 2012-2014 design values are also defined as maintenance-only receptors. Maintenance-only receptors therefore include both (1) those sites with projected average design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 76 ppb or greater. In addition to the maintenance-only receptors, the 2017 ozone nonattainment receptors are also maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value. The procedures for calculating projected 2017 average and maximum design values are described below.  The monitoring sites that we project to be nonattainment and maintenance receptors for the ozone NAAQS in the 2017 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of ozone NAAQS as part of this proposal.

### 3.2 Approach for Projecting 2017 Ozone Design Values

The ozone predictions from the 2011 and 2017 CAMx model simulations were used to project ambient (i.e., measured) ozone design values to 2017 following the approach described in EPA's current guidance for attainment demonstration modeling (US EPA, 2014a),[10] as summarized here. The modeling guidance recommends using 5-year weighted average ambient design values[11] centered on the base modeling year as the starting point for projecting average design values to the future. Because 2011 is the base emissions year, we used the average ambient 8-hour ozone design values for the period 2009 through 2013 (i.e., the average of design values for 2009-2011, 2010-2012 and 2011-2013) to calculate the 5-year weighted average design values. The 5-year weighted average ambient design value at each site was projected to 2017 using the Model Attainment Test Software program (Abt Associates, 2014). This program calculates the 5-year weighted average DV based on observed data and projects future year

---

[10] EPA's ozone attainment demonstration modeling guidance is referred to as "the modeling guidance" in the remainder of this document.

[11] The air quality design value for a site is the 3-year average of the annual fourth-highest daily maximum 8-hour average ozone concentration.

values using the relative response predicted by the model. Equation (3-1) describes the recommended model attainment test in its simplest form, as applied for monitoring site $i$:

$$(\text{DVF})_i = (RRF)_i * (DVB)_i \qquad\qquad \text{Equation 3-1}$$

$\text{DVF}_i$ is the estimated design value for the future year at monitoring site $i$; $\text{RRF}_i$ is the relative response factor for monitoring site $i$; and $\text{DVB}_i$ is the base period design value monitored at site $i$. The relative response factor for each monitoring site $(RRF)_i$ is the fractional change in 8-hour daily maximum ozone between the base and future year. The RRF is based on the average ozone on model-predicted "high" ozone days in grid cells in the vicinity of the monitoring site. The modeling guidance recommends calculating RRFs based on the highest 10 modeled ozone days in the base year simulation at each monitoring site. Specifically, the RRF was calculated based on the 10 highest days in the 2011 base year modeling in the vicinity of each monitor location.

As recommended by the modeling guidance, we considered model response in grid cells immediately surrounding the monitoring site along with the grid cell in which the monitor is located. The RRF was based on a 3 x 3 array of 12 km grid cells centered on the location of the grid cell containing the monitor. On each high ozone day, the grid cell with the highest base year ozone value in the 3 x 3 array surrounding the location of the monitoring site was used for both the base and future components of the RRF calculation (paired in space). In cases for which the base year model simulation did not have 10 days with ozone values greater than or equal to 60 ppb at a site, we used all days with ozone >= 60 ppb, as long as there were at least 5 days that meet that criteria. At monitor locations with less than 5 days with modeled 2011 base year ozone >= 60 ppb, no RRF or DVF was calculated for the site and the monitor in question was not included in this analysis.

The approach for calculating 2017 maximum design values is similar to the approach for calculating 2017 average design values. To calculate the 2017 maximum design value we start with the highest (i.e., maximum) ambient design value from the 2011-centered 5-year period (i.e., the maximum of design values from 2009-2011, 2010-2012, and 2011-2013). The base period maximum design value at each site was projected to 2017 using the site-specific RRFs, as determined using the procedures for calculating RRFs described above.

Table 3-1 contains the 2009-2013 base period average and maximum 8-hour ozone design values, the 2017 base case average and maximum design values, and the 2012-2014 design values for the 8 sites in the eastern U.S. projected to be 2017 nonattainment receptors.

14

Table 3-2 contains this same information for the 6 maintenance-only sites in the eastern U.S. that are projected nonattainment but currently measuring clean data. Table 3-3 contains this same information for the 23 maintenance-only sites in the eastern U.S. that are projected to have average design values below the NAAQS, but maximum design values above the NAAQS. The design values for all monitoring sites in the U.S. are provided in docket item EPA-HQ-OAR-2015-0500-0006.[12]

Table 3-1. Average and maximum 2009-2013 and 2017 base case 8-hour ozone design values and 2012-2014 design values (ppb) at projected nonattainment sites in the eastern U.S. (nonattainment receptors).

| Monitor ID | State | County | Average Design Value 2009-2013 | Maximum Design Value 2009-2013 | Average Design Value 2017 | Maximum Design Value 2017 | 2012-2014 Design Value |
|---|---|---|---|---|---|---|---|
| 90013007 | Connecticut | Fairfield | 84.3 | 89.0 | 77.1 | 81.4 | 84.0 |
| 90019003 | Connecticut | Fairfield | 83.7 | 87.0 | 78.0 | 81.1 | 85.0 |
| 90099002 | Connecticut | New Haven | 85.7 | 89.0 | 77.2 | 80.2 | 81.0 |
| 480391004 | Texas | Brazoria | 88.0 | 89.0 | 81.4 | 82.3 | 80.0 |
| 481210034 | Texas | Denton | 84.3 | 87.0 | 76.9 | 79.4 | 81.0 |
| 484392003 | Texas | Tarrant | 87.3 | 90.0 | 79.6 | 82.1 | 77.0 |
| 484393009 | Texas | Tarrant | 86.0 | 86.0 | 78.6 | 78.6 | 80.0 |
| 551170006 | Wisconsin | Sheboygan | 84.3 | 87.0 | 77.0 | 79.4 | 81.0 |

---

[12] There are 7 sites in 3 counties in the West that were excluded from this listing because the ambient design values at these sites were dominated by wintertime ozone episodes and not summer season conditions that are the focus of this transport assessment. High winter ozone concentrations that have been observed in certain parts of the Western U.S. are believed to result from the combination of strong wintertime inversions, large NOx and VOC emissions from nearby oil and gas operations, increased UV intensity due to reflection off of snow surfaces and potentially still uncharacterized sources of free radicals. The 7 sites excluded from this analysis are in Rio Blanco County, CO (site ID 081030006), Fremont County, WY (site ID 560130099), and Sublette County, WY (site IDs 560350097, 560350099, 560350100, 560350101, and 560351002). Information on the analysis to identify these sites as influenced by wintertime ozone episodes can be found in Appendix 3A of the Regulatory Impact Analysis of the Proposed Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (EPA, 2014d) (http://www.epa.gov/ttn/ecas/ria.html)

Table 3-2. Average and maximum 2009-2013 and 2017 base case 8-hour ozone design values and 2012-2014 design values (ppb) at sites in the eastern U.S. that are projected nonattainment but currently measuring clean data (maintenance-only receptors).

| Monitor ID | State | County | Average Design Value 2009-2013 | Maximum Design Value 2009-2013 | Average Design Value 2017 | Maximum Design Value 2017 | 2012-2014 Design Value |
|---|---|---|---|---|---|---|---|
| 240251001 | Maryland | Harford | 90.0 | 93.0 | 81.3 | 84.0 | 75.0 |
| 360850067 | New York | Richmond | 81.3 | 83.0 | 76.3 | 77.8 | 73.0 |
| 361030002 | New York | Suffolk | 83.3 | 85.0 | 79.2 | 80.8 | 73.0 |
| 390610006 | Ohio | Hamilton | 82.0 | 85.0 | 76.3 | 79.1 | 75.0 |
| 482011034 | Texas | Harris | 81.0 | 82.0 | 76.8 | 77.8 | 72.0 |
| 482011039 | Texas | Harris | 82.0 | 84.0 | 78.2 | 80.2 | 72.0 |

Table 3-3. Average and maximum 2009-2013 and 2017 base case 8-hour ozone design values and 2012-2014 design values (ppb) at projected maintenance sites in the eastern U.S. Based on the CSAPR methodology (maintenance-only receptors).

| Monitor ID | State | County | Average Design Value 2009-2013 | Maximum Design Value 2009-2013 | Average Design Value 2017 | Maximum Design Value 2017 | 2012-2014 Design Value |
|---|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 80.3 | 83.0 | 75.8 | 78.4 | 82.0 |
| 211110067 | Kentucky | Jefferson | 82.0 | 85.0 | 75.8 | 78.6 | Incomplete Data |
| 211850004 | Kentucky | Oldham | 82.0 | 86.0 | 73.7 | 77.3 | 74.0 |
| 240053001 | Maryland | Baltimore | 80.7 | 84.0 | 73.2 | 76.2 | 72.0 |
| 260050003 | Michigan | Allegan | 82.7 | 86.0 | 75.5 | 78.5 | 83.0 |
| 261630019 | Michigan | Wayne | 78.7 | 81.0 | 74.0 | 76.2 | 74.0 |
| 340071001 | New Jersey | Camden | 82.7 | 87.0 | 74.2 | 78.1 | 76.0 |
| 340150002 | New Jersey | Gloucester | 84.3 | 87.0 | 75.1 | 77.5 | 76.0 |
| 340230011 | New Jersey | Middlesex | 81.3 | 85.0 | 73.0 | 76.3 | 74.0 |
| 340290006 | New Jersey | Ocean | 82.0 | 85.0 | 73.9 | 76.6 | 75.0 |
| 360810124 | New York | Queens | 78.0 | 80.0 | 75.7 | 77.6 | 72.0 |
| 420031005 | Pennsylvania | Allegheny | 80.7 | 82.0 | 75.3 | 76.5 | 77.0 |
| 421010024 | Pennsylvania | Philadelphia | 83.3 | 87.0 | 75.1 | 78.4 | 75.0 |
| 480850005 | Texas | Collin | 82.7 | 84.0 | 74.9 | 76.0 | 78.0 |
| 481130069 | Texas | Dallas | 79.7 | 84.0 | 74.0 | 78.0 | 78.0 |
| 481130075 | Texas | Dallas | 82.0 | 83.0 | 75.8 | 76.7 | 77.0 |
| 481211032 | Texas | Denton | 82.7 | 84.0 | 75.1 | 76.3 | 79.0 |
| 482010024 | Texas | Harris | 80.3 | 83.0 | 75.9 | 78.5 | 72.0 |
| 482010026 | Texas | Harris | 77.3 | 80.0 | 73.5 | 76.1 | 67.0 |
| 482010055 | Texas | Harris | 81.3 | 83.0 | 75.4 | 77.0 | 75.0 |
| 482011050 | Texas | Harris | 78.3 | 80.0 | 74.6 | 76.2 | 72.0 |
| 484390075 | Texas | Tarrant | 82.0 | 83.0 | 75.5 | 76.4 | 79.0 |
| 484393011 | Texas | Tarrant | 80.7 | 83.0 | 74.5 | 76.6 | 75.0 |

### 4. Ozone Contribution Modeling

*4.1 Methodology*

The EPA performed nationwide,[13] state-level ozone source apportionment modeling using the CAMx OSAT/APCA technique[14] (ENVIRON, 2014) to quantify the contribution of 2017 base case $NO_X$ and VOC emissions from all sources in each state to projected 2017 ozone concentrations at ozone monitoring sites. In the source apportionment model run, we tracked the ozone formed from each of the following contribution categories (i.e., "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each state tracked individually (emissions from all anthropogenic sectors in a given state were combined);

- Biogenics – biogenic $NO_X$ and VOC emissions domain-wide (i.e., not by state)[15];

- Boundary Concentrations – concentrations transported into the modeling domain;

- Tribes – the emissions from those tribal lands for which we have point source inventory data in the 2011 NEI (we did not model the contributions from individual tribes);

- Canada and Mexico – anthropogenic emissions from sources in the portions of Canada and Mexico included in the modeling domain (we did not model the contributions from Canada and Mexico separately);

- Fires – combined emissions from wild and prescribed fires domain-wide (i.e., not by state); and

- Offshore – combined emissions from offshore marine vessels and offshore drilling platforms.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wild fire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. That is, the contributions from the "biogenic" and

---

[13] As shown in Figure 2-1, the EPA's nationwide modeling includes the 48 contiguous states.

[14] As part of this technique, ozone formed from reactions between biogenic VOC and NOx with anthropogenic NOx and VOC are assigned to the anthropogenic emissions.

[15] Biogenic emissions and emissions from wild fires and prescribed fires were held constant between 2011 and 2017 since (1) these emissions are tied to the 2011 meteorological conditions and (2) the focus of this rule is on the contribution from anthropogenic emissions to projected ozone nonattainment and maintenance.

"fires" categories are not assigned to individual states nor are they included in the state contributions.

CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected 2017 base case emissions and 2011 meteorology for this time period. The hourly contributions[16] from each tag were processed to calculate an 8-hour average contribution metric. The process for calculating the contribution metric uses the contribution modeling outputs in a "relative sense" to apportion the projected 2017 average design value at each monitoring location into contributions from each individual tag. This process is similar in concept to the approach described above for using model predictions to calculate 2017 ozone design values. The approach used to calculate the contribution metric is described by the following steps:

**Step 1.** Modeled hourly ozone concentrations are used to calculate the 8-hour daily maximum ozone (MDA8) concentration in each grid cell on each day.

**Step 2.** The gridded hourly ozone contributions from each tag are subtracted from the corresponding gridded hourly total ozone concentrations to create a "pseudo" hourly ozone value for each tag for each hour in each grid cell.

**Step 3.** The hourly "pseudo" concentrations from Step 2 are used to calculate 8-hour average "pseudo" concentrations for each tag for the time period that corresponds to the MDA8 concentration from Step 1.  Step 2 results in spatial fields of 8-hour average "pseudo" concentrations for each grid cell for each tag on each day.

**Step 4.**  The 8-hour average "pseudo" concentrations for each tag and the MDA8 concentrations are extracted for those grid cells containing ozone monitoring sites. We used the data for all days with 2017 MDA8 concentrations >=76 ppb (i.e., projected 2017 exceedance days) in the downstream calculations. If there were fewer than five 2017 exceedance days at a particular monitoring site then the data from the top five 2017 MDA8 concentration days are extracted and used in the calculations.[17]

---

[16] Contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.

[17] If there were fewer than 5 days with a modeled 2017 MDA8 concentration $\geq$ 60 ppb for the location of a particular monitoring site, then contributions were not calculated at that monitor.

**Step 5.** For each monitoring site and each tag, the 8-hour "pseudo" concentrations are then averaged across the days selected in Step 4 to create a multi-day average "pseudo" concentration for tag at each site.  Similarly, the MDA8 concentrations were average across the days selected in Step 4.

**Step 6.** The multi-day average "pseudo" concentration and the corresponding multi-day average MDA8 concentration are used to create a Relative Contribution Factor (RCF) for each tag at each monitoring site.  The RCF is the difference between the MDA8 concentration and the corresponding "pseudo" concentration, normalized by the MDA8 concentration.

**Step 7.** The RCF for each tag is multiplied by the 2017 average ozone design value to create the ozone contribution metrics for each tag at each site. Note that the sum of the contributions from each tag equals the 2017 average design value for that site.

**Step 8.** The contributions calculated from Step 7 are truncated to two digits to the right of the decimal (e.g., a calculated contribution of 0.78963… is truncated to 0.78 ppb).

Table 4-1 provides an example of the calculation of contributions from two states (state A and state B) to a particular nonattainment site starting with Step 4, above. The table includes the daily "pseudo" concentrations for state A and state B and corresponding MDA8 ozone concentrations on those days with 2017 model-predicted exceedances at this site. The MDA8 ozone concentrations on these days are ranked-ordered in the table. The 2017 average design value for this example is 77.5 ppb. Using the data in Table 4-1, the RCF for state A and state B are calculated as:

(90.372 – 81.857) / 90.372 = 0.09422 for state A, and

(90.372 – 90.163) / 90.372 = 0.00231 for state B

The contributions from state A and state B to the 2017 average design value at this site are calculated as:

77.5 x 0.09422 = 7.3020 which is truncated to 7.30 ppb for state A, and

77.5 x 0.00231 = 0.1790 which is truncated to 0.17 ppb for state B

Table 4-1. Example calculation of ozone contributions (units are ppb).

| Month | Day | Predicted MDA8 O3 on 2017 Modeled Exceedance Days | "Pseudo" 8-Hr O3 for State A | "Pseudo" 8-Hr O3 for State B |
|---|---|---|---|---|
| 7 | 11 | 110.832 | 98.741 | 110.817 |
| 7 | 6 | 102.098 | 89.017 | 102.081 |
| 7 | 21 | 100.739 | 87.983 | 100.560 |
| 6 | 9 | 94.793 | 87.976 | 93.179 |
| 6 | 8 | 92.255 | 84.707 | 92.207 |
| 7 | 18 | 84.768 | 72.196 | 84.635 |
| 8 | 1 | 81.719 | 81.065 | 81.718 |
| 7 | 17 | 81.453 | 73.034 | 81.443 |
| 7 | 22 | 78.377 | 74.500 | 78.303 |
| 6 | 16 | 76.695 | 69.357 | 76.695 |
| Multi-Day Average => | | 90.372 | 81.857 | 90.163 |
| 2017 Average Design Value is 77.5 ppb | Relative Contribution Factors => | | 0.09422 | 0.00231 |
| | Contributions => | | 7.3020 | 0.1790 |
| | Truncated Contributions => | | 7.30 | 0.17 |

The average contribution metric calculated in this manner is intended to provide a reasonable representation of the contribution from individual states to the projected 2017 design value, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations in the vicinity of the monitoring site. This average contribution metric is beneficial since the magnitude of the contributions is directly related to the magnitude of the design value at each site.

*4.2 Contribution Modeling Results*

The contributions from each tag to individual nonattainment and maintenance-only sites are provided in Appendix B. The largest contributions from each state to 2017 downwind nonattainment sites and to downwind maintenance-only sites are provided in Table 4-2. The 2017 contributions from each tag to each monitoring site are provided in docket item EPA-HQ-OAR-2015-0500-0007.

Table 4-2. Largest ozone contributions from each state to downwind 2017 projected nonattainment and 2017 projected maintenance-only sites in the eastern U.S. (units are ppb).

| Upwind State | Largest Downwind Contribution to Nonattainment Receptors for Ozone (ppb) | Largest Downwind Contribution to Maintenance Receptors for Ozone (ppb |
|---|---|---|
| AL | 0.79 | 1.28 |
| AR | 0.98 | 2.15 |
| CT | 0.00 | 0.46 |
| DE | 0.37 | 2.23 |
| DC | 0.06 | 0.73 |
| FL | 0.54 | 0.72 |
| GA | 0.47 | 0.58 |
| IL | 17.48 | 23.17 |
| IN | 6.24 | 14.95 |
| IA | 0.61 | 0.85 |
| KS | 0.80 | 1.03 |
| KY | 0.75 | 11.17 |
| LA | 3.09 | 4.23 |
| ME | 0.00 | 0.08 |
| MD | 2.07 | 7.11 |
| MA | 0.10 | 0.37 |
| MI | 2.69 | 1.79 |
| MN | 0.40 | 0.47 |
| MS | 0.78 | 1.48 |
| MO | 1.63 | 3.69 |
| NE | 0.24 | 0.36 |
| NH | 0.02 | 0.07 |
| NJ | 8.84 | 12.38 |
| NY | 16.96 | 17.21 |
| NC | 0.55 | 0.93 |
| ND | 0.11 | 0.28 |
| OH | 2.18 | 7.92 |
| OK | 1.70 | 2.46 |
| PA | 9.39 | 15.93 |
| RI | 0.02 | 0.08 |
| SC | 0.16 | 0.21 |
| SD | 0.08 | 0.12 |
| TN | 0.51 | 1.67 |

| Upwind State | Largest Downwind Contribution to Nonattainment Receptors for Ozone (ppb) | Largest Downwind Contribution to Maintenance Receptors for Ozone (ppb |
|---|---|---|
| TX | 2.44 | 2.95 |
| VT | 0.01 | 0.05 |
| VA | 1.87 | 5.29 |
| WV | 0.95 | 3.11 |
| WI | 0.34 | 2.59 |

As discussed in the preamble, the EPA is proposing to establish an air quality screening threshold calculated as one percent of the NAAQS. For this rule, we propose an 8-hour ozone threshold of 0.75 ppb as the quantification of one percent of the 2008 ozone NAAQS. This threshold is used to identify upwind states that contribute to downwind ozone concentrations in amounts sufficient to "link" them to these to downwind nonattainment and maintenance receptors.

States in the East whose contributions to a specific receptor meet or exceed the screening threshold are considered linked to that receptor; those states' ozone contributions and emissions (and available emission reductions) are analyzed further, as described in the premable, to determine whether and what emissions reductions might be required from each state.

Based on the maximum downwind contributions in Table 4-2, the following states contribute at or above the 0.75 ppb threshold to downwind nonattainment receptors: Alabama, Arkansas, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, and West Virginia. Based on the maximum downwind contributions in Table 4-2, the following states contribute at or above the 0.75 ppb threshold to downwind maintenance-only receptors: Alabama, Arkansas, Delaware, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. The linkages between each upwind state and downwind nonattainment receptors and maintenance-only receptors in the eastern U.S. are provided in Table 4-3 and Table 4-4, respectively.

Table 4-3. Linkages between each upwind state and downwind nonattainment receptors in the eastern U.S.

| Upwind State | Downwind Nonattainment Receptors | | |
|---|---|---|---|
| AL | Tarrant Co, TX (484392003) | | |
| AR | Brazoria Co, TX (480391004) | Tarrant Co, TX (484392003) | Tarrant Co, TX (484393009) |
| IL | Brazoria Co, TX (480391004) | Sheboygan Co, WI (551170006) | |
| IN | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | Sheboygan Co, WI (551170006) |
| KS | Sheboygan Co, WI (551170006) | | |
| KY | Sheboygan Co, WI (551170006) | | |
| LA | Brazoria Co, TX (480391004) | Denton Co, TX (481210034) | Tarrant Co, TX (484392003) |
| | Tarrant Co, TX (484393009) | Sheboygan Co, WI (551170006) | |
| MD | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| MI | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| | Sheboygan Co, WI (551170006) | | |
| MS | Brazoria Co, TX (480391004) | | |
| MO | Brazoria Co, TX (480391004) | Sheboygan Co, WI (551170006) | |
| NJ | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| NY | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| OH | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| | Sheboygan Co, WI (551170006) | | |
| OK | Denton Co, TX (481210034) | Tarrant Co, TX (484392003) | Tarrant Co, TX (484393009) |

24

| Upwind State | Downwind Nonattainment Receptors | | |
|---|---|---|---|
| | Sheboygan Co, WI (551170006) | | |
| PA | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| TX | Sheboygan Co, WI (551170006) | | |
| VA | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | New Haven Co, CT (90099002) |
| WV | Fairfield Co, CT (90013007) | Fairfield Co, CT (90019003) | |

Table 4-4. Linkages between each upwind states and downwind maintenance-only receptors in the eastern U.S.

| Upwind State | Downwind Nonattainment Receptors | | |
|---|---|---|---|
| AL | Hamilton Co, OH (390610006) | Harris Co, TX (482010055) | |
| AR | Oldham Co, KY (211850004) | Allegan Co, MI (260050003) | Dallas Co, TX (481130069) |
| | Dallas Co, TX (481130075) | Harris Co, TX (482010026) | Harris Co, TX (482010055) |
| | Harris Co, TX (482011039) | Harris Co, TX (482011050) | Tarrant Co, TX (484390075) |
| | Tarrant Co, TX (484393011) | | |
| DE | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) | Ocean Co, NJ (340290006) |
| | Philadelphia Co, PA (421010024) | | |
| IL | Jefferson Co, KY (211110067) | Oldham Co, KY (211850004) | Allegan Co, MI (260050003) |
| | Wayne Co, MI (261630019) | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) |
| | Ocean Co, NJ (340290006) | Queens Co, NY (360810124) | Suffolk Co, NY (361030002) |
| | Hamilton Co, OH (390610006) | Allegheny Co, PA (420031005) | Harris Co, TX (482010026) |

25

| Upwind State | Downwind Nonattainment Receptors | | |
|---|---|---|---|
| | Harris Co, TX (482011039) | | |
| IN | Jefferson Co, KY (211110067) | Oldham Co, KY (211850004) | Baltimore Co, MD (240053001) |
| | Harford Co, MD (240251001) | Allegan Co, MI (260050003) | Wayne Co, MI (261630019) |
| | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) |
| | Ocean Co, NJ (340290006) | Queens Co, NY (360810124) | Richmond Co, NY (360850067) |
| | Suffolk Co, NY (361030002) | Hamilton Co, OH (390610006) | Allegheny Co, PA (420031005) |
| | Philadelphia Co, PA (421010024) | | |
| IA | Allegan Co, MI (260050003) | | |
| KS | Allegan Co, MI (260050003) | Tarrant Co, TX (484390075) | Tarrant Co, TX (484393011) |
| KY | Baltimore Co, MD (240053001) | Harford Co, MD (240251001) | Camden Co, NJ (340071001) |
| | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) | Ocean Co, NJ (340290006) |
| | Richmond Co, NY (360850067) | Hamilton Co, OH (390610006) | Allegheny Co, PA (420031005) |
| | Philadelphia Co, PA (421010024) | | |
| LA | Collin Co, TX (480850005) | Dallas Co, TX (481130069) | Dallas Co, TX (481130075) |
| | Denton Co, TX (481211032) | Harris Co, TX (482010024) | Harris Co, TX (482010026) |
| | Harris Co, TX (482010055) | Harris Co, TX (482011034) | Harris Co, TX (482011039) |
| | Harris Co, TX (482011050) | Tarrant Co, TX (484390075) | Tarrant Co, TX (484393011) |
| MD | Fairfield Co, CT (90010017) | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) |
| | Ocean Co, NJ (340290006) | Queens Co, NY (360810124) | Richmond Co, NY (360850067) |
| | Suffolk Co, NY (361030002) | Philadelphia Co, PA (421010024) | |

| Upwind State | Downwind Nonattainment Receptors | | |
|---|---|---|---|
| MI | Fairfield Co, CT (90010017) | Jefferson Co, KY (211110067) | Oldham Co, KY (211850004) |
| | Harford Co, MD (240251001) | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) |
| | Ocean Co, NJ (340290006) | Queens Co, NY (360810124) | Richmond Co, NY (360850067) |
| | Suffolk Co, NY (361030002) | Hamilton Co, OH (390610006) | Allegheny Co, PA (420031005) |
| MS | Harris Co, TX (482010055) | Harris Co, TX (482011039) | |
| MO | Oldham Co, KY (211850004) | Allegan Co, MI (260050003) | Camden Co, NJ (340071001) |
| | Hamilton Co, OH (390610006) | Harris Co, TX (482010026) | Harris Co, TX (482010055) |
| | Harris Co, TX (482011039) | Harris Co, TX (482011050) | |
| NJ | Fairfield Co, CT (90010017) | Queens Co, NY (360810124) | Richmond Co, NY (360850067) |
| | Suffolk Co, NY (361030002) | Philadelphia Co, PA (421010024) | |
| NY | Fairfield Co, CT (90010017) | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) |
| | Middlesex Co, NJ (340230011) | Ocean Co, NJ (340290006) | |
| NC | Baltimore Co, MD (240053001) | | |
| OH | Fairfield Co, CT (90010017) | Jefferson Co, KY (211110067) | Oldham Co, KY (211850004) |
| | Baltimore Co, MD (240053001) | Harford Co, MD (240251001) | Wayne Co, MI (261630019) |
| | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) |
| | Ocean Co, NJ (340290006) | Queens Co, NY (360810124) | Richmond Co, NY (360850067) |
| | Suffolk Co, NY (361030002) | Allegheny Co, PA (420031005) | Philadelphia Co, PA (421010024) |
| OK | Allegan Co, MI (260050003) | Hamilton Co, OH (390610006) | Dallas Co, TX (481130069) |
| | Dallas Co, TX (481130075) | Denton Co, TX (481211032) | Harris Co, TX (482010026) |

| Upwind State | Downwind Nonattainment Receptors | | |
|---|---|---|---|
| | Harris Co, TX (482011034) | Harris Co, TX (482011039) | Tarrant Co, TX (484390075) |
| | Tarrant Co, TX (484393011) | | |
| PA | Fairfield Co, CT (90010017) | Baltimore Co, MD (240053001) | Harford Co, MD (240251001) |
| | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) |
| | Ocean Co, NJ (340290006) | Queens Co, NY (360810124) | Richmond Co, NY (360850067) |
| | Suffolk Co, NY (361030002) | | |
| TN | Hamilton Co, OH (390610006) | Philadelphia Co, PA (421010024) | |
| TX | Baltimore Co, MD (240053001) | Harford Co, MD (240251001) | Allegan Co, MI (260050003) |
| | Camden Co, NJ (340071001) | Gloucester Co, NJ (340150002) | Ocean Co, NJ (340290006) |
| | Queens Co, NY (360810124) | Richmond Co, NY (360850067) | Suffolk Co, NY (361030002) |
| | Hamilton Co, OH (390610006) | Allegheny Co, PA (420031005) | Philadelphia Co, PA (421010024) |
| VA | Fairfield Co, CT (90010017) | Baltimore Co, MD (240053001) | Harford Co, MD (240251001) |
| | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) | Ocean Co, NJ (340290006) |
| | Queens Co, NY (360810124) | Richmond Co, NY (360850067) | Suffolk Co, NY (361030002) |
| | Philadelphia Co, PA (421010024) | | |
| WV | Baltimore Co, MD (240053001) | Harford Co, MD (240251001) | Camden Co, NJ (340071001) |
| | Gloucester Co, NJ (340150002) | Middlesex Co, NJ (340230011) | Ocean Co, NJ (340290006) |
| | Queens Co, NY (360810124) | Richmond Co, NY (360850067) | Suffolk Co, NY (361030002) |
| | Hamilton Co, OH (390610006) | Allegheny Co, PA (420031005) | Philadelphia Co, PA (421010024) |
| WI | Allegan Co, MI (260050003) | Wayne Co, MI (261630019) | |

## 5. References

Abt Associates, 2014. User's Guide: Modeled Attainment Test Software. http://www.epa.gov/scram001/modelingapps_mats.htm

Camalier, L., W. Cox, and P. Dolwick, 2007. The Effects of Meteorology on Ozone in Urban Areas and Their Use in Assessing Ozone Trends. *Atmospheric Environment*, **41**, 7127-7137.

ENVIRON, 2014. User's Guide Comprehensive Air Quality Model with Extensions version 6.11, www.camx.com. ENVIRON International Corporation, Novato, CA.

ENVIRON, 2013. wrfcamx version 4.0 Release Notes. May 06, 2013. www.camx.com. ENVIRON International Corporation, Novato, CA.

Gilliam, R.C. and J.E. Pleim, 2010. Performance Assessment of New Land Surface and Planetary Boundary Layer Physics in the WRF-ARW. *J. Appl. Meteor. Climatol.*, **49**, 760–774.

Henderson, B.H., F. Akhtar, H.O.T. Pye, S.L. Napelenok, W.T. Hutzell, 2014.  A Database and Tool for Boundary Conditions for Regional Air Quality Modeling: Description and Evaluations, *Geoscientific Model Development*, **7**, 339-360.

Hong, S-Y, Y. Noh, and J. Dudhia, 2006. A New Vertical Diffusion Package with an Explicit Treatment of Entrainment Processes. *Mon. Wea. Rev.*, **134**, 2318–2341.

Houyoux, M.R., Vukovich, J.M., Coats, C.J., Wheeler, N.J.M., Kasibhatla, P.S.,2000. Emissions Inventory Development and Processing for the Seasonal Model for Regional Air Quality (SMRAQ) project, *Journal of Geophysical Research – Atmospheres*, **105(D7)**, 9079-9090.

Iacono, M.J., J.S. Delamere, E.J. Mlawer, M.W. Shephard, S.A Clough, and W.D. Collins, 2008. Radiative Forcing by Long-Lived Greenhouse Gases: Calculations with the AER Radiative Transfer Models, *J. Geophys. Res.,* **113**, D13103.

Kain, J.S., 2004. The Kain-Fritsch Convective Parameterization: An Update, *J. Appl. Meteor.,* **43**, 170-181.

Ma, L-M. and Tan Z-M, 2009. Improving the Behavior of Cumulus Parameterization for Tropical Cyclone Prediction: Convective Trigger, *Atmospheric Research*, **92**, 190-211.

Morrison, H.J., A. Curry, and V.I. Khvorostyanov, 2005. A New Double-Moment Microphysics Parameterization for Application in Cloud and Climate Models. Part I: Description, *J. Atmos. Sci.*, **62**, 1665–1677.

Morrison, H. and A. Gettelman, 2008. A New Two-Moment Bulk Stratiform Cloud Microphysics Scheme in the Community Atmosphere Model, version 3 (CAM3). Part I: Description and Numerical Tests, *J. Climate,* **21**, 3642-3659.

Pleim, J.E. and A. Xiu, 2003. Development of a Land-Surface Model. Part II: Data Assimilation, *J. Appl. Meteor.*, **42,** 1811–1822

Pleim, J.E., 2007a. A Combined Local and Nonlocal Closure Model for the Atmospheric Boundary Layer. Part I: Model Description and Testing, *J. Appl. Meteor. Climatol.*, **46,** 1383–1395.

Pleim, J.E., 2007b. A Combined Local and Nonlocal Closure Model for the Atmospheric Boundary Layer. Part II: Application and Evaluation in a Mesoscale Meteorological Model, *J. Appl. Meteor. Climatol.*, **46,** 1396–1409.

Ruiz, L.H. and Yarwood, G., 2013. Interactions between Organic Aerosol and NOy: Influence on Oxidant Production. Prepared for the Texas AQRP (Project 12-012), by the University of Texas at Austin, and ENVIRON International Corporation, Novato, CA. http://aqrp.ceer.utexas.edu/viewprojectsFY12-13.cfm?Prop_Num=12-012

Skamarock, W.C., J.B. Klemp, J. Dudhia, et al. 2008. A Description of the Advanced Research WRF Version 3. NCAR Tech. Note NCAR/TN-475+STR. http://wwww.mmm.ucar.edu/wrf/users/docs/arw_v3.pdf

Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, **61**, 124-139.

Stammer, D., F.J. Wentz, and C.L. Gentemann**,** 2003. Validation of Microwave Sea Surface Temperature Measurements for Climate Purposes, *J. of Climate*, **16(1)**, 73-87.

U.S. Environmental Protection Agency, 2014a. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC. (http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf)

U.S. Environmental Protection Agency, 2014b. Meteorological Model Performance for Annual 2011 Simulation WRF v3.4, Research Triangle Park, NC. (http://www.epa.gov/scram001/)

U.S. Environmental Protection Agency, 2015a. Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform, Research Triangle Park, NC. (http://www.epa.gov/ttn/chief/emch)

U.S. Environmental Protection Agency, 2015b. 2011 National Emissions Inventory, version 2, Research Triangle Park, NC. (http://www.epa.gov/ttn/chief/emch)

Xiu, A., and J.E. Pleim, 2001, Development of a Land Surface Model. Part I: Application in a Meso scale Meteorological Model, *J. Appl. Meteor.,* **40**, 192-209.

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Zhang, L., J. R. Brook, and R. Vet. 2003. A Revised Parameterization for Gaseous Dry Deposition in Air-Quality Models, *Atmos. Chem. Phys.*, **3**, 2067–2082.

Appendix A

2011 Model Performance Evaluation

An operational model evaluation was conducted for the 2011 base year CAMx annual model simulation performed for the 12-km U.S. modeling domain. The purpose of this evaluation is to examine the ability of the 2011 air quality modeling platform to represent the magnitude and spatial and temporal variability of measured (i.e., observed) ozone concentrations within the modeling domain. The evaluation presented here is based on model simulations using the v2 version of the 2011 emissions platform (i.e., case name 2011eh_cb6v2_v6_11g). The model evaluation for ozone focuses on comparisons of model predicted 8-hour daily maximum concentrations to the corresponding observed data at monitoring sites in the EPA Air Quality System (AQS) and the Clean Air Status and Trends Network (CASTNet) (Figures A-1a and A-1b).

Included in the evaluation are statistical measures of model performance based upon model-predicted versus observed concentrations that were paired in space and time. Model performance statistics were calculated for several spatial scales and temporal periods. Statistics were calculated for individual monitoring sites and for each of nine climate regions of the 12-km U.S. modeling domain. The regions include the Northeast, Ohio Valley, Upper Midwest, Southeast, South, Southwest, Northern Rockies, Northwest and West[1,2], which are defined based upon the states contained within the National Oceanic and Atmospheric Administration (NOAA) climate regions (Figure A-2)[3] as defined in Karl and Koss (1984).

For maximum daily average 8-hour (MDA8) ozone, model performance statistics were created for each climate region for the period May through September.[4] In addition to the performance statistics, we prepared several graphical presentations of model performance for MDA8 ozone. These graphical presentations include:

---

[1] The nine climate regions are defined by States where: Northeast includes CT, DE, ME, MA, MD, NH, NJ, NY, PA, RI, and VT; Ohio Valley includes IL, IN, KY, MO, OH, TN, and WV; Upper Midwest includes IA, MI, MN, and WI; Southeast includes AL, FL, GA, NC, SC, and VA; South includes AR, KS, LA, MS, OK, and TX; Southwest includes AZ, CO, NM, and UT; Northern Rockies includes MT, NE, ND, SD, WY; Northwest includes ID, OR, and WA; and West includes CA and NV.

[2] Note most monitoring sites in the West region are located in California (see Figures 2A-2a and 2A-2b), therefore statistics for the West will be mostly representative of California ozone air quality.

[3] NOAA, National Centers for Environmental Information scientists have identified nine climatically consistent regions within the contiguous U.S., http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php.

[4] In calculating the ozone season statistics we limited the data to those observed and predicted pairs with observations that are greater than or equal 60 ppb in order to focus on concentrations at the upper portion of the distribution of values.

(1) density scatter plots of observed AQS data and predicted MDA8 ozone concentrations for May through September;

(2) regional maps that show the mean bias and error as well as normalized mean bias and error calculated for MDA8 ≥ 60 ppb for May through September at individual AQS and CASTNet monitoring sites;

(3) bar and whisker plots that show the distribution of the predicted and observed MDA8 ozone concentrations by month (May through September) and by region and by network; and

(4) time series plots (May through September) of observed and predicted MDA8 ozone concentrations for 13 of the projected 2017 nonattainment and maintenance-only sites as identified below.

The Atmospheric Model Evaluation Tool (AMET) was used to calculate the model performance statistics used in this document (Gilliam et al., 2005). For this evaluation of the ozone predictions in the 2011 CAMx modeling platform, we have selected the mean bias, mean error, normalized mean bias, and normalized mean error to characterize model performance, statistics which are consistent with the recommendations in Simon et al. (2012) and the draft photochemical modeling guidance (US EPA, 2014c). As noted above, we calculated the performance statistics by climate region for the period May through September.

Mean bias (MB) is the average of the difference (predicted – observed) divided by the total number of replicates ($n$). Mean bias is given in units of ppb and is defined as:

$MB = \frac{1}{n}\sum_1^n (P - O)$ , where P = predicted and O = observed concentrations.

Mean error (ME) calculates the absolute value of the difference (predicted - observed) divided by the total number of replicates ($n$). Mean error is given in units of ppb and is defined as:

$ME = \frac{1}{n}\sum_1^n |P - O|$

Normalized mean bias (NMB) is the average the difference (predicted - observed) over the sum of observed values. NMB is a useful model performance indicator because it avoids over

inflating the observed range of values, especially at low concentrations. Normalized mean bias is given in percentage units and is defined as:

$$\text{NMB} = \frac{\sum_1^n (P - O)}{\sum_1^n (O)} * 100$$

Normalized mean error (NME) is the absolute value of the difference (predicted - observed) over the sum of observed values. Normalized mean error is given in percentage units and is defined as:

$$\text{NME} = \frac{\sum_1^n |P - O|}{\sum_1^n (O)} * 100$$

As described in more detail below, the model performance statistics indicate that the 8-hour daily maximum ozone concentrations predicted by the 2011 CAMx modeling platform closely reflect the corresponding 8-hour observed ozone concentrations in space and time in each region of the 12-km U.S. modeling domain. The acceptability of model performance was judged by considering the 2011 CAMx performance results in light of the range of performance found in recent regional ozone model applications (NRC, 2002; Phillips et al., 2007; Simon et al., 2012; US EPA, 2005; US EPA, 2009; US EPA, 2011). These other modeling studies represent a wide range of modeling analyses that cover various models, model configurations, domains, years and/or episodes, chemical mechanisms, and aerosol modules. Overall, the ozone model performance results for the 2011 CAMx simulations are within the range found in other recent peer-reviewed and regulatory applications. The model performance results, as described in this document, demonstrate that the predictions from the 2011 modeling platform closely replicate the corresponding observed concentrations in terms of the magnitude, temporal fluctuations, and spatial differences for 8-hour daily maximum ozone.

The density scatter plots of MDA8 ozone are provided Figure A-3. The 8-hour ozone model performance bias and error statistics by network for the ozone season (May-September average) for each region are provided in Table A-1. The statistics shown were calculated using data pairs on days with observed 8-hour ozone of $\geq 60$ ppb. The distributions of observed and predicted 8-hour ozone by month in the period May through September for each region are shown in Figures A-4 through A-12. Spatial plots of the mean bias and error as well as the

normalized mean bias and error for individual monitors are shown in Figures A-13 through A-16. Time series plots of observed and predicted MDA 8-hour ozone during the period May through September at 13 sites are provided in Figure A-17, (a) through (m). These sites are listed in Table A-2.

The density scatter plots in Figure A-3 provide a qualitative comparison of model-predicted and observed MDA8 ozone concentrations.  In these plots the intensity of the colors indicates the density of individual observed/predicted paired values.  The greatest number of individual paired values is denoted by the core area in white. The plots indicate that the predictions correspond closely to the observations in that a large number of observed/predicted paired values lie along or close to the 1:1 line shown on each plot. Overall, performance is best for observed values ≥ 60. The model tends to over-predict the observed values to some extent particularly at low and mid-range concentrations generally < 60 ppb in each of the regions. This feature is most evident in the South and Southeast regions. In the West, high concentrations are under-predicted and low and mid-range concentrations are over-predicted.  Observed and predicted values are in close agreement in the Southwest and Northwest regions.

As indicated by the statistics in Table A-1, bias and error for 8-hour daily maximum ozone are relatively low in each region. Generally, MB for 8-hour ozone ≥ 60 ppb during the ozone season is less than 5 ppb except at AQS sites in the West region and at rural CASTNet sites in the South, Southwest, and West for which ozone is somewhat under-predicted.  The monthly distribution of 8-hour daily maximum ozone during the ozone season generally corresponds well with that of the observed concentrations, as indicated by the graphics in Figures A-4 through A-12. The distribution of predicted concentrations tends to be close to that of the observed data at the 25th percentile, median and 75th percentile values for each region, although there is a small persistent overestimation bias for these metrics in the Northeast, Southeast, and Ohio Valley regions, and under-prediction at CASTNet sites in the West and Southwest[5]. The CAMx model, as applied here, also has a tendency to under-predict the highest observational concentrations at both the AQS and CASTNet network sites.

---

[5] The over-prediction at CASTNet sites in the Northwest may not be representative of performance in rural areas of this region because there are so few observed and predicted data pairs in this region.

Figures A-13 through A-16 show the spatial variability in bias and error at monitor locations. Mean bias, as seen from Figure A-13, is less than 5 ppb at many sites across the East with over-prediction of 5 to 10 ppb at some sites from the Southeast into the Northeast. Elsewhere, mean bias is generally in the range of -5 to -10 ppb. Figure A-14 indicates that the normalized mean bias for days with observed 8-hour daily maximum ozone greater than or equal to 60 ppb is within ± 10 percent at the vast majority of monitoring sites across the modeling domain. There are regional differences in model performance, where the model tends to over-predict from the Southeast into the Northeast and generally under predict in the Southwest, Northern Rockies, Northwest and West. Model performance in the Ohio Valley and Upper Midwest states shows both under and over predictions.

Model error, as seen from Figure A-15, is 10 ppb or less at most of the sites across the modeling domain. Figure A-16 indicates that the normalized mean error for days with observed 8-hour daily maximum ozone greater than or equal to 60 ppb is within 10 percent at the vast majority of monitoring sites across the modeling domain. Somewhat greater error (i.e., greater than 15 percent) is evident at sites in several areas most notably along portions of the Northeast and in portions of Florida, North Dakota, Illinois, Ohio, North Carolina, and the western most part of the modeling domain.

In addition to the above analysis of overall model performance, we also examine how well the modeling platform replicates day to day fluctuations in observed 8-hour daily maximum concentrations using data for 13 of the projected 2017 nonattainment and maintenance-only sites. For this site-specific analysis we present the time series of observed and predicted 8-hour daily maximum concentrations by site over the period May through September. The results, as shown in Figures A-17 (a) through (m), indicate that the modeling platform generally replicates the day-to-day variability in ozone during this time period. For example, several of the sites not only have minimal bias but also accurately capture the day-to-day variability in the observations: Jefferson County, KY; Alleghany County, PA; and Philadelphia, PA.  Other sites generally track well and capture day-to-day variability but underestimate some of the peak ozone days: Imperial County, CA; Suffolk, NY; Tarrant County, TX; Brazoria County, TX; and Sheboygan County, WI. Note that at the site in Brazoria County, TX there is an extended period from mid-July to mid-August with very low observed ozone concentrations, mostly in the range of 30 to 40 ppb.

The model predicted values during this period in the range of 40 to 60 ppb which is not quite as low as the observed values. The sites in Douglas County, CO, Harford County, MD, Allegan, MI, and Hamilton County, OH closely track the day-to-day variability in the observed MDA8 values, but some days are over predicted while other days are under predicted to some extent. Finally, the site in Fairfield County, CT tracks closely with the observations, but there is a tendency to over predict on several of the observed high ozone days. Looking across all 13 sites indicates that the modeling platform is able to capture the site to site differences in the short-term variability of the observed ozone concentrations.



CIRCLE=AQS_Daily;

Figure A-1a. AQS ozone monitoring sites.



TRIANGLE=CASTNET;

Figure A-1b. CASTNet ozone monitoring sites.



Figure A-2. NOAA climate regions (source: http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php#references)

Table A-1. Performance statistics for MDA8 ozone ≥ 60 ppb for May through September by climate region, by network.

| Network | Climate region | No. of Obs | MB | ME | NMB (%) | NME (%) |
|---------|----------------|-----------|-----|-----|---------|---------|
| AQS | Northeast | 3,998 | 2.2 | 7.4 | 3.2 | 10.8 |
| | Ohio Valley | 6,325 | 0.3 | 7.6 | 0.4 | 11.3 |
| | Upper Midwest | 1,162 | -3.0 | 7.5 | -4.4 | 11.0 |
| | Southeast | 37,280 | -2.5 | 8.1 | -3.6 | 11.9 |
| | South | 5,694 | -3.7 | 8.1 | -5.4 | 11.7 |
| | Southwest | 6,033 | -5.2 | 7.9 | -7.8 | 12.0 |
| | Northern Rockies | 380 | -5.9 | 7.4 | -9.4 | 11.7 |
| | Northwest | 79 | -5.4 | 8.1 | -8.5 | 12.6 |
| | West | 8,665 | -7.3 | 9.5 | -10.3 | 13.5 |
| CASTNet | Northeast | 264 | 2.3 | 6.1 | 3.4 | 9.1 |
| | Ohio Valley | 107 | -2.3 | 6.2 | -3.4 | 9.4 |
| | Upper Midwest | 38 | -3.9 | 5.9 | -5.8 | 8.8 |
| | Southeast | 2,068 | -5.0 | 8.2 | -7.5 | 12.1 |
| | South | 215 | -7.1 | 8.0 | -10.7 | 12.0 |
| | Southwest | 382 | -7.7 | 8.6 | -11.7 | 13.1 |
| | Northern Rockies | 110 | -7.8 | 8.1 | -12.2 | 12.8 |
| | Northwest | - | - | - | - | - |
| | West | 425 | -12.1 | 12.5 | -16.6 | 17.1 |



Figure A-3. Density scatter plots of observed vs predicted MDA8 ozone for the Northeast, Ohio River Valley, Upper Midwest, Southeast, South, Southwest, Northern Rockies, Northwest, and West Regions.



Figure A-4. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Northeast region, (a) AQS Network and (b) CASTNet Network. [symbol = median; top/bottom of box = 75th/25th percentiles; top/bottom line = max/min values]



Figure A-5. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Ohio Valley region, (a) AQS Network and (b) CASTNet Network.



Figure A-6. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Upper Midwest region, (a) AQS Network and (b) CASTNet Network.



Figure A-7. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Southeast region, (a) AQS Network and (b) CASTNet Network.



Figure A-8. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the South region, (a) AQS Network and (b) CASTNet Network.



Figure A-9. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Southwest region, (a) AQS Network and (b) CASTNet Network.



Figure A-10. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Northern Rockies region, (a) AQS Network and (b) CASTNet Network.



Figure A-11. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Northwest region, (a) AQS Network and (b) CASTNet Network.



Figure A-12. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the West region, (a) AQS Network and (b) CASTNet Network.



Figure A-13. Mean Bias (ppb) of MDA8 ozone ≥ 60 ppb over the period May-September 2011 at AQS and CASTNet monitoring sites.



Figure A-14. Normalized Mean Bias (%) of MDA8 ozone ≥ 60 ppb over the period May-
September 2011 at AQS and CASTNet monitoring sites.



Figure A-15. Mean Error (ppb) of MDA8 ozone ≥ 60 ppb over the period May-September 2011
at AQS and CASTNet monitoring sites.



Figure A-16.   Normalized Mean Error (%) of MDA8 ozone ≥ 60 ppb over the period May-
September 2011 at AQS and CASTNet monitoring sites.

Table A-2. Monitoring sites used for the ozone time series analysis.

| County | State | Monitoring Site ID |
|--------|-------|--------------------|
| Fairfield | Connecticut | 090013007 |
| Suffolk | New York | 361030002 |
| Philadelphia | Pennsylvania | 421010024 |
| Harford | Maryland | 240251001 |
| Allegheny | Pennsylvania | 420031005 |
| Hamilton | Ohio | 390610006 |
| Jefferson | Kentucky | 211110067 |
| Allegan | Michigan | 261630019 |
| Sheboygan | Wisconsin | 551170006 |
| Tarrant | Texas | 484392003 |
| Brazoria | Texas | 480391004 |
| Douglas | Colorado | 080350004 |
| Imperial | California | 060251003 |



Figure A-17a.   Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 090013007 in Fairfield Co., Connecticut.



Figure A-17b.   Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 361030002 in Suffolk Co., New York.



Figure A-17c.  Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 421010024 in Philadelphia Co., Pennsylvania.



Figure A-17d.  Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 240251001 in Harford Co., Maryland.



Figure A-17e.    Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 420031005 in Allegheny Co., Pennsylvania.



Figure A-17f.    Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 390610006 in Hamilton Co., Ohio.



Figure A-17g.   Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 211110067 in Jefferson Co., Kentucky.



Figure A-17h.   Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 26005003 in Allegan Co., Michigan.



Figure A-17i.   Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 551170006 in Sheboygan Co., Wisconsin.



Figure A-17j.   Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 484392003 in Tarrant Co., Texas.



Figure A-17k.    Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 480391004 in Brazoria Co., Texas.



Figure A-17l.    Time series of observed (black) and predicted (red) MDA8 ozone for May through September 2011 at site 080350004 in Douglas Co., Colorado.



Figure A-17m.   Time series of observed (black) and predicted (red) MDA8 ozone for May
through September 2011 at site 060251003 in Imperial Co., California.

Appendix B

Contributions to 2017 8-Hour Ozone Design Values

at Projected 2017 Nonattainment and Maintenance-Only Sites

This appendix contains tables with the projected ozone contributions from 2017 anthropogenic NOx and VOC emissions in each state to each projected 2017 nonattainment receptor and each maintenance-only receptor in the eastern U.S.  Nonattainment and maintenance-only receptors are defined in section 3 of this TSD. In addition to the state contributions, we have included the contributions from each of the other categories tracked in the contribution modeling including point source emissions on Tribal lands, anthropogenic emissions in Canada and Mexico, emissions from Offshore sources, Fires, Initial and Boundary concentrations, and Biogenics.

For each monitoring site we provide the site ID, state name, and county name in the first three columns of the table.  This information is followed by columns containing the projected 2017 average and maximum design values.  Next we provide the contributions from each state and the District of Columbia, individually.  Lastly, we provide the contributions from the Tribal, Canada and Mexico, Offshore, Fires, Initial and Boundary concentrations, and Biogenics categories. The units of the 2017 design values and contributions are "ppb". Note that the contributions presented in these tables may not sum exactly to the 2017 average design value due to truncation of the contributions to two places to the right of the decimal.

## Contributions to 2017 Nonattainment and Maintenance-Only Sites in the East (Part 1)

| Monitor ID | State | County | 2017 Average DV | 2017 Maximum DV | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 75.8 | 78.4 | 0.10 | 0.04 | 0.11 | 0.05 | 0.10 | 9.04 | 0.22 | 0.04 | 0.03 | 0.11 | 0.03 | 0.50 | 0.62 | 0.21 | 0.18 | 0.35 | 0.07 | 0.01 | 1.34 | 0.06 | 0.98 | 0.25 | 0.07 | 0.34 | 0.06 |
| 90013007 | Connecticut | Fairfield | 77.1 | 81.4 | 0.15 | 0.04 | 0.16 | 0.04 | 0.11 | 5.22 | 0.34 | 0.06 | 0.02 | 0.20 | 0.01 | 0.49 | 0.76 | 0.10 | 0.16 | 0.48 | 0.06 | 0.00 | 2.07 | 0.05 | 0.89 | 0.11 | 0.09 | 0.27 | 0.03 |
| 90019003 | Connecticut | Fairfield | 78.0 | 81.1 | 0.14 | 0.06 | 0.15 | 0.06 | 0.14 | 4.75 | 0.30 | 0.06 | 0.04 | 0.19 | 0.02 | 0.70 | 0.89 | 0.17 | 0.20 | 0.57 | 0.08 | 0.00 | 1.83 | 0.03 | 0.89 | 0.13 | 0.09 | 0.38 | 0.04 |
| 90099002 | Connecticut | New Haven | 77.2 | 80.2 | 0.09 | 0.05 | 0.12 | 0.06 | 0.11 | 8.29 | 0.37 | 0.04 | 0.04 | 0.10 | 0.04 | 0.57 | 0.68 | 0.21 | 0.20 | 0.43 | 0.09 | 0.00 | 1.55 | 0.10 | 0.91 | 0.15 | 0.06 | 0.39 | 0.05 |
| 211110067 | Kentucky | Jefferson | 75.8 | 78.6 | 0.04 | 0.03 | 0.06 | 0.07 | 0.13 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.05 | 1.15 | 11.33 | 0.23 | 0.21 | 22.87 | 0.10 | 0.00 | 0.00 | 0.00 | 1.20 | 0.35 | 0.04 | 0.27 | 0.17 |
| 211850004 | Kentucky | Oldham | 73.7 | 77.3 | 0.06 | 0.03 | 0.85 | 0.05 | 0.14 | 0.00 | 0.00 | 0.00 | 0.03 | 0.04 | 0.04 | 0.89 | 14.95 | 0.14 | 0.17 | 20.93 | 0.33 | 0.00 | 0.00 | 0.00 | 0.91 | 0.25 | 0.10 | 0.82 | 0.15 |
| 240053001 | Maryland | Baltimore | 73.2 | 76.2 | 0.34 | 0.07 | 0.20 | 0.08 | 0.14 | 0.01 | 0.12 | 0.64 | 0.10 | 0.27 | 0.02 | 0.64 | 1.53 | 0.19 | 0.22 | 1.77 | 0.20 | 0.00 | 23.15 | 0.01 | 0.69 | 0.11 | 0.13 | 0.47 | 0.05 |
| 240251001 | Maryland | Harford | 81.3 | 84.0 | 0.40 | 0.09 | 0.22 | 0.11 | 0.19 | 0.01 | 0.15 | 0.73 | 0.11 | 0.30 | 0.03 | 0.67 | 1.88 | 0.19 | 0.28 | 1.97 | 0.25 | 0.00 | 24.59 | 0.00 | 0.83 | 0.11 | 0.15 | 0.52 | 0.06 |
| 260050003 | Michigan | Allegan | 75.5 | 78.5 | 0.33 | 0.08 | 2.15 | 0.06 | 0.23 | 0.00 | 0.00 | 0.00 | 0.13 | 0.20 | 0.01 | 23.17 | 8.02 | 0.85 | 1.03 | 0.53 | 0.57 | 0.00 | 0.01 | 0.00 | 2.74 | 0.06 | 0.42 | 3.69 | 0.01 |
| 261630019 | Michigan | Wayne | 74.0 | 76.2 | 0.02 | 0.03 | 0.09 | 0.10 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 | 0.05 | 0.90 | 2.64 | 0.30 | 0.23 | 0.67 | 0.11 | 0.00 | 0.03 | 0.00 | 20.77 | 0.47 | 0.04 | 0.28 | 0.13 |
| 340071001 | New Jersey | Camden | 74.2 | 78.1 | 0.32 | 0.11 | 0.37 | 0.11 | 0.20 | 0.17 | 1.36 | 0.00 | 0.07 | 0.15 | 0.04 | 1.33 | 1.71 | 0.37 | 0.42 | 0.93 | 0.58 | 0.02 | 0.57 | 0.17 | 1.43 | 0.15 | 0.26 | 0.76 | 0.07 |
| 340150002 | New Jersey | Gloucester | 75.1 | 77.5 | 0.34 | 0.10 | 0.15 | 0.11 | 0.16 | 0.10 | 2.23 | 0.30 | 0.14 | 0.33 | 0.03 | 0.87 | 1.02 | 0.27 | 0.17 | 1.23 | 0.26 | 0.00 | 7.11 | 0.09 | 1.01 | 0.15 | 0.13 | 0.48 | 0.06 |
| 340230011 | New Jersey | Middlesex | 73.0 | 76.3 | 0.28 | 0.08 | 0.12 | 0.08 | 0.14 | 0.33 | 0.73 | 0.07 | 0.09 | 0.31 | 0.03 | 0.58 | 0.85 | 0.18 | 0.17 | 1.08 | 0.14 | 0.08 | 2.35 | 0.33 | 0.62 | 0.12 | 0.10 | 0.38 | 0.04 |
| 340290006 | New Jersey | Ocean | 73.9 | 76.6 | 0.21 | 0.06 | 0.23 | 0.08 | 0.15 | 0.36 | 0.76 | 0.06 | 0.05 | 0.17 | 0.04 | 0.80 | 1.06 | 0.34 | 0.26 | 0.88 | 0.19 | 0.07 | 2.01 | 0.37 | 1.31 | 0.17 | 0.12 | 0.52 | 0.07 |
| 360810124 | New York | Queens | 75.7 | 77.6 | 0.13 | 0.07 | 0.12 | 0.09 | 0.13 | 0.41 | 0.60 | 0.07 | 0.08 | 0.20 | 0.05 | 0.84 | 0.80 | 0.34 | 0.24 | 0.49 | 0.14 | 0.00 | 2.15 | 0.06 | 1.79 | 0.21 | 0.06 | 0.49 | 0.09 |
| 360850067 | New York | Richmond | 76.3 | 77.8 | 0.25 | 0.08 | 0.16 | 0.09 | 0.15 | 0.30 | 0.68 | 0.08 | 0.09 | 0.30 | 0.04 | 0.74 | 1.02 | 0.27 | 0.27 | 0.96 | 0.15 | 0.00 | 2.39 | 0.04 | 1.20 | 0.16 | 0.11 | 0.54 | 0.06 |
| 361030002 | New York | Suffolk | 79.2 | 80.8 | 0.19 | 0.07 | 0.17 | 0.08 | 0.16 | 0.46 | 0.32 | 0.04 | 0.06 | 0.19 | 0.05 | 0.79 | 1.03 | 0.30 | 0.30 | 0.71 | 0.13 | 0.00 | 1.47 | 0.01 | 1.34 | 0.18 | 0.11 | 0.58 | 0.07 |
| 390610006 | Ohio | Hamilton | 76.3 | 79.1 | 0.79 | 0.06 | 0.62 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.11 | 0.58 | 0.04 | 1.28 | 7.15 | 0.29 | 0.34 | 11.17 | 0.26 | 0.00 | 0.01 | 0.00 | 0.99 | 0.23 | 0.30 | 0.77 | 0.10 |
| 420031005 | Pennsylvania | Allegheny | 75.3 | 76.5 | 0.16 | 0.05 | 0.22 | 0.11 | 0.13 | 0.00 | 0.00 | 0.00 | 0.06 | 0.17 | 0.07 | 1.35 | 1.86 | 0.17 | 0.32 | 1.64 | 0.17 | 0.00 | 0.05 | 0.00 | 1.51 | 0.15 | 0.13 | 0.55 | 0.13 |
| 421010024 | Pennsylvania | Philadelphia | 75.1 | 78.4 | 0.51 | 0.09 | 0.23 | 0.09 | 0.16 | 0.03 | 1.33 | 0.16 | 0.14 | 0.54 | 0.02 | 0.65 | 1.71 | 0.17 | 0.21 | 2.14 | 0.18 | 0.00 | 5.10 | 0.03 | 0.33 | 0.07 | 0.17 | 0.52 | 0.04 |
| 480391004 | Texas | Brazoria | 81.4 | 82.3 | 0.56 | 0.08 | 0.98 | 0.23 | 0.25 | 0.00 | 0.00 | 0.00 | 0.19 | 0.30 | 0.09 | 0.86 | 0.24 | 0.42 | 0.46 | 0.18 | 3.09 | 0.00 | 0.01 | 0.00 | 0.05 | 0.40 | 0.78 | 1.00 | 0.15 |
| 480850005 | Texas | Collin | 74.9 | 76.0 | 0.41 | 0.07 | 0.35 | 0.10 | 0.19 | 0.00 | 0.00 | 0.00 | 0.06 | 0.24 | 0.02 | 0.03 | 0.03 | 0.02 | 0.20 | 0.05 | 1.40 | 0.00 | 0.02 | 0.00 | 0.01 | 0.00 | 0.24 | 0.12 | 0.03 |
| 481130069 | Texas | Dallas | 74.0 | 78.0 | 0.41 | 0.05 | 0.83 | 0.09 | 0.15 | 0.00 | 0.00 | 0.00 | 0.72 | 0.33 | 0.02 | 0.13 | 0.06 | 0.04 | 0.19 | 0.10 | 1.44 | 0.00 | 0.02 | 0.00 | 0.01 | 0.04 | 0.23 | 0.19 | 0.03 |
| 481130075 | Texas | Dallas | 75.8 | 76.7 | 0.34 | 0.05 | 0.92 | 0.08 | 0.18 | 0.00 | 0.00 | 0.00 | 0.65 | 0.24 | 0.02 | 0.14 | 0.06 | 0.04 | 0.23 | 0.09 | 1.22 | 0.00 | 0.02 | 0.00 | 0.01 | 0.04 | 0.21 | 0.18 | 0.03 |
| 481210034 | Texas | Denton | 76.9 | 79.4 | 0.67 | 0.10 | 0.51 | 0.14 | 0.25 | 0.00 | 0.00 | 0.00 | 0.30 | 0.39 | 0.06 | 0.11 | 0.12 | 0.08 | 0.43 | 0.14 | 1.99 | 0.00 | 0.00 | 0.00 | 0.11 | 0.04 | 0.51 | 0.23 | 0.09 |
| 481211032 | Texas | Denton | 75.1 | 76.3 | 0.29 | 0.07 | 0.68 | 0.11 | 0.29 | 0.00 | 0.00 | 0.00 | 0.27 | 0.21 | 0.07 | 0.05 | 0.04 | 0.05 | 0.39 | 0.05 | 1.77 | 0.00 | 0.02 | 0.00 | 0.06 | 0.03 | 0.47 | 0.15 | 0.12 |
| 482010024 | Texas | Harris | 75.9 | 78.5 | 0.54 | 0.04 | 0.28 | 0.09 | 0.16 | 0.00 | 0.00 | 0.00 | 0.62 | 0.36 | 0.03 | 0.16 | 0.06 | 0.09 | 0.13 | 0.09 | 2.82 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.56 | 0.31 | 0.05 |
| 482010026 | Texas | Harris | 73.5 | 76.1 | 0.09 | 0.02 | 1.21 | 0.08 | 0.23 | 0.00 | 0.00 | 0.00 | 0.07 | 0.05 | 0.05 | 0.76 | 0.11 | 0.35 | 0.42 | 0.05 | 3.66 | 0.00 | 0.00 | 0.00 | 0.24 | 0.26 | 0.49 | 1.13 | 0.11 |
| 482010055 | Texas | Harris | 75.4 | 77.0 | 1.28 | 0.07 | 0.79 | 0.22 | 0.20 | 0.00 | 0.00 | 0.00 | 0.64 | 0.56 | 0.08 | 0.60 | 0.21 | 0.18 | 0.33 | 0.19 | 4.23 | 0.00 | 0.02 | 0.00 | 0.02 | 0.01 | 1.48 | 0.78 | 0.14 |
| 482011034 | Texas | Harris | 76.8 | 77.8 | 0.46 | 0.04 | 0.52 | 0.12 | 0.18 | 0.00 | 0.00 | 0.00 | 0.57 | 0.27 | 0.05 | 0.40 | 0.07 | 0.30 | 0.39 | 0.06 | 3.81 | 0.00 | 0.00 | 0.00 | 0.10 | 0.27 | 0.65 | 0.69 | 0.10 |
| 482011039 | Texas | Harris | 78.2 | 80.2 | 0.41 | 0.03 | 1.24 | 0.11 | 0.16 | 0.00 | 0.00 | 0.00 | 0.15 | 0.21 | 0.05 | 0.87 | 0.15 | 0.33 | 0.38 | 0.09 | 3.33 | 0.00 | 0.01 | 0.00 | 0.28 | 0.23 | 0.77 | 1.15 | 0.11 |
| 482011050 | Texas | Harris | 74.6 | 76.2 | 0.32 | 0.03 | 0.92 | 0.06 | 0.11 | 0.00 | 0.00 | 0.00 | 0.18 | 0.17 | 0.01 | 0.74 | 0.14 | 0.24 | 0.21 | 0.06 | 2.76 | 0.00 | 0.00 | 0.00 | 0.34 | 0.26 | 0.61 | 0.75 | 0.03 |
| 484390075 | Texas | Tarrant | 75.5 | 76.4 | 0.66 | 0.09 | 0.88 | 0.13 | 0.34 | 0.00 | 0.00 | 0.00 | 0.17 | 0.35 | 0.07 | 0.36 | 0.26 | 0.21 | 0.81 | 0.21 | 2.20 | 0.00 | 0.00 | 0.00 | 0.21 | 0.13 | 0.46 | 0.42 | 0.12 |
| 484392003 | Texas | Tarrant | 79.6 | 82.1 | 0.79 | 0.10 | 0.87 | 0.14 | 0.36 | 0.00 | 0.00 | 0.00 | 0.34 | 0.47 | 0.07 | 0.35 | 0.27 | 0.09 | 0.37 | 0.22 | 2.64 | 0.00 | 0.00 | 0.00 | 0.12 | 0.07 | 0.54 | 0.34 | 0.10 |
| 484393009 | Texas | Tarrant | 78.6 | 78.6 | 0.73 | 0.08 | 0.80 | 0.14 | 0.24 | 0.00 | 0.00 | 0.00 | 0.54 | 0.43 | 0.06 | 0.29 | 0.22 | 0.07 | 0.33 | 0.18 | 2.21 | 0.00 | 0.01 | 0.00 | 0.09 | 0.05 | 0.47 | 0.30 | 0.08 |
| 484393011 | Texas | Tarrant | 74.5 | 76.6 | 0.15 | 0.08 | 1.19 | 0.11 | 0.26 | 0.00 | 0.00 | 0.00 | 0.13 | 0.16 | 0.07 | 0.32 | 0.10 | 0.21 | 0.57 | 0.09 | 1.47 | 0.00 | 0.01 | 0.00 | 0.18 | 0.13 | 0.17 | 0.44 | 0.13 |
| 551170006 | Wisconsin | Sheboygan | 77.0 | 79.4 | 0.25 | 0.08 | 0.57 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.11 | 0.12 | 0.02 | 17.48 | 6.24 | 0.61 | 0.80 | 0.75 | 1.11 | 0.00 | 0.02 | 0.00 | 2.69 | 0.07 | 0.56 | 1.63 | 0.03 |

## Contributions to 2017 Nonattainment and Maintenance-Only Sites in the East (Part 2)

| Monitor ID | State | County | 2017 Average DV | 2017 Maximum DV | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 75.8 | 78.4 | 0.13 | 0.01 | 0.01 | 7.98 | 0.05 | 17.21 | 0.33 | 0.13 | 1.57 | 0.30 | 0.01 | 7.14 | 0.01 | 0.07 | 0.06 | 0.17 | 0.47 | 0.06 | 0.01 | 1.51 | 0.02 | 0.67 | 0.35 | 0.16 |
| 90013007 | Connecticut | Fairfield | 77.1 | 81.4 | 0.08 | 0.01 | 0.01 | 8.45 | 0.08 | 15.98 | 0.55 | 0.04 | 1.89 | 0.24 | 0.00 | 9.29 | 0.01 | 0.16 | 0.02 | 0.31 | 0.46 | 0.05 | 0.00 | 1.87 | 0.01 | 0.92 | 0.17 | 0.12 |
| 90019003 | Connecticut | Fairfield | 78.0 | 81.1 | 0.12 | 0.02 | 0.00 | 8.84 | 0.08 | 16.16 | 0.47 | 0.06 | 2.18 | 0.34 | 0.01 | 9.39 | 0.00 | 0.14 | 0.03 | 0.28 | 0.59 | 0.07 | 0.00 | 1.75 | 0.01 | 0.95 | 0.22 | 0.20 |
| 90099002 | Connecticut | New Haven | 77.2 | 80.2 | 0.13 | 0.02 | 0.02 | 7.04 | 0.06 | 16.96 | 0.38 | 0.11 | 1.68 | 0.36 | 0.01 | 7.16 | 0.02 | 0.07 | 0.05 | 0.18 | 0.56 | 0.07 | 0.01 | 1.22 | 0.02 | 0.66 | 0.21 | 0.19 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 211110067 | Kentucky | Jefferson | 75.8 | 78.6 | 0.16 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.01 | 0.24 | 4.05 | 0.35 | 0.02 | 0.46 | 0.00 | 0.01 | 0.12 | 0.11 | 0.66 | 0.05 | 0.00 | 0.01 | 0.07 | 0.61 | 0.55 | 0.27 |
| 211850004 | Kentucky | Oldham | 73.7 | 77.3 | 0.13 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 3.13 | 0.22 | 0.02 | 0.35 | 0.00 | 0.02 | 0.09 | 0.11 | 0.39 | 0.05 | 0.00 | 0.00 | 0.06 | 0.40 | 0.41 | 0.24 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 240053001 | Maryland | Baltimore | 73.2 | 76.2 | 0.13 | 0.02 | 0.00 | 0.37 | 0.12 | 0.35 | 0.93 | 0.07 | 2.98 | 0.35 | 0.01 | 4.80 | 0.00 | 0.10 | 0.05 | 0.67 | 0.77 | 0.07 | 0.00 | 4.70 | 0.02 | 2.65 | 0.19 | 0.17 |
| 240251001 | Maryland | Harford | 81.3 | 84.0 | 0.15 | 0.02 | 0.00 | 0.43 | 0.16 | 0.40 | 0.46 | 0.08 | 3.99 | 0.46 | 0.02 | 6.07 | 0.00 | 0.10 | 0.05 | 0.70 | 1.05 | 0.09 | 0.00 | 5.29 | 0.03 | 2.99 | 0.21 | 0.20 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 260050003 | Michigan | Allegan | 75.5 | 78.5 | 0.17 | 0.01 | 0.00 | 0.00 | 0.21 | 0.00 | 0.05 | 0.01 | 0.10 | 1.78 | 0.00 | 0.02 | 0.00 | 0.03 | 0.02 | 0.68 | 2.95 | 0.06 | 0.00 | 0.03 | 0.03 | 2.59 | 0.12 |
| 261630019 | Michigan | Wayne | 74.0 | 76.2 | 0.09 | 0.03 | 0.00 | 0.01 | 0.04 | 0.10 | 0.32 | 0.28 | 7.92 | 0.22 | 0.06 | 0.27 | 0.00 | 0.04 | 0.04 | 0.12 | 0.52 | 0.07 | 0.00 | 0.24 | 0.09 | 0.27 | 1.00 | 0.20 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 340071001 | New Jersey | Camden | 74.2 | 78.1 | 0.23 | 0.02 | 0.04 | 10.93 | 0.22 | 2.70 | 0.07 | 0.10 | 4.16 | 0.69 | 0.02 | 15.93 | 0.03 | 0.04 | 0.09 | 0.25 | 1.52 | 0.10 | 0.04 | 0.32 | 0.03 | 1.07 | 0.44 | 0.24 |
| 340150002 | New Jersey | Gloucester | 75.1 | 77.5 | 0.11 | 0.02 | 0.01 | 4.41 | 0.19 | 1.22 | 0.33 | 0.07 | 3.85 | 0.35 | 0.01 | 15.73 | 0.02 | 0.07 | 0.04 | 0.38 | 1.07 | 0.08 | 0.02 | 3.33 | 0.02 | 2.35 | 0.44 | 0.19 |
| 340230011 | New Jersey | Middlesex | 73.0 | 76.3 | 0.10 | 0.02 | 0.07 | 10.78 | 0.12 | 3.71 | 0.50 | 0.05 | 2.42 | 0.32 | 0.01 | 15.16 | 0.07 | 0.12 | 0.03 | 0.48 | 0.73 | 0.08 | 0.05 | 2.10 | 0.01 | 1.91 | 0.30 | 0.17 |
| 340290006 | New Jersey | Ocean | 73.9 | 76.6 | 0.17 | 0.02 | 0.07 | 11.44 | 0.10 | 5.10 | 0.33 | 0.11 | 2.54 | 0.44 | 0.02 | 13.30 | 0.08 | 0.09 | 0.07 | 0.40 | 0.95 | 0.08 | 0.05 | 1.07 | 0.03 | 1.08 | 0.47 | 0.22 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 360810124 | New York | Queens | 75.7 | 77.6 | 0.18 | 0.02 | 0.01 | 11.48 | 0.09 | 10.61 | 0.39 | 0.17 | 2.36 | 0.43 | 0.02 | 8.83 | 0.01 | 0.11 | 0.08 | 0.16 | 0.76 | 0.09 | 0.00 | 2.10 | 0.03 | 0.92 | 0.49 | 0.24 |
| 360850067 | New York | Richmond | 76.3 | 77.8 | 0.18 | 0.02 | 0.00 | 12.38 | 0.12 | 4.57 | 0.55 | 0.11 | 2.70 | 0.44 | 0.01 | 13.51 | 0.00 | 0.14 | 0.07 | 0.42 | 0.83 | 0.10 | 0.00 | 2.27 | 0.02 | 1.64 | 0.33 | 0.22 |
| 361030002 | New York | Suffolk | 79.2 | 80.8 | 0.21 | 0.02 | 0.00 | 11.37 | 0.09 | 15.95 | 0.38 | 0.14 | 2.49 | 0.52 | 0.01 | 9.39 | 0.00 | 0.08 | 0.08 | 0.35 | 0.82 | 0.10 | 0.00 | 1.62 | 0.02 | 0.98 | 0.27 | 0.26 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 390610006 | Ohio | Hamilton | 76.3 | 79.1 | 0.19 | 0.03 | 0.00 | 0.00 | 0.14 | 0.11 | 0.13 | 0.12 | 16.72 | 0.76 | 0.03 | 0.37 | 0.00 | 0.14 | 0.06 | 1.67 | 1.74 | 0.08 | 0.00 | 0.11 | 0.04 | 0.97 | 0.56 | 0.22 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 420031005 | Pennsylvania | Allegheny | 75.3 | 76.5 | 0.21 | 0.03 | 0.00 | 0.09 | 0.24 | 0.07 | 0.11 | 7.89 | 0.48 | 0.04 | 23.66 | 0.00 | 0.05 | 0.10 | 0.62 | 0.84 | 0.07 | 0.00 | 0.16 | 0.05 | 2.47 | 0.33 | 0.21 |
| 421010024 | Pennsylvania | Philadelphia | 75.1 | 78.4 | 0.11 | 0.02 | 0.00 | 1.66 | 0.16 | 0.20 | 0.72 | 0.04 | 3.55 | 0.38 | 0.01 | 21.46 | 0.00 | 0.25 | 0.03 | 0.90 | 0.94 | 0.07 | 0.00 | 2.63 | 0.00 | 3.11 | 0.14 | 0.16 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 480391004 | Texas | Brazoria | 81.4 | 82.3 | 0.24 | 0.07 | 0.00 | 0.00 | 0.11 | 0.00 | 0.08 | 0.06 | 0.04 | 0.72 | 0.05 | 0.03 | 0.00 | 0.08 | 0.08 | 0.37 | 38.93 | 0.14 | 0.00 | 0.04 | 0.05 | 0.03 | 0.34 | 0.30 |
| 480850005 | Texas | Collin | 74.9 | 76.0 | 0.05 | 0.03 | 0.00 | 0.00 | 0.13 | 0.01 | 0.14 | 0.00 | 0.04 | 0.73 | 0.01 | 0.04 | 0.00 | 0.11 | 0.01 | 0.10 | 40.58 | 0.08 | 0.00 | 0.07 | 0.01 | 0.04 | 0.00 | 0.16 |
| 481130069 | Texas | Dallas | 74.0 | 78.0 | 0.05 | 0.03 | 0.00 | 0.00 | 0.08 | 0.01 | 0.22 | 0.01 | 0.05 | 0.77 | 0.01 | 0.05 | 0.00 | 0.21 | 0.01 | 0.12 | 35.26 | 0.07 | 0.00 | 0.09 | 0.01 | 0.06 | 0.01 | 0.14 |
| 481130075 | Texas | Dallas | 75.8 | 76.7 | 0.06 | 0.03 | 0.00 | 0.00 | 0.09 | 0.01 | 0.16 | 0.01 | 0.04 | 0.86 | 0.01 | 0.04 | 0.00 | 0.12 | 0.01 | 0.10 | 37.23 | 0.08 | 0.00 | 0.07 | 0.01 | 0.05 | 0.01 | 0.16 |
| 481211034 | Texas | Denton | 76.9 | 79.4 | 0.17 | 0.06 | 0.00 | 0.00 | 0.13 | 0.01 | 0.08 | 0.02 | 0.10 | 1.33 | 0.02 | 0.03 | 0.00 | 0.09 | 0.03 | 0.19 | 33.85 | 0.15 | 0.00 | 0.03 | 0.02 | 0.04 | 0.06 | 0.28 |
| 481211032 | Texas | Denton | 75.1 | 76.3 | 0.16 | 0.04 | 0.00 | 0.00 | 0.11 | 0.01 | 0.11 | 0.02 | 0.06 | 1.61 | 0.02 | 0.06 | 0.00 | 0.15 | 0.03 | 0.15 | 34.09 | 0.11 | 0.00 | 0.07 | 0.04 | 0.05 | 0.03 | 0.33 |
| 482010024 | Texas | Harris | 75.9 | 78.5 | 0.07 | 0.03 | 0.00 | 0.00 | 0.08 | 0.00 | 0.14 | 0.02 | 0.03 | 0.24 | 0.01 | 0.02 | 0.00 | 0.17 | 0.02 | 0.19 | 32.55 | 0.07 | 0.00 | 0.05 | 0.01 | 0.04 | 0.02 | 0.14 |
| 482010026 | Texas | Harris | 73.5 | 76.1 | 0.26 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.06 | 0.02 | 1.05 | 0.02 | 0.00 | 0.00 | 0.01 | 0.06 | 0.12 | 30.45 | 0.07 | 0.00 | 0.05 | 0.00 | 0.28 | 0.23 |
| 482010055 | Texas | Harris | 75.4 | 77.0 | 0.13 | 0.07 | 0.00 | 0.00 | 0.11 | 0.00 | 0.16 | 0.04 | 0.06 | 0.20 | 0.04 | 0.03 | 0.00 | 0.15 | 0.04 | 0.41 | 34.58 | 0.12 | 0.00 | 0.06 | 0.04 | 0.05 | 0.08 | 0.28 |
| 482011034 | Texas | Harris | 76.8 | 77.8 | 0.21 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.16 | 0.04 | 0.04 | 0.94 | 0.02 | 0.02 | 0.00 | 0.19 | 0.05 | 0.10 | 32.18 | 0.09 | 0.00 | 0.06 | 0.04 | 0.04 | 0.18 | 0.21 |
| 482011039 | Texas | Harris | 78.2 | 80.2 | 0.21 | 0.04 | 0.00 | 0.00 | 0.05 | 0.01 | 0.06 | 0.03 | 0.03 | 0.83 | 0.02 | 0.02 | 0.00 | 0.06 | 0.05 | 0.31 | 33.69 | 0.07 | 0.00 | 0.03 | 0.02 | 0.01 | 0.35 | 0.09 |
| 482011050 | Texas | Harris | 74.6 | 76.2 | 0.15 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.03 | 0.03 | 0.03 | 0.67 | 0.00 | 0.02 | 0.00 | 0.05 | 0.04 | 0.21 | 36.47 | 0.03 | 0.00 | 0.02 | 0.01 | 0.35 | 0.09 |
| 484390075 | Texas | Tarrant | 75.5 | 76.4 | 0.36 | 0.05 | 0.00 | 0.00 | 0.15 | 0.02 | 0.05 | 0.05 | 0.15 | 2.46 | 0.04 | 0.07 | 0.00 | 0.09 | 0.04 | 0.07 | 29.82 | 0.16 | 0.00 | 0.03 | 0.04 | 0.05 | 0.05 | 0.36 |
| 484392003 | Texas | Tarrant | 79.6 | 82.1 | 0.18 | 0.06 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.03 | 0.12 | 1.23 | 0.03 | 0.03 | 0.00 | 0.10 | 0.03 | 0.21 | 34.52 | 0.18 | 0.00 | 0.03 | 0.03 | 0.04 | 0.09 | 0.36 |
| 484393009 | Texas | Tarrant | 78.6 | 78.6 | 0.14 | 0.05 | 0.00 | 0.00 | 0.11 | 0.01 | 0.13 | 0.02 | 0.11 | 1.03 | 0.02 | 0.05 | 0.00 | 0.11 | 0.03 | 0.20 | 35.64 | 0.13 | 0.00 | 0.06 | 0.02 | 0.05 | 0.07 | 0.26 |
| 484393011 | Texas | Tarrant | 74.5 | 76.6 | 0.34 | 0.04 | 0.00 | 0.00 | 0.15 | 0.02 | 0.10 | 0.04 | 0.10 | 2.41 | 0.03 | 0.09 | 0.00 | 0.12 | 0.08 | 0.10 | 32.06 | 0.15 | 0.00 | 0.05 | 0.04 | 0.07 | 0.17 | 0.30 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 551170006 | Wisconsin | Sheboygan | 77.0 | 79.4 | 0.09 | 0.02 | 0.00 | 0.00 | 0.21 | 0.02 | 0.06 | 0.04 | 0.78 | 1.70 | 0.01 | 0.20 | 0.00 | 0.04 | 0.02 | 0.51 | 2.44 | 0.07 | 0.00 | 0.08 | 0.01 | 0.29 | 12.22 | 0.11 |

## Contributions to 2017 Nonattainment and Maintenance-Only Sites in the East (Part 3)

| Monitor ID | State | County | 2017 Average DV | 2017 Maximum DV | Tribal | Canada & Mexico | Offshore | Fires | Initial & Boundary | Biogenics |
|---|---|---|---|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 75.8 | 78.4 | 0.02 | 1.66 | 0.61 | 0.18 | 15.66 | 4.08 |
| 90013007 | Connecticut | Fairfield | 77.1 | 81.4 | 0.02 | 1.61 | 1.30 | 0.20 | 16.90 | 4.17 |
| 90019003 | Connecticut | Fairfield | 78.0 | 81.1 | 0.03 | 1.48 | 1.00 | 0.22 | 16.73 | 4.49 |
| 90099002 | Connecticut | New Haven | 77.2 | 80.2 | 0.02 | 1.67 | 2.33 | 0.21 | 16.52 | 4.33 |
| 211110067 | Kentucky | Jefferson | 75.8 | 78.6 | 0.01 | 0.52 | 0.05 | 0.20 | 21.86 | 6.71 |
| 211850004 | Kentucky | Oldham | 73.7 | 77.3 | 0.02 | 0.41 | 0.14 | 0.22 | 18.81 | 7.04 |
| 240053001 | Maryland | Baltimore | 73.2 | 76.2 | 0.03 | 0.68 | 0.51 | 0.29 | 15.67 | 5.04 |
| 240251001 | Maryland | Harford | 81.3 | 84.0 | 0.04 | 0.73 | 0.44 | 0.30 | 16.63 | 6.08 |
| 260050003 | Michigan | Allegan | 75.5 | 78.5 | 0.04 | 0.28 | 0.34 | 0.73 | 11.71 | 9.01 |
| 261630019 | Michigan | Wayne | 74.0 | 76.2 | 0.01 | 4.89 | 0.08 | 0.17 | 24.10 | 5.57 |
| 340071001 | New Jersey | Camden | 74.2 | 78.1 | 0.04 | 1.73 | 0.55 | 0.46 | 14.07 | 6.14 |
| 340150002 | New Jersey | Gloucester | 75.1 | 77.5 | 0.03 | 1.05 | 0.62 | 0.30 | 15.90 | 5.75 |
| 340230011 | New Jersey | Middlesex | 73.0 | 76.3 | 0.03 | 1.95 | 0.64 | 0.25 | 16.30 | 5.01 |
| 340290006 | New Jersey | Ocean | 73.9 | 76.6 | 0.03 | 2.28 | 0.75 | 0.31 | 16.60 | 5.04 |
| 360810124 | New York | Queens | 75.7 | 77.6 | 0.02 | 2.00 | 1.54 | 0.21 | 17.29 | 5.14 |
| 360850067 | New York | Richmond | 76.3 | 77.8 | 0.03 | 1.74 | 1.21 | 0.29 | 16.47 | 5.51 |
| 361030002 | New York | Suffolk | 79.2 | 80.8 | 0.03 | 1.67 | 1.31 | 0.31 | 16.51 | 5.12 |
| 390610006 | Ohio | Hamilton | 76.3 | 79.1 | 0.03 | 0.76 | 0.21 | 0.58 | 17.48 | 7.45 |
| 420031005 | Pennsylvania | Allegheny | 75.3 | 76.5 | 0.02 | 1.38 | 0.11 | 0.38 | 21.40 | 5.03 |
| 421010024 | Pennsylvania | Philadelphia | 75.1 | 78.4 | 0.03 | 0.48 | 0.71 | 0.37 | 16.52 | 5.62 |
| 480391004 | Texas | Brazoria | 81.4 | 82.3 | 0.03 | 0.35 | 0.99 | 1.62 | 19.53 | 6.57 |
| 480850005 | Texas | Collin | 74.9 | 76.0 | 0.02 | 0.25 | 2.23 | 0.90 | 19.19 | 5.62 |
| 481130069 | Texas | Dallas | 74.0 | 78.0 | 0.02 | 0.20 | 1.93 | 1.20 | 22.27 | 5.78 |
| 481130075 | Texas | Dallas | 75.8 | 76.7 | 0.02 | 0.30 | 1.76 | 1.14 | 22.41 | 6.02 |
| 481210034 | Texas | Denton | 76.9 | 79.4 | 0.03 | 0.40 | 1.57 | 0.95 | 24.23 | 6.50 |
| 481211032 | Texas | Denton | 75.1 | 76.3 | 0.02 | 0.35 | 0.87 | 0.93 | 23.75 | 6.52 |
| 482010024 | Texas | Harris | 75.9 | 78.5 | 0.02 | 0.18 | 4.14 | 0.73 | 27.62 | 2.68 |
| 482010026 | Texas | Harris | 73.5 | 76.1 | 0.01 | 0.24 | 2.95 | 2.36 | 21.17 | 4.44 |
| 482010055 | Texas | Harris | 75.4 | 77.0 | 0.02 | 0.31 | 1.46 | 1.55 | 18.26 | 4.81 |
| 482011034 | Texas | Harris | 76.8 | 77.8 | 0.01 | 0.22 | 4.08 | 1.58 | 22.78 | 4.22 |
| 482011039 | Texas | Harris | 78.2 | 80.2 | 0.01 | 0.29 | 2.50 | 2.70 | 21.03 | 5.31 |
| 482011050 | Texas | Harris | 74.6 | 76.2 | 0.01 | 0.31 | 3.95 | 1.84 | 17.62 | 4.39 |
| 484390075 | Texas | Tarrant | 75.5 | 76.4 | 0.03 | 0.58 | 0.99 | 2.06 | 22.71 | 6.49 |
| 484392003 | Texas | Tarrant | 79.6 | 82.1 | 0.03 | 0.44 | 1.62 | 1.33 | 23.94 | 6.28 |
| 484393009 | Texas | Tarrant | 78.6 | 78.6 | 0.02 | 0.34 | 1.62 | 1.40 | 23.61 | 5.78 |
| 484393011 | Texas | Tarrant | 74.5 | 76.6 | 0.03 | 0.69 | 0.65 | 1.54 | 22.51 | 6.25 |
| 551170006 | Wisconsin | Sheboygan | 77.0 | 79.4 | 0.03 | 0.47 | 0.67 | 0.56 | 14.91 | 7.79 |

# Tab 12

Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS;
Ozone Transport Policy Analysis TSD; 80 FR 75706
(December 3, 2015)

Technical Support Document (TSD)

for the Cross-State Air Pollution Rule for the 2008 Ozone NAAQS

Docket ID No. EPA-HQ-OAR-2015-0500

# Ozone Transport Policy Analysis

# Proposed Rule TSD

U.S. Environmental Protection Agency

Office of Air and Radiation

November 2015

This Technical Support Document (TSD) provides information that supports EPA's proposal to update the Cross-State Air Pollution Rule (CSAPR) to address the 2008 ozone National Ambient Air Quality Standards (NAAQS). This TSD includes analysis to quantify upwind state emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states; quantification of emissions budgets (i.e., limits on emissions); and illustrative analysis to evaluate compliance with the regulatory control alternatives. The analysis is described in detail in the preamble to the proposed rule. This TSD is organized as follows:

A. Background on EPA's Analysis to Quantify Emissions that Significantly Contribute to Nonattainment or Interfere with Maintenance of the 2008 ozone NAAQS

B. Electric Generating Unit Significant Contribution Cost Analysis

C. Analysis of Significant Contribution Using an Ozone Air Quality Assessment Tool

    1. Introduction: Development of the assessment tool

    2. Details on the construction of the assessment tool

    3. Description of the results of the analysis using the assessment tool for the approach

A. <u>Background on EPA's Analysis to Quantify Emissions that Significantly Contribute to Nonattainment or Interfere with Maintenance of the 2008 ozone NAAQS</u>

In the preamble, we describe EPA's multi-step process to identify upwind states' emissions that significantly contribute to nonattainment or interfere with maintenance with respect to the 2008 ozone NAAQS. This approach is consistent with the approach used in CSAPR. See section III of the preamble for an overview of this approach.

The approach first uses air quality analysis to identify nonattainment and maintenance receptors with respect to interstate transport for the 2008 ozone NAAQS. The approach then uses further air quality analysis to identify upwind states whose ozone pollution contributions to these monitoring sites meet or exceed a specified threshold amount of 1% of the NAAQS. See section V of the preamble for details of applying these steps with respect to interstate emissions transport for the 2008 ozone NAAQS.

The next step in the process identifies the EGU $NO_x$ reductions in each state in response to ascending uniform $NO_X$ cost thresholds. <u>See</u> section B in this TSD for discussion of this analysis. Next, the process uses the ozone Air Quality Assessment Tool (AQAT) to estimate the impact of the upwind state EGU $NO_x$ reductions on downwind ozone pollution levels for the assessed EGU $NO_x$ cost-per-ton levels. <u>See</u> section C in this TSD for discussion of the development and use of the ozone AQAT.

As described in the preamble, the EPA uses this air quality information in a multi-factor test, along with EGU $NO_x$ reductions and costs, to select a cost threshold to quantify each state's significant contribution to nonattainment and interference with maintenance. The cost threshold assessment evaluates EGU $NO_x$ mitigation potential for all states in the contiguous U.S. However, the EPA only evaluates EGU $NO_x$ reductions in the multi-factor test from states that

were "linked" and which have EGU $NO_x$ reduction potential in at least one of the evaluated EGU $NO_x$ cost thresholds. These states are listed in Table A-1 below. As described in preamble section VII, Delaware is "linked" to downwind ozone problems but is not currently regulated under CSAPR and does not have any EGU $NO_x$ reduction potential at any of the cost thresholds evaluated. Therefore, the EPA is not proposing to include Delaware in the proposal and the EPA did not include Delaware in applying the multi-factor test.

| Table A-1. States Evaluated in the Multi-factor Test | |
|---|---|
| Ozone Season $NO_x$ | |
| Alabama | New Jersey |
| Arkansas | New York |
| Illinois | North Carolina |
| Indiana | Ohio |
| Iowa | Oklahoma |
| Kansas | Pennsylvania |
| Kentucky | Tennessee |
| Louisiana | Texas |
| Maryland | Virginia |
| Michigan | West Virginia |
| Mississippi | Wisconsin |
| Missouri | |

A set of Excel spreadsheet files containing ozone AQAT data supporting the determination of emissions that constitute significant contribution to nonattainment and interference with maintenance of downwind air quality is available in the docket for this rulemaking. Appendix B in this TSD describes these files.

B. Electric Generating Unit Significant Contribution Cost Analysis

EPA used the Integrated Planning Model (IPM) to analyze the ozone-season $NO_x$ emissions reductions available from electric generating units (EGUs) at various uniform cost levels in each upwind state. IPM was also used to evaluate illustrative compliance with the proposal's regulatory control alternatives (i.e., compliance with the proposed emissions budgets, with a more stringent alternative, and with a less stringent alternative).

IPM is a multiregional, dynamic, deterministic linear programming model of the U.S. electric power sector that EPA uses to analyze cost and emissions impacts of environmental policies. See "Documentation for EPA Base Case v.5.13 Using the Integrated Planning Model", "EPA Base Case v.5.14 Using IPM Incremental Documentation. March 25, 2015", and "EPA

Base Case v.5.15 Using IPM Incremental Documentation. August, 2015" for further description of the IPM model.[1]

Using IPM, the EPA first modeled a base case EGU emissions scenario (i.e., a scenario absent any emission reduction requirements related to this rule). The base case modeling includes the Title IV $SO_2$ cap and trade program; $NO_x$ SIP Call regional ozone season cap and trade program; the CSAPR regional cap and trade programs; settlements; and state and federal rules as listed in the IPM documentation referenced above.

The air quality modeling for this proposal, including identifying nonattainment and maintenance receptors, performing contribution analysis, and modeling an illustrative control case relied on IPM v5.14. After the modeling analyses were underway, the EPA released an updated IPM base case, version 5.15, and the final Clean Power Plan (CPP). In order to reflect all on-the-books policies as well as the most current power sector modeling data, the EPA performed an assessment (described in this TSD) to reflect inclusion of IPM 5.15 with the CPP for this proposal.[2]

EPA modeled the emissions reductions that would occur within each state first from moving from the IPM v5.14 base case to the IPM v5.15 base case, and then from applying ascending cost thresholds of emissions control based on IPM v5.15 cost threshold scenarios. EPA designed a series of IPM runs that imposed increasing cost thresholds for ozone-season $NO_x$ emissions and tabulated those projected emissions for each state at each cost level. EPA has referred to these tabulations as "cost curves".[3] The cost curves report the remaining emissions at each cost threshold after the state has made emission reductions that are available up to the particular cost threshold analyzed.

This part of the analysis applied ozone-season cost thresholds to all fossil-fuel-fired EGUs with a capacity greater than 25 MW in each state. Because of the time required to build advanced pollution controls, the model was prevented from building any new post-combustion controls, such as SCR or SNCR in 2017 in response to the cost thresholds.[4] The modeling does allow the turning on of idled existing SCR and SNCR, the optimization of existing SCR and SNCR, shifting generation to lower-$NO_x$ emitting EGUs, and addition or upgrading of $NO_x$ combustion controls in 2017, such as low $NO_x$ burners (LNB).

In these scenarios, EPA imposed cost thresholds ranging from $500 per ton to $10,000 per ton of ozone-season $NO_x$. The IPM-projected EGU emissions of ozone-season $NO_x$ from the

---

[1] http://www.epa.gov/airmarkets/powersectormodeling

[2] Changes between IPM v5.14 and v5.15 are documented in "EPA Base Case v. 5.15 Using IPM Incremental Documentation. August, 2015" available in the docket for this rule.

[3] These projected state level emissions for each "cost threshold" run are presented in several formats. The IPM analysis outputs available in the docket contain a "state emissions" file for each analysis. The file contains two worksheets. The first is titled "all units" and shows aggregate emissions for all units in the state. The second is titled "all fossil > 25MW" and shows emissions for a subset of these units that have a capacity greater than 25 MW. The emissions in the "all fossil > 25 MW" worksheet are used to derive the budgets for each upwind state at the cost thresholds determined to eliminate significant contribution to nonattainment or interference with maintenance in linked downwind states, in an average year.

[4] IPM results do include newly built 2017 post-combustion pollution control retrofits in base case modeling, cost curve runs, and remedy runs. These 2017 retrofits do not reflect any controls installed in response to the rule, but instead represent those that are already announced and/or under construction and expected to be online by 2017, or controls that were projected to be built in the base case in response to existing consent decree or state rule requirements.

"Fossil > 25 MW" units and "All Units" are shown at each cost threshold for 2017[5] in Tables B-1 and B-2.[6] For more information about EPA's adjustment of IPM outputs to reflect 2017, please see Appendix C.

As described in Preamble section VI, the EPA limited generation shifting potential to units within each state in IPM as an analytic proxy designed to respect the feasibility of near-term generation shifting in light of these potential near-term out-of-merit dispatch constraints. The EPA conducted a separate analysis similar to the $1,300 per ton cost threshold scenario, except without limiting IPM's ability to shift generation between states. That analysis, described in detail Appendix F, showed a minimal impact on the overall tons of reductions available at the $1,300 per ton cost threshold (1,686 tons in the proposed Transport Rule states) and a minimal impact on state budgets (the largest percent change was a less than 3% decrease).

As explained in preamble section VI, EPA determined that $500/ton was the appropriate lowest cost threshold for ozone-season $NO_x$ control for all potentially covered states in this rulemaking. EPA then used the ozone AQAT to identify improvements in downwind air quality at $500 per ton and, then, for the higher cost thresholds when that level did not completely resolve all nonattainment and maintenance to which each state was "linked". EPA examined cost levels of $500/ton, $1,300/ton, $3,400/ton, $5,000/ton, $6,400/ton, and $10,000/ton as a representative sampling of points along the $NO_x$ cost curve. EPA selected these particular cost levels because analysis suggested they were associated either with costs when particular emission controls were widely available, reflected the costs examined for other EPA rules (e.g., $6,400/ton), or served as an upper-bound of the cost curve analysis (e.g., $10,000/ton). At each cost threshold examined with the IPM model, the model outputs include state emission totals from "All Units" as well as from "All fossil > 25 MW". The "All Fossil > 25 MW" totals represent an approximation of emissions from EGUs subject to this rule. The resulting state ozone season $NO_x$ emissions levels from "All Units" at each cost threshold analyzed were examined in the ozone AQAT to determine the impact on downwind air quality. The preamble explains how EPA considered the results of the cost and air quality analyses described in this TSD to determine the appropriate set of cost thresholds for reducing significant contribution to nonattainment and interference with maintenance. Because there are slight differences in the units labeled as "EGUs" in the air quality modeling and the "All Units" from IPM, in the ozone AQAT EPA used the difference in emissions between the base case emissions and the other cost

---

[5] See section 2.3.3 "Documentation for EPA Base Case v.5.13 Using the Integrated Planning Model" for a description about IPM model run years. Each year in the future is mapped to one of seven modeled years. While 2017 is mapped to the "2016" run year, for this analysis, EPA started with the 2018 run year and made small modifications to emissions to simulate 2017. Specifically, individual units that may be retiring, converting to gas, or retrofitting $NO_x$ controls in 2018 were adjusted to match their expected operation in 2017. This approach provided a better estimate than using the "2016" run year because that run year would not capture similar fleet changes expected to occur before 2017. Additionally, it provides a better projection of allowance banking behavior, as the model would have two years to bank ozone-season $NO_x$ allowances in the CSAPR ozone-season $NO_x$ Phase 1 period, which matches the real world timeline.

[6] EPA notes that, while ozone-season emissions generally decline as the cost threshold increases, there are instances where a state may see a small increase in emissions at a higher cost threshold compared to a lower cost threshold analyzed. This is related to the interconnected, interstate nature of the grid, and the ability of generation to shift from a less efficient/higher emitting source in one state to a more efficient/lower emitting source in another state at higher cost levels. In other words, as multiple states experience the higher cost threshold on ozone-season $NO_x$, a region may minimize cost by dispatching more generation from lower-emitting-rate units in a particular state that counterintuitively raise that state's total ozone-season $NO_x$ emissions, even as the regional ozone-season $NO_x$ emissions decline as a result.

thresholds from "All Units".  The emission differences are shown in Table B-3.  To construct total emissions for use in ozone AQAT, these differences were added to the total base case ozone season anthropogenic $NO_x$ emissions used in the air quality modeling.

As described in the preamble, EPA developed state EGU $NO_x$ emissions budgets for each of the three regulatory control alternatives. First, EPA calculated each covered state's IPM ozone-season $NO_x$ emission rate (i.e. lbs $NO_x$ /MMBtu) from the $500, $1,300, and $3,400 per ton uniform cost threshold assessment. The state-level rate was calculated as the total emissions from affected sources within the state, divided by the total heat input from these sources.

Second, the EPA multiplied this modeled state-level emissions rate by 2014 reported historical state-level heat input. Multiplying the projected state-level emissions rate by historical heat input yielded state-specific ozone season EGU $NO_X$ emissions. While the Energy Information Administration's Annual Energy Outlook projects a slight increase in national generation from 2014 to 2017, it projects generation from fossil sources to decrease slightly (-0.4%). As electricity generation from fossil sources is projected to be almost unchanged from 2014 to 2017, the EPA did not adjust the 2014 heat input to calculate state-specific ozone season EGU $NO_X$ emissions.

Third, the EPA added an adjustment to account for differences in unit and SCR availability and operation between the IPM run year of 2018 and the expected conditions applicable to calendar year 2017[7].  Appendix C explains the 2017 adjustments and shows the adjustments made by model plant.

Fourth, the EPA selected EGU emissions budgets as the lower of this calculated 2017 emission level and the 2014 historic monitored emissions. EPA conducted this analysis, and estimated a resulting "budget" of emissions, for 37 states and the District of Columbia in the Eastern U.S., whether or not this proposal would subject a given state to its emission budget estimated here.  The state-level emission rate from IPM, the 2014 historic heat input, and the resulting ozone-season $NO_x$ EGU emissions budgets are shown in Table B-4.
Finally, the EPA calculated the variability limits and assurance levels for each state based on the calculated emissions budgets. Each state's variability limit is 21% of its budget, and its assurance level is the sum of its budget and variability limit, shown in Table B-5. Under the methodology established in the final Transport Rule, the state-specific portion of the NUSA (including the Indian Country NUSA) is calculated as the percentage equal to the projected emissions from "planned units" divided by the state budget plus a base two percent. The calculated existing unit allocation and new unit set aside (NUSA), including the Indian Country NUSA, for the proposed budgets is shown in table B-6.[8]

As explained in the preamble, EPA proposes to promulgate EGU $NO_x$ ozone-season emissions budgets reflecting the uniform cost threshold of $1,300/ton to reduce significant contribution to nonattainment and interference with maintenance.

The IPM runs performed for the cost analyses are listed in Table Appendix A-1 in of this TSD.  Table Appendix A-1 lists the name of each IPM run next to a description of the run.  The output files of these model runs can be found in the rulemaking docket.  In Tables B-1 through

---

[7] In modeling the three regulatory control alternatives in IPM, EPA did not include the 2017 budget adjustments. This allowed EPA to accurately understand the policy impacts of the regulatory alternatives for two reasons. First, the 2017 adjustments account for emissions that IPM does not have included in the 2018 run year. Including the adjustments would artificially inflate the 2018 cap since it would be adding in allowances that the model did not need. Second, using the 2018 model run year for analysis allowed units two years to use and bank allowances, matching the time that these units will have to use and bank allowances under CSAPR Phase 1.
[8] See 'O3 NAAQS CSAPR Update -- NUSA Calculations' (Excel spreadsheet) in the docket for this proposal.

B-4, the emissions are presented rounded to the nearest ton. A summary of the budgets and assurance levels can be found in Appendix D and detailed calculations can be found in Appendix E.

      As noted above, EPA used the emissions shown in Table B-3 as inputs to the air quality assessment tool to estimate the impact that the combined reductions available from states covered under the proposal to update CSAPR, at different cost-per-ton levels, would have on air quality at downwind monitors that were identified as nonattainment and/or maintenance receptors for this proposal.  Section C in this TSD describes EPA's development and use of the assessment tool and the results from our analysis.

**Table B-1.  2017 Ozone Season NO$_x$ EGU Emissions\* for Each State at Various Pollution Control Cost Thresholds (CT) per Ton of Reduction (Tons) "Fossil >25 MW".**

| | 5.14 Base Case | 5.15 Base Case | $500/ton CT | $1300/ton CT | $3400/ton CT | $5000/ton CT | $6400/ton CT | $10000/ton CT | Less Stringent Control Alternative | Proposed Emissions Budgets | More Stringent Control Alternative |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama** | 11,821 | 13,289 | 11,560 | 9,708 | 9,620 | 8,509 | 7,871 | 7,450 | 11,792 | 10,182 | 10,221 |
| **Arizona** | 20,695 | 16,823 | 16,823 | 10,758 | 11,012 | 10,895 | 10,875 | 10,787 | 16,838 | 16,837 | 16,838 |
| **Arkansas** | 11,767 | 6,224 | 6,211 | 6,120 | 5,365 | 5,076 | 4,982 | 4,289 | 6,239 | 6,239 | 6,361 |
| **California** | 1,799 | 1,723 | 1,722 | 1,721 | 1,715 | 1,718 | 1,718 | 1,603 | 1,723 | 1,723 | 1,723 |
| **Colorado** | 14,369 | 13,000 | 12,999 | 12,964 | 12,316 | 12,051 | 11,619 | 10,888 | 13,000 | 13,000 | 13,000 |
| **Connecticut** | 382 | 409 | 408 | 408 | 381 | 362 | 362 | 336 | 408 | 408 | 408 |
| **Delaware** | 285 | 477 | 477 | 477 | 477 | 477 | 477 | 473 | 477 | 477 | 477 |
| **District of Columbia** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Florida** | 28,786 | 25,345 | 24,138 | 18,812 | 18,200 | 18,052 | 17,626 | 17,410 | 25,584 | 25,733 | 25,769 |
| **Georgia** | 9,432 | 7,394 | 7,275 | 7,157 | 7,055 | 6,968 | 6,937 | 6,968 | 7,397 | 7,406 | 7,412 |
| **Idaho** | 0 | 42 | 36 | 36 | 35 | 35 | 35 | 35 | 43 | 39 | 41 |
| **Illinois** | 15,323 | 10,021 | 9,626 | 9,549 | 9,475 | 9,399 | 9,381 | 9,260 | 9,772 | 9,760 | 9,749 |
| **Indiana** | 43,122 | 41,748 | 35,137 | 29,575 | 28,759 | 27,978 | 28,310 | 24,639 | 35,095 | 30,285 | 30,270 |
| **Iowa** | 8,629 | 7,911 | 7,725 | 7,488 | 7,194 | 7,194 | 7,194 | 6,594 | 7,757 | 7,539 | 7,539 |
| **Kansas** | 11,434 | 11,332 | 10,904 | 10,894 | 10,867 | 10,654 | 10,494 | 10,182 | 10,904 | 10,904 | 10,904 |
| **Kentucky** | 38,933 | 27,141 | 23,533 | 15,245 | 14,759 | 14,668 | 13,685 | 12,638 | 24,143 | 15,916 | 15,966 |
| **Louisiana** | 13,662 | 10,897 | 10,833 | 10,780 | 10,497 | 10,436 | 10,430 | 10,191 | 10,900 | 10,812 | 10,807 |
| **Maine** | 222 | 261 | 261 | 261 | 261 | 253 | 249 | 248 | 261 | 261 | 261 |
| **Maryland** | 4,317 | 6,470 | 5,442 | 5,444 | 5,307 | 5,294 | 5,102 | 5,102 | 5,279 | 5,285 | 5,156 |
| **Massachusetts** | 652 | 863 | 912 | 874 | 860 | 825 | 754 | 699 | 866 | 866 | 863 |
| **Michigan** | 29,743 | 20,049 | 19,646 | 17,016 | 16,520 | 16,293 | 16,160 | 15,638 | 19,875 | 18,437 | 18,437 |
| **Minnesota** | 9,579 | 9,275 | 9,196 | 8,999 | 8,779 | 8,729 | 8,672 | 7,597 | 9,278 | 9,278 | 9,278 |
| **Mississippi** | 8,549 | 7,871 | 7,789 | 7,574 | 6,978 | 6,706 | 6,392 | 5,663 | 7,360 | 7,151 | 6,639 |
| **Missouri** | 18,495 | 17,050 | 16,116 | 16,054 | 15,897 | 15,752 | 15,120 | 14,275 | 16,144 | 16,180 | 16,218 |
| **Montana** | 8,498 | 7,756 | 7,743 | 7,743 | 7,743 | 7,719 | 7,719 | 7,719 | 7,756 | 7,756 | 7,756 |
| **Nebraska** | 14,164 | 14,173 | 14,173 | 13,770 | 10,921 | 10,742 | 10,284 | 9,248 | 14,173 | 14,173 | 14,173 |
| **Nevada** | 4,055 | 4,410 | 4,395 | 4,393 | 3,186 | 3,021 | 2,447 | 1,690 | 4,409 | 4,409 | 4,409 |
| **New Hampshire** | 140 | 140 | 140 | 140 | 140 | 139 | 139 | 138 | 140 | 140 | 140 |
| **New Jersey** | 3,980 | 3,302 | 2,932 | 2,931 | 2,924 | 2,921 | 2,918 | 2,837 | 2,439 | 2,438 | 2,433 |
| **New Mexico** | 17,248 | 17,356 | 17,356 | 16,848 | 16,850 | 16,721 | 16,272 | 15,989 | 17,356 | 17,356 | 17,356 |
| **New York** | 6,419 | 4,948 | 4,833 | 4,664 | 4,589 | 4,578 | 4,287 | 4,042 | 4,908 | 4,712 | 4,714 |
| **North Carolina** | 19,753 | 14,435 | 12,513 | 12,513 | 10,909 | 10,809 | 10,020 | 9,792 | 12,468 | 12,468 | 11,342 |
| **North Dakota** | 23,037 | 16,423 | 16,423 | 13,078 | 13,054 | 12,743 | 12,480 | 12,430 | 16,246 | 16,246 | 16,246 |
| **Ohio** | 27,785 | 27,795 | 22,049 | 18,149 | 18,129 | 18,022 | 17,718 | 17,564 | 22,050 | 18,369 | 18,369 |
| **Oklahoma** | 24,327 | 19,593 | 18,891 | 17,423 | 16,425 | 15,772 | 13,891 | 12,984 | 19,587 | 18,076 | 18,087 |
| **Oregon** | 212 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Pennsylvania** | 50,517 | 41,661 | 39,451 | 14,902 | 14,870 | 14,748 | 14,729 | 14,657 | 40,466 | 15,152 | 15,150 |
| **Rhode Island** | 150 | 199 | 199 | 202 | 199 | 199 | 199 | 199 | 196 | 197 | 198 |
| **South Carolina** | 5,998 | 5,678 | 4,622 | 4,542 | 4,505 | 4,497 | 4,494 | 4,447 | 5,815 | 5,845 | 5,847 |
| **South Dakota** | 653 | 297 | 297 | 297 | 297 | 297 | 297 | 297 | 297 | 297 | 297 |
| **Tennessee** | 6,369 | 5,554 | 5,480 | 5,441 | 5,408 | 5,329 | 5,312 | 5,269 | 5,480 | 5,480 | 5,481 |
| **Texas** | 64,959 | 58,199 | 57,513 | 54,589 | 52,389 | 51,259 | 50,427 | 49,819 | 58,227 | 56,145 | 56,188 |
| **Utah** | 25,153 | 24,482 | 24,482 | 21,011 | 21,011 | 20,071 | 19,839 | 18,984 | 24,482 | 24,482 | 24,482 |
| **Vermont** | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| **Virginia** | 8,130 | 7,196 | 6,773 | 6,656 | 5,609 | 4,092 | 3,636 | 3,586 | 7,247 | 6,877 | 6,906 |
| **Washington** | 146 | 136 | 136 | 136 | 136 | 136 | 136 | 70 | 136 | 136 | 136 |
| **West Virginia** | 25,326 | 25,384 | 24,792 | 14,475 | 13,369 | 13,173 | 13,141 | 13,141 | 24,792 | 14,475 | 13,369 |
| **Wisconsin** | 8,214 | 5,257 | 5,252 | 5,221 | 5,150 | 5,126 | 4,981 | 4,639 | 5,251 | 5,251 | 5,251 |
| **Wyoming** | 14,281 | 10,796 | 10,724 | 10,167 | 9,258 | 9,244 | 8,810 | 8,334 | 10,796 | 10,796 | 10,796 |
| **Nationwide** | 661,514 | 570,787 | 539,942 | 457,206 | 439,404 | 397,120 | 386,293 | 367,409 | 511,907 | 486,000 | 451,848 |

\*Source:  Integrated Planning Model run by EPA, 2015.  See Appendix A for list and description of these IPM runs.  Emissions have been rounded to the nearest ton.  Emissions shown for all fossil-fired units greater than 25 MW when only an ozone season cost constraint is applied.  Costs are in 2011$.

**Table B-2.  2017 Ozone Season NOₓ EGU Emissions\* for Each State at Various Pollution Control Cost Thresholds (CT) per Ton of Reduction (Tons) "All Units".**

| | 5.14 Base Case | 5.15 Base Case | $500/ton CT | $1300/ton CT | $3400/ton CT | $5000/ton CT | $6400/ton CT | $10000/ton CT | Less Stringent Control Alternative | Proposed Emissions Budgets | More Stringent Control Alternative |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama** | 12,151 | 13,592 | 11,863 | 10,015 | 9,944 | 8,846 | 8,219 | 7,797 | 12,095 | 10,486 | 10,531 |
| **Arizona** | 20,835 | 16,960 | 16,961 | 10,895 | 11,150 | 11,032 | 11,012 | 10,924 | 16,975 | 16,975 | 16,975 |
| **Arkansas** | 11,890 | 6,399 | 6,386 | 6,295 | 5,624 | 5,335 | 5,254 | 4,560 | 6,414 | 6,414 | 6,536 |
| **California** | 4,122 | 3,789 | 3,789 | 3,788 | 3,781 | 3,786 | 3,785 | 3,670 | 3,789 | 3,789 | 3,789 |
| **Colorado** | 14,897 | 13,467 | 13,467 | 13,444 | 12,835 | 12,584 | 12,176 | 11,541 | 13,467 | 13,467 | 13,467 |
| **Connecticut** | 1,587 | 1,607 | 1,607 | 1,610 | 1,589 | 1,570 | 1,570 | 1,544 | 1,607 | 1,607 | 1,607 |
| **Delaware** | 388 | 580 | 580 | 580 | 580 | 580 | 580 | 576 | 580 | 580 | 580 |
| **District of Columbia** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Florida** | 33,539 | 30,046 | 28,840 | 23,522 | 22,968 | 22,820 | 22,397 | 22,190 | 30,284 | 30,433 | 30,469 |
| **Georgia** | 9,535 | 7,498 | 7,378 | 7,260 | 7,159 | 7,072 | 7,041 | 7,072 | 7,501 | 7,510 | 7,516 |
| **Idaho** | 206 | 251 | 244 | 245 | 245 | 246 | 246 | 246 | 252 | 248 | 249 |
| **Illinois** | 15,810 | 11,002 | 10,627 | 10,564 | 10,493 | 10,427 | 10,415 | 10,295 | 10,773 | 10,761 | 10,750 |
| **Indiana** | 43,910 | 42,496 | 35,885 | 30,374 | 29,590 | 28,811 | 29,143 | 25,797 | 35,843 | 31,033 | 31,018 |
| **Iowa** | 9,364 | 8,307 | 8,190 | 7,951 | 7,913 | 7,913 | 7,940 | 7,342 | 8,153 | 7,935 | 7,935 |
| **Kansas** | 11,694 | 11,820 | 11,393 | 11,424 | 11,602 | 11,426 | 11,393 | 11,766 | 11,393 | 11,393 | 11,393 |
| **Kentucky** | 38,993 | 27,201 | 23,593 | 15,306 | 14,848 | 14,756 | 13,774 | 12,726 | 24,203 | 15,976 | 16,027 |
| **Louisiana** | 13,925 | 11,162 | 11,127 | 11,074 | 10,791 | 10,739 | 10,741 | 10,535 | 11,166 | 11,077 | 11,083 |
| **Maine** | 1,609 | 1,565 | 1,565 | 1,565 | 1,565 | 1,557 | 1,552 | 1,552 | 1,565 | 1,565 | 1,565 |
| **Maryland** | 5,107 | 7,324 | 6,295 | 6,297 | 6,160 | 6,147 | 5,955 | 5,955 | 6,132 | 6,138 | 6,009 |
| **Massachusetts** | 1,956 | 2,219 | 2,268 | 2,229 | 2,221 | 2,186 | 2,115 | 2,069 | 2,222 | 2,222 | 2,219 |
| **Michigan** | 32,421 | 22,233 | 21,858 | 19,340 | 18,862 | 18,713 | 18,717 | 18,677 | 22,073 | 20,635 | 20,635 |
| **Minnesota** | 11,501 | 11,223 | 11,145 | 10,947 | 10,743 | 10,691 | 10,650 | 9,576 | 11,226 | 11,226 | 11,226 |
| **Mississippi** | 8,951 | 8,299 | 8,217 | 8,002 | 7,416 | 7,208 | 6,895 | 6,258 | 7,788 | 7,579 | 7,067 |
| **Missouri** | 20,632 | 18,663 | 17,732 | 17,705 | 17,767 | 17,881 | 17,322 | 17,113 | 17,757 | 17,793 | 17,831 |
| **Montana** | 8,502 | 7,759 | 7,746 | 7,746 | 7,746 | 7,722 | 7,722 | 7,722 | 7,759 | 7,759 | 7,759 |
| **Nebraska** | 14,548 | 14,613 | 14,613 | 14,237 | 11,388 | 11,209 | 10,752 | 9,786 | 14,579 | 14,577 | 14,578 |
| **Nevada** | 4,192 | 4,547 | 4,532 | 4,530 | 3,323 | 3,158 | 2,584 | 1,840 | 4,546 | 4,546 | 4,546 |
| **New Hampshire** | 301 | 289 | 289 | 289 | 294 | 296 | 295 | 299 | 289 | 289 | 289 |
| **New Jersey** | 4,617 | 3,950 | 3,581 | 3,580 | 3,576 | 3,573 | 3,570 | 3,489 | 3,091 | 3,090 | 3,085 |
| **New Mexico** | 17,266 | 17,372 | 17,372 | 16,940 | 16,942 | 16,813 | 16,364 | 16,238 | 17,372 | 17,372 | 17,372 |
| **New York** | 9,123 | 7,911 | 7,807 | 7,638 | 7,578 | 7,579 | 7,305 | 7,072 | 7,870 | 7,675 | 7,676 |
| **North Carolina** | 22,048 | 17,307 | 15,385 | 15,389 | 13,784 | 13,685 | 12,895 | 12,774 | 15,341 | 15,341 | 14,215 |
| **North Dakota** | 23,037 | 16,423 | 16,423 | 13,078 | 13,054 | 12,743 | 12,480 | 12,430 | 16,246 | 16,246 | 16,246 |
| **Ohio** | 29,693 | 29,249 | 23,503 | 19,603 | 19,583 | 19,785 | 19,545 | 19,473 | 23,504 | 19,823 | 19,823 |
| **Oklahoma** | 24,335 | 19,620 | 18,918 | 17,450 | 16,452 | 15,799 | 13,930 | 13,023 | 19,614 | 18,103 | 18,114 |
| **Oregon** | 1,038 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 |
| **Pennsylvania** | 52,173 | 43,599 | 41,389 | 16,834 | 16,826 | 16,704 | 16,686 | 16,613 | 42,421 | 17,094 | 17,087 |
| **Rhode Island** | 208 | 257 | 257 | 260 | 257 | 257 | 257 | 257 | 254 | 255 | 256 |
| **South Carolina** | 6,183 | 5,875 | 4,819 | 4,739 | 4,701 | 4,693 | 4,690 | 4,721 | 6,016 | 6,046 | 6,047 |
| **South Dakota** | 653 | 297 | 297 | 297 | 297 | 297 | 297 | 297 | 297 | 297 | 297 |
| **Tennessee** | 6,382 | 5,566 | 5,492 | 5,454 | 5,446 | 5,367 | 5,350 | 5,307 | 5,493 | 5,493 | 5,494 |
| **Texas** | 66,651 | 59,199 | 58,570 | 56,391 | 54,406 | 53,283 | 52,529 | 52,707 | 59,228 | 57,146 | 57,223 |
| **Utah** | 25,160 | 24,489 | 24,489 | 21,018 | 21,018 | 20,078 | 19,846 | 19,209 | 24,489 | 24,489 | 24,489 |
| **Vermont** | 198 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 |
| **Virginia** | 11,254 | 9,201 | 8,778 | 8,662 | 7,809 | 6,292 | 6,182 | 6,339 | 9,252 | 8,882 | 8,911 |
| **Washington** | 1,002 | 747 | 747 | 747 | 747 | 747 | 747 | 926 | 747 | 747 | 747 |
| **West Virginia** | 25,606 | 25,664 | 25,071 | 14,755 | 13,649 | 13,453 | 13,421 | 13,421 | 25,071 | 14,755 | 13,649 |
| **Wisconsin** | 8,801 | 5,923 | 5,920 | 5,906 | 5,845 | 5,825 | 5,674 | 5,331 | 5,917 | 5,917 | 5,917 |
| **Wyoming** | 14,281 | 10,796 | 10,724 | 10,167 | 9,258 | 9,245 | 8,812 | 8,345 | 10,796 | 10,796 | 10,796 |
| **Nationwide** | 702,278 | 609,317 | 578,695 | 497,105 | 480,788 | 397,120 | 386,293 | 367,409 | 511,907 | 524,543 | 451,848 |

\*Source:  Integrated Planning Model run by EPA, 2015.  See Appendix A for list and description of these IPM runs.  Emissions have been rounded to the nearest ton.  Emissions shown for all fossil-fired units greater than 25 MW when only an ozone season cost constraint is applied.  Costs are in 2011$.

9

**Table B-3. Emission Differences between the 5.14 Base Case and the Other Pollution Control Cost Thresholds (Tons) from "All Units".**

| | 5.14 Base Case | 5.15 Base Case | $500/ton CT | $1300/ton CT | $3400/ton CT | $5000/ton CT | $6400/ton CT | $10000/ton CT | Less Stringent Control Alternative | Proposed Emissions Budgets | More Stringent Control Alternative |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 0 | 1,441 | -288 | -2,136 | -2,207 | -3,305 | -3,932 | -4,354 | -56 | -1,665 | -1,620 |
| Arizona | 0 | -3,874 | -3,874 | -9,940 | -9,685 | -9,802 | -9,822 | -9,911 | -3,860 | -3,860 | -3,860 |
| Arkansas | 0 | -5,492 | -5,505 | -5,595 | -6,267 | -6,555 | -6,637 | -7,330 | -5,476 | -5,476 | -5,355 |
| California | 0 | -333 | -333 | -334 | -341 | -336 | -337 | -452 | -333 | -333 | -333 |
| Colorado | 0 | -1,430 | -1,430 | -1,453 | -2,062 | -2,313 | -2,721 | -3,356 | -1,430 | -1,430 | -1,430 |
| Connecticut | 0 | 20 | 19 | 22 | 2 | -17 | -17 | -44 | 20 | 20 | 20 |
| Delaware | 0 | 192 | 192 | 192 | 192 | 192 | 192 | 188 | 192 | 192 | 192 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | 0 | -3,493 | -4,700 | -10,017 | -10,571 | -10,719 | -11,142 | -11,350 | -3,255 | -3,106 | -3,070 |
| Georgia | 0 | -2,038 | -2,157 | -2,275 | -2,376 | -2,464 | -2,494 | -2,463 | -2,035 | -2,025 | -2,019 |
| Idaho | 0 | 44 | 38 | 38 | 39 | 39 | 39 | 39 | 45 | 42 | 43 |
| Illinois | 0 | -4,808 | -5,183 | -5,245 | -5,317 | -5,383 | -5,394 | -5,515 | -5,037 | -5,049 | -5,060 |
| Indiana | 0 | -1,414 | -8,025 | -13,536 | -14,320 | -15,099 | -14,767 | -18,113 | -8,067 | -12,877 | -12,892 |
| Iowa | 0 | -1,057 | -1,174 | -1,413 | -1,452 | -1,452 | -1,424 | -2,023 | -1,211 | -1,429 | -1,429 |
| Kansas | 0 | 126 | -301 | -271 | -93 | -269 | -301 | 71 | -301 | -301 | -301 |
| Kentucky | 0 | -11,792 | -15,400 | -23,687 | -24,146 | -24,237 | -25,220 | -26,267 | -14,790 | -23,017 | -22,967 |
| Louisiana | 0 | -2,764 | -2,798 | -2,851 | -3,134 | -3,187 | -3,185 | -3,391 | -2,760 | -2,849 | -2,843 |
| Maine | 0 | -44 | -44 | -44 | -44 | -52 | -57 | -57 | -44 | -44 | -44 |
| Maryland | 0 | 2,217 | 1,189 | 1,191 | 1,053 | 1,041 | 848 | 848 | 1,026 | 1,032 | 903 |
| Massachusetts | 0 | 262 | 312 | 273 | 264 | 230 | 158 | 113 | 265 | 265 | 262 |
| Michigan | 0 | -10,188 | -10,563 | -13,081 | -13,559 | -13,708 | -13,704 | -13,744 | -10,348 | -11,786 | -11,786 |
| Minnesota | 0 | -278 | -356 | -553 | -758 | -810 | -851 | -1,925 | -275 | -275 | -275 |
| Mississippi | 0 | -653 | -734 | -949 | -1,536 | -1,743 | -2,056 | -2,693 | -1,163 | -1,372 | -1,884 |
| Missouri | 0 | -1,969 | -2,900 | -2,927 | -2,865 | -2,751 | -3,310 | -3,519 | -2,875 | -2,839 | -2,801 |
| Montana | 0 | -743 | -756 | -756 | -756 | -780 | -780 | -780 | -743 | -743 | -743 |
| Nebraska | 0 | 65 | 65 | -311 | -3,160 | -3,339 | -3,796 | -4,762 | 31 | 29 | 30 |
| Nevada | 0 | 355 | 340 | 338 | -868 | -1,034 | -1,608 | -2,352 | 355 | 354 | 354 |
| New Hampshire | 0 | -12 | -12 | -12 | -7 | -5 | -6 | -2 | -12 | -12 | -12 |
| New Jersey | 0 | -667 | -1,036 | -1,037 | -1,041 | -1,044 | -1,047 | -1,128 | -1,526 | -1,528 | -1,532 |
| New Mexico | 0 | 106 | 106 | -326 | -324 | -452 | -902 | -1,027 | 106 | 106 | 106 |
| New York | 0 | -1,213 | -1,317 | -1,486 | -1,545 | -1,545 | -1,818 | -2,051 | -1,253 | -1,448 | -1,447 |
| North Carolina | 0 | -4,741 | -6,663 | -6,659 | -8,263 | -8,363 | -9,153 | -9,274 | -6,707 | -6,707 | -7,833 |
| North Dakota | 0 | -6,614 | -6,614 | -9,959 | -9,983 | -10,295 | -10,557 | -10,607 | -6,791 | -6,791 | -6,791 |
| Ohio | 0 | -444 | -6,190 | -10,090 | -10,110 | -9,908 | -10,147 | -10,220 | -6,189 | -9,870 | -9,870 |
| Oklahoma | 0 | -4,714 | -5,417 | -6,884 | -7,883 | -8,535 | -10,404 | -11,311 | -4,720 | -6,232 | -6,220 |
| Oregon | 0 | -238 | -238 | -238 | -238 | -238 | -238 | -238 | -238 | -238 | -238 |
| Pennsylvania | 0 | -8,575 | -10,785 | -35,339 | -35,347 | -35,469 | -35,488 | -35,560 | -9,752 | -35,079 | -35,086 |
| Rhode Island | 0 | 49 | 49 | 52 | 49 | 49 | 49 | 49 | 47 | 48 | 48 |
| South Carolina | 0 | -308 | -1,365 | -1,444 | -1,482 | -1,491 | -1,493 | -1,462 | -167 | -137 | -136 |
| South Dakota | 0 | -356 | -356 | -356 | -356 | -356 | -356 | -356 | -356 | -356 | -356 |
| Tennessee | 0 | -816 | -890 | -928 | -937 | -1,015 | -1,032 | -1,075 | -890 | -889 | -888 |
| Texas | 0 | -7,452 | -8,081 | -10,260 | -12,245 | -13,369 | -14,123 | -13,944 | -7,423 | -9,506 | -9,428 |
| Utah | 0 | -671 | -671 | -4,142 | -4,142 | -5,082 | -5,314 | -5,951 | -671 | -671 | -671 |
| Vermont | 0 | -36 | -36 | -36 | -36 | -36 | -36 | -36 | -36 | -36 | -36 |
| Virginia | 0 | -2,054 | -2,476 | -2,593 | -3,445 | -4,962 | -5,072 | -4,915 | -2,002 | -2,372 | -2,343 |
| Washington | 0 | -256 | -256 | -256 | -256 | -256 | -256 | -76 | -256 | -256 | -256 |
| West Virginia | 0 | 57 | -535 | -10,851 | -11,957 | -12,153 | -12,185 | -12,185 | -535 | -10,851 | -11,957 |
| Wisconsin | 0 | -2,878 | -2,881 | -2,894 | -2,955 | -2,976 | -3,127 | -3,469 | -2,884 | -2,884 | -2,884 |
| Wyoming | 0 | -3,486 | -3,558 | -4,115 | -5,023 | -5,037 | -5,470 | -5,937 | -3,486 | -3,486 | -3,486 |
| Nationwide | 0 | -92,961 | -123,583 | -205,173 | -221,490 | -230,390 | -240,492 | -253,916 | -117,865 | -177,736 | -180,222 |

*Source: Integrated Planning Model run by EPA, 2015. See Appendix A for list and description of these IPM runs. Emissions have been rounded to the nearest ton. Emissions shown for all fossil-fired units greater than 25 MW when only an ozone season cost constraint is applied. Costs are in 2011$.

**Table B-4.  2014 Heat Input, Emission Rates, and State Budgets**

| State | 2014 Heat Input (MMBtu) | Less Stringent Control Alternative | | | Proposed Alternative | | | More Stringent Control Alternative | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 IPM Emission Rate | 2018 IPM Emission Rate * 2014 Heat Input | 2017 Budget (w/2017 Adjustment and 2014 Historic Emission Limiter) | 2018 IPM Emission Rate | 2018 IPM Emission Rate * 2014 Heat Input (Historic * IPM Rate) | 2017 Budget (w/2017 Adjustment and 2014 Historic Emission Limiter) (w/ 2017 Adjustment) | 2018 IPM Emission Rate | 2018 IPM Emission Rate * 2014 Heat Input (Historic * IPM Rate) | 2017 Budget (w/2017 Adjustment and 2014 Historic Emission Limiter) (w/ 2017 Adjustment) |
| Alabama | 410,477,094 | 0.058 | 11,886 | 11,886 | 0.049 | 9,979 | 9,979 | 0.048 | 9,931 | 9,931 |
| Arkansas | 185,511,093 | 0.076 | 6,987 | 7,038 | 0.075 | 6,898 | 6,949 | 0.066 | 6,051 | 6,101 |
| Illinois | 388,382,456 | 0.063 | 12,121 | 12,144 | 0.062 | 12,069 | 12,078 | 0.062 | 11,992 | 11,992 |
| Indiana | 447,417,615 | 0.150 | 33,483 | 33,483 | 0.126 | 28,284 | 28,284 | 0.123 | 27,585 | 27,585 |
| Iowa | 151,989,571 | 0.113 | 8,614 | 8,614 | 0.110 | 8,351 | 8,351 | 0.107 | 8,118 | 8,118 |
| Kansas | 154,921,650 | 0.120 | 9,278 | 9,278 | 0.120 | 9,272 | 9,272 | 0.120 | 9,259 | 9,259 |
| Kentucky | 380,694,315 | 0.184 | 28,320 | 32,783 | 0.119 | 19,350 | 21,519 | 0.116 | 18,776 | 20,945 |
| Louisiana | 326,662,000 | 0.097 | 15,844 | 15,861 | 0.097 | 15,790 | 15,807 | 0.094 | 15,360 | 15,378 |
| Maryland | 86,239,563 | 0.098 | 2,155 | 4,026 | 0.098 | 2,160 | 4,026 | 0.096 | 2,160 | 4,026 |
| Michigan | 307,723,171 | 0.145 | 20,186 | 22,022 | 0.126 | 17,279 | 19,115 | 0.123 | 16,646 | 18,624 |
| Mississippi | 172,406,970 | 0.071 | 6,083 | 6,083 | 0.069 | 5,910 | 5,910 | 0.064 | 5,487 | 5,487 |
| Missouri | 330,006,788 | 0.093 | 14,257 | 15,380 | 0.093 | 14,113 | 15,323 | 0.092 | 13,740 | 15,240 |
| New Jersey | 112,887,439 | 0.036 | 2,016 | 2,016 | 0.036 | 2,015 | 2,015 | 0.036 | 2,011 | 2,011 |
| New York | 235,619,397 | 0.039 | 4,607 | 4,607 | 0.038 | 4,450 | 4,450 | 0.037 | 4,391 | 4,391 |
| North Carolina | 315,255,877 | 0.078 | 12,278 | 12,278 | 0.078 | 12,275 | 12,275 | 0.068 | 10,705 | 10,705 |
| Ohio | 457,251,027 | 0.088 | 20,194 | 20,194 | 0.073 | 16,660 | 16,660 | 0.073 | 16,637 | 16,637 |
| Oklahoma | 236,715,186 | 0.158 | 16,215 | 16,215 | 0.145 | 16,215 | 16,215 | 0.138 | 16,215 | 16,215 |
| Pennsylvania | 508,608,673 | 0.151 | 38,270 | 38,270 | 0.057 | 14,387 | 14,387 | 0.056 | 14,358 | 14,358 |
| Tennessee | 196,132,311 | 0.056 | 5,520 | 5,520 | 0.056 | 5,481 | 5,481 | 0.056 | 5,449 | 5,449 |
| Texas | 1,474,773,212 | 0.083 | 58,492 | 58,492 | 0.079 | 57,970 | 58,002 | 0.076 | 55,764 | 55,864 |
| Virginia | 179,324,728 | 0.078 | 6,955 | 6,955 | 0.076 | 6,818 | 6,818 | 0.065 | 5,834 | 5,834 |
| West Virginia | 317,087,558 | 0.145 | 22,932 | 22,932 | 0.084 | 13,390 | 13,390 | 0.078 | 12,367 | 12,367 |
| Wisconsin | 205,305,933 | 0.054 | 5,588 | 5,588 | 0.054 | 5,561 | 5,561 | 0.054 | 5,511 | 5,511 |

11

**Table B-5.  2017 State Budgets, Variability Limits, and Assurance Levels**

| State | Less Stringent Alternative | | | Proposed Budgets and Assurance Levels | | | More Stringent Alternative | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 Budgets | 2017 Variability Limit | 2017 Assurance Level | 2017 Budgets | 2017 Variability Limit | 2017 Assurance Level | 2017 Budgets | 2017 Variability Limit | 2017 Assurance Level |
| Alabama | 11,886 | 2,496 | 14,382 | 9,979 | 2,096 | 12,075 | 9,931 | 2,086 | 12,017 |
| Arkansas | 7,038 | 1,478 | 8,516 | 6,949 | 1,459 | 8,408 | 6,101 | 1,281 | 7,382 |
| Illinois | 12,144 | 2,550 | 14,694 | 12,078 | 2,536 | 14,614 | 11,992 | 2,518 | 14,510 |
| Indiana | 33,483 | 7,031 | 40,514 | 28,284 | 5,940 | 34,224 | 27,585 | 5,793 | 33,378 |
| Iowa | 8,614 | 1,809 | 10,423 | 8,351 | 1,754 | 10,105 | 8,118 | 1,705 | 9,823 |
| Kansas | 9,278 | 1,948 | 11,226 | 9,272 | 1,947 | 11,219 | 9,259 | 1,944 | 11,203 |
| Kentucky | 32,783 | 6,884 | 39,667 | 21,519 | 4,519 | 26,038 | 20,945 | 4,398 | 25,343 |
| Louisiana | 15,861 | 3,331 | 19,192 | 15,807 | 3,319 | 19,126 | 15,378 | 3,229 | 18,607 |
| Maryland | 4,026 | 845 | 4,871 | 4,026 | 845 | 4,871 | 4,026 | 845 | 4,871 |
| Michigan | 22,022 | 4,625 | 26,647 | 19,115 | 4,014 | 23,129 | 18,624 | 3,911 | 22,535 |
| Mississippi | 6,083 | 1,277 | 7,360 | 5,910 | 1,241 | 7,151 | 5,487 | 1,152 | 6,639 |
| Missouri | 15,380 | 3,230 | 18,610 | 15,323 | 3,218 | 18,541 | 15,240 | 3,200 | 18,440 |
| New Jersey | 2,016 | 423 | 2,439 | 2,015 | 423 | 2,438 | 2,011 | 422 | 2,433 |
| New York | 4,607 | 967 | 5,574 | 4,450 | 935 | 5,385 | 4,391 | 922 | 5,313 |
| North Carolina | 12,278 | 2,578 | 14,856 | 12,275 | 2,578 | 14,853 | 10,705 | 2,248 | 12,953 |
| Ohio | 20,194 | 4,241 | 24,435 | 16,660 | 3,499 | 20,159 | 16,637 | 3,494 | 20,131 |
| Oklahoma | 16,215 | 3,405 | 19,620 | 16,215 | 3,405 | 19,620 | 16,215 | 3,405 | 19,620 |
| Pennsylvania | 38,270 | 8,037 | 46,307 | 14,387 | 3,021 | 17,408 | 14,358 | 3,015 | 17,373 |
| Tennessee | 5,520 | 1,159 | 6,679 | 5,481 | 1,151 | 6,632 | 5,449 | 1,144 | 6,593 |
| Texas | 58,492 | 12,283 | 70,775 | 58,002 | 12,180 | 70,182 | 55,864 | 11,731 | 67,595 |
| Virginia | 6,955 | 1,461 | 8,416 | 6,818 | 1,432 | 8,250 | 5,834 | 1,225 | 7,059 |
| West Virginia | 22,932 | 4,816 | 27,748 | 13,390 | 2,812 | 16,202 | 12,367 | 2,597 | 14,964 |
| Wisconsin | 5,588 | 1,173 | 6,761 | 5,561 | 1,168 | 6,729 | 5,511 | 1,157 | 6,668 |

**Table B-6.  Existing Unit Allocation and NUSA Calculations for Proposed Budgets.**

| | Proposed 2017 Budgets | Existing Unit Allocation | NUSA | Non Indian Country NUSA (tons) | Indian Country NUSA (tons) |
|---|---|---|---|---|---|
| **Alabama** | 9,979 | 9,774 | 205 | 205 | |
| **Arkansas** | 6,949 | 6,808 | 141 | 141 | |
| **Illinois** | 12,078 | 11,487 | 591 | 591 | |
| **Indiana** | 28,284 | 27,719 | 565 | 565 | |
| **Iowa** | 8,351 | 7,932 | 419 | 411 | 8 |
| **Kansas** | 9,272 | 8,991 | 281 | 272 | 9 |
| **Kentucky** | 21,519 | 20,872 | 647 | 647 | |
| **Louisiana** | 15,807 | 15,179 | 628 | 612 | 16 |
| **Maryland** | 4,026 | 3,541 | 485 | 485 | |
| **Michigan** | 19,115 | 18,733 | 382 | 363 | 19 |
| **Mississippi** | 5,910 | 5,320 | 590 | 584 | 6 |
| **Missouri** | 15,323 | 15,009 | 314 | 314 | |
| **New Jersey** | 2,015 | 864 | 1,151 | 1,151 | |
| **New York** | 4,450 | 4,357 | 93 | 89 | 4 |
| **North Carolina** | 12,275 | 12,027 | 248 | 236 | 12 |
| **Ohio** | 16,660 | 16,323 | 337 | 337 | |
| **Oklahoma** | 16,215 | 15,890 | 325 | 309 | 16 |
| **Pennsylvania** | 14,387 | 13,370 | 1,017 | 1,017 | |
| **Tennessee** | 5,481 | 5,372 | 109 | 109 | |
| **Texas** | 58,002 | 55,092 | 2,910 | 2,852 | 58 |
| **Virginia** | 6,818 | 4,974 | 1,844 | 1,844 | |
| **West Virginia** | 13,390 | 13,122 | 268 | 268 | |
| **Wisconsin** | 5,561 | 5,440 | 121 | 115 | 6 |

C. Analysis of Significant Contribution Using an Ozone Air Quality Assessment Tool

EPA has defined significant contribution to nonattainment and interference with maintenance of downwind air quality using a multi-factor test (described in the preamble) which is based on cost, emissions, and air quality factors. A key quantitative input for determining the amount of significant contribution is the predicted downwind ambient air quality impacts of upwind EGU emission reductions under the various $NO_x$ cost thresholds described in section B of this TSD. Time and resource limitations (in particular the amount of time needed to set up, run the CAMx model,[9] and analyze the results for a single model run precluded the use of full air quality modeling for all but a few emissions scenarios. Because EPA needed to evaluate emission reductions under several different $NO_x$ cost thresholds, it was not possible to use CAMx air quality modeling to evaluate all cases.

Consequently, EPA used a simplified assessment tool to estimate the downwind air quality impacts from the $NO_x$ cost thresholds. For the $NO_x$ cost thresholds, the state-by-state EGU emissions are projected using EPA's IPM model under a given cost threshold of emission reductions (see section B of this TSD for details about the IPM model runs and for the emission projections). The air quality impacts of these cost thresholds are then estimated using the ozone AQAT. The inputs and outputs of the tool can be found in the "ozone_AQAT.xlsx" excel workbook. The simplified tool allows the Agency to analyze many more $NO_x$ cost thresholds than would otherwise be possible. The remainder of section C of this document will:

- Present an introduction and overview of the ozone AQAT;
- Describe the construction of the ozone AQAT;
- Provide the results of the $NO_x$ cost threshold analyses;

1. Introduction: Development of the ozone AQAT

The ozone AQAT was developed specifically for use in the rule's significant contribution analysis. EPA described and used a similar tool in CSAPR to evaluate fine particulate matter (PM2.5) significant contribution. For this rule, EPA refined both the construction and application of the assessment tool for use in estimating change in ozone concentrations in response to changes in $NO_x$ emissions. One important change between CSAPR and this effort is to use the ozone AQAT to examine changes in ozone. We follow the methodology developed in the final CSAPR where we calibrate the response of a pollutant[10] using two CAMx simulations at different emission levels. In this rule, we used CAMx to calibrate the assessment tool's predicted change in ozone concentrations to changes in $NO_x$ emissions. This calibration is

---

[9] See the Air Quality Modeling TSD, or "Updated Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Transport Assessment" for additional details. www.epa.gov/airtransport/pdfs/Updated_2008_Ozone_NAAQS_Transport_AQModeling_TSD.pdf and the Emission inventory information relevant to the 2011 and 2018 simulations , available at www.epa.gov/ttn/chief/emch/index.html

[10] In CSAPR, we estimated changes in sulfate using changes in $SO_2$ emissions.

receptor-specific and is based on the changes in $NO_x$ emissions and resulting ozone concentrations between the 2017 base case and the modeled illustrative control case[11] in 2017.

A critical factor in the assessment tool is the establishment of a relationship between ozone-season $NO_x$ emission reductions and reductions in ozone. For the purposes of developing and using an assessment tool to compare the air quality impacts of $NO_x$ emission reductions under various cost thresholds, we determine the relationship between changes in emissions and changes in ozone contributions on a receptor-by-receptor basis. Specifically, EPA assumed that, within the range of total $NO_x$ emissions being considered (as defined by the $NO_x$ cost thresholds), a change in ozone-season $NO_x$ emissions leads to a proportional change in downwind ozone contributions[12]. This proportional relationship was then modified using calibration factors based on air quality modeling, as described below.

Within the assessment tool, the relationships between upwind emissions and downwind air quality are defined using the 2017 base case contribution air quality modeling and a 2017 illustrative control case. As described in the Air Quality Modeling TSD, CAMx state-by-state source-apportionment modeling was used to quantify the contributions to ozone at monitoring sites due to $NO_x$ emissions from each upwind state for the 2017 base case emission scenario. For example, from the output of the CAMx source apportionment modeling, we know the ozone contribution at a downwind monitor resulting from the specific $NO_x$ emissions in the 2017 base case from a particular upwind state. In the ozone AQAT, we associate a change in emissions from that upwind state with a particular change in its downwind contribution. In the "uncalibrated" ozone AQAT, for example, we assume that a 20% decrease in the upwind state's emissions leads to a 20% decrease in its downwind ozone contribution. This relationship is calibrated using emission reductions from the 2017 base case to the 2017 illustrative control case[13] by calculating the relationship between the relative change in ozone at each receptor using CAMx air quality modeling and the relative change in ozone at each receptor using the ozone AQAT. Using this relationship, it was possible to calibrate the ozone AQAT's ozone response for use in assessing ozone under various $NO_x$ cost thresholds. This is described further in section C.2 of this document. For the example above, where a 20% reduction in emissions resulted in a 20% decrease in contribution, using "calibrated" ozone AQAT may yield, for example, a 10% reduction in concentration from the 20% reduction in emissions (as derived directly from the emission reduction and concentration change from the 2017 base case to the 2017 illustrative control case).

In the application of the uncalibrated ozone AQAT, we assume that the reduction of a ton of emissions of $NO_x$ from the upwind state has an equivalent air quality effect downwind (on an

---

[11] An integral input to the creation and use of the assessment tool was CAMx air quality modeling of the control scenario used in calibration. This "illustrative control case" was created during the development of the assessment tool for the proposed rule and its EGU emissions modeling reflects the geography and cost threshold from the control scenario at $1,300/ton for ozone-season $NO_x$ using IPM v. 5.14. Note that the emission reductions for this scenario differ from the final values used in the proposed rule.

[12] The relationship between $NO_x$ emissions and ozone concentrations is known to be non-linear when examined over large ranges of $NO_x$ emissions (e.g., Seinfeld and Pandis, pp 236-236). However, for some ranges of $NO_x$, VOC, and meteorological conditions, the relationship may be reasonably linear. In this assessment tool, we are assuming a linear relationship between $NO_x$ emissions and ozone concentrations. This assumption is reasonable because the changes in $NO_x$ emissions and ozone concentrations are small (a few ppb), and the results are "bracketed" using two modeled scenarios. Over this range, a majority of the nonlinearity in the relationship between emissions and concentrations is directly accounted for by the air quality model.

[13] The illustrative control case is an EGU $NO_x$ ozone-season emission budget sensitivity scenario, reflecting emission reductions in the 23 eastern states that the EPA proposes to regulate under this rule.

air quality impact per ton basis), regardless of source sector or the location of the particular emission source within the state where the ton was reduced. For example, reducing one ton of $NO_x$ emissions from the power sector is assumed to have the same downwind ozone reduction as reducing one ton of $NO_x$ emissions of from the mobile source sector. For this rule, we are examining all emission reductions within a 2017 time-frame. Consequently, only reductions from the power sector are anticipated. Because the calibration factor is based only on modeling of 2017 with only emission reductions from the power sector, the calibration factor and thereby calibrated ozone AQAT better represents changes in emissions in the power sector.

Because the tool is only being used over a fairly narrow range (for which a calibration factor has been developed), and because other options such as using CAMx to model all other scenarios is cost and time-prohibitive, EPA proposes to use ozone AQAT as a cost-effective tool for estimating the downwind ozone reductions due to upwind $NO_x$ emission reductions for the air quality input to the multi-factor test for this rule. Other options, such as directly scaling the results (i.e., an "uncalibrated ozone AQAT") will likely greatly overestimate the air quality impacts of emission reductions.

Section C.2, below, is a technical explanation of the construction of the ozone AQAT. Readers who prefer to access the results of the analysis using the ozone AQAT are directed to section C.3.

## 2. Details on the construction of the ozone AQAT

### (a) Overview of the ozone AQAT

This section describes the step-by-step development process for the ozone AQAT. All of the input and output data can be found in the Excel worksheets described in Appendix B. In the ozone AQAT, EPA links state-by-state $NO_x$ emission reductions (from IPM) with CAMx modeled ozone contributions in order to predict ozone concentrations at different cost thresholds at monitoring sites with projected nonattainment and/or maintenance problems in the 2017 base case. The reduction in ozone contributions and resulting air quality improvement were then considered in a multi-factor test for defining significant contribution to nonattainment and interference with maintenance. In the analysis for a given receptor, emissions were reduced in only those upwind states that were "linked" to that receptor (i.e., contributed an air quality impact at or above the 1 percent -- of the NAAQS standard -- air quality threshold) as well as the state that contained that receptor (regardless of that state's contribution). For a discussion of the 1% threshold, see preamble section V.

Specifically, the key estimates from the ozone AQAT for each receptor are:
- The ozone contribution as a function of emissions at each cost threshold, for each upwind state that is contributing above the 1 percent air quality threshold and the state containing the receptor.
- The ozone contribution under base case $NO_x$ emissions (i.e., the IPM 5.14 base case), for each upwind state that is not above the 1 percent air quality threshold for that receptor. These base level emissions may be different/reduced in other scenarios (i.e., the IPM 5.15 base case) due to projected changes in the EGU sector (see section B and references therein for additional details).

16

● The non-anthropogenic (i.e., background, boundary, biogenic, and wildfire) ozone concentrations (these are assumed to be constant and equal to the contributions from the 2017 source apportionment modeling (using IPM v. 5.14).

The results of the ozone AQAT analysis for each cost threshold can be found in section C.3 of this document.

(b) Data used to construct the ozone AQAT for this rule

Several data sources were used to construct the calibrated ozone AQAT for this rule. Three data sources provide the necessary initial information to construct the uncalibrated versions of the ozone AQAT. The uncalibrated versions of the ozone AQAT were used to create estimates of ozone response under $NO_x$ emissions defined by the illustrative control case. The datasets required to construct the ozone AQAT included: the 2017 base case ozone-season $NO_x$ emission inventories from all source sectors used in the source apportionment CAMx air quality modeling (this includes all anthropogenic sources and excludes biogenic sources and wildfires); the CAMx 2017 ozone-season contributions for each upwind state to each downwind receptor; and the 2017 illustrative control case ozone-season $NO_x$ emissions inventories from all source sectors. An additional dataset, 2017 ozone concentrations from CAMx for the illustrative control case, was used to compare the ozone AQAT-estimated ozone concentrations for this scenario to the corresponding air quality modeling results, and develop calibration factors to align the response of ozone to changes in $NO_x$ emissions in the ozone AQAT with the response predicted by CAMx. These calibration factors were then used to create a "calibrated" ozone AQAT. Finally, EGU ozone-season $NO_x$ emissions (from IPM) at each cost threshold were used to generate ozone AQAT air quality results using the calibrated ozone AQAT. The base case emissions inventories for the 2017 base case (using both versions 5.14 and 5.15 versions of IPM for EGUs), as well as the CAMx 2017 base case source apportionment air quality modeling results are discussed in preamble section V. The ozone-season $NO_x$ EGU emissions for each cost threshold (projected using IPM), including the base case, are listed in Table B-2 and described in section B of this TSD.

As described in the Air Quality Modeling TSD and the preamble, the air quality contributions and emissions were modeled for all states[14] in the contiguous US. Thus, in the ozone AQAT, these states had the possibility of making reductions in emissions leading to changes in air quality contributions at the downwind receptors. Additionally, due to the modeling domain, the ozone AQAT is only able to estimate changes in ozone concentrations from monitors within these states[15].

(c) Detailed outline of the process for constructing and utilizing the ozone AQAT

The ozone AQAT was created and used in a multi-step process. First, a version of the ozone AQAT was created specifically for calibration. As described in the following paragraphs, the ozone AQAT simulated the response of ozone to reductions in emissions of $NO_x$. Next, the

---

[14] The District of Columbia was also modeled.
[15] Because the illustrative control case does not include emission changes in some upwind states (e.g., states in the western portion of the domain), calibration factors developed for these states, and the resulting changes in air quality, may not be representative.

relative ozone response from the ozone AQAT was calibrated to the ozone response from CAMx using the change in emissions from the 2017 base case to the illustrative control case. Next, the calibrated ozone AQAT was used to evaluate the ozone response of emission reductions for each $NO_x$ cost threshold assessed. At each cost threshold, the state-specific calibrated ozone estimates were combined with other constituents from the base case resulting in estimated ozone design values.[16]

The illustrative control case played a key role in calibrating the assessment tool for use in the rule. One intent of this control scenario was to create a calibration point within the range of all emission reductions examined by EPA using the assessment tool. This calibration point was used to create site-specific calibration factors so that the response of ozone concentrations to upwind $NO_x$ emission changes would more-closely align with ozone estimates from CAMx. To fill this role, EPA used the results of IPM modeling of an illustrative control case[11] with similar level and geographic distribution to the control remedy for this rule (except using IPM version 5.14 to estimate EGU emissions). Among other reasons, this scenario served to develop the calibration points for the assessment tool which allowed EPA to reasonably assess the downwind impacts of $NO_x$ reductions both more and less stringent than the illustrative control case.

In order to facilitate understanding of the calibration process, EPA is including an example monitor for evaluation in this text: monitor number 240251001 in Harford County, Maryland, with a 2017 base case predicted ozone average design value of 81.3 ppb and maximum design value of 84.0 ppb. Additional details for all monitors can be found in the referenced tables in the docket.

(1) Create an uncalibrated version of the ozone AQAT for calibration

To create the version of the ozone AQAT for calibration, EPA used emissions and contributions to estimate the change in predicted ozone due to $NO_x$ emission reductions under the illustrative control case relative to the 2017 base case.

First, EPA calculated ozone-season state-level 2017 base case total $NO_x$ emissions from all source sectors. These emissions estimates were used for the CAMx 2017 source apportionment modeling. This emissions data is divided into multiple source sectors for the purposes of air quality modeling: power sector point (from v 5.14 IPM), non-power sector point, non-point, onroad, nonroad, C3 marine, alm, and fires (see the Emissions Inventory TSD[17] for additional details on the emissions inventories used in the CAMx air quality modeling). The state-level total $NO_x$ emissions are the sum of emissions from all these source sectors. Next, EPA calculated the ozone-season 2017 total $NO_x$ emissions across all source sectors for the illustrative control case. EPA calculated the ratio of the emissions for the illustrative control case to the total emissions for the base case for each state modeled in CAMx. More information on the emissions inventories can be found in the preamble and in the Notice of Data Availability, or NODA[18]. The total emissions data and resulting ratios can be found in Table C-1.

---

[16] Details on procedures for calculating average and maximum design values can be found in the Air Quality Modeling TSD.

[17] "Technical Support Document (TSD) Preparation of Emissions Inventories for the Version 6.2, 2011 Emissions Modeling Platform", available at
www.epa.gov/ttn/chief/emch/2011v6/2011v6_2_2017_2025_EmisMod_TSD_aug2015.pdf

[18] "Notice of Availability of the Environmental Protection Agency's Updated Ozone Transport Modeling Data for the 2008 Ozone National Ambient Air Quality Standard (NAAQS)" (July 23, 2015), available at
http://www.epa.gov/airtransport/pdfs/FR_Version_Transport_NODA.pdf

For each monitor, "uncalibrated" change in concentration is found by multiplying the 2017 base case ozone contribution by the difference in the ratio of emissions.  The difference in the ratio of emissions is calculated as the ratio of total ozone-season $NO_x$ emissions in the illustrative control case to the 2017 base case scenario minus 1.  Thus, if the illustrative control case has smaller emissions, the net result is a negative number.  When the change in concentrations are summed across all states, the result is the total "uncalibrated" change in concentration.

Table C-1. 2017 Base Case and 2017 Illustrative Control Case Ozone Contributions for Monitor Number 240251001 in Harford County, Maryland, as well as Total $NO_x$ Emissions from all Source-Sectors for Each State.

| State/Source | 2017 Base Case Ozone Contributions (ppb) | 2017 Base Case $NO_x$ Emissions (tons) | 2017 Illustrative Control Case $NO_x$ Emissions (tons) | Ratio of Illustrative Control Case Emissions to Base Case Emissions | Difference between the Illustrative Control Case Emissions and Base Case Emissions as a Fraction of Base Case Emissions | Estimated 2017 Contribution of Ozone (Uncalibrated Ozone AQAT) (ppb) |
|---|---|---|---|---|---|---|
| AL | 0.4053 | 88,805 | 85,721 | 0.97 | -0.03 | -0.01 |
| AZ | 0.0958 | 71,906 | 71,906 | 1.00 | 0.00 | 0.00 |
| AR | 0.2264 | 69,737 | 69,039 | 0.99 | -0.01 | 0.00 |
| CA | 0.1106 | 236,322 | 236,322 | 1.00 | 0.00 | 0.00 |
| CO | 0.1942 | 90,756 | 90,756 | 1.00 | 0.00 | 0.00 |
| CT | 0.011 | 17,672 | 17,672 | 1.00 | 0.00 | 0.00 |
| DE | 0.1559 | 7,786 | 7,786 | 1.00 | 0.00 | 0.00 |
| DC | 0.7334 | 2,252 | 2,252 | 1.00 | 0.00 | 0.00 |
| FL | 0.1141 | 177,514 | 177,513 | 1.00 | 0.00 | 0.00 |
| GA | 0.3035 | 103,536 | 103,526 | 1.00 | 0.00 | 0.00 |
| ID | 0.0349 | 27,893 | 27,893 | 1.00 | 0.00 | 0.00 |
| IL | 0.672 | 148,178 | 147,770 | 1.00 | 0.00 | 0.00 |
| IN | 1.8904 | 139,133 | 127,487 | 0.92 | -0.08 | -0.16 |
| IA | 0.1933 | 70,467 | 70,045 | 0.99 | -0.01 | 0.00 |
| KS | 0.285 | 79,939 | 79,513 | 0.99 | -0.01 | 0.00 |
| KY | 1.973 | 106,830 | 97,311 | 0.91 | -0.09 | -0.18 |
| LA | 0.2597 | 173,330 | 172,886 | 1.00 | 0.00 | 0.00 |
| ME | 0.0005 | 17,576 | 17,576 | 1.00 | 0.00 | 0.00 |
| MD | 24.619 | 46,029 | 45,312 | 0.98 | -0.02 | -0.38 |
| MA | 0.0037 | 35,369 | 35,369 | 1.00 | 0.00 | 0.00 |
| MI | 0.8339 | 131,486 | 124,374 | 0.95 | -0.05 | -0.05 |
| MN | 0.1142 | 89,328 | 89,332 | 1.00 | 0.00 | 0.00 |
| MS | 0.1596 | 54,832 | 54,706 | 1.00 | 0.00 | 0.00 |
| MO | 0.5299 | 101,035 | 99,736 | 0.99 | -0.01 | -0.01 |
| MT | 0.0688 | 38,504 | 38,504 | 1.00 | 0.00 | 0.00 |
| NE | 0.1569 | 70,005 | 70,005 | 1.00 | 0.00 | 0.00 |
| NV | 0.0279 | 28,192 | 28,192 | 1.00 | 0.00 | 0.00 |
| NH | 0.0009 | 8,932 | 8,932 | 1.00 | 0.00 | 0.00 |
| NJ | 0.4374 | 52,743 | 52,031 | 0.99 | -0.01 | -0.01 |
| NM | 0.1688 | 65,263 | 65,263 | 1.00 | 0.00 | 0.00 |
| NY | 0.4009 | 109,910 | 107,416 | 0.98 | -0.02 | -0.01 |
| NC | 0.4684 | 98,064 | 91,850 | 0.94 | -0.06 | -0.03 |
| ND | 0.0848 | 74,118 | 74,118 | 1.00 | 0.00 | 0.00 |
| OH | 4.0022 | 160,110 | 150,516 | 0.94 | -0.06 | -0.24 |
| OK | 0.4683 | 131,763 | 129,215 | 0.98 | -0.02 | -0.01 |
| OR | 0.0232 | 40,507 | 40,507 | 1.00 | 0.00 | 0.00 |
| PA | 6.0769 | 174,664 | 147,166 | 0.84 | -0.16 | -0.96 |
| RI | 0.0006 | 5,845 | 5,844 | 1.00 | 0.00 | 0.00 |
| SC | 0.1097 | 55,897 | 55,846 | 1.00 | 0.00 | 0.00 |
| SD | 0.0587 | 22,192 | 22,192 | 1.00 | 0.00 | 0.00 |

20

| TN | 0.7044 | 85,759 | 85,693 | 1.00 | 0.00 | 0.00 |
|---|---|---|---|---|---|---|
| TX | 1.0563 | 467,245 | 465,179 | 1.00 | 0.00 | 0.00 |
| UT | 0.0942 | 66,486 | 66,486 | 1.00 | 0.00 | 0.00 |
| VT | 0.0015 | 5,473 | 5,473 | 1.00 | 0.00 | 0.00 |
| VA | 5.3016 | 87,754 | 87,514 | 1.00 | 0.00 | -0.01 |
| WA | 0.0327 | 75,833 | 75,833 | 1.00 | 0.00 | 0.00 |
| WV | 2.9988 | 64,839 | 53,954 | 0.83 | -0.17 | -0.50 |
| WI | 0.2178 | 75,047 | 75,035 | 1.00 | 0.00 | 0.00 |
| WY | 0.2063 | 68,864 | 68,864 | 1.00 | 0.00 | 0.00 |
| TRIBAL | 0.0436 | 26,717 | 26,717 | 1.00 | 0.00 | 0.00 |
| CNMX | 0.7368 | | | 1.00 | 0.00 | 0.00 |
| OFFSHORE | 0.4494 | | | 1.00 | 0.00 | 0.00 |
| FIRE | 0.3074 | | | 1.00 | 0.00 | 0.00 |
| ICBC | 16.652 | | | 1.00 | 0.00 | 0.00 |
| BIOG | 6.0915 | | | 1.00 | 0.00 | 0.00 |

## (2) Calibrate the ozone response in the ozone AQAT using CAMx modeling of the 2017 base and 2017 illustrative control case

Next, the estimate of the monitor specific ozone responses under the illustrative control case was used to calibrate the ozone AQAT to CAMx. First, the changes in ozone predicted by the ozone AQAT and CAMx for the average design values were calculated for each monitor for the illustrative control case relative to the 2017 base case concentrations. The difference from CAMx was then divided by the difference from the ozone AQAT, resulting in a monitor-specific calibration factor (see Table C-2 for an example calculation). The calculation of these monitor-specific calibration factors provided EPA with the ability to align the ozone response predicted by the ozone AQAT to the ozone response predicted by CAMx at a level of $NO_x$ reductions that EPA expected to be close to the range of all emission reductions examined by EPA.

The ozone AQAT and CAMx concentration differences can be found in the "ozone_AQAT.xlsx" excel workbook on worksheet "2017 contributions uncalibrated" in columns BN and BO, respectively. The calibration factor can be found in column BP of the aforementioned excel worksheet.

Table C-2. Ozone Contributions in the 2017 Base Case and 2017 Illustrative Control Case Calibration Scenario from CAMx and Uncalibrated Ozone AQAT for Monitor Number 240251001 in Harford County, Maryland (See Table C-1).  These Values are then Used to Create a Calibration Factor.

| | 2017 Base Case Ozone Concentration (ppb) | Estimated 2017 Illustrative Control Case Calibration Scenario Ozone Concentration (ppb) | Estimated Change in Concentration |
|---|---|---|---|
| CAMx | 81.369 | 80.469 | -0.900 |
| Ozone AQAT | 81.369 | 78.803 | -2.566 |
| Calibration Factor – Change in Concentration from CAMx Divided by Change in Concentration from the Ozone AQAT | | | 0.3508 |

### (3) Create a calibrated version of the ozone AQAT for cost threshold analysis

Next, EPA created the calibrated version of the ozone AQAT for the cost threshold analysis.  EPA used emissions, air quality ozone contributions, and calibration factors to estimate the change in predicted ozone due to $NO_x$ emission reductions under each cost threshold evaluated.  First, as described in step 2, EPA calculated ozone-season state-level 2017 base case total $NO_x$ emissions.  EPA calculated the state-level total emissions using both IPM v5.14 as well as v5.15.  Thus, in all cost threshold simulations, the contributions for all states were adjusted (either to the base level or to a cost level using IPM v5.15).  Next, because the emissions from all other sectors are constant, EPA focused on the differences in EGU emissions between each cost threshold and the 2017 base case using IPM v 5.14 (see Table B-3 for the emission differences)[19].  Finally, EPA calculated the ratio of the emission differences to the total[20] $NO_x$ emissions for the 2017 base case (using IPM v. 5.14) for each state modeled in CAMx (see Table C-1).  More information on the emissions inventories can be found in preamble and in the NODA.

For each cost threshold level analyzed, on a receptor-by-receptor basis, the emissions change for each upwind state is associated with one of two cost threshold levels (either the IPM v5.15 base case emissions level or the particular threshold cost level) depending on whether the upwind state is "linked" to that receptor or if the receptor is located within the state.  States that are contributing above the air quality threshold (i.e., greater than or equal to 1 percent

---

[19] We note that the total ozone-season $NO_x$ emissions from the IPM "all units" outputs used in the assessment tool air quality analysis and the EGU emissions used in the CAMx air quality modeling were slightly different (i.e., some "all units" emissions are apportioned to different sectors in the emission inventory used in CAMx).  However, within ozone AQAT, because the difference in emissions were consistently calculated using IPM's "all units", the resulting air quality estimates are not affected.

[20] The total emissions from all anthropogenic sources (excluding Biogenics and Fires), coinciding with the emissions that were "tagged" in the source-apportionment modeling

.

contribution of ozone) to the monitor, as well as the state containing the monitor, make $NO_x$ emissions reductions available at the particular threshold level. The emissions for all other states are adjusted to the IPM v 5.15 base case level (from the IPM v. 5.14 base case level).

For the three regulatory control alternatives, all states were adjusted to the emission levels in the case, regardless of whether the state was "linked". These scenarios examine the emission results when budgets have been applied to the 23-state geography.

For each monitor, the predicted 2017 change in contribution of ozone from each state is calculated by multiplying the state specific 2017 IPM v5.14 base case ozone contribution by the calibration factor as well as by the ratio of the change in emissions (Table B-3, for either the cost threshold level or the IPM v. 5.15 base case level depending on whether the state is linked and divided by the total 2017 IPM v. 5.14 base case emissions for all sectors (Table C-1)). This calibrated change in ozone is then added to the ozone contribution from the 2017 IPM v5.14 base case modeling. The result is the "calibrated" total ozone contribution.

For each monitor, these state-level "calibrated" contributions are then summed to estimate total ozone contribution from the states in the CAMx modeling domain. Finally, "other" modeled ozone contributions ("TRIBAL", "CNMX", "OFFSHORE", "FIRE", "ICBC", and "BIOG") are added from the 2017 IPM v. 5.14 base case modeling to the state contributions to account for other sources of ozone affecting the modeling domain. The total ozone from all the states and "other" contributions equals the average design values estimated in the assessment tool. The maximum design values were estimated by multiplying the estimated average design values by the ratio of the modeled 2017 IPM v5.14 base case maximum to average design values.

Generally, as the cost threshold value increased, the estimated average and maximum design values at each receptor decreased. In the assessment tool, the estimated value of the average design value was used to estimate whether the location will be out of attainment, while the estimated maximum design value was used to estimate whether the location will be out of maintenance. The area was noted as having a nonattainment or maintenance issue if its estimated air quality level was greater than or equal to 76 ppb.

## 3. Description of the results of the analysis using the assessment tool for the approach.

This section describes the results of the IPM v5.15 base case and cost threshold analysis using the ozone AQAT. In section C.2 of this TSD, we described the construction of the ozone AQAT to estimate the air quality impacts of various levels of EGU $NO_x$ emissions.

As described in section B, EPA examined a number of different emission scenarios: the IPM 5.15 base case; the illustrative control case; cost threshold levels of $500/ton, $1,300/ton, $3,400/ton, $5,000/ton, $6,400/ton, and $10,000/ton; and three regulatory control alternatives (i.e., proposed EGU $NO_x$ emissions budgets, and more and less stringent alternatives).

The average and maximum design values (ppb) estimated using the assessment tool for each identified receptor for each cost threshold level can be found in Tables C-3 and C-4, respectively. The monitors are in alphabetical order by state. No monitors are estimated to have resolved their average design value problems (i.e., estimated nonattainment) at any of the $NO_x$ cost thresholds examined when examined across the IPM v. 5.15 scenarios. However, the average design value for two monitors dropped below 76 ppb in the transition from the IPM v. 5.14 to IPM v. 5.15 base cases[21].

---

[21] Monitors 360850067 in Richmond, New York and 390610006 in Hamilton, Ohio.

Many monitors are projected to have maintenance issues at all cost levels. However, some monitors have their maintenance issues solved at various cost levels. In the IPM 5.15 base case, Monitors 261630019 in Wayne County, Michigan, 340230011 in Middlesex, New Jersey, 420031005 in Allegheny, Pennsylvania, and 480850005 in Colin, Texas are estimated to not have maintenance issues. No states appear to be solely linked to these receptors.

Examining the incremental difference in receptors at the $500/ton cost threshold (where non-linked states are kept at IPM v5.15 emission levels), we estimate that maintenance problems for monitors 340290006 in New Jersey and 211850004 in Kentucky would be resolved. However, no states are linked solely to these receptors.

At the $1,300/ton cost threshold, five additional monitors are projected to be clean. These are monitors 211110067 in Kentucky, 240053001 in Maryland, 340150002 in New Jersey, 390610006 in Ohio, and 482010026 in Texas. North Carolina is linked solely to monitor 240053001 in Baltimore Maryland.

At the $3,400/ton cost threshold, one additional monitor 481211032 in Texas is estimated to have a clean maintenance value. No states are solely linked to this monitor.

No additional monitors are projected to be clean until the $10,000/ton level, where one monitor, 421010024 in Pennsylvania, is projected to have a clean maintenance value. At the $6,400/ton cost level, Tennessee was linked solely to this monitor.

In the assessment of air quality using the calibrated assessment tool, we are able to estimate the relative contributions of particular upwind states contributing to a particular estimated design values. As noted, at each of the cost levels up to $10,000/ton, we also compared each state's adjusted ozone concentration against the 1% air quality threshold. Aside from North Carolina at $1,300/ton and Tennessee at $10,000/ton, where their final monitor is clean, we did not see instances where a state's contributions dropped below 1% of the NAAQS for all of its linkages.

 Lastly, once the budgets for the rule were established (based on the results of the multi-factor test) and IPM was used to model compliance with the rule, it was possible to estimate air quality concentrations at each downwind receptor using the ozone AQAT for each of the three regulatory control alternatives. Average and maximum design value estimates for the "less stringent alternative", the "proposed emissions budgets", and the "more stringent alternative" can be found in Tables C-5 and C-6. The design value results (i.e., which receptors are estimated to have nonattainment and/or maintenance problems) for the proposed emissions budgets scenario are similar to that of the $1,300/ton cost threshold.

Table C-3. Average Ozone DVs (ppb) for NO$_x$ Cost Thresholds ($/ton) Assessed Using the Ozone AQAT.

| Monitor Identification Number | State | County | CAMx 2017 5.14 Base Case (ppb) | Assessment Tool Average Ozone Design Values (ppb). | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 5.15 Base Case | $500 | $1,300 | $3,400 | $5,000 | $6,400 | $10,000 |
| 90010017 | Connecticut | Fairfield | 75.8 | 75.6 | 75.6 | 75.3 | 75.3 | 75.3 | 75.3 | 75.3 |
| 90013007 | Connecticut | Fairfield | 77.1 | 76.9 | 76.8 | 76.5 | 76.5 | 76.5 | 76.5 | 76.4 |
| 90019003 | Connecticut | Fairfield | 78.0 | 77.9 | 77.8 | 77.5 | 77.5 | 77.5 | 77.5 | 77.5 |
| 90099002 | Connecticut | New Haven | 77.2 | 77.1 | 77.1 | 76.9 | 76.9 | 76.9 | 76.9 | 76.9 |
| 211110067 | Kentucky | Jefferson | 75.8 | 74.6 | 73.9 | 72.9 | 72.8 | 72.8 | 72.7 | 72.5 |
| 211850004 | Kentucky | Oldham | 73.7 | 72.5 | 71.8 | 70.7 | 70.7 | 70.6 | 70.5 | 70.3 |
| 240053001 | Maryland | Baltimore | 73.2 | 73.3 | 73.0 | 72.5 | 72.4 | 72.4 | 72.3 | 72.3 |
| 240251001 | Maryland | Harford | 81.3 | 81.4 | 81.1 | 80.5 | 80.4 | 80.4 | 80.3 | 80.3 |
| 260050003 | Michigan | Allegan | 75.5 | 75.1 | 75.0 | 74.9 | 74.9 | 74.9 | 74.8 | 74.8 |
| 261630019 | Michigan | Wayne | 74.0 | 73.5 | 73.4 | 73.3 | 73.2 | 73.2 | 73.2 | 73.2 |
| 340071001 | New Jersey | Camden | 74.2 | 73.8 | 73.6 | 72.6 | 72.6 | 72.6 | 72.6 | 72.6 |
| 340150002 | New Jersey | Gloucester | 75.1 | 74.7 | 74.5 | 73.4 | 73.3 | 73.3 | 73.3 | 73.3 |
| 340230011 | New Jersey | Middlesex | 73 | 72.5 | 72.3 | 71.2 | 71.2 | 71.1 | 71.1 | 71.1 |
| 340290006 | New Jersey | Ocean | 73.9 | 73.4 | 73.2 | 72.1 | 72.1 | 72.1 | 72.0 | 72.0 |
| 360810124 | New York | Queens | 75.7 | 75.4 | 75.3 | 74.8 | 74.8 | 74.8 | 74.8 | 74.8 |
| 360850067 | New York | Richmond | 76.3 | 75.9 | 75.7 | 74.9 | 74.9 | 74.8 | 74.8 | 74.8 |
| 361030002 | New York | Suffolk | 79.2 | 79.0 | 79.0 | 78.7 | 78.7 | 78.7 | 78.7 | 78.7 |
| 390610006 | Ohio | Hamilton | 76.3 | 74.7 | 73.4 | 71.7 | 71.6 | 71.6 | 71.5 | 71.2 |
| 420031005 | Pennsylvania | Allegheny | 75.3 | 74.5 | 74.2 | 72.2 | 72.2 | 72.2 | 72.2 | 72.1 |
| 421010024 | Pennsylvania | Philadelphia | 75.1 | 74.6 | 74.3 | 72.8 | 72.8 | 72.8 | 72.7 | 72.7 |
| 480391004 | Texas | Brazoria | 81.4 | 81.2 | 81.1 | 81.1 | 81.1 | 81.0 | 81.0 | 81.0 |
| 480850005 | Texas | Collin | 74.9 | 74.6 | 74.6 | 74.5 | 74.5 | 74.4 | 74.4 | 74.4 |
| 481130069 | Texas | Dallas | 74.0 | 73.7 | 73.7 | 73.6 | 73.6 | 73.5 | 73.5 | 73.5 |
| 481130075 | Texas | Dallas | 75.8 | 75.5 | 75.5 | 75.5 | 75.4 | 75.4 | 75.4 | 75.4 |
| 481210034 | Texas | Denton | 76.9 | 76.7 | 76.7 | 76.6 | 76.6 | 76.6 | 76.5 | 76.5 |
| 481211032 | Texas | Denton | 75.1 | 74.9 | 74.9 | 74.8 | 74.7 | 74.7 | 74.7 | 74.7 |
| 482010024 | Texas | Harris | 75.9 | 75.8 | 75.8 | 75.8 | 75.8 | 75.7 | 75.7 | 75.7 |
| 482010026 | Texas | Harris | 73.5 | 73.4 | 73.4 | 73.4 | 73.3 | 73.3 | 73.3 | 73.3 |
| 482010055 | Texas | Harris | 75.4 | 75.3 | 75.3 | 75.2 | 75.2 | 75.2 | 75.2 | 75.2 |
| 482011034 | Texas | Harris | 76.8 | 76.7 | 76.7 | 76.6 | 76.6 | 76.6 | 76.6 | 76.6 |
| 482011039 | Texas | Harris | 78.2 | 78.1 | 78.1 | 78.0 | 78.0 | 78.0 | 78.0 | 78.0 |
| 482011050 | Texas | Harris | 74.6 | 74.5 | 74.5 | 74.4 | 74.4 | 74.4 | 74.4 | 74.4 |
| 484390075 | Texas | Tarrant | 75.5 | 75.3 | 75.2 | 75.2 | 75.1 | 75.1 | 75.1 | 75.1 |
| 484392003 | Texas | Tarrant | 79.6 | 79.4 | 79.3 | 79.3 | 79.2 | 79.2 | 79.2 | 79.2 |
| 484393009 | Texas | Tarrant | 78.6 | 78.4 | 78.4 | 78.3 | 78.3 | 78.2 | 78.2 | 78.2 |
| 484393011 | Texas | Tarrant | 74.5 | 74.2 | 74.2 | 74.1 | 74.0 | 74.0 | 74.0 | 74.0 |
| 551170006 | Wisconsin | Sheboygan | 77.0 | 76.7 | 76.6 | 76.6 | 76.6 | 76.5 | 76.5 | 76.5 |

Table C-4. Maximum Ozone DVs (ppb) for $NO_x$ Cost Thresholds ($/ton) Assessed Using the Ozone AQAT.

| Monitor Identification Number | State | County | CAMx 2017 5.14 Base Case (ppb) | Assessment Tool Maximum Ozone Design Values (ppb). | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 5.15 Base Case | $500 | $1,300 | $3,400 | $5,000 | $6,400 | $10,000 |
| 90010017 | Connecticut | Fairfield | 78.4 | 78.2 | 78.1 | 77.8 | 77.8 | 77.8 | 77.8 | 77.8 |
| 90013007 | Connecticut | Fairfield | 81.4 | 81.2 | 81.1 | 80.8 | 80.8 | 80.7 | 80.7 | 80.7 |
| 90019003 | Connecticut | Fairfield | 81.1 | 80.9 | 80.9 | 80.6 | 80.5 | 80.5 | 80.5 | 80.5 |
| 90099002 | Connecticut | New Haven | 80.2 | 80.1 | 80.0 | 79.9 | 79.9 | 79.9 | 79.9 | 79.9 |
| 211110067 | Kentucky | Jefferson | 78.6 | 77.3 | 76.6 | 75.6 | 75.5 | 75.4 | 75.4 | 75.1 |
| 211850004 | Kentucky | Oldham | 77.3 | 76.0 | 75.3 | 74.2 | 74.1 | 74.1 | 74.0 | 73.7 |
| 240053001 | Maryland | Baltimore | 76.2 | 76.3 | 76.0 | 75.4 | 75.4 | 75.3 | 75.3 | 75.2 |
| 240251001 | Maryland | Harford | 84.0 | 84.1 | 83.8 | 83.2 | 83.1 | 83.0 | 83.0 | 83.0 |
| 260050003 | Michigan | Allegan | 78.5 | 78.1 | 78.0 | 77.9 | 77.9 | 77.8 | 77.8 | 77.8 |
| 261630019 | Michigan | Wayne | 76.2 | 75.7 | 75.6 | 75.4 | 75.4 | 75.4 | 75.4 | 75.4 |
| 340071001 | New Jersey | Camden | 78.1 | 77.6 | 77.4 | 76.4 | 76.4 | 76.4 | 76.4 | 76.3 |
| 340150002 | New Jersey | Gloucester | 77.5 | 77.1 | 76.8 | 75.7 | 75.7 | 75.6 | 75.6 | 75.6 |
| 340230011 | New Jersey | Middlesex | 76.3 | 75.8 | 75.6 | 74.4 | 74.4 | 74.4 | 74.4 | 74.3 |
| 340290006 | New Jersey | Ocean | 76.6 | 76.1 | 75.8 | 74.7 | 74.7 | 74.7 | 74.7 | 74.6 |
| 360810124 | New York | Queens | 77.6 | 77.3 | 77.2 | 76.7 | 76.7 | 76.7 | 76.7 | 76.7 |
| 360850067 | New York | Richmond | 77.8 | 77.4 | 77.3 | 76.5 | 76.4 | 76.4 | 76.4 | 76.4 |
| 361030002 | New York | Suffolk | 80.8 | 80.6 | 80.6 | 80.3 | 80.3 | 80.3 | 80.3 | 80.3 |
| 390610006 | Ohio | Hamilton | 79.1 | 77.4 | 76.1 | 74.4 | 74.3 | 74.2 | 74.1 | 73.8 |
| 420031005 | Pennsylvania | Allegheny | 76.5 | 75.7 | 75.4 | 73.4 | 73.3 | 73.3 | 73.3 | 73.3 |
| 421010024 | Pennsylvania | Philadelphia | 78.4 | 77.9 | 77.6 | 76.1 | 76.0 | 76.0 | 76.0 | 75.9 |
| 480391004 | Texas | Brazoria | 82.3 | 82.1 | 82.1 | 82.0 | 82.0 | 82.0 | 81.9 | 81.9 |
| 480850005 | Texas | Collin | 76.0 | 75.8 | 75.8 | 75.7 | 75.6 | 75.6 | 75.6 | 75.6 |
| 481130069 | Texas | Dallas | 78.0 | 77.7 | 77.7 | 77.6 | 77.5 | 77.5 | 77.5 | 77.5 |
| 481130075 | Texas | Dallas | 76.7 | 76.5 | 76.4 | 76.4 | 76.3 | 76.3 | 76.3 | 76.3 |
| 481210034 | Texas | Denton | 79.4 | 79.2 | 79.2 | 79.1 | 79.0 | 79.0 | 79.0 | 79.0 |
| 481211032 | Texas | Denton | 76.3 | 76.0 | 76.0 | 76.0 | 75.9 | 75.9 | 75.8 | 75.8 |
| 482010024 | Texas | Harris | 78.5 | 78.4 | 78.4 | 78.3 | 78.3 | 78.3 | 78.3 | 78.3 |
| 482010026 | Texas | Harris | 76.1 | 76.0 | 76.0 | 75.9 | 75.9 | 75.9 | 75.9 | 75.9 |
| 482010055 | Texas | Harris | 77.0 | 76.9 | 76.9 | 76.8 | 76.8 | 76.8 | 76.7 | 76.7 |
| 482011034 | Texas | Harris | 77.8 | 77.6 | 77.6 | 77.6 | 77.5 | 77.5 | 77.5 | 77.5 |
| 482011039 | Texas | Harris | 80.2 | 80.0 | 80.0 | 80.0 | 79.9 | 79.9 | 79.9 | 79.9 |
| 482011050 | Texas | Harris | 76.2 | 76.1 | 76.1 | 76.0 | 76.0 | 76.0 | 76.0 | 76.0 |
| 484390075 | Texas | Tarrant | 76.4 | 76.2 | 76.2 | 76.1 | 76.1 | 76.0 | 76.0 | 76.0 |
| 484392003 | Texas | Tarrant | 82.1 | 81.8 | 81.8 | 81.7 | 81.7 | 81.6 | 81.6 | 81.6 |
| 484393009 | Texas | Tarrant | 78.6 | 78.4 | 78.4 | 78.3 | 78.3 | 78.2 | 78.2 | 78.2 |
| 484393011 | Texas | Tarrant | 76.6 | 76.3 | 76.3 | 76.2 | 76.2 | 76.1 | 76.1 | 76.1 |
| 551170006 | Wisconsin | Sheboygan | 79.4 | 79.2 | 79.1 | 79.0 | 79.0 | 79.0 | 79.0 | 79.0 |

Table C-5. Average Ozone DVs (ppb) Three Remedy Control Alternatives Assessed Using the Assessment Tool.

| Monitor Identification Number | State | County | CAMx 2017 5.14 Base Case (ppb) | Assessment Tool Average Ozone Design Values (ppb). | | |
|---|---|---|---|---|---|---|
| | | | | Less Stringent Alternative | Proposed Emissions Budgets | More Stringent Alternative |
| 90010017 | Connecticut | Fairfield | 75.8 | 75.5 | 75.2 | 75.2 |
| 90013007 | Connecticut | Fairfield | 77.1 | 76.8 | 76.5 | 76.5 |
| 90019003 | Connecticut | Fairfield | 78.0 | 77.8 | 77.5 | 77.5 |
| 90099002 | Connecticut | New Haven | 77.2 | 77.1 | 76.9 | 76.9 |
| 211110067 | Kentucky | Jefferson | 75.8 | 74.0 | 72.9 | 72.9 |
| 211850004 | Kentucky | Oldham | 73.7 | 71.8 | 70.8 | 70.8 |
| 240053001 | Maryland | Baltimore | 73.2 | 73.0 | 72.4 | 72.4 |
| 240251001 | Maryland | Harford | 81.3 | 81.1 | 80.5 | 80.4 |
| 260050003 | Michigan | Allegan | 75.5 | 75.0 | 74.9 | 74.9 |
| 261630019 | Michigan | Wayne | 74.0 | 73.4 | 73.3 | 73.3 |
| 340071001 | New Jersey | Camden | 74.2 | 73.6 | 72.6 | 72.6 |
| 340150002 | New Jersey | Gloucester | 75.1 | 74.5 | 73.4 | 73.3 |
| 340230011 | New Jersey | Middlesex | 73.0 | 72.3 | 71.1 | 71.1 |
| 340290006 | New Jersey | Ocean | 73.9 | 73.1 | 72.1 | 72.0 |
| 360810124 | New York | Queens | 75.7 | 75.3 | 74.8 | 74.8 |
| 360850067 | New York | Richmond | 76.3 | 75.7 | 74.9 | 74.8 |
| 361030002 | New York | Suffolk | 79.2 | 79.0 | 78.7 | 78.7 |
| 390610006 | Ohio | Hamilton | 76.3 | 73.4 | 71.8 | 71.8 |
| 420031005 | Pennsylvania | Allegheny | 75.3 | 74.2 | 72.2 | 72.2 |
| 421010024 | Pennsylvania | Philadelphia | 75.1 | 74.3 | 72.8 | 72.8 |
| 480391004 | Texas | Brazoria | 81.4 | 81.2 | 81.1 | 81.1 |
| 480850005 | Texas | Collin | 74.9 | 74.6 | 74.5 | 74.5 |
| 481130069 | Texas | Dallas | 74.0 | 73.7 | 73.6 | 73.6 |
| 481130075 | Texas | Dallas | 75.8 | 75.5 | 75.5 | 75.5 |
| 481210034 | Texas | Denton | 76.9 | 76.7 | 76.6 | 76.6 |
| 481211032 | Texas | Denton | 75.1 | 74.9 | 74.8 | 74.8 |
| 482010024 | Texas | Harris | 75.9 | 75.8 | 75.8 | 75.8 |
| 482010026 | Texas | Harris | 73.5 | 73.4 | 73.4 | 73.4 |
| 482010055 | Texas | Harris | 75.4 | 75.3 | 75.2 | 75.2 |
| 482011034 | Texas | Harris | 76.8 | 76.7 | 76.6 | 76.6 |
| 482011039 | Texas | Harris | 78.2 | 78.1 | 78.0 | 78.0 |
| 482011050 | Texas | Harris | 74.6 | 74.5 | 74.4 | 74.4 |
| 484390075 | Texas | Tarrant | 75.5 | 75.2 | 75.2 | 75.2 |
| 484392003 | Texas | Tarrant | 79.6 | 79.3 | 79.3 | 79.3 |
| 484393009 | Texas | Tarrant | 78.6 | 78.4 | 78.3 | 78.3 |
| 484393011 | Texas | Tarrant | 74.5 | 74.2 | 74.1 | 74.1 |
| 551170006 | Wisconsin | Sheboygan | 77.0 | 76.6 | 76.6 | 76.6 |

27

Table C-6. Maximum Ozone DVs (ppb) Three Remedy Control Scenarios Assessed Using the Assessment Tool.

| Monitor Identification Number | State | County | CAMx 2017 5.14 Base Case (ppb) | Assessment Tool Maximum Ozone Design Values (ppb). | | |
|---|---|---|---|---|---|---|
| | | | | Less Stringent Alternative | Proposed Emissions Budgets | More Stringent Alternative |
| 90010017 | Connecticut | Fairfield | 78.4 | 78.1 | 77.8 | 77.8 |
| 90013007 | Connecticut | Fairfield | 81.4 | 81.1 | 80.7 | 80.7 |
| 90019003 | Connecticut | Fairfield | 81.1 | 80.9 | 80.5 | 80.5 |
| 90099002 | Connecticut | New Haven | 80.2 | 80.0 | 79.8 | 79.8 |
| 211110067 | Kentucky | Jefferson | 78.6 | 76.7 | 75.6 | 75.6 |
| 211850004 | Kentucky | Oldham | 77.3 | 75.3 | 74.2 | 74.2 |
| 240053001 | Maryland | Baltimore | 76.2 | 76.0 | 75.4 | 75.4 |
| 240251001 | Maryland | Harford | 84.0 | 83.8 | 83.1 | 83.1 |
| 260050003 | Michigan | Allegan | 78.5 | 78.0 | 77.9 | 77.9 |
| 261630019 | Michigan | Wayne | 76.2 | 75.6 | 75.4 | 75.4 |
| 340071001 | New Jersey | Camden | 78.1 | 77.4 | 76.4 | 76.4 |
| 340150002 | New Jersey | Gloucester | 77.5 | 76.9 | 75.7 | 75.7 |
| 340230011 | New Jersey | Middlesex | 76.3 | 75.6 | 74.4 | 74.4 |
| 340290006 | New Jersey | Ocean | 76.6 | 75.8 | 74.7 | 74.7 |
| 360810124 | New York | Queens | 77.6 | 77.2 | 76.7 | 76.7 |
| 360850067 | New York | Richmond | 77.8 | 77.3 | 76.4 | 76.4 |
| 361030002 | New York | Suffolk | 80.8 | 80.6 | 80.3 | 80.3 |
| 390610006 | Ohio | Hamilton | 79.1 | 76.1 | 74.4 | 74.4 |
| 420031005 | Pennsylvania | Allegheny | 76.5 | 75.4 | 73.4 | 73.4 |
| 421010024 | Pennsylvania | Philadelphia | 78.4 | 77.6 | 76.1 | 76.0 |
| 480391004 | Texas | Brazoria | 82.3 | 82.1 | 82.0 | 82.0 |
| 480850005 | Texas | Collin | 76.0 | 75.8 | 75.7 | 75.7 |
| 481130069 | Texas | Dallas | 78.0 | 77.7 | 77.6 | 77.6 |
| 481130075 | Texas | Dallas | 76.7 | 76.5 | 76.4 | 76.4 |
| 481210034 | Texas | Denton | 79.4 | 79.2 | 79.1 | 79.1 |
| 481211032 | Texas | Denton | 76.3 | 76.0 | 76.0 | 76.0 |
| 482010024 | Texas | Harris | 78.5 | 78.4 | 78.3 | 78.3 |
| 482010026 | Texas | Harris | 76.1 | 76.0 | 75.9 | 75.9 |
| 482010055 | Texas | Harris | 77.0 | 76.9 | 76.8 | 76.8 |
| 482011034 | Texas | Harris | 77.8 | 77.6 | 77.6 | 77.6 |
| 482011039 | Texas | Harris | 80.2 | 80.0 | 80.0 | 80.0 |
| 482011050 | Texas | Harris | 76.2 | 76.1 | 76.0 | 76.0 |
| 484390075 | Texas | Tarrant | 76.4 | 76.2 | 76.1 | 76.1 |
| 484392003 | Texas | Tarrant | 82.1 | 81.8 | 81.7 | 81.7 |
| 484393009 | Texas | Tarrant | 78.6 | 78.4 | 78.3 | 78.3 |
| 484393011 | Texas | Tarrant | 76.6 | 76.3 | 76.2 | 76.2 |
| 551170006 | Wisconsin | Sheboygan | 79.4 | 79.1 | 79.0 | 79.0 |

28

**Appendix A:  IPM Runs Used in Transport Rule Significant
Contribution Analysis**

Table A-1 lists IPM runs used in the significant contribution analysis.  The IPM runs can be found in the docket for this rulemaking.

**Table Appendix A-1. IPM Runs Used in Transport Rule Significant Contribution Analysis**

| Run Name | Run Description |
|---|---|
| 5.14_Base_Case | Base Case model run, which includes the national Title IV $SO_2$ cap-and-trade program; $NO_x$ SIP Call regional ozone season cap-and-trade program; the Cross-State Air Pollution trading programs, and settlements and state rules.  This is based on AEO estimates from 2014. |
| 5.14_OS_NOx_500_CT | Imposes a marginal cost of $500 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation".  Created using IPM v5.14. |
| 5.14_OS_NOx_1300_CT | Imposes a marginal cost of $1,300 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Created using IPM v5.14. |
| 5.14_OS_NOx_3400_CT | Imposes a marginal cost of $3,400 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.14. |
| 5.14_OS_NOx_5000_CT | Imposes a marginal cost of $5,000 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.14. |
| 5.14_OS_NOx_6200_CT | Imposes a marginal cost of $6,200 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.14. |
| 5.14_OS_NOx_10000_CT | Imposes a marginal cost of $10,000 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.14. |
| 5.14_OS_NOx_Illustrative_Control_Case | Imposes the state emission limits with variability limits derived from the $1,300 per ton of $NO_x$ case were applied to states covered by this proposal. Units with SCRs operate them at "full operation" and units with SCRs that are not operating return to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Created using IPM v5.14.  This run is also called the "Illustrative Control Case" |
| 5.15_Base_Case | Base Case model run, which includes the national Title IV $SO_2$ cap-and-trade program; $NO_x$ SIP Call regional ozone season cap-and-trade program; the Cross-State Air Pollution trading programs, and settlements and state rules.  This is based on AEO estimates from 2015 and includes the final Clean Power Plan. |
| 5.15_OS_NOx_500_CT | Imposes a marginal cost of $500 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation".  Created using IPM v5.15. |
| 5.15_OS_NOx_1300_CT | Imposes a marginal cost of $1,300 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". |

| | |
|---|---|
| | Units without SOA combustion controls upgraded to SOA combustion controls. Created using IPM v5.15. |
| 5.15_OS_NOx_3400_CT | Imposes a marginal cost of $3,400 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.15. |
| 5.15_OS_NOx_5000_CT | Imposes a marginal cost of $5,000 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.15. |
| 5.15_OS_NOx_6400_CT | Imposes a marginal cost of $6,400 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.15. |
| 5.15_OS_NOx_10000_CT | Imposes a marginal cost of $10,000 per ton of ozone season $NO_x$ in all states starting in 2017.  Also forces all extant and currently operating SCR to operate at "full operation" and all non-operating SCR are returned to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Units with SNCR "fully operate" those controls. Created using IPM v5.15. |
| 5.15_OS_NOx_Less_Stringent | Imposes the budgets with variability limits derived from the $500 per ton of $NO_x$ case were applied to states covered by this proposal.  Units with SCRs operate them at "full operation". Created using IPM v5.15. |
| 5.15_OS_NOx_Proposed | Imposes the budgets with variability limits derived from the $1,300 per ton of $NO_x$ case were applied to states covered by this proposal.  Units with SCRs operate them at "full operation" and units with SCRs that are not operating return them to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Created using IPM v5.15. |
| 5.15_OS_NOx_More_Stringent | Imposes the budgets with variability limits derived from the $3,400 per ton of $NO_x$ case were applied to states covered by this proposal.  Units with SCRs operate them at "full operation" and units with SCRs and SNCRs that are not operating return them to "full operation". Units without SOA combustion controls upgraded to SOA combustion controls. Created using IPM v5.15. |

31

**Appendix B:  Description of Excel Spreadsheet Data Files for the Significant Contribution Analysis**

EPA placed the following Excel workbook file in the Transport Rule docket.

The annual and quarterly emissions for all AQAT simulations can be found in this file. sensitivity_tool.xlsx. This workbook contains a number of worksheets.

State-level emission totals used in the modeling
- "2017eh (base)" contains state and source-sector specific ozone-season $NO_x$ emission totals for the 5.14 base case. Column D, "TOTAL w/o beis, fires" is an input in the tool.
- "2017eh (illustrative control)" contains state and source-sector specific ozone-season $NO_x$ emission totals for the illustrative control case. Column D, "TOTAL w/o beis, fires" is an input in the tool for use in development of the calibration factor.
- "State Level Emissions" are the total ozone-season $NO_x$ emissions from IPM for the various base, cost thresholds (CT), and regulatory control alternatives. The results include totals for "all units" and for all fossil units greater than 25 MW for 2018. Results also include totals for "all units" for 2017 (the sum of the results for 2018 plus the values from "2017 additions").
- "2017 additions" includes emissions from units that are projected to remain in operation in 2017, but are retired in 2018.
- "IPM Summary" contains the emission difference (in tons) between the 5.14 base case for all units and each of the other scenarios.
- "emission fractions" contains the emission difference as a fraction of the 2017 5.14 base case total emissions without beis and fires. These fractions are directly used in the tool. Column E contains the emission fraction for the illustrative control case (used in calibration of the tool).

Air quality modeling design values from CAMx
- "CAMx O3 DVs" contains design values for three scenarios (the 2011 case, the 2017 IPM v. 5.14 base case, and the 2017 illustrative control case". The average and maximum design values are shown using one decimal place and to four decimal places".

State-level ozone contributions
- "2017 contributions (orig)" includes the original contributions with five decimal places of resolution. The truncated shortened version of these contributions equal the truncated base case average design value. See the Air Quality Modeling TSD and the preamble for details about the contributions.
- "2017 contributions (scaled)" adjusts the "2017 contributions (orig)" using the ratio of the four decimal place base case design value to the one decimal place base case design value.
- "2017 contributions" contains a copy of the "2017 contributions (scaled)" contributions. These contributions are used throughout the rest of the assessment tool.

Air quality estimates
- "Summary DVs" contains the average and maximum design value estimates (truncated to one decimal place) for receptors that were nonattainment or maintenance in the 2017 base case air quality modeling. Monitors that are at or above 76.0 ppb are shaded.

- "2017 contributions uncalibrated". Contains the unadjusted estimated change in concentration resulting from the difference in emissions between the 2017 5.14 base case and the illustrative control case. The calibration factor is calculated in column BP. The ratio of the maximum to average design value for the base case is found in column BU. This fraction is used in the other air quality worksheets to adjust the average design value to a maximum value.
- "515 base" contains the estimated state-by-state and receptor-by-receptor air quality contributions and design values for the 2017 IPM v. 5.15 base case emissions. All states are adjusted to the 5.15 base case emission level regardless of whether they are "linked" to a specific monitor.
- "500 CT" contains the contributions and design values for the $500/ton cost threshold analysis (where non-linked states were adjusted to the IPM v. 5.15 base case emission level).
- "1300 CT" contains the contributions and design values for the $1,300/ton cost threshold analysis (where non-linked states were adjusted to the IPM v. 5.15 base case emission level).
- "3400 CT" contains the contributions and design values for the $3,400/ton cost threshold analysis (where non-linked states were adjusted to the IPM v. 5.15 base case emission level).
- "5000 CT" contains the contributions and design values for the $5,000/ton cost threshold analysis (where non-linked states were adjusted to the IPM v. 5.15 base case emission level).
- "6400 CT" contains the contributions and design values for the $6,400/ton cost threshold analysis (where non-linked states were adjusted to the IPM v. 5.15 base case emission level).
- "10000 CT" contains the contributions and design values for the $10,000/ton cost threshold analysis (where non-linked states were adjusted to the IPM v. 5.15 base case emission level).
- "Less stringent" contains the estimated state-by-state and receptor-by-receptor air quality contributions and design values for the $500/ton policy case emissions. All states are adjusted to this emission level regardless of whether they are "linked" to a specific monitor.
- "Proposed budgets" contains the estimated state-by-state and receptor-by-receptor air quality contributions and design values for the $1,300/ton policy case emissions. All states are adjusted to this emission level regardless of whether they are "linked" to a specific monitor.
- "More stringent" contains the estimated state-by-state and receptor-by-receptor air quality contributions and design values for the $3,400/ton policy case emissions. All states are adjusted to this emission level regardless of whether they are "linked" to a specific monitor.
- The "10000 CT (links)", "6400 CT (links)", "5000 CT (links)", "3400 CT (links)", "1300 CT (links)", "500 CT (links)", "515 Base (links)", "More stringent (links)", "Proposed budgets (links)", "Less stringent (links)" worksheets assess the linkages for the 1% threshold. A contribution is set to zero if the maximum design value is less than 76.0 ppb or if it is a contribution from the state containing the monitor (i.e., "home" state). Compare rows 4 and 5 to look for linkages that affect whether a state is no longer linked

to a monitor that continues to have air quality issues. A value of 1 indicates that the state is "linked". Note that we are particularly interested in states where there is a value of 1 in row 4 and no value in row 5.

**Appendix C:  Description of 2017 Adjustments to 2018 IPM EGU Ozone-Season NO$_X$ Emissions Data**

To calculate the 2017 emissions for the base case, uniform $NO_X$ cost threshold cases, proposed remedy and alternative cases, and produce a flat files for air quality modeling, EPA started with the 2018 Base Case results and made modifications to emissions of units in three categories as described in the table below.

Table Appendix C-1. Description of 2017 ozone-season $NO_X$ Adjustment Calculation

| 2017 ozone-season $NO_X$ Adjustment Case | How 2017 Adjustments Were Calculated |
|---|---|
| SCR Operation/Installation | For units that had an SCR in 2018 but were assumed to not operate (or be installed) in 2017, EPA recalculated the $NO_X$ emissions for the unit with the 2018 heat input and the 2016 emissions rate |
| Retirement | For units projected to retire in 2018, emissions from the 2016 run year were included in the 2017 emissions

For uniform $NO_X$ cost threshold cases and policy alternative cases, emissions from units with SCRs were determined by multiplying their heat input in the 2016 run year by their optimized $NO_X$ removal rate. |
| Coal-To-Gas | For units that had implemented coal-to-gas retrofit options in 2018 and had not dispatched, emissions from the 2016 run year were incorporated. However, if the coal-to-gas retrofit options had dispatched in 2018, then the $NO_X$ emissions were calculated based on the 2018 fuel use and 2016 $NO_X$ rate. |

The tables below lists the units that were affected by these changes and for each case the number of tons of ozone season $NO_X$ added to the 2018 results to calculate the 2017 ozone season $NO_X$ emissions. Units may not have added emissions in every case. Separate tables are provided to show adjustments for IPM v5.14 and IPM v5.15 cases. These adjustments are summarized at the state level in Appendix E.

**Table Appendix C-2. Incremental ozone season $NO_X$ emissions added to 2018 IPM v5.14 cases to calculate 2017 ozone season $NO_X$ emissions.**

| NEEDS ID | Reason for Adjustment (Ozone Transport Base Case) | Base Case Incremental Ozone Season NOx (tons) | Reason for Adjustment (Illustrative Control Case) | Proposed Remedy Case Incremental Ozone Season NOx (tons) |
|---|---|---|---|---|
| 113_B_2 | SCR Retrofit | 922 | SCR Retrofit | 590 |
| 113_B_3 | SCR Retrofit | 918 | SCR Retrofit | 864 |
| 113_B_4 | SCR Retrofit | 1344 | SCR Retrofit | 1265 |

| 160_B_2 | SCR Retrofit | 829 | SCR Retrofit | 639 |
|---|---|---|---|---|
| 160_B_3 | SCR Retrofit | 1205 | SCR Retrofit | 1140 |
| 1710_B_3 | | 0 | SCR Retrofit | 0 |
| 1893_B_1 | | 0 | SCR Retrofit | 1 |
| 1893_B_2 | | 0 | SCR Retrofit | 1 |
| 1893_B_4 | SCR Retrofit | 509 | SCR Retrofit | 509 |
| 2442_B_4 | SCR Retrofit | 4734 | SCR Retrofit | 4734 |
| 2442_B_5 | SCR Retrofit | 4850 | SCR Retrofit | 4850 |
| 2817_B_1 | SCR Retrofit | 240 | SCR Retrofit | 240 |
| 2963_B_3313 | SCR Retrofit | 1176 | SCR Retrofit | 153 |
| 6030_B_1 | SCR Retrofit | 593 | SCR Retrofit | 467 |
| 6030_B_2 | SCR Retrofit | 461 | SCR Retrofit | 310 |
| 6076_B_1 | SCR Retrofit | 961 | SCR Retrofit | 595 |
| 6076_B_2 | SCR Retrofit | 935 | SCR Retrofit | 573 |
| 6101_B_BW91 | SCR Retrofit | 905 | SCR Retrofit | 905 |
| 6204_B_1 | SCR Retrofit | 1085 | SCR Retrofit | 1085 |
| 6204_B_2 | SCR Retrofit | 1062 | SCR Retrofit | 1062 |
| 6204_B_3 | SCR Retrofit | 1390 | SCR Retrofit | 1390 |
| 879_B_52 | | 0 | SCR Retrofit | 528 |
| 1378_B_1 | Retirement | 1257 | Coal-To-Gas | 1257 |
| 1378_B_2 | Retirement | 1163 | Coal-To-Gas | 1163 |
| 1378_B_3 | Retirement | 5390 | Coal-To-Gas | 5390 |
| 469_B_4 | Coal-To-Gas | 1666 | Coal-To-Gas | 1666 |
| 10676_B_5 | Retirement | 185 | Retirement | 129 |
| 667_B_1 | Coal-To-Gas | 166 | Retirement | 165 |
| 667_B_2 | Coal-To-Gas | 195 | Retirement | 194 |
| 1077_G_3 | Retirement | 24 | Retirement | 24 |
| 1394_B_1 | Retirement | 3 | Retirement | 3 |
| 1394_B_2 | Retirement | 4 | Retirement | 4 |
| 1394_B_5 | Retirement | 10 | Retirement | 10 |
| 1507_B_1 | Retirement | 4 | Retirement | 4 |
| 1507_B_2 | Retirement | 3 | Retirement | 3 |
| 1507_B_3 | Retirement | 3 | Retirement | 3 |
| 1507_B_4 | Retirement | 22 | Retirement | 22 |
| 1571_B_1 | Retirement | 710 | Retirement | 710 |
| 1619_B_3 | Retirement | 0 | Retirement | 0 |
| 1619_B_4 | Retirement | 8 | Retirement | 8 |
| 170_B_4 | Retirement | 51 | Retirement | 51 |

| | | | | |
|---|---|---|---|---|
| **1769_B_7** | Retirement | 618 | Retirement | 618 |
| **1769_B_8** | Retirement | 604 | Retirement | 604 |
| **1769_B_9** | Retirement | 613 | Retirement | 613 |
| **2324_B_4** | Retirement | 975 | Retirement | 975 |
| **271_B_5** | Retirement | 1 | Retirement | 1 |
| **271_B_6** | Retirement | 1 | Retirement | 1 |
| **477_B_5** | Retirement | 1020 | Retirement | 1020 |
| **6181_B_1** | Retirement | 544 | Retirement | 544 |
| **6181_B_2** | Retirement | 252 | Retirement | 252 |
| **6183_B_SM-1** | Retirement | 332 | Retirement | 332 |
| **170_B_1*** | | 0 | Adjustment for state assurance level specification error | -170 |
| **170_B_2*** | | 0 | Adjustment for state assurance level specification error | -394 |
| **2408_B_1*** | | 0 | Adjustment for state assurance level specification error | -230 |
| **56963_G_E101*** | | 0 | Adjustment for state assurance level specification error | -53 |
| **56963_G_E102*** | | 0 | Adjustment for state assurance level specification error | -53 |
| **6641_B_1*** | | 0 | Adjustment for state assurance level specification error | -69 |
| **6641_B_2*** | | 0 | Adjustment for state assurance level specification error | -66 |

*Seven units had emissions revised downward for air quality modeling purposes because of mis-specified state assurance levels in the modeling. These adjustments were determined by a subsequent model run, "5.14_OS_NOX_Proposal_AQ2" that can be found in the docket.

**Table Appendix C-3. Incremental ozone season NO$_X$ emissions added to 2018 IPM v5.15 results to calculate 2017 ozone season NO$_X$ emissions.[22]**

| Reason for 2017 Adjustment | |
|---|---|
| Retirement | |
| SCR Retrofit | |
| C2G | |

| NEEDS ID | Base Case | $500/ton Cost Threshold | $1300/ton Cost Threshold | $3400/ton Cost Threshold | $5000/ton Cost Threshold | $64000/ton Cost Threshold | $10,000/ton Cost Threshold | Less Stringent Alternative | Proposed Remedy Case | More Stringent Alternative |
|---|---|---|---|---|---|---|---|---|---|---|
| 10676_B_3 | | | | | | | 86 | | | |
| 10676_B_5 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 |
| 113_B_2 | 580 | 580 | 592 | 876 | 835 | 825 | 846 | 594 | 594 | 594 |
| 113_B_3 | 874 | 874 | 874 | 874 | 874 | 874 | 874 | 874 | 874 | 874 |
| 113_B_4 | 1,280 | 1,280 | 1,280 | 1,280 | 1,280 | 1,280 | 1,280 | 1,280 | 1,280 | 1,280 |
| 1378_B_1 | 2,420 | 1,499 | 1,499 | 1,499 | 1,499 | 1,499 | 1,499 | 2,420 | 1,499 | 1,499 |
| 1378_B_3 | 2,964 | 2,964 | 670 | 670 | 670 | 670 | 670 | 2,964 | 670 | 670 |
| 1394_B_1 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| 141_B_1 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| 141_B_3 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 |
| 1507_B_1 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| 1507_B_2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| 1507_B_3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| 1507_B_4 | 17 | 17 | 17 | 17 | 9 | 5 | 4 | 17 | 17 | 17 |
| 1571_B_1 | 587 | 296 | 293 | 293 | 293 | 293 | 293 | 296 | 296 | 296 |
| 1571_B_2 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 |
| 1572_B_1 | 1,180 | 1,180 | 1,180 | 1,058 | 1,058 | 1,058 | 1,058 | 1,180 | 1,180 | 1,071 |
| 1572_B_3 | 240 | 240 | 240 | 218 | 218 | 218 | 218 | 240 | 240 | 220 |
| 1599_B_1 | | | 0.89 | | | | | 0.19 | 0.20 | |
| 1619_B_3 | 0.60 | 0.96 | 0.68 | 0.98 | 0.92 | 0.53 | 0.14 | 0.62 | 0.62 | 0.60 |
| 1619_B_4 | 82 | 131 | 94 | 134 | 126 | 73 | 20 | 85 | 85 | 82 |

---

[22] This table shows adjustments at the NEEDS unit level. The calculated adjustments at the IPM model plant level can be found in the file "IPM v5.15 2017 Emissions Adjustments" in the docket for this rule.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **170_B_4** | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| **1710_B_3** | 4 | 0.24 | 0.27 | 0.15 | 0.17 | 0.17 | 0.18 | 4 | 4 | 0.24 |
| **1743_B_1** | | | | 142 | 381 | 366 | 158 | | | |
| **1769_B_7** | 1,836 | 1,836 | 1,836 | 1,836 | 1,836 | 1,836 | 1,836 | 1,836 | 1,836 | 1,836 |
| **2104_B_3** | 510 | 560 | 508 | 506 | 506 | 597 | 742 | 619 | 629 | 665 |
| **2104_B_4** | 521 | 563 | 702 | 995 | 995 | 995 | 995 | 521 | 521 | 498 |
| **2107_B_1** | | | | | | | 158 | | | |
| **2324_B_4** | 975 | 975 | 975 | 975 | 975 | 975 | 975 | 975 | 975 | 975 |
| **2442_B_4** | 4,734 | 4,734 | 4,734 | 4,734 | 4,734 | 4,662 | 4,615 | 4,734 | 4,734 | 4,734 |
| **2442_B_5** | 4,850 | 4,850 | 4,850 | 4,850 | 4,850 | 4,778 | 4,719 | 4,850 | 4,850 | 4,850 |
| **2454_G_1** | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 |
| **271_B_5** | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **2817_B_1** | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 |
| **2963_B_3313** | 154 | 154 | 154 | 146 | 146 | 136 | 136 | 154 | 154 | 154 |
| **315_B_2** | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| **350_B_1** | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| **356_B_8** | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| **469_B_4** | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 |
| **470_B_2** | 3 | 3 | 3 | 7 | 3 | 3 | 1 | 3 | 3 | 3 |
| **50976_B_AAB01** | 82 | 62 | 77 | | | | | 175 | 308 | 269 |
| **562_B_4** | 0.47 | 0.47 | 0.47 | 0.47 | | | | 0.47 | 0.47 | 0.47 |
| **564_B_1** | | | | | | | 271 | | | |
| **6021_B_C2** | | | 8 | | 5 | | 0.26 | | | |
| **6030_B_1** | 2,031 | 2,031 | 2,031 | 2,031 | 1,956 | 1,893 | 2,031 | 2,031 | 2,031 | 2,031 |
| **6030_B_2** | 218 | 218 | | | | | | | | |
| **6076_B_1** | 595 | 595 | 595 | 595 | 587 | 587 | 587 | 595 | 595 | 595 |
| **6076_B_2** | 573 | 573 | 573 | 573 | 573 | 573 | 573 | 573 | 573 | 573 |
| **6101_B_BW91** | 905 | 905 | 905 | 905 | 905 | 905 | 881 | 905 | 905 | 905 |
| **6165_B_1** | | | | | | | 815 | | | |
| **6181_B_2** | | | 33 | 100 | 100 | 100 | 101 | | | |
| **6204_B_1** | 851 | 856 | 874 | 1,084 | 1,079 | 1,063 | 974 | 851 | 852 | 852 |
| **6204_B_2** | 1,062 | 1,062 | 1,062 | 1,062 | 1,062 | 1,057 | 1,026 | 1,062 | 1,062 | 1,062 |
| **6204_B_3** | 1,390 | 1,390 | 1,390 | 1,390 | 1,390 | 1,390 | 1,368 | 1,390 | 1,390 | 1,390 |
| **667_B_1** | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 |
| **676_B_2** | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 861_B_01 | 21 | 21 | 8 | | | | | 17 | 13 | |
| 879_B_62 | 2 | 2 | 1 | | | | | 2 | 2 | 2 |
| Total | 35,161 | 34,075 | 31,680 | 32,472 | 32,566 | 32,331 | 33,430 | 34,869 | 31,793 | 31,619 |

**Table Appendix C-4. Reason for each 2017 adjustment by unit and case (text version)**

| Reason for 2017 Adjustment | |
|---|---|
| Retirement | R |
| SCR Retrofit | SCR |
| C2G | C2G |

| NEEDS ID | Base Case | $500/ton Cost Threshold | $1300/ton Cost Threshold | $3400/ton Cost Threshold | $5000/ton Cost Threshold | $64000/ton Cost Threshold | $10,000/ton Cost Threshold | Less Stringent Alternative | Proposed Remedy Case | More Stringent Alternative |
|---|---|---|---|---|---|---|---|---|---|---|
| 10676_B_3 | | | | | | | R | | | |
| 10676_B_5 | R | R | R | R | R | R | R | R | R | R |
| 113_B_2 | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| 113_B_3 | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| 113_B_4 | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| 1378_B_1 | R | R | R | R | R | R | R | R | R | R |
| 1378_B_3 | R | R | R | R | R | R | R | R | R | R |
| 1394_B_1 | R | R | R | R | R | R | R | R | R | R |
| 141_B_1 | R | R | R | R | R | R | R | R | R | R |
| 141_B_3 | R | R | R | R | R | R | R | R | R | R |
| 1507_B_1 | R | R | R | R | R | R | R | R | R | R |
| 1507_B_2 | R | R | R | R | R | R | R | R | R | R |
| 1507_B_3 | R | R | R | R | R | R | R | R | R | R |
| 1507_B_4 | R | R | R | R | R | R | R | R | R | R |
| 1571_B_1 | R | R | R | R | R | R | R | R | R | R |
| 1571_B_2 | R | R | R | R | R | R | R | R | R | R |
| 1572_B_1 | R | R | R | R | R | R | R | R | R | R |
| 1572_B_3 | R | R | R | R | R | R | R | R | R | R |
| 1599_B_1 | | | R | | | | | R | R | |
| 1619_B_3 | R | R | R | R | R | R | R | R | R | R |
| 1619_B_4 | R | R | R | R | R | R | R | R | R | R |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **170_B_4** | R | R | R | R | R | R | R | R | R | R |
| **1710_B_3** | R | SCR | SCR | C2G | C2G | C2G | C2G | R | R | SCR |
| **1743_B_1** | | | | R | R | R | R | | | |
| **1769_B_7** | R | R | R | R | R | R | R | R | R | R |
| **2104_B_3** | R | R | R | R | R | R | R | R | R | R |
| **2104_B_4** | R | R | R | R | R | R | R | R | R | R |
| **2107_B_1** | | | | | | | SCR | | | |
| **2324_B_4** | R | R | R | R | R | R | R | R | R | R |
| **2442_B_4** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **2442_B_5** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **2454_G_1** | R | R | R | R | R | R | R | R | R | R |
| **271_B_5** | R | R | R | R | R | R | R | R | R | R |
| **2817_B_1** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **2963_B_3313** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **315_B_2** | R | R | R | R | R | R | R | R | R | R |
| **350_B_1** | R | R | R | R | R | R | R | R | R | R |
| **356_B_8** | R | R | R | R | R | R | R | R | R | R |
| **469_B_4** | R | R | R | R | C2G | R | R | R | R | R |
| **470_B_2** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **50976_B_AAB01** | R | R | R | | | | | R | R | R |
| **562_B_4** | R | R | R | R | | | | R | R | R |
| **564_B_1** | | | | | | | R | | | |
| **6021_B_C2** | | | SCR | | SCR | | SCR | | | |
| **6030_B_1** | R | R | R | R | C2G | C2G | R | R | R | R |
| **6030_B_2** | C2G | C2G | | | | | | | | |
| **6076_B_1** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **6076_B_2** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **6101_B_BW91** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **6165_B_1** | | | | | | | R | | | |
| **6181_B_2** | | | R | R | R | R | R | | | |
| **6204_B_1** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **6204_B_2** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **6204_B_3** | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR | SCR |
| **667_B_1** | R | R | R | R | R | R | R | R | R | R |
| **676_B_2** | R | R | R | R | R | R | R | R | R | R |

| 861_B_01 | R | R | R | | | | | R | R | |
| 879_B_62 | SCR | SCR | SCR | | | | | SCR | SCR | SCR |

# Appendix D:  Ozone-Season NO$_x$ Emissions Budgets for IPM Modeling

To best model the three regulatory control alternatives in IPM, EPA did not include the 2017 budget adjustments in the state budgets. Table Appendix D-1 shows the proposed 2017 state budgets and the equivalent 2018 transport region and state emission constraints used for IPM analysis in the IPM v5.15 model platform. Data for the state budgets and assurance levels that were developed for the air quality modeling using the IPM v5.14 platform appear in table appendix D-2.

**Table Appendix D-1. Ozone-Season NO$_X$ Emissions Budgets For IPM v5.15 Modeling**

| | 2016-2017 Budgets (CSAPR Phase 1) | Less Stringent Alternative Budgets | | | | Proposed Budgets | | | | More Stringent Alternative Budgets | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2017 Budgets | 2017 Assurance Level | 2018 Emission Allowances For IPM | 2018 IPM Emissions Constraint (Assurance Level) for IPM | 2017 Budgets | 2017 Assurance Level | 2018 Emission Allowances For IPM | 2018 IPM Emissions Constraint (Assurance Level) for IPM | 2017 Budgets | 2017 Assurance Level | 2018 Emission Allowances For IPM | 2018 IPM Emissions Constraint (Assurance Level) for IPM |
| Alabama | 31,623 | 11,886 | 14,382 | 11,886 | 14,382 | 9,979 | 12,075 | 9,979 | 12,075 | 9,931 | 12,017 | 9,931 | 12,017 |
| Arkansas | 15,110 | 7,038 | 8,516 | 6,987 | 8,454 | 6,949 | 8,408 | 6,898 | 8,347 | 6,101 | 7,382 | 6,051 | 7,322 |
| Illinois | 21,208 | 12,144 | 14,694 | 12,121 | 14,667 | 12,078 | 14,614 | 12,069 | 14,604 | 11,992 | 14,510 | 11,992 | 14,511 |
| Indiana | 46,526 | 33,483 | 40,514 | 33,483 | 40,515 | 28,284 | 34,224 | 28,284 | 34,224 | 27,585 | 33,378 | 27,585 | 33,378 |
| Iowa | 16,370 | 8,614 | 10,423 | 8,614 | 10,423 | 8,351 | 10,105 | 8,351 | 10,105 | 8,118 | 9,823 | 8,118 | 9,823 |
| Kansas | | 9,278 | 11,226 | 9,278 | 11,226 | 9,272 | 11,219 | 9,272 | 11,219 | 9,259 | 11,203 | 9,259 | 11,203 |
| Kentucky | 34,421 | 32,783 | 39,667 | 28,320 | 34,268 | 21,519 | 26,037 | 19,350 | 23,413 | 20,945 | 25,343 | 18,776 | 22,719 |
| Louisiana | 18,115 | 15,861 | 19,192 | 15,844 | 19,171 | 15,807 | 19,127 | 15,790 | 19,106 | 15,378 | 18,607 | 15,360 | 18,586 |
| Maryland | 7,179 | 4,026 | 4,871 | 2,155 | 2,607 | 4,026 | 4,871 | 2,160 | 2,613 | 4,026 | 4,871 | 2,160 | 2,614 |
| Michigan | 27,529 | 22,022 | 26,647 | 20,186 | 24,425 | 19,115 | 23,129 | 17,279 | 20,907 | 18,624 | 22,535 | 16,646 | 20,142 |
| Mississippi | 12,429 | 6,083 | 7,360 | 6,083 | 7,360 | 5,910 | 7,151 | 5,910 | 7,151 | 5,487 | 6,639 | 5,487 | 6,639 |
| Missouri | 21,944 | 15,380 | 18,610 | 14,257 | 17,251 | 15,323 | 18,541 | 14,113 | 17,077 | 15,240 | 18,440 | 13,740 | 16,625 |
| New Jersey | 3,930 | 2,016 | 2,439 | 2,016 | 2,439 | 2,015 | 2,438 | 2,015 | 2,438 | 2,011 | 2,433 | 2,011 | 2,433 |
| New York | 10,369 | 4,607 | 5,574 | 4,607 | 5,575 | 4,450 | 5,385 | 4,450 | 5,385 | 4,391 | 5,313 | 4,391 | 5,313 |
| North Carolina | 20,312 | 12,278 | 14,856 | 12,278 | 14,856 | 12,275 | 14,853 | 12,275 | 14,853 | 10,705 | 12,953 | 10,705 | 12,953 |
| Ohio | 40,149 | 20,194 | 24,435 | 20,194 | 24,435 | 16,660 | 20,159 | 16,660 | 20,159 | 16,637 | 20,131 | 16,637 | 20,131 |
| Oklahoma | 22,694 | 16,215 | 19,620 | 16,215 | 19,620 | 16,215 | 19,620 | 16,215 | 19,620 | 16,215 | 19,620 | 16,215 | 19,620 |
| Pennsylvania | 52,057 | 38,270 | 46,306 | 38,270 | 46,306 | 14,387 | 17,408 | 14,387 | 17,408 | 14,358 | 17,373 | 14,358 | 17,373 |
| Tennessee | 11,462 | 5,520 | 6,679 | 5,520 | 6,679 | 5,481 | 6,632 | 5,481 | 6,632 | 5,449 | 6,593 | 5,449 | 6,593 |
| Texas | 65,560 | 58,492 | 70,775 | 58,492 | 73,819 | 58,002 | 70,183 | 57,970 | 70,143 | 55,864 | 67,595 | 55,764 | 67,475 |
| Virginia | 14,452 | 6,955 | 8,416 | 6,955 | 8,416 | 6,818 | 8,250 | 6,818 | 8,250 | 5,834 | 7,059 | 5,834 | 7,059 |
| West Virginia | 24,287 | 22,932 | 27,748 | 22,932 | 27,748 | 13,390 | 16,202 | 13,390 | 16,202 | 12,367 | 14,964 | 12,367 | 14,964 |
| Wisconsin | 14,540 | 5,588 | 6,761 | 5,588 | 6,761 | 5,561 | 6,729 | 5,561 | 6,729 | 5,511 | 6,668 | 5,511 | 6,669 |
| Region cap | 532,266 | 371,665 | | 362,281 | | 311,867 | | 304,677 | | 302,028 | | 294,347 | |

Budgets in GREY indicate states where budgets were limited based on 2014 emissions.

**Table Appendix D-2. Ozone-Season NO$_X$ Emissions Budgets For IPM v5.14 Modeling**

|  | | Budgets For IPM v5.14 Modeling | |
|---|---|---|---|
|  | 2016-2017 Budgets (CSAPR Phase 1) | 2018 Emission Allowances s for IPM | 2018 IPM Assurance Level for IPM |
| **Alabama** | 31,623 | 10,474 | 12,673 |
| **Arkansas** | 15,110 | 9,105 | 11,017 |
| **Delaware** |  | 683 | 827 |
| **Illinois** | 21,208 | 14,109 | 17,072 |
| **Indiana** | 46,526 | 28,460 | 34,437 |
| **Iowa** | 16,370 | 9,234 | 11,174 |
| **Kansas** |  | 9,558 | 11,565 |
| **Kentucky** | 34,421 | 25,918 | 31,361 |
| **Louisiana** | 18,115 | 17,425 | 21,085 |
| **Maryland** | 7,179 | 2,389 | 2,891 |
| **Michigan** | 27,529 | 22,152 | 26,804 |
| **Mississippi** | 12,429 | 7,369 | 8,917 |
| **Missouri** | 21,944 | 15,215 | 18,410 |
| **New Jersey** | 3,930 | 2,676 | 3,238 |
| **New York** | 10,369 | 4,313 | 5,218 |
| **North Carolina** | 20,312 | 12,435 | 15,047 |
| **Ohio** | 40,149 | 17,951 | 21,720 |
| **Oklahoma** | 22,694 | 18,899 | 22,868 |
| **Pennsylvania** | 52,057 | 21,664 | 26,213 |
| **Tennessee** | 11,462 | 5,988 | 7,246 |
| **Texas** | 65,560 | 64,020 | 77,464 |
| **Virginia** | 14,452 | 7,261 | 8,786 |
| **West Virginia** | 24,287 | 13,687 | 16,562 |
| **Wisconsin** | 14,540 | 7,676 | 9,288 |
| **Region cap** | **532,266** | **348,663** | |

**Appendix E:  Detailed Budget Calculations**

See the spreadsheet "Ozone Transport Policy Analysis TSD Appendix E" for detailed calculations of state budgets and assurance levels.

**Appendix F: State Generation Constraint Analysis**

As described in Preamble section VI, the EPA limited generation shifting potential to units within each state in IPM as an analytic proxy designed to respect the feasibility of near-term generation shifting in light of these potential near-term out-of-merit order dispatch constraints. The EPA conducted a separate analysis similar to the $1,300 per ton cost threshold scenario, except without limiting IPM's ability to shift generation between states.[23]

The resulting state level emissions and calculated budgets from this scenario are compared to those of the $1,300 per ton cost threshold run and proposed budgets in Table F-1.

Overall, removing the state generation limit constraints in IPM achieve only an additional 1686 tons of ozone season $NO_X$ emissions reductions. The resulting state budgets were minimally affected, at most seeing a 2.7% decrease in any individual state budget. The transport regional cap decreased by only 636 tons, or 0.2%.[24]

**Table F-1.** Comparison of state level ozone season $NO_X$ emission reductions from affected sources and resulting state budgets between the $1300 per ton cost threshold cases with and without state level generation constraints.

| Proposal States | State | 2018 IPM $1,300 per ton Cost Threshold Scenario Emissions from Affect Units (tons) | | | Resulting 2017 Budgets of Two Scenarios | | |
|---|---|---|---|---|---|---|---|
| | | As Proposed With State Generation Limits | No State Generation Limits | Delta | Proposed Budgets | Budgets Based On No State Generation Limit Scenario | Delta |
| Y | Alabama | 9,708 | 9,709 | 1 | 9,979 | 9,974 | -5 |
| Y | Arkansas | 6,069 | 5,955 | -115 | 6,949 | 6,863 | -86 |
| | Connecticut | 407 | 407 | 0 | 325 | 325 | 0 |
| | Delaware | 477 | 477 | 0 | 610 | 610 | 0 |
| | District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 |
| | Florida | 18,369 | 18,511 | 142 | 18,414 | 18,455 | 41 |
| | Georgia | 7,157 | 7,299 | 142 | 7,307 | 7,358 | 51 |
| Y | Illinois | 9,541 | 9,732 | 191 | 12,078 | 11,957 | -121 |
| Y | Indiana | 29,575 | 29,732 | 158 | 28,284 | 28,626 | 342 |
| Y | Iowa | 7,488 | 7,487 | -1 | 8,351 | 8,353 | 2 |
| Y | Kansas | 10,894 | 10,818 | -76 | 9,272 | 9,247 | -25 |
| Y | Kentucky | 13,076 | 13,081 | 5 | 21,519 | 21,528 | 9 |
| Y | Louisiana | 10,762 | 10,671 | -91 | 15,807 | 15,926 | 119 |
| | Maine | 234 | 234 | 0 | 150 | 150 | 0 |
| Y | Maryland | 2,775 | 2,766 | -10 | 4,026 | 4,026 | 0 |
| | Massachusetts | 778 | 672 | -107 | 720 | 684 | -36 |
| Y | Michigan | 15,180 | 14,743 | -437 | 19,115 | 18,978 | -136 |

[23] IPM Output files for this scenario can be found in the docket as "5.15_OS_NOx_1300_CT_NoGenLimit"
[24] Details of the budget calculations for 5.15_OS_NOx_1300_CT_NoGenLimit can be found in the docket as "Budget Calculations For 1300CT No State Gen Limit Scenario.xlsx"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Minnesota | 8,999 | 9,014 | 14 | 7,884 | 7,795 | -90 |
| Y | Mississippi | 7,574 | 7,328 | -246 | 5,910 | 5,766 | -144 |
| Y | Missouri | 14,843 | 14,649 | -194 | 15,323 | 15,406 | 82 |
| | Nebraska | 13,770 | 13,766 | -4 | 10,284 | 10,284 | 0 |
| | New Hampshire | 140 | 140 | 0 | 106 | 106 | 0 |
| Y | New Jersey | 2,931 | 2,930 | 0 | 2,015 | 2,014 | -1 |
| Y | New York | 4,664 | 4,556 | -108 | 4,450 | 4,394 | -57 |
| Y | North Carolina | 12,513 | 11,951 | -563 | 12,275 | 12,041 | -234 |
| | North Dakota | 10,808 | 10,270 | -538 | 15,063 | 14,964 | -99 |
| Y | Ohio | 18,149 | 18,131 | -18 | 16,660 | 16,733 | 73 |
| Y | Oklahoma | 17,269 | 17,279 | 10 | 16,215 | 16,215 | 0 |
| Y | Pennsylvania | 14,773 | 14,905 | 132 | 14,387 | 14,412 | 25 |
| | Rhode Island | 202 | 218 | 17 | 190 | 197 | 7 |
| | South Carolina | 4,542 | 4,668 | 125 | 5,082 | 5,067 | -14 |
| | South Dakota | 297 | 297 | 0 | 386 | 386 | 0 |
| Y | Tennessee | 5,441 | 5,441 | 0 | 5,481 | 5,481 | 0 |
| Y | Texas | 54,557 | 54,583 | 26 | 58,002 | 57,913 | -89 |
| | Vermont | 3 | 3 | 0 | 61 | 61 | 0 |
| Y | Virginia | 6,656 | 6,793 | 136 | 6,818 | 6,810 | -8 |
| Y | West Virginia | 14,475 | 13,916 | -560 | 13,390 | 13,028 | -362 |
| Y | Wisconsin | 5,221 | 5,295 | 74 | 5,561 | 5,540 | -21 |
| | **Total of 23 Proposed States** | **294,135** | **292,450** | **-1,686** | **311,867** | **311,231** | **-636** |

# Tab 13

Federal Implementation Plans: Interstate Transport of Fine
Particulate Matter and Ozone and Correction of SIP Approvals;
Final Rule; 76 FR 48208, 48238 (August 8, 2011)

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 51, 52, 72, 78, and 97**

**[EPA–HQ–OAR–2009–0491; FRL–9436–8]**

**RIN 2060–AP50**

**Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** In this action, EPA is limiting the interstate transport of emissions of nitrogen oxides ($NO_X$) and sulfur dioxide ($SO_2$) that contribute to harmful levels of fine particle matter ($PM_{2.5}$) and ozone in downwind states. EPA is identifying emissions within 27 states in the eastern United States that significantly affect the ability of downwind states to attain and maintain compliance with the 1997 and 2006 fine particulate matter national ambient air quality standards (NAAQS) and the 1997 ozone NAAQS. Also, EPA is limiting these emissions through Federal Implementation Plans (FIPs) that regulate electric generating units (EGUs) in the 27 states. This action will substantially reduce adverse air quality impacts in downwind states from emissions transported across state lines. In conjunction with other federal and state actions, it will help assure that all but a handful of areas in the eastern part of the country achieve compliance with the current ozone and $PM_{2.5}$ NAAQS by the deadlines established in the Clean Air Act (CAA or Act). The FIPs may not fully eliminate the prohibited emissions from certain states with respect to the 1997 ozone NAAQS for two remaining downwind areas and EPA is committed to identifying any additional required upwind emission reductions and taking any necessary action in a future rulemaking. In this action, EPA is also modifying its prior approvals of certain State Implementation Plan (SIP) submissions to rescind any statements that the submissions in question satisfy the interstate transport requirements of the CAA or that EPA's approval of the SIPs affects our authority to issue interstate transport FIPs with respect to the 1997 fine particulate and 1997 ozone standards for 22 states. EPA is also issuing a supplemental proposal to request comment on its conclusion that six additional states significantly affect downwind states' ability to attain and maintain compliance with the 1997 ozone NAAQS.

**DATES:** This final rule is effective on October 7, 2011.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2009–0491. All documents in the docket are listed on the *http://www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http://www.regulations.gov* or in hard copy at the EPA Docket Center, EPA West, Room B102, 1301 Constitution Avenue, NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For general questions concerning this action, please contact Ms. Meg Victor, Clean Air Markets Division, Office of Atmospheric Programs, Mail Code 6204J, Environmental Protection Agency, 1200 Pennsylvania Avenue, NW., Washington, DC 20460; telephone number: (202) 343–9193; fax number: (202) 343–2359; e-mail address: *victor.meg@epa.gov.* For legal questions, please contact Ms. Sonja Rodman, U.S. EPA, Office of General Counsel, Mail Code 2344A, 1200 Pennsylvania Avenue, NW., Washington, DC 20460, telephone (202) 564–4079; e-mail address: *rodman.sonja@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Preamble Glossary of Terms and Abbreviations

The following are abbreviations of terms used in the preamble.

AQAT    Air Quality Assessment Tool
ARP    Acid Rain Program
BART    Best Available Retrofit Technology
BACT    Best Available Control Technology
CAA or Act    Clean Air Act
CAIR    Clean Air Interstate Rule
CAMx    Comprehensive Air Quality Model with Extensions
CBI    Confidential Business Information
CCR    Coal Combustion Residuals
CEM    Continuous Emissions Monitoring
CENRAP    Central Regional Air Planning Association
CFR    Code of Federal Regulations
DEQ    Department of Environmental Quality
DSI    Dry Sorbent Injection
EGU    Electric Generating Unit
FERC    Federal Energy Regulatory Commission
FGD    Flue Gas Desulfurization
FIP    Federal Implementation Plan
FR    **Federal Register**
EPA    U.S. Environmental Protection Agency
GHG    Greenhouse Gas
GW    Gigawatts
Hg    Mercury
ICR    Information Collection Request
IPM    Integrated Planning Model
km    Kilometers
lb/mmBtu    Pounds Per Million British Thermal Unit
LNB    Low-$NO_X$ Burners
MACT    Maximum Achievable Control Technology
MATS    Modeled Attainment Test Software
$\mu g/m^3$    Micrograms Per Cubic Meter
MSAT    Mobile Source Air Toxics
MOVES    Motor Vehicle Emission Simulator
NAAQS    National Ambient Air Quality Standards
NBP    $NO_X$ Budget Trading Program
NEI    National Emission Inventory
NESHAP    National Emissions Standards for Hazardous Air Pollutants
$NO_X$    Nitrogen Oxides
NODA    Notices of Data Availability
NSPS    New Source Performance Standard
NSR    New Source Review
OFA    Overfire Air
OSAT    Ozone Source Apportionment Technique
OTAG    Ozone Transport Assessment Group
ppb    Parts Per Billion
$PM_{2.5}$    Fine Particulate Matter, Less Than 2.5 Micrometers
$PM_{10}$    Fine and Coarse Particulate Matter, Less Than 10 Micrometers
PM    Particulate Matter
ppm    Parts Per Million
PUC    Public Utility Commission
RIA    Regulatory Impact Analysis
SCR    Selective Catalytic Reduction
SIP    State Implementation Plan
SMOKE    Sparse Matrix Operator Kernel Emissions
SNCR    Selective Non-catalytic Reduction
$SO_2$    Sulfur Dioxide
$SO_X$    Sulfur Oxides, Including Sulfur Dioxide ($SO_2$) and Sulfur Trioxide ($SO_3$)
TAF    Terminal Area Forecast
TCEQ    Texas Commission on Environmental Quality
TIP    Tribal Implementation Plan
TLN3    Tangential Low $NO_X$
TPY    Tons Per Year
TSD    Technical Support Document
WRAP    Western Regional Air Partnership

## II. General Information

*A. Does this action apply to me?*

This rule affects EGUs, and regulates the following groups:

| Industry group | NAICS [a] |
|---|---|
| Utilities (electric, natural gas, other systems.) ... | 2211, 2212, 2213 |

[a] North American Industry Classification System.

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this action. This table lists

the types of entities that EPA is aware of that could potentially be regulated. Other types of entities not listed in the table could also be regulated. To determine whether your facility would be regulated by the proposed rule, you should carefully examine the applicability criteria in proposed §§ 97.404, 97.504, and 97,604.

### B. How is the preamble organized?

I. Preamble Glossary of Terms and Abbreviations
II. General Information
 A. Does this action apply to me?
 B. How is the preamble organized?
III. Executive Summary
IV. Legal Authority, Environmental Basis, and Correction of CAIR SIP Approvals
 A. EPA's Authority for Transport Rule
 B. Rulemaking History
 C. Air Quality Problems and NAAQS Addressed
 1. Air Quality Problems and NAAQS Addressed
 2. FIP Authority for Each State and NAAQS Covered
 3. Additional Information Regarding CAA Section 110(a)(2)(D)(i)(I) SIPs for States in the Transport Rule Modeling Domain
 D. Correction of CAIR SIP Approvals
V. Analysis of Downwind Air Quality and Upwind State Emissions
 A. Pollutants Regulated
 1. Background
 2. Which pollutants did EPA propose to control for purposes of $PM_{2.5}$ and Ozone Transport?
 3. Comments and Responses
 B. Baseline for Pollution Transport Analysis
 C. Air Quality Modeling to Identify Downwind Nonattainment and Maintenance Receptors
 1. Emission Inventories
 2. Air Quality Basis for Identifying Receptors
 3. How did EPA project future nonattainment and maintenance for annual $PM_{2.5}$, 24-hour $PM_{2.5}$, and 8-hour ozone?
 D. Pollution Transport From Upwind States
 1. Choice of Air Quality Thresholds
 2. Approach for Identifying Contributing Upwind States
VI. Quantification of State Emission Reductions Required
 A. Cost and Air Quality Structure for Defining Reductions
 1. Summary
 2. Background
 B. Cost of Available Emission Reductions (Step 1)
 1. Development of Annual $NO_X$ and Ozone-Season $NO_X$ Cost Curves
 2. Development of $SO_2$ Cost Curves
 3. Amount of Reductions That Could Be Achieved by 2012 and 2014
 C. Estimates of Air Quality Impacts (Step 2)
 1. Development of the Air Quality Assessment Tool and Air Quality Modeling Strategy
 2. Utilization of AQAT to Evaluate Control Scenarios
 3. Air Quality Assessment Results
 D. Multi-Factor Analysis and Determination of State Emission Budgets
 1. Multi-Factor Analysis (Step 3)
 2. State Emission Budgets (Step 4)
 E. Approach to Power Sector Emission Variability
 1. Introduction to Power Sector Variability
 2. Transport Rule Variability Limits
 F. Variability Limits and State Emission Budgets: State Assurance Levels
 G. How the State Emission Reduction Requirements Are Consistent With Judicial Opinions Interpreting the Clean Air Act
VII. FIP Program Structure to Achieve Reductions
 A. Overview of Air Quality-Assured Trading Programs
 B. Applicability
 C. Compliance Deadlines
 1. Alignment With NAAQS Attainment Deadlines
 2. Compliance and Deployment of Pollution Control Technologies
 D. Allocation of Emission Allowances
 1. Allocations to Existing Units
 2. Allocations to New Units
 E. Assurance Provisions
 F. Penalties
 G. Allowance Management System
 H. Emissions Monitoring and Reporting
 I. Permitting
 1. Title V Permitting
 2. New Source Review
 J. How the Program Structure Is Consistent With Judicial Opinions Interpreting the Clean Air Act
VIII. Economic Impacts of the Transport Rule
 A. Emission Reductions
 B. The Impacts on $PM_{2.5}$ and Ozone of the Final $SO_2$ and $NO_X$ Strategy
 C. Benefits
 1. Human Health Benefit Analysis
 2. Quantified and Monetized Visibility Benefits
 3. Benefits of Reducing GHG Emissions
 4. Total Monetized Benefits
 5. How do the benefits in 2012 compare to 2014?
 6. How do the benefits compare to the costs of this final rule?
 7. What are the unquantified and non-monetized benefits of the Transport Rule emission reductions?
 D. Costs and Employment Impacts
 1. Transport Rule Costs and Employment Impacts
 2. End-Use Energy Efficiency
IX. Related Programs and the Transport Rule
 A. Transition From the Clean Air Interstate Rule
 1. Key Differences Between the Transport Rule and CAIR
 2. Transition From the Clean Air Interstate Rule to the Transport Rule
 B. Interactions With $NO_X$ SIP Call
 C. Interactions With Title IV Acid Rain Program
 D. Other State Implementation Plan Requirements
X. Transport Rule State Implementation Plans
XI. Structure and Key Elements of Transport Rule Air Quality-Assured Trading Program Rules
XII. Statutory and Executive Order Reviews
 A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
 B. Paperwork Reduction Act
 C. Regulatory Flexibility Act
 D. Unfunded Mandates Reform Act
 E. Executive Order 13132: Federalism
 F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
 G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
 H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
 I. National Technology Transfer and Advancement Act
 J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
 1. Consideration of Environmental Justice in the Transport Rule Development Process and Response to Comments
 2. Potential Environmental and Public Health Impacts Among Populations Susceptible or Vulnerable to Air Pollution
 3. Meaningful Public Participation
 4. Summary
 K. Congressional Review Act
 L. Judicial Review

## III. Executive Summary

The CAA section 110(a)(2)(D)(i)(I) requires states to prohibit emissions that contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any primary or secondary NAAQS. In this final rule, EPA finds that emissions of $SO_2$ and $NO_X$ in 27 eastern, midwestern, and southern states contribute significantly to nonattainment or interfere with maintenance in one or more downwind states with respect to one or more of three air quality standards—the annual $PM_{2.5}$ NAAQS promulgated in 1997, the 24-hour $PM_{2.5}$ NAAQS promulgated in 2006, and the ozone NAAQS promulgated in 1997 (EPA uses the term ''states'' to include the District of Columbia in this preamble).

These emissions are transported downwind either as $SO_2$ and $NO_X$ or, after transformation in the atmosphere, as fine particles or ozone. This final rule identifies emission reduction responsibilities of upwind states, and also promulgates enforceable FIPs to achieve the required emission reductions in each state through cost-effective and flexible requirements for power plants. Each state has the option of replacing these federal rules with state rules to achieve the required amount of emission reductions from sources selected by the state.

Section 110(a)(2)(D)(i)(I) of the CAA requires the elimination of upwind state emissions that significantly contribute to nonattainment or interfere with maintenance of a NAAQS in another state. Elimination of these upwind state emissions may not necessarily, in itself, fully resolve nonattainment or maintenance problems at downwind state receptors. Downwind states also have control responsibilities because, among other things, the Act requires each state to adopt enforceable plans to attain and maintain air quality standards. Indeed, states have put in place measures to reduce local emissions that contribute to nonattainment within their borders. Section 110(a)(2)(D)(i)(I) only requires the elimination of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states; it does not shift to upwind states the responsibility for ensuring that all areas in other states attain the NAAQS.

The reductions obtained through the Transport Rule will help all but a few downwind areas come into attainment with and maintain the 1997 annual $PM_{2.5}$ NAAQS, the 2006 24-hour $PM_{2.5}$ NAAQS, and the 1997 ozone NAAQS. With respect to the annual $PM_{2.5}$ NAAQS, this rule finds that 18 states have $SO_2$ and annual $NO_X$ emission reduction responsibilities, and this rule quantifies each state's full emission reduction responsibility under section 110(a)(2)(D)(i)(I). *See* Table III–1 for the list of these states. With these reductions, EPA projects that no areas will have nonattainment or maintenance concerns with respect to the annual $PM_{2.5}$ NAAQS.

With respect to the 24-hour $PM_{2.5}$ NAAQS, this rule finds that 21 states have $SO_2$ and annual $NO_X$ emission reduction responsibilities, and this rule quantifies each state's full emission reduction responsibility under section 110(a)(2)(D)(i)(I). *See* Table III–1 for the list of these states. In all, this rule requires emission reductions related to interstate transport of fine particles in 23 states. With these reductions, as discussed in section VI.D of this preamble, only one area (Liberty-Clairton) is projected to remain in nonattainment, and three other areas (Chicago,[1] Detroit, and Lancaster) are projected to have remaining

maintenance concerns for the 24-hour $PM_{2.5}$ NAAQS.

With respect to the 1997 ozone NAAQS, this rule finds that 20 states have ozone-season $NO_X$ emission reduction responsibilities. For 10 of these states this rule quantifies the state's full emission reduction responsibility under section 110(a)(2)(D)(i)(I).[2] For 10 additional states, EPA quantifies in this rule the ozone-season $NO_X$ emission reductions that are necessary but may not be sufficient to eliminate all significant contribution to nonattainment and interference with maintenance in other states.[3] *See* Table III–1 for the complete list of 20 states required to reduce ozone-season $NO_X$ emissions in this rule. With the Transport Rule reductions, only one area (Houston) is projected to remain in nonattainment, and one area (Baton Rouge) to have a remaining maintenance concern with respect to the 1997 ozone NAAQS. The 10 states upwind of either of these two areas are the states for which additional reductions may be necessary to fully eliminate each state's significant contribution to nonattainment and interference with maintenance, as discussed in section VI of this preamble.[4]

As discussed further below, EPA's analysis also demonstrates that six additional states should be required to reduce ozone-season $NO_X$ emissions. EPA is issuing a supplemental proposal to request comment on requiring ozone-season $NO_X$ reductions in these six states. For five of these six states, EPA's analysis identifies the state's full emission reduction responsibility under section 110(a)(2)(D)(i)(I), and for the remaining one state EPA's analysis identifies reductions that are necessary

but may not be sufficient to satisfy the requirements of 110(a)(2)(D)(i)(I).[5]

On January 19, 2010, EPA proposed revisions to the 8-hour ozone NAAQS that the Agency had issued March 12, 2008 (75 FR 2938); the Agency intends to finalize its reconsideration in the summer of 2011. EPA intends to propose a rule to address transport with respect to the reconsidered 2008 ozone NAAQS as expeditiously as possible after reconsideration is completed. EPA intends to include in that proposed rule requirements to address any remaining significant contribution to nonattainment and interference with maintenance with respect to the 1997 ozone NAAQS for the states identified in this final rule, or the associated supplemental notice of proposed rulemaking, for which EPA was unable to fully quantify the emissions that must be prohibited to satisfy the requirements of 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS.

The Act requires EPA to conduct periodic reviews of each of the NAAQS. When NAAQS are set or revised, the CAA requires revision of SIPs to ensure the standards are met expeditiously and within relevant timetables in the Act. If more protective NAAQS are promulgated, in the case of pollutants for which interstate transport is important, additional emission reductions to address transported pollution may be required from the power sector, from other sectors, and from sources in additional states. EPA will act promptly to promulgate any future rules addressing transport with respect to revised NAAQS.

The Transport Rule requires substantial near-term emission reductions in every covered state to address each state's significant contribution to nonattainment and interference with maintenance downwind. This rule achieves these reductions through FIPs that regulate the power sector using air quality-assured trading programs whose assurance provisions ensure that necessary reductions will occur within every covered state. This remedy structure is substantially similar to the preferred trading remedy structure presented in the proposal. The Transport Rule's air quality-assured trading approach will assure

---

[1] This area is not currently designated as nonattainment for the 24-hour $PM_{2.5}$ standard. EPA is portraying the receptors and counties in this area as a single 24-hour maintenance area based on the annual $PM_{2.5}$ nonattainment designation of Chicago-Gary-Lake County, IL-IN.

[2] The 10 states for which this rule quantifies the state's full responsibility under section 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS are Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, and West Virginia.

[3] The 10 states for which this rule quantifies reductions that are necessary but may not be sufficient to satisfy the requirements of 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS are Alabama, Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Tennessee, and Texas.

[4] This preamble uses the term "significant contribution" only in the context of the CAA section 110(a)(2)(D)(i)(I) requirement that states prohibit emissions that "contribute significantly to nonattainment" in any other state with respect to any primary or secondary NAAQS. Thus, a significant contribution, as used in this preamble, is one that is significant for purposes of CAA section 110(a)(2)(D)(i)(I) as coming from a particular state.

[5] The five states addressed in the supplemental proposal for which EPA's analysis identifies the state's full reduction responsibility under section 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS are Iowa, Kansas, Michigan, Oklahoma, and Wisconsin. The one state addressed in the supplemental proposal for which EPA's analysis identifies reductions that are necessary but may not be sufficient to satisfy section 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS is Missouri.

environmental results in each state while providing market-based flexibility to covered sources through interstate trading. The final rule includes four air quality-assured trading programs: An annual $NO_X$ trading program, an ozone-season $NO_X$ trading program, and two separate $SO_2$ trading programs (''$SO_2$ Group 1'' and ''$SO_2$ Group 2''), as discussed further in sections VI and VII, below.

The first phase of Transport Rule compliance commences January 1, 2012, for $SO_2$ and annual $NO_X$ reductions and May 1, 2012, for ozone-season $NO_X$ reductions. The second phase of Transport Rule reductions, which commences January 1, 2014, increases the stringency of $SO_2$ reductions in a number of states as discussed further below.

EPA projects that with the Transport Rule, covered EGU will substantially reduce $SO_2$, annual $NO_X$ and ozone-season $NO_X$ emissions, as shown in Tables III–2 and III–3, below. This rule generally covers electric generating units that are fossil fuel-fired boilers and turbines producing electricity for sale, as detailed in section VII.B.

EPA is promulgating the Transport Rule in response to the remand of the Clean Air Interstate Rule (CAIR) by the U.S. Court of Appeals for the District of Columbia Circuit (''Court'') in 2008. CAIR, promulgated May 12, 2005 (70 FR 25162), required 29 states to adopt and submit revisions to their State Implementation Plans (SIPs) to eliminate $SO_2$ and $NO_X$ emissions that contribute significantly to downwind nonattainment of the $PM_{2.5}$ and ozone NAAQS promulgated in July 1997. CAIR covered a similar but not identical set of states as the Transport Rule. CAIR FIPs were promulgated April 26, 2006 (71 FR 25328) to regulate electric generating units in the covered states and achieve the emission reduction requirements established by CAIR until states could submit and obtain approval of SIPs to achieve the reductions.

In July 2008, the Court found CAIR and the CAIR FIPs unlawful. *North Carolina* v. *EPA,* 531 F.3d 896 (D.C. Cir. 2008), modified on rehearing, *North Carolina* v. *EPA,* 550 F.3d 1176, 1178 (D.C. Cir. 2008). The Court's original decision vacated CAIR. *North Carolina,* 531 F.3d at 929–30. However, the Court subsequently remanded CAIR to EPA without vacatur because it found that ''allowing CAIR to remain in effect until it is replaced by a rule consistent with our opinion would at least temporarily preserve the environmental values covered by CAIR.'' *North Carolina,* 550 F.3d at 1178. The CAIR requirements have remained in place while EPA has

developed the Transport Rule to replace them.

EPA's approach in the Transport Rule to measure and address each state's significant contribution to downwind nonattainment and interference with maintenance is guided by and consistent with the Court's opinion in *North Carolina* and addresses the flaws in CAIR identified by the Court therein. This final rule also responds to extensive public comments and stakeholder input received during the public comment periods in response to the proposal and subsequent Notices of Data Availability (NODAs).

In this action, EPA both identifies and addresses emissions within states that significantly contribute to nonattainment or interfere with maintenance in other downwind states. In developing this rule, EPA used a state-specific methodology to identify emission reductions that must be made in covered states to address the CAA section 110(a)(2)(D)(i)(I) prohibition on emissions that significantly contribute to nonattainment or interfere with maintenance in a downwind state. EPA believes this methodology addresses the Court's concern that the approach used in CAIR was insufficiently state-specific. EPA used detailed air quality analysis to determine whether a state's contribution to downwind air quality problems is at or above specific thresholds. A state is covered by the Transport Rule if its contribution meets or exceeds one of those air quality thresholds and the Agency identifies, using a multi-factor analysis that takes into account both air quality and cost considerations, emissions within the state that constitute the state's significant contribution to nonattainment and interference with maintenance with respect to the 1997 ozone or the 1997 annual or 2006 24-hour $PM_{2.5}$ NAAQS. Section 110(a)(2)(D)(i)(I) requires states to eliminate the emissions that constitute this ''significant contribution'' and ''interference with maintenance.'' [6]

In this final rule, EPA determined the emission reductions required from all upwind states to eliminate significant contribution to nonattainment and interference with maintenance with respect to the 1997 ozone, 1997 annual $PM_{2.5}$, and 2006 24-hour $PM_{2.5}$ NAAQS, using, in part, an assessment of modeled air quality in 2012 and 2014. EPA first

identified the following two sets of downwind receptors: (1) Receptors that EPA projects will have nonattainment problems; and, (2) receptors that EPA projects may have difficulty maintaining the NAAQS based on historic variation in air quality. To identify areas that may have problems attaining or maintaining these air quality standards, EPA projected a suite of future air quality design values, based on measured data during the period 2003 through 2007. EPA used the average of these future design values to assess whether an area will be in nonattainment. EPA used the maximum projected future design value to assess whether an area may have difficulty maintaining the relevant NAAQS (*i.e.,* whether an area has a reasonable possibility of being in nonattainment under adverse emission and weather conditions). Section V.C of this preamble details the Transport Rule's approach to identify downwind nonattainment and maintenance areas.

After identifying downwind nonattainment and/or maintenance areas, EPA next used air quality modeling to determine which upwind states are projected to contribute at or above threshold levels to the air quality problems in those areas. Section V.D details the choice of air quality thresholds and the approach to determine how much each upwind state contributes. States whose contributions meet or exceed the threshold levels were analyzed further, as detailed in section VI, to determine whether they significantly contribute to nonattainment or interfere with maintenance of a relevant NAAQS, and if so, the quantity of emissions that constitute their significant contribution and interference with maintenance.

When EPA proposed this air-quality and cost-based multi-factor approach to identify emissions that constitute significant contribution to nonattainment and interference with maintenance from upwind states with respect to the 1997 ozone, annual $PM_{2.5}$, and 2006 24-hour $PM_{2.5}$ NAAQS, the Agency indicated that the approach was designed to be applicable to both current and potential future ozone and $PM_{2.5}$ NAAQS (75 FR 45214). EPA believes that the Transport Rule's approach of using air-quality thresholds to determine upwind-to-downwind-state linkages and using the air-quality and cost-based multi-factor approach to determine the quantity of emissions that each upwind state must eliminate, *i.e.,* the state's significant contribution to nonattainment and interference with maintenance, could serve as a precedent for quantifying upwind state emission reduction responsibilities with respect

---

[6] In this preamble, EPA uses the terms ''significant contribution'' and ''interference with maintenance'' to refer to the emissions that must be prohibited pursuant to section 110(a)(2)(D)(i)(I) because they significantly contribute to nonattainment or interfere with maintenance of the NAAQS in another state.

to potential future NAAQS, as discussed further in section VI.A of this preamble. The Agency further believes that the final Transport Rule demonstrates the strong value of this approach for addressing the role of interstate transport of air pollution in communities' ability to comply with current and future NAAQS.

EPA thus identified specific emission reduction responsibilities for each upwind state found to significantly contribute to nonattainment or interfere with maintenance in other states. Using that information, EPA developed individual state budgets for emissions from covered units under the Transport Rule. The Transport Rule emission budgets are based on EPA's state-by-state analysis of each upwind state's significant contribution to nonattainment and interference with maintenance. Because each state's budget is directly linked to this state-specific analysis of the state's obligations pursuant to section 110(a)(2)(D)(i)(I), this approach addresses the Court's concerns about the development of CAIR budgets.

In this rule, EPA is finalizing SO$_2$ and annual NO$_X$ budgets for each state covered for the 24-hour and/or annual PM$_{2.5}$ NAAQS and an ozone-season NO$_X$ budget for each state covered for the ozone NAAQS. A state's emission budget is the quantity of emissions that will remain from covered units under the Transport Rule after elimination of significant contribution to nonattainment and interference with maintenance in an average year (*i.e.*, before accounting for the inherent variability in power system operations).[7]

Baseline power sector emissions from a state can be affected by changing weather patterns, demand growth, or disruptions in electricity supply from other units or from the transmission grid. As a consequence, emissions could vary from year to year even in a state where covered sources have installed all controls and taken all measures necessary to eliminate the state's significant contribution to nonattainment and interference with maintenance. As described in detail in

sections VI and VII of this preamble, the Transport Rule accounts for the inherent variability in power system operations through "assurance provisions" based on state-specific variability limits which extend above the state budgets to form each state's "assurance level." The state assurance levels take into account the inherent variability in baseline emissions from year to year. The final Transport Rule FIPs will implement assurance provisions starting in 2012 as discussed in section VII, below.

The emission reduction requirements (*i.e.*, the "remedy") EPA is promulgating in this rule respond to the Court's concerns that in CAIR, EPA had not shown that the emission reduction requirements would get all necessary reductions within the state as required by section 110(a)(2)(D)(i)(I). The Transport Rule FIPs include assurance provisions specifically designed to ensure that no state's emissions are allowed to exceed that specific state's budget plus the variability limit (*i.e.*, the state's assurance level).

Each state's Transport Rule SO$_2$, annual NO$_X$, or ozone-season NO$_X$ emission budget is composed of a number of emission allowances ("allowances") equivalent to the tonnage of that specific state budget. Under the Transport Rule FIPs, EPA is distributing ("allocating") allowances under each state's budget to covered units in that state. In this rule, EPA analyzed each individual state's significant contribution to nonattainment and interference with maintenance and calculated budgets that represent each state's emissions after the elimination of those prohibited emissions in an average year. The methodology used to allocate allowances to individual units in a particular state has no impact on that state's budget or on the requirement that the state's emissions not exceed that budget plus the variability limit; the allocation methodology therefore has no impact on the rule's ability to satisfy the statutory mandate of CAA section 110(a)(2)(D)(i)(I).

The Transport Rule's approach to allocate emission allowances to existing units is based on historic heat-input data, as detailed in section VII.D of this preamble. The Transport Rule SO$_2$, annual NO$_X$, and ozone-season NO$_X$ emission allowances each authorize the emission of one ton of SO$_2$, annual NO$_X$, or ozone-season NO$_X$ emissions, respectively, during a Transport Rule

control period, and are the currency in the Transport Rule's air quality-assured trading programs. As discussed in section IX.A.2 below, EPA is creating these Transport Rule allowances as distinct compliance instruments with no relation to allowances from the CAIR trading programs. EPA agrees with the general principle that it is desirable, where possible, to provide continuity under successive regulatory trading programs, for example through the carryover of allowances from one program into a subsequent one. However, EPA is promulgating the Transport Rule as a court-ordered replacement for (not a successor to) CAIR's trading programs. In light of the specific circumstances of this case, including legal and technical issues discussed in Section IX.A.2 below, the final rule will not allow any carryover of banked SO$_2$ or NO$_X$ allowances from the Title IV or CAIR trading programs. EPA will strongly consider administrative continuity of this rule's trading programs under any future actions designed to address related problems of interstate transport of air pollution. A state may submit a SIP revision under which the state (rather than EPA) would determine allocations for one or more of the Transport Rule trading programs beginning with vintage year 2013 or later allowances.[8] Section X of this preamble discusses the final rule's provisions for SIP submissions in detail.

Table III–1 lists states covered by the Transport Rule for PM$_{2.5}$ and ozone. It also, with respect to PM$_{2.5}$, identifies whether EPA determined the state was significantly contributing to nonattainment or interfering with maintenance of the 1997 annual PM$_{2.5}$ NAAQS, the 2006 24-hour PM$_{2.5}$ NAAQS, or both. As discussed below, the Transport Rule sorts the states required to reduce SO$_2$ emissions due to their contribution to PM$_{2.5}$ downwind into two groups of varying reduction stringency, with "Group 1" states subject to greater SO$_2$ reduction stringency than "Group 2" states starting in 2014. Table III–1 also lists which SO$_2$ Group each of the states is in.

---

[7] For the states discussed above for which EPA has quantified the minimum amount of emission reductions needed to make measurable progress toward satisfying the state's section 110(a)(2)(D)(i)(I) responsibility, the emission budget is the quantity of emissions that will remain from covered units after removal of those emissions.

[8] This final rule allows states to make 2013 allowance allocations through the use of a SIP revision that is narrower in scope than the other SIP revisions states can use to replace the FIPs and/or to make allocation decisions for 2014 and beyond, as discussed in section X.

TABLE III–1—STATES THAT SIGNIFICANTLY CONTRIBUTE TO NONATTAINMENT OR INTERFERE WITH MAINTENANCE OF A NAAQS DOWNWIND IN THE FINAL TRANSPORT RULE

| State | 1997 Ozone NAAQS | 1997 Annual PM$_{2.5}$ NAAQS | 2006 24-Hour PM$_{2.5}$ NAAQS | SO$_2$ group |
|---|---|---|---|---|
| Alabama | X | X | X | 2 |
| Arkansas | X | | | |
| Florida | X | | | |
| Georgia | X | X | X | 2 |
| Illinois | X | X | X | 1 |
| Indiana | X | X | X | 1 |
| Iowa | | X | X | 1 |
| Kansas | | | X | 2 |
| Kentucky | X | X | X | 1 |
| Louisiana | X | | | |
| Maryland | X | X | X | 1 |
| Michigan | | X | X | 1 |
| Minnesota | | | X | 2 |
| Mississippi | X | | | |
| Missouri | | X | X | 1 |
| Nebraska | | | X | 2 |
| New Jersey | X | | X | 1 |
| New York | X | X | X | 1 |
| North Carolina | X | X | X | 1 |
| Ohio | X | X | X | 1 |
| Pennsylvania | X | X | X | 1 |
| South Carolina | X | X | | 2 |
| Tennessee | X | X | X | 1 |
| Texas | X | X | | 2 |
| Virginia | X | | X | 1 |
| West Virginia | X | X | X | 1 |
| Wisconsin | | X | X | 1 |
| Number of States | 20 | 18 | 21 | |

As explained in this preamble, EPA has improved and updated both steps of its significant contribution analysis. It updated and improved the modeling platforms and modeling inputs used to identify states with contributions to certain downwind receptors that meet or exceed specified thresholds. It also updated and improved its analysis for identifying any emissions within such states that constitute the state's significant contribution to nonattainment or interference with maintenance. Therefore, the results of the analysis conducted for the final rule differ somewhat from the results of the analysis conducted for the proposal.[9]

With respect to the 1997 ozone NAAQS, the analysis EPA conducted for the proposal did not identify Wisconsin, Iowa and Missouri as states that significantly contribute to nonattainment or interfere with maintenance of the ozone NAAQS in another state. However, the analysis conducted for the final rule shows that emissions from these states do significantly contribute to nonattainment or interfere with maintenance of the ozone NAAQS in

another state. EPA is not issuing FIPs with respect to the 1997 ozone NAAQS or finalizing ozone season NO$_X$ budgets for these states in this rule. EPA is publishing a supplemental notice of proposed rulemaking that will provide an opportunity for public comment on our conclusion that these states significantly contribute to nonattainment or interfere with maintenance of the 1997 ozone NAAQS.

In the other direction, the analysis conducted for the proposal supported EPA's conclusion at the time that Connecticut, Delaware, and the District of Columbia significantly contributed to nonattainment or interfered with maintenance with respect to the 1997 ozone NAAQS, whereas the modeling for the final rule no longer supports that conclusion for those states.

Additionally, the modeling conducted for the final rule identified two ozone maintenance receptors that were not identified in the modeling conducted for the proposal—Allegan County (MI) and Harford County (MD). Five states that EPA identified as significantly contributing to maintenance problems at the Allegan and/or Harford County receptors in the modeling for the final rule uniquely contribute to these receptors, i.e., absent these receptors the states would not be covered by the Transport Rule ozone-season program.

The five states that uniquely contribute to these receptors are Iowa, Kansas, Michigan, Oklahoma, and Wisconsin. EPA is not issuing FIPs with respect to the 1997 ozone NAAQS or finalizing ozone-season NO$_X$ budgets for these states in this rule. EPA is publishing a supplemental notice of proposed rulemaking that will provide an opportunity for public comment on our conclusion that these states significantly contribute to nonattainment or interfere with maintenance of the 1997 ozone NAAQS.

EPA did not change its methodology between the proposed Transport Rule and the final Transport Rule for identifying upwind states that significantly contribute to nonattainment or interfere with maintenance in other states; nor did EPA change its methodology for identifying receptors of concern with respect to maintenance of the 1997 ozone NAAQS. The final rule's air quality modeling identifies the new states and new receptors described above based on updated input information (including emission inventories), much of which was provided to EPA through public comment on the proposal and subsequent NODAs. Section V of this preamble details the approach EPA used

---

[9] EPA updated its modeling platforms and modeling inputs in response to public comments received on the proposed Transport Rule and subsequent NODAs and performed other standard updates.

to identify contributing states and receptors of concern.

With respect to the annual PM$_{2.5}$ NAAQS, the analysis EPA conducted for the proposal supported EPA's conclusion that the states of Delaware, the District of Columbia, Florida, Louisiana, Minnesota, New Jersey, and Virginia were significantly contributing to nonattainment and interfering with maintenance of the annual PM$_{2.5}$ NAAQS while the final rule's analysis does not. Also, with respect to the 24-hour PM$_{2.5}$ NAAQS, the analysis conducted for the proposal supported EPA's conclusion that the states of Connecticut, Delaware, the District of Columbia, and Massachusetts were significantly contributing to nonattainment or interfering with maintenance in other states while the analysis conducted for the final rule did not.

In the proposal EPA also requested comment on whether Texas should be included in the Transport Rule for annual PM$_{2.5}$. EPA's analysis for the proposal showed that emissions in Texas would significantly contribute to nonattainment or interfere with maintenance of the annual PM$_{2.5}$ NAAQS if Texas were not included in the rule for PM$_{2.5}$. The proposal did not include an illustrative budget for Texas or illustrative allowance allocations. However, the budgets and allowance allocations provided for other states in the proposal were included solely to illustrate the result of applying EPA's proposed methodology for quantifying significant contribution to the data EPA proposed to use. EPA provided an ample opportunity for comment on this methodology and on the data, including data regarding emissions from Texas sources, used in the significant contribution analysis. EPA received numerous comments on and corrections to Texas-specific data. The modeling conducted for the final rule demonstrates that Texas significantly contributes to nonattainment or interferes with maintenance of the annual PM$_{2.5}$ NAAQS in another state. EPA provided a full opportunity for comment on whether Texas should be included in the rule for annual PM$_{2.5}$, as well as on the methodology and data

used for the significant contribution analysis for the final rule. EPA therefore believes its determination that Texas must be included in the rule for annual PM$_{2.5}$ is a logical outgrowth of its proposal.

With respect to the 24-hour PM$_{2.5}$ NAAQS, the analysis EPA conducted for the proposal did not identify Texas as a state that significantly contributes to nonattainment or interferes with maintenance of 24-hour PM$_{2.5}$ in another state. However, the analysis conducted for the final rule shows that emissions from Texas do significantly contribute to nonattainment of the 24-hour PM$_{2.5}$ NAAQS in another state. EPA is not issuing a FIP for Texas with respect to the 24-hour PM$_{2.5}$ NAAQS in this rule. However, EPA believes that the FIP for Texas with respect to the 1997 annual PM$_{2.5}$ NAAQS also addresses the emissions in Texas that significantly contribute to nonattainment and interference with maintenance of the 2006 24-hour PM$_{2.5}$ NAAQS in another state.

The final rule, however, does not cover the states of Connecticut, Delaware, the District of Columbia, Florida, Louisiana, or Massachusetts for annual or 24-hour PM$_{2.5}$ as the analysis for the final rule does not support their inclusion.

The Transport Rule FIPs require the 23 states covered for purposes of the 24-hour and/or annual PM$_{2.5}$ NAAQS to reduce SO$_2$ and annual NO$_X$ emissions by specified amounts. The FIPs require the 20 states covered for purposes of the ozone NAAQS to reduce ozone-season NO$_X$ emissions by specified amounts. As discussed in detail in section VI, below, the 23 states covered for the 24-hour and/or annual PM$_{2.5}$ NAAQS are grouped in two tiers reflecting the stringency of SO$_2$ reductions required to eliminate that state's significant contribution to nonattainment and interference with maintenance downwind. The more-stringent SO$_2$ tier ("Group 1") is comprised of the 16 states indicated in Table III–1, above, and the less-stringent SO$_2$ tier ("Group 2") is comprised of the 7 states identified in the table. The two SO$_2$ trading programs are exclusive, *i.e.*, a covered source in a Group 1 state may

use only a Group 1 allowance for compliance, and likewise a source in a Group 2 state may use only a Group 2 allowance for compliance. In Group 1 states, the SO$_2$ reduction requirements become more stringent in the second phase, which starts in 2014.

In response to the Court's opinion in *North Carolina*, EPA has coordinated the Transport Rule's compliance deadlines with the NAAQS attainment deadlines that apply to the downwind nonattainment and maintenance areas. The Transport Rule requires that all significant contribution to nonattainment and interference with maintenance identified in this action with respect to the 1997 annual PM$_{2.5}$ NAAQS and the 2006 24-hour PM$_{2.5}$ NAAQS be eliminated by no later than 2014, with an initial phase of reductions starting in 2012 to ensure that reductions are made as expeditiously as practicable and, consistent with the Court's remand, to "preserve the environmental values covered by CAIR." Sources must comply by January 1, 2012 and January 1, 2014 for the first and second phases, respectively.

With respect to the 1997 ozone NAAQS, the Transport Rule requires NO$_X$ reductions starting in 2012 to ensure that reductions are made as expeditiously as practicable to assist downwind state attainment and maintenance of the standard. Sources must comply by May 1, 2012. The Transport Rule's compliance schedule and alignment with downwind NAAQS attainment deadlines are discussed in detail in section VII below.

Table III–2 shows projected Transport Rule emissions compared to projected base case emissions, and Table III–3 shows projected Transport Rule emissions compared to historical emissions (*i.e.*, 2005 emissions), for the power sector in all Transport Rule states. The ozone-season NO$_X$ results shown in Tables III–2 and III–3 are based on analysis of the group of 26 states that would be covered for the ozone-season program if EPA finalizes the supplemental proposal regarding ozone-season requirements for Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin.

TABLE III–2—PROJECTED SO$_2$ AND NO$_X$ ELECTRIC GENERATING UNIT EMISSION REDUCTIONS IN COVERED STATES WITH THE TRANSPORT RULE COMPARED TO BASE CASE WITHOUT TRANSPORT RULE OR CAIR **

[Million tons]

|  | 2012 Base case emissions | 2012 Transport rule emissions | 2012 Emission reductions | 2014 Base case emissions | 2014 Transport rule emissions | 2014 Emission reductions |
|---|---|---|---|---|---|---|
| SO$_2$ .......................................... | 7.0 | 3.0 | 4.0 | 6.2 | 2.4 | 3.9 |
| Annual NO$_X$ ............................... | 1.4 | 1.3 | 0.1 | 1.4 | 1.2 | 0.2 |

TABLE III–2—PROJECTED SO$_2$ AND NO$_X$ ELECTRIC GENERATING UNIT EMISSION REDUCTIONS IN COVERED STATES WITH THE TRANSPORT RULE COMPARED TO BASE CASE WITHOUT TRANSPORT RULE OR CAIR **—Continued

[Million tons]

| | 2012 Base case emissions | 2012 Transport rule emissions | 2012 Emission reductions | 2014 Base case emissions | 2014 Transport rule emissions | 2014 Emission reductions |
|---|---|---|---|---|---|---|
| Ozone-Season NO$_X$ ................................ | 0.7 | 0.6 | 0.1 | 0.7 | 0.6 | 0.1 |

\* Note that numbers may not sum exactly due to rounding.
\*\* As explained in section V.B, EPA's base case projections for the Transport Rule assume that CAIR is not in place.

**Notes:** The SO$_2$ and annual NO$_X$ emissions in this table reflect EGUs in the 23 states covered by this rule for purposes of the 24-hour and/or annual PM$_{2.5}$ NAAQS (Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin). The ozone-season NO$_X$ emissions reflect EGUs in the 20 states covered by this rule for purposes of the ozone NAAQS (Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia) and the six states that would be covered for the ozone NAAQS if EPA finalizes its supplemental proposal (Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin).

TABLE III–3—PROJECTED SO$_2$ AND NO$_X$ ELECTRIC GENERATING UNIT EMISSION REDUCTIONS IN COVERED STATES WITH THE TRANSPORT RULE COMPARED TO 2005 ACTUAL EMISSIONS

[Million tons]

| | 2005 Actual emissions | 2012 Transport rule emissions | 2012 Emission reductions from 2005 | 2014 Transport rule emissions | 2014 Emission reductions from 2005 |
|---|---|---|---|---|---|
| SO$_2$ ............................................................ | 8.8 | 3.0 | 5.8 | 2.4 | 6.4 |
| Annual NO$_X$ ................................................ | 2.6 | 1.3 | 1.3 | 1.2 | 1.4 |
| Ozone-Season NO$_X$ .................................. | 0.9 | 0.6 | 0.3 | 0.6 | 0.3 |

**Notes:** The SO$_2$ and annual NO$_X$ emissions in this table reflect EGUs in the 23 states covered by this rule for purposes of the 24-hour and/or annual PM$_{2.5}$ NAAQS (Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin). The ozone-season NO$_X$ emissions reflect EGUs in the 20 states covered by this rule for purposes of the ozone NAAQS (Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia) and the six states that would be covered for the ozone NAAQS if EPA finalizes its supplemental proposal (Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin).

In addition to the emission reductions shown above, EPA projects other substantial benefits of the Transport Rule, as described in section VIII in this preamble. EPA used air quality modeling to quantify the improvements in PM$_{2.5}$ and ozone concentrations that are expected to result from the Transport Rule emission reductions in 2014. The Agency used the results of this modeling to calculate the average and peak reduction in annual PM$_{2.5}$, 24-hour PM$_{2.5}$, and 8-hour ozone concentrations for monitoring sites in the Transport Rule covered states (including the six states for which EPA issued a supplemental proposal for ozone-season NO$_X$ requirements) in 2014.

For annual PM$_{2.5}$, the average reduction across all monitoring sites in covered states in 2014 is 1.41 microgram per meter cubed (µg/m$^3$) and the greatest reduction at a single site is 3.60 µg/m$^3$.

For 24-hour PM$_{2.5}$, the average reduction across all monitoring sites in covered states in 2014 is 4.3 µg/m$^3$ and the greatest reduction at a single site is 11.6 µg/m$^3$. And finally, for 8-hour ozone, the average reduction across all monitoring sites in covered states in 2014 is 0.3 parts per billion (ppb) and the greatest is 3.9 ppb. See section VIII for further information on air quality improvements.

EPA estimated the Transport Rule's costs and benefits, including effects on sensitive and vulnerable and environmental justice communities. Table III–4, below, summarizes some of these results. Further discussion of the results is provided in preamble section VIII, below, and in the Regulatory Impact Analysis (RIA). Estimates here are subject to uncertainties discussed further in the RIA.

TABLE III–4.—SUMMARY OF ANNUAL BENEFITS, COSTS, AND NET BENEFITS OF THE FINAL TRANSPORT RULE IN 2014

[Billions of 2007$] [a]

| Description | Transport rule remedy (billions of 2007 $) | |
|---|---|---|
| | 3% discount rate | 7% discount rate |
| Social costs ............................................................................................................................ | $0.81 ......................... | $0.81. |
| Total monetized benefits [b] ....................................................................................................... | $120 to $280 .............. | $110 to $250. |
| Net benefits (benefits-costs) ..................................................................................................... | $120 to $280 .............. | $110 to $250. |

[a] All estimates are for 2014, and are rounded to two significant figures.

---

[b] The total monetized benefits reflect the human health benefits associated with reducing exposure to $PM_{2.5}$ and ozone and the welfare benefits associated with improved visibility in Class I areas. The reduction in premature mortalities account for over 90 percent of total monetized $PM_{2.5}$ and ozone benefits.

As a result of updated analyses and in response to public comments, the final Transport Rule differs from the proposal in a number of ways. The differences between proposal and final rule are discussed throughout this preamble. Some key changes between proposal and final rule are that EPA:

• Updated emission inventories (resulting in generally lower base case emissions). *See* section V.C.

• Updated modeling and analysis tools (including improved alignment between air quality estimates and air quality modeling results). *See* sections V and VI.

• Updated conclusions regarding which states significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. *See* Table III–1 and sections V.D and VI.

• Recalculated state budgets and variability limits, *i.e.,* state assurance levels, based on updated modeling. *See* section VI.

• Simplified variability limits for one-year application only. *See* section VI.E.

• Revised allocation methodology for existing and new units and revised new unit set-asides for new units in Transport Rule states and new units potentially locating in Indian country. *See* section VII.D.

• Changed start of assurance provisions to 2012 and increased assurance provision penalties. *See* section VII.E.

• Removed opt-in provisions. *See* section VII.B

• Added provisions for full and abbreviated Transport Rule SIP revisions. *See* section X.

EPA conducted substantial stakeholder outreach in developing the Transport Rule, starting with a series of ''listening sessions'' in the spring of 2009 with states, nongovernmental organizations, and industry. EPA docketed stakeholder-related materials in the Transport Rule docket (Docket ID No. EPA–HQ–OAR–2009–0491). The Agency conducted general teleconferences on the rule with tribal environmental professionals, conducted consultation with tribal governments, and hosted a webinar for communities and tribal governments. EPA continued to provide updates to regulatory partners and stakeholders through several conference calls with states as well as at conferences where EPA officials often made presentations. The Agency conducted additional stakeholder outreach during the public comment period. EPA responded to extensive public comments received during the public comment periods on the proposed rule and associated NODAs.

This Transport Rule is one of a series of regulatory actions to reduce the adverse health and environmental impacts of the power sector. EPA is developing these rules to address judicial review of previous rulemakings and to issue rules required by environmental laws. Finalizing these rules will effectuate health and environmental protection mandated by Congress while substantially reducing uncertainty over the future regulatory obligations of power plants, which will assist the power sector in planning for compliance more cost effectively. The Agency is providing full opportunity for notice and comment for each rule.

As discussed above, rules to address transport under revised NAAQS, including the reconsidered 2008 ozone NAAQS, may result in additional emission reduction requirements for the power sector. In addition, existing Clean Air Act rules establishing best available retrofit technology (BART) requirements and other requirements for addressing visibility and regional haze may also result in future state requirements for certain power plant emission reductions where needed.

On May 3, 2011 (76 FR 24976), EPA proposed national emission standards for hazardous air pollutants from coal- and oil-fired electric utility steam generating units under CAA section 112(d), also called Mercury and Air Toxics Standards (MATS), and proposed revised new source performance standards for fossil fuel-fired EGUs under section 111(b). As discussed in the EPA-led public listening sessions during February and March 2011, EPA is preparing to propose innovative, cost-effective and flexible greenhouse gas (GHG) emissions performance standards under section 111 for steam electric generating units, the largest U.S. source of greenhouse gas emissions. On April 20, 2011 (76 FR 22174), EPA proposed requirements under section 316(b) of the Clean Water Act for existing power generating facilities, manufacturing and industrial facilities that withdraw more than two million gallons per day of water from waters of the U.S. and use at least twenty-five percent of that water exclusively for cooling purposes. On June 21, 2010 (75 FR 35128), the Agency proposed to regulate coal combustion residuals (CCRs) under the Resource Conservation and Recovery Act to address the risks from the disposal of CCRs generated from the combustion of coal at electric utilities and independent power producers.

EPA will coordinate utility-related air pollution rules with each other and with other actions affecting the power sector including these rules from EPA's Office of Water and its Office of Resource Conservation and Recovery to the extent consistent with legal authority in order to provide timely information needed to support regulated sources in making informed decisions. Use of a small number of air pollution control technologies, widely deployed, can assist with compliance for multiple rules. EPA also notes that the flexibility inherent in the allowance-trading mechanism included in the Transport Rule affords utilities themselves a degree of latitude to determine how best to integrate compliance with the emission reduction requirements of this rule and those of the other rules. EPA will pursue energy efficiency improvements in the use of electricity throughout the economy, along with other federal agencies, states and other groups, which will contribute to additional environmental and public health improvements while lowering the costs of realizing those improvements.

## IV. Legal Authority, Environmental Basis, and Correction of CAIR SIP Approvals

### A. EPA's Authority for Transport Rule

The statutory authority for this action is provided by the CAA, as amended, 42 U.S.C. 7401 *et seq.* Section 110(a)(2)(D) of the CAA, often referred to as the ''good neighbor'' provision of the Act, and requires states to prohibit certain emissions because of their impact on air quality in downwind states. Specifically, it requires all states, within 3 years of promulgation of a new or revised NAAQS, to submit SIPs that prohibit certain emissions of air pollutants because of the impact they would have on air quality in other states. 42 U.S.C. 7410(a)(2)(D). This action addresses the requirement in section 110(a)(2)(D)(i)(I) regarding the prohibition of emissions within a state that will significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any other

state. EPA has previously issued two rules interpreting and clarifying the requirements of section 110(a)(2)(D)(i)(I). The NO$_X$ SIP Call, promulgated in 1998, was largely upheld by the U.S. Court of Appeals for the DC Circuit in *Michigan,* 213 F.3d 663. CAIR, promulgated in 2005, was remanded by the DC Circuit in *North Carolina,* 531 F.3d 896, *modified on reh'g,* 550 F.3d. 1176. These decisions provide additional guidance regarding the requirements of section 110(a)(2)(D)(i)(I) and are discussed later in this notice.

Section 301(a)(1) of the CAA also gives the Administrator of EPA general authority to prescribe such regulations as are necessary to carry out her functions under the Act. 42 U.S.C. 7601(a)(1). Pursuant to this section, EPA has authority to clarify the applicability of CAA requirements. In this action, among other things, EPA is clarifying the applicability of section 110(a)(2)(D)(i)(I) by identifying SO$_2$ and NO$_X$ emissions that must be prohibited pursuant to this section with respect to the PM$_{2.5}$ NAAQS promulgated in 1997 and 2006 and the 8-hour ozone NAAQS promulgated in 1997.

Section 110(c)(1) requires the Administrator to promulgate a FIP at any time within 2 years after the Administrator finds that a state has failed to make a required SIP submission, finds a SIP submission to be incomplete or disapproves a SIP submission unless the state corrects the deficiency, and the Administrator approves the SIP revision, before the Administrator promulgates a FIP. 42 U.S.C. 7410(c)(1).

Tribes are not required to submit state implementation plans. However, as explained in EPA's regulations outlining Tribal Clean Air Act authority, EPA is authorized to promulgate FIPs for Indian country as necessary or appropriate to protect air quality if a tribe does not submit and get EPA approval of an implementation plan. *See* 40 CFR 49.11(a); see also 42 U.S.C. section 7601(d)(4).

Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIPs, upon determining that those actions were in error.

*B. Rulemaking History*

The Transport Rule FIPs will limit the interstate transport of emissions of NO$_X$ and SO$_2$ within 27 states in the eastern, midwestern, and southern United States that affect the ability of downwind states to attain and maintain compliance with the 1997 and 2006 PM$_{2.5}$ NAAQS and the 1997 ozone NAAQS.[10] Prior to this Transport Rule, CAIR was EPA's most recent regulatory action in a longstanding series of regulatory initiatives to address interstate transport of air pollution. The proposed Transport Rule preamble provides more information on EPA actions prior to CAIR (75 FR 45221–45225).

CAIR, promulgated May 12, 2005 (70 FR 25162), required 29 states to adopt and submit revisions to their SIPs to eliminate SO$_2$ and NO$_X$ emissions that contribute significantly to downwind nonattainment of the PM$_{2.5}$ and ozone NAAQS promulgated in 1997. The states covered by CAIR were similar but not identical to the states covered by the Transport Rule. The CAIR FIPs, promulgated April 26, 2006 (71 FR 25328), regulated electric generating units in the covered states and achieved CAIR's emission reduction requirements unless or until states had approved SIPs to achieve the required reductions.

In July 2008, the DC Circuit Court found CAIR and the CAIR FIPs unlawful and vacated CAIR. *North Carolina,* 531 F.3d at 929–30. However, the Court subsequently remanded CAIR to EPA without vacatur in order to "at least temporarily preserve the environmental values covered by CAIR." *North Carolina,* 550 F.3d at 1178. CAIR requirements have remained in place and CAIR's emission trading programs have operated while EPA developed replacement rules in response to the remand.

By promulgating the Transport Rule FIPs, EPA is responding to the Court's remand of CAIR and the CAIR FIPs and replacing those rules. The approaches EPA used in the Transport Rule to measure and address each state's significant contribution to downwind nonattainment and interference with maintenance are guided by and consistent with the Court's opinion in *North Carolina* and address the flaws in CAIR identified by the Court therein.

By notice of proposed rulemaking (Federal Implementation Plans To Reduce Interstate Transport of Fine Particulate Matter and Ozone, 75 FR 45210; August 2, 2010), EPA proposed the Transport Rule to identify and limit NO$_X$ and SO$_2$ emissions within 32 states in the eastern, midwestern, and southern United States that affect the ability of downwind states to attain and maintain compliance with the 1997 and 2006 PM$_{2.5}$ NAAQS and the 1997 ozone NAAQS. EPA proposed to achieve the emission reductions under FIPs, which states may choose to replace by submitting SIPs for EPA approval. EPA proposed to limit emissions by regulating electric generating units in the 32 states with interstate emission trading programs and assurance provisions to ensure the required reductions occur in each covered state. EPA also requested comment on two alternative FIP remedies.

EPA supplemented the Transport Rule record with additional information relevant to the rulemaking in three NODAs for which EPA requested comments:

• Notice of Data Availability Supporting Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone (75 FR 53613; September 1, 2010). This NODA provided an updated database of unit-level characteristics of EGUs included in EPA modeling, an updated version of the power sector modeling platform EPA used to support the final rule, and other input assumptions and data EPA provided for public review and comment.

• Notice of Data Availability Supporting Federal Implementation Plans To Reduce Interstate Transport of Fine Particulate Matter and Ozone: Revisions to Emission Inventories (75 FR 66055; October 27, 2010). This NODA provided additional information relevant to the rulemaking, including updated emission inventory data for 2005, 2012 and 2014 for several stationary and mobile source inventory components.

• Notice of Data Availability for Federal Implementation Plans To Reduce Interstate Transport of Fine Particulate Matter and Ozone: Request for Comment on Alternative Allocations, Calculation of Assurance Provision Allowance Surrender Requirements, New-Unit Allocations in Indian Country, and Allocations by States (76 FR 1109; January 7, 2011). This NODA provided additional information relevant to the rulemaking, including emissions allowance allocations for existing units calculated using two alternative methodologies, data supporting those calculations, information about an alternative approach to calculation of assurance provision allowance surrender requirements, allocations for new units locating in Indian country in Transport Rule states in the future, and provisions for states to submit SIPs providing for state allocation of allowances in the Transport Rule trading programs.

---

[10] As discussed in section III of this preamble, EPA is proposing to apply ozone-season NO$_X$ requirements to additional states. If EPA finalizes that action as proposed, the total number of states covered by the Transport Rule FIPs would be 28.

*C. Air Quality Problems and NAAQS Addressed*

1. Air Quality Problems and NAAQS Addressed

a. Fine Particles

Fine particles are associated with a number of serious health effects including premature mortality, aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions, emergency room visits, health-related absences from school or work, and restricted activity days), lung disease, decreased lung function, asthma attacks, and certain cardiovascular problems. In addition to effects on public health, fine particles are linked to a number of public welfare effects, including (1) Reduced visibility (haze) in scenic areas, (2) effects caused by particles settling on ground or water, such as: making lakes and streams acidic, changing the nutrient balance in coastal waters and large river basins, depleting the nutrients in soil, damaging sensitive forests and farm crops, and affecting the diversity of ecosystems, and (3) staining and damaging of stone and other materials, including culturally important objects such as statues and monuments.

In 1997, EPA revised the NAAQS for PM to add new annual and 24-hour standards for fine particles, using $PM_{2.5}$ as the indicator (62 FR 38652). These revisions established an annual standard of 15 $\mu g/m^3$ and a 24-hour standard of 65 $\mu g/m^3$. During 2006, EPA revised the air quality standards for $PM_{2.5}$. The 2006 standards decreased the level of the 24-hour fine particle standard from 65 $\mu g/m^3$ to 35 $\mu g/m^3$, and retained the annual fine particle standard at 15 $\mu g/m^3$.

b. Ozone

Short-term (1- to 3-hour) and prolonged (6- to 8-hour) exposures to ambient ozone have been linked to a number of adverse health effects. At sufficient concentrations, short-term exposure to ozone can irritate the respiratory system, causing coughing, throat irritation, and chest pain. Ozone can reduce lung function and make it more difficult to breathe deeply. Breathing may become more rapid and shallow than normal, thereby limiting a person's normal activity. Ozone also can aggravate asthma, leading to more asthma attacks that may require a doctor's attention and the use of additional medication. Increased hospital admissions and emergency room visits for respiratory problems have been associated with ambient ozone exposures. Longer-term ozone exposure can inflame and damage the lining of the lungs, which may lead to permanent changes in lung tissue and irreversible reductions in lung function. A lower quality of life may result if the inflammation occurs repeatedly over a long time period (such as months, years, or a lifetime). There is also epidemiological evidence indicating a correlation between short-term ozone exposure and premature mortality.

In addition to causing adverse health effects, ozone affects vegetation and ecosystems, leading to reductions in agricultural crop and commercial forest yields; reduced growth and survivability of tree seedlings; and increased plant susceptibility to disease, pests, and other environmental stresses (*e.g.*, harsh weather). In long-lived species, these effects may become evident only after several years or even decades and have the potential for long-term adverse impacts on forest ecosystems. Ozone damage to the foliage of trees and other plants can also decrease the aesthetic value of ornamental species used in residential landscaping, as well as the natural beauty of our national parks and recreation areas. In 1997, at the same time we revised the $PM_{2.5}$ standards, EPA issued its final action to revise the NAAQS for ozone (62 FR 38856) to establish new 8-hour standards. In this action published on July 18, 1997, we promulgated identical revised primary and secondary ozone standards that specified an 8-hour ozone standard of 0.08 parts per million (ppm). Specifically, the standards require that the 3-year average of the fourth highest 24-hour maximum 8-hour average ozone concentration may not exceed 0.08 ppm. In general, the 8-hour standards are more protective of public health and the environment and more stringent than the pre-existing 1-hour ozone standards.

On March 12, 2008, EPA published a revision to the 8-hour ozone standard, lowering the level from 0.08 ppm to 0.075 ppm. On September 16, 2009, EPA announced it would reconsider these 2008 ozone standards. The purpose of the reconsideration is to ensure that the ozone standards are clearly grounded in science, protect public health with an adequate margin of safety, and are sufficient to protect the environment. EPA proposed revisions to the standards on January 19, 2010 (75 FR 2938) and anticipates issuing final standards soon.

c. Which NAAQS does this rule address?

This action addresses the requirements of CAA section 110(a)(2)(D)(i)(I) as they relate to:

(1) The 1997 annual $PM_{2.5}$ standard,
(2) The 2006 24-hour $PM_{2.5}$ standard, and
(3) The 1997 ozone standard.

The original CAIR and CAIR FIP rules, which pre-dated the 2006 $PM_{2.5}$ standards, addressed the 1997 ozone and 1997 $PM_{2.5}$ standards only.

In this action, EPA fully addresses, for the states covered by this rule, the requirements of CAA section 110(a)(2)(D)(i)(I) for the annual $PM_{2.5}$ standard of 15 $\mu g/m^3$ and the 24-hour standard of 35 $\mu g/m^3$. For the 1997 8-hour ozone standard of 0.08 ppm, EPA fully addresses the CAA section 110(a)(2)(D)(i)(I) requirements for some states covered by this rule, but for the remaining states EPA is conducting further analysis to determine whether further requirements are needed, as discussed in section III of this preamble.

This action does not address the CAA section 110(a)(2)(D)(i)(I) requirements for the revised ozone standards promulgated in 2008. These standards are currently under reconsideration. We are, however, actively conducting the technical analyses and other work needed to address interstate transport for the reconsidered ozone standard as soon as possible. We intend to issue as soon as possible a proposal to address the transport requirements with respect to the reconsidered standard.

This action addresses these CAA transport requirements through reductions in annual emissions of $SO_2$ and $NO_X$, and through reductions in ozone-season $NO_X$. The rationale for these reductions is discussed in detail later in the preamble.

d. Public Comments

EPA received comments on two issues related to the NAAQS regulated under the proposed FIPs.

A number of commenters believed that EPA's approach to ozone was inadequate, and that EPA should not have based the proposed requirements on the 1997 ozone NAAQS. These commenters cited EPA's 2008 revision to the standard which lowered the standard to 75 ppb, and noted that EPA's January 2010 proposal for reconsidered ozone NAAQS would, if finalized, further lower the primary NAAQS from 75 ppb to a value between 60 and 70 ppb. Accordingly, many of the commenters believed that EPA should have considered the 75 ppb level to be the maximum possible value moving forward, and that EPA should have used a value no greater than 75 ppb in its analysis.

EPA agrees with commenters that EPA and states should address interstate transport with respect to the tighter

ozone NAAQS as quickly as possible. EPA, as commenters noted, intends to propose a second rule to address interstate transport of ozone that will be appropriately configured for the revised level of the ozone NAAQS after reconsideration of the 2008 standard is finalized. EPA is mindful of the need for SIPs to provide for continuing ozone progress to meet the 75 ppb level of the 2008 NAAQS, or possibly lower levels based on the reconsideration. EPA believes that the ozone-season $NO_X$ requirements of this rule will provide important initial assistance to states in this regard.

Some commenters questioned whether EPA had given states the opportunity to provide SIPs addressing transport under the 2006 $PM_{2.5}$ NAAQS, and thus questioned the appropriateness of the issuance of FIPs addressing those NAAQS. Those comments, and EPA's response, are discussed in detail in section IV.C.2.

2. FIP Authority for Each State and NAAQS Covered

The CAA requires and authorizes EPA to promulgate each of the Federal Implementation Plans in this final rule. Section 110(c)(1) of the CAA requires the Administrator to promulgate a FIP at any time within 2 years after the Administrator takes one of three distinct actions: (1) She finds that a state has failed to make a required SIP submission; (2) she finds a SIP submission to be incomplete; or (3) she disapproves a SIP submission. Once the Administrator has taken one of these actions with respect to a specific state's 110(a)(2)(D)(i)(I) obligation for a specific NAAQS, she has a legal obligation to promulgate a FIP to correct the SIP deficiency within 2 years. EPA is relieved of the obligation to promulgate a FIP only if two events occur before the FIP is promulgated: (1) The state submits a SIP correcting the deficiency; and (2) the Administrator approves the SIP revision. 42 U.S.C. 7410(c)(1).[11]

For each FIP in this rule,[12] EPA either has found that the state has failed to make a required 110(a)(2)(D)(i)(I) SIP submission, or has disapproved a SIP submission.[13] In addition, EPA has determined, in each case, that there has been no approval by the Administrator of a SIP submission correcting the deficiency prior to promulgation of the FIP. EPA's obligation to promulgate a FIP arose when the finding of failure to submit or disapproval was made, and in no case has it been relieved of that obligation.

Some commenters argued that EPA was relieved of its obligation to promulgate FIPs when it approved the CAIR SIPs for certain states. As an initial matter, EPA notes that this argument applies only to EPA's authority to promulgate FIPs with respect to the 1997 $PM_{2.5}$ and/or 1997 ozone NAAQS for a subset of states covered by the CAIR. It does not apply to EPA's authority to promulgate FIPs for the 2006 $PM_{2.5}$ NAAQS which was not addressed in CAIR. It also does not apply to EPA's authority to promulgate FIPs for the 1997 ozone and 1997 $PM_{2.5}$ NAAQS for states that remain subject to the CAIR FIPs, including the states that received EPA approval of abbreviated CAIR SIPs which allowed the states to allocate allowances while remaining subject to the CAIR FIPs.[14]

Further, the CAIR SIP approvals do not eliminate EPA's obligation and authority to promulgate a FIP to address the requirements of 110(a)(2)(D)(i)(I) because the Court in *North Carolina* v. *EPA*, 531 F.3d 896 (D.C. Cir. 2008) found that compliance with CAIR does not satisfy the requirement that each state prohibit all emissions within the state that significantly contribute to nonattainment or interfere with maintenance in another state. The Court's finding that CAIR was unlawful because it did not make measureable progress towards the statutory mandate of section 110(a)(2)(D)(i)(I) meant that the CAIR SIPs were not adequate to satisfy that mandate. The CAIR SIPs thus do not correct the SIP deficiencies identified in the 2005 findings of failure

to submit. The SIPs remained in force for the limited purpose allowed by the Court—that is, to achieve interim reductions until EPA promulgated a rule to replace CAIR. Given the flaws the court identified with CAIR, EPA's approval of a CAIR SIP does not relieve it of the obligation to promulgate FIPs created under section 110(c)(1) of the CAA.

Further, to avoid any confusion, EPA has decided to correct, in this notice, the full CAIR SIP approvals for states covered by this rule and the CAA 110(a)(2)(D)(i) SIP approvals for states covered by CAIR to rescind any statements suggesting that the SIP submissions satisfied or relieved states of the obligation to submit SIPs to satisfy the requirements of section 110(a)(2)(D)(i)(I) or that EPA was relieved of its obligation and authority to promulgate FIPs under 110(a)(2)(D)(I)(i).

Some commenters further argued that states should be given additional time, following promulgation of the Transport Rule, to submit a SIP to meet the requirements of section 110(a)(2)(D)(i)(I) and that CAIR should remain in place in the meantime. Some commenters specifically suggested that EPA restart the "FIP clock"[15] to give states this additional time. EPA does not interpret the CAA as giving it authority to extend the deadline for SIP submissions or restart the FIP clock. And nothing in the Act requires EPA to give the states another opportunity, following promulgation of the Transport Rule, to promulgate a SIP before EPA promulgates a FIP. The plain language of section 110(a)(1) of the Act requires the submission of SIPs that meet the requirements of 110(a)(2)(D)(i)(I) within 3 years after the promulgation of or revision of a primary NAAQS. *See* 42 U.S.C. 7410(a)(1). Section 110(a)(2)(D)(i)(I) SIPs for the 1997 ozone and $PM_{2.5}$ NAAQS were due in 2000 and 110(a)(2)(D)(i)(I) SIPs for the 2006 $PM_{2.5}$ NAAQS were due in 2009. While the statute gives EPA authority to prescribe a shorter period of time for states to make these SIP submissions, it does not give EPA authority to extend the 3-year deadline established by the Act. *See* 42 U.S.C. 7410(a)(1). The plain language of section 110(c)(1) of the Act, in turn, provides that EPA shall promulgate a FIP at any time within 2 years after the Administrator makes a finding of failure to make a required SIP

---

[11] The CAA provides that EPA is not relieved of its obligation to promulgate FIPs unless the state submits a SIP that corrects the deficiency and EPA approves the SIP. Nonetheless, in the preamble to the proposed rule, EPA indicated that for states not covered by CAIR which had 110(a)(2)(D)(i)(I) SIPs pending at the time of proposal, EPA would finalize the FIP only if EPA determined the submission was incomplete or disapproved the SIP submission. The only two states covered by this rule but not covered by CAIR are Kansas and Nebraska. Both Kansas and Nebraska are covered by this rule based only on their significant contribution to nonattainment or interference with maintenance of the 2006 $PM_{2.5}$ NAAQS. EPA has not received a 110(a)(2)(D)(i)(I) submission from Nebraska with respect to the requirements of the 2006 $PM_{2.5}$ NAAQS. EPA disapproved a SIP submission from Kansas with respect to the requirements of 110(a)(2)(D)(i)(I) for the 2006 $PM_{2.5}$ NAAQS.

[12] In this action, EPA is issuing 59 FIPs. EPA is issuing 20 FIPs to remedy SIP deficiencies relating to the 110(a)(2)(D)(i)(I) requirements for the 1997 ozone NAAQS. EPA is also issuing 18 FIPs to remedy SIP deficiencies relating to the 1997 $PM_{2.5}$ NAAQS. Finally, EPA is issuing 21 FIPs to remedy SIP deficiencies relating to the 2006 $PM_{2.5}$ NAAQS.

[13] The specific findings made and actions taken by EPA are described in greater detail in the TSD entitled "Status of CAA 110(a)(2)(D)(i)(I) SIPs."

[14] States may also have received approval to expand the applicability of the CAIR $NO_X$ ozone season program to include all units subject to the $NO_X$ Budget Program, allow opt-ins, or provide for distribution of a Compliance Supplement Pool under the CAIR $NO_X$ (annual) program.

[15] "FIP clock" is a term used to describe EPA's responsibility found in CAA Section 110(c)(1) to promulgate a FIP within 2 years after either: Finding that a state has not submitted a required SIP revision or that a submitted SIP revision is incomplete; or disapproving a SIP revision.

submission of disapproves, in whole or in part, a SIP submission. *See* 42 U.S.C. 7410(c)(1). EPA does not have authority to set aside the specific deadlines established in the statute, and neither provision allows for the deadlines to be extended or to run from promulgation by EPA of a rule to quantify the state's specific obligations pursuant to section 110(a)(2)(D)(i)(I). The Act does not require EPA to promulgate a rule or issue guidance regarding the specific requirements of section 110(a)(2)(D)(i)(I) in advance of the SIP submittal deadline, much less require EPA to promulgate such a rule a specific amount of time before the SIP submittal deadline. For these reasons, EPA has neither authority to alter the SIP submittal deadline nor authority to alter the statute provision regarding when EPA's obligation to promulgate a FIP is triggered.

Finally, EPA does not believe it would be appropriate, in light of the Court's decision in *North Carolina,* to establish a lengthy transition period to the rule that will replace CAIR. The Court decision remanding CAIR without vacatur stressed the court's conclusion that CAIR was deeply flawed and emphasized EPA's obligation to remedy those flaws expeditiously. *North Carolina,* 550 F.3d 1176. Although the Court did not set a specific deadline for corrective action, the Court took care to note that the effect of its opinion would not be delayed "indefinitely" and that petitioners could bring a mandamus petition if EPA were to fail to modify CAIR in a manner consistent with its prior opinion. *Id.* Given the Court's emphasis on remedying CAIR's flaws expeditiously, EPA does not believe it would be appropriate to establish a lengthy transition period to the rule which is to replace CAIR.

3. Additional Information Regarding CAA Section 110(a)(2)(D)(i)(I) SIPs for States in the Transport Rule Modeling Domain

This final rule quantifies out-of-state contributions for the 38 states that are fully contained within the 12 kilometers (km) eastern U.S. modeling domain. EPA is making no specific finding for states that are not fully contained within the eastern 12 km modeling domain. EPA did not conduct a contribution analysis or make any specific finding for New Mexico, Colorado, Wyoming, and Montana since they are only partially contained within the 12 km modeling domain. With regard to the 1997 PM$_{2.5}$ NAAQS and 2006 PM$_{2.5}$ NAAQS, EPA believes that states that are included in this 38 state modeling domain will meet their section 110(a)(2)(D)(i)(I)

obligations to address the "significant contribution" and "interference with maintenance" requirements by complying with the requirements in this rule. With regard to the 1997 ozone NAAQS, EPA believes that states that are included in this 38 state modeling domain will meet their section 110(a)(2)(D)(i)(I) obligations to address the "significant contribution" and "interference with maintenance" requirements by complying with the requirements in this rule, except for the 10 states found to significantly contribute to nonattainment or interference of maintenance in either Houston or Baton Rouge (*i.e.,* Alabama, Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Tennessee, and Texas). States that are in the 38 state modeling domain, and that are not found to be contributing significantly to nonattainment or interfering with maintenance for any NAAQS evaluated in the modeling for the final rule, could rely on this analysis as technical support that their existing or future interstate transport SIP submittals are adequate to address the transport requirements of 110(a)(2)(D)(i)(I). For example, this rule finds that South Carolina significantly contributes to nonattainment and interferes with maintenance of the 1997 ozone NAAQS and the 1997 PM$_{2.5}$ NAAQS in downwind states. The technical support for the rule does not show that South Carolina significantly contributes to nonattainment or interferes with maintenance of the 2006 PM$_{2.5}$ NAAQS in downwind states. EPA believes that South Carolina can make a negative declaration concluding that the state does not significantly contribute to nonattainment or interfere with maintenance in other states with regard to the 2006 PM$_{2.5}$ NAAQS.

*D. Correction of CAIR SIP Approvals*

In this action, EPA is also correcting its prior approvals of CAIR related SIP submissions and CAA 110(a)(2)(D)(i) SIP submissions from Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia and West Virginia to rescind any statements that the SIP submissions either satisfy or relieve the state of the obligation to submit a SIP to satisfy the requirements of section 110(a)(2)(D)(i)(I) with respect to the 1997 ozone and/or 1997 PM$_{2.5}$ NAAQS or any statements that EPA's approval of the SIP submissions either relieve EPA of the obligation to promulgate a FIP or

remove EPA's authority to promulgate a FIP. This action is based on EPA's determination that those SIP approvals were in error to the extent they provided explicitly or implicitly that compliance with CAIR satisfies the requirements of 110(a)(2)(D)(i)(I) with respect to the 1997 ozone and 1997 PM$_{2.5}$ NAAQS. The July 2008 decision of the DC Circuit held, among other things, that the CAIR rule did not "achieve[] something measureable toward the goal of prohibiting sources 'within the State' from contributing to nonattainment or interfering with maintenance in 'any other State.'" *North Carolina,* 531 F.3d 908; see also, *e.g., id.* at 916 (EPA not exercising its authority to make measureable progress towards the goals of section 110(a)(2)(D)(i)(I) because the emission budgets were insufficiently related to the statutory mandate). EPA's actions to approve CAIR SIP submittals as satisfying the requirements of section 110(a)(2)(D)(i)(I), based on the flawed determination in CAIR that compliance with CAIR satisfied those statutory requirements, were thus in error as were the separate actions taken to approve section 110(a)(2)(D)(i)(I) submissions that relied wholly or in part on CAIR.

The approval for Alabama titled "Approval and Promulgation of Implementation Plans; Alabama; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 1, 2007 (72 FR 55659).

The approval for Arkansas titled "Approval and Promulgation of Implementation Plans; Arkansas; Clean Air Interstate Rule Nitrogen Oxides Ozone Season Trading Program" which is hereby corrected was originally published in the **Federal Register** on September 26, 2007 (72 FR 54556).

The approval for Connecticut titled "Approval and Promulgation of Air Quality Implementation Plans; Connecticut; State Implementation Plan Revision to Implement the Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on January 24, 2008 (73 FR 4105) and the approval for Connecticut titled "Approval and Promulgation of Air Quality Implementation Plans; Connecticut; Interstate Transport of Pollution" which is hereby corrected was originally published in the **Federal Register** on May 7, 2008 (73 FR 25516).

The approval for Florida titled "Approval and Promulgation of Implementation Plans; Florida; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 12, 2007 (72 FR 58016).

The approval for Georgia titled "Approval and Promulgation of Implementation Plans; Georgia; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 9, 2007 (72 FR 57202).

The approval for Illinois titled "Approval of Implementation Plans of Illinois; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 16, 2007 (72 FR 58528).

The approval for Indiana titled "Limited Approval of Implementation Plans of Indiana; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 22, 2007 (72 FR 59480) and the approval for Indiana titled "Approval and Promulgation of Air Quality Implementation Plans; Indiana; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on November 29, 2010 (75 FR 72956).

The approval for Iowa titled "Approval and Promulgation of Implementation Plans; Iowa; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on August 6, 2007 (72 FR 43539) and the approval for Iowa titled "Approval and Promulgation of Implementation Plans; Iowa; Interstate Transport of Pollution" which is hereby corrected was originally published in the **Federal Register** on March 8, 2007 (72 FR 10380).

The approval for Kentucky titled "Approval of Implementation Plans of Kentucky; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 4, 2007 (72 FR 56623).

The approval for Louisiana titled "Approval and Promulgation of Implementation Plans; Louisiana; Clean Air Interstate Rule Sulfur Dioxide Trading Program" which is hereby corrected was originally published in the **Federal Register** on July 20, 2007 (72 FR 39741) and the approval for Louisiana titled "Approval and Promulgation of Implementation Plans; Louisiana; Clean Air Interstate Rule Nitrogen Oxides Trading Program" which is hereby corrected was originally published in the **Federal Register** on September 28, 2007 (72 FR 55064).

The approval for Maryland titled "Approval and Promulgation of Air Quality Implementation Plans; Maryland; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 30, 2009 (74 FR 56117).

The approval for Massachusetts titled "Approval and Promulgation of Air Quality Implementation Plans; Massachusetts; State Implementation Plan Revision to Implement the Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on December 3, 2007 (72 FR 67854).

The approval for Minnesota titled "Approval and Promulgation of Air Quality Implementation Plans; Minnesota; Interstate Transport of Pollution" which is hereby corrected was originally published in the **Federal Register** on June 2, 2008 (73 FR 31366).

The approval for Mississippi titled "Approval and Promulgation of Implementation Plans; Mississippi; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 3, 2007 (72 FR 56268).

The approval for Missouri titled "Approval and Promulgation of Implementation Plans; Missouri; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on December 14, 2007 (72 FR 71073) and the approval of Missouri titled "Approval and Promulgation of Implementation Plans; Missouri; Interstate Transport of Pollution" which is hereby corrected was originally published in the **Federal Register** on May 8, 2007 (75 FR 25975).

The approval for New York titled "Approval and Promulgation of Implementation Plans; New York; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on January 24, 2008 (73 FR 4109).

The approval for North Carolina titled "Approval of Implementation Plans; North Carolina; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 5, 2007 (72 FR 56914) and the approval for North Carolina titled "Approval and Promulgation of Air Quality Implementation Plans; North Carolina; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on November 30, 2009 (74 FR 62496).

The approval for Ohio titled "Approval and Promulgation of Air Quality Implementation Plans; Ohio; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on February 1, 2008 (73 FR 6034) and the approval for Ohio titled "Approval and Promulgation of Air Quality Implementation Plans; Ohio; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on September 25, 2009 (74 FR 48857).

The approval for Pennsylvania titled "Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Clean Air Interstate Rule; $NO_X$ SIP Call Rule; Amendments to $NO_X$ Control Rules" which is hereby corrected was originally published in the **Federal Register** on December 10, 2009 (74 FR 65446).

The approval for South Carolina titled "Approval of Implementation Plans of South Carolina; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 9, 2007 (72 FR 57209) and the approval for South Carolina titled "Approval and Promulgation of Air Quality Implementation Plans; South Carolina; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on October 16, 2009 (74 FR 53167).

The approval for Virginia titled "Approval and Promulgation of Air Quality Implementation Plans; Virginia; Clean Air Interstate Rule Budget Trading Programs" which is hereby corrected was originally published in the **Federal Register** on December 28, 2007 (72 FR 73602).

The approval for West Virginia titled "Approval and Promulgation of Air Quality Implementation Plans; West Virginia; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on December 18, 2007 (72 FR 71576) and the approval for West Virginia titled "Approval and Promulgation of Air Quality Implementation Plans; West Virginia; Clean Air Interstate Rule" which is hereby corrected was originally published in the **Federal Register** on August 4, 2009 (74 FR 38536).

EPA is taking this final action without prior opportunity for notice and comment because EPA finds, for good cause, that notice and public procedure thereon are unnecessary and not in the public interest. Section 553(b)(B) of the Administrative Procedure Act provides that the notice and comment requirements in section 553 do not apply when the agency for good cause finds that notice and public procedure there on are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. 553(b)(B). Section 307(d)(1) of the CAA in turn provides that the requirements of section 307(d) do not apply in the case of a rule or circumstance referred to in section 553(b)(A) or section 553(b)(B) of the Administrative Procedure Act in Title 5. 42 U.S.C. 7607(1).

EPA finds that notice and public procedure are unnecessary because EPA has no discretion given the specific

circumstances presented in this case. EPA is bound by the decisions of the courts and must act in accordance with those decisions. EPA must accept the Court's conclusion that compliance with CAIR does not satisfy the requirements of CAA section 110(a)(2)(D)(i)(I) and lacks discretion to reach a different conclusion. This correction is a ministerial matter consistent with the decisions of the courts. For these reasons, it is unnecessary to provide an opportunity for notice and comment.

## V. Analysis of Downwind Air Quality and Upwind State Emissions

### A. Pollutants Regulated

To address interstate transport of air pollution, EPA must choose which pollutants to regulate relevant to significant contribution to nonattainment or interference with maintenance of the NAAQS of concern downwind. This section of the preamble discusses the pollutants regulated under the final Transport Rule.

### 1. Background

Based on scientific and technical information, as well as EPA's air quality modeling, EPA concluded for CAIR that the most effective approach to reducing the contribution of interstate transport to $PM_{2.5}$ was to control $SO_2$ and $NO_X$ emissions. For CAIR, EPA did not limit emissions of other components of $PM_{2.5}$, noting that "current information relating to sources and controls for other components identified in transported $PM_{2.5}$ (carbonaceous particles, ammonium, and crustal materials) does not, at this time, provide an adequate basis for regulating the regional transport of emissions responsible for these $PM_{2.5}$ components" (69 FR 4582).

With respect to ozone transport, EPA has previously concluded that it is proper to control ozone-season $NO_X$ emissions. For CAIR and the $NO_X$ SIP Call programs, EPA based this conclusion on the assessment of ozone transport conducted by the Ozone Transport Assessment Group (OTAG) in the mid-1990s. The OTAG Regional and Urban Scale Modeling and Air Quality Analysis Work Groups concluded that regional $NO_X$ emission reductions are effective in producing ozone benefits that grow with increasing regional $NO_X$ abatement.

The relative importance of $NO_X$ and VOC in ozone formation and control varies with local and time-specific factors, including the relative amounts of VOC and $NO_X$ present. In rural areas and many urban areas with high concentrations of VOC from biogenic sources, ozone formation and control is governed by $NO_X$. In some urban core situations, $NO_X$ concentrations can be high enough relative to VOC to suppress ozone formation locally, but still contribute to increased ozone downwind from the city. In such situations, VOC reductions are most effective at reducing ozone within the urban environment and immediately downwind. The formation of ozone increases with temperature and sunlight, which is one reason ozone levels are higher during the summer. Increased temperature also increases emissions of volatile man-made and biogenic organics and can indirectly increase $NO_X$ as well (e.g., increased electricity generation for air conditioning). Summertime conditions also bring increased episodes of large scale stagnation of air masses, which promote the build-up of direct emissions and pollutants formed through atmospheric reactions over large regions. Authoritative assessments of ozone control approaches have concluded that, for reducing regional scale ozone transport, a $NO_X$ control strategy is most effective, whereas VOC reductions are generally most effective locally, in more dense urbanized areas.

Studies conducted since the 1970s established that ozone occurs on a regional scale (i.e., thousands of kilometers) over much of the eastern U.S., with elevated concentrations occurring in rural as well as metropolitan areas. While substantial progress has been made in reducing ozone in many urban areas, regional-scale ozone transport is still an important component of high ozone concentrations during the extended summer ozone season. A series of more recent progress reports discussing the effect of the $NO_X$ SIP Call programs can be found on EPA's Web site at: *http://www.epa.gov/airmarkets/ progress/progress-reports.html.*

More recent assessments of ozone (including those conducted for the Regulatory Impact Analysis for the ozone standards in 2008) continue to show the importance of $NO_X$ transport as a factor in ozone formation. For addressing interstate ozone transport in CAIR, EPA required $NO_X$ emission reductions but did not include requirements for VOCs. EPA believes that VOCs from some upwind states do indeed have an impact in some nearby downwind states, particularly over short transport distances. EPA expects that states, typically in local nonattainment planning, would benefit from examining the extent to which VOC emissions affect ozone pollution levels within and near urban nonattainment areas, and states may identify areas where multi-

state VOC strategies might assist in attainment planning for meeting the 8-hour standard. However, EPA continues to believe that the most effective regional pollution control strategy for mitigation of interstate transport of ozone remains $NO_X$ emission reductions.

### 2. Which pollutants did EPA propose to control for purposes of $PM_{2.5}$ and ozone transport?

For the proposed rule, EPA concluded that its findings in CAIR regarding the nature of pollutant contributions are still appropriate. EPA proposed to require $SO_2$ and annual $NO_X$ emission reductions to control $PM_{2.5}$ transport and to require ozone-season $NO_X$ emission reductions to control ozone transport. In the proposal, EPA discussed and requested comment on the inclusion of southern states in the annual $NO_X$ program for $PM_{2.5}$ control.

### 3. Comments and Responses

EPA received no adverse comments on its proposal to regulate $SO_2$ for addressing $PM_{2.5}$ transport, the proposal not to regulate direct $PM_{2.5}$ or organic $PM_{2.5}$ precursors, and the proposal to focus ozone-season efforts on $NO_X$ and not to regulate VOCs.

One commenter questioned EPA's regulation of $NO_X$ for purposes of addressing $PM_{2.5}$ transport in all states (including northern states with cooler climates and higher nitrate deposition). Several commenters, representing southern state air quality agencies and regulated sources in southern states, disagreed with EPA's proposed regulation of annual $NO_X$ emissions for all regulated states. These commenters, while not disagreeing with the need for regulation of $SO_2$, observed that in EPA's modeling analysis, contributions from certain southern states' $NO_X$ emissions to $PM_{2.5}$ in downwind states were relatively small.

Accordingly, these commenters argued that either (1) EPA should remove $NO_X$ as a precursor analyzed for $PM_{2.5}$ contribution from those states, or (2) the required remedy for emission reductions in those states should not require reductions in annual $NO_X$.

For the final rule, EPA retains the approach for regulated pollutants in the proposal, which regulates annual $NO_X$ and $SO_2$ for states affecting downwind state $PM_{2.5}$ nonattainment and maintenance sites, and ozone-season $NO_X$ for states impacting downwind state ozone nonattainment and maintenance. EPA considered commenters' requests to remove some states from the annual $NO_X$ program. However, EPA believes that it is

appropriate to establish a cap on these states' annual $NO_X$ emissions, in part to ensure the continued annual operation of existing control equipment that would prevent substantial increases in $NO_X$ emissions. EPA believes that without these reductions, increased "nitrate replacement" could occur, a known atmospheric phenomenon whereby some of the sulfate reductions due to $SO_2$ emission reductions are eroded by increases in nitrate concentrations due solely to those $SO_2$ reductions.[16] This is an especially pertinent concern for southern states which have significant impacts on northern receptors in colder climates where nitrate concentrations are generally higher. For example, Alabama and Tennessee are both linked to Washtenaw County, MI for 24-hour $PM_{2.5}$; North Carolina is linked to Lancaster County, PA for 24-hour $PM_{2.5}$; and Texas is linked to Madison County, IL for both annual and 24-hour $PM_{2.5}$. All of these downwind areas have appreciable nitrate deposition contributing to nonattainment and maintenance concerns for the $PM_{2.5}$ NAAQS. If the states linked to those receptors were to make $SO_2$ reductions only, their beneficial impact on downwind air quality would be partially eroded by nitrate replacement. EPA therefore believes that it is reasonable to seek both $SO_2$ and $NO_X$ reductions from states included in the Transport Rule program that are found to significantly contribute to nonattainment or interfere with maintenance of the $PM_{2.5}$ NAAQS in downwind states.

In addition, EPA notes that there would be important disbenefits to effectively removing CAIR's existing annual $NO_X$ requirements in those states. If EPA were to allow annual $NO_X$ emissions to increase for those states, there would be potentially harmful effects on visibility, nitrogen deposition, and other aspects of human and environmental health.

### B. Baseline for Pollution Transport Analysis

Implementing the mandate of CAA section 110(a)(2)(D)(i)(I) requires EPA to determine which states significantly contribute to nonattainment and interfere with maintenance of the NAAQS in other states, as well as to

---

[16] $SO_2$ reductions successfully decrease atmospheric formation of ammonium sulfate, but in doing so they "free up" the ammonia component that would otherwise have reacted with $SO_2$ and is now free to react with $NO_X$ instead, causing a "rebound effect" partially eroding the improvement in $PM_{2.5}$ concentrations. This effect can be mitigated with tandem $NO_X$ reductions.

quantify the emissions in each state that must be eliminated. This process begins with an analysis of baseline emissions. Baseline emissions are the emissions that would occur in each state if EPA did not promulgate the Transport Rule. To conduct such analysis, EPA generally takes into account emission limitations that are currently, and will continue to be, in place. From that baseline, EPA analyzes whether additional reductions are necessary beyond those already mandated by existing emission limitation requirements. For example, the base case used in CAIR reflected the reductions already required by the $NO_X$ SIP Call, which remained in effect even after the CAIR emission reduction requirements took effect.

The unique legal situation addressed by the Transport Rule necessarily affects the quantification of baseline emissions. Specifically, because the Transport Rule will replace CAIR, EPA cannot consider reductions associated with CAIR in the "base case" (*i.e.,* analytical baseline emissions scenario). If EPA were to consider all reductions associated with CAIR in the "base case," the baseline emissions would not adequately reflect the true 2012 baseline in each state (*i.e.,* the emissions that would occur in each state in 2012 if the Transport Rule did not require any reductions in that state). Similarly, if EPA were to treat the capital investments that have already been made to meet the requirements of CAIR as new costs rather than treating them as "sunk" capital costs, EPA's analysis would not accurately reflect the cost of emission reductions required by the Transport Rule. As explained below, EPA's analysis both properly considered all capital investments made in response to CAIR and properly recognized that, after CAIR is terminated, the emission limitations imposed by CAIR will cease to exist.

In 2005 EPA promulgated CAIR, which required large electric generating units in 29 states to make phase I emission reductions in $NO_X$ emissions starting in 2009, phase I emission reductions in $SO_2$ starting in 2010 and phase II reductions in emissions of both pollutants starting in 2015. On July 11, 2008, the DC Court of Appeals held that CAIR had "more than several fatal flaws," *North Carolina*, 531 F.3d at 901, and remanded and vacated the rule, *id.* at 930. The Court subsequently granted EPA's petition for rehearing in part and remanded CAIR without vacatur "for EPA to conduct further proceedings consistent with" the Court's July 11, 2008 opinion. *North Carolina*, 550 F.3d 1176. The Court explained that it was "allowing CAIR to remain in effect until

it is replaced by a rule consistent with [the July 11, 2008] opinion" because this "would at least temporarily preserve the environmental values covered by CAIR." *Id.* at 1178. Moreover, the Court stated that it did not "intend to grant an indefinite stay of the effectiveness of" the July 11, 2008 order vacating CAIR. *Id.* In summary, the Court determined that CAIR was fatally flawed and could remain in effect only as a stopgap measure until EPA could act to replace it.

Thus, unlike most other regulatory requirements (such as the Acid Rain Program under CAA Title IV, the $NO_X$ Budget Trading Program under the $NO_X$ SIP Call, New Source Performance Standards, and state laws and consent orders requiring emission reductions), the emission limitations contained in CAIR are only temporary. Moreover, the duration of these limitations is directly tied to the Transport Rule. The Transport Rule replaces CAIR. Thus, CAIR itself will be terminated for the $SO_2$, annual $NO_X$, and ozone-season $NO_X$ control periods starting in 2012 when the emission limitations established in the final Transport Rule for those control periods take effect (January 1, 2012 for the annual control periods and May 1, 2012 for the ozone-season control period). For this reason, emission reductions made to comply with CAIR cannot be treated as if they were emission reductions achieved to comply with statutory provisions, rules, consent decrees, and other enforceable requirements that establish permanent emission limitations. EPA takes reductions made to comply with permanent limitations into consideration when quantifying each state's baseline emissions for the purpose of analyzing whether its emissions significantly contribute to nonattainment or interfere with maintenance in another state. However, the unique legal status of CAIR and its replacement with the Transport Rule distinguish the emission reductions required by CAIR from those of other regulatory requirements. Since the limitations and emission reduction requirements in CAIR are temporary and will be terminated by the Transport Rule, they must be excluded from the Transport Rule's base case analysis.

Some comments on the Transport Rule proposal claim that EPA's treatment of CAIR is inconsistent with the treatment, in prior rulemakings, of the Acid Rain Program and the $NO_X$ SIP Call. Such comments ignore the unique legal status of CAIR, and EPA therefore rejects these claims.

A simple example illustrates this point. Assume state Z's emissions before

CAIR were 2,000 tons and that state Z was required by CAIR to reduce its emissions to 1,000 tons. If EPA were to determine that state Z's baseline emissions were 1,000 tons and then conclude, based on that assumption, that no additional reductions in state Z are necessary because state Z does not significantly contribute to downwind nonattainment unless its emissions exceed 1,500 tons, then state Z would not be covered by the Transport Rule. However, the Transport Rule will terminate all CAIR requirements in all CAIR states regardless of whether they are covered by the Transport Rule. Thus, after promulgation of the Transport Rule, state Z would again be allowed, and would be projected in this example, to emit 2,000 tons. In other words, state Z would be allowed to significantly contribute to nonattainment and/or interfere with maintenance in other states—a result that would be inconsistent with the statutory mandate of CAA section 110(a)(2)(D)(i)(I). On the other hand, if EPA assumes state Z's baseline emissions are 2,000 tons as projected without CAIR in place, EPA can properly determine whether, if state Z were allowed to emit that amount (*i.e.,* the amount state Z would be projected to emit if excluded from the Transport Rule), the state would significantly contribute to nonattainment or interfere with maintenance in any other state. In other words, EPA can determine the stringency of emission limitations needed (if any) to replace those that were established by CAIR in order to ensure that state Z prohibits all emissions that significantly contribute to nonattainment or interfere with maintenance in other states.

In fact, commenters' suggestion that the Transport Rule base case should include CAIR would cause the anomalous result of excluding sources in a state from the Transport Rule because of their CAIR–required emission reductions while simultaneously eliminating those CAIR emission reduction requirements. If EPA's base case analysis were to assume erroneously that reductions from CAIR would continue indefinitely, a state currently covered by CAIR, but not covered by the Transport Rule, would have no CAIR requirements once the Transport Rule programs began and so could increase emissions beyond the CAIR limitations. Downwind areas that are in attainment (and are not experiencing interference with maintenance of such attainment) solely because of emission reductions required by CAIR could again face nonattainment

or interference with maintenance problems because the current protection from upwind pollution from such an upwind state would not be replaced. In short, the analysis of whether a state should be included in a rule eliminating and replacing CAIR cannot logically assume that CAIR remains in place. For these reasons, EPA believes it is reasonable to use a base case that does not assume that the CAIR reduction requirements will continue to be achieved and so does not include CAIR-specific emission reductions.

As a result, EPA's 2012 base case shows emissions higher than current levels in some states. In the absence of the CAIR $SO_2$ and $NO_X$ programs that EPA has been directed to eliminate and replace, utility emissions in CAIR states will be limited only by non-CAIR constraints including the Acid Rain Program, the $NO_X$ SIP Call, New Source Performance Standards, any state laws and consent order requiring emission reductions, and any other permanent and enforceable binding reduction commitments. This will lead to increased emissions in some states in the 2012 base case relative to current emissions. For example, efforts to comply with the Acid Rain Program at the least cost may occur, in some cases, without the operation of existing scrubbers through use of readily available, inexpensive Title IV allowances.

It is important to note that, to the extent that emission reductions currently required by CAIR are also reflected in emission reduction requirements under the Acid Rain Program, the $NO_X$ SIP Call, New Source Performance Standards, any state laws and consent orders requiring emission reductions, and any other enforceable binding reduction commitments, such reductions are accounted for in EPA's 2012 base case. Some commenter claimed that in excluding CAIR-specific emission reductions from the base case, EPA ignores non-CAIR legal requirements (*e.g.,* in Title V permits) that may prevent sources from increasing emissions above CAIR levels. Such allegations are incorrect. As discussed elsewhere in this preamble, EPA accounted for any Title V permits, consent decrees, state rules, and other enforceable limitations on sources' emissions; if these non-CAIR limitations effectively restrain a state's emissions to not exceed the state's CAIR limitations, EPA's base case modeling would reflect this outcome. Commenters also assert that utilities are unlikely to dismantle or discontinue running the installed controls to the point of returning to pre-CAIR emission levels. EPA agrees that

installed controls are not likely to be physically dismantled, and as discussed elsewhere in this preamble, EPA's analysis properly treats the capital investments made in emission controls attributed to CAIR as "sunk" capital costs (*i.e.,* capital costs already obligated in the past) that are not included as costs of meeting Transport Rule requirements.

Our cost analysis for significant contribution reflects on-the-ground realities. Investments in pollution control equipment were made in response to CAIR requirements. Those expenditures are "sunk" capital costs, meaning that those investments were committed in the past, prior to the Transport Rule. Adding the capital costs of that equipment into the costs of Transport Rule emission reduction options would be incorrect; those capital investments are represented in place in the base case.

However, given ongoing costs associated with operating these controls, EPA believes sources would have an economic incentive to discontinue operating installed controls, or to operate those controls less effectively, except to the extent non-CAIR legal requirements mandate emission reductions or to the extent that sources would find it economic to operate the controls for non-CAIR market-based emission control programs. EPA properly treats the costs of operating controls installed to meet CAIR requirements as costs of meeting Transport Rule requirements.[17] EPA's base case accounts for non-CAIR requirements and does not make the unreasonable assumption that installed controls would be operated to achieve emission reductions that are not necessary to meet non-CAIR requirements. For all of these reasons, EPA rejects commenters' claims that the base case is "unrepresentative" or lacks "a rational relationship to the real world."

*C. Air Quality Modeling To Identify Downwind Nonattainment and Maintenance Receptors*

1. Emission Inventories

To inform air quality modeling for the development of the final Transport Rule, EPA developed emission

---

[17] For more details on how EPA models economic operation of existing pollution control equipment in the Transport Rule base case, please see Section 6 ("Dispatchable Controls") in "Updates to EPA Base Case v3.02 EISA Using the Integrated Planning Model" Technical Support Document (TSD) for the Transport Rule Docket ID No. EPA–HQ–OAR–2009–0491, U.S. EPA, July 2010 (available at *http://www.epa.gov/airmarkets/progsregs/epa-ipm/IPM Update Documentation.pdf*).

inventories for a 2005 base year and for 2012 and 2014 projections. The inventories for all years include emission estimates for EGUs, non-EGU point sources, stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, and biogenic (non-human) sources. EPA's air quality modeling relies on this comprehensive set of emission inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements. In addition, EPA considers all relevant emissions (regardless of source category) when determining whether a state is found to be significantly contributing to or interfering with maintenance of a particular NAAQS in another state.

The emission inventories were processed through the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 2.6 to produce the gridded, hourly, speciated, model-ready emissions for input to the CAMx air quality model. Additional information on the development of the emission inventories and related data sets for emissions modeling are provided in the Emission Inventory Final Transport Rule TSD.

On October 27, 2010, EPA issued a NODA on "Revisions to Emission Inventories." The NODA's primary purpose was to notify the public about changes to emission inventories made since the proposal modeling. The affected emission sectors were non-EGU stationary point sources, nonpoint sources, and Category 3 commercial marine vessel sources. The NODA also presented a newly released model for developing onroad mobile source emissions for use in air quality modeling for the final Transport Rule.

The major comments received in response to the emission inventories and modeling included in the proposed Transport Rule and the October 27 NODA are summarized in the following subsections. EPA agreed with the comments summarized below and adopted technical corrections or updates to the emission inventories and modeling accordingly. For EPA to be able to take appropriate action, comments on the emission inventories needed to be specific enough to allow for credible alternative data sources to be located. EPA adopted corrections from comments on in-place control programs or devices where the controls were enforceable and quantifiable.

a. Foundation Emission Inventory Data Sets

EPA developed emission data representing the year 2005 to support air quality modeling of a base year from which future air quality could be forecasted. EPA used the 2005 National Emission Inventory (NEI), version 2 from October 6, 2008, as the chief basis for the U.S. inventories supporting the 2005 air quality modeling. This inventory includes 2005-specific data for point and mobile sources, while most nonpoint data were carried forward from version 3 of the 2002 NEI. The future base case scenarios modeled for 2012 and 2014 represent predicted emission reductions primarily from already promulgated federal measures.

EPA used a 2006 Canadian inventory and a 1999 Mexican inventory for the portions of Canada and Mexico within the air quality modeling domains for all modeled scenarios. Emissions from Canada and Mexico for all source sectors (including EGUs) in these countries were held constant for all base- and future-year cases. EPA made this assumption because it does not currently have sufficient data to support projections of future-year emissions from Canada and Mexico.

b. Development of Emission Inventories for EGUs

The annual $NO_X$ and $SO_2$ emissions for EGUs in the 2005 NEI v2 are based primarily on data from continuous emissions monitoring systems (CEMS), with other EGU pollutants estimated using emission factors and annual heat input data reported to EPA. Although only $NO_X$ and $SO_2$ are considered for control in this rule, emissions for all criteria air pollutants are necessary to model air quality. For EGUs without CEMS, EPA used data submitted to the NEI by the states. For more information on the details of how the 2005 EGU emissions were developed, see the Emissions Inventory Final Rule TSD.

Commenters stated that some point sources that were classified as non-EGUs in the proposal modeling were actually EGUs, resulting in double counting of emissions in future-year modeling. EPA reviewed its assignment of EGUs and non-EGUs and reclassified EGU sources found to be in the non-EGU inventory for the updated 2005 EGU inventory to prevent double counting of future-year emissions.

The future base case scenarios for EGUs reflect projected changes to fuel usage and economics, as described in the Emission Inventory Final Rule TSD. Future year base case EGU emissions that predict $SO_2$, $NO_X$, and $PM_{2.5}$ were obtained from version 4.10_FTransport of the Integrated Planning Model (IPM) outputs (*http://epa.gov/airmarkt/progsregs/epa-ipm/index.html*). The IPM is a multi-regional, dynamic, deterministic linear programming model of the U.S. electric power sector; version 4.10_FTransport reflects state rules and consent decrees through December 1, 2010, and incorporates public comments on existing controls submitted to EPA through both the Transport Rule-related notice and comment process as well as the proposed Mercury and Air Toxics Standards Information Collection Request (ICR). The operation of existing $SO_2$ or $NO_X$ advanced controls (*e.g.*, scrubber, SCR) on units that were not required to operate those controls for compliance with Title IV, New Source Review (NSR), state settlements, or state-specific rules was projected by IPM on the basis of providing least cost operation of the power generation system subject to existing regulatory requirements except CAIR (see baseline discussion in section V.B).

Additionally, IPM v.4.10_FTransport incorporates comments received during the rulemaking process. Fuel-related updates include comment-driven unit-specific limitations on 2012 coal rank selection, limiting unrestricted switching from bituminous to subbituminous coal by imposing boiler modification costs for those units shifting from bituminous to subbituminous coal without historical precedent, and a correction of waste coal prices. Pollution control-related updates include keying the performance assumptions for FGD and SCR more closely to historic performance data, and the inclusion of dry sorbent injection (DSI), a $SO_2$ removal technology. Other notable updates include revised assumptions on the heat rate and consequent dispatching of cogenerating units and incorporation of additional planned retirements. Further details on these updates are available in the IPM Documentation, available in the docket and at: *http://www.epa.gov/airmarkets/progsregs/epa-ipm/index.html*.

c. Development of Emission Inventories for Non-EGU Point Sources

Details on the development of emission inventories are available in the Emission Inventory Final Rule TSD. In both the proposal and final modeling, controls on industrial boilers installed under the $NO_X$ SIP call were assumed to have been implemented by 2005 and captured in the 2005 NEI v2. The non-EGU point source emissions were updated from the 2005 NEI and the

emissions used for the proposal modeling through the incorporation of comments on the proposal emissions values, previously unknown facility closures, and through other data improvements as identified by EPA analyses.

EPA does not factor in economic growth to develop non-EGU point source emission projections because analysis of historical emission trends and economic data did not support using economic growth to project non-EGU emissions. More details on the rationale for not applying economic growth to non-EGU industrial sources can be found in Appendix D of the Regulatory Impact Assessment (RIA) for the PM NAAQS rule (*http:// www.epa.gov/ttn/ecas/regdata/RIAs/ Appendix%20D—Inventory.pdf*). Although projections based on economic growth were not included, EPA did include reductions resulting from plant and unit closures, local and federal consent decrees, and several Maximum Achievable Control Technology (MACT) standards.

For non-EGU point sources, local control programs that may be necessary for areas to attain the annual $PM_{2.5}$ NAAQS and the ozone NAAQS are only included in the future base case projections when specific information about existing enforceable local controls was provided.

Since aircraft at airports were treated as point emissions sources in the 2005 NEI v2, we applied projection factors based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast (TAF) system, published in December 2008.

A number of comments were received on the stationary non-EGU point source inventories. Below is a summary of the major comments that impacted the stationary non-EGU point source inventories for the final modeling:

*Comment:* Commenters stated that EPA did not properly represent some point source emissions in base-year and future-year inventories due to facility and unit closures, consent decrees, emission caps, control programs, and alternative emission estimates.

*Response:* EPA reviewed the sources referenced in the individual comments regarding the base-year and future-year inventories. In cases where credible alternative data were available, EPA revised the emission inventories to incorporate additional facility and unit closures, consent decrees, emission caps, control programs, enforceable local controls, and alternative emission estimates.

*Comment:* Commenters stated that EPA should include controls from the National Emission Standards for Hazardous Air Pollutants for Reciprocating Internal Combustion Engines (RICE NESHAP) in our modeling.

*Response:* EPA included reductions expected to be achieved by the RICE NESHAP across the United States in our final modeling of stationary non-EGU and nonpoint sources.

*Comment:* Commenters stated that EPA was not properly representing existing or planned controls for cement plants.

*Response:* EPA updated control and projection information for cement plants based on the latest available data and cement sector-specific modeling results.

*Comment:* EPA specifically requested comments on whether to incorporate emission reduction estimates from the NESHAP for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters (75 FR 32006). Commenters stated that emission reduction estimates should not be included until the rule became final.

*Response:* EPA did not incorporate emission reduction estimates from the NESHAP for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters (75 FR 32006) into the proposal or final modeling because the rule was not final at the time the modeling was performed. Note that reductions from this rule would not have impacted the 2012 base case due to its implementation schedule, and only the 2014 emissions would have been affected.

### d. Development of Emission Inventories for Onroad Mobile Sources

The onroad emissions in the proposal modeling were primarily based on the National Mobile Inventory Model (NMIM) monthly, county, and process level emissions along with gasoline exhaust emissions from a fall 2008 draft version of the Motor Vehicle Emission Simulator (MOVES). A major comment on the proposal modeling for onroad mobile sources was the following:

*Comment:* Commenters stated that EPA should use a publicly released version of MOVES for its final modeling.

*Response:* EPA updated the final modeling to use data from the publicly released version of the MOVES 2010 model because the model became available in time for inclusion of its results in the final modeling. It was not used for the proposal modeling because it was not available at the time the modeling was performed.

In the final Transport Rule modeling, EPA used MOVES 2010 state-month level emissions for all criteria pollutants and all modes (evaporative, exhaust, brake wear and tire wear) and allocated those emissions to counties according to state-county NMIM emissions ratios. For California (the emissions for which are included to support the coarse modeling domain), the onroad mobile emissions data were derived from data provided by the state. These data were augmented with MOVES 2010 outputs for $NH_3$ because data for that pollutant had not been provided. Additional information on the approach to onroad mobile source emissions is available in the Emission Inventory Final Rule TSD.

In the future-year base modeling for mobile sources, all national measures available at the time of modeling were included. The future scenarios for mobile sources reflect projected changes to fuel usage, as described in the Emission Inventory Final Rule TSD. Emissions for these years reflect onroad mobile control programs including the Light-Duty Vehicle Tier 2 Rule, the Onroad Heavy-Duty Rule, the Light-Duty Vehicle Greenhouse Gas Rule, the Renewable Fuel Standards Rule, and the Mobile Source Air Toxics (MSAT) final rule.

### e. Development of Commercial Marine Category 3 Vessel Emission Inventories

For the 2005 modeling, the commercial marine category 3 (C3) vessel emissions, a portion of nonroad mobile emissions, were augmented with gridded 2005 emissions from the previous modeling efforts for the rule called "Control of Emissions from New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder." Emissions out to 200 nautical miles from the coastline were allocated to states in the proposal modeling. A major comment on the proposal modeling was the following:

*Comment:* Commenters stated that emissions from commercial marine sources (a component of the nonroad emissions in the summaries that were provided for the NPR) were too high.

*Response:* EPA reviewed the approach used for commercial marine $C_3$ emissions in the proposal. In the final modeling, instead of using the boundary of 200 nautical miles from the coast as was used in the proposal, EPA adopted the Mineral Management Service state-federal water boundaries that assign state waters 3–10 nautical miles from the coast. This approach is consistent with the approach used in the 2005 and 2008 National Emission Inventories. In addition, the category 3 commercial marine emissions were adjusted to reflect a coordination between the Emissions Control Area proposal to the International Maritime Organization

(EPA–420–F–10–041, August 2010) control strategy; reductions of $NO_x$, VOC, and CO emissions for new $C_3$ engines starting in 2011; and fuel sulfur limits that go into effect as early as 2010.

### f. Development of Emission Inventories for Other Nonroad Mobile Sources

The nonroad mobile source emissions for sources other than $C_3$ marine were primarily based on NMIM monthly, county, and process level emissions from the 2005 NEI v2. These emissions were unchanged from proposal modeling, except for PM emissions in California that were updated to correct for missing emissions in a few counties and source categories.

Nonroad mobile emissions were created for future years with NMIM using an approach consistent with that used for 2005. The nonroad emissions for 2012 and 2014 were calculated using NMIM future-year equipment population estimates and control programs. Nonroad mobile emission reductions for 2012 and 2014 include reductions to locomotives, various nonroad engines including diesel engines and various marine engine types, fuel sulfur content, and evaporative emissions standards. A more comprehensive list of control programs included for mobile sources is available in the Emission Inventory Final Rule TSD.

The 2012 and 2014 nonroad mobile emissions for locomotives and category 1 and 2 (C1 and C2) commercial marine vessels were based on emissions published in EPA's Locomotive Marine Rule, Regulatory Impact Assessment, Chapter 3.

### g. Development of Nonpoint Emission Inventories

For the proposal Transport Rule modeling, EPA augmented the 2002 NEI nonpoint emission inventory with a non-California Western Regional Air Partnership (WRAP) oil and gas exploration inventory, which includes emissions in several states within the eastern U.S. 12 km modeling domain and additional states within the national 36 km modeling domain. For the final Transport Rule modeling, EPA updated the nonpoint emission estimates for oil and gas sources. EPA continued to use the same WRAP inventory from the proposal, emissions in Texas and Oklahoma were updated but for the final modeling with data from the Texas Commission on Environmental Quality (TCEQ) and the Oklahoma Department of Environmental Quality (DEQ), respectively.

The average-year county-based inventories for wildfire and prescribed burning emissions were unchanged between the proposal and final modeling.

For stationary nonpoint sources, local control programs that may be necessary for areas to attain the annual $PM_{2.5}$ NAAQS and the ozone NAAQS are not included in the future base case projections unless specific information about existing enforceable controls was available (*e.g.,* ozone SIP controls from Ozone Transport Commission rules that impact source categories such as Consumer Products, Solvent Cleaning, Adhesives and Sealants). EPA specifically requested comment on local control data as part of the proposal and the October 27 NODA, and incorporated any usable data that was provided into the final inventories.

For stationary nonpoint sources, refueling emissions were projected using the refueling results from the NMIM runs performed for the onroad mobile sector.

Portable fuel container emissions were projected to future years using estimates from previous OTAQ rulemaking inventories. Emissions of ammonia and dust from animal operations were projected based on animal population data from the Department of Agriculture and EPA. Residential wood combustion was projected by replacement of obsolete wood stoves with new wood stoves and a 1 percent annual increase in fireplaces. Landfill emissions were projected using MACT controls. All other nonpoint sources were held constant between 2005 and the future years.

Some specific adjustments to the inventories were made in the final modeling to address comments that were received as described below. Area source MACT programs and controls from the RICE NESHAP were included in the final modeling to address submitted comments, as were fuel sulfur controls that were enforceable and that take effect by 2014.

The major comments that impacted the nonpoint sectors are as follows:

*Comment:* Commenters stated that the $SO_2$ emissions from industrial fuel combustion in Nebraska EPA are too high.

*Response:* EPA reviewed the NEI 2002-based data that had been used for the proposal modeling and determined that emissions from the 2005 inventory compiled for the Central Regional Air Planning Association (CENRAP) were more up to date for this source category and based on more localized data sources. The 2005 CENRAP emissions

for industrial fuel combustion were used in the final modeling.

*Comment:* Commenters stated that EPA should include sulfur rule controls that take effect prior to the future years that were modeled.

*Response:* EPA included quantifiable sulfur rule controls in 2014 modeling for those states that had implemented the rules (New Jersey and Maine).

*Comment:* A commenter stated that emissions for Delaware were overestimated for several nonpoint categories in base-year and future-year inventories and provided alternative estimates for these categories.

*Response:* EPA reviewed the alternative estimates provided and found them to be credible and based on more detailed local scale information than were available in the national inventories. EPA incorporated the alternative emission estimates for Delaware into the final modeling.

*Comment:* A commenter stated that residual oil is not used as an industrial fuel in South Carolina.

*Response:* EPA analyzed the emissions from residual oil industrial fuel combustion in South Carolina and all other states, and preliminary regional planning office inventories and the 2008 NEI submittals. The South Carolina residual oil industrial fuel emissions were determined to be anomalously large in comparison to the near zero emissions in other submittals and were therefore removed from the nonpoint inventory.

### 2. Air Quality Basis for Identifying Receptors

#### a. Introduction

In this section, we describe the final approach to identify downwind nonattainment and maintenance receptors. We briefly summarize the modeling platform, the proposed approach to identify receptors, comments received, and the results of the final analysis.

In the Transport Rule, EPA has explicitly given independent meaning to the ''interfere with maintenance'' prong of section 110(a)(2)(D)(i)(I) by evaluating contributions to identified maintenance receptors as well as contributions to identified nonattainment receptors. EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historic variability in air quality at that receptor. Specifically, EPA projects future air quality design values based on measured data during the period 2003 to 2007. In determining the downwind receptors of concern, EPA

does not solely rely on the projection of an average design value based on measured data from the relevant period (in this case 2003 to 2007) to make a determination of "attainment" or "nonattainment." Instead, EPA also evaluates the maximum future design value at that receptor based on measured data over the relevant period. Receptors for which this latter analysis projects design values higher than the NAAQS are identified as maintenance receptors.

EPA believes it is appropriate and reasonable to use this approach to identify receptors that may have maintenance problems in the future. This approach uses measured data in order to establish potential air quality outcomes at each receptor that take into account the variable meteorological conditions present across the entire period of measured data (2003 to 2007). EPA interprets the maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor. In other words, the average design value gives a reasonable projection of future air quality at the receptor under "average" conditions. However, EPA also recognizes that previously experienced meteorological conditions (*e.g.*, dominant wind direction, temperatures, air mass patterns) promoting ozone or fine particle formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. It also identifies upwind emissions that under those circumstances could interfere with the downwind area's ability to maintain the NAAQS.

Per the court's opinion in *North Carolina*, it is necessary for the Agency to evaluate "interference with maintenance" separately from "significant contribution to nonattainment" in order to give independent meaning to that phrase in the statute. The approach described above does so and provides a reasonable basis for identifying upwind emissions that interfere with maintenance of the NAAQS at downwind receptors.

Because the methodology is based on actual variations in design values measured at the receptors, EPA believes that the application of this design value methodology for identifying maintenance receptors reasonably anticipates possible future air quality

outcomes based on meteorological conditions independent of emission reduction requirements occurring between 2005 (the base year for air quality analysis) and 2012 (the future year for air quality analysis of the base case without CAIR or the Transport Rule in place). EPA uses air quality modeling to properly account for changes in air quality from 2005 to 2012 due to emission control requirements and trends in emission source fleet turnover (such as increasingly cleaner motor vehicle fleets). The air quality modeling process allows EPA to effectively adjust measured data to project design values in 2012 based on the forecast changes in emissions. For a given receptor, the forecast change in emissions from 2005 to 2012 is a constant factor applied across all of the design values from the period 2003 to 2007. Thus, a comparison of the projected (future-year) design values themselves is equivalent to comparing the base period design values from the data set to consider how pollution concentrations are affected by non-modeled factors such as environmental and meteorological variability independent of the forecast emission reductions that stem from successful imposition of emission limitations and controls on various sources between the base and future modeling years. EPA believes it is reasonable to anticipate that these year-to-year meteorological fluctuations may reoccur at any time in the future and are relevant to determining receptors that are at risk of having a problem in the future with maintenance of the NAAQS. Therefore, EPA assesses the relationship of the maximum projected design value for 2012 at each receptor to the relevant NAAQS, and where such a value exceeds the NAAQS, EPA determines that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance under the Transport Rule.

To provide an illustrative example, consider a hypothetical receptor "Y" whose measured data for 2003–2007 yields three design values for annual fine particles: 17 for 2003–05; 14 for 2004–06; and 12 μg/m³ for 2005–07. Thus, the maximum measured design value for this period is 17 and the average design value is 14.3. To determine whether the receptor is a nonattainment or maintenance receptor, EPA projects a corresponding future-year (2012) design value for each measured design value. These projections are based on the results of air quality modeling, which demonstrates predicted changes in pollution concentrations for each

receptor from 2005 to 2012. For this example, assume that the projected future-year design values that correspond with the measured design values, are 16 (corresponds with the 2003–05 design value of 17), 13 (corresponds with the 2004–06 design value of 14), and 11 μg/m³ (corresponds with the 2005–07 design value of 12). The average future-year design value is 13.3 (corresponds with the average measured design value from 2003–2007 of 14.3). The projected future design values are all lower than the measured design values because air quality is projected to improve between 2005 and 2012. In this example, the analysis establishes that the average projected future design value is 13.3 and the maximum projected future design value is 16.

The average future (2012) projected design value of 13.3 based on the average design value for the period 2003–07 does not exceed the 1997 annual PM$_{2.5}$ NAAQS. For this reason, EPA would conclude that receptor Y will most likely have attainment air quality in the future year. Therefore, it would not be identified as a nonattainment receptor.

However, the future projected design value of 16 based on the maximum design value for the period 2003–07 does exceed the NAAQS. For this reason, EPA would conclude that the receptor may have difficulty maintaining attainment with the NAAQS under future potential meteorological conditions. EPA therefore would identify the receptor as a maintenance receptor and evaluate whether upwind state emissions interfere with maintenance of the NAAQS at that receptor.

EPA's methodology accounts for the range of meteorological conditions reflected by design values from the measured 2003–2007 data at receptor Y and also accounts for the projected changes in emissions from 2005 to 2012 at receptor Y. The range of meteorological conditions is accounted for by using data from three different 3-year periods as described above. The projected changes in emissions are accounted for by applying to the measured design values the forecasted change in PM$_{2.5}$ concentrations, as determined through air quality modeling of the 2005 and 2012 emissions. In this example, the maximum measured design value for receptor Y is 17. This design value represents measured data from 2003 to 2005. EPA applies to this design value the modeled 2005–to–2012 change in concentrations at receptor Y to obtain a 2012 maximum design value for that

receptor, which is 16. In this way, this maximum 2012 design value takes into consideration the air quality impacts of all known and legally applicable emission limitations taking effect after the 2003 to 2005 base period. Therefore, each of the projected future-year design values provide a fair representation of future air quality at receptor Y under different conditions while accounting for the emissions projected to remain in 2012. EPA thus believes that if one of these future-year design values for a particular receptor exceeds the NAAQS, it is reasonable to conclude that the area may have difficulty maintaining that NAAQS. For this reason, EPA identifies such receptors as maintenance receptors. In this example, EPA would find that while receptor Y's average future-year design value would not exceed the NAAQS, its maximum future-year design value (16) would exceed the NAAQS, and it would thus be designated as a "maintenance" receptor for purposes of the Transport Rule analyses.

In the proposed rule we used air quality modeling to (1) Identify locations where we expected there to be nonattainment and/or maintenance problems for annual average $PM_{2.5}$, 24-hour $PM_{2.5}$, and/or 8-hour ozone in 2012, (2) quantify the impacts (*i.e.*, air quality contributions) of $SO_2$ and $NO_X$ emissions from upwind states on downwind annual average and 24-hour $PM_{2.5}$ concentrations at monitoring sites projected to be nonattainment or have maintenance problems in 2012 for the 1997 annual and 2006 24-hour $PM_{2.5}$ NAAQS, respectively, and (3) quantify the impacts of $NO_X$ emissions from upwind states on downwind 8-hour ozone concentrations at monitoring sites projected to be nonattainment or have maintenance problems in 2012 for the 1997 ozone NAAQS.

To support the proposal, air quality modeling was performed for four emission scenarios: a 2005 base year, a 2012 "no CAIR" base case, a 2014 "no CAIR" base case, and a 2014 control case that reflects the emission reductions expected from the FIPs. The modeling for 2005 was used as the base year for projecting air quality for each of the 3 future-year scenarios. The 2012 base case modeling was used to identify future nonattainment and maintenance locations and to quantify the contributions of emissions in upwind states to annual average and 24-hour $PM_{2.5}$ and 8-hour ozone. The 2012 ozone and $PM_{2.5}$ concentrations were derived by projecting 2003 through 2007 based ambient ozone and/or $PM_{2.5}$ data to the future using the relative (percent) change in modeled concentrations

between 2005 and 2012. The 2014 base case and 2014 control case modeling were used to quantify the benefits of this proposal.

In the proposed rule, EPA used the Comprehensive Air Quality Model with Extensions (CAMx) version 5.20 [18] to simulate ozone and $PM_{2.5}$ concentrations for the 2005 base year and the 2012 and 2014 future year scenarios. The CAMx model applications were designed to cover states in the central and eastern U.S. using a horizontal resolution of 12 x 12 km.[19]

CAMx contains "source apportionment" tools that are designed to quantify the contribution of emissions from various sources and areas to ozone and $PM_{2.5}$ component species in other downwind locations. The source apportionment tools were used to quantify the downwind contributions of ozone and $PM_{2.5}$ from upwind states.

In the proposed rule, EPA used a 2005-based air quality modeling platform which included 2005 base year emissions and 2005 meteorology for modeling ozone and $PM_{2.5}$ with CAMx.

We received comments related to several aspects of the air quality modeling platform.

*Comment:* There was wide support from commenters for the use of CAMx as an appropriate, state-of-the science air quality tool for use in the Transport Rule. There were no comments that suggested that EPA should use an alternative model for quantifying interstate transport. Many commenters requested that EPA update the emission inventories used for the Transport Rule and then remodel the 2005 base year and future year emissions using the updated emissions and the most recent version of CAMx to reassess interstate transport for the final rule.

*Response:* For the final rule we have updated our modeling using the latest public release of CAMx (version 5.30) and associated preprocessors. We have also made numerous improvements to the emission inventories for the 2005 base year as well as the 2012 and 2014 future year base cases in response to public comments. The emissions changes are described in section V.C.1. The projection of future year

nonattainment and maintenance sites and the quantification of ozone and $PM_{2.5}$ transport for the final rule are based on modeling with CAMx v5.30 using the updated emission inventories. The final rule air quality projections of 2012 nonattainment and maintenance are described below. The final rule interstate contributions are presented in section V.D.

*Comment:* The performance evaluation of the 2005 base year model predictions for the proposed rule was too cursory and did not provide sufficient detail on model performance. Commenters requested additional analyses and spatial resolution describing how well base year model predictions compare to the corresponding measured values.

*Response:* For the final rule we have expanded the scope of the model evaluation for 2005 to include a broader suite of statistics to characterize performance for individual subregions of the eastern U.S. modeling domain. The results of the performance evaluation for the final rule 2005 base year air quality modeling are described in the Air Quality Modeling Final Rule TSD.

*Comment:* The 2005 based modeling platform should be updated to a more recent year. There were several different aspects of this comment. Some commenters stated that EPA should be using a more recent emission inventory as a base year, due to identified changes and updates to the inventories. Other commenters stated that EPA should use a more recent base year, due to a trend of improvement in air quality over the past few years. The commenters claim that the 2005-based EPA modeling does not account for large emission reductions and air quality improvements that have occurred over the last several years.

*Response:* There are several reasons why the use of a 2005 modeling base case is both reasonable and, in fact, necessary for the Transport Rule. As explained in section V.B, above, because the Transport Rule will replace CAIR, EPA cannot consider reductions associated with CAIR in the analytical baseline emissions scenario. Thus, the base year for the air quality projections should be a year that represents emissions before CAIR was in place (*i.e.* 2005). We are projecting emissions to a future 2012 "no CAIR" case and therefore want to best represent the air quality change between 2005 and 2012, without CAIR. To do this, we projected emissions that existed before CAIR was in effect and modeled the air quality change that occurs between 2005 and 2012 without CAIR.

---

[18] Comprehensive Air Quality Model with Extensions Version 5 User's Guide. Environ International Corporation. Novato, CA. March 2009.

[19] The 12 km domain was nested within a coarse grid, 36 x 36 km modeling domain which covers the lower 48 states and adjacent portions of Canada and Mexico. Predictions from this Continental U.S. (CONUS) domain were used to provide initial and boundary concentrations for simulations in the 12 km domain.

A key consideration in our projection methodology is the use of ambient data to anchor the design value projections to the future. The modeling is used in a relative sense by multiplying the modeled percent change in ozone or $PM_{2.5}$ species concentrations by the base year ambient data. The ozone and $PM_{2.5}$ modeling guidance recommends projecting design values based on 5 years [20] of monitoring data that is centered on the base model year. Using 2005 as a base emissions and meteorological year entailed the use of 2003–2007 ambient air quality data (5 years of data centered about 2005). This was a reasonable choice because the majority of the ambient data from this period was not impacted by CAIR emission reductions.

After 2005, early emission reductions of $SO_2$ and $NO_X$ in response to CAIR began to impact the measured air quality concentrations. Since the modeling projection methodology uses both modeled and observed data, 2005 is the latest base year that we deemed appropriate (before CAIR emission reductions took place) for use in projecting the measured air quality to a 2012 future year. The early years of the 5 year period (2003, 2004, and 2005) were not impacted by CAIR.[21] The last 2 years in the period (2006 and 2007) were slightly impacted by CAIR emission reductions. But the 5 year average is weighted towards the middle year of the period (2005), so the impact of the years after CAIR promulgation should be minimal.

The 2005 base year was also chosen because it was an appropriate meteorological year. In the eastern U.S. there was relatively high ozone during the summer of 2005 and relatively high $PM_{2.5}$ periods during the year. The modeled attainment tests for both ozone and 24-hour $PM_{2.5}$ depend on having a sufficient number of "high" modeled days to project to the future. Modeling a year that is not meteorologically conducive to ozone and/or $PM_{2.5}$ formation is discouraged by the modeling guidance because a meteorological year that is not conducive to ozone or $PM_{2.5}$ formation may be less responsive to changes in emissions in the future. Therefore, projecting the relative change in ozone or $PM_{2.5}$ for a non-conducive base year may underestimate the future change in ozone and/or $PM_{2.5}$ concentrations.

Additionally, all enforceable emission reductions that occurred between 2005 and 2012 (other than those required under CAIR) are captured by the modeling system. Any enforceable non-EGU emission reductions due to existing rules or the installation of emissions controls after 2005 were included in the 2012 base case inventory. As explained above in section V.B, to capture changes in EGU emissions between 2005 and 2012, EPA did not assume operation of all controls installed during that time period, as many of those controls were built in response to CAIR. EPA used IPM to project 2012 EGU emissions incorporating all non-CAIR enforceable emission constraints; operation of existing pollution controls was taken into account only where non-CAIR constraints made it economic or legally necessary to operate them. We also accounted for permanent source shutdowns that occurred after 2005. Where possible, we incorporated reported emission changes based on comments to the proposed rule and a subsequent emission inventory NODA.

*Comment:* Several commenters stated that we used a "modeled + monitored" test in CAIR to identify future year nonattainment receptors, but we only used a modeled test in the Transport Rule proposal. They suggest that we should either go back to the "modeled + monitored" test or explain why we should not use monitoring data in the identification of nonattainment and maintenance receptors. They say that we should not base nonattainment and maintenance receptors solely on modeled violations. They also say that we if we had looked at the most recent ambient data we would see that most of the modeled nonattainment and maintenance receptors are already attaining the ozone and/or $PM_{2.5}$ NAAQS.

*Response:* In the identification of future year nonattainment receptors for CAIR, EPA used what was called the "modeled + monitored test". The most recent ambient data (2001–2003 design values at the time) were examined to further verify that nonattainment was still being measured at potential future year nonattainment receptors. In the proposed Transport Rule, EPA identified future year nonattainment and maintenance receptors based on modeled projections of ambient data from the 2003–2007 time period. The future year receptors were not compared to most recent ambient data to verify that nonattainment still existed.

For the final Transport Rule, there are several reasons that EPA did not examine the most recent ambient data to verify that receptors were still measuring nonattainment. The main reason for dropping the "monitored" part of the modeled + monitored test is the fact that the most recent monitoring data (2007–2009 design values) include large emission reductions from CAIR. As explained in section V.B, above, because the Transport Rule will replace CAIR, we must model a future year base case which does not assume that CAIR is in place (a "no-CAIR" case). It is simply not appropriate to examine the current monitoring data, which represent air quality with CAIR emission reductions in place, and compare the values to 2012 projected air quality that is based on a no-CAIR modeling case. As discussed above, we modeled a 2005 base case with pre-CAIR emissions and a 2012 future "no CAIR" case. The change in modeled air quality is due to the non-CAIR enforceable emission changes between 2005 and 2012 and therefore explicitly does not take CAIR into account. As a consequence, the 2012 projected design values represent a unique case (necessary for analyzing future air quality without either CAIR or its replacement Transport Rule in effect) that cannot be represented by current ambient data.

It is also important to note that all of the projected 2012 design values are based on projections of measured ambient data. They are a combination of measured data and modeled response factors. Therefore, it is inaccurate to imply that future year nonattainment and maintenance receptors are solely based on modeled projections. The future year concentrations are firmly rooted in base year measured ambient data that have been projected to the future using modeled data.

There are additional reasons for not verifying the nonattainment and maintenance receptors against the most recent ambient data. In CAIR we did not explicitly identify maintenance receptors. In the Transport Rule proposal we identified maintenance receptors based on 2012 projections of maximum design values from the 2003–2007 period. Even though receptors may be measuring attainment based on recent data, they may still be at risk for falling back into nonattainment. Therefore, even if commenters argue that recent data show that monitoring sites should not be nonattainment receptors (with which we disagree), the same argument cannot be made regarding maintenance receptors. Clearly, receptors with recent "clean" ambient data may still experience higher $PM_{2.5}$ and/or ozone concentrations in the future (based on

[20] The modeling guidance recommends using a five year weighted average design value. This is calculated by averaging the three consecutive design value periods of 2003–2005, 2004–2006, and 2005–2007.

[21] The CAIR final rule was published on May 12, 2005.

meteorological and emission variability) and therefore may be appropriate maintenance receptors.

*Comment:* Several commenters claim that the maintenance receptor methodology overstates actual future design values. They also recommend an alternative methodology which takes into account the downward trend in observed $PM_{2.5}$ concentrations over the last 5+ years. The methodology would remove the trend in the data where air quality is improving over the period by applying a linear fit to the data, calculating the residuals and then adding the residuals back to the average of the data. Given a site with a downward trend, this has the effect of decreasing the calculated maximum values from the early years in the period and increasing the values from the end years in the period.

*Response:* EPA continues to believe that our approach to identify maintenance receptors is reasonable and appropriate. For the final rule, we continue to identify maintenance receptors by projecting the maximum design value from the 2003–2007 period to the future. The methodology assumes that the combination of emissions and meteorology that occurred in the base period (which led to relatively high ambient design values) could happen again in the future (albeit at lower emissions levels). There is no information presented by the commenters which explains why the magnitude of base year design value variability could not occur in the same way in the future. The commenters cite the downward trend in ambient data as the reason why the EPA methodology is not reasonable. However, in most cases, the recent downward trend in ambient data is due to a combination of ongoing emission reductions (which includes CAIR), variability in meteorology, and depressed emissions due to the recession. In fact, the most recent ambient design value period (2007–2009) is heavily influenced by extremely low ozone and $PM_{2.5}$ concentrations measured in 2009. The 2009 data are marked by relatively low emissions due to cool summer weather and ongoing effects of the recession. The preliminary [22] 2010 ambient data in the eastern U.S. show that ozone and $PM_{2.5}$ values were considerably higher in 2010 compared to 2009. In the states that are included in the final Transport Rule region, there were 158 ozone monitor days that exceeded 84 ppb in 2009 compared to 412 monitor exceedance

days in 2010. For $PM_{2.5}$, there were 251 monitor days that exceeded 35 $\mu g/m^3$ in 2009 compared to 417 monitor exceedance days in 2010. Even though the $SO_2$ and $NO_X$ emissions were generally lower in 2010, the observed ozone and $PM_{2.5}$ concentrations were higher. This shows the important influence of meteorology on ambient concentrations. Clearly, the year to year variability due to meteorology can be large. We acknowledge the downward trend in ambient data over the last few years. But this does not mean that conditions that led to high ozone and/or $PM_{2.5}$ in the 2003–2007 period could not occur again in the future. The 2010 ambient data show that meteorology can cause concentrations to go back up, even though there is a downward trend in emissions.

We also believe that the alternate maintenance methodology presented by the commenter is inappropriate. The EPA modeling for 2012 (and 2014) appropriately accounts for emission reductions that occur after 2005 except for those that should not be considered, as explained in section V.B., because they were required only by CAIR. Therefore, the starting point design values used to project to the future should not be lowered to account for emission reduction trends that occur after 2005. Doing so would give "double credit" to the more recent emission reductions and provides an inappropriate downward adjustment to the early design value periods of the 2003–2007 period.

*Comment:* One commenter claims that EPA did not follow our own modeling guidance by not doing local scale modeling in urban areas with high $PM_{2.5}$ concentration gradients. They suggested that the methodology to calculate future year design values should have included dispersion modeling to calculate the change in concentration over time of primary $PM_{2.5}$ emissions.

*Response:* EPA modeling guidance for $PM_{2.5}$ attainment demonstrations recommends photochemical grid modeling to examine future year changes in $PM_{2.5}$ concentrations. There are several optional aspects of the modeling which are recommended in specific cases. This includes a recommendation for a "local area analysis" using a dispersion model. An area with relatively large local primary $PM_{2.5}$ concentration gradients may want to do additional modeling to examine the impacts of local controls on its future year $PM_{2.5}$ concentrations. This is particularly important when local controls of primary $PM_{2.5}$ are included as part of the attainment demonstration.

As noted above, a "local area analysis" is recommended as part of the local attainment demonstration process in specific situations. It is impractical for EPA to perform this type of analysis for each local area in the regional Transport Rule. National rulemakings are not attainment demonstrations. We are not able to perform fine scale analyses for each area. For the final rule modeling, we have attempted to address all emissions and modeling related comments. We have updated the modeling platform to use the latest version of CAMx and are continuing to model ozone and $PM_{2.5}$ at 12km grid resolution, which for $PM_{2.5}$ is a more refined grid resolution compared to the CAIR modeling.

Additionally, there is no evidence presented by the commenter that would indicate that the future year $PM_{2.5}$ concentrations from the Transport Rule are biased high. In fact, depending on the circumstances, local fine scale grid or dispersion modeling may result in lower or higher future year design values. In a fine scale analysis, the dominant local primary $PM_{2.5}$ emissions become a larger percentage of the $PM_{2.5}$ concentrations. Therefore, if the local emissions are forecast to decrease, fine scale modeling may lead to lower future design values. However, if the local emissions are forecast to increase or stay the same between the base and future years, local modeling will likely show higher future year design values compared to a regional analysis. This points to the fact that perceived biases in modeling results may not always be correct.

In sum, fine scale modeling of local areas may lead to either higher or lower future year design values. There is no indication that EPA's regional modeling is biased in either direction. EPA's Transport Rule modeling generally followed EPA's modeling guidance and is appropriate for the purpose of this rulemaking.

*Comment:* One commenter completed and submitted a detailed CAMx based modeling analysis with a 2008 base year and future years of 2014 and 2018. The analysis shows that the majority of the proposed rule 2012 nonattainment and maintenance sites are already attaining based on either 2006–2008 or 2007–2009 ambient data. Based on this, the commenter claims that air quality has improved more rapidly than predicted by EPA's proposed rule modeling. Also, based on the commenter's 2014 modeling of CAIR emissions (including utility consent decrees and state programs), the commenter concludes that no additional controls are needed

---

[22] The 2010 data is preliminary. Exceptional event data has not been flagged and removed from the reported data.

beyond CAIR to bring most or all sites into attainment by 2014.

*Response:* As an initial matter, we note that the basic question addressed by the commenter, "whether additional controls beyond CAIR are necessary," is not on point. As explained previously, the D.C. Circuit remanded CAIR to EPA and it remains in place only temporarily. The question EPA must answer in this rulemaking, therefore, is not what controls in addition to CAIR are necessary but what, if any, restrictions on emissions must be put in place to replace CAIR in order to satisfy the requirements of section 110(a)(2)(D)(i)(I) of the CAA. For this reason, and as explained in greater detail in section V.B of this preamble, any analysis of whether beyond CAIR controls are necessary is irrelevant to this rulemaking. Nonetheless, we have carefully reviewed different aspects of the commenter's analysis. We previously addressed comments related to the use of more recent ambient data to examine future year nonattainment and maintenance receptors. As noted above, the 2006–2008 and 2007–2009 ambient data is heavily influenced by several factors. Among them are the emissions reductions from CAIR, the relatively low recent observed ozone and PM$_{2.5}$ concentrations at least partially due to non-conducive meteorology (particularly in 2009), and the atypical suppression of emissions due to the sharp recession. For all of these reasons, we believe it is not possible to directly compare the most recent design values to the predicted future year 2012 and 2014 design values from the Transport Rule. In particular, it is inappropriate to compare current design values to EPA's no-CAIR 2012 future year modeling results. As noted in the comment summary, the commenter's modeling analysis assumed that CAIR was in place in both 2008 and the future years. This is a fundamentally different assumption than the modeling EPA used to define the Transport Rule nonattainment and maintenance receptors in 2012 and is inappropriate for purposes of the Transport Rule for reasons described above and in section V.B.

Additionally, EPA's maintenance methodology chooses the highest of three base year design value periods projected to the future. The commenter only used a single design value period in their analysis and therefore did not fully examine maintenance issues. In fact, the 2014 nonattainment modeling receptors in the final Transport Rule and the commenter's modeling analysis are similar. As documented in section VI.D, in the 2014 final rule remedy case,

there is only one remaining nonattainment area for ozone and one remaining nonattainment area for 24-hour PM$_{2.5}$. This is similar to the modeling results presented in the comments.[23] However, EPA modeling identifies additional maintenance receptors in 2012 that continue to have maintenance issues in 2014.

EPA also examined our ozone and PM$_{2.5}$ projection procedures to see if there might be additional reasons for the relatively lower current ambient design values (and modeled design values in the commenter's analysis) compared to the 2014 remedy modeled values. Upon further analysis of EPA's 24-hour attainment test methodology, we noted certain discrepancies between the methodology and the calculation of the ambient 24-hour design values. In the proposed rule 24-hour attainment test, for each PM$_{2.5}$ monitor, we projected the measured 98th percentile concentrations from the 2003–2007 period to the future. A basic assumption in this methodology is that the distribution of high measured days in the base period will be the same in the future. For example, if the observed 98th percentile day is the 3rd high day for a particular year, we assume that the 1st, 2nd, and 3rd high days (and subsequent high days) in the future remain in the same basic distribution. Further examination of the proposed rule modeling found that this is not always the case. In situations where there are large summer PM$_{2.5}$ concentration reductions, some of the high days may switch from the summer in the base period to the winter in the future period.

In order to better account for the complicated future response in 24-hour design values, we have updated the 24-hour attainment demonstration methodology to more closely reflect the way 24-hour design values are calculated. In the revised methodology, we do not assume that the temporal distribution of high days in the base and future periods will remain the same. We project a larger set of ambient days from the base period to the future and then re-rank the entire set of days to find the new future 98th percentile value (for each year). More specifically, we project the highest 8 days per quarter (32 days per year) to the future and then re-rank the 32 days to derive the future year

98th percentile concentrations. In the case of the Transport Rule model results, this has the effect of lowering the future year 24-hour design values compared to the old methodology. The 2012 base case design values for all nonattainment and maintenance receptors were either unchanged or lower with the revised methodology.

**3. How did EPA project future nonattainment and maintenance for annual PM$_{2.5}$, 24-hour PM$_{2.5}$, and 8-hour ozone?**

*Final Rule:* In general, the methodology to project ozone and PM$_{2.5}$ concentrations to the future year(s) remains the same for the final rule. The proposal modeling followed the modeling guidance procedures for projecting ambient design values to future years. For the final rule, we continue to follow the basic procedures outlined in the guidance. The 8-hour ozone and annual PM$_{2.5}$ methodology are unchanged from the proposal. However, the 24-hour PM$_{2.5}$ methodology has been updated in the final rule to be more consistent with the calculation of 24-hour PM$_{2.5}$ design values. There were also additional minor updates to the ambient data.[24] The methodology to identify maintenance receptors is also unchanged from the proposal. We continue to use the maximum design value (projected from the 5 year base period) to calculate future year maintenance receptors.

As noted in the proposal, EPA considers that the maintenance concept has two components: Year-to-year variability in emissions and air quality, and continued maintenance of the air quality standard over time. The way that EPA defined maintenance based on year-to-year variability (as discussed in detail here) directly affects the requirements of this final rule. EPA also considered whether further reductions were necessary to ensure continued lack of interference with maintenance of the NAAQS over time (*e.g.,* after 2014). EPA concluded that in light of projected emission trends, and also considering the emission reductions from this proposed rule, no further reductions are required solely for this purpose at PM$_{2.5}$ and ozone receptors for which we are partially or fully determining significant contribution for the current NAAQS. (*See* discussion of emission trends in Chapter 7 of TSD entitled "Emission Inventories," included in the docket for the Transport Rule proposal.)

---

[23] The purpose of this comparison is to note that the modeling analyses are actually more similar than the commenter implies. However, the Transport Rule differs from the commenter's modeling due to the assumption that CAIR was in place. CAIR and the Transport Rule differ in state coverage and emission budgets. They are therefore not directly comparable.

[24] The base year design values were updated based on the latest official data. *See http://www.epa.gov/airtrends/values.html.*

a. Which ambient ozone and $PM_{2.5}$ data did EPA use for the purpose of projecting future year concentrations?

The final rule modeling continues to use a 2005 base case inventory and 2005 meteorology. Therefore, we continue to use ambient data from the 2003–2007 period. For each monitoring site, all valid design values (up to 3) from this period were averaged together. Since 2005 is included in all three design value periods, this has the effect of creating a 5-year weighted average, where the middle year is weighted 3 times, the 2nd and 4th years are weighted twice, and the 1st and 5th years are weighted once. We refer to this as the 5-year weighted average value. The 5-year weighted average values were then projected to the future years that were analyzed for this final rule. The 2003–2005, 2004–2006, and 2005–2007 design values are accessible at *http://www.epa.gov/airtrends/ values.html.* The design values have been updated based on the latest official values. The official values have exceptional events removed from the calculations if they are flagged by states and concurred with by EPA Regional offices.

The procedures for projecting annual average $PM_{2.5}$ and 8-hour ozone conform to the methodology in the current attainment demonstration modeling guidance.[25]

b. Projection of Future Annual and 24-Hour $PM_{2.5}$ Nonattainment and Maintenance

(1) Methodology for Projecting Future Annual $PM_{2.5}$ Nonattainment and Maintenance

For the final rule, annual $PM_{2.5}$ modeling was performed for the 2005 base year emissions and for the 2012 base case as part of the approach for projecting which locations are expected to be in nonattainment and/or have

difficulty maintaining the $PM_{2.5}$ standards in 2012. We refer to these areas as nonattainment sites and maintenance sites respectively.

Concentrations of $PM_{2.5}$ in 2012 were estimated by applying the modeled 2005-to-2012 relative change in $PM_{2.5}$ species to each of the 3-year ambient monitoring data periods (*i.e.,* 2003– 2005, 2004–2006, and 2005–2007) to obtain up to 3 future-year $PM_{2.5}$ design values for each monitoring site. We used the highest of these projections at each monitoring site to determine which sites are expected to have maintenance problems in 2012. We used the 5 year weighted average of those projections to determine which monitoring sites are expected to be nonattainment in this future year.

For the analysis of both nonattainment and maintenance, monitoring sites were included in the analysis if they had at least one complete design value in the 2003–2007 period.[26] There were 721 monitoring sites in the 12 km modeling domain which had at least one complete design value period for the annual $PM_{2.5}$ NAAQS, and 722 sites which met this criterion for the 24-hour NAAQS.[27]

EPA followed the procedures recommended in the modeling guidance for projecting $PM_{2.5}$ by projecting individual $PM_{2.5}$ component species and then summing these to calculate the concentration of total $PM_{2.5}$. EPA's Modeled Attainment Test Software (MATS) was used to calculate the future year design values. The software (including documentation) is available at: *http://www.epa.gov/scram001/ modelingapps_mats.htm.* Additional details on the annual $PM_{2.5}$ nonattainment and maintenance projections methodology can be found in the Air Quality Modeling Final Rule TSD.

The 2012 annual $PM_{2.5}$ design values were calculated for each of the 721 sites.

The calculated annual $PM_{2.5}$ design values are truncated after the second decimal place.[28] This is consistent with the ambient monitoring data truncation and rounding procedures for the annual $PM_{2.5}$ NAAQS. Any value that is greater than or equal to 15.05 µg/m³ is rounded to 15.1 µg/m³ and is considered to be violating the NAAQS. Thus, sites with projected 5-year weighted average ("average") annual $PM_{2.5}$ design values of 15.05 µg/m³ or greater are predicted to be nonattainment sites. Sites with projected maximum design values of 15.05 µg/m³ or greater are predicted to be maintenance sites. Note that nonattainment sites are also maintenance sites because the maximum design value is always greater than or equal to the 5-year weighted average. For ease of reference we use the term "nonattainment sites" to refer to those sites that are projected to exceed the NAAQS based on both the average and maximum design values. Those sites that are projected to be attainment based on the average design value, but exceed the NAAQS based on the maximum design value, are referred to as maintenance sites. The monitoring sites that we project to be nonattainment and/or maintenance for the annual $PM_{2.5}$ NAAQS in the 2012 base case are the nonattainment/maintenance receptors used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the annual $PM_{2.5}$ NAAQS.

Table V.C–1 contains the 2003–2007 base case period average and maximum annual $PM_{2.5}$ design values and the corresponding 2012 base case average and maximum design values for sites projected to be nonattainment of the annual $PM_{2.5}$ NAAQS in 2012. Table V.C–2 contains this same information for projected 2012 maintenance sites.

TABLE V.C–1—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE ANNUAL $PM_{2.5}$ DESIGN VALUES (µG/M³) AT PROJECTED NONATTAINMENT SITES

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Final rule average design value 2012 | Final rule maximum design value 2012 |
|---|---|---|---|---|---|---|
| 010730023 ........ | Alabama .................... | Jefferson .................... | 18.57 | 18.94 | 16.15 | 16.46 |
| 010732003 ........ | Alabama .................... | Jefferson .................... | 17.15 | 17.69 | 15.16 | 15.64 |
| 131210039 ........ | Georgia .................... | Fulton .................... | 17.43 | 17.47 | 15.07 | 15.10 |
| 171191007 ........ | Illinois .................... | Madison .................... | 16.72 | 17.01 | 15.46 | 15.73 |
| 261630033 ........ | Michigan .................... | Wayne .................... | 17.50 | 18.16 | 15.73 | 16.32 |

[25] U.S. EPA, 2007: Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze; Office of Air Quality Planning and Standards, Research Triangle Park, NC.

[26] If there is only one complete design value, then the nonattainment and maintenance design values are the same.

[27] Design values were only used if they were deemed to be officially complete based on CFR 40 Part 50 Appendix N. The completeness criteria for the annual and 24-hour $PM_{2.5}$ NAAQS are different.

Therefore, there are fewer complete sites for the annual NAAQS.

[28] For example, a calculated annual average concentration of 14.94753 * * * becomes 14.94 when digits beyond two places to the right of the decimal are truncated.

TABLE V.C–1—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE ANNUAL PM$_{2.5}$ DESIGN VALUES (µG/M$^3$) AT PROJECTED NONATTAINMENT SITES—Continued

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Final rule average design value 2012 | Final rule maximum design value 2012 |
|---|---|---|---|---|---|---|
| 390350038 ........ | Ohio ............................ | Cuyahoga .................. | 17.37 | 18.10 | 15.99 | 16.66 |
| 390350045 ........ | Ohio ............................ | Cuyahoga .................. | 16.47 | 16.98 | 15.14 | 15.61 |
| 390350060 ........ | Ohio ............................ | Cuyahoga .................. | 17.11 | 17.66 | 15.67 | 16.18 |
| 390610014 ........ | Ohio ............................ | Hamilton .................... | 17.29 | 17.53 | 15.76 | 15.98 |
| 390610042 ........ | Ohio ............................ | Hamilton .................... | 16.85 | 17.25 | 15.40 | 15.77 |
| 390618001 ........ | Ohio ............................ | Hamilton .................... | 17.54 | 17.90 | 16.01 | 16.33 |
| 420030064 ........ | Pennsylvania ............. | Allegheny ................... | 20.31 | 20.75 | 17.94 | 18.33 |

TABLE V.C–2—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE ANNUAL PM$_{2.5}$ DESIGN VALUES (µG/M$^3$) AT PROJECTED MAINTENANCE-ONLY SITES

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Final rule average design value 2012 | Final rule maximum design value 2012 |
|---|---|---|---|---|---|---|
| 180970081 ........ | Indiana ........................ | Marion ....................... | 16.05 | 16.36 | 14.86 | 15.16 |
| 180970083 ........ | Indiana ........................ | Marion ....................... | 15.90 | 16.27 | 14.71 | 15.06 |
| 390350065 ........ | Ohio ............................ | Cuyahoga .................. | 15.97 | 16.44 | 14.67 | 15.10 |
| 390617001 ........ | Ohio ............................ | Hamilton .................... | 16.17 | 16.56 | 14.74 | 15.10 |

(2) Methodology for Projecting Future 24-Hour PM$_{2.5}$ Nonattainment and Maintenance

The procedures for calculating the future year 24-hour PM$_{2.5}$ design values have been updated for the final rule.[29] The revised procedures are in response to comments which noted relatively high future year 24-hour PM$_{2.5}$ design values in EPA's modeling of the proposed Transport Rule. The updates are intended to make the projection methodology more consistent with the procedures for calculating ambient design values.

As noted above, for the proposed Transport Rule EPA projected for each PM$_{2.5}$ monitor the measured 98th percentile concentrations from the 2003–2007 period to the future. As an additional check, we also projected the next highest concentrations from the three calendar quarters in each year when the 98th percentile did not occur in the 2003–2007 base period, to ensure that the future year 98th percentile did not switch seasons in the future year compared to the base year. A basic assumption in this methodology is that the distribution of high measured days in the base period will be the same in the future.

In other words, EPA assumed at proposal that the 98th-percentile day could only be displaced "from below" in the instance that a different day's future concentration exceeded the original 98th-percentile day's future concentration. In that case, the original

98th-percentile day may become the 97th- or 96th-percentile day in the future year; EPA accounted for this possibility at proposal. EPA did not, however, consider that the 98th-percentile day could also be displaced "from above" in the instance that higher-concentration days in the base period were projected to have future concentrations lower than the original 98th-percentile day's future concentration. In that case, the original 98th-percentile day may become the 99th- or 100th-percentile day. Because EPA continued to use that day's future concentration to determine the monitor's future design value at proposal, this sometimes resulted in overstatement of future-year design values for 24-hour PM$_{2.5}$ monitoring sites whose seasonal distribution of highest-concentration 24-hour PM$_{2.5}$ days changed between the 2003–2007 period and the future year modeling. Examination of the proposed rule remedy modeling (2014 remedy case) showed that many of the highest PM$_{2.5}$ days switched from the summer in the base period to the winter in the future period. This is especially true in areas of the upper Midwest which experience both high summer and winter PM$_{2.5}$ episodes.

In the revised methodology, we do not assume that the seasonal distribution of high days in the base period years and future years will remain the same. We project a larger set of ambient days from the base period to the future and then re-rank the entire set of days to find the new future 98th percentile value (for

each year). More specifically, we project the highest 8 days per quarter (32 days per year) to the future and then re-rank the 32 days to derive the future year 98th percentile concentrations. In the case of the Transport Rule model results, this has the effect of lowering the future year 24-hour design value compared to the old methodology.

The modeling guidance recommendations for state attainment demonstrations have been updated to reflect the changes outlined above. Further details on the 24-hour PM$_{2.5}$ design value calculations can be found in the Air Quality Modeling Final Rule TSD. The above procedures for determining future year 24-hour PM$_{2.5}$ concentrations were applied for each site. The 24-hour PM$_{2.5}$ design values are truncated after the first decimal place. This approach is consistent with the ambient data truncation and rounding procedures for the 24-hour PM$_{2.5}$ NAAQS. Any value that is greater than or equal to 35.5 µg/m$^3$ is rounded to 36 µg/m$^3$ and is violating the NAAQS. Sites with future year 5-year weighted average design values of 35.5 µg/m$^3$ or greater, based on the projection of 5-year weighted average concentrations, are predicted to be nonattainment. Sites with future year maximum design values of 35.5 µg/m$^3$ or greater are predicted to be maintenance sites. Note that nonattainment sites for the 24-hour NAAQS are also maintenance sites because the maximum design value is always greater than or equal to the 5-year weighted average. The monitoring

[29] There were no updates to the ozone and annual PM$_{2.5}$ attainment test methodology.

sites that we project to be nonattainment and/or maintenance for the 24-hour PM$_{2.5}$ NAAQS in the 2012 base case are the nonattainment/maintenance receptors used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of 24-hour PM$_{2.5}$ NAAQS as part of this final rule.

Table V.C–3 contains the 2003–2007 base period average and maximum 24-hour PM$_{2.5}$ design values and the 2012 base case average and maximum design values for sites projected to be 2012 nonattainment of the 24-hour PM$_{2.5}$ NAAQS in 2012. Table V.C–4 contains this same information for projected 2012 24-hour maintenance sites.

TABLE V.C–3—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE 24-HOUR PM$_{2.5}$ DESIGN VALUES (μG/M$_3$) AT PROJECTED NONATTAINMENT SITES

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Final rule average design value 2012 | Final rule maximum design value 2012 |
|---|---|---|---|---|---|---|
| 010730023 | Alabama | Jefferson | 44.0 | 44.2 | 36.9 | 37.3 |
| 170311016 | Illinois | Cook | 43.0 | 46.3 | 37.5 | 40.4 |
| 171191007 | Illinois | Madison | 39.1 | 40.1 | 36.5 | 36.8 |
| 180970043 | Indiana | Marion | 38.4 | 39.9 | 35.7 | 37.1 |
| 180970066 | Indiana | Marion | 38.3 | 39.6 | 35.7 | 36.9 |
| 180970081 | Indiana | Marion | 38.2 | 39.2 | 35.8 | 36.9 |
| 261470005 | Michigan | St Clair | 39.6 | 40.6 | 36.2 | 37.1 |
| 261630015 | Michigan | Wayne | 40.1 | 40.6 | 35.5 | 36.0 |
| 261630016 | Michigan | Wayne | 42.9 | 45.4 | 38.9 | 41.2 |
| 261630019 | Michigan | Wayne | 40.9 | 41.4 | 37.3 | 37.8 |
| 261630033 | Michigan | Wayne | 43.8 | 44.2 | 39.4 | 39.8 |
| 390350038 | Ohio | Cuyahoga | 44.2 | 47.0 | 39.4 | 41.8 |
| 390350060 | Ohio | Cuyahoga | 42.1 | 45.7 | 37.7 | 40.8 |
| 420030064 | Pennsylvania | Allegheny | 64.2 | 68.2 | 56.7 | 59.9 |
| 420030093 | Pennsylvania | Allegheny | 45.6 | 51.5 | 39.1 | 44.3 |
| 420030116 | Pennsylvania | Allegheny | 42.5 | 42.5 | 35.5 | 35.5 |
| 420070014 | Pennsylvania | Beaver | 43.4 | 44.6 | 36.2 | 37.4 |
| 420710007 | Pennsylvania | Lancaster | 40.8 | 44.0 | 35.9 | 38.3 |
| 540090011 | West Virginia | Brooke | 43.9 | 44.9 | 37.5 | 38.3 |
| 550790043 | Wisconsin | Milwaukee | 39.9 | 40.8 | 36.2 | 37.1 |

TABLE V.C–4—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE 24-HOUR PM$_{2.5}$ DESIGN VALUES (μG/M$^3$) AT PROJECTED MAINTENANCE-ONLY SITES

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Final rule average design value 2012 | Final rule maximum design value 2012 |
|---|---|---|---|---|---|---|
| 010732003 | Alabama | Jefferson | 40.3 | 40.8 | 35.3 | 35.9 |
| 170310052 | Illinois | Cook | 40.2 | 41.4 | 34.9 | 36.0 |
| 170312001 | Illinois | Cook | 37.7 | 40.6 | 33.6 | 36.1 |
| 170313301 | Illinois | Cook | 40.2 | 43.3 | 34.9 | 37.6 |
| 170316005 | Illinois | Cook | 39.1 | 41.8 | 34.1 | 36.4 |
| 171190023 | Illinois | Madison | 37.3 | 38.1 | 35.1 | 35.8 |
| 180890022 | Indiana | Lake | 38.9 | 44.0 | 34.9 | 39.5 |
| 180890026 | Indiana | Lake | 38.4 | 41.3 | 34.0 | 37.0 |
| 261610008 | Michigan | Washtenaw | 39.4 | 40.8 | 35.0 | 36.3 |
| 390170003 | Ohio | Butler | 39.2 | 41.1 | 34.4 | 36.5 |
| 390350045 | Ohio | Cuyahoga | 38.5 | 41.5 | 34.7 | 37.5 |
| 390350065 | Ohio | Cuyahoga | 38.6 | 41.0 | 34.9 | 37.6 |
| 390618001 | Ohio | Hamilton | 40.6 | 40.9 | 35.2 | 35.8 |
| 390811001 | Ohio | Jefferson | 41.9 | 45.5 | 34.5 | 37.8 |
| 391130032 | Ohio | Montgomery | 37.8 | 40.0 | 33.6 | 35.6 |
| 420031008 | Pennsylvania | Allegheny | 41.3 | 42.8 | 35.0 | 36.3 |
| 420031301 | Pennsylvania | Allegheny | 40.3 | 42.4 | 33.9 | 35.6 |
| 420033007 | Pennsylvania | Allegheny | 37.5 | 43.1 | 32.3 | 37.3 |
| 421330008 | Pennsylvania | York | 38.2 | 40.7 | 33.3 | 36.0 |
| 550790010 | Wisconsin | Milwaukee | 38.6 | 40.0 | 35.4 | 36.7 |
| 550790026 | Wisconsin | Milwaukee | 37.3 | 41.3 | 33.6 | 37.2 |

(3) Methodology for Projecting Future 8-Hour Ozone Nonattainment and Maintenance

The final rule methodology to calculate 8-hour ozone nonattainment and maintenance receptors is identical to the proposed rule. The May-to-September 24-hour maximum 8-hour average concentrations from the 2005 base case and the 2012 base case were used to project ambient design values to 2012. The following is a brief summary of the future year 8-hour average ozone calculations. Additional details are provided in the Air Quality Modeling Final Rule TSD.

We are using the base period 2003–2007 ambient ozone design value data for projecting future year design values. Relative response factors (RRF) for each monitoring site were calculated as the

percent change in ozone on days with modeled ozone greater than 85 ppb.[30]

The maximum future design value is calculated by projecting design values for each of the three base periods (2003–2005, 2004–2006, and 2005–2007) separately. The highest of the three future values is the maximum design value. This maximum value is used to identify the 8-hour ozone maintenance receptors.

The future year design values are truncated to integers in units of ppb. This approach is consistent with the ambient data truncation and rounding procedures for the 8-hour ozone NAAQS. Future year design values that

are greater than or equal to 85 ppb are considered to be violating the NAAQS. Sites with future year 5-year weighted average design values of 85 ppb or greater are predicted to be nonattainment. Sites with future year maximum design values of 85 ppb or greater are predicted to be future year maintenance sites. Note that, as described previously for the annual and 24-hour PM$_{2.5}$ NAAQS, nonattainment sites for the ozone NAAQS are also maintenance sites because the maximum design value is always greater than or equal to the 5-year weighted average. The monitoring sites that we project to be nonattainment and/or

maintenance for the 8-hour ozone NAAQS in the 2012 base case are the nonattainment/maintenance receptors used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of ozone NAAQS.

Table V.C–5 contains the 2003–2007 base period average and maximum 8-hour ozone design values and the 2012 base case average and maximum design values for sites projected to be 2012 nonattainment of the 8-hour ozone NAAQS in 2012. Table V.C–6 contains this same information for projected 2012 8-hour ozone maintenance sites.

TABLE V.C–5—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE 8-HOUR OZONE DESIGN VALUES (PPB) AT PROJECTED NONATTAINMENT SITES

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Final rule average design value 2012 | Final rule maximum design value 2012 |
|---|---|---|---|---|---|---|
| 220330003 ........ | Louisiana .................. | East Baton Rouge ..... | 92.0 | 96 | 85.6 | 89.3 |
| 480391004 ........ | Texas ....................... | Brazoria ...................... | 94.7 | 97 | 86.7 | 88.8 |
| 482010051 ........ | Texas ....................... | Harris ......................... | 93.0 | 98 | 86.1 | 90.8 |
| 482010055 ........ | Texas ....................... | Harris ......................... | 100.7 | 103 | 93.3 | 95.4 |
| 482010062 ........ | Texas ....................... | Harris ......................... | 95.7 | 99 | 88.8 | 91.8 |
| 482010066 ........ | Texas ....................... | Harris ......................... | 92.3 | 96 | 87.1 | 90.6 |
| 482011039 ........ | Texas ....................... | Harris ......................... | 96.3 | 100 | 88.8 | 92.2 |

TABLE V.C–6—AVERAGE AND MAXIMUM 2003–2007 AND 2012 BASE CASE 8-HOUR OZONE DESIGN VALUES (PPB) AT PROJECTED MAINTENANCE-ONLY SITES

| Monitor ID | State | County | Average design value 2003–2007 | Maximum design value 2003–2007 | Average design value 2012 | Maximum design value 2012 |
|---|---|---|---|---|---|---|
| 090011123 ........ | Connecticut ............... | Fairfield ...................... | 92.3 | 94 | 83.9 | 85.5 |
| 090093002 ........ | Connecticut ............... | New Haven ................. | 90.3 | 93 | 82.7 | 85.1 |
| 240251001 ........ | Maryland ................... | Harford ...................... | 92.7 | 94 | 84.4 | 85.6 |
| 260050003 ........ | Michigan ................... | Allegan ...................... | 90.0 | 93 | 82.4 | 85.1 |
| 482010024 ........ | Texas ....................... | Harris ......................... | 88.0 | 92 | 83.4 | 87.2 |
| 482010029 ........ | Texas ....................... | Harris ......................... | 91.7 | 93 | 84.2 | 85.4 |
| 482011015 ........ | Texas ....................... | Harris ......................... | 89.0 | 96 | 82.4 | 88.9 |
| 482011035 ........ | Texas ....................... | Harris ......................... | 86.3 | 95 | 79.9 | 88.0 |
| 482011050 ........ | Texas ....................... | Harris ......................... | 89.3 | 92 | 82.8 | 85.4 |

*D. Pollution Transport From Upwind States*

1. Choice of Air Quality Thresholds

a. Thresholds

In this action, EPA uses air quality thresholds to identify linkages between upwind states and downwind nonattainment and maintenance receptors. States whose contributions to a specific receptor meet or exceed the thresholds identified are considered linked to that receptor; those states' emissions (and available emission reductions) are analyzed further in the

second step of EPA's significant contribution analysis. States whose contributions are below the thresholds are not included in the Transport Rule for that NAAQS. In other words, we are finding that states whose contributions are below these thresholds do not significantly contribute to nonattainment or interfere with maintenance of the relevant NAAQS.

We use separate air quality thresholds for annual PM$_{2.5}$, 24-hour PM$_{2.5}$, and 8-hour ozone. Each air quality threshold is calculated as 1 percent of the NAAQS. Specifically, we use an air quality threshold of 0.15 μg/m³ for

annual PM$_{2.5}$, 0.35 μg/m³ for 24-hour PM$_{2.5}$, and 0.8 ppb for 8-hour ozone. These are the same air quality thresholds we proposed.

EPA received a number of comments on the thresholds we proposed, and those comments and EPA's responses are discussed below.

b. General Comments on the Overall Stringency and Use of 1 Percent of the NAAQS

EPA received numerous comments supporting and opposing the proposed thresholds. A number of commenters cited support for EPA's approach. Some

---

[30] As specified in the attainment demonstration modeling guidance, if there are less than 10 modeled days > 85 ppb, then the threshold is

lowered in 1 ppb increments (to as low as 70 ppb) until there are 10 days. If there are less than 5 days

> 70 ppb, then an RRF calculation is not completed for that site.

commenters believed that use of a 1 percent threshold was too stringent, and recommended that EPA should use a threshold greater than 1 percent. Others believed that 1 percent was not stringent enough, and they recommended using a lower value such as 0.5 percent. EPA believes that for both $PM_{2.5}$ and for ozone, it is appropriate to use a threshold of 1 percent of the NAAQS for identifying states whose contributions do not significantly contribute to nonattainment or interfere with maintenance of the relevant NAAQS; therefore, EPA has retained the 1 percent threshold for the reasons described below.

As we found at the time of CAIR, EPA's analysis of base case $PM_{2.5}$ transport shows that, in general, $PM_{2.5}$ nonattainment problems result from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of particular upwind states. (*See* section II of the January 2004 CAIR proposal, 69 FR 4575–87).

In the 1998 $NO_X$ SIP Call (63 FR 57456, October 27, 1998) and in CAIR, EPA also found important contributions from multiple upwind states. As a result of the upwind ''collective contributions,'' EPA determined that it is appropriate to use a low air quality threshold when analyzing upwind states' contributions to downwind states' attainment and maintenance problems for ozone as well as $PM_{2.5}$.

Low threshold values are also warranted, as EPA discussed in the notices for CAIR, due to adverse health impacts associated with ambient $PM_{2.5}$ and ozone even at low concentrations (See relevant portions of the CAIR proposal notice (63 FR 4583–84) and the CAIR final rule notice (70 FR 25189–25192)).

To aid in responding to comments, EPA has compiled the contribution modeling results to analyze the impact of different possible thresholds. This analysis demonstrates the reasonableness of using the 1 percent threshold to account for the combined impact of relatively small contributions from many upwind states (see Air Quality Modeling Final Rule TSD). In this analysis, EPA identifies for annual $PM_{2.5}$ (sulfate and nitrate), 24-hour $PM_{2.5}$ (sulfate and nitrate), and 8-hour ozone receptors: (1) Total upwind state contributions, and (2) the amount of the total upwind state contribution that is captured at thresholds of 1 percent, 5 percent and 0.5 percent of the NAAQS. EPA continues to find that the total ''collective contribution'' from upwind sources represents a large portion of $PM_{2.5}$ and ozone at downwind locations and that the total amount of transport is composed of the individual contribution from numerous upwind states.

The analysis shows that the 1 percent threshold captures a high percentage of the total pollution transport affecting downwind states for both $PM_{2.5}$ and ozone. In response to commenters who advocated a higher threshold, EPA observes that higher thresholds would exclude increasingly large percentages of total transport, which we do not believe would be appropriate. For example, a 5 percent threshold would exclude the majority—and for annual PM, more than 80 percent—of interstate pollution transport affecting the downwind state receptors analyzed (based on the average percentage of total interstate transport across all receptors captured at the 5 percent threshold).

In response to commenters who advocated a lower threshold, EPA observes that the analysis shows that a lower threshold such as 0.5 percent would result in relatively modest increases in the overall percentages of $PM_{2.5}$ and ozone pollution transport captured relative to the amounts captured at the 1 percent level. A 0.5 percent threshold could lead to emission reduction responsibilities in additional states that individually have a very small impact on those receptors—an indicator that emission controls in those states are likely to have a smaller air quality impact at the downwind receptor. We are not convinced that selecting a threshold below 1 percent is necessary or desirable. A strong indication that the amount of pollution transport being excluded from consideration is not excessive is that the controls required under this rule are projected to eliminate nonattainment and maintenance problems with air quality standards at most downwind state receptors.

Considering the combined downwind impact of multiple upwind states, the health effects of low levels of $PM_{2.5}$ and ozone pollution, and EPA's previous use of a 1 percent threshold for $PM_{2.5}$ in CAIR, EPA's judgment is that the 1 percent threshold is a reasonable choice.

Some commenters noted that the $PM_{2.5}$ thresholds used for this rule are less than the ''significant impact levels'' (SILs) used for permitting programs. As EPA stated at the time of CAIR, since the thresholds referred to by the commenters serve different purposes than the CAIR threshold for significant contribution, it does not follow that they should be made equivalent (70 FR 25191; May 12, 2005).

c. Comments on the Rounding Conventions for $PM_{2.5}$

In the final Transport Rule, EPA is using two-digit values for the $PM_{2.5}$ thresholds. Some commenters suggested that EPA should use the same rounding convention for annual $PM_{2.5}$ used in CAIR; that is, the threshold should be 0.2 μg/m³ rather than 0.15 μg/m³. The reasons for EPA's decision are below.

The rationale for the single digit value for the final CAIR rule was that a single digit is consistent with the EPA monitoring data reporting requirements in Part 50, Appendix N, section 4.3. These reporting requirements specify that design values for the annual $PM_{2.5}$ standard shall be rounded to the tenths place (decimals 0.05 and greater are rounded up to the next 0.1, and any decimal lower than 0.05 is rounded down to the nearest 0.1).

Because the design value is to be reported only to the nearest 0.1 μg/m³, EPA deemed it preferable for the final CAIR to select the threshold value at the nearest 0.1 μg/m³ as well, and hence one percent of the 15 μg/m³, rounded to the nearest 0.1 μg/m³ became 0.2 μg/m³.

The reporting requirements in section Part 50, Appendix N, section 4.3 for the 24-hour $PM_{2.5}$ standard state that design values for this standard shall be rounded to the nearest 1 μg/m³ (decimals 0.5 and greater are rounded up to the nearest whole number, and any decimal lower than 0.5 is rounded down to the nearest whole number).

If the approach used in CAIR were to be used to establish an air quality threshold for the 24-hour $PM_{2.5}$ NAAQS (which CAIR did not address), the resulting threshold would be zero. One percent of the 24-hour standard is 0.35 μg/m³, and rounding to the nearest whole number would yield an air quality threshold of zero. Thus if we were to apply the same rationale used to develop the annual $PM_{2.5}$ threshold for the final CAIR, there would be no air quality threshold for 24-hour $PM_{2.5}$, which EPA believes to be counter-intuitive and unworkable as an approach for assessing interstate contributions.

Therefore, for this rule, EPA proposed and is now finalizing an approach that decouples the precision of the air quality thresholds from the monitoring reporting requirements, and uses 2-digit values representing one percent of the $PM_{2.5}$ NAAQS; that is, 0.15 μg/m³ for the annual standard, and 0.35 μg/m³ for the 24-hour standard. EPA believes there are a number of considerations favoring this approach. First, it provides for a consistent approach for the annual and 24-hour standards. Second, the

approach is readily applicable to any current and future NAAQS and would automatically adjust the stringency of the transport threshold to maintain a constant relationship with the stringency of the relevant NAAQS as they are revised. The CAIR approach would not allow for this continuity: For example, if EPA were to retain the CAIR approach for the annual standard, any future lowering of the $PM_{2.5}$ NAAQS to below 15 μg/m³ would reduce the air quality threshold to the same outcome: 0.1 μg/m³. This would occur because any value less than 0.15 μg/m³ would round to 0.1 μg/m³ (assuming EPA would not round down to zero for the reasons described above), which means that the air quality threshold would have a different relative stringency to each possible future NAAQS value. For the above reasons, EPA believes the use of two-digit thresholds for both annual $PM_{2.5}$ and 24-hour $PM_{2.5}$ in the final rule is both reasonable and appropriate. The departure from the approach used for annual $PM_{2.5}$ in CAIR is appropriate given the additional considerations that were not in existence at the time of the final CAIR, and the importance of using a consistent approach to developing air quality thresholds for all NAAQS addressed by this rule as well as future NAAQS considered in future transport-related actions.

Some of these commenters suggested using the CAIR rounding conventions coupled with use of a 1-digit threshold of 0.4 μg/m³ for 24-hour $PM_{2.5}$. EPA considered the approach suggested by commenters, but determined that the proposed approach is more appropriate. First, adhering to the rounding conventions used for CAIR for annual $PM_{2.5}$ is not workable for the 24-hour standard because the rounding convention would yield a threshold of zero. Rounding alternatively to 0.4 μg/m³ would require EPA to find a basis for rounding the threshold to the nearest 0.1 μg/m³ instead of using a strict application of 1 percent; we do not see any basis for such rounding at this time.

d. Comments Related to the Multi-Factor Test EPA Used for Ozone in CAIR

Some commenters suggested that, for ozone, EPA should use the multiple-metric test we used for CAIR, and not a simple threshold based on 1 percent of the NAAQS. With respect to ozone, EPA proposed in the Transport Rule to take a more straightforward approach to air quality thresholds than the multi-factor approaches used for the $NO_X$ SIP Call and the CAIR. As proposed, EPA is using a contribution metric that is calculated based on the multi-day

average contribution. This metric is compared to one percent of the 1997 8-hour ozone standard of 0.08 ppm. Under this approach, one percent of the NAAQS is a value of 0.8 ppb. Contributions of 0.8 ppb and higher are above the threshold; ozone contributions less than 0.8 ppb are below the threshold. In past rulemakings (*e.g.*, CAIR) EPA used multiple ozone metrics, including the average contribution and maximum single day contribution to downwind nonattainment. EPA believes the average contribution (calculated over multiple high ozone days) is a robust metric compared to the maximum contribution on a single day. EPA believes that this approach is preferable because it uses a robust metric, it is consistent with the approach for $PM_{2.5}$, and it provides for a consistent approach that takes into account, and is applicable to, any future ozone standards below 0.08 ppm.

One of these commenters suggested that the 0.8 ppb threshold value was substantially more stringent than the 2 ppb screening test which was a part of the approach used for CAIR. The 1 percent threshold (0.8 ppb) is not substantially more stringent than the previous 2 ppb test because of differences in the metrics used to evaluate contributions against these two levels. The 2 ppb test was evaluated using the highest single day absolute model-predicted downwind contribution from an upwind state. The 1 percent threshold is evaluated based on the average relative downwind impact calculated over multiple days. Therefore, it is appropriate to set a lower concentration threshold for use with the average contribution metric calculated for the Transport Rule. More details on the calculation of the contribution metric can be found in the Air Quality Modeling Final Rule TSD. As noted above, EPA believes that the approach used for the proposed rule provides for a simplified, yet robust approach compared to CAIR. Accordingly, for the final rule we have retained the approach used for the proposal.

One commenter suggested that EPA retain the CAIR multiple-factor approach for ozone, and to apply that same approach to 24-hour $PM_{2.5}$. As noted above, EPA is not retaining this approach for ozone, and for similar reasons we believe a multi-factor approach is not needed for 24-hour $PM_{2.5}$. The approach based on 1 percent of the NAAQS is consistent with the form of the 24-hour standard. In addition, this approach is based on contributions on days with high 24-hour

$PM_{2.5}$ predictions and therefore is relevant for characterizing transport during short-term high $PM_{2.5}$ episodic conditions.

e. Comments on the Relationship to Measurement Precision

Other commenters suggested that, as did commenters on the thresholds used in CAIR, EPA should take into consideration the measurement precision of existing $PM_{2.5}$ monitors in setting the thresholds for the Transport Rule. EPA disagrees that monitoring precision is relevant to determining the amount of modeled $PM_{2.5}$ or ozone that should be considered to be a ''contribution'' from upwind states since states are not required to, nor would it be possible for them to, measure their individual state impacts on downwind receptors. The approach for eliminating significant contribution is based on the implementation of enforceable emissions budgets and not on a measurement of ambient air quality. Thus, EPA believes it is a reasonable exercise of its discretion to de-couple monitoring precision from the choice of contribution states.

f. Comments Related to the CAIR Court Decision

Commenters recommended that EPA should have retained the criteria used for CAIR because those values were upheld by the Court. As noted above, EPA could not have used the approach for annual $PM_{2.5}$ that was used in CAIR to develop a 24-hour $PM_{2.5}$ threshold, as that approach would have yielded a threshold value of zero for 24-hour $PM_{2.5}$.

Further, nothing in the *North Carolina* opinion suggests that the thresholds and methods used in CAIR were the only possible approaches EPA could have used, that they were preferable to other approaches, or that other alternatives would not be acceptable. Instead, the Court upheld the 0.2 μg/m³ threshold used for $PM_{2.5}$ on the grounds that it was not ''wholly unsupported by the record'' (*North Carolina*, 531 F.3d at 915). EPA has determined for reasons explained in the record that the thresholds used in this final rule are both reasonable and appropriate for use in this final rule.

2. Approach for Identifying Contributing Upwind States

This section documents the procedures used by EPA to quantify the contribution of emissions in specific upwind states to air quality concentrations in projected 2012 downwind nonattainment and maintenance locations for annual $PM_{2.5}$, 24-hour $PM_{2.5}$, and 8-hour ozone. In the

proposed rule EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on projected downwind nonattainment and maintenance receptors for both $PM_{2.5}$ and 8-hour ozone. In this modeling we tracked the ozone and $PM_{2.5}$ formed from 2012 base case emissions from anthropogenic sources in each upwind state in the 12 km modeling domain. The CAMx Particulate Source Apportionment Technique (PSAT) was used to calculate downwind contributions to nonattainment and maintenance of $PM_{2.5}$. In the PSAT simulation $NO_X$ emissions are tracked to particulate nitrate concentrations, $SO_2$ emissions are tracked to particulate sulfate concentrations, and primary particulates (organic carbon, elemental carbon, and other $PM_{2.5}$) are tracked as primary particulates. As described earlier in section V.A, the nitrate and sulfate contributions were combined and used to evaluate interstate contributions of $PM_{2.5}$.

The CAMx Ozone Source Apportionment Technique (OSAT) was used to calculate downwind 8-hour ozone contributions to nonattainment and maintenance. OSAT tracks the formation of ozone from $NO_X$ and VOC emissions.

*Comment:* Three commenters stated that the CAMx source apportionment techniques used for the proposed rule reflect state-of-the science technologies and are appropriate for evaluating interstate transport. One commenter asked that EPA do more to demonstrate that the PSAT and OSAT techniques give reliable answers, although no suggestions were provided on how this might be done. Another commenter said that the results of the contribution analyses were consistent with the results of their scientific research.

*Response:* EPA is not changing its conclusion that the CAMx source apportionment techniques are appropriate for quantifying interstate transport. The strength of the source apportionment technique is that all modeled ozone and/or $PM_{2.5}$ mass at a given location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources. No commenters provided technically valid analyses indicating that EPA's use of CAMx source apportionment techniques are inappropriate for the purposes of the Transport Rule.

*Comment:* We received comments that certain states included in the proposed rule should be excluded from the final rule because EPA had overstated the 2012 emissions in these

states. Commenter requested that we redo the contribution modeling using 2012 base case emission inventories that are revised based on proposed rule comments. Several commenters also asked that EPA update the contribution modeling analyses using the latest version of CAMx.

*Response:* In response to these comments, we have rerun our source apportionment modeling for $PM_{2.5}$ and ozone for the 2012 base case using the updated emission inventories described above in section V.C.1 and the latest version of CAMx, version 5.30.

The states EPA analyzed for interstate contributions for ozone and for $PM_{2.5}$ for the final rule are: Alabama, Arkansas, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,[31] Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, West Virginia, and Wisconsin.[32] These are the same states that EPA analyzed for the proposed rule.

For the proposed rule, we used a relative approach for calculating the contributions to downwind nonattainment and maintenance receptors from the outputs of the source apportionment modeling. As part of this approach, the source apportionment predictions are combined with measurement-based concentrations to calculate the contributions from each state to nonattainment and/or maintenance receptors. This is similar to the approach used to calculate future year design values, as described in section V.C.2.

*Comment:* One commenter said that using the source apportionment modeling predictions in a relative sense strengthens the determination of contributions and addresses an important source of uncertainty. There were no comments that suggested an alternative approach.

*Response:* For the final Transport Rule we are applying the relative approach developed for the proposed rule to calculate contributions from each state to downwind nonattainment and maintenance receptors.

As noted above, for the final rule we modeled the updated 2012 base case emissions using CAMx v5.30 to determine the contributions from emissions in upwind states to nonattainment and maintenance sites in downwind states. Contributions to nonattainment and maintenance receptors are evaluated independently for each state to determine if the contributions are at or above the threshold criteria.

For each upwind state, the maximum contribution to nonattainment is calculated based on the single largest contribution to a future year (2012) downwind nonattainment receptor. The maximum contribution to maintenance is calculated based on the single largest contribution to a future year (2012) downwind maintenance receptor. Since the contributions are calculated independently for each receptor, the upwind contribution to maintenance can sometimes be larger than the contribution to nonattainment, and vice versa. This also means that maximum contributions to nonattainment can be below the threshold while maximum contributions to maintenance may be at or above the threshold, or vice versa.

V.D.2.a. Estimated Interstate Contributions to Annual $PM_{2.5}$ and 24-Hour $PM_{2.5}$

In this section, we present the interstate contributions from emissions in upwind states to downwind nonattainment and maintenance sites for the annual $PM_{2.5}$ NAAQS and the 24-hour $PM_{2.5}$ NAAQS based on modeling updated for the final rule. As described previously in section V.D.1, states which contribute 0.15 $\mu g/m^3$ or more to annual $PM_{2.5}$ nonattainment or maintenance in another state are identified as states with contributions large enough to warrant further analysis. For 24-hour $PM_{2.5}$, states which contribute 0.35 $\mu g/m^3$ or more to 24-hour $PM_{2.5}$ nonattainment or maintenance in another state are identified as states with contributions to downwind nonattainment and maintenance sites large enough to warrant further analysis.

For annual $PM_{2.5}$, we calculated each state's contribution to each of the 12 monitoring sites that are projected to be nonattainment and each of the 4 sites that are projected to have maintenance problems for the annual $PM_{2.5}$ NAAQS in the 2012 base case. A detailed

---

[31] As in the proposal, EPA has combined the contributions from Maryland and the District of Columbia as a single entity in our contribution analysis for the final rule. EPA believes that this is a fair representation of emissions for transport analysis because of the small size of the District of Columbia and its close proximity to Maryland. However, the District of Columbia is not included in the Transport Rule due to the significant contribution analysis findings in section VI.D.

[32] There were also several other states that are only partially contained within the 12 km modeling domain (i.e., Colorado, Montana, New Mexico, and Wyoming). However, EPA did not individually track the emissions or assess the contribution from emissions in these states.

description of the calculations can be found in the Air Quality Modeling Final Rule TSD. The largest contribution from each state to annual $PM_{2.5}$ nonattainment in downwind sites is provided in Table V.D–1. The Largest Contribution from Each State to Annual $PM_{2.5}$ maintenance in downwind sites is also provided in Table V.D–1. The contributions from each state to all projected 2012 nonattainment and maintenance sites for the annual $PM_{2.5}$ NAAQS are provided in the Air Quality Modeling Final Rule TSD.

TABLE V.D–1—LARGEST CONTRIBUTION TO DOWNWIND ANNUAL $PM_{2.5}$ (μG/M³) NONATTAINMENT AND MAINTENANCE FOR EACH OF 37 STATES

| Upwind state | Largest downwind contribution to non-attainment for annual $PM_{2.5}$ (μg/m³) | Largest downwind contribution to maintenance for annual $PM_{2.5}$ (μg/m³) |
|---|---|---|
| Alabama | 0.51 | 0.19 |
| Arkansas | 0.10 | 0.04 |
| Connecticut | 0.00 | 0.00 |
| Delaware | 0.00 | 0.00 |
| Florida | 0.08 | 0.01 |
| Georgia | 0.46 | 0.13 |
| Illinois | 0.50 | 0.65 |
| Indiana | 1.34 | 1.27 |
| Iowa | 0.26 | 0.14 |
| Kansas | 0.09 | 0.04 |
| Kentucky | 0.94 | 0.81 |
| Louisiana | 0.09 | 0.03 |
| Maine | 0.00 | 0.00 |
| Maryland | 0.15 | 0.06 |
| Massachusetts | 0.00 | 0.00 |
| Michigan | 0.64 | 0.64 |
| Minnesota | 0.14 | 0.09 |
| Mississippi | 0.05 | 0.01 |
| Missouri | 1.22 | 0.27 |
| Nebraska | 0.06 | 0.03 |
| New Hampshire | 0.00 | 0.00 |
| New Jersey | 0.02 | 0.01 |
| New York | 0.21 | 0.21 |
| North Carolina | 0.20 | 0.06 |
| North Dakota | 0.06 | 0.04 |
| Ohio | 1.34 | 0.94 |
| Oklahoma | 0.08 | 0.03 |
| Pennsylvania | 0.54 | 0.54 |
| Rhode Island | 0.00 | 0.00 |
| South Carolina | 0.24 | 0.04 |
| South Dakota | 0.03 | 0.01 |
| Tennessee | 0.32 | 0.32 |
| Texas | 0.18 | 0.07 |
| Vermont | 0.00 | 0.00 |
| Virginia | 0.12 | 0.06 |
| West Virginia | 0.95 | 0.40 |
| Wisconsin | 0.22 | 0.19 |

Based on the state-by-state contribution analysis, there are 18 states [33] which contribute 0.15 μg/m³ or more to downwind annual $PM_{2.5}$ nonattainment. These states are: Alabama, Georgia, Illinois, Indiana, Iowa, Kentucky, Maryland, Michigan, Missouri, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin. In Table V.D–2, we provide a list of the downwind nonattainment sites to which each upwind state contributes 0.15 μg/m³ or more (*i.e.,* the upwind state to downwind nonattainment "linkages").

There are 12 states which contribute 0.15 μg/m³ or more to downwind annual $PM_{2.5}$ maintenance. These states are: Alabama, Illinois, Indiana, Kentucky, Michigan, Missouri, New York, Ohio, Pennsylvania, Tennessee, West Virginia, and Wisconsin. In Table V.D–3, we provide a list of the downwind maintenance sites to which each upwind state contributes 0.15 μg/m³ or more (*i.e.,* the upwind state to downwind maintenance "linkages").

---

[33] As in the proposal, EPA has combined the contributions from Maryland and the District of Columbia as a single entity in our contribution analysis for the final rule. EPA believes that this is a fair representation of emissions for transport analysis because of the small size of the District of Columbia and its close proximity to Maryland. However, the District of Columbia is not included in the Transport Rule due to the significant contribution analysis findings in section VI.D.

TABLE V.D–2—UPWIND STATE TO DOWNWIND NONATTAINMENT SITE "LINKAGES" FOR ANNUAL PM$_{2.5}$

| Upwind state | Downwind receptor sites | | | |
|---|---|---|---|---|
| Alabama | Fulton, GA (131210039) | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001). |
| Georgia | Jefferson, AL (10730023) | Jefferson, AL (10732003). | | |
| Illinois | Jefferson, AL (10732003) | Fulton, GA (131210039) | Wayne, MI (261630033) | Cuyahoga, OH (390350038). |
| | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350060) | Hamilton, OH (390610014) .. | Hamilton, OH (390610042). |
| | Hamilton, OH (390618001) | Allegheny, PA (420030064). | | |
| Indiana | Jefferson, AL (10730023) | Jefferson, AL (10732003) | Fulton, GA (131210039) | Madison, IL (171191007). |
| | Wayne, MI (261630033) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350060). |
| | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001) .. | Allegheny, PA (420030064). |
| Iowa | Madison, IL (171191007). | | | |
| Kentucky | Jefferson, AL (10730023) | Jefferson, AL (10732003) | Fulton, GA (131210039) | Madison, IL (171191007). |
| | Wayne, MI (261630033) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350060). |
| | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001) .. | Allegheny, PA (420030064). |
| Maryland | Allegheny, PA (420030064). | | | |
| Michigan | Madison, IL (171191007) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350060). |
| | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001) .. | Allegheny, PA (420030064). |
| Missouri | Madison, IL (171191007) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350060). |
| | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001). | |
| New York | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350060) | Allegheny, PA (420030064). |
| North Carolina | Fulton, GA (131210039). | | | |
| Ohio | Jefferson, AL (10730023) | Jefferson, AL (10732003) | Fulton, GA (131210039) | Madison, IL (171191007). |
| | Wayne, MI (261630033) | Allegheny, PA (420030064). | | |
| Pennsylvania | Fulton, GA (131210039) | Wayne, MI (261630033) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045). |
| | Cuyahoga, OH (390350060) | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001). |
| South Carolina | Fulton, GA (131210039). | | | |
| Tennessee | Jefferson, AL (10730023) | Jefferson, AL (10732003) | Fulton, GA (131210039) | Madison, IL (171191007). |
| | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001). | |
| Texas | Madison, IL (171191007). | | | |
| West Virginia | Fulton, GA (131210039) | Wayne, MI (261630033) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045). |
| | Cuyahoga, OH (390350060) | Hamilton, OH (390610014) .. | Hamilton, OH (390610042) .. | Hamilton, OH (390618001). |
| | Allegheny, PA (420030064). | | | |
| Wisconsin | Madison, IL (171191007) | Wayne, MI (261630033) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350045) |
| | Cuyahoga, OH (390350060) | Hamilton, OH (390610014) .. | Hamilton, OH (390618001). | |

TABLE V.D–3—UPWIND STATE TO DOWNWIND MAINTENANCE SITE "LINKAGES" FOR ANNUAL PM$_{2.5}$

| Upwind state | Downwind receptor sites | | | |
|---|---|---|---|---|
| Alabama | Marion, IN (180970081) | Marion, IN (180970083) | Hamilton, OH (390617001). | |
| Illinois | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |
| Indiana | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). | | |
| Kentucky | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |
| Michigan | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |
| Missouri | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |
| New York | Cuyahoga, OH (390350065). | | | |
| Ohio | Marion, IN (180970081) | Marion, IN (180970083). | | |
| Pennsylvania | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |
| Tennessee | Marion, IN (180970081) | Marion, IN (180970083) | Hamilton, OH (390617001). | |
| West Virginia | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |
| Wisconsin | Marion, IN (180970081) | Marion, IN (180970083) | Cuyahoga, OH (390350065) | Hamilton, OH (390617001). |

For 24-hour PM$_{2.5}$, we calculated each state's contribution to each of the 20 monitoring sites that are projected to be nonattainment and each of the 21 sites that are projected to have maintenance problems for the 24-hour PM$_{2.5}$ NAAQS in the 2012 base case. A detailed description of the calculations can be found in the Air Quality Modeling Final Rule TSD. The largest contribution from each state to 24-hour PM$_{2.5}$ nonattainment in downwind sites is provided in Table V.D–4. The largest contribution from each state to 24-hour PM$_{2.5}$ maintenance in downwind sites is also provided in Table V.D–4. The contributions from each state to all projected 2012 nonattainment and maintenance sites for the 24-hour PM$_{2.5}$ NAAQS are provided in the Air Quality Modeling Final Rule TSD.

TABLE V.D–4—LARGEST CONTRIBUTION TO DOWNWIND 24-HOUR PM$_{2.5}$ (µG/M$^3$) NONATTAINMENT AND MAINTENANCE FOR EACH OF 37 STATES

| Upwind state | Largest downwind contribution to non-attainment for 24-hour PM$_{2.5}$ (µg/m$^3$) | Largest downwind contribution to maintenance for 24-hour PM$_{2.5}$ (µg/m$^3$) |
|---|---|---|
| Alabama | 0.51 | 0.42 |

TABLE V.D–4—LARGEST CONTRIBUTION TO DOWNWIND 24-HOUR PM$_{2.5}$ (µG/M³) NONATTAINMENT AND MAINTENANCE FOR EACH OF 37 STATES—Continued

| Upwind state | Largest downwind contribution to non-attainment for 24-hour PM$_{2.5}$ (µg/m³) | Largest downwind contribution to maintenance for 24-hour PM$_{2.5}$ (µg/m³) |
|---|---|---|
| Arkansas | 0.24 | 0.23 |
| Connecticut | 0.10 | 0.18 |
| Delaware | 0.22 | 0.20 |
| Florida | 0.07 | 0.03 |
| Georgia | 1.10 | 0.92 |
| Illinois | 3.72 | 5.70 |
| Indiana | 3.56 | 5.15 |
| Iowa | 0.82 | 1.55 |
| Kansas | 0.37 | 0.81 |
| Kentucky | 4.38 | 3.58 |
| Louisiana | 0.11 | 0.13 |
| Maine | 0.06 | 0.10 |
| Maryland | 2.83 | 2.11 |
| Massachusetts | 0.19 | 0.30 |
| Michigan | 1.86 | 2.03 |
| Minnesota | 0.61 | 1.01 |
| Mississippi | 0.06 | 0.07 |
| Missouri | 3.73 | 3.71 |
| Nebraska | 0.24 | 0.52 |
| New Hampshire | 0.05 | 0.10 |
| New Jersey | 0.68 | 0.75 |
| New York | 0.83 | 1.34 |
| North Carolina | 0.40 | 0.38 |
| North Dakota | 0.21 | 0.33 |
| Ohio | 5.85 | 4.74 |
| Oklahoma | 0.17 | 0.20 |
| Pennsylvania | 2.85 | 2.29 |
| Rhode Island | 0.02 | 0.03 |
| South Carolina | 0.29 | 0.25 |
| South Dakota | 0.10 | 0.17 |
| Tennessee | 1.38 | 1.30 |
| Texas | 0.37 | 0.33 |
| Vermont | 0.03 | 0.05 |
| Virginia | 1.21 | 1.01 |
| West Virginia | 4.02 | 3.33 |
| Wisconsin | 0.69 | 0.97 |

Based on the state-by-state contribution analysis, there are 21 states[34] which contribute 0.35 µg/m³ or more to downwind 24-hour PM$_{2.5}$ nonattainment. These states are: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.

In Table V.D–5, we provide a list of the downwind nonattainment counties to which each upwind state contributes 0.35 µg/m³ or more (*i.e.,* the upwind state to downwind nonattainment "linkages").

There are 21 states which contribute 0.35 µg/m³ or more to downwind 24-hour PM$_{2.5}$ maintenance. These states are: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland,

Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and Wisconsin. In Table V.D–6, we provide a list of the downwind maintenance sites to which each upwind state contributes 0.35 µg/m³ or more (*i.e.,* the upwind state to downwind maintenance "linkages").

TABLE V.D–5—UPWIND STATE TO DOWNWIND NONATTAINMENT SITE "LINKAGES" FOR 24-HOUR PM$_{2.5}$

| Upwind state | Downwind receptor sites | | | |
|---|---|---|---|---|
| Alabama | Marion, IN (180970043) | Marion, IN (180970066) | Marion, IN (180970081). | |
| Georgia | Jefferson, AL (10730023). | | | |
| Illinois | Marion, IN (180970043) | Marion, IN (180970066) | Marion, IN (180970081) | St Clair, MI (261470005). |
| | Wayne, MI (261630015) | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033). |
| | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350060) | Allegheny, PA (420030064) | Allegheny, PA (420030093). |
| | Allegheny, PA (420030116) | Beaver, PA (420070014) | Brooke, WV (540090011) | Milwaukee, WI (550790043). |

---

[34] As in the proposal, EPA has combined the contributions from Maryland and the District of Columbia as a single entity in our contribution analysis for the final rule. EPA believes that this is a fair representation of emissions for transport analysis because of the small size of the District of Columbia and its close proximity to Maryland. However, the District of Columbia is not included in the Transport Rule due to the significant contribution analysis findings in section VI.D.

TABLE V.D–5—UPWIND STATE TO DOWNWIND NONATTAINMENT SITE "LINKAGES" FOR 24-HOUR $PM_{2.5}$—Continued

| | | | | |
|---|---|---|---|---|
| Indiana | Jefferson, AL (10730023) | Cook, IL (170311016) | Madison, IL (171191007) | St Clair, MI (261470005). |
| | Wayne, MI (261630015) | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033). |
| | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350060) | Allegheny, PA (420030064) | Allegheny, PA (420030093). |
| | Allegheny, PA (420030116) | Beaver, PA (420070014) | Brooke, WV (540090011) | Milwaukee, WI (550790043). |
| Iowa | Cook, IL (170311016) | | | |
| Kansas | Madison, IL (171191007). | | | |
| Kentucky | Jefferson, AL (10730023) | Cook, IL (170311016) | Madison, IL (171191007) | Marion, IN (180970043). |
| | Marion, IN (180970066) | Marion, IN (180970081) | St Clair, MI (261470005) | Wayne, MI (261630015). |
| | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033) | Cuyahoga, OH (390350038). |
| | Cuyahoga, OH (390350060) | Allegheny, PA (420030064) | Allegheny, PA (420030093) | Allegheny, PA (420030116). |
| | Beaver, PA (420070014) | Brooke, WV (540090011) | Milwaukee, WI (550790043). | |
| Maryland | Cuyahoga, OH (390350038) | Lancaster, PA (420710007). | | |
| Michigan | Cook, IL (170311016) | Madison, IL (171191007) | Cuyahoga, OH (390350038) | Cuyahoga, OH (390350060). |
| | Allegheny, PA (420030064) | Allegheny, PA (420030093) | Beaver, PA (420070014) | Brooke, WV (540090011). |
| | Milwaukee, WI (550790043). | | | |
| Minnesota | Milwaukee, WI (550790043). | | | |
| Missouri | Cook, IL (170311016) | Madison, IL (171191007) | Marion, IN (180970043) | Marion, IN (180970066). |
| | Marion, IN (180970081) | St Clair, MI (261470005) | Wayne, MI (261630015) | Allegheny, PA (420030064). |
| | Allegheny, PA (420030116) | Beaver, PA (420070014) | Milwaukee, WI (550790043). | |
| New Jersey | Lancaster, PA (420710007). | | | |
| New York | St Clair, MI (261470005) | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033). |
| | Cuyahoga, OH (390350060) | Lancaster, PA (420710007). | | |
| North Carolina | Lancaster, PA (420710007). | | | |
| Ohio | Jefferson, AL (10730023) | Cook, IL (170311016) | Madison, IL (171191007) | Marion, IN (180970043). |
| | Marion, IN (180970081) | Marion, IN (180970081) | St Clair, MI (261470005) | Wayne, MI (261630015). |
| | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033) | Allegheny, PA (420030064). |
| | Allegheny, PA (420030093) | Allegheny, PA (420030116) | Beaver, PA (420070014) | Lancaster, PA (420710007). |
| | Brooke, WV (540090011) | Milwaukee, WI (550790043). | | |
| Pennsylvania | Jefferson, AL (10730023) | Cook, IL (170311016) | Madison, IL (171191007) | Marion, IN (180970043). |
| | Marion, IN (180970066) | Marion, IN (180970081) | St Clair, MI (261470005) | Wayne, MI (261630015). |
| | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033) | Cuyahoga, OH (390350038). |
| | Cuyahoga, OH (390350060) | Brooke, WV (540090011) | Milwaukee, WI (550790043).. | |
| Tennessee | Jefferson, AL (10730023) | Madison, IL (171191007) | Marion, IN (180970043) | Marion, IN (180970066). |
| | Marion, IN (180970081) | St Clair, MI (261470005) | Wayne, MI (261630015) | Wayne, MI (261630033). |
| | Cuyahoga, OH (390350038) | Allegheny, PA (420030116). | | |
| Texas | Madison, IL (171191007). | | | |
| Virginia | Lancaster, PA (420710007). | | | |
| West Virginia | Jefferson, AL (10730023) | Cook, IL (170311016) | Madison, IL (171191007) | Marion, IN (180970043). |
| | Marion, IN (180970081) | Marion, IN (180970081) | St Clair, MI (261470005) | Wayne, MI (261630015). |
| | Wayne, MI (261630016) | Wayne, MI (261630019) | Wayne, MI (261630033) | Cuyahoga, OH (390350038). |
| | Cuyahoga, OH (390350060) | Allegheny, PA (420030093) | Allegheny, PA (420030064) | Allegheny, PA (420030116). |
| | Beaver, PA (420070014) | Lancaster, PA (420710007) | Milwaukee, WI (550790043). | |
| Wisconsin | Cook, IL (170311016) | Wayne, MI (261630019) | Wayne, MI (261630033). | |

TABLE V.D–6—UPWIND STATE TO DOWNWIND MAINTENANCE SITE "LINKAGES" FOR 24-HOUR $PM_{2.5}$

| Upwind state | Downwind receptor sites | | | |
|---|---|---|---|---|
| Alabama | Washtenaw, MI (261610008) | Butler, OH (390170003) | Montgomery, OH (391130032). | |
| Georgia | Jefferson, AL (10732003). | | | |
| Illinois | Lake, IN (180890026) | Lake, IN (180890026) | Washtenaw, MI (261610008) | Butler, OH (390170003). |
| | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065) | Hamilton, OH (390618001) | Jefferson, OH (390811001). |
| | Montgomery, OH (391130032) | Allegheny, PA (420031008) | Allegheny, PA (420031301) | Allegheny, PA (420033007). |
| | York, PA (421330008) | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | |
| Indiana | Jefferson, AL (10732003) | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301). |
| | Cook, IL (170316005) | Madison, IL (171190023) | Washtenaw, MI (261610008) | Butler, OH (390170003). |
| | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065) | Hamilton, OH (390618001) | Jefferson, OH (390811001). |
| | Montgomery, OH (391130032) | Allegheny, PA (420031008) | Allegheny, PA (420031301) | Allegheny, PA (420033007). |
| | York, PA (421330008) | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | |
| Iowa | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301) | Cook, IL (170316005). |
| | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026) | Milwaukee, WI (550790010). |
| | Milwaukee, WI (550790026). | | | |
| Kansas | Cook, IL (170310052) | Cook, IL (170316005) | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). |
| Kentucky | Jefferson, AL (10732003) | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301). |
| | Cook, IL (170316005) | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026). |
| | Washtenaw, MI (261610008) | Butler, OH (390170003) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065). |
| | Hamilton, OH (390618001) | Jefferson, OH (390811001) | Montgomery, OH (391130032). | Allegheny, PA (420031008). |
| | Allegheny, PA (420031301) | Allegheny, PA (420033007) | York, PA (421330008) | Milwaukee, WI (550790010). |
| | Milwaukee, WI (550790026). | | | |

TABLE V.D–6—UPWIND STATE TO DOWNWIND MAINTENANCE SITE "LINKAGES" FOR 24-HOUR PM₂.₅—Continued

| | | | | |
|---|---|---|---|---|
| Maryland | York, PA (421330008). | | | |
| Michigan | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301) | Cook, IL (170316005). |
| | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026) | Butler, OH (390170003). |
| | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065) | Hamilton, OH (390618001) | Jefferson, OH (390811001). |
| | Montgomery, OH (391130032). | Allegheny, PA (420031008) | Allegheny, PA (420031301) | Allegheny, PA (420033007). |
| | York, PA (421330008) | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | |
| | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | | |
| Minnesota | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301) | Cook, IL (170316005). |
| Missouri | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026) | Washtenaw, MI (261610008). |
| | Butler, OH (390170003) | Hamilton, OH (390618001) | Montgomery, OH (391130032). | Allegheny, PA (420031008). |
| | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | | |
| Nebraska | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | | |
| New Jersey | York, PA (421330008). | | | |
| New York | Washtenaw, MI (261610008) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065) | York, PA (421330008). |
| North Carolina | York, PA (421330008). | | | |
| Ohio | Jefferson, AL (10732003) | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301). |
| | Cook, IL (170316005) | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026). |
| | Washtenaw, MI (261610008) | Allegheny, PA (420031008) | Allegheny, PA (420031301) | Allegheny, PA (420033007). |
| | York, PA (421330008) | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). | |
| Pennsylvania | Jefferson, AL (10732003) | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301). |
| | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026) | Washtenaw, MI (261610008). |
| | Butler, OH (390170003) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065) | Hamilton, OH (390618001). |
| | Jefferson, OH (390811001) | Montgomery, OH (391130032). | Milwaukee, WI (550790010) | Milwaukee, WI (550790026). |
| Tennessee | Jefferson, AL (10732003) | Madison, IL (171190023) | Washtenaw, MI (261610008) | Butler, OH (390170003). |
| | Cuyahoga, OH (390350065) | Hamilton, OH (390618001) | Montgomery, OH (391130032). | |
| Virginia | York, PA (421330008). | | | |
| West Virginia | Jefferson, AL (10732003) | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301). |
| | Madison, IL (171190023) | Lake, IN (180890022) | Lake, IN (180890026) | Washtenaw, MI (261610008). |
| | Butler, OH (390170003) | Cuyahoga, OH (390350045) | Cuyahoga, OH (390350065) | Hamilton, OH (390618001). |
| | Jefferson, OH (390811001) | Montgomery, OH (391130032). | Allegheny, PA (420031008) | Allegheny, PA (420031301). |
| | Allegheny, PA (420033007) | York, PA (421330008) | Milwaukee, WI (550790010). | |
| Wisconsin | Cook, IL (170310052) | Cook, IL (170312001) | Cook, IL (170313301) | Cook, IL (170316005). |
| | Lake, IN (180890022) | Lake, IN (180890026). | | |

## b. Estimated Interstate Contributions to 8-Hour Ozone

In this section, we present the interstate contributions from emissions in upwind states to downwind nonattainment and maintenance sites for the ozone NAAQS. As described previously in section V.D.1, states which contribute 0.8 ppb or more to 8-hour ozone nonattainment or maintenance in another state are identified as states with contributions to

downwind attainment and maintenance sites large enough to warrant further analysis.

We calculated each state's contribution to ozone at each of the 4 monitoring sites that are projected to be nonattainment and each of 6 [35] sites that are projected to have maintenance problems for the 8-hour ozone NAAQS in the 2012 base case. A detailed description of the calculations can be found in the Air Quality Modeling Final

Rule TSD. The largest contribution from each state to 8-hour ozone nonattainment in downwind sites is provided in Table V.D–7. The largest contribution from each state to 8-hour ozone maintenance in downwind sites is also provided in Table V.D.2–7. The contributions from each state to all projected 2012 nonattainment and maintenance sites for the 8-hour ozone NAAQS are provided in the Air Quality Modeling Final Rule TSD.

TABLE V.D–7—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE FOR EACH OF 37 STATES

| Upwind state | Largest downwind contribution to nonattainment for ozone (ppb) | Largest downwind contribution to maintenance for ozone (ppb) |
|---|---|---|
| Alabama | 4.0 | 2.8 |
| Arkansas | 2.1 | 2.0 |

---

[35] There are 6 additional sites with projected 2012 nonattainment or maintenance (Harris Co., Texas sites 482010024, 482010062, 482010066,

482011015, 482011035, and 482011039) for which there are less than 5 days with 8-hour ozone

predictions of at least 70 ppb. Thus, we did not calculate contributions for these 6 sites.

TABLE V.D–7—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE FOR EACH OF 37 STATES—Continued

| Upwind state | Largest downwind contribution to nonattainment for ozone (ppb) | Largest downwind contribution to maintenance for ozone (ppb) |
|---|---|---|
| Connecticut | 0.0 | 0.2 |
| Delaware | 0.0 | 0.6 |
| Florida | 0.5 | 3.6 |
| Georgia | 1.6 | 2.8 |
| Illinois | 1.9 | 26.8 |
| Indiana | 1.3 | 9.4 |
| Iowa | 0.6 | 0.9 |
| Kansas | 0.5 | 1.0 |
| Kentucky | 1.6 | 1.6 |
| Louisiana | 8.0 | 11.1 |
| Maine | 0.0 | 0.0 |
| Maryland | 0.0 | 2.7 |
| Massachusetts | 0.0 | 0.6 |
| Michigan | 0.0 | 0.9 |
| Minnesota | 0.3 | 0.2 |
| Mississippi | 4.0 | 3.3 |
| Missouri | 1.1 | 4.8 |
| Nebraska | 0.2 | 0.2 |
| New Hampshire | 0.0 | 0.1 |
| New Jersey | 0.0 | 11.5 |
| New York | 0.0 | 18.8 |
| North Carolina | 0.5 | 1.3 |
| North Dakota | 0.2 | 0.1 |
| Ohio | 0.1 | 3.2 |
| Oklahoma | 0.3 | 2.8 |
| Pennsylvania | 0.1 | 8.2 |
| Rhode Island | 0.0 | 0.0 |
| South Carolina | 0.4 | 0.9 |
| South Dakota | 0.1 | 0.1 |
| Tennessee | 2.2 | 1.1 |
| Texas | 3.9 | 1.9 |
| Vermont | 0.0 | 0.0 |
| Virginia | 0.2 | 8.2 |
| West Virginia | 0.0 | 2.8 |
| Wisconsin | 0.2 | 2.2 |

Based on the state-by-state contribution analysis, there are 11 states that contribute 0.8 ppb or more to downwind 8-hour ozone nonattainment. These states are: Alabama, Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Tennessee, and Texas.[36] In Table V.D–8, we provide a list of the downwind nonattainment counties to which each upwind state contributes 0.8 ppb or more (*i.e.,* the upwind state to downwind nonattainment "linkages").

There are 26 states [37] which contribute 0.8 ppb or more to downwind 8-hour ozone maintenance. These states are: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.[38] In Table V.D.2–9, we provide a list of the downwind nonattainment counties to which each upwind state contributes 0.8 ppb or more (*i.e.,* the upwind state to downwind nonattainment "linkages").

[36] As discussed in section III, EPA is issuing a supplemental notice of proposed rulemaking to provide an opportunity for public comment on our conclusion that emissions from Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin significantly contribute to nonattainment or interfere with maintenance of the 1997 ozone NAAQS in other states.

[37] As in the proposal, EPA has combined the contributions from Maryland and the District of Columbia as a single entity in our contribution analysis for the final rule. EPA believes that this is a fair representation of emissions for transport analysis because of the small size of the District of Columbia and its close proximity to Maryland. However, the District of Columbia is not included in the Transport Rule due to the significant contribution analysis findings in section VI.D.

[38] As discussed in section III, EPA is issuing a supplemental notice of proposed rulemaking to provide an opportunity for public comment on our conclusion that emissions from Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin significantly contribute to nonattainment or interfere with maintenance of the 1997 ozone NAAQS in other states.

TABLE V.D–8—UPWIND STATE TO DOWNWIND NONATTAINMENT "LINKAGES" FOR 8-HOUR OZONE

| Upwind state | Downwind receptor sites | | | |
|---|---|---|---|---|
| Alabama | East Baton Rouge, LA (220330003). | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). |
| Arkansas | East Baton Rouge, LA (220330003). | Brazoria, TX (480391004). | | |
| Georgia | East Baton Rouge, LA (220330003). | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). |
| Illinois | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). | |
| Indiana | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). | |
| Kentucky | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). | |
| Louisiana | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). | |
| Mississippi | East Baton Rouge, LA (220330003). | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). |
| Missouri | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). | |
| Tennessee | East Baton Rouge, LA (220330003). | Brazoria, TX (480391004) | Harris, TX (482010051) | Harris, TX (482010055). |
| Texas | East Baton Rouge, LA (220330003). | | | |

TABLE V.D–9—UPWIND STATE TO DOWNWIND MAINTENANCE "LINKAGES" FOR 8-HOUR OZONE

| Upwind state | Downwind receptor sites | | | |
|---|---|---|---|---|
| Alabama | Harris, TX (482010029) | Harris, TX (482011050). | | |
| Arkansas | Allegan, MI (260050003). | | | |
| Florida | Harris, TX (482010029) | Harris, TX (482011050). | | |
| Georgia | Harris, TX (482010029) | Harris, TX (482011050). | | |
| Illinois | Fairfield, CT (90011123) | Allegan, MI (260050003) | Harris, TX (482011050). | |
| Indiana | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001) | Allegan, MI (260050003). |
| Iowa | Allegan, MI (260050003). | | | |
| Kansas | Allegan, MI (260050003). | | | |
| Kentucky | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001) | Harris, TX (482011050). |
| Louisiana | Harris, TX (482010029) | Harris, TX (482011050). | | |
| Maryland | Fairfield, CT (90011123) | New Haven, CT (90093002). | | |
| Michigan | Harford, MD (240251001). | | | |
| Mississippi | Harris, TX (482010029) | Harris, TX (482011050). | | |
| Missouri | Allegan, MI (260050003). | | | |
| New Jersey | Fairfield, CT (90011123) | New Haven, CT (90093002). | | |
| New York | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001). | |
| North Carolina | New Haven, CT (90093002) | Harford, MD (240251001). | | |
| Ohio | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001). | |
| Oklahoma | Allegan, MI (260050003). | | | |
| Pennsylvania | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001). | |
| South Carolina | Harris, TX (482010029). | | | |
| Tennessee | Fairfield, CT (90011123) | Harford, MD (240251001) | Harris, TX (482011050). | |
| Texas | Allegan, MI (260050003). | | | |
| Virginia | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001). | |
| West Virginia | Fairfield, CT (90011123) | New Haven, CT (90093002) | Harford, MD (240251001). | |
| Wisconsin | Allegan, MI (260050003). | | | |

## VI. Quantification of State Emission Reductions Required

### A. Cost and Air Quality Structure for Defining Reductions

1. Summary

Section V, above, describes EPA's approach to identifying upwind states with air quality contributions that meet or exceed the air quality thresholds discussed therein for each of the NAAQS addressed in this rule. A state is covered by the Transport Rule if its contributions meet or exceed one of those air quality thresholds and the Agency identifies, using the cost- and air quality-based approach described

below, emissions within the state that constitute the state's significant contribution to nonattainment and interference with maintenance with respect to the 1997 ozone, 1997 $PM_{2.5}$ or 2006 $PM_{2.5}$ NAAQS.

In this section, EPA explains its final cost- and air quality-based approach to quantify the amount of emissions that represent significant contribution to nonattainment and interference with maintenance for each state. EPA then applies that approach for the three different NAAQS being addressed in this rule: The 1997 ozone NAAQS, the 1997 annual $PM_{2.5}$ NAAQS and the 2006 24-hour $PM_{2.5}$ NAAQS. EPA believes that the methodology finalized could

also be used to address transport concerns under other NAAQS, including future revisions to the ozone and $PM_{2.5}$ NAAQS.

EPA applies the methodology described herein to fully quantify the emissions that constitute each covered state's significant contribution to nonattainment and interference with maintenance with respect to the 1997 annual $PM_{2.5}$ and the 2006 24-hour $PM_{2.5}$ NAAQS. The FIPs with respect to the annual and 24-hour $PM_{2.5}$ NAAQS that are finalized in this action ensure that all such emissions are prohibited. Each such FIP thus fully satisfies the requirements of 110(a)(2)(D)(i)(I) with

respect to the annual and/or 24-hour $PM_{2.5}$ NAAQS for the covered state.

EPA also applies the methodology to quantify significant contribution to nonattainment and interference with maintenance with respect to the 1997 ozone NAAQS. However, we have not been able to fully quantify such emissions for all covered states. In this action, EPA fully quantifies the significant contribution to nonattainment and interference with maintenance for 15 states. We finalize FIPs with respect to the 1997 ozone standards for 10 of these 15 states (Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, and West Virginia). We are also publishing a supplemental notice of rulemaking to take comment on whether FIPs should be finalized for the remaining 5 states (Iowa, Kansas, Michigan, Oklahoma, and Wisconsin). The FIPs for these 10 states (and the FIPs for the remaining 5 states, if finalized) fully satisfy the requirements of 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS for the covered state.

In addition, we apply the methodology described herein to quantify, for 11 additional states, ozone-season $NO_X$ emission reductions that are necessary but may not be sufficient to eliminate all significant contribution to nonattainment and interference with maintenance in other states. We finalize FIPs with respect to the 1997 ozone standards for 10 of these 11 states (Alabama, Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Tennessee, and Texas). We are also publishing a supplemental notice of rulemaking to take comment on whether FIPs should be finalized for the remaining state (Missouri). The FIPs for these 10 states (and the FIP for the remaining state, if finalized) make measurable progress toward satisfying the requirements of 110(a)(2)(D)(i)(I) with respect to the 1997 ozone NAAQS in each covered state. To the extent that significant contribution to nonattainment and interference with maintenance is not entirely eliminated for the 1997 ozone NAAQS through today's action, EPA will address these instances in a future rulemaking. This is further explained in section VI.D.

With respect to the 1997 annual $PM_{2.5}$ NAAQS, this rule finds that 18 states have $SO_2$ and $NO_X$ emission reduction responsibilities. EPA also finds that 21 states have $SO_2$ and $NO_X$ emission reduction responsibilities with respect to the 2006 24-hour $PM_{2.5}$ NAAQS. There are a total of 23 states that have $SO_2$ and $NO_X$ emission reduction

responsibilities for one or both of the above $PM_{2.5}$ NAAQS. We apply the methodology to quantify emission reductions that these states must achieve to eliminate the state's significant contribution to nonattainment and interference with maintenance. The states are listed in Table III–1 in section III of this preamble.

This rule will prohibit all significant contribution to nonattainment and interference with maintenance with respect to the annual and 24-hour $PM_{2.5}$. In addition, it will resolve air quality issues at most nonattainment and maintenance receptors identified by EPA. EPA projects that unresolved nonattainment and maintenance issues will remain in only a few downwind states after promulgation and implementation of the Transport Rule. For the annual $PM_{2.5}$ standard, EPA projects that this rule will help assure that all areas in the east fully resolve their nonattainment and maintenance concerns. This rule will also help a number of areas achieve the standard earlier than they may have otherwise. For the 2006 24-hour $PM_{2.5}$ NAAQS, one area is projected to remain in nonattainment (Liberty-Clairton) and three areas are projected to have remaining maintenance concerns after imposition of the Transport Rule (Chicago,[39] Detroit, and Lancaster County).[40]

The methodology provides similar assistance for ozone, assuring upwind reductions that will assist downwind states in controlling ozone pollution. It reduces ozone concentration levels in 2012 and helps assure that all but two downwind areas fully resolve their nonattainment and maintenance problems with the 1997 ozone NAAQS by 2014. While Houston is projected to still face nonattainment and Baton Rouge is projected to still face maintenance concerns with the 1997 ozone NAAQS, the Transport Rule improves air quality in these two areas and provides both health benefits and assistance for these local areas in meeting the NAAQS requirements. For reasons explained below, EPA will conduct further analysis in a subsequent transport-related rulemaking to determine whether further upwind state

reductions are warranted to assist attainment and maintenance of the ozone NAAQS in Houston and Baton Rouge areas.

When EPA proposed this air-quality and cost-based multi-factor approach to identify emissions that constitute significant contribution to nonattainment and interference with maintenance from upwind states with respect to the 1997 ozone, annual $PM_{2.5}$, and 2006 24-hour $PM_{2.5}$ NAAQS, the Agency indicated that the approach was designed to be applicable to both current and potential future ozone and $PM_{2.5}$ NAAQS (75 FR 45214). EPA believes that the final Transport Rule demonstrates the value of this approach for addressing the role of interstate transport of air pollution in communities' ability to comply with current and future NAAQS. EPA believes that the Transport Rule's approach of using air-quality thresholds to determine upwind-to-downwind state linkages and using the cost- and air quality-based multi-factor approach to quantify significant contribution to nonattainment and interference with maintenance (*i.e.,* to determine the specific amount of emissions that each upwind state must reduce) could serve as a precedent for quantifying upwind state emission reduction responsibilities with respect to potential future NAAQS.

One commenter suggested that the rule could set a flawed precedent for future transport analyses and remedies, as it does not fully eliminate the prohibited emissions in every upwind state. EPA disagrees with this characterization of the Transport Rule. EPA notes that the partial determination of significant contribution to nonattainment and interference with maintenance for certain upwind states in the Transport Rule with respect to the ozone NAAQS is not a function of the multi-factor approach itself, but is instead a function of its limited application in this rulemaking to identify emission reductions from a single source category (EGUs). In fact, the Transport Rule's approach itself allowed EPA to determine for which upwind states we have identified all emissions that constitute significant contribution to nonattainment and interference with maintenance, and for which upwind states we have identified emissions that are necessary but may not be sufficient to eliminate the prohibited emissions. As EPA explained at proposal, developing the additional information needed to consider $NO_X$ emissions from non-EGU source categories in order to fully quantify upwind state responsibility with respect to the 1997 ozone NAAQS would

---

[39] This area is not currently designated as nonattainment for the 24-hour $PM_{2.5}$ standard. EPA is portraying the receptors and counties in this area as a single 24-hour maintenance area based on the annual $PM_{2.5}$ nonattainment designation of Chicago-Gary-Lake County, IL-IN.

[40] In the Transport Rule proposal, EPA noted that the Liberty-Clairton receptor in Allegheny county was significantly impacted by local emissions from a sizeable coke production facility and other nearby sources (75 FR 45281).

substantially delay promulgation of the Transport Rule. EPA explained that we do not believe that effort should delay the emission reductions and large health benefits this final rule will deliver (75 FR 45213). EPA further explained that we believe it is likely that the Agency can provide the greatest assistance to states in addressing transported pollution by issuing a separate (subsequent) rule to address additional reductions that may be necessary to fully eliminate upwind state responsibility with respect to the 1997 ozone NAAQS (75 FR 45288). Thus, EPA decided to promulgate the Transport Rule as quickly as possible. EPA anticipates that application of this air-quality and cost-based multi-factor approach to a broader set of source categories in a subsequent rulemaking will identify any remaining prohibited emissions in the upwind states for which the Transport Rule may not fully eliminate those emissions with respect to the 1997 ozone NAAQS.

2. Background

After using air quality analysis to identify upwind states that are "linked" to downwind air quality monitoring sites with nonattainment and maintenance problems through contribution of at least one percent of the relevant NAAQS, EPA quantifies the portion of each state's contribution that constitutes its "significant contribution" or "interference with maintenance."

This section describes the methodology developed by EPA for this analysis and then explains how that methodology is applied to measure significant contribution to nonattainment and interference with maintenance with respect to the NAAQS of concern. For this portion of the analysis, EPA expands upon the methodology used in the NO$_X$ SIP Call and CAIR but modifies it in important respects. In the NO$_X$ SIP Call and CAIR, EPA's methodology defined significant contribution as those emissions that could be removed with the use of "highly cost effective" controls. In the Transport Rule, rather than relying solely on an analysis of what constitutes "highly cost effective" controls, EPA relies on an analysis that accounts for both cost and air quality improvement to identify the portion of a state's contribution that constitutes its significant contribution to nonattainment and interference with maintenance. Furthermore, in response to the Court's opinion in *North Carolina,* EPA has developed an approach which gives independent meaning to the "interfere with

maintenance" prong of section 110(a)(2)(D)(i)(I).

The methodology takes into account both the D.C. Circuit Court's determination that EPA may consider cost when measuring significant contribution, *Michigan,* 213 F.3d at 679, and its rejection of the manner in which cost was used in the CAIR analysis, *North Carolina,* 531 F.3d at 917. It also recognizes that the Court accepted—but did not require—EPA's use of a single, uniform cost threshold to measure significant contribution. *Michigan,* 213 F.3d at 679.

As EPA discussed at length in the Transport Rule proposal, using both air quality and cost factors allows EPA to consider the full range of circumstances and state-specific factors that affect the relationship between upwind emissions and downwind nonattainment and maintenance problems (75 FR 45271). For example, considering cost takes into account the extent to which existing plants are already controlled as well as the potential for, and relative difficulty of, additional emission reductions. Therefore, EPA believes that it is appropriate to consider both cost and air quality metrics when quantifying each state's significant contribution.

This methodology is consistent with the statutory mandate in section 110(a)(2)(D)(i)(I) which requires upwind states to prohibit emissions that significantly contribute to nonattainment or interference with maintenance in another state. As discussed in more detail in the proposal, interpreting significant contribution to nonattainment and interference with maintenance inherently involves a decision on how much emissions control responsibility should be assigned to upwind states, and how much responsibility should be left to downwind states. EPA's methodology is intended to "assign a substantial but reasonable amount of responsibility to upwind states. * * * to control their emissions" (75 FR 45272). EPA believes that upwind states contributing to downwind state air quality degradation should bear substantial responsibility to control their emissions because of the plain language of the good neighbor provision, the health risks and control cost impacts that upwind emissions cause in the downwind state, and the cumulative impact in the downwind state of emissions from multiple upwind states, and the importance of achieving attainment in downwind states as expeditiously as practicable but no later than specific deadlines as required by the Act. EPA's approach does not shift the responsibility for achieving or

maintaining the NAAQS to the upwind state. *See* 75 FR 45272.

The methodology defines each state's significant contribution to nonattainment and interference with maintenance as the emission reductions available at a particular cost threshold in a specific upwind state which effectively address nonattainment and maintenance of the relevant NAAQS of concern. Unlike the NO$_X$ SIP Call and CAIR, where EPA's significant contribution analysis had a regional focus, the methodology used in the Transport Rule focuses on state-specific factors. The methodology uses a multi-step process to analyze costs and air quality impacts, identify appropriate cost thresholds, quantify reductions available from EGUs in each state at those thresholds, and consider the impact of variability in EGU operations. There are four steps to this methodology: (1) Identification of each state's emission reductions available at ascending costs per ton as appropriate; (2) assessment of those upwind emission reductions' downwind air quality impacts; (3) identification of upwind "cost thresholds" delivering effective emission reductions and downwind air quality improvement; and (4) enshrinement of the upwind emission reductions available at those cost thresholds in state budgets.

In step one, EPA identifies what emission reductions are available at various cost thresholds, quantifying emission reductions that would occur within each state at ascending costs per ton of emission reductions. In other words, EPA determined for specific cost per ton thresholds, the emission reductions that would be achieved in a state if all EGUs greater than 25 MW in that state used all emission controls and emission reduction measures available at that cost threshold. For purposes of this discussion, we refer to these as "cost curves."

For this final rule, EPA used updated IPM modeling to conduct a similar cost curve analysis as conducted in the Transport Rule proposal (75 FR 45275). In the proposal, the cost curves only reflected escalating cost for one pollutant while the other pollutant cost was held constant at base case levels (*i.e.,* $0/ton). However, EPA improved the costing analysis for the final rule by identifying upwind emission reductions available as costs were imposed on both SO$_2$ and NO$_X$ simultaneously for states linked to downwind states on the basis of the PM$_{2.5}$ NAAQS. In other words, the cost curves in the proposal depicted state level emissions when only one pollutant was priced (*i.e.,* NO$_X$ at $500/

ton). Separate cost curves were done for each pollutant. For the final rule, EPA conducted some preliminary cost curve analysis for identifying $NO_X$ thresholds in this manner. However, for the final cost curve analysis, EPA relied on cost curves that reflected state emissions when pollutants were priced simultaneously (*e.g.*, $NO_X$ at $500/ton and $SO_2$ at $1,600/ton). For reasons described in section VI.B, EPA was able to conduct this type of analysis because the preliminary cost curves specific to annual and ozone-season $NO_X$ suggested little flexibility in adjusting the $500/ ton cost thresholds imposed for each. Therefore, EPA was able to hold the cost threshold constant at $500/ton for these pollutants in its examination of $SO_2$ at various cost thresholds. EPA believes this approach to cost analysis is a better simulation of the Transport Rule's likely impact on covered sources. Under the final Transport Rule, covered sources in states regulated for $PM_{2.5}$ must address compliance requirements for $SO_2$ and $NO_X$ emissions simultaneously, and this refined approach to cost curve analysis and subsequent air quality analysis better reflects this reality. Section VI.B of this preamble describes the costing analysis in further detail. Also, for more detail on the development of the cost curves, *see* "Significant Contribution and State Emission Budgets Final Rule TSD" in the docket for this rule.

Although the cost curves presented in this rule only include EGU reductions, EPA also assessed the cost of $SO_2$ and $NO_X$ emission reductions available for source categories other than EGUs in the proposed rulemaking. This preliminary assessment in the rule proposal suggested that there likely would be very large emission reductions available from EGUs before costs reach the point for which non-EGU sources have available reductions (75 FR 45272). EPA revisited these non-EGU reduction cost levels in this final rulemaking and verified that there are little or no reductions available from non-EGUs at costs lower than the thresholds that EPA has chosen ($500/ton for $NO_X$, $2,300/ ton for $SO_2$).

Further details on EPA's application of cost curves are provided below, in section VI.B.

In step two, EPA uses an air quality assessment tool to estimate the impact that the combined reductions available from upwind contributing states and the downwind receptor state at different cost-per-ton levels would have on air quality at downwind monitoring sites projected to have nonattainment and/or

maintenance problems.[41] While less rigorous than the air quality models used for attainment demonstrations, EPA believes this air quality assessment tool (which has been refined since proposal) is acceptable for assessing the impact of numerous options for upwind emission reductions in the process of defining an upwind state's significant contribution to nonattainment and interference with maintenance. It allows the Agency to anticipate specific air quality impacts of many more potential emission reduction scenarios pertinent to the relevant NAAQS than time- and resource-intensive comprehensive air quality modeling would permit.

Further details on EPA's application of step two in this methodology are provided below, in section VI.C.

In step three, EPA examines cost and air quality information to identify "significant cost thresholds." EPA considered a significant cost threshold to be a point along the cost curves where a noticeable change occurred in downwind air quality, such as a point where large upwind emission reductions become available because a certain type of emissions control strategy becomes cost-effective.[42]

This methodology allows EPA, where appropriate, to define multiple cost thresholds that vary for a particular pollutant for different upwind states. As explained in the Transport Rule proposal, EPA does not believe it is required to utilize multiple cost thresholds to regulate upwind emissions for purposes of the mandate in CAA section 110(a)(2)(D), but EPA's multi-factor methodology developed for the Transport Rule to define significant contribution to nonattainment and interference with maintenance allows the Agency to consider whether a single cost threshold or multiple cost thresholds are appropriate for meeting the requirements of CAA section 110(a)(2)(D) relevant to a particular NAAQS (75 FR 45274).

In step four, EPA uses the information regarding emission reductions available in each "linked" upwind state at the appropriate cost threshold to form a state "budget," representing the remaining emissions from covered sources for the state in an average year once significant contribution to nonattainment and interference with maintenance have been eliminated; each budget also allows for the identification of an associated variability limit. These budgets and variability limits are used to develop enforceable requirements under the final remedy. The final rule's methodology for identifying state budgets is derived directly from the cost curves and multi-factor analysis EPA uses to determine each state's significant contribution to nonattainment and interference with maintenance. State emission budgets are discussed in section VI.D and the variability limits are discussed in section VI.E.

*B. Cost of Available Emission Reductions (Step 1)*

This subsection provides more detail on the cost curves that EPA developed to assess the costs of reducing $SO_2$ and $NO_X$ emissions to address transport related to ozone and $PM_{2.5}$ concentrations (described previously as Step 1). It summarizes the information from the curves and then provides EPA's interpretation of that information. EPA used IPM to develop the EGU cost curves described in this rulemaking. More information can be found regarding EPA's use of IPM for the final Transport Rule in the "Significant Contribution and State Emission Budgets Final Rule TSD".

The amount of emission reductions that the cost curves suggest are available at various costs are specific to the 2012 and 2014 time periods. These cost estimates factor in the time interval between rule finalization and compliance periods, existing controls already in place, and controls that could potentially come on line by the start of the compliance period. EPA notes that cost curves are a fluid concept and would vary given different compliance dates.

1. Development of Annual $NO_X$ and Ozone-Season $NO_X$ Cost Curves

EPA conducted preliminary cost curve analysis for annual $NO_X$ and ozone-season $NO_X$ in a similar manner to that used in the proposed rulemaking. That is, the impact of various cost thresholds on emissions was examined individually. For example, state level emissions were examined at cost levels for annual $NO_X$ of $500, $1,000, and

---

[41] As discussed in the RIA, EPA also used the CAMx model to perform air quality analysis of its proposed remedy to address significant contribution. Results from this modeling will not exactly correspond to results from the air quality assessment tool both because the inputs to the air quality modeling are different and the sophisticated model more fully accounts for the complex air chemistry interactions. The full air quality modeling looks at the remedy, including reductions in upwind states that do not contribute as well as the impacts of the variability provisions discussed later in this section. It also provides a metric against which to evaluate the air quality assessment tool.

[42] The cost thresholds identified in this rule are specific to the section 110(a)(2)(D)(i)(I) requirements for the states and NAAQS considered in this proposal. They do not represent an agency position on the appropriateness of such cost thresholds for any other application under the Act.

$2,500/ton while SO$_2$ was held at base case levels. EPA used this approach to examine NO$_X$ and ozone-season NO$_X$ emission reductions available from EGUs by 2012 and 2014 at various cost levels, reaching to $2,500/ton for annual NO$_X$ and up to $5,000/ton for ozone-season NO$_X$ (in 2007-year dollars). Section VI.D explains why EPA analyzed the $500/ton threshold for annual and ozone-season NO$_X$. EPA selected two higher cost thresholds to analyze for annual and ozone-season NO$_X$ that provided a reasonable spectrum of emission reduction opportunities from EGUs at higher cost thresholds. Specifically, EPA analyzed these two higher cost thresholds because the first ($1,000/ton) was informative in regards to the additional EGU NO$_X$ emissions reductions available without installation of advanced controls, and the second ($2,500/ton for annual NO$_X$, $5,000/ton for ozone-season NO$_X$) was informative in regards to additional EGU reductions available at cost thresholds where advanced NO$_X$ control retrofits are economic for some units. The cost thresholds were only applied to states with air quality contributions that meet or exceed the air quality thresholds as identified in section V.D. For both annual and ozone-season NO$_X$, EPA did not consider cost thresholds below $500/ton for reasons explained in section VI.D.

EPA observed in the proposal that low-cost NO$_X$ reductions are available at upwind sources with existing pollution control equipment that may not otherwise be operated in the future without the Transport Rule. EPA believes it is appropriate to prohibit any "linked" upwind state from potentially increasing its emissions through a failure to operate these existing pollution controls, which could worsen downwind air quality problems. Thus, EPA reflected operation of these controls in all modeling of different cost thresholds (i.e., the modeling assumes year-round operation of post-combustion NO$_X$ controls in covered PM$_{2.5}$ states and ozone-season operation of post-combustion NO$_X$ controls in covered ozone states).

Table VI.B–1 shows the annual NO$_X$ emissions from EGUs at various levels of control cost per ton for 2014. Table VI.B–2 presents the cost curves for ozone-season NO$_X$ emissions from EGUs. As discussed in section VI.D, EPA determined that $500/ton for annual and ozone NO$_X$ was the appropriate cost threshold for this rule (although EPA plans to determine in the future whether a higher cost/ton threshold may be warranted for states contributing to nonattainment or maintenance problems with the 1997 ozone air quality standard projected to remain in two downwind areas).

TABLE VI.B–1—2014 ANNUAL NO$_X$ EMISSIONS FROM FOSSIL-FUEL FIRED EGUs GREATER THAN 25 MW FOR EACH TRANSPORT RULE STATE AT VARIOUS COSTS PER TON

[(2007$) per ton (thousand tons)]

|  | Base case level | $500 | $1,000 | $2,500 |
|---|---|---|---|---|
| Alabama | 75 | 72 | 72 | 70 |
| Georgia | 48 | 41 | 41 | 39 |
| Illinois | 55 | 51 | 50 | 49 |
| Indiana | 117 | 108 | 107 | 100 |
| Iowa | 45 | 40 | 39 | 37 |
| Kansas | 32 | 25 | 25 | 23 |
| Kentucky | 83 | 83 | 81 | 78 |
| Maryland | 17 | 17 | 17 | 17 |
| Michigan | 64 | 61 | 61 | 60 |
| Minnesota | 38 | 30 | 30 | 30 |
| Missouri | 55 | 54 | 54 | 51 |
| Nebraska | 43 | 27 | 26 | 21 |
| New Jersey | 8 | 8 | 8 | 8 |
| New York | 19 | 19 | 18 | 18 |
| North Carolina | 46 | 46 | 46 | 44 |
| Ohio | 99 | 95 | 94 | 92 |
| Pennsylvania | 132 | 124 | 124 | 116 |
| South Carolina | 38 | 38 | 37 | 36 |
| Tennessee | 29 | 29 | 29 | 29 |
| Texas | 141 | 138 | 138 | 136 |
| Virginia | 36 | 35 | 35 | 28 |
| West Virginia | 64 | 64 | 64 | 61 |
| Wisconsin | 37 | 32 | 32 | 31 |
| Total | 1,321 | 1,236 | 1,229 | 1,174 |

TABLE VI.B–2—2012 OZONE-SEASON NO$_X$ EMISSIONS FROM FOSSIL-FUEL FIRED EGUs GREATER THAN 25 MW FOR EACH TRANSPORT RULE STATE AT VARIOUS COSTS

[(2007$) per ton (thousand tons)]

|  | Base case level | $500 | $1,000 | $5,000 |
|---|---|---|---|---|
| Alabama | 34 | 34 | 34 | 31 |
| Arkansas | 15 | 15 | 15 | 14 |
| Florida | 42 | 27 | 27 | 24 |
| Georgia | 29 | 28 | 28 | 25 |
| Illinois | 21 | 21 | 21 | 21 |
| Indiana | 47 | 46 | 46 | 43 |
| Kentucky | 38 | 37 | 36 | 34 |

TABLE VI.B–2—2012 OZONE-SEASON NOX EMISSIONS FROM FOSSIL-FUEL FIRED EGUS GREATER THAN 25 MW FOR EACH TRANSPORT RULE STATE AT VARIOUS COSTS—Continued

[(2007$) per ton (thousand tons)]

| | Base case level | $500 | $1,000 | $5,000 |
|---|---|---|---|---|
| Louisiana | 13 | 13 | 13 | 13 |
| Maryland | 7 | 7 | 7 | 7 |
| Mississippi | 10 | 10 | 10 | 9 |
| New Jersey | 3 | 3 | 3 | 3 |
| New York | 8 | 8 | 8 | 8 |
| North Carolina | 23 | 23 | 23 | 21 |
| Ohio | 42 | 42 | 42 | 38 |
| Pennsylvania | 53 | 53 | 52 | 49 |
| South Carolina | 15 | 15 | 15 | 14 |
| Tennessee | 16 | 16 | 15 | 15 |
| Texas | 65 | 63 | 63 | 60 |
| Virginia | 15 | 15 | 15 | 13 |
| West Virginia | 26 | 26 | 26 | 24 |
| Total | 523 | 504 | 501 | 467 |

EPA notes that the cost curves presented here differ somewhat from the cost curves presented in the proposal. The NOX emissions modeled at a $500/ton cost threshold for the final rule are lower than they were at proposal. In addition, the emission reductions they represent from the updated base case are not as pronounced as was found in modeling for the proposed rule. It is worth emphasizing that the lower emission reductions observed at $500/ton in this final rulemaking are due to a lower starting point in updated base case EGU NOX emission levels (and thus do not reflect higher NOX emissions remaining after the reductions made at the $500/ton threshold). While the base case 2012 nationwide annual EGU NOX emissions were approximately 3 million tons in the proposal, they were only 2.1 million tons in the final rule. This approximately 33 percent reduction in base case EGU NOX emissions in the final rule modeling relative to the proposal is due to a combination of modeling updates, including lower natural gas prices, reduced electricity demand, newly-modeled consent decrees and state rules, and updated NOX rates to reflect 2009 emissions data. All of these factors resulted in substantially lower base case Transport Rule NOX emissions in the final rule modeling.

2. Development of SO2 Cost Curves

As explained in detail below in section VI.D, EPA determined that a single threshold of $500/ton for ozone-season NOX control in the states covered for the 1997 ozone NAAQS and a single threshold of $500/ton for annual NOX control in the states covered for the PM2.5 NAAQS were appropriate cost thresholds for identifying upwind

control under the Transport Rule. With these parameters determined, EPA was able to assess the availability of SO2 emission reductions from EGUs at various SO2 cost per ton thresholds with the corresponding NOX reduction requirements simultaneously represented in the analysis.

This approach of simultaneously modeling cost levels for covered pollutants is different from the approach taken in the proposal. In the proposal, cost curves were developed and examined independently for each pollutant. For example, with the SO2 cost curves in the proposal, the NOX cost level was held constant at base case levels as the SO2 cost threshold was varied from base case levels to $2,400/ton. Commenters noted that this did not accurately reflect a reality where source owners/operators view price signals for all covered pollutants simultaneously and make operation decisions accordingly. For the final rule, EPA included cost thresholds of $500/ton for annual NOX in PM2.5 states and $500/ton for ozone-season NOX in ozone-season states while examining different SO2 cost thresholds. This allows EPA to develop final cost curves for air quality analysis and budget determination that reflect EGU operation when faced with the appropriate cost thresholds on all covered pollutants. EPA believes this approach of modeling final cost curves is superior to the methodology used in the proposal because it reflects market signals for each pollutant simultaneously, as would be experienced by states and sources regulated under the Transport Rule.

In this manner, EPA examined several SO2 cost thresholds of $500, $1,600, $2,300, $2,800, $3,300 and $10,000 per ton. EPA selected these cost thresholds

for the final rule's analysis as a representative sampling of points along the SO2 cost curve thoroughly explored at proposal. Modeling of these cost thresholds provided a spectrum of emission reduction opportunities yielding meaningful differences to consider in total costs and air quality improvements at each threshold. The proposal's more detailed analysis using smaller increments between cost thresholds outlined the general form of the sector's SO2 emission reduction cost curve and therefore allowed EPA to use larger increments between cost thresholds for the final rule's analysis. Each of the cost thresholds examined for the final rule represents a point where there is a significant change in available controls, emission reductions, or costs and economic impacts. EPA believes analysis of these thresholds illustrate a meaningful progression of costs and air quality impacts that enabled the Agency to determine a proper threshold along this cost curve to identify significant contribution to nonattainment and interference with maintenance for this rulemaking.

The cost thresholds above $500/ton were applied starting in 2014. In all modeling, the 2012 cost per ton threshold was held constant at $500/ton as EPA believes that this cost threshold captures all emission reductions feasible by 2012 (see section VI.B.3 below for more discussion). At the higher cost levels (e.g., $2,800/ton and above), the curve does not include all available reductions as they do not include non-EGU reductions. As described above for NOX, EPA also observed at proposal that substantial low-cost SO2 reductions are available from the operation of existing scrubbers that may not otherwise operate in the future without the

Transport Rule in place. Therefore, all of the final $SO_2$ cost curves assume operation of existing scrubbers in $PM_{2.5}$ states under the Transport Rule. In 2014, approximately 3 million tons of $SO_2$ reductions can be achieved at the $500/ton cost threshold through operation of existing controls and some fuel switching.

This final cost curve also appropriately reflects the Group 1/Group 2 distinction for states covered for $PM_{2.5}$. As discussed in more detail in section VI.D, EPA identified Group 2 states as those that were linked to states where all nonattainment and maintenance issues had been resolved at $500/ton levels. There is no longer any significant contribution to nonattainment or interference with maintenance by these seven Group 2 states at levels above $500/ton. Therefore, in the final curves, these Group 2 states' cost thresholds were held constant at $500/ton as the higher cost thresholds were applied to the remaining Group 1 states starting in 2014. For example, the modeled emissions at the $2,300 per ton cost threshold shown in Table VI.B–3 below reflect each state's emissions when Group 1 states are subjected to a $2,300 per ton $SO_2$ constraint and Group 2 states are subjected to a $500/ton $SO_2$ constraint.

Additional reductions can be achieved at the higher cost thresholds. The cost curves demonstrate that sources begin to build significant additional flue gas desulfurization (FGD) retrofits at an $SO_2$ cost threshold of $1,600 per ton and additional dry sorbent injection (DSI) retrofits at an $SO_2$ cost threshold of $2,300 per ton.

With these final cost curves in hand, EPA was able to identify the combined reductions available from upwind contributing states and the downwind state, at different cost-per-ton levels. Additionally, EPA was able to examine the economic impacts of imposing such cost constraints on power sector generation. However, this only constitutes a portion of EPA's multi-factor assessment used to determine the amount of emissions that represent significant contribution to nonattainment and interference with maintenance. As noted in the Transport Rule proposal, EPA's multi-factor assessment considered air quality and cost considerations when identifying cost thresholds (75 FR 45271). The air quality portion of the assessment is described in section VI.C of the final Transport Rule preamble.

3. Amount of Reductions That Could Be Achieved by 2012 and 2014

EPA applied escalating $SO_2$ cost per ton thresholds for Group 1 states to create the cost curves for 2014 and beyond. For 2012 $SO_2$, the cost per ton was held constant at $500/ton as the cost thresholds in 2014 and beyond were varied. The advanced pollution controls incentivized by these higher cost-per-ton levels can reasonably be installed by 2014. EPA also considered whether any of these emission reductions could be achieved prior to 2014. For the reasons that follow, EPA concluded that significant reductions could be achieved by 2012 and that it is important to require all such

reductions by 2012 to ensure that they are achieved as expeditiously as practicable. $SO_2$ and $NO_X$ reductions come from operating existing controls, installing combustion controls, fuel switching, and increased dispatch of lower-emitting generation which can be achieved by 2012. In general, compliance mechanisms that do not involve post-combustion control installation are feasible before 2014. For this reason, EPA believes it is appropriate to require these emissions to be removed in 2012, consistent with the Act's requirement that downwind states attain the NAAQS as expeditiously as practicable.

Therefore, all of the cost curves presented below include all feasible 2012 reductions up to a threshold of $500/ton for $SO_2$ and $500/ton for annual $NO_X$ in states linked to receptors for $PM_{2.5}$, as well as $500/ton for ozone-season $NO_X$ in states linked to receptors for ozone. These cost per ton levels do not precipitate advanced post-combustion control installation in 2012 (as EPA acknowledges that such installations are not feasible by 2012), but they do promote the compliance options outlined above. The higher cost thresholds for $SO_2$ Group 1 states were only applied starting in 2014. Therefore, the 2012 state level emissions in the "$2,300 per ton threshold" reflect a cost threshold of only $500/ton for all pollutants (the $2,300 per ton value starts in 2014 for Group 1 states' $SO_2$).

The table below illustrates the change in state level $SO_2$ emissions as the higher cost per ton thresholds are applied to Group 1 states.

TABLE VI.B–3—2014 $SO_2$ EMISSIONS FROM FOSSIL-FUEL-FIRED EGUS GREATER THAN 25 MW FOR EACH TRANSPORT RULE STATE AT VARIOUS COSTS PER TON

[Thousand tons] a

|  | State $SO_2$ group | Base case level | $500 | $1,600 | $2,300 | $2,800 | $3,300 | $10,000 |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2 | 417 | 201 | 226 | 213 | 214 | 236 | 190 |
| Georgia | 2 | 170 | 94 | 94 | 95 | 95 | 95 | 98 |
| Illinois | 1 | 138 | 134 | 130 | 124 | 117 | 102 | 36 |
| Indiana | 1 | 711 | 245 | 179 | 161 | 153 | 121 | 69 |
| Iowa | 1 | 127 | 112 | 78 | 75 | 67 | 45 | 13 |
| Kansas | 2 | 70 | 55 | 57 | 61 | 61 | 61 | 45 |
| Kentucky | 1 | 488 | 161 | 126 | 106 | 103 | 89 | 46 |
| Maryland | 1 | 43 | 32 | 28 | 28 | 26 | 24 | 18 |
| Michigan | 1 | 266 | 206 | 189 | 144 | 105 | 94 | 24 |
| Minnesota | 2 | 66 | 43 | 45 | 46 | 46 | 46 | 44 |
| Missouri | 1 | 382 | 212 | 173 | 166 | 109 | 84 | 21 |
| Nebraska | 2 | 72 | 68 | 70 | 70 | 70 | 70 | 66 |
| New Jersey | 1 | 39 | 7 | 7 | 7 | 7 | 6 | 5 |
| New York | 1 | 40 | 21 | 20 | 12 | 11 | 10 | 8 |
| North Carolina | 1 | 120 | 104 | 61 | 58 | 49 | 40 | 30 |
| Ohio | 1 | 832 | 294 | 175 | 137 | 123 | 115 | 65 |
| Pennsylvania | 1 | 507 | 294 | 164 | 112 | 107 | 102 | 75 |
| South Carolina | 2 | 210 | 93 | 100 | 103 | 104 | 104 | 105 |
| Tennessee | 1 | 284 | 82 | 63 | 59 | 59 | 59 | 24 |

TABLE VI.B–3—2014 SO₂ EMISSIONS FROM FOSSIL-FUEL-FIRED EGUs GREATER THAN 25 MW FOR EACH TRANSPORT RULE STATE AT VARIOUS COSTS PER TON—Continued

[Thousand tons]ᵃ

|  | State SO₂ group | Base case level | $500 | $1,600 | $2,300 | $2,800 | $3,300 | $10,000 |
|---|---|---|---|---|---|---|---|---|
| Texas | 2 | 453 | 281 | 282 | 284 | 281 | 281 | 243 |
| Virginia | 1 | 65 | 59 | 51 | 35 | 33 | 32 | 16 |
| West Virginia | 1 | 497 | 157 | 122 | 76 | 74 | 72 | 55 |
| Wisconsin | 1 | 125 | 51 | 47 | 40 | 38 | 34 | 14 |
| Total | ............. | 6,122 | 3,007 | 2,487 | 2,212 | 2,053 | 1,919 | 1,311 |
| Group 1 total | ............. | 4,665 | 2,172 | 1,612 | 1,340 | 1,180 | 1,025 | 520 |
| Group 2 total | ............. | 1,457 | 835 | 875 | 872 | 872 | 894 | 791 |

ᵃ**Note:** As described in the preamble language for this section, the escalating cost per ton figures in each column header only apply to Group 1 states in 2014 and each year thereafter. Cost per ton for Group 2 states is held constant at $500/ton for all the costing runs. In some cases, the escalating cost levels in Group 1 states affect emission levels in Group 2 states as some generation shifts between states in response to newly imposed costs.

## C. Estimates of Air Quality Impacts (Step 2)

After developing cost curves to show the state-by-state cost-effective emission reductions available, EPA estimates the air quality impacts of these reductions using the air quality assessment tool coupled with full-scale air quality modeling where possible. EPA uses the air quality assessment tool to evaluate the impact on air quality for downwind nonattainment and maintenance receptors from upwind reductions in "linked" states. This section describes the development of the air quality assessment tool and summarizes the results of this evaluation.

### 1. Development of the Air Quality Assessment Tool and Air Quality Modeling Strategy

In response to comments on the methodology used for the proposed rule, EPA made significant improvements to the air quality assessment tool (AQAT) for the final Transport Rule. Furthermore, EPA relied on CAMx to model the air quality response to NOₓ reductions and limited AQAT's role (relative to the Transport Rule proposal) to estimating the relative response of sulfate concentrations from SO₂ reductions. EPA did not use AQAT to address NOₓ reductions in the final rule analyses. These and other changes to our approach, as described below and in the "Significant Contribution and State Emission Budgets Final Rule TSD", address commenter's concerns about the scientific rigor of the design and application of AQAT and commenter's recommendations to rely upon air quality modeling as part of this analysis.

For the final Transport Rule, EPA created an AQAT calibration scenario consisting of full-scale air quality

modeling using CAMx of a 2014 control scenario reflecting SO₂ and NOₓ emission reductions of similar stringency and from the same geography as the Transport Rule proposal. Modeling of this AQAT calibration scenario reflected all updates made to the air quality modeling platform, as described in the "Air Quality Modeling Final Rule TSD" found in the docket for this rulemaking. CAMx modeling of each receptor's response in this control scenario accounts for complex chemical interactions and covariation of these pollutants. Among the important atmospheric chemical interactions accounted for in CAMx is "nitrate replacement." [43] Nitrate replacement occurs when SO₂ emission reductions lead to decreases in ammonium sulfate, which in turn, can result in an increase in ammonium nitrate concentrations. As described below, EPA used the CAMx modeling results for this AQAT calibration scenario together with the modeling for the 2012 base case to characterize the response of ozone, nitrate, and sulfate at each nonattainment and maintenance receptor to the mix of upwind NOₓ and SO₂ emission reductions at each cost threshold.

As described in section VI.D, EPA determined that the $500/ton threshold for upwind annual and ozone-season NOₓ control is appropriate for the final Transport Rule (although EPA plans to determine in the future whether a higher cost/ton threshold may be

warranted for states contributing to nonattainment or maintenance problems with the 1997 ozone air quality standard projected to remain at receptors in two downwind areas [44]). Because this threshold corresponds to the NOₓ control strategy modeled in the AQAT calibration scenario described above, EPA is able to rely on this CAMx air quality modeling to assess the response of ozone and nitrate concentrations due to NOₓ reductions and does not estimate ozone or nitrate impacts for this final rulemaking using AQAT. Further information on the air quality modeling of this AQAT calibration scenario can be found in the Air Quality Modeling Final Rule TSD and the Significant Contribution and State Emission Budgets Final Rule TSD in the docket for this rulemaking.

In order to estimate 2014 annual and 24-hour PM₂.₅ concentrations, AQAT uses the 2012 annual and seasonal contributions which quantify the contribution of SO₂ emissions in specific upwind states to sulfate concentrations at specific downwind receptors. These contributions are described in section V.D.2 and the Air Quality Modeling Final Rule TSD.

EPA utilizes CAMx modeling of the AQAT calibration scenario, described above, to "calibrate" the contribution factors by developing and applying linear sulfate response factors for each downwind receptor. These factors calibrate each receptor's sulfate response to varying levels of upwind SO₂ emissions. These calibration factors are based on the sulfate response modeled by CAMx due to emission changes occurring between the 2012 base case and the 2014 AQAT

---

[43] Observable indicators of the sensitivity of PM₂.₅ nitrate to emission reductions—Part II: Sensitivity to errors in total ammonia and total nitrate of the CMAQ-predicted non-linear effect of SO₂ emission reductions. R.L. Dennis, P.K. Bhave, and R.W. Pinder. 2008. Atmospheric Environment (42):1287–1300.doi:10.1016/j.atmosenv.2007.10.036.

[44] Houston and Baton Rouge nonattainment areas.

calibration scenario. Calibration factors were constructed for the annual and 24-hour $PM_{2.5}$ AQAT.

To further allow adequate assessment of the seasonal impacts of various levels of upwind $SO_2$ reductions on each receptor's 24-hour $PM_{2.5}$ concentration using AQAT, EPA developed response factors for sulfate on a quarterly basis to capture important air quality differences between summer and winter emissions and concentrations. This process allowed EPA to estimate the air quality values for each season at each cost threshold, and, then estimate the air quality design values.

Finally, EPA's air quality assessment accounts for the impact that this differential response in sulfate by quarter can have on the ordering of 24-hour concentrations when calculating the 98th percentile for the 24-hour standard. AQAT estimates quarterly-specific relative response factors that estimate quarterly-specific proportional change in ammonium sulfate resulting from the $SO_2$ emission reduction from the 2012 base case scenario to the 2014 cost threshold scenario being assessed. These quarterly relative response factors are then applied to each of the maximum 24-hour $PM_{2.5}$ concentrations for eight days per quarter per year at each receptor from the 2012 base case. This methodology improvement allows EPA to redetermine the 98th percentile day for each year and recalculate average and maximum design values for the 24-hour $PM_{2.5}$ standard.

These improvements for the final rule increase EPA's confidence that the air quality estimates provided by AQAT, now customized for this application, more accurately estimate the results of full-scale air quality modeling of the various levels of upwind $SO_2$ reductions considered. EPA evaluated the estimates from AQAT using an independent data set, the 2014 base case estimates from CAMx, finding that the results are unbiased with minimal differences. *See* "Significant Contribution and State Emission Budgets Final Rule TSD" for more details.

As such, EPA believes the revised AQAT provides an appropriate basis for assessing the air quality portion of the multi-factor methodology to define significant contribution to nonattainment and interference with maintenance.[45]

## 2. Utilization of AQAT To Evaluate Control Scenarios

For the final Transport Rule, EPA performed air quality analysis for each downwind annual and 24-hour $PM_{2.5}$ receptor with a nonattainment and/or maintenance problem in the 2012 base case. For each receptor, EPA quantified the sulfate reduction and resulting air quality improvement when a group of states consisting of the upwind states that are "linked" to the downwind receptor (as explained in section V.D) and the downwind state where the receptor is located, all made the $SO_2$ emission reductions that EPA identified as available at each cost threshold. EPA assumes reductions at each cost threshold from the linked upwind states as well as the downwind receptor state to assess the shared responsibility of these upwind states to address air quality at the identified receptors. Analysis of each receptor did not assume any emission reductions beyond those included in the 2014 base case from upwind states that are not "linked" to that specific downwind receptor (even if the state was "linked" to a different receptor and/or otherwise would have made emission reductions beginning in 2012 due to the Transport Rule).

EPA disagrees with comments suggesting that emission reductions, and resulting decreases in contribution, from upwind states that are not "linked" to a particular downwind receptor should be accounted for in the 2014 AQAT analysis of that receptor. EPA decided to assume reductions only from linked states when analyzing each receptor because EPA is performing a state-specific analysis to support a determination of the amount of each upwind state's responsibility for air quality problems at the downwind receptors that it significantly affects. If the AQAT analysis were to assume emissions reductions in other non-linked states, the AQAT analysis would then contradict the first step of our two-

step approach to defining significant contribution to nonattainment and interference with maintenance. Under EPA's two-step approach, only a state that (1) contributes a threshold amount or more to a particular downwind state receptor's air quality problem, and (2) has emission reductions available at the selected cost threshold can be deemed to have responsibility to reduce its emissions to improve air quality at that downwind receptor. EPA believes that the commenters' suggested approach would not qualify as a state-specific approach for determining upwind state responsibility for downwind air quality problems.

Because EPA is relying on the CAMx estimate of nitrate concentrations from the AQAT calibration scenario, the response in nitrate to $NO_X$ reductions at a cost threshold of $500/ton is present in each $SO_2$ cost threshold scenario analyzed.

EPA determines the cumulative air quality improvement that can be expected at a particular downwind receptor by multiplying each upwind state's percent $SO_2$ emission reduction by its calibrated receptor specific sulfate response factor and summing the sulfate, nitrate, and other $PM_{2.5}$ components (also taken from the 2014 CAMx AQAT calibration scenario).

## 3. Air Quality Assessment Results

The results of EPA's air quality assessment of the cost threshold scenarios focus on air quality metrics including, but not limited to, average air quality improvement at receptors with 2012 base case nonattainment and maintenance exceedances and an evaluation of estimated receptor design values against annual and 24-hour $PM_{2.5}$ standards. *See* "Significant Contribution and State Emission Budgets Final Rule TSD" for more details.

In EPA's air quality analysis of each downwind receptor, all air quality improvements are measured relative to the "AQAT base case." This base case reflects AQAT's estimated $PM_{2.5}$ concentrations under base case 2014 $SO_2$ emissions. The AQAT base case itself is not used for any decision points and only serves as an appropriate starting point for comparison of air quality improvements at $SO_2$ cost thresholds. EPA ensures internal analytic consistency by comparing all air quality improvements at analyzed $SO_2$ cost thresholds to the AQAT base case.

Regarding average air quality improvement at exceeding 2012 base case receptors, EPA identified 41 receptors with nonattainment or maintenance problems in the 2012 base

---

[45] EPA used CAMx to conduct full air quality modeling of the final Transport Rule remedy embodying the emission reductions that EPA first selected on the basis of the multi-factor analysis using AQAT to project air quality impacts from varying levels of emission reductions analyzed. The CAMx results confirmed the relative magnitude and direction of AQAT's estimates of the outcomes for

the 2012 base case nonattainment and maintenance receptors analyzed, and the AQAT estimates closely tracked CAMx-modeled concentrations at those receptors under the Transport Rule remedy. The paired AQAT-estimated and CAMx-modeled concentrations were found to be highly correlated with an $R^2$ value of 0.997. As a result, EPA is confident that AQAT's estimates of impacts on sulfate concentrations at the varying levels of $SO_2$ emission reductions analyzed provide a technically valid and sound basis for the Agency's selection of the final rule's emission reductions necessary to eliminate (or make meaningful progress toward eliminating) significant contribution and interference with maintenance for the $PM_{2.5}$ NAAQS considered in this rulemaking. Further details on the comparison of CAMx and AQAT results can be found in the Significant Contribution and State Emission Budgets Final Rule TSD.

case. EPA assessed the cumulative reduction in 24-hour $PM_{2.5}$ maximum design value at each increasing $SO_2$ cost threshold from the maximum design value from the AQAT base case, and averaged the reduction across the 41 receptors. The results of this assessment indicate diminishing incremental returns to 24-hour $PM_{2.5}$ maximum design value reduction as $SO_2$ cost threshold levels increase. EPA finds reductions in maximum design value of 4.28 µg/m³ at $500; 4.98 µg/m³ at $1,600; 5.33 µg/m³ at $2,300; 5.46 µg/m³ at $2,800; 5.60 µg/m³ at $3,300; and 6.08 µg/m³ at $10,000. These results are provided in table VI.C–1.

TABLE VI.C–1—AVERAGE 2014 AIR QUALITY IMPROVEMENT AT RECEPTORS WITH 2012 BASE CASE NON-ATTAINMENT AND MAINTENANCE PROBLEMS

| Group 1 state $SO_2$ cost per ton threshold | Average air quality improvement at exceeding receptors in 2012 base case (µg/m³) |
|---|---|
| $500 ............................... | 4.28 |
| $1,600 ............................ | 4.98 |
| $2,300 ............................ | 5.33 |
| $2,800 ............................ | 5.46 |
| $3,300 ............................ | 5.60 |
| $10,000 .......................... | 6.08 |

Additionally, EPA evaluated the AQAT estimated 2014 average and maximum design values for these receptors at each cost threshold against the annual and 24-hour $PM_{2.5}$ standards. EPA determined the estimated number of receptors with nonattainment or maintenance problems at $500/ton cost threshold of $NO_X$ and each of the cost threshold scenarios assessed for $SO_2$. These results are provided in table VI.C–2 in terms of the number of receptors and the number of nonattainment areas containing these receptors.

TABLE VI.C–2—RECEPTORS WITH NONATTAINMENT AND/OR MAINTENANCE EXCEEDANCES OF THE ANNUAL OR 24-HOUR $PM_{2.5}$ NAAQS IN 2014

| $SO_2$ cost threshold | Annual nonattainment | | Annual nonattainment or maintenance | | 24-hour nonattainment | | 24-hour nonattainment or maintenance | | Annual and 24-hour nonattainment and maintenance | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Receptors | Areas | Receptors | Areas | Receptors | Areas | Receptors | Areas | Receptors | Areas |
| $500 ................................. | 1 | 1 | 1 | 1 | 2 | 2 | 9 | 6 | 9 | 6 |
| $1,600 .............................. | 1 | 1 | 1 | 1 | 2 | 2 | 8 | 5 | 8 | 5 |
| $2,300 .............................. | 0 | 0 | 1 | 1 | 1 | 1 | 6 | 4 | 6 | 4 |
| $2,800 .............................. | 0 | 0 | 1 | 1 | 1 | 1 | 5 | 4 | 5 | 4 |
| $3,300 .............................. | 0 | 0 | 1 | 1 | 1 | 1 | 5 | 4 | 5 | 4 |
| $10,000 ............................ | 0 | 0 | 1 | 1 | 1 | 1 | 3 | 3 | 3 | 3 |

In the proposal, EPA evaluated whether the imposition of the rule's upwind emission reduction requirements could cause changes in operation of electric generating units in states not regulated under the proposal. EPA recognized that such changes could lead to increased emissions in those states, potentially affecting whether they would meet or exceed the 1 percent contribution thresholds used to identify linkages between upwind and downwind states. Such shifting of emissions between states may occur because of the interconnected nature of the country's energy system (including both the electricity grid as well as coal and natural gas supplies).

Using updated emissions and air quality information developed for the final rule, EPA's IPM modeling found that of the states not covered in the final rule for $PM_{2.5}$, Arkansas, Colorado, Louisiana, Montana, and Wyoming are all projected to have $SO_2$ emission increases above 5,000 tons in 2014 with the rule in effect. EPA analysis shows the $SO_2$ emission increases result from expected shifts to higher sulfur coal in these states. Using AQAT, a state-level assessment of these emission increases relative to the state specific contributions to downwind receptors

(where available) indicates that projected increases in the $SO_2$ emissions would not increase any of these states' contributions to an amount that would meet or exceed the 0.15 µg/m³ or 0.35 µg/m³ thresholds for annual and 24-hour $PM_{2.5}$, respectively. For this reason, EPA has determined that it is not necessary to include these additional states in the Transport Rule as a result of the effects of the rule itself on $SO_2$ emissions in uncovered states. See "Significant Contribution and State Emission Budgets Final Rule TSD" in the docket for this rulemaking for more details.

*D. Multi-Factor Analysis and Determination of State Emission Budgets*

EPA used the cost, emission, and air quality information described in the previous sections to perform its multi-factor analysis. By looking at different "cost thresholds"—places where there was a noticeable change on the cost curve because emission reductions occur—and examining the corresponding impact on air quality, EPA identified the amount of emissions that represent significant contribution to nonattainment and interference with maintenance within each state. After quantifying this amount of emissions,

EPA established state "budgets" which represent the remaining emissions for the state in an average year (step 4).

For states covered by the rule for $PM_{2.5}$, EPA calculated annual $NO_X$ and annual $SO_2$ budgets. For states covered by the rule for ozone, EPA calculated ozone-season $NO_X$ budgets. This section explains the multi-factor assessment and how EPA used this assessment to determine state-specific budgets.

1. Multi-Factor Analysis (Step 3)

a. Overview

As described in section VI.B, EPA examined how different cost thresholds impacted emissions in states with air quality contributions that meet or exceed specific air quality thresholds, as discussed in section V.D of this preamble. Section VI.C summarizes the estimated air quality impacts in 2014 of these emission levels at downwind receptors, including estimates of their nonattainment and maintenance status (see "Significant Contribution and State Emission Budgets Final Rule TSD" for more details). From these two steps, EPA evaluated the interaction between upwind emissions at different cost levels and air quality at downwind receptors to identify "significant cost thresholds." These cost thresholds are

based on air quality considerations (such as the cost at which the air quality assessment analysis projects large numbers of downwind site maintenance and nonattainment problems would be resolved) or cost criteria (such as a cost where large emissions reductions occur because a particular technology is widely implemented at that cost). EPA examined each cost threshold and then used a multi-factor assessment to determine which serve as cost thresholds that eliminate significant contribution to nonattainment and interference with maintenance for upwind states. Air quality considerations in the assessment include, for example, how much air quality improvement in downwind states results from upwind state emission reductions at different levels; whether, considering upwind emission reductions and assumed local (in-state) reductions, the downwind air quality problems would be resolved; and the components of the remaining downwind air quality problem (*e.g.*, whether it is a predominantly local or in-state problem, or whether it still contains a large upwind component). Cost considerations include, for example, how the cost per ton of emission reduction compares with the cost per ton of existing federal and state rules for the same pollutant; whether the cost per ton is consistent with the cost per ton of technologies already widely deployed (similar to the highly-cost-effective criteria used in both the NO$_X$ SIP Call and CAIR); and what cost increase is required to achieve additional meaningful air quality improvement.

The specific cost per ton thresholds selected as a basis for identifying significant contribution to nonattainment and interference with maintenance in this rulemaking apply only to the determinations made in this rule and do not establish any precedent for future EPA actions under section 110(a)(2)(D)(i)(I) or any other section of the CAA. EPA's selection of specific cost thresholds in the context of this rulemaking relies on current analyses of the cost of available emission reductions, the pattern of interstate linkages for pollution transport, and the downwind air quality impacts specifically related to the 1997 ozone NAAQS, the 1997 annual PM$_{2.5}$ NAAQS, and the 2006 24-hour PM$_{2.5}$ NAAQS. In addition and as explained below, the selection of the threshold for ozone-season NO$_X$ was influenced by the limited scope of this rule. Any or all of these variables used to identify specific cost thresholds are subject to

change. Thus, EPA may use different cost thresholds in future actions, even if those actions relate to the same NAAQS addressed in this rule.

b. Cost Thresholds Examined and Selected for Ozone-Season NO$_X$

In the proposal, EPA examined various cost thresholds for ozone season NO$_X$ and identified a cost threshold with rapidly diminishing returns at $500/ton. EPA observed that moving beyond the $500 cost threshold up to a $2,500 cost threshold would result in only minimal additional ozone season NO$_X$ emission reductions and would likely bypass less expensive non-EGU emission reduction opportunities (75 FR 45281). EPA noted that for greater costs the curves did not include all available reductions as they do not include non-EGU reductions (75 FR 44286). In the proposal, EPA noted the timely promulgation and implementation of this rule is responsive to the Court's remand of CAIR, will accelerate critical air quality improvement, and more effectively address the mandate of CAA section 110(a)(2)(D) to address significant contribution to nonattainment and interference with maintenance as expeditiously as practicable. EPA did not want to risk delaying air quality benefits available from EGU emission reductions, particularly those emission reductions which eliminate significant contribution to nonattainment and interference with maintenance for many receptors, while the Agency conducts additional analysis to support subsequent transport-related rulemakings including coverage of non-EGU sources (75 FR 45285).

EPA received comments suggesting that it consider cost thresholds higher than $500/ton as reductions beyond the proposed $500/ton cost threshold were needed to fully resolve nonattainment and maintenance issues in downwind states analyzed at proposal. Some of these comments suggested EPA should include non-EGUs as they consider the higher cost thresholds, others suggested EPA continue to exclude non-EGU sources in this rulemaking.

In response to those comments that suggested EPA explore higher cost thresholds because nonattainment and maintenance was not fully resolved, EPA first notes that CAA section 110 (a)(2)(D)(i)(I) only requires the elimination of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. Section 110(a)(2)(D)(i)(I) focuses exclusively on the transport component of nonattainment and maintenance problems. Section 110(a)(2)(D)(i)(I) does

not shift to upwind states the responsibility for ensuring that all areas in other states attain the NAAQS. As such, the mandate of section 110(a)(2)(D)(i)(I) is not to ensure that reductions in upwind states are sufficient to bring all downwind areas in to attainment, it is simply to ensure that all significant contribution to nonattainment and interference with maintenance is eliminated. Thus, the presence of residual nonattainment or maintenance areas does not, by itself, signify a failure to satisfy the requirements of 110(a)(2)(D)(i)(I).

Furthermore, as noted in section VI.A, EPA is finalizing coverage only for the EGU emission source-sector category in this rulemaking. EPA has not included non-EGU sources in this final rulemaking. EPA remains convinced that timely promulgation and implementation of this rule is responsive to the Court's remand of CAIR.

To the extent that significant contribution is not eliminated for the 1997 ozone NAAQS standard at the $500/ton cost threshold, EPA is not addressing in this rulemaking whether a cost threshold greater than $500/ton is justified for some upwind states and downwind receptors. EPA believes it can best serve these states where concerns persist regarding projected nonattainment or maintenance of the 1997 ozone NAAQS by quickly finalizing this rule and seeking further non-EGU reductions in subsequent rulemakings. Table VI.B–2 illustrates the small amount of EGU reductions available as cost threshold increases above $500/ton. The ozone-season NO$_X$ reductions available in the Transport Rule states between the $500/ton and $1,000/ton cost thresholds amount to less than 3,000 tons. EPA believes that potentially substantial non-EGU ozone-season NO$_X$ reductions become available approaching the $1,000/ton cost threshold. EPA emphasized this in the proposal, noting that the cost curves for ozone season NO$_X$ did not reflect all available reductions as they do not include non-EGU reductions (75 FR 45286). For these reasons, EPA did not consider cost thresholds greater than $500/ton.

EPA did not consider cost thresholds below $500/ton for ozone-season NO$_X$. $500/ton is a reasonable threshold representing a significant amount of lowest-cost NO$_X$ emission reductions from EGUs, largely accruing from the installation of combustion controls, such as low-NO$_X$ burners, and constitutes a reasonable cost level for operation of existing NO$_X$ controls such as SCRs. EPA believes it would be

inappropriate for a state linked to downwind nonattainment or maintenance areas to stop operating existing pollution control equipment (which would increase their emissions and contribution). This is increasingly likely to occur at cost thresholds lower than $500/ton. Therefore, EPA did not find cost thresholds lower than $500/ton for ozone-season $NO_X$ to be reasonable for development of the Transport Rule cost curves.

As discussed in section III of this preamble, EPA intends to finalize reconsideration of the March 2008 ozone NAAQS in the summer of 2011 and to expeditiously propose a transport-related action to address any necessary upwind state control responsibilities with respect to that reconsidered NAAQS.

c. Cost Thresholds Examined and Selected for Annual $NO_X$

Following the assessment of the cost curves in section IV.B and the air quality modeling of the AQAT calibration scenario using CAMx, EPA identified a single cost threshold at $500/ton for annual $NO_X$. Beyond requiring the year-round operation of existing post-combustion $NO_X$ controls and other reductions modeled at $500/ton threshold, EPA observed a limitation in available low-cost annual $NO_X$ reductions from EGUs. Approximately 7,000 tons of annual $NO_X$ reductions were available from EGUs between the $500/ton and the $1,000/ton cost thresholds (See Table VI.B.–1). Furthermore, above the $500/ton threshold, similar to ozone-season $NO_X$ cost curves, the annual $NO_X$ cost curves do not include all available reductions as they do not include non-EGU reductions. EPA analysis suggests that while $NO_X$ emission reductions lead to reductions in $PM_{2.5}$, $SO_2$ reductions are generally more cost-effective than $NO_X$ reductions at reducing $PM_{2.5}$ (75 FR 45281). In part, for these reasons, EPA's multi-factor assessment suggested that the $500/ton cost threshold for annual $NO_X$ in concert with the cost thresholds identified for $SO_2$ were the appropriate cost thresholds for eliminating significant contribution to nonattainment and interference with maintenance. EPA finds in the final Transport Rule that the $500/ton cost threshold for annual $NO_X$, in concert with the $SO_2$ cost threshold selected below, successfully eliminates significant contribution to nonattainment and interference with maintenance for the 1997 annual $PM_{2.5}$ NAAQS and the 2006 24-hour $PM_{2.5}$

NAAQS in the states covered by this Rule for $PM_{2.5}$.

The reasons for not considering cost thresholds lower than $500/ton for annual $NO_X$ are the same as those identified for not doing so for ozone-season $NO_X$. In addition to its $PM_{2.5}$ reduction benefits, annual $NO_X$ control at the $500/ton threshold can help to reduce nitrate replacement in the atmosphere. As explained earlier, nitrate replacement happens when $SO_2$ emissions reductions successfully reduce ammonium sulfate (a component of $PM_{2.5}$) but provoke a $PM_{2.5}$ rebound effect by freeing up additional ammonia to form ammonium nitrate (another component of $PM_{2.5}$).

d. Cost Thresholds Examined and Selected for $SO_2$

EPA first assessed the downwind air quality impacts of emission reductions modeled at the $500/ton threshold in all states found to be linked to downwind sites for $PM_{2.5}$ transport, as well as in the states hosting those downwind sites. The air quality assessment tool projected that those reductions do not fully resolve nonattainment and maintenance problems with the $PM_{2.5}$ standards for certain areas to which the following states are linked: Illinois, Indiana, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and Wisconsin. EPA proceeded to analyze available 2014 emission reductions at higher cost thresholds from these states, collectively referred to as Group 1 states for $SO_2$ control.

For Group 2 states, the air quality assessment tool projected that the $SO_2$ reductions at this first cost threshold assessed would resolve the nonattainment and maintenance problems for all of the areas to which the following states are linked: Alabama, Georgia, Kansas, Minnesota, Nebraska, South Carolina, and Texas. EPA thus finds that these states' significant contribution is eliminated at the $500 per ton level in 2014; they are collectively referred to as Group 2 states for $SO_2$ control. Because their significant contribution is eliminated at this stringency of control, EPA did not analyze higher cost thresholds for Group 2 states.

The states in Group 1 and Group 2 are rationally grouped considering air quality and cost. EPA determined that it would not be appropriate to assign the same cost threshold to Group 2 and Group 1 states because a significantly lower cost threshold was sufficient to resolve air quality problems at all

downwind receptors linked to the Group 2 states. Although states are linked to different sets of downwind receptors, EPA analysis indicated that the cost threshold needed to resolve downwind air quality problems varied only to a limited extent among states within Group 1 and among states within Group 2. It did, however, vary greatly between the Group 1 and Group 2 states. The ruling of the DC Circuit in *Michigan* v. *EPA*, 213 F.3d 663, 679–80 (D.C. Cir. 2000), accepting EPA's prior use of a transport remedy with uniform controls, supports EPA's decision to use a uniform cost threshold for a group of states.

As discussed in section VI.B, the cost threshold for Group 1 states was examined at escalating levels in 2014 (it remained at $500/ton for Group 2 states). EPA examined emissions at $SO_2$ cost thresholds of $500, $1,600, $2,300, $2,800, $3,300, and $10,000/ton for Group 1 states in 2014. The higher $SO_2$ marginal costs were only imposed in Transport Rule states starting in 2014, by which time the advanced pollution control retrofits induced at those higher cost thresholds could be installed. (*See* section VI.D.2 for EPA's assessment and decisions regarding $SO_2$ budget formation in Group 1 states in 2014.)

EPA observed some degree of additional air quality benefit at downwind receptors across all of the cost thresholds examined for $SO_2$, but significant air quality outcomes were achieved at the $2,300/ton cost threshold. The $2,300/ton threshold is projected to resolve the last remaining nonattainment area for the annual $PM_{2.5}$ standard (Liberty-Clairton),[46] and it also is projected to resolve the nonattainment and maintenance problems with the 24-hour $PM_{2.5}$ standard at 1 monitor in the Detroit area and resolve the maintenance problems in the Cleveland area. There were significant air quality improvements at this level in connection with widespread deployment of pollution control technology, while the cost impacts remained reasonable.

Moving beyond $2,300/ton to the $2,800/ton and $3,300/ton thresholds, EPA projected notably smaller air quality improvements compared to those projected when moving from the $1,600/ton threshold to the $2,300/ton threshold. EPA also projected no ultimate change in the 24-hour $PM_{2.5}$

---

[46] AQAT results indicated that one receptor in the Liberty-Clairton area continued to have maintenance problems with the annual $PM_{2.5}$ standard. However, final air quality modeling results (described in section VII.B) indicated that this maintenance problem was resolved for this receptor under the final Transport Rule.

attainment status of the remaining nonattainment area (Liberty-Clairton) or three remaining maintenance areas (Chicago,[47] Detroit, and Lancaster).[48] At the same time, the total program cost continued to increase by about the same interval at each of these thresholds as it had between the $1,600/ton and $2,300/ton thresholds. EPA thus observed a relatively lower cost-effectiveness of downwind $PM_{2.5}$ control via upwind $SO_2$ reductions beyond $2,300/ton for the receptors linked to Group 1 states. Table VI.D–1 and Figure VI.D–1 demonstrate this relationship between cost of EGU $SO_2$ control and downwind $PM_{2.5}$ concentration impacts, showing a sustained diminishing of cost effectiveness beyond the $2,300/ton threshold. The $2,300/ton threshold in this analysis is situated at the "knee-in-the-curve" area of cost-effectiveness for addressing downwind $PM_{2.5}$ concentrations with $SO_2$ reductions, beyond which point the air quality gains per dollar spent on additional reductions are much smaller. This relationship is demonstrative of the economic potency of $SO_2$ reductions at each cost threshold to address the $PM_{2.5}$ concentrations at linked receptors in this analysis.

TABLE VI.D–1—COST-EFFECTIVENESS OF GROUP 1 STATE $SO_2$ REDUCTIONS [a] FOR DOWNWIND $PM_{2.5}$ CONTROL

| $SO_2$ cost threshold | Additional system cost expended (2007$, billions) | Average $PM_{2.5}$ air quality improvement ($\mu g/m^3$) [b] | Air quality cost-effectiveness (average $\mu g/m^3$ reduced per billion $ expended) |
|---|---|---|---|
| $500 | 0.22 | 3.27 | 14.74 |
| $1,600 | 0.82 | 3.86 | 4.70 |
| $2,300 | 1.35 | 4.22 | 3.11 |
| $2,800 | 1.94 | 4.37 | 2.25 |
| $3,300 | 2.36 | 4.50 | 1.91 |
| $10,000 | 3.61 | 4.99 | 1.38 |

[a] Downwind $PM_{2.5}$ improvement based on $SO_2$ reductions from states "linked" to specific receptors. See section VI.C.
[b] Measured as the reduction in maximum design value for the 24-hour $PM_{2.5}$ NAAQS from AQAT base case to each $SO_2$ threshold for receptors with remaining nonattainment and maintenance exceedances at the $500/ton threshold, averaged across these receptors.



Figure VI.D–1

Air Quality Cost-Effectiveness
(average µg/m³ reduced per billion $ expended)

Furthermore, even at the $10,000/ton cost threshold, AQAT still projects Liberty-Clairton to face maintenance concerns with the annual $PM_{2.5}$ standard and is projected to remain in nonattainment of the 24-hour $PM_{2.5}$ standard, while the Chicago[49] and Lancaster areas are still projected to have residual maintenance problems

---

[47] This area is not currently designated as nonattainment for the 24-hour $PM_{2.5}$ standard. EPA is portraying the receptors and counties in this area as a single 24-hour maintenance area based on the annual $PM_{2.5}$ nonattainment designation of Chicago-Gary-Lake County, IL-IN.

[48] AQAT results indicated that two receptors in the Detroit area continued to have maintenance problems with the 24-hour $PM_{2.5}$ standard. However, final air quality modeling results (described in section VIII.B) indicated that only one receptor continued to have maintenance problems in this area for this standard under the final Transport Rule.

[49] This area is not currently designated as nonattainment for the 24-hour $PM_{2.5}$ standard. EPA is portraying the receptors and counties in this area as a single 24-hour maintenance area based on the annual $PM_{2.5}$ nonattainment designation of Chicago-Gary-Lake County, IL-IN.

with the 24-hour PM$_{2.5}$ standard. EPA projected that even total elimination of EGU SO$_2$ emissions (no matter the cost) would not be able to resolve either nonattainment of the 24-hour PM$_{2.5}$ standard in the Liberty-Clairton area or the residual maintenance concerns with that standard in Lancaster County. EPA thus finds that other PM$_{2.5}$ strategies, including local reductions of other PM$_{2.5}$ precursors, are important to consider for remaining nonattainment and maintenance areas to seek further improvements in PM$_{2.5}$ concentrations.

Considering both air quality and cost, EPA's multi-factor analysis indicated $2,300 per ton as an appropriate cost threshold for SO$_2$ in the Group 1 states. EPA believes the analyzed cost thresholds lower than $2,300/ton were not appropriate for SO$_2$ control in the Group 1 states under the Transport Rule for the following reasons:

• Downwind air quality impacts up to the $2,300 threshold are significant. Moving up to $2,300/ton successfully resolves all downwind nonattainment of the annual and 24-hour PM$_{2.5}$ standards except for the Liberty-Clairton receptor in Allegheny county with respect to 24-hour PM$_{2.5}$, which EPA has noted is heavily influenced by a local source of organic carbon (75 FR 45281).

• Upwind emission reductions available up to $2,300/ton are highly cost-effective compared with similar regulations.

• The emission reductions up to this threshold are achievable with widespread deployment of controls that can be installed at power plants by 2014.

• As stated at proposal, EPA finds it reasonable to require a substantial level of control of upwind state emissions that significantly contribute to nonattainment or maintenance problems in another state. The $2,300/ton cost threshold is comparable to EPA's survey of local non-EGU SO$_2$ reduction opportunities in the PM$_{2.5}$ NAAQS RIA, which range in cost from just above $2,300/ton to over $16,000/ton (2007 $). EPA thus finds it reasonable to seek EGU SO$_2$ reductions up to $2,300/ton (rather than at a lower cost threshold) in the states linked to receptors with ongoing attainment and maintenance concerns with the PM$_{2.5}$ NAAQS.

EPA believes the analyzed cost thresholds above $2,300/ton were not appropriate for SO$_2$ control in the Group 1 states under the Transport Rule for the following reasons:

• As noted above, AQAT suggests reductions up to $2,300/ton were able to resolve all projected downwind nonattainment of the annual and 24-hour PM$_{2.5}$ NAAQS, with the sole exception of projected nonattainment of the 24-hour PM$_{2.5}$ standard at a receptor in Liberty-Clairton. It is well-established that, in addition to being impacted by regional sources, the Liberty-Clairton area is significantly affected by local emissions from a sizable coke production facility and other nearby sources, leading to high concentrations of organic carbon in this area.[50] EPA finds that the remaining PM$_{2.5}$ nonattainment problem is predominantly local and therefore does not believe that it would be appropriate to establish a higher cost threshold solely on the basis of this projected ongoing nonattainment of the 24-hour PM$_{2.5}$ standard at the Liberty-Clairton receptor.

• Approximately 70 percent of base case SO$_2$ emissions from Group 1 states were eliminated at the $2,300/ton cost threshold, leaving a decreasing amount of emission reductions available at each increased cost threshold beyond $2,300/ton.

• Additional EGU SO$_2$ reductions available from EGUs beyond the $2,300/ton threshold level realize significantly less improvement in downwind PM$_{2.5}$ concentrations per dollar spent to impact receptors linked to Group 1 states. In other words, the cost-effectiveness of controlling EGU emissions in Group 1 states to improve downwind PM$_{2.5}$ concentrations at the linked receptors is notably diminished beyond the $2,300/ton threshold in this analysis. See Figure VI.D–1.

• EGUs are by far the largest source category for SO$_2$ emissions. This analysis shows that reductions of EGU SO$_2$ emissions up to the $2,300/ton cost threshold were significantly more cost-effective for improving downwind PM$_{2.5}$ concentrations than further such reductions (beyond the $2,300/ton cost threshold) would be to address the remaining PM$_{2.5}$ maintenance concerns. EPA's analysis also shows that these maintenance concerns cannot be fully resolved even with complete elimination of all remaining EGU SO$_2$ emissions, no matter the cost. EPA finds that other PM$_{2.5}$ precursor emission reductions, particularly those from local sources, will be critical for states in these remaining areas to consider for controlling PM$_{2.5}$ concentrations with respect to maintenance of the 2006 24-hour PM$_{2.5}$ NAAQS.

In summary, the appropriate cost thresholds for each state were identified through the multi-factor assessment. This assessment included both cost and air quality considerations. As explained above, the ozone-season NO$_X$ threshold was determined to be $500/ton for all states required to reduce ozone-season NO$_X$, with residual nonattainment and maintenance concerns to be addressed in a future rulemaking addressing a broader set of cost categories for additional cost-effective reductions. For PM$_{2.5}$, the appropriate cost threshold for each state was determined to be either the level at which nonattainment and maintenance issues were completely resolved in downwind states to which the state is linked, the level where remaining nonattainment and maintenance issues are primarily local, or where we found greatly diminished improvements in air quality occurring if EPA moved further up the cost curve. This assessment yielded a cost threshold of $2,300/ton on SO$_2$ for Group 1 states starting in 2014 ($500/ton in 2012), a cost threshold of $500/ton on SO$_2$ for Group 2 states, and a cost threshold of $500/ton on annual NO$_X$ for all states required to reduce emissions for purposes of the annual or 24-hour PM$_{2.5}$ NAAQS in this rule.

As explained above, none of these specific cost thresholds establish any precedent for the cost per ton stringency of reductions EPA may require in future transport-related rulemakings; these specific cost thresholds are based on current analyses of air quality and cost of emission reductions with respect to the NAAQS considered in this rulemaking and thus would not be relevant to future rulemakings (which would consider updated information) or rulemakings with respect to different NAAQS. In particular, EPA acknowledges that additional action EPA will require in a subsequent rulemaking to address significant contribution to nonattainment and interference with maintenance of the 2008 ozone NAAQS (once reconsideration is finalized) is very likely to require a higher cost per ton stringency of ozone-season NO$_X$ control applied to a broader set of source categories from upwind states than found to be appropriate for this rulemaking.

2. State Emission Budgets (Step 4)

a. Budget Methodology

EPA used the multi-factor assessment to identify, for each state, the cost threshold that should be used to quantify that state's significant contribution. As described above, in the context of this rulemaking EPA identified a cost threshold of $500/ton for ozone-season NO$_X$ control for all states required to reduce ozone-season

---

[50] http://www.epa.gov/pmdesignations/2006standards/final/TSD/tsd_4.0_4.3_4.3.3_r03_PA_2.pdf.

$NO_X$ emissions for purposes of the 1997 ozone NAAQS in this rule. EPA also identified a cost threshold of $500/ton for annual $NO_X$ control for all states required to reduce annual $NO_X$ emissions for purposes of the annual or 24-hour $PM_{2.5}$ NAAQS in this rule. Finally, EPA identified a cost threshold of $500/ton of $SO_2$ starting in 2012 for all states required to reduce $SO_2$ emissions for purposes of the annual or 24-hour $PM_{2.5}$ NAAQS in this rule, and

$2,300/ton for the Group 1 states starting in 2014.

EPA used these cost thresholds from the multi-factor analysis to quantify each state's emissions that significantly contribute to nonattainment or interfere with maintenance downwind. For example, for a Group 1 state, EPA modeling of the cost threshold conveys emission reductions available in each covered state from operation of existing pollution controls as well as all

emission reductions available at cost thresholds of $500/ton for annual $NO_X$ in 2012 and 2014, $500/ton for $SO_2$ in 2012, and $2,300/ton for $SO_2$ in 2014. The total $SO_2$ and $NO_X$ projected at these cost levels in that state in those years represents that state's emissions once significant contribution to nonattainment or interference with maintenance downwind for the relevant $PM_{2.5}$ NAAQS has been eliminated.

TABLE VI.D–2—EXAMPLE OF EMISSION REDUCTIONS AND BUDGET FORMATION IN PENNSYLVANIA FOR ANNUAL $SO_2$ AND $NO_X$[a]

| | | Final cost threshold | Base case emissions (1,000 tons) | Remaining emissions at cost thresholds (1,000 tons) | Emissions eliminated (1,000 tons) |
|---|---|---|---|---|---|
| A | B | C | D | E | F |
| 2012 .......................... | $SO_2$ .......................... | $500 | 493 | 279 | 215 |
| | $NO_X$ .......................... | 500 | 129 | 120 | 9 |
| 2014 .......................... | $SO_2$ .......................... | 2,300 | 507 | 112 | 395 |
| | $NO_X$ .......................... | 500 | 132 | 119 | 13 |

[a] **Note:** In this table, emissions are shown for fossil-fuel-fired EGUs > 25 MW (*i.e.*, those units likely covered by the Transport Rule). Table VI.D.2 illustrates how budgets are derived from the elimination of significant contribution for the state of Pennsylvania. Column C illustrates the cost thresholds applied in the costing run that was ultimately identified as the final cost threshold in the multi-factor analysis. Column D shows the base case emissions for the identified pollutant in the identified time period. Column E shows the emission levels that result when the cost thresholds identified in column C are applied. Because this is the cost threshold identified through the multi-factor analysis and the point where all significant contribution to nonattainment and interference with maintenance has been addressed for the $PM_{2.5}$ NAAQS—state budgets are based on these emission levels. The final column illustrates the emission reductions for the state in an average year (before accounting for variability).

EPA's modeling of a state's $SO_2$ and annual $NO_X$ emission levels (from fossil-fired EGUs > 25 MW) at the relevant cost thresholds in each state reflect that state's emissions from covered sources after the removal of significant contribution to nonattainment and interference with maintenance of the $PM_{2.5}$ NAAQS considered in this rulemaking. As these state emission levels reflect the removal of significant contribution and interference with maintenance, they are reasonable levels on which to determine state budgets. Consequently, EPA based state budget levels on the state level emissions that remained at the cost threshold. Each state's budget corresponds to its emission level following the elimination of significant contribution to nonattainment and interference with maintenance in an average year (before taking year-to-year variability into account, as discussed in section VI.E below). Therefore, the implementation and realization of these budgeted emission levels leads to the elimination of significant contribution to nonattainment and interference with maintenance and EPA meets the statutory mandate of section 110(a)(2)(D)(i)(I) with respect to the 1997 annual $PM_{2.5}$ NAAQS and the 2006 24-hour $PM_{2.5}$ NAAQS.

EPA's establishment of state budgets for ozone-season $NO_X$ control follow the same methodology as described above for $SO_2$ and annual $NO_X$. Implementation of these ozone-season $NO_X$ budgets reflects the elimination of significant contribution to nonattainment and interference with maintenance of the 1997 ozone NAAQS for 15 states, whereas 11 other states' ozone-season $NO_X$ budgets reflect meaningful progress toward (but may not reflect full completion of) this elimination under the mandate of section 110(a)(2)(D)(i)(I). *See* section III for lists of states.

This approach to basing budgets on projected state level emissions used in the multi-factor analysis is identical to the approach used in the proposal for determining 2014 $SO_2$ budgets for Group 1 states. EPA is extending this approach more broadly in the final Transport Rule to create state budgets for ozone-season $NO_X$, annual $NO_X$, and $SO_2$ in all relevant states in both 2012 and 2014. In the proposal EPA used a more complex approach based on a comparison of historic and projected unit-level emissions (further adjusted for operation of existing controls) in each state to create 2012 state budgets for ozone-season $NO_X$, annual $NO_X$, and Group 2 $SO_2$. At the time of proposal,

EPA believed that historic 2009 emissions data were in some cases more representative of expected emissions in 2012 than pure modeling projections made at the time (75 FR 45290).

However, following the proposal EPA has made significant updates to the IPM model for projecting EGU emissions, including specifically the adoption of 2009 historic data into its modeling parameters directly. EPA also received substantial public input following the proposal on the model's assumptions and representation of individual units, which allowed EPA to improve its 2012 and 2014 emission projections for states under the cost thresholds considered. These modeling updates diminish the concerns EPA expressed at proposal that 2009 historic data may have offered for some states a better proxy for 2012 emissions than model projections, particularly now that EPA is incorporating 2009 data directly in its updated modeling projections. Given these updates to the model in response to public comment, EPA believes it is more appropriate for the final rule to use a consistent approach based on projected state level emissions for all state budgets, as was done for Group 1 $SO_2$ budgets in 2014 at proposal. EPA received significant comment supporting the use of the model to

project state-level emissions for creating budgets in this manner. EPA also received comments that criticized the proposal's methodology for 2012 budgets for lack of transparency, unnecessary complexity, and inconsistency with the state-level emission projections used in the air quality modeling. EPA's decision for the final Transport Rule to consistently apply across all pollutants the budget methodology originally used for Group 1 $SO_2$ budgets in 2014 addresses those concerns.

This budget methodology for the final rule uses projected state-level emissions in 2012 and 2014 to set emission budgets for those years on relevant pollutants for that state to control under the Transport Rule. EPA's modeling projects that some states have 2014 emissions that are lower than their 2012 projected emissions even as the same cost threshold (e.g., $500/ton) is applied in both years. This occurs in the annual $NO_X$, ozone-season $NO_X$, and Group 2 $SO_2$ program. As such, EPA's application of this budgeting methodology results in a tightening of budgets in states whose projected emissions of that budgeted pollutant decline from 2012 to 2014 as the cost threshold is held constant.

There are two primary variables that explain the decrease in emissions for some states between 2012 and 2014 as the cost threshold remains constant over both time periods. First, even though the cost threshold is constant between 2012 and 2014 for the programs noted above, the cost threshold for $SO_2$ Group 1 increases in 2014. This higher cost threshold for Group 1 $SO_2$ results in obvious reductions in $SO_2$ emissions in the Group 1 states, but also may lower the cost of certain related $NO_X$ reductions in those states as well such that they become newly available within the $500/ton threshold. For example, if a state increases natural gas generation in response to the higher $SO_2$ cost threshold, such action also yields additional annual and ozone-season

$NO_X$ emission reductions that are cost-effective at the $500/ton $NO_X$ threshold. Where the cost curve modeling shows such additional cost-effective $NO_X$ reductions in tandem with $SO_2$ control, EPA is therefore reducing those states' 2014 annual $NO_X$ and ozone-season $NO_X$ budgets accordingly, so that those budgets accurately reflect remaining emissions from covered sources in those states after the elimination of all emissions that can be reduced up to the relevant cost thresholds (e.g., $500/ton).

Second, some of these additional reductions are driven by non-Transport Rule variables. These are reductions that occur due to state rules, consent decrees, and other planned changes in generation patterns that occur after 2012, but during or prior to 2014. For example, EPA modeling reflects emission reduction requirements under provisions of a Georgia state rule that go into effect after 2012 but before 2014. These requirements involve the installation and operation of specific advanced pollution controls. These source-specific requirements under a legal authority unrelated to the Transport Rule result in sharp reductions in Georgia's baseline emission projections between 2012 and 2014. Even though the cost threshold for $NO_X$ and for $SO_2$ in Georgia is $500/ton in both 2012 and 2014, EPA believes it is important to establish separate $NO_X$ and $SO_2$ budgets that accurately reflect the emissions remaining in Georgia (and other states experiencing similar reductions) after the elimination of emissions that can be reduced up to the Transport Rule remedy's cost thresholds (e.g., $500/ton) (see Table VI.D.3). It illustrates a notable decrease between the 2012 and 2014 state budgets for $NO_X$ and $SO_2$ in Georgia that is largely driven by state rule requirements. If EPA did not adjust 2014 budgets to account for other emission reductions that would occur even in the baseline, other sources within the state would be allowed to increase their emissions under the unadjusted Transport Rule budgets to

offset the emission reductions planned under other requirements such as state rules. Therefore, to prevent the Transport Rule from allowing such offsetting of emission reductions already expected to occur between 2012 and 2014, EPA is establishing separate budgets for 2012 and 2014 in the final Transport Rule to capture emission reductions in each state that would occur for non-Transport Rule-related reasons (i.e., in the base case) during that time.

EPA's modeling also projects that other states would slightly increase emissions from 2012 to 2014 even at the same cost threshold, such as $500/ton. There are two primary variables that explain the increase in emissions for these states between 2012 and 2014. These increases are generally small in magnitude. For annual and ozone season $NO_X$, they occur as a byproduct of small changes in dispatch related to changes in non-Transport Rule factors (e.g., higher demand in 2014). For $SO_2$, they primarily occur in Group 2 states and, in addition to the reasons given above, are influenced by some generation shifting from Group 1 to Group 2 states as the Group 1 states begin to face a higher cost threshold in 2014. EPA believes that allowing for such emission growth in covered states beyond 2012 would be inconsistent with the Transport Rule's identification and elimination of significant contribution to nonattainment and interference with maintenance beginning in 2012. Therefore, for any covered state whose emissions of a relevant pollutant are projected to increase from 2012 to 2014 under the relevant cost thresholds selected in the multi-factor analysis described above, EPA is finalizing that state's 2014 emission budget to maintain the same level of the 2012 emission budget, thereby disallowing such an emission increase that is inconsistent with the 110(a)(2)(D)(i)(I) mandate. Tables VI.D–3 and VI.D–4 below list state emission budgets.[51]

TABLE VI.D–3—$SO_2$ AND ANNUAL $NO_X$ STATE EMISSION BUDGETS FOR ELECTRIC GENERATING UNITS BEFORE ACCOUNTING FOR VARIABILITY *

[Tons]

| | Group | $SO_2$ | | $NO_X$ | |
|---|---|---|---|---|---|
| | | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond |
| Alabama ............................................ | 2 | 216,033 | 213,258 | 72,691 | 71,962 |
| Georgia ............................................ | 2 | 158,527 | 95,231 | 62,010 | 40,540 |

[51] These budgets include minor technical corrections to $SO_2$ budgets in three states (KY, MI, and NY) that were made after the impact analyses for the final rule were conducted. EPA conducted sensitivity analysis confirming that these differences do not meaningfully alter any of the Agency's findings or conclusions based on the projected cost, benefit, and air quality impacts presented for the final Transport Rule. The results of this sensitivity analysis are presented in Appendix F in the final Transport Rule RIA.

TABLE VI.D–3—SO₂ AND ANNUAL NOₓ STATE EMISSION BUDGETS FOR ELECTRIC GENERATING UNITS BEFORE ACCOUNTING FOR VARIABILITY *—Continued

[Tons]

| | Group | $SO_2$ | | $NO_X$ | |
|---|---|---|---|---|---|
| | | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond |
| Illinois | 1 | 234,889 | 124,123 | 47,872 | 47,872 |
| Indiana | 1 | 285,424 | 161,111 | 109,726 | 108,424 |
| Iowa | 1 | 107,085 | 75,184 | 38,335 | 37,498 |
| Kansas | 2 | 41,528 | 41,528 | 30,714 | 25,560 |
| Kentucky | 1 | 232,662 | 106,284 | 85,086 | 77,238 |
| Maryland | 1 | 30,120 | 28,203 | 16,633 | 16,574 |
| Michigan | 1 | 229,303 | 143,995 | 60,193 | 57,812 |
| Minnesota | 2 | 41,981 | 41,981 | 29,572 | 29,572 |
| Missouri | 1 | 207,466 | 165,941 | 52,374 | 48,717 |
| Nebraska | 2 | 65,052 | 65,052 | 26,440 | 26,440 |
| New Jersey | 1 | 5,574 | 5,574 | 7,266 | 7,266 |
| New York | 1 | 27,325 | 18,585 | 17,543 | 17,543 |
| North Carolina | 1 | 136,881 | 57,620 | 50,587 | 41,553 |
| Ohio | 1 | 310,230 | 137,077 | 92,703 | 87,493 |
| Pennsylvania | 1 | 278,651 | 112,021 | 119,986 | 119,194 |
| South Carolina | 2 | 88,620 | 88,620 | 32,498 | 32,498 |
| Tennessee | 1 | 148,150 | 58,833 | 35,703 | 19,337 |
| Texas | 2 | 243,954 | 243,954 | 133,595 | 133,595 |
| Virginia | 1 | 70,820 | 35,057 | 33,242 | 33,242 |
| West Virginia | 1 | 146,174 | 75,668 | 59,472 | 54,582 |
| Wisconsin | 1 | 79,480 | 40,126 | 31,628 | 30,398 |
| Grand Total | | 3,385,929 | 2,135,026 | 1,245,869 | 1,164,910 |
| Group 1 Total | | 2,530,234 | 1,345,402 | NA | NA |
| Group 2 Total | | 855,695 | 789,624 | NA | NA |

**Note:** These state emission budgets apply to emissions from electric generating units covered by the Transport Rule Program. Group 1/Group 2 designations are only relevant for $SO_2$ emissions budgets.

* The impact of variability on budgets is discussed in section VI.E.

The District of Columbia is not covered by the final Transport Rule. As discussed in section V.D of this preamble and as done for the Transport Rule proposal, EPA combined contributions projected in the air quality modeling from Maryland and the District of Columbia to determine whether those jurisdictions collectively contribute to any downwind nonattainment or maintenance receptor in amounts equal to or greater than the 1 percent thresholds. This modeling confirmed that the combined contributions exceed the air quality threshold at downwind receptors for the ozone, annual $PM_{2.5}$, and 24-hour $PM_{2.5}$ NAAQS considered. Both Maryland and the District of Columbia are therefore linked to these receptors.[52] However, the District of Columbia is not included in the Transport Rule because, in the second step of EPA's significant

contribution analysis, we concluded that there are no emission reductions available from EGUs in the District of Columbia at the cost thresholds deemed sufficient to eliminate significant contribution to nonattainment and interference with maintenance of the NAAQS considered at the linked receptors. At the time of this rulemaking, EPA finds only one facility with units meeting the Transport Rule applicability requirements in the District of Columbia. EPA's projections do not show any generation from this facility to be economic under any scenario analyzed (including the base case), and the facility's owners have also announced plans to retire its units in early 2012.[53] Therefore, this unit is projected to have zero emissions in 2012. As such, the total $SO_2$ and $NO_X$ emissions in the District of Columbia for EGUs that meet the Transport Rule applicability requirements is also projected to be zero. It follows therefore,

that EPA did not identify any emission reductions available at any of the cost thresholds considered in the final rule's multi-factor analysis to identify significant contribution to nonattainment and interference with maintenance. For this reason, EPA concludes that no additional limits or reductions are necessary, at this time, in the District of Columbia to satisfy the requirements of section 110(a)(2)(D)(i)(I) with respect to the 1997 ozone, the 1997 $PM_{2.5}$ and the 2006 $PM_{2.5}$ NAAQS. EPA is therefore neither establishing budgets nor finalizing any FIPs for the District of Columbia in this rule.

TABLE VI.D–4—OZONE SEASON NOₓ STATE EMISSION BUDGETS FOR ELECTRIC GENERATING UNITS BEFORE ACCOUNTING FOR VARIABILITY *

[Tons]

| | 2012–2013 | 2014 and beyond |
|---|---|---|
| Alabama | 31,746 | 31,499 |
| Arkansas | 15,037 | 15,037 |
| Florida | 27,825 | 27,825 |
| Georgia | 27,944 | 18,279 |
| Illinois | 21,208 | 21,208 |

[52] It is important to note that Maryland's modeled contributions in isolation were greater than the 1 percent threshold for all three of the NAAQS considered at all of the same receptors for which Maryland and DC were "linked," and therefore EPA would have considered Maryland "linked" to the same set of downwind receptors even if the Agency had treated Maryland's contributions and the District of Columbia's contributions separately.

[53] The future retirement status of this D.C. facility was also supported by its inclusion on PJM's future deactivation list. PJM further suggested that reliability issues related to their retirement are expected to be resolved by next year in time for its planned retirement date. (*See* PJM pending deactivation request in TR Docket.)

TABLE VI.D–4—OZONE SEASON NO<sub>X</sub> STATE EMISSION BUDGETS FOR ELECTRIC GENERATING UNITS BEFORE ACCOUNTING FOR VARIABILITY *—Continued

[Tons]

|  | 2012–2013 | 2014 and beyond |
|---|---|---|
| Indiana | 46,876 | 46,175 |
| Kentucky | 36,167 | 32,674 |
| Louisiana | 13,432 | 13,432 |
| Maryland | 7,179 | 7,179 |
| Mississippi | 10,160 | 10,160 |
| New Jersey | 3,382 | 3,382 |
| New York | 8,331 | 8,331 |
| North Carolina | 22,168 | 18,455 |
| Ohio | 40,063 | 37,792 |
| Pennsylvania | 52,201 | 51,912 |
| South Carolina | 13,909 | 13,909 |
| Tennessee | 14,908 | 8,016 |
| Texas | 63,043 | 63,043 |
| Virginia | 14,452 | 14,452 |
| West Virginia | 25,283 | 23,291 |
| Total | 495,314 | 466,051 |

**Note:** These state emission budgets apply to emissions from electric generating units covered by the Transport Rule Program. Group 1/Group 2 designations are only relevant for $SO_2$ emissions budgets.

* The impact of variability on budgets is discussed in section VI.E.

EPA notes that the $NO_X$ budgets for five states linked to downwind ozone receptors in the final Transport Rule are equal to their projected 2012 base case emissions. The five states are Arkansas, Indiana, Louisiana, Maryland, and Mississippi. These states are among those found to meet or exceed the 1 percent contribution threshold for the 1997 ozone NAAQS at downwind receptors and are thus "linked" to downwind receptors. EPA therefore evaluates, in the second step of its significant contribution analysis, what emission limits are necessary to ensure that all emissions that constitute the state's significant contribution to nonattainment and interference with maintenance are prohibited. As explained above, EPA decided to require from all such states all reductions available at the $500/ton cost threshold. The five states identified above do not appear to show EGU ozone-season $NO_X$ reductions at the $500/ton cost threshold relative to the 2012 base case projections (which do not take into account reductions to be made in other states as a result of this rule). Therefore, EPA conducted further analysis to evaluate whether such reductions were available in these states and whether emission limits are necessary to prohibit these states from significantly contributing to downwind nonattainment or interfering with

maintenance of the 1997 ozone NAAQS in other states. (*See* the docket to this rulemaking for the IPM run titled TR_uncontrolled_ozone_states_Final.")

Specifically, EPA projected those states' ozone-season $NO_X$ emissions if all other linked states (but not these five states) were to make all available reductions at the $500/ton threshold. That analysis revealed that if emission limits were not established for these five states, ozone-season $NO_X$ emissions in each of the states would increase (beyond the 2012 base case emission projections), due to interstate shifts in electricity generation that cause "emissions leakage" in uncovered states. These increases would result in each state's emissions being above the level associated with the prohibition of all emissions that can be eliminated at the $500/ton threshold. EPA thus determined that it is necessary to establish emission limits for these states at the $500/ton level. These limits, although equal to the state's 2012 projected base case emissions, are necessary to prohibit all emissions that can be controlled at the $500/ton cost threshold. In other words, the significant contribution to nonattainment and interference with maintenance addressed by the ozone FIPs for these states is the difference between these states' projected emissions if they were not covered under the Transport Rule (but other states were), and their emissions after all emissions that can be eliminated at $500/ton are prohibited.

In addition, EPA notes that four of these five states (Arkansas, Indiana, Louisiana, and Mississippi) are linked to receptors in either the Houston or Baton Rouge areas, which are projected to continue facing nonattainment or maintenance concerns with the 1997 ozone NAAQS, respectively. To allow these states to increase emissions above base case projections would erode the measurable progress toward eliminating significant contribution to nonattainment and interference with maintenance secured by achieving ozone-season $NO_X$ reductions in the other states linked to these receptors. Furthermore, as discussed in section III, EPA may require additional reductions in these states to fully address significant contribution to nonattainment and interference with maintenance with respect to the 1997 ozone NAAQS in a future rulemaking to be proposed after finalizing reconsideration of the 2008 ozone NAAQS.

b. Relationship of Group 1 and Group 2 States for $SO_2$ Control

In the Proposal, EPA chose not to allow sources in Group 1 states to use Group 2 $SO_2$ allowances for compliance, and likewise not to allow sources in Group 2 states to use Group 1 $SO_2$ allowances for compliance at any time. The preamble clearly states, "With regard to interstate trading, the two $SO_2$ stringency tiers would lead to two exclusive $SO_2$ trading groups. That is, states in $SO_2$ Group 1 could not trade with states in $SO_2$ Group 2" (75 FR 45216). No such distinction or limitation exists for $NO_X$ allowance trading.

EPA received significant public comment both in support of and opposition to the two distinct $SO_2$ trading programs. Those in opposition noted that the variability limits imposed at the state level made the compliance restrictions between the two groups unnecessary. Commenters also noted that it may unfairly penalize sources that are part of the same airshed, but are on opposite sides of a state boundary. Those in favor of the separate $SO_2$ compliance programs noted that it would reduce the probability of a state exceeding its variability limit. Allowing the use of Group 1 or Group 2 allowances for compliance between the two $SO_2$ programs would potentially encourage Group 1 states to purchase allowances instead of making reductions necessary to eliminate significant contribution. Group 1 states are states that need continued reductions (beyond the $500/ton threshold) to eliminate their significant contribution to nonattainment and interference with maintenance. Group 2 states have already eliminated their significant contribution to nonattainment and interference with maintenance at the $500/threshold. So to allow Group 1 or Group 2 allowances to be used interchangeably for compliance between the two $SO_2$ groups would be to allow the shifting of reductions from areas where they are needed to eliminate significant contribution to nonattainment and interference with maintenance to areas where they are not needed to eliminate the prohibited emissions. EPA also agrees that allowing for trading between the two groups in the remedy finalized in this action would increase risk of a state exceeding its variability limit. For these reasons, EPA is finalizing this rulemaking with the same prohibition on $SO_2$ trading between Group 1 and Group 2 states that was defined in the proposal. Further, EPA clarifies that while trading of allowances (*i.e.,*

buying, selling, and banking) is allowed without restriction, it is specifically the surrender of $SO_2$ allowances for compliance that is limited. As mentioned earlier, a source in a Group 1 state can only use $SO_2$ allowances allocated to Group 1 states for compliance with the $SO_2$ trading program. Likewise, a source in a Group 2 state can only use $SO_2$ allowances allocated to Group 2 states for compliance with the $SO_2$ trading program.

c. Ozone-Season Budgets

EPA established the ozone-season $NO_X$ budgets in a similar manner to the annual $NO_X$ and $SO_2$ budgets by using the state level emissions from the cost threshold that reflected the removal of significant contribution to nonattainment and interference with maintenance. Ozone-season budgets were based on the state level emissions from fossil-fuel-fired units greater than 25 MW observed at this cost threshold. As described in section VI.B, all cost thresholds examined reflected the final Transport Rule geography and the marginal costs were applied accordingly. Therefore, for an ozone-only state like Florida, the state level emissions would only reflect an ozone-season cost threshold of $500/ton in the final cost curves for 2012 and 2014. For a state subject to both annual and ozone-season programs, the marginal cost curves would reflect a $500/ton $NO_X$ cost year round, a $500/ton $SO_2$ cost in 2012 and the $2,300/ton $SO_2$ cost starting in 2014 if a Group 1 state.

(1) Length of Ozone Season

(a) Proposed Rule. For purposes of determining ozone-season budgets in the proposed rule, EPA defined the ozone season based on a 5 month period (May 1 through September 30). This 5 month ozone season was consistent with the approach taken by the OTAG, the $NO_X$ SIP Call, and CAIR. EPA requested comment on whether EPA should base final rule budgets on a longer season, such as March through October.

(b) Public Comments. Several commenters supported continuing with the May through September time period. One commenter supported continuing with this time period, but argued that EPA should consider lengthening the ozone season for future efforts. One commenter questioned the concept of ozone season budgets and recommended EPA focus on sources with greater emissions on high ozone days.

(c) Final rule. For the final rule, EPA has retained the approach in the proposed rule, as commenters broadly supported the proposal's ozone-season duration and ozone-season $NO_X$ limitations. Notably, many Transport Rule states covered for $PM_{2.5}$ reductions will have sources with annual $NO_X$ controls that are likely to keep operating year round to address $PM_{2.5}$ and ozone. EPA believes that experience from ozone-season $NO_X$ trading has consistently shown that the emission measures taken to comply with ozone-season budgets provide emission reductions throughout the ozone-season, including the highest ozone days. (*See* $NO_X$ Budget Trading Program and CAIR Program progress reports in the docket to this rulemaking or at *http://www.epa.gov/airmarkets/progress/nbp08.html* and *http://www.epa.gov/airmarkets/progress/CAIR_09/CAIR09.html*.) However, EPA believes that there is merit in future Agency actions addressing ozone transport in considering strategies to target high ozone days more specifically.

d. Summary of Cost Thresholds and Final Budgets for $PM_{2.5}$ and Ozone

Summary of methodology. In summary, EPA determined that $SO_2$ emissions that could be reduced for $2,300/ton in 2014 should be considered a state's significant contribution to nonattainment and interference with maintenance, unless EPA determined that a lesser reduction would fully resolve the nonattainment and/or maintenance problem for all the downwind receptors to which a particular state might be linked. For these Group 2 states EPA is determining that a lesser reduction of $SO_2$, based on the amount of $SO_2$ reductions that can be reasonably achieved by 2012 is appropriate. This level is defined by the reductions observed in the $500/ton cost threshold. EPA also determined that all states linked to downwind $PM_{2.5}$ nonattainment and maintenance problems should be required to achieve those emission reductions that can be reasonably achieved by 2012. Finally, EPA determined that all states linked to downwind $PM_{2.5}$ nonattainment and maintenance problems should, by 2012, remove all $NO_X$ emissions that can be reduced for $500/ton and run all existing controls in 2012.

For ozone-season $NO_X$, EPA determined that all states linked to downwind ozone and nonattainment and maintenance problems should be required to achieve those ozone-season emission reductions associated with a cost threshold of $500 per ton. Additionally, EPA examined final 2012 and 2014 budgets based on state level emissions at $500 cost threshold.

The budget formation methodology finalized in this action responds to concerns about state budgets expressed by commenters on the Transport Rule proposal. EPA requested comment on the four step approach used to determine significant contribution and determine budgets in the proposal. Some commenters noted that the state level emissions from the cost thresholds used to determine significant contribution to nonattainment and interference with maintenance did not match the state level emissions allowed by the final budgets. The concern was that the state level emissions that reflected the elimination of significant contribution in the AQAT analysis, in particular for $NO_X$, were less than the emissions allowed by the final budgets. The result would be an implementation that did not quite fully eliminate the significant contribution to nonattainment and interference with maintenance defined in the rule. The proposed budgets not matching the levels reflected in the proposed costing runs were an artifact of the budget formation process that relied on a combination of historic and projected data. While EPA noted this process resulted in state budgets that ''reflected'' EGU emissions at $500/ton, it was not always consistent with the EGU emissions at $500/ton in the costing runs as the commenters noted. By using the cost curves to determine both significant contribution to nonattainment and interference with maintenance—and state budgets—in the final rule, EPA addresses the commenter's concerns about any inconsistency between the two in the proposal.

Some commenters expressed concern that the Transport Rule would result in state budgets that were in some cases higher than those established in CAIR. Commenters suggested that this would be inconsistent with requirements or the spirit of certain CAA provisions aimed at preventing backsliding, *i.e.*, sections 110(l), 172(e), and 193. However, the DC Court of Appeals rejected the state budgets in CAIR as arbitrary and capricious and not consistent with CAA section 110(a)(2)(D)(i)(I) (North Carolina, 531 F.3d 918 and 921) and remanded CAIR to EPA to promulgate a new rule replacing CAIR consistent with the Court's decision (North Carolina, 550 F.3d 1178). As discussed elsewhere in this section, on remand EPA developed new, final state budgets that address the Court's concerns and meet section 110(a)(2)(D)(i)(I) requirements.

Although some state budgets under the final rule are higher than those

under CAIR, this does not violate either the letter or the spirit of CAA provisions aimed at backsliding. In particular, CAA section 110(l) provides that the Administrator may not approve a plan revision that would ''interfere with any * * * applicable requirement'' of the CAA. 42 U.S.C. 7410(l). Because the Court reversed and remanded CAIR with instructions to ''remedy'' the rule's ''fundamental flaws'' (including specifically the state budgets found to be unlawful (North Carolina, 550 F.3d 1178), it is difficult to see how new state budgets replacing unlawful budgets and meeting section 110(a)(2)(D)(i)(I) requirements could be viewed as interfering with requirements of the CAA. Indeed, the commenters' approach would severely limit EPA's ability to meet the Court's mandate to develop a new rule consistent with section 110(a)(2)(D)(i)(I). *See* North Carolina, 531 F.3d 921 (explaining that EPA may not require ''some states to exceed the mark'' of eliminating their significant contribution). Further, the other CAA sections cited by the commenters (section 172(e), addressing circumstances where the Administrator relaxes a NAAQS, and section 193, addressing the treatment of requirements promulgated before the November 15, 1990, enactment date for the 1990 Amendments to the Clean Air Act) are not applicable here.

Additionally, while the CAIR budgets may have been tighter than Transport Rule state budgets for a couple of states, the sum of state budgets that were subject to both CAIR and the Transport Rule is lower under the Transport Rule for the annual programs. Moreover, the carryover of the large Title IV allowance bank in CAIR allowed for a great deal more emissions within any given state than is permitted under the Transport Rule.

*E. Approach to Power Sector Emission Variability*

1. Introduction to Power Sector Variability

Variability is an inherent aspect of the production and delivery of electricity. It follows that variations in state emissions are not only a result of variations in the level of emission control, but also are caused by the inherent variability in power generation. The state budgets do not account for this latter source of variability at the state level. Emission variability is built into the design of power systems, which use a wide mix of power generation sources with varying use and emission patterns to ensure reliability in electric power generation. Variations in weather, demand due to changes in the level of economic activity, the portion of electric generation that is fossil-fuel-fired, the length and number of outages at power generation units, and other factors, can lead to significant variations in the load levels of different power generation sources. Variations in the load levels of sources in any given state cause variations in the level of emissions in that state. Thus, EPA believes it is appropriate, in this rule, to take into account the variations that are caused by inherent variability in power generation. More specifically, variations in these external variables can cause significant fluctuations in state emissions, even when action has been taken to prohibit all emissions within a state that significantly contribute to nonattainment or interfere with maintenance in another state. For this reason, EPA considers variability when determining the state specific requirements in this rule. EPA does so by developing variability limits and assurance levels for each state, as described in this section, that are consistent with the statutory mandate of CAA section 110(a)(2)(D)(i)(I).

Loads on a power system, and thus on power generation sources in a given state that are on the power system, vary over every time interval, changing not only in the short term and seasonally, but also annually. As noted above, load patterns and levels are determined by a multiplicity of factors, including weather, economic activity, the portion of electric generation that is fossil-fuel-fired, and the length and number of outages at power generation units, which vary over time. In particular, weather obviously varies not just from season-to-season but also from year-to-year, and even small changes in annual weather patterns can affect how the power system and power generation sources on the power system operate during a year. For example, load, and the resulting use of generation sources on an interconnected grid to meet load, depend not only on how hot a summer day is, but also on where a heat wave occurs and how long it lasts. Similarly, a relatively cold winter that drives up winter load may also change what generation sources are used to address the increased demand for heat. Thus, the pattern of generation may shift geographically as a weather pattern moves across the country. Because weather and other factors affecting loads, and the patterns of generation used to meet loads, vary over time and from state to state, the resulting level of emissions also varies over time and from state to state.

This variability in emissions is not a result of variation in emission rates, emission controls, or emission control strategies, but instead is a result of the inherent variability in power generation. Patterns of generation change to ensure demand for electricity is met and to ensure continued reliability of the power system. This results in temporal and geographic fluctuations in emissions. In the final Transport Rule, like the proposed rule, EPA explicitly takes account of these changing patterns of generation and the resultant variability in power sector emissions.

As discussed previously, EPA identified a specific amount of emissions that must be prohibited by each state to meet the requirements of CAA section 110(a)(2)(D)(i)(I). EPA also developed state baseline emissions for power generation sources based on projections of state emissions in an average year before the elimination of prohibited emissions, and state budgets for power generation sources based on projections of state emissions in an average year after the elimination of such emissions. However, because of the inherent variability in state-level baseline emissions—resulting from the inherent variability in loads and power system and power generation source operations—state-level emissions will fluctuate from year-to-year even after all significant contribution to nonattainment and interference with maintenance that EPA identified in this final rule are eliminated. In an above average year, emissions may exceed the state budgets which are based on an analysis of projected emissions in an average year. EPA believes that, because baseline emissions are variable for reasons unrelated to the degree of emission control in a state and emissions after the elimination of all significant contribution to nonattainment and interference with maintenance are therefore also variable, it is appropriate to take this variability into account in developing the remedy for meeting the requirements of CAA section 110(a)(2)(D)(i)(I). The variability limits and assurance levels in the final rule account for this inherent variability, while ensuring that emissions within each state that significantly contribute to nonattainment or interfere with maintenance in another state are prohibited. EPA believes this approach is both reasonable in that it reflects the operation of the power system generation in order to maintain electric reliability and consistent with the statutory mandate of CAA section 110(a)(2)(D)(i)(I). For these reasons, EPA

is finalizing variability limits for each state budget to identify the range of emissions that EPA believes is likely to occur in each state following the elimination of all the state's significant contribution to nonattainment and interference with maintenance.

As discussed above, the air quality-assured trading remedy's state-specific budgets represent each state's emissions in an average year after elimination of significant contribution to nonattainment and interference with maintenance. Because actual base case emissions are likely to vary from projected base case emissions, this remedy incorporates provisions that account for such variability. While the primary purpose of this remedy is to eliminate significant contribution and interference with maintenance, EPA believes variability limits also satisfy several other objectives. The remedy provides the flexibility to deal with real-world variability in the operation of the power system through air quality-assured trading and reduces costs of compliance with emission reduction requirements, while still providing assurance for downwind states that significant contribution to nonattainment and interference with maintenance by upwind states will be eliminated. EPA believes the limited fluctuation in state level emissions that this approach permits is consistent with the statutory mandate of section 110(a)(2)(D)(i)(I) because some geographic and temporal shifting of emissions necessarily results from the inherent variability in power generation and is caused by factors unrelated to the degree of emission control, such as weather, economic activity, and unit availability. Far from excusing any state from addressing emissions within the state that significantly contribute to nonattainment or interfere with maintenance in other states, these variability limits ensure that the system can accommodate the inherent variability in the power sector while ensuring that each state eliminates the amount of emissions within the state, in a given year, that must be eliminated to meet the statutory mandate of section 110(a)(2)(D)(i)(I).

Moreover, the structure of the program, which achieves the required emission reductions through limits on the total number of allowances allocated, assurance provisions, and penalty mechanisms, ensures that the variability limits only allow the amount of temporal and geographic shifting of emissions that is likely to result from the inherent variability in power generation, and not from decisions to avoid or delay the installation of

necessary controls. Under the remedy, an individual state can have emissions up to its budget plus the variability limit. However, the requirement that all sources hold allowances covering emissions, and the fact that those allowances are allocated based on state-specific budgets *without* variability, ensure that the total emissions from the states do not exceed the sum of the state budgets. The remedy, therefore, ensures both that total emissions do not exceed the total of the state budgets and that the required emission reductions occur in each state.

This section describes how EPA calculated variability limits for each state to achieve this goal.

2. Transport Rule Variability Limits

EPA performed analyses using historical data to demonstrate that there is year-to-year variability in base case emissions (even when emission rates for all units are held constant) and to quantify the magnitude of this variability.

The focus of the analysis is on quantifying the magnitude of the inherent year-to-year variability in state-level EGU emissions independent of measures taken to control those emissions (and thus due only to changes in electricity generation within each state). EPA used this analysis to set variability limits as part of the remedy to ensure that states are eliminating their significant contribution to nonattainment and interference with maintenance to protect air quality.

As discussed in detail below, EPA is finalizing the Transport Rule with 1-year variability limits calculated using a modified approach from the one described in the proposal. EPA is not including the proposal's 3-year variability limits in the final Transport Rule. EPA received comments that the 3-year variability limits increased program costs and diminished compliance flexibility without delivering any additional air quality benefits. EGU owners and operators expressed concern that 3-year variability limits would be impracticable to implement and that the 1-year variability limits themselves would be adequately stringent to ensure elimination of significant contribution to nonattainment and interference with maintenance in each state.

After further consideration, EPA has concluded that 3-year variability limits would be unnecessary, would be difficult to anticipate, and would not have a measurable impact on air quality benefits. EPA has determined that annual limits are sufficient to eliminate significant contribution to

nonattainment and interference with maintenance in all upwind states while accommodating the historically observed year-to-year fluctuation in state-level EGU emissions even at the same rate of emissions control in a given state.

In the proposal, EPA used statistical methods to derive the 3-year variability limit directly from the 1-year variability limit, meaning that the two are statistically equivalent in the long run under certain statistical assumptions. Primarily, these assumptions were that the variation in electric demand around the budget is random from year-to-year and that, when the annual emissions are averaged over a multi-year time period, the average emissions per year will equal the state's budget. The first assumption was also made in the assessment of the historical year-to-year variation in heat input in developing the 1-year limit (*see* section 2 of the ''Power Sector Variability Final Rule TSD'' for more details). Regarding the second assumption, since the state-by-state emission budgets are based on the availability of emission reductions at an equal marginal cost level, EPA expects the sources in each of the upwind states to make these cost-effective reductions and to meet the emission budgets each year, on average.

Since the 3-year variability limit was based on average year-to-year variability over a longer time horizon, EPA notes that a random ordering of those years could yield 2 above-average years in a row. If, by chance, a third above-average year were to follow, the state could face violation of the 3-year limit, even if over a time period longer than 3 years, that state would never have exceeded the statistically-equivalent 1-year variability limit and its annual emissions would have averaged to the level of its budget. Effectively, this means that imposing a multi-year variability limit would erode the 1-year variability limit's ability to accommodate historically observed year-to-year variability in state-level EGU emissions (due only to generation changes), and it would do so without providing any additional air quality benefits or protection for downwind areas (since the average emissions over the long time horizon equal the level of the budget).

For more details about the relationship between the 1- and 3-year limits, see the discussions in section 3 of the ''Power Sector Variability'' TSD from the proposed Transport Rule, which describes the derivation of the 3-year limit from the 1-year variability and section 3 of the ''Power Sector Variability Final Rule TSD'', which describes the results of a numerical

simulation showing that the 1- and 3-year limits are statistically indistinguishable and, thus, redundant over the course of the program to accommodate year-to-year variability.

While EPA expects the yearly emissions in each state, on average, to equal the level of the budgets, EPA also estimated the air quality impacts of 5, 10, 15, and 20 percent emission variability using the air quality assessment tool, which is presented in section 4 of the "Power Sector Variability Final Rule TSD." That analysis shows that year-to-year fluctuations of up to 20 percent in $SO_2$ emissions from upwind states linked to a given downwind receptor do not undermine the ability of the Transport Rule programs to resolve nonattainment or maintenance concerns at that receptor. The analysis presented in the TSD focuses on $SO_2$ emissions and was designed to examine the sensitivity of downwind air quality to upwind EGU emission levels. The share of total $SO_2$ emitted by EGUs is significantly larger than the share of total $NO_X$ emitted by EGUs. For example, in the states for which EPA modeled base case contributions of these pollutants, EGUs accounted for 74 percent of total $SO_2$, 14 percent of total annual $NO_X$, and 15 percent of total ozone-season $NO_X$ emissions. Therefore, when varying EGU emissions only, downwind air quality would be most sensitive to upwind variations in $SO_2$, because relative variations in EGU $SO_2$ emissions have a greater impact on total $SO_2$ emissions than the same relative variation in EGU $NO_X$ emissions would have on total $NO_X$ emissions affecting downwind air quality. Because the Transport Rule only affects upwind emissions from EGU sources, downwind air quality would be more sensitive to variability in upwind state $SO_2$ emissions under this rule than variability in upwind state $NO_X$ emissions under this rule (given that the rule affects a smaller scope of total $NO_X$ emissions compared to the scope affected of total $SO_2$ emissions). Thus, EPA chose to analyze the "worst-case" potential downwind air quality impacts from year-to-year variability above upwind state $SO_2$ budgets, and EPA therefore believes that its findings from this analysis are valid for ascertaining the potential downwind air quality impacts from variation at those levels in both $SO_2$ and $NO_X$ under the Transport Rule programs.

Furthermore, because the state budgets are based directly on IPM modeling of electric generation when cost-effective emission reductions have been achieved, sources within each state should have the same incentive to meet that budget, on average, in any given year. Additional EPA analysis supports the claim that states would be no more likely to exceed 1-year variability limits without the 3-year limits than with the 3-year limits. *See* the "Power Sector Variability Final Rule TSD" for more details on this statistical analysis. Finally, because the state budgets (and thus the total amount of allowances available) are fixed and every covered source must hold allowances covering its emissions, it is not feasible for all, or even many, states to repeatedly exceed their budgets.

The approach calculated the standard deviation in state-level heat input from units expected to be covered by the final Transport Rule over an 11-year time period (2000 through 2010), from which the 95th percent confidence level was calculated. EPA divided this value by the mean to get the percentage variance in heat input. The two-tailed 95th percent confidence level is the equivalent of the 97.5 percent upper (single-tailed) confidence level. This approach yielded an average year-to-year heat input variability for each state, as a proxy for historic year-to-year variability in state-level EGU emissions while holding emission rates constant. The result, expressed as a percentage, conveys the maximum degree to which EGU emissions at the state level may be expected with 95th percent confidence to vary around a given target (*i.e.*, budget) from year-to-year, on average, based on the statistical analysis of historic heat input over the 2000 through 2010 time period.

From the state-by-state variability calculations, EPA identified a single variability level (percentage) for each of the annual and ozone-season programs based on the historic variability measured at units in covered states on an annual basis and an ozone-season basis, respectively. In the proposal, EPA "identified a single set of variability levels * * * to apply to all states in order to make the application of the variability limits straightforward rather than developing state-by-state percentage variability values" (75 FR 45293). In the final rule, EPA is taking the straightforward approach of identifying a single set of variability levels to apply to all states because EPA has determined that it is reasonable to afford all states under the Transport Rule programs the extent of measured historic variability experienced by any Transport Rule state during 2000 through 2010. In the variability analysis for the final rule, EPA identified Tennessee as having the highest measured historic variability of annual heat input of 18 percent, and Virginia as having the highest measured historic variability of ozone-season heat input of 21 percent. Because the percentage of variability in Tennessee on an annual basis and in Virginia on an ozone-season basis are reasonably likely to occur in each of the other states in the future, EPA believes it is appropriate to apply an 18 percent annual variability limit to all states covered by the annual $SO_2$ and $NO_X$ programs and a 21 percent ozone-season variability limit to all states covered by the ozone-season $NO_X$ program.[54]

EPA's analysis of historic heat input variability in multiple states over the 2000 to 2010 baseline yields a range of potential year-to-year variability values for state-level EGU emissions. As discussed above, any one state's measured variability (in this case, from 2000 to 2010) is due to a multiplicity of factors. These factors include, but are not limited to, variation in weather, variation in demand due to increased or decreased level of economic activity, variation in the portion of electric generation that is fossil-fuel-fired, and variation in the length and number of outages at power generation units, and these individual factors may sometimes act in concert and may other times be offsetting.

The mix and levels of factors present in a state from year-to-year can lead to variation of state-level emissions above and below the level for the state under average conditions. Because the levels of the various factors are difficult to predict on a year-to-year basis for an individual state, the resulting variability in state-level emissions is difficult to predict. Moreover, because the electric generation, transmission, and distribution system in the eastern half of the U.S. is highly integrated, year-to-year variation in these factors in one state can cause year-to-year variability in state-level emissions both in that state and in other states on the system. For example, increased demand due to extreme weather or increased economic activity in one state can be met through increased generation and emissions in a number of states.

Because these factors can vary year-to-year in every state in ways that are difficult to predict and can affect other states, EPA maintains that the maximum variability measured in one state for a discrete period (2000–2010) is

---

[54] The six states in the supplemental proposal for inclusion in the Transport Rule's ozone-season $NO_X$ program have measured historic ozone-season variability that would be adequately covered by this final rule's ozone-season $NO_X$ variability level (21 percent). Please see the "Power Sector Variability Final Rule TSD" for more details.

reasonably likely to occur in the future in any of the states in the region. Consequently, EPA believes that it is reasonable to use the maximum historic percentage variability figure as a proxy for the percentage variability that any of the states is likely to experience in the future. Although EPA is therefore using a uniform percentage figure for variability, EPA applies that percentage figure to each state-specific budget so that variability in tons of emissions is determined on a state-specific basis. That state-specific number is used in determining whether the assurance provisions and penalty are triggered in the specific state. EPA also believes that it is appropriate to accommodate this potential future variability at the state level if and only if it can be accommodated without undermining the programs' beneficial impacts on downwind air quality that eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS assessed in this rulemaking (*see* the ''Power Sector Variability Final Rule TSD'' for more information on this analysis). The Transport Rule identifies and quantifies, on a state-by-state basis, the emissions in each state that significantly contribute to nonattainment or interfere with maintenance in another state. This is done by analyzing specific air pollution linkages between each upwind state and each downwind maintenance or nonattainment receptor. Nonetheless, it is clear from the air quality analyses that the air quality outcome at a given downwind receptor is a function of the cumulative emissions from all upwind states and the receptor's home state. Once the Transport Rule emission reduction requirements are implemented in all states subject to the programs, EPA's analysis shows that the impact on a downwind receptor of any single upwind state's year-to-year fluctuation of up to 20 percent in $SO_2$ emissions would be so limited as to not disturb that receptor's ability to maintain or attain the NAAQS analyzed in this rulemaking. Therefore, to the extent that such variability has been measured in historic data in any state subject to the Transport Rule programs, it is reasonable to provide for potential future variability in Transport Rule states within the scope of what EPA's analysis shows to preserve downwind

air quality gains achieved by the Transport Rule programs.

The approach to establishing variability limits in the final rule modifies the approach from the proposed rule in two ways. First, EPA is applying only a percentage variability limit to each budget in the final rule, whereas the proposed rule applied the greater of a percentage or an absolute tonnage variability limit to each budget. EPA explained in the proposal that it was necessary to impose both a percentage and a tonnage limit due to the inclusion of ''states with small numbers of units where expected variability would be more pronounced in percentage terms'' (75 FR 45293). However, the states with the smallest numbers of units included at proposal (such as Connecticut and the District of Columbia) are not covered by any of the final Transport Rule's programs. In the final rule's variability analysis, Tennessee has the highest measured annual variability percentage and Virginia has the highest measured ozone-season variability percentage. Both of these states have a sufficient number of units for the percentage variability findings to be representative of variability in all of the Transport Rule states; therefore, it is not necessary to impose a tonnage limitation in the final rule.

Second, EPA has expanded the historic baseline of the variability analysis to consider heat input data from 2000 through 2010, as compared to 2002 through 2008 at proposal, and EPA has also expanded the dataset to include all units expected to be covered by the final Transport Rule's programs. EPA received a number of comments that the proposal's variability limits were too stringent in part because they relied on too short a historical baseline that failed to capture the full extent of long-run year-to-year variability. EPA agrees with these comments and believes that the historic baseline modification described above supports variability limits in the final rule that are a better approximation of future potential year-to-year variability in state-level EGU emissions around the budgets as a function of inherent variability in baseline state-level EGU operations. EPA believes the 2000 through 2010 historic baseline supports a more accurate approximation of year-to-year variability in state-level EGU operations than previously

measured on a 2002 through 2008 baseline.

Some commenters expressed the view that allowing variability limits in addition to state budgets undermines the requirements of CAA section 110(a)(2)(D)(i)(I) to eliminate significant contribution to nonattainment and interference with maintenance of the NAAQS in downwind states. EPA disagrees with these comments. As explained above, EPA finds that year-to-year variability is an inherent characteristic of power sector emissions whether or not such emissions are controlled by state budgets; the future year-to-year variability is a component of the sector's emissions baseline before emission reductions are required. As done for proposal, EPA has analyzed the impact of allowing emissions from upwind states in a given year to rise above the budgets but within the variability limits allowed in the final rule. This analysis shows that emission fluctuations around the budgets but within the variability limits will not undermine the downwind air quality gains achieved by the implementation of the Transport Rule budgets, and therefore the variability limits cannot be said to undermine the elimination of significant contribution to nonattainment or interference with maintenance achieved under the Transport Rule programs. Based on historical data and projected air quality impacts, the Agency believes that states will have sufficient flexibility and room to operate within the final rule's variability limits while addressing all emissions identified as significantly contributing to nonattainment or interfering with maintenance in other states.

*F. Variability Limits and State Emission Budgets: State Assurance Levels*

As explained above, EPA applied the variability levels on a state-by-state basis to calculate specific emission budgets with variability limits. The state budget plus the variability limit is also called the ''state assurance level.'' Table VI.F–1 shows final state budgets, variability limits, and assurance levels by state for $SO_2$ emissions. Table VI.F–2 shows final state budgets, variability limits, and assurance levels by state for annual $NO_X$ emissions. Table VI.F–3 shows final state budgets, variability limits, and assurance levels by state for ozone-season $NO_X$ emissions.

TABLE VI.F–1—STATE BUDGETS, VARIABILITY LIMITS, AND ASSURANCE LEVELS FOR SO₂ EMISSIONS

| | Emission budget (tons) | | Emission variability limit (tons) | | State emissions assurance level (tons) | |
|---|---|---|---|---|---|---|
| | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond |
| Alabama | 216,033 | 213,258 | 38,886 | 38,386 | 254,919 | 251,644 |
| Georgia | 158,527 | 95,231 | 28,535 | 17,142 | 187,062 | 112,373 |
| Illinois | 234,889 | 124,123 | 42,280 | 22,342 | 277,169 | 146,465 |
| Indiana | 285,424 | 161,111 | 51,376 | 29,000 | 336,800 | 190,111 |
| Iowa | 107,085 | 75,184 | 19,275 | 13,533 | 126,360 | 88,717 |
| Kansas | 41,528 | 41,528 | 7,475 | 7,475 | 49,003 | 49,003 |
| Kentucky | 232,662 | 106,284 | 41,879 | 19,131 | 274,541 | 125,415 |
| Maryland | 30,120 | 28,203 | 5,422 | 5,077 | 35,542 | 33,280 |
| Michigan | 229,303 | 143,995 | 41,275 | 25,919 | 270,578 | 169,914 |
| Minnesota | 41,981 | 41,981 | 7,557 | 7,557 | 49,538 | 49,538 |
| Missouri | 207,466 | 165,941 | 37,344 | 29,869 | 244,810 | 195,810 |
| Nebraska | 65,052 | 65,052 | 11,709 | 11,709 | 76,761 | 76,761 |
| New Jersey | 5,574 | 5,574 | 1,003 | 1,003 | 6,577 | 6,577 |
| New York | 27,325 | 18,585 | 4,919 | 3,345 | 32,244 | 21,930 |
| North Carolina | 136,881 | 57,620 | 24,639 | 10,372 | 161,520 | 67,992 |
| Ohio | 310,230 | 137,077 | 55,841 | 24,674 | 366,071 | 161,751 |
| Pennsylvania | 278,651 | 112,021 | 50,157 | 20,164 | 328,808 | 132,185 |
| South Carolina | 88,620 | 88,620 | 15,952 | 15,952 | 104,572 | 104,572 |
| Tennessee | 148,150 | 58,833 | 26,667 | 10,590 | 174,817 | 69,423 |
| Texas | 243,954 | 243,954 | 43,912 | 43,912 | 287,866 | 287,866 |
| Virginia | 70,820 | 35,057 | 12,748 | 6,310 | 83,568 | 41,367 |
| West Virginia | 146,174 | 75,668 | 26,311 | 13,620 | 172,485 | 89,288 |
| Wisconsin | 79,480 | 40,126 | 14,306 | 7,223 | 93,786 | 47,349 |

**Note:** Budgets, limits, and assurance levels apply to each state's emissions from covered sources, as defined by this final rule, only.

TABLE VI.F–2—STATE BUDGETS, VARIABILITY LIMITS, AND ASSURANCE LEVELS FOR ANNUAL NOₓ EMISSIONS

| | Emission budget (tons) | | Emission variability limit (tons) | | State emissions assurance level (tons) | |
|---|---|---|---|---|---|---|
| | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond |
| Alabama | 72,691 | 71,962 | 13,084 | 12,953 | 85,775 | 84,915 |
| Georgia | 62,010 | 40,540 | 11,162 | 7,297 | 73,172 | 47,837 |
| Illinois | 47,872 | 47,872 | 8,617 | 8,617 | 56,489 | 56,489 |
| Indiana | 109,726 | 108,424 | 19,751 | 19,516 | 129,477 | 127,940 |
| Iowa | 38,335 | 37,498 | 6,900 | 6,750 | 45,235 | 44,248 |
| Kansas | 30,714 | 25,560 | 5,529 | 4,601 | 36,243 | 30,161 |
| Kentucky | 85,086 | 77,238 | 15,315 | 13,903 | 100,401 | 91,141 |
| Maryland | 16,633 | 16,574 | 2,994 | 2,983 | 19,627 | 19,557 |
| Michigan | 60,193 | 57,812 | 10,835 | 10,406 | 71,028 | 68,218 |
| Minnesota | 29,572 | 29,572 | 5,323 | 5,323 | 34,895 | 34,895 |
| Missouri | 52,374 | 48,717 | 9,427 | 8,769 | 61,801 | 57,486 |
| Nebraska | 26,440 | 26,440 | 4,759 | 4,759 | 31,199 | 31,199 |
| New Jersey | 7,266 | 7,266 | 1,308 | 1,308 | 8,574 | 8,574 |
| New York | 17,543 | 17,543 | 3,158 | 3,158 | 20,701 | 20,701 |
| North Carolina | 50,587 | 41,553 | 9,106 | 7,480 | 59,693 | 49,033 |
| Ohio | 92,703 | 87,493 | 16,687 | 15,749 | 109,390 | 103,242 |
| Pennsylvania | 119,986 | 119,194 | 21,597 | 21,455 | 141,583 | 140,649 |
| South Carolina | 32,498 | 32,498 | 5,850 | 5,850 | 38,348 | 38,348 |
| Tennessee | 35,703 | 19,337 | 6,427 | 3,481 | 42,130 | 22,818 |
| Texas | 133,595 | 133,595 | 24,047 | 24,047 | 157,642 | 1 57,642 |
| Virginia | 33,242 | 33,242 | 5,984 | 5,984 | 39,226 | 39,226 |
| West Virginia | 59,472 | 54,582 | 10,705 | 9,825 | 70,177 | 64,407 |
| Wisconsin | 31,628 | 30,398 | 5,693 | 5,472 | 37,321 | 35,870 |

**Note:** Budgets, limits, and assurance levels apply to each state's emissions from covered sources, as defined by this final rule, only.

TABLE VI.F–3—STATE BUDGETS, VARIABILITY LIMITS, AND ASSURANCE LEVELS FOR OZONE-SEASON NOₓ EMISSIONS

| | Emission budget (tons) | | Emission variability limit (tons) | | State emissions assurance level (tons) | |
|---|---|---|---|---|---|---|
| | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond | 2012–2013 | 2014 and beyond |
| Alabama | 31,746 | 31,499 | 6,667 | 6,615 | 38,413 | 38,114 |
| Arkansas | 15,037 | 15,037 | 3,158 | 3,158 | 18,195 | 18,195 |
| Florida | 27,825 | 27,825 | 5,843 | 5,843 | 33,668 | 33,668 |
| Georgia | 27,944 | 18,279 | 5,868 | 3,839 | 33,812 | 22,118 |
| Illinois | 21,208 | 21,208 | 4,454 | 4,454 | 25,662 | 25,662 |
| Indiana | 46,876 | 46,175 | 9,844 | 9,697 | 56,720 | 55,872 |
| Kentucky | 36,167 | 32,674 | 7,595 | 6,862 | 43,762 | 39,536 |
| Louisiana | 13,432 | 13,432 | 2,821 | 2,821 | 16,253 | 16,253 |
| Maryland | 7,179 | 7,179 | 1,508 | 1,508 | 8,687 | 8,687 |
| Mississippi | 10,160 | 10,160 | 2,134 | 2,134 | 12,294 | 12,294 |
| New Jersey | 3,382 | 3,382 | 710 | 710 | 4,092 | 4,092 |
| New York | 8,331 | 8,331 | 1,750 | 1,750 | 10,081 | 10,081 |
| North Carolina | 22,168 | 18,455 | 4,655 | 3,876 | 26,823 | 22,331 |
| Ohio | 40,063 | 37,792 | 8,413 | 7,936 | 48,476 | 45,728 |
| Pennsylvania | 52,201 | 51,912 | 10,962 | 10,902 | 63,163 | 62,814 |
| South Carolina | 13,909 | 13,909 | 2,921 | 2,921 | 16,830 | 16,830 |
| Tennessee | 14,908 | 8,016 | 3,131 | 1,683 | 18,039 | 9,699 |
| Texas | 63,043 | 63,043 | 13,239 | 13,239 | 76,282 | 76,282 |
| Virginia | 14,452 | 14,452 | 3,035 | 3,035 | 17,487 | 17,487 |
| West Virginia | 25,283 | 23,291 | 5,309 | 4,891 | 30,592 | 28,182 |

**Note:** Budgets, limits, and assurance levels apply to each state's emissions from covered sources, as defined by this final rule, only.

See section VII.E for the discussion of how variability limits and state assurance levels are used in the implementation of assurance provisions for the air quality-assured trading programs.

### G. How the State Emission Reduction Requirements Are Consistent With Judicial Opinions Interpreting the Clean Air Act

The methodology described in this notice quantifies states' significant contribution to nonattainment and interference with maintenance in a manner that is consistent with the decisions of the DC Circuit. As discussed previously, the DC Circuit has issued two significant decisions addressing the requirements of 110(a)(2)(D)(i)(I). The first opinion largely upheld the NOₓ SIP Call, *Michigan,* 213 F.3d 663, and the second found significant flaws in CAIR, *North Carolina,* 531 F.3d. 896. In both cases, the Court considered aspects of the methodology used by EPA to identify emissions that, pursuant to section 110(a)(2)(D)(i)(I), must be eliminated due to their impact on air quality in downwind states. EPA believes that the methodology used in this final rule is consistent with both opinions and rectifies the flaws the *North Carolina* court identified with the methodology used in CAIR. The methodology used for this rule relies on state-specific data to analyze each individual state's significant contribution, uses air quality considerations in addition to cost considerations to identify each state's significant contribution, and gives independent meaning to the "interference with maintenance" prong. This methodology is then applied in a reasonable manner consistent with the relevant judicial opinions.

In *North Carolina,* the Court held that EPA's approach to evaluating significant contribution was inadequate because, by evaluating only whether emission reductions were highly cost effective "at the regional level assuming a trading program", it failed to conduct the required state-specific analysis of significant contribution. *See id.* at 907. EPA, the Court concluded, "never measured the 'significant contribution' from sources within an individual state to downwind nonattainment areas." *Id.* The Court did not, however, disturb the air-quality-based methodology used by EPA to identify the states with contributions large enough to warrant further consideration.

For this rule, EPA uses a first step similar to that used in CAIR to identify the states with relatively large contributions. However, in contrast to CAIR, it then uses a state-specific analysis. Instead of identifying a single emission level that could be achieved by the application of highly cost effective controls in the region, EPA determines, on a state-by-state basis, what reductions could effectively be achieved by sources in each state. EPA's new approach does not, as the CAIR methodology did, establish a regional cap on emissions that is then divided

into state budgets that set the emission reduction requirements for each state. Instead, EPA develops, for each covered state, emission budgets based on the reductions achievable at a particular cost per ton in that particular state, taking into account the need to ensure reliability of the electric generating system. The selected cost/ton levels reflect consideration of both cost factors and air quality factors including the estimated impact of upwind states' emissions on each downwind receptor.

In addition, in developing this approach, EPA was guided by the Court's holdings regarding the use of cost to identify significant contribution. Specifically, the Court held in *Michigan* that EPA could "in selecting the 'significant' level of 'contribution' under section 110(a)(2)(D)(i)(I), choose a level corresponding to a certain reduction in cost." *North Carolina,* 531 F.3d at 917 (citing *Michigan,* 213 F.3d at 676–77). This holding also supported the Court's conclusion in *Michigan* that it was acceptable for EPA to apply a uniform cost-criterion across states. *See Michigan,* 213 F.3d at 679. In the CAIR case, the Court rejected EPA's analysis, not because it relied on cost considerations to identify significant contribution, but because it found that EPA had failed to draw the significant contribution line at all. *See North Carolina,* 531 F.3d at 918 ("* * * here EPA did not draw the [significant contribution] line at all. It simply verified sources could meet the SO₂ caps with controls EPA dubbed 'highly

cost-effective.' ''). The holdings in *Michigan* regarding the use of cost and a uniform cost-criterion across states were left undisturbed. *See, e.g., North Carolina,* 531 F.3d at 917 (explaining that in *Michigan* the Court held that ''EPA may 'after [a state's] reduction of all [it] could * * * cost-effectively eliminate[],' consider 'any remaining contribution insignificant''). In fact, the Court acknowledged that, based on the *Michigan* holdings, the measurement of a state's significant contribution need not ''directly correlate with each state's individualized air quality impact on downwind nonattainment relative to other upwind states.'' *North Carolina,* 531 F.3d at 908.

For these reasons, EPA determined that it was appropriate in this rulemaking to consider the cost of controls to determine what portion of a state's contribution is its ''significant contribution.'' However, EPA also heeded the *North Carolina* Court's warning that ''EPA can't just pick a cost for a region, and deem 'significant' any emissions that sources can eliminate more cheaply.'' *North Carolina,,* 531 F.3d at 918. Thus, in this rulemaking, EPA departs from the practice used in the NOₓ SIP Call and in CAIR of evaluating, based solely on the cost of control required in other regulatory environments, what controls would be considered ''highly-cost-effective.'' Instead, as part of its determination of a reasonable cost per ton for upwind state control, EPA evaluates the air quality impact of reductions at various cost levels and considers the reasonableness of possible cost thresholds as part of a multi-factor analysis.

In addition, the methodology used in this rulemaking gives independent meaning to the interfere with maintenance prong of section 110(a)(2)(D)(i)(I). In *North Carolina,* the Court concluded that CAIR improperly ''gave no independent significance to the 'interfere with maintenance' prong of section 110(a)(2)(D)(i)(I) to separately identify upwind sources interfering with downwind maintenance.'' *North Carolina,* 531 F.3d at 910. EPA rectified this flaw in this rulemaking by separately identifying downwind ''nonattainment sites'' and downwind ''maintenance sites.'' EPA decided to consider upwind states' contributions not only to sites that EPA projected would be in nonattainment, but also to sites that, based on their historic variability of their emissions, EPA determined may have difficulty maintaining the relevant standards. The specific mechanism EPA used to implement this approach is described in

detail in section V.C, previously. For annual PM₂.₅, this approach identified 16 maintenance sites in addition to the 32 nonattainment sites identified in the analysis of nonattainment receptors. For 24-hour PM₂.₅ this approach identified 38 maintenance sites in addition to the 92 nonattainment sites identified in the analysis of nonattainment receptors. For ozone it identified 16 maintenance sites in addition to the 11 ozone nonattainment sites identified.

EPA applied this methodology using available information and data to measure the emissions from states in the eastern United States that significantly contribute to nonattainment or interfere with maintenance in downwind areas with regard to the 1997 and 2006 PM₂.₅ NAAQS and the 1997 ozone NAAQS. Although EPA has not completely quantified the total significant contribution of these states with regard to all existing standards, EPA has determined, on a state-specific basis, that the emissions prohibited in the FIPs are either part of or constitute the state's significant contribution to nonattainment and interference with maintenance. Thus, elimination of these emissions will, at a minimum, make measurable progress towards satisfying the section 110(a)(2)(D)(i)(I) prohibition on significant contribution to nonattainment and interference with maintenance.

## VII. FIP Program Structure To Achieve Reductions

### A. Overview of Air Quality-Assured Trading Programs

EPA is finalizing an air quality-assured trading remedy that is substantially similar to the preferred trading remedy presented in the proposal. Key differences from the preferred trading remedy in the proposal include:

• Recalculated state budgets and variability limits (*i.e.,* state assurance levels) based on updated modeling;
• Simplified variability limits for 1-year application only;
• Revised allocation methodology for existing and new units and revised new unit set-asides for new units in Transport Rule states and new units potentially locating in Indian country;
• Changed start of assurance provisions to 2012 and increased assurance provision penalties; and
• Removed opt-in provisions.

In the final rule, as in the proposed rule, EPA is promulgating FIPS to require SO₂ and NOₓ reductions from power plants in jurisdictions [55] that

contribute significantly to nonattainment in, or interfere with maintenance by, a downwind area with respect to the 1997 ozone NAAQS, the 1997 annual PM₂.₅ NAAQS, and/or the 2006 24-hour PM₂.₅ NAAQS. These FIPs establish state-specific emission control requirements using state budgets starting in 2012, with a second phase of SO₂ reductions in some states in 2014. Section IV explains EPA's authority to issue FIPs.

The air quality-assured trading remedy in the final rule allows interstate trading to account for variability in the electricity sector, but also includes assurance provisions to ensure that the necessary emission reductions occur within each covered state. The assurance provisions restrict EGU emissions within each state to the state's budget plus the variability limit and ensure that every state is making reductions to eliminate the significant contribution to nonattainment and interference with maintenance that EPA has identified. While EPA proposed to impose these assurance provisions starting in 2014, the final rule implements these provisions starting in 2012 (*see* section VII.E of this preamble). Additionally, the final FIPs include penalty provisions adequate to ensure that the state budget with the variability limit will not be exceeded.

In the final rule, as in the preferred trading remedy discussed in the proposed rule, state-specific emission budgets without the variability limits are used to determine the number of emission allowances allocated to sources in each state. An EGU source is required to hold one SO₂ or one NOₓ allowance, respectively, for every ton of SO₂ or NOₓ emitted during the control period. Banking of allowances for use or trading in future years is allowed.

The final rule establishes four interstate trading programs, each starting in 2012: two for annual SO₂, one for annual NOₓ, and one for ozone-season NOₓ. One SO₂ trading program is for sources in states (referred to as SO₂ Group 1) that need to make larger reductions to eliminate their significant contribution, while the second is for sources in states (referred to as SO₂ Group 2) that need to make smaller reductions. A source in a Group 1 state can only use SO₂ allowances allocated to Group 1 states for compliance with

[55] Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana,

Maryland, Michigan, Minnesota, Mississippi, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. As discussed in section III, in a separate notice, EPA is proposing to include Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin in the ozone-season NOₓ requirements.

the $SO_2$ trading program. A source in a Group 2 state can only use $SO_2$ allowances allocated to Group 2 states for compliance with the $SO_2$ trading program. For compliance in the annual $NO_X$ and ozone-season $NO_X$ trading programs respectively, sources may use annual $NO_X$ and ozone-season $NO_X$ allowances allocated for any state, even if that state is in a different group for $SO_2$ than the source's state. Four sets of new emission allowances based on the new state-specific budgets without variability are allocated to sources, one set for each of the four trading programs. Each state has the option of replacing these FIPs with state rules. EPA believes that this remedy meets the concerns raised by the Court in the 2008 *North Carolina* decisions which remanded CAIR to EPA.

In the proposed rule, EPA took comment on all aspects of the preferred trading remedy and on two alternative regulatory options: (1) intrastate trading; and (2) direct control. EPA also took comment on a trading ratios approach.

Comments on the Preferred Trading Remedy: The great majority of public comments supported the preferred trading remedy. Most of these commenters voiced their support for the broadest possible trading mechanism because it allows for the most cost-effective implementation of any emission controls. Commenters noted that flexibility is always needed in the early years of new programs. Further, commenters favoring the preferred remedy agreed with EPA that, by using state-specific control budgets and allowing for interstate trading, the preferred remedy provided electricity generators the flexibility to undertake the most cost-effective reductions while assuring that the resulting reductions occur within the individual states.

Some commenters that supported the preferred remedy felt that, while not ideal, the interstate trading remedy was preferable to the alternative options of intrastate trading or direct control. Many commenters that supported the preferred remedy felt that the intrastate trading remedy and direct control remedy options offer minimal flexibility from a compliance perspective. They stated that this lack of flexibility would unnecessarily increase the cost of emission reductions.

Other commenters who generally support the preferred remedy cited concerns about the level of complexity in the assurance provisions. One commenter surmised that the preferred option creates significant risk where a company could unexpectedly find itself in a noncompliance situation due to the after-the-fact variability analysis.

Another said that the rule's features needlessly reduce the system's efficiency and increase complexity. These commenters generally preferred unlimited trading, noting that EPA has proven success with Title IV, the $NO_X$ SIP Call, and CAIR unlimited interstate trading programs and that allowing unrestricted interstate trading would increase flexibility to meet reduction goals and minimize increases in power costs.

EPA is finalizing the preferred trading remedy for the following reasons. EPA believes this approach is the most cost-effective and practical way to comply with the Court decision in *North Carolina* to ensure that all emissions in a given state that EPA has identified as significantly contributing to downwind nonattainment or interfering with maintenance are eliminated. The vast majority of public commenters agree. In addition, this approach provides the most flexibility for sources while meeting the Clean Air Act requirements and protecting public health. As a result, potential innovations and resulting cost savings are more likely to be found and implemented. Based on historical experience (see the Transport Rule proposal, 75 FR 45315), EPA has shown that the results offered by a flexible trading approach (*e.g.*, flexible compliance choices, incentives to reduce emissions early and in the highest emitting areas, 100 percent compliance with requirements) are substantial. A large number of commenters have corroborated this assessment. As summarized in the proposal, EPA believes that the preferred trading remedy will allow source owners to choose among several compliance options to achieve required emission reductions in the most cost-effective manner, such as installing controls, changing fuels, reducing utilization, buying allowances, or any combination of these actions. Interstate trading with assurance provisions provides additional regulatory flexibility that promotes the power sector's ability to operate as an integrated, interstate system and to provide electric reliability.

Comments on Intrastate Trading: A few commenters favored the first alternative, intrastate trading. One commenter who favored intrastate trading stated that many power plants have avoided investment in pollution controls by buying allowances from other plants, affecting local air quality improvement. EPA notes that this Transport Rule aims to address emissions from one state that significantly contribute to nonattainment or interfere with

maintenance of certain NAAQS in other states. Local air quality issues are directly addressed by other provisions in the Clean Air Act.

Several commenters raised concerns about the intrastate trading approach. Some stated, as EPA noted in the proposal, that the intrastate trading option would be more resource intensive, more complex, less flexible, and potentially more susceptible to market manipulation than the other options. In addition, some commenters felt that this alternative would provide less flexibility to ensure electric reliability than the preferred approach, resulting in greater private costs to the power sector and greater social costs for consumers.

EPA is not finalizing the intrastate trading option for the following reasons. As EPA expressed in the proposal and as commenters have agreed, the intrastate trading option would be more resource intensive (both for EPA and for sources), more complex, less flexible, and potentially more susceptible to market manipulation than the preferred trading approach that EPA is finalizing. The intrastate trading option would be more costly and less transparent due to the large number of trading programs that would be operated simultaneously and the large number of annual auctions that would be held every year to address the issues of market power within states. This option would also result in a greater burden for participants operating EGUs in multiple states.

Comments on Direct Control Option: Several commenters favored the second alternative, direct control. One commenter stated that direct control—allowing no trading—was the option best aligned with the 2008 Court decisions. EPA disagrees with this comment for the reasons given below and because, as explained in this rule, EPA believes the air quality-assured trading remedy finalized today is consistent with the decisions of the DC Circuit in *North Carolina.*

Some commenters, who support direct control, voiced concerns that the other emission trading approaches would disadvantage poor and minority communities or allow increased emission impacts in neighborhoods near power plants. EPA notes that a direct control approach would not require controls on all plants in a state, but only on a sufficient number to address the transport requirements under section 110(a)(2)(d)(i)(I) that this rule addresses, and therefore would not necessarily mandate controls on each neighborhood power plant.

In addition, EPA has conducted an analysis of the effects of the Transport

Rule on environmental justice and other vulnerable communities. We concluded that, similar to our experience with the Acid Rain Program,[56] many environmental justice communities are expected to see large health benefits, and none are expected to experience any disbenefits, from implementing an air quality-assured trading program. The results of this analysis are presented in section XII of this preamble and Chapter 5 of the RIA for this rule. In addition, the CAA provides flexibility for state and local entities to impose stricter limits on sources to address specific local air quality concerns. Such limits are independent of the requirements in this rule, and compliance with Transport Rule requirements in no way excuses a source from complying with other CAA or state law requirements.

Several commenters raised concerns with the direct control approach. One commenter felt that issues with electricity market reliability could occur during high electricity demand periods if sources ceased operations due to approaching their emission rate limitations under a direct control remedy. Another commenter was concerned that applying emission rates under a direct control remedy to small municipal units would cause disproportionate impacts on power plants where pollution control is more expensive. Other commenters cited concerns that EPA's proposed within-state company-wide averaging provision in the direct control proposed alternative (designed to allow some flexibility for sources) would place companies with fewer units at a disadvantage compared to companies with more units. EPA generally agrees with the commenters concerns and has decided not to finalize the direct control remedy for the following reasons. EPA modeling projects that the direct control alternative would result in fewer emission reductions and higher costs compared to the air quality-assured trading remedy. EPA analysis indicates that it is not necessary to implement a direct control approach in order to protect vulnerable and sensitive populations or environmental justice communities. Also, the direct control approach would result in fewer compliance options because a direct control approach would directly regulate individual sources by setting unit-level emission rate limits. This lack of flexibility could lead to potential

increases in reliability risks in the electric power system and fewer opportunities for potential technological innovations that reduce emissions further and/or lower costs. For these reasons, EPA believes that this approach is inferior to the air quality-assured trading remedy.

*Other Comments:* A handful of commenters mentioned the trading ratios approach, though none favored it as a viable alternative. One commenter said the trading ratios approach was not consistent with CAA section 110(a)(2)(D) requirements that reductions in emissions occur in particular geographic locations. Other commenters agreed that it was administratively unworkable and would be difficult to implement due to the complexity and variety of meteorological conditions. EPA generally concurs with the commenters. In the proposal, EPA noted that it would not be possible under this approach, as contemplated, to include enforceable legal requirements to ensure that a specific state's emissions remain below a specified level or to ensure that a specific amount of reductions occur within a particular state. EPA specifically requested comment on whether a ratios trading program could be designed to provide such legal assurances. Of the few comments received, none offered such a solution. For these reasons, EPA is not finalizing this approach.

Some commenters offered additional suggestions, such as: unrestricted trading; using different authorities in the CAA to address interstate transport such as section 110(k)(5) and section 126; and an approach that would replace the assurance provisions by a system using both emission allowances usable (as well as bankable) in any state and assurance allowances usable (but not bankable) in only the state for which they would be issued. While EPA appreciates the thoughtful and constructive comments, we did not find any of these suggestions improved our ability to address interstate transport under CAA section 110(a)(2)(D)(i)(I), in line with the Court decision, in an administratively practical way.

Several commenters liked the idea of establishing unit-by-unit short-term and long-term performance standards/emission rates but suggested adding an overlaid cap and trade program. EPA believes the air quality-assured trading remedy finalized today is consistent with the decisions of the Court in *North Carolina* and will ensure the reductions necessary to meet statutory requirements.

For the 2012–2013 period, EPA took comment on whether the assurance provisions are needed, since the state-specific budgets would be based on known air pollution controls and the penalty provisions would be adequate to ensure that the budget, including a variability limit, would not be exceeded. Further, EPA proposed to use two variability limits: a 1-year limit, based on the year-to-year variability in emissions relative to the proposed budgets; and a 3-year limit based on the variability in a 3-year average relative to the proposed budget.

Based on comments on the assurance provisions (*see* section VII.E of this preamble) and variability limits (*see* section VI.E.2 of this preamble), EPA is finalizing the Transport Rule with state budgets plus variability limits and assurance provisions starting in 2012 for all of the trading programs. EPA sees an immediate need to ensure that emissions within a state do not exceed the state budget plus the variability limitation in order to comply with the Court's opinion. Further, commenters stated that the 3-year variability limit increased costs and unnecessarily complicated the trading programs. As explained in section VI.E.2, EPA is finalizing the 1-year variability limit starting in 2012, but not the 3-year limit.

*B. Applicability*

The applicability provisions in the final rule are, except as discussed herein, essentially the same as in the proposed rules and for each of the Transport Rule trading programs.

Under the general applicability provisions of the proposed rule, the Transport Rule trading programs would cover fossil-fuel-fired boilers and combustion turbines serving—on any day starting November 15, 1990 or later—an electrical generator with a nameplate capacity exceeding 25 MWe and producing power for sale, with the exception of certain cogeneration units and solid waste incineration units.

EPA requested comment on whether a more recent year should be used instead. The proposed use of the November 15, 1990 date was consistent with the use of 1990 as the beginning of the historical period for which owners and operators would generally be required to have information about their units for purposes of determining whether the units were covered by the Transport Rule trading programs. Because unit information is generally compiled and retained on a calendar year basis, EPA believes that, for the general applicability provisions, it is preferable to use January 1, rather than November 15. In determining which

---

[56] *See* http://www.epa.gov/airmarkets/resource/docs/ejanalysis.pdf and Ringquist, Evan J. 2011. ''Trading Equity for Efficiency in Environmental Protection? Environmental Justice Effects from the SO₂ Allowance Trading Program.'' Social Science Quarterly 92(2):297–323

year should be used as the reference year in the general applicability provisions, EPA considers several factors.

First, in order for owners and operators, and EPA, to be able to determine which units are subject to the Transport Rule trading programs, EPA believes that the reference year should not be so far in the past that the unit information necessary to make applicability determinations is not readily available. This particularly becomes an issue in cases of older units that have changed ownership over time. EPA found, in making some applicability determinations under the CAIR trading programs, that some older units with ownership changes had difficulty obtaining information back as far as twenty or more years. Using January 1, 1990 as the reference date in the general applicability provisions could effectively require some owners and operators to retain unit information going back as far as 20 years. As a point of contrast, under the title V permitting rules, owners and operators are generally required to retain data for 5 years. *See* 40 CFR 70.6(a)(3)(B).

Second, EPA also believes that the reference year used in the applicability provisions should be far enough in the past that the unit information on which applicability determinations are based provides a full picture of the nature of the unit and its operations over time, such as the types of fuels combusted at the unit and whether the unit has produced electricity for sale.

Third, EPA considers whether selecting a different reference year for the applicability provisions than the one in the proposed rule dramatically changes what units will be covered by the Transport Rule trading programs. In this case, EPA believes, based on available information about the units potentially subject to the Transport Rule, that using a somewhat later year than the one in the proposed rule will likely have little effect on what units are covered. Balancing these factors, EPA concludes that it is reasonable to use January 1, 2005, rather than November 15, 1990, in the general applicability provisions in the final rule.

In the final rule, EPA is taking the same approach with regard to defining whether a boiler or combustion turbine is considered to be "fossil-fuel-fired" as the one used in the proposal. Under the proposed rule, a unit was considered to be "fossil-fuel-fired" if it combusts any amount of fossil fuel at any time in 1990 or later. For the same reasons that EPA decided to use January 1, 2005 in the general applicability provisions, and in order to have a consistent reference year

in all applicability-related provisions, the final rule defines a "fossil-fuel-fired" unit as one that combusts any amount of fossil fuel in 2005 or later.

EPA notes that the final Transport Rule allows a state to submit a SIP revision (an abbreviated or full SIP) under which the state may—in addition to making certain types of changes concerning allowance allocations in the Transport Rule trading programs—expand the general applicability provisions of the Transport Rule NO_X Ozone Season Trading Program to cover fossil-fuel-fired boilers and combustion turbines serving—at any time starting January 1, 2005 or later— a generator with a nameplate capacity as low as 15 MWe producing power for sale. The exemptions, discussed below, for cogeneration units and solid waste incineration units still will continue to apply.

Cogeneration unit exemption. Under the final rule (as well as the proposed rule) certain cogeneration units or solid waste incinerators are exempt from the FIP requirements. In particular, the final rule includes an exemption for a unit that qualifies as a cogeneration unit throughout the later of 2005 or the first 12 months during which the unit first produces electricity and continues to qualify through each calendar year ending after the later of 2005 or that 12-month period and that meets the limitation on electricity sales to the grid. In order to meet the definition of "cogeneration unit" in the final rules, a unit (*i.e.,* a fossil-fuel-fired boiler or combustion turbine) must be a topping-cycle or bottoming-cycle that operates as part of a "cogeneration system," which is defined as an integrated group of equipment at a source (including a boiler, or combustion turbine, and a steam turbine generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy. A topping-cycle unit is a unit where the sequential use of energy results in production of useful power first and then, through use of reject heat from such production, in production of useful thermal energy. A bottoming-cycle unit is a unit where the sequential use of energy results in production of useful thermal energy first and then, through use of reject heat from such production, in production of useful power. In order to qualify as a cogeneration unit, a unit also must meet certain efficiency and operating standards.

In the proposed rule, a unit would have to qualify as a cogeneration unit and meet the limitation on electricity sales starting the later of 1990 or the

year when the unit begins operating. EPA requested comment on whether a more recent year should be used. For the reasons discussed above concerning the reference year used in the general applicability provisions and in order to have a consistent reference year in all applicability-related provisions, EPA concludes that it is reasonable to use 2005, rather than 1990, in the cogeneration unit exemption provisions in the final rule. Consequently, the final rule provides that the requirements to qualify as a cogeneration unit and to meet the electricity sales limitation start no earlier than 2005.

In the final rule, EPA also clarifies that the electricity sales limitation under the exemption is applied in the same way whether a unit serves only one generator or serves more than one generator. In both cases, the total amount of electricity produced annually by a unit and sold to the grid cannot exceed the greater of one-third of the unit's potential electric output capacity or 219,000 MWhr. This is consistent with the approach taken in the Acid Rain Program (40 CFR 72.7(b)(4)), where the cogeneration unit exemption originated. EPA believes that this clarification is needed to ensure that a unit serving, for example, two generators would not have a limit on sales of electricity to the grid that would be different (*i.e.,* twice as high) from the limit for a unit serving only one generator with the same total nameplate capacity as the first unit's two generators.

EPA also took comment on whether efficiency standards should be applied on a system-wide basis to bottoming-cycle units (where useful thermal energy is produced before useful power is produced), as they are for topping-cycle units (where useful thermal energy is produced after useful power) and whether to exclude, from the requirement to meet the operating and efficiency standards, calendar years during which a cogeneration unit does not operate at all. Several commenters argued EPA should apply efficiency standards to both types of units. EPA agrees that applying efficiency standards on a system-wide basis to both bottoming-cycle and topping-cycle units is reasonable because EPA sees no technical reason to distinguish between the two types of units in this instance. EPA further agrees with commenters that excluding calendar years in which the cogeneration unit does not operate at all, *i.e.,* does not combust any fuel, from the requirements to meet operating and efficiency standards is also reasonable. For such a year, the unit would not produce any useful thermal

energy or useful power and therefore could not meet the minimum output requirements in the operating and efficiency standards, but the unit also would not have any emissions. For these reasons, the final rule expressly provides that the operating and efficiency standards do not have to be met for a calendar year throughout which a unit did not operate at all.

Solid waste incineration unit exemption. The final rule also includes an exemption for a unit that qualifies as a solid waste incineration unit during the later of 2005 or the first 12 months during which the unit first produces electricity, that continues to qualify throughout each calendar year ending after the later of 2005 or that 12-month period each year thereafter, and that meets the limitation on fossil-fuel use. In contrast, the exemption for solid waste incineration units in the proposed rule distinguished between units commencing operation before January 1, 1985 and those commencing operation on or after that date. A unit commencing operation before January 1, 1985 would be exempt if it qualified as a solid waste incineration unit starting the later of 1990 or the year when it began producing electricity and its average annual fuel consumption of non-fossil fuels exceeded 80 percent of total heat input during 1985–1987 and during any three consecutive calendar years after 1990. A unit commencing operation on or after January 1, 1985 would be exempt if it qualified as a solid waste incineration unit starting the later of 1990 or the year when it began producing electricity and its average annual fuel consumption of non-fossil fuel exceeded 80 percent of total heat input for the first 3 calendar years of operation and for any 3 consecutive calendar years thereafter.

In the proposal, EPA requested comment on whether it would be problematic to obtain sufficiently detailed information about unit operation potentially as far back as 1985–1987 and 1990, and whether the fuel consumption standard for each unit should be limited to more recent years. For the reasons discussed above concerning the reference year used in the general applicability provisions and in order to have a consistent reference year for all applicability-related provisions, EPA concludes that it is reasonable to use 2005, rather than 1990, in the solid waste incineration unit exemption in the final rule. In particular, EPA notes that the proposed provisions for units commencing operation before January 1, 1985 and for units commencing operation on or after January 1, 1985 could require some

owners and operators to retain unit information going back more than 20 years before the promulgation of this final rule. Further, EPA believes that removing the distinction between units commencing operation during these two periods, and referencing somewhat later years as the earliest years for which information on fossil-fuel consumption is required, will result in the exemption still being based on sufficient data to provide a full picture of the nature and operation of the units involved. EPA also believes, based on available information about the units potentially subject to the Transport Rule, that this approach will not significantly change which units qualify for the exemption. Consequently, the final rule removes the distinction based on whether a solid waste incineration unit commences operation before January 1, 1985 or on or after January 1, 1985. In order to be exempt, the unit must qualify as a solid waste incineration unit during the later of 2005 or the first 12 months during which the unit first produces electricity, must continue to qualify throughout each calendar year ending after the later of 2005 or that 12-month period, and must meet the limitation on fossil-fuel use on a 3-year average basis during the first 3 years of operation starting no earlier than 2005 and every 3 years of operation thereafter.

Opt-in units. EPA is not finalizing the opt-in provisions that were discussed in the Transport Rule proposal. EPA proposed opt-in provisions to allow non-covered units to voluntarily opt in to any of the proposed Transport Rule trading programs and receive allocations reflecting 70 percent of the unit's emissions before opting in. These allowances were above the state-specific budgets developed under the Transport Rule to eliminate a state's significant contribution to nonattainment and interference with maintenance. In theory, an opt-in unit that makes reductions below its baseline and sells the freed-up allowances is effectively substituting its new, lower-cost reductions for higher-cost reductions otherwise required by a covered EGU, with the result that the state's significant contribution is still eliminated but at a lower total program cost.

EPA notes that theoretical benefits anticipated from allowing opt-ins did not materialize in prior trading programs with opt-in provisions. The Acid Rain Program has about 23 opt in units; the $NO_X$ Budget Trading Program had five opt-in units; and no units opted into the CAIR programs. As a group, these opt-in units neither eased the achievement of required emission

reductions in past trading programs, nor reduced overall program costs.

In the proposal, EPA requested comment on the opt-in provisions, specifically regarding: What are the benefits of and concerns about including opt-in provisions; how to ensure units are not credited for emission reductions the units would have made anyway; whether the proposed 30 percent reduction (*i.e.,* application of the 70 percent multiplier to baseline emissions) or some other percentage reduction, or no reduction, should be applied to the baseline emission rate used in determining allocations; and whether any additional percentage reduction (such as 45 percent) should be applied to $SO_2$ Group 1 opt-in units in Phase II to reflect the stricter limits for covered units.

Some commenters argued that increasing the Transport Rule budgets for opt-ins would undermine the goal of CAA section 110(a)(2)(D)(i)(I) to eliminate a state's significant contribution to nonattainment and interference with maintenance. One commenter stated that it does not favor allowing sources that are not subject to the emission reduction requirements to be issued allowances that would increase the overall state emission budgets, due to the uncertainty that any reductions made by such units would be surplus, verifiable, permanent and enforceable. This could compromise the integrity of the EGU emission reduction requirements of the Transport Rule and jeopardize assurance that a state's significant contribution would be eliminated, as required by the Court in *North Carolina*. Other commenters claim that, while no cheap tons are available from non-EGUs and EPA is right not to require non-EGU reductions, EPA should nonetheless allow non-EGUs to choose voluntarily to be covered by opting in.

As mentioned previously, the final Transport Rule does not include any opt-in provisions either in the FIPs or in the provisions allowing modification or replacement of the FIPs through submission of trading program provisions in SIPs. EPA has several reasons for not adopting provisions to allow opt-in units. First, as mentioned above, historically, very few units have opted in. As of 2010, 28 units out of more than 4,700 covered units (23 units out of a total of about 3,600 covered units in the Acid Rain Program and 5 units out of a total of about 2,600 covered units in the $NO_X$ SIP Call) have opted in to EPA trading programs over the past 15 years. In the Acid Rain Program, 3 of the units opted in and

then, effective for 2005, opted out. Four of the units opted in, immediately shut down, and continue to receive allowance allocations. Four of the units opted in and continue to operate and receive allowance allocations. Finally, 12 of the units opted in, after CAIR was finalized, in order to receive allowances usable for compliance in the CAIR SO$_2$ trading program. Because CAIR will be replaced by this Transport Rule, EPA anticipates that these 12 units will opt out of the Acid Rain Program. In the NO$_X$ Budget Trading Program, 3 plants with 5 opt-in units received allocations between 2003 and 2008.

Moreover, EPA has determined that the inclusion of opt-in units in the Transport Rule trading programs would undermine the rule's objective of addressing emissions in each state that significantly contribute to nonattainment or interfere with maintenance in other states. As explained above, EPA has established budgets plus variability limits that states must meet to ensure that the significant contribution to nonattainment and interference with maintenance identified by EPA is addressed. If EPA were to allow opt-ins, and if any opt-in unit were to receive an allocation of allowances for emissions that would be reduced even if the units did not opt in, then the inclusion of that opt-in unit in the program would allow the sources covered by the Transport Rule to emit in excess of the budget plus variability limit with no new, offsetting reduction in emissions. For example, after a unit would opt in, process or fuel changes made for economic reasons (rather than due to any regulatory requirements), or installation of new emission controls or fuel-switching conducted to meet future, non-Transport Rule regulatory requirements, could result in emission reductions that would have occurred "anyway" (*i.e.*, even if the unit had not opted in), and the opt-in unit would be allocated allowances for the portion of its baseline emissions that would be removed by these "anyway" reductions. Allocations above the cap to opt-in units making "anyway" emission reductions would convert these reductions into extra allowances (*i.e.*, authorizations to emit) usable by covered facilities to hold allowances for emissions. Because the extra EGU emissions authorized by these extra allowances would not be offset by any new emission reductions by the opt-in units, this could threaten a state's ability to eliminate the significant contribution to nonattainment and interference with maintenance identified by EPA in the final rule. Also, opt-in units, which are

allocated allowances outside the state budget for covered units, could increase the possibility that a state's total emissions would exceed the state budget plus variability and thus that the assurance provisions would be triggered.

This problem of allocating allowances for emissions that would have been reduced anyway is illustrated by the recent promulgation of the final rule, National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters (76 FR 15608 (March 21, 2011)) ("final Boiler MACT rule"), which requires certain industrial, commercial, and institutional boilers to meet maximum achievable control technology (MACT) standards for emissions of specified hazardous air pollutants, such as hydrogen chloride (HCL) and mercury (Hg). Some of the control technologies that can be used to meet these standards will also provide significant reductions of SO$_2$ emissions. For example, a boiler may use a wet scrubber or the combination of a dry sorbent injection system and a fabric filter (among other options) to meet the applicable HCL standard or may use a wet scrubber or a combination of activated carbon injection and a fabric filter (among other options) to meet the applicable Hg standard. *See* 76 FR 15614 (describing testing and compliance requirements when such controls are used to meet these standards); and Memo from Brian Shrager to Amanda Singleton and Graham Gibson, *Revised Methodology for Estimating Cost and Emissions Impacts for Industrial, Commercial and Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants—Major Source* (February 11, 2011), Document ID EPA–HQ–OAR–2009–0491–4036 (section 3.1, describing control options for HCL and Hg control). In fact, EPA estimated that the new standards would result in emission reductions of not only the hazardous air pollutants directly subject to the standards, but also in other air pollutants such as SO$_2$. Specifically, EPA projected that compliance with the final Boiler MACT rule standards will result in about 431,000 tons of annual SO$_2$ reductions from existing boilers subject to the final Boiler MACT rule. This will comprise on average about a 46 percent reduction in SO$_2$ emissions for this group of boilers. Coal- and oil-fired boilers— which are the boilers likely to have the most uncontrolled SO$_2$ emissions and so would be the most likely types of units to consider opting into the Transport

Rule trading programs if opting-in were allowed—are projected to reduce about 409,000 tons of annual SO$_2$ as a result of complying with the final Boiler MACT rule, or about a 50 percent reduction in SO$_2$ emissions. *See* Memo from Brian Shrager to Amanda Singleton and Graham Gibson, Appendix B–1, (where column CE represents baseline SO$_2$ emissions and column CH represents SO$_2$ reductions resulting from the final Boiler MACT rule compliance). The amount of offsetting SO$_2$ increases projected to result from final Boiler MACT rule compliance, *e.g.*, from additional fuel being combusted to generate electricity to operate emission controls, is minor. *See* 76 FR 15651 (Table 4) and 15653 (showing projected total SO$_2$ reductions for all boilers and process heaters of about 442,000 tons and net SO$_2$ reductions of about 440,000 tons).

Consequently, a boiler subject to the final Boiler MACT rule may install a wet acid gas scrubber or a bag house in order to meet the HCL or Hg standard applicable to boilers under the final Boiler MACT rule and thereby achieve SO$_2$ emission reductions. If that boiler were to opt in to one of the Transport Rule SO$_2$ trading programs during the year before installing these controls to comply with the final Boiler MACT rule, then the boiler would be allocated allowances for the unit's current tons of SO$_2$ emissions and would not need to use these allowances for compliance under the Transport Rule once the final Boiler MACT-related controls were installed. The allowances allocated to the boiler would be additional allowances above the Transport Rule trading budget for the state where the boiler was located. As a result, the boiler would have freed-up allowances above the state trading budget that represent reductions that the boiler would have made anyway (*i.e.*, even if the boiler had not opted in) and that could be sold to EGUs covered by the Transport Rule. In effect, the opting-in of the boiler would result in the conversion of the boiler's SO$_2$ reductions from the final Boiler MACT rule into increased emissions above the state trading budget from EGUs subject to the Transport Rule.

Commenters addressed this issue. For instance, one commenter suggested that SO$_2$ reductions made by a boiler under the final Boiler MACT rule should be eligible for opt-in provision allowances under the Transport Rule trading programs. Another commenter stated that, given the uncertainty that reductions made by opt-in units would be surplus, verifiable, permanent, and enforceable, opt-in provisions could

compromise the integrity of the EGU emission reductions.

For the reasons explained above, EPA agrees with the latter commenter. Further, EPA notes that none of the commenters supporting adoption of the opt-in provisions suggested any revision to the proposed opt-in provisions that would address this problem. While the proposed opt-in provisions would limit an opt-in unit's allocation for a control period by calculating the allocation using the lesser of the unit's pre-opt-in $SO_2$ emission rate or the most stringent $SO_2$ emission rate applicable in that control period, this would not address $SO_2$ rate reductions that are not directly required by the final Boiler MACT rule but that are a secondary result of using and operating certain emission controls installed to comply with the HCL or Hg standards under the final Boiler MACT rule. Because the secondary $SO_2$ reductions will vary depending on the type of controls installed and on the extent to which the controls are used, and a boiler may use a combination of emission controls and other approaches to reduce HCL or Hg emissions (such as fuel switching), EPA believes that it is highly unlikely that opt-in provisions could prevent allocation for "anyway" emission reductions resulting from compliance with the final Boiler MACT rule. EPA therefore believes that the final Boiler MACT rule provides a concrete example of why adoption of opt-in provisions could undermine the rule's objective of addressing emissions in each state that significantly contribute to nonattainment or interfere with maintenance in other states. EPA notes that the final Boiler MACT rule, of course, is simply one example of how allocations for "anyway" reductions could occur and undermine the statutory requirements of the Transport Rule.

*C. Compliance Deadlines*

1. Alignment With NAAQS Attainment Deadlines

The compliance dates in the final Transport Rule are aligned with the attainment deadlines for the relevant NAAQS and consistent with the charges given to EPA by the Court in *North Carolina.* EPA proposed to require, and the final rule requires, compliance by 2014 with an initial phase of reductions in 2012.[57] Sources are required to

comply with annual $SO_2$ and $NO_X$ requirements by January 1, 2012 and January 1, 2014 for the first and second phases, respectively. Similarly, sources are required to comply with ozone-season $NO_X$ requirements by May 1, 2012, and by May 1, 2014. In selecting these dates, EPA was mindful of the NAAQS attainment deadlines which require reductions as expeditiously as practicable and no later than specified dates (see 42 U.S.C. 7502(a)(2)(A) (general attainment dates); 42 U.S.C. 7511(a)(1) (attainment dates for ozone nonattainment areas)), and also mindful of the court's instruction to "decide what date, whether 2015 or earlier, is as expeditious as practicable for states to eliminate their significant contributions to downwind nonattainment." *North Carolina,* 531 F.3d at 930.

1997 $PM_{2.5}$ NAAQS Attainment Deadlines. For all areas designated as nonattainment with respect to the 1997 $PM_{2.5}$ NAAQS, the deadline for attaining that standard is as expeditious as practicable but no later than April 2010 (5 years after designation), with a possible extension to no later than April 2015 (10 years after designation).[58] Many areas have already come into attainment by the April 2010 deadline due in part to reductions achieved under CAIR. The fact that the 2010 deadline will have passed before the Transport Rule is finalized emphasizes the importance of obtaining reductions as expeditiously as practicable. In addition, reductions achieved in upwind states by the 2014 emissions year will help downwind states demonstrate attainment by the April 2015 deadline.

2006 $PM_{2.5}$ NAAQS Attainment Deadlines. For all areas designated as nonattainment with respect to the 2006 24-hour $PM_{2.5}$ NAAQS, the attainment deadline must be as expeditious as practicable but no later than December 2014. Areas that fail to meet that deadline can request an extension to as late as December 2019.

Upwind emission reductions achieved by the 2014 emissions year

will help meet the December 2014 attainment deadline. In addition, the first phase of reductions in 2012 will help many areas attain in a more expeditious manner.

Further, a deadline of January 1, 2014 also provides adequate and reasonable time for sources to plan for compliance with the Transport Rule and install any necessary controls. EPA believes that this deadline is as expeditious as practicable for the installation of the controls, if any, needed for compliance with the 2014 state emission budgets. (*See* further discussion in section V.C.2.)

1997 Ozone NAAQS Attainment Deadlines. Ozone nonattainment areas must attain permissible levels of ozone "as expeditiously as practicable," but no later than the date assigned by EPA in the ozone implementation rule. 40 CFR 51.903. The areas designated nonattainment in 2004 with respect to the 1997 8-hour ozone NAAQS in the eastern United States were assigned maximum attainment dates effectively corresponding to the end of the 2006, 2009, and 2012 ozone seasons. The maximum attainment deadlines for the 1997 standard run from the June 15, 2004 effective date of designation for that standard. The time periods are based on the time periods provided for these classifications in section 181 of the Act, 45 U.S.C. 7511(a). However, instead of running from the 1990 date of enactment of the CAA as specified in section 181, our regulation provides that they run from the date of designation. An area's maximum attainment date is based on its nonattainment classification—that is, whether it is classified as a marginal, moderate, serious, severe, or extreme ozone nonattainment area. Marginal areas have three years from designation to attain the standard. Moderate, serious, severe, and extreme areas have 6, 9, 15, and 20 years, respectively. The maximum attainment deadlines associated with the 1997 ozone standards are June 15, 2007 for marginal areas, June 15, 2010 for moderate areas, and June 15, 2013 for serious areas. Because the actual deadline occurs in the middle of an ozone season, data from that ozone season is not considered when determining whether the area has attained by the deadline. Thus, these maximum attainment deadline dates effectively correspond with the end of the 2006, 2009, and 2012 ozone seasons. Reductions achieved or air quality improvements realized after those dates will not help the areas meet their maximum attainment deadlines.

Many areas have already attained the standard due in part to CAIR, federal

---

[57] For the annual programs, sources are required to have, by March 1, 2013, sufficient allowances in their accounts to cover their 2012 emissions. For the ozone-season program, they must have allowances in their accounts by December 1, 2012 to cover 2012 ozone-season emissions. The state budgets which determine the number of allowances

allocated to units in each state become more stringent for some states in 2014.

[58] Section 172(a)(2) of the Clean Air Act provides that the attainment dates for areas designated nonattainment with a NAAQS shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date of designation. This section also allows the Administrator to extend the attainment date to the extent she determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures. Designations for the 1997 $PM_{2.5}$ NAAQS became effective on April 5, 2005. Designations for the 2006 24-hour $PM_{2.5}$ NAAQS became effective on December 14, 2009.

mobile source standards, and other local, state, and federal measures. Other areas, however, have been reclassified to a higher classification either because they failed to attain by their attainment date or because the state requested reclassification to avoid missing an attainment date. Those that have not yet attained the standard now have maximum attainment dates ranging from June 2011 (these are the moderate areas that have been granted a 1-year extension due to clean data for the 2009 ozone season) to June 2024. The areas classified as "serious" nonattainment areas have a June 2013 maximum attainment deadline. Areas that missed their earlier deadlines and have been reclassified as "severe" or "extreme" nonattainment areas now have maximum nonattainment deadlines of June 2019 and June 2024 respectively. As explained above, an area with a June 2013 deadline would need to attain based on ozone data from the 2010–2012 ozone seasons, an area with a June 2019 deadline would need to attain based on ozone data from the 2016–2018 ozone seasons, and an area with a June 2024 deadline would need to attain based on ozone data from the 2021–2023 ozone seasons.

The Transport Rule's first phase of reductions in 2012 will help the remaining areas with June 2013 maximum attainment deadlines attain the 1997 8-hour ozone NAAQS by their deadline. If EPA determines that an area failed to attain by the 2013 deadline, the area would be reclassified to severe and would be subject to the more stringent emission control requirements that apply to the severe classification. The reductions will also help areas with later deadlines attain as expeditiously as practicable and improve air quality in those areas.

2012 Interim Compliance Deadline. EPA is requiring an initial phase of reductions starting in 2012. These reductions are necessary to ensure that significant contribution to nonattainment and interference with maintenance are eliminated as expeditiously as practicable and in time to help states meet their attainment deadlines. As the court emphasized in *North Carolina*, the significant contribution to nonattainment and interference with maintenance from upwind states must be eliminated as expeditiously as practicable to help downwind states to achieve attainment as expeditiously as practicable as required by the CAA. Further, reductions are needed by 2012 to help states attain before the June 2013 maximum attainment date for "serious" ozone nonattainment areas, to ensure

states attain as soon after the original April 2010 attainment deadline for the 1997 $PM_{2.5}$ NAAQS, and to help states attain before the December 2014 attainment deadline for the 2006 $PM_{2.5}$ NAAQS.

In addition, because this final rule will replace CAIR, EPA could not assume that after this rule is finalized, EGUs would continue to emit at the reduced emission levels achieved by CAIR. Instead, it is the emission reduction requirements in the proposed FIPs that will determine the level of EGU emissions in the eastern United States. For this reason also, EPA concludes that it is appropriate to require an initial phase of reductions by 2012 to ensure that existing and planned $SO_2$ and $NO_X$ controls operate as anticipated.

Addressing the Court's Concern about Timing. As directed by the Court in *North Carolina*, 531 F.3d 896, and as described previously, EPA established the compliance deadlines in the Transport Rule based on the respective NAAQS attainment requirements and deadlines applicable to the downwind nonattainment and maintenance sites.

The 2012 deadline for compliance with the limits on ozone-season $NO_X$ emissions is necessary to ensure that states with June 2013 maximum attainment deadlines get the assistance needed from upwind states to meet those deadlines. The 2012 deadline for compliance with the limits on annual $NO_X$ and annual $SO_2$ emissions is necessary to ensure attainment as expeditiously as practicable in areas which failed to attain by the 2010 attainment deadline for the 1997 $PM_{2.5}$ NAAQS and had to request an extension to 2015.

Similarly, the 2014 deadline for compliance with the limits on annual $NO_X$ and annual $SO_2$ emissions is necessary to ensure that downwind states get the benefit of upwind reductions prior to the December 2014 maximum attainment deadline for the 2006 $PM_{2.5}$ NAAQS. It is also necessary to ensure reductions occur in time to assist with attainment in downwind areas that received the maximum 5-year extension of the 5-year attainment deadline for the 1997 $PM_{2.5}$ NAAQS (taking into account the need for reductions by 2014 to demonstrate attainment by April 2015).

The 2012 compliance deadline for the first-phase of annual $NO_X$ and annual $SO_2$ emission reductions will assure the reductions are achieved as expeditiously as practicable. A significant amount of the emissions identified as significantly contributing to nonattainment or interfering with

maintenance in other states can be eliminated by 2012. EPA believes it is appropriate to do so in light of the court's direction to EPA to ensure states eliminate such emissions as expeditiously as practicable. *North Carolina* 531, F.3d at 930. Given the time needed to design and construct scrubbers at a large number of facilities, EPA believes the 2014 compliance date is as expeditious as practicable for the full quantity of $SO_2$ reductions necessary to fully address the significant contribution to nonattainment and interference with maintenance. Requiring reductions in transported pollution as expeditiously as practicable, as well as within maximum deadlines, helps to promote attainment as expeditiously as practicable. This is consistent with statutory provisions that require states to adopt SIPs that provide for attainment as expeditiously as practicable and within the applicable maximum deadlines.

b. Public Comments and EPA Responses

EPA received numerous comments on the proposed compliance dates. A number of commenters supported EPA's compliance schedule and rationale. Other commenters supported extending the compliance deadlines to later dates.

Many commenters questioned the technical feasibility of achieving the required reductions by the 2012 and 2014 dates. EPA's responses to those comments are discussed below in section VII.C.2.

Other commenters provided policy and legal arguments for allowing states to develop SIP alternatives to the FIP, and to build time for that SIP development and review process into the compliance schedule. For example, some commenters asserted that the requirement in the CAA for providing reductions "as expeditiously as practicable" must be balanced with CAA provisions allowing states to develop state implementation plans prior to EPA imposing FIPs. EPA responses to those comments are discussed in section X.

Some commenters suggested that EPA had the ability to leave CAIR in place for a transition period, and by doing this EPA could allow for a longer compliance period for this rule. EPA does not believe it would be appropriate, in light of the Court's decision in *North Carolina*, to establish a lengthy transition period to the rule that will replace CAIR. Although the Court decided on rehearing to remand CAIR without vacatur, the Court stressed its prior decision that CAIR was deeply flawed and EPA's obligation to remedy those flaws. *North Carolina*, 550

F.3d 1176. Although the Court did not set a definitive deadline for corrective action, the Court took care to note that the effectiveness of its opinion would not be delayed "indefinitely" and that petitioners could bring a mandamus petition if EPA were to fail to modify CAIR in a manner consistent with its prior opinion. *Id.* Given the Court's emphasis on remedying CAIR's flaws expeditiously, EPA does not believe it would be appropriate to establish a lengthy transition period to the rule which is to replace CAIR.

As relates to $PM_{2.5}$, EPA received a number of comments on its proposal to include a 2012 deadline to ensure that emission reductions needed to reduce $PM_{2.5}$ be achieved "as expeditiously as practicable." Some commenters supported EPA's 2012 deadline. Other commenters believed that it was unnecessary and unwarranted for EPA to impose emission reduction requirements in advance of the 2014 attainment date. In light of the 2014 five-year attainment date for the 2006 $PM_{2.5}$ NAAQS (with a possible extension to 2019), and the possible extension to April 2015 for the 1997 $PM_{2.5}$ NAAQS, these commenters believed EPA's 2012 emission reduction requirements for annual $PM_{2.5}$ and $NO_X$ were not necessary. EPA disagrees with these commenters, for a number of reasons. First, EPA notes (supported by commenters) that there is a clear statutory obligation to attain "as expeditiously as practicable." Second, EPA notes that there are feasible reductions available by 2012. Third, EPA believes that the substantial health and environmental benefits achieved by the rule underscore the importance of achieving the reductions as soon as possible.

With respect to ozone, some commenters noted that the proposed rule required ozone reductions by 2012 for states impacting areas which EPA's analysis shows will attain the 1997 ozone NAAQS by 2014 without further controls. Those commenters questioned the importance of getting reductions in such states and whether the 2012 deadline is necessary. EPA disagrees with those comments. Except for Houston, all ozone areas within the region addressed by this rule have attainment dates no later than 2013. In effect, this means that emission reductions needed to attain the 1997 ozone NAAQS must be in place by the 2012 ozone season. EPA believes that if there are reductions available by 2012, and those emission reductions have in fact been identified, it is appropriate and necessary to ensure that those reductions are in place.

2. Compliance and Deployment of Pollution Control Technologies

The power industry will undertake a diverse set of actions to comply with the Transport Rule at the start of 2012 and another set of actions when companies in Group 1 states comply with more stringent $SO_2$ budgets at the start of 2014. In 2012, the industry will largely meet the rule's $NO_X$ requirements by: Operating an extensive existing set of combustion and post-combustion controls on fossil fuel-fired generators; dispatching lower emitting units more often; and installing and operating a limited amount of relatively simple $NO_X$ pollution controls in states not previously subject to CAIR. For the $SO_2$ requirements, EPA anticipates at a minimum that coal-fired generators will operate the substantial capacity of advanced pollution controls already in place or scheduled for 2012 use; some

units will also elect to burn lower-sulfur coals; and the fleet will increase dispatch from lower-sulfur-emitting units as well as from natural gas-fired generators. EPA provides a more detailed explanation below of how fuel switching to lower sulfur coals factored in to the design of the final Transport Rule.

By 2014, EPA's budgets under the Transport Rule will sustain previous $NO_X$ and $SO_2$ reductions as well as account for reductions from additional advanced $NO_X$ and $SO_2$ controls that are driven by other state and federal requirements. In addition to these reductions, companies in Group 1 states are also projected to add a limited amount of advanced $SO_2$ controls in 2014 that will be discussed below.

EPA's expectations are supported by the IPM analysis reported in this rule's RIA (see Chapter 7). Notably, since EPA has established a cap and trade control system for lowering $NO_X$ and $SO_2$ emissions, individual owners and operators of covered units have some flexibility in meeting the program's requirements as needed and are free to find alternative ways to comply. The RIA clearly shows a viable known pathway for owners and operators to comply at reasonable costs, although it is not the only compliance pathway possible under this flexible regulation that could deliver the emission reductions required under the rule. Notably, by 2014 and beyond, the power industry may also augment the projected compliance efforts with programs aimed at improving energy efficiency.

Table VII.C.2–1—shows EPA's projection of the amount of existing coal-fired generating capacity in gigawatts (GW) that may retrofit various systems for compliance with this rule.

TABLE VII.C.2–1—PROJECTED POTENTIAL AIR POLLUTION CONTROL (APC) RETROFITS FOR TRANSPORT RULE [59]

| Capacity retrofitted by | Wet FGD | Dry FGD | DSI | SCR | LNB/OFA improvements |
|---|---|---|---|---|---|
| January 1, 2012 | | | | | 10 GW |
| January 1, 2014 | 5.7 GW | 0.2 GW | 3.0 GW | 0 GW. | |

EPA received proposal comments expressing a concern about the feasibility of deploying retrofit air pollution control (APC) technologies in the time frames available between the final date of this rule and the compliance dates. As discussed below, EPA believes that it is feasible for the electric power sector and its APC supply chain to either make most of the projected retrofits in time to meet the 2012 and 2014 compliance deadlines, or to comply by other means.

a. 2012 Power Industry Compliance

EPA's analysis of emission reductions available in 2012 assumes year-round operation of existing post-combustion pollution controls in states covered for $PM_{2.5}$ and ozone-season operation of $NO_X$ post-combustion controls in states covered for ozone. EPA also modeled emission reductions available in 2012 at the $500/ton threshold for $SO_2$, $500/ton for annual $NO_X$, and $500/ton for ozone-season $NO_X$.

For $SO_2$, EPA believes that reductions associated with the following methods of control are available and will be used

[59] GW: Gigawatts of capacity retrofitted; FGD: Flue gas desulfurization ($SO_2$ control); DSI: Dry sorbent injection ($SO_2$ control); SCR: Selective catalytic reduction ($NO_X$ control); LNB/OFA: Low-$NO_X$ burner and/or overfire air ($NO_X$ controls).

as compliance strategies to meet the 2012/2013 budgets: (1) Operation of existing controls year-round in $PM_{2.5}$ states, (2) operation of scrubbers that are currently scheduled to come online by 2012, (3) some sources switching to lower-sulfur coal (see section VII.C.2.c that follows), and (4) changes in dispatch and generation shifting from higher emitting units to lower emitting units. EPA modeling and selection of a $500/ton cost threshold includes all existing and planned controls operating year round (items 1 and 2). It also reflects an amount of coal switching and generation shifting that can be achieved for $500/ton. This set of expected actions is confirmed in the detailed modeling of EPA's final remedy in the RIA and can be reviewed there.

The power sector is already strongly positioned to achieve the Transport Rule state budgets presented in section VI.D through at least three distinct strategies. First, the sector will optimize its use of the large proportions of advanced pollution controls already present throughout the fleet. Second, the sector will take advantage of the substantial new pollution control technology that is already on the way for deployment by 2012. Third, the remainder of the fleet will flexibly adopt the most economic low-emitting fuel mix available at each unit to deliver cost-effective emission reductions complementing the reductions achieved from optimized use of the fleet's pollution control technology. The state maps in Chapter 7 of this rule's Regulatory Impact Analysis demonstrate how these emission reduction strategies for 2012 will build off of the sector's historic trend toward cleaner generation profiles. Also, the detailed unit-level projection files from EPA's IPM power sector modeling of the Transport Rule remedy (found in the docket for this rulemaking) show how EGUs adopt these strategies to not only reach the 2012 budgets, but in fact in many states overcomply with the budgets and build up a bank of allowances under the programs for future flexibility.

The following paragraphs illustrate the degree to which the existing fleet is already prepared to adopt these emission reductions in 2012 in order to attain the required emission reductions for $SO_2$, annual $NO_X$, and ozone-season $NO_X$ under the Transport Rule. More specifically, the illustrative paragraphs demonstrate emission reduction pathways for coal capacity to optimize or increase operation of existing control technology, timely implement existing

plans to bring additional control technology on line, and to cost-effectively make use of lower-emitting fuel alternatives.

Of the 240 GW of coal capacity in the Transport Rule region covered for fine particles, approximately 110 GW—more than 45 percent—had existing advanced pollution control for $SO_2$ already in place in 2010, including scrubbers (FGD), dry sorbent injection (DSI), or circulating fluidized bed boilers. Of this controlled coal capacity, EPA expects a significant portion will improve emission rates through either increased use of control technology and/or additional fuel switching. EPA notes that an additional 39 GW of advanced $SO_2$ controls in the region are scheduled to come online over the 2010–2012 timeframe and will also assist in meeting 2012 emission reduction requirements. Thus, by 2012 more than half of affected coal capacity—152 GW—will be operating with advanced $SO_2$ control equipment. Additionally, EPA expects approximately 40 GW of uncontrolled coal capacity in the region to take advantage of the existing coal supply infrastructure, possibly switching coal use or coal blending behaviors to make cost-effective reductions in $SO_2$ emission rates where economic to respond to the Transport Rule 2012 emission reduction requirements.

EPA notes that approximately 136 GW of the 240 GW—more than 56 percent—of coal capacity in the Transport Rule region covered for fine particles had existing advanced pollution control for $NO_X$ already in place in 2010, including selective catalytic reduction (SCR), selective non-catalytic reduction (SNCR), or circulating fluidized bed boilers. Of this capacity, EPA anticipates a significant portion will improve their $NO_X$ emission rate through increased operation of these existing controls. Additionally, EPA notes that an additional 21 GW of SCR and 4 GW of enhanced combustion controls (including low-$NO_X$ burners and overfire air) are scheduled to come online in the region during the 2010–2012 timeframe, bringing the total region's coal capacity operating with $NO_X$ emission reduction technology to 158 GW (more than 65 percent of total coal capacity in the Transport Rule fine particle region). EPA also projects that approximately 13 GW of coal capacity will make some reduction in their $NO_X$ emission rates by enhancing performance of existing combustion controls or SNCR, or by fuel switching.

In the Transport Rule states covered under the ozone-season program, approximately 145 GW of the 260 GW (more than 55 percent) of coal capacity had existing $NO_X$ control technology in place in 2010. EPA expects a significant portion of that capacity to achieve emission reductions during the 2012 ozone-season through improved operation of SCR. Additionally, in the Transport Rule ozone region there will be approximately 21 GW of additional advanced $NO_X$ control installations and 7 GW of additional combustion control improvements or installations coming online during the 2010 to 2012 time frame. EPA projects that 17 GW of coal capacity in the Transport Rule ozone region will reduce $NO_X$ emission rates by enhancing performance of existing combustion controls or SNCR or by fuel switching.

For $NO_X$, EPA has also concluded that it is appropriate to require reductions through a limited amount of combustion control improvements, and in some cases, retrofits such as low-$NO_X$ burners (LNB) and/or overfire air (OFA). EPA recognizes that the 6-month time frame between rule finalization and start of the first compliance period would not allow for the installation of a major post-combustion $NO_X$ control such as SCR. Assumed improvements and retrofits for the January 1, 2012 deadline for annual $NO_X$ reductions therefore only involve the much simpler LNB/OFA control modifications or installations. Alternatively, some plant owners might choose to achieve $NO_X$ reductions in a similar time period through an even simpler retrofit—SNCR.[60]

Although the improvements, and in some cases, installation of combustion controls would be an economic means of achieving emission reductions, these specific controls are not required for compliance purposes under the final Transport Rule remedy. Individual sources may comply through other measures (such as purchasing additional allowances) in the event that it takes more than 6 months for installation of a given combustion control. The vast majority of covered sources already have combustion controls installed; therefore, the $NO_X$ reductions associated with these incremental control improvements and installations are small.

---

[60] David L. Wojichowski, SNCR System—Design, Installation, and Operating Experience *http://www.netl.doe.gov/publications/proceedings/02/scr-sncr/wojichowski-1.pdf.*

Based on the Transport Rule's geography, EPA estimates that approximately 10 GW of coal-fired units may improve, and in some cases, install LNB/OFA specifically in reaction to the Transport Rule $NO_X$ caps. EPA reflects the effects of these installations in the 2012 annual and ozone-season $NO_X$ budgets, which would yield reductions of approximately 28,000 tons of annual $NO_X$ and 14,000 tons of ozone-season $NO_X$. EPA assumes these controls are cost effective at $500/ton and that they should be incentivized through budgets given the 2013 attainment deadline for ozone areas classified as "serious." Once installed, LNB/OFA operates any time the boiler is fired and thus yields $NO_X$ reductions beyond the ozone season alone.

In the proposal's LNB technical support document,[61] EPA observes that LNB and/or OFA installations, burner modifications, or other $NO_X$ reduction controls would likely have to be installed during fall 2011 or spring 2012 outages in order to achieve significant reductions for 2012. While this 6-month schedule is aggressive, industry has shown that it can be met. For example,

Limestone Electric Generating Station Unit 2, an 820 MW tangentially-fired lignite unit, was retrofitted with Foster Wheeler's Tangential Low $NO_X$ (TLN3) system in less than six months, including engineering, fabrication, delivery and installation.[62] Harlee Branch Unit 4, a 535 MW cell-fired unit, was retrofitted with Riley Power's low-$NO_X$ Dual Air Zone CCV burners on a similar schedule.[63] These are tangentially-fired and wall-fired units, respectively, representative of the unit types that might make LNB/OFA improvements for compliance with this rule. Although such 6-month schedules can be achieved on some units, under favorable circumstances, historical projects suggest a more typical schedule would be 12 to 16 months for the contractor's portion of the work.[64] A plant owner's project planning and procurement work in advance of a contract award would typically involve several additional months. On the other hand, there are other approaches that can also be implemented in a short time frame to achieve significant $NO_X$ reduction. As mentioned above, relatively simple SNCR systems can be

installed quickly; and the re-tuning or upgrading of existing combustion control systems can often provide significant $NO_X$ reductions and can be performed quickly.[65]

As stated above, EPA believes that LNB/OFA modifications or retrofits would be possible during the 6-month interim between rule signature and the start of the first compliance period, particularly for those "early movers" who have initiated LNB projects based on the proposed rule. However, as shown in Table VII.C.2–2, below, even if all LNB modifications or installations are delayed until the beginning of the 2012 ozone season, the reductions only represent 1 percent of most covered states' annual $NO_X$ budgets, and no more than 11 percent of any affected state's annual $NO_X$ budget. Under such a scenario, these delayed reductions would still be well within the 18 percent variability limit applied to each state's annual $NO_X$ budget. In light of this limited consequence and the supporting material above, EPA includes LNB-driven $NO_X$ reductions in both annual and ozone-season $NO_X$ budgets for 2012.

TABLE VII.C.2–2—EARLIEST REDUCTIONS ASSUMED FROM LNB INSTALLATIONS IN THE TRANSPORT RULE STATES SUBJECT TO THE ANNUAL $NO_X$ PROGRAM *

| | $NO_X$ reductions from LNB operation from January–April (tons) | Annual $NO_X$ state budget (tons) | Percent of budget met by earliest LNB reductions (percent) |
|---|---|---|---|
| Georgia | 646 | 62,010 | 1 |
| Iowa | 567 | 38,335 | 1 |
| Kansas | 2,131 | 30,714 | 7 |
| Minnesota | 2,303 | 29,572 | 8 |
| Nebraska | 3,008 | 26,440 | 11 |
| Region-wide Total | 8,656 | 1,245,869 | 1 |

*Based on EPA IPM Analysis of Final Transport Rule.

b. 2014 Power Industry Compliance

EPA projects that compliance with 2014 requirements for $NO_X$ will result largely from operation of existing and future controls required by state and other federal requirements, as well as the appropriate dispatch of the electric generation fleet. EPA does not project additional $NO_X$ pollution control retrofits aside from about 10 GWs of combustion control improvements or retrofits projected for the 2012

compliance period. To comply with the rule's $SO_2$ requirements, EPA projects that the power industry will rely on existing controls, operate newly installed advanced controls necessary for other binding state and federal requirements, rely more on relatively lower sulfur coals, and dispatch lower-emitting generation units. In Group 1 states, industry is projected to increase switching to lower sulfur coals and install a limited amount of additional scrubbers and other advanced pollution

control technology. EPA's assessment of the industry's ability to install $SO_2$ pollution controls in 2014 and undertake the projected coal switching follows below.

EPA's modeling of least-cost compliance with the state budgets under the Transport Rule projects approximately 5.9 GW of FGD systems and lesser amounts of other technologies will be retrofitted by 2014

---

[61] Technical Support Document (TSD) for the Transport Rule, Docket ID No. EPA–HQ–OAR–2009–0491, Installation Timing for Low $NO_X$ Burners (LNB).

[62] R. Pearce, J. Grusha, Reliant Energy Tangential Low $NO_X$ System at Limestone Unit 2 Cuts Texas Lignite, PRB and Pet Coke $NO_X$, *http://*

*www.fwc.com/publications/tech_papers/files/ tp_firsys_01_02.pdf.*

[63] B. Courtemanche, *et al.,* Reducing $NO_X$ Emissions and Commissioning Time on Southern Company Coal Fired Boilers With Low $NO_X$ Burners and CFD Analysis, *http:// www.babcockpower.com/pdf/t-182.pdf.*

[64] M. O'Donnell, Babcock & Wilcox Company, (personal communication with EPA staff, February 22, 2011).

[65] N.C Widmer, et al., Coal Power, October 8, 2009, *http://www.coalpowermag.com/ops_and_ maintenance/Zonal-Combustion-Tuning-Systems-Improve-Coal-Fired-Boiler-Performance_226.html.*

for compliance with the Transport Rule.[66][67] EPA's schedule assumptions for these larger more complex projects were developed in an earlier study and mentioned in the proposal: 27 months for retrofitted wet FGD and 21 months for SCR.[68] Note that a dry FGD system, due to its relatively simpler configuration and lesser cost, would typically take somewhat less time to retrofit than wet FGD.

As discussed below, EPA believes that its schedule assumptions remain reasonable expectations for sources that have completed most of their preliminary project planning and can quickly make commitments to proceed. These schedules do not include the extensive time that some plant owners might spend in making a decision on whether or not to retrofit. They do include the time needed to make a final confirmation of the type of technology to be used at a particular site, to prepare bid requests, award contracts, perform engineering, obtain construction and operating permits (in parallel with project activities), perform construction, tie-in to the existing plant systems, and perform integrated systems testing.

EPA received comments on the proposed rule indicating that some past single-unit APC retrofits had considerably longer schedules, with a few exceeding 48 months. EPA engineering staff have extensive experience with power plant and APC system design, construction, and operation. Based on that experience, EPA can observe that in the absence of a compelling deadline or major economic incentive, many large project schedules are considerably longer than necessary. Given further observations as explained below, EPA believes it is reasonable to expect that almost all future APC retrofits can be completed far more quickly than they were in recent history. EPA's perspective on this matter derives in part from a comparison of longer APC schedules (as provided by some commenters) to the project schedule for an entire new coal-fired unit, including its APC systems. Springerville Unit 3, for example, is a new 400 MW subbituminous coal-fired unit with SCR and dry FGD that became operational in July 2006, some 33 months after the turnkey engineering-construction contractor was given a notice to proceed with engineering.[69] Springerville was clearly on an accelerated schedule, as its original planned schedule was about 38 months. Another example is Dallman Unit 4, a high-sulfur bituminous coal-fired 200 MW unit with SCR, fabric filter, wet FGD, and wet ESP. Dallman Unit 4 was first synchronized in May 2009, several months ahead of schedule, and about 36 months after its turnkey contractor placed initial major equipment orders.[70] The main point here is that recent APC project schedules, and those of large complex power projects, can be significantly accelerated. Because the scope and complexity of the work involved for an entire new coal unit and its APC systems is perhaps five times greater than that of a retrofit wet FGD system alone, EPA believes it is reasonable to expect that even the most complex retrofit APC project can be significantly accelerated as well. Additional factors are discussed below that further support the feasibility of installing by 2014 the 5.9 GW of FGD retrofits projected for this rule.

Although IPM modeling provides reliable estimates on a regional basis, and cannot be as accurate at the level of individual plants or units, it is informative and relevant to consider IPM's plant level projections in this case. Although the IPM-projected retrofits named below may not actually occur, IPM projects that they would be economic and would allow industry to meet the tighter $SO_2$ emission standards in Group 1 states in 2014. EPA notes that the owners of the particular plants mentioned below (Duke Energy, AEP, Edison International) are large, experienced, versatile utilities that have done considerable advance planning and should also have above-average flexibility to comply with state budgets across their fleets. EPA would expect such owners to have relatively little difficulty in permitting and financing FGD retrofits.

Of the Transport Rule-related FGD retrofits, 0.2 GW is projected to use dry FGD, which EPA expects to be simpler and quicker to install than wet FGD. Half of the 5.9 GW (Muskingum, Rockport) has already been committed under consent decrees to add controls or retire;[71] and EPA reasonably believes that significant preliminary project planning work has already been done for those projects. An additional 1,200 MW (Homer City) had completed project planning and was ready to proceed in 2007, before putting the project on hold.[72] The latter plant is now facing EPA legal action and the possibility of a required expeditious FGD retrofit.[73] Thus, of the 5.9 GW of projected FGD retrofits resulting from this rule, nearly 75 percent appears to be in good position for an early start of construction, and over 3 GW of that would be bringing forward already committed compliance start dates.

Any of the above mentioned potential retrofits or any other unit that might choose to retrofit FGD for a January 2014 compliance date will likely have to use various methods to accelerate the project schedule. Such methods could include the use of parallel permitting, overtime and/or two-shift work schedules during construction, and 5- or 6-day work weeks instead of the 4-day × 10-hour schedules often used to minimize cost when time is not of the essence. Increased use of offsite modularization and pre-fabrication of APC components could also shorten schedules and reduce job hours.

EPA believes that the January 1, 2014 compliance date is as expeditious as practicable for the sources installing large, complex control systems. The following additional observations support EPA's expectation that the limited 5.9 GW of FGD retrofits can be realized in the 30 month interim between rule signature and the start of 2014:

• There are documented instances of large, complex wet FGD retrofits being deployed in less than 30-months (excluding the time for owners' project

---

[66] Nearly all of the 5.9 GW of FGD retrofits are comprised by some 12 units at 7 plants (Beckjord, Muskingum River, Homer City, Rockport, Kammer, Danskammer, and Will County).

[67] As noted elsewhere in this preamble, the projected impacts of this final rule presented in the preamble do not reflect minor technical corrections to $SO_2$ budgets in three states (KY, MI, and NY) and assumed preliminary variability limits that were smaller than the variability limits finalized in this rule. EPA conducted sensitivity analysis factoring in these corrections; the results of this analysis include a small increase of about 700 MW of additional wet FGD retrofit projected for 2014. This projected additional retrofitting capacity is already required to retrofit under a consent decree and should therefore have already conducted advanced retrofit planning. EPA therefore believes that this incremental projected retrofit behavior (factoring in the technical corrections made after the main impact analyses were conducted) is feasible by 2014 for the same reasons presented in this section regarding the projected retrofit behavior from the main analysis of the final rule.

[68] EPA, Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies; EPA–600/R–02/073 October 2002.

[69] Best Coal-fired Projects, Springerville Unit 3 Expansion Project, Power Engineering, November 2006, http://www.powergenworldwide.com/index/display/articledisplay/282547/articles/power-engineering/volume-111/issue-1/features/projects-of-the-year.html.

[70] http://www.cwlp.com/electric_division/generation/Dallman%204%20Power%20Plant%20of%20the%20Year.pdf.

[71] http://www.epa.gov/compliance/resources/decrees/civil/caa/americanelectricpower-cd.pdf.

[72] http://www.businesswire.com/news/home/20060731005193/en/Contractors-Selected-Install-Emissions-Control-System-Pennsylvania.

[73] http://www.epa.gov/Compliance/resources/complaints/civil/caa/homercity-cp.pdf.

planning). Examples are Killen Station Unit 2,[74] and Asheville Unit 1.[75]

• In 2009 the APC supply chain deployed more than six times more GW capacity of FGD and SCR controls than the 5.9 GW of FGD that would be deployed by 2014 under this Rule.

• The APC supply chain has seen a 2-year decline in deployments since its peak in 2009, but in 2011 is nonetheless putting into service about three times more GW capacity of FGD and SCR controls than the 5.9 GW of FGD that would be deployed under this Rule.

• Because the supply chain has been in decline, but remains quite active, there are now adequate supply chain resources available that can be quickly reengaged to support a rapid deployment of 5.9 GW of FGD.

EPA recognizes that the installation of any amount of scrubbers in this short time frame will require aggressive action by plant owners and that the owners who can meet this schedule will already have done their project planning and will be ready to place orders. An example of such "early movers" was seen in the power sector's anticipation of CAIR. EPA data indicate that solely CAIR-driven FGD and SCR deployments of about 6 GW occurred within two and one-half years after CAIR's finalization in mid-2005, showing that at least 20 percent of the total CAIR-only controls effort through a 2010 compliance date was sufficiently planned for installation to start before or immediately upon finalization of the rule. EPA reasonably expects that similar advance planning has already been done for units that would retrofit under this rule.

In the event that a particular control installation requires additional time into 2014 to come online, EPA believes compliance would not be jeopardized given the ability of sources to purchase allowances during that time. This approach could be supported by some sources with FGD that have the ability to increase their SO$_2$ removal above historic rates, perhaps through relatively low cost upgrades to improve scrubber effectiveness, or by operating scrubbers at higher chemistry ratios. The ability of sources to temporarily or permanently substitute dry DSI for FGD serves as another backstop for any feasibility issues regarding FGD. Note that the updated modeling for this rule projects

the addition by 2014 of about 3 GW of DSI for SO$_2$ control using trona or other sorbent. DSI is a relatively low capital cost technology that readily can be installed in the time frame available for compliance.[76][77]

It should also be noted that most APC retrofits will involve a source outage for final "tie-in" of retrofitted systems to existing systems, during which time emissions from the affected units are zero. For some sources, the duration of this tie-in outage may effectively extend the deadline by which all of the projected emission reductions need to occur.

Although EPA believes that installation of 5.9 GW of FGD at facilities by January 1, 2014 is feasible, EPA also conducted an IPM sensitivity analysis to examine a scenario in which FGD retrofitting by 2014 is not allowed. Results of EPA's "no FGD build in 2014" analysis indicate that if the power industry were subjected to the requirements of this rule without an FGD retrofit option for compliance until after 2014, covered units would still be able to meet the Transport Rule requirements in every state while respecting each state's assurance level. (*See* the docket to this rulemaking for the IPM run titled "TR_No_FGD_in2014_Scenario_Final.")

In this scenario without the availability of new FGD by 2014, sources in covered states complied with the Transport Rule budgets by using moderate additional amounts of DSI retrofits, switching to larger shares of sub-bituminous coal, and dispatching larger amounts of natural gas-fired generation in lieu of the FGD retrofits that are projected as being most economic under modeling of the Transport Rule remedy. Because new FGD capacity is included in EPA's projection of the least-cost set of SO$_2$ emission reductions required in Group 1 states, the "no FGD" sensitivity scenario did project higher system costs, although these costs were still substantially lower than the remedy EPA modeled in the Transport Rule proposal.

The "no FGD" analysis indicates that while the ability of Group 1 states to meet their 2014 SO$_2$ budgets is facilitated by FGD retrofits, they are by no means required, nor is Transport Rule compliance jeopardized by their

absence. Even under a scenario in which sources fail to complete FGD retrofits by 2014, sources in the affected states would have other compliance options available at reasonable cost to meet the state's budget requirements. This analysis shows that Group 1 states would be able to comply with their 2014 SO$_2$ budgets by relying on other emission reduction opportunities that do not require FGD retrofits. EPA analysis confirms that those alternatives are feasible both in terms of cost and timing.

Finally, EPA recognizes that, when finalized later this year as currently scheduled, the Mercury and Air Toxics Standards (MATS) will require significant retrofit activity at covered sources in the power sector with a 2015 compliance date for that rule. EPA's projections of retrofit activity under the final Transport Rule are highly compatible with its projections of retrofit activity under the proposed MATS (which included the proposed Transport Rule in its baseline). EPA therefore anticipates that the Transport Rule's projected retrofit activity will not only be the least-cost compliance pathway to meeting state budgets in 2014 but will also accelerate emission reductions subsequently required by the effective date of MATS. The final Transport Rule's projected 2014 retrofit installations will also further incentivize the power sector to ramp up its retrofit installation capabilities to achieve broader deployment of the projected pollution control retrofits under the proposed MATS.

Considering all the reasons given above, EPA has concluded that the 2014 requirements for SO$_2$ emissions in the states covered by the Transport Rule are reasonable and can be met by the power industry by a variety of means.

c. Coal Switching for SO$_2$ Compliance in 2012 and 2014

Coal switching is another mechanism which can be used along with operating pollution controls in 2012 for compliance. It will be a complementary activity by many coal-fired units alongside of operating pollution controls and the addition of more scrubbers and DSI in 2014.

In the proposal, EPA noted that coal switching could serve as a compliance mechanism for 2012. EPA requested comment on the reasonableness of EPA's assumption that coal switching will have relatively little impact on most units. EPA received substantial comment suggesting that the coal switching and coal blending projected by EPA modeling are not feasible for all units,

[74] Black & Veatch, *http://www.bv.com/News_3_Publications/News_Releases/2005/0503.aspx* (start), *http://www.bv.com/wcm/press_release/07252007_9767.aspx* (completion).

[75] PowerGenWorldwide, Projects of the Year, January 1, 2007, *http://www.powergenworldwide.com/index/display/articledisplay/282547/articles/power-engineering/volume-111/issue-1/features/projects-of-the-year.html.*

[76] ICAC letter to Senator Carper, November 3, 2010, *http://www.icac.com/files/public/ICAC_Carper_Response_110310.pdf.*

[77] Assessment of Technology Options Available to Achieve Reductions of Hazardous Air Pollutants, URS Corporation, April 5, 2011, *http://www.supportcleanair.com/resources/studies/file/4-8-11-URSTechnologyReport.pdf.*

and that, if feasible, would often incur a cost through the derating of the unit associated with the switch to a lower sulfur coal or coal blend. Additionally, sources indicated that coal switching by 2012 would not always be possible in the six month window between final rule signature and start of compliance. These feasibility concerns stemmed from restrictions included in existing coal supply contracts and from boiler design constraints that may hinder coal switching within a 6 month window.

EPA agrees with these concerns and revised its IPM modeling to limit coal switching capability in 2012 for particular units that may have trouble switching coals or coal blends in a six month time frame. A cost adder was also included in the IPM modeling for coal switching to capture the potential cost burden of deratings that might accompany switching to a very low sulfur subbituminous coal or coal blend.

A particular commenter concern regarding switching to lower sulfur within the eastern bituminous coals related to a possible impact on the performance of a cold-side electrostatic precipitator (ESP). Some ESPs that operate at acceptably high collection efficiency when using a high- or medium-sulfur bituminous coal may experience some loss in collection efficiency when a lower sulfur coal is used. Whether this occurs on a specific unit, and the extent to which it occurs, would depend on the design margins built into the existing ESP, the percentage change in coal sulfur content, and other factors. In any case, industry experience indicates that relatively inexpensive practices to maintain high ESP performance on lower sulfur bituminous coals are available and can be used successfully where necessary. These include a range of upgrades to ESP components and flue gas conditioning.[78] EPA therefore assumes that it will not be necessary for units that switch from higher to lower sulfur bituminous to make a costly replacement of the ESP.

Coal switching as a $SO_2$ compliance option might also include switching from bituminous to subbituminous coal. EPA's analysis does not assume that a unit designed for bituminous can switch to (very low sulfur) subbituminous coal unless the unit's historical data demonstrate that capability in the past. EPA assumes that units with that demonstrated capability have already made any investments needed to handle

a switch back to the use of subbituminous coal at a similar percentage of its heat input as in the past. For IPM analysis in the final rule EPA also introduced a coal switching option that assumes that units can increase a historically low percentage use of subbituminous to a "maximum" level, if economic. This option includes an appropriate derate in output, increase in heat rate, and additional capital and operating costs. Details of this and other IPM updates for this rule are provided in the IPM Modeling Documentation in the docket for this rulemaking ("Documentation Supplement for EPA Base Case v.4.10_FTransport—Updates for Final Transport Rule").

Some commenters also expressed concern with the assumption that coal-switching from lignite to subbituminous is a cost-effective or feasible emission reduction strategy, particularly at Texas EGUs. EPA carefully considered these comments and adjusted its modeling of cost-effective reductions to address this concern. Specifically, EPA made adjustment in the model so that it assumes coal-switching is not a compliance option at the specific units where commenters identified technical barriers to subbituminous coal consumption. The Transport Rule emission budgets are based on this adjusted modeling which does not assume any infeasible coal-switching from lignite to subbituminous. In addition, EPA's analysis of cost-effective reductions in each state presented in section VI.B shows that Texas is capable of cost-effectively meeting its Transport Rule emission budgets; however, EPA also conducted sensitivity analysis that shows Texas can also achieve the required cost-effective emission reductions even while maintaining current levels of lignite consumption at affected EGUs. More details regarding this analysis, including a table comparing key parameters between the main Transport Rule remedy analysis and this Texas lignite sensitivity, can be found in the response to comments document and the IPM model output files included in the docket for this rulemaking.

*D. Allocation of Emission Allowances*

Under the final rule, EPA distributes a number of $SO_2$, annual $NO_X$, and ozone-season $NO_X$ emission allowances to covered units in each state equal to the $SO_2$, annual $NO_X$, and ozone-season $NO_X$ budgets for those states. These budgets are addressed in section VI.D of this preamble. This section discusses the methodology EPA uses to allocate

allowances to covered units in each state.

As discussed later in section VII.D.2, EPA is setting aside a base 2 percent of each state's budgets for allowance allocations for new units, with 5 percent of that 2 percent, or 0.1 percent of the total state budget being set aside for new units located in Indian country. To this base 2 percent, EPA is setting aside an additional percentage on a state-by-state basis, ranging from 0 to 6 percent (yielding total set asides of 2 percent to 8 percent), for units planned to be built. The remainder of the state budget is allocated to existing units. Tables VI.D.–3 and VI.D.–4 in this preamble show the $SO_2$, annual $NO_X$, and ozone-season $NO_X$ budgets for each covered state (without the variability limits). In allocating allowances to existing and new units, EPA distributes four discrete types of emission allowances for four separate programs: $SO_2$ Group 1 allowances, $SO_2$ Group 2 allowances, annual $NO_X$ allowances, and ozone-season $NO_X$ allowances.

In the $SO_2$ Group 1 and $SO_2$ Group 2 programs, each $SO_2$ allowance authorizes the emission of one ton of $SO_2$ in that vintage year or earlier and is usable for compliance only in the program for which the allowance was issued. In the annual $NO_X$ program, each annual $NO_X$ allowance authorizes the emission of one ton of $NO_X$ in that vintage year or earlier in that program. In the ozone-season $NO_X$ program, each ozone-season $NO_X$ allowance authorizes the emission of one ton of $NO_X$ during the regulatory ozone season (May through September for this final rule) in that vintage year or earlier for that program.

In each of the four trading programs, a covered source is required to hold sufficient allowances (issued in the respective trading program) to cover the emissions from all covered units at the source during the control period. EPA assesses compliance with these allowance-holding requirements at the source (*i.e.,* facility) level.

This section explains how, in this final rule, EPA allocates a state's budget to existing units and new units in that state. This section also describes the new unit set-asides and Indian country new unit set-asides in each state, allocations to units that are not operating, and the recordation of allowance allocations in source compliance accounts.

1. Allocations to Existing Units

This subsection describes the methodology EPA will use in the FIPs finalized in this action to allocate to

[78] Assessment of Technology Options Available to Achieve Reductions of Hazardous Air Pollutants, URS Corporation, April 5, 2011, *http://www.supportcleanair.com/resources/studies/file/4-8-11-URSTechnologyReport.pdf.*

existing units.[79] The same methodology will be used to allocate allowances to existing units for all four trading programs.

For the reasons explained below, EPA has decided to base allocations made under the FIPs on historic heat input, subject to a maximum allocation limit to any individual unit based on that unit's maximum historic emissions. This methodology gives each existing unit an allocation equal to its share of the state's historic heat input for all the covered units in the program, except where that allocation would exceed its maximum historic emissions; this methodology constrains the heat input-based allocations from exceeding any unit's maximum historic emissions. Further detail on the implementation of this approach is provided in section VII.D.1.c below as well as in the Allowance Allocation Final Rule TSD in the docket for this rulemaking. All existing-unit allocations for 2012 will be made pursuant to the FIPs. However, as described in section X, states may submit SIPs or abbreviated SIPs to use different allocation methodologies for allowances of vintage year 2013 and later.

a. Summary of Allocation Methodologies and Comments

EPA took comment on three distinct allocation methodologies for existing units. The first—an emissions-based option—was presented in the original Transport Rule proposal (75 FR 45309). The second and third—heat input option 1 and heat input option 2—were presented in a Notice of Data Availability (76 FR 1113). EPA received numerous comments on all three options.

i. Emission-Based Allocation Methodology

The emission-based option presented in the original Transport Rule proposal would base allowance allocations to existing units on each covered unit's calculated emission "share" of that state's budget for a given pollutant under the Transport Rule. The proposed rule stated that "for 2012, each existing unit in a given state receives allowances commensurate with the unit's emissions reflected in whichever total emissions amount is lower for the state, 2009 emissions or 2012 base case emissions projections. In either case, the allocation

is adjusted downward, if the unit has additional pollution controls projected to be online by 2012. * * * For states with lower SO$_2$ budgets in 2014 (SO$_2$ Group 1 states), each unit's allocation for 2014 and later is determined in proportion to its share of the 2014 state budget, as projected by IPM" (75 FR 45309).

Many commenters objected to this projected emission allocation methodology. Commenters offered two principle objections. First, they argued EPA should not use unit-level model projections to allocate allowances. Second, they argued the use of any emission-based allowance methodology is improper. Many of these commenters argued that instead of an emission-based allocation methodology, EPA should use a heat-input-based allocation methodology.

Commenters' objections to the use of unit level model projections focused primarily on the accuracy of such projections. While many commenters supported the use of modeling projections in determining state emission budgets, they argued that the unit-level model projections were not sufficiently accurate to use as a basis for allocating allowances to individual units. Among other things, they argued that the modeling used for the proposal did not recognize certain non-economic factors that may cause individual units to operate differently than the model projects. Commenters also argued that EPA's modeling does not capture all up-to-date contracts and other economic arrangements made at the unit-level which may affect operational decision-making. Some of these commenters continued to support the use of an emission-based allocation approach, but urged EPA to use more up-to-date and specific unit-level data in its modeling projections. Others opposed the use of any emission-based allocation approach.

EPA acknowledges that the model may not, at this time, capture all relevant operational decision factors for each individual unit. EPA also recognizes that there are unit-level details of operational decision-making and economic arrangements (such as certain contracts for electricity sales) that are private and thus unavailable to EPA on an ongoing basis for modeling purposes. EPA believes these potential omissions would not have a significant impact on EPA's determination of significant contribution at the state level; however, EPA recognizes they could conceivably have a significant impact on projections at the individual unit level. EPA thus agrees with commenters that the unit-level emission projections from its modeling may not

reflect all possible operational decisions at a given unit and are therefore not an appropriate proxy measure to use as a basis for allocating allowances to individual units.

Many commenters also argued that, even if the emission projections could be adjusted to capture all known and up-to-date unit-level operational factors, EPA should not use any emission-based allocation approach. They argued that an emission-based approach should not be used because it is not fuel-neutral. That is to say, the type of fuel consumed significantly affects the emissions from, and therefore the allocation to, a given unit under an emission-based approach. Commenters argued that an approach that is not fuel-neutral effectively awards higher-emitting units. Commenters also argued that a projected emission-based approach should not be used because it is not control-neutral. In other words, whether or not a unit has installed controls would significantly affect the allocation for a given unit under an emission-based approach. Under an emission-based approach, controlled units receive significantly fewer allowances than uncontrolled units. Such an approach, commenters pointed out, effectively penalizes sources who have taken action to reduce emissions.

EPA acknowledges that an emission-based approach would not be fuel-neutral or control-neutral. EPA notes that the DC Circuit rejected the fuel adjustment factors that were used in CAIR to adjust state budgets based on the type of fuel burned at each covered unit. *North Carolina*, 531 F.3d 918–21 (rejecting use of fuel adjustments in setting state NO$_X$ budgets). While the proposal's allocation methodology did not explicitly adopt "fuel adjustment factors" for allocation purposes, EPA recognizes that an emission-based allocation methodology effectively advantages or disadvantages units based on the type of fuel they combust.

In addition, several commenters argued that the proposal's emission-based methodology would inappropriately reward the highest emitters under the program with more allowances than their lower-emitting counterparts would receive. EPA acknowledges that such a methodology would allocate more allowances to units whose emissions make up a larger share of the proposed Transport Rule programs' state budgets. EPA notes that because any allocation patterns under the Transport Rule FIPs would be established in advance of covered sources' compliance decisions (*i.e.*, decisions regarding how much to emit under the programs), covered sources

---

[79] In this rule, existing units are defined as covered units that commenced commercial operation prior to January 1, 2010. As explained in greater detail in Section VII.B. of this preamble, EPA decided to use this definition to ensure that EPA would have at least 1 full year of quality-assured data on which to base a unit's allocation.

cannot be "rewarded" by adjusting their future emissions. However, EPA notes commenters' observations that the proposal's methodology would reduce allocations to units that previously installed pollution control technology or invested in cleaner forms of generation in anticipation of CAIR. EPA concluded in review of these comments that the proposed Transport Rule's allocation methodology unintentionally yielded this distributional outcome. EPA therefore considered alternative allocation methodologies described below.

A substantial portion of the commenters who objected to the proposal's emission-based allocation option urged EPA to consider historic heat input based approaches. EPA agreed it should accept comment on the use of historic heat input-based approaches and published a NODA to provide an opportunity for comment on two specific heat input options and the allocations that would result from application of those options to the proposed Transport Rule state budgets.

ii. Heat Input Allocation Option 1

The first heat input option presented by EPA in the NODA ("Option 1") allocates allowances to units based solely on their historic heat input. Under this option, EPA would establish a 5-year historic heat input baseline for each covered unit and allocate allowances to sources at levels proportional to the each unit's share of the total historic heat input at all covered units in that state.

Numerous commenters supported the use of a heat-input based allocation methodology. These commenters stated that basing allocations on historic heat input has the following advantages over the proposal's emission-based allocation methodology:

(A) For certain types of units, historic heat input data may offer a better representation of unit-level operation than model projections of unit-level emissions; furthermore, for all units, historic heat input is typically represented by quality-assured data reported by sources from continuous emission monitoring systems, which strengthens its accuracy.

(B) Historic heat input data are generally fuel-neutral in that they do not generally yield higher allocations for units burning or projected to burn higher emitting fuels.

(C) Historic heat input data are generally emission-control-neutral in that they do not generally yield reduced allocations for units that installed or are projected to install pollution control technology.

Many commenters also argued that a heat input-based allocation methodology should be used because, unlike the proposal's emission-based methodology, a heat-input based methodology would be generally fuel-neutral and control-neutral and would rely on unit-level quality-assured data instead of on modeling projections.

Several commenters expressed support for specific aspects of heat input option number one. From a technical standpoint, commenters noted that heat input option 1 relied on the highest-quality and most transparent data EPA had provided as a basis for allocating allowances under the Transport Rule programs. They argued that the calculation methodology for heat input option 1 is more readily re-created and understood by sources than either the proposal's methodology or EPA's application of the "reasonable upper-bound capacity utilization factor and a well-controlled emission rate" in heat input option 2 (described in greater detail below). They also pointed out that it is similar to methodologies used in previous trading programs, such as the $NO_X$ Budget Trading Program (see 40 CFR 96.42(a) & (b) (calculating each existing EGU's allocation by multiplying each unit's historic heat input by 0.15 lb/mmBtu)). In addition, commenters supported the reliance of heat input option 1 on continuous emission monitoring systems (CEMS) data that are reported to EPA and certified by the source's designated representative (DR) as accurate and complete. In addition, many commenters supported EPA's use of historic data without further transformation by any calculation factors created by EPA.

From a policy perspective, commenters highlighted the fuel neutrality and emission-control neutrality aspects of heat input option 1. They noted that this option does not, in contrast to the proposal's emission-based methodology, penalize a source, through a reduced allowance allocation, for having chosen a generation technology or emission control technology that was more favorable to public health and the environment. EPA agrees with these observations. The allocation pattern associated with this option does not advantage or disadvantage units based on either the fuel consumed or the presence or absence of a pollution control technology. In this respect, it is a neutral approach that does not "reward" high-emitting units or "penalize" low-emitting units, including, for example, those units on which pollution control technology was installed in anticipation of CAIR.

EPA agrees with the aforementioned arguments from these commenters regarding the technical and policy merits of this heat input-based allocation methodology. EPA believes that the quality-assured heat input data reported by EGUs under its programs are among the most detailed and sound unit-level data accessible by EPA. EPA believes the calculation of any individual unit's share of this historic heat input data is a straightforward, clear, and simple calculation to perform, such that EPA's calculated allowance allocations under this approach can be relatively easily replicated.

EPA also agrees with commenters that such data has previously supported allowance allocation procedures for highly successful program implementation of the ARP and the $NO_X$ Budget Trading Program (NBP). Notably, Congress chose a heat input-based allocation approach when authorizing the ARP in title IV of the Clean Air Act, suggesting that Congress viewed heat input as a reasonable basis for allocation. Additionally, EPA's selection of a heat input-based approach for the NBP was not legally challenged, implying that stakeholders generally saw a heat input-based approach as reasonable.

EPA also agrees with comments observing that allocations made under this heat input approach do not advantage or disadvantage units based on their choice of fuel combustion or pollution control technology, and that allocations under this approach would thus be "fuel-neutral" and "control-neutral." EPA also agrees with commenters that unlike the proposed rule's emission-based methodology, this heat input methodology does not yield lower allocation to units that reduced emissions in advance of the Transport Rule relative to units that did not make such emission reductions.

Other commenters objected to the use of a heat-input based allocation methodology. These commenters argued that the allocation pattern associated with a heat-input allocation methodology would yield "windfall profits"—in the form of allowance allocations greatly in excess of likely emissions—for certain units, particularly with regard to $SO_2$ allowance allocations for units combusting natural gas. EPA disagrees with the characterization of the excess allowances as "windfall profits." Allocations based on heat-input alone are fuel-neutral and control-neutral. The characterization of the heat-input allocation methodology as creating "windfall profits" for any unit is based on the assumption that all units should

be allocated allowances based on emissions, not heat input. In arguing the heat-input approach creates a "windfall" for some units, commenters are assuming that the allocation of allowances above a unit's projected emissions constitutes a "windfall"—a conclusion EPA does not accept. EPA believes that under market-based regulatory programs, it is appropriate to base initial allowance allocations on a neutral factor and allow the market to determine the least-cost pattern of emission reductions in each state to achieve the reductions that address the state's significant contribution and interference with maintenance under the final Transport Rule programs. EPA disagrees that future allowance transactions (following a neutral-factor initial allocation) in response to these market forces can be characterized as "windfall profits." As explained above, EPA believes it is appropriate to allocate allowances based on a neutral factor. Commenters appear to ask EPA, instead of allocating based on a neutral factor, to consider the unit-level distributional impacts of each allocation methodology and to select an allocation methodology on the basis of equity. EPA does not believe it would be appropriate for the agency to pick an allocation methodology to achieve any particular distributional outcome as such considerations are not related to the statutory mandate of CAA section 110(a)(2)(D)(i)(I). Instead, EPA believes it is appropriate to allocate allowances to sources covered by its trading programs based on a neutral factor. Furthermore, CAA section 110(a)(2)(D)(i)(I) requires prohibition of certain emissions within a state (*i.e.,* a state's significant contribution and interference with maintenance). It does not direct EPA to use any particular methodology for allocating allowances under a trading program designed to ensure all such emissions are prohibited. As such, EPA believes it is appropriate to allocate allowances based on a neutral factor representing fossil energy content used to produce electricity. Detailed considerations of equity, as the DC Circuit reminded EPA, are not related to the statutory mandate of section 110(a)(2)(D)(i)(I). *North Carolina,* 531 F.3d 921.

Some commenters objected to the use of a heat input-based approach by arguing that higher-emitting units would not receive an initial allocation sufficient to cover their emissions. EPA does not believe it is reasonable to expect initial allocations to cover each unit's emissions under a trading program aimed at producing meaningful emission reductions. In its administration of prior trading programs such as the ARP and the NBP, EPA has made initial allowance allocations using a heat input-based approach, and virtually all covered sources have successfully complied at the end of each compliance period by making cost-effective emission reductions, purchasing additional allowances through robust markets to cover emissions, or undertaking both types of activities. EPA disagrees with commenters' arguments that allowance allocations should be used to compensate units with higher emissions.

### iii. Heat Input Allocation Methodology Option 2

The second heat input option presented by EPA for public comment also would use historic heat input but would apply a constraint to unit-level allocations under certain circumstances. Specifically, under this option unit-level allocations would not be allowed to exceed what EPA determines, based on historic emissions and other factors, to be the units' "reasonably foreseeable maximum emissions."

To apply this constraint, EPA first would determine whether the allocation to a unit under an unconstrained heat-input methodology would exceed that unit's maximum historic emissions of the relevant pollutant since 2003 "in order to reflect unit-level emissions before and after the promulgation of the CAIR" (76 FR 1115). Using this baseline would enhance the neutrality of the maximum historic emissions data because it would capture the highest emissions of the unit during that period regardless of what fuels it combusted or what pollution control devices were installed and used at any particular time during that period. In other words, a unit's allocation would not be reduced due to a recent decision to switch fuels or install pollution controls.

Second, for this option, EPA then would adjust that maximum historic emissions data by applying a "well-controlled rate maximum," designed to place "a reasonably foreseeable maximum emissions level reflecting a reasonable upper-bound capacity utilization factor and a well-controlled emission rate that all units (regardless of the type of fuel they combust) can meet for the pollutant" (76 FR 1115). This option would constrain certain units' allocations that, if based solely on historic heat input, would be determined by EPA to be "in excess of their reasonably foreseeable maximum emissions" under the Transport Rule programs (76 FR 1115).

As noted above, commenters offered numerous arguments in favor of using a historic heat input approach. These arguments apply equally to heat input option 1 and heat input option 2. EPA also received numerous comments comparing the two heat input options presented.

Many commenters preferred heat input option 1's reliance purely on historic data as compared with heat input option 2's reliance on that data modified by the application of EPA-determined "reasonable upper bound capacity factors" and "well-controlled emission rates." Commenters also criticized the complexity of these modification factors in heat input option 2. While EPA believes both options represent viable approaches, the Agency agrees with commenters that the application of these factors increase the complexity of allocation determinations and would adjust unit-specific historic data by applying EPA-created factors generically determined for broad categories of units.

Some commenters suggested that EPA's application of these modification factors could also represent legal vulnerabilities for the Transport Rule. In particular, they were concerned that the capacity factors and well controlled emission rates presented as part of heat input option 2 could be perceived as arbitrary. While EPA does not agree that these modification factors are arbitrary, the Agency does recognize that application of such EPA-created generic factors in determining unit-specific allocations increases the complexity of the allocation approach and raises issues regarding whether such generic factors are appropriately applied to each individual unit.

### iv. General Comments on EPA's Authority To Allocate Allowances

Numerous commenters also noted that EPA has generally broad authority in selecting an allocation methodology under CAA sections 110(a)(2)(D)(i)(I) and 302(y).[80] EPA agrees with commenters that the Agency has broad discretion in this area. Neither the CAA nor the D.C. Circuit Court's opinion in *North Carolina* specifies a particular methodology that EPA must use to allocate allowances to individual units.

---

[80] CAA section 302(y) defines the term "Federal implementation plan" as "a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard."

CAA section 110(a)(2)(D)(i)(I) requires prohibition of emissions "within the state" that significantly contribute to nonattainment or interfere with maintenance and gives states broad discretion to develop a control program in a SIP that achieves this objective. EPA has similarly broad discretion when issuing a FIP to realize this objective. Moreover, while the definition of FIP in CAA section 302(y) clarifies that a FIP may include "enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances)," this section does not require EPA to use any particular methodology to allocate allowances under a FIP trading program. In light of this lack of direction in the CAA concerning allowance allocation, EPA has broad discretion to select an allocation methodology that is reasonable and consistent with the goals of CAA section 110(a)(2)(D)(i)(I).

The body of public comment makes it clear that no allocation option could be deemed satisfactory from the perspective of all stakeholders. Public comments from most states and industrial stakeholders with a substantial interest in how EPA allocates allowances under the Transport Rule FIPs expressed support for an historical heat input-based approach as opposed to the proposal's emission-based approach. Most commenters favored this historical heat input data basis as the most sound and offered technical data corrections, which EPA considered and generally used in the final rule. EPA believes it is reasonable to select a heat input-based approach for the final Transport Rule because this approach is consistent with the rule's statutory objectives and has been found, when implemented in prior trading programs, to be a credible, workable allocation approach.

b. Final FIP Allocation Methodology

After consideration of all comments, EPA decided to allocate allowances to individual units based on that units' share of the state's historic heat-input, but to ensure that no unit's allocations exceed that unit's historic emissions. EPA decided to use the allocation methodology originally presented as heat input option 2, modified in response to public comments. EPA decided to use heat input option 2 but without the application of the "reasonable upper-bound capacity utilization factor and a well-controlled emission rate" factors. This allocation approach reflects the Agency's response to extensive public comment on the

options presented in the proposed Transport Rule and subsequent NODAs and is a logical outgrowth of those actions. EPA is using this approach to allocate allowances under the FIPs for all four trading programs. Further details on the calculation and implementation of this approach are provided below in section VII.D.1.c and can also be found in the Allowance Allocation Final Rule TSD in the docket for this rulemaking.

The principal reasons for this decision are:

• EPA believes that existing-unit allowance allocation under the Transport Rule should not generally advantage or disadvantage units based on the selection of fuels consumed or of pollution controls installed at a given unit in anticipation of either the Clean Air Interstate Rule or the Transport Rule, *i.e.,* fuel or control decisions taken from 2003 onward. An approach that does not advantage or disadvantage units in this way would effectively penalize units that have already invested in cleaner fuels or other pollution reduction measures that will continue to deliver important emission reductions under this rulemaking. The approach selected in the final rule generally does not penalize such units and is thus generally fuel-neutral and control-neutral in its allocation determinations.

• EPA finds that the selected approach maximizes transparency and clarity of allowance allocations. EPA has already made public the historic heat input and historic emissions data on which this approach is based, and its application to calculate unit-level allocations in each state under that state's emission budgets finalized in this Transport Rule can be relatively easily replicated.

• EPA finds that quality-assured historic CEMS-quality data used to implement this approach represent the most technically superior data available to EPA at the time of this rulemaking for calculating unit-level allocations. The selected approach relies on unmodified historic data reported directly by the vast majority of covered sources, whose designated representatives have already attested to the validity and accuracy of this data. EPA agrees with commenters that allowance allocations should be based on quality-assured data to the maximum extent possible. This approach uses the most accurate data currently available to EPA.

• Heat-input based approaches were used to allocate allowances under both the $NO_X$ Budget Trading Program and the Acid Rain Program. Allocation under these programs was readily and

easily administered, and the programs achieved or exceeded their environmental goals. The selected approach's use of heat input as a basis for allocations builds on prior legislative and administrative approaches to allowance allocations for trading programs.

• EPA also finds that the selected approach's addition of a constraint to heat input-based allocations where such allocations would otherwise exceed a unit's maximum historic emissions is a reasonable extension of a heat input-based allocation approach. The Transport Rule trading programs are established to achieve overall emission reductions in each covered state. As a group, covered sources within each state must make the necessary reductions under these programs. In light of each program's goal to reduce each state's overall emissions, it is logical and consistent with that goal that the starting point for each source under these programs—*i.e.,* the initial allocations of shares of the state budget to covered units—be an amount of allowances no greater than each unit's maximum historic emissions. Under the trading programs, any source may emit a ton of $SO_2$ or $NO_X$ for which it holds a corresponding allowance, which it may acquire either by initial allocation or by subsequent purchase, to the extent consistent with the assurance provisions (discussed elsewhere in this preamble) that ensure achievement of the requisite overall reductions in each state. Consequently, the initial allocations to the units at each source are the starting point for each source's efforts to comply with the allowance-holding and assurance provision requirements, but do not determine the source's strategies for compliance and ultimate level of emissions. EPA believes that a starting point of unit-level heat input-based allocations constrained not to exceed each specific units' maximum historic emissions is reasonable and consistent with the program goals of reducing overall emissions in each state: Each existing unit is allocated an amount that either reflects reduced unit emissions or does not exceed historic emissions, and, from that starting point, the units, as a group, reduce overall emissions to the level required for each state. Conversely, EPA believes that a starting point allocating some units more than they have ever emitted would be illogical in programs aimed at reducing overall emissions.

EPA believes that this selected allocation methodology for the final Transport Rule FIPs is within its authority under the Clean Air Act. Section 110(a)(2)(D)(i)(I) of the CAA

requires that emissions "within a state" that significantly contribute to nonattainment or interfere with maintenance in another state be prohibited. In the final Transport Rule, EPA analyzed each individual state's significant contribution and interference with maintenance and calculated budgets that represent each state's emissions after the elimination of prohibited emissions in an average year. The methodology used to allocate allowances in a state budget to individual units in the state has no impact on that state's budget or on the requirement that the state's emissions not exceed that budget plus variability. Regardless of the allocation methodology used, the state's responsibility for eliminating its significant contribution and interference with maintenance remains unchanged. This is reflected by the fact that allocations under each state's budget, regardless of how they are made, cannot change that state's budget. In sum, the allocation methodology has no impact on the final rule's ability to satisfy the statutory mandate of CAA section 110(a)(2)(D)(i)(I) to eliminate significant contribution to nonattainment and interference with maintenance.

Consistent with its broad authority in CAA sections 110(a)(2)(D)(i)(II) and 302(y), EPA believes that data quality, fuel-neutrality, control-neutrality, transparency, clarity, consistency with program goals, and successful experience in previous trading programs are reasonable factors on which to base the selection of an allowance allocation methodology for existing units for the final Transport Rule. EPA believes that the transparency and clarity of this allocation approach builds credibility with the public that the government is distributing a public resource—*i.e.,* allowances—precisely as stated in this rulemaking, with clear execution that can be relatively easily verified.

EPA also believes that the final Transport Rule's heat input-based approach for existing units is consistent with the goals of the Clean Air Act because it allocates allowances to existing units on the basis of a neutral factor that does not advantage or disadvantage a unit based on what fuel the unit burns or whether or not a unit has installed controls in anticipation of these regulations. In contrast, allocations under the proposal's emission-based methodology would give a greater share of allowances to units with higher emission rates, which are generally responsible for a greater share of a state's total emissions. Because these higher-emitting rate units are generally responsible for a greater

share of emissions, it follows that they are also responsible for a greater share of a state's significant contribution to nonattainment and interference with maintenance. The proposal's emission-based allocation methodology would disadvantage one of two otherwise identical existing units if it invested in emission reductions in anticipation of the Clean Air Interstate Rule or this final Transport Rule.

The heat-input allocation methodology selected for the final Transport Rule does not have this flaw. In contrast to the proposal's emission-based allocation approach, the heat input allocation methodology selected by EPA yields a smaller proportion of allowances relative to emissions to higher-emission-rate units and a higher proportion of allowances relative to emissions to lower-emission-rate units. For example, assume that in a state with two units and in a baseline year, Unit A combusts 100 mmBtu of heat input and emits 1,000 tons while Unit B combusts 100 mmBtu of heat input and emits only 500 tons. Assume also that this state's future Transport Rule emissions budget for this pollutant is only 500 tons. Because Units A and B each make up an even share of historic heat input for the state, the final rule's heat input-based approach would allocate the same share of allowances (250 tons) to each unit. In this example, Unit A's initial allocation of 250 is a smaller proportion of its historic emissions (25 percent of its baseline 1,000-ton emissions), while Unit B's initial allocation of 250 is a larger proportion of its historic emissions (50 percent of its baseline 500-ton emissions). Therefore, Unit B's ability to emit fewer tons per mmBtu of heat content used for generating electricity (as compared with Unit A) results in Unit B receiving a larger proportion of its historic emissions as an initial allocation share than Unit A receives.

This relative distributional pattern yielded is consistent with the goals of CAA section 110(a)(2)(D)(i)(I) because under this distribution, higher-emitting units, which are responsible for a greater share of the state's significant contribution to nonattainment and interference with maintenance, would require relatively more allowances in order to cover their pre-existing emissions than would lower-emitting units. EPA believes this initial allocation pattern is an appropriate reflection of the goals of CAA section 110(a)(2)(D)(i)(I).

The heat input-based allocation methodology selected by EPA is fuel-neutral, control-neutral, transparent, based on reliable data, and similar to the

allocation methodologies used in the $NO_X$ SIP Call and Acid Rain Program. For all these reasons, EPA determined that it is appropriate to use a heat input-based allocation methodology in this rule.

In addition, this allocation methodology is similar to an output-based allocation approach, which would base allocations on the quantity of electricity generated (rather than energy content combusted) and would also be fuel-neutral, control-neutral, and able to reward generation units that operate the most efficiently. Many state and industry commenters advocated using an output-based approach due to its reported strong value in promoting efficiency. However, at this time EPA does not have access to unit-level output data that is as quality-assured or comprehensive as its data sets on heat input across the units considered. Therefore, EPA is using a heat input-based approach under the Transport Rule in part due to its ability to serve as a reasonable proxy for an output-based standard using the most quality-assured data that EPA has to date.

In the NODA, EPA noted that final state budgets and allocations may differ from the proposed budgets and allocations because EPA was still in the process of updating its emission inventories and modeling in response to public comments, including comments on IPM. Thus, unit-level allocations in the NODA provided an indication of the proportional share of a state's budget that would be allocated to individual existing units if the alternative methodologies were used. The allocations made final today are based on budgets that reflect the updated modeling and comments received during the comment period.

c. Calculation of Existing Unit Allocations Under the Final Transport Rule FIPs

Allocations under this final methodology for each existing unit are determined by applying the following steps.

1. For each unit in the list of potential existing Transport Rule units, annual heat input values for the baseline period of 2006 through 2010 are identified using data reported to EPA or, where EPA data is unavailable, using data reported to the Energy Information Administration (EIA). For a baseline year for which a unit has no data on heat input (*e.g.,* for a baseline year before the year when a unit started operating), the unit is assigned a zero value. (Step 2 explains how such zero values are treated in the calculations.) The allocation method uses a 5-year

baseline to approximate a unit's normal operating conditions over time.

2. For each unit, the three highest, non-zero annual heat input values within the 5-year baseline are selected and averaged. Selecting the three highest, non-zero annual heat input values within the five-year baseline reduces the likelihood that any particular single year's operations (which might be negatively affected by outages or other unusual events) would determine a unit's allocation. If a unit does not have three non-zero heat input values during the 5-year baseline period, EPA averages only those years for which a unit does have non-zero heat input values. For example, if a unit has only reported data for 2008 and 2009 among the baseline years and the reported heat input values are 2 and 4 mmBtus, respectively, then the unit's average heat input used to determine its pro-rata share of the state budget is $(2+4)/2 = 3$.

3. Each unit is assigned a baseline heat input value calculated as described in step 2, above, referred to as the ''3-year average heat input.''

4. The 3-year average heat inputs of all covered existing units in a state are summed to obtain that state's total ''3-year average heat input.''

5. Each unit's 3-year average heat input is divided by the state's total 3-year average heat input to determine that unit's share of the state's total 3-year average heat input.

6. Each unit's share of the state's total 3-year average heat input is multiplied by the existing-unit portion of the state budget (*i.e.*, the state budget minus the state's new unit set-aside and, if applicable, minus the Indian country new unit set-aside) to determine that unit's initial allocation.

7. An 8-year (2003–2010) historic emissions baseline is established for $SO_2$, $NO_X$, and ozone-season $NO_X$ based on data reported to EPA or, where EPA data is unavailable, based on EIA data. This approach uses this 8-year historic emissions baseline in order to capture the unit-level emissions before and after the promulgation of CAIR.

8. For each unit, the maximum annual historic $SO_2$ and $NO_X$ emissions are identified within the 8-year baseline. Similarly, the maximum ozone season

$NO_X$ emissions from the 8-year baseline for each unit are identified. These values are referred to as the ''maximum historic baseline emissions'' for each unit.

9. If a unit has an initial historic heat-input based allocation (as determined in step 6) that exceeds its maximum historic baseline emissions (as determined in step 8), then its allocation equals the maximum historic baseline emissions for that unit.

10. The difference (if positive) under step 9 between a unit's historic heat-input-based allocation and its ''maximum historic baseline emissions'' is reapportioned on the same basis as described in steps 1 through 6 to units whose historic heat-input-based allocation does not exceed its maximum historic baseline emissions. Steps 7, 8, and 9 are repeated with each revised allocation distribution until the entire existing-unit portion of the state budget is allocated. The resulting allocation value is rounded to the nearest whole ton using conventional rounding.

Table VI.D–1 below provides an illustrative application of the steps 1–10 in a hypothetical state.

TABLE VI.D–1—DEMONSTRATION OF ALLOCATIONS USING FINAL ALLOCATION METHODOLOGY IN A THREE-UNIT STATE WITH AN 80-TON STATE BUDGET

| | Steps 1–6 | Steps 7, 8, 9 | Steps 1–9 reiterated | Step 10 |
|---|---|---|---|---|
| | Initial historic heat input-based allocation | Maximum historic baseline emissions | Revised historic heat input-based allocation | Final allocation |
| Unit A | 20 | 16 | N/A | 16 |
| Unit B | 30 | 50 | 32 | 32 |
| Unit C | 30 | 50 | 32 | 32 |

### 2. Allocations to New Units

EPA is finalizing—similar to the proposal (75 FR 45310)—an approach to allocate emission allowances to new units from new unit set-asides in each state. A ''new unit'' may be any of the following: (1) A covered unit commencing commercial operation on or after January 1, 2010; (2) any unit that becomes a covered unit by meeting applicability criteria subsequent to January 1, 2010; (3) any unit that relocates into a different state covered by the Transport Rule;[81] and (4) any existing covered unit that stopped operating for 2 consecutive years but

resumes commercial operation at some point thereafter.

The proposed Transport Rule would have required that owners and operators initially request allowances from the new unit set-aside when the unit first became eligible for an allocation. EPA now believes that it can identify which units become eligible and when they become eligible, based on information provided in other submissions (*e.g.*, certificates of representation, monitoring system certifications, and quarterly emissions reports) that the final rule already requires such units to make to EPA. EPA concludes that requiring owners and operators to submit requests of new unit set-aside allocations would impose an unnecessary burden on the owners and operators, as well as on EPA, and therefore EPA has removed this requirement in the final rule.

The following sections describe the methodology in the final Transport Rule for allocating to new units, how EPA determined the size of new unit set-asides in the final rule, and how EPA has provided for allocations to new units that locate in Indian Country.

#### a. New Unit Allocation Methodology

The proposal's new unit allocation methodology did not provide any allocation for a new unit's first control period of commercial operation. Some commenters expressed concern about the lack of new unit allocations the first year of commercial operation. In order to address this concern, EPA is modifying the new unit allocation methodology in this final rule to include allocations to new units for the first control period in which the units are in commercial operation, as well as for control periods in subsequent years. Some

---

[81] Existing- or new-unit allocations drawn from the budget of the relocated unit's original state are replaced by new unit set-aside allocations from the budget of the unit's relocation state in order to generally ensure that allocations are drawn from the correct state budget.

The final rule's allocation to new units is performed in two "rounds." The first round is the same as the new unit allocation procedures in the proposal (except for elimination of the requirements that owners and operators request the allocations) and occurs during the control period for which the allocations are made. These first round allocations are based on new unit emissions during the prior control period and are recorded in allowance accounts in the Allowance Management System for the units by August 1 of each control period. For example, for the 2012 vintage year, "first-round" allocations would be made to new units by August 1, 2012 based on their emissions in the 2011 control period (as monitored and reported in accordance with Part 75 of the Acid Rain Program regulations). If the new unit set-aside is insufficient to accommodate first round allocations reflecting new units' prior control period emissions, the first round allocations are made pro rata to new units based on their share of total new unit emissions in the prior control period.

The second round of allocations accommodates new units that come online during the control period for which the allocations are made and did not therefore receive any allocation in the first round. The second round also accommodates new units that come online partway into the prior control period and therefore received an allocation in the first round that did not extend to cover operations in a full control period. This second round of new unit allocation is therefore applicable only to new units coming online either during the control period of the allocation or during the control period immediately prior. New units coming online earlier than the previous control period only receive first-round allocations from the new unit set-asides, as first-round allocations to those units are based on operational data spanning an entire control period.

Second-round allocations are based on new unit emissions during the same control period as the vintage year of the allowances allocated. For example, for the 2012 vintage year, "second-round" allocations are based on the difference between the new unit's emissions in the 2012 control period and the new unit allocation (if any) that the unit received in the first round of allocations. For a unit coming online in 2012, this amount equals its total emissions during the 2012 control period. For a unit coming online in 2011, this amount equals its incremental emissions in 2012 beyond its emissions in 2011, as such a unit would have already received a first-round allocation from the new unit set-aside based on its emissions in 2011. Second-round allocations are recorded in allowance accounts by November 15 for the $NO_X$ ozone season trading program (ahead of the December 1 compliance deadline) and by February 15 of the following calendar year for $NO_X$ and $SO_2$ annual trading programs (ahead of the March 1 compliance deadline).

This methodology only allocates in the second round whatever allowances remain in the new unit set-asides after the first-round allocations have been recorded. If the new unit set-aside available for second round allocations is insufficient to accommodate allocations based on the difference between control period emissions and any first round allocations for the units involved, then the second round allocations are made pro rate to the new units based on their share of the total of such differences.

### b. Determination of New Unit Set-Asides

The proposed Transport Rule identified new units using a threshold online date of January 1, 2012, whereas the final Transport Rule uses a threshold online date of January 1, 2010. As explained above, EPA adjusted this cutoff date because the final Transport Rule's allocation methodology for existing units requires that EPA possess at least 1 full year of historic data in order to calculate allocations. As a consequence, EPA recognizes that the proposal's methodology to determine the size of the new unit set-asides based only on new EGUs forecast by the model would fail to account for known EGUs that have come online, or are planned to come online, after January 1, 2010. Therefore, EPA has modified its approach to determining the size of the new unit set-asides in the final rule to account for both "potential" units (*i.e.*, those that are not yet planned or under construction but are projected by modeling to be built) and "planned" units (*i.e.*, those that are known units with planned online dates after January 1, 2010). EPA uses the distinction between "potential" and "planned" new units to determine the ultimate size of each state's new unit set-aside (as a percentage of that state's budgets for each pollutant covered); however, the new unit allocation methodology described above applies the same to "potential" and "planned" new units.

The first step of EPA's analysis to determine the new unit set-asides accounts for likely future emissions from potential units, and its methodology is taken directly from the Transport Rule proposal but reflects updated modeling (*see* "Allowance Allocation to Existing and New Units Under the Transport Rule Federal Implementation Plans" TSD for detailed findings). This analysis informed EPA's decision to establish a minimum new unit set-aside size of 2 percent of each state's budget for each pollutant that is configured to accommodate future emissions from potential units.

For the final rule, EPA augmented its new unit set-aside determination to account for "planned" units through an additional step. Because the location of these "planned" units is known and identified in EPA modeling, this second step is a state-specific modification of the size of the new unit set-asides. That is, EPA only increased new unit set-asides above the 2 percent minimum established in the first step for states that had additional known units coming online between January 1, 2010, and January 1, 2012.

The increases made to the new unit set-asides for these planned units reflect the projected emissions from these units. Therefore, if the expected emissions of a given pollutant from all "planned" new units in a given state were equal to 3 percent of that state's budget for that pollutant, then EPA added that amount to the base 2 percent new unit set-aside (creating a hypothetical new unit set-aside of 5 percent for that pollutant in that state). *See* "Allowance Allocation to Existing and New Units Under the Transport Rule Federal Implementation Plans" TSD for detailed results showing how EPA determined the size of each new unit set-aside reflecting the application of both of the steps described above. This approach to determining the size of state new unit set-asides is a logical outgrowth of the proposal, the NODA on allowance allocations, and updated modeling results. In fact, EPA received comments that using a January 1, 2010 cutoff date for distinguishing between existing and new units would result in the new unit set-aside, as proposed, being insufficient to meet the needs of units already under construction. EPA believes that the approach adopted in the final rule results in new unit set-asides that reasonably accommodate the foreseeable emissions from both planned and potential new units in each state.

The new unit allocation percentages for each state are shown in Table VII.D.2–1.

TABLE VII.D.2–1—PERCENTAGE OF STATE EMISSION BUDGETS FOR ALLOWANCES IN STATE NEW UNIT SET-ASIDES

|  | Annual $SO_2$ | Annual $NO_X$ | Ozone-season $NO_X$ |
|---|---|---|---|
| Alabama | 2% | 2% | 2% |
| Arkansas | | | 2% |
| Florida | | | 2% |
| Georgia | 2% | 2% | 2% |
| Illinois | 5% | 8% | 8% |
| Indiana | 3% | 3% | 3% |
| Iowa | 2% | 2% | |
| Kansas | 2% | 2% | |
| Kentucky | 6% | 4% | 4% |
| Louisiana | | | 3% |
| Maryland | 2% | 2% | 2% |
| Michigan | 2% | 2% | |
| Minnesota | 2% | 2% | |
| Mississippi | | | 2% |
| Missouri | 2% | 3% | |
| Nebraska | 4% | 7% | |
| New Jersey | 2% | 2% | 2% |
| New York | 2% | 3% | 3% |
| North Carolina | 8% | 6% | 6% |
| Ohio | 2% | 2% | 2% |
| Pennsylvania | 2% | 2% | 2% |
| South Carolina | 2% | 2% | 2% |
| Tennessee | 2% | 2% | 2% |
| Texas | 5% | 3% | 3% |
| Virginia | 4% | 5% | 5% |
| West Virginia | 7% | 5% | 5% |
| Wisconsin | 5% | 6% | |

c. Procedures for Allocating New Unit Set-Asides

For the first round of new unit set-aside allocations, the Administrator will promulgate a notice of data availability informing the public of the specific new unit allocations and provide an opportunity for submission of objections on the grounds that the allocations are not consistent with the requirements of the relevant final rule provisions. A second notice of data availability will subsequently be promulgated in order to make any necessary corrections in the specific new unit allocations. As discussed elsewhere in this preamble, the final rule establishes a different schedule for promulgation of these notices of data availability than the proposed rule. In particular, a single set of deadlines (*i.e.,* for the first notice in the first round of allocations, June 1 of the year for which the new unit allocations are described in the notice and, for the second notice of the first round, August 1 of that year) for promulgation of the notices is established for all of the Transport Rule trading programs. EPA believes that these deadlines will provide sufficient time for EPA to obtain final emissions data for the prior year for the units involved and to calculate the allocations and promulgate the notices. Further, the approach of using the same deadline for all of the Transport Rule trading programs will simplify EPA's implementation and reduce the complexity of the process for source owners and operators.

For the second round of new unit set-aside allocations, the Administrator will also promulgate two notices of data availability. However, the deadlines for the notices differ for the $NO_X$ ozone season trading program and for the $SO_2$ and $NO_X$ annual trading programs because control period emissions data (used in making second round allocations) become available sooner, and the compliance deadline for holding allowances covering emissions is sooner, in the $NO_X$ ozone season trading program. The control period in the $NO_X$ ozone season program ends on September 30, and fourth quarter emissions reports must be submitted to EPA by October 30, while the control periods in the $SO_2$ and $NO_X$ annual programs end on December 31 and fourth quarter emission reports are due by January 30. Further, in order for the second round allocations to be available to be used for compliance with the allowance-holding requirement, the second round needs to be completed before the compliance dates, which are December 1 in the $NO_X$ ozone season program and March 1 in the $SO_2$ and $NO_X$ annual programs. Consequently, for the $NO_X$ ozone season program the Administrator will promulgate by September 15 a notice of data availability identifying the units eligible for second round allocations and by November 15 a second NODA of the list of eligible units and their second round allocations, which will also be recorded in the allowance accounts by that date. The comparable deadlines for the $SO_2$ and $NO_X$ annual programs are December 15 and February 15. EPA believes that these deadlines will provide sufficient time for EPA to identify the units and obtain their needed emissions data and to calculate the allocations and promulgate the notices.

d. Addition of Allowances to New Unit Set-Asides

As discussed elsewhere in this preamble, EPA proposed that, if a unit with an existing-unit allocation does not operate for 3 consecutive years, the allowances that would otherwise have been allocated to that unit, starting in the seventh year after the first year of non-operation, would be allocated to the new unit set-aside for the state in which the retired unit is located. EPA is retaining this provision in the final rule but is changing the time of non-operation to 2 years and the time of allowance allocation to a non-operating unit to 4 years. Starting in the fifth year of non-operation, allowances will be allocated to the new unit set-aside for the state in which the non-operating unit is located.

EPA received comments that the new unit set-asides were not sufficient to

encourage the operation of new units. One commenter suggested that allowance allocations should cease after 3 years of non-operation because the financial incentive gained from receiving allowances beyond the 3-year period is insignificant relative to operating and fuel costs. Another commenter said that providing allowances to non-operating units is unnecessary and distorts the market.

In addition to increasing the size of the new unit set-aside in this final rule, as described above, EPA is terminating existing unit allocations starting in the fifth year after the unit does not operate for 2 consecutive years and reallocating to the new unit set-aside the allowances that the unit otherwise would have received for the fifth and subsequent years in order to make them available for new units in the state. This approach allows the new unit set-asides to grow over time.

e. Allocations to New Units Locating in Indian Country

EPA received several comments on the proposed rule that it did not explicitly address the distribution of allowances to potential new units built in Indian country. EPA recognized this concern and requested comment on this topic in the January 7, 2011 NODA.

In the final rule, EPA is providing a mechanism to make allowances available in the future for new units built in Indian country. The final rule establishes an Indian country new unit set-aside for each pollutant in each state whose borders encompass Indian country (*i.e.,* Florida, Iowa, Kansas, Louisiana, Michigan, Minnesota,

Mississippi, Nebraska, New York, North Carolina, South Carolina, Texas, and Wisconsin). EPA will retain administration of these Indian country new unit set-asides as part of the Transport Rule trading programs whether or not a Transport Rule state elects to modify or replace the Transport Rule FIPs through approved SIP revisions. EPA does not create Indian country new unit set-asides for states lacking Indian country within their borders.

EPA determined the size of each Indian country new unit set-aside by calculating the ratio of square mileage of Indian country to the square mileage of the state within whose borders Indian country is located. This calculation yielded a maximum percentage of 5 percent when assessing all of the states encompassing Indian country subject to the final Transport Rule; this is referred to as the "5 percent Indian country factor" below. To determine the maximum percentage, EPA used the American Indian Reservations/Federally Recognized Tribal Entities dataset, which contains data for the 562 federally recognized tribal entities in the contiguous U.S. and Alaska. EPA accessed the data to analyze the Transport Rule region and compare the square miles of Indian country with the square miles of the Transport Rule state that includes the Indian country. EPA then took the highest percentage as the number to be applied across all states with Indian country to determine the size of the Indian country new unit set-aside pertinent to that state's budgets under the Transport Rule. EPA chose to use the maximum percentage (5 percent)

from the Indian country analysis to determine the Indian country set-aside for each state on the basis that this approach would reserve a reasonable number of allowances from each state's budget for potential allocation to new units that may locate in Indian country within that state's borders. Any allowances from the Indian country new unit set-aside that are not allocated in a given control period are redistributed into the state's new unit set-aside. As discussed above, any allowances not allocated from that new unit set-aside are redistributed to existing units based on the existing units' share of the total existing unit allocations.

To calculate the size of each tribal new unit set-aside, EPA applied this 5 percent Indian country factor to the portion of the state's new unit set-aside originally determined by accounting for "potential" new units, which as described above was set at 2 percent of each pollutant's budget in each state. Therefore, the Indian country new unit set-aside is 5 percent of 2 percent of a state's budget, or 0.1 percent of that total state budget. EPA did not apply the 5 percent Indian country factor to the state-specific planned unit portion of each state's new unit set-aside because the planned unit portion is determined using projected emissions from specific, known units coming online after January 1, 2010, and none of these known units are located in Indian country.

The Indian country new unit set-asides in the following Transport Rule states with Indian Country are shown in Table VII.D.2–2.

TABLE VII.D.2–2—NEW UNIT SET-ASIDE ALLOWANCES FOR INDIAN COUNTRY

[Tons]

| | SO$_2$ 2012–2013 | SO$_2$ 2014 and beyond | Annual NO$_X$ 2012–2013 | Annual NO$_X$ 2014 and beyond | Ozone-season NO$_X$ 2012–2013 | Ozone-season NO$_X$ 2014 and beyond |
|---|---|---|---|---|---|---|
| Florida | ............ | ............ | ............ | ............ | 28 | 28 |
| Iowa | 107 | 75 | 38 | 38 | ............ | ............ |
| Kansas | 42 | 42 | 31 | 26 | ............ | ............ |
| Louisiana | ............ | ............ | ............ | ............ | 13 | 13 |
| Michigan | 229 | 144 | 60 | 58 | ............ | ............ |
| Minnesota | 42 | 42 | 30 | 30 | ............ | ............ |
| Mississippi | ............ | ............ | ............ | ............ | 10 | 10 |
| Nebraska | 65 | 65 | 26 | 26 | ............ | ............ |
| New York | 27 | 19 | 18 | 18 | 8 | 8 |
| North Carolina | 137 | 58 | 51 | 42 | 22 | 18 |
| South Carolina | 89 | 89 | 32 | 32 | 14 | 14 |
| Texas | 244 | 244 | 134 | 134 | 63 | 63 |
| Wisconsin | 80 | 40 | 32 | 30 | ............ | ............ |

Under the FIPs, EPA allocates allowances from Indian country new unit set-asides in essentially the same manner as it allocates allowances from state new unit set-asides. The approach for identifying, and determining the number of allowances allocated to, new units in Indian country is the same as the approach for identifying and determining allocations for non-Indian country new units covered by the state new unit set-aside, and allocations are made in two rounds using the same schedules for promulgation of notices of data availability. However, as discussed above, unallocated allowances in the Indian country set-asides are handled differently from unallocated allowances in the state new unit set-asides in that unallocated Indian country new unit set-aside allowances are first transferred back into the state new unit set-aside and then, if still not allocated to new units, are distributed to existing units in the state. EPA believes that the above-described approach in establishing and handling the Indian country new unit set-asides and state new unit set-asides is a reasonable way of making a sufficient amount of allowances available for new units in the state and Indian country located in the state and ensuring that the entire state budget is available to either new or existing units in the state and Indian country. EPA retains administration of these Indian country new unit set-asides (and, of course, the portions of state budgets that comprise these set-asides) as part of the Transport Rule trading programs even if a state elects to modify or replace the Transport Rule FIPs through approved SIP revisions. EPA continues to manage and distribute the Indian country new unit set-aside allowances in the same manner as under the FIPs. Unallocated allowances in the Indian country new unit set-aside will be returned to the portion of the state budget allocated under the approved SIP's allocation provisions. EPA believes that this approach is reasonable because EPA, rather than the states, has the authority and responsibility of administering the Transport Rule with regard to new units that locate in Indian country.

*E. Assurance Provisions*

To ensure that the FIPs require the elimination of all emissions that EPA has identified that significantly contribute to nonattainment or interfere with maintenance within each individual state, the Agency is adopting assurance provisions in addition to the requirement that sources hold allowances sufficient to cover their emissions. These assurance provisions limit emissions from each state to an

amount equal to that state's trading budget plus the variability limit for that state (*i.e.,* the state assurance level). As discussed in section VI of this preamble, this variability limit takes into account the inherent variability in baseline EGU emissions and recognizes that state emissions may vary somewhat after all significant contribution to nonattainment and interference with maintenance are eliminated. This approach also provides sources with flexibility to manage growth and electric reliability requirements, thereby ensuring the country's electric demand will be met, while meeting the statutory requirement of eliminating significant contribution to nonattainment and interference with maintenance.

Starting in 2012, EPA is establishing, as part of the FIPs, limits on the total emissions that may be emitted from EGUs at sources in each state. For any single year, the state's emissions must not exceed the state budget with the variability limit allowed for any single year for that state (*i.e.,* the state's 1-year variability limit). In other words, in addition to covered sources being required to hold allowances sufficient to cover their emissions, the total sum of EGU emissions in a particular state cannot exceed the state budget with the state's 1-year variability limit in any 1 year (*i.e.,* the state's assurance level). EPA is not finalizing 3-year variability limits that were included in the proposal for the reasons explained previously in section VI.E of this preamble. The state budgets, variability limits, and state assurance levels for each state are shown in Tables VI.F–1, VI.F–2 and VI.F–3 in section VI.F of this preamble. The basis for the variability limits is also described in section VI.E of this preamble. Additional details may be found in the Power Sector Variability Final Rule TSD in the docket to this rule.

To implement this requirement, EPA first evaluates whether any state's total EGU emissions in a control period exceeded the state's assurance level. If any state's EGU emissions in a control period exceed the state assurance level, then EPA applies additional criteria to determine which owners and operators of units in the state will be subject to an allowance surrender requirement. In applying the additional criteria, EPA evaluates which groups of units at the common designated representative (DR) level had emissions exceeding the respective common DR's share of the state assurance level (regardless of whether the source had enough

allowances to cover its emissions) during the control period.[82]

The requirement that owners and operators surrender allowances under the assurance provisions will be triggered only if two criteria are met: (1) The group of sources and units with a common DR are located in a state where the total state EGU emissions for a control period exceed the state assurance level; and (2) that group with the common DR had emissions exceeding the respective DR's share of the state assurance level. The share of the assurance penalty borne by the owners and operators will be based on the amount by which the total emissions for the units in the group exceed the common DR's share of the state assurance level as a percentage of the total calculated for all such groups of sources and units in the state. Thus, the owners and operators of each such group of sources and units must surrender an amount of allowances equal to the excess of state EGU emissions over the state assurance level multiplied by the owners' and operators' percentage and multiplied by two (to reflect the penalty of two allowances for each ton of the state's excess EGU emissions). *See* Table VII.E–1 below for an illustrative example.

This approach in the final rule of implementing the assurance provisions on a common designated representative basis contrasts with the approach in the proposed rule of implementing the assurance provisions on an owner basis. In the January 7, 2011 NODA, EPA requested comment on the alternative of basing the assurance provision penalty using common designated representatives, and some commenters supported this alternative. The common designated representative approach is simpler and avoids the need to collect information on percentage ownership (which information is not used in any other provisions of the Transport Rule trading programs).

In addition, the common designated representative approach provides additional flexibility to owners and operators who have only one or a few units in a given state but have the option of selecting a common designated representative with owners and operators of other units in the state. EPA expects companies in various states will readily be able to manage their

---

[82] A group of one or more sources and units in a state has a common designated representative where the same individual is authorized as the designated representative (not the alternate designated representative) for that group of sources and units as of April 1 immediately following the allowance transfer deadline for the control period involved.

emissions to stay collectively below their state's assurance levels as they track emissions quarterly throughout the year and manage their generation units and pollution control efforts accordingly. However, if the state appears to be approaching its assurance level, this final rule also gives companies the ability to further ensure that they will not have excess emissions by combining multiple units under a common DR. This flexibility allows utilities to re-balance allowances and emissions to mitigate penalty risk if the state violates its assurance level. In a state that does not appear to risk violating its assurance level in a given period, utilities would not need to consider the assurance aspect of selecting DRs. However, EPA anticipates that in the event utilities desire additional certainty or mitigation of assurance penalty risk, they will take advantage of this common DR provision or pursue similar private arrangements with each other to cover their emissions at the lowest possible cost.

While the DR provision could benefit utilities by allowing them to pool their penalty risk, the utilities would still be subject to the antitrust laws. As with any joint venture between competitors, the efficiency benefits of pooling risk would be weighed against any anticompetitive harm associated with DRs.

This new feature in the final rule, in conjunction with the simplifications to the final rule's variability limits described in section VI.E, will give companies under the air quality-assured trading program greater flexibility in each state to determine the most cost-effective pattern of emission reductions while EPA ensures each state meets its assurance level needed to address the significant contribution in each state.

In the January 7, 2011 NODA, EPA also requested comment on continuing to link allocations to assurance provision allowance surrender requirements. Even though the final rule uses a different allowance allocation methodology than the allocation methodology that was proposed, the final rule continues to treat the groups of units with greater emissions than their allocations plus share of state variability as responsible for the state's excess of emissions over the state assurance level. EPA believes that this approach is reasonable because any state that exceeds its state assurance level likely does so because not all units have made the reductions necessary to eliminate the state's contribution to nonattainment or interference with maintenance. Moreover, the groups of units with emissions exceeding their

allocations plus share of variability are the units most likely to have contributed to the state's exceedance of its state assurance level and thus to the state's triggering of the assurance provisions. Consequently, EPA concludes that it is reasonable to penalize owners and operators of those sources and units (grouped by common DR) for the state's exceedance through application of the assurance provision allowance surrender requirement. Some commenters stated that this is a reasonable approach.

While a few commenters suggested alternative approaches to the assurance provisions, EPA believes that the suggested alternatives are not workable and are likely to create implementation problems. These commenters suggested variations of approaches that would have created state-specific and vintage year-specific allowances that would have been traded independently of compliance allowances. These differentiated allowances would have fragmented the allowance markets and made the programs resemble the intrastate trading option that EPA rejected because of market power and other concerns described in the proposal.

The existence of the assurance provisions with significant penalties imposed if a state's emissions exceed the state budget with the variability limit, along with other features of the Transport Rule trading programs discussed below, will ensure that state emissions stay below the level of the budget with the variability limit. In making compliance decisions and determining to what extent to rely on purchased or banked allowances, owners and operators will have to take into account the risk of triggering the assurance provisions in the state involved and of incurring significant assurance provision penalties. The greater the extent to which units sharing a common DR have emissions exceeding the DR units' allocations plus share of the state variability limit, the greater the risk of being subject to the assurance provision penalties.

As discussed previously in section VII.D.2, EPA allocates allowances to a new unit for the control period during which the unit commences commercial operation from the new unit set-aside based on its emissions. In the case where assurance provisions for a state are triggered in the year that a new unit commences operation, the unit's share of the state assurance level is calculated using the unit's allocation from the new unit set-aside plus its proportional share of the variability limit. There is the possibility that a new unit would

receive no allocation for the control period during which the unit commences commercial operation. EPA sees no reasonable basis for disadvantaging owners and operators because they started up a new unit and EPA had no emissions data on which to base an allocation from the new unit set-aside or no allowances were available for the unit in the state's new unit set-aside.[83] For these new units, EPA would use a specific surrogate number to calculate the maximum amount of emissions that the unit would likely have had during that year. The surrogate emission number applies only if the state's assurance provisions are triggered and only in the first year of the new unit's commercial operation for a new unit that did not receive an allocation from the set-aside. The methodology for calculating the surrogate emission number is essentially unchanged from the proposal (75 FR 45313). For more details on capacity factors for new units, see "Capacity Factors Analysis for New Units Final Rule TSD."

These assurance provisions are above and beyond the fundamental requirement for each source to hold enough allowances to cover its emissions in the control period. Failure to hold enough allowances to cover emissions is a violation of the CAA, subject to an automatic penalty and discretionary civil penalties, as described in section VII.F of this preamble.

Several features of the air quality-assured trading programs work in conjunction with the assurance provisions to ensure state emissions do not exceed state assurance levels. The air quality-assured trading programs have: State-specific budgets that do not include the variability limits and that are the basis for allocating allowances in each state so that total allocations in a state cannot exceed the state budget; a requirement that owners and operators of each source hold enough allowances to cover source emissions for each control period; assurance provisions that require owners and operators to hold a significant amount of additional allowances in a state if the assurance provisions are triggered; and additional penalties for failing to hold sufficient allowances under the assurance provisions. The underlying mechanism of cap and trade—with a cap on allowances issued and a requirement to

---

[83] Some other units (e.g., those units with no data for the 2006–2010 base period) may have a zero allocation for a control period. However, those are highly likely to be units that will continue to operate rarely or not at all and so will incur little or none of the assurance provision penalties.

hold allowances covering emissions—has succeeded, even without assurance provisions, in broadly reducing emissions below allowance allocation levels. The accumulated data, history, and experience from cap and trade programs underscore that emission reduction requirements and environmental and public health goals of the programs have been met and, in many instances, exceeded. Additionally, EPA has now added assurance provisions to ensure that emissions within a state do not exceed the state budget with the variability limitation that eliminates the state's significant contribution to nonattainment and interference with maintenance in downwind states.

Emissions from a common DR's group of units in excess of the DR's share of the state budget with the variability limit are not a violation of the rule or the CAA, but do lead to strict allowance surrender requirements. Specifically, the owners and operators with a common DR will be required to surrender two allowances for each ton of their proportional share of the

exceedance of the state budget with the variability limit. Failing to hold sufficient allowances to meet the allowance surrender requirement will be a violation of the regulations and the CAA and subject to discretionary civil penalties under CAA section 113. Allowances surrendered to meet an assurance provision penalty may be from the year immediately following the control period in which the state assurance level was exceeded (*i.e.,* the year during which the penalty is assessed) or any prior year. Any future vintage allowances beyond the year in which the penalty is assessed may not be used to meet an assurance provision penalty.

This penalty level is a change from the proposal, in which one allowance was to be surrendered for each ton of emissions over the state assurance level. EPA ran an IPM modeling scenario in order to assess the level of penalty that would be sufficient to deter sources from exceeding state assurance levels. According to the model, no state would exceed its assurance level and incur the two-for-one allowance penalty in either

2012 or 2014, although some states emit up to the assurance level. The two-for-one allowance surrender requirement is significant, and EPA believes that this penalty—along with the other elements of the Transport Rule discussed above—will be sufficient to ensure that the state emissions will not exceed the budgets plus the variability limits. *See* the Assurance Penalty Level Analysis Final Rule TSD for further details of the analysis.

Below are examples of how the penalty will be assessed for four common designated representatives in the same state if the assurance provisions are triggered. In the first case, DR1's combined units were allowed to emit up to 71 tons of $SO_2$ (60 * 118 percent), but actually emitted 75 tons during the control period, or 4 more than their share of the state assurance level. Since the state, as a whole exceeded the state assurance level by 15 tons, DR1's share of the penalty is 25 percent of the total penalty, or 8 allowances (25 percent of 30).

FIGURE VII.E–1—ASSURANCE PROVISION ALLOWANCE SURRENDER EXAMPLE

| | Allowances allocated | Allocation + share of variability | Total emissions | Emissions above allocation | Emissions above allocation + share of variability | Share of state exceedance (%) | Penalty (allowances surrendered) |
|---|---|---|---|---|---|---|---|
| DR1 ......................... | 60 | 71 | 75 | 15 | 4 | 25% | 8 |
| DR2 ......................... | 20 | 24 | 33 | 13 | 9 | 56% | 17 |
| DR3 ......................... | 10 | 12 | 15 | 5 | 3 | 19% | 6 |
| DR4 ......................... | 10 | 12 | 10 | 0 | −2 | 0% | – |
| Total ...................... | 100 | 118 | 133 | 33 | 15 | 100% | 30 |

DR1, DR2, DR3, and DR4 are all in the same state.
State budget plus 18 percent variability limit is 118 tons (100 + 18 = 118).
State exceeded its assurance level by 15 tons (133 − 118 = 15).
Penalty is 2 allowances per ton over the assurance level (2 × 15 = 30).
Some numbers may not add up due to rounding.

In the proposal, EPA took comment on whether assurance provisions should be implemented starting in 2012 or 2014. While a number of commenters supported the proposal to start in 2014, EPA received several comments making the case that starting assurance provisions in 2012 would be more compatible with the Court's opinion in *North Carolina,* which emphasized EPA's obligation to require elimination of emissions within the states that significantly contribute to nonattainment or interfere with maintenance. In this final rule, EPA makes the assurance provisions effective starting in 2012 because this approach provides even further assurance, consistent with *North Carolina,* that each state's prohibited emissions will be

eliminated from the start of the Transport Rule trading programs.

*F. Penalties*

Under the final Transport Rule FIPs (like under the proposed rule), the owners and operators of each covered source must hold, as of the allowance transfer deadline, an allowance for each ton of $SO_2$ or $NO_X$ emitted by the source and are subject to penalties if they fail to comply with this allowance-holding requirement.

In particular, the owners and operators must hold in the source's compliance account in the Allowance Management System enough allowances issued for the respective Transport Rule annual trading program ($SO_2$ Group 1, $SO_2$ Group 2, or annual $NO_X$ program) to cover the annual emissions of the

relevant pollutant from all covered units at the source. The allowances must have been issued for the year in which the emissions occurred or a prior year. If the owners and operators fail to meet this allowance-holding requirement, they must provide—for deduction by the Administrator from the source's compliance account—one allowance as an offset, and one allowance as an excess emissions penalty, for each ton of emissions (*i.e.,* excess emissions) in excess of the amount of allowances held. The allowances surrendered for the excess emissions penalty must be allocated for the control period in the year immediately following the year when the excess emissions occurred or for a control period in any prior year. The offset and the excess emissions penalty are automatic requirements in

that they must be met without any further action by EPA (*e.g.,* any additional proceedings) regardless of the reason for the occurrence of the excess emissions. In addition, each ton of excess emissions, as well as each day in the averaging period (*i.e.,* the control period of one calendar year), constitute a violation of the CAA, and the maximum discretionary civil penalty is $25,000 (inflation-adjusted to $37,500 for 2010) per violation under CAA section 113. This means that, if a source has emissions in excess of allowances held for the source as of the allowance transfer deadline for a control period, the number of tons of excess emissions multiplied by the total number of days in that control period and multiplied by $25,000 (inflation adjusted) equals the maximum discretionary civil penalty for that occurrence of excess emissions.

For the ozone-season $NO_X$ trading program, the same provisions apply as for an annual program, except that the averaging period (*i.e.,* the control period) is the ozone season, not a calendar year. Consequently, the relevant emissions are for an ozone season, the allowances usable to meet the allowance-holding requirement are allowances issued for Transport Rule ozone-season $NO_X$ trading program for the ozone season involved or a prior ozone season, and the number of days used in calculating the maximum civil penalty is the number in the ozone season.

Commenters expressed concern that the proposed FIPs expressly stated that, for purposes of determining the maximum discretionary civil penalty for failure to meet the allowance-holding requirement, each ton of emissions lacking a held allowance would be a violation and each day in the averaging period involved would be a violation. Some commenters compared the proposed penalty provisions for excess emissions with the excess emissions penalty provisions under the Acid Rain Program and claimed that the proposed penalty provisions differed from the Acid Rain Program provisions and were excessive.

In fact, however, the final FIP provisions concerning discretionary civil penalties are essentially the same as those under the Acid Rain Program, as well as those under the $NO_X$ Budget Trading Program and the CAIR trading programs. In particular, the Acid Rain Program regulations state that each ton of $SO_2$ excess emissions constitutes "a separate violation" of the CAA. 40 CFR 72.9(c)(2). Moreover, while the Acid Rain Program regulations do not expressly address that each day in the averaging period (*i.e.,* a calendar year

control period under the Acid Rain Program) constitutes a separate violation when a unit has excess emissions for the calendar year, the courts have addressed this question. In decisions applying the discretionary civil penalty provisions in section 309(d) of the Clean Water Act, which are analogous to the civil penalty provisions in CAA section 113, the courts have interpreted the provisions to mean that, when a source violates the emission limitation for a multi-day control period, the source has a violation for each day in the control period, as well as for each ton of excess emissions on each such day. *See, e.g., Chesapeake Bay Foun.* v. *Gwaltney of Smithfield,* 791 F.2d 304, 313–15 (4th Cir. 1986), *Atlantic States Legal Foun.* v. *Tyson Foods,* 897 F.2d 1128, 1139–40 (11th Cir. 1990), and *U.S.* v. *Allegheny Ludlum Corp.,* 366 F.3d 164, 169 (3d. Cir. 2004). As noted by the courts, the treatment of each ton and each day as a separate violation is used for purposes of setting the maximum discretionary civil penalty. Because CAA section 113 sets the maximum civil penalty, EPA, of course, has the discretion to tailor the penalty amount that it seeks in any specific occurrence of excess emissions to reflect the circumstances of that excess emission occurrence. *See* 42 U.S.C. 7413(b) (stating that the Administrator may commence a civil action "to assess and recover a civil penalty of not more than $25,000 per day for each violation"). Moreover, when a district court imposes a civil penalty, the court "retains discretion to assess a penalty much smaller than the maximum, as the situation requires." *Chesapeake Bay,* 791 F.2d at 316. In addition, the Acid Rain Program regulations state that any allowance deduction, excess emission penalty, or interest under the Acid Rain Program regulations "shall not affect liability" of the owners and operators "for any additional fine, penalty, or assessment, or their obligation to comply with any other remedy, for the same violation, as ordered under the [CAA]," including under CAA section 113 providing for discretionary civil penalties. 40 CFR 77.1(b). In summary, under the Acid Rain Program, each ton of excess emissions and each day in the averaging period (*i.e.,* the calendar year) constitute a violation, the resulting number of violations times $2,000 is the maximum civil penalty for violating owners and operators, and EPA has the discretion to impose a civil penalty at or below such maximum, in addition to the automatic requirement to surrender one allowance and pay $2,000 (inflation adjusted) for each ton of excess emissions.

The final FIPs take an analogous approach to that under the Acid Rain Program. Specifically, the final FIPs state both that each ton of excess emissions is a violation of the CAA and that each day in the averaging period (*i.e.,* a calendar year under the annual programs and the ozone season under the ozone-season program) is a violation. Moreover, the imposition of civil penalties at or below the maximum amount resulting from the maximum penalty calculation is in addition to the automatic allowance surrender and penalty totaling 2 allowances per ton of excess emissions. Thus, commenters' assertion that the approach in the final FIPs is inconsistent with the approach in the Acid Rain Program is incorrect. Moreover, EPA has taken this same general approach in two other trading programs (*i.e.,* the $NO_X$ Budget Trading Program and the CAIR trading programs), whose regulations explicitly state that each ton and each day of the averaging period constitute a violation. *See* 40 CFR 96.54(d)(3) ($NO_X$ Budget Trading Program); and 40 CFR 96.106(d) (CAIR).

In any event, EPA maintains that the approach of treating each excess emission ton and each day in the averaging period as a violation for purposes of calculating the maximum discretionary civil penalty is reasonable. Some commenters suggested that only the days on which a source's cumulative control period emissions exceed the amount of allowances that the source then holds for that control period should be treated as a violation. However, this suggested approach makes little sense in the context of the Transport Rule trading programs.

In order to provide owners and operators compliance flexibility, the Transport Rule trading programs do not require source owners and operators to hold any amount of allowances to cover emissions until the allowance transfer deadline, no matter what the source's cumulative control period emissions are before that deadline. The commenters' approach of comparing—each day, cumulative emissions and allowances held—for purposes of calculating maximum civil penalties would be inconsistent with the flexibility that EPA intends to provide owners and operators. For example, under the commenters' suggested approach, owners and operators that buy or sell allowances in the allowance market or hold allowances in a company-wide account, do not transfer allowances into their source's compliance account until just before the allowance transfer deadline, and end up with some excess emissions for the calendar year would

face a significantly higher maximum civil penalty than owners and operators that every day increase the amount of allowances held in their source's compliance account as the source's cumulative emissions increase and end up with the same amount of excess emissions for the calendar year. In short, the commenters' approach would penalize owners and operators that use some of the compliance flexibility that the trading programs are intended to provide.

EPA also maintains that it is reasonable to both impose the automatic allowance surrender and penalty provisions and to retain the discretion to impose civil penalties for the same occurrence of excess emissions. This approach encourages compliance with the allowance-holding requirement by ensuring that violating owners and operators are penalized automatically (*i.e.*, without any further administrative or judicial proceedings, except for appeals) and that EPA can seek additional penalties where the circumstances warrant discretionary civil penalties. In fact, the Acid Rain Program, for which CAA Title IV mandated this approach, has achieved a very high level of compliance with the requirement to hold allowances covering $SO_2$ emissions and therefore resulted in major reductions in utility $SO_2$ emissions. *See* 42 U.S.C.7651j(a). Similarly, the $NO_X$ Budget Trading Program and CAIR trading programs, which took the same approach, also have achieved very high compliance levels and major utility emission reductions.

EPA notes that, in calculating maximum civil penalties when owners and operators fail to hold allowances required under the assurance provisions in the final FIPs, EPA takes a similar approach in determining the number of violations. Each ton for which an allowance is not held as required and each day in the control period involved constitute a violation of the CAA. As discussed elsewhere in this preamble, EPA believes that this calculation approach is also reasonable in the context of the assurance provisions and that taking an approach like the commenters' suggested approach described above would be inconsistent with some of the flexibility that the Transport Rule trading programs are intended to provide.

*G. Allowance Management System*

The final Transport Rule trading programs, like the proposed preferred remedy, utilize EPA's allowance management system (AMS), which currently supports allowance surrender, transfer, and tracking activity under the Acid Rain Program and CAIR. EPA received no adverse comment on this aspect of the proposed rule.

The primary role of AMS is to provide an efficient, automated means for covered sources to comply and for EPA to determine whether covered sources are complying, with the emissions-related provisions of the Transport Rule trading programs. As was proposed, each of the final $SO_2$ trading programs and final $NO_X$ trading programs is separately handled in the AMS, which is used to track Transport Rule trading program $SO_2$ and $NO_X$ allowances held by covered sources, as well as such allowances held by other entities or individuals.

In addition, the AMS tracks: The allocation of all $SO_2$ and $NO_X$ allowances; holdings of $SO_2$ and $NO_X$ allowances in compliance accounts (*i.e.*, accounts for individual covered sources), general accounts (*i.e.*, accounts for other entities such as companies and brokers), and assurance accounts (*i.e.*, accounts for allowance surrender by owners and operators of groups of sources and units with common designated representatives under the assurance provisions); deduction of $SO_2$ and $NO_X$ allowances for compliance purposes (including deductions from assurance accounts where necessary); and transfers of allowances between accounts. The AMS also allows the public to see whether each source is in compliance and provides information to the allowance market and the public in general, including information on ownership of allowances, dates of allowance transfers, buyer and seller information, and the serial numbers of allowances transferred.

*H. Emissions Monitoring and Reporting*

Under the proposed rule, units subject to the Transport Rule trading programs would monitor and report $NO_X$ and $SO_2$ mass emissions in accordance with 40 CFR part 75, as incorporated in the proposed rule, and with certain other specified requirements, such as compliance deadlines.

In the final rule, like the proposed rule, covered units must comply with emissions monitoring and reporting requirements that are largely incorporated from Part 75 monitoring and reporting requirements.

Under the final rule and under Part 75, a unit has several options for monitoring and reporting, namely the use of: a CEMS; an excepted monitoring methodology ($NO_X$ mass monitoring for certain peaking units and $SO_2$ mass monitoring for certain oil- and gas-fired units); low mass emissions monitoring for certain non-coal-fired, low emitting units; or an alternative monitoring system approved by the Administrator through a petition process. In addition, the Administrator can approve petitions for alternatives to Transport Rule and Part 75 monitoring, recordkeeping, and reporting requirements.

Further, the final rule and Part 75 specify that each CEMS must undergo rigorous initial certification testing and periodic quality assurance testing thereafter, including the use of relative accuracy test audits (RATAs) and 24-hour calibrations. In addition, when a monitoring system is not operating properly, standard substitute data procedures are applied and result in a conservative estimate of emissions for the period involved.

In addition, the final rule and Part 75 require electronic submission, to the Administrator and in a format prescribed by the Administrator, of a quarterly emissions report. The report must contain all of the data required concerning $NO_X$ annual and ozone-season and $SO_2$ annual emissions.

Most Transport Rule units are in states subject to CAIR and are already monitoring and reporting $NO_X$ and/or $SO_2$ under CAIR and the Acid Rain Program, which programs also use Part 75 monitoring and reporting. Units under the Transport Rule annual trading programs and in states subject to CAIR generally have no changes to their monitoring and reporting requirements. These units must continue to monitor and submit reports on a year-round basis as they have under CAIR. Therefore, units in the following states must monitor and report both $SO_2$ and $NO_X$ year-round under the Transport Rule: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia and Wisconsin.

Some states (Kansas, Minnesota, and Nebraska) subject to the Transport Rule annual trading programs were not subject to CAIR. Transport Rule units in those states must meet monitoring and reporting requirements that are new except to the extent the units were subject to Part 75 under some other program (such as the Acid Rain Program).

Further, some states (Florida, Louisiana, and Mississippi) subject to the Transport Rule ozone-season trading program but not the Transport Rule annual trading programs were subject to the annual and ozone-season trading programs under CAIR. Transport Rule

units in those states must continue to monitor and report in accordance with Part 75 but have the option of monitoring and reporting on a year-round or ozone-season-only basis.

In addition, one state (Arkansas) subject to the Transport Rule ozone-season trading program but not to the Transport Rule annual trading program was similarly subject to only the ozone-season trading program in CAIR. Transport Rule units in that state continue to have the option of monitoring and reporting NO$_X$ on a year-round or ozone-season-only basis.

Finally, some states (Connecticut, Delaware, District of Columbia, and Massachusetts) that were subject to CAIR but not subject to the Transport Rule. Electric generating units in those states must continue to meet monitoring and reporting requirements only to the extent the units are subject to Part 75 under some other program (such as the Acid Rain Program or a state adopted program requiring such monitoring and reporting).

EPA is finalizing requirements for existing Transport Rule units in states covered by the Transport Rule annual trading programs to monitor and report SO$_2$ and NO$_X$ emissions by January 1, 2012 programs and for existing Transport Rule units in states covered by the Transport Rule ozone-season trading program to monitor NO$_X$ emissions by May 1, 2012. The use of Part 75 certified monitoring methodologies is required in both cases. As discussed previously, most covered existing units will generally have no changes to their monitoring and reporting requirements and will continue to monitor and submit reports under Part 75 as they have under CAIR. Existing units that have not been subject to Part 75 monitoring and reporting requirements in the past have less than 1 year to install, certify, and operate the required monitoring systems. EPA believes that these units will be able to comply with this requirement because the monitoring equipment needed is not extensive or is largely in place already for the purpose of meeting other requirements. Quality assurance and reporting provisions and data system upgrades may be necessary, but EPA believes that there is sufficient time to accomplish this by the deadline for existing units in the final rule.

In the proposed rule, the compliance deadline for installing, certifying, and operating the required monitoring systems at new units was based upon the date of commencement of commercial operation. A new unit would have to install and certify its monitoring system within 180 days of the commencement of commercial operation. The final rule adopts this deadline, which is consistent with the approach recently adopted in Part 75 under the Acid Rain Program. *See* 76 FR 17288, 17289 (March 28, 2011).

Using this deadline (rather than a deadline, used previously in Part 75, of the earlier of the unit's 90th operating day or 180 days after the unit's commencement of commercial operation) ensures that new units have sufficient time to complete installation and certification of monitoring systems and facilitates units' compliance. Because of unit shakedown problems, some new units have had difficulty meeting a deadline earlier than 180 days after commencement of commercial operation. Further, using this deadline facilitates owners' and operators, and EPA's, ability to track important dates related to monitoring, reporting, and allowance holding. Under the final rule, the requirement that a unit hold enough allowances to cover its emissions starts on the later of the commencement of the Transport Rule trading program involved or the deadline for installation and certification of the monitoring system. Having a simple, easily determined deadline (180 days after the commencement of commercial operation) makes it easier for owners and operators and EPA to determine when allowance-holding requirements begin, as well as when monitoring and reporting requirements begin. In contrast, using a deadline involving determination of a unit's 90th operating day required keeping track of any days on which the unit did not operate (*e.g.*, due to problems associated with shakedown of the unit). EPA found that owners and operators have had more difficulty reporting the 90th operating day than in reporting the commencement of commercial operation, and once the latter date is reported, EPA can independently determine the 180th calendar day after the reported date.

*I. Permitting*

1. Title V Permitting

The final Transport Rule (like the proposed rule) does not establish any permitting requirements independent of those under Title V of the CAA and the regulations implementing Title V, 40 CFR Parts 70 and 71.[84] All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emission limitations and other

conditions as necessary to assure compliance with applicable requirements of the CAA, including the requirements of the applicable State Implementation Plan. CAA §§ 502(a) and 504(a), 42 U.S.C. 7661a(a) and 7661c(a). The "applicable requirements," that must be addressed in title V permits are defined in the Title V regulations (40 CFR 70.2 and 71.2 (definition of "applicable requirement")).

EPA anticipates that, given the nature of the units covered by the final Transport Rule, most of the sources at which they are located are already or will be subject to Title V permitting requirements. For sources subject to Title V, the requirements applicable to them under the final FIPs will be "applicable requirements" under Title V and therefore will need to be addressed in the Title V permits. For example, requirements under the final FIPs concerning designated representatives, monitoring, reporting, and recordkeeping, the requirement to hold allowances covering emissions, the assurance provisions, and liability will be "applicable requirements" to be addressed in the permits.

The Title V permits program includes, among other things, provisions for permit applications, permit content, and permit revisions that will address the applicable requirements under the final FIPs in a manner that will provide the flexibility necessary to implement market-based programs such as the Transport Rule trading programs. For example, the Title V regulations provide that a permit issued under Title V must include, for any "approved * * * emissions trading and other similar programs or processes" applicable to the source, a provision stating that no permit revision is required "for changes that are provided for in the permit." 40 CFR 70.6(a)(8) and 71.6(a)(8). Consistent with this provision in the Title V regulations, the Transport Rule trading program regulations include a provision stating that no permit revision is necessary for the allocation, holding, deduction, or transfer of allowances. Consistent with the Title V regulations, this provision will also be included in each Title V permit for a covered source. As a result, allowances can be traded (or allocated, held, or deducted) under the final FIPs without a revision of the Title V permit of any of the sources involved.

As a further example of flexibility under Title V, the Title V regulations allow the use of the minor permit modification procedures for permit modifications "involving the use of economic incentives, marketable permits, emissions trading, and other

---

[84] Part 70 addresses requirements for state Title V programs, and Part 71 governs the federal Title V program.

similar approaches, to the extent that such minor permit modification procedures are explicitly provided for in an applicable implementation plan or in applicable requirements promulgated by EPA.'' 40 CFR 70.7(e)(2)(i)(B) and 40 CFR 71.7(e)(1)(i)(B). The final FIPs set forth in detail, and reference relevant provisions in Part 75 concerning, the approaches that are available for covered units to use for monitoring and reporting emissions (*i.e.,* approaches using a continuous emission monitoring system, an excepted monitoring system under appendices D and E to Part 75, a low mass emissions excepted monitoring methodology under § 75.19, or an alternative monitoring system under subpart E of Part 75). The final FIPs also require unit owners and operators to submit monitoring system certification applications (or, for alternative monitoring systems, petitions) to EPA establishing the monitoring and reporting approach actually to be used by the unit and allow owners and operators to submit petitions for alternatives to any specific monitoring and reporting requirement. These applications and petitions are subject to EPA review and approval to ensure consistency in monitoring and reporting among all trading program participants, and EPA's responses to any petitions for alternative monitoring systems or for alternatives to specific monitoring or reporting requirements are to be posted on EPA's Web site. Moreover, EPA intends that each covered unit's Title V permit will include a description of the general approach that the covered unit is required to use for monitoring and reporting emissions and that the description will reference the relevant sections of the Transport Rule trading program regulations and Part 75 and will state that the requirements may be modified through EPA approval of petitions for alternatives to specific requirements. Finally, consistent with §§ 70.7(e)(2)(i)(B) and 71.7(e)(1)(i)(B) of the Title V regulations, the final FIPs provide that a description of the general monitoring and reporting approach for a covered unit can be added to, or an existing description of a unit's general monitoring and reporting approach can be changed, in a Title V permit, using minor permit modification procedures, provided that the approach being described in the changed or new general description and the requirements applicable to that approach are already incorporated elsewhere in the permit. As a result, minor permit modification procedures can be used to revise a covered unit's Title V permit to be

consistent with the monitoring and reporting approach, or any changes in the approach, allowed for the unit by EPA through the monitoring system certification or petition process under the Transport Rule trading programs.

As new applicable requirements under Title V, the requirements for covered units under the final FIPs will be incorporated into covered sources' existing Title V permits either pursuant to the provisions for reopening for cause (40 CFR 70.7(f) and 40 CFR 71.7(f)) or the permit renewal provisions (40 CFR 70.7(c) and 71.7(c)).[85] In contrast to the approach in CAIR of imposing permitting requirements and deadlines independent of those under Title V, the approach to permitting under the final FIPS of imposing no independent permitting requirements should reduce the burden on sources already required to be permitted under Title V and on permitting authorities. For sources newly subject to Title V that will also be covered sources under the final FIPs, the initial Title V permit issued pursuant to 40 CFR 70.7(a) will address the final FIP requirements.

In order to ensure that covered sources' Title V permit provisions concerning the final FIPs will reflect the Transport Rule trading program requirements and flexibilities properly and in a manner consistent from permit to permit, EPA intends to issue guidance to assist permitting authorities. This guidance would include information on permit issuance and permit modification requirements, as well as a permit content template that will identify the applicable requirements under the applicable Transport Rule trading program and thereby ensure that they will be correctly and comprehensively reflected in each permit in a manner that will reduce the burden on sources and permitting authorities related to the issuance of the permit and will reduce the need for permit revisions.

*2. New Source Review*

a. Background

EPA recognizes that, following the vacatur of the new source review (NSR) pollution control project exemption in *New York* v. *EPA, 413 F.3d 3, 40–41 (D.C. Cir. 2005),* pollution control projects, including pollution control projects constructed to comply with this

rule, have the potential to trigger NSR permitting.

This issue was previously addressed in the context of CAIR. On December 20, 2005, the EPA agreed to reconsider one specific aspect of CAIR. In that notice, EPA granted reconsideration and sought comment on the potential impact of the opinion in *New York* v. *EPA,* which vacated the previously existing NSR exemption for certain environmentally beneficial pollution control projects. For this reconsideration, EPA conducted an analysis which showed that the court decision did not impact the CAIR analyses. Details of this analysis can be found in a technical support document which is available on EPA's Web site at: *http://epa.gov/cair/pdfs/0053-2263.pdf*

Because GHG emissions were not considered by EPA to be air pollutants within the meaning of the CAA at the time of CAIR, GHG emissions were not addressed in the 2005 analysis. GHG requirements related to the component of NSR concerning the Prevention of Significant Deterioration (''PSD'') program are addressed in EPA's ''Interpretation of Regulations that Determine Pollutants Covered by Clean Air Act Permitting Programs,'' 75 FR 17004 (April 2, 2010), and ''Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule,'' 75 FR (June 3, 2010) (''Tailoring Rule''). Generally, as discussed in those actions, major stationary sources will be required to address GHG emissions as part of the PSD program if these sources emit GHG in amounts that equal or exceed the thresholds in the Tailoring Rule. Major sources that undergo a modification, including the addition of pollution control equipment, will trigger PSD requirements for their emissions of GHG if such emissions increase by at least 75,000 [86] tons per year of $CO_2$ equivalent ($CO_2$e).

b. Proposed Rule

In the proposed rule, EPA presented the following conclusions:

(1) The 2005 analysis remains current and relevant for all pollutants except for GHG, and it shows that NSR requirements would not significantly impact the construction of controls that

---

[85] A permit is reopened for cause if any new applicable requirements (such as those under a FIP) become applicable to a covered source with a remaining permit term of 3 or more years. If the remaining permit term is less than 3 years, such new applicable requirements will be added to the permit during permit renewal. *See* 40 CFR 70.7(f)(1)(i) and 71.7(f)(1)(i).

[86] We note that, for sources that are modifying and are not subject to PSD for emissions of a non-GHG pollutant, in order to be subject to PSD for GHGs the source must not only have an emissions increase of 75,000 TPY $CO_2$e, but must also have a PTE of at least 100,000 TPY $CO_2$e and 100 TPY mass GHG. *See* 40 CFR 52.21(b)(49)(v)(b). However, since it is reasonable to assume that all sources that are potentially subject to the Transport Rule will have a PTE of at least 100,000 TPY $CO_2$e and 100 TPY, for the purposes of discussions in this section we will only note the requirement to have an emissions increase of 75,000 TPY $CO_2$e.

are installed to comply with the proposed Transport Rule.

(2) It is very unlikely that pollution control projects would cause GHG increases that would exceed the 75,000 tons per year threshold.

Consistent with these proposed conclusions, EPA also concluded that there would be no significant impacts from NSR for any pollution control projects resulting from the proposed rule such as low-$NO_X$ burners, $SO_2$ scrubbers, or SCR. EPA requested comment on this issue.

### c. Public Comments

EPA received a number of comments on the NSR issue, which can be divided into four types of comments: (1) Comments related to GHGs, (2) comments related to sulfuric acid mist, (3) comments related to CO emission increases from low-$NO_X$ burners, and (4) suggested changes to the EPA rules.

*Greenhouse Gases.* A number of commenters recommended that EPA should document and substantiate its conclusion that greenhouse gases would be unlikely to trigger NSR requirements. Other commenters suggested that some units installing a FGD scrubber could exceed the 75,000 ton threshold for GHGs in the Tailoring Rule by emitting $CO_2$ produced from the chemical reaction of $SO_2$ with limestone. Commenters also suggested that NSR applicability for GHGs would also need to consider that an FGD would consume 1–3 percent of a scrubbed unit's generation, referred to as "parasitic load," which (all else held equal) lowers that unit's net generation.[87] Commenters argued that any post-retrofit increase in generation to offset that "parasitic load" could lead to GHG increases potentially exceeding the 75,000 ton threshold.

*Sulfuric Acid Mist.* Two commenters noted that use of high sulfur fuels, in combination with SCR, can lead to increases in sulfuric acid mist, a pollutant regulated under NSR. One of these commenters noted that reagent injection was necessary to avoid triggering NSR for sulfuric acid mist when their SCR was installed.

*Carbon Monoxide (CO).* One commenter believed that EPA's 2005 analysis may not be adequate as it related to carbon monoxide emission increases that result from installation of low-$NO_X$ burners. The commenter noted EPA's statement in the 2005 analysis that read as follows: "Since the $NO_X$

removal efficiencies used in EPA's analysis are not aggressive, it is believed that the units installing combustion controls can opt for moderate levels of overfire air flow rates and still achieve the $NO_X$ reduction levels projected in EPA's analysis, without causing significant increases in the CO and unburned carbon emissions." The commenter suggested that the transport rule $NO_X$ may be more aggressive than CAIR and thus EPA should conduct a review to determine whether EPA retains the same conclusion regarding CO emissions.

*Recommended Rule Changes.* Some commenters suggested changes to EPA rules to address their concerns that control equipment installed as a result of the Transport Rule could trigger NSR. Some commenters suggested that EPA craft an exclusion from NSR in the Transport Rule. One of these commenters suggested that EPA could do this by: (1) Providing special definition of baseline actual emissions; (2) a causation determination specifically tied to the Transport Rule; or (3) interpret the term "stationary source" in CAA 110(a)(4) in a way that doesn't impede Transport Rule compliance.

Other commenters expressed the concern that if NSR is triggered, the proposed Transport Rule did not allow enough time for compliance for sources needing to install control equipment. These commenters recommend that EPA should waive Transport Rule requirements or provide extra allowances until NSR review is complete.

### d. Final Rule and Responses to Comments

*Greenhouse Gases.* EPA has carefully reviewed relevant data in assessing the comments suggesting that NSR permitting would likely be triggered for facilities installing FGD scrubbers to comply with this rule. EPA believes that sources installing FGD to comply with the Transport Rule can achieve those installations without triggering NSR.

EPA notes that its forecast of the number and extent of FGD scrubber installations substantially decreased since the time of proposal. For the proposed rule, EPA modeled 14 GW of FGD retrofit installations by 2014. For the final rule, EPA models a total of 5.7 GW of wet FGD installations from 7 units at 5 plants.

There are two factors associated with wet FGD scrubbers that commenters suggested individually or in combination could lead to increases above the 75,000 tons per year threshold in the Tailoring Rule. The first is the

$CO_2$ chemically produced from the reaction of $SO_2$ with limestone in wet FGD scrubbers. The second is that owners or operators of the affected units may desire to increase coal usage after the retrofit is made to offset the "parasitic load" that is consumed on-site in order to operate the scrubber.

With respect to chemically produced $CO_2$, EPA concludes that only in very limited circumstances when installation of a scrubber is coupled with a change to considerably higher sulfur coal could installation of a wet limestone scrubber be associated with a more than 75,000 ton increase in $CO_2$ emissions. EPA finds this possibility unlikely to occur. For example, EPA's acid rain emissions reporting system shows that the plant with the greatest emissions from unscrubbed units in 2009 emitted about 103,000 tons of $SO_2$ from those units. If this plant installed a wet limestone scrubber assumed to reduce those $SO_2$ emissions by 96 percent, EPA calculates that chemically produced $CO_2$ could increase emissions by:

$$103,000 \times (0.96) \times (44/64) = 67,980 \text{ tons } CO_2.[88]$$

Therefore, EPA finds that all currently uncontrolled units are technically capable of retrofitting with wet FGD without chemically produced $CO_2$ increases leading to a triggering of NSR. In limited circumstances, an owner or operator may elect to switch fuels to a significantly higher-sulfur coal subsequent to FGD installation and may risk an increase in chemically produced $CO_2$ emissions that would trigger NSR, but such a decision is not necessary in order to successfully install and operate the scrubber as a strategy for compliance with Transport Rule requirements.

With respect to the "parasitic load" issue, EPA estimates that today's wet FGD retrofit technology would consume typically about 1.7 percent of on-site generation.[89] If a facility made no other changes to its operation than installing an FGD retrofit, that facility's $CO_2$ emissions from fuel combustion would remain constant. It is possible, however, that a source's owner or operator may elect to increase coal usage by some amount after retrofitting FGD, if for example the owner or operator desires to increase net generation after retrofitting. Under NSR, any such source would be able to

---

[87] "Net generation" refers to total generation minus the amount of power consumed on-site for various purposes, including operation of pollution control equipment.

[88] The factor 44/64 reflects the relative molecular weight of $CO_2$ and $SO_2$, respectively. A wet FGD's removal of one ton of $SO_2$ involves a chemical reaction that releases the equivalent molecular weight of $CO_2$ (thus equaling 44/64 of a ton of $CO_2$ emissions).

[89] Documentation Supplement for EPA Base Case v.4.10_FTransport—Updates for Final Transport Rule.

compare such a $CO_2$ emissions increase against the highest average annual emissions in any consecutive 24-month period from a 5-year historic baseline. Therefore, a unit retrofitting a scrubber under the Transport Rule may be able to increase its $CO_2$ emissions by more than 75,000 tons without triggering NSR if that increase would register as less than 75,000 tons against a higher emissions level in the aforementioned NSR baseline.

EPA also notes that scrubber installations provide facilities with the opportunity to make other capital improvements at the unit on which the scrubber is installed to improve the efficiency of boilers, steam turbines, motors, other auxiliary equipment, and plant control systems. Such improvements could allow a retrofitting unit to lower its $CO_2$ output rate such that a subsequent decision to increase net generation may not result in increased coal use, or may limit any $CO_2$ emission increase to less than the 75,000 tons per year threshold for triggering NSR.

As discussed in section VII.C, EPA notes that the Transport Rule does not mandate any specific control activity, including scrubber retrofitting, as a compliance strategy for units within a state to meet that state's $SO_2$ budget. As demonstrated by EPA's "no FGD" sensitivity analysis described in VII.C, covered sources within the Group 1 states are capable of meeting their emission reduction obligations through a variety of emission reduction strategies even if no unit is able to complete a scrubber installation by 2014. Therefore, EPA does not believe that NSR permitting presents an obstacle in any way to Transport Rule compliance, even if a given unit retrofitting with FGD triggers NSR for $CO_2$.

For some plants, EPA's IPM modeling forecasts installation and operation of dry sorbent injection (DSI) systems. EPA does not believe any of these systems would result in $CO_2$ emission increases above the 75,000 ton threshold. Moreover, given the relatively short construction schedule for DSI systems, EPA believes that if any of the plants did require NSR permitting, installation of DSI could still be accomplished by 2014.

In summary, EPA believes that the operators of plants projected to install scrubbers for Transport Rule $SO_2$ reductions could readily develop workable compliance strategies whether or not such an installation would trigger NSR. Plant owners could readily develop strategies to avoid emission increases that would trigger NSR,

including but not limited to alternative $SO_2$ reduction strategies or technologies, efficiency improvements, or the ability to adjust net electricity generation to prevent a 75,000 ton increase in $CO_2$ emissions. EPA believes that projected scrubber installations under the Transport Rule are broadly unlikely to trigger NSR, but even in the limited conditions where such a triggering may occur, the NSR permitting process would not infringe on a state's ability to comply with its budgets under the Transport Rule. (*See* section VII.C for more details on EPA's analysis of a "no FGD" sensitivity supporting these points.)

*Sulfuric Acid Mist.* EPA continues to conclude that, consistent with the 2005 TSD, sulfuric acid mist increases due to compliance with this rule are very unlikely to trigger NSR permitting. Such increases are most commonly seen from installation of SCR units on facilities with relatively high sulfur coal. However, as acknowledged by one of the commenters, engineering solutions have been developed to prevent such increases, and EPA believes that facility owners would take this into account in designing such an SCR system. Moreover, EPA's IPM modeling of the $NO_X$ budgets in the final rule suggests that no new SCR units will result from the final rule.

*Carbon Monoxide.* EPA concludes that any NSR permitting required due to CO increases associated with $NO_X$ controls should not hinder the ability of sources to comply with Transport Rule requirements. For states that were included in the CAIR for either ozone, $PM_{2.5}$, or both, EPA finds no evidence to suggest that the $NO_X$ control requirements of the Transport Rule would require more aggressive controls triggering NSR. As EPA's baseline analysis acknowledges, many sources in these states installed $NO_X$ controls to comply with CAIR. In addition, their historic emissions reflect operation of these controls and there is no evidence to suggest that the Transport Rule will require sources to operate these controls more aggressively, thereby increasing CO emissions above the relevant threshold and triggering NSR. In a few states that were not covered by CAIR, a limited number of facilities may install new combustion controls (such as low-$NO_X$ burners, overfire air, or other combustion controls or upgrades) as a result of the Transport Rule. EPA expects relatively few such installations, and believes that NSR permitting, if required, is not an obstacle to compliance with the rule. First, EPA believes that NSR permitting should be relatively straightforward for these

installations and that the BACT determination for CO will be very straightforward. EPA expects a relatively short time period for permitting, and as discussed later, EPA is planning to initiate actions that will further expedite any required permitting.

Second, EPA notes that the rule achieves reductions through a trading program rather than direct control requirements. Accordingly, even if a few installations do not have controls in place at the very beginning of the compliance period, this should not hinder the ability of states to meet their ozone-season $NO_X$ budgets. Covered sources have a suite of $NO_X$ pollution control strategies and technologies available to them, including coal selection, selective non-catalytic reduction, gas re-burn, low-$NO_X$ burner and overfire air installations or upgrades, and neural network optimization of combustion controls operation. Sources may consider all of these technologies and strategies, which can be designed and operated so as to minimize CO emission increases that may otherwise trigger NSR. EPA also notes that during the downtime for installation of the construction controls, there would be no $NO_X$ emissions, and thus the source's allowance holding requirements would also be lower for that period.

*Recommended Rule Changes.* EPA disagrees with commenters who suggested rule changes, either to the NSR program or to this rule, to account for installations triggering NSR. As noted above, EPA concludes that NSR would be triggered at most for just a few of the projected control installations. EPA believes, however, that even if required these NSR permits would likely be issued in a timely manner given the overall environmental benefits resulting from the control equipment installation. In addition, this rule's requirements are based on a flexible trading approach rather than a direct control approach. Accordingly, if this affect occurs for only a few installations, EPA believes that any extra emissions that occur during the relatively short time needed to obtain an NSR permit could be accommodated within the overall trading system.

*Expediting Permitting.* In the limited circumstances where pollution control installations under the Transport Rule may trigger NSR, we also note that an expedited permitting process can occur with sufficient time to obtain permits and achieve emission reductions under the Transport Rule programs. For this reason, we strongly encourage permitting authorities to expedite

permitting for any such projects, which are likely to be very limited in number. To ensure that the permitting decisions are expedited, separate from this rulemaking EPA will provide assistance and guidance in order to expedite issuance of any such permits. For example, we are considering assistance that would serve to expedite BACT reviews or required air quality analysis. EPA requests early notification of any specific cases where such guidance and assistance may be needed.

## J. How the Program Structure Is Consistent With Judicial Opinions Interpreting the Clean Air Act

The air quality-assured trading programs established by this rule eliminate all of the emissions that EPA has identified as significantly contributing to downwind nonattainment or interference with maintenance [90] in a manner that is consistent with section 110(a)(2)(D)(i) of the CAA as interpreted by the DC Circuit in *North Carolina,* 531 F.3d 896. The FIPs finalized in this action require sources to participate in air quality-assured interstate emission trading programs that include provisions to ensure that no state's emissions exceed that state's budget with variability limit. These assurance provisions, combined with the requirement that all sources hold emission allowances sufficient to cover their emissions, effectuate the requirement that emission reductions occur within the state. *See* 42 U.S.C. 7410(a)(1)(2)(D).

The state budgets developed in this rule represent an estimate of the emissions that will remain in a given state after the elimination of all emissions in that state that EPA has determined must be prohibited pursuant to section 110(a)(2)(D)(i)(I). However, for the reasons explained above, the amount of emissions that remain after the requirements of 110(a)(2)(D)(i)(I) are satisfied may vary. EPA recognizes that shifts in generation due to, among other things, changing weather patterns, demand growth, or disruptions in electricity supply from other units can affect the amount of generation needed in a specific state and thus baseline EGU emissions from that state. Because a state's significant contribution to nonattainment or interference with maintenance is defined by EPA as all emissions that can be eliminated for a specific cost (as explained above, using air quality considerations to identify this cost threshold), and because EGU baseline emissions are variable, the amount of emissions remaining in a state after all significant contribution or interference with maintenance is eliminated is also variable. In other words, EGU emissions in a state whose sources have installed all controls and taken all measures necessary to eliminate its significant contribution to nonattainment or interference with maintenance could exceed the state budget without variability.

For this reason, EPA determined that it is appropriate for the program to recognize the inherent variability in state EGU emissions. The program does so by identifying a variability range for each state in the program. The assurance provisions, in turn, limit a state's emissions to the state's budget with variability limit.

In addition, the requirement that all sources hold emission allowances sufficient to cover their emissions (and the fact that the total number of emission allowances allocated will be equal to the sum of all state budgets without variability) ensures that the use of variability limits both takes into account the inherent variability of baseline EGU emissions in individual states (*i.e.,* the variability of total state EGU emissions before the elimination of significant contribution or interference with maintenance) and recognizes that this variability is not as great in a larger region. The variability of emissions across a larger region is not as large as the variability of emissions in a single state for several reasons. Increased EGU emissions in one state in one control period often are offset by reduced EGU emissions in another state within the control region in the same control period. In a larger region that includes multiple states, factors that affect electricity generation, and thus EGU emission levels, are more likely to vary significantly within the region so that resulting emission changes in different parts of the region are more likely to offset each other. For example, a broad region can encompass states with differing weather patterns, with the result that increased electricity demand and emissions due to weather in one state may be offset by decreased demand and emissions due to weather in another state. By further example, a broad region can encompass states with differing types of industrial and commercial electricity end-users, with the result that changes in electricity demand and emissions among the states due to the effect of economic changes on industrial and commercial companies may be offsetting. Similarly, because states in a broad region may vary in their degree of dependence on fossil-fuel-based electric generation, the impact of an outage of non-fossil-fuel-based generation (*e.g.,* a nuclear plant) in one state may have a very different impact in that state than on other states in the region. Thus, EPA does not believe it is necessary to allow total regional allowance allocations for the states covered by a given trading program to exceed the sum of all state budgets without variability for these states.

For these reasons, the fact that the use of state budgets with variability limits may allow limited shifting of emissions between states is not inconsistent with the court's holding that emission reductions must occur "within the state." *North Carolina,* 531 F.3d at 907. Under the FIPs, no state may emit more than its budget with variability limit and total emissions cannot exceed the sum of all state budgets without variability. This approach takes into account the inherent variability of the baseline emissions without excusing any state from eliminating its significant contribution to nonattainment or interference with maintenance. It is thus consistent with the statutory mandate of section 110(a)(2)(D)(i)(I) as interpreted by the Court.

Most commenters voiced support for a remedy option that allows some degree of interstate trading. However, one commenter argued that the structure of the preferred trading remedy that EPA proposed is legally problematic. The program, the commenter argues, provides no legal assurance that the variability margins will be used by market participants to account for variability. The commenter does not suggest a solution, but instead says, if a solution cannot be found, EPA should not allow any amount of interstate trading.

EPA disagrees with the commenter that the structure of the preferred interstate trading program is legally problematic. In *North Carolina,* the Court held that the CAIR interstate trading programs were inconsistent with section 110(a)(2)(D)(i)(I), concluding that "EPA's apportionment decisions have nothing to do with each state's 'significant contribution' " (531 F.3d at

---

[90] As explained in greater detail in Section VI of this notice, for each covered state, EPA has identified emissions that must be prohibited pursuant to section 110(a)(2)(D)(i)(I). In most instances, EPA has determined that elimination of such emissions is sufficient to satisfy the requirements of that section. Thus, in these instances, the budgets represent an estimate of the emissions that will remain after the elimination of all emissions in that state that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in another state. In a few limited instances, however, EPA determined that elimination of the emissions is necessary but may not be sufficient to satisfy the requirements of that section. In these instances, the budgets represent an estimate of the emissions that will remain after the elimination of all emissions that EPA, at this time, has determined must be eliminated.

907) and that "EPA is not exercising its section 110(a)(2)(D)(i)(I) duty unless it is promulgating a rule that achieves something measurable toward the goal of prohibiting sources 'within the State' from contributing to nonattainment or interfering with maintenance 'in any other State.' " (531 F.3d at 908). It emphasized that "[t]he trading program is unlawful, because it does not connect states' emission reductions to any measure of their own significant contributions. To the contrary, it relates their $SO_2$ reductions to their Title IV allowances. * * * The allocation of $NO_X$ caps is similarly arbitrary because EPA distributed allowances simply in the interest of fairness." 531 F.3d at 930. As explained in this rule, EPA has addressed these concerns by using source specific analysis to identify each individual state's significant contribution to nonattainment and interference with maintenance, and including assurance provisions to ensure that the necessary reductions occur in each state. The Court did not go further to prohibit all interstate trading. In fact, it notes that "after rebuilding, a somewhat similar CAIR may emerge" (531 F.3d at 930). For all of these reasons, EPA does not believe the opinion in *North Carolina* can be read to stand for the proposition that no interstate trading can be allowed unless the specific reasons behind market participants' decisions to purchase allowances can be ascertained. Because allowance purchase decisions are likely to be based on multiple factors, which can include the desire to hedge against potential emission variability as well as to address actually occurring variability,

requiring ascertainment of the specific reasons for allowance purchases would be tantamount to prohibiting all interstate trading.

Moreover, as discussed above, variability is inherent to the operation of the electric generation system and thus to emissions from this sector. In fact, variability in emissions occurs every year in every state and, like variability of year-to-year weather conditions (which is a major cause of emission variability), cannot be accurately predicted. *See* the Power Sector Variability Final Rule TSD in the docket for this rulemaking. EPA maintains that its approach of adjusting state EGU emissions each year to vary by up to the historically representative, annual amount of inherent, emission variability reasonably reflects the realities of the electric generation system and is consistent with the *North Carolina* decision. In summary, the variability limits take into account inherent variability over time of emissions in each state from this sector while also ensuring that each state makes necessary emission reductions to eliminate significant contribution and interference with maintenance. EPA thus concludes that the commenter's argument that the use of variability limits allows sources "within the state" to avoid eliminating their significant contribution or interference with maintenance is without merit.

## VIII. Economic Impacts of the Transport Rule

### A. Emission Reductions

The projected impacts of this final rule as presented throughout the

preamble do not reflect minor technical corrections to $SO_2$ budgets in three states (KY, MI, and NY) made after the impact analyses were conducted. These projections also assumed preliminary variability limits that were smaller than the variability limits finalized in this rule. EPA conducted sensitivity analysis confirming that these differences do not meaningfully alter any of the Agency's findings or conclusions based on the projected cost, benefit, and air quality impacts presented for the final Transport Rule. The results of this sensitivity analysis are presented in Appendix F in the final Transport Rule RIA.

Table VIII.A–1 presents projected power sector emissions in the base case (*i.e.,* without the Transport Rule or CAIR) compared to projected emissions with the Transport Rule in 2012 and 2014 for all covered states. Table VIII.A–2 presents 2005 historical power sector emissions compared to projected emissions with the Transport Rule in 2012 and 2014. Note that for ozone-season emissions, these tables present results from a modeling scenario that reflects ozone-season $NO_X$ requirements in 26 states. This modeling differs from the final Transport Rule because it includes ozone-season $NO_X$ requirements for six states (Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin) that the final Transport Rule does not cover (as discussed previously, EPA is issuing a supplemental proposal to request comment on inclusion of these six states).

TABLE VIII.A–1—PROJECTED $SO_2$ AND $NO_X$ ELECTRIC GENERATING UNIT EMISSION REDUCTIONS IN COVERED STATES WITH THE TRANSPORT RULE COMPARED TO BASE CASE WITHOUT TRANSPORT RULE OR CAIR

[Million tons]

|  | 2012 Base case emissions | 2012 Transport rule emissions | 2012 Emission reductions | 2014 Base case emissions | 2014 Transport rule emissions | 2014 Emission reductions |
|---|---|---|---|---|---|---|
| $SO_2$ | 7.0 | 3.0 | 4.0 | 6.2 | 2.4 | 3.9 |
| Annual $NO_X$ | 1.4 | 1.3 | 0.1 | 1.4 | 1.2 | 0.2 |
| Ozone-Season $NO_X$ | 0.7 | 0.6 | 0.1 | 0.7 | 0.6 | 0.1 |

**Notes:** The $SO_2$ and annual $NO_X$ emissions in this table reflect EGUs in the 23 states covered by this rule for purposes of the 24-hour and/or annual $PM_{2.5}$ NAAQS (Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin).

The ozone-season $NO_X$ emissions reflect EGUs in the 20 states covered by this rule for purposes of the ozone NAAQS (Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia) and the six states that would be covered for the ozone NAAQS if EPA finalizes its supplemental

proposal (Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin).

Tables VIII.A–3 through VIII.A–5 present projected state-level emissions with and without the Transport Rule in 2012 and 2014 from fossil-fuel-fired EGUs greater than 25 MW in covered states.

TABLE VIII.A–2—PROJECTED SO₂ AND NOₓ ELECTRIC GENERATING UNIT EMISSION REDUCTIONS IN COVERED STATES WITH THE TRANSPORT RULE COMPARED TO 2005 ACTUAL EMISSIONS

[Million tons]

|  | 2005 Actual emissions | 2012 Transport rule emissions | 2012 Emission reductions from 2005 | 2014 Transport rule emissions | 2014 Emission reductions from 2005 |
|---|---|---|---|---|---|
| SO₂ | 8.8 | 3.0 | 5.8 | 2.4 | 6.4 |
| Annual NOₓ | 2.6 | 1.3 | 1.3 | 1.2 | 1.4 |
| Ozone-Season NOₓ | 0.9 | 0.6 | 0.3 | 0.6 | 0.3 |

**Notes:** The SO₂ and annual NOₓ emissions in this table reflect EGUs in the 23 states covered by this rule for purposes of the 24-hour and/or annual PM₂.₅ NAAQS (Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin).

The ozone-season NOₓ emissions reflect EGUs in the 20 states covered by this rule for purposes of the ozone NAAQS (Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia) and the six states that would be covered for the ozone NAAQS if EPA finalizes its supplemental proposal (Iowa, Kansas, Michigan, Missouri, Oklahoma, and Wisconsin).

**Table VIII.A-3 – Projected State-level Annual SO₂ Emissions from Fossil-Fired Electric Generating Units Greater than 25 MW in Covered States in 2012 and 2014 in Base Case and with Transport Rule (tons)**

|  | Base Case | | Transport Rule | |
|---|---|---|---|---|
|  | 2012 | 2014 | 2012 | 2014 |
| Alabama | 455,503 | 417,009 | 219,067 | 173,231 |
| Georgia | 405,933 | 169,702 | 158,581 | 92,605 |
| Illinois | 485,417 | 137,522 | 209,701 | 128,143 |
| Indiana | 776,359 | 711,265 | 241,258 | 177,222 |
| Iowa | 121,663 | 127,354 | 75,003 | 77,931 |
| Kansas | 68,490 | 69,767 | 41,433 | 45,681 |
| Kentucky | 520,531 | 487,990 | 146,133 | 116,912 |
| Maryland | 49,942 | 42,926 | 26,630 | 30,368 |
| Michigan | 252,411 | 265,611 | 190,274 | 158,394 |
| Minnesota | 64,524 | 66,268 | 42,862 | 45,143 |
| Missouri | 375,771 | 381,939 | 181,662 | 177,359 |
| Nebraska | 70,754 | 71,821 | 65,079 | 70,087 |
| New Jersey | 26,346 | 38,857 | 5,518 | 6,243 |
| New York | 51,243 | 40,416 | 20,378 | 12,689 |
| North Carolina | 144,554 | 120,441 | 117,383 | 63,382 |
| Ohio | 871,401 | 831,648 | 230,216 | 150,784 |
| Pennsylvania | 493,206 | 507,360 | 250,484 | 123,224 |
| South Carolina | 184,045 | 209,538 | 84,435 | 96,589 |
| Tennessee | 324,372 | 284,463 | 96,520 | 64,716 |
| Texas | 445,715 | 452,978 | 244,239 | 266,288 |
| Virginia | 80,889 | 64,917 | 66,640 | 38,562 |
| West Virginia | 535,586 | 497,398 | 119,174 | 83,235 |
| Wisconsin | 131,199 | 124,862 | 77,505 | 44,139 |
| Total | 6,935,853 | 6,122,051 | 2,910,173 | 2,242,927 |

Table VIII.A-4 – Projected State-level Annual $NO_x$ Emissions from Fossil-Fired Electric Generating Units Greater than 25 MW in Covered States in 2012 and 2014 in Base Case and with Transport Rule (tons)

| | Base Case | | Transport Rule | |
|---|---|---|---|---|
| | 2012 | 2014 | 2012 | 2014 |
| Alabama | 82,005 | 74,937 | 73,600 | 68,119 |
| Georgia | 66,384 | 47,808 | 61,464 | 39,817 |
| Illinois | 51,969 | 54,661 | 47,635 | 48,533 |
| Indiana | 119,625 | 116,552 | 109,773 | 109,392 |
| Iowa | 42,563 | 44,614 | 36,953 | 38,302 |
| Kansas | 37,106 | 32,390 | 30,603 | 23,938 |
| Kentucky | 88,136 | 83,481 | 83,856 | 76,026 |
| Maryland | 16,602 | 17,444 | 15,665 | 17,061 |
| Michigan | 60,594 | 64,345 | 59,405 | 57,311 |
| Minnesota | 36,833 | 37,952 | 30,524 | 30,849 |
| Missouri | 53,199 | 54,528 | 51,329 | 48,888 |
| Nebraska | 42,985 | 43,410 | 26,488 | 26,552 |
| New Jersey | 7,391 | 7,858 | 7,355 | 7,562 |
| New York | 17,556 | 18,505 | 17,616 | 17,250 |
| North Carolina | 51,902 | 46,130 | 47,679 | 41,676 |
| Ohio | 100,420 | 99,389 | 84,679 | 84,126 |
| Pennsylvania | 129,125 | 132,299 | 117,612 | 116,994 |
| South Carolina | 34,635 | 37,862 | 33,144 | 35,591 |
| Tennessee | 37,674 | 29,256 | 32,984 | 20,490 |
| Texas | 136,124 | 140,788 | 133,406 | 136,638 |
| Virginia | 34,567 | 35,798 | 33,244 | 34,891 |
| West Virginia | 61,792 | 64,182 | 55,808 | 53,335 |
| Wisconsin | 36,701 | 36,904 | 30,643 | 29,688 |
| Total | 1,345,888 | 1,321,092 | 1,221,466 | 1,163,027 |

Table VIII.A-5 – Projected State-level Ozone-Season $NO_X$ Emissions from Fossil-Fired Electric Generating Units Greater than 25 MW in Covered States in 2012 and 2014 in Base Case and with Transport Rule (tons)

|  | Base Case | | Transport Rule | |
|---|---|---|---|---|
|  | 2012 | 2014 | 2012 | 2014 |
| Alabama | 34,074 | 31,365 | 31,607 | 29,532 |
| Arkansas | 15,037 | 16,644 | 15,087 | 16,728 |
| Florida | 41,646 | 45,993 | 27,645 | 29,435 |
| Georgia | 29,106 | 19,293 | 26,660 | 17,838 |
| Illinois | 21,371 | 22,043 | 21,102 | 21,210 |
| Indiana | 46,877 | 46,086 | 46,789 | 46,564 |
| Iowa | 18,307 | 19,440 | 15,746 | 16,346 |
| Kansas | 16,126 | 13,967 | 13,425 | 10,217 |
| Kentucky | 37,588 | 35,296 | 34,969 | 31,547 |
| Louisiana | 13,433 | 13,924 | 13,669 | 13,943 |
| Maryland | 7,179 | 7,540 | 6,705 | 7,248 |
| Michigan | 25,989 | 28,037 | 25,476 | 24,248 |
| Mississippi | 10,161 | 11,212 | 10,639 | 10,960 |
| Missouri | 23,156 | 23,759 | 21,788 | 20,805 |
| New Jersey | 3,440 | 3,668 | 3,403 | 3,518 |
| New York | 8,336 | 9,031 | 8,404 | 8,399 |
| North Carolina | 22,902 | 20,169 | 21,081 | 18,154 |
| Ohio | 42,274 | 41,327 | 34,576 | 35,769 |
| Oklahoma | 31,415 | 31,723 | 20,910 | 21,200 |
| Pennsylvania | 52,895 | 54,217 | 50,384 | 50,446 |
| South Carolina | 15,145 | 16,586 | 13,810 | 15,058 |
| Tennessee | 15,505 | 12,141 | 14,305 | 8,461 |
| Texas | 64,711 | 65,492 | 62,824 | 63,749 |
| Virginia | 15,148 | 15,339 | 14,311 | 14,744 |
| West Virginia | 26,464 | 27,099 | 23,352 | 22,406 |
| Wisconsin | 15,876 | 16,048 | 12,840 | 12,768 |
| Total | 654,161 | 647,439 | 591,508 | 571,293 |

BILLING CODE 6560–50–C

*B. The Impacts on $PM_{2.5}$ and Ozone of the Final $SO_2$ and $NO_X$ Strategy*

The air quality modeling platform described in section V was used by EPA to model the impacts of the final rule $SO_2$ and $NO_X$ emission reductions on annual average $PM_{2.5}$, 24-hour $PM_{2.5}$, and 8-hour ozone concentrations. In brief, we ran the CAMx model for the meteorological conditions in the year of 2005 for the eastern U.S. modeling domain.[91] Modeling was performed for the 2014 base case and the 2014 air quality-assured trading (*i.e.*, remedy) scenario to assess the expected effects of the final rule on projected $PM_{2.5}$ and ozone design value concentrations and nonattainment and maintenance. The procedures used to project future design values and nonattainment and maintenance are described in section V.

The projected 2014 concentrations of annual $PM_{2.5}$, 24-hour $PM_{2.5}$, and ozone at each monitoring site in the East for which projections were made are provided in the Air Quality Modeling Final Rule TSD. The number of nonattainment and/or maintenance sites in the East for the 2012 base case, 2014 base case, and 2014 remedy for annual $PM_{2.5}$, 24-hour $PM_{2.5}$, and ozone are provided in Table VIII.B–1.[92] The average and peak reductions in annual $PM_{2.5}$, 24-hour $PM_{2.5}$, and ozone predicted at 2012 nonattainment and/or maintenance sites due the emission reductions between 2012 and the 2014 remedy are provided in Table VIII.B–2.

---

[91] As described in the Air Quality Modeling Final Rule TSD, the eastern U.S. was modeled at a horizontal resolution of 12 x 12 km. The remainder of the U.S. was modeled at a resolution of 36 x 36 km.

[92] To provide a point of reference, Table VIII.B–1 also includes the number of nonattainment and/or maintenance sites based on ambient design values for the period 2003 through 2007.

TABLE VIII.B–1—PROJECTED REDUCTION IN NONATTAINMENT AND/OR MAINTENANCE PROBLEMS FOR PM$_{2.5}$ AND OZONE IN THE EASTERN U.S.

| | Ambient (2003–2007) | 2012 Base case | 2014 Base case | 2014 remedy | Percent reduction: 2012 base case vs. 2014 remedy (percent) | Percent reduction: 2014 base case vs. 2014 remedy |
|---|---|---|---|---|---|---|
| Annual PM$_{2.5}$ Nonattainment Sites [93] ........ | 103 | 12 | 7 | 0 | 100 | 100 percent. |
| Annual PM$_{2.5}$ Maintenance-Only Sites ...... | 22 | 4 | 3 | 0 | 100 | 100 percent. |
| 24-hour PM$_{2.5}$ Nonattainment Sites .......... | 151 | 20 | 10 | 1 | 95 | 90 percent. |
| 24-hour PM$_{2.5}$ Maintenance-Only Sites ..... | 48 | 21 | 12 | 4 | 81 | 67 percent. |
| Ozone Nonattainment Sites ..................... | 104 | 7 | 4 | 4 | 43 | No Change. |
| Ozone Maintenance-Only Sites ................. | 65 | 9 | 6 | 6 | 33 | No Change. |

TABLE VIII.B–2—AVERAGE AND PEAK REDUCTION IN ANNUAL PM$_{2.5}$, 24-HOUR PM$_{2.5}$, AND OZONE FOR SITES THAT ARE PROJECTED TO HAVE NONATTAINMENT AND/OR MAINTENANCE PROBLEMS IN THE 2012 BASE CASE

| | Average reduction: 2012 base Case to 2014 remedy | Peak reduction: 2012 base case to 2014 remedy |
|---|---|---|
| Annual PM$_{2.5}$ Nonattainment Sites ................................................................ | 2.73 µg/m³ .............. | 3.32 µg/m³. |
| Annual PM$_{2.5}$ Maintenance-Only Sites ............................................................ | 2.99 µg/m³ .............. | 3.26 µg/m³. |
| 24-hour PM$_{2.5}$ Nonattainment Sites .............................................................. | 6.8 µg/m³ ................ | 11.7 µg/m³. |
| 24-hour PM$_{2.5}$ Maintenance-Only Sites .......................................................... | 6.5 µg/m³ ................ | 11.0 µg/m³. |
| Ozone Nonattainment Sites ............................................................................. | 1.9 ppb .................... | 2.3 ppb. |
| Ozone Maintenance-Only Sites ........................................................................ | 1.8 ppb .................... | 2.1 ppb. |

The information in Table VIII.B–1 shows that there will be significant reductions in the extent of nonattainment and maintenance problems for annual PM$_{2.5}$, 24-hour PM$_{2.5}$, and ozone between 2012 and 2014 as a result of the emission budgets in this rule coupled with emission reductions during this time period from other existing control programs. Specifically, the results of the air quality modeling indicate that no sites are projected to be in nonattainment or projected to have a maintenance problem for annual PM$_{2.5}$ in 2014 with the emission reductions expected from the Transport Rule. As indicated in Table VIII.B–2, the average reduction in annual PM$_{2.5}$ across the twelve 2012 nonattainment sites is 2.73 µg/m³ and the peak reduction at an individual nonattainment site is 3.32 µg/m³. Large reductions are also projected at annual PM$_{2.5}$ maintenance-only sites.

For 24-hour PM$_{2.5}$, we project that the number of nonattainment sites will be reduced by 95 percent and the number of maintenance-only sites by 81 percent in 2014 compared to the 2012 base case. The average reduction in 24-hour PM$_{2.5}$ across the twenty 2012 nonattainment sites is 6.8 µg/m³ and the peak reduction at an individual nonattainment site is 11.7 µg/m³. Similarly large reductions are projected

at 24-hour PM$_{2.5}$ maintenance-only sites, as indicated in Table VIII.B–2.

The emission reductions in the Transport Rule will result in considerable progress toward attainment and maintenance at the 5 sites that remain as nonattainment and/or maintenance for the 24-hour PM$_{2.5}$ standard. On average for these 5 sites, the predicted amount of PM$_{2.5}$ reduction in 2014 is 64 percent of what is needed for these sites to attain and/or maintain the 24-hour PM$_{2.5}$ standard.

Thus, the SO$_2$ and NO$_X$ emission reductions which will result from the Transport Rule will greatly reduce the extent of PM$_{2.5}$ nonattainment and maintenance problems by 2014 and beyond. As described previously, these emission reductions are expected to substantially reduce the number of PM$_{2.5}$ nonattainment and/or maintenance sites in the East and make attainment easier for those counties that remain nonattainment by substantially lowering PM$_{2.5}$ concentrations in residual nonattainment sites. The emission reductions will also help those locations that may have maintenance problems.

Based on the 2012 base air quality modeling for ozone, 16 sites in the East are projected to be nonattainment or have problems maintaining the 1997 ozone standard. The summer NO$_X$ reductions are projected to lower 8-hour ozone concentration by 1.8 ppb, on average by 2014, at monitoring sites projected to be nonattainment and/or

have maintenance problems in the 2012 base case. We expect that the number of nonattainment sites will be reduced by 43 percent and the number of maintenance-only sites by 33 percent in 2014 compared to the 2012 base case. Thus, our modeling indicates that by 2014 the summer NO$_X$ emission reductions in this rule, coupled with other existing control programs, will lower ozone concentrations in the East and help bring areas closer to attainment for the 8-hour ozone NAAQS. As discussed in section III of this preamble, EPA plans to finalize its reconsideration of the 2008 revised ozone NAAQS soon, and these reductions will help areas achieve those revised NAAQS.

*C. Benefits*

1. Human Health Benefit Analysis

To estimate the human health benefits of the final Transport Rule, EPA used the BenMAP model to quantify the changes in PM$_{2.5}$ and ozone-related health impacts and monetized benefits based on changes in air quality. For context, it is important to note that the magnitude of the PM$_{2.5}$ benefits is largely driven by the concentration response function for premature mortality. Experts have advised EPA to consider a variety of assumptions, including estimates based both on empirical (epidemiological) studies and judgments elicited from scientific experts, to characterize the uncertainty in the relationship between PM$_{2.5}$

---

[93] ''Nonattainment'' is used to denote sites that are projected to have both nonattainment and maintenance problems.

concentrations and premature mortality. For this rule we cite two key empirical studies, one based on the American Cancer Society cohort study [94] and the other based on the extended Six Cities cohort study.[95]

The estimated benefits of this rule are substantial, particularly when viewed within the context of the total public health burden of $PM_{2.5}$ and ozone air pollution. A recent EPA analysis estimated that 2005 levels of $PM_{2.5}$ and ozone were responsible for between 130,000 and 320,000 $PM_{2.5}$-related and 4,700 ozone-related premature deaths, or about 6.1 percent of total deaths from all causes in the continental U.S. (using the lower end of the range for premature deaths).[96] In other words, 1 in 20 deaths

in the U.S. is attributable to $PM_{2.5}$ and ozone exposure. This same analysis attributed almost 200,000 non-fatal heart attacks, 90,000 hospital admissions due to respiratory or cardiovascular illness, 2.5 million cases of aggravated asthma among children, and many other human health impacts to exposure to these two air pollutants.

We estimate that $PM_{2.5}$ improvements under the Transport Rule will, starting in 2014, annually reduce between 13,000 and 34,000 $PM_{2.5}$-related premature deaths, 15,000 non-fatal heart attacks, 8,700 incidences of chronic bronchitis, 8,500 hospital admissions, and 400,000 cases of aggravated asthma while also reducing 10 million days of restricted activity due to respiratory illness and approximately 1.7 million work-loss days. We also estimate substantial health improvements for children from fewer cases of upper and lower respiratory illness and acute bronchitis.

Ozone health-related benefits are expected to occur during the summer

ozone season (usually ranging from May to September in the eastern U.S.). Based upon modeling for 2014, annual ozone related health benefits are expected to include between 27 and 120 fewer premature mortalities, 240 fewer hospital admissions for respiratory illnesses, 86 fewer emergency room admissions for asthma, 160,000 fewer days with restricted activity levels, and 51,000 fewer days where children are absent from school due to illnesses.

Table VIII.C–1 presents the primary estimates of annual reduced incidence of $PM_{2.5}$ and ozone-related health effects for the final rule based on 2014 air quality improvements. When adding the PM and ozone-related mortalities together, we find that the Transport Rule will yield between 13,000 and 34,000 fewer premature mortalities annually. By 2014, in combination with other federal and state air quality actions, the Transport Rule will address a substantial fraction of the total public health burden of $PM_{2.5}$ and ozone air pollution.

**BILLING CODE 6560–50–P**

[94] Pope *et al.,* 2002. "Lung Cancer, Cardiopulmonary Mortality, and Long-term Exposure to Fine Particulate Air Pollution." Journal of the American Medical Association. 287:1132–1141.

[95] Laden *et al.,* 2006. "Reduction in Fine Particulate Air Pollution and Mortality." American Journal of Respiratory and Critical Care Medicine. 173:667–672.

[96] Fann N, Lamson A, Wesson K, Risley D, Anenberg SC, Hubbell BJ. Estimating the National Public Health Burden Associated with Exposure to

Ambient $PM_{2.5}$ and Ozone. Risk Analysis; 2011 In Press.

## VIII.C-1 Estimated Annual Reductions in Incidences of Health Effects Based on 2014 Modeling[a]

| Health Effect | Within transport region | Beyond transport region | Total |
|---|---|---|---|
| **PM-Related endpoints** | | | |
| Premature Mortality | | | |
|     Pope et al. (2002) (age >30) | 13,000 (5,200—21,000) | 33 (5—60) | 13,000 (5,200—21,000) |
|     Laden et al. (2006) (age >25) | 34,000 (18,000—49,000) | 84 (31—140) | 34,000 (18,000—49,000) |
|     Infant (< 1 year) | 59 (-47—160) | 0.15 (-0.2—0.5) | 59 (-47—160) |
| Chronic Bronchitis | 8,700 (1,600—16,000) | 23 (-5—50) | 8,700 (1,600—16,000) |
| Non-fatal heart attacks (age > 18) | 15,000 (5,600—24,000) | 40 (7—72) | 15,000 (5,600—24,000) |
| Hospital admissions— respiratory (all ages) | 2,700 (1,300—4,000) | 5 (2—9) | 2,700 (1,300—4,000) |
| Hospital admissions— cardiovascular (age > 18) | 5,700 (4,200—6,600) | 15 (10—19) | 5,800 (4,200—6,600) |
| Emergency room visits for asthma (age < 18) | 9,800 (5,800—14,000) | 21 (7—36) | 9,800 (5,800—14,000) |
| Acute bronchitis (age 8-12) | 19,000 (-630—37,000) | 50 (-29—130) | 19,000 (-660—37,000) |
| Lower respiratory symptoms (age 7-14) | 240,000 (120,000—360,000) | 630 (130—1,100) | 240,000 (120,000—360,000) |
| Upper respiratory symptoms (asthmatics age 9-18) | 180,000 (57,000—310,000) | 480 (-25—980) | 180,000 (57,000—310,000) |
| Asthma exacerbation (asthmatics 6-18) | 400,000 (45,000— 1,100,000) | 1,100 (-250—2,900) | 400,000 (45,000— 1,100,000) |
| Lost work days (ages 18-65) | 1,700,000 (1,500,000— 1,900,000) | 4,300 (3,500—5,200) | 1,700,000 (1,500,000— 1,900,000) |
| Minor restricted-activity days (ages 18-65) | 10,000,000 (8,400,000— 11,000,000) | 26,000 (20,000— 32,000) | 10,000,000 (8,400,000— 12,000,000) |

### Ozone-related endpoints

Premature mortality

| | | | | |
|---|---|---|---|---|
| Multi-city and NMMAPS | Bell et al. (2004) (all ages) | 27 (11–42) | 0.1 (0.01–0.3) | 27 (11–42) |
| | Schwartz et al. (2005) (all ages) | 41 (17–64) | 0.2 (0.1–0.4) | 41 (17–65) |
| | Huang et al. (2005) (all ages) | 37 (17–57) | 0.2 (0.1–0.4) | 37 (17–57) |
| Meta-analyses | Ito et al. (2005) (all ages) | 120 (78–160) | 0.6 (0.3–0.9) | 120 (79–160) |
| | Bell et al. (2005) (all ages) | 87 (48–130) | 0.5 (0.2–0.8) | 87 (48–130) |
| | Levy et al. (2005) (all ages) | 120 (89–150) | 0.7 (0.4–0.9) | 120 (90–160) |
| Hospital admissions—respiratory causes (ages > 65) | | 160 (21–280) | 1.2 (0.1–2.3) | 160 (21–290) |
| Hospital admissions—respiratory causes (ages <2) | | 83 (43–120) | 0.5 (0.2–0.8) | 84 (43–120) |
| Emergency room visits for asthma (all ages) | | 86 (−2–260) | 0.4 (−0.2–1.4) | 86 (−2–260) |
| Minor restricted-activity days (ages 18-65) | | 160,000 (80,000–240,000) | 910 (240–1,600) | 160,000 (80,000–240,000) |
| School absence days | | 51,000 (22,000–73,000) | 290 (59–490) | 51,000 (22,000–74,000) |

[a] Values rounded to two significant figures. Benefits from reducing other criteria pollutants and hazardous air pollutants and ecosystem effects are not included here.
Source: EPA, 2011

2. Quantified and Monetized Visibility Benefits

Only a subset of the expected visibility benefits—those for Class I areas—are included in the monetary benefit estimates we project for this rule. We anticipate improvement in visibility in residential areas where people live, work, and recreate within the Transport Rule region for which we are currently unable to monetize benefits. For the Class I areas we estimate annual benefits of $4.1 billion beginning in 2014 for visibility improvements. The value of visibility benefits in areas where we are unable to monetize benefits could be substantial.

3. Benefits of Reducing GHG Emissions

When fully implemented in 2014, the Transport Rule will reduce emissions of $CO_2$ from electrical generating units by about 25 million metric tons annually. Using a "social cost of carbon" (SCC) estimate that accounts for the marginal dollar value (*i.e.*, cost) of climate-related damages resulting from $CO_2$ emissions, previous analyses, including the RIA for the Final Rulemaking to Establish Light-Duty Vehicle Greenhouse Gas Emissions Standards and Corporate Average Fuel Efficiency Standards, have found the total benefit of $CO_2$ reductions is substantial. The monetary value of these avoided damages also grows over time. Readers interested in learning more

about the calculation of the SCC metric should refer to the SCC TSD, Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 [Docket No. EPA–HQ–OAR–2009–0472].

4. Total Monetized Benefits

Table VIII.C–2 presents the estimated annual monetary value of reductions in the incidence of health and welfare effects. These estimates account for increases in the value of risk reduction over time. Total monetized benefits are driven primarily by the reduction in premature fatalities each year, which account for between 89 and 96 percent of total benefits.

**VIII.C-2 Estimated Annual Monetary Value of Reductions in Incidence of Health and Welfare Effects Based on 2014 Modeling (Billions of 2007$)[A]**

| Health Effect | Pollutant | Within Transport Rule Region | Beyond Transport Rule Region[B] | Total |
|---|---|---|---|---|
| Premature Mortality (Pope et al. 2002 PM mortality and Bell et al. 2004 ozone mortality estimates) | | | | |
| 3% discount rate | PM$_{2.5}$ & O$_3$ | $100 ($8.3–$320) | $0.3 ($0.01–$0.9) | $100 ($8.3–$320) |
| 7% discount rate | PM$_{2.5}$ & O$_3$ | $94 ($7.5–$280) | $0.2 ($0.01–$0.8) | $94 ($7.5–$290) |
| Premature Mortality (Laden et al. 2006 PM mortality and Levy et al. 2005 ozone mortality estimates) | | | | |
| 3% discount rate | PM$_{2.5}$ & O$_3$ | $270 ($23–$770) | $0.7 ($0.05–$2) | $270 ($23–$770) |
| 7% discount rate | PM$_{2.5}$ & O$_3$ | $240 ($21–$700) | $0.6 ($0.05–$1.8) | $240 ($21–$700) |
| Chronic Bronchitis | PM$_{2.5}$ | $4.2 ($0.2–$19) | $0.01 ($-0.003–$0.06) | $4.2 ($0.2–$19) |
| Non-fatal heart attacks | | | | |
| 3% discount rate | PM$_{2.5}$ | $1.7 ($0.3–$4.2) | $0.004 ($0.003–$0.01) | $1.7 ($0.3–$4.2) |
| 7% discount rate | PM$_{2.5}$ | $1.3 ($0.3–$3.1) | $0.004 ($0.002–$0.001) | $1.3 ($0.3–$3.1) |
| Hospital admissions—respiratory | PM$_{2.5}$ & O$_3$ | $0.04 ($0.02–$0.06) | --- | $0.04 ($0.02–$0.06) |
| Hospital admissions—cardiovascular | PM$_{2.5}$ | $0.09 ($0.01–$0.2) | --- | $0.09 ($0.01–$0.2) |
| Emergency room visits for asthma | PM$_{2.5}$ & O$_3$ | $0.003 ($0.002–$0.006) | --- | $0.003 ($0.002–$0.006) |
| Acute bronchitis | PM$_{2.5}$ | $0.008 (<$-0.01–$0.02)[c] | --- | $0.008 (<$-0.01–$0.02)[c] |
| Lower respiratory symptoms | PM$_{2.5}$ | $0.004 ($0.002–$0.009) | --- | $0.004 ($0.002–$0.009) |
| Upper respiratory symptoms | PM$_{2.5}$ | $0.005 (<$0.01–$0.014) | --- | $0.005 (<$0.01–$0.014) |
| Asthma exacerbation | PM$_{2.5}$ | $0.02 ($0.002–$0.08) | --- | $0.02 ($0.002–$0.08) |
| Lost work days | PM$_{2.5}$ | $0.2 ($0.17–$0.24) | --- | $0.2 ($0.17–$0.24) |
| School loss days | O$_3$ | $0.01 | --- | $0.01 |

| | | | | |
|---|---|---|---|---|
| | | ($0.004–$0.013) | | ($0.004–$0.013) |
| Minor restricted-activity days | $PM_{2.5}$ & $O_3$ | $0.7 ($0.3–$1) | --- | $0.7 ($0.3–$1) |
| Recreational visibility, Class I areas | $PM_{2.5}$ | | | $4.1 |
| Social cost of carbon (3% discount rate, 2014 value) | $CO_2$ | | | $0.6 |
| **Monetized total Benefits** (Pope et al. 2002 $PM_{2.5}$ mortality and Bell et al. 2004 ozone mortality estimates) | | | | |
| 3% discount rate | $PM_{2.5}$, $O_3$ | $110 ($8.8–$340) | $0.28 ($0.01–$0.9) | $120 ($14–$350) |
| 7% discount rate | $PM_{2.5}$, $O_3$ | $100 ($8–$310) | $0.25 ($0.01–$0.85) | $110 ($13–$320) |
| **Monetized total Benefits** (Laden et al. 2006 $PM_{2.5}$ mortality and Levy et al. 2005 ozone mortality estimates) | | | | |
| 3% discount rate | $PM_{2.5}$, $O_3$ | $270 ($24–$800) | $0.7 ($0.05–$2.1) | $280 ($29–$810) |
| 7% discount rate | $PM_{2.5}$, $O_3$ | $250 ($22–$720) | $0.6 ($0.04–$1.9) | $250 ($26–$730) |

[A] Values rounded to two significant figures. Benefits from reducing other criteria pollutants and hazardous air pollutants and ecosystem effects are not included here.
[B] Monetary value of endpoints marked with dashes are < $100,000.
[C] The negative estimates for certain endpoints are the result of the weak statistical power of the study used to calculate these health impacts and do not suggest that increases in air pollution exposure result in decreased health impacts.
Source: EPA, 2011

BILLING CODE 6560–50–C

**5. How do the benefits in 2012 compare to 2014?**

The magnitude of $SO_2$ emission reductions achieved under the rule is actually larger in 2012 than in 2014, due to substantial emission reductions expected to occur in the baseline (*i.e.,* unrelated to the Transport Rule) between those years. As a consequence, EPA expects correspondingly greater reductions in harmful effects to accrue in 2012 compared to 2014.

As presented in Table VIII.C–1, the Transport Rule is expected to prevent between 13,000 and 34,000 premature deaths annually from 2014 onward due to reductions in ambient $PM_{2.5}$ concentrations, which are most significantly impacted by $SO_2$ emission reductions. Based on EPA's analysis of power sector emission reductions under the Transport Rule, the decline in $SO_2$ in 2012 is 4 percent greater than the decline in $SO_2$ in 2014 in the states modeled. EPA therefore anticipates that the Transport Rule will deliver greater reductions in ambient $PM_{2.5}$ concentrations in 2012 and increased annual benefits to human health and welfare beyond those presented in this section.

**6. How do the benefits compare to the costs of this final rule?**

The estimated annual private costs to implement the emission reduction requirements of the final rule for the Transport Rule states are $1.85 billion in 2012 and $0.83 billion in 2014 (2007 $). These costs are the annual incremental electric generation production costs that are expected to occur with the Transport Rule. The EPA uses these costs as compliance cost estimates in developing cost-effectiveness estimates.

In estimating the net benefits of regulation, the appropriate cost measure is ''social costs.'' Social costs represent the welfare costs of the rule to society. These costs do not consider transfer payments (such as taxes) that are simply redistributions of wealth. The social costs of this rule are estimated to be approximately $0.81 billion in 2014 assuming either a 3 percent discount rate or a 7 percent discount rate. Thus, the annual net benefit (social benefits minus social costs) as shown in Table VIII.C–3 for the Transport Rule is approximately $120 to $280 billion or

$110 to $250 billion (3 percent and 7 percent discount rates, respectively) in 2014. Implementation of the rule is expected to provide society with a substantial net gain in social welfare based on economic efficiency criteria.

A listing of the benefit categories that could not be quantified or monetized in our benefit estimates is provided in Table VIII.C–4.

TABLE VIII.C–3—SUMMARY OF ANNUAL BENEFITS, COSTS, AND NET BENEFITS OF THE FINAL TRANSPORT RULE IN 2014

[Billions of 2007$] [a]

| Description | Transport Rule remedy (billions of 2007 $) | |
|---|---|---|
| | 3% discount rate | 7% discount rate |
| Social costs | $0.81 | $0.81. |
| Total monetized benefits [b] | $120 to $280 | $110 to $250. |
| Net benefits (benefits-costs) | $120 to $280 | $110 to $250. |

[a] All estimates are for 2014, and are rounded to two significant figures.
[b] The total monetized benefits reflect the human health benefits associated with reducing exposure to $PM_{2.5}$ and ozone and the welfare benefits associated with improved visibility in Class I areas. The reduction in premature mortalities account for over 90 percent of total monetized $PM_{2.5}$ and ozone benefits.

The annualized regional cost of the rule, as quantified here, is EPA's best assessment of the cost of implementing the Transport Rule. These costs are generated from rigorous economic modeling of changes in the power sector expected from the rule. This type of analysis, using IPM, has undergone peer review and been upheld in federal courts. The direct cost includes, but is not limited to, capital investments in pollution controls, operating expenses of the pollution controls, investments in new generating sources, and additional fuel expenditures. The EPA believes that these costs reflect, as closely as possible, the additional costs of the Transport Rule to industry. The relatively small cost associated with monitoring emissions, reporting, and recordkeeping for affected sources is not included in these annualized cost estimates, but EPA has done a separate analysis and estimated the cost to be about $26 million (see section XII.B, Paperwork Reduction Act). However, there may exist certain costs that EPA has not quantified in these estimates. These costs may include costs of transitioning to this rule, such as the costs associated with the retirement of smaller or less efficient EGUs, employment shifts as workers are retrained at the same company or re-employed elsewhere in the economy, and certain relatively small permitting costs associated with Title V that new program entrants face.

An optimization model was employed that assumes cost minimization. Costs may be understated if the regulated community chooses not to minimize its compliance costs in the same manner to comply with the rules. Although EPA has not quantified these costs, the Agency believes that they are small compared with the quantified costs of the program to the power sector.

However, EPA's experience and results of independent evaluation suggests that costs are likely to be lower by some degree (see RIA for details). The annualized cost estimates presented are the best and most accurate based upon available information. In a separate analysis, EPA estimates the indirect costs and impacts of higher electricity prices on the entire economy. These impacts are summarized in the RIA for this final rule.

Every benefit-cost analysis examining the potential effects of a change in environmental protection requirements is limited to some extent by data gaps, model capabilities (such as geographic coverage), and uncertainties in the underlying scientific and economic studies used to configure the benefit and cost models. Gaps in the scientific literature often result in the inability to estimate quantitative changes in health and environmental effects, or to assign economic values even to those health and environmental outcomes that can be quantified. While uncertainties in the underlying scientific and economics literatures (that may result in overestimation or underestimation of benefits) are discussed in detail in the economic analyses and its supporting documents and references, the key uncertainties which have a bearing on the results of the benefit-cost analysis of this rule include the following:

• EPA's inability to quantify potentially significant benefit categories;
• Uncertainties in population growth and baseline incidence rates;
• Uncertainties in projection of emission inventories and air quality into the future;
• Uncertainty in the estimated relationships of health and welfare effects to changes in pollutant concentrations, including the shape of the C–R function, the size of the effect estimates, and the relative toxicity of the many components of the PM mixture;
• Uncertainties in exposure estimation; and
• Uncertainties associated with the effect of potential future actions to limit emissions.

Despite these uncertainties, we believe the benefit-cost analysis provides a reasonable indication of the expected economic benefits of the rulemaking in future years under a set of reasonable assumptions. This approach calculates a mean value across value of a statistical life (VSL) estimates derived from 26 labor market and contingent valuation studies published between 1974 and 1991. The mean VSL across these studies is $6.3 million (2000$).[97] The benefits estimates generated for this rule are subject to a number of assumptions and uncertainties, which are discussed throughout the RIA document.

As Table VIII.C–2 indicates, total annual monetary benefits are driven primarily by the reduction in premature mortalities each year. Some key assumptions underlying the primary estimate for the premature mortality category include the following:

(1) EPA assumes inhalation of fine particles is causally associated with premature death at concentrations near those experienced by most Americans on a 24-hour basis. Plausible biological mechanisms for this effect have been hypothesized for the endpoints included in the primary analysis, and the weight of the available epidemiological evidence supports an assumption of causality.

---

[97] In this analysis, we adjust the VSL to account for a different currency year (2007$) and to account for income growth to 2014. After applying these adjustments to the $6.3 million value, the VSL is $8.7 million.

(2) EPA assumes all fine particles, regardless of their chemical composition, are equally potent in causing premature mortality. This is an important assumption, because the proportion of certain components in the PM mixture produced via precursors emitted from EGUs may differ significantly from direct PM released from automotive engines and other industrial sources, but no clear scientific grounds exist for supporting differential effects estimates by particle type.

(3) We assume that the health impact function for fine particles is linear down to the lowest air quality levels modeled in this analysis. Thus, the estimates include health benefits from reducing fine particles in areas with varied concentrations of $PM_{2.5}$, including both regions that are in attainment with the fine particle standard and those that do not meet the standard down to the lowest modeled concentrations.

The EPA recognizes the difficulties, assumptions, and inherent uncertainties in the overall enterprise. The analyses upon which the Transport Rule is based were selected from the peer-reviewed scientific literature. We used up-to-date assessment tools, and we believe the results are highly useful in assessing this rule.

There are a number of health and environmental effects that we were unable to quantify or monetize. A complete benefit-cost analysis of the Transport Rule requires consideration of all benefits and costs expected to result from the rule, not just those benefits and costs which could be expressed here in dollar terms. A listing of the benefit categories that were not quantified or monetized in our estimate are provided in Table VIII.C–4.

TABLE VIII.C–4—UNQUANTIFIED AND NON-MONETIZED EFFECTS OF THE TRANSPORT RULE

| Pollutant/Effect | Endpoint |
|---|---|
| PM: Health [a] | Low birth weight. |
| | Pulmonary function. |
| | Chronic respiratory diseases other than chronic bronchitis. |
| | Non-asthma respiratory emergency room visits. |
| | UVb exposure [b]. |
| PM: Welfare | Household soiling. |
| | Visibility in residential areas. |
| | Visibility in non-class I areas and class 1 areas in NW, NE, and Central regions. |
| | UVb exposure [b]. |
| | Global climate impacts [b]. |
| Ozone: Health | Chronic respiratory damage. |
| | Premature aging of the lungs. |
| | Non-asthma respiratory emergency room visits. |
| | UVb exposure [b]. |
| Ozone: Welfare | Yields for: |
| | —Commercial forests. |
| | —Fruits and vegetables, and |
| | —Other commercial and noncommercial crops. |
| | Damage to urban ornamental plants. |
| | Recreational demand from damaged forest aesthetics. |
| | Ecosystem functions. |
| | Increased exposure to UVb [b]. |
| | Climate impacts. |
| $NO_2$: Health | Respiratory hospital admissions. |
| | Respiratory emergency department visits. |
| | Asthma exacerbation. |
| | Acute respiratory symptoms. |
| | Premature mortality. |
| | Pulmonary function. |
| $NO_2$: Welfare | Commercial fishing and forestry from acidic deposition effects. |
| | Commercial fishing, agriculture and forestry from nutrient deposition effects. |
| | Recreation in terrestrial and estuarine ecosystems from nutrient deposition effects. |
| | Other ecosystem services and existence values for currently healthy ecosystems. |
| | Coastal eutrophication from nitrogen deposition effects. |
| $SO_2$: Health | Respiratory hospital admissions. |
| | Asthma emergency room visits. |
| | Asthma exacerbation. |
| | Acute respiratory symptoms. |
| | Premature mortality. |
| | Pulmonary function. |
| $SO_2$: Welfare | Commercial fishing and forestry from acidic deposition effects. |
| | Recreation in terrestrial and aquatic ecosystems from acid deposition effects. |
| | Increased mercury methylation. |
| Mercury: Health | Incidence of neurological disorders. |
| | Incidence of learning disabilities. |
| | Incidences in developmental delays. |
| Mercury: Welfare | Impact on birds and mammals (*e.g.*, reproductive effects). |
| | Impacts to commercial, subsistence and recreational fishing. |

Source: EPA.

[a] In addition to primary economic endpoints, there are a number of biological responses that have been associated with PM health effects including morphological changes and altered host defense mechanisms. The public health impact of these biological responses may be partly represented by our quantified endpoints.

[b] May result in benefits or disbenefits.

7. What are the unquantified and non-monetized benefits of the Transport Rule emission reductions?

Important benefits beyond the human health and welfare benefits quantified in this section and the RIA are expected to occur from this rule. These other benefits occur directly from $NO_X$ and $SO_2$ emission reductions and from co-benefits due to Transport Rule compliance. These benefits are listed in Table VIII.C–4. Some of the more important examples include: Reduced acidification and, in the case of $NO_X$, eutrophication of water bodies; possible reduced nitrate contamination of drinking water; and reduced acid and particulate deposition that causes damages to cultural monuments, as well as, soiling and other materials damage. To illustrate the important nature of benefit categories EPA is currently unable to monetize, we discuss four categories of public welfare and environmental impacts related to reductions in emissions required by the Transport Rule: Reduced acid deposition, reduced eutrophication of estuaries, reduced mercury methylation and deposition, and reduced vegetation impairment from ozone.

a. What are the benefits of reduced deposition of sulfur and nitrogen to aquatic, forest, and coastal ecosystems?

Atmospheric deposition of sulfur and nitrogen, often referred to as acid rain, occurs when emissions of $SO_2$ and $NO_X$ react in the atmosphere (with water, oxygen, and oxidants) to form various acidic compounds. These acidic compounds fall to earth in either a wet form (rain, snow, and fog) or a dry form (gases and particles). Prevailing winds can transport acidic compounds hundreds of miles, across state borders. These compounds are deposited onto terrestrial and aquatic ecosystems across the U.S., contributing to the problems of acidification.

(1) Acid Deposition and Acidification of Lakes and Streams

The extent of adverse effects of acid deposition on freshwater and forest ecosystems depends largely upon the ecosystem's ability to neutralize the acid. The neutralizing ability depends largely on the watershed's physical characteristics, such as geology, soils, and size. A key indicator of neutralizing ability is termed Acid Neutralizing Capacity (ANC). Higher ANC indicates greater ability to neutralize acidity. Acidic conditions occur more frequently during rainfall and snowmelt that cause high flows of water, and less commonly during low-flow conditions except

where chronic acidity conditions are severe. Biological effects are primarily attributable to a combination of low pH and high inorganic aluminum concentrations. Biological effects of episodes include reduced fish condition factor—changes in species composition and declines in aquatic species richness across multiple taxa, ecosystems and regions—as well as fish mortality. Waters that are sensitive to acidification tend to be located in small watersheds that have few alkaline minerals and shallow soils. Conversely, watersheds that contain alkaline minerals, such as limestone, tend to have waters with a high ANC. Areas especially sensitive to acidification include portions of the Northeast (particularly, the Adirondack and Catskill Mountains, portions of New England, and streams in the mid-Appalachian highlands) and southeastern streams. This regulatory action will decrease acid deposition within and downwind of the transport region and is likely to have positive effects on the health and productivity of aquatic ecosystems in the region.

(2) Acid Deposition and Forest Ecosystem Impacts

Acidifying deposition has altered major biogeochemical processes in the U.S. by increasing the nitrogen and sulfur content of soils, accelerating nitrate and sulfate leaching from soil to drainage waters, depleting base cations (especially calcium and magnesium) from soils, and increasing the mobility of aluminum. Inorganic aluminum is toxic to some tree roots. Plants affected by high levels of aluminum from the soil often have reduced root growth, which restricts the ability of the plant to take up water and nutrients, especially calcium.[98] These direct effects can, in turn, influence the response of these plants to climatic stresses such as droughts and cold temperatures. They can also influence the sensitivity of plants to other stresses, including insect pests and disease,[99] leading to increased mortality of canopy trees.

Both coniferous and deciduous forests throughout the eastern U.S. are experiencing gradual losses of base cation nutrients from the soil due to accelerated leaching from acidifying

deposition. This change in nutrient availability may reduce the quality of forest nutrition over the long term. Evidence suggests that red spruce and sugar maple in some areas in the eastern U.S. have experienced declining health because of this deposition. For red spruce *(Picea rubens)*, dieback or decline has been observed across high elevation landscapes of the northeastern U.S. and, to a lesser extent, the southeastern U.S. Acidifying deposition has been implicated as a causal factor.[100]

This regulatory action will decrease acid deposition within and downwind of the transport region and is likely to have positive effects on the health and productivity of forest systems in the region.

b. Coastal Ecosystems

Since 1990, a large amount of research has been conducted on the impact of nitrogen deposition to coastal waters. Nitrogen is often the limiting nutrient in coastal ecosystems. Increasing the levels of nitrogen in coastal waters can cause significant changes to those ecosystems. In recent decades, human activities have accelerated nitrogen nutrient inputs, causing excessive growth of algae and leading to degraded water quality and associated impairments of estuarine and coastal resources.

Atmospheric deposition of nitrogen is a significant source of nitrogen to many estuaries. The amount of nitrogen entering estuaries due to atmospheric deposition varies widely, depending on the size and location of the estuarine watershed and other sources of nitrogen in the watershed. A recent assessment of 141 estuaries nationwide by the National Oceanic and Atmospheric Administration (NOAA) concluded that 19 estuaries (13 percent) suffered from moderately high or high levels of eutrophication due to excessive inputs of both nitrogen and phosphorus, and a majority of these estuaries are located in the coastal area from North Carolina to Massachusetts.[101] For estuaries in the Mid-Atlantic region, the contribution of atmospheric distribution to total nitrogen loads is estimated to range between 10 percent and 58 percent.[102]

[98] U.S. Environmental Protection Agency (U.S. EPA). 2008. Integrated Science Assessment for Oxides of Nitrogen and Sulfur—Ecological Criteria National (Final Report). National

Center for Environmental Assessment, Research Triangle Park, NC. EPA/600/R–08/139. December. *http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm? deid=201485.*

[99] Joslin, J.D., Kelly, J.M., van Miegroet, H. 1992. Soil chemistry and nutrition of North American spruce-fir stands: evidence for recent change. Journal of Environmental Quality, 21, 12–30.

[100] DeHayes, D.H., P.G. Schaberg, G.J. Hawley, and G.R. Strimbeck. 1999. Acid rain impacts on calcium nutrition and forest health. Bioscience 49(10):789–800.

[101] National Oceanic and Atmospheric Administration (NOAA). 2007. Annual Commercial Landing Statistics. August. *http://www.st.nmfs. noaa.gov/st1/commercial/landings/annual_ landings.html.*

[102] Valigura, R.A., R.B. Alexander, M.S. Castro, T.P. Meyers, H.W. Paerl, P.E. Stacy, and R.E. Turner. 2001. Nitrogen Loading in Coastal Water

**Federal Register** / Vol. 76, No. 152 / Monday, August 8, 2011 / Rules and Regulations    **48317**

Eutrophication in estuaries is associated with a range of adverse ecological effects. The conceptual framework developed by NOAA emphasizes four main types of eutrophication effects: low dissolved oxygen (DO), harmful algal blooms (HABs), loss of submerged aquatic vegetation (SAV), and low water clarity. Low DO disrupts aquatic habitats, causing stress to fish and shellfish, which, in the short-term, can lead to episodic fish kills and, in the long-term, can damage overall growth in fish and shellfish populations. Low DO also degrades the aesthetic qualities of surface water. In addition to often being toxic to fish and shellfish, and leading to fish kills and aesthetic impairments of estuaries, HABs can, in some instances, also be harmful to human health. SAV provides critical habitat for many aquatic species in estuaries and, in some instances, can also protect shorelines by reducing wave strength. Therefore, declines in SAV due to nutrient enrichment are an important source of concern. Low water clarity is the result of accumulations of both algae and sediments in estuarine waters. In addition to contributing to declines in SAV, high levels of turbidity also degrade the aesthetic qualities of the estuarine environment.

Estuaries in the eastern United States are an important source of food production, in particular fish and shellfish production. The estuaries are capable of supporting large stocks of resident commercial species, and they serve as the breeding grounds and interim habitat for several migratory species.

This rule is anticipated to reduce nitrogen deposition within and downwind of the Transport Rule states. Thus, reductions in the levels of nitrogen deposition will have a positive impact upon current eutrophic conditions in estuaries and coastal areas in the region.

## c. Mercury Methylation and Deposition

Mercury is a highly neurotoxic contaminant that enters the food web as a methylated compound, methylmercury.[103] The contaminant is concentrated in higher trophic levels, including fish eaten by humans. Experimental evidence has established that only inconsequential amounts of methylmercury can be produced in the absence of sulfate. Current evidence indicates that in watersheds where mercury is present, increased $SO_X$ deposition very likely results in methylmercury accumulation in fish.[104][105] The $SO_2$ Integrated Science Assessment concluded that evidence is sufficient to infer a causal relationship between sulfur deposition and increased mercury methylation in wetlands and aquatic environments.

## d. Ozone Vegetation Effects

Ozone causes discernible injury to a wide array of vegetation.[106] In terms of forest productivity and ecosystem diversity, ozone may be the pollutant with the greatest potential for regional-scale forest impacts.[107] Studies have demonstrated repeatedly that ozone concentrations commonly observed in polluted areas can have substantial impacts on plant function.[108][109]

Assessing the impact of ground-level ozone on forests in the eastern United States involves understanding the risks to sensitive tree species from ambient ozone concentrations and accounting for the prevalence of those species within the forest. As a way to quantify the risks to particular plants from ground-level ozone, scientists have developed ozone-exposure/tree-response functions by exposing tree seedlings to different ozone levels and measuring reductions in growth as "biomass loss." Typically, seedlings are used because they are easy to manipulate and measure their growth loss from ozone pollution. The mechanisms of susceptibility to ozone within the leaves of seedlings and mature trees are identical, and the decreases predicted using the seedlings should be related to the decrease in overall plant fitness for mature trees, but the magnitude of the effect may be higher or lower depending on the tree species.[110] In areas where certain ozone-sensitive species dominate the forest community, the biomass loss from ozone can be significant. Significant biomass loss can be defined as a more than 2 percent annual biomass loss, which would cause long-term ecological harm, as the short-term negative effects on seedlings compound to affect long-term forest health.[111]

Urban ornamentals are an additional vegetation category likely to experience some degree of negative effects associated with exposure to ambient ozone levels. Because ozone causes visible foliar injury, the aesthetic value of ornamentals (such as petunia, geranium, and poinsettia) in urban landscapes would be reduced. Sensitive ornamental species would require more frequent replacement and/or increased maintenance (fertilizer or pesticide application) to maintain the desired appearance because of exposure to ambient ozone.[112] In addition, many businesses rely on healthy-looking vegetation for their livelihoods (*e.g.*, horticulturalists, landscapers, Christmas tree growers, farmers of leafy crops, etc.) and a variety of ornamental species have been listed as sensitive to ozone.[113]

## D. Costs and Employment Impacts

### 1. Transport Rule Costs and Employment Impacts

For the affected region, the projected annual private incremental costs of the rule to the power industry are $1.4 billion in 2012 and $0.8 billion in 2014. These costs represent the private compliance cost to the electric generating industry of reducing $NO_X$ and $SO_2$ emissions to meet the requirements set forth in the rule. Estimates are in 2007 dollars.

In estimating the net benefits of regulation, the appropriate cost measure

Bodies: An Atmospheric Perspective. Washington, DC: American Geophysical Union.

[103] U.S. Environmental Protection Agency (U.S. EPA). 2008. Integrated Science Assessment for Sulfur Oxides—Health Criteria (Final Report). National Center for Environmental Assessment, Research Triangle Park, NC. September. *http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=198843.*

[104] Drevnick, P.E., D.E. Canfield, P.R. Gorski, A.L.C. Shinneman, D.R. Engstrom, D.C.G. Muir, G.R. Smith, P.J. Garrison, L.B. Cleckner, J.P. Hurley, R.B. Noble, R.R. Otter, and J.T. Oris. 2007. Deposition and cycling of sulfur controls mercury accumulation in Isle Royale fish. Environmental Science and Technology 41(21):7266–7272.

[105] Munthe, J., R.A. Bodaly, B.A. Branfireun, C.T. Driscoll, C.C. Gilmour, R. Harris, M. Horvat, M. Lucotte, and O. Malm. 2007. Recovery of mercury-contaminated fisheries. AMBIO: A Journal of the Human Environment 36:33–44.

[106] Fox, S., Mickler, R.A. (Eds.). 1996. Impact of Air Pollutants on Southern Pine Forests. Ecological Studies. (Vol. 118, 513 pp.) New York: Springer-Verlag.

[107] U.S. Environmental Protection Agency (U.S. EPA). 2006. Air Quality Criteria for Ozone and Related Photochemical Oxidants (Final). EPA/600/R–05/004aF–cF. Washington, DC: U.S. EPA. February. *http://cfpub.epa.gov/ncea/CFM/recordisplay.cfm?deid=149923.*

[108] De Steiguer, J., Pye, J., Love, C. 1990. Air Pollution Damage to U.S. Forests. Journal of Forestry, 88(8), 17–22.

[109] Pye, J.M. 1988. Impact of ozone on the growth and yield of trees: A review. Journal of Environmental Quality, 17, 347–360.

[110] Chappelka, A.H., Samuelson, L.J. 1998. Ambient ozone effects on forest trees of the eastern United States: a review. New Phytologist, 139, 91–108.

[111] Heck, W.W. & Cowling, E.B. 1997. The need for a long term cumulative secondary ozone standard—an ecological perspective. Environmental Management, January, 23–33.

[112] U.S. Environmental Protection Agency (U.S. EPA). 2007. Review of the National Ambient Air Quality Standards for Ozone: Policy assessment of scientific and technical information. Staff paper. Office of Air Quality Planning and Standards. EPA–452/R–07–007a. July. *http://www.epa.gov/ttn/naaqs/standards/ozone/data/2007_07_ozone_staff_paper.pdf.*

[113] Abt Associates, Inc. 2005. U.S. EPA. Urban ornamental plants: sensitivity to ozone and potential economic losses. Memorandum to Bryan Hubbell and Zachary Pekar.

is "social costs." Social costs represent the welfare costs of the rule to society. These costs do not consider transfer payments (such as taxes) that are simply redistributions of wealth. The social costs of this rule are estimated to be approximately $0.8 billion annually in 2014. Overall, the economic impacts of the Transport Rule are modest in 2014, particularly in light of the large benefits ($120 to $280 billion annually at a 3 percent discount rate and $110 to $250 billion annually at a 7 percent discount rate) we expect, as shown in section XII.A of this preamble. Ultimately, we believe the electric power industry will pass along most of the costs of the rule to consumers, so that the costs of the rule will largely fall upon the consumers of electricity. For more information on electricity price changes that result from this final rule, refer to section XII.H (Statement of Energy Effects) later in this preamble.

For this rule, EPA analyzed the costs using the Integrated Planning Model (IPM). The IPM is a dynamic linear programming model that can be used to examine the economic impacts of air pollution control policies for $SO_2$ and $NO_X$ throughout the contiguous United States for the entire power system. Documentation for IPM can be found in the docket for this rulemaking or at *http://www.epa.gov/airmarkets/progsregs/epa-ipm/index.html.*

EPA also included an analysis of impacts of the final rule to industries outside of the electric power sector by using the Multi-Market Model. This model is a partial equilibrium economic impact model that includes 100 sectors that cover energy, manufacturing, and service applications and is designed to capture the short-run effects associated with an environmental regulation. This model was used to estimate economic impacts for the proposed MATS, and the promulgated industrial boilers major and area source standards and CISWI standard.

We use the Multi-Market Model to estimate the social costs of the final rule. Using this model, we estimate the social costs of the final rule to be approximately $0.8 billion (2007 dollars), which is close to the compliance costs. Documentation for the Multi-Market Model can be found in the RIA for this final rule.

Also note that as explained in section V.B (Baseline for Pollution Transport Analysis), the baseline used in this analysis assumes no CAIR. As explained in that section, EPA believes that this is the most appropriate baseline to use for purposes of determining whether an upwind state has an impact on a downwind monitoring site in violation of section 110(a)(2)(D).

Although a stand-alone analysis of employment impacts is not included in a standard cost-benefit analysis, the current economic climate has led to heightened concerns about potential job impacts. Such an analysis is of particular concern in the current economic climate as sustained periods of excess unemployment may introduce a wedge between observed (market) wages and the social cost of labor. In such conditions, the opportunity cost of labor required by regulated sectors to bring their facilities into compliance with an environmental regulation may be lower than it would be during a period of full employment (particularly if regulated industries employ otherwise idled labor to design, fabricate, or install the pollution control equipment required under this rule). For that reason, EPA also includes estimates of job impacts associated with the final rule. EPA presents an estimate of short-term employment opportunities as a result of increased demand for pollution control equipment. Overall, the results suggest that the final rule could support a net increase of roughly 2,250 job-years in direct employment in 2014.

The basic approach to estimate these employment impacts involved using projections from IPM from the final rule analysis such as the amount of capacity that will be retrofit with control technologies, for various energy market implications, along with data on labor and resource needs of new pollution

controls and labor productivity from secondary sources, to estimate employment impacts for 2014. This analysis was also applied for the proposed MATS. For more information, refer to Appendix D of the RIA for the final Transport Rule."

EPA relied on Morgenstern, et al. (2002), a study that is a basis for employment impacts estimated for the final industrial boiler major and area source rules and CISWI standard, and the proposed MATS. The Morgenstern study identifies three economic mechanisms by which pollution abatement activities can indirectly influence jobs: (1) Higher production costs raise market prices, higher prices reduce consumption, and employment within an industry falls ("demand effect"); (2) pollution abatement activities require additional labor services to produce the same level of output ("cost effect"); and (3) post regulation production technologies may be more or less labor intensive (*i.e.,* more/less labor is required per dollar of output) ("factor-shift effect").

Using plant-level Census information between the years 1979 and 1991, Morgenstern, et al., estimate the size of each effect for four polluting and regulated industries (petroleum, plastic material, pulp and paper, and steel). On average across the four industries, each additional $1 million spending on pollution abatement results in a small net increase of 1.6 jobs; however, the estimated effect is not statistically significant. As a result, the authors conclude that increases in pollution abatement expenditures do not necessarily cause economically significant employment changes. The conclusion is similar to Berman and Bui (2001), who found that increased air quality regulation in Los Angeles did not cause large employment changes. For more information, please refer to the RIA for this final rule.

The ranges of job effects calculated using the Morgenstern, et al., approach are listed in Table VIII.D–1.

TABLE VIII.D–1—RANGE OF JOB EFFECTS FOR THE ELECTRICITY SECTOR

[Estimates using Morgenstern, et al. (2002)]

| | Demand effect | Cost effect | Factor shift effect | Net effect |
|---|---|---|---|---|
| Change in Full-Time Jobs per Million Dollars of Environmental Expenditure [a]. | −3.56 | 2.42 | 2.68 | 1.55. |
| Standard Error | 2.03 | 0.83 | 1.35 | 2.24. |
| EPA Estimate for Final Rule [b] | + 200 to −3,000 | + 400 to 2,000 | 0 to 2,000 | −1,000 to + 3,000. |

[a] Expressed in 1987 dollars. *See* footnote a of Table 8–3 in the RIA for the inflation adjustment factor used in the analysis.
[b] According to the 2007 Economic Census, the electric power generation, transmission, and distribution sector (NAICS 2211) had approximately 510,000 paid employees.

EPA recognizes there may be other job effects which are not considered in the Morgenstern, et al., study. Although EPA has considered some economy-wide changes in industry output as shown earlier with the Multi-Market model, we do not have sufficient information to quantify other associated job effects associated with this rule.

2. End-Use Energy Efficiency

EPA believes that achievement of energy efficiency (EE) improvements in homes, buildings, and industry is an important component of achieving emission reductions from the power sector while minimizing associated compliance costs. By reducing electricity demand, energy efficiency avoids emissions of all pollutants associated with electricity generation, including emissions of $NO_X$ and $SO_2$ targeted by this final rule, and reduces the need for investments in EGU emission control technologies in order to meet emission reduction requirements. Moreover, energy efficiency can often be implemented at a lower cost than traditional control technologies.

EPA recognizes that significant opportunities remain for energy efficiency improvements in businesses, homes, and industry. However, there are several informational and market barriers that limit investment in cost-effective energy efficient practices. Several federal programs authorized under the CAA, including ENERGY STAR, are designed to address these barriers.

Congress, EPA, and states have all recognized the value of incorporating energy efficiency into air regulatory programs. Several allowance-based programs—including the Acid Rain Program, EPA's $NO_X$ Budget Trading program, and the Regional Greenhouse Gas Initiative (an effort of 10 states from the Northeast and Mid-Atlantic regions) – have provided mechanisms for rewarding energy efficiency through either the award of allowances, typically through the use of a fixed set-aside pool, or the use of revenues obtained through the auction of allowances. The emission caps established by these programs are unaffected by this approach. However, to the extent electricity demand reductions are realized, compliance costs are reduced. In addition to these allowance-based programs, EPA has also provided guidance [114] concerning the recognition, in SIPs, of emission reduction benefits of energy efficiency and has approved the inclusion of EE measures in individual SIPs.[115]

While all remedy options considered in the proposed rule would have lead to an increase in the relative cost-effectiveness of EE investments by internalizing environmental costs associated with emission of these pollutants, EPA took comment on whether EPA has authority, and whether it would be appropriate for EPA, to consider EE in developing the allowance allocation methodology and to consider other approaches for encouraging EE in the Transport Rule.

Some commenters suggested that EPA has authority to consider EE in developing the allocation methodology. Other commenters do not believe EPA has the authority to consider EE. Some commenters suggested that EPA should establish an EE set-aside provision. Other commenters suggested that EPA should allow, and help, states to establish EE set-asides as states transition from Transport Rule FIPs to SIPs. EPA believes that, while EE set-asides can be effective at encouraging incremental investments in EE, EE set-asides are more likely to be practically and effectively implemented at the state level. Establishing EE set-asides in the allowance allocation provisions in the final rule would not allow for the tailoring of the set-asides to the unique characteristics of individual states and would not build on the existing EE program delivery infrastructure that many states already possess. Instead of establishing EPA-administered EE set-asides in the final rule, EPA is clarifying that it allows and supports EE set-asides (including auction-based approaches) in abbreviated or full SIPs that states may submit, as provided in the final rule. Under this approach states have the ability to implement EE set-asides tailored to their state circumstances, if they choose. EPA anticipates providing additional information in the future for states on EE set-asides, as needed.[116]

As discussed elsewhere in this preamble, the final rule provides for submission and approval of abbreviated and full SIPs providing for continued state participation in the Transport Rule trading programs, and adopting alternative allowance allocation methodologies (which may include EE set-asides) to the allocation methodologies adopted in the FIPs. While the final rule establishes certain requirements for approval of any such alternative allocation methodology, the final rule provides states flexibility to create state-implemented EE set-asides.

## IX. Related Programs and the Transport Rule

### A. Transition From the Clean Air Interstate Rule

1. Key Differences Between the Transport Rule and CAIR

The Transport Rule replaces CAIR and its associated trading programs. There are a number of differences between implementation of the Transport Rule and implementation of CAIR. This section describes key implementation differences including differences in states covered, compliance deadlines, applicability, structure of the remedy, provisions for early reductions, and provisions for SIPs. The next section discusses the transition from CAIR to the Transport Rule.

*States covered.* The states covered by the Transport Rule differ somewhat from states covered by CAIR. This section summarizes differences in state coverage. EPA's approach to determine states covered by the Transport Rule is discussed in sections V and VI of this preamble.

The Transport Rule's $SO_2$ and annual $NO_X$ requirements apply to covered sources in the 23 states listed in Table III–1 in section III of this preamble. CAIR's $SO_2$ and annual $NO_X$ requirements applied to covered sources in 25 states. There are many states in common between the Transport Rule and CAIR $SO_2$ and annual $NO_X$ programs. The differences are summarized in Table IX.A–1.

---

[114] U.S. EPA. 2004. Guidance on State Implementation Plan (SIP) Credits for Emission Reductions from Electric-Sector Energy Efficiency and Renewable Energy Measures.

*http://www.epa.gov/ttn/oarpg/t1/memoranda/ereseerem_gd.pdf.*

[115] Metropolitan Washington Council of Governments developed a regional air quality plan for the eight-hour ozone standard for the DC Region nonattainment area that included an EE measure. The plan was adopted by Virginia, Maryland, and the District of Columbia and the respective ozone SIPs were approved by the EPA regions in 2007.

[116] Because the question of EPA authority to create EE set-asides in the FIPs would be best addressed in the context of actual FIP provisions for EPA-created EE set-asides and EPA is, for other reasons, not adopting such provisions in the final rule, EPA is not addressing in the final rule the question of EPA's authority.

TABLE IX.A–1—DIFFERENCES IN SO₂ AND ANNUAL NOₓ STATE COVERAGE BETWEEN THE TRANSPORT RULE AND CAIR

| State | Transport rule SO₂ and annual NOₓ programs | CAIR SO₂ and annual NOₓ programs |
|---|---|---|
| Kansas | Yes | No. |
| Minnesota | Yes | No. |
| Nebraska | Yes | No. |
| Delaware | No | Yes. |
| District of Columbia | No | Yes. |
| Florida | No | Yes. |
| Louisiana | No | Yes. |
| Mississippi | No | Yes. |

The Transport Rule's ozone-season NOₓ requirements apply to covered sources in the 20 states listed in Table III–1 in section III of this preamble, while CAIR's ozone-season NOₓ requirements applied to 26 states. There are many states in common between the Transport Rule and CAIR ozone-season NOₓ programs. The differences are summarized in Table IX.A–2.

TABLE IX.A–2—DIFFERENCES IN OZONE-SEASON NOₓ STATE COVERAGE BETWEEN THE TRANSPORT RULE AND CAIR

| State | Transport rule ozone-season NOₓ program | CAIR ozone-season NOₓ program |
|---|---|---|
| Georgia | Yes | No. |
| Texas | Yes | No. |
| Connecticut | No | Yes. |
| Delaware | No | Yes. |
| District of Columbia | No | Yes. |
| Iowa | No | Yes. |
| Massachusetts | No | Yes. |
| Michigan | No | Yes. |
| Missouri | No | Yes. |
| Wisconsin | No | Yes. |

In addition, EPA is proposing a supplemental notice to apply Transport Rule ozone-season requirements to the states of Iowa, Kansas, Michigan, Missouri, and Wisconsin, as discussed in section III of this preamble.

The transition from CAIR to the Transport Rule is discussed in section IX.A.2 and SIPs are discussed in section X of this preamble.

*Compliance deadlines.* The Transport Rule reduction requirements commence January 1, 2012 for annual NOₓ and SO₂ requirements and May 1, 2012 for ozone-season NOₓ requirements. More stringent SO₂ reduction requirements commence January 1, 2014 for Group 1 states.

In contrast, the first phase of CAIR NOₓ reductions commenced January 1, 2009 for annual NOₓ requirements and May 1, 2009 for ozone-season NOₓ requirements. On January 1, 2010, the first phase of CAIR SO₂ requirements commenced. However, in anticipation of CAIR, SO₂ reductions actually started as early as 2006 because of the incentive to reduce emissions and bank Title IV Acid Rain Program SO₂ allowances for use when their value would increase under CAIR in 2010 and later. The second phase of CAIR reductions would have (if not replaced by the Transport Rule) commenced January 1, 2015 for annual NOₓ and SO₂ requirements, and May 1, 2015 for ozone-season NOₓ requirements.

*Applicability.* Except for the changes to the states covered, the general applicability provisions of the final Transport Rule trading programs are essentially the same as the CAIR general applicability provisions, with a few exceptions.

First, the final Transport Rule does not allow any non-covered units to opt into the trading programs, for the reasons discussed in section VII.B of this preamble. In contrast, under CAIR, through SIPs, the states could elect to allow boilers, combustion turbines, and other combustion devices to opt into the CAIR trading programs under opt-in provisions specified by EPA.

Second, the Transport Rule FIPs' ozone-season NOₓ trading program applicability provisions do not cover NOₓ SIP Call small EGUs and non-EGUs that a number of CAIR states brought into the CAIR ozone-season NOₓ trading program. The Transport Rule does allow any state in the ozone-season NOₓ program, through SIPs, to expand the applicability of the Transport Rule ozone-season NOₓ trading program to cover small EGUs. However, the Transport Rule does not allow states to expand the applicability to cover NOₓ SIP Call non-EGUs, for the reasons discussed elsewhere in this preamble.

In contrast, in the CAIR trading programs, a NOₓ SIP Call state could expand the applicability of the CAIR ozone-season NOₓ trading program in the state in order to include all units subject to the NOₓ Budget Trading Program under the NOₓ SIP Call. A number of states chose to expand the CAIR ozone-season NOₓ trading program applicability in this way. The transition from CAIR to the Transport Rule is discussed in section IX.A.2 and SIPs are discussed in section X of this preamble.

*Structure of the remedy.* The CAIR FIPs (and CAIR model trading rules adopted by a number of states in their CAIR SIPs) implemented reductions through SO₂, annual NOₓ, and ozone-season NOₓ interstate emission trading programs covering primarily large EGUs. The owners and operators of a covered source could buy allowances

from or sell allowances to other covered sources (or other market participants) and were required to surrender allowances equal to the source's emissions for each compliance period. CAIR's trading programs did not impose limitations on the aggregate emissions from covered units within any covered state.

The Transport Rule FIPs will also achieve the required reductions through $SO_2$, annual $NO_X$, and ozone-season $NO_X$ interstate reductions. However, in contrast to CAIR and for the reasons discussed in section VII of this preamble, the Transport Rule FIPs include assurance provisions specifically designed to ensure that no state's emissions will exceed that state's emission budget plus the variability limit, *i.e.,* the state's assurance level.

Another difference in the remedy structure is in the design of the $SO_2$ trading programs. In CAIR all of the states required to reduce $SO_2$ emissions were grouped together in one $SO_2$ trading program with no restriction on the use of $SO_2$ allowances from any state in the program by any source in the program. In contrast, and for the reasons discussed in section VI of this preamble, the Transport Rule divides states required to reduce $SO_2$ emissions into two groups with emission reduction requirements of different stringency starting in 2014 ($SO_2$ Group 1, whose reduction requirements become more stringent starting in 2014, and $SO_2$ Group 2, whose reduction requirements in 2014 do not change). A covered source may only use for compliance— with the requirements to hold allowances covering emissions and, if applicable, to surrender allowances under the assurance provisions—an $SO_2$ allowance issued for the $SO_2$ Group in which the source's state is included. In other words, an $SO_2$ Group 1 source may only use a $SO_2$ Group 1 allowance for compliance, and likewise an $SO_2$ Group 2 source may only use a $SO_2$ Group 2 allowance for compliance.

*Provisions for early reductions.* CAIR included provisions for covered sources to make early reductions prior to the start of CAIR's $SO_2$ and $NO_X$ trading programs, bank emission allowances, and carry banked allowances into its trading programs. In contrast, the Transport Rule does not include provisions for covered sources to carry over any allowances (*i.e.,* Title IV $SO_2$ allowances or CAIR annual or ozone-season $NO_X$ allowances) into the Transport Rule trading programs. EPA's reasons for not allowing the use of banked Title IV $SO_2$ allowances or CAIR annual or ozone-season $NO_X$ allowances

in the Transport Rule trading programs are discussed in the next section.

*Provisions for SIPs.* The following is a summary of the key differences between the Transport Rule and CAIR provisions for SIPs. A more detailed discussion of Transport Rule SIPs is in section X of this preamble.

The SIP provisions in the Transport Rule and CAIR are very similar. Both include provisions that allow states to submit SIP revisions (referred to as full SIPs) that replace an applicable FIP trading program with a comparable SIP trading program that has certain limited differences from the FIP trading program. Similarly, both rules include provisions that allow states to submit SIP revisions (referred to as abbreviated SIPs) that may modify certain limited provisions in the FIP trading program, which remain in place. Inclusion of this provision in the Transport Rule allows a state to modify certain elements of a Transport Rule FIP trading program in order to better meet the needs of the state. Both the Transport Rule and CAIR allow full or abbreviated SIPs that involve one or more applicable FIP trading programs. However, there are a few differences.

In particular, under the Transport Rule, states may submit SIP revisions under which the state determines allocations for the applicable trading program using either full or abbreviated SIP revisions. States could submit similar revisions under CAIR. Under the Transport Rule, the state may use the same allocation methodology as that currently used in the Transport Rule FIP trading program or some other allocation methodology. However, the Transport Rule specifies certain requirements that must be met concerning, for example, the timing of such allocation determinations, and expressly allows allowance auctions to be used. CAIR did not include similar provisions. Further, the SIP submission deadlines, allocation submission, and allocation recordation dates are different between the Transport Rule and CAIR. The Transport Rule SIP submission deadlines and allocation recordation dates are discussed in section X of this preamble.

In addition, both the Transport Rule and CAIR include provisions that allow states to submit SIP revisions under which the state expands the general applicability provisions of the ozone-season $NO_X$ trading programs to cover certain units subject to the $NO_X$ SIP Call. However, for the reasons discussed elsewhere in this preamble, this flexibility is more limited in the Transport Rule than it was in CAIR.

While CAIR allowed states to adopt, through full or abbreviated SIPs, opt-in provisions, the Transport Rule does not allow for opt-in provisions. The reasons for this are discussed in section VII.B of this preamble.

Finally, neither full nor abbreviated SIPs can replace FIP provisions that apply to units in Indian country within the borders of a state. For example, the FIPs include, for states within whose borders Indian country is located, an Indian country new unit set-aside. For states not having Indian country within their borders, abbreviated SIPs are limited to replacing the allowance allocation provisions of the FIPs for the state involved and may replace some or all of those provisions. However, for states having Indian country within their borders, abbreviated SIPs cannot replace the FIP provisions for the Indian country new unit set-aside. Similarly, for states not having Indian country, full SIPs can replace an entire FIP, but, in doing so, can only change the allowance allocation provisions. For states having Indian country, full SIPs can replace the FIPs except for the Indian country new unit set-aside provisions, which will remain under the applicable FIPs, and, like the abbreviated SIPs, can only change the allowance allocation provisions that are replaced.

Details of the Transport Rule provisions for abbreviated and full SIP revisions, including deadlines for submission to EPA, are discussed in section X of this preamble.

2. Transition From the Clean Air Interstate Rule to the Transport Rule

The Transport Rule replaces CAIR and its associated trading programs. This section elaborates on areas of transition from CAIR to the Transport Rule.

a. Sunsetting of CAIR, CAIR SIPs, and CAIR FIPs

The proposal explained that, for control periods in 2012 and thereafter, CAIR, CAIR SIPs, and CAIR FIPs would be replaced entirely by the Transport Rule provisions. The proposal outlined implementation of the sunsetting of CAIR and CAIR FIPs, through revisions to CAIR, §§ 51.123 and 51.124, and the CAIR FIPs, §§ 52.35 and 52.36. For the control period in these years, the CAIR trading programs would not continue, and the Administrator would not carry out any of the functions established for the Administrator in the CAIR model trading rule, the CAIR FIPs, or any state trading programs approved under CAIR. Offset and automatic penalty provisions under CAIR would not apply to excess emissions for 2011 control periods.

Also discussed were the processes for modifying provisions in Part 52 reflecting state-specific CAIR SIP and CAIR FIP requirements, which would vary depending on whether a state has an approved CAIR SIP or a CAIR FIP. The proposal further explained that sources in some states covered by CAIR or the CAIR FIPs would not be subject to the Transport Rule and that to the extent that CAIR reductions were needed or relied upon to satisfy other SIP requirements, states might need to find alternative ways to satisfy requirements for their SIPs.

EPA is finalizing regulatory changes to sunset CAIR and the CAIR FIPs. The final rule revises the general CAIR and CAIR FIP provisions in Parts 51 and 52 applicable to all CAIR states. For control periods in 2012 and thereafter, the Administrator rescinds the determination that states must meet SIP requirements under CAIR, and the requirements of the CAIR FIPs are not applicable. Further, with regard to these control periods, the Administrator will no longer carry out any of the functions established for the Administrator in the CAIR model trading rule, the CAIR FIPs, or any state trading programs approved under CAIR with the exception of enforcing the provisions for the previous control periods, if necessary.

For the reasons discussed in the proposed rule preamble (75 FR 45337), CAIR allowances allocated for these control periods cannot be used in any CAIR trading program and, as discussed below, in any Transport Rule trading program. Specifically, for the reasons discussed in the proposed rule, offset and automatic allowance penalty provisions in the CAIR trading programs will not be applied to 2011 control period excess emissions, which will remain subject to discretionary civil penalties under CAA section 113. EPA still retains all enforcement options for excess emissions during the 2011 control period. CAIR allowances allocated for 2012 and thereafter are not usable in any CAIR or Transport Rule trading program. In light of that fact, in order to prevent any confusion by owners and operators and other members of the public concerning the status of such allowances, the final rule provides that, within 90 days after publication of the final Transport Rule, the Administrator will remove post-2011 CAIR annual $NO_X$ and ozone-season allowances from the Allowance Tracking System.

The CAIR $SO_2$ trading program, of course, uses Acid Rain allowances, which will remain in the Allowance Tracking System because they were created by CAA Title IV and continue to be usable in the Acid Rain Program.

The final rule also adopts the discussion in the proposed rule concerning state-specific Part 52 provisions concerning CAIR (75 FR 45337–38). With regard to Part 52 provisions reflecting EPA's adoption of ongoing CAIR FIPs for some individual states, the final rule revises the CAIR FIP provisions to make them inapplicable to control periods in 2012 and thereafter and to require the Administrator to remove from the Allowance Tracking System, CAIR allowances for these control periods. The final, state-specific CAIR FIP provisions in Part 52 essentially echo the language in the final, general CAIR provisions in Part 52 discussed above. In making the CAIR FIP provisions inapplicable to control periods in 2012 and thereafter, the final, state-specific provisions sunset the applicable CAIR FIP trading programs whether or not the CAIR FIPs were revised by approved, abbreviated CAIR SIPs. (Under CAIR, abbreviated CAIR SIPs were adopted by certain states so that states, rather than EPA, made $NO_X$ allowance allocations.) Consequently, states with approved, abbreviated CAIR SIPs will not need to revise their abbreviated CAIR SIPs in order to sunset the CAIR trading programs to which these abbreviated SIPs applied. Thus, although such abbreviated SIPs may remain in the state SIPs, they will have no force and effect, once the CAIR FIPs sunset.

With regard to Part 52 provisions reflecting EPA's approval of full CAIR SIPs submitted to EPA by many individual states, the Court's *North Carolina* decision essentially overrides these Agency approvals of individual CAIR SIPs. (Under CAIR, full CAIR SIPs were adopted by certain states to replace CAIR FIPs and continue participation through the CAIR SIPs in the CAIR trading programs.) The Court found CAIR to be illegal and only allowed it to remain in effect temporarily. For this reason, the CAIR SIPs though approved, can have no force and effect once CAIR is replaced by this rule. For this reason, although the proposed rule indicated that states would need to submit SIP revisions to, among other things, make the CAIR SIPs inapplicable to control periods after 2011, the final rule does not require states to take any actions to revise their full or abbreviated CAIR SIPs. For states covered by CAIR or CAIR FIPs that are not subject to the Transport Rule and have relied on CAIR reductions to satisfy other SIP requirements, EPA will discuss with states alternative ways to satisfy requirements for those SIP requirements, *e.g.,* through intrastate cap and trade programs that require the level of reductions on which the state has recently relied.

b. $NO_X$ SIP Call Units

The $NO_X$ Budget Trading program was used by states to reduce ozone-season $NO_X$ emissions from EGUs and large non-EGUs under $NO_X$ SIP Call requirements. The program started in 2003 and ended in 2008. Under CAIR, a state subject to the $NO_X$ SIP Call was allowed to expand the applicability of the CAIR ozone-season $NO_X$ trading program in the state in order to include all units subject to the $NO_X$ Budget Trading Program under the $NO_X$ SIP Call and thereby to continue to meet the state's $NO_X$ SIP Call requirements. Fourteen states chose to expand the CAIR ozone-season $NO_X$ applicability in this way, while six states chose not to expand the applicability and instead to meet their $NO_X$ SIP Call obligations in other ways. EPA proposed to not allow this expansion in applicability for the Transport Rule, primarily because these sources as a group did not actually reduce emissions for the $NO_X$ Budget Trading Program or CAIR. EPA took comment on the proposed approach.

Several commenters generally advocated allowing, at state discretion, all $NO_X$ Budget Trading Program units to be regulated under the Transport Rule ozone-season $NO_X$ trading program. Some also questioned how states would otherwise satisfy $NO_X$ SIP Call requirements for these units. Some commenters argued that some units did in fact make emission reductions in the $NO_X$ Budget Trading Program, but did not provide information on specific units.

The final rule provides states an option to expand the general applicability provisions of the Transport Rule ozone-season $NO_X$ trading program to cover small EGUs, but not other units in the $NO_X$ SIP Call. Specifically, consistent with the comments, EPA determined that it is appropriate to allow states to expand the applicability of the Transport Rule ozone-season $NO_X$ trading program to include units serving a generator with a nameplate capacity equal to or greater than 15 MWe producing electricity for sale. This will allow states with $NO_X$ SIP Call obligations to meet those requirements with respect to these small EGUs. These units can be brought into the program through abbreviated or full Transport Rule SIPs. However, if a state chooses to expand the general applicability provisions, the state Transport Rule ozone-season $NO_X$ budget cannot be increased. EPA believes that the level of

emissions from small EGUs is sufficiently small that the existing Transport Rule state budget can accommodate these units. This is consistent with the approach taken in the $NO_X$ Budget Trading Program, where the states that added these small EGUs did not increase their $NO_X$ SIP Call EGU budgets. This also removes concern (expressed in the proposed rule) that increasing state budgets in the Transport Rule ozone-season $NO_X$ trading program, as part of the expansion of the applicability provisions to include small EGUs, would jeopardize elimination of a state's significant contribution to nonattainment and interference with maintenance.

With regard to large non-EGUs that were included in the $NO_X$ Budget Trading Program (the remainder of the sources in the $NO_X$ Budget Trading Program), the final Transport Rule, like the proposed rule, does not allow expansion of the general applicability provisions to include such units. As explained in the proposed rule (75 FR 43340), while some of these units may have installed controls around the start of the $NO_X$ Budget Trading Program, EPA analysis shows that, as a group, these units did not collectively reduce emissions, their current emission rates are nearly identical to their emission rates before the start of the $NO_X$ Budget Trading Program, and their allocations are about twice their emissions, with the result that the excess allocations were sold to covered EGUs.[117] Moreover, EPA believes that there are little or no emission reductions available by non-EGUs at the cost thresholds used in the final rule and so no basis for developing non-EGUs state budgets reflecting the elimination of significant contribution to nonattainment and interference with maintenance. For these reasons, the final rule allows states to expand the ozone-season $NO_X$ trading program to cover small EGUs that were in the $NO_X$ Budget Trading Program, but not to cover large non-EGUs that were in that program. As explained in the proposed rule, if a state were to do so, emissions from these units could jeopardize elimination of the state's significant contribution to nonattainment and interference with maintenance. *See* 75 FR 45340. For states that relied on large

non-EGUs for emission reductions required by the $NO_X$ SIP Call, EPA will assist in identifying ways to ensure continued, future compliance with the $NO_X$ SIP Call requirements.

*c. Early Reduction Provisions*

Substantial emission reductions have occurred as a result of previous emission trading programs, under both Title IV and CAIR. This has lead to substantial "banks" of allowances (*i.e.,* holdings of unused allowances allocated for years before the programs sunset) in each of the CAIR programs. In the proposal, EPA requested comment on whether to allow banked CAIR allowances to be used in the Transport Rule trading programs. EPA recognizes the importance of continuity in emission trading programs as a general principle. However, for the reasons explained below, EPA has decided not to allow banked CAIR allowances to be used in any of the Transport Rule trading programs. (1) $SO_2$ Allowance Bank

The bank of Title IV allowances was more than 12 million tons at the end of 2009. This bank is the result of emission reductions under the Title IV Acid Rain Program. Under the CAIR $SO_2$ trading program, EPA allowed banked (as well as future year) Title IV allowances to be used in the CAIR $SO_2$ trading program— in lieu of being used in the Acid Rain Program—for compliance with the requirement to hold allowances covering $SO_2$ emissions. This approach encouraged early reductions for the CAIR $SO_2$ trading program, but was held to be unlawful in *North Carolina.*

In the proposed rule, EPA took comment on whether sources should be allowed to use banked Title IV allowances in the Transport Rule $SO_2$ program. EPA proposed to not allow the use of Title IV allowances either as the basis for allocating Transport Rule $SO_2$ allowances or directly for compliance with allowance-holding requirements, in part, because EPA was concerned that those approaches would be perceived as inconsistent with the requirements of CAA section 110(a)(2)(D)(i)(I) as interpreted by the Court in *North Carolina. See* 75 FR 45338–39.

A number of commenters advocated that EPA recognize Title IV allowance holdings in the Transport Rule, either by allowing full or limited carryover of the allowances or by allocating all or a portion of the Transport Rule $SO_2$ allowances based on Title IV allowance holdings. Other commenters agreed with EPA's assessment that allowing Title IV allowance carryover in the Transport Rule is inconsistent with *North Carolina* and that any linkage of

Transport Rule allocations with Title IV allowance holdings would carry unnecessary, significant legal risk. Therefore, for the reasons explained above and in the proposal, EPA has decided not to permit sources to use Title IV allowances for compliance with the Transport Rule $SO_2$ trading programs.

In addition, unlike CAIR, in the Transport Rule, EPA decided not to base allocation of Transport Rule $SO_2$ allowances on the specific distribution of existing Title IV allowances. Title IV allowances continue, of course, to be usable for compliance in the Acid Rain Program.[118]

(2) $NO_X$ Allowance Banks

In the proposed rule, EPA estimated that the CAIR ozone-season $NO_X$ bank would contain over 600,000 allowances and the CAIR annual $NO_X$ bank would contain about 720,000 allowances after completion of true-up of allowance holdings and emissions for 2011. EPA considered the alternatives of allowing or not allowing pre-2012 CAIR $NO_X$ allowances and CAIR ozone-season $NO_X$ allowances to be used in the Transport Rule $NO_X$ trading programs.

EPA also described and requested comment on several possible approaches for handling banked pre-2012 CAIR $NO_X$ allowances in the Transport Rule $NO_X$ trading programs and the pros and cons of each (75 FR 45339):

• Allow all such banked CAIR allowances to be brought into the Transport Rule $NO_X$ programs, make the assurance provisions effective starting in 2012, and rely on the assurance provisions to ensure that each state continues to eliminate all of its significant contribution to nonattainment and interference with maintenance;

• Allow only a limited amount of banked pre-2012 CAIR allowances to be brought into the Transport Rule $NO_X$ programs;

• Factor the bank into the calculation of state $NO_X$ budgets by reducing the state $NO_X$ budgets to take account of the banked pre-2012 CAIR allowances; and

• Do not allow the use of any banked pre-2012 CAIR allowances in the Transport Rule $NO_X$ programs.

EPA proposed the last of these approaches and requested comment on all of the described approaches or suggestions on other ways to handle banked pre-2012 CAIR allowances in the Transport Rule $NO_X$ programs.

---

[117] Although the proposed rule discussed the EPA analysis in the context of considering the treatment of both small EGUs and large non-EGUs from the $NO_X$ Budget Trading Program, the analysis actually addresses, and draws conclusions about emission reductions, emission rates, and allowance allocations concerning only large non-EGUs.

[118] The Title IV allowance bank is expected to be about 14 million tons at the beginning of 2012.

• Many commenters advocated allowing the carryover of CAIR NO$_X$ allowances to the Transport Rule. Reasons given included: preservation of early reduction investments; need for market continuity; increased flexibility during program start up and early years of the programs; preservation of the credibility of, and certainty under, trading approaches; and the lack of a prohibition in *North Carolina* of carryover of CAIR NO$_X$ allowances. Commenters also suggested that surrender ratios be used to limit the amount, and negative effects, of a carryover.

• Many other commenters were against allowing CAIR NO$_X$ allowance carryover into the Transport Rule. Reasons given included: unnecessary, significant legal risk; concerns about the efficacy of the Transport Rule if state budgets are supplemented by a carryover; and differences in the nature of the programs (the NO$_X$ Budget Trading Program, which addressed the 1-hour ozone NAAQS, and the CAIR ozone-season NO$_X$ trading program, which addressed the 1997 8-hour ozone NAAQS and was reversed in *North Carolina*) under which the allowances were banked, and the Transport Rule ozone-season NO$_X$ trading program, which addresses the 1997 8-hour ozone NAAQS.

For the reasons explained below, after evaluating all comments on this issue, EPA decided not to allow the use of CAIR NO$_X$ allowances in the Transport Rule NO$_X$ trading programs. EPA reevaluated the estimated size of the potential carryover (allowances that will remain unused in the CAIR programs at the end of 2011 compliance periods), taking into account 2010 emissions. EPA estimates that more than 440,000 CAIR ozone-season NO$_X$ allowances will remain and that more than 460,000 CAIR annual NO$_X$ allowances will remain at the end of the 2011 compliance periods. EPA considered whether to allow these CAIR ozone-season NO$_X$ and CAIR annual NO$_X$ allowances to be used in the Transport Rule NO$_X$ trading programs. The CAIR ozone-season NO$_X$ allowances expected to remain unused represent nearly three-quarters of aggregate state ozone-season NO$_X$ budgets [119] in a single year under the final Transport Rule. The allowances expected to remain unused in the annual NO$_X$ program represent

more than one-third of aggregate state annual NO$_X$ budgets in a single year under the Transport Rule. As discussed in the proposal, if these allowances were carried over in addition to the Transport Rule state budgets, EPA could not be assured that significant contribution to nonattainment or interference with maintenance would be eliminated. EPA therefore rejects any approach under which all banked CAIR NO$_X$ allowances would be added to the Transport Rule trading programs on top of each state's annual NO$_X$ and/or ozone-season NO$_X$ budgets.

In response to public comments, EPA considered whether the Transport Rule trading programs should allow some form of exchange of banked CAIR annual NO$_X$ and ozone-season allowances for new Transport Rule NO$_X$ allowances within each state's annual NO$_X$ and/or ozone-season budgets, respectively. However, EPA believes that this type of approach carries substantial legal and technical problems. First, the state-by-state distribution of CAIR NO$_X$ allowances resulted from the methodology applied by EPA in CAIR of using fuel factors to set the total amounts of allowance allocations in each state (*i.e.*, the state NO$_X$ budgets). The CAIR NO$_X$ allowance banks therefore are—at least in part—the result of this methodology, which was reversed in *North Carolina. See* North Carolina, 531 F.3d at 918–22. Thus, EPA did not use fuel factors in developing the Transport Rule state budgets. However, EPA is concerned that the distribution of some or all Transport Rule NO$_X$ allowances through exchanges of banked CAIR NO$_X$ allowances for Transport Rule NO$_X$ allowances would blur the bright line between the methodology used for setting budgets in the Transport Rule and the methodology used for setting budgets in CAIR that was rejected by the Court. At least to some extent, the parties that were advantaged under EPA's budget-setting methodology in CAIR would continue to have an advantage under the Transport Rule by receiving more Transport Rule NO$_X$ allowances. EPA therefore believes that allowing exchange of banked CAIR NO$_X$ allowances for Transport Rule NO$_X$ allowances carries significant legal risk.

Second, establishing a procedure for exchanging banked CAIR NO$_X$ allowances for Transport Rule NO$_X$ allowances within each state's budget would mean that Transport Rule NO$_X$ allowances could not be allocated until after completion of the process for determining compliance with allowance-holding requirements for 2011 in the CAIR NO$_X$ trading programs.

This process cannot begin until after the allowance transfer deadline for the 2011 control periods (*i.e.*, March 1, 2012 for the CAIR annual NO$_X$ program and November 1, 2011 for the CAIR ozone-season NO$_X$ program) and will not likely be completed until mid-2012. At that time, EPA could begin the procedure of implementing, state-by-state, the exchanges of the remaining CAIR NO$_X$ allowance banks held by parties (owners and operators, brokers, and other entities) for some or all of the allowances in the state NO$_X$ budgets for 2012. The portion of each state budget that would be used up by such exchanges would likely vary from state to state. The resulting delay, and uncertainty about the unit-by-unit amounts, of Transport Rule NO$_X$ allowance allocations for 2012 would undermine Transport Rule allowance market liquidity, significantly disrupt planning by owners and operators for compliance with allowance-holding requirements for the 2012 control periods, and likely impose increased compliance costs under the Transport Rule NO$_X$ trading programs or impact the ability to comply with the 2012 limits.

In light of the specific circumstances in this case and the above-described legal and technical problems that would result from a carryover of CAIR NO$_X$ allowances into the Transport Rule trading programs, the final rule does not allow any such carryover. EPA agrees that, as a general principle, it is desirable to provide continuity between sequential regulatory programs involving emission trading and thereby to ensure that allowances in the past program continue to have some value in the new program. Balancing the general desirability of providing program continuity against the potential negative consequences of a carryover in, and the specific circumstances of, this case, EPA concludes that the carryover of banked CAIR NO$_X$ allowances into the Transport Rule trading programs should not be allowed. EPA notes that, in this case, it signaled the possibility that it would take such an approach in order to provide markets with full information and avoid unnecessary disruptions. After CAIR was remanded by the Court in *North Carolina,* 550 F.3d 1176, in December 2008, EPA was concerned about the future status of CAIR NO$_X$ allowances and consequently advised the public—through a statement posted on the EPA Web site in March, 2009— that ''EPA's continued recording of CAIR NO$_X$ allowances does not guarantee or imply that any allowances will continue to be usable for

---

[119] This analysis is for all states identified to be contributing significantly to nonattainment or interfering with maintenance. When the analysis is conducted using the aggregate state budgets for only those states for which we are finalizing ozone season requirements in this rule, the percentage increases.

compliance after a replacement rule is finalized or that they will continue to have value in the future.'' [120] EPA believes its decision to disallow carryover of banked allowances here reflects the specific factors in this case and should not be treated as setting any precedent for the treatment, in any future trading programs, of any past trading program's banked allowances.

However, EPA notes that, under the CAIR ozone-season $NO_X$ trading program, where unused allowances were carried forward from the preceding $NO_X$ Budget Trading Program, and under the CAIR annual $NO_X$ trading program, where extra allowances (from the compliance supplement pool) were allocated for early reductions made during the $NO_X$ Budget Trading Program, the vast majority of allowance allocation decisions were made by the states administering these programs. Moreover, a number of states did not allocate CAIR allowances to their sources using fuel adjustment factors, whose use the Court rejected in *North Carolina* in connection with EPA's setting of state $NO_X$ emission budgets.

In light of the general desirability of providing continuity between state programs, states may want to address the CAIR $NO_X$ banks when developing, in SIP revisions, the Transport Rule allowance allocations for control periods after 2012. EPA encourages each state that wants to allocate Transport Rule $NO_X$ allowances through SIP revisions to consider using information on the CAIR $NO_X$ allowance banks that will remain after 2011. Any such allowance allocations, of course, must be within the respective state's $NO_X$ trading budget, and must be submitted to EPA within the applicable submission deadlines, established in the final rule for the control periods for which the allocations are made. The Agency intends to contact states concerning the desirability of holding a workshop to discuss issues related to state allowance allocations.

## B. Interactions With $NO_X$ SIP Call

The proposed rule explained that states covered by both the $NO_X$ SIP Call and the Transport Rule would be required to comply with the requirements of both rules and that the Transport Rule would not preempt or replace the requirements of the $NO_X$ SIP Call. Most, but not all, $NO_X$ SIP Call

states would be included in the Transport Rule. The proposed rule further explained that the Transport Rule ozone-season $NO_X$ trading program would achieve the emission reductions required by the $NO_X$ SIP Call from EGUs serving generators with a nameplate capacity greater than 25 MW and producing electricity for sale in most $NO_X$ SIP Call states. (This would not be the case, of course, for those $NO_X$ SIP Call states not covered by the Transport Rule.)

The $NO_X$ SIP Call states used the $NO_X$ Budget Trading Program to comply with the $NO_X$ SIP Call requirements for EGUs serving a generator with a nameplate capacity greater than 25 MW and large non-EGUs with a maximum rated heat input capacity greater than 250 mmBtu/ hour. (In some states, EGUs serving a generator with a nameplate capacity of 25 MW or less were also included in the $NO_X$ Budget Trading Program as a carryover from the Ozone Transport Commission $NO_X$ Budget Trading Program.) EPA stopped administering the $NO_X$ Budget Trading Program under the $NO_X$ SIP Call after the completion of compliance activities related to the 2008 ozone-season control period, and states used other mechanisms to comply with the $NO_X$ SIP Call requirements.

The proposal further explained that, if EPA promulgated a final rule that did not allow the expansion of the Transport Rule to $NO_X$ Budget Trading Program units, any state that allowed these units to participate in the CAIR ozone-season $NO_X$ trading program would need to submit a SIP revision to address the state's $NO_X$ SIP Call requirement for the reductions. The proposal also explained that states in the CAIR ozone-season $NO_X$ trading program or the $NO_X$ Budget Trading Program that would not be in the Transport Rule ozone-season $NO_X$ trading program would need to submit SIP revisions addressing the $NO_X$ SIP Call requirements for any emission reductions (by EGUs and non-EGUs) addressed in the $NO_X$ Budget Trading Program and not addressed in some other way. *See* 75 FR 45340–41.

As discussed elsewhere in this preamble, the final Transport Rule allows states to expand the general applicability provisions of the Transport Rule ozone-season $NO_X$ trading program to include small EGUs, which were included by some states in the $NO_X$ Budget Trading Program, but not for large non-EGUs, which were included in the $NO_X$ Budget Trading Program. This will allow states with $NO_X$ SIP Call obligations to meet those requirements with respect to small EGUs brought into

the Transport Rule trading program, but not with regard to large non-EGUs.

With the issuance of the final Transport Rule, $NO_X$ SIP Call requirements remain in place. *See* 40 CFR 51.121. EPA is not changing any of the $NO_X$ SIP Call requirements. The $NO_X$ SIP Call generally requires that states choosing to rely on large EGUs and large non-EGUs for meeting $NO_X$ SIP Call emission reduction requirements must establish a $NO_X$ mass emissions cap on each source and require Part 75, subpart H monitoring. As an alternative to source-by-source $NO_X$ mass emissions caps, a state may impose $NO_X$ emission rate limits on each source and use maximum operating capacity for estimating $NO_X$ mass emissions or may rely on other requirements that the state demonstrates to be equivalent to either the $NO_X$ mass emissions caps or the $NO_X$ emission rate limits that assume maximum capacity. Collectively, the caps or their alternatives cannot exceed the portion of the state budget for those sources. *See* 40 CFR 51.121(f)(2) and (i)(4). EPA will work with states to ensure that $NO_X$ SIP Call obligations continue to be met (*e.g.*, through intrastate cap and trade programs that require the level of reductions on which the state has recently relied).

## C. Interactions With Title IV Acid Rain Program

The final rule does not affect any Acid Rain Program requirements. Acid Rain Program requirements are established independently in Title IV of the CAA and are not replaced by the Transport Rule. Title IV sources that are subject to final Transport Rule provisions still need to continue to comply with all Acid Rain provisions. Title IV $SO_2$ and $NO_X$ requirements continue to apply independently of the Transport Rule provisions. For the reasons explained above, Title IV $SO_2$ allowances are not allowed to be used in the Transport Rule trading programs. Similarly, Transport Rule $SO_2$ allowances are not usable in the Acid Rain Program.

The final Transport Rule does not include any opt-in unit provisions in the FIPs and does not allow SIP revisions to include opt-in unit provisions in the Transport Rule trading programs. Consequently, no sources, including those that have opted in to the Acid Rain Program, can opt-in to the Transport Rule trading programs.

There will likely be changes to emissions at some Acid Rain units outside of the Transport Rule area as a result of the transition from CAIR to the Transport Rule. Namely, emissions at some non-Transport Rule Acid Rain

---

[120] *http://epa.gov/airmarkets/business/ cairallowancestatus.html.* EPA posed similar statements in the on-line systems for trading CAIR $NO_X$ allowances. *See* 40 CFR 96.102 and 96.302 (definitions of "CAIR $NO_X$ Allowance Tracking System" and "CAIR $NO_X$ Ozone Season Allowance Tracking System").

units in the states that border the Transport Rule states may increase because of potential load-shifting from units in Transport Rule states and because of a potential decrease in the Title IV allowance price. There is a discussion of possible emission increases in non-covered states in section VI.C of this preamble.

*D. Other State Implementation Plan Requirements*

In this final action, EPA has not conducted any technical analysis to determine whether compliance with the Transport Rule would satisfy RACT requirements for EGUs in any nonattainment areas, or Regional Haze BART-related requirements. For that reason, EPA is neither making determinations nor establishing any presumptions that compliance with the Transport Rule satisfies any RACT or BART-related requirements for EGUs. Based on analyses that states conduct on a case-by-case basis, states may be able to conclude that compliance with the Transport Rule for certain EGUs fulfills nonattainment area RACT requirements. EPA intends to undertake a separate analysis to determine if compliance with the Transport Rule would provide sufficient reductions to satisfy BART requirements for EGUs in accordance with Regional Haze Rule requirements for alternative BART compliance options as soon as practicable following promulgation of the Transport Rule.

## X. Transport Rule State Implementation Plans

EPA proposed (75 FR 45342) FIPs setting state-specific emission reduction requirements for each upwind state covered by the proposed Transport Rule and with respect to one or more of three air quality standards—the 1997 annual $PM_{2.5}$ NAAQS, the 2006 24-hour $PM_{2.5}$ NAAQS, and the 1997 ozone NAAQS. In CAIR, EPA allowed the states to replace the CAIR FIP with SIPs and provided substantial flexibility. In the proposed Transport Rule, EPA proposed to allow similar flexibility to states for addressing the CAA section 110(a)(2)(D)(i)(I) transport issues through a SIP. EPA proposed to allow a state to submit a SIP for the ozone requirements only, for the $PM_{2.5}$ requirements only, or for both the ozone and the $PM_{2.5}$ requirements with the specific quantity of emission reductions necessary for a state's SIP determined based on the state emission budgets provided in the final Transport Rule.

EPA received comments suggesting that if the proposal's remedy were finalized, EPA should allow states to replace the FIP allowance allocation

provisions in the proposed Transport Rule trading programs by state-developed allocation provisions. Commenters referenced the two alternatives provided to states in the CAIR trading programs where: (1) EPA adopted a rule and model trading regulations under which states that adopted, as state SIP trading programs, the model regulations (with only certain limited changes allowed, *e.g.,* in the allocation provisions) could participate in the EPA-administered CAIR trading programs; and (2) EPA adopted a rule allowing states to adopt in SIPs provisions replacing only certain provisions in the CAIR FIPs (*e.g.,* the allocation provisions) and to remain in the CAIR trading programs under the CAIR FIPs. Under both approaches, the covered states in the state participated in the CAIR trading programs, albeit with state-, rather than EPA-, determined allocations. Comments on the Transport Rule proposal supported these two types of approaches for allowing states to replace EPA allocations under the proposed Transport Rule trading programs by state allocations. EPA requested additional comment on this topic in the NODA published January 7, 2011 (76 FR 1109).

Two approaches with associated deadlines were explained in the NODA. Under the first approach, EPA would adopt new provisions, as part of the proposed Transport Rule FIP that would allow a state to submit a SIP (referred to as an abbreviated SIP) that would modify specified provisions of the proposed Transport Rule FIP trading programs. Specifically, the abbreviated SIP would substitute state allocation provisions for control periods in years after 2012, applicable to one or more of the proposed Transport Rule FIP trading programs that apply to the state. The NODA explained which specific provisions in the FIP could be replaced. If the state allocation provisions met certain requirements and the abbreviated SIP did not change any other provisions in the respective proposed Transport Rule FIP trading program, then EPA would approve the abbreviated SIP. In the substitute state allocation provisions, the state could allocate allowances to Transport Rule units (whether existing or new units) or other entities (such as renewable energy facilities) or could auction some or all of the allowances. The NODA went on to describe the requirements for EPA approval of an abbreviated SIP (76 FR 1119) including that the total amount of allowances allocated and auctioned each year could not exceed the applicable budget; allocations and

auction results would need to be reported to EPA by the permitting authority (usually the state) by particular dates prior to the applicable control period depending on whether allowances were going to existing or new sources; the reported allocations and auction results could not be changed; and no other provisions of the FIP would be changed.

Under the second approach, EPA would adopt a new rule that would provide that, if a state submitted a SIP (referred to as a full SIP) that adopted trading program regulations meeting certain requirements for control periods in years after 2012, then EPA would approve the full SIP as correcting the deficiency under CAA section 110(a)(2)(D)(i)(I) in the state's SIP that was the basis for issuance of the comparable proposed Transport Rule FIP. In the state allocation provisions, the state could allocate allowances to Transport Rule units (whether existing or new units, except for opt-in units) or other entities (such as renewable energy facilities) or could auction allowances. Upon EPA approval of a state's full SIP, the state's SIP-based trading program would be integrated with the comparable FIP-based Transport Rule trading program (whether or not modified by an abbreviated SIP) covering other states. Moreover, covered sources in the state could participate in the integrated trading program, and the allowances issued under the SIP-based state trading program would be interchangeable with the allowances issued in the comparable FIP-based Transport Rule trading program.

The NODA went on to describe the limited changes that states could make under the full SIP option. Only allocation provisions could be modified with the same requirements as for abbreviated SIPs, including, among other things, that the total amount of allowances allocated each year could not exceed the applicable budget and that allocations would need to be reported to EPA by the permitting authority (usually the state) by particular dates prior to the applicable control period depending on whether allowances were going to existing or new sources.

The NODA also discussed the option for states to submit SIPs using emission reduction approaches other than the proposed Transport Rule trading programs to correct the deficiency under CAA section 110(a)(2)(D)(i)(I) in the state's SIP. EPA would review on a case-by-case basis SIPs using such alternative approaches (76 FR 1120).

Suggested deadlines for abbreviated and full SIPs were given in tables in the

NODA (76 FR 1120). These deadlines generally required states to submit SIPs about 2 years ahead of a particular control period for which state allocations would apply in order to give EPA time to review and approve the SIP and record allowances.

Most commenters on the NODA supported state allocation options, within the preferred FIP remedy, that would replace FIP allocations with SIP-based state allocations.

In the final rule, EPA adopts, with some revisions, both of the approaches described in the January 7, 2011 NODA. Under the first approach, a state may submit an abbreviated SIP that modifies a final Transport Rule FIP trading program in only a limited way (*i.e.*, by replacing the allowance allocation provisions in §§ 97.411(a) and (b)(1) and 97.412(a) for the annual $NO_X$ trading program, §§ 97.511(a) and (b)(1) and 97.512(a) for the ozone-season $NO_X$ trading program, §§ 97.611(a) and (b)(1) and 97.612(a) for the $SO_2$ Group 1 trading program, and §§ 97.711(a) and (b)(1) and 97.712(a) for the $SO_2$ Group 2 trading program). In the state's replacement provisions, the state may allocate allowances to Transport Rule units (whether existing or new units)[121] or other entities (such as renewable energy facilities) or may auction allowances. Additionally, state SIPs can address one or all of the pollutants addressed by the FIPs. For $PM_{2.5}$, EPA is finalizing the flexibility for a state SIP to address either $SO_2$ or $NO_X$, or both. Further, if a state is required to make ozone-season and annual $NO_X$ reductions, the SIP could address either ozone-season or annual $NO_X$ emissions, or both. In other words, states can replace provisions in all FIPs that apply or some subset of the FIPs that apply to a particular state, and leave in place the FIPs for the requirements not addressed by a SIP.

Further, EPA will approve the abbreviated SIP only if the state replacement for the Transport Rule FIP allocation provisions meets certain requirements and the abbreviated SIP does not change any other provisions in the Transport Rule trading program. For EPA approval, the state allocation and, where applicable, auction provisions (and any accompanying definitions of terms applying only to terms as used in these provisions) must meet the following requirements. First, the provisions must provide that, for each year for which the state allocation and, where applicable, auction

provisions will apply, the total amount of control period (annual or ozone-season) allowances allocated and, where applicable, auctioned in accordance with these provisions cannot exceed the applicable state budget (less any applicable Indian country new unit set-aside, which will continue to be administered by EPA) for that year under the relevant Transport Rule FIP trading program.

Second, to the extent the state provisions provide for allocations for, or auctions open to, existing units, the provisions must require that the state or the permitting authority under title V of the CAA for the state submit to the Administrator final allocations and, if any auction is to be held, final auction results in accordance with a schedule of deadlines discussed below. To the extent the provisions provide for allocations for or auctions open to new units or any other entities, the provisions must require that the permitting authority submit to the Administrator final allocations and, if applicable, auction results by July 1 of the year of the control period for which the allowances will be distributed. The allocation and auction results must be final and cannot be subject to modification (*e.g.*, through an allowance surrender adjusting the allocation or auction results).

As noted above, the state's submission to the Administrator of allocations or auction results with regard to existing units must meet a specified schedule of deadlines. These submission deadlines reflect, and are necessarily coordinated with, the deadlines for recordation by the Administrator of allowance allocations and any auction results under the Transport Rule trading programs. The recordation deadlines, which are discussed in detail in section XI of this preamble, provide that the Administrator must record existing-unit allowance allocations and auction results by: July 1, 2013 for the applicable control periods in 2014 and 2015; July 1, 2014 for the applicable control periods in 2016 and 2017; July 1, 2015 for the applicable control periods in 2018 and 2019; and July 1, 2016 and July 1 of each year thereafter for the control period in the fourth year after the year of the applicable recordation deadline. In order to provide the Administrator 1 month to review the submissions of allocations and auction results to ensure that the submissions include sufficient information (*e.g.*, the correct identification for each unit involved) to record correctly the submitted allocations and auction results, the state or permitting authority must make these

submissions to the Administrator by: June 1, 2013 for the applicable control periods in 2014 and 2015; June 1, 2014 for the applicable control periods in 2016 and 2017; June 1, 2015 for the applicable control periods in 2018 and 2019; and June 1, 2016 and June 1 of each year thereafter for the applicable control period in the fourth year after the year of the applicable submission deadline.

Under the second approach, a state may submit a full SIP adopting a Transport Rule trading program that differs from the comparable Transport Rule FIP trading program only with regard to limited provisions of the FIP trading program. First, the full SIP may include new allocation or auction provisions instead of the Transport Rule FIP allowance allocation provisions other than those concerning the Indian country new unit set-aside. In the state allocation or auction provisions, the state may allocate allowances to Transport Rule units (whether existing or new units) or other entities (such as renewable energy facilities) or may auction allowances. EPA will approve the full SIP only if the state allocation or auction provisions (and any accompanying definitions of terms applying only to terms as used in these provisions) meet certain requirements. Second, the full SIP may substitute the name of the state for the term "State" as used in the FIP trading program provisions, provided that EPA determines that the substitutions are not substantive changes. Third, as discussed in more detail below, all references to units in Indian country, as used in the FIP trading program provisions, must be removed, and the full SIP cannot impose any requirements on units in Indian country within the borders of the state and may not include the Indian country set-aside provisions. Other than these allowed changes, all other provisions in the Transport Rule trading program in the full SIP must be the same as those in the Transport Rule FIP trading program with regard to non-Indian country units. For EPA approval, the state allocation provisions must meet the same requirements, as discussed above, that state allocation or auction provisions in an abbreviated SIP must meet.

A Transport Rule trading program adopted by a state in a full SIP, and approved by EPA, under the second approach will be fully integrated with the comparable Transport Rule FIP trading program (*i.e.*, the "TR $NO_X$ Annual Trading Program", "TR $NO_X$ Ozone Season Trading Program", "TR $SO_2$ Group 1 Trading Program", or "TR $SO_2$ Group 2 Trading Program"

---

[121] EPA is not finalizing opt-in provisions, so the reference to federal-only opt-in allocations in the NODA has been removed.

respectively) for other states. This will apply whether the comparable Transport Rule FIP program for other states was modified by an abbreviated SIP approved by EPA under the first approach or was not modified by such an abbreviated SIP. The integration of these three types of trading programs will be accomplished primarily through the definitions of the terms, ''TR NO$_X$ Annual allowance'', ''TR NO$_X$ Ozone Season allowance'', ''TR SO$_2$ Group 1 allowance'', and ''TR SO$_2$ Group 2 allowance'' in the full SIPs approved by EPA and the TR FIP trading programs (whether or not the programs were modified by abbreviated SIPs). ''TR NO$_X$ Annual allowance'' will be defined in the state and Transport Rule FIP trading programs as including allowances issued under any of the following trading programs: The comparable EPA-approved state Transport Rule trading programs; the comparable Transport Rule FIP trading programs with EPA-approved state allocation and auction provisions; and the Transport Rule FIP trading programs with EPA allocation provisions. Similarly, the definitions in the state and Transport Rule FIP trading programs of ''TR NO$_X$ Ozone Season allowance'', ''TR SO$_2$ Group 1 allowance'', and ''TR SO$_2$ Group 2 allowance'' respectively will include allowances issued under all three types of trading programs. As a result, allowances issued in one approved state Transport Rule trading program will be interchangeable with allowances issued in the comparable Transport Rule FIP trading program (whether or not modified by an abbreviated SIP), and all these allowances will be available for use for compliance with the allowance-holding requirements (to cover emissions and to meet assurance provision requirements) in all three types of trading programs.

The integration of state and the proposed Transport Rule FIP trading programs will also be reflected in the definitions of ''TR NO$_X$ Annual Trading Program,'' ''TR NO$_X$ Ozone Season Trading Program'', ''TR SO$_2$ Group 1 Trading Program'', and ''TR SO$_2$ Group 2 Trading Program''. Each of these definitions in the state Transport Rule and Transport Rule FIP trading programs will expressly encompass the comparable Transport Rule FIP trading programs (whether or not modified by an abbreviated SIP) and the comparable EPA-approved state full SIP trading program.

The final rule also sets deadlines for the submission of complete abbreviated and full SIPs. These deadlines are based on the first year for which the state wants to allocate or auction allowances,

reflect the above-discussed deadlines for the Administrator's recordation of allocations and auction results, and build in a 6-month period for EPA review, provision of notice and opportunity for public comment, and approval of the SIP revisions. This 6-month period is built into the final rule's SIP submission deadlines because that is the period EPA found was needed for reviewing, providing notice and comment for, and approving state trading program provisions in abbreviated and full SIPs under CAIR. As a result, the final rule requires that complete abbreviated and full SIPs must be submitted to the Administrator by: December 1, 2012 in order to govern allowance allocation and auction for control periods in 2014 and 2015; December 1, 2013 in order to govern control periods in 2016 and 2017; December 1, 2014 in order to govern allowance allocation and auction for control periods in 2018 and 2019; and December 1, 2015 and by December 1 of any year thereafter in order to govern allowance allocation and auction for control periods in the fifth year after such submission deadline.

EPA notes that, in cases where a state that has Indian country within its borders submits, and EPA approves, a full SIP, the comparable FIP will not be entirely replaced. In such cases, the FIP will continue to be in place with regard to the Transport Rule trading program provisions that concern units in Indian country, and the full SIP will encompass all other provisions of the trading program. Specifically, to the extent Transport Rule trading program provisions reference and apply to Indian country units (including, for example, references in the applicability provisions and the Indian country new unit set-aside provisions), those provisions, as they apply to Indian country units, will remain in the FIP. The full SIP will include those provisions only as they apply to non-Indian country units.

As a practical matter, this means that the Indian country new unit set-aside provisions, which apply exclusively to Indian country new units, will remain entirely in the FIP. Further, other trading program provisions that reference both non-Indian country units and Indian country units (such as the applicability provisions) will remain in the FIP to the extent of their application to Indian country units and will be included in the full SIP to the extent of their application to non-Indian country units.

However, EPA notes that the assurance provisions in each Transport Rule trading program require

calculations using the entire state budget, including any portion of the budget that may be allocated to Indian country new units. Further, EPA notes that currently no new units are planned or anticipated to be located in Indian country. Under these circumstances, EPA will handle the assurance provisions as follows. The full SIP for a state having Indian country will initially include the assurance provisions, as set forth in the FIP, except with removal of any references to sources and units in Indian country. The FIP will initially not include the assurance provisions, which will be fully effective and enforceable under the full SIP. In the event that any new unit is located in Indian country in the state, EPA intends to modify its approval of the full SIP to take back the assurance provisions in order to apply, in the FIP, the assurance provisions to both Indian country and non-Indian country units.

This final rule not only allows a state to choose to submit an abbreviated or a full SIP; it also allows a state to choose to submit either form of SIP to replace any or all of the FIPs in this rule as they apply to a particular state. By promulgating these Transport Rule FIPs, EPA in no way affects the right of a state to submit, for review and approval, a SIP that replaces the federal requirements of the FIP with state requirements that do not involve state participation in the Transport Rule trading programs. In order to replace the FIP in a state, the state's SIP taking an approach other than participation in Transport Rule trading programs must provide adequate provisions to prohibit NO$_X$ and SO$_2$ emissions that are determined in the Transport Rule to contribute significantly to nonattainment or interfere with maintenance in another state or states. EPA will review such a SIP on a case-by-case basis. The Transport Rule FIPs remain fully in place in each covered state until a state's SIP is submitted and approved by EPA to revise or replace a FIP.

In response to numerous comments urging EPA to allow states to determine allowance allocations as soon as possible, EPA has developed a SIP revision procedure that applies to 2013 allowance allocations only. In developing this procedure, EPA is balancing the desire to allow states the flexibility to tailor allowance allocations to the specific needs and situations in a particular state with the need to provide certainty to source owners and operators by having allowances recorded sufficiently ahead of the control period for which the allocations are made in order to facilitate owners'

and operators' efforts to optimize their compliance strategies. This final rule allows states to make 2013 allowance allocations through the use of a SIP revision that is narrower in scope than the other SIP revisions states can use to replace the FIPs and/or to make allocation decisions for 2014 and beyond. For 2013 allocations, the scope of the SIP revision is limited to allocations made to units that commence commercial operation before January 1, 2010 and provided in the form of a list of those units and their corresponding allocations for 2013. Additionally, this particular SIP revision may allocate only the portions of the state budgets set forth in Tables X–1 through X–3, *i.e.*, each state budget minus the new unit set-aside and the Indian country new unit set-aside.

In developing this procedure, EPA set deadlines for submissions of the SIP revisions for 2013 allocations and for recordation of the allocations that balanced the need to record allowances sufficiently ahead of the control period with the desire to allow state flexibility for 2013. EPA set deadlines that will allow sufficient time for EPA to review and approve these SIP revisions, taking into account that EPA approval must be final and effective before the 2013 allocations can be recorded and the allowances are available for trading. In order to ensure that EPA review and approval (which must include public notice and opportunity for comment) can be completed in time, the final rule necessarily limits the allowed scope of the SIP revisions for 2013 allocations, as set forth in the requirements discussed below, and thereby limits the issues that must be considered and addressed in the review and approval process. Further, the final rule prescribes the form in which the state allocations for 2013 must be provided to EPA in order to facilitate rapid recordation of the allocations upon their approval.

States, along with their sources, will need to weigh the trade-offs of a relatively short period of recording before the control period for which the allocation is made (about 6 months) with the desire to have state allocations in 2013, when deciding whether to pursue a SIP revision for 2013 allocations. States may choose to submit a SIP revision for one or more of the trading programs. In other words, state allocations for 2013 could apply in one trading program while 2013 FIP allocations apply in another.

States can make 2013 allowance allocations provided the state meets certain requirements.

• By the date 70 days after publication of the final rule in the **Federal Register**, a state must provide notification to EPA if the state intends to submit state allocations for 2013. The notification must be in a format prescribed by the Administrator and submitted electronically.

• By April 1, 2012, the state must submit a SIP revision to EPA that:

○ Allocates to existing units [122] only, provides a list of the units and their

state allocations to EPA electronically and in a format prescribed by EPA, and does not provide for any change in the units and allocations on the list and in any allocation previously determined and recorded by the Administrator;

○ Allocates a total amount of allowances for 2013 that does not exceed the applicable amount in Tables X–1 through X–3 for each trading program that applies in that particular state; and

○ Provides for no set-asides and does not alter the new unit set-asides, the Indian country new unit set-asides, and any aspect of the FIP rules other than the existing-unit allocations for 2013.

If EPA does not receive notification from a state by the date 70 days after publication of the final rule in the **Federal Register**, EPA will record FIP allocations for 2012 and 2013 as scheduled (by the date 90 days after publication of the final rule). If EPA receives timely notification from a state, EPA will record FIP allocations for 2012 only and wait to record 2013 allocations. If the state provides a timely (not later than April 1, 2012) SIP revision meeting all the above-described requirements and EPA approves the SIP revision by October 1, 2012, EPA will record state-determined allocations for 2013 by October 1, 2012. Otherwise, EPA will record the EPA-determined allocations for 2013.

**BILLING CODE 6560–50–P**

---

[122] Existing unit means a unit that commenced commercial operation before January 1, 2010.

**Table X-1 Portion of the Annual NO$_X$ Trading Budget Available for State Allocation in 2013**

| State | Portion of the NO$_X$ Annual Trading Budget Available for State Allocation in 2013 |
|---|---|
| Alabama | 71,237 |
| Georgia | 60,770 |
| Illinois | 44,042 |
| Indiana | 106,434 |
| Iowa | 37,568 |
| Kansas | 30,100 |
| Kentucky | 81,683 |
| Maryland | 16,300 |
| Michigan | 58,989 |
| Minnesota | 28,981 |
| Missouri | 50,803 |
| Nebraska | 24,589 |
| New Jersey | 7,121 |
| New York | 17,017 |
| North Carolina | 47,552 |
| Ohio | 90,849 |
| Pennsylvania | 117,586 |
| South Carolina | 31,848 |
| Tennessee | 34,989 |
| Texas | 129,587 |
| Virginia | 31,580 |
| West Virginia | 56,498 |
| Wisconsin | 29,730 |

**Table X-2 Portion of the Ozone-Season NO$_X$ Trading Budget Available for State Allocation in 2013**

| State | Portion of the Ozone Season NO$_X$ Trading Budget Available for State Allocation in 2013 |
|---|---|
| Alabama | 31,111 |
| Arkansas | 14,736 |
| Florida | 27,268 |
| Georgia | 27,385 |
| Illinois | 19,511 |
| Indiana | 45,470 |
| Kentucky | 34,720 |
| Louisiana | 13,029 |
| Maryland | 7,035 |
| Mississippi | 9,957 |
| New Jersey | 3,314 |
| New York | 8,081 |
| North Carolina | 20,838 |
| Ohio | 39,262 |
| Pennsylvania | 51,157 |
| South Carolina | 13,631 |
| Tennessee | 14,610 |
| Texas | 61,152 |
| Virginia | 13,729 |
| West Virginia | 24,019 |

Table X-3 Portion of the $SO_2$ Group 1 or Group 2 Trading Budget Available for State Allocation in 2013

| State | Portion of the $SO_2$ Group 1 or Group 2 Trading Budget Available for State Allocation in 2013 |
|---|---|
| Alabama | 211,712 |
| Georgia | 155,356 |
| Illinois | 223,145 |
| Indiana | 276,861 |
| Iowa | 104,943 |
| Kansas | 40,697 |
| Kentucky | 218,702 |
| Maryland | 29,518 |
| Michigan | 224,717 |
| Minnesota | 41,141 |
| Missouri | 203,317 |
| Nebraska | 62,450 |
| New Jersey | 5,463 |
| New York | 26,778 |
| North Carolina | 125,931 |
| Ohio | 304,025 |
| Pennsylvania | 273,078 |
| South Carolina | 86,848 |
| Tennessee | 145,187 |
| Texas | 231,756 |
| Virginia | 67,987 |
| West Virginia | 135,942 |
| Wisconsin | 75,506 |

BILLING CODE 6560–50–C

EPA will work with states that wish to submit full SIPs or abbreviated SIPs to ensure a smooth integration with the relevant Transport Rule trading programs. The Agency intends to provide information and tools to assist states in their rulemaking efforts, including electronic versions of the Transport Rule trading rules and EPA will work with states that wish to submit full SIPs or abbreviated SIPs to ensure a smooth integration with the relevant Transport Rule trading programs. The Agency intends to provide information and tools to assist states in their rulemaking efforts, including electronic versions of the Transport Rule trading rules and other products states feel may be helpful.

States that submit approvable full SIPs or abbreviated SIPs to implement one or all of the Transport Rule trading programs are not required to include an additional technical demonstration relating to elimination of emissions that contribute significantly to nonattainment or contribute to maintenance in downwind areas.

**XI. Structure and Key Elements of Transport Rule Air Quality-Assured Trading Program Rules**

In order to make the final FIP trading program rules as simple and consistent as possible, EPA designed them so that the final rules (like the proposed rules) for each of the trading programs (*i.e.,* the "TR NO$_X$ Annual Trading Program", "TR NO$_X$ Ozone Season Trading Program", "TR SO$_2$ Group 1 Trading Program", and "TR SO$_2$ Group 2 Trading Program") are parallel in structure and contain the same basic elements. For example, the rules for the Transport Rule annual NO$_X$, ozone-season NO$_X$, SO$_2$ Group 1, and SO$_2$ Group 2 trading programs are located, respectively, in subparts AAAAA (§§ 97.401, *et seq.*), BBBBB (§§ 97.501, *et seq.*), CCCCC (§§ 97.601, *et seq.*), and DDDDD (§§ 97.701, *et seq.*) of Part 97 in Title 40 of the Code of Federal Regulations. Moreover, the order of the specific provisions for each trading program is the same, and the provisions have parallel numbering. The key elements of the final Transport Rule trading program rules are as follows.

(1) General Provisions

(i) §§ 97.402 and 97.403, 97.502 and 97.503, 97.602 and 97.603, and 97.702 and 97.703—Definitions and Abbreviations

Most of the definitions in the final Transport Rule trading program rules are essentially the same as in the proposed rules and for each of the Transport Rule trading programs (except where necessary to reflect the different pollutants ($NO_X$ and $SO_2$), control periods (for annual and ozone-season $NO_X$, and for annual $SO_2$), and geographic coverage involved in the trading programs). Moreover, many of the definitions in the final rules that are essentially the same as in the proposed rule are also essentially the same as in prior EPA-administered trading programs. However, as discussed in more detail below, some of the definitions in the final rules clarify, or differ from, the definitions in the proposed rule.

As noted, several definitions in the final rules are essentially the same as those both in the proposed rules and in prior EPA-administered trading programs. Examples include the definitions of "source," "allowance transfer deadline," "owner," "operator", "Allowance Management System" (used instead of the term "Allowance Tracking System"), and "continuous emission monitoring system."

One example of a definition in the final rules that is the same as in the proposed rule, but that clarifies the definition used in prior trading programs is the definition of "fossil fuel." In the final rule, the term "fossil fuel" is defined in general as including natural gas, petroleum, coal, or any form of fuel derived from such material, regardless of the purpose for which such material is derived. For example, with regard to consumer products that are made of materials derived from natural gas, petroleum, or coal, are used by consumers, and then are used as fuel, these materials in the consumer products qualify as fossil fuel. The definition in the final rules also includes language establishing a narrower meaning of "fossil fuel" that is not generally applicable, but rather is applicable only for purposes of applying the limitation on fossil-fuel use under the solid waste incineration unit exemption (which is discussed elsewhere in this preamble). This latter portion of the "fossil fuel" definition makes explicit an interpretation that EPA adopted in CAIR that—solely for purposes of applying the fossil-fuel use limitation in that exemption—the term "fossil fuel" is limited to natural gas,

petroleum, coal, or any form of fuel derived from such material "for the purpose of creating useful heat." For example, applying this narrower meaning, consumer products made from natural gas, petroleum, or coal are not fossil fuel, for purposes of determining qualification under the fossil-fuel use limitation, because the products (e.g., tires) were derived from natural gas, petroleum, or coal in order to meet certain consumer needs (e.g., to meet transportation needs), not in order to create fuel (i.e., material that would be combusted to produce useful heat).

As noted above, some of definitions in the final rules clarify definitions in the proposed rules. The definitions of "allowable $NO_X$ emission rate" and "allowable $SO_2$ emission rate" are clarified by explaining that such a rate is the most stringent state or federal emission rate limitation, expressed in lb/MWhr or, if originally expressed in lb/mmBtu, converted to lb/MWhr by multiplying it by the unit's heat rate in mmBtu/MWhr. This clarification ensures consistency from unit to unit in determining a unit's allowable rate.

By further example, while the proposed rules used the same definition of "commence commercial operation" as in prior EPA-administered trading programs, the final rules clarify the definition. Under the definition in the proposed rules, a unit that is physically changed is treated as the same unit. However, the proposed rules were unclear about the treatment of a unit that is replaced and whether moving a unit to a different location or source constitutes a physical change. The definition of "commence commercial operation" in the final rules clarifies that a unit that is physically changed (which includes a unit that is replaced) continues to be treated, for purposes of this final rule, as the same unit with the same commence-commercial-operation date. The definition also clarifies that moving a unit to a different location or source is treated the same as a physical change, and so the unit continues to be treated as the same unit. The definition also clarifies that a unit (the replaced unit) that is replaced, whether at the same source or a different source, is treated as the same unit, while the unit (the replacement unit) that replaces the unit is treated as a separate unit with a new commence-commercial-operation date. (The definition of "commence operation" is removed in the final rules because they do not use this term.)

By further example, while the proposed rules used the same definition of "unit" as in prior EPA-administered trading programs, the final rules clarify the definition. The "unit" definition is

clarified by expanding it to incorporate explicitly the concepts—set forth in the definition in the final rules of "commence commercial operation" and thus already applicable to all units—that a unit that is physically changed, moved to a different location or source, or replaced at the same or a different source continues to be treated as the same unit and that a replacement unit at the same source is treated as a separate unit. EPA believes that it is preferable to provide a comprehensive definition of "unit" in one place because the term is used so frequently in the final rules.

By further example, the definition of "nameplate capacity" is clarified in the final rules by explaining that it is expressed in MWe rounded to the nearest tenth. This is the same rounding convention that is used in the reporting of nameplate capacity to the Energy Information Administration.

As noted above, some of the definitions in the final rules are similar to those in the proposed rules but have some substantive differences. For example, in the proposed rules, the definitions of "cogeneration unit" and "fossil-fuel-fired" are similar to those in prior trading programs but with changes to minimize the need for data concerning individual units or combustion devices for periods before 1990. In order to qualify as fossil-fuel-fired, a unit would have to combust any amount of fossil fuel in 1990 or thereafter. In order to qualify as a cogeneration unit, a unit would have to meet certain efficiency and operating standards during the later of: the 12-month period starting when the unit begins producing electricity, or 1990. For a topping-cycle unit, useful power plus one-half of useful thermal energy output of the unit must equal no less than a certain percentage of the total energy input and useful thermal energy must be no less than a certain percentage of total energy output, and, for a bottoming-cycle unit, useful power must be no less than a certain percentage of total energy input. EPA proposed to limit to 1990 or later the historical period for which information on fuel consumption and on cogeneration unit efficiency and operations would be required to apply the "fossil-fuel-fired" and "cogeneration unit" definitions. This limitation was proposed because EPA was concerned that some owners and operators could have difficulty obtaining pre-1990 information about older units, particularly for units whose ownership has changed over time.

While EPA proposed to use 1990 as the earliest year for which information

would be required under these definitions, EPA requested comment on whether a more recent year should be used. As discussed elsewhere in this preamble, the final rules use 2005 (about 5 years before this rule's promulgation), rather than 1990, as the reference year. Further, because the language describing the historical time period used (including the reference year), appeared in the proposal both in the "cogeneration unit" definition and the provisions concerning cogeneration units in the applicability provisions, the final rules removed any language about the historical time period from the "cogeneration unit" definition and revised the language in the applicability provisions to use the 2005 reference year for the requirements for meeting the exemption for cogeneration units from the Transport Rule trading programs. Further, consistent with this use of 2005 as the reference year, the "fossil-fuel-fired" definition in the final rule specifically references 2005, rather than 1990, and as discussed elsewhere in this preamble, the final rules also use January 1, 2005 (rather than November 15, 1990) as the reference date throughout the applicability provisions.

With this change in the reference date for the requirement to meet the operating and efficiency standards under the "cogeneration unit" definition, a unit would have to meet these standards throughout the later of 2005 or the 12-month period starting when the unit begins producing electricity and continuing thereafter. EPA requested comment on whether these standards should be applied to a calendar year when the unit involved did not combust any fuel, *i.e.,* did not operate at all. As discussed elsewhere in this preamble, the final rules expressly provide that the operating and efficiency standards do not have to be met for a calendar year throughout which a unit did not operate at all.

In addition, under the proposed rules, if a group of cogeneration units operating as an integrated cogeneration system met the efficiency standards, a topping-cycle unit in that system would be deemed to meet those standards. EPA requested comment on whether this provision should also apply to a bottoming-cycle unit. As discussed elsewhere in this preamble, this provision in the final rules is not limited to topping-cycle units.

By further example of definitions in the final rules that have substantive differences from the definitions in the proposed rules, the proposed definitions of "TR NO$_X$ Annual allowance," "TR NO$_X$ Ozone Season allowance," "TR SO$_2$ Group 1 allowance," "TR SO$_2$ Group 1 allowance," "TR NO$_X$ Annual Trading Program," "TR NO$_X$ Ozone Season Trading Program," "TR SO$_2$ Group 1 Trading Program," and "TR SO$_2$ Group 1 Trading Program" are changed in the final rules. Language is added to the definitions in order to reference comparable allowances and trading programs established through SIP revisions submitted by states and approved by the Administrator. As discussed elsewhere in this preamble, the final Transport Rule provides that, if a state submits SIP revisions meeting certain specified requirements, the state or permitting authority (rather than the Administrator) will allocate allowances, and the covered sources in the state will participate—along with covered sources in states remaining subject to the Transport Rule FIPs—in an integrated, region-wide air quality-assured trading program under which both any allowance allocated by the Administrator and any allowance allocated by the state or permitting authority will each authorize one ton of emissions of the relevant pollutant and will be usable by any source for compliance with the requirement to hold allowances covering emissions.

As noted above, the final rules include some definitions that were not used in prior EPA-administered trading programs and that reflect unique provisions of the Transport Rule trading programs. For example, the terms, "assurance account," "TR NO$_X$ Annual unit," "TR NO$_X$ Ozone Season unit," "TR SO$_2$ Group 1 unit," "TR SO$_2$ Group 2 unit," "common designated representative," "common designated representative's assurance level," and "common designated representative's share" are used and defined in the final rule.

While the proposed rules included definitions for the terms, "owner's assurance level" and "owner's share," the final rules replace these terms and instead define the terms, "common designated representative," "common designated representative's assurance level," and "common designated representative's share." This is because, as discussed elsewhere in this preamble, the final rules include assurance provisions similar to those in the proposed rules but that are implemented based on groups of units having a common designated representative, instead of being implemented on an owner-by-owner basis. The definition of "common designated representative" in the final rules reflects that the determination of what groups of units and sources in a State have a common designated representative is made based on the identity of units' and sources' designated representatives as of April 1 of the year after the year of the control period when a state triggers the assurance provisions. EPA believes that the use of this reference date will give owners and operators greater flexibility to select common designated representatives after information about total state control period emissions is available and after the allowance transfer deadline when owners and operators may prefer to have a designated representative for their specific source (rather than a common designated representative for a larger group) who is focused on ensuring that sufficient allowances are held in or transferred to the source's account to cover the sources' emissions. EPA notes that the definition of "common designated representative's share" is simpler than the definition of "owner's share" because implementing the assurance provisions at the designated representative level means it is no longer necessary to address, in the definition, owner- and unit-level issues that may arise when a unit has multiple owners or where two or more units emit through the same stack.

Finally, some definitions are added to the final rules that are not in the proposed rules. For example, because the term, "business day," was used, but not defined, in the proposed rule, its meaning was unclear. Specifically, it was unclear whether a day that was uniquely a state holiday, and not a federal holiday, was a business day for purposes of the federally administered Transport Rule trading programs, *e.g.,* whether the allowance transfer deadline applicable to all sources in all states in a Transport Rule trading program could fall on a day that was a unique state holiday in one or a few states or whether the allowance transfer deadline would be advanced to the next business day for all sources in all states or perhaps only for sources in the state with the state holiday. EPA believes that, for a federally administered trading program covering sources in multiple states, the deadlines should be clear and uniform for all sources, regardless of the state in which the sources are located, and should not be affected by unique state holidays of which owners and operators of sources in other states may not even be aware. Consequently, the "business day" definition is added in the final rules and means a day that does not fall on a weekend or a federal holiday.

By further example, a definition for "natural gas" was added in the final rules. That definition, as well as the definition for "coal," incorporate the

corresponding definitions in Part 72 of the Acid Rain Program regulations. The Part 72 definitions are incorporated because they are also used in the Part 75 monitoring, reporting, and recordkeeping provisions, which provisions are already incorporated in the final Transport Rule Trading Program rules. (ii) §§ 97.404 and 97.405, 97.504 and 97.505, 97.604 and 97.605, and 97.704 and 97.705—Applicability and Retired Units

The applicability provisions in the final rules are, except as discussed herein, essentially the same as in the proposed rules and for each of the Transport Rule trading programs. Of course, for each trading program, the definition of "State" reflects differences in the specific states whose electric generating units are covered by the respective trading program.

Under the general applicability provisions of the proposed rules, the Transport Rule trading programs would cover fossil-fuel-fired boilers and combustion turbines serving—at any time starting November 15, 1990 or later—an electrical generator with a nameplate capacity exceeding 25 MWe and producing power for sale, with the exception of certain cogeneration units and solid waste incineration units. As discussed elsewhere in this preamble, the general applicability provisions in the final rules reference January 1, 2005 (about 5 years before this rule's promulgation), rather than November 15, 1990.

*Cogeneration unit exemption.* Under the final rules (as well as the proposed rules) certain cogeneration units or solid waste incinerators otherwise covered by the general category of covered units are exempt from the FIP requirements. In particular, the final rules include an exemption for a unit that qualifies as a cogeneration unit throughout the later of 2005 or the first 12 months during which the unit first produces electricity and continues to qualify throughout each calendar year ending after the later of 2005 or such 12-month period and that meets the limitation on electricity sales to the grid. In order to qualify as a cogeneration unit (*i.e.,* meet the definition of "cogeneration unit") in the final rules, a unit (*i.e.,* a boiler or combustion turbine) must operate as part of a "cogeneration system," which is defined as an integrated group of equipment at a source (including a boiler or combustion turbine, and a steam turbine generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy. In addition, in order to qualify, a unit must

be a topping-cycle unit or a bottoming cycle unit because units that produce useful thermal energy and useful power through sequential use of energy either produce useful power first (*i.e.,* are topping-cycle units) or produce thermal energy first (*i.e.,* are bottom-cycle units).

Further, in order to qualify as a cogeneration unit, a unit also must meet, on a 12-month or annual basis, the above described efficiency and operating standards. As discussed elsewhere in this preamble, EPA clarifies that the electricity sales limitation under the exemption is applied in the same way whether a unit serves only one generator or serves more than one generator. In both cases, the total amount of electricity produced annually by a unit and sold to the grid cannot exceed the greater of one-third of the unit's potential electric output capacity or 219,000 MWhr.

The final rules also clarify when a unit that meets the requirements for the cogeneration unit exemption and subsequently fails to meet all these requirements loses the exemption and becomes a covered unit. Such a unit loses the exemption starting the earlier of January 1 (or May 1 for the $NO_X$ ozone season trading program) after the first year during which the unit no longer meets the "cogeneration unit" definition or January 1 (or May 1) of the first year during which the unit no longer meets the electricity sales limitation.

*Solid waste incineration unit exemption.* The final rules also include an exemption for a unit that qualifies as a solid waste incineration unit during the later of 2005 or the first 12 months during which the unit first produces electricity, that continues to qualify throughout each calendar year ending after the later of 2005 or such 12-month period, and that meets the limitation on fossil-fuel use. In contrast, the exemption for solid waste incineration units in the proposed rules distinguished between units commencing operation before January 1, 1985 and those commencing operation on or after that date and established somewhat different criteria for these two categories of units. As discussed elsewhere in this preamble, the final rules remove the distinction based on whether a solid waste incineration unit commences operation before January 1, 1985 or on or after January 1, 1985. In order to be exempt, the unit must qualify as a solid waste incineration units during the later of 2005 or the first 12 months during which the unit first produces electricity, must continue to qualify throughout each calendar year ending after the later of 2005 or such 12-

month period, and must meet the limitation on fossil-fuel use on a three-year average basis during the first 3 years of operation starting no earlier than 2005 and every 3 years of operation thereafter.

*Retired unit exemption.* The final rule provisions exempting permanently retired units from most of the requirements of the Transport Rule trading programs are essentially the same as in the proposed rules and for each of the Transport Rule trading programs. The retired unit provisions exempt these units from the requirements for emission monitoring, recordkeeping, and reporting and for holding allowances, as of the allowance transfer deadline, sufficient to cover their emissions. However, the permanently retired units in a state must be included in determining whether owners and operators must surrender allowances, and, if so, how many, to comply with the assurance provisions (which are discussed elsewhere in this preamble) if the state's total covered-unit emissions exceed the state assurance level.

Specifically, a common designated representative must include these units in determining whether his or her share of total emissions of covered units in a state exceed his or her share (generally based on the allowances allocated to the units that he or she represents) of the state trading budget with the variability limit and thus whether the owners and operators of the units that he or she represents have to surrender allowances under the assurance provisions.

(iii) §§ 97.406, 97.506, 97.606, and 97.706—Standard Requirements

The basic requirements applicable to owners and operators of units and sources covered by the Transport Rule trading programs and presented as standard requirements in the final rules are, except as discussed herein, essentially the same as in proposed rules and for each of the Transport Rule trading programs. These basic requirements include: designated representative requirements; emissions monitoring, reporting, and recordkeeping requirements; emissions requirements comprising emissions limitations and assurance provisions; permit requirements; additional recordkeeping and reporting requirements; liability provisions; and provisions describing the effect of the Transport Rule trading program requirements on other CAA provisions.

In particular, the paragraphs addressing emissions requirements for owners and operators describe these requirements in detail and reference

other sections of the final rules that set forth the procedures for determining compliance with the emissions limitations and assurance provisions. The paragraphs in the final rules concerning compliance with the emissions limitations clarify that owners and operators of a source and each covered unit at the source must hold allowances at least equaling the total control period emissions of all covered units at the source. Further, the paragraphs in the final rules concerning compliance with the assurance provisions differ from those in the proposed rules in that, as discussed elsewhere in this preamble, the final rules implement the assurance provisions based on groups of units with a common designated representative, instead of being implemented on an owner-by-owner basis, as proposed. Under the final rules, the assurance provisions are triggered when total control period emissions by covered units in a state (starting in 2012) exceed the state trading budget plus variability limit. If the assurance provisions are triggered for a state for a control period in a given year, owners' and operators' responsibility for the resulting penalty (*i.e.,* the surrender of allowances for deduction through the transfer of such allowances to the assurance account created by the Administrator for such owners and operators) is determined on a common designated representative basis.

For purposes of implementing the assurance provisions, covered units in a state are in effect grouped by common designated representative (which is defined as an individual (*i.e.,* a natural person) who is the designated representative, as distinguished from the alternate designated representative, for a group of one or more units and sources as of April 1 after the control period for which the state exceeds the state assurance level). The control period emissions of all covered units with a common designated representative are compared with the allowance allocations of such units plus their share of the state variability limit. The owners and operators of the units and sources in each group that has emissions in excess of allocations plus share of the variability limit are subject to the assurance provisions penalty. The owners and operators of the units and sources in each group must transfer to the assurance account created for such owners and operators a total amount of allowances equal to two times such owners' and operators' proportionate share of the state's excess of covered-unit emissions over the state trading budget plus variability.

The group's proportionate share is the percentage resulting from division of the amount of the group's excess of emissions over allocations plus share of variability by the sum of these excess amounts for all groups of units with a common designated representative in the state. The final rule makes it clear that this percentage is not rounded to the nearest whole number, but rather that the calculated amount of allowances resulting from application of this percentage is rounded to the nearest whole number because, in the Transport Rule trading programs, only whole (not fractional) allowances are used. If instead this percentage were rounded before its application, each group's share would be either 100 percent or 0 percent, which would be contrary to the intent of the assurance provisions in both the final rules and the proposed rules.

The provisions addressing the assurance requirements in the final rules reflect this common-designated-representative-based approach. For example, as discussed elsewhere in this preamble, these provisions use the terms, "common designated representative's share" and "common designated representative's assurance level," in lieu of the terms, "owner's share" and "owner's assurance level," used in the proposed rules. By further example, these final rule provisions refer to both "common designated representatives" and "owners and operators," rather than simply "owners."

The final rules also explain what vintage year (*i.e.,* allocation year) of allowances can be used in order to comply with the requirement to cover emissions and with the requirements of the assurance provisions. With regard to emissions during a control period in a given year, only allowances allocated for that year or any prior year can be used to cover such emissions. Further, only allowances of the following vintage can be used to meet excess emissions penalties and assurance penalties concerning emissions during a control period in a given year: allowances allocated for that year, any year before that year, or the year immediately after that year. This approach makes the vintage years usable for excess emissions and assurance penalties consistent and helps ensure that allowances will be available to meet these obligations.

The final rules also clarify the standard emission requirements by explaining further what is meant by the provision that an allowance is a limited authorization to emit. The final rules clarify that an allowance provides authorization to emit during the control period in one year and is limited in both its use and its duration. For example, each Transport Rule trading program's final rules state that an allowance provides an emission authorization that can only be used in accordance with the requirements of the respective trading program, such as the requirements specifying what allowances are available for use, and how such allowances must be held or transferred, in order to cover emissions or meet the assurance provisions. By further example, under the final rules, an allowance continues to provide an authorization to emit one ton of the relevant pollutant until the allowance is deducted, *e.g.,* in order to be used for compliance with the requirement to cover emissions or the requirements of the assurance provisions. Moreover, under the final rules, the Administrator has the express authority to terminate or limit the authorization to emit, and thereby change the use and duration of the authorization, described in the final rules, to the extent he or she determines to be necessary or appropriate to implement any provision of the CAA.

The remaining paragraphs in the standard requirements section address permitting, recordkeeping and reporting, liability provisions, and the effect on other CAA provisions. For example, the paragraphs concerning permitting requirements are limited to stating that no title V permit revisions are necessary to account for allowance allocation, holding, deduction, or transfer and that the minor permit modification procedures can be used to add or change general descriptions in the title V permits of the monitoring and reporting approach used by the units covered by each title V permit. These provisions remain essentially the same in the final rules as in the proposed rules.

(iv) §§ 96.407, 97.507, 97.607, and 97.707—Computation of Time

These sections address how to determine the deadlines referenced in the Transport Rule trading program rules and are, except as discussed herein, essentially the same as in the proposed rules and for each of the Transport Rule trading programs. The final rules revise the proposed rule provisions concerning the treatment of the final date in any time period in order to make the provision consistent with the approach discussed above with regard to the new definition of "business day." The revised provision states that, if the final date is not a

''business day'', then the time period is extended to the next ''business day.''

(v) §§ 97.408, 97.508, 97.608, 97.708 and Part 78—Administrative Appeal Procedures

Under the final Transport Rule, final decisions of the Administrator under the Transport Rule trading programs are appealable to EPA's Environmental Appeals Board under the regulations set forth in Part 78 (40 CFR part 78), which are revised by the final Transport Rule to accommodate such appeals. The provisions in the final Transport Rule concerning appeals are, except as discussed herein, essentially the same as in the proposed Transport Rule. The proposed Transport Rule would add a provision in Part 78 explaining who is an ''interested person'' with regard to a decision, *i.e.,* a person who submitted comments, testimony, or objections as part of the process of making the decision or a person who submitted his or her name to the Administrator to be placed to an interested persons list. The final Transport Rule includes that provision, but with additional language that clarifies the process for submitting a name to be placed on such a list.

(2) Allowance Allocations

Sections 97.410 through 97.412, 97.510 through 97.512, 97.610 through 97.612, and 97.710 through 97.712 set forth: certain information related to allowance allocation and for implementation of the assurance provisions; the timing for allocation of allowances to existing and new units; and the procedures for new unit allocations. In particular, these sections include tables providing, for each state covered by the particular Transport Rule trading program and for each year, the state trading budget (without the variability limit), new unit set-aside, Indian country new unit set-aside (where applicable), and variability limit. These provisions in the final rules differ in several ways, from the proposed rules and are essentially the same for each of the Transport Rule trading programs.

With regard to the tables in the final rules for the state trading budgets (without the variability limits), new unit set-asides, and variability limits, the identity of the specific states involved and the values for each state differ from the tables in the proposed rules. The final rule values reflect the determinations and modeling underlying the final rules and discussed elsewhere in this preamble. Further, as discussed elsewhere in this preamble, the variability limits are only those based on one-year variability and not those proposed to be based on three-

year variability, and Indian country set-asides are shown for states with Indian country within their borders.

With regard to existing unit allocations, the final rules provide that these allocations will be set forth in a notice of data availability to be issued by the Administrator. In contrast, the proposed rules stated that existing unit allocations would be set forth in an appendix to the rules for each Transport Rule trading program. EPA believes that including these allocations in a notice of data availability referencing the EPA Web site (rather than publishing them in tables requiring a large number of pages in the **Federal Register** for each Transport Rule trading program) is a more efficient method of making these allocations public, particularly since these allocations may be changed for 2013 and thereafter by states through SIP revisions. In addition, under the final rules the allocations for an existing unit can change if the unit does not operate (*i.e.,* has no heat input) for 2 consecutive years starting in 2012. In that case, the unit continues to receive its existing unit allocation for those years plus only 2 more years. As explained elsewhere in this preamble, this is a modification of the proposed rules, under which a unit that did not operate for 3 consecutive years would continue to receive its existing unit allocation for those years plus 3 more years.

Under the final rule provisions for new units, the Administrator allocates allowances from the new unit set-aside for the state where the respective unit is located and for each year when the unit first becomes eligible for an allocation and each year thereafter. The units eligible for new unit set-aside allocations include units commencing commercial operation on or after January 1, 2010, as well as several other categories of units, such as, for example, existing units that were not initially but then become covered units, existing units whose allocations are lost due to lack of unit operation and that subsequently begin operating again, and units that lost their allocations because they changed location from one state to another. The approach in the final rules differs from the proposed rules, which required that owners and operators initially request allowances from the new unit set-aside when the unit first became eligible for an allocation. As discussed elsewhere in this preamble, under the final rules, EPA identifies which units become eligible and when they become eligible, based on information provided in other submissions (*e.g.,* certificates of representation, monitoring system

certifications, and quarterly emissions reports) that such units must make to EPA, and the requirement that owners and operators submit requests for new unit set-aside allocations is removed in the final rules.

The final rules also provide for two rounds of allocations from the new unit set-aside, in contrast with the proposed rules that provided for only one round. In the first round in the final rules (as in the single round in the proposed rules), a unit's new unit set-aside allocation initially equals that unit's emissions—as determined in accordance with §§ 97.430–97.435, 97.530–97.535, 97.630–97.635, and 97.730–97.735 of the final rules and Part 75 (40 CFR part 75)—for the control period (annual or ozone season, depending on the Transport Rule trading program involved) in the preceding year. If the new unit set-aside lacks sufficient allowances to provide this initial allocation for all of the new units, then each new unit is allocated its proportionate share (based on its initial allocation amount) of the allowances in the new unit set-aside. The Administrator issues a notice of data availability informing the public of the specific new unit allocations and provides an opportunity for submission of objections on the grounds that the allocations are not consistent with the requirements of the relevant final rule provisions. A second notice of data availability is subsequently issued in order to make any necessary corrections in the specific new unit allocations. As discussed elsewhere in this preamble, the final rules establish a somewhat different schedule for issuance of these notices of data availability than the proposed rules. In particular, a single set of dates (*i.e.,* for the first notice, June 1 of the year for which the new unit allocations are described in the notice and, for the second notice, August 1 of that year) is established for all of the Transport Rule trading programs. For the reasons discussed elsewhere in this preamble, the final rules provide for a second round of allocations to the extent that any allowances remain in the new unit set-aside after the allocations are made to new units in the first round. (In the proposed rules, remaining allowances were immediately allocated to existing units.) The units eligible for allocations in the second round are new units that commenced commercial operation during the control period for which allocations are being made and during the prior control period. The second round allocation for each such unit initially equals the positive difference (if any) between the unit's

first round allocation (if any) and the unit's emissions during the control period for which allocations are being made. If the amount of allowances remaining in the new unit set-aside after the first round is insufficient to provide this initial allocation for all of the second round new units, then each such new unit is allocated its proportionate share of the allowances remaining in the new unit set-aside. The Administrator uses notices of data availability (which are issued by December 15 (for the annual trading programs) and September 15 (for the ozone season trading program) of the control period involved and February 15 (for the annual trading programs) and November 15 (for the ozone season trading program) before the allowance transfer deadline for the control period involved, in a manner analogous to the use of such notices in the first round, to inform the public about the identification of the new units in the second round allocations and obtain and consider any objections. The February 15 and November 15 notices also inform the public about the amounts of the second round allocations. If, after both rounds of allocations, any allowances remain in the new unit set-aside, those allowances are allocated to existing units in proportion to such units' allocations.

The final rules also establish a separate Indian country new unit set-aside in each state where Indian country is located (*i.e.,* in Florida, Iowa, Kansas, Louisiana, Michigan, Minnesota, Mississippi, Nebraska, New York, North Carolina, South Carolina, Texas, and Wisconsin). As discussed elsewhere in this preamble, the Administrator operates the Indian country new unit set-aside in essentially the same manner as state new unit set-aside, except that unallocated allowances remaining in the Indian country new unit set-aside after the two rounds of new unit set-aside allocations are first placed in the new unit set-aside in the state where the Indian country involved is located and then, if still unallocated, are allocated to existing units in the state. As with the state new unit set-aside, EPA will identify the new units qualifying for the Indian country new unit set-aside, calculate the allocations, and issue notices of data availability using the same schedules as notices for the state new unit set-aside.

Under the final rules (like under the proposed rules), if a unit in certain specified categories is allocated allowances that should not have received them, the Administrator applies procedures under which the allocation is not recorded or the amount of the recorded allocations is deducted as an incorrect allocation, with one exception. The exception is where the determination of compliance with the emissions limitation (*i.e.,* requirement to hold allowances covering emissions, as distinguished from the assurance provisions) for the source that includes the unit has already been completed, in which case no action is taken to account for the erroneous allocation for the control period involved.

While this procedure concerning recordation or deduction of allocations is the same as under the proposed rules, the final rules change the description of the circumstances under which this procedure concerning recordation or deduction of allocations is applied. Under both the final rules and the proposed rules, this procedure is applied to a unit (whether an existing unit or a new unit) that receives an allocation but is not actually a covered unit. However, under the final rules, another category of units—*i.e.,* any existing unit that is not located—as of January 1 of the control period for which the allocation is received—in the state from whose trading budget the allocation was made is also subject to this procedure. Although relatively few units are moved from one state to another, EPA believes that it is important to address what happens to such units' allocations, both because each state has a limited trading budget out of which all allocations for a year to existing and new units in that state must be made and because, under the assurance provisions, determinations are made about owners' and operators' surrender of allowances based on, among other things, the allocations for units in a specific state. Because, under the final rules, a unit that is moved from one state to another may lose its existing unit allocation in the first state under the above-described procedure, the final rules also makes such a unit eligible for allocations from the new-unit set-aside of the second state.

Finally, the final rules remove, as no longer necessary, one category of units that the proposed rules included as subject to this procedure. The proposed rules, treated, as existing units, some units that had not yet operated but were projected to operate by January 1, 2012, and so the proposed rules made these units subject to the procedure for not recording or for deducting allocations if they actually were not required to certify their monitoring systems and hold allowances covering emissions starting January 1, 2012. The final rule does not treat projected units as existing units and so this category of units no longer needs to be made subject to this procedure.

(3) Designated Representatives and Alternate Designated Representatives

Sections 97.413 through 97.418, 97.513 through 97.518, 97.613 through 97.618, and 97.713 through 97.718 establish the procedures for certifying and authorizing the designated representative, and alternate designated representative, of the owners and operators of a source and the units at the source, and for changing the designated representative and alternate designated representative. These sections also describe the designated representative's and alternate designated representative's responsibilities and the process through which he or she can delegate to an agent the authority to make electronic submissions to the Administrator. Except as discussed herein, the provisions in the final rules are essentially the same as in the proposed rules and for each of the Transport Rule trading programs.

The designated representative is the individual (*i.e.,* the natural person) authorized to represent the owners and operators of each covered source and covered unit at the source in matters pertaining to all Transport Rule trading programs to which the source and units were subject. One alternate designated representative (also an individual) can be selected to act on behalf of, and legally bind, the designated representative and thus the owners and operators. Because the actions of the designated representative and alternate legally bind the owners and operators, the designated representative and alternate must submit a certificate of representation certifying that each was selected by an agreement binding on all such owners and operators and is authorized to act on their behalf.

In the final rules (like in the proposed rules), the certificate of representation must contain: Specified identifying information for the covered source (including location) and the covered units at the source and for the designated representative and alternate; the name of every owner and operator of the source and units; and certification language and signatures of the designated representative and alternate. The final rules require an additional piece of identifying information, *i.e.,* whether the unit is located in Indian country. This is necessary in order for the Administrator to implement the above-described Indian country new unit set-aside. All submissions (*e.g.,* monitoring plans, monitoring system certifications, and allowance transfers) under the final rules for a covered

source or covered unit must be submitted, signed, and certified by the designated representative or alternate, except that electronic submission may be delegated.

In order to change the designated representative or alternate, a new certificate of representation must be received by the Administrator. A new certificate of representation must also be submitted to reflect changes in the owners and operators of the source and units involved. The new certificate must be submitted within 30 days of such changes.

The final rules make explicit an implied requirement of the proposed rules, *i.e.,* that, if a unit is added to a source or is moved from one source to a second source, a certificate of representation needs to be submitted to reflect the change. This requirement is implicit in the proposed rules when a unit is added to a source because the designated representative would not be authorized to make submissions concerning the added unit unless that unit were included on the certificate of representation. Similarly, where a unit is moved to another source, new certificates of representation would need to be submitted in order for the correct designated representative to be authorized to make submissions concerning the moved unit. Moreover, because compliance accounts in the Allowance Management System would cover all units at a given source and would be based on the information in the certificate of representation submitted by the designated representative for the source, when a unit is moved from a source to a second source, the designated representative of the second source would need to submit a certificate of representation removing the moved unit from the list of units.

The final rules explicitly require that a new certificate of representation be submitted to reflect changes (whether caused by the addition or removal of units) in which units are located at a source. In addition, the final rules impose a deadline on the submission requirement of 30 days from the date of the change in the units. This is analogous to the maximum time period between a change in a unit's owner or operator and the deadline for submission of a new certificate of representative reflecting to the change. Long before any actual move of a unit to a new location, owners and operators will need to make decisions about, and plan the implementation of, such a move. Consequently, EPA believes that a 30-day deadline after any move for reflecting the move in the certificate of representation is reasonable. In the

event the change involves the addition of a unit that operated before being located at the source, the final Transport Rule also requires that the designated representative provide in the certificate of representation information on the entity from which the unit was obtained, the date on which the unit was obtained, and the date on which the unit became located at the source. In the event of a change involving the removal of a unit, the designated representative must provide in the certificate of representation information on the entity that obtained the unit, the date on which that entity obtained the unit, and the date on which the unit became no longer located at the source. This information will enable the Administrator to determine what actions are necessary to reflect the change in units located at the sources involved. For example, if a covered unit is moved from one source to second source, the Administrator will have the information necessary to determine whether the unit's allocation should be changed to reflect movement of the unit from one state to another.

### (4) Allowance Management System

Sections 97.420 through 97.428, 97.520 through 97.528, 97.620 through 97.628, and 97.720 through 97.728 establish the procedures and requirements for using and operating the Allowance Management System (which is the electronic data system through which the Administrator handles allowance allocation, holding, transfer, and deduction), and for determining compliance with the emissions limitations and assurance provisions, in an efficient and transparent manner. The Allowance Management System also provides the allowance markets with a record of ownership of allowances, dates of allowance transfers, buyer and seller information, and the serial numbers of allowances transferred. Except as discussed herein, these sections of the final rules are essentially the same as in the proposed rules and for each of the Transport Rule trading programs.

### (i) §§ 97.420, 97.520, 97.620, and 97.720—Compliance, Assurance, and General Accounts

Under the final rules, the Allowance Management System contains three types of accounts. One type comprises compliance accounts, one of which the Administrator establishes for each covered source upon receipt of the certificate of representation for the source. A compliance account is the account in which all allowance allocations must be recorded and in

which any allowances used by the covered source for compliance with the emission limitations must be held. The designated representative and alternate for the source are also the authorized account representative and alternate for the compliance account.

A second type comprises general accounts, which can be established by any entity upon receipt by the Administrator of an application for a general account. General accounts can be used by any person or group for holding or trading allowances. To open a general account, a person or group must submit an application for a general account, which is similar in many ways to a certificate of representation. The provisions for changing the authorized account representative and alternate, for submitting a superseding application to take account of changes in the persons having an ownership interest with respect to allowances, and for delegating authority to make electronic submissions are analogous to those applicable to comparable matters for designated representatives and alternates.

A third type comprises assurance accounts. The Administrator establishes one assurance account for each group of units having a common designated representative and located in a state where the assurance provisions are triggered by total emissions exceeding the state trading budget plus variability.

### (ii) §§ 97.421 Through 97.423, 97.521 Through 97.523, 97.621 Through 97.623, and 97.721 Through 97.723— Recordation of Allowance Allocations and Transfers

Under the final rules, by November 7, 2011, the Administrator must record allowance allocations for existing units, as set forth in a required notice of data availability, for the Transport Rule annual $NO_X$, ozone-season $NO_X$, and $SO_2$ trading programs for 2012 and 2013, unless, as discussed elsewhere in this preamble, a state notifies the Administrator that the state will submit a SIP revision with existing-unit allocations for 2013 by May 1, 2012. If the Administrator approves that SIP revision by October 1, 2012, the Administrator will record the state-determined existing-unit allocations for 2013, and, in the absence of such approval by that date, the Administrator will record the EPA-determined existing-unit allocations for 2013. By July 1, 2013, the Administrator must record existing-unit allowance allocations (whether EPA- or state-determined) for each Transport Rule trading program for 2014 and 2015. By July 1, 2014, the Administrator must

record existing-unit allowance allocations for each Transport Rule trading program for 2016 and 2017. By July 1, 2015, the Administrator must record existing-unit allowance allocations for each Transport Rule trading program for 2018 and 2019. By July 1, 2016 and July 1 of each year thereafter, the Administrator must record existing-unit allowance allocations for each Transport Rule trading program for the control period in the fourth year after the year of the applicable recordation deadline. By August 1, 2012 and August 1 of each year thereafter, the Administrator must record new-unit allowance allocations for each Transport Rule trading program for that year. These recordation deadlines differ from those in the proposed rules for two reasons. First, as discussed elsewhere in this preamble, EPA is adopting provisions that allow states to submit, and EPA to approve, SIP revisions (abbreviated or full SIPs) under which the state, rather than the Administrator, determines the distribution of allowances under one or more of the Transport Rule trading programs applicable in the state. In selecting allocation recordation deadlines, EPA took into account and balanced certain countervailing factors. On one hand, EPA considered the need to provide a reasonable time for a state to develop, propose, and finalize, and for EPA to review and propose and finalize approval of, the SIP revision and the desirability of providing a reasonable opportunity for state distributions to become effective for a year relatively soon after the 2012 commencement of the Transport Rule trading programs. EPA's experience with prior trading programs has shown that the process for development and submission of SIP revisions by states and approval by EPA in many cases is about 18 months and in some cases even longer. On the other hand, EPA considered the desirability of owners and operators having allocations in their compliance accounts a reasonable time before the year for which the allocations are made (*i.e.,* the vintage year). Having the allocations recorded, to the extent possible, before the vintage year facilitates compliance decisions and use of the allowance market in implementing such decisions. EPA believes that optimally allocations would be recorded at least 3 years in advance of the vintage year.

In balancing these countervailing factors, EPA is adopting an allocation recordation schedule that provides initially for recordation ranging from 6 months to 18 months before the beginning of the control period in the first 2 years (*i.e.,* 2012 and 2013) for which allocations are made and that, as allocations for control periods in subsequent years are recorded, gradually increases the amount of time between recordation and the beginning of the year of the year of the control period involved until allocations are recorded about three and one-half years in advance. With regard to the need to facilitate states' distribution of allowances, this approach gives states multiple opportunities to develop, submit, and obtain EPA approval for SIPs under which the states (rather than EPA) will distribute allowances under the Transport Rule trading programs for control periods relatively early in the programs. Because of time (which has in the past ranged from about 6 months to about 2 years) it may take for a state to develop and submit such a SIP and because of the time (which has in the past been at least 6 months) it will likely take EPA to review and approve such a SIP, EPA believes that 2013 is the first year for which a state can determine allowance distributions and have them recorded some minimal time before the control period involved. With regard to the need to record allowances in advance, this approach achieves recordation at least 6 months in advance and eventually achieves recordation by what EPA believes is an optimal amount of time (greater than 3 years) before the control period for which recorded allowances are issued.

As discussed elsewhere in this preamble, the approach to allowance recordation in the final rules results in following schedule for submission of abbreviated or full SIPs under the final Transport Rule. SIP revisions with existing-unit allocations for 2013 control periods must be submitted to the Administrator by April 1, 2012. Complete abbreviated and full SIPs must be submitted to the Administrator by: December 1, 2012 in order to govern allowance allocation and auction for control periods in 2014 and 2015; December 1, 2013 in order to govern control periods in 2016 and 2017; December 1, 2014 in order to govern allowance allocation and auction for control periods in 2018 and 2019; and December 1, 2015 and by January 1 of any year thereafter in order to govern allowance allocation and auction for control periods in the fifth year after the year of such submission deadline.

The second reason for the differences in the recordation deadlines in the final rules, as compared to the proposed rules, is that, in order to simplify the recordation schedule for owners and operators and EPA, EPA set uniform recordation deadlines for all of the Transport Rule trading programs. EPA believes that these deadlines provide the Agency sufficient time, after receipt of any information necessary to determine allocations (*e.g.,* for new unit set-aside allocations, the emission data from the control period in the prior year), to complete the recordation of allocations and, as discussed above, makes the allocations available to owners and operators before the year for which the allocations are made. EPA notes that these are deadlines and that the Administrator has the discretion, where feasible and appropriate, to record allocations before such deadlines.

Under the final rules (as under the proposed rules), the process for transferring allowances from one account to another is quite simple. A transfer is submitted providing, in a format prescribed by the Administrator, the account numbers of the accounts involved, the serial numbers of the allowances involved, and the name and signature of the transferring authorized account representative or alternate. If the transfer form containing all the required information is submitted to the Administrator and, when the Administrator attempts to record the transfer, the transferor account includes the allowances identified in the form, the Administrator records the transfer by moving the allowances from the transferor account to the transferee account within 5 business days of the receipt of the transfer form.

**(iii) §§ 97.424, 97.524, 97.624, and 97.724—Compliance With Emissions Limitations**

Under the final rules (as under the proposed rules), once a control period has ended (*i.e.,* December 31 for the Transport Rule $NO_X$ and $SO_2$ annual trading programs and September 30 for the ozone-season $NO_X$ trading program), covered sources have a window of opportunity—until the allowance transfer deadline of midnight on March 1 or December 1 following the control period for the annual and ozone season trading programs respectively—to evaluate their reported emissions and obtain any allowances that they need to cover their emissions during that control period. Each allowance issued in each Transport Rule trading program authorizes emission of one ton of the pollutant involved, and so is usable for compliance in that trading program, for a control period in the year for which the allowance was allocated or a later year. Consequently, each source needs—as of the allowance transfer deadline—to have in its compliance account, or

properly submit a transfer that moves into its compliance account, enough allowances usable for compliance to authorize the source's total emissions for the control period.

If a source fails to hold sufficient allowances for compliance to cover the emissions, then the owners and operators must provide, for deduction by the Administrator, two allowances allocated for the control period, in the year of when the emissions occurred, any prior year, or the year immediately after the year of the emissions, for every allowance that the owners and operators failed to hold as required to cover emissions. In addition, the owners and operators are subject to discretionary civil penalties for each violation.

(iv) §§ 97.425, 97.525, 97.625, and 97.725—Compliance With Assurance Provisions

Under the final rules (as under the proposed rules), the assurance provisions ensure that each state will eliminate its significant contribution to nonattainment and interference with maintenance that EPA identifies in this action. A requirement that owners and operators surrender allowances under the assurance provisions is triggered only for certain owners and operators of sources and units in a state where the total state covered-unit emissions for a control period exceed the applicable state trading budget with the variability limit. Moreover, the surrender requirement is implemented based on groups of sources and units with a common designated representative. For each group of sources and units with a common designated representative, the owners and operators of such sources and units must surrender allowances only if the units' emissions (referred to as the common designated representative's share of emissions) during the control period involved exceed the units' allocations plus share of the state variability limit (referred to as the common designated representative's share of the state trading budget with variability).

As discussed elsewhere in this preamble, EPA decided to implement the assurance provisions on a common designated representative basis, rather than on an owner basis. The final rules implement in a series of steps the process of determining which states have total covered-unit emissions sufficient to trigger the allowance surrender requirement for a given control period and determining, using the approach based on common designated representatives, which owners and operators are subject to the allowance surrender and whether those

owners and operators are in compliance. This common-designated-representative-based process is more streamlined than the owner-based process in the proposed rules.

First, the Administrator performs the calculations necessary to determine whether any state has total covered-unit emissions for a control period greater than the state trading budget with the 1-year variability limit. As discussed elsewhere in this preamble, EPA decided not to use a 3-year variability limit because, among other things, such a limit seems unnecessary to ensuring elimination of significant contribution to nonattainment and interference with maintenance and would make compliance planning extremely difficult for owners and operators. By June 1, 2013 and June 1 of each year thereafter, the Administrator promulgates a notice of data availability of the results of these calculations.

Second, by July 1, for states identified in the June 1 notice of data availability as having emissions exceeding the state trading budget with variability, the designated representative of each new unit in the state that operated during but did not receive an allocation for the year involved must submit a statement to the Administrator with certain information about the unit. This information—*i.e.,* the unit's allowable emission rate for the pollutant involved ($NO_X$ or $SO_2$) and heat rate—is used to calculate a surrogate allocation for the unit to be used solely for the purposes of determining whether the group of units with a common designated representative that includes the unit had emissions exceeding allocations plus share of the state's variability limit.

Third, the Administrator calculates, for each state identified in the June 1 notice of data availability and for each common designated representative of a group of units (which groups can include one or more units and sources) in the state, the common designated representative's share of emissions, the common designated representative's share of the state trading budget with the variability limit, and the amount (if any) that the groups of owners and operators of units represented by the common designated representative (which groups can include one or more owners and operators) in the state must surrender under the assurance provisions (*i.e.,* the common designated representative's proportionate share of the excess of state emissions over the state trading budget with the variability limit). The Administrator promulgates by August 1 a notice of data availability of the results of these calculations, provides an opportunity for submission

of objections, and promulgates by October 1 a second notice of data availability of any necessary adjustments to the calculations. In contrast with the proposed rules, objections may be submitted concerning information in the August 1 notice, whether or not that information was also provided in the June 1 notice. In short, the process of issuing notices is shortened in the final rules by providing one, comprehensive opportunity to submit objections to the June 1 and August 1 notices, rather than two separate opportunities, one for each notice.

Also in contrast with the proposed rules, the deadlines for issuance of notices of data availability for implementation of the assurance provisions are made uniform under the final rules for all of the Transport Rule trading programs. EPA is taking this approach for the same reasons that the deadlines for issuance of notices of data availability for new unit set-aside allocations are made uniform for all of these trading programs.

Fourth, the owners and operators identified in the October 1 notice of data availability as being required to surrender allowances under the assurance provisions must transfer, by November 1, to the assurance account created by the Administrator for such owners and operators the amount of allowances (usable for compliance) that the Administrator determined in the October 1 notice of data availability. Where the October 1 notice indicates that a specified surrender amount is owed by a group of two or more owners and operators, all the group members are liable for the surrender amount, and it is up to the owners and operators in the group to decide who will actually surrender allowances. This is analogous to the situation where a group of two or more owners and operators of covered units at a source is required to hold allowances covering the unit's emissions and therefore the group of owners and operators is liable. *See* 58 FR 3590, 3599 (January 11, 1993) (discussing liability of owners and operators under allowance-holding requirements of the Acid Rain Program).

EPA believes that the approach of making the owners and operators responsible for deciding which of them will actually surrender the necessary allowances under the assurance provisions is reasonable because the identity of who is an owner or operator (particularly who is an owner) of a unit or source and the percentage of an owner's share can change during the year and this information is available to the owners and operators on an ongoing

basis, and not to EPA unless EPA were to impose new requirements for reporting this information. Further, EPA believes that it is reasonable to leave to private agreements the establishment of procedures for determining when, and under what conditions, specific owners and operators will provide the allowances for surrender. Owners and operators already make these types of determinations with regard to the surrender requirements in meeting the emissions limitations and any excess emission penalties.

As part of implementing the common-designated-representative-based approach of the assurance provisions in the final Transport Rule, the final rules provide that the Administrator (instead of the owners, as in the proposed rules) will create an assurance account for each group of the owners and operators of units and sources with a common designated representative in each state where the assurance provisions are triggered. Because the final rules require owners and operators to transfer surrendered allowances to the appropriate assurance account (rather than requiring the Administrator to deduct from accounts established by the owners), there is no need for the proposed rule provisions concerning identification of which allowances are to be deducted and first-in, first-out deduction in the absence of such identification.

The final rules provide that, in general, the surrender amounts specified in the October 1 notice for owners and operators are final and will not be revised even if the underlying data (*e.g.,* emission data) used in the calculations underlying the October 1 notice are subsequently revised. However, the final rules set forth limited exceptions to this: Where such data are revised as a result of a decision in or settlement of litigation concerning the data on appeal. EPA believes that the limitation on revisions of the surrender amounts specified in the October 1 notice are necessary to provide some certainty to owners and operators and avoid the potential for multiple changes in owners' and operators' required surrender amounts. Because the surrender amount for each group of owners and operators of units and sources with a common designated representative in a state is calculated using emission data from all of the covered units in that state, each change in one or a few units' emission data that might occur after issuance of the October 1 notice could otherwise change the calculated surrender amounts for all or many groups in the state. For the limited exceptions where

the final rules provide that the surrender amounts specified in the August 1 notice may be revised, the final rules require the Administrator to set a new surrender deadline for any additional surrender required and to transfer allowances back out of the assurance account involved for any reduced surrender requirement, as appropriate.

Under the final rules (as under the proposed rules), it is not a violation of the CAA for total state covered-unit emissions to exceed the state trading budget with the variability limit or for a group of owners and operators to become subject to the allowance surrender requirement under the assurance provisions. However, the failure of any group of owners and operators to surrender the required amount of allowances in the assurance account created for such owners and operators violates the CAA and is subject to discretionary penalties, with each required allowance that was not surrendered and each day of the control period involved constituting a violation.

### (v) §§ 97.426 Through 97.428, 97.526 Through 97.528, 97.626 Through 97.628, and 97.726 Through 97.728—Miscellaneous Provisions

These sections in the final rules (as in the proposed rules) include provisions allowing banking of the allowances issued in the Transport Rule trading programs, *i.e.,* the retention of unused Transport Rule allowances allocated for a given control period for use or trading in a later control period. While this can potentially cause emissions from sources in some states in some control periods to be greater than the allowances allocated for those control periods, the assurance provisions limit such emissions in a way that ensures that each state's significant contribution to nonattainment and interference with maintenance that EPA has identified in this action will be eliminated.

These sections also include provisions stating that the Administrator can, at his or her discretion and on his or her own motion, correct any type of error that he or she finds in an account in the Allowance Management System. In addition, the Administrator can review any submission under the Transport Rule trading programs, make adjustments to the information in the submission, and deduct or transfer allowances based on such adjusted information.

### (5) Emissions Monitoring, Recordkeeping, and Reporting

Sections 97.430 through 97.435, 97.530 through 97.535, 97.630 through 97.635, and 97.730 through 97.735 establish emissions monitoring, recordkeeping, and reporting requirements for Transport Rule units. These provisions reference the relevant sections of Part 75 (40 CFR part 75), where the specific procedures and requirements for monitoring and reporting $NO_X$ and $SO_2$ mass emissions are set forth. The provisions in the final rules are virtually the same as the monitoring, recordkeeping, and reporting requirements in the proposed rules and under previous EPA-administered trading programs, *e.g.,* the Acid Rain Program and $NO_X$ Budget and CAIR trading programs. The final rule provisions are also essentially the same for each of the Transport Rule trading programs, except for differences reflecting the different pollutants and control periods involved.

Under the provisions of the final rules and under Part 75, a unit has several options for monitoring and reporting. A unit's options are to use: a CEMS; an excepted monitoring methodology ($NO_X$ mass monitoring for certain peaking units and $SO_2$ mass monitoring for certain oil- and gas-fired units); low mass emissions monitoring for certain, non-coal-fired, low emitting units; or an alternative monitoring system approved by the Administrator through a petition process. In addition, unit owners and operators may submit, and the Administrator can approve, petitions for alternatives to Transport Rule and Part 75 monitoring, recordkeeping, and reporting requirements.

As discussed elsewhere in this preamble, the final rules and Part 75 specify that each CEMS must undergo rigorous initial certification testing and periodic quality assurance testing thereafter. In addition, when a monitoring system is not operating properly, standard substitute data procedures are applied and result in a conservative estimate of emissions for the period involved. Further, the final rules and Part 75 require electronic submission, to the Administrator and in a format prescribed by the Administrator, of a quarterly emissions report.

The final rules include revised language in §§ 97.430(b)(3), 97.530(b)(3), 97.630(b)(3), and 97.730(b)(3) that incorporates by reference, and thereby applies to units in the Transport Rule trading programs, clarification that EPA recently adopted in § 75.4(e) of Part 75 (for Acid Rain Program units)

concerning the requirements for certification, recertification, and diagnostic testing of emission monitoring systems when a unit adds a new stack or new add-on $SO_2$ or $NO_X$ emission control device. *See* 76 FR 17288, 17298–300 (March 28, 2011). The revised language is adopted for the reasons set forth in the preamble of that Acid Rain Program final rule and in order to continue the approach, in the Transport Rule trading program rules, of adopting monitoring, recordkeeping, and reporting requirements that are generally consistent with those in the Acid Rain Program, which covers many units in the Transport Rule trading programs.

## XII. Statutory and Executive Order Reviews

The projected impacts of this final rule as presented throughout the preamble do not reflect minor technical corrections to $SO_2$ budgets in three states (KY, MI, and NY) made after the impact analyses were conducted. These projections also assumed preliminary variability limits that were smaller than the variability limits finalized in this rule. EPA conducted sensitivity analysis confirming that these differences do not meaningfully alter any of the Agency's findings or conclusions based on the projected cost, benefit, and air quality impacts presented for the final Transport Rule. The results of this sensitivity analysis are presented in Appendix F in the final Transport Rule RIA.

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

Under EO 12866 (58 FR 51735, October 4, 1993), this action is an ''economically significant regulatory action'' because it is likely to have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities.

Accordingly, EPA submitted this action to the OMB for review under EO 12866 and EO 13563 (76 FR 3821, January 21, 2011) and any changes in response to OMB recommendations have been documented in the docket for this action. In addition, EPA prepared an analysis of the potential costs and benefits for this action. This analysis is contained in the Regulatory Impact Analysis (RIA) for this action. For more information on the costs and benefits for this rule, please refer to Table VIII.C–3 of this preamble.

When estimating the human health benefits and compliance costs in Table VIII.C–3 of this preamble, EPA applied methods and assumptions consistent with the state-of-the-science for human health impact assessment, economics, and air quality analysis. EPA applied its best professional judgment in performing this analysis and believes that these estimates provide a reasonable indication of the expected benefits and costs to the nation of this rulemaking. The RIA available in the docket describes in detail the empirical basis for EPA's assumptions and characterizes the various sources of uncertainties affecting the estimates below. In doing what is laid out above in this paragraph, EPA adheres to EO 13563, ''Improving Regulation and Regulatory Review,'' (76 FR 3,821, January 21, 2011), which is a supplement to EO 12866.

In addition to estimating costs and benefits, EO 13563 focuses on the importance of a ''regulatory system [that] * * * promote[s] predictability and reduce[s] uncertainty'' and that ''identify[ies] and use[s] the best, most innovative, and least burdensome tools for achieving regulatory ends.'' EO 13563 also states that ''[i]n developing regulatory actions and identifying appropriate approaches, each agency shall attempt to promote such coordination, simplification, and harmonization. Each agency shall also seek to identify, as appropriate, means to achieve regulatory goals that are designed to promote innovation.'' We recognize that the utility sector has compliance obligations related to multiple environmental statutes authorizing regulatory action, including this rule's requirements to reduce interstate transport of harmful ozone and fine particles and their precursors, as well as other rules' requirements to reduce air toxic emissions, to reduce greenhouse gas emissions, to safely manage coal combustion wastes, and to protect aquatic wildlife from water intake procedures. In the wake of promulgating this final rule, EPA recognizes that moving forward the agency needs to approach these rulemakings in ways that allow the industry to make practical investment decisions that minimize costs in complying with all of the final rules, while still securing the fundamentally important environmental and public health benefits that led Congress to enact those authorities in the first place. At the same time, EPA notes that the flexibility inherent in the allowance-trading mechanism included in this rule affords utilities themselves a degree of latitude to determine how best to integrate compliance with the emission reduction requirements of this rule and those of the other rules.

The final rule will also reduce emissions of directly emitted PM and ozone precursors, and estimates of the $PM_{2.5}$-related benefits of these air quality improvements may be found in Tables VIII.C–1 and VIII.C–2 of this preamble. When characterizing uncertainty in the PM-mortality relationship, EPA has historically presented a sensitivity analysis applying alternate assumed thresholds in the PM concentration-response relationship. In its synthesis of the current state of the PM science, EPA's 2009 Integrated Science Assessment for Particulate Matter concluded that a no-threshold log-linear model most adequately portrays the PM-mortality concentration-response relationship. In the RIA accompanying this rulemaking, rather than segmenting out impacts predicted to be associated levels above and below a ''bright line'' threshold, EPA includes a ''lowest measured level'' (LML) analysis that illustrates the increasing uncertainty that characterizes exposure attributed to levels of $PM_{2.5}$ below the LML of each epidemiological study used to estimate $PM_{2.5}$-related premature death. Figures provided in the RIA show the distribution of baseline exposure to $PM_{2.5}$, as well as the lowest air quality levels measured in each of the epidemiology cohort studies. This information provides a context for considering the likely portion of PM-related mortality benefits occurring above or below the LML of each study; in general, our confidence in the size of the estimated reduction $PM_{2.5}$-related premature mortality diminishes as baseline concentrations of $PM_{2.5}$ are lowered. Approximately 69 percent of the avoided impacts occur at or above an annual mean $PM_{2.5}$ level of 10 $\mu g/m^3$ (the LML of the Laden et al. 2006 study); about 96 percent occur at or above an annual mean $PM_{2.5}$ level of 7.5 $\mu g/m^3$ (the LML of the Pope et al. 2002 study). Although the LML analysis provides some insight into the level of uncertainty in the estimated PM mortality benefits, EPA does not view the LML as a threshold and continues to quantify PM-related mortality impacts using a full range of modeled air quality concentrations. It is important to note that the monetized benefits include many but not all health effects associated with $PM_{2.5}$ exposure. Benefits are shown as a range from Pope, et al., (2002) to Laden, et al., (2006). These models assume that all fine particles,

regardless of their chemical composition, are equally potent in causing premature mortality because there is no clear scientific evidence that would support the development of differential effects estimates by particle type.

The cost analysis is also subject to uncertainties. Estimating the cost conversion from one process to another is more difficult than estimating the cost of adding control equipment because it is more dependent on plant specific information. More information on the cost uncertainties can be found in the RIA.

A summary of the monetized benefits and net benefits for the final rule at discount rates of 3 percent and 7 percent is in Table VIII.C–3 of this preamble. For more information on the benefits analysis, please refer to the RIA for this rulemaking, which is available in the docket.

## B. Paperwork Reduction Act

EPA is required to document the information collection burden imposed by the Transport Rule on industry, states, and EPA in an information collection request (ICR). The ICR describes the information collection requirements associated with the Transport Rule and estimates the incremental costs of compliance with all such requirements, such as the requirement for industry to monitor, record, and report emission data to EPA.

The ICR for the final Transport Rule has been submitted for approval by OMB under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*, and the information collection requirements it documents are not enforceable until such approval has been granted. An ICR was also submitted to OMB in support of the proposed Transport Rule; no adverse comment was received by EPA on either the information collection requirements or their associated cost estimates as described in that document.

The costs associated with the information collection requirements of the Transport Rule include start-up and capital costs for units newly affected by an emission trading program, or whose reporting status has changed (*e.g.*, from ozone-season-only to annual reporting), as well as the additional operation and maintenance costs for Transport Rule-affected units already participating in an EPA-administered cap and trade program. More information on the ICR analysis is included in the final Transport Rule docket.

The records and reports generated by these activities will be used by EPA and states to ensure that affected facilities comply with emission limits and other requirements. Such records and reports are also helpful to EPA and states in both identifying affected facilities that may not be in compliance with applicable requirements and in discerning which units and what records or processes should be inspected.

The incremental capital and operating costs associated with the recordkeeping and reporting burden to Transport Rule-affected sources in states participating in the Transport Rule trading programs are approximately \$26 million annually in 2010 dollars. The total number of burden hours associated with the recordkeeping and reporting burden to Transport Rule-affected sources in states participating in the Transport Rule trading programs is approximately 185,000 hours annually. These estimates include the annualized cost of installing and operating appropriate $SO_2$ and $NO_X$ emission monitoring equipment to measure and report the total emissions of these pollutants from affected EGUs (serving generators greater than 25 MW). The burden to state and local air agencies, as documented in the ICR, includes any necessary SIP revisions, performance of monitor certifications, and fulfillment of audit responsibilities. Burden is defined at 5 CFR 1320.3(b).

The amendments do not require any notifications or reports beyond those required by the General Provisions. The recordkeeping requirements require only the specific information needed to determine compliance, which is specifically authorized by CAA section 114 (42 U.S.C. 7414). All information submitted to EPA for which a claim of confidentiality is made will be safeguarded according to EPA policies in 40 CFR part 2, subpart B, Confidentiality of Business Information. An Agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR part 9. When this ICR is approved by OMB, the Agency will publish a technical amendment to 40 CFR part 9 in the **Federal Register** to display the OMB control number for the approved information collection requirements contained in this final rule.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations, and small governmental jurisdictions.

For purposes of assessing the impacts of this final rule on small entities, small entity is defined as:

(1) A small business as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201. For the electric power generation industry, the small business size standard is an ultimate parent entity defined as having a total electric output of 4 million megawatt-hours (MWh) or less in the previous fiscal year.

(2) A small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and

(3) A small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

TABLE XII.C–1—POTENTIALLY REGULATED CATEGORIES AND ENTITIES[a]

| Category | NAICS code[b] | Examples of potentially regulated entities |
|---|---|---|
| Industry ............................................. | 221112 | Fossil-fuel-fired electric utility steam generating units. |
| Federal Government ........................... | [c]221112 | Fossil-fuel-fired electric utility steam generating units owned by the federal government. |
| State/Local Government .................... | 2[c]21112 | Fossil-fuel-fired electric utility steam generating units owned by municipalities. |
| Tribal Government .............................. | 921150 | Fossil-fuel-fired electric utility steam generating units in Indian Country. |

[a] Include NAICS categories for source categories that own and operate electric generating units only.
[b] North American Industry Classification System.
[c] Federal, state, or local government-owned and operated establishments are classified according to the activity in which they are engaged.

EPA used Velocity Suite's Ventyx data as a basis for identifying plant ownership and compiling the list of potentially affected small entities. For plants burning fossil fuel as the primary fuel, plant-level boiler and generator capacity, heat input, generation, and emission data were aggregated by owner and then parent company. For cooperatives, investor-owned utilities, and subdivisions that generate less than 4 billion kWh of electricity annually but may be part of a large entity, additional research on power sales, operating revenues, and other business activities was performed to make a final determination regarding size.

After considering the economic impacts of this final rule on small entities, EPA certifies that this action will not have a significant economic impact on a substantial number of small entities (No SISNOSE). This certification is based on the economic impact of this final rule to all affected small entities across all industries affected. EPA assessed the potential impact of this action on small entities and found that there are about 660 potentially affected small units (*i.e.*, greater than 25 MW and generating less than 4 million MWh) out of 3,625 existing units in the Transport Rule states. The majority of these EGUs are owned by entities that do not meet the small entity definition. The remaining 271 of the 660 EGUs are owned by 108 potentially affected small entities and are likely to be affected by this rule. EPA estimates that 24 of the 108 identified small entities will have annualized costs greater than 1 percent of their revenues, and the other 84 are projected to incur costs less than 1 percent of revenues. Eleven small entities out of 108—approximately 10 percent—are estimated to have annualized costs greater than 3 percent of their revenues. EPA has lessened the impacts for small entities by excluding all units smaller than 25 MWe. This exclusion, in addition to the exemptions for cogeneration units and solid waste incineration units, eliminates the burden of higher costs for a substantial number of small entities located in the Transport Rule states.

While the total number of small entities has increased compared to the proposal as a result of updated modeling and changes in geographic coverage, the number with compliance costs greater than 1 percent of revenues has fallen, and both the number and percentage of significantly impacted small entities (costs greater than 3 percent of revenues) are lower—now 10 percent compared to 17 percent in the proposal. The share of significantly impacted small entities has fallen because of updated modeling and the change in the allowance allocation methodology (see section VII.D for more information about allowance allocations).

Although this final rule will not have a significant economic impact on a substantial number of small entities, EPA nonetheless has tried to reduce the impact of this rule on small entities. In EPA's modeling, most of the cost impacts for these small entities and their associated units are driven by lower electricity generation relative to the base case. Specifically, two small units reduce their generation by significant amounts, driving the bulk of the costs for all small entities. Excluding these two units, one of the main drivers of small entity impacts is higher fuel costs, which the affected units would incur irrespective of whether they had to comply with this rule. In addition, EPA's decision to exclude units smaller than 25 MWe has already significantly reduced the burden on approximately 390 small entities.

For more information on the small entity impacts associated with the final rule, refer to the Regulatory Impact Analysis for this final rule, which can be found in the docket for this rule and on the Web site *http://www.epa.gov/airtransport*.

### D. Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), 2 U.S.C. 1531–1538, requires federal agencies, unless otherwise prohibited by law, to assess the effects of their regulatory actions on state, local, and tribal governments, and the private sector. This rule contains a federal mandate that may result in expenditures of $100 million or more for state, local, and tribal governments, in the aggregate, or the private sector in any 1 year. Accordingly, EPA has prepared, under section 202 of the UMRA, a written statement which is summarized later.

Consistent with the intergovernmental consultation provisions of section 204 of the UMRA, EPA held consultations with the governmental entities affected by this rule during the proposal phase. Subsequently, EPA sent a letter to the ten Representative National Organizations to draw their attention to the Transport Rule Notice of Data Availability (NODA) on allowance allocations and other related matters and to invite their comments. During the NODA comment period, EPA participated in informational calls with the Environmental Council of the States (ECOS) and the National Governors Association to provide information about the NODA directly to state and local officials. There were no new concerns raised during these informational calls. In addition, EPA also conducted consultations with federally recognized tribes prior to finalizing this rule and invited them to comment on the allowance allocation NODA. EPA has added a new unit set-aside provision to this final rule specifically for EGUs constructed in Indian country to ensure allowances are available to tribes and tribal sovereignty is respected.

Consistent with section 205, EPA identified and considered a reasonable number of regulatory alternatives. In the proposal, EPA included three remedy options that it considered when developing this final rule: (1) The preferred remedy trading programs, (2) State Budgets/Intrastate Trading, and (3) Direct Controls. Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted.

EPA examined the potential economic impacts on state- and municipality-owned entities associated with this rulemaking based on assumptions of how the affected states will implement control measures to meet program requirements. Although EPA does not conclude that the requirements of the UMRA apply to the Transport Rule, these impacts have been calculated to provide additional understanding of the nature of potential impacts and additional information.

EPA has determined that this rule contains a federal mandate that may result in expenditures of $100 million or more in 1 year. EPA has determined that this rule contains no regulatory requirements that might significantly or uniquely affect small governments and that development of a small government plan under section 203 of the Act is not required. The costs of compliance will be borne predominately by sources in the private sector although a small number of sources owned by state and local governments may also be impacted. The requirements in this action do not distinguish EGUs based on ownership, either for those units that are included within the scope of the rule or for those units that are exempted by the generating capacity cut-off. Therefore, this rule is not subject to the requirements of section 203 of UMRA because it contains no regulatory requirements that might significantly or uniquely affect small governments.

*E. Executive Order 13132: Federalism*

This final rule does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. The final rule primarily affects private industry, and does not impose significant economic costs on state or local governments. Thus, Executive Order 13132 does not apply to the final rule.

Although section 6 of Executive Order 13132 does not apply to the final rule, EPA did provide information to state and local officials during development of both the proposal and final rule. EPA sent a letter to the ten Representative National Organizations to draw their attention to the Transport Rule NODA on allowance allocations and other related matters and to invite their comments. Following that letter in early 2011, EPA participated in informational calls with the Environmental Council of the States (ECOS) and the National Governors Association to provide information about the NODA directly to state and local officials. There were no new concerns raised during these informational calls.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

Under Executive Order 13175 (65 FR 67249, November 9, 2000), EPA may not issue a regulation that has tribal implications, that imposes substantial direct compliance costs, and that is not required by statute, unless the federal government provides the funds necessary to pay the direct compliance costs incurred by tribal governments, or EPA consults with tribal officials early in the process of developing the proposed regulation and develops a tribal summary impact statement.

EPA has concluded that this action may have tribal implications if a new unit covered by the rule is built in Indian country. Additionally, tribes have a vested interest in how this final rule affects their air quality. However, it will neither impose substantial direct compliance costs on tribal governments, nor preempt tribal law. EPA consulted with tribal officials during the process of finalizing this regulation to permit them to have meaningful and timely input into its development.

EPA received comments on the proposed Transport Rule that the Agency did not properly conduct consultation during the proposal phase of the rulemaking process. In response to these comments, EPA sent a letter to all federally-recognized tribes in the country offering consultation. In addition, several commenters also noted that the Agency did not adequately consider opportunities for tribes to enter into any of the trading programs and, in particular, did not consider sovereignty issues when addressing how to distribute allowances to potential new units in Indian country. On January 7, 2011, EPA issued a NODA requesting comment on allocations for new units in Indian country, among other topics.

The Agency held a consultation call with three tribes on January 21, 2011. A follow-up call was held on February 4, 2011 with two of the three original tribes plus 13 additional tribes, as well as representatives from the National Tribal Air Association. In all ten tribes participated in these calls as consultation and six participated as information-sharing. EPA considered the additional input from these consultation and information calls, in conjunction with the public comments, in the development of the final rule. Accordingly, EPA created an Indian country new unit set-aside to specifically address tribes' concerns regarding the protection of tribal sovereignty in the distribution of allowances for new units in Indian country. *See* section VII.D.2 of this preamble for details on the Indian country set-aside for new units constructed in Indian country within states covered by the Transport Rule.

As required by section 7(a) of the Executive Order, EPA's Tribal Consultation Official has certified that the requirements of the Executive Order have been met in a meaningful and timely manner. A copy of the certification is included in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

Executive Order 13045 (62 FR 19,885, April 23, 1997) applies to any rule that: (1) Is determined to be "economically significant" as defined under EO 12866, and (2) concerns an environmental health or safety risk that EPA has reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, the Agency must evaluate the environmental health or safety effects of this planned rule on children, and explain why this planned regulation is preferable to other potentially effective and reasonably feasible alternatives considered by the Agency.

This action is not subject to Executive Order 13045 because it does not involve decisions on environmental health or safety risks that may disproportionately affect children. EPA believes that the emission reductions from the strategies in this rule will further improve air quality and will further improve children's health. Analyses by EPA that show how the emission reductions from the strategies in this rule will further improve air quality and children's health can be found in the RIA for this rule.

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

Executive Order 13211 (66 FR 28355, May 22, 2001) provides that agencies shall prepare and submit to the Administrator of the Office of Regulatory Affairs, OMB, a Statement of Energy Effects for certain actions identified as "significant energy actions." Section 4(b) of Executive Order 13211 defines "significant energy action" as "any action by an agency (normally published in the **Federal Register**) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking: (1)(i) That is a significant regulatory action under Executive Order 12866 or any successor order, and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy; or (2) that is designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action." This rule is a significant regulatory action under Executive Order 12866, and this rule is likely to have a significant adverse effect on the supply, distribution, or use of energy. EPA prepared a Statement of Energy Effects for this action as follows.

Under the provisions of this rule, EPA projects that approximately 4.8 GW of additional coal-fired generation may be removed from operation by 2014. In practice, however, the units projected to be uneconomic to maintain may be "mothballed," retired, or kept in service to ensure transmission reliability in certain parts of the grid. These units are predominantly small and infrequently-used generating units dispersed throughout the area affected by the rule. If current forecasts of either natural gas prices or electricity demand were revised in the future to be higher, that would create a greater incentive to keep these units operational.

EPA estimates that average retail electricity prices could increase in the

contiguous U.S. by about 1.7 percent in 2012 and 0.8 percent in 2014. This is generally less of an increase than often occurs with fluctuating fuel prices and other market factors. Related to this, EPA projects limited impacts on coal and gas prices. The average delivered coal price decreases by about 1.4 percent in 2012 and 0.9 percent in 2014 relative to the base case as a result of decreased coal demand and shifts in the type of coal demanded. EPA also projects that the electric power sector-delivered natural gas price will increase by about 0.3 percent over the 2012–2030 timeframe and that natural gas use for electricity generation will increase by approximately 200 billion cubic feet (BCF) by 2014. These impacts are well within the range of price variability that is regularly experienced in natural gas markets. Finally, under the Transport Rule, EPA projects that coal production for use by the power sector will increase above 2009 levels by 21 million tons in 2012 and a further 14 million tons in 2014, as opposed to 30 million tons in 2012 and a further 26 million tons in 2014 without the Transport Rule in place. The Transport Rule is not projected to impact production of coal for uses outside the power sector (*e.g.*, export, industrial sources), which represent approximately 6 percent of total coal production in 2009. EPA does not believe that this rule will have any other impacts (*e.g.*, on oil markets) that exceed the significance criteria.

EPA believes that a number of features of the rulemaking serve to reduce its impact on energy supply. First, the trading component of the Transport Rule provides flexibility to the power sector and enables industry to comply with the emission reduction requirements in the most cost-effective manner compared to the alternative remedy approaches on which EPA took comment in the proposal, thus minimizing overall costs and the ultimate impact on energy supply. Second, the more stringent budgets for $SO_2$ are set in two phases, providing adequate time for EGUs to install pollution controls. In addition, both the operational flexibility of trading and the ability to bank allowances for future years helps industry plan for and ensure reliability in the electrical system.

For more details concerning energy impacts, *see* the RIA for the Transport Rule.

## I. National Technology Transfer Advancement Act

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (NTTAA), Public Law 104–113, 12(d) (15 U.S.C. 272 note) directs EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (*e.g.,* materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards. This rule will require all sources to meet the applicable monitoring requirements of 40 CFR part 75. Part 75 already incorporates a number of voluntary consensus standards. Consistent with the Agency's Performance Based Measurement System (PBMS), Part 75 sets forth performance criteria that allow the use of alternative methods to the ones set forth in Part 75. The PBMS approach is intended to be more flexible and cost effective for the regulated community; it is also intended to encourage innovation in analytical technology and improved data quality. At this time, EPA is not recommending any revisions to Part 75; however, EPA periodically revises the test procedures set forth in Part 75. When EPA revises the test procedures set forth in Part 75 in the future, EPA will address the use of any new voluntary consensus standards that are equivalent. Currently, even if a test procedure is not set forth in Part 75, EPA is not precluding the use of any method, whether it constitutes a voluntary consensus standard or not, as long as it meets the performance criteria specified; however, any alternative methods must be approved through the petition process under 40 CFR 75.66 before they are used.

## J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order (EO) 12898 (59 FR 7629 (Feb. 16, 1994)) establishes federal executive policy on environmental justice. Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority, low-income, and Tribal populations in the United States. During development of this final Transport Rule, EPA considered its impacts on low-income, minority, and tribal communities in several ways and provided multiple opportunities for these communities to meaningfully participate in the rulemaking process. The proposed Transport Rule included an analysis of its effects on these populations; this section describes additional analysis conducted since proposal, EPA's responses to key comments on environmental justice issues raised during the comment period, and the public outreach and comment opportunities for this rule.

A summary of the history, statutory authority, and key components of this final Transport Rule are described in the Executive Summary (section III) of this preamble. That section also summarizes a supplemental notice of proposed rulemaking (SNPR) that EPA is publishing to correct a procedural flaw by providing an opportunity for public comment on issues that arose from new analyses with updated inventories and modeling platforms.

Briefly, this final Transport Rule will reduce emissions of $SO_2$ and $NO_X$ in 23 eastern and central states in 2012 and 2014 that contribute to annual and/or 24-hour $PM_{2.5}$ nonattainment or interfere with maintenance in downwind states. It will also reduce emissions of ozone-season $NO_X$ in 20 eastern and central states in 2012 and 2014 that contribute to the 1997 ozone nonattainment or interfere with maintenance in downwind states. This rule is replacing an earlier rule (the 2005 Clean Air Interstate Rule (CAIR)) that was first vacated and then remanded to EPA by the U.S. Court of Appeals for the District of Columbia Circuit in 2008.

1. Consideration of Environmental Justice in the Transport Rule Development Process and Response to Comments

The effects of this final Transport Rule on the most highly exposed populations were integral in its development. This rule uses EPA's authority in CAA section 110(a)(2)(d) to reduce sulfur dioxide ($SO_2$) and (nitrogen oxides) $NO_X$ pollution that significantly contributes to downwind $PM_{2.5}$ and ozone nonattainment or maintenance areas. As a result, the rule will reduce exposures to ozone and $PM_{2.5}$ in the most-contaminated areas (*i.e.,* areas that are not meeting the 1997 ozone and 1997 and 2006 $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS)). In addition, the rule separately identifies both nonattainment areas and maintenance areas (maintenance areas are those that are projected to meet the NAAQS but that, based on past data, are in danger of

exceeding the standards in the future). This requirement reduces the likelihood that any areas close to the level of the standard will exceed the current health-based standards in the future.

This final Transport Rule implements these emission reductions using an emission trading mechanism with assurance provisions for power plants. EPA recognizes that many environmental justice communities have voiced concerns in the past about emission trading and the potential for any emission increases in any location. EPA also received several comments on this issue during the comment period for the proposed Transport Rule. As described below, we believe this final rule addresses the concerns raised on this issue during the comment period.

$PM_{2.5}$ and ozone pollution from power plants have both local and regional components: Part of the pollution in a given location—even in locations near emission sources—is due to emissions from nearby sources and part is due to emissions that travel hundreds of miles and mix with emissions from other sources. Therefore, in many instances the exact location of the upwind reductions does not affect the levels of air pollution downwind.

It is important to note that the section of the Clean Air Act providing authority for this rule, section 110(a)(2)(D), unlike some other provisions, does not dictate levels of control for particular facilities. As at least one commenter noted, none of the alternatives put forward by EPA in the proposed rule could have ensured no emission increases at any facility. Under the direct control alternative, the emission rate for each facility would have been limited but each facility could emit more by increasing their power output in order to meet electricity reliability or other goals. Under the intrastate trading option, sources could not trade allowances with sources in other states but individual facilities within each state could have increased their emissions as long as another facility in the state had decreased theirs at some time.

The final Transport Rule allows sources to trade allowances with other sources in the same or different states while firmly constraining any emissions shifting that may occur by requiring a strict emission ceiling in each state (the budget plus variability limit). In addition, assurance provisions in the rule outline the allowance surrender penalties for failing to meet the budget plus variability limits; there are additional allowance penalties as well as financial penalties for failing to hold an adequate number of allowances to cover emissions. This approach

eliminates emissions in each state that significantly contribute to downwind nonattainment or maintenance areas, while allowing power companies to adjust generation as needed and ensure that the country's electricity needs will continue to be met. EPA maintains that the existence of these assurance provisions, including the penalties imposed when triggered, will ensure that state emissions will stay below the level of the budget plus variability limit.

In addition, all sources must hold enough allowances to cover their emissions. Therefore, if a source emits more than its allocation in a given year, either another source must have used less than its allocation and be willing to sell some of its excess allowances, or the source itself had emitted less than its allocation in one or more previous years (*i.e.,* banked allowances for future use).

In summary, the final remedy addresses commenter concerns about localized hot spots and reduces ambient concentrations of pollution where they are most needed by sensitive and vulnerable populations by: Considering the science of ozone and $PM_{2.5}$ transport to set strict state budgets to eliminate significant contributions to ozone and $PM_{2.5}$ nonattainment and maintenance (*i.e.,* the most polluted) areas; implementing air quality-assured trading; requiring any emissions above the level of the allocations to be offset by emission decreases; and imposing strict penalties for sources that contribute to a state's exceedance of its budget plus variability limit. In addition, it is important to note that nothing in this final rule allows sources to violate their title V permit or any other federal, state, or local emissions or air quality requirements.

EPA received comments from several tribal commenters regarding the lack of allocations in the proposal to new units in Indian Country. EPA responded to these comments by changing the allocation approach in the final rule to create Indian country new unit set-asides. In order to protect tribal sovereignty, these set-asides will be managed and distributed by the federal government regardless of whether the Transport Rule in the adjoining or surrounding state is implemented through a FIP or SIP. While there are no existing power plants in Indian country covered by this Transport Rule, the Indian country set-asides will ensure that any future new units built in Indian country will be able to get the necessary allowances. A full discussion of the Indian country new unit set-asides can be found in section VII.D.2.

EPA also received several comments during the comment period from

individuals and groups requesting additional emission reductions to further protect sensitive and vulnerable communities. While EPA has adjusted the emission requirements somewhat in the final rule to accommodate revised data and updated modeling results, we are finalizing emission reductions very similar to the level in the proposal. This is because EPA believes that the emission reductions required by this final rule are appropriate to meet the statutory requirements of CAA section 110(a)(2)(d) and respond to the concerns raised by the Court's opinion in *North Carolina* that remanded CAIR to the Agency in 2008.

In addition, it is important to note that CAA section 110(a)(2)(d), which addresses transport of criteria pollutants between states, is only one of many provisions of the CAA that provide EPA, states, and local governments with authorities to reduce exposure to ozone and $PM_{2.5}$ in communities. These legal authorities work together to reduce exposure to these pollutants in communities, including for minority, low-income, and tribal populations, and provide substantial health benefits to both the general public and sensitive sub-populations.

For example, the recently-proposed Mercury and Air Toxics Standards (MATS) would also result in significant reductions in $SO_2$ emissions and provide significant health and environmental benefits nationwide. This and other actions described in section III will have substantial and long-term effects on both the U.S. power industry and on communities currently breathing dirty air. Therefore, we anticipate significant interest in many, if not most, of these actions from environmental justice communities, among many others. EPA will continue to provide multiple opportunities for comment on these actions, similar to the opportunities provided during the comment process for this rule, detailed at the end of this section. We encourage environmental justice communities to review and comment on these actions.

2. Potential Environmental and Public Health Impacts Among Populations Susceptible or Vulnerable to Air Pollution

EPA expects that this final rule will provide significant health and environmental benefits to, among others, people with asthma, people with heart disease, and people living in ozone or $PM_{2.5}$ nonattainment areas. EPA's analysis of the effects of this rule, including information on air quality changes and the resulting health benefits, is presented both in section

VIII of this preamble and in the Regulatory Impact Analysis (RIA) for this rule. These documents can be accessed through the rule docket No. EPA–HQ–OAR–2009–0491 and from the main EPA webpage for the rule at *http://www.epa.gov/airtransport.*

EPA considered several aspects of the effects of the Transport Rule on minority, low-income, and tribal populations. These included: amount of emission reductions and where they take place (including any potential for areas of increased emissions); the changes in ambient concentrations across the affected area; the estimated health benefits; and how the estimated health benefits are distributed among different populations, including those susceptible and vulnerable to air pollution health impacts.

a. Emission Reductions

EPA's emission modeling data indicate that implementation of the Transport Rule will substantially reduce $SO_2$ emissions from electric generating units (EGUs). As noted in section III, emissions in states covered by the Transport Rule will decrease by 6.4 million tons (73 percent) in 2014 compared to 2005 (the year the Clean Air Interstate Rule was finalized). Emissions are also projected to decrease when compared to the base case (the base case estimates emissions in 2014 in the absence of this rule or the Clean Air Interstate Rule it is replacing. EPA estimates that $SO_2$ emissions in 2014 in covered states will be 3.9 million tons lower (62 percent lower) compared to the base case.

EPA also assessed emission changes in states not covered by the Transport Rule. Emissions in the states not covered by the Transport Rule are also projected to decrease substantially compared to 2005 levels; in 2014 $SO_2$ emissions are projected to be approximately 430,000 tons lower (30 percent lower) in 2005.

As described in section VI.C, EPA's modeling does project that some states not covered by any of the fine particle control programs in the final Transport Rule may experience increases of $SO_2$ emissions greater than 5,000 tons compared to the base case. These states are Arkansas, Colorado, Louisiana, Montana, and Wyoming. These emission increases are the result of forecasted changes in operation of power plant units outside of the Transport Rule states due to the interconnected nature of the utility grid (*i.e.,* shifts in generation of electricity to sources outside the Transport Rule states) or influence of the rule on the market for lower sulfur coal. For example, EPA projects that the rule will raise demand for lower sulfur coal in the states covered by the Transport Rule for $PM_{2.5}$ (thereby raising its price), which may lead sources in states not covered for $PM_{2.5}$ to choose higher-sulfur coals that increase $SO_2$ emissions in those states.

EPA is not requiring $SO_2$ emission reductions in these states under this rule because our modeling indicates none of these states' contributions would increase enough to cause them to meet or exceed the thresholds described in section V.D for either of the $PM_{2.5}$ standards. EPA's authority under CAA section 110(a)(2)(d) is limited to addressing this significant contribution to nonattainment and interference with maintenance. However, as noted above, EPA has recently proposed the Mercury and Air Toxics Standards that will apply nationwide and result in substantial additional $SO_2$ emission reductions, including in states not covered by the Transport Rule.

EPA's emission modeling data indicates that ozone-season $NO_X$ emissions from EGUs in states covered by the Transport Rule will be approximately 340,000 tons lower (36 percent lower) in 2014 than they were in 2005. Emissions in states not covered by the Transport Rule are also expected to decrease somewhat (approximately 82,000 tons or 25 percent). EPA's modeling does project that two states (California and Pennsylvania) may experience increases of $NO_X$ emissions greater than 5,000 tons in 2014 compared to 2005 levels. California is not covered by the Transport Rule; in Pennsylvania, 2005 was an unusually low-emitting year and sources are projected to increase their heat input slightly (usually meaning they are generating more power) after the rule takes effect.

EPA also assessed the expected changes in seasonal $NO_X$ emissions with implementation of the Transport Rule compared to the base case (*i.e.,* without the rule) in 2014. The modeling indicates ozone-season $NO_X$ emissions from EGUs in both covered states and non-Transport Rule states under this rule will be lower than they would have been in 2014 in the base case. Ozone-season $NO_X$ emissions in covered states are projected to decrease by approximately 74,000 tons (11 percent); ozone-season $NO_X$ emissions in non-Transport Rule states are projected to decrease by approximately 10,000 tons (4 percent). Both California and Pennsylvania are projected to have lower $NO_X$ emissions in 2014 under the Transport Rule as compared to the base case. In addition, EPA anticipates that additional upcoming actions, including likely additional interstate transport reductions to help states attain the upcoming new ozone NAAQS, will result in significant additional $NO_X$ reductions in the future.

b. Air Quality Improvements

EPA assessed the air quality metrics (called ''design values'') for each NAAQS addressed in this rule: 24-hour $PM_{2.5}$, annual $PM_{2.5}$, and ozone. We then compared these metrics for the final rule to the same metrics in the recent past (2003–2007 average ambient air quality) and for the 2014 base case to assess improvements in air quality.

EPA's modeling indicates that there will be significant improvements in air quality as measured by the 24-hour $PM_{2.5}$ standard. Throughout much of the eastern half of the U.S., 24-hour $PM_{2.5}$ design values are projected to improve more than 10 $\mu g/m^3$ compared to the 2003–2007 average levels. In addition, compared to the 2014 base case levels, we project the Transport Rule will result in improvements of 8–10 $\mu g/m^3$ in a broad swath of states stretching from far southwestern New York through Pennsylvania, Ohio, West Virginia, Maryland, Indiana, southern Illinois, eastern Missouri, eastern Arkansas, Kentucky, Tennessee, northern Alabama, and northern Mississippi. Isolated areas of Virginia and northern New Jersey are also expected to see this level of improvement. Improvements of 2–6 $\mu g/m^3$ are projected in surrounding states stretching from New England and New York to Minnesota, Iowa, the far eastern edge of Nebraska, Missouri, eastern Kansas, Oklahoma, Texas, the Gulf of Mexico states, and the states bordering the Atlantic Ocean from Florida to New Hampshire.

EPA modeling indicates that air quality as measured by the annual $PM_{2.5}$ design value will also improve. Improvements range from 2 to over 4 $\mu g/m^3$ compared to the 2003–2007 average levels throughout the eastern half of the U.S. Annual $PM_{2.5}$ air quality with the Transport Rule is also projected to improve compared to the 2014 base case levels. The largest improvements of up to 4 $\mu g/m^3$ are projected to occur in northern West Virginia and a small area in northwestern Tennessee. Improvements of up to 3 $\mu g/m^3$ are projected for portions of the Ohio River valley areas of southwestern Pennsylvania, Ohio, West Virginia, Kentucky, central Tennessee, and southern Indiana. Improvements of up to 2 $\mu g/m^3$ are projected to take place in a ring of surrounding states including all or most of New York, Michigan, Indiana,

Illinois, Missouri, Arkansas, the far eastern edge of Oklahoma, the northeastern edge of Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina, North Carolina, Virginia, Maryland, Delaware, Pennsylvania, and New Jersey. Smaller improvements are projected in New England, Wisconsin, the Plains states, southeastern New Mexico, and Florida.

EPA modeling indicates that ozone air quality will improve greatly (10–12 ppb or more) across much of the eastern U.S. between the average levels seen in 2003–2007 and implementation of the Transport Rule. Most of the improvements take place in the base case; that is, they are the result of federal and state programs other than the Transport Rule. However, ozone air quality is projected to improve somewhat as a direct result of the Transport Rule. Improvements in ozone design values compared to the base case of more than 1 ppb are projected for portions of Florida, eastern Oklahoma, and areas along the upper reaches of the Ohio River. In addition, improvements in ozone design values of up to 1 ppb are projected over a wide area across the eastern U.S. from New England to Texas and north to Minnesota. Improvements are also projected in north-central Colorado.

EPA's modeling does indicate small increases in annual PM$_{2.5}$ air quality design values in the final rule compared to the 2014 base case in two counties outside of the Transport Rule states: one county in northern Colorado and one county in eastern Montana. As noted above in the section on emissions, these increases are likely the result of forecasted changes in electricity generation due to the interconnected nature of both the utility grid and the national low-sulfur coal market. It should be noted that 2003–2007 average air quality levels in these counties are well below the level of the NAAQS. In addition, other actions, including federal rules such as the recently proposed Mercury and Air Toxics Standards, state, or local actions may also improve air quality in these areas over the next few years.

As described in section VIII.B, EPA anticipates that this final rule will reduce, but not eliminate, the number of nonattainment and maintenance areas for the 1997 ozone and PM$_{2.5}$ and 2006 PM$_{2.5}$ NAAQS. As noted above, ozone and PM$_{2.5}$ concentrations are the result of both local emissions and long-range transport of pollution. Even when the significant contributions of upwind states are fully eliminated, additional emission reductions within the nonattainment area and/or the downwind state will be needed for some areas to attain and maintain the NAAQS.

c. Estimated Health Benefits

This rule reduces concentrations of PM$_{2.5}$ and ozone pollution. Exposure to these pollutants can cause, or contribute to, adverse health effects that affect many minority, low-income, and tribal individuals and communities. PM$_{2.5}$ and ozone are particularly (but not exclusively) harmful to children, the elderly, and people with existing heart and lung diseases, including asthma. Exposure to these pollutants can cause premature death and trigger heart attacks, asthma attacks in those with asthma, chronic and acute bronchitis, emergency room visits and hospitalizations, as well as milder illnesses that keep children home from school and adults home from work. High rates of heart disease (*e.g.,* high blood pressure)[123] and asthma[124] exist in many environmental justice communities, making these populations more susceptible to air pollution health impacts. In addition, many individuals in these communities lack access to high quality health care to treat these illnesses.[125]

We estimate that in 2014 the PM-related annual benefits of the final rule include approximately 13,000 to 34,000 fewer premature mortalities, 8,700 fewer cases of chronic bronchitis, 15,000 fewer non-fatal heart attacks, 8,500 fewer hospitalizations (for respiratory and cardiovascular disease combined), 10 million fewer days of restricted activity due to respiratory illness, and approximately 1.7 million fewer lost work days. We also estimate substantial health improvements for children in the form of fewer cases of upper and lower respiratory illness, acute bronchitis, and asthma attacks.

Ozone health-related benefits are expected to occur during the summer ozone season (usually ranging from May to September in the eastern U.S.). Based upon modeling for 2014, annual ozone related health benefits are expected to include (in addition to the PM-related benefits above) between 27–120 fewer premature mortalities, 240 fewer hospital admissions for respiratory illnesses in children and older adults, 86 fewer emergency room admissions for asthma, 160,000 fewer days with restricted activity levels, and 51,000 fewer "school absence" days when children are absent from school due to illnesses. When adding the PM and ozone-related mortalities together, we find that the final rule will yield between 13,000 and 34,000 fewer premature mortalities.

It should be noted that, as discussed in the RIA, there are other benefits to the emission reductions discussed here, including many other health benefits beyond reducing the risk of premature mortality. Additional benefits of reducing emissions of SO$_2$ include improved visibility, reduced acidification of lakes and streams, and reduced mercury methylation in contaminated waters; additional benefits of NO$_X$ reductions include improved visibility, reduced acidification of lakes and streams, and reduced coastal eutrophication.

d. Distribution of Health Benefits Among Different Populations

EPA also estimated the PM$_{2.5}$ mortality risks according to race, income, and educational attainment before and after implementation of this Transport Rule. We used premature mortality for this analysis for several reasons: It is the most serious health effect of exposure to PM$_{2.5}$, and EPA has access to nationwide incidence and demographic data at an appropriate scale to conduct this type of analysis. EPA included educational attainment in this assessment because research on the effects of PM$_{2.5}$ has found that educational attainment is inversely related to the risk of all-cause mortality. That is, populations with lower levels of education (in particular, less than grade 12) experience higher rates of PM$_{2.5}$ mortality. Krewski and colleagues[126] note in their analysis of this relationship that the level of education attainment is likely to be a surrogate for the effects of complex socioeconomic processes (including factors such as race and income) on mortality.

In the first step of the analysis, we estimated baseline (2005) PM$_{2.5}$ mortality risk by race (White, Black, Asian, Native American) among people living in the counties with the highest (top 5 percent) PM$_{2.5}$ mortality risk. We

---

[123] Neighborhood of Residence and Incidence of Coronary Heart Disease Ana V. Diez Roux, M.D., PhD *et al.* N Engl J Med 2001; 345:99–106; July 12, 2001.

[124] Centers for Disease Control and Prevention. 2007 National Health 11. Interview Survey Data. Table 4–1. Current Asthma Prevalence Percents by Age, United States: National Health Interview Survey, 2007. Atlanta, GA: U.S. Department of Health and Human Services, CDC, 2010. Accessed June 1, 2010.

[125] R. Nelson, Eds. National Institute of Medicine, 2003.

[126] Krewski D, Jerrett M, Burnett RT, Ma R, Hughes E, Shi Y, Turner C, Pope CA, Thurston G, Calle EE, Thunt MJ. Extended follow-up and spatial analysis of the American Cancer Society study linking particulate air pollution and mortality. HEI Research Report, 140, 2009; Health Effects Institute, Boston, MA.

also estimated baseline $PM_{2.5}$ mortality risk by race among people living in the counties with both the highest (top 5 percent) poverty rate and the highest (top 5 percent) $PM_{2.5}$ mortality risk in 2005. And, we estimated the baseline (2005) $PM_{2.5}$ mortality risk by educational attainment for people living in the highest $PM_{2.5}$ mortality risk counties. In the second step, we estimated the changes in risk for different races among the people living in these "high-risk" and "high risk and high-poverty" counties resulting from implementation of other existing rules in 2014 and from implementation of just the Transport Rule in 2014. Finally, in the third step, we compared the effects of the Transport Rule by race in the high-risk and high risk/high-poverty counties with the effects on people (by race) living in all other counties.

In 2005, people living in the highest-risk counties and in the high risk/high poverty counties had substantially greater risks of $PM_{2.5}$-related death than people living in the other 95 percent of counties. This was true regardless of race: The difference among races in both groups of counties was very small and dwarfed by the large difference between the two groups of counties for all races. For educational attainment, in contrast, our analysis found that people with less than high school education had significantly greater risks from $PM_{2.5}$ mortality than people with a greater than high school education. This was especially true for people living in the highest-risk counties, but also held true for people living in all other counties. In summary, in 2005, having less than a high school or high school education, living in one of the poorest counties, and living in a high air pollution risk county are associated with higher $PM_{2.5}$ mortality risk; race is not.

Our analysis of the effects of the Transport Rule on this underlying exposure pattern finds that the rule will significantly reduce the $PM_{2.5}$ mortality among all populations of different races living throughout the U.S. compared to both 2005 and 2014 pre-rule (i.e., base case) levels. No group will experience any increases in $PM_{2.5}$ related deaths as a result of implementing the Transport Rule.

The analysis indicates that the populations with the largest improvement (i.e., largest decline) in $PM_{2.5}$ mortality risk as a result of the Transport Rule in 2014 (compared to the base case in 2014) are people living in the highest-risk counties. Among these counties, the largest improvements are for people with less than high school or high school education. These reductions in risk within the highest-risk counties,

as well as the reductions in risk within the other 95 percent of counties, are distributed among populations of different races fairly evenly. Therefore, there is no indication that people of particular race receive a greater benefit (or smaller benefit) than others.

The analysis indicates that people living in the high risk/high poverty counties will experience larger improvements in risk from the Transport Rule compared to their counterparts in the other counties. This result suggests that the Transport Rule is providing the greatest risk reduction improvements among counties containing the poorest, and highest risk, populations. There is also little difference in the improvement in risk among races; in other words, people in the high risk/high poverty counties experience the same improvement in risk regardless of race.

The analysis also indicates that this rule, in conjunction with the implementation of existing or proposed rules (e.g., the proposed Mercury and Air Toxics Standards), will reduce the disparity in risk between the highest-risk counties and the other 95 percent of counties for all races and educational levels. In addition, implementation of this Transport Rule and other rules will, together, reduce risks in the poorest and highest risk counties to the approximate level of risk for the rest of the counties before implementation. This analysis is presented in more detail in the RIA for this rule which is available in the rule docket No. EPA–HQ–OAR–2009–0491 and from the main EPA webpage for the rule at *http://www.epa.gov/airtransport*.

### 3. Meaningful Public Participation

EPA defines "Environmental Justice" to include meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. To promote meaningful involvement, EPA developed a communication and outreach strategy to ensure that interested communities had access to the proposed Transport Rule, were aware of its content, and had an opportunity to comment during the comment period. These efforts are summarized below.

As EPA began considering approaches to address the court remand of the 2005 Clean Air Interstate Rule, long before the rule was proposed, the agency also began gathering input from a large range of stakeholders. In the spring of 2009, EPA held a series of listening sessions to gather information and perspectives from stakeholders prior to the formal

start of the rulemaking process. These stakeholders included a number of environmental groups who requested that EPA consider several potential environmental justice issues during development of this rule. In addition, many environmental justice organizations were represented at a November 2009 EPA-Health and Human Services White House Stakeholder Briefing titled, "The Public Health Benefits of Energy Reform" in which EPA discussed our intention to propose this rule in the spring of 2010 and participants had the opportunity to respond. Finally, EPA notified Indian Tribes of our intent to propose this rule in the fall of 2009 during a regularly scheduled meeting to update the National Tribal Air Association members of upcoming EPA policies and regulations and to receive input from them on the effects of these efforts in Indian country. These were not opportunities for stakeholders to comment on the specifics of the proposal, as they took place prior to its development, but they provided valuable information that EPA used in developing the proposal.

Just after the rule was proposed in July 2010, EPA presented a summary of information related to the proposed Transport Rule at the National Environmental Justice Advisory Council (NEJAC) meeting in Washington, DC, and responded to questions from NEJAC members regarding the proposed rule. EPA also solicited suggestions for how to engage environmental justice communities during the rule comment period.

During the public comment period, EPA held public hearings in Chicago, Philadelphia, and Atlanta. Each hearing was advertised by EPA through a variety of products targeted to general audiences (e.g., fact sheets, press release, slide presentation, etc.); on EPA's environmental justice listserve; and by non-profit organizations (e.g., American Lung Association). The public hearings were held in public buildings (i.e., no formal identification required to enter or to speak) and were open for 11 hours (9 a.m.–8 p.m.) to accommodate commenters with various work schedules. All three hearings were well-attended by members of the general public. During hearing breaks, EPA staff spent time talking with individuals, including those representing environmental justice organizations or communities, to understand their perspectives in greater detail. As noted above, several commenters at each hearing made comments related to the need to protect communities living near power plants and the most vulnerable

individuals. Some of these commenters specifically mentioned environmental justice; others mentioned issues often of concern to environmental justice communities, such as hot spots, interest in additional emission reductions and greater environmental protection, and concern over the effects of the rule on the most sensitive and vulnerable populations.

In September 2010, during the comment period, EPA held a webinar for EJ communities on the proposed Transport Rule. A presentation tailored for an audience of environmental justice, community, and tribal representatives was specifically designed for this webinar. It was sent to registered participants beforehand and put on the Transport Rule webpage, where it remains posted. The presentation included both information on the context of the rule, plain language information describing the rule itself, and directions on how to comment on the rule.

EPA staff made a short presentation and answered questions about the Transport Rule on a standing bi-monthly community conference call targeted to environmental justice and tribal representatives and organizations. In addition, at the fall 2010 NEJAC meeting in Kansas City, Missouri, EPA provided details of the proposed Transport Rule as part of a larger discussion of a sector-based approach to utility regulation.

Regarding tribal consultation, EPA sent letters to all 565 federally-recognized Tribes in the country offering consultation on the proposed Transport Rule. In addition, the January 7 NODA on allowance allocation methodologies specifically requested comment on allocating allowances to new units in Indian Country. EPA held two consultation and information-sharing calls with 16 interested Tribes in late January and early February 2011. Tribes participating on these consultation and information calls provided comments on the proposed rule and the allowance allocation NODA. As noted above, this additional input from the consultation process was taken into account in the development of the final rule. *See Section XII.F* for more information on tribal consultation.

4. Summary

EPA believes that the vast majority of communities and individuals in areas covered by this rule, including numerous low-income, minority, and tribal individuals and communities in both rural areas and inner cities in the eastern and central U.S., will see significant improvements in air quality

and resulting improvements in health. EPA's assessment of the effects of the proposed and final Transport Rules on these communities included: (a) The structure of the rule and responses to comments received on issues specific to these communities; (b) expected $SO_2$ and $NO_X$ emission reductions; (c) expected $PM_{2.5}$ and ozone air quality improvements; (d) expected health benefits, including asthma and other health effects of particular concern for environmental justice communities; and (e) a quantitative assessment of the expected socioeconomic distribution of a key health benefit (reduction in premature mortality). All of these analyses indicate large health and environmental benefits for these communities; none shows evidence of adverse effects. As a result, EPA concludes that we do not expect disproportionately high and adverse human health or environmental effects on minority, low-income, or tribal populations in the United States as a result of implementing this final Transport Rule.

*K. Congressional Review Act*

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is a "major rule" as defined by 5 U.S.C. 804(2). This rule will be effective October 7, 2011.

*L. Judicial Review*

Petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by October 7, 2011. Section 307(b)(1) of the CAA indicates which Federal Courts of Appeal have venue for petitions of review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit if (i) the agency action consists of "nationally applicable regulations promulgated, or final action taken, by the Administrator," or (ii) such action is locally or regionally applicable, if "such

action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination."

Any final action related to the Transport Rule is "nationally applicable" within the meaning of section 307(b)(1). Through this rule, EPA interprets section 110 of the CAA, a provision which has nationwide applicability. In addition, the Transport Rule applies to 27 States. The Transport Rule is also based on a common core of factual findings and analyses concerning the transport of pollutants between the different states subject to it. For these reasons, the Administrator also is determining that any final action regarding the Transport Rule is of nationwide scope and effect for purposes of section 307(b)(1). Thus, pursuant to section 307(b) any petitions for review of final actions regarding the Transport Rule must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date final action is published in the **Federal Register**.

Filing a petition for reconsideration of this action does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed and shall not postpone the effectiveness of such rule or action. In addition, pursuant to CAA section 307(b)(2) this action may not be challenged later in proceedings to enforce its requirements.

In addition, this action is subject to the provisions of section 307(d). CAA section 307(d)(1)(B) provides that section 307(d) applies to, among other things, to "the promulgation or revision of an implementation plan by the Administrator under CAA section 110(c)" (42 U.S.C. 7407(d)(1)(B)). The Agency has complied with procedural requirements of CAA section 307(d) during the course of this rulemaking.

List of Subjects

*40 CFR Part 51*

Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Regional haze, Reporting and recordkeeping requirements, Sulfur dioxide.

*40 CFR Part 52*

Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen

oxides, Ozone, Particulate matter, Regional haze, Reporting and recordkeeping requirements, Sulfur dioxide.

*40 CFR Part 72*

Acid rain, Administrative practice and procedure, Air pollution control, Electric utilities, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Reporting and recordkeeping requirements, Sulfur dioxide.

*40 CFR Part 78*

Acid rain, Administrative practice and procedure, Air pollution control, Electric utilities, Intergovernmental relations, Nitrogen oxides, Reporting and recordkeeping requirements, Sulfur dioxide.

*40 CFR Part 97*

Administrative practice and procedure, Air pollution control, Electric utilities, Nitrogen oxides, Reporting and recordkeeping requirements, Sulfur dioxide.

Dated: July 6, 2011.

**Lisa P. Jackson,**

*Administrator.*

For the reasons set forth in the preamble, parts 51, 52, 72, 78, and 97 of chapter I of title 40 of the Code of Federal Regulations are amended as follows:

## PART 51—[AMENDED]

■ 1. The authority citation for part 51 continues to read as follows:

**Authority:** 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

### § 51.121   [Amended]

■ 2. In § 51.121 paragraph (r)(2) is amended by removing the words "§ 51.123(bb)" and adding, in their place, the words "§ 51.123(bb) with regard to an ozone season that occurs before January 1, 2012".

■ 3. Section 51.123 is amended by adding a new paragraph (ff) to read as follows:

### § 51.123   Findings and requirements for submission of State implementation plan revisions relating to emissions of oxides of nitrogen pursuant to the Clean Air Interstate Rule.

\* \* \* \* \*

(ff) Notwithstanding any provisions of paragraphs (a) through (ee) of this section, subparts AA through II and AAAA through IIII of part 96 of this chapter, subparts AA through II and AAAA through IIII of part 97 of this chapter, and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011, the Administrator:

(i) Rescinds the determination in paragraph (a) of this section that the States identified in paragraph (c) of this section must submit a SIP revision with respect to the fine particles ($PM_{2.5}$) NAAQS and the 8-hour ozone NAAQS meeting the requirements of paragraphs (b) through (ee) of this section; and

(ii) Will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 96 of this chapter, subparts AA through II and AAAA through IIII of part 97 of this chapter, or in any emissions trading program provisions in a State's SIP approved under this section;

(2) The Administrator will not deduct for excess emissions any CAIR $NO_X$ allowances or CAIR $NO_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Allowance Tracking System accounts all CAIR $NO_X$ allowances allocated for a control period in 2012 and any subsequent year and, thereafter, no holding or surrender of CAIR $NO_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Ozone Season Allowance Tracking System accounts all CAIR $NO_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR $NO_X$ Ozone Season allowances will be required with regard to emissions or excess emissions for such control periods.

■ 4. Section 51.124 is amended by adding a new paragraph (s) to read as follows:

### § 51.124   Findings and requirements for submission of State implementation plan revisions relating to emissions of sulfur dioxide pursuant to the Clean Air Interstate Rule.

\* \* \* \* \*

(s) Notwithstanding any provisions of paragraphs (a) through (r) of this section, subparts AAA through III of part 96 of this chapter, subparts AAA through III of part 97 of this chapter, and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011, the Administrator:

(i) Rescinds the determination in paragraph (a) of this section that the States identified in paragraph (c) of this section must submit a SIP revision with respect to the fine particles ($PM_{2.5}$) NAAQS meeting the requirements of paragraphs (b) through (r) of this section; and

(ii) Will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 96 of this chapter, subparts AAA through III of part 97 of this chapter, or in any emissions trading program in a State's SIP approved under this section; and

(2) The Administrator will not deduct for excess emissions any CAIR $SO_2$ allowances allocated for 2012 or any year thereafter.

### § 51.125   [Reserved]

■ 5. Section 51.125 is removed and reserved.

## PART 52—[AMENDED]

■ 6. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

## Subpart A—General Provisions

■ 7. Section 52.35 is amended by adding a new paragraph (f) to read as follows:

### § 52.35   What are the requirements of the Federal Implementation Plans (FIPs) for the Clean Air Interstate Rule (CAIR) relating to emissions of nitrogen oxides?

\* \* \* \* \*

(f) Notwithstanding any provisions of paragraphs (a) through (d) of this section, subparts AA through II and AAAA through IIII of part 97 of this chapter, and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) through (d) of this section relating to $NO_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter;

(2) The Administrator will not deduct for excess emissions any CAIR $NO_X$ allowances or CAIR $NO_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Allowance Tracking System accounts all CAIR $NO_X$ allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR $NO_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Ozone Season Allowance Tracking System accounts all CAIR NO$_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods.

■ 8. Section 52.36 is amended by adding a new paragraph (e) to read as follows:

### § 52.36   What are the requirements of the Federal Implementation Plans (FIPs) for the Clean Air Interstate Rule (CAIR) relating to emissions of sulfur dioxide?

\*    \*    \*    \*    \*

(e) Notwithstanding any provisions of paragraphs (a) through (c) of this section, subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraphs (a) through (e) of this section relating to SO$_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR SO$_2$ allowances allocated for 2012 or any year thereafter.

■ 9. Sections §§ 52.38 and 52.39 are added to subpart A to read as follows:

### § 52.38   What are the requirements of the Federal Implementation Plans (FIPs) under the Transport Rule (TR) relating to emissions of nitrogen oxides?

(a)(1) The TR NO$_X$ Annual Trading Program provisions set forth in subpart AAAAA of part 97 of this chapter constitute the TR Federal Implementation Plan provisions that relate to annual emissions of nitrogen oxides (NO$_X$).

(2) The provisions of subpart AAAAA of part 97 of this chapter apply to the sources in the following States and Indian country located within the borders of such States: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.

(3) Notwithstanding the provisions of paragraph (a)(1) of this section, a State listed in paragraph (a)(2) of this section may adopt and include in a SIP revision, and the Administrator will approve, as TR NO$_X$ Annual allowance allocation provisions replacing the provisions in § 97.411(a) of this chapter with regard to the State and the control period in 2013, a list of TR NO$_X$ Annual units and the amount of TR NO$_X$ Annual allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(i) All of the units on the list must be units that are in the State and commenced commercial operation before January 1, 2010;

(ii) The total amount of TR NO$_X$ Annual allowance allocations on the list must not exceed the amount, under § 97.410(a) of this chapter for the State and the control period in 2013, of TR NO$_X$ Annual trading budget minus the sum of the new unit set-aside and Indian country new unit set-aside;

(iii) The list must be submitted electronically in a format specified by the Administrator; and

(iv) The SIP revision must not provide for any change in the units and allocations on the list after approval of the SIP revision by the Administrator and must not provide for any change in any allocation determined and recorded by the Administrator under subpart AAAAA of part 97 of this chapter;

(v) Provided that:

(A) By October 17, 2011, the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraph (a)(3)(i) through (iv) of this section by April 1, 2012; and

(B) The State must submit to the Administrator a complete SIP revision described in paragraph (a)(3)(v)(A) of this section by April 1, 2012.

(4) Notwithstanding the provisions of paragraph (a)(1) of this section, a State listed in paragraph (a)(2) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations revising subpart AAAAA of part 97 of this chapter as follows and not making any other substantive revisions of that subpart:

(i) The State may adopt, as TR NO$_X$ Annual allowance allocation or auction provisions replacing the provisions in §§ 97.411(a) and (b)(1) and 97.412(a) of this chapter with regard to the State and the control period in 2014 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR NO$_X$ Annual allowances, and may adopt, in addition to the definitions in § 97.402 of this chapter, one or more definitions that shall apply only to terms as used in the adopted TR NO$_X$ Annual allowance allocation or auction provisions, if such methodology—

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR NO$_X$ Annual allowances for any such control period not exceeding the amount, under §§ 97.410(a) and 97.421 of this chapter for the State and such control period, of the TR NO$_X$ Annual trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR NO$_X$ Annual allowances already allocated and recorded by the Administrator.

(B) Requires, to the extent the State adopts provisions for allocations or auctions of TR NO$_X$ Annual allowances for any such control period to any TR NO$_X$ Annual units covered by § 97.411(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR NO$_X$ Annual allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR NO$_X$ annual allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 ......................... | June 1, 2013. |
| 2015 ......................... | June 1, 2013. |
| 2016 ......................... | June 1, 2014. |
| 2017 ......................... | June 1, 2014. |
| 2018 ......................... | June 1, 2015. |
| 2019 ......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(C) Requires, to the extent the State adopts provisions for allocations or auctions of TR NO$_X$ Annual allowances for any such control period to any TR NO$_X$ Annual units covered by §§ 97.411(b)(1) and 97.412(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR NO$_X$ Annual allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(D) Does not provide for any change, after the submission deadlines in paragraphs (a)(4)(i)(B) and (C) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in

any allocation determined and recorded by the Administrator under subpart AAAAA of part 97 of this chapter;

(ii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (a)(4)(i) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (a)(4)(i)(B) and (C) of this section for the first control period for which the State wants to make allocations or hold an auction under paragraph (a)(4)(i) of this section.

(5) Notwithstanding the provisions of paragraph (a)(1) of this section, a State listed in paragraph (a)(2) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting in whole or in part, as appropriate, the deficiency in the SIP that is the basis for the TR Federal Implementation Plan set forth in paragraphs (a)(1) through (4) of this section, regulations that are substantively identical to the provisions of the TR $NO_X$ Annual Trading Program set forth in §§ 97.402 through 97.435 of this chapter, except that the SIP revision:

(i) May adopt, as TR $NO_X$ Annual allowance allocation or auction provisions replacing the provisions in §§ 97.411(a) and (b)(1) and 97.412(a) of this chapter with regard to the State and the control period in 2014 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR $NO_X$ Annual allowances and that—

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR $NO_X$ Annual allowances for any such control period not exceeding the amount, under §§ 97.410(a) and 97.421 of this chapter for the State and such control period, of the TR $NO_X$ Annual trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR $NO_X$ Annual allowances already allocated and recorded by the Administrator.

(B) Requires, to the extent the State adopts provisions for allocations or auctions of TR $NO_X$ Annual allowances for any such control period to any TR $NO_X$ Annual units covered by § 97.411(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR $NO_X$ Annual allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR $NO_X$ annual allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
|---|---|
| 2014 | June 1, 2013. |
| 2015 | June 1, 2013. |
| 2016 | June 1, 2014. |
| 2017 | June 1, 2014. |
| 2018 | June 1, 2015. |
| 2019 | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(C) Requires, to the extent the State adopts provisions for allocations or auctions of TR $NO_X$ Annual allowances for any such control period to any TR $NO_X$ Annual units covered by §§ 97.411(b)(1) and 97.412(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR $NO_X$ Annual allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(D) Does not provide for any change, after the submission deadlines in paragraphs (a)(5)(i)(B) and (C) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart AAAAA of part 97 of this chapter;

(ii) May adopt, in addition to the definitions in § 97.402 of this chapter, one or more definitions that shall apply only to terms as used in the TR $NO_X$ Annual allowance allocation or auction provisions adopted under paragraph (a)(5)(i) of this section;

(iii) May substitute the name of the State for the term "State" as used in subpart AAAAA of part 97 of this chapter, to the extent the Administrator determines that such substitutions do not make substantive changes in the provisions in §§ 97.402 through 97.435 of this chapter; and

(iv) Must not include any of the references to, or requirements imposed on, any unit in Indian country within the borders of the State in the provisions in §§ 97.402 through 97.435 of this chapter and must not include the provisions in §§ 97.411(b)(2) and 97.412(b), all of which provisions will continue to apply under the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision;

(v) Provided that, if and when any covered unit is located in Indian country within the borders of the State, the Administrator may modify his or her approval of the SIP revision to exclude the provisions in §§ 97.402 (definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.406(c)(2), 97.425, and the portions of other provisions referencing these sections and may modify the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions;

(vi) Provided that the State must submit a complete SIP revision meeting the requirements of paragraphs (a)(5)(i) through (iv) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (a)(5)(i)(B) and (C) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraphs (a)(5)(i) and (ii) of this section.

(6) Following promulgation of an approval by the Administrator of a State's SIP revision as correcting in whole or in part, as appropriate, the SIP's deficiency that is the basis for the TR Federal Implementation Plan described in paragraphs (a)(1) through (5) of this section, the provisions of paragraph (a)(2) of this section will no longer apply to the sources in the State, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in any Indian country within the borders of the State.

(7) Notwithstanding the provisions of paragraph (a)(6) of this section, if, at the time of such approval of the State's SIP revision, the Administrator has already started recording any allocations of TR $NO_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in a State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The TR $NO_X$ Ozone Season Trading Program provisions set forth in part 97 of this chapter constitute the TR Federal Implementation Plan provisions that relate to emissions of $NO_X$ during the ozone season, defined as May 1 through September 30 of a calendar year.

(2) The provisions of subpart BBBBB of part 97 of this chapter apply to

sources in each of the following States and Indian country located within the borders of such States: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

(3) Notwithstanding the provisions of paragraph (b)(1) of this section, a State listed in paragraph (b)(2) of this section may adopt and include in a SIP revision, and the Administrator will approve, as TR NO$_X$ Ozone Season allowance allocation provisions replacing the provisions in § 97.511(a) of this chapter with regard to the State and the control period in 2013, a list of TR NO$_X$ Ozone Season units and the amount of TR NO$_X$ Ozone Season allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(i) All of the units on the list must be units that are in the State and commenced commercial operation before January 1, 2010;

(ii) The total amount of TR NO$_X$ Ozone Season allowance allocations on the list must not exceed the amount, under § 97.510(a) of this chapter for the State and the control period in 2013, of TR NO$_X$ Ozone Season trading budget minus the sum of the new unit set-aside and Indian country new unit set-aside;

(iii) The list must be submitted electronically in a format specified by the Administrator; and

(iv) The SIP revision must not provide for any change in the units and allocations on the list after approval of the SIP revision by the Administrator and must not provide for any change in any allocation determined and recorded by the Administrator under subpart BBBBB of part 97 of this chapter;

(v) Provided that:

(A) By October 17, 2011, the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraph (b)(3)(i) through (iv) of this section by April 1, 2012; and

(B) The State must submit to the Administrator a complete SIP revision described in paragraph (b)(3)(v)(A) of this section by April 1, 2012.

(4) Notwithstanding the provisions of paragraph (b)(1) of this section, a State listed in paragraph (b)(2) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations revising subpart BBBBB of part 97 of this chapter as

follows and not making any other substantive revisions of that subpart:

(i) The State may adopt, as applicability provisions replacing the provisions in §§ 97.504(a)(1) and (2) of this chapter, provisions substantively identical to those provisions, except that the words ''more than 25 MWe'' are replaced, whenever such words appear, by words specifying a uniform lower limit on the amount of megawatts that is not greater than the amount specified by the words ''more than 25 MWe'' and is not less than the amount specified by the words ''15 MWe or more''; or

(ii) The State may adopt, as TR NO$_X$ Ozone Season allowance allocation or auction provisions replacing the provisions in §§ 97.511(a) and (b)(1) and 97.512(a) of this chapter with regard to the control period in 2014 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR NO$_X$ Ozone Season allowances, and may adopt, in addition to the definitions in § 97.502 of this chapter, one or more definitions that shall apply only to terms as used in the adopted TR NO$_X$ Ozone Season allowance allocation or auction provisions, if such methodology—

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR NO$_X$ Ozone Season allowances for any such control period not exceeding the amount, under §§ 97.510(a) and 97.521 of this chapter for the State and such control period, of the TR NO$_X$ Ozone Season trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR NO$_X$ Ozone Season allowances already allocated and recorded by the Administrator.

(B) Requires, to the extent the State adopts provisions for allocations or auctions of TR NO$_X$ Ozone Season allowances for any such control period to any TR NO$_X$ Ozone Season units covered by § 97.511(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR NO$_X$ Ozone Season allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR NO$_X$ Ozone Season allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 .......................... | June 1, 2013. |
| 2015 .......................... | June 1, 2013. |

| Year of the control period for which TR NO$_X$ Ozone Season allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2016 .......................... | June 1, 2014. |
| 2017 .......................... | June 1, 2014. |
| 2018 .......................... | June 1, 2015. |
| 2019 .......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(C) Requires, to the extent the State adopts provisions for allocations or auctions of TR NO$_X$ Ozone Season allowances for any such control period to any TR NO$_X$ Ozone Season units covered by §§ 97.511(b)(1) and 97.512(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR NO$_X$ Ozone Season allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(D) Does not provide for any change, after the submission deadlines in paragraphs (b)(4)(ii)(B) and (C) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart BBBBB of part 97 of this chapter;

(iii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (b)(4)(i) or (ii) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (b)(4)(ii)(B) and (C) of this section applicable to the first control period for which the State wants to replace the applicability provisions, make allocations, or hold an auction under paragraph (b)(4)(i) or (ii) of this section.

(5) Notwithstanding the provisions of paragraph (b)(1) of this section, a State listed in paragraph (b)(2) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting in whole or in part, as appropriate, the deficiency in the SIP that is the basis for the TR Federal Implementation Plan set forth in paragraphs (b)(1) through (4) of this section, regulations that are substantively identical to the provisions of the TR NO$_X$ Ozone Season Trading Program set forth in §§ 97.502 through 97.535 of this chapter, except that the SIP revision:

(i) May adopt, as applicability provisions replacing the provisions in §§ 97.504(a)(1) and (2) of this chapter, provisions substantively identical to those provisions, except that the words "more than 25 MWe" are replaced, whenever such words appear, by words specifying a uniform lower limit on the amount of megawatts that is not greater than the amount specified by the words "more than 25 MWe" and is not less than the amount specified by the words "15 MWe or more"; or

(ii) May adopt, as TR NO$_X$ Ozone Season allowance allocation provisions replacing the provisions in §§ 97.511(a) and (b)(1) and 97.512(a) of this chapter with regard to the control period in 2014 and any subsequent year, any methodology under which the State or the permitting authority allocates auctions TR NO$_X$ Ozone Season allowances and that—

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR NO$_X$ Ozone Season allowances for any such control period not exceeding the amount, under §§ 97.510(a) and 97.521 of this chapter for the State and such control period, of the TR NO$_X$ Ozone Season trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR NO$_X$ Ozone Season allowances already allocated and recorded by the Administrator.

(B) Requires, to the extent the State adopts provisions for allocations or auction of TR NO$_X$ Ozone Season allowances for any such control period to any TR NO$_X$ Ozone Season units covered by § 97.511(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR NO$_X$ Ozone Season allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR NO$_X$ Ozone Season allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 ......................... | June 1, 2013. |
| 2015 ......................... | June 1, 2013. |
| 2016 ......................... | June 1, 2014. |
| 2017 ......................... | June 1, 2014. |
| 2018 ......................... | June 1, 2015. |
| 2019 ......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(C) Requires, to the extent the State adopts provisions for allocations or auctions of TR NO$_X$ Ozone Season allowances for any control period to any TR NO$_X$ Ozone Season units covered by §§ 97.511(b)(1) and 97.512(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR NO$_X$ Ozone Season allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(D) Does not provide for any change, after the submission deadlines in paragraphs (b)(5)(ii)(B) and (C) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart BBBBB of part 97 of this chapter;

(iii) May adopt in addition to the definitions in § 97.502 of this chapter, one or more definitions that shall apply only to terms as used in the TR NO$_X$ Ozone Season allowance allocation or auction provisions adopted under paragraph (b)(5)(ii) of this section;

(iv) May substitute the name of the State for the term "State" as used in subpart BBBBB of part 97 of this chapter, to the extent the Administrator determines that such substitutions do not make substantive changes in the provisions in §§ 97.502 through 97.535 of this chapter; and

(v) Must not include any of the references to, or requirements imposed on, any unit in Indian country within the borders of the State in the provisions in §§ 97.502 through 97.535 of this chapter and must not include the provisions in §§ 97.511(b)(2) and 97.512(b), all of which provisions will continue to apply under the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision;

(vi) Provided that, if and when any covered unit is located in Indian country within the borders of the State, the Administrator may modify his or her approval of the SIP revision to exclude the provisions in §§ 97.502 (definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.506(c)(2), 97.525, and the portions of other provisions referencing these sections and may modify the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions;

(vii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (b)(5)(i) through (v) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (5)(ii)(B) and (C) of this section applicable to the first control period for which the State wants to replace the applicability provisions, make allocations, or hold an auction under paragraphs (b)(5)(ii) and (iii) of this section.

(6) Following promulgation of an approval by the Administrator of a State's SIP revision as correcting in whole or in part, as appropriate, the SIP's deficiency that is the basis for the TR Federal Implementation Plan set forth in paragraphs (b)(1) through (5) of this section, the provisions of paragraph (b)(2) of this section will no longer apply to sources in the State, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in any Indian country within the borders of the State.

(7) Notwithstanding the provisions of paragraph (b)(6) of this section, if, at the time of such approval of the State's SIP revision, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in a State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## § 52.39   What are the requirements of the Federal Implementation Plans (FIPs) for the Transport Rule (TR) relating to emissions of sulfur dioxide?

(a) The TR SO$_2$ Group 1 Trading Program provisions and the TR SO$_2$ Group 2 Trading Program provisions set forth respectively in subparts CCCCC and DDDDD of part 97 of this chapter constitute the TR Federal Implementation Plan provisions that relate to emissions of sulfur dioxide (SO$_2$).

(b) The provisions of subpart CCCCC of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States: Illinois, Indiana, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and Wisconsin.

(c) The provisions of subpart DDDDD of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States: Alabama, Georgia, Kansas, Minnesota, Nebraska, South Carolina, and Texas.

(d) Notwithstanding the provisions of paragraph (a) of this section, a State listed in paragraph (b) of this section may adopt and include in a SIP revision, and the Administrator will approve, as TR SO$_2$ Group 1 allowance allocation provisions replacing the provisions in § 97.611(a) of this chapter with regard to the State and the control period in 2013, a list of TR SO$_2$ Group 1 units and the amount of TR SO$_2$ Group 1 allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(1) All of the units on the list must be units that are in the State and commenced commercial operation before January 1, 2010;

(2) The total amount of TR SO$_2$ Group 1 allowance allocations on the list must not exceed the amount, under § 97.610(a) of this chapter for the State and the control period in 2013, of TR SO$_2$ Group 1 trading budget minus the sum of the new unit set-aside and Indian country new unit set-aside;

(3) The list must be submitted electronically in a format specified by the Administrator; and

(4) The SIP revision must not provide for any change in the units and allocations on the list after approval of the SIP revision by the Administrator and must not provide for any change in any allocation determined and recorded by the Administrator under subpart CCCCC of part 97 of this chapter;

(5) Provided that:

(i) By October 17, 2011, the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraph (d)(1) through (4) of this section by April 1, 2012; and

(ii) The State must submit to the Administrator a complete SIP revision described in paragraph (d)(5)(i) of this section by April 1, 2012.

(e) Notwithstanding the provisions of paragraph (a) of this section, a State listed in paragraph (b) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations revising subpart CCCCC of part 97 of this chapter as follows and not making any other substantive revisions of that subpart:

(1) The State may adopt, as TR SO$_2$ Group 1 allowance allocation or auction

provisions replacing the provisions in §§ 97.611(a) and (b)(1) and 97.612(a) of this chapter with regard to the control period in 2014 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR SO$_2$ Group 1 allowances and may adopt, in addition to the definitions in § 97.602 of this chapter, one or more definitions that shall apply only to terms as used in the adopted TR SO$_2$ Group 1 allowance allocation or auction provisions, if such methodology—

(i) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR SO$_2$ Group 1 allowances for any such control period not exceeding the amount, under §§ 97.610(a) and 97.621 of this chapter for the State and such control period, of the TR SO$_2$ Group 1 trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR SO$_2$ Group 1 allowances already allocated and recorded by the Administrator.

(ii) Requires, to the extent the State adopts provisions for allocations or auction of TR SO$_2$ Group 1 allowances for any such control period to any TR SO$_2$ Group 1 units covered by § 97.611(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR SO$_2$ Group 1 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR SO$_2$ Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 .......................... | June 1, 2013. |
| 2015 .......................... | June 1, 2013. |
| 2016 .......................... | June 1, 2014. |
| 2017 .......................... | June 1, 2014. |
| 2018 .......................... | June 1, 2015. |
| 2019 .......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(iii) Requires, to the extent the State adopts provisions for allocations or auctions of TR SO$_2$ Group 1 allowances for any such control period to any TR SO$_2$ Group 1 units covered by §§ 97.611(b)(1) and 97.612(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such

units of TR SO$_2$ Group 1 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(iv) Does not provide for any change, after the submission deadlines in paragraphs (e)(1)(ii) and (iii) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart CCCCC of part 97 of this chapter;

(2) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (e)(1) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (e)(1)(ii) and (iii) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (e)(1) of this section.

(f) Notwithstanding the provisions of paragraph (a) of this section, a State listed in paragraph (b) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting in whole or in part, as appropriate, the deficiency in the SIP that is the basis for the TR Federal Implementation Plan set forth in paragraphs (a), (b), (d), and (e) of this section, regulations that are substantively identical to the provisions of the TR SO$_2$ Group 1 Trading Program set forth in §§ 97.602 through 97.635 of this chapter, except that the SIP revision:

(1) May adopt, as TR SO$_2$ Group 1 allowance allocation or auction provisions replacing the provisions in §§ 97.611(a) and (b)(1) and 97.612(a) of this chapter with regard to the control period in 2014 and any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR SO$_2$ Group 1 allowances and that—

(i) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR SO$_2$ Group 1 allowances for such control period not exceeding the amount, under §§ 97.610(a) and 97.621 of this chapter for the State and such control period, of the TR SO$_2$ Group 1 trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR SO$_2$ Group 1 allowances already allocated and recorded by the Administrator.

(ii) Requires, to the extent the State adopts provisions for allocations or auction of TR SO$_2$ Group 1 allowances for any such control period to any TR

SO₂ Group 1 units covered by § 97.611(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR SO₂ Group 1 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR SO₂ Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 .......................... | June 1, 2013. |
| 2015 .......................... | June 1, 2013. |
| 2016 .......................... | June 1, 2014. |
| 2017 .......................... | June 1, 2014. |
| 2018 .......................... | June 1, 2015. |
| 2019 .......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(iii) Requires, to the extent the State adopts provisions for allocations or auctions of TR SO₂ Group 1 allowances for any such control period to any TR SO₂ Group 1 units covered by §§ 97.611(b)(1) and 97.612(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR SO₂ Group 1 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(iv) Does not provide for any change, after the submission deadlines in paragraphs (f)(2)(ii) and (iii) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart CCCCC of part 97 of this chapter;

(2) May adopt, in addition to the definitions in § 97.602 of this chapter, one or more definitions that shall apply only to terms as used in the TR SO₂ Group 1 allowance allocation or auction provisions adopted under paragraph (f)(1) of this section;

(3) May substitute the name of the State for the term ''State'' as used in subpart CCCCC of part 97 of this chapter, to the extent the Administrator determines that such substitutions do not make substantive changes in the provisions in §§ 97.602 through 97.635 of this chapter; and

(4) Must not include any of the references to, or requirements imposed on, any unit in Indian country within the borders of the State in the provisions in §§ 97.602 through 97.635 of this chapter and must not include the provisions in §§ 97.611(b)(2) and 97.612(b), all of which provisions will continue to apply under the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision;

(5) Provided that, if and when any covered unit is located in Indian country within the borders of the State, the Administrator may modify his or her approval of the SIP revision to exclude the provisions in §§ 97.602 (definitions of ''common designated representative'', ''common designated representative's assurance level'', and ''common designated representative's share''), 97.606(c)(2), 97.625, and the portions of other provisions referencing these sections and may modify the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions;

(6) Provided that the State must submit a complete SIP revision meeting the requirements of paragraphs (f)(1) through (4) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (f)(1)(ii) and (iii) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (f)(1)(ii) and (iii) of this section.

(g) Notwithstanding the provisions of paragraph (a) of this section, a State listed in paragraph (c) of this section may adopt and include in a SIP revision, and the Administrator will approve, as TR SO₂ Group 2 allowance allocation provisions replacing the provisions in § 97.711(a) of this chapter with regard to the control period in 2013, a list of TR SO₂ Group 2 units and the amount of TR SO₂ Group 2 allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(1) All of the units on the list must be units that are in the State and commenced commercial operation before January 1, 2010;

(2) The total amount of TR SO₂ Group 2 allowance allocations on the list must not exceed the amount, under § 97.710(a) of this chapter for the State and the control period in 2013, of TR SO₂ Group 2 trading budget minus the sum of the new unit set-aside and Indian country new unit set-aside;

(3) The list must be submitted electronically in a format specified by the Administrator; and

(4) The SIP revision must not provide for any change in the units and allocations on the list after approval of the SIP revision by the Administrator and must not provide for any change in any allocation determined and recorded by the Administrator under subpart DDDDD of part 97 of this chapter;

(5) Provided that:

(i) By October 17, 2011, the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraph (g)(1) through (4) of this section by April 1, 2012; and

(ii) The State must submit to the Administrator a complete SIP revision described in paragraph (g)(5)(i) of this section by April 1, 2012.

(h) Notwithstanding the provisions of paragraph (a) of this section, a State listed in paragraph (c) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations revising subpart DDDDD of part 97 of this chapter as follows and not making any other substantive revisions of that subpart:

(1) The State may adopt, as TR SO₂ Group 2 allowance allocation or auction provisions replacing the provisions in §§ 97.711(a) and (b)(1) and 97.712(a) of this chapter with regard to the control period in 2014 and any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR SO₂ Group 2 allowances and may adopt, in addition to the definitions in § 97.702 of this chapter, one or more definitions that shall apply only to terms as used in the adopted TR SO₂ Group 2 allowance allocation or auction provisions, if such methodology—

(i) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR SO₂ Group 2 allowances for any such control period not exceeding the amount, under §§ 97.710(a) and 97.721 of this chapter for the State and such control period, of the TR SO₂ Group 2 trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR SO₂ Group 2 allowances already allocated and recorded by the Administrator.

(ii) Requires, to the extent the State adopts provisions for allocations or auction of TR SO₂ Group 2 allowances for any such control period to any TR SO₂ Group 2 units covered by § 97.711(a) of this chapter, that the State or the permitting authority submit such

allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of TR SO$_2$ Group 2 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR SO$_2$ Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 ......................... | June 1, 2013. |
| 2015 ......................... | June 1, 2013. |
| 2016 ......................... | June 1, 2014. |
| 2017 ......................... | June 1, 2014. |
| 2018 ......................... | June 1, 2015. |
| 2019 ......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(iii) Requires, to the extent the State adopts provisions for allocations or auctions of TR SO$_2$ Group 2 allowances for any such control period to any TR SO$_2$ Group 2 units covered by §§ 97.711(b)(1) and 97.712(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR SO$_2$ Group 2 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(iv) Does not provide for any change, after the submission deadlines in paragraphs (h)(1)(ii) and (iii) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart DDDDD of part 97 of this chapter;

(2) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (h)(1) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs (h)(1)(ii) and (iii) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (h)(1)(ii) and (iii) of this section.

(i) Notwithstanding the provisions of paragraph (a) of this section, a State listed in paragraph (c) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting in whole or in part, as appropriate, the deficiency in the SIP that is the basis for the TR Federal Implementation Plan set forth in paragraphs (a), (c), (g), and (h) of this section, regulations that are substantively identical to the provisions of the TR SO$_2$ Group 2 Trading Program set forth in §§ 97.702 through 97.735 of this chapter, except that the SIP revision:

(1) May adopt, as TR SO$_2$ Group 2 allowance allocation or auction provisions replacing the provisions in §§ 97.711(a) and (b)(1) and 97.712(a) of this chapter with regard to the control period in 2014 and any subsequent year, any methodology under which the State or the permitting authority allocates or auctions TR SO$_2$ Group 2 allowances and that—

(i) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of TR SO$_2$ Group 2 allowances for any such control period not exceeding the amount, under §§ 97.710(a) and 97.721 of this chapter for the State and such control period, of the TR SO$_2$ Group 2 trading budget minus the sum of the Indian country new unit set-aside and the amount of any TR SO$_2$ Group 2 allowances already allocated and recorded by the Administrator.

(ii) Requires, to the extent the State adopts provisions for allocations or auction of TR SO$_2$ Group 2 allowances for any such control period to any TR SO$_2$ Group 2 units covered by § 97.711(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR SO$_2$ Group 1 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator no later than the following dates:

| Year of the control period for which TR SO$_2$ Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to administrator |
| --- | --- |
| 2014 ......................... | June 1, 2013. |
| 2015 ......................... | June 1, 2013. |
| 2016 ......................... | June 1, 2014. |
| 2017 ......................... | June 1, 2014. |
| 2018 ......................... | June 1, 2015. |
| 2019 ......................... | June 1, 2015. |
| 2020 and any year thereafter. | June 1 of the fourth year before the year of the control period. |

(iii) Requires, to the extent the State adopts provisions for allocations or auctions of TR SO$_2$ Group 2 allowances for any such control period to any TR SO$_2$ Group 2 units covered by §§ 97.711(b)(1) and 97.712(a) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions (except allocations or results of auctions to such units of TR SO$_2$ Group 2 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by July 1 of the year of such control period.

(iv) Does not provide for any change, after the submission deadlines in paragraphs (i)(1)(ii) and (iii) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart DDDDD of part 97 of this chapter;

(2) May adopt, in addition to the definitions in § 97.702 of this chapter, one or more definitions that shall apply only to terms as used in the TR SO$_2$ Group 2 allowance allocation or auction provisions adopted under paragraph (i)(1) of this section;

(3) May substitute the name of the State for the term "State" as used in subpart DDDDD of part 97 of this chapter, to the extent the Administrator determines that such substitutions do not make substantive changes in the provisions in §§ 97.702 through 97.735 of this chapter; and

(4) Must not include any of the references to, or requirements imposed on, any unit in Indian country within the borders of the State in the provisions in §§ 97.702 through 97.735 of this chapter and must not include the provisions in §§ 97.711(b)(2) and 97.712(b), all of which provisions will continue to apply under the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision;

(5) Provided that, if and when any covered unit is located in Indian country within the borders of the State, the Administrator may modify his or her approval of the SIP revision to exclude the provisions in §§ 97.702 (definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.706(c)(2), 97.725, and the portions of other provisions referencing these sections and may modify the portion of the TR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions;

(6) Provided that the State must submit a complete SIP revision meeting the requirements of paragraphs (i)(1) through (4) of this section by December 1 of the year before the year of the deadlines for submission of allocations or auction results under paragraphs

(i)(1)(ii) and (iii) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraphs (i)(1)(ii) and (iii) of this section.

(j) Following promulgation of an approval by the Administrator of a State's SIP revision as correcting in whole or in part, as appropriate, the SIP's deficiency that is the basis for the TR Federal Implementation Plan, the provisions of paragraph (b) and (c) of this section, as applicable, will no longer apply to sources in the State, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in any Indian country within the borders of the State.

(k) Notwithstanding the provisions of paragraph (j) of this section, if, at the time of such approval of the State's SIP revision, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter, or allocations of TR SO$_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter, to units in a State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances, or of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 2 allowances, as applicable, to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart B—Alabama

■ 10. Section 52.54 is added to read as follows:

**§ 52.54 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Alabama and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the

Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Alabama's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Alabama and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of the Alabama's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 11. Section 52.55 is added to read as follows:

**§ 52.55 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of Alabama and for which requirements are set forth under the TR SO$_2$ Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply

with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Alabama's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 2 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart E—Arkansas

■ 12. Section 52.184 is added to read as follows:

**§ 52.184 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a) The owner and operator of each source and each unit located in the State of Arkansas and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Arkansas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Arkansas' SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to

units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart I—Delaware

■ 13. Section 52.440 is amended by adding a new paragraph (c) to read as follows:

**§ 52.440 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to $NO_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR $NO_X$ allowances or CAIR $NO_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Allowance Tracking System accounts all CAIR $NO_X$ allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR $NO_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Ozone Season Allowance Tracking System accounts all CAIR $NO_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR $NO_X$ Ozone Season allowances will be required with regard to emissions or excess emissions for such control periods.

■ 14. Section 52.441 is amended by designating the existing text as paragraph (a) and adding a new paragraph (b) to read as follows:

**§ 52.441 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

\*    \*    \*    \*    \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to $SO_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR $SO_2$ allowances allocated for 2012 or any year thereafter.

## Subpart J—District of Columbia

■ 15. Section 52.484 is amended by adding a new paragraph (c) to read as follows:

**§ 52.484 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to $NO_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR $NO_X$ allowances or CAIR $NO_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Allowance Tracking System accounts all CAIR $NO_X$ allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR $NO_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR $NO_X$ Ozone Season Allowance Tracking System accounts all CAIR $NO_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR $NO_X$ Ozone Season allowances will be

required with regard to emissions or excess emissions for such control periods.

■ 16. Section 52.485 is amended by designating the existing text as paragraph (a) and adding a new paragraph (b) to read as follows:

**§ 52.485 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

\*    \*    \*    \*    \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to $SO_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR $SO_2$ allowances allocated for 2012 or any year thereafter.

## Subpart K—Florida

■ 17. Section 52.540 is added to read as follows:

**§ 52.540 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a) The owner and operator of each source and each unit located in the State of Florida and Indian country within the borders of the State and for which requirements are set forth under the TR $NO_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units located in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Florida's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Florida's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the

time of the approval of Florida's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR $NO_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart L—Georgia

■ 18. Section 52.584 is added to read as follows:

### § 52.584 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Georgia and for which requirements are set forth under the TR $NO_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Georgia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Georgia's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR $NO_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Georgia and for which requirements are set forth under the TR $NO_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the

promulgation of an approval by the Administrator of a revision to Georgia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Georgia's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR $NO_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 19. Section 52.585 is added to read as follows:

### § 52.585 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Georgia and for which requirements are set forth under the TR $SO_2$ Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Georgia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Georgia's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR $SO_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $SO_2$ Group 2 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart O—Illinois

■ 20. Section 52.745 is added to read as follows:

### § 52.745 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Illinois and for which requirements are set forth under the TR $NO_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Illinois' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Illinois' SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR $NO_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Illinois and for which requirements are set forth under the TR $NO_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Illinois' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Illinois' SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR $NO_X$ Ozone Season allowances under subpart BBBBB of part 97 of this

chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 21. Section 52.746 is added to read as follows:

**§ 52.746 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of Illinois and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Illinois' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Illinois' SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart P—Indiana**

■ 22. Section 52.789 is added to read as follows:

**§ 52.789 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Indiana and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will

be eliminated by the promulgation of an approval by the Administrator of a revision to Indiana's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Indiana's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Indiana and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Indiana's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Indiana's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 23. Section 52.790 is added to read as follows:

**§ 52.790 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of Indiana and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Indiana's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39 except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Indiana's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart Q—Iowa**

■ 24. Section 52.840 is added to read as follows:

**§ 52.840 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Iowa and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Iowa's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to

sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Iowa's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Iowa's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NOX Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NOX Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) [Reserved]

■ 25. Section 52.841 is added to read as follows:

### § 52.841  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Iowa and Indian country within the borders of the State and for which requirements are set forth under the TR SO2 Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Iowa's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Iowa's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Iowa's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO2 Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter

authorizing the Administrator to complete the allocation and recordation of TR SO2 Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart R—Kansas

■ 26. Section 52.882 is added to read as follows:

### § 52.882  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Kansas and Indian country within the borders of the State and for which requirements are set forth under the TR NOX Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Kansas' SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NOX Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NOX Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) [Reserved]

■ 27. Section 52.883 is added to read as follows:

### § 52.883  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Kansas and Indian country within the borders of the State and for which requirements are set forth under the TR SO2 Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated with regard to sources and units in the State by the promulgation of an approval by the Administrator of a revision to Kansas' State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Kansas' SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO2 Group 2 allowances under subpart DDDDD of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO2 Group 2 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart S—Kentucky

■ 28. Section 52.940 is added to read as follows:

### § 52.940  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Kentucky and for which requirements are set forth under the TR NOX Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Kentucky's State

Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Kentucky's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Kentucky and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Kentucky's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Kentucky's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 29. Section 52.941 is added to read as follows:

**§ 52.941   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of Kentucky and for which requirements

are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Kentucky's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Kentucky's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart T—Louisiana**

■ 30. Section 52.984 is amended by adding new paragraphs (c) and (d) to read as follows:

**§ 52.984   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*      \*      \*      \*      \*

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to NO$_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter;

(2) The Administrator will not deduct for excess emissions any CAIR NO$_X$ allowances or CAIR NO$_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Allowance Tracking System accounts all CAIR NO$_X$ allowances allocated for a control period in 2012

and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Ozone Season Allowance Tracking System accounts all CAIR NO$_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ Ozone Season allowances will be required with regard to emissions or excess emissions for such control periods.

(d)(1) The owner and operator of each source and each unit located in the State of Louisiana and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Louisiana's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Louisiana's SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Louisiana's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart V—Maryland**

■ 31. Section 52.1084 is added to read as follows:

**§ 52.1084 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Maryland and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Maryland's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Maryland's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Maryland and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Maryland's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Maryland's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation

of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 32. Section 52.1085 is added to read as follows:

**§ 52.1085 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of Maryland and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Maryland's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Maryland's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart X—Michigan**

■ 33. Section 52.1186 is amended by adding new paragraphs (c) and (d) to read as follows:

**§ 52.1186 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\* \* \* \* \*

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to NO$_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter;

(2) The Administrator will not deduct for excess emissions any CAIR NO$_X$ allowances or CAIR NO$_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Allowance Tracking System accounts all CAIR NO$_X$ allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Ozone Season Allowance Tracking System accounts all CAIR NO$_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ Ozone Season allowances will be required with regard to emissions or excess emissions for such control periods.

(d)(1) The owner and operator of each source and each unit located in the State of Michigan and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Michigan's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Michigan's SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Michigan's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of

subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(e) [Reserved]

■ 34. Section 52.1187 is amended by designating the existing text as paragraph (a) and adding new paragraphs (b) and (c) to read as follows:

**§ 52.1187 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

\* \* \* \* \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to $SO_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR $SO_2$ allowances allocated for 2012 or any year thereafter.

(c)(1) The owner and operator of each source and each unit located in the State of Michigan and Indian country within the borders of the State and for which requirements are set forth under the TR $SO_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Michigan's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Michigan's SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Maryland's SIP revision described in paragraph (c)(1) of this section, the Administrator has

already started recording any allocations of TR $SO_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $SO_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart Y—Minnesota**

■ 35. Section 52.1240 is amended by adding paragraph (c) to read as follows:

**§ 52.1240 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\* \* \* \* \*

(c)(1) The owner and operator of each source and each unit located in the State of Minnesota and Indian country within the borders of the State and for which requirements are set forth under the TR $NO_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Minnesota's SIP revision described in paragraph (c)(1) of this section, the Administrator has already started recording any allocations of TR $NO_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $NO_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 36. Section 52.1241 is amended by adding paragraph (c) to read as follows:

**§ 52.1241 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

\* \* \* \* \*

(c)(1) The owner and operator of each source and each unit located in the State of Minnesota and Indian country within the borders of the State and for which requirements are set forth under the TR $SO_2$ Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Minnesota's SIP revision described in paragraph (c)(1) of this section, the Administrator has already started recording any allocations of TR $SO_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR $SO_2$ Group 2 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart Z—Mississippi**

■ 37. Section 52.1284 is added to read as follows:

**§ 52.1284 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a) The owner and operator of each source and each unit located in the State of Mississippi and Indian country within the borders of the State and for which requirements are set forth under the TR $NO_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of

this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Mississippi's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Mississippi's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Mississippi's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart AA—Missouri

■ 38. Section 52.1326 is added to read as follows:

### § 52.1326 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Missouri and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Missouri's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Missouri's SIP revision described in paragraph (a)(1) of this section, the Administrator has

already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) [Reserved]

■ 39. Section 52.1327 is added to read as follows:

### § 52.1327 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Missouri and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Missouri's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Missouri's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart CC—Nebraska

■ 40. Section 52.1428 is added to read as follows:

### § 52.1428 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) The owner and operator of each source and each unit located in the State of Nebraska and Indian country within the borders of the State and for which

requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Nebraska's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Nebraska's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Nebraska's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 41. Section 52.1429 is added to read as follows:

### § 52.1429 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Nebraska and Indian country within the borders of the State and for which requirements are set forth under the TR SO$_2$ Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Nebraska's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to

sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval to Nebraska's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Nebraska's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 2 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart FF—New Jersey

■ 42. Section 52.1584 is amended by adding new paragraphs (c), (d), and (e) to read as follows:

### § 52.1584 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*   *   *   *   *

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to NO$_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter;

(2) The Administrator will not deduct for excess emissions any CAIR NO$_X$ allowances or CAIR NO$_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Allowance Tracking System accounts all CAIR NO$_X$ allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Ozone Season Allowance

Tracking System accounts all CAIR NO$_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year and, thereafter, no holding or surrender of CAIR NO$_X$ Ozone Season allowances will be required with regard to emissions or excess emissions for such control periods.

(d)(1) The owner and operator of each source and each unit located in the State of New Jersey and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to New Jersey's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of New Jersey's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(e)(1) The owner and operator of each source and each unit located in the State of New Jersey and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to New Jersey's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (e)(1) of this section, if, at the time of the approval of New Jersey's SIP revision described in paragraph (e)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances

under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 43. Section 52.1585 is amended by designating the existing text as paragraph (a) and adding new paragraphs (b) and (c) to read as follows:

### § 52.1585 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

*   *   *   *   *

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to SO$_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR SO$_2$ allowances allocated for 2012 or any year thereafter.

(c)(1) The owner and operator of each source and each unit located in the State of New Jersey and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to New Jersey's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of New Jersey's SIP revision described in paragraph (c)(1) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation

of TR SO₂ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart HH—New York

■ 44. Section 52.1684 is revised to read as follows:

### § 52.1684  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of New York and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to New York's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to New York's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of New York's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of New York and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to New York's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to New York's SIP.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of New York's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 45. Section 52.1685 is added to read as follows:

### § 52.1685  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of New York and Indian country within the borders of the State and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to New York's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to New York's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of New York's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart II—North Carolina

■ 46. Section 52.1784 is revised to read as follows:

### § 52.1784  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of North Carolina and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to North Carolina's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to North Carolina's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of North Carolina's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall

continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of North Carolina and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to North Carolina's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to North Carolina's SIP.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of North Carolina's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 47. Section 52.1785 is revised to read as follows:

**§ 52.1785   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of North Carolina and Indian country within the borders of the State and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to North

Carolina's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to North Carolina's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of North Carolina's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**Subpart KK—Ohio**

■ 48. Section 52.1882 is added to read as follows:

**§ 52.1882   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Ohio and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Ohio's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Ohio's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this

chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Ohio and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Ohio's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Ohio's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 49. Section 52.1883 is added to read as follows:

**§ 52.1883   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

(a) The owner and operator of each source and each unit located in the State of Ohio and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Ohio's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Ohio's SIP

revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart NN—Pennsylvania

■ 50. Section 52.2040 is added to read as follows:

### § 52.2040 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Pennsylvania and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Pennsylvania's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Pennsylvania's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Pennsylvania and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such

requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Pennsylvania's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Pennsylvania's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 51. Section 52.2041 is added to read as follows:

### § 52.2041 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Pennsylvania and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Pennsylvania's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Pennsylvania's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period

shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart PP—South Carolina

■ 52. Section 52.2140 is revised to read as follows:

### § 52.2140 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of South Carolina and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to South Carolina's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to South Carolina's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of South Carolina's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of South Carolina and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be

eliminated by the promulgation of an approval by the Administrator of a revision to South Carolina's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval of a revision to South Carolina's SIP.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of South Carolina's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 53. Section 52.2141 is revised to read as follows:

### § 52.2141 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of South Carolina and Indian country within the borders of the State and for which requirements are set forth under the TR SO$_2$ Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to South Carolina's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to South Carolina's SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of South Carolina's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart RR—Tennessee

■ 54. Section 52.2240 is amended by adding new paragraphs (c), (d), and (e) to read as follows:

### § 52.2240 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to NO$_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR NO$_X$ allowances or CAIR NO$_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Allowance Tracking System accounts all CAIR NO$_X$ allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Ozone Season Allowance Tracking System accounts all CAIR NO$_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ Ozone Season allowances will be

required with regard to emissions or excess emissions for such control periods.

(d)(1) The owner and operator of each source and each unit located in the State of Tennessee and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Tennessee's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Tennessee's SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Tennessee's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(e)(1) The owner and operator of each source and each unit located in the State of Tennessee and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Tennessee's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an

approval by the Administrator of a revision to Tennessee's SIP.

(2) Notwithstanding the provisions of paragraph (e)(1) of this section, if, at the time of the approval of Tennessee's SIP revision described in paragraph (e)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 55. Section 52.2241 is amended by designating the existing text as paragraph (a) and adding new paragraphs (b) and (c) to read as follows:

### § 52.2241   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

\*     \*     \*     \*     \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to SO$_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR SO$_2$ allowances allocated for 2012 or any year thereafter.

(c)(1) The owner and operator of each source and each unit located in the State of Tennessee and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval of a revision to Tennessee's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be

eliminated by the promulgation of an approval by the Administrator of a revision to Tennessee's SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Tennessee's SIP revision described in paragraph (c)(1) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

### Subpart SS—Texas

■ 56. Section 52.2283 is amended by adding new paragraphs (b), (c) and (d) to read as follows:

### § 52.2283   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*     \*     \*     \*     \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AA through II of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraph (a) of this section relating to NO$_X$ annual emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II of part 97 of this chapter;

(2) The Administrator will not deduct for excess emissions any CAIR NO$_X$ allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Allowance Tracking System accounts all CAIR NO$_X$ allowances allocated for a control period in 2012 and any subsequent year and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods.

(c)(1) The owner and operator of each source and each unit located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to

sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Texas' SIP revision described in paragraph (c)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(d)(1) The owner and operator of each source and each unit located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Texas' SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this

chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 57. Section 52.2284 is amended by designating the existing text as paragraph (a) and adding new paragraphs (b) and (c) to read as follows:

### § 52.2284  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

\*    \*    \*    \*    \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to SO$_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR SO$_2$ allowances allocated for 2012 or any year thereafter.

(c)(1) The owner and operator of each source and each unit located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth under the TR SO$_2$ Group 2 Trading Program in subpart DDDDD of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Texas' SIP revision described in paragraph (c)(1) of

this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart DDDDD of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 2 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart VV—Virginia

■ 58. Section 52.2440 is added to read as follows:

### § 52.2440  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Virginia and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Virginia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Virginia's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of Virginia and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Virginia's

State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of Virginia's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 59. Section 52.2241 is added to read as follows:

### § 52.2241  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of Virginia and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Virginia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of Virginia's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart XX—West Virginia

■ 60. Section 52.2540 is added to read as follows:

### §52.2540 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of West Virginia and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to West Virginia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under §52.38(a), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of West Virginia's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b)(1) The owner and operator of each source and each unit located in the State of West Virginia and for which requirements are set forth under the TR NO$_X$ Ozone Season Trading Program in subpart BBBBB of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to West Virginia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under §52.38(b), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, if, at the time of the approval of West Virginia's SIP revision described in paragraph (b)(1) of this section, the Administrator has already started recording any

allocations of TR NO$_X$ Ozone Season allowances under subpart BBBBB of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart BBBBB of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Ozone Season allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 61. Section 52.2541 is added to read as follows:

### §52.2541 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?

(a) The owner and operator of each source and each unit located in the State of West Virginia and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to West Virginia's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the TR Federal Implementation Plan under §52.39, except to the extent the Administrator's approval is partial or conditional.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of West Virginia's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart YY—Wisconsin

■ 62. Section 52.2587 is amended by adding new paragraphs (c) and (d) to read as follows:

### §52.2587 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

* * * * *

(c) Notwithstanding any provisions of paragraphs (a) and (b) of this section and subparts AA through II and AAAA

through IIII of part 97 of this chapter to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions in paragraphs (a) and (b) of this section relating to NO$_X$ annual or ozone season emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AA through II and AAAA through IIII of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR NO$_X$ allowances or CAIR NO$_X$ Ozone Season allowances allocated for 2012 or any year thereafter;

(3) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Allowance Tracking System accounts all CAIR NO$_X$ allowances allocated for a control period in 2012 and any subsequent year and, thereafter, no holding or surrender of CAIR NO$_X$ allowances will be required with regard to emissions or excess emissions for such control periods; and

(4) By November 7, 2011, the Administrator will remove from the CAIR NO$_X$ Ozone Season Allowance Tracking System accounts all CAIR NO$_X$ Ozone Season allowances allocated for a control period in 2012 and any subsequent year, and, thereafter, no holding or surrender of CAIR NO$_X$ Ozone Season allowances will be required with regard to emissions or excess emissions for such control periods.

(d)(1) The owner and operator of each source and each unit located in the State of Wisconsin and Indian country within the borders of the State and for which requirements are set forth under the TR NO$_X$ Annual Trading Program in subpart AAAAA of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under §52.38(a), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the

time of the approval of Wisconsin's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of TR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart AAAAA of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR NO$_X$ Annual allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

■ 63. Section 52.2588 is amended by designating existing text as paragraph (a) and adding new paragraphs (b) and (c) to read as follows:

**§ 52.2588 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of sulfur dioxide?**

\* \* \* \* \*

(b) Notwithstanding any provisions of paragraph (a) of this section and subparts AAA through III of part 97 of this chapter and any State's SIP to the contrary:

(1) With regard to any control period that begins after December 31, 2011,

(i) The provisions of paragraph (a) of this section relating to SO$_2$ emissions shall not be applicable; and

(ii) The Administrator will not carry out any of the functions set forth for the Administrator in subparts AAA through III of part 97 of this chapter; and

(2) The Administrator will not deduct for excess emissions any CAIR SO$_2$ allowances allocated for 2012 or any year thereafter.

(c)(1) The owner and operator of each source and each unit located in the State of Wisconsin and Indian country within the borders of the State and for which requirements are set forth under the TR SO$_2$ Group 1 Trading Program in subpart CCCCC of part 97 of this chapter must comply with such requirements. The obligation to comply with such requirements with regard to sources and units in the State will be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's State Implementation Plan (SIP) as correcting in part the SIP's deficiency that is the basis for the TR Federal Implementation Plan under § 52.39, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in Indian country within the borders of the State will not be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's SIP.

(2) Notwithstanding the provisions of paragraph (c)(1) of this section, if, at the time of the approval of Wisconsin's SIP revision described in paragraph (c)(1) of this section, the Administrator has already started recording any allocations of TR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart CCCCC of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of TR SO$_2$ Group 1 allowances to units in the State for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

**PART 72—[AMENDED]**

■ 64. The authority citation for part 72 is revised to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7411, 7426, 7601, *et seq.*

**§ 72.2   [Amended]**

■ 65. Section 72.2 is amended by removing the definition of "Interested person".

**PART 78—[AMENDED]**

■ 66. The authority citation for part 78 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7411, 7426, 7601, *et seq.*

■ 67. Section 78.1 is amended by adding paragraphs (b)(13) through (b)(16) to read as follows:

**§ 78.1   Purpose and scope.**

\* \* \* \* \*

(b) \* \* \*

(13) Under subpart AAAAA of part 97 of this chapter,

(i) The decision on allocation of TR NO$_X$ Annual allowances under § 97.411(a)(2) and (b) of this chapter.

(ii) The decision on the transfer of TR NO$_X$ Annual allowances under § 97.423 of this chapter.

(iii) The decision on the deduction of TR NO$_X$ Annual allowances under §§ 97.424 and 97.425 of this chapter.

(iv) The correction of an error in an Allowance Management System account under § 97.427 of this chapter.

(v) The adjustment of information in a submission and the decision on the deduction and transfer of TR NO$_X$ Annual allowances based on the information as adjusted under § 97.428 of this chapter.

(vi) The finalization of control period emissions data, including retroactive adjustment based on audit.

(vii) The approval or disapproval of a petition under § 97.435 of this chapter.

(14) Under subpart BBBBB of part 97 of this chapter,

(i) The decision on allocation of TR NO$_X$ Ozone Season allowances under § 97.511(a)(2) and (b) of this chapter.

(ii) The decision on the transfer of TR NO$_X$ Ozone Season allowances under § 97.523 of this chapter.

(iii) The decision on the deduction of TR NO$_X$ Ozone Season allowances under §§ 97.524 and 97.525 of this chapter.

(iv) The correction of an error in an Allowance Management System account under § 97.527 of this chapter.

(v) The adjustment of information in a submission and the decision on the deduction and transfer of TR NO$_X$ Ozone Season allowances based on the information as adjusted under § 97.528 of this chapter.

(vi) The finalization of control period emissions data, including retroactive adjustment based on audit.

(vii) The approval or disapproval of a petition under § 97.535 of this chapter.

(15) Under subpart CCCCC of part 97 of this chapter,

(i) The decision on allocation of TR SO$_2$ Group 1 allowances under § 97.611(a)(2) and (b) of this chapter.

(ii) The decision on the transfer of TR SO$_2$ Group 1 allowances under § 97.623 of this chapter.

(iii) The decision on the deduction of TR SO$_2$ Group 1 allowances under §§ 97.624 and 97.625 of this chapter.

(iv) The correction of an error in an Allowance Management System account under § 97.627 of this chapter.

(v) The adjustment of information in a submission and the decision on the deduction and transfer of TR SO$_2$ Group 1 allowances based on the information as adjusted under § 97.628 of this chapter.

(vi) The finalization of control period emissions data, including retroactive adjustment based on audit.

(vii) The approval or disapproval of a petition under § 97.635 of this chapter.

(16) Under subpart DDDDD of part 97 of this chapter,

(i) The decision on allocation of TR SO$_2$ Group 2 allowances under § 97.711(a)(2) and (b) of this chapter.

(ii) The decision on the transfer of TR SO$_2$ Group 1 allowances under § 97.723 of this chapter.

(iii) The decision on the deduction of TR SO$_2$ Group 1 allowances under §§ 97.724 and 97.725 of this chapter.

(iv) The correction of an error in an Allowance Management System account under § 97.727 of this chapter.

(v) The adjustment of information in a submission and the decision on the

deduction and transfer of TR SO$_2$ Group 1 allowances based on the information as adjusted under § 97.728 of this chapter.

(vi) The finalization of control period emissions data, including retroactive adjustment based on audit.

(vii) The approval or disapproval of a petition under § 97.735 of this chapter.

\* \* \* \* \*

■ 68. Section 78.2 is revised to read as follows:

§ 78.2   General.

(a) *Definitions.* (1) The terms used in this subpart with regard to a decision of the Administrator that is appealed under this section shall have the meaning as set forth in the regulations under which the Administrator made such decision and as set forth in paragraph (a)(2) of this section.

(2) *Interested person* means, with regard to a decision of the Administrator:

(i) Any person who submitted comments, or testified at a public hearing, pursuant to an opportunity for comment provided by the Administrator as part of the process of making such decision;

(ii) Who submitted objections pursuant to an opportunity for objections provided by the Administrator as part of the process of making such decision; or

(iii) Who submitted, to the Administrator and in a format prescribed by the Administrator, his or her name, service address, telephone number, and facsimile number and identified such decision in order to be placed on a list of persons interested in such decision;

(iv) Provided that the Administrator may update the list of interested persons from time to time by requesting additional written indication of continued interest from the persons listed and may delete from the list the name of any person failing to respond as requested.

(b) *Availability of information.* The availability to the public of information provided to, or otherwise obtained by, the Administrator under this subpart shall be governed by part 2 of this chapter.

(c) *Computation of time.* (1) In computing any period of time prescribed or allowed under this part, except as otherwise provided, the day of the event from which the period begins to run shall not be included, and Saturdays, Sundays, and federal holidays shall be included. When the period ends on a Saturday, Sunday, or federal holiday, the stated period shall

be extended to include the next business day.

(2) Where a document is served by first class mail or commercial delivery service, but not by overnight or same-day delivery, 5 days shall be added to the time prescribed or allowed under this part for the filing of a responsive document or for otherwise responding.

■ 69. Section 78.3 is amended by:

■ a. In paragraphs (a)(1)(iii), (a)(3)(ii), (a)(4)(ii), (a)(5)(ii), (a)(6)(ii), (a)(7)(ii), (a)(8)(ii), and (a)(9)(ii), adding, after the word ''person'', the words ''with regard to the decision''.

■ b. Adding paragraph (a)(10);

■ c. In paragraph (b)(3)(i), removing the words ''paragraph (a)(1) and (2)'' and adding, in their place, the words ''paragraph (a)(1), (2), and (10)''; and

■ d. Adding paragraph (d)(11) to read as follows:

§ 78.3   Petition for administrative review and request or evidentiary hearing.

(a) \* \* \*

(10) The following persons may petition for administrative review of a decision of the Administrator that is made under subparts AAAAA, BBBBB, CCCCC, and DDDDD of part 97 of this chapter:

(i) The designated representative for a unit or source, or the authorized account representative for any Allowance Management System account, covered by the decision; or

(ii) Any interested person with regard to the decision.

\* \* \* \* \*

(d) \* \* \*

(11) Any provision or requirement of subparts AAAAA, BBBBB, CCCCC, or DDDDD of part 97 of this chapter, including the standard requirements under § 97.406, § 97.506, § 97.606, or § 97.706 of this chapter and any emission monitoring or reporting requirements.

\* \* \* \* \*

■ 70. Section 78.4 is amended by:

■ a. Revising paragraph (a) by:

■ i. Removing the first, second, third, fourth, fifth, and last sentences;

■ ii. In the sixth and seventh sentences, removing the words ''interest in'' and adding, in their place, the words ''ownership interest with respect to'';

■ iii. Redesignating the paragraph as paragraph (a)(1)(iii); and

■ b. Adding paragraphs (a)(1) introductory text, (a)(1)(i), and (a)(1)(ii); and

■ c. Revising paragraph (a)(2) to read as follows:

§ 78.4   Filings.

(a)(1) All original filings made under this part shall be signed by the person

making the filing or by an attorney or authorized representative, in accordance with the following requirements:

(i) Any filings on behalf of owners and operators of a affected unit or affected source, TR NO$_X$ Annual unit or TR NO$_X$ Annual source, TR NO$_X$ Ozone Season unit or TR NO$_X$ Ozone Season source, TR SO$_2$ Group 1 unit or TR SO$_2$ Group 1 source, TR SO$_2$ Group 2 unit or TR SO$_2$ Group 2 source, or a unit for which a TR opt-in application is submitted and not withdrawn shall be signed by the designated representative. Any filing on behalf of persons with an ownership interest with respect to allowances, TR NO$_X$ Annual allowances, TR NO$_X$ Ozone Season allowances, TR SO$_2$ Group 1 allowances, or TR SO$_2$ Group 2 allowances in a general account shall be signed by the authorized account representative.

(ii) Any filings on behalf of owners and operators of a NO$_X$ Budget unit or NO$_X$ Budget source shall be signed by the NO$_X$ authorized account representative. Any filing on behalf of persons with an ownership interest with respect to NO$_X$ allowances in a general account shall be signed by the NO$_X$ authorized account representative.

\* \* \* \* \*

(2) The name, address, e-mail address (if any), telephone number, and facsimile number (if any) of the person making the filing shall be provided with the filing.

\* \* \* \* \*

§ 78.5   [Amended]

■ 71. Section 78.5 is amended by, in paragraph (a):

■ a. Removing the words ''public comment prior to'' and adding, in their place, the words ''submission of public comments or objections prior to'';

■ b. Removing the words ''public comment period'' whenever they appear and adding, in their place, the words ''period for submission of public comments or objections''.

§ 78.12   [Amended]

■ 72. Section 78.12 is amended by, in paragraph (a), removing the words ''public comment'' and adding, in their place, the words ''submission of public comments or objections''.

PART 97—[AMENDED]

■ 73. The authority citation for part 97 continues to read as follows:

Authority: 42 U.S.C. 7401, 7403, 7410, 7426, 7601, and 7651, *et seq.*

■ 74. Part 97 is amended by adding subpart AAAAA to read as follows:

**Subpart AAAAA—TR NO$_X$ Annual Trading Program**

97.401 Purpose.
97.402 Definitions.
97.403 Measurements, abbreviations, and acronyms.
97.404 Applicability.
97.405 Retired unit exemption.
97.406 Standard requirements.
97.407 Computation of time.
97.408 Administrative appeal procedures.
97.409 [Reserved]
97.410 State NO$_X$ Annual trading budgets, new unit set-asides, Indian country new unit set-asides and variability limits.
97.411 Timing requirements for TR NO$_X$ Annual allowance allocations.
97.412 TR NO$_X$ Annual allowance allocations to new units.
97.413 Authorization of designated representative and alternate designated representative.
97.414 Responsibilities of designated representative and alternate designated representative.
97.415 Changing designated representative and alternate designated representative; changes in owners and operators.
97.416 Certificate of representation.
97.417 Objections concerning designated representative and alternate designated representative.
97.418 Delegation by designated representative and alternate designated representative.
97.419 [Reserved]
97.420 Establishment of compliance accounts and general accounts.
97.421 Recordation of TR NO$_X$ Annual allowance allocations.
97.422 Submission of TR NO$_X$ Annual allowance transfers.
97.423 Recordation of TR NO$_X$ Annual allowance transfers.
97.424 Compliance with TR NO$_X$ Annual emissions limitation.
97.425 Compliance with TR NO$_X$ Annual assurance provisions.
97.426 Banking.
97.427 Account error.
97.428 Administrator's action on submissions.
97.429 [RESERVED]
97.430 General monitoring, recordkeeping, and reporting requirements.
97.431 Initial monitoring system certification and recertification procedures.
97.432 Monitoring system out-of-control periods.
97.433 Notifications concerning monitoring.
97.434 Recordkeeping and reporting.
97.435 Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

**Subpart AAAAA—TR NO$_X$ Annual Trading Program**

**§ 97.401 Purpose.**

This subpart sets forth the general, designated representative, allowance, and monitoring provisions for the Transport Rule (TR) NO$_X$ Annual Trading Program, under section 110 of the Clean Air Act and § 52.38 of this chapter, as a means of mitigating interstate transport of fine particulates and nitrogen oxides.

**§ 97.402 Definitions.**

The terms used in this subpart shall have the meanings set forth in this section as follows:

*Acid Rain Program* means a multi-state SO$_2$ and NO$_X$ air pollution control and emission reduction program established by the Administrator under title IV of the Clean Air Act and parts 72 through 78 of this chapter.

*Administrator* means the Administrator of the United States Environmental Protection Agency or the Director of the Clean Air Markets Division (or its successor determined by the Administrator) of the United States Environmental Protection Agency, the Administrator's duly authorized representative under this subpart.

*Allocate* or *allocation* means, with regard to TR NO$_X$ Annual allowances, the determination by the Administrator, State, or permitting authority, in accordance with this subpart and any SIP revision submitted by the State and approved by the Administrator under § 52.38(a)(3), (4), or (5) of this chapter, of the amount of such TR NO$_X$ Annual allowances to be initially credited, at no cost to the recipient, to:

(1) A TR NO$_X$ Annual unit;
(2) A new unit set-aside;
(3) An Indian country new unit set-aside; or
(4) An entity not listed in paragraphs (1) through (3) of this definition;
(5) Provided that, if the Administrator, State, or permitting authority initially credits, to a TR NO$_X$ Annual unit qualifying for an initial credit, a credit in the amount of zero TR NO$_X$ Annual allowances, the TR NO$_X$ Annual unit will be treated as being allocated an amount (*i.e.,* zero) of TR NO$_X$ Annual allowances.

*Allowable* NO$_X$ *emission rate* means, for a unit, the most stringent State or federal NO$_X$ emission rate limit (in lb/MWhr or, if in lb/mmBtu, converted to lb/MWhr by multiplying it by the unit's heat rate in mmBtu/MWhr) that is applicable to the unit and covers the longest averaging period not exceeding one year.

*Allowance Management System* means the system by which the Administrator records allocations, deductions, and transfers of TR NO$_X$ Annual allowances under the TR NO$_X$ Annual Trading Program. Such allowances are allocated, recorded, held, deducted, or transferred only as whole allowances.

*Allowance Management System account* means an account in the Allowance Management System established by the Administrator for purposes of recording the allocation, holding, transfer, or deduction of TR NO$_X$ Annual allowances.

*Allowance transfer deadline* means, for a control period in a given year, midnight of March 1 (if it is a business day), or midnight of the first business day thereafter (if March 1 is not a business day), immediately after such control period and is the deadline by which a TR NO$_X$ Annual allowance transfer must be submitted for recordation in a TR NO$_X$ Annual source's compliance account in order to be available for use in complying with the source's TR NO$_X$ Annual emissions limitation for such control period in accordance with §§ 97.406 and 97.424.

*Alternate designated representative* means, for a TR NO$_X$ Annual source and each TR NO$_X$ Annual unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to act on behalf of the designated representative in matters pertaining to the TR NO$_X$ Annual Trading Program. If the TR NO$_X$ Annual source is also subject to the Acid Rain Program, TR NO$_X$ Ozone Season Trading Program, TR SO$_2$ Group 1 Trading Program, or TR SO$_2$ Group 2 Trading Program, then this natural person shall be the same natural person as the alternate designated representative, as defined in the respective program.

*Assurance account* means an Allowance Management System account, established by the Administrator under § 97.425(b)(3) for certain owners and operators of a group of one or more TR NO$_X$ Annual sources and units in a given State (and Indian country within the borders of such State), in which are held TR NO$_X$ Annual allowances available for use for a control period in a given year in complying with the TR NO$_X$ Annual assurance provisions in accordance with §§ 97.406 and 97.425.

*Authorized account representative* means, for a general account, the natural person who is authorized, in accordance with this subpart, to transfer and otherwise dispose of TR NO$_X$ Annual allowances held in the general account and, for a TR NO$_X$ Annual source's compliance account, the designated representative of the source.

*Automated data acquisition and handling system* or *DAHS* means the component of the continuous emission monitoring system, or other emissions monitoring system approved for use

under this subpart, designed to interpret and convert individual output signals from pollutant concentration monitors, flow monitors, diluent gas monitors, and other component parts of the monitoring system to produce a continuous record of the measured parameters in the measurement units required by this subpart.

*Biomass* means—

(1) Any organic material grown for the purpose of being converted to energy;

(2) Any organic byproduct of agriculture that can be converted into energy; or

(3) Any material that can be converted into energy and is nonmerchantable for other purposes, that is segregated from other material that is nonmerchantable for other purposes, and that is;

(i) A forest-related organic resource, including mill residues, precommercial thinnings, slash, brush, or byproduct from conversion of trees to merchantable material; or

(ii) A wood material, including pallets, crates, dunnage, manufacturing and construction materials (other than pressure-treated, chemically-treated, or painted wood products), and landscape or right-of-way tree trimmings.

*Boiler* means an enclosed fossil- or other-fuel-fired combustion device used to produce heat and to transfer heat to recirculating water, steam, or other medium.

*Bottoming-cycle unit* means a unit in which the energy input to the unit is first used to produce useful thermal energy, where at least some of the reject heat from the useful thermal energy application or process is then used for electricity production.

*Business day* means a day that does not fall on a weekend or a federal holiday.

*Certifying official* means a natural person who is:

(1) For a corporation, a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function or any other person who performs similar policy- or decision-making functions for the corporation;

(2) For a partnership or sole proprietorship, a general partner or the proprietor respectively; or

(3) For a local government entity or State, federal, or other public agency, a principal executive officer or ranking elected official.

*Clean Air Act* means the Clean Air Act, 42 U.S.C. 7401, *et seq.*

*Coal* means "coal" as defined in § 72.2 of this chapter.

*Coal-derived fuel* means any fuel (whether in a solid, liquid, or gaseous state) produced by the mechanical, thermal, or chemical processing of coal.

*Cogeneration system* means an integrated group, at a source, of equipment (including a boiler, or combustion turbine, and a steam turbine generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy.

*Cogeneration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a topping-cycle unit or a bottoming-cycle unit:

(1) Operating as part of a cogeneration system; and

(2) Producing on an annual average basis—

(i) For a topping-cycle unit,

(A) Useful thermal energy not less than 5 percent of total energy output; and

(B) Useful power that, when added to one-half of useful thermal energy produced, is not less than 42.5 percent of total energy input, if useful thermal energy produced is 15 percent or more of total energy output, or not less than 45 percent of total energy input, if useful thermal energy produced is less than 15 percent of total energy output.

(ii) For a bottoming-cycle unit, useful power not less than 45 percent of total energy input;

(3) Provided that the requirements in paragraph (2) of this definition shall not apply to a calendar year referenced in paragraph (2) of this definition during which the unit did not operate at all;

(4) Provided that the total energy input under paragraphs (2)(i)(B) and (2)(ii) of this definition shall equal the unit's total energy input from all fuel, except biomass if the unit is a boiler; and

(5) Provided that, if, throughout its operation during the 12-month period or a calendar year referenced in paragraph (2) of this definition, a unit is operated as part of a cogeneration system and the cogeneration system meets on a system-wide basis the requirement in paragraph (2)(i)(B) or (2)(ii) of this definition, the unit shall be deemed to meet such requirement during that 12-month period or calendar year.

*Combustion turbine* means an enclosed device comprising:

(1) If the device is simple cycle, a compressor, a combustor, and a turbine and in which the flue gas resulting from the combustion of fuel in the combustor passes through the turbine, rotating the turbine; and

(2) If the device is combined cycle, the equipment described in paragraph (1) of this definition and any associated duct burner, heat recovery steam generator, and steam turbine.

*Commence commercial operation* means, with regard to a unit:

(1) To have begun to produce steam, gas, or other heated medium used to generate electricity for sale or use, including test generation, except as provided in § 97.405.

(i) For a unit that is a TR NO$_X$ Annual unit under § 97.404 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that subsequently undergoes a physical change or is moved to a new location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit that is a TR NO$_X$ Annual unit under § 97.404 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

(2) Notwithstanding paragraph (1) of this definition and except as provided in § 97.405, for a unit that is not a TR NO$_X$ Annual unit under § 97.404 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in introductory text of paragraph (1) of this definition, the unit's date for commencement of commercial operation shall be the date on which the unit becomes a TR NO$_X$ Annual unit under § 97.404.

(i) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition and that subsequently undergoes a physical change or is moved to a different location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for

commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

*Common designated representative* means, with regard to a control period in a given year, a designated representative where, as of April 1 immediately after the allowance transfer deadline for such control period, the same natural person is authorized under §§ 97.413(a) and 97.415(a) as the designated representative for a group of one or more TR NO$_X$ Annual sources and units located in a State (and Indian country within the borders of such State).

*Common designated representative's assurance level* means, with regard to a specific common designated representative and a State (and Indian country within the borders of such State) and control period in a given year for which the State assurance level is exceeded as described in § 97.406(c)(2)(iii), the common designated representative's share of the State NO$_X$ Annual trading budget with the variability limit for the State for such control period.

*Common designated representative's share* means, with regard to a specific common designated representative for a control period in a given year:

(1) With regard to a total amount of NO$_X$ emissions from all TR NO$_X$ Annual units in a State (and Indian country within the borders of such State) during such control period, the total tonnage of NO$_X$ emissions during such control period from a group of one or more TR NO$_X$ Annual units located in such State (and such Indian country) and having the common designated representative for such control period;

(2) With regard to a State NO$_X$ Annual trading budget with the variability limit for such control period, the amount (rounded to the nearest allowance) equal to the sum of the total amount of TR NO$_X$ Annual allowances allocated for such control period to a group of one or more TR NO$_X$ Annual units located in the State (and Indian country within the borders of such State) and having the common designated representative for such control period and of the total amount of TR NO$_X$ Annual allowances purchased by an owner or operator of such TR NO$_X$ Annual units in an auction for such control period and submitted by the State or the permitting authority to the Administrator for recordation in the compliance accounts for such TR NO$_X$ Annual units in accordance with the TR NO$_X$ Annual allowance auction provisions in a SIP revision approved by the Administrator under § 52.38(a)(4) or (5) of this chapter, multiplied by the sum of the State NO$_X$

Annual trading budget under § 97.410(a) and the State's variability limit under § 97.410(b) for such control period and divided by such State NO$_X$ Annual trading budget;

(3) Provided that, in the case of a unit that operates during, but has no amount of TR NO$_X$ Annual allowances allocated under §§ 97.411 and 97.412 for, such control period, the unit shall be treated, solely for purposes of this definition, as being allocated an amount (rounded to the nearest allowance) of TR NO$_X$ Annual allowances for such control period equal to the unit's allowable NO$_X$ emission rate applicable to such control period, multiplied by a capacity factor of 0.85 (if the unit is a boiler combusting any amount of coal or coal-derived fuel during such control period), 0.24 (if the unit is a simple combustion turbine during such control period), 0.67 (if the unit is a combined cycle turbine during such control period), 0.74 (if the unit is an integrated coal gasification combined cycle unit during such control period), or 0.36 (for any other unit), multiplied by the unit's maximum hourly load as reported in accordance with this subpart and by 8,760 hours/control period, and divided by 2,000 lb/ton.

*Common stack* means a single flue through which emissions from 2 or more units are exhausted.

*Compliance account* means an Allowance Management System account, established by the Administrator for a TR NO$_X$ Annual source under this subpart, in which any TR NO$_X$ Annual allowance allocations to the TR NO$_X$ Annual units at the source are recorded and in which are held any TR NO$_X$ Annual allowances available for use for a control period in a given year in complying with the source's TR NO$_X$ Annual emissions limitation in accordance with §§ 97.406 and 97.424.

*Continuous emission monitoring system or CEMS* means the equipment required under this subpart to sample, analyze, measure, and provide, by means of readings recorded at least once every 15 minutes and using an automated data acquisition and handling system (DAHS), a permanent record of NO$_X$ emissions, stack gas volumetric flow rate, stack gas moisture content, and O$_2$ or CO$_2$ concentration (as applicable), in a manner consistent with part 75 of this chapter and §§ 97.430 through 97.435. The following systems are the principal types of continuous emission monitoring systems:

(1) A flow monitoring system, consisting of a stack flow rate monitor and an automated data acquisition and handling system and providing a permanent, continuous record of stack

gas volumetric flow rate, in standard cubic feet per hour (scfh);

(2) A NO$_X$ concentration monitoring system, consisting of a NO$_X$ pollutant concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of NO$_X$ emissions, in parts per million (ppm);

(3) A NO$_X$ emission rate (or NO$_X$-diluent) monitoring system, consisting of a NO$_X$ pollutant concentration monitor, a diluent gas (CO$_2$ or O$_2$) monitor, and an automated data acquisition and handling system and providing a permanent, continuous record of NO$_X$ concentration, in parts per million (ppm), diluent gas concentration, in percent CO$_2$ or O$_2$, and NO$_X$ emission rate, in pounds per million British thermal units (lb/mmBtu);

(4) A moisture monitoring system, as defined in § 75.11(b)(2) of this chapter and providing a permanent, continuous record of the stack gas moisture content, in percent H$_2$O;

(5) A CO$_2$ monitoring system, consisting of a CO$_2$ pollutant concentration monitor (or an O$_2$ monitor plus suitable mathematical equations from which the CO$_2$ concentration is derived) and an automated data acquisition and handling system and providing a permanent, continuous record of CO$_2$ emissions, in percent CO$_2$; and

(6) An O$_2$ monitoring system, consisting of an O$_2$ concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of O$_2$, in percent O$_2$.

*Control period* means the period starting January 1 of a calendar year, except as provided in § 97.406(c)(3), and ending on December 31 of the same year, inclusive.

*Designated representative* means, for a TR NO$_X$ Annual source and each TR NO$_X$ Annual unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to represent and legally bind each owner and operator in matters pertaining to the TR NO$_X$ Annual Trading Program. If the TR NO$_X$ Annual source is also subject to the Acid Rain Program, TR NO$_X$ Ozone Season Trading Program, TR SO$_2$ Group 1 Trading Program, or TR SO$_2$ Group 2 Trading Program, then this natural person shall be the same natural person as the designated representative, as defined in the respective program.

*Emissions* means air pollutants exhausted from a unit or source into the atmosphere, as measured, recorded, and

reported to the Administrator by the designated representative, and as modified by the Administrator:

(1) In accordance with this subpart; and

(2) With regard to a period before the unit or source is required to measure, record, and report such air pollutants in accordance with this subpart, in accordance with part 75 of this chapter.

*Excess emissions* means any ton of emissions from the TR $NO_X$ Annual units at a TR $NO_X$ Annual source during a control period in a given year that exceeds the TR $NO_X$ Annual emissions limitation for the source for such control period.

*Fossil fuel* means—

(1) Natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material; or

(2) For purposes of applying the limitation on "average annual fuel consumption of fossil fuel" in §§ 97.404(b)(2)(i)(B) and (ii), natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material for the purpose of creating useful heat.

*Fossil-fuel-fired* means, with regard to a unit, combusting any amount of fossil fuel in 2005 or any calendar year thereafter.

*General account* means an Allowance Management System account, established under this subpart, that is not a compliance account or an assurance account.

*Generator* means a device that produces electricity.

*Gross electrical output* means, for a unit, electricity made available for use, including any such electricity used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Heat input* means, for a unit for a specified period of time, the product (in mmBtu/time) of the gross calorific value of the fuel (in mmBtu/lb) fed into the unit multiplied by the fuel feed rate (in lb of fuel/time), as measured, recorded, and reported to the Administrator by the designated representative and as modified by the Administrator in accordance with this subpart and excluding the heat derived from preheated combustion air, recirculated flue gases, or exhaust.

*Heat input rate* means, for a unit, the amount of heat input (in mmBtu) divided by unit operating time (in hr) or, for a unit and a specific fuel, the amount of heat input attributed to the fuel (in mmBtu) divided by the unit operating time (in hr) during which the unit combusts the fuel.

*Heat rate* means, for a unit, the unit's maximum design heat input (in Btu/hr), divided by the product of 1,000,000 Btu/mmBtu and the unit's maximum hourly load.

*Indian country* means "Indian country" as defined in 18 U.S.C. 1151.

*Life-of-the-unit, firm power contractual arrangement* means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of nameplate capacity and associated energy generated by any specified unit and pays its proportional amount of such unit's total costs, pursuant to a contract:

(1) For the life of the unit;

(2) For a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or

(3) For a period no less than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit is built, with option rights to purchase or release some portion of the nameplate capacity and associated energy generated by the unit at the end of the period.

*Maximum design heat input* means, for a unit, the maximum amount of fuel per hour (in Btu/hr) that the unit is capable of combusting on a steady state basis as of the initial installation of the unit as specified by the manufacturer of the unit.

*Monitoring system* means any monitoring system that meets the requirements of this subpart, including a continuous emission monitoring system, an alternative monitoring system, or an excepted monitoring system under part 75 of this chapter.

*Nameplate capacity* means, starting from the initial installation of a generator, the maximum electrical generating output (in MWe, rounded to the nearest tenth) that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings) as of such installation as specified by the manufacturer of the generator or, starting from the completion of any subsequent physical change in the generator resulting in an increase in the maximum electrical generating output that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings), such increased maximum amount (in MWe, rounded to the nearest tenth) as of such completion as specified by the person conducting the physical change.

*Natural gas* means "natural gas" as defined in § 72.2 of this chapter.

*Newly affected TR $NO_X$ Annual unit* means a unit that was not a TR $NO_X$ Annual unit when it began operating but that thereafter becomes a TR $NO_X$ Annual unit.

*Operate* or *operation* means, with regard to a unit, to combust fuel.

*Operator* means, for a TR $NO_X$ Annual source or a TR $NO_X$ Annual unit at a source respectively, any person who operates, controls, or supervises a TR $NO_X$ Annual unit at the source or the TR $NO_X$ Annual unit and shall include, but not be limited to, any holding company, utility system, or plant manager of such source or unit.

*Owner* means, for a TR $NO_X$ Annual source or a TR $NO_X$ Annual unit at a source respectively, any of the following persons:

(1) Any holder of any portion of the legal or equitable title in a TR $NO_X$ Annual unit at the source or the TR $NO_X$ Annual unit;

(2) Any holder of a leasehold interest in a TR $NO_X$ Annual unit at the source or the TR $NO_X$ Annual unit, provided that, unless expressly provided for in a leasehold agreement, "owner" shall not include a passive lessor, or a person who has an equitable interest through such lessor, whose rental payments are not based (either directly or indirectly) on the revenues or income from such TR $NO_X$ Annual unit; and 3) Any purchaser of power from a TR $NO_X$ Annual unit at the source or the TR $NO_X$ Annual unit under a life-of-the-unit, firm power contractual arrangement.

*Permanently retired* means, with regard to a unit, a unit that is unavailable for service and that the unit's owners and operators do not expect to return to service in the future.

*Permitting authority* means "permitting authority" as defined in §§ 70.2 and 71.2 of this chapter.

*Potential electrical output capacity* means, for a unit, 33 percent of the unit's maximum design heat input, divided by 3,413 Btu/kWh, divided by 1,000 kWh/MWh, and multiplied by 8,760 hr/yr.

*Receive* or *receipt of* means, when referring to the Administrator, to come into possession of a document, information, or correspondence (whether sent in hard copy or by authorized electronic transmission), as indicated in an official log, or by a notation made on the document, information, or correspondence, by the Administrator in the regular course of business.

*Recordation, record,* or *recorded* means, with regard to TR $NO_X$ Annual allowances, the moving of TR $NO_X$

Annual allowances by the Administrator into, out of, or between Allowance Management System accounts, for purposes of allocation, auction, transfer, or deduction.

*Reference method* means any direct test method of sampling and analyzing for an air pollutant as specified in § 75.22 of this chapter.

*Replacement, replace,* or *replaced* means, with regard to a unit, the demolishing of a unit, or the permanent retirement and permanent disabling of a unit, and the construction of another unit (the replacement unit) to be used instead of the demolished or retired unit (the replaced unit).

*Sequential use of energy* means:

(1) The use of reject heat from electricity production in a useful thermal energy application or process; or

(2) The use of reject heat from useful thermal energy application or process in electricity production.

*Serial number* means, for a TR NO$_X$ Annual allowance, the unique identification number assigned to each TR NO$_X$ Annual allowance by the Administrator.

*Solid waste incineration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a "solid waste incineration unit" as defined in section 129(g)(1) of the Clean Air Act.

*Source* means all buildings, structures, or installations located in one or more contiguous or adjacent properties under common control of the same person or persons. This definition does not change or otherwise affect the definition of "major source", "stationary source", or "source" as set forth and implemented in a title V operating permit program or any other program under the Clean Air Act.

*State* means one of the States that is subject to the TR NO$_X$ Annual Trading Program pursuant to § 52.38(a) of this chapter.

*Submit* or *serve* means to send or transmit a document, information, or correspondence to the person specified in accordance with the applicable regulation:

(1) In person;

(2) By United States Postal Service; or

(3) By other means of dispatch or transmission and delivery;

(4) Provided that compliance with any "submission" or "service" deadline shall be determined by the date of dispatch, transmission, or mailing and not the date of receipt.

*Topping-cycle unit* means a unit in which the energy input to the unit is first used to produce useful power, including electricity, where at least

some of the reject heat from the electricity production is then used to provide useful thermal energy.

*Total energy input* means, for a unit, total energy of all forms supplied to the unit, excluding energy produced by the unit. Each form of energy supplied shall be measured by the lower heating value of that form of energy calculated as follows:

$$LHV = HHV - 10.55(W + 9H)$$

Where:

LHV = lower heating value of the form of energy in Btu/lb,
HHV = higher heating value of the form of energy in Btu/lb,
W = weight % of moisture in the form of energy, and
H = weight % of hydrogen in the form of energy.

*Total energy output* means, for a unit, the sum of useful power and useful thermal energy produced by the unit.

*TR NO$_X$ Annual allowance* means a limited authorization issued and allocated or auctioned by the Administrator under this subpart, or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.38(a)(3), (4), or (5) of this chapter, to emit one ton of NO$_X$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the TR NO$_X$ Annual Trading Program.

*TR NO$_X$ Annual allowance deduction* or *deduct TR NO$_X$ Annual allowances* means the permanent withdrawal of TR NO$_X$ Annual allowances by the Administrator from a compliance account (*e.g.*, in order to account for compliance with the TR NO$_X$ Annual emissions limitation) or from an assurance account (*e.g.*, in order to account for compliance with the assurance provisions under §§ 97.406 and 97.425).

*TR NO$_X$ Annual allowances held* or *hold TR NO$_4$ Annual allowances* means the TR NO$_X$ Annual allowances treated as included in an Allowance Management System account as of a specified point in time because at that time they:

(1) Have been recorded by the Administrator in the account or transferred into the account by a correctly submitted, but not yet recorded, TR NO$_X$ Annual allowance transfer in accordance with this subpart; and

(2) Have not been transferred out of the account by a correctly submitted, but not yet recorded, TR NO$_X$ Annual allowance transfer in accordance with this subpart.

*TR NO$_X$ Annual emissions limitation* means, for a TR NO$_X$ Annual source, the

tonnage of NO$_X$ emissions authorized in a control period in a given year by the TR NO$_X$ Annual allowances available for deduction for the source under § 97.424(a) for such control period.

*TR NO$_X$ Annual source* means a source that includes one or more TR NO$_X$ Annual units.

*TR NO$_X$ Annual Trading Program* means a multi-state NO$_X$ air pollution control and emission reduction program established in accordance with this subpart and § 52.38(a) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(a)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(a)(5) of this chapter), as a means of mitigating interstate transport of fine particulates and NO$_X$.

*TR NO$_X$ Annual unit* means a unit that is subject to the TR NO$_X$ Annual Trading Program.

*TR NO$_X$ Ozone Season Trading Program* means a multi-state NO$_X$ air pollution control and emission reduction program established in accordance with subpart BBBBB of this part and § 52.38(b) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(5) of this chapter), as a means of mitigating interstate transport of ozone and NO$_X$.

*TR SO$_2$ Group 1 Trading Program* means a multi-state SO$_2$ air pollution control and emission reduction program established in accordance with subpart CCCCC of this part and § 52.39(a), (b), (d) through (f), (j), and (k) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(d) or (e) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(f) of this chapter), as a means of mitigating interstate transport of fine particulates and SO$_2$.

*TR SO$_2$ Group 2 Trading Program* means a multi-state SO$_2$ air pollution control and emission reduction program established in accordance with subpart DDDDD of this part and § 52.39(a), (c), and (g) through (k) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(g) or (h) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(i) of this chapter), as a means of mitigating interstate transport of fine particulates and SO$_2$.

*Unit* means a stationary, fossil-fuel-fired boiler, stationary, fossil-fuel-fired combustion turbine, or other stationary, fossil-fuel-fired combustion device. A unit that undergoes a physical change or is moved to a different location or source shall continue to be treated as the same unit. A unit (the replaced unit) that is replaced by another unit (the replacement unit) at the same or a different source shall continue to be treated as the same unit, and the replacement unit shall be treated as a separate unit.

*Unit operating day* means, with regard to a unit, a calendar day in which the unit combusts any fuel.

*Unit operating hour or hour of unit operation* means, with regard to a unit, an hour in which the unit combusts any fuel.

*Useful power* means, with regard to a unit, electricity or mechanical energy that the unit makes available for use, excluding any such energy used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Useful thermal energy* means thermal energy that is:

(1) Made available to an industrial or commercial process (not a power production process), excluding any heat contained in condensate return or makeup water;

(2) Used in a heating application (*e.g.,* space heating or domestic hot water heating); or

(3) Used in a space cooling application (*i.e.,* in an absorption chiller).

*Utility power distribution system* means the portion of an electricity grid owned or operated by a utility and dedicated to delivering electricity to customers.

### § 97.403  Measurements, abbreviations, and acronyms.

Measurements, abbreviations, and acronyms used in this subpart are defined as follows:

Btu—British thermal unit
$CO_2$—carbon dioxide
$H_2O$—water
hr—hour
kW—kilowatt electrical
kWh—kilowatt hour
lb—pound
mmBtu—million Btu
MWe—megawatt electrical
MWh—megawatt hour
$NO_X$—nitrogen oxides
$O_2$—oxygen
ppm—parts per million
scfh—standard cubic feet per hour
$SO_2$—sulfur dioxide
yr—year

### § 97.404  Applicability.

(a) Except as provided in paragraph (b) of this section:

(1) The following units in a State (and Indian country within the borders of such State) shall be TR $NO_X$ Annual units, and any source that includes one or more such units shall be a TR $NO_X$ Annual source, subject to the requirements of this subpart: any stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine serving at any time, on or after January 1, 2005, a generator with nameplate capacity of more than 25 MWe producing electricity for sale.

(2) If a stationary boiler or stationary combustion turbine that, under paragraph (a)(1) of this section, is not a TR $NO_X$ Annual unit begins to combust fossil fuel or to serve a generator with nameplate capacity of more than 25 MWe producing electricity for sale, the unit shall become a TR $NO_X$ Annual unit as provided in paragraph (a)(1) of this section on the first date on which it both combusts fossil fuel and serves such generator.

(b) Any unit in a State (and Indian country within the borders of such State) that otherwise is a TR $NO_X$ Annual unit under paragraph (a) of this section and that meets the requirements set forth in paragraph (b)(1)(i) or (2)(i) of this section shall not be a TR $NO_X$ Annual unit:

(1)(i) Any unit:

(A) Qualifying as a cogeneration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a cogeneration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) Not supplying in 2005 or any calendar year thereafter more than one-third of the unit's potential electric output capacity or 219,000 MWh, whichever is greater, to any utility power distribution system for sale.

(ii) If, after qualifying under paragraph (b)(1)(i) of this section as not being a TR $NO_X$ Annual unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR $NO_X$ Annual unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a cogeneration unit or January 1 after the first calendar year during which the unit no longer meets the requirements of paragraph (b)(1)(i)(B) of this section. The unit shall thereafter continue to be a TR $NO_X$ Annual unit.

(2)(i) Any unit:

(A) Qualifying as a solid waste incineration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a solid waste incineration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) With an average annual fuel consumption of fossil fuel for the first 3 consecutive calendar years of operation starting no earlier than 2005 of less than 20 percent (on a Btu basis) and an average annual fuel consumption of fossil fuel for any 3 consecutive calendar years thereafter of less than 20 percent (on a Btu basis).

(ii) If, after qualifying under paragraph (b)(2)(i) of this section as not being a TR $NO_X$ Annual unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR $NO_X$ Annual unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a solid waste incineration unit or January 1 after the first 3 consecutive calendar years after 2005 for which the unit has an average annual fuel consumption of fossil fuel of 20 percent or more. The unit shall thereafter continue to be a TR $NO_X$ Annual unit.

(c) A certifying official of an owner or operator of any unit or other equipment may submit a petition (including any supporting documents) to the Administrator at any time for a determination concerning the applicability, under paragraphs (a) and (b) of this section or a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, of the TR $NO_X$ Annual Trading Program to the unit or other equipment.

(1) Petition content. The petition shall be in writing and include the identification of the unit or other equipment and the relevant facts about the unit or other equipment. The petition and any other documents provided to the Administrator in connection with the petition shall include the following certification statement, signed by the certifying official: "I am authorized to make this submission on behalf of the owners and operators of the unit or other equipment for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements

and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(2) Response. The Administrator will issue a written response to the petition and may request supplemental information determined by the Administrator to be relevant to such petition. The Administrator's determination concerning the applicability, under paragraphs (a) and (b) of this section, of the TR NO$_X$ Annual Trading Program to the unit or other equipment shall be binding on any State or permitting authority unless the Administrator determines that the petition or other documents or information provided in connection with the petition contained significant, relevant errors or omissions.

### § 97.405   Retired unit exemption.

(a)(1) Any TR NO$_X$ Annual unit that is permanently retired shall be exempt from § 97.406(b) and (c)(1), § 97.424, and §§ 97.430 through 97.435.

(2) The exemption under paragraph (a)(1) of this section shall become effective the day on which the TR NO$_X$ Annual unit is permanently retired. Within 30 days of the unit's permanent retirement, the designated representative shall submit a statement to the Administrator. The statement shall state, in a format prescribed by the Administrator, that the unit was permanently retired on a specified date and will comply with the requirements of paragraph (b) of this section.

(b) Special provisions. (1) A unit exempt under paragraph (a) of this section shall not emit any NO$_X$, starting on the date that the exemption takes effect.

(2) For a period of 5 years from the date the records are created, the owners and operators of a unit exempt under paragraph (a) of this section shall retain, at the source that includes the unit, records demonstrating that the unit is permanently retired. The 5-year period for keeping records may be extended for cause, at any time before the end of the period, in writing by the Administrator. The owners and operators bear the burden of proof that the unit is permanently retired.

(3) The owners and operators and, to the extent applicable, the designated representative of a unit exempt under paragraph (a) of this section shall comply with the requirements of the TR NO$_X$ Annual Trading Program concerning all periods for which the exemption is not in effect, even if such requirements arise, or must be complied with, after the exemption takes effect.

(4) A unit exempt under paragraph (a) of this section shall lose its exemption on the first date on which the unit resumes operation. Such unit shall be treated, for purposes of applying allocation, monitoring, reporting, and recordkeeping requirements under this subpart, as a unit that commences commercial operation on the first date on which the unit resumes operation.

### § 97.406   Standard requirements.

(a) *Designated representative requirements.* The owners and operators shall comply with the requirement to have a designated representative, and may have an alternate designated representative, in accordance with §§ 97.413 through 97.418.

(b) *Emissions monitoring, reporting, and recordkeeping requirements.*

(1) The owners and operators, and the designated representative, of each TR NO$_X$ Annual source and each TR NO$_X$ Annual unit at the source shall comply with the monitoring, reporting, and recordkeeping requirements of §§ 97.430 through 97.435.

(2) The emissions data determined in accordance with §§ 97.430 through 97.435 shall be used to calculate allocations of TR NO$_X$ Annual allowances under §§ 97.411(a)(2) and (b) and 97.412 and to determine compliance with the TR NO$_X$ Annual emissions limitation and assurance provisions under paragraph (c) of this section, provided that, for each monitoring location from which mass emissions are reported, the mass emissions amount used in calculating such allocations and determining such compliance shall be the mass emissions amount for the monitoring location determined in accordance with §§ 97.430 through 97.435 and rounded to the nearest ton, with any fraction of a ton less than 0.50 being deemed to be zero.

(c) *NO$_X$ emissions requirements.* (1) TR NO$_X$ Annual emissions limitation. (i) As of the allowance transfer deadline for a control period in a given year, the owners and operators of each TR NO$_X$ Annual source and each TR NO$_X$ Annual unit at the source shall hold, in the source's compliance account, TR NO$_X$ Annual allowances available for deduction for such control period under § 97.424(a) in an amount not less than the tons of total NO$_X$ emissions for such control period from all TR NO$_X$ Annual units at the source.

(ii) If total NO$_X$ emissions during a control period in a given year from the TR NO$_X$ Annual units at a TR NO$_X$ Annual source are in excess of the TR NO$_X$ Annual emissions limitation set forth in paragraph (c)(1)(i) of this section, then:

(A) The owners and operators of the source and each TR NO$_X$ Annual unit at the source shall hold the TR NO$_X$ Annual allowances required for deduction under § 97.424(d); and

(B) The owners and operators of the source and each TR NO$_X$ Annual unit at the source shall pay any fine, penalty, or assessment or comply with any other remedy imposed, for the same violations, under the Clean Air Act, and each ton of such excess emissions and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(2) TR NO$_X$ Annual assurance provisions. (i) If total NO$_X$ emissions during a control period in a given year from all TR NO$_X$ Annual units at TR NO$_X$ Annual sources in a State (and Indian country within the borders of such State) exceed the State assurance level, then the owners and operators of such sources and units in each group of one or more sources and units having a common designated representative for such control period, where the common designated representative's share of such NO$_X$ emissions during such control period exceeds the common designated representative's assurance level for the State and such control period, shall hold (in the assurance account established for the owners and operators of such group) TR NO$_X$ Annual allowances available for deduction for such control period under § 97.425(a) in an amount equal to two times the product (rounded to the nearest whole number), as determined by the Administrator in accordance with § 97.425(b), of multiplying—

(A) The quotient of the amount by which the common designated representative's share of such NO$_X$ emissions exceeds the common designated representative's assurance level divided by the sum of the amounts, determined for all common designated representatives for such sources and units in the State (and Indian country within the borders of such State) for such control period, by which each common designated representative's share of such NO$_X$ emissions exceeds the respective common designated representative's assurance level; and

(B) The amount by which total NO$_X$ emissions from all TR NO$_X$ Annual units at TR NO$_X$ Annual sources in the State (and Indian country within the borders of such State) for such control period exceed the State assurance level.

(ii) The owners and operators shall hold the TR NO$_X$ Annual allowances required under paragraph (c)(2)(i) of this section, as of midnight of November 1 (if it is a business day), or midnight of the first business day thereafter (if November 1 is not a business day), immediately after such control period.

(iii) Total NO$_X$ emissions from all TR NO$_X$ Annual units at TR NO$_X$ Annual sources in a State (and Indian country within the borders of such State) during a control period in a given year exceed the State assurance level if such total NO$_X$ emissions exceed the sum, for such control period, of the State NO$_X$ Annual trading budget under § 97.410(a) and the State's variability limit under § 97.410(b).

(iv) It shall not be a violation of this subpart or of the Clean Air Act if total NO$_X$ emissions from all TR NO$_X$ Annual units at TR NO$_X$ Annual sources in a State (and Indian country within the borders of such State) during a control period exceed the State assurance level or if a common designated representative's share of total NO$_X$ emissions from the TR NO$_X$ Annual units at TR NO$_X$ Annual sources in a State (and Indian country within the borders of such State) during a control period exceeds the common designated representative's assurance level.

(v) To the extent the owners and operators fail to hold TR NO$_X$ Annual allowances for a control period in a given year in accordance with paragraphs (c)(2)(i) through (iii) of this section,

(A) The owners and operators shall pay any fine, penalty, or assessment or comply with any other remedy imposed under the Clean Air Act; and

(B) Each TR NO$_X$ Annual allowance that the owners and operators fail to hold for such control period in accordance with paragraphs (c)(2)(i) through (iii) of this section and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(3) Compliance periods. A TR NO$_X$ Annual unit shall be subject to the requirements under paragraphs (c)(1) and (c)(2) of this section for the control period starting on the later of January 1, 2012 or the deadline for meeting the unit's monitor certification requirements under § 97.430(b) and for each control period thereafter.

(4) Vintage of allowances held for compliance. (i) A TR NO$_X$ Annual allowance held for compliance with the requirements under paragraph (c)(1)(i) of this section for a control period in a given year must be a TR NO$_X$ Annual allowance that was allocated for such

control period or a control period in a prior year.

(ii) A TR NO$_X$ Annual allowance held for compliance with the requirements under paragraphs (c)(1)(ii)(A) and (2)(i) through (iii) of this section for a control period in a given year must be a TR NO$_X$ Annual allowance that was allocated for a control period in a prior year or the control period in the given year or in the immediately following year.

(5) Allowance Management System requirements. Each TR NO$_X$ Annual allowance shall be held in, deducted from, or transferred into, out of, or between Allowance Management System accounts in accordance with this subpart.

(6) Limited authorization. A TR NO$_X$ Annual allowance is a limited authorization to emit one ton of NO$_X$ during the control period in one year. Such authorization is limited in its use and duration as follows:

(i) Such authorization shall only be used in accordance with the TR NO$_X$ Annual Trading Program; and

(ii) Notwithstanding any other provision of this subpart, the Administrator has the authority to terminate or limit the use and duration of such authorization to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act.

(7) Property right. A TR NO$_X$ Annual allowance does not constitute a property right.

(d) Title V permit requirements. (1) No title V permit revision shall be required for any allocation, holding, deduction, or transfer of TR NO$_X$ Annual allowances in accordance with this subpart.

(2) A description of whether a unit is required to monitor and report NO$_X$ emissions using a continuous emission monitoring system (under subpart H of part 75 of this chapter), an excepted monitoring system (under appendices D and E to part 75 of this chapter), a low mass emissions excepted monitoring methodology (under § 75.19 of this chapter), or an alternative monitoring system (under subpart E of part 75 of this chapter) in accordance with §§ 97.430 through 97.435 may be added to, or changed in, a title V permit using minor permit modification procedures in accordance with §§ 70.7(e)(2) and 71.7(e)(1) of this chapter, provided that the requirements applicable to the described monitoring and reporting (as added or changed, respectively) are already incorporated in such permit. This paragraph explicitly provides that the addition of, or change to, a unit's description as described in the prior sentence is eligible for minor permit

modification procedures in accordance with §§ 70.7(e)(2)(i)(B) and 71.7(e)(1)(i)(B) of this chapter.

(e) Additional recordkeeping and reporting requirements. (1) Unless otherwise provided, the owners and operators of each TR NO$_X$ Annual source and each TR NO$_X$ Annual unit at the source shall keep on site at the source each of the following documents (in hardcopy or electronic format) for a period of 5 years from the date the document is created. This period may be extended for cause, at any time before the end of 5 years, in writing by the Administrator.

(i) The certificate of representation under § 97.416 for the designated representative for the source and each TR NO$_X$ Annual unit at the source and all documents that demonstrate the truth of the statements in the certificate of representation; provided that the certificate and documents shall be retained on site at the source beyond such 5-year period until such certificate of representation and documents are superseded because of the submission of a new certificate of representation under § 97.416 changing the designated representative.

(ii) All emissions monitoring information, in accordance with this subpart.

(iii) Copies of all reports, compliance certifications, and other submissions and all records made or required under, or to demonstrate compliance with the requirements of, the TR NO$_X$ Annual Trading Program.

(2) The designated representative of a TR NO$_X$ Annual source and each TR NO$_X$ Annual unit at the source shall make all submissions required under the TR NO$_X$ Annual Trading Program, except as provided in § 97.418. This requirement does not change, create an exemption from, or otherwise affect the responsible official submission requirements under a title V operating permit program in parts 70 and 71 of this chapter.

(f) Liability. (1) Any provision of the TR NO$_X$ Annual Trading Program that applies to a TR NO$_X$ Annual source or the designated representative of a TR NO$_X$ Annual source shall also apply to the owners and operators of such source and of the TR NO$_X$ Annual units at the source.

(2) Any provision of the TR NO$_X$ Annual Trading Program that applies to a TR NO$_X$ Annual unit or the designated representative of a TR NO$_X$ Annual unit shall also apply to the owners and operators of such unit.

(g) Effect on other authorities. No provision of the TR NO$_X$ Annual Trading Program or exemption under

§ 97.405 shall be construed as exempting or excluding the owners and operators, and the designated representative, of a TR NO$_X$ Annual source or TR NO$_X$ Annual unit from compliance with any other provision of the applicable, approved State implementation plan, a federally enforceable permit, or the Clean Air Act.

§ 97.407   **Computation of time.**

(a) Unless otherwise stated, any time period scheduled, under the TR NO$_X$ Annual Trading Program, to begin on the occurrence of an act or event shall begin on the day the act or event occurs.

(b) Unless otherwise stated, any time period scheduled, under the TR NO$_X$ Annual Trading Program, to begin before the occurrence of an act or event shall be computed so that the period ends the day before the act or event occurs.

(c) Unless otherwise stated, if the final day of any time period, under the TR NO$_X$ Annual Trading Program, is not a business day, the time period shall be extended to the next business day.

§ 97.408   **Administrative appeal procedures.**

The administrative appeal procedures for decisions of the Administrator under the TR NO$_X$ Annual Trading Program are set forth in part 78 of this chapter.

§ 97.409   [Reserved]

§ 97.410   **State NO$_X$ Annual trading budgets, new unit set-asides, Indian country new unit set-aside, and variability limits.**

(a) The State NO$_X$ Annual trading budgets, new unit set-asides, and Indian country new unit set-asides for allocations of TR NO$_X$ Annual allowances for the control periods in 2012 and thereafter are as follows:

| State | NO$_X$ Annual trading budget (tons)* for 2012 and 2013 | New unit set-aside (tons) for 2012 and 2013 | Indian country new unit set-aside (tons) for 2012 and 2013 |
|---|---|---|---|
| Alabama | 72,691 | 1,454 | |
| Georgia | 62,010 | 1,240 | |
| Illinois | 47,872 | 3,830 | |
| Indiana | 109,726 | 3,292 | |
| Iowa | 38,335 | 729 | 38 |
| Kansas | 30,714 | 583 | 31 |
| Kentucky | 85,086 | 3,403 | |
| Maryland | 16,633 | 333 | |
| Michigan | 60,193 | 1,144 | 60 |
| Minnesota | 29,572 | 561 | 30 |
| Missouri | 52,374 | 1,571 | |
| Nebraska | 26,440 | 1,825 | 26 |
| New Jersey | 7,266 | 145 | |
| New York | 17,543 | 508 | 18 |
| North Carolina | 50,587 | 2,984 | 51 |
| Ohio | 92,703 | 1,854 | |
| Pennsylvania | 119,986 | 2,400 | |
| South Carolina | 32,498 | 617 | 33 |
| Tennessee | 35,703 | 714 | |
| Texas | 133,595 | 3,874 | 134 |
| Virginia | 33,242 | 1,662 | |
| West Virginia | 59,472 | 2,974 | |
| Wisconsin | 31,628 | 1,866 | 32 |

| State | NO$_X$ Annual trading budget (tons)* for 2014 and thereafter | New unit set-aside (tons) for 2014 and thereafter | Indian country new unit set-aside (tons) for 2014 and thereafter |
|---|---|---|---|
| Alabama | 71,962 | 1,439 | |
| Georgia | 40,540 | 811 | |
| Illinois | 47,872 | 3,830 | |
| Indiana | 108,424 | 3,253 | |
| Iowa | 37,498 | 712 | 38 |
| Kansas | 25,560 | 485 | 26 |
| Kentucky | 77,238 | 3,090 | |
| Maryland | 16,574 | 331 | |
| Michigan | 57,812 | 1,098 | 58 |
| Minnesota | 29,572 | 561 | 30 |
| Missouri | 48,717 | 1,462 | |
| Nebraska | 26,440 | 1,825 | 26 |
| New Jersey | 7,266 | 145 | |
| New York | 17,543 | 508 | 18 |
| North Carolina | 41,553 | 2,451 | 42 |
| Ohio | 87,493 | 1,750 | |
| Pennsylvania | 119,194 | 2,384 | |
| South Carolina | 32,498 | 617 | 33 |
| Tennessee | 19,337 | 387 | |

| State | NO$_X$ Annual trading budget (tons)* for 2014 and thereafter | New unit set-aside (tons) for 2014 and thereafter | Indian country new unit set-aside (tons) for 2014 and thereafter |
|---|---|---|---|
| Texas | 133,595 | 3,874 | 134 |
| Virginia | 33,242 | 1,662 | .................... |
| West Virginia | 54,582 | 2,729 | .................... |
| Wisconsin | 30,398 | 1,794 | 30 |

*Each trading budget includes the new unit set-aside and, where applicable, the Indian country new unit set-aside and does not include the variability limit.

(b) The States' variability limits for the State NO$_X$ Annual trading budgets for the control periods in 2012 and thereafter are as follows:

| State | Variability limits for 2012 and 2013 | Variability limits for 2014 and thereafter |
|---|---|---|
| Alabama | 13,084 | 12,953 |
| Georgia | 11,162 | 7,297 |
| Illinois | 8,617 | 8,617 |
| Indiana | 19,751 | 19,516 |
| Iowa | 6,900 | 6,750 |
| Kansas | 5,529 | 4,601 |
| Kentucky | 15,315 | 13,903 |
| Maryland | 2,994 | 2,983 |
| Michigan | 10,835 | 10,406 |
| Minnesota | 5,323 | 5,323 |
| Missouri | 9,427 | 8,769 |
| Nebraska | 4,759 | 4,759 |
| New Jersey | 1,308 | 1,308 |
| New York | 3,158 | 3,158 |
| North Carolina | 9,106 | 7,480 |
| Ohio | 16,687 | 15,749 |
| Pennsylvania | 21,597 | 21,455 |
| South Carolina | 5,850 | 5,850 |
| Tennessee | 6,427 | 3,481 |
| Texas | 24,047 | 24,047 |
| Virginia | 5,984 | 5,984 |
| West Virginia | 10,705 | 9,825 |
| Wisconsin | 5,693 | 5,472 |

**§ 97.411   Timing requirements for TR NO$_X$ Annual allowance allocations.**

(a) *Existing units.* (1) TR NO$_X$ Annual allowances are allocated, for the control periods in 2012 and each year thereafter, as provided in a notice of data availability issued by the Administrator. Providing an allocation to a unit in such notice does not constitute a determination that the unit is a TR NO$_X$ Annual unit, and not providing an allocation to a unit in such notice does not constitute a determination that the unit is not a TR NO$_X$ Annual unit.

(2) Notwithstanding paragraph (a)(1) of this section, if a unit provided an allocation in the notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2011, during the control period in two consecutive years, such unit will not be allocated the TR NO$_X$ Annual allowances provided in such notice for the unit for the control

periods in the fifth year after the first such year and in each year after that fifth year. All TR NO$_X$ Annual allowances that would otherwise have been allocated to such unit will be allocated to the new unit set-aside for the State where such unit is located and for the respective years involved. If such unit resumes operation, the Administrator will allocate TR NO$_X$ Annual allowances to the unit in accordance with paragraph (b) of this section.

(b) *New units.* (1) New unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR NO$_X$ Annual allowance allocation to each TR NO$_X$ Annual unit in a State, in accordance with § 97.412(a)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR NO$_X$ Annual units) are in accordance with § 97.412(a)(2) through (7) and (12) and §§ 97.406(b)(2) and 97.430 through 97.435.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(1)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(i) of this section, the

Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.412(a)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(ii)(A) of this section.

(iii) If the new unit set-aside for such control period contains any TR NO$_X$ Annual allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(1)(ii) of this section, the Administrator will promulgate, by December 15 immediately after such notice, a notice of data availability that identifies any TR NO$_X$ Annual units that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR NO$_X$ annual units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(iii) of this section and shall be limited to addressing whether the identification of TR NO$_X$ annual units in such notice is in accordance with paragraph (b)(1)(iii) of this section.

(B) The Administrator will adjust the identification of TR NO$_X$ Annual units in the each notice of data availability required in paragraph (b)(1)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(1)(iii) of this section and will calculate the TR NO$_X$ Annual allowance allocation to each TR NO$_X$ Annual unit in accordance with § 97.412(a)(9), (10), and (12) and §§ 97.406(b)(2) and 97.430 through 97.435. By February 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR NO$_X$ Annual units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR NO$_X$ Annual allowances are added to the new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(1)(iv) of this section, the

Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR NO$_X$ Annual allowances in accordance with § 97.412(a)(10).

(2) Indian country new unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR NO$_X$ Annual allowance allocation to each TR NO$_X$ Annual unit in Indian country within the borders of a State, in accordance with § 97.412(b)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR NO$_X$ Annual units) are in accordance with § 97.412(b)(2) through (7) and (12) and §§ 97.406(b)(2) and 97.430 through 97.435.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.412(b)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(ii)(A) of this section.

(iii) If the Indian country new unit set-aside for such control period contains any TR NO$_X$ Annual allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(2)(ii) of this section, the Administrator will promulgate, by December 15 immediately after such notice, a notice of data availability that identifies any TR NO$_X$ Annual units that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR NO$_X$ annual units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(iii) of this section and shall be limited to addressing whether the identification of TR NO$_X$ annual units in such notice is in accordance with paragraph (b)(2)(iii) of this section.

(B) The Administrator will adjust the identification of TR NO$_X$ Annual units in the each notice of data availability required in paragraph (b)(2)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(2)(iii) of this section and will calculate the TR NO$_X$ Annual allowance allocation to each TR NO$_X$ Annual unit in accordance with § 97.412(b)(9), (10), and (12) and §§ 97.406(b)(2) and 97.430 through 97.435. By February 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR NO$_X$ Annual units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR NO$_X$ Annual allowances are added to the Indian country new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(2)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR NO$_X$ Annual allowances in accordance with § 97.412(b)(10).

(c) *Units incorrectly allocated* TR NO$_X$ *Annual allowances.* (1) For each control period in 2012 and thereafter, if the Administrator determines that TR NO$_X$ Annual allowances were allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.38(a)(3), (4), or (5) of this chapter, where such control period and the recipient are covered by the provisions of paragraph (c)(1)(i) of this section or were allocated under § 97.412(a)(2) through (7), (9), and (12) and (b)(2) through (7), (9), and (12), or under a provision of a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, where such control period and the recipient are covered by the

provisions of paragraph (c)(1)(ii) of this section, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section:

(i)(A) The recipient is not actually a TR NO$_X$ Annual unit under § 97.404 as of January 1, 2012 and is allocated TR NO$_X$ Annual allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.38(a)(3), (4), or (5) of this chapter, the recipient is not actually a TR NO$_X$ Annual unit as of January 1, 2012 and is allocated TR NO$_X$ Annual allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR NO$_X$ Annual units as of January 1, 2012; or

(B) The recipient is not located as of January 1 of the control period in the State from whose NO$_X$ Annual trading budget the TR NO$_X$ Annual allowances allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.38(a)(3), (4), or (5) of this chapter, were allocated for such control period.

(ii) The recipient is not actually a TR NO$_X$ Annual unit under § 97.404 as of January 1 of such control period and is allocated TR NO$_X$ Annual allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.38(a)(3), (4), or (5) of this chapter, the recipient is not actually a TR NO$_X$ Annual unit as of January 1 of such control period and is allocated TR NO$_X$ Annual allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR NO$_X$ Annual units as of January 1 of such control period.

(2) Except as provided in paragraph (c)(3) or (4) of this section, the Administrator will not record such TR NO$_X$ Annual allowances under § 97.421.

(3) If the Administrator already recorded such TR NO$_X$ Annual allowances under § 97.421 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.424(b) for such control period, then the Administrator will deduct from the account in which such TR NO$_X$ Annual allowances were recorded an amount of TR NO$_X$ Annual allowances allocated for the same or a prior control period equal to the amount of such already recorded TR NO$_X$ Annual allowances. The authorized account representative shall ensure that there are sufficient TR NO$_X$ Annual allowances in such

account for completion of the deduction.

(4) If the Administrator already recorded such TR NO$_X$ Annual allowances under § 97.421 and if the Administrator makes the determination under paragraph (c)(1) of this section after making deductions for the source that includes such recipient under § 97.424(b) for such control period, then the Administrator will not make any deduction to take account of such already recorded TR NO$_X$ Annual allowances.

(5)(i) With regard to the TR NO$_X$ Annual allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(i) of this section, the Administrator will:

(A) Transfer such TR NO$_X$ Annual allowances to the new unit set-aside for such control period for the State from whose NO$_X$ Annual trading budget the TR NO$_X$ Annual allowances were allocated; or

(B) If the State has a SIP revision approved under § 52.38(a)(4) or (5) covering such control period, include such TR NO$_X$ Annual allowances in the portion of the State NO$_X$ Annual trading budget that may be allocated for such control period in accordance with such SIP revision.

(ii) With regard to the TR NO$_X$ Annual allowances that were not allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will:

(A) Transfer such TR NO$_X$ Annual allowances to the new unit set-aside for such control period; or

(B) If the State has a SIP revision approved under § 52.38(a)(4) or (5) covering such control period, include such TR NO$_X$ Annual allowances in the portion of the State NO$_X$ Annual trading budget that may be allocated for such control period in accordance with such SIP revision.

(iii) With regard to the TR NO$_X$ Annual allowances that were allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will transfer such TR NO$_X$ Annual allowances to the Indian country new unit set-aside for such control period.

### § 97.412 TR NO$_X$ Annual allowance allocations to new units.

(a) For each control period in 2012 and thereafter and for the TR NO$_X$ Annual units in each State, the Administrator will allocate TR NO$_X$ Annual allowances to the TR NO$_X$ Annual units as follows:

(1) The TR NO$_X$ Annual allowances will be allocated to the following TR NO$_X$ Annual units, except as provided in paragraph (a)(10) of this section:

(i) TR NO$_X$ Annual units that are not allocated an amount of TR NO$_X$ Annual allowances in the notice of data availability issued under § 97.411(a)(1);

(ii) TR NO$_X$ Annual units whose allocation of an amount of TR NO$_X$ Annual allowances for such control period in the notice of data availability issued under § 97.411(a)(1) is covered by § 97.411(c)(2) or (3);

(iii) TR NO$_X$ Annual units that are allocated an amount of TR NO$_X$ Annual allowances for such control period in the notice of data availability issued under § 97.411(a)(1), which allocation is terminated for such control period pursuant to § 97.411(a)(2), and that operate during the control period immediately preceding such control period; or

(iv) For purposes of paragraph (a)(9) of this section, TR NO$_X$ Annual units under § 97.411(c)(1)(ii) whose allocation of an amount of TR NO$_X$ Annual allowances for such control period in the notice of data availability issued under § 97.411(b)(1)(ii)(B) is covered by § 97.411(c)(2) or (3).

(2) The Administrator will establish a separate new unit set-aside for the State for each such control period. Each such new unit set-aside will be allocated TR NO$_X$ Annual allowances in an amount equal to the applicable amount of tons of NO$_X$ emissions as set forth in § 97.410(a) and will be allocated additional TR NO$_X$ Annual allowances (if any) in accordance with §§ 97.411(a)(2) and (c)(5) and paragraph (b)(10) of this section.

(3) The Administrator will determine, for each TR NO$_X$ Annual unit described in paragraph (a)(1) of this section, an allocation of TR NO$_X$ Annual allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012;

(ii) The first control period after the control period in which the TR NO$_X$ Annual unit commences commercial operation;

(iii) For a unit described in paragraph (a)(1)(ii) of this section, the first control period in which the TR NO$_X$ Annual unit operates in the State after operating in another jurisdiction and for which

the unit is not already allocated one or more TR NO$_X$ Annual allowances; and

(iv) For a unit described in paragraph (a)(1)(iii) of this section, the first control period after the control period in which the unit resumes operation.

(4)(i) The allocation to each TR NO$_X$ annual unit described in paragraph (a)(1)(i) through (iii) of this section and for each control period described in paragraph (a)(3) of this section will be an amount equal to the unit's total tons of NO$_X$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (a)(4)(i) in accordance with paragraphs (a)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR NO$_X$ Annual allowances determined for all such TR NO$_X$ Annual units under paragraph (a)(4)(i) of this section in the State for such control period.

(6) If the amount of TR NO$_X$ Annual allowances in the new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (a)(5) of this section, then the Administrator will allocate the amount of TR NO$_X$ Annual allowances determined for each such TR NO$_X$ Annual unit under paragraph (a)(4)(i) of this section.

(7) If the amount of TR NO$_X$ Annual allowances in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(5) of this section, then the Administrator will allocate to each such TR NO$_X$ Annual unit the amount of the TR NO$_X$ Annual allowances determined under paragraph (a)(4)(i) of this section for the unit, multiplied by the amount of TR NO$_X$ Annual allowances in the new unit set-aside for such control period, divided by the sum under paragraph (a)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.411(b)(1)(i) and (ii), of the amount of TR NO$_X$ Annual allowances allocated under paragraphs (a)(2) through (7) and (12) of this section for such control period to each TR NO$_X$ Annual unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (a)(5) through (8) of this section for such control period, any unallocated TR NO$_X$ Annual allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate such TR NO$_X$ Annual allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (a)(1) of this section that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR NO$_X$ Annual allowances referenced in the notice of data availability required under § 97.411(b)(1)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (a)(9)(i) of this section;

(iii) If the amount of unallocated TR NO$_X$ Annual allowances remaining in the new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (a)(9)(ii) of this section, then the Administrator will allocate the amount of TR NO$_X$ Annual allowances determined for each such TR NO$_X$ Annual unit under paragraph (a)(9)(i) of this section; and

(iv) If the amount of unallocated TR NO$_X$ Annual allowances remaining in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(9)(ii) of this section, then the Administrator will allocate to each such TR NO$_X$ Annual unit the amount of the TR NO$_X$ Annual allowances determined under paragraph (a)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR NO$_X$ Annual allowances remaining in the new unit set-aside for such control period, divided by the sum under paragraph (a)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (a)(9) and (12) of this section for such control period, any unallocated TR NO$_X$ Annual allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each TR NO$_X$ Annual unit that is in the State, is allocated an amount of TR NO$_X$ Annual allowances in the notice of data availability issued under § 97.411(a)(1), and continues to be allocated TR NO$_X$ Annual allowances for such control period in accordance with § 97.411(a)(2), an amount of TR NO$_X$ Annual allowances equal to the following: the total amount of such remaining unallocated TR NO$_X$ Annual allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.411(a) for such control period, divided by the remainder of the amount of tons in the applicable State NO$_X$ Annual trading budget minus the sum of the amounts of tons in such new unit set-aside and the Indian country

new unit set-aside for the State for such control period, and rounded to the nearest allowance.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.411(b)(1)(iii), (iv), and (v), of the amount of TR NO$_X$ Annual allowances allocated under paragraphs (a)(9), (10), and (12) of this section for such control period to each TR NO$_X$ Annual unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (a)(2) through (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraph (a)(7) of this section, paragraphs (a)(6) and (9)(iv) of this section, or paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such new unit set-aside exceeding the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR NO$_X$ Annual units in descending order based on the amount of such units' allocations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, by one TR NO$_X$ Annual allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (a)(10) and (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such new unit set-aside less than the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(10) of this section, as follows. The Administrator will list the TR NO$_X$ Annual units in descending order based on the amount of such units' allocations under paragraph (a)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's

allocation under paragraph (a)(10) of this section by one TR NO$_X$ Annual allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(b) For each control period in 2012 and thereafter and for the TR NO$_X$ Annual units located in Indian country within the borders of each State, the Administrator will allocate the TR NO$_X$ Annual allowances to the TR NO$_X$ Annual units as follows:

(1) The TR NO$_X$ Annual allowances will be allocated to the following TR NO$_X$ Annual units, except as provided in paragraph (b)(10) of this section:

(i) TR NO$_X$ Annual units that are not allocated an amount of TR NO$_X$ Annual allowances in the notice of data availability issued under § 97.411(a)(1); or

(ii) For purposes of paragraph (b)(9) of this section, TR NO$_X$ Annual units under § 97.411(c)(1)(ii) whose allocation of an amount of TR NO$_X$ Annual allowances for such control period in the notice of data availability issued under § 97.411(b)(2)(ii)(B) is covered by § 97.411(c)(2) or (3).

(2) The Administrator will establish a separate Indian country new unit set-aside for the State for each such control period. Each such Indian country new unit set-aside will be allocated TR NO$_X$ Annual allowances in an amount equal to the applicable amount of tons of NO$_X$ emissions as set forth in § 97.410(a) and will be allocated additional TR NO$_X$ Annual allowances (if any) in accordance with § 97.411(c)(5).

(3) The Administrator will determine, for each TR NO$_X$ Annual unit described in paragraph (b)(1) of this section, an allocation of TR NO$_X$ Annual allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012; and

(ii) The first control period after the control period in which the TR NO$_X$ Annual unit commences commercial operation.

(4)(i) The allocation to each TR NO$_X$ annual unit described in paragraph (b)(1)(i) of this section and for each control period described in paragraph (b)(3) of this section will be an amount equal to the unit's total tons of NO$_X$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (b)(4)(i) in accordance with paragraphs (b)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR NO$_X$ Annual

allowances determined for all such TR NO$_X$ Annual units under paragraph (b)(4)(i) of this section in Indian country within the borders of the State for such control period.

(6) If the amount of TR NO$_X$ Annual allowances in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (b)(5) of this section, then the Administrator will allocate the amount of TR NO$_X$ Annual allowances determined for each such TR NO$_X$ Annual unit under paragraph (b)(4)(i) of this section.

(7) If the amount of TR NO$_X$ Annual allowances in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(5) of this section, then the Administrator will allocate to each such TR NO$_X$ Annual unit the amount of the TR NO$_X$ Annual allowances determined under paragraph (b)(4)(i) of this section for the unit, multiplied by the amount of TR NO$_X$ Annual allowances in the Indian country new unit set-aside for such control period, divided by the sum under paragraph (b)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.411(b)(2)(i) and (ii), of the amount of TR NO$_X$ Annual allowances allocated under paragraphs (b)(2) through (7) and (12) of this section for such control period to each TR NO$_X$ Annual unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (b)(5) through (8) of this section for such control period, any unallocated TR NO$_X$ Annual allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will allocate such TR NO$_X$ Annual allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (b)(1) of this section that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR NO$_X$ Annual allowances referenced in the notice of data availability required under § 97.411(b)(2)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (b)(9)(i) of this section;

(iii) If the amount of unallocated TR NO$_X$ Annual allowances remaining in

the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (b)(9)(ii) of this section, then the Administrator will allocate the amount of TR NO$_X$ Annual allowances determined for each such TR NO$_X$ Annual unit under paragraph (b)(9)(i) of this section; and

(iv) If the amount of unallocated TR NO$_X$ Annual allowances remaining in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(9)(ii) of this section, then the Administrator will allocate to each such TR NO$_X$ Annual unit the amount of the TR NO$_X$ Annual allowances determined under paragraph (b)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR NO$_X$ Annual allowances remaining in the Indian country new unit set-aside for such control period, divided by the sum under paragraph (b)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (b)(9) and (12) of this section for such control period, any unallocated TR NO$_X$ Annual allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will:

(i) Transfer such unallocated TR NO$_X$ Annual allowances to the new unit set-aside for the State for such control period; or

(ii) If the State has a SIP revision approved under § 52.38(a)(4) or (5) covering such control period, include such unallocated TR NO$_X$ Annual allowances in the portion of the State NO$_X$ Annual trading budget that may be allocated for such control period in accordance with such SIP revision.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.411(b)(2)(iii), (iv), and (v), of the amount of TR NO$_X$ Annual allowances allocated under paragraphs (b)(9), (10), and (12) of this section for such control period to each TR NO$_X$ Annual unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (b)(2) through (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraph (b)(7) of this section, paragraphs (b)(6) and (9)(iv) of this section, or paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such Indian country new unit set-aside exceeding the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations

under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR NO$_X$ Annual units in descending order based on the amount of such units' allocations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, by one TR NO$_X$ Annual allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (b)(10) and (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such Indian country new unit set-aside less than the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(10) of this section, as follows. The Administrator will list the TR NO$_X$ Annual units in descending order based on the amount of such units' allocations under paragraph (b)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's allocation under paragraph (b)(10) of this section by one TR NO$_X$ Annual allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

### § 97.413 Authorization of designated representative and alternate designated representative.

(a) Except as provided under § 97.415, each TR NO$_X$ Annual source, including all TR NO$_X$ Annual units at the source, shall have one and only one designated representative, with regard to all matters under the TR NO$_X$ Annual Trading Program.

(1) The designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR NO$_X$ Annual units at the source and shall act in accordance with the certification statement in § 97.416(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.416:

(i) The designated representative shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each owner and operator of the source and each TR NO$_X$ Annual unit at the source in all matters pertaining to the TR NO$_X$ Annual Trading Program, notwithstanding any agreement between the designated representative and such owners and operators; and

(ii) The owners and operators of the source and each TR NO$_X$ Annual unit at the source shall be bound by any decision or order issued to the designated representative by the Administrator regarding the source or any such unit.

(b) Except as provided under § 97.415, each TR NO$_X$ Annual source may have one and only one alternate designated representative, who may act on behalf of the designated representative. The agreement by which the alternate designated representative is selected shall include a procedure for authorizing the alternate designated representative to act in lieu of the designated representative.

(1) The alternate designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR NO$_X$ Annual units at the source and shall act in accordance with the certification statement in § 97.416(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.416,

(i) The alternate designated representative shall be authorized;

(ii) Any representation, action, inaction, or submission by the alternate designated representative shall be deemed to be a representation, action, inaction, or submission by the designated representative; and

(iii) The owners and operators of the source and each TR NO$_X$ Annual unit at the source shall be bound by any decision or order issued to the alternate designated representative by the Administrator regarding the source or any such unit.

(c) Except in this section, § 97.402, and §§ 97.414 through 97.418, whenever the term "designated representative" (as distinguished from the term "common designated representative") is used in this subpart, the term shall be construed to include the designated representative or any alternate designated representative.

### § 97.414 Responsibilities of designated representative and alternate designated representative.

(a) Except as provided under § 97.418 concerning delegation of authority to make submissions, each submission under the TR NO$_X$ Annual Trading Program shall be made, signed, and certified by the designated representative or alternate designated representative for each TR NO$_X$ Annual source and TR NO$_X$ Annual unit for which the submission is made. Each such submission shall include the following certification statement by the designated representative or alternate designated representative: "I am authorized to make this submission on behalf of the owners and operators of the source or units for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment."

(b) The Administrator will accept or act on a submission made for a TR NO$_X$ Annual source or a TR NO$_X$ Annual unit only if the submission has been made, signed, and certified in accordance with paragraph (a) of this section and § 97.418.

### § 97.415 Changing designated representative and alternate designated representative; changes in owners and operators; changes in units at the source.

(a) *Changing designated representative.* The designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.416. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new designated representative and the owners and operators of the TR NO$_X$ Annual source and the TR NO$_X$ Annual units at the source.

(b) *Changing alternate designated representative.* The alternate designated representative may be changed at any

time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.416. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new alternate designated representative, the designated representative, and the owners and operators of the TR NO$_X$ Annual source and the TR NO$_X$ Annual units at the source.

(c) *Changes in owners and operators.* (1) In the event an owner or operator of a TR NO$_X$ Annual source or a TR NO$_X$ Annual unit at the source is not included in the list of owners and operators in the certificate of representation under § 97.416, such owner or operator shall be deemed to be subject to and bound by the certificate of representation, the representations, actions, inactions, and submissions of the designated representative and any alternate designated representative of the source or unit, and the decisions and orders of the Administrator, as if the owner or operator were included in such list.

(2) Within 30 days after any change in the owners and operators of a TR NO$_X$ Annual source or a TR NO$_X$ Annual unit at the source, including the addition or removal of an owner or operator, the designated representative or any alternate designated representative shall submit a revision to the certificate of representation under § 97.416 amending the list of owners and operators to reflect the change.

(d) *Changes in units at the source.* Within 30 days of any change in which units are located at a TR NO$_X$ Annual source (including the addition or removal of a unit), the designated representative or any alternate designated representative shall submit a certificate of representation under § 97.416 amending the list of units to reflect the change.

(1) If the change is the addition of a unit that operated (other than for purposes of testing by the manufacturer before initial installation) before being located at the source, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity from whom the unit was purchased or otherwise obtained (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was purchased or otherwise obtained, and the date on which the unit became located at the source.

(2) If the change is the removal of a unit, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity to which the unit was sold or that otherwise obtained the unit (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was sold or otherwise obtained, and the date on which the unit became no longer located at the source.

**§ 97.416  Certificate of representation.**

(a) A complete certificate of representation for a designated representative or an alternate designated representative shall include the following elements in a format prescribed by the Administrator:

(1) Identification of the TR NO$_X$ Annual source, and each TR NO$_X$ Annual unit at the source, for which the certificate of representation is submitted, including source name, source category and NAICS code (or, in the absence of a NAICS code, an equivalent code), State, plant code, county, latitude and longitude, unit identification number and type, identification number and nameplate capacity (in MWe, rounded to the nearest tenth) of each generator served by each such unit, actual or projected date of commencement of commercial operation, and a statement of whether such source is located in Indian Country. If a projected date of commencement of commercial operation is provided, the actual date of commencement of commercial operation shall be provided when such information becomes available.

(2) The name, address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the designated representative and any alternate designated representative.

(3) A list of the owners and operators of the TR NO$_X$ Annual source and of each TR NO$_X$ Annual unit at the source.

(4) The following certification statements by the designated representative and any alternate designated representative—

(i) "I certify that I was selected as the designated representative or alternate designated representative, as applicable, by an agreement binding on the owners and operators of the source and each TR NO$_X$ Annual unit at the source."

(ii) "I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR NO$_X$ Annual Trading Program on behalf of the owners and operators of the source and of each TR NO$_X$ Annual unit at the source and that each such owner and operator shall be fully bound by my

representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the source or unit."

(iii) "Where there are multiple holders of a legal or equitable title to, or a leasehold interest in, a TR NO$_X$ Annual unit, or where a utility or industrial customer purchases power from a TR NO$_X$ Annual unit under a life-of-the-unit, firm power contractual arrangement, I certify that: I have given a written notice of my selection as the 'designated representative' or 'alternate designated representative', as applicable, and of the agreement by which I was selected to each owner and operator of the source and of each TR NO$_X$ Annual unit at the source; and TR NO$_X$ Annual allowances and proceeds of transactions involving TR NO$_X$ Annual allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement, except that, if such multiple holders have expressly provided for a different distribution of TR NO$_X$ Annual allowances by contract, TR NO$_X$ Annual allowances and proceeds of transactions involving TR NO$_X$ Annual allowances will be deemed to be held or distributed in accordance with the contract."

(5) The signature of the designated representative and any alternate designated representative and the dates signed.

(b) Unless otherwise required by the Administrator, documents of agreement referred to in the certificate of representation shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

**§ 97.417  Objections concerning designated representative and alternate designated representative.**

(a) Once a complete certificate of representation under § 97.416 has been submitted and received, the Administrator will rely on the certificate of representation unless and until a superseding complete certificate of representation under § 97.416 is received by the Administrator.

(b) Except as provided in paragraph (a) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission, of a designated representative or alternate designated representative shall affect any representation, action, inaction, or submission of the designated representative or alternate designated representative or the finality of any

decision or order by the Administrator under the TR NO$_X$ Annual Trading Program.

(c) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of any designated representative or alternate designated representative, including private legal disputes concerning the proceeds of TR NO$_X$ Annual allowance transfers.

### § 97.418 Delegation by designated representative and alternate designated representative.

(a) A designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(b) An alternate designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(c) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (a) or (b) of this section, the designated representative or alternate designated representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(1) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such designated representative or alternate designated representative;

(2) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an "agent");

(3) For each such natural person, a list of the type or types of electronic submissions under paragraph (a) or (b) of this section for which authority is delegated to him or her; and

(4) The following certification statements by such designated representative or alternate designated representative:

(i) "I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am a designated representative or alternate designated representative, as appropriate, and before this notice of delegation is superseded by another

notice of delegation under 40 CFR 97.418(d) shall be deemed to be an electronic submission by me."

(ii) "Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.418(d), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.418 is terminated.".

(d) A notice of delegation submitted under paragraph (c) of this section shall be effective, with regard to the designated representative or alternate designated representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such designated representative or alternate designated representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(e) Any electronic submission covered by the certification in paragraph (c)(4)(i) of this section and made in accordance with a notice of delegation effective under paragraph (d) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

### § 97.419 [Reserved]

### § 97.420 Establishment of compliance accounts, assurance accounts, and general accounts.

(a) *Compliance accounts.* Upon receipt of a complete certificate of representation under § 97.416, the Administrator will establish a compliance account for the TR NO$_X$ Annual source for which the certificate of representation was submitted, unless the source already has a compliance account. The designated representative and any alternate designated representative of the source shall be the authorized account representative and the alternate authorized account representative respectively of the compliance account.

(b) *Assurance accounts.* The Administrator will establish assurance accounts for certain owners and operators and States in accordance with § 97.425(b)(3).

(c) *General accounts.* (1) Application for general account. (i) Any person may apply to open a general account, for the purpose of holding and transferring TR NO$_X$ Annual allowances, by submitting to the Administrator a complete

application for a general account. Such application shall designate one and only one authorized account representative and may designate one and only one alternate authorized account representative who may act on behalf of the authorized account representative.

(A) The authorized account representative and alternate authorized account representative shall be selected by an agreement binding on the persons who have an ownership interest with respect to TR NO$_X$ Annual allowances held in the general account.

(B) The agreement by which the alternate authorized account representative is selected shall include a procedure for authorizing the alternate authorized account representative to act in lieu of the authorized account representative.

(ii) A complete application for a general account shall include the following elements in a format prescribed by the Administrator:

(A) Name, mailing address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the authorized account representative and any alternate authorized account representative;

(B) An identifying name for the general account;

(C) A list of all persons subject to a binding agreement for the authorized account representative and any alternate authorized account representative to represent their ownership interest with respect to the TR NO$_X$ Annual allowances held in the general account;

(D) The following certification statement by the authorized account representative and any alternate authorized account representative: "I certify that I was selected as the authorized account representative or the alternate authorized account representative, as applicable, by an agreement that is binding on all persons who have an ownership interest with respect to TR NO$_X$ Annual allowances held in the general account. I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR NO$_X$ Annual Trading Program on behalf of such persons and that each such person shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the general account."

(E) The signature of the authorized account representative and any alternate authorized account representative and the dates signed.

(iii) Unless otherwise required by the Administrator, documents of agreement referred to in the application for a

general account shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

(2) Authorization of authorized account representative and alternate authorized account representative. (i) Upon receipt by the Administrator of a complete application for a general account under paragraph (b)(1) of this section, the Administrator will establish a general account for the person or persons for whom the application is submitted, and upon and after such receipt by the Administrator:

(A) The authorized account representative of the general account shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each person who has an ownership interest with respect to TR NO$_X$ Annual allowances held in the general account in all matters pertaining to the TR NO$_X$ Annual Trading Program, notwithstanding any agreement between the authorized account representative and such person.

(B) Any alternate authorized account representative shall be authorized, and any representation, action, inaction, or submission by any alternate authorized account representative shall be deemed to be a representation, action, inaction, or submission by the authorized account representative.

(C) Each person who has an ownership interest with respect to TR NO$_X$ Annual allowances held in the general account shall be bound by any decision or order issued to the authorized account representative or alternate authorized account representative by the Administrator regarding the general account.

(ii) Except as provided in paragraph (c)(5) of this section concerning delegation of authority to make submissions, each submission concerning the general account shall be made, signed, and certified by the authorized account representative or any alternate authorized account representative for the persons having an ownership interest with respect to TR NO$_X$ Annual allowances held in the general account. Each such submission shall include the following certification statement by the authorized account representative or any alternate authorized account representative: ''I am authorized to make this submission on behalf of the persons having an ownership interest with respect to the TR NO$_X$ Annual allowances held in the general account. I certify under penalty of law that I have personally examined, and am familiar with, the statements

and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(iii) Except in this section, whenever the term ''authorized account representative'' is used in this subpart, the term shall be construed to include the authorized account representative or any alternate authorized account representative.

(3) Changing authorized account representative and alternate authorized account representative; changes in persons with ownership interest. (i) The authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new authorized account representative and the persons with an ownership interest with respect to the TR NO$_X$ Annual allowances in the general account.

(ii) The alternate authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new alternate authorized account representative, the authorized account representative, and the persons with an ownership interest with respect to the TR NO$_X$ Annual allowances in the general account.

(iii)(A) In the event a person having an ownership interest with respect to TR NO$_X$ Annual allowances in the general account is not included in the list of such persons in the application for a general account, such person shall be deemed to be subject to and bound by the application for a general account,

the representation, actions, inactions, and submissions of the authorized account representative and any alternate authorized account representative of the account, and the decisions and orders of the Administrator, as if the person were included in such list.

(B) Within 30 days after any change in the persons having an ownership interest with respect to NO$_X$ Annual allowances in the general account, including the addition or removal of a person, the authorized account representative or any alternate authorized account representative shall submit a revision to the application for a general account amending the list of persons having an ownership interest with respect to the TR NO$_X$ Annual allowances in the general account to include the change.

(4) Objections concerning authorized account representative and alternate authorized account representative. (i) Once a complete application for a general account under paragraph (c)(1) of this section has been submitted and received, the Administrator will rely on the application unless and until a superseding complete application for a general account under paragraph (b)(1) of this section is received by the Administrator.

(ii) Except as provided in paragraph (c)(4)(i) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account shall affect any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative or the finality of any decision or order by the Administrator under the TR NO$_X$ Annual Trading Program.

(iii) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account, including private legal disputes concerning the proceeds of TR NO$_X$ Annual allowance transfers.

(5) Delegation by authorized account representative and alternate authorized account representative. (i) An authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator

provided for or required under this subpart.

(ii) An alternate authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(iii) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (c)(5)(i) or (ii) of this section, the authorized account representative or alternate authorized account representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(A) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such authorized account representative or alternate authorized account representative;

(B) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an "agent");

(C) For each natural person, a list of the type or types of electronic submissions under paragraph (c)(5)(i) or (ii) of this section for which authority is delegated to him or her;

(D) The following certification statement by such authorized account representative or alternate authorized account representative: "I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am an authorized account representative or alternate authorized account representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.420(c)(5)(iv) shall be deemed to be an electronic submission by me."; and

(E) The following certification statement by such authorized account representative or alternate authorized account representative: "Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.420(c)(5)(iv), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.420(c)(5) is terminated.".

(iv) A notice of delegation submitted under paragraph (c)(5)(iii) of this section shall be effective, with regard to the authorized account representative or alternate authorized account representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such authorized account representative or alternate authorized account representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(v) Any electronic submission covered by the certification in paragraph (c)(5)(iii)(D) of this section and made in accordance with a notice of delegation effective under paragraph (c)(5)(iv) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

(6) Closing a general account. (i) The authorized account representative or alternate authorized account representative of a general account may submit to the Administrator a request to close the account. Such request shall include a correctly submitted TR NO$_X$ Annual allowance transfer under § 97.422 for any TR NO$_X$ Annual allowances in the account to one or more other Allowance Management System accounts.

(ii) If a general account has no TR NO$_X$ Annual allowance transfers to or from the account for a 12-month period or longer and does not contain any TR NO$_X$ Annual allowances, the Administrator may notify the authorized account representative for the account that the account will be closed after 30 days after the notice is sent. The account will be closed after the 30-day period unless, before the end of the 30-day period, the Administrator receives a correctly submitted TR NO$_X$ Annual allowance transfer under § 97.422 to the account or a statement submitted by the authorized account representative or alternate authorized account representative demonstrating to the satisfaction of the Administrator good cause as to why the account should not be closed.

(d) *Account identification.* The Administrator will assign a unique identifying number to each account established under paragraph (a), (b), or (c) of this section.

(e) *Responsibilities of authorized account representative and alternate authorized account representative.* After the establishment of a compliance account or general account, the Administrator will accept or act on a submission pertaining to the account, including, but not limited to, submissions concerning the deduction or transfer of TR NO$_X$ Annual allowances in the account, only if the submission has been made, signed, and certified in accordance with §§ 97.414(a) and 97.418 or paragraphs (c)(2)(ii) and (c)(5) of this section.

## § 97.421   Recordation of TR NO$_X$ Annual allowance allocations and auction results.

(a) By November 7, 2011, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source in accordance with § 97.411(a) for the control period in 2012.

(b) By November 7, 2011, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source in accordance with § 97.411(a) for the control period in 2013, unless the State in which the source is located notifies the Administrator in writing by October 17, 2011 of the State's intent to submit to the Administrator a complete SIP revision by April 1, 2012 meeting the requirements of § 52.38(a)(3)(i) through (iv) of this chapter.

(1) If, by April 1, 2012, the State does not submit to the Administrator such complete SIP revision, the Administrator will record by April 15, 2012 in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source in accordance with § 97.411(a) for the control period in 2013.

(2) If the State submits to the Administrator by April 1, 2012, and the Administrator approves by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source as provided in such approved, complete SIP revision for the control period in 2013.

(3) If the State submits to the Administrator by April 1, 2012, and the Administrator does not approve by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source in accordance with § 97.411(a) for the control period in 2013.

(c) By July 1, 2013, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR

NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Annual allowances auctioned to TR NO$_X$ Annual units, in accordance with § 97.411(a), or with a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, for the control period in 2014 and 2015.

(d) By July 1, 2014, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Annual allowances auctioned to TR NO$_X$ Annual units, in accordance with § 97.411(a), or with a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, for the control period in 2016 and 2017.

(e) By July 1, 2015, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Annual allowances auctioned to TR NO$_X$ Annual units, in accordance with § 97.411(a), or with a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, for the control period in 2018 and 2019.

(f) By July 1, 2016 and July 1 of each year thereafter, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Annual allowances auctioned to TR NO$_X$ Annual units, in accordance with § 97.411(a), or with a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, for the control period in the fourth year after the year of the applicable recordation deadline under this paragraph.

(g) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Annual allowances auctioned to TR NO$_X$ Annual units, in accordance with § 97.412(a)(2) through (8) and (12), or with a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, for the control period in the year of the applicable recordation deadline under this paragraph.

(h) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source in accordance with § 97.412(b)(2) through (8) and (12) for the control period in the year of the applicable recordation deadline under this paragraph.

(i) By February 15, 2013 and February 15 of each year thereafter, the Administrator will record in each TR NO$_X$ Annual source's compliance account the TR NO$_X$ Annual allowances allocated to the TR NO$_X$ Annual units at the source in accordance with § 97.412(a)(9) through (12), for the control period in the year before the year of the applicable recordation deadline under this paragraph.

(j) By the date on which any allocation or auction results, other than an allocation or auction results described in paragraphs (a) through (i) of this section, of TR NO$_X$ Annual allowances to a recipient is made by or are submitted to the Administrator in accordance with § 97.411 or § 97.412 or with a SIP revision approved under § 52.38(a)(4) or (5) of this chapter, the Administrator will record such allocation or auction results in the appropriate Allowance Management System account.

(k) When recording the allocation or auction of TR NO$_X$ Annual allowances to a TR NO$_X$ Annual unit or other entity in an Allowance Management System account, the Administrator will assign each TR NO$_X$ Annual allowance a unique identification number that will include digits identifying the year of the control period for which the TR NO$_X$ Annual allowance is allocated or auctioned.

**§ 97.422   Submission of TR NO$_X$ Annual allowance transfers.**

(a) An authorized account representative seeking recordation of a TR NO$_X$ Annual allowance transfer shall submit the transfer to the Administrator.

(b) A TR NO$_X$ Annual allowance transfer shall be correctly submitted if:

(1) The transfer includes the following elements, in a format prescribed by the Administrator:

(i) The account numbers established by the Administrator for both the transferor and transferee accounts;

(ii) The serial number of each TR NO$_X$ Annual allowance that is in the transferor account and is to be transferred; and

(iii) The name and signature of the authorized account representative of the transferor account and the date signed; and

(2) When the Administrator attempts to record the transfer, the transferor account includes each TR NO$_X$ Annual allowance identified by serial number in the transfer.

**§ 97.423   Recordation of TR NO$_X$ Annual allowance transfers.**

(a) Within 5 business days (except as provided in paragraph (b) of this section) of receiving a TR NO$_X$ Annual allowance transfer that is correctly submitted under § 97.422, the Administrator will record a TR NO$_X$ Annual allowance transfer by moving each TR NO$_X$ Annual allowance from the transferor account to the transferee account as specified in the transfer.

(b) A TR NO$_X$ Annual allowance transfer to or from a compliance account that is submitted for recordation after the allowance transfer deadline for a control period and that includes any TR NO$_X$ Annual allowances allocated for any control period before such allowance transfer deadline will not be recorded until after the Administrator completes the deductions from such compliance account under § 97.424 for the control period immediately before such allowance transfer deadline.

(c) Where a TR NO$_X$ Annual allowance transfer is not correctly submitted under § 97.422, the Administrator will not record such transfer.

(d) Within 5 business days of recordation of a TR NO$_X$ Annual allowance transfer under paragraphs (a) and (b) of the section, the Administrator will notify the authorized account representatives of both the transferor and transferee accounts.

(e) Within 10 business days of receipt of a TR NO$_X$ Annual allowance transfer that is not correctly submitted under § 97.422, the Administrator will notify the authorized account representatives of both accounts subject to the transfer of:

(1) A decision not to record the transfer, and

(2) The reasons for such non-recordation.

**§ 97.424   Compliance with TR NO$_X$ Annual emissions limitation.**

(a) *Availability for deduction for compliance.* TR NO$_X$ Annual allowances are available to be deducted for compliance with a source's TR NO$_X$ Annual emissions limitation for a control period in a given year only if the TR NO$_X$ Annual allowances:

(1) Were allocated for such control period or a control period in a prior year; and

(2) Are held in the source's compliance account as of the allowance transfer deadline for such control period.

(b) *Deductions for compliance.* After the recordation, in accordance with § 97.423, of TR NO$_X$ Annual allowance transfers submitted by the allowance transfer deadline for a control period in a given year, the Administrator will deduct from each source's compliance account TR NO$_X$ Annual allowances available under paragraph (a) of this section in order to determine whether the source meets the TR NO$_X$ Annual emissions limitation for such control period, as follows:

(1) Until the amount of TR NO$_X$ Annual allowances deducted equals the number of tons of total NO$_X$ emissions from all TR NO$_X$ Annual units at the source for such control period; or

(2) If there are insufficient TR NO$_X$ Annual allowances to complete the deductions in paragraph (b)(1) of this section, until no more TR NO$_X$ Annual allowances available under paragraph (a) of this section remain in the compliance account.

(c)(1) *Identification of TR NO$_X$ Annual allowances by serial number.* The authorized account representative for a source's compliance account may request that specific TR NO$_X$ Annual allowances, identified by serial number, in the compliance account be deducted for emissions or excess emissions for a control period in a given year in accordance with paragraph (b) or (d) of this section. In order to be complete, such request shall be submitted to the Administrator by the allowance transfer deadline for such control period and include, in a format prescribed by the Administrator, the identification of the TR NO$_X$ Annual source and the appropriate serial numbers.

(2) *First-in, first-out.* The Administrator will deduct TR NO$_X$ Annual allowances under paragraph (b) or (d) of this section from the source's compliance account in accordance with a complete request under paragraph (c)(1) of this section or, in the absence of such request or in the case of identification of an insufficient amount of TR NO$_X$ Annual allowances in such request, on a first-in, first-out accounting basis in the following order:

(i) Any TR NO$_X$ Annual allowances that were allocated to the units at the source and not transferred out of the compliance account, in the order of recordation; and then

(ii) Any TR NO$_X$ Annual allowances that were allocated to any unit and transferred to and recorded in the compliance account pursuant to this subpart, in the order of recordation.

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the TR NO$_X$ Annual source has excess emissions, the Administrator will deduct from the source's compliance account an amount of TR NO$_X$ Annual allowances, allocated for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, equal to two times the number of tons of the source's excess emissions.

(e) *Recordation of deductions.* The Administrator will record in the appropriate compliance account all deductions from such an account under paragraphs (b) and (d) of this section.

## § 97.425 Compliance with TR NO$_X$ Annual assurance provisions.

(a) *Availability for deduction.* TR NO$_X$ Annual allowances are available to be deducted for compliance with the TR NO$_X$ Annual assurance provisions for a control period in a given year by the owners and operators of a group of one or more TR NO$_X$ Annual sources and units in a State (and Indian country within the borders of such State) only if the TR NO$_X$ Annual allowances:

(1) Were allocated for a control period in a prior year or the control period in the given year or in the immediately following year; and

(2) Are held in the assurance account, established by the Administrator for such owners and operators of such group of TR NO$_X$ Annual sources and units in such State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, as of the deadline established in paragraph (b)(4) of this section.

(b) *Deductions for compliance.* The Administrator will deduct TR NO$_X$ Annual allowances available under paragraph (a) of this section for compliance with the TR NO$_X$ Annual assurance provisions for a State for a control period in a given year in accordance with the following procedures:

(1) By June 1, 2013 and June 1 of each year thereafter, the Administrator will:

(i) Calculate, for each State (and Indian country within the borders of such State), the total NO$_X$ emissions from all TR NO$_X$ Annual units at TR NO$_X$ Annual sources in the State (and Indian country within the borders of such State) during the control period in the year before the year of this calculation deadline and the amount, if any, by which such total NO$_X$ emissions exceed the State assurance level as described in § 97.406(c)(2)(iii); and

(ii) Promulgate a notice of data availability of the results of the calculations required in paragraph (b)(1)(i) of this section, including separate calculations of the NO$_X$ emissions from each TR NO$_X$ Annual source.

(2) For each notice of data availability required in paragraph (b)(1)(ii) of this section and for any State (and Indian country within the borders of such State) identified in such notice as having TR NO$_X$ Annual units with total NO$_X$ emissions exceeding the State assurance level for a control period in a given year, as described in § 97.406(c)(2)(iii):

(i) By July 1 immediately after the promulgation of such notice, the designated representative of each TR NO$_X$ Annual source in each such State (and Indian country within the borders of such State) shall submit a statement, in a format prescribed by the Administrator, providing for each TR NO$_X$ Annual unit (if any) at the source that operates during, but is not allocated an amount of TR NO$_X$ Annual allowances for, such control period, the unit's allowable NO$_X$ emission rate for such control period and, if such rate is expressed in lb per mmBtu, the unit's heat rate.

(ii) By August 1 immediately after the promulgation of such notice, the Administrator will calculate, for each such State (and Indian country within the borders of such State) and such control period and each common designated representative for such control period for a group of one or more TR NO$_X$ Annual sources and units in the State (and Indian country within the borders of such State), the common designated representative's share of the total NO$_X$ emissions from all TR NO$_X$ Annual units at TR NO$_X$ Annual sources in the State (and Indian country within the borders of such State), the common designated representative's assurance level, and the amount (if any) of TR NO$_X$ Annual allowances that the owners and operators of such group of sources and units must hold in accordance with the calculation formula in § 97.406(c)(2)(i) and will promulgate a notice of data availability of the results of these calculations.

(iii) The Administrator will provide an opportunity for submission of objections to the calculations referenced by the notice of data availability required in paragraph (b)(2)(ii) of this section and the calculations referenced by the relevant notice of data availability required in paragraph (b)(1)(i) of this section.

(A) Objections shall be submitted by the deadline specified in such notice

and shall be limited to addressing whether the calculations referenced in the relevant notice required under paragraph (b)(1)(ii) of this section and referenced in the notice required under paragraph (b)(2)(ii) of this section are in accordance with § 97.406(c)(2)(iii), §§ 97.406(b) and 97.430 through 97.435, the definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share" in § 97.402, and the calculation formula in § 97.406(c)(2)(i).

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(iii)(A) of this section. By October 1 immediately after the promulgation of such notice, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iii)(A) of this section.

(3) For any State (and Indian country within the borders of such State) referenced in each notice of data availability required in paragraph (b)(2)(iii)(B) of this section as having TR $NO_X$ Annual units with total $NO_X$ emissions exceeding the State assurance level for a control period in a given year, the Administrator will establish one assurance account for each set of owners and operators referenced, in the notice of data availability required under paragraph (b)(2)(iii)(B) of this section, as all of the owners and operators of a group of TR $NO_X$ Annual sources and units in the State (and Indian country within the borders of such State) having a common designated representative for such control period and as being required to hold TR $NO_X$ Annual allowances.

(4)(i) As of midnight of November 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section, the owners and operators described in paragraph (b)(3) of this section shall hold in the assurance account established for the them and for the appropriate TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section a total amount of TR $NO_X$ Annual allowances, available for deduction under paragraph (a) of this section, equal to the amount such owners and operators are required to hold with regard to such sources, units and State (and Indian country within the borders of such State) as calculated

by the Administrator and referenced in such notice.

(ii) Notwithstanding the allowance-holding deadline specified in paragraph (b)(4)(i) of this section, if November 1 is not a business day, then such allowance-holding deadline shall be midnight of the first business day thereafter.

(5) After November 1 (or the date described in paragraph (b)(4)(ii) of this section) immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section and after the recordation, in accordance with § 97.423, of TR $NO_X$ Annual allowance transfers submitted by midnight of such date, the Administrator will determine whether the owners and operators described in paragraph (b)(3) of this section hold, in the assurance account for the appropriate TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) established under paragraph (b)(3) of this section, the amount of TR $NO_X$ Annual allowances available under paragraph (a) of this section that the owners and operators are required to hold with regard to such sources, units, and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in the notice required in paragraph (b)(2)(iii)(B) of this section.

(6) Notwithstanding any other provision of this subpart and any revision, made by or submitted to the Administrator after the promulgation of the notice of data availability required in paragraph (b)(2)(iii)(B) of this section for a control period in a given year, of any data used in making the calculations referenced in such notice, the amounts of TR $NO_X$ Annual allowances that the owners and operators are required to hold in accordance with § 97.406(c)(2)(i) for such control period shall continue to be such amounts as calculated by the Administrator and referenced in such notice required in paragraph (b)(2)(iii)(B) of this section, except as follows:

(i) If any such data are revised by the Administrator as a result of a decision in or settlement of litigation concerning such data on appeal under part 78 of this chapter of such notice, or on appeal under section 307 of the Clean Air Act of a decision rendered under part 78 of this chapter on appeal of such notice, then the Administrator will use the data as so revised to recalculate the amounts of TR $NO_X$ Annual allowances that owners and operators are required to hold in accordance with the calculation

formula in § 97.406(c)(2)(i) for such control period with regard to the TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) involved, provided that such litigation under part 78 of this chapter, or the proceeding under part 78 of this chapter that resulted in the decision appealed in such litigation under section 307 of the Clean Air Act, was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(ii) If any such data are revised by the owners and operators of a TR $NO_X$ Annual source and TR $NO_X$ Annual unit whose designated representative submitted such data under paragraph (b)(2)(i) of this section, as a result of a decision in or settlement of litigation concerning such submission, then the Administrator will use the data as so revised to recalculate the amounts of TR $NO_X$ Annual allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.406(c)(2)(i) for such control period with regard to the TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) involved, provided that such litigation was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(iii) If the revised data are used to recalculate, in accordance with paragraphs (b)(6)(i) and (ii) of this section, the amount of TR $NO_X$ Annual allowances that the owners and operators are required to hold for such control period with regard to the TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) involved—

(A) Where the amount of TR $NO_X$ Annual allowances that the owners and operators are required to hold increases as a result of the use of all such revised data, the Administrator will establish a new, reasonable deadline on which the owners and operators shall hold the additional amount of TR $NO_X$ Annual allowances in the assurance account established by the Administrator for the appropriate TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section. The owners' and operators' failure to hold such additional amount, as required, before the new deadline shall not be a violation of the Clean Air Act. The owners' and operators' failure to hold such additional amount, as required, as of the new deadline shall be a violation of the Clean Air Act. Each

TR $NO_X$ Annual allowance that the owners and operators fail to hold as required as of the new deadline, and each day in such control period, shall be a separate violation of the Clean Air Act.

(B) For the owners and operators for which the amount of TR $NO_X$ Annual allowances required to be held decreases as a result of the use of all such revised data, the Administrator will record, in all accounts from which TR $NO_X$ Annual allowances were transferred by such owners and operators for such control period to the assurance account established by the Administrator for the appropriate at TR $NO_X$ Annual sources, TR $NO_X$ Annual units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, a total amount of the TR $NO_X$ Annual allowances held in such assurance account equal to the amount of the decrease. If TR $NO_X$ Annual allowances were transferred to such assurance account from more than one account, the amount of TR $NO_X$ Annual allowances recorded in each such transferor account will be in proportion to the percentage of the total amount of TR $NO_X$ Annual allowances transferred to such assurance account for such control period from such transferor account.

(C) Each TR $NO_X$ Annual allowance held under paragraph (b)(6)(iii)(A) of this section as a result of recalculation of requirements under the TR $NO_X$ Annual assurance provisions for such control period must be a TR $NO_X$ Annual allowance allocated for a control period in a year before or the year immediately following, or in the same year as, the year of such control period.

### § 97.426  Banking.

(a) A TR $NO_X$ Annual allowance may be banked for future use or transfer in a compliance account or a general account in accordance with paragraph (b) of this section.

(b) Any TR $NO_X$ Annual allowance that is held in a compliance account or a general account will remain in such account unless and until the TR $NO_X$ Annual allowance is deducted or transferred under § 97.411(c), § 97.423, § 97.424, § 97.425, 97.427, or 97.428.

### § 97.427  Account error.

The Administrator may, at his or her sole discretion and on his or her own motion, correct any error in any Allowance Management System account. Within 10 business days of making such correction, the Administrator will notify the authorized account representative for the account.

### § 97.428  Administrator's action on submissions.

(a) The Administrator may review and conduct independent audits concerning any submission under the TR $NO_X$ Annual Trading Program and make appropriate adjustments of the information in the submission.

(b) The Administrator may deduct TR $NO_X$ Annual allowances from or transfer TR $NO_X$ Annual allowances to a compliance account or an assurance account, based on the information in a submission, as adjusted under paragraph (a)(1) of this section, and record such deductions and transfers.

### § 97.429  [Reserved]

### § 97.430  General monitoring, recordkeeping, and reporting requirements.

The owners and operators, and to the extent applicable, the designated representative, of a TR $NO_X$ Annual unit, shall comply with the monitoring, recordkeeping, and reporting requirements as provided in this subpart and subpart H of part 75 of this chapter. For purposes of applying such requirements, the definitions in § 97.402 and in § 72.2 of this chapter shall apply, the terms "affected unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") in part 75 of this chapter shall be deemed to refer to the terms "TR $NO_X$ Annual unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") respectively as defined in § 97.402, and the term "newly affected unit" shall be deemed to mean "newly affected TR $NO_X$ Annual unit". The owner or operator of a unit that is not a TR $NO_X$ Annual unit but that is monitored under § 75.72(b)(2)(ii) of this chapter shall comply with the same monitoring, recordkeeping, and reporting requirements as a TR $NO_X$ Annual unit.

(a) *Requirements for installation, certification, and data accounting.* The owner or operator of each TR $NO_X$ Annual unit shall:

(1) Install all monitoring systems required under this subpart for monitoring $NO_X$ mass emissions and individual unit heat input (including all systems required to monitor $NO_X$ emission rate, $NO_X$ concentration, stack gas moisture content, stack gas flow rate, $CO_2$ or $O_2$ concentration, and fuel flow rate, as applicable, in accordance with §§ 75.71 and 75.72 of this chapter);

(2) Successfully complete all certification tests required under § 97.431 and meet all other requirements of this subpart and part 75 of this chapter applicable to the

monitoring systems under paragraph (a)(1) of this section; and

(3) Record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section.

(b) *Compliance deadlines.* Except as provided in paragraph (e) of this section, the owner or operator shall meet the monitoring system certification and other requirements of paragraphs (a)(1) and (2) of this section on or before the following dates and shall record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section on and after the following dates.

(1) For the owner or operator of a TR $NO_X$ Annual unit that commences commercial operation before July 1, 2011, January 1, 2012;

(2) For the owner or operator of a TR $NO_X$ Annual unit that commences commercial operation on or after July 1, 2011, the later of the following:

(i) January 1, 2012; or

(ii) 180 calendar days after the date on which the unit commences commercial operation;

(3) The owner or operator of a TR $NO_X$ Annual unit for which construction of a new stack or flue or installation of add-on $NO_X$ emission controls is completed after the applicable deadline under paragraph (b)(1) or (2) of this section shall meet the requirements of §§ 75.4(e)(1) through (e)(4) of this chapter, except that:

(i) Such requirements shall apply to the monitoring systems required under § 97.430 through § 97.435, rather than the monitoring systems required under part 75 of this chapter;

(ii) $NO_X$ emission rate, $NO_X$ concentration, stack gas moisture content, stack gas volumetric flow rate, and $O_2$ or $CO_2$ concentration data shall be determined and reported, rather than the data listed in § 75.4(e)(2) of this chapter; and

(iii) Any petition for another procedure under § 75.4(e)(2) of this chapter shall be submitted under § 97.435, rather than § 75.66.

(c) *Reporting data.* The owner or operator of a TR $NO_X$ Annual unit that does not meet the applicable compliance date set forth in paragraph (b) of this section for any monitoring system under paragraph (a)(1) of this section shall, for each such monitoring system, determine, record, and report maximum potential (or, as appropriate, minimum potential) values for $NO_X$ concentration, $NO_X$ emission rate, stack gas flow rate, stack gas moisture content, fuel flow rate, and any other parameters required to determine $NO_X$ mass emissions and heat input in accordance with § 75.31(b)(2) or (c)(3) of

this chapter, section 2.4 of appendix D to part 75 of this chapter, or section 2.5 of appendix E to part 75 of this chapter, as applicable.

(d) *Prohibitions.* (1) No owner or operator of a TR $NO_X$ Annual unit shall use any alternative monitoring system, alternative reference method, or any other alternative to any requirement of this subpart without having obtained prior written approval in accordance with § 97.435.

(2) No owner or operator of a TR $NO_X$ Annual unit shall operate the unit so as to discharge, or allow to be discharged, $NO_X$ to the atmosphere without accounting for all such $NO_X$ in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(3) No owner or operator of a TR $NO_X$ Annual unit shall disrupt the continuous emission monitoring system, any portion thereof, or any other approved emission monitoring method, and thereby avoid monitoring and recording $NO_X$ mass discharged into the atmosphere or heat input, except for periods of recertification or periods when calibration, quality assurance testing, or maintenance is performed in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(4) No owner or operator of a TR $NO_X$ Annual unit shall retire or permanently discontinue use of the continuous emission monitoring system, any component thereof, or any other approved monitoring system under this subpart, except under any one of the following circumstances:

(i) During the period that the unit is covered by an exemption under § 97.405 that is in effect;

(ii) The owner or operator is monitoring emissions from the unit with another certified monitoring system approved, in accordance with the applicable provisions of this subpart and part 75 of this chapter, by the Administrator for use at that unit that provides emission data for the same pollutant or parameter as the retired or discontinued monitoring system; or

(iii) The designated representative submits notification of the date of certification testing of a replacement monitoring system for the retired or discontinued monitoring system in accordance with § 97.431(d)(3)(i).

(e) *Long-term cold storage.* The owner or operator of a TR $NO_X$ Annual unit is subject to the applicable provisions of § 75.4(d) of this chapter concerning units in long-term cold storage.

### § 97.431   Initial monitoring system certification and recertification procedures.

(a) The owner or operator of a TR $NO_X$ Annual unit shall be exempt from the initial certification requirements of this section for a monitoring system under § 97.430(a)(1) if the following conditions are met:

(1) The monitoring system has been previously certified in accordance with part 75 of this chapter; and

(2) The applicable quality-assurance and quality-control requirements of § 75.21 of this chapter and appendices B, D, and E to part 75 of this chapter are fully met for the certified monitoring system described in paragraph (a)(1) of this section.

(b) The recertification provisions of this section shall apply to a monitoring system under § 97.430(a)(1) that is exempt from initial certification requirements under paragraph (a) of this section.

(c) If the Administrator has previously approved a petition under § 75.17(a) or (b) of this chapter for apportioning the $NO_X$ emission rate measured in a common stack or a petition under § 75.66 of this chapter for an alternative to a requirement in § 75.12 or § 75.17 of this chapter, the designated representative shall resubmit the petition to the Administrator under § 97.435 to determine whether the approval applies under the TR $NO_X$ Annual Trading Program.

(d) Except as provided in paragraph (a) of this section, the owner or operator of a TR $NO_X$ Annual unit shall comply with the following initial certification and recertification procedures for a continuous monitoring system (*i.e.,* a continuous emission monitoring system and an excepted monitoring system under appendices D and E to part 75 of this chapter) under § 97.430(a)(1). The owner or operator of a unit that qualifies to use the low mass emissions excepted monitoring methodology under § 75.19 of this chapter or that qualifies to use an alternative monitoring system under subpart E of part 75 of this chapter shall comply with the procedures in paragraph (e) or (f) of this section respectively.

(1) Requirements for initial certification. The owner or operator shall ensure that each continuous monitoring system under § 97.430(a)(1) (including the automated data acquisition and handling system) successfully completes all of the initial certification testing required under § 75.20 of this chapter by the applicable deadline in § 97.430(b). In addition, whenever the owner or operator installs a monitoring system to meet the requirements of this subpart in a location where no such monitoring system was previously installed, initial certification in accordance with § 75.20 of this chapter is required.

(2) Requirements for recertification. Whenever the owner or operator makes a replacement, modification, or change in any certified continuous emission monitoring system under § 97.430(a)(1) that may significantly affect the ability of the system to accurately measure or record $NO_X$ mass emissions or heat input rate or to meet the quality-assurance and quality-control requirements of § 75.21 of this chapter or appendix B to part 75 of this chapter, the owner or operator shall recertify the monitoring system in accordance with § 75.20(b) of this chapter. Furthermore, whenever the owner or operator makes a replacement, modification, or change to the flue gas handling system or the unit's operation that may significantly change the stack flow or concentration profile, the owner or operator shall recertify each continuous emission monitoring system whose accuracy is potentially affected by the change, in accordance with § 75.20(b) of this chapter. Examples of changes to a continuous emission monitoring system that require recertification include replacement of the analyzer, complete replacement of an existing continuous emission monitoring system, or change in location or orientation of the sampling probe or site. Any fuel flowmeter system, and any excepted $NO_X$ monitoring system under appendix E to part 75 of this chapter, under § 97.430(a)(1) are subject to the recertification requirements in § 75.20(g)(6) of this chapter.

(3) Approval process for initial certification and recertification. For initial certification of a continuous monitoring system under § 97.430(a)(1), paragraphs (d)(3)(i) through (v) of this section apply. For recertifications of such monitoring systems, paragraphs (d)(3)(i) through (iv) of this section and the procedures in §§ 75.20(b)(5) and (g)(7) of this chapter (in lieu of the procedures in paragraph (d)(3)(v) of this section) apply, provided that in applying paragraphs (d)(3)(i) through (iv) of this section, the words "certification" and "initial certification" are replaced by the word "recertification" and the word "certified" is replaced by with the word "recertified".

(i) Notification of certification. The designated representative shall submit to the appropriate EPA Regional Office and the Administrator written notice of the dates of certification testing, in accordance with § 97.433.

(ii) *Certification application.* The designated representative shall submit to the Administrator a certification application for each monitoring system. A complete certification application shall include the information specified in § 75.63 of this chapter.

(iii) *Provisional certification date.* The provisional certification date for a monitoring system shall be determined in accordance with § 75.20(a)(3) of this chapter. A provisionally certified monitoring system may be used under the TR NO$_X$ Annual Trading Program for a period not to exceed 120 days after receipt by the Administrator of the complete certification application for the monitoring system under paragraph (d)(3)(ii) of this section. Data measured and recorded by the provisionally certified monitoring system, in accordance with the requirements of part 75 of this chapter, will be considered valid quality-assured data (retroactive to the date and time of provisional certification), provided that the Administrator does not invalidate the provisional certification by issuing a notice of disapproval within 120 days of the date of receipt of the complete certification application by the Administrator.

(iv) *Certification application approval process.* The Administrator will issue a written notice of approval or disapproval of the certification application to the owner or operator within 120 days of receipt of the complete certification application under paragraph (d)(3)(ii) of this section. In the event the Administrator does not issue such a notice within such 120-day period, each monitoring system that meets the applicable performance requirements of part 75 of this chapter and is included in the certification application will be deemed certified for use under the TR NO$_X$ Annual Trading Program.

(A) *Approval notice.* If the certification application is complete and shows that each monitoring system meets the applicable performance requirements of part 75 of this chapter, then the Administrator will issue a written notice of approval of the certification application within 120 days of receipt.

(B) *Incomplete application notice.* If the certification application is not complete, then the Administrator will issue a written notice of incompleteness that sets a reasonable date by which the designated representative must submit the additional information required to complete the certification application. If the designated representative does not comply with the notice of incompleteness by the specified date,

then the Administrator may issue a notice of disapproval under paragraph (d)(3)(iv)(C) of this section.

(C) *Disapproval notice.* If the certification application shows that any monitoring system does not meet the performance requirements of part 75 of this chapter or if the certification application is incomplete and the requirement for disapproval under paragraph (d)(3)(iv)(B) of this section is met, then the Administrator will issue a written notice of disapproval of the certification application. Upon issuance of such notice of disapproval, the provisional certification is invalidated by the Administrator and the data measured and recorded by each uncertified monitoring system shall not be considered valid quality-assured data beginning with the date and hour of provisional certification (as defined under § 75.20(a)(3) of this chapter).

(D) *Audit decertification.* The Administrator may issue a notice of disapproval of the certification status of a monitor in accordance with § 97.432(b).

(v) *Procedures for loss of certification.* If the Administrator issues a notice of disapproval of a certification application under paragraph (d)(3)(iv)(C) of this section or a notice of disapproval of certification status under paragraph (d)(3)(iv)(D) of this section, then:

(A) The owner or operator shall substitute the following values, for each disapproved monitoring system, for each hour of unit operation during the period of invalid data specified under § 75.20(a)(4)(iii), § 75.20(g)(7), or § 75.21(e) of this chapter and continuing until the applicable date and hour specified under § 75.20(a)(5)(i) or (g)(7) of this chapter:

(*1*) For a disapproved NO$_X$ emission rate (*i.e.,* NO$_X$-diluent) system, the maximum potential NO$_X$ emission rate, as defined in § 72.2 of this chapter.

(*2*) For a disapproved NO$_X$ pollutant concentration monitor and disapproved flow monitor, respectively, the maximum potential concentration of NO$_X$ and the maximum potential flow rate, as defined in sections 2.1.2.1 and 2.1.4.1 of appendix A to part 75 of this chapter.

(*3*) For a disapproved moisture monitoring system and disapproved diluent gas monitoring system, respectively, the minimum potential moisture percentage and either the maximum potential CO$_2$ concentration or the minimum potential O$_2$ concentration (as applicable), as defined in sections 2.1.5, 2.1.3.1, and 2.1.3.2 of appendix A to part 75 of this chapter.

(*4*) For a disapproved fuel flowmeter system, the maximum potential fuel flow rate, as defined in section 2.4.2.1 of appendix D to part 75 of this chapter.

(*5*) For a disapproved excepted NO$_X$ monitoring system under appendix E to part 75 of this chapter, the fuel-specific maximum potential NO$_X$ emission rate, as defined in § 72.2 of this chapter.

(B) The designated representative shall submit a notification of certification retest dates and a new certification application in accordance with paragraphs (d)(3)(i) and (ii) of this section.

(C) The owner or operator shall repeat all certification tests or other requirements that were failed by the monitoring system, as indicated in the Administrator's notice of disapproval, no later than 30 unit operating days after the date of issuance of the notice of disapproval.

(e) The owner or operator of a unit qualified to use the low mass emissions (LME) excepted methodology under § 75.19 of this chapter shall meet the applicable certification and recertification requirements in §§ 75.19(a)(2) and 75.20(h) of this chapter. If the owner or operator of such a unit elects to certify a fuel flowmeter system for heat input determination, the owner or operator shall also meet the certification and recertification requirements in § 75.20(g) of this chapter.

(f) The designated representative of each unit for which the owner or operator intends to use an alternative monitoring system approved by the Administrator under subpart E of part 75 of this chapter shall comply with the applicable notification and application procedures of § 75.20(f) of this chapter.

### § 97.432  Monitoring system out-of-control periods.

(a) *General provisions.* Whenever any monitoring system fails to meet the quality-assurance and quality-control requirements or data validation requirements of part 75 of this chapter, data shall be substituted using the applicable missing data procedures in subpart D or subpart H of, or appendix D or appendix E to, part 75 of this chapter.

(b) *Audit decertification.* Whenever both an audit of a monitoring system and a review of the initial certification or recertification application reveal that any monitoring system should not have been certified or recertified because it did not meet a particular performance specification or other requirement under § 97.431 or the applicable provisions of part 75 of this chapter, both at the time of the initial certification or

recertification application submission and at the time of the audit, the Administrator will issue a notice of disapproval of the certification status of such monitoring system. For the purposes of this paragraph, an audit shall be either a field audit or an audit of any information submitted to the Administrator or any State or permitting authority. By issuing the notice of disapproval, the Administrator revokes prospectively the certification status of the monitoring system. The data measured and recorded by the monitoring system shall not be considered valid quality-assured data from the date of issuance of the notification of the revoked certification status until the date and time that the owner or operator completes subsequently approved initial certification or recertification tests for the monitoring system. The owner or operator shall follow the applicable initial certification or recertification procedures in § 97.431 for each disapproved monitoring system.

### § 97.433 Notifications concerning monitoring.

The designated representative of a TR NO$_X$ Annual unit shall submit written notice to the Administrator in accordance with § 75.61 of this chapter.

### § 97.434 Recordkeeping and reporting.

(a) *General provisions.* The designated representative shall comply with all recordkeeping and reporting requirements in paragraphs (b) through (e) of this section, the applicable recordkeeping and reporting requirements under § 75.73 of this chapter, and the requirements of § 97.414(a).

(b) *Monitoring plans.* The owner or operator of a TR NO$_X$ Annual unit shall comply with requirements of § 75.73(c) and (e) of this chapter.

(c) *Certification applications.* The designated representative shall submit an application to the Administrator within 45 days after completing all initial certification or recertification tests required under § 97.431, including the information required under § 75.63 of this chapter.

(d) *Quarterly reports.* The designated representative shall submit quarterly reports, as follows:

(1) The designated representative shall report the NO$_X$ mass emissions data and heat input data for the TR NO$_X$ Annual unit, in an electronic quarterly report in a format prescribed by the Administrator, for each calendar quarter beginning with:

(i) For a unit that commences commercial operation before July 1,

2011, the calendar quarter covering January 1, 2012 through March 31, 2012; or

(ii) For a unit that commences commercial operation on or after July 1, 2011, the calendar quarter corresponding to the earlier of the date of provisional certification or the applicable deadline for initial certification under § 97.430(b), unless that quarter is the third or fourth quarter of 2011, in which case reporting shall commence in the quarter covering January 1, 2012 through March 31, 2012.

(2) The designated representative shall submit each quarterly report to the Administrator within 30 days after the end of the calendar quarter covered by the report. Quarterly reports shall be submitted in the manner specified in § 75.73(f) of this chapter.

(3) For TR NO$_X$ Annual units that are also subject to the Acid Rain Program, TR NO$_X$ Ozone Season Trading Program, TR SO$_2$ Group 1 Trading Program, or TR SO$_2$ Group 2 Trading Program, quarterly reports shall include the applicable data and information required by subparts F through H of part 75 of this chapter as applicable, in addition to the NO$_X$ mass emission data, heat input data, and other information required by this subpart.

(4) The Administrator may review and conduct independent audits of any quarterly report in order to determine whether the quarterly report meets the requirements of this subpart and part 75 of this chapter, including the requirement to use substitute data.

(i) The Administrator will notify the designated representative of any determination that the quarterly report fails to meet any such requirements and specify in such notification any corrections that the Administrator believes are necessary to make through resubmission of the quarterly report and a reasonable time period within which the designated representative must respond. Upon request by the designated representative, the Administrator may specify reasonable extensions of such time period. Within the time period (including any such extensions) specified by the Administrator, the designated representative shall resubmit the quarterly report with the corrections specified by the Administrator, except to the extent the designated representative provides information demonstrating that a specified correction is not necessary because the quarterly report already meets the requirements of this subpart and part 75 of this chapter that are relevant to the specified correction.

(ii) Any resubmission of a quarterly report shall meet the requirements applicable to the submission of a quarterly report under this subpart and part 75 of this chapter, except for the deadline set forth in paragraph (d)(2) of this section.

(e) *Compliance certification.* The designated representative shall submit to the Administrator a compliance certification (in a format prescribed by the Administrator) in support of each quarterly report based on reasonable inquiry of those persons with primary responsibility for ensuring that all of the unit's emissions are correctly and fully monitored. The certification shall state that:

(1) The monitoring data submitted were recorded in accordance with the applicable requirements of this subpart and part 75 of this chapter, including the quality assurance procedures and specifications; and

(2) For a unit with add-on NO$_X$ emission controls and for all hours where NO$_X$ data are substituted in accordance with § 75.34(a)(1) of this chapter, the add-on emission controls were operating within the range of parameters listed in the quality assurance/quality control program under appendix B to part 75 of this chapter and the substitute data values do not systematically underestimate NO$_X$ emissions.

### § 97.435 Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

(a) The designated representative of a TR NO$_X$ Annual unit may submit a petition under § 75.66 of this chapter to the Administrator, requesting approval to apply an alternative to any requirement of §§ 97.430 through 97.434.

(b) A petition submitted under paragraph (a) of this section shall include sufficient information for the evaluation of the petition, including, at a minimum, the following information:

(i) Identification of each unit and source covered by the petition;

(ii) A detailed explanation of why the proposed alternative is being suggested in lieu of the requirement;

(iii) A description and diagram of any equipment and procedures used in the proposed alternative;

(iv) A demonstration that the proposed alternative is consistent with the purposes of the requirement for which the alternative is proposed and with the purposes of this subpart and part 75 of this chapter and that any adverse effect of approving the alternative will be *de minimis;* and

(v) Any other relevant information that the Administrator may require.

(c) Use of an alternative to any requirement referenced in paragraph (a) of this section is in accordance with this subpart only to the extent that the petition is approved in writing by the Administrator and that such use is in accordance with such approval.

■ 75. Part 97 is amended by adding subpart BBBBB to read as follows:

## Subpart BBBBB—TR NO$_X$ Ozone Season Trading Program

97.501  Purpose.
97.502  Definitions.
97.503  Measurements, abbreviations, and acronyms.
97.504  Applicability.
97.505  Retired unit exemption.
97.506  Standard requirements.
97.507  Computation of time.
97.508  Administrative appeal procedures.
97.509  [Reserved]
97.510  State NO$_X$ Ozone Season trading budgets, new unit set-asides, Indian country new unit set-asides and variability limits.
97.511  Timing requirements for TR NO$_X$ Ozone Season allowance allocations.
97.512  TR NO$_X$ Ozone Season allowance allocations to new units.
97.513  Authorization of designated representative and alternate designated representative.
97.514  Responsibilities of designated representative and alternate designated representative.
97.515  Changing designated representative and alternate designated representative; changes in owners and operators.
97.516  Certificate of representation.
97.517  Objections concerning designated representative and alternate designated representative.
97.518  Delegation by designated representative and alternate designated representative.
97.519  [Reserved]
97.520  Establishment of compliance accounts and general accounts.
97.521  Recordation of TR NO$_X$ Ozone Season allowance allocations.
97.522  Submission of TR NO$_X$ Ozone Season allowance transfers.
97.523  Recordation of TR NO$_X$ Ozone Season allowance transfers.
97.524  Compliance with TR NO$_X$ Ozone Season emissions limitation.
97.525  Compliance with TR NO$_X$ Ozone Season assurance provisions.
97.526  Banking.
97.527  Account error.
97.528  Administrator's action on submissions.
97.529  [RESERVED]
97.530  General monitoring, recordkeeping, and reporting requirements.
97.531  Initial monitoring system certification and recertification procedures.
97.532  Monitoring system out-of-control periods.
97.533  Notifications concerning monitoring.
97.534  Recordkeeping and reporting.
97.535  Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

## Subpart BBBBB—TR NO$_X$ Ozone Season Trading Program

### § 97.501  Purpose.

This subpart sets forth the general, designated representative, allowance, and monitoring provisions for the Transport Rule (TR) NO$_X$ Ozone Season Trading Program, under section 110 of the Clean Air Act and § 52.38 of this chapter, as a means of mitigating interstate transport of ozone and nitrogen oxides.

### § 97.502  Definitions.

The terms used in this subpart shall have the meanings set forth in this section as follows:

*Acid Rain Program* means a multi-state SO$_2$ and NO$_X$ air pollution control and emission reduction program established by the Administrator under title IV of the Clean Air Act and parts 72 through 78 of this chapter.

*Administrator* means the Administrator of the United States Environmental Protection Agency or the Director of the Clean Air Markets Division (or its successor determined by the Administrator) of the United States Environmental Protection Agency, the Administrator's duly authorized representative under this subpart.

*Allocate* or *allocation* means, with regard to TR NO$_X$ Ozone Season allowances, the determination by the Administrator, State, or permitting authority, in accordance with this subpart and any SIP revision submitted by the State and approved by the Administrator under § 52.38(b)(3), (4), or (5) of this chapter, of the amount of such TR NO$_X$ Ozone Season allowances to be initially credited, at no cost to the recipient, to:

(1) A TR NO$_X$ Ozone Season unit;

(2) A new unit set-aside;

(3) An Indian country new unit set-aside; or

(4) An entity not listed in paragraphs (1) through (3) of this definition;

(5) Provided that, if the Administrator, State, or permitting authority initially credits, to a TR NO$_X$ Ozone Season unit qualifying for an initial credit, a credit in the amount of zero TR NO$_X$ Ozone Season allowances, the TR NO$_X$ Ozone Season unit will be treated as being allocated an amount (*i.e.*, zero) of TR NO$_X$ Ozone Season allowances.

*Allowable NO$_X$ emission rate* means, for a unit, the most stringent State or federal NO$_X$ emission rate limit (in lb/MWhr or, if in lb/mmBtu, converted to lb/MWhr by multiplying it by the unit's heat rate in mmBtu/MWhr) that is applicable to the unit and covers the longest averaging period not exceeding one year.

*Allowance Management System* means the system by which the Administrator records allocations, deductions, and transfers of TR NO$_X$ Ozone Season allowances under the TR NO$_X$ Ozone Season Trading Program. Such allowances are allocated, recorded, held, deducted, or transferred only as whole allowances.

*Allowance Management System account* means an account in the Allowance Management System established by the Administrator for purposes of recording the allocation, holding, transfer, or deduction of TR NO$_X$ Ozone Season allowances.

*Allowance transfer deadline* means, for a control period in a given year, midnight of December 1 (if it is a business day), or midnight of the first business day thereafter (if December 1 is not a business day), immediately after such control period and is the deadline by which a TR NO$_X$ Ozone Season allowance transfer must be submitted for recordation in a TR NO$_X$ Ozone Season source's compliance account in order to be available for use in complying with the source's TR NO$_X$ Ozone Season emissions limitation for such control period in accordance with §§ 97.506 and 97.524.

*Alternate designated representative* means, for a TR NO$_X$ Ozone Season source and each TR NO$_X$ Ozone Season unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to act on behalf of the designated representative in matters pertaining to the TR NO$_X$ Ozone Season Trading Program. If the TR NO$_X$ Ozone Season source is also subject to the Acid Rain Program, TR NO$_X$ Annual Trading Program, TR SO$_2$ Group 1 Trading Program, or TR SO$_2$ Group 2 Trading Program, then this natural person shall be the same natural person as the alternate designated representative, as defined in the respective program.

*Assurance account* means an Allowance Management System account, established by the Administrator under § 97.525(b)(3) for certain owners and operators of a group of one or more TR NO$_X$ Ozone Season sources and units in a given State (and Indian country within the borders of such State), in which are held TR NO$_X$ Ozone Season allowances available for use for a control period in a given year in complying with the TR NO$_X$ Ozone

Season assurance provisions in accordance with §§ 97.506 and 97.525.

*Authorized account representative* means, for a general account, the natural person who is authorized, in accordance with this subpart, to transfer and otherwise dispose of TR NO$_X$ Ozone Season allowances held in the general account and, for a TR NO$_X$ Ozone Season source's compliance account, the designated representative of the source.

*Automated data acquisition and handling system* or *DAHS* means the component of the continuous emission monitoring system, or other emissions monitoring system approved for use under this subpart, designed to interpret and convert individual output signals from pollutant concentration monitors, flow monitors, diluent gas monitors, and other component parts of the monitoring system to produce a continuous record of the measured parameters in the measurement units required by this subpart.

*Biomass* means—

(1) Any organic material grown for the purpose of being converted to energy;

(2) Any organic byproduct of agriculture that can be converted into energy; or

(3) Any material that can be converted into energy and is nonmerchantable for other purposes, that is segregated from other material that is nonmerchantable for other purposes, and that is;

(i) A forest-related organic resource, including mill residues, precommercial thinnings, slash, brush, or byproduct from conversion of trees to merchantable material; or

(ii) A wood material, including pallets, crates, dunnage, manufacturing and construction materials (other than pressure-treated, chemically-treated, or painted wood products), and landscape or right-of-way tree trimmings.

*Boiler* means an enclosed fossil- or other-fuel-fired combustion device used to produce heat and to transfer heat to recirculating water, steam, or other medium.

*Bottoming-cycle unit* means a unit in which the energy input to the unit is first used to produce useful thermal energy, where at least some of the reject heat from the useful thermal energy application or process is then used for electricity production.

*Business day* means a day that does not fall on a weekend or a federal holiday.

*Certifying official* means a natural person who is:

(1) For a corporation, a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function or any other person

who performs similar policy- or decision-making functions for the corporation;

(2) For a partnership or sole proprietorship, a general partner or the proprietor respectively; or

(3) For a local government entity or State, federal, or other public agency, a principal executive officer or ranking elected official.

*Clean Air Act* means the Clean Air Act, 42 U.S.C. 7401, *et seq.*

*Coal* means ''coal'' as defined in § 72.2 of this chapter.

*Coal-derived fuel* means any fuel (whether in a solid, liquid, or gaseous state) produced by the mechanical, thermal, or chemical processing of coal.

*Cogeneration system* means an integrated group, at a source, of equipment (including a boiler, or combustion turbine, and a steam turbine generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy.

*Cogeneration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a topping-cycle unit or a bottoming-cycle unit:

(1) Operating as part of a cogeneration system; and

(2) Producing on an annual average basis—

(i) For a topping-cycle unit,

(A) Useful thermal energy not less than 5 percent of total energy output; and

(B) Useful power that, when added to one-half of useful thermal energy produced, is not less than 42.5 percent of total energy input, if useful thermal energy produced is 15 percent or more of total energy output, or not less than 45 percent of total energy input, if useful thermal energy produced is less than 15 percent of total energy output.

(ii) For a bottoming-cycle unit, useful power not less than 45 percent of total energy input;

(3) Provided that the requirements in paragraph (2) of this definition shall not apply to a calendar year referenced in paragraph (2) of this definition during which the unit did not operate at all;

(4) Provided that the total energy input under paragraphs (2)(i)(B) and (2)(ii) of this definition shall equal the unit's total energy input from all fuel, except biomass if the unit is a boiler; and

(5) Provided that, if, throughout its operation during the 12-month period or a calendar year referenced in paragraph (2) of this definition, a unit is operated as part of a cogeneration system and the cogeneration system meets on a system-

wide basis the requirement in paragraph (2)(i)(B) or (2)(ii) of this definition, the unit shall be deemed to meet such requirement during that 12-month period or calendar year.

*Combustion turbine* means an enclosed device comprising:

(1) If the device is simple cycle, a compressor, a combustor, and a turbine and in which the flue gas resulting from the combustion of fuel in the combustor passes through the turbine, rotating the turbine; and

(2) If the device is combined cycle, the equipment described in paragraph (1) of this definition and any associated duct burner, heat recovery steam generator, and steam turbine.

*Commence commercial operation* means, with regard to a unit:

(1) To have begun to produce steam, gas, or other heated medium used to generate electricity for sale or use, including test generation, except as provided in § 97.505.

(i) For a unit that is a TR NO$_X$ Ozone Season unit under § 97.504 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that subsequently undergoes a physical change or is moved to a new location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit that is a TR NO$_X$ Ozone Season unit under § 97.504 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

(2) Notwithstanding paragraph (1) of this definition and except as provided in § 97.505, for a unit that is not a TR NO$_X$ Ozone Season unit under § 97.504 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in introductory text of paragraph (1) of this definition, the unit's date for commencement of commercial operation shall be the date on which the unit becomes a TR NO$_X$ Ozone Season unit under § 97.504.

(i) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition

and that subsequently undergoes a physical change or is moved to a different location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

*Common designated representative* means, with regard to a control period in a given year, a designated representative where, as of April 1 immediately after the allowance transfer deadline for such control period, the same natural person is authorized under §§ 97.513(a) and 97.515(a) as the designated representative for a group of one or more TR NO$_X$ Ozone Season sources and units located in a State (and Indian country within the borders of such State).

*Common designated representative's assurance level* means, with regard to a specific common designated representative and a State (and Indian country within the borders of such State) and control period in a given year for which the State assurance level is exceeded as described in § 97.506(c)(2)(iii), the common designated representative's share of the State NO$_X$ Ozone Season trading budget with the variability limit for the State for such control period.

*Common designated representative's share* means, with regard to a specific common designated representative for a control period in a given year:

(1) With regard to a total amount of NO$_X$ emissions from all TR NO$_X$ Ozone Season units in a State (and Indian country within the borders of such State) during such control period, the total tonnage of NO$_X$ emissions during such control period from a group of one or more TR NO$_X$ Ozone Season units located in such State (and such Indian country) and having the common designated representative for such control period;

(2) With regard to a State NO$_X$ Ozone Season trading budget with the variability limit for such control period, the amount (rounded to the nearest allowance) equal to the sum of the total amount of TR NO$_X$ Ozone Season

allowances allocated for such control period to a group of one or more TR NO$_X$ Ozone Season units located in the State (and Indian country within the borders of such State) and having the common designated representative for such control period and of the total amount of TR NO$_X$ Ozone Season allowances purchased by an owner or operator of such TR NO$_X$ Ozone Season units in an auction for such control period and submitted by the State or the permitting authority to the Administrator for recordation in the compliance accounts for such TR NO$_X$ Ozone Season units in accordance with the TR NO$_X$ Ozone Season allowance auction provisions in a SIP revision approved by the Administrator under § 52.38(b)(4) or (5) of this chapter, multiplied by the sum of the State NO$_X$ Ozone Season trading budget under § 97.510(a) and the State's variability limit under § 97.510(b) for such control period and divided by such State NO$_X$ Ozone Season trading budget;

(3) Provided that, in the case of a unit that operates during, but has no amount of TR NO$_X$ Ozone Season allowances allocated under §§ 97.511 and 97.512 for, such control period, the unit shall be treated, solely for purposes of this definition, as being allocated an amount (rounded to the nearest allowance) of TR NO$_X$ Ozone Season allowances for such control period equal to the unit's allowable NO$_X$ emission rate applicable to such control period, multiplied by a capacity factor of 0.92 (if the unit is a boiler combusting any amount of coal or coal-derived fuel during such control period), 0.32 (if the unit is a simple combustion turbine during such control period), 0.71 (if the unit is a combined cycle turbine during such control period), 0.73 (if the unit is an integrated coal gasification combined cycle unit during such control period), or 0.44 (for any other unit), multiplied by the unit's maximum hourly load as reported in accordance with this subpart and by 3,672 hours/control period, and divided by 2,000 lb/ton.

*Common stack* means a single flue through which emissions from 2 or more units are exhausted.

*Compliance account* means an Allowance Management System account, established by the Administrator for a TR NO$_X$ Ozone Season source under this subpart, in which any TR NO$_X$ Ozone Season allowance allocations to the TR NO$_X$ Ozone Season units at the source are recorded and in which are held any TR NO$_X$ Ozone Season allowances available for use for a control period in a given year in complying with the source's TR NO$_X$ Ozone Season emissions limitation

in accordance with §§ 97.506 and 97.524.

*Continuous emission monitoring system or CEMS* means the equipment required under this subpart to sample, analyze, measure, and provide, by means of readings recorded at least once every 15 minutes and using an automated data acquisition and handling system (DAHS), a permanent record of NO$_X$ emissions, stack gas volumetric flow rate, stack gas moisture content, and O$_2$ or CO$_2$ concentration (as applicable), in a manner consistent with part 75 of this chapter and §§ 97.530 through 97.535. The following systems are the principal types of continuous emission monitoring systems:

(1) A flow monitoring system, consisting of a stack flow rate monitor and an automated data acquisition and handling system and providing a permanent, continuous record of stack gas volumetric flow rate, in standard cubic feet per hour (scfh);

(2) A NO$_X$ concentration monitoring system, consisting of a NO$_X$ pollutant concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of NO$_X$ emissions, in parts per million (ppm);

(3) A NO$_X$ emission rate (or NO$_X$-diluent) monitoring system, consisting of a NO$_X$ pollutant concentration monitor, a diluent gas (CO$_2$ or O$_2$) monitor, and an automated data acquisition and handling system and providing a permanent, continuous record of NO$_X$ concentration, in parts per million (ppm), diluent gas concentration, in percent CO$_2$ or O$_2$, and NO$_X$ emission rate, in pounds per million British thermal units (lb/mmBtu);

(4) A moisture monitoring system, as defined in § 75.11(b)(2) of this chapter and providing a permanent, continuous record of the stack gas moisture content, in percent H$_2$O;

(5) A CO$_2$ monitoring system, consisting of a CO$_2$ pollutant concentration monitor (or an O$_2$ monitor plus suitable mathematical equations from which the CO$_2$ concentration is derived) and an automated data acquisition and handling system and providing a permanent, continuous record of CO$_2$ emissions, in percent CO$_2$; and

(6) An O$_2$ monitoring system, consisting of an O$_2$ concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of O$_2$, in percent O$_2$.

*Control period* means the period starting May 1 of a calendar year, except as provided in § 97.506(c)(3), and

ending on September 30 of the same year, inclusive.

*Designated representative* means, for a TR $NO_X$ Ozone Season source and each TR $NO_X$ Ozone Season unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to represent and legally bind each owner and operator in matters pertaining to the TR $NO_X$ Ozone Season Trading Program. If the TR $NO_X$ Ozone Season source is also subject to the Acid Rain Program, TR $NO_X$ Annual Trading Program, TR $SO_2$ Group 1 Trading Program, or TR $SO_2$ Group 2 Trading Program, then this natural person shall be the same natural person as the designated representative, as defined in the respective program.

*Emissions* means air pollutants exhausted from a unit or source into the atmosphere, as measured, recorded, and reported to the Administrator by the designated representative, and as modified by the Administrator:

(1) In accordance with this subpart; and

(2) With regard to a period before the unit or source is required to measure, record, and report such air pollutants in accordance with this subpart, in accordance with part 75 of this chapter.

*Excess emissions* means any ton of emissions from the TR $NO_X$ Ozone Season units at a TR $NO_X$ Ozone Season source during a control period in a given year that exceeds the TR $NO_X$ Ozone Season emissions limitation for the source for such control period.

*Fossil fuel* means—

(1) Natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material; or

(2) For purposes of applying the limitation on "average annual fuel consumption of fossil fuel" in §§ 97.504(b)(2)(i)(B) and (ii), natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material for the purpose of creating useful heat.

*Fossil-fuel-fired* means, with regard to a unit, combusting any amount of fossil fuel in 2005 or any calendar year thereafter.

*General account* means an Allowance Management System account, established under this subpart, that is not a compliance account or an assurance account.

*Generator* means a device that produces electricity.

*Gross electrical output* means, for a unit, electricity made available for use, including any such electricity used in the power production process (which process includes, but is not limited to,

any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Heat input* means, for a unit for a specified period of time, the product (in mmBtu/time) of the gross calorific value of the fuel (in mmBtu/lb) fed into the unit multiplied by the fuel feed rate (in lb of fuel/time), as measured, recorded, and reported to the Administrator by the designated representative and as modified by the Administrator in accordance with this subpart and excluding the heat derived from preheated combustion air, recirculated flue gases, or exhaust.

*Heat input rate* means, for a unit, the amount of heat input (in mmBtu) divided by unit operating time (in hr) or, for a unit and a specific fuel, the amount of heat input attributed to the fuel (in mmBtu) divided by the unit operating time (in hr) during which the unit combusts the fuel.

*Heat rate* means, for a unit, the unit's maximum design heat input (in Btu/hr), divided by the product of 1,000,000 Btu/mmBtu and the unit's maximum hourly load.

*Indian country* means "Indian country" as defined in 18 U.S.C. 1151.

*Life-of-the-unit, firm power contractual arrangement* means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of nameplate capacity and associated energy generated by any specified unit and pays its proportional amount of such unit's total costs, pursuant to a contract:

(1) For the life of the unit;

(2) For a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or

(3) For a period no less than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit is built, with option rights to purchase or release some portion of the nameplate capacity and associated energy generated by the unit at the end of the period.

*Maximum design heat input* means, for a unit, the maximum amount of fuel per hour (in Btu/hr) that the unit is capable of combusting on a steady state basis as of the initial installation of the unit as specified by the manufacturer of the unit.

*Monitoring system* means any monitoring system that meets the requirements of this subpart, including a continuous emission monitoring system, an alternative monitoring system, or an excepted monitoring system under part 75 of this chapter.

*Nameplate capacity* means, starting from the initial installation of a generator, the maximum electrical generating output (in MWe, rounded to the nearest tenth) that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings) as of such installation as specified by the manufacturer of the generator or, starting from the completion of any subsequent physical change in the generator resulting in an increase in the maximum electrical generating output that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings), such increased maximum amount (in MWe, rounded to the nearest tenth) as of such completion as specified by the person conducting the physical change.

*Natural gas* means "natural gas" as defined in § 72.2 of this chapter.

*Newly affected TR $NO_X$ Ozone Season unit* means a unit that was not a TR $NO_X$ Ozone Season unit when it began operating but that thereafter becomes a TR $NO_X$ Ozone Season unit.

*Operate* or *operation* means, with regard to a unit, to combust fuel.

*Operator* means, for a TR $NO_X$ Ozone Season source or a TR $NO_X$ Ozone Season unit at a source respectively, any person who operates, controls, or supervises a TR $NO_X$ Ozone Season unit at the source or the TR $NO_X$ Ozone Season unit and shall include, but not be limited to, any holding company, utility system, or plant manager of such source or unit.

*Owner* means, for a TR $NO_X$ Ozone Season source or a TR $NO_X$ Ozone Season unit at a source respectively, any of the following persons:

(1) Any holder of any portion of the legal or equitable title in a TR $NO_X$ Ozone Season unit at the source or the TR $NO_X$ Ozone Season unit;

(2) Any holder of a leasehold interest in a TR $NO_X$ Ozone Season unit at the source or the TR $NO_X$ Ozone Season unit, provided that, unless expressly provided for in a leasehold agreement, "owner" shall not include a passive lessor, or a person who has an equitable interest through such lessor, whose rental payments are not based (either directly or indirectly) on the revenues or income from such TR $NO_X$ Ozone Season unit; and

(3) Any purchaser of power from a TR $NO_X$ Ozone Season unit at the source or the TR $NO_X$ Ozone Season unit under a life-of-the-unit, firm power contractual arrangement.

*Permanently retired* means, with regard to a unit, a unit that is

unavailable for service and that the unit's owners and operators do not expect to return to service in the future.

*Permitting authority* means "permitting authority" as defined in §§ 70.2 and 71.2 of this chapter.

*Potential electrical output capacity* means, for a unit, 33 percent of the unit's maximum design heat input, divided by 3,413 Btu/kWh, divided by 1,000 kWh/MWh, and multiplied by 8,760 hr/yr.

*Receive* or *receipt of* means, when referring to the Administrator, to come into possession of a document, information, or correspondence (whether sent in hard copy or by authorized electronic transmission), as indicated in an official log, or by a notation made on the document, information, or correspondence, by the Administrator in the regular course of business.

*Recordation, record,* or *recorded* means, with regard to TR NO$_X$ Ozone Season allowances, the moving of TR NO$_X$ Ozone Season allowances by the Administrator into, out of, or between Allowance Management System accounts, for purposes of allocation, auction, transfer, or deduction.

*Reference method* means any direct test method of sampling and analyzing for an air pollutant as specified in § 75.22 of this chapter.

*Replacement, replace,* or *replaced* means, with regard to a unit, the demolishing of a unit, or the permanent retirement and permanent disabling of a unit, and the construction of another unit (the replacement unit) to be used instead of the demolished or retired unit (the replaced unit).

*Sequential use of energy* means:

(1) The use of reject heat from electricity production in a useful thermal energy application or process; or

(2) The use of reject heat from useful thermal energy application or process in electricity production.

*Serial number* means, for a TR NO$_X$ Ozone Season allowance, the unique identification number assigned to each TR NO$_X$ Ozone Season allowance by the Administrator.

*Solid waste incineration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a "solid waste incineration unit" as defined in section 129(g)(1) of the Clean Air Act.

*Source* means all buildings, structures, or installations located in one or more contiguous or adjacent properties under common control of the same person or persons. This definition does not change or otherwise affect the definition of "major source", "stationary source", or "source" as set forth and implemented in a title V operating permit program or any other program under the Clean Air Act.

*State* means one of the States that is subject to the TR NO$_X$ Ozone Season Trading Program pursuant to § 52.38(b) of this chapter.

*Submit* or *serve* means to send or transmit a document, information, or correspondence to the person specified in accordance with the applicable regulation:

(1) In person;

(2) By United States Postal Service; or

(3) By other means of dispatch or transmission and delivery;

(4) Provided that compliance with any "submission" or "service" deadline shall be determined by the date of dispatch, transmission, or mailing and not the date of receipt.

*Topping-cycle unit* means a unit in which the energy input to the unit is first used to produce useful power, including electricity, where at least some of the reject heat from the electricity production is then used to provide useful thermal energy.

*Total energy input* means, for a unit, total energy of all forms supplied to the unit, excluding energy produced by the unit. Each form of energy supplied shall be measured by the lower heating value of that form of energy calculated as follows:

$$LHV = HHV - 10.55 \ (W + 9H)$$

Where:

LHV = lower heating value of the form of energy in Btu/lb,

HHV = higher heating value of the form of energy in Btu/lb,

W = weight % of moisture in the form of energy, and

H = weight % of hydrogen in the form of energy.

*Total energy output* means, for a unit, the sum of useful power and useful thermal energy produced by the unit.

*TR NO$_X$ Annual Trading Program* means a multi-state NO$_X$ air pollution control and emission reduction program established in accordance with subpart AAAAA of this part and § 52.38(a) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(a)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(a)(5) of this chapter), as a means of mitigating interstate transport of fine particulates and NO$_X$.

*TR NO$_X$ Ozone Season allowance* means a limited authorization issued and allocated or auctioned by the Administrator under this subpart, or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.38(b)(3), (4), or (5) of this chapter, to emit one ton of NO$_X$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the TR NO$_X$ Ozone Season Trading Program.

*TR NO$_X$ Ozone Season allowance deduction or deduct TR NO$_X$ Ozone Season allowances* means the permanent withdrawal of TR NO$_X$ Ozone Season allowances by the Administrator from a compliance account (*e.g.*, in order to account for compliance with the TR NO$_X$ Ozone Season emissions limitation) or from an assurance account (*e.g.*, in order to account for compliance with the assurance provisions under §§ 97.506 and 97.525).

*TR NO$_X$ Ozone Season allowances held or hold TR NO$_X$ Ozone Season allowances* means the TR NO$_X$ Ozone Season allowances treated as included in an Allowance Management System account as of a specified point in time because at that time they:

(1) Have been recorded by the Administrator in the account or transferred into the account by a correctly submitted, but not yet recorded, TR NO$_X$ Ozone Season allowance transfer in accordance with this subpart; and

(2) Have not been transferred out of the account by a correctly submitted, but not yet recorded, TR NO$_X$ Ozone Season allowance transfer in accordance with this subpart.

*TR NO$_X$ Ozone Season emissions limitation* means, for a TR NO$_X$ Ozone Season source, the tonnage of NO$_X$ emissions authorized in a control period in a given year by the TR NO$_X$ Ozone Season allowances available for deduction for the source under § 97.524(a) for such control period.

*TR NO$_X$ Ozone Season source* means a source that includes one or more TR NO$_X$ Ozone Season units.

*TR NO$_X$ Ozone Season Trading Program* means a multi-state NO$_X$ air pollution control and emission reduction program established in accordance with this subpart and § 52.38(b) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(5) of this chapter), as a means of mitigating interstate transport of ozone and NO$_X$.

*TR NO$_X$ Ozone Season unit* means a unit that is subject to the TR NO$_X$ Ozone Season Trading Program.

*TR SO₂ Group 1 Trading Program* means a multi-state SO₂ air pollution control and emission reduction program established in accordance with subpart CCCCC of this part and 52.39(a), (b), (d) through (f), (j), and (k) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(d) or (e) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(f) of this chapter), as a means of mitigating interstate transport of fine particulates and SO₂.

*TR SO₂ Group 2 Trading Program* means a multi-state SO₂ air pollution control and emission reduction program established in accordance with subpart DDDDD of this part and 52.39(a), (c), and (g) through (k) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(g) or (h) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(i) of this chapter), as a means of mitigating interstate transport of fine particulates and SO₂.

*Unit* means a stationary, fossil-fuel-fired boiler, stationary, fossil-fuel-fired combustion turbine, or other stationary, fossil-fuel-fired combustion device. A unit that undergoes a physical change or is moved to a different location or source shall continue to be treated as the same unit. A unit (the replaced unit) that is replaced by another unit (the replacement unit) at the same or a different source shall continue to be treated as the same unit, and the replacement unit shall be treated as a separate unit.

*Unit operating day* means, with regard to a unit, a calendar day in which the unit combusts any fuel.

*Unit operating hour* or *hour of unit operation* means, with regard to a unit, an hour in which the unit combusts any fuel.

*Useful power* means, with regard to a unit, electricity or mechanical energy that the unit makes available for use, excluding any such energy used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Useful thermal energy* means thermal energy that is:

(1) Made available to an industrial or commercial process (not a power production process), excluding any heat contained in condensate return or makeup water;

(2) Used in a heating application (*e.g.,* space heating or domestic hot water heating); or

(3) Used in a space cooling application (*i.e.,* in an absorption chiller).

*Utility power distribution system* means the portion of an electricity grid owned or operated by a utility and dedicated to delivering electricity to customers.

### § 97.503  Measurements, abbreviations, and acronyms.

Measurements, abbreviations, and acronyms used in this subpart are defined as follows:

Btu—British thermal unit
CO₂—carbon dioxide
H₂O—water
hr—hour
kW—kilowatt electrical
kWh—kilowatt hour
lb—pound
mmBtu—million Btu
MWe—megawatt electrical
MWh—megawatt hour
NO$_X$—nitrogen oxides
O₂—oxygen
ppm—parts per million
scfh—standard cubic feet per hour
SO₂—sulfur dioxide
yr—year

### § 97.504  Applicability.

(a) Except as provided in paragraph (b) of this section:

(1) The following units in a State (and Indian country within the borders of such State) shall be TR NO$_X$ Ozone Season units, and any source that includes one or more such units shall be a TR NO$_X$ Ozone Season source, subject to the requirements of this subpart: any stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine serving at any time, on or after January 1, 2005, a generator with nameplate capacity of more than 25 MWe producing electricity for sale.

(2) If a stationary boiler or stationary combustion turbine that, under paragraph (a)(1) of this section, is not a TR NO$_X$ Ozone Season unit begins to combust fossil fuel or to serve a generator with nameplate capacity of more than 25 MWe producing electricity for sale, the unit shall become a TR NO$_X$ Ozone Season unit as provided in paragraph (a)(1) of this section on the first date on which it both combusts fossil fuel and serves such generator.

(b) Any unit in a State (and Indian country within the borders of such State) that otherwise is a TR NO$_X$ Ozone Season unit under paragraph (a) of this section and that meets the requirements set forth in paragraph (b)(1)(i) or (2)(i) of this section shall not be a TR NO$_X$ Ozone Season unit:

(1)(i) Any unit:

(A) Qualifying as a cogeneration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a cogeneration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) Not supplying in 2005 or any calendar year thereafter more than one-third of the unit's potential electric output capacity or 219,000 MWh, whichever is greater, to any utility power distribution system for sale.

(ii) If, after qualifying under paragraph (b)(1)(i) of this section as not being a TR NO$_X$ Ozone Season unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR NO$_X$ Ozone Season unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a cogeneration unit or January 1 after the first calendar year during which the unit no longer meets the requirements of paragraph (b)(1)(i)(B) of this section. The unit shall thereafter continue to be a TR NO$_X$ Ozone Season unit.

(2)(i) Any unit:

(A) Qualifying as a solid waste incineration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a solid waste incineration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) With an average annual fuel consumption of fossil fuel for the first 3 consecutive calendar years of operation starting no earlier than 2005 of less than 20 percent (on a Btu basis) and an average annual fuel consumption of fossil fuel for any 3 consecutive calendar years thereafter of less than 20 percent (on a Btu basis).

(ii) If, after qualifying under paragraph (b)(2)(i) of this section as not being a TR NO$_X$ Ozone Season unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR NO$_X$ Ozone Season unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a solid waste incineration unit or January 1 after the first 3 consecutive calendar years after 2005 for which the unit has an average annual fuel consumption of fossil fuel of 20 percent or more. The unit shall thereafter continue to be a TR NOX Ozone Season unit.

(c) A certifying official of an owner or operator of any unit or other equipment

may submit a petition (including any supporting documents) to the Administrator at any time for a determination concerning the applicability, under paragraphs (a) and (b) of this section or a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, of the TR NO$_X$ Ozone Season Trading Program to the unit or other equipment.

(1) Petition content. The petition shall be in writing and include the identification of the unit or other equipment and the relevant facts about the unit or other equipment. The petition and any other documents provided to the Administrator in connection with the petition shall include the following certification statement, signed by the certifying official: ''I am authorized to make this submission on behalf of the owners and operators of the unit or other equipment for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(2) Response. The Administrator will issue a written response to the petition and may request supplemental information determined by the Administrator to be relevant to such petition. The Administrator's determination concerning the applicability, under paragraphs (a) and (b) of this section, of the TR NO$_X$ Ozone Season Trading Program to the unit or other equipment shall be binding on any State or permitting authority unless the Administrator determines that the petition or other documents or information provided in connection with the petition contained significant, relevant errors or omissions.

### § 97.505  Retired unit exemption.

(a)(1) Any TR NO$_X$ Ozone Season unit that is permanently retired shall be exempt from § 97.506(b) and (c)(1), § 97.524, and §§ 97.530 through 97.535.

(2) The exemption under paragraph (a)(1) of this section shall become effective the day on which the TR NO$_X$ Ozone Season unit is permanently retired. Within 30 days of the unit's permanent retirement, the designated

representative shall submit a statement to the Administrator. The statement shall state, in a format prescribed by the Administrator, that the unit was permanently retired on a specified date and will comply with the requirements of paragraph (b) of this section.

(b) Special provisions. (1) A unit exempt under paragraph (a) of this section shall not emit any NO$_X$, starting on the date that the exemption takes effect.

(2) For a period of 5 years from the date the records are created, the owners and operators of a unit exempt under paragraph (a) of this section shall retain, at the source that includes the unit, records demonstrating that the unit is permanently retired. The 5-year period for keeping records may be extended for cause, at any time before the end of the period, in writing by the Administrator. The owners and operators bear the burden of proof that the unit is permanently retired.

(3) The owners and operators and, to the extent applicable, the designated representative of a unit exempt under paragraph (a) of this section shall comply with the requirements of the TR NO$_X$ Ozone Season Trading Program concerning all periods for which the exemption is not in effect, even if such requirements arise, or must be complied with, after the exemption takes effect.

(4) A unit exempt under paragraph (a) of this section shall lose its exemption on the first date on which the unit resumes operation. Such unit shall be treated, for purposes of applying allocation, monitoring, reporting, and recordkeeping requirements under this subpart, as a unit that commences commercial operation on the first date on which the unit resumes operation.

### § 97.506  Standard requirements.

(a) Designated representative requirements. The owners and operators shall comply with the requirement to have a designated representative, and may have an alternate designated representative, in accordance with §§ 97.513 through 97.518.

(b) Emissions monitoring, reporting, and recordkeeping requirements. (1) The owners and operators, and the designated representative, of each TR NO$_X$ Ozone Season source and each TR NO$_X$ Ozone Season unit at the source shall comply with the monitoring, reporting, and recordkeeping requirements of §§ 97.530 through 97.535.

(2) The emissions data determined in accordance with §§ 97.530 through 97.535 shall be used to calculate allocations of TR NO$_X$ Ozone Season allowances under §§ 97.511(a)(2) and (b)

and 97.512 and to determine compliance with the TR NO$_X$ Ozone Season emissions limitation and assurance provisions under paragraph (c) of this section, provided that, for each monitoring location from which mass emissions are reported, the mass emissions amount used in calculating such allocations and determining such compliance shall be the mass emissions amount for the monitoring location determined in accordance with §§ 97.530 through 97.535 and rounded to the nearest ton, with any fraction of a ton less than 0.50 being deemed to be zero.

(c) NO$_X$ emissions requirements. (1) TR NO$_X$ Ozone Season emissions limitation. (i) As of the allowance transfer deadline for a control period in a given year, the owners and operators of each TR NO$_X$ Ozone Season source and each TR NO$_X$ Ozone Season unit at the source shall hold, in the source's compliance account, TR NO$_X$ Ozone Season allowances available for deduction for such control period under § 97.524(a) in an amount not less than the tons of total NO$_X$ emissions for such control period from all TR NO$_X$ Ozone Season units at the source.

(ii) If total NO$_X$ emissions during a control period in a given year from the TR NO$_X$ Ozone Season units at a TR NO$_X$ Ozone Season source are in excess of the TR NO$_X$ Ozone Season emissions limitation set forth in paragraph (c)(1)(i) of this section, then:

(A) The owners and operators of the source and each TR NO$_X$ Ozone Season unit at the source shall hold the TR NO$_X$ Ozone Season allowances required for deduction under § 97.524(d); and

(B) The owners and operators of the source and each TR NO$_X$ Ozone Season unit at the source shall pay any fine, penalty, or assessment or comply with any other remedy imposed, for the same violations, under the Clean Air Act, and each ton of such excess emissions and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(2) TR NO$_X$ Ozone Season assurance provisions. (i) If total NO$_X$ emissions during a control period in a given year from all TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in a State (and Indian country within the borders of such State) exceed the State assurance level, then the owners and operators of such sources and units in each group of one or more sources and units having a common designated representative for such control period, where the common designated representative's share of such NO$_X$ emissions during such control period exceeds the common designated

representative's assurance level for the State and such control period, shall hold (in the assurance account established for the owners and operators of such group) TR NO$_X$ Ozone Season allowances available for deduction for such control period under § 97.525(a) in an amount equal to two times the product (rounded to the nearest whole number), as determined by the Administrator in accordance with § 97.525(b), of multiplying—

(A) The quotient of the amount by which the common designated representative's share of such NO$_X$ emissions exceeds the common designated representative's assurance level divided by the sum of the amounts, determined for all common designated representatives for such sources and units in the State (and Indian country within the borders of such State) for such control period, by which each common designated representative's share of such NO$_X$ emissions exceeds the respective common designated representative's assurance level; and

(B) The amount by which total NO$_X$ emissions from all TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in the State (and Indian country within the borders of such State) for such control period exceed the State assurance level.

(ii) The owners and operators shall hold the TR NO$_X$ Ozone Season allowances required under paragraph (c)(2)(i) of this section, as of midnight of November 1 (if it is a business day), or midnight of the first business day thereafter (if November 1 is not a business day), immediately after such control period.

(iii) Total NO$_X$ emissions from all TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in a State (and Indian country within the borders of such State) during a control period in a given year exceed the State assurance level if such total NO$_X$ emissions exceed the sum, for such control period, of the State NO$_X$ Ozone Season trading budget under § 97.510(a) and the State's variability limit under § 97.510(b).

(iv) It shall not be a violation of this subpart or of the Clean Air Act if total NO$_X$ emissions from all TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in a State (and Indian country within the borders of such State) during a control period exceed the State assurance level or if a common designated representative's share of total NO$_X$ emissions from the TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in a State (and Indian country within the borders of such State) during a control period exceeds the common

designated representative's assurance level.

(v) To the extent the owners and operators fail to hold TR NO$_X$ Ozone Season allowances for a control period in a given year in accordance with paragraphs (c)(2)(i) through (iii) of this section,

(A) The owners and operators shall pay any fine, penalty, or assessment or comply with any other remedy imposed under the Clean Air Act; and

(B) Each TR NO$_X$ Ozone Season allowance that the owners and operators fail to hold for such control period in accordance with paragraphs (c)(2)(i) through (iii) of this section and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(3) Compliance periods. A TR NO$_X$ Ozone Season unit shall be subject to the requirements under paragraphs (c)(1) and (c)(2) of this section for the control period starting on the later of May 1, 2012 or the deadline for meeting the unit's monitor certification requirements under § 97.530(b) and for each control period thereafter.

(4) Vintage of allowances held for compliance. (i) A TR NO$_X$ Ozone Season allowance held for compliance with the requirements under paragraph (c)(1)(i) of this section for a control period in a given year must be a TR NO$_X$ Ozone Season allowance that was allocated for such control period or a control period in a prior year.

(ii) A TR NO$_X$ Ozone Season allowance held for compliance with the requirements under paragraphs (c)(1)(ii)(A) and (2)(i) through (iii) of this section for a control period in a given year must be a TR NO$_X$ Ozone Season allowance that was allocated for a control period in a prior year or the control period in the given year or in the immediately following year.

(5) Allowance Management System requirements. Each TR NO$_X$ Ozone Season allowance shall be held in, deducted from, or transferred into, out of, or between Allowance Management System accounts in accordance with this subpart.

(6) Limited authorization. A TR NO$_X$ Ozone Season allowance is a limited authorization to emit one ton of NO$_X$ during the control period in one year. Such authorization is limited in its use and duration as follows:

(i) Such authorization shall only be used in accordance with the TR NO$_X$ Ozone Season Trading Program; and

(ii) Notwithstanding any other provision of this subpart, the Administrator has the authority to terminate or limit the use and duration of such authorization to the extent the

Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act.

(7) Property right. A TR NO$_X$ Ozone Season allowance does not constitute a property right.

(d) *Title V permit requirements.* (1) No title V permit revision shall be required for any allocation, holding, deduction, or transfer of TR NO$_X$ Ozone Season allowances in accordance with this subpart.

(2) A description of whether a unit is required to monitor and report NO$_X$ emissions using a continuous emission monitoring system (under subpart H of part 75 of this chapter), an excepted monitoring system (under appendices D and E to part 75 of this chapter), a low mass emissions excepted monitoring methodology (under § 75.19 of this chapter), or an alternative monitoring system (under subpart E of part 75 of this chapter) in accordance with §§ 97.530 through 97.535 may be added to, or changed in, a title V permit using minor permit modification procedures in accordance with §§ 70.7(e)(2) and 71.7(e)(1) of this chapter, provided that the requirements applicable to the described monitoring and reporting (as added or changed, respectively) are already incorporated in such permit. This paragraph explicitly provides that the addition of, or change to, a unit's description as described in the prior sentence is eligible for minor permit modification procedures in accordance with §§ 70.7(e)(2)(i)(B) and 71.7(e)(1)(i)(B) of this chapter.

(e) *Additional recordkeeping and reporting requirements.* (1) Unless otherwise provided, the owners and operators of each TR NO$_X$ Ozone Season source and each TR NO$_X$ Ozone Season unit at the source shall keep on site at the source each of the following documents (in hardcopy or electronic format) for a period of 5 years from the date the document is created. This period may be extended for cause, at any time before the end of 5 years, in writing by the Administrator.

(i) The certificate of representation under § 97.516 for the designated representative for the source and each TR NO$_X$ Ozone Season unit at the source and all documents that demonstrate the truth of the statements in the certificate of representation; provided that the certificate and documents shall be retained on site at the source beyond such 5-year period until such certificate of representation and documents are superseded because of the submission of a new certificate of representation under § 97.516 changing the designated representative.

(ii) All emissions monitoring information, in accordance with this subpart.

(iii) Copies of all reports, compliance certifications, and other submissions and all records made or required under, or to demonstrate compliance with the requirements of, the TR NO$_X$ Ozone Season Trading Program.

(2) The designated representative of a TR NO$_X$ Ozone Season source and each TR NO$_X$ Ozone Season unit at the source shall make all submissions required under the TR NO$_X$ Ozone Season Trading Program, except as provided in § 97.518. This requirement does not change, create an exemption from, or otherwise affect the responsible official submission requirements under a title V operating permit program in parts 70 and 71 of this chapter.

(f) *Liability.* (1) Any provision of the TR NO$_X$ Ozone Season Trading Program that applies to a TR NO$_X$ Ozone Season source or the designated representative of a TR NO$_X$ Ozone Season source shall also apply to the owners and operators of such source and of the TR NO$_X$ Ozone Season units at the source.

(2) Any provision of the TR NO$_X$ Ozone Season Trading Program that applies to a TR NO$_X$ Ozone Season unit or the designated representative of a TR NO$_X$ Ozone Season unit shall also apply to the owners and operators of such unit.

(g) *Effect on other authorities.* No provision of the TR NO$_X$ Ozone Season Trading Program or exemption under § 97.505 shall be construed as exempting or excluding the owners and operators, and the designated representative, of a TR NO$_X$ Ozone Season source or TR NO$_X$ Ozone Season unit from compliance with any other provision of the applicable, approved State implementation plan, a federally enforceable permit, or the Clean Air Act.

### § 97.507 Computation of time.

(a) Unless otherwise stated, any time period scheduled, under the TR NO$_X$ Ozone Season Trading Program, to begin on the occurrence of an act or event shall begin on the day the act or event occurs.

(b) Unless otherwise stated, any time period scheduled, under the TR NO$_X$ Ozone Season Trading Program, to begin

before the occurrence of an act or event shall be computed so that the period ends the day before the act or event occurs.

(c) Unless otherwise stated, if the final day of any time period, under the TR NO$_X$ Ozone Season Trading Program, is not a business day, the time period shall be extended to the next business day.

### § 97.508 Administrative appeal procedures.

The administrative appeal procedures for decisions of the Administrator under the TR NO$_X$ Ozone Season Trading Program are set forth in part 78 of this chapter.

### § 97.509 [Reserved]

### § 97.510 State NO$_X$ Ozone Season trading budgets, new unit set-asides, Indian country new unit set-aside, and variability limits.

(a) The State NO$_X$ Ozone Season trading budgets, new unit set-asides, and Indian country new unit set-asides for allocations of TR NO$_X$ Ozone Season allowances for the control periods in 2012 and thereafter are as follows:

| State | NO$_X$ Ozone Season trading budget (tons) * for 2012 and 2013 | New unit set-aside (tons) for 2012 and 2013 | Indian country new unit set-aside (tons) for 2012 and 2013 |
|---|---|---|---|
| Alabama | 31,746 | 635 | |
| Arkansas | 15,037 | 301 | |
| Florida | 27,825 | 529 | 28 |
| Georgia | 27,944 | 559 | |
| Illinois | 21,208 | 1,697 | |
| Indiana | 46,876 | 1,406 | |
| Kentucky | 36,167 | 1,447 | |
| Louisiana | 13,432 | 390 | 13 |
| Maryland | 7,179 | 144 | |
| Mississippi | 10,160 | 193 | 10 |
| New Jersey | 3,382 | 68 | |
| New York | 8,331 | 242 | 8 |
| North Carolina | 22,168 | 1,308 | 22 |
| Ohio | 40,063 | 801 | |
| Pennsylvania | 52,201 | 1,044 | |
| South Carolina | 13,909 | 264 | 14 |
| Tennessee | 14,908 | 298 | |
| Texas | 63,043 | 1,828 | 63 |
| Virginia | 14,452 | 723 | |
| West Virginia | 25,283 | 1,264 | |

| State | NO$_X$ Ozone Season trading budget (tons) * for 2014 and thereafter | New unit set-aside (tons) for 2014 and thereafter | Indian country new unit set-aside (tons) for 2014 and thereafter |
|---|---|---|---|
| Alabama | 31,499 | 630 | |
| Arkansas | 15,037 | 301 | |
| Florida | 27,825 | 529 | 28 |
| Georgia | 18,279 | 366 | |
| Illinois | 21,208 | 1,697 | |
| Indiana | 46,175 | 1,385 | |
| Kentucky | 32,674 | 1,307 | |
| Louisiana | 13,432 | 390 | 13 |
| Maryland | 7,179 | 144 | |
| Mississippi | 10,160 | 193 | 10 |
| New Jersey | 3,382 | 68 | |

| State | NOₓ Ozone Season trading budget (tons) * for 2014 and thereafter | New unit set-aside (tons) for 2014 and thereafter | Indian country new unit set-aside (tons) for 2014 and thereafter |
|---|---|---|---|
| New York | 8,331 | 242 | 8 |
| North Carolina | 18,455 | 1,089 | 18 |
| Ohio | 37,792 | 756 | |
| Pennsylvania | 51,912 | 1,038 | |
| South Carolina | 13,909 | 264 | 14 |
| Tennessee | 8,016 | 160 | |
| Texas | 63,043 | 1,828 | 63 |
| Virginia | 14,452 | 723 | |
| West Virginia | 23,291 | 1,165 | |

*Each trading budget includes the new unit set-aside and, where applicable, the Indian country new unit set-aside and does not include the variability limit.

(b) The States' variability limits for the State NOₓ Ozone Season trading budgets for the control periods in 2012 and thereafter are as follows:

| State | Variability limits for 2012 and 2013 | Variability limits for 2014 and thereafter |
|---|---|---|
| Alabama | 6,667 | 6,615 |
| Arkansas | 3,158 | 3,158 |
| Florida | 5,843 | 5,843 |
| Georgia | 5,868 | 3,839 |
| Illinois | 4,454 | 4,454 |
| Indiana | 9,844 | 9,697 |
| Kentucky | 7,595 | 6,862 |
| Louisiana | 2,821 | 2,821 |
| Maryland | 1,508 | 1,508 |
| Mississippi | 2,134 | 2,134 |
| New Jersey | 710 | 710 |
| New York | 1,750 | 1,750 |
| North Carolina | 4,655 | 3,876 |
| Ohio | 8,413 | 7,936 |
| Pennsylvania | 10,962 | 10,902 |
| South Carolina | 2,921 | 2,921 |
| Tennessee | 3,131 | 1,683 |
| Texas | 13,239 | 13,239 |
| Virginia | 3,035 | 3,035 |
| West Virginia | 5,309 | 4,891 |

**§ 97.511  Timing requirements for TR NOₓ Ozone Season allowance allocations.**

(a) *Existing units.* (1) TR NOₓ Ozone Season allowances are allocated, for the control periods in 2012 and each year thereafter, as provided in a notice of data availability issued by the Administrator. Providing an allocation to a unit in such notice does not constitute a determination that the unit is a TR NOₓ Ozone Season unit, and not providing an allocation to a unit in such notice does not constitute a determination that the unit is not a TR NOₓ Ozone Season unit.

(2) Notwithstanding paragraph (a)(1) of this section, if a unit provided an allocation in the notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2011, during the control period in two consecutive years, such unit will not be allocated the TR NOₓ Ozone Season allowances provided in such notice for the unit for the control periods in the fifth year after the first

such year and in each year after that fifth year. All TR NOₓ Ozone Season allowances that would otherwise have been allocated to such unit will be allocated to the new unit set-aside for the State where such unit is located and for the respective years involved. If such unit resumes operation, the Administrator will allocate TR NOₓ Ozone Season allowances to the unit in accordance with paragraph (b) of this section.

(b) *New units.*—(1) New unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR NOₓ Ozone Season allowance allocation to each TR NOₓ Ozone Season unit in a State, in accordance with § 97.512(a)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR NOₓ Ozone Season units) are in accordance with § 97.512(a)(2) through (7) and (12) and §§ 97.506(b)(2) and 97.530 through 97.535.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(1)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will promulgate a notice

of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.512(a)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(ii)(A) of this section.

(iii) If the new unit set-aside for such control period contains any TR NO$_X$ Ozone Season allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(1)(ii) of this section, the Administrator will promulgate, by September 15 immediately after such notice, a notice of data availability that identifies any TR NO$_X$ Ozone Season units that commenced commercial operation during the period starting May 1 of the year before the year of such control period and ending August 31 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR NO$_X$ Ozone Season units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(iii) of this section and shall be limited to addressing whether the identification of TR NO$_X$ Ozone Season units in such notice is in accordance with paragraph (b)(1)(iii) of this section.

(B) The Administrator will adjust the identification of TR NO$_X$ Ozone Season units in the each notice of data availability required in paragraph (b)(1)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(1)(iii) of this section and will calculate the TR NO$_X$ Ozone Season allowance allocation to each TR NO$_X$ Ozone Season unit in accordance with § 97.512(a)(9), (10), and (12) and §§ 97.506(b)(2) and 97.530 through 97.535. By November 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR NO$_X$ Ozone Season units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR NO$_X$ Ozone Season allowances are added to the new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(1)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR NO$_X$ Ozone Season allowances in accordance with § 97.512(a)(10).

(2) Indian country new unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR NO$_X$ Ozone Season allowance allocation to each TR NO$_X$ Ozone Season unit in Indian country within the borders of a State, in accordance with § 97.512(b)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR NO$_X$ Ozone Season units) are in accordance with § 97.512(b)(2) through (7) and (12) and §§ 97.506(b)(2) and 97.530 through 97.535.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.512(b)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(ii)(A) of this section.

(iii) If the Indian country new unit set-aside for such control period contains any TR NO$_X$ Ozone Season allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(2)(ii) of this section, the Administrator will promulgate, by September 15 immediately after such notice, a notice of data availability that identifies any TR NO$_X$ Ozone Season units that commenced commercial operation during the period starting May 1 of the year before the year of such control period and ending August 31 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR NO$_X$ Ozone Season units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(iii) of this section and shall be limited to addressing whether the identification of TR NO$_X$ Ozone Season units in such notice is in accordance with paragraph (b)(2)(iii) of this section.

(B) The Administrator will adjust the identification of TR NO$_X$ Ozone Season units in the each notice of data availability required in paragraph (b)(2)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(2)(iii) of this section and will calculate the TR NO$_X$ Ozone Season allowance allocation to each TR NO$_X$ Ozone Season unit in accordance with § 97.512(b)(9), (10), and (12) and §§ 97.506(b)(2) and 97.530 through 97.535. By November 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR NO$_X$ Ozone Season units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iv)(A) of this section, and the results of such calculations. (v) To the extent any TR NO$_X$ Ozone Season allowances are added to the Indian country new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(2)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR NO$_X$ Ozone Season allowances in accordance with § 97.512(b)(10).

(c) *Units incorrectly allocated TR NO$_X$ Ozone Season allowances.* (1) For each control period in 2012 and thereafter, if the Administrator determines that TR NO$_X$ Ozone Season allowances were allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.38(b)(3), (4), or (5) of this chapter, where such control period and the recipient are covered by the provisions of paragraph (c)(1)(i) of this section or were allocated under § 97.512(a)(2) through (7), (9), and (12) and (b)(2) through (7), (9), and (12), or under a provision of a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, where such control period and the recipient are covered by the

provisions of paragraph (c)(1)(ii) of this section, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section:

(i)(A) The recipient is not actually a TR $NO_X$ Ozone Season unit under § 97.504 as of May 1, 2012 and is allocated TR $NO_X$ Ozone Season allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.38(b)(3), (4), or (5) of this chapter, the recipient is not actually a TR $NO_X$ Ozone Season unit as of May 1, 2012 and is allocated TR $NO_X$ Ozone Season allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR $NO_X$ Ozone Season units as of May 1, 2012; or

(B) The recipient is not located as of May 1 of the control period in the State from whose $NO_X$ Ozone Season trading budget the TR $NO_X$ Ozone Season allowances allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.38(b)(3), (4), or (5) of this chapter, were allocated for such control period.

(ii) The recipient is not actually a TR $NO_X$ Ozone Season unit under § 97.504 as of May 1 of such control period and is allocated TR $NO_X$ Ozone Season allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.38(b)(3), (4), or (5) of this chapter, the recipient is not actually a TR $NO_X$ Ozone Season unit as of January 1 of such control period and is allocated TR $NO_X$ Ozone Season allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR $NO_X$ Ozone Season units as of May 1 of such control period.

(2) Except as provided in paragraph (c)(3) or (4) of this section, the Administrator will not record such TR $NO_X$ Ozone Season allowances under § 97.521.

(3) If the Administrator already recorded such TR $NO_X$ Ozone Season allowances under § 97.521 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.524(b) for such control period, then the Administrator will deduct from the account in which such TR $NO_X$ Ozone Season allowances were recorded an amount of TR $NO_X$ Ozone Season allowances allocated for the same or a prior control period equal to the amount of such already recorded TR $NO_X$ Ozone

Season allowances. The authorized account representative shall ensure that there are sufficient TR $NO_X$ Ozone Season allowances in such account for completion of the deduction.

(4) If the Administrator already recorded such TR $NO_X$ Ozone Season allowances under § 97.521 and if the Administrator makes the determination under paragraph (c)(1) of this section after making deductions for the source that includes such recipient under § 97.524(b) for such control period, then the Administrator will not make any deduction to take account of such already recorded TR $NO_X$ Ozone Season allowances.

(5)(i) With regard to the TR $NO_X$ Ozone Season allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(i) of this section, the Administrator will:

(A) Transfer such TR $NO_X$ Ozone Season allowances to the new unit set-aside for such control period for the State from whose $NO_X$ Ozone Season trading budget the TR $NO_X$ Ozone Season allowances were allocated; or

(B) If the State has a SIP revision approved under § 52.38(b)(4) or (5) covering such control period, include such TR $NO_X$ Annual allowances in the portion of the State $NO_X$ Ozone Season trading budget that may be allocated for such control period in accordance with such SIP revision.

(ii) With regard to the TR $NO_X$ Ozone Season allowances that were not allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will:

(A) Transfer such TR $NO_X$ Ozone Season allowances to the new unit set-aside for such control period; or

(B) If the State has a SIP revision approved under § 52.38(b)(4) or (5) covering such control period, include such TR $NO_X$ Ozone Season allowances in the portion of the State $NO_X$ Ozone Season trading budget that may be allocated for such control period in accordance with such SIP revision.

(iii) With regard to the TR $NO_X$ Ozone Season allowances that were allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will transfer such TR

$NO_X$ Ozone Season allowances to the Indian country new unit set-aside for such control period.

### § 97.512   TR $NO_X$ Ozone Season allowance allocations to new units.

(a) For each control period in 2012 and thereafter and for the TR $NO_X$ Ozone Season units in each State, the Administrator will allocate TR $NO_X$ Ozone Season allowances to the TR $NO_X$ Ozone Season units as follows:

(1) The TR $NO_X$ Ozone Season allowances will be allocated to the following TR $NO_X$ Ozone Season units, except as provided in paragraph (a)(10) of this section:

(i) TR $NO_X$ Ozone Season units that are not allocated an amount of TR $NO_X$ Ozone Season allowances in the notice of data availability issued under § 97.511(a)(1);

(ii) TR $NO_X$ Ozone Season units whose allocation of an amount of TR $NO_X$ Ozone Season allowances for such control period in the notice of data availability issued under § 97.511(a)(1) is covered by § 97.511(c)(2) or (3);

(iii) TR $NO_X$ Ozone Season units that are allocated an amount of TR $NO_X$ Ozone Season allowances for such control period in the notice of data availability issued under § 97.511(a)(1), which allocation is terminated for such control period pursuant to § 97.511(a)(2), and that operate during the control period immediately preceding such control period; or

(iv) For purposes of paragraph (a)(9) of this section, TR $NO_X$ Ozone Season units under § 97.511(c)(1)(ii) whose allocation of an amount of TR $NO_X$ Ozone Season allowances for such control period in the notice of data availability issued under § 97.511(b)(1)(ii)(B) is covered by § 97.511(c)(2) or (3).

(2) The Administrator will establish a separate new unit set-aside for the State for each such control period. Each such new unit set-aside will be allocated TR $NO_X$ Ozone Season allowances in an amount equal to the applicable amount of tons of $NO_X$ emissions as set forth in § 97.510(a) and will be allocated additional TR $NO_X$ Ozone Season allowances (if any) in accordance with §§ 97.511(a)(2) and (c)(5) and paragraph (b)(10) of this section.

(3) The Administrator will determine, for each TR $NO_X$ Ozone Season unit described in paragraph (a)(1) of this section, an allocation of TR $NO_X$ Ozone Season allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012;

(ii) The first control period after the control period in which the TR $NO_X$

Ozone Season unit commences commercial operation;

(iii) For a unit described in paragraph (a)(1)(ii) of this section, the first control period in which the TR NO$_X$ Ozone Season unit operates in the State after operating in another jurisdiction and for which the unit is not already allocated one or more TR NO$_X$ Ozone Season allowances; and

(iv) For a unit described in paragraph (a)(1)(iii) of this section, the first control period after the control period in which the unit resumes operation.

(4)(i) The allocation to each TR NO$_X$ Ozone Season unit described in paragraph (a)(1)(i) through (iii) of this section and for each control period described in paragraph (a)(3) of this section will be an amount equal to the unit's total tons of NO$_X$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (a)(4)(i) in accordance with paragraphs (a)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR NO$_X$ Ozone Season allowances determined for all such TR NO$_X$ Ozone Season units under paragraph (a)(4)(i) of this section in the State for such control period.

(6) If the amount of TR NO$_X$ Ozone Season allowances in the new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (a)(5) of this section, then the Administrator will allocate the amount of TR NO$_X$ Ozone Season allowances determined for each such TR NO$_X$ Ozone Season unit under paragraph (a)(4)(i) of this section.

(7) If the amount of TR NO$_X$ Ozone Season allowances in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(5) of this section, then the Administrator will allocate to each such TR NO$_X$ Ozone Season unit the amount of the TR NO$_X$ Ozone Season allowances determined under paragraph (a)(4)(i) of this section for the unit, multiplied by the amount of TR NO$_X$ Ozone Season allowances in the new unit set-aside for such control period, divided by the sum under paragraph (a)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.511(b)(1)(i) and (ii), of the amount of TR NO$_X$ Ozone Season allowances allocated under paragraphs (a)(2) through (7) and (12) of this section for such control period to each TR NO$_X$ Ozone Season unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (a)(5) through (8) of this section for such control period, any unallocated TR NO$_X$ Ozone Season allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate such TR NO$_X$ Ozone Season allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (a)(1) of this section that commenced commercial operation during the period starting May 1 of the year before the year of such control period and ending August 31 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR NO$_X$ Ozone Season allowances referenced in the notice of data availability required under § 97.511(b)(1)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (a)(9)(i) of this section;

(iii) If the amount of unallocated TR NO$_X$ Ozone Season allowances remaining in the new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (a)(9)(ii) of this section, then the Administrator will allocate the amount of TR NO$_X$ Ozone Season allowances determined for each such TR NO$_X$ Ozone Season unit under paragraph (a)(9)(i) of this section; and

(iv) If the amount of unallocated TR NO$_X$ Ozone Season allowances remaining in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(9)(ii) of this section, then the Administrator will allocate to each such TR NO$_X$ Ozone Season unit the amount of the TR NO$_X$ Ozone Season allowances determined under paragraph (a)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR NO$_X$ Ozone Season allowances remaining in the new unit set-aside for such control period, divided by the sum under paragraph (a)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (a)(9) and (12) of this section for such control period, any unallocated TR NO$_X$ Ozone Season allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each TR NO$_X$ Ozone Season unit that is in the State, is allocated an amount of TR NO$_X$ Ozone Season allowances in the notice of data availability issued under § 97.511(a)(1), and continues to be allocated TR NO$_X$

Ozone Season allowances for such control period in accordance with § 97.511(a)(2), an amount of TR NO$_X$ Ozone Season allowances equal to the following: the total amount of such remaining unallocated TR NO$_X$ Ozone Season allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.511(a) for such control period, divided by the remainder of the amount of tons in the applicable State NO$_X$ Ozone Season trading budget minus the sum of the amounts of tons in such new unit set-aside and the Indian country new unit set-aside for the State for such control period, and rounded to the nearest allowance.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.511(b)(1)(iii), (iv), and (v), of the amount of TR NO$_X$ Ozone Season allowances allocated under paragraphs (a)(9), (10), and (12) of this section for such control period to each TR NO$_X$ Ozone Season unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (a)(2) through (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraph (a)(7) of this section, paragraphs (a)(6) and (9)(iv) of this section, or paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such new unit set-aside exceeding the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR NO$_X$ Ozone Season units in descending order based on the amount of such units' allocations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, by one TR NO$_X$ Ozone Season allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (a)(10) and (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in a total

allocations of such new unit set-aside less than the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(10) of this section, as follows. The Administrator will list the TR NO$_X$ Ozone Season units in descending order based on the amount of such units' allocations under paragraph (a)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's allocation under paragraph (a)(10) of this section by one TR NO$_X$ Ozone Season allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(b) For each control period in 2012 and thereafter and for the TR NO$_X$ Ozone Season units located in Indian country within the borders of each State, the Administrator will allocate TR NO$_X$ Ozone Season allowances to the TR NO$_X$ Ozone Season units as follows:

(1) The TR NO$_X$ Ozone Season allowances will be allocated to the following TR NO$_X$ Ozone Season units, except as provided in paragraph (b)(10) of this section:

(i) TR NO$_X$ Ozone Season units that are not allocated an amount of TR NO$_X$ Ozone Season allowances in the notice of data availability issued under § 97.511(a)(1); or

(ii) For purposes of paragraph (b)(9) of this section, TR NO$_X$ Ozone Season units under § 97.511(c)(1)(ii) whose allocation of an amount of TR NO$_X$ Ozone Season allowances for such control period in the notice of data availability issued under § 97.511(b)(2)(ii)(B) is covered by § 97.511(c)(2) or (3).

(2) The Administrator will establish a separate Indian country new unit set-aside for the State for each such control period. Each such Indian country new unit set-aside will be allocated TR NO$_X$ Ozone Season allowances in an amount equal to the applicable amount of tons of NO$_X$ emissions as set forth in § 97.510(a) and will be allocated additional TR NO$_X$ Ozone Season allowances (if any) in accordance with § 97.511(c)(5).

(3) The Administrator will determine, for each TR NO$_X$ Ozone Season unit described in paragraph (b)(1) of this section, an allocation of TR NO$_X$ Ozone Season allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012; and

(ii) The first control period after the control period in which the TR NO$_X$ Ozone Season unit commences commercial operation.

(4)(i) The allocation to each TR NO$_X$ Ozone Season unit described in paragraph (b)(1)(i) of this section and for each control period described in paragraph (b)(3) of this section will be an amount equal to the unit's total tons of NO$_X$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (b)(4)(i) in accordance with paragraphs (b)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR NO$_X$ Ozone Season allowances determined for all such TR NO$_X$ Ozone Season units under paragraph (b)(4)(i) of this section in Indian country within the borders of the State for such control period.

(6) If the amount of TR NO$_X$ Ozone Season allowances in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (b)(5) of this section, then the Administrator will allocate the amount of TR NO$_X$ Ozone Season allowances determined for each such TR NO$_X$ Ozone Season unit under paragraph (b)(4)(i) of this section.

(7) If the amount of TR NO$_X$ Ozone Season allowances in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(5) of this section, then the Administrator will allocate to each such TR NO$_X$ Ozone Season unit the amount of the TR NO$_X$ Ozone Season allowances determined under paragraph (b)(4)(i) of this section for the unit, multiplied by the amount of TR NO$_X$ Ozone Season allowances in the Indian country new unit set-aside for such control period, divided by the sum under paragraph (b)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.511(b)(2)(i) and (ii), of the amount of TR NO$_X$ Ozone Season allowances allocated under paragraphs (b)(2) through (7) and (12) of this section for such control period to each TR NO$_X$ Ozone Season unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (b)(5) through (8) of this section for such control period, any unallocated TR NO$_X$ Ozone Season allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will allocate such TR NO$_X$ Ozone Season allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (b)(1) of this section that commenced commercial operation during the period starting May 1 of the year before the year of such control period and ending August 31 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR NO$_X$ Ozone Season allowances referenced in the notice of data availability required under § 97.511(b)(2)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (b)(9)(i) of this section;

(iii) If the amount of unallocated TR NO$_X$ Ozone Season allowances remaining in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (b)(9)(ii) of this section, then the Administrator will allocate the amount of TR NO$_X$ Ozone Season allowances determined for each such TR NO$_X$ Ozone Season unit under paragraph (b)(9)(i) of this section; and

(iv) If the amount of unallocated TR NO$_X$ Ozone Season allowances remaining in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(9)(ii) of this section, then the Administrator will allocate to each such TR NO$_X$ Ozone Season unit the amount of the TR NO$_X$ Ozone Season allowances determined under paragraph (b)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR NO$_X$ Ozone Season allowances remaining in the Indian country new unit set-aside for such control period, divided by the sum under paragraph (b)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (b)(9) and (12) of this section for such control period, any unallocated TR NO$_X$ Ozone Season allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will:

(i) Transfer such unallocated TR NO$_X$ Ozone Season allowances to the new unit set-aside for the State for such control period; or

(ii) If the State has a SIP revision approved under § 52.38(b)(4) or (5) covering such control period, include such unallocated TR NO$_X$ Ozone Season allowances in the portion of the State NO$_X$ Ozone Season trading budget that may be allocated for such control period in accordance with such SIP revision.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.511(b)(2)(iii), (iv), and (v), of the amount of TR NO$_X$ Ozone Season allowances allocated under paragraphs (b)(9), (10), and (12) of this section for such control period to each TR NO$_X$ Ozone Season unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (b)(2) through (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraph (b)(7) of this section, paragraphs (b)(6) and (9)(iv) of this section, or paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such Indian country new unit set-aside exceeding the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR NO$_X$ Ozone Season units in descending order based on the amount of such units' allocations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, by one TR NO$_X$ Ozone Season allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (b)(10) and (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such Indian country new unit set-aside less than the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(10) of this section, as follows. The Administrator will list the TR NO$_X$ Ozone Season units in descending order based on the amount of such units' allocations under paragraph (b)(10) of this section, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's

identification number, and will increase each unit's allocation under paragraph (b)(10) of this section by one TR NO$_X$ Ozone Season allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

### § 97.513 Authorization of designated representative and alternate designated representative.

(a) Except as provided under § 97.515, each TR NO$_X$ Ozone Season source, including all TR NO$_X$ Ozone Season units at the source, shall have one and only one designated representative, with regard to all matters under the TR NO$_X$ Ozone Season Trading Program.

(1) The designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR NO$_X$ Ozone Season units at the source and shall act in accordance with the certification statement in § 97.516(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.516:

(i) The designated representative shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each owner and operator of the source and each TR NO$_X$ Ozone Season unit at the source in all matters pertaining to the TR NO$_X$ Ozone Season Trading Program, notwithstanding any agreement between the designated representative and such owners and operators; and

(ii) The owners and operators of the source and each TR NO$_X$ Ozone Season unit at the source shall be bound by any decision or order issued to the designated representative by the Administrator regarding the source or any such unit.

(b) Except as provided under § 97.515, each TR NO$_X$ Ozone Season source may have one and only one alternate designated representative, who may act on behalf of the designated representative. The agreement by which the alternate designated representative is selected shall include a procedure for authorizing the alternate designated representative to act in lieu of the designated representative.

(1) The alternate designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR NO$_X$ Ozone Season units at the source and shall act in accordance with the certification statement in § 97.516(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.516,

(i) The alternate designated representative shall be authorized;

(ii) Any representation, action, inaction, or submission by the alternate designated representative shall be deemed to be a representation, action, inaction, or submission by the designated representative; and

(iii) The owners and operators of the source and each TR NO$_X$ Ozone Season unit at the source shall be bound by any decision or order issued to the alternate designated representative by the Administrator regarding the source or any such unit.

(c) Except in this section, § 97.502, and §§ 97.514 through 97.518, whenever the term "designated representative" (as distinguished from the term "common designated representative") is used in this subpart, the term shall be construed to include the designated representative or any alternate designated representative.

### § 97.514 Responsibilities of designated representative and alternate designated representative.

(a) Except as provided under § 97.518 concerning delegation of authority to make submissions, each submission under the TR NO$_X$ Ozone Season Trading Program shall be made, signed, and certified by the designated representative or alternate designated representative for each TR NO$_X$ Ozone Season source and TR NO$_X$ Ozone Season unit for which the submission is made. Each such submission shall include the following certification statement by the designated representative or alternate designated representative: "I am authorized to make this submission on behalf of the owners and operators of the source or units for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment."

(b) The Administrator will accept or act on a submission made for a TR NO$_X$ Ozone Season source or a TR NO$_X$ Ozone Season unit only if the

submission has been made, signed, and certified in accordance with paragraph (a) of this section and § 97.518.

### § 97.515 Changing designated representative and alternate designated representative; changes in owners and operators; changes in units at the source.

(a) *Changing designated representative.* The designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.516. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new designated representative and the owners and operators of the TR NO$_X$ Ozone Season source and the TR NO$_X$ Ozone Season units at the source.

(b) *Changing alternate designated representative.* The alternate designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.516. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new alternate designated representative, the designated representative, and the owners and operators of the TR NO$_X$ Ozone Season source and the TR NO$_X$ Ozone Season units at the source.

(c) *Changes in owners and operators.* (1) In the event an owner or operator of a TR NO$_X$ Ozone Season source or a TR NO$_X$ Ozone Season unit at the source is not included in the list of owners and operators in the certificate of representation under § 97.516, such owner or operator shall be deemed to be subject to and bound by the certificate of representation, the representations, actions, inactions, and submissions of the designated representative and any alternate designated representative of the source or unit, and the decisions and orders of the Administrator, as if the owner or operator were included in such list.

(2) Within 30 days after any change in the owners and operators of a TR NO$_X$ Ozone Season source or a TR NO$_X$ Ozone Season unit at the source, including the addition or removal of an owner or operator, the designated representative or any alternate designated representative shall submit a revision to the certificate of representation under § 97.516 amending the list of owners and operators to reflect the change.

(d) *Changes in units at the source.* Within 30 days of any change in which units are located at a TR NO$_X$ Ozone Season source (including the addition or removal of a unit), the designated representative or any alternate designated representative shall submit a certificate of representation under § 97.516 amending the list of units to reflect the change.

(1) If the change is the addition of a unit that operated (other than for purposes of testing by the manufacturer before initial installation) before being located at the source, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity from whom the unit was purchased or otherwise obtained (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was purchased or otherwise obtained, and the date on which the unit became located at the source.

(2) If the change is the removal of a unit, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity to which the unit was sold or that otherwise obtained the unit (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was sold or otherwise obtained, and the date on which the unit became no longer located at the source.

### § 97.516 Certificate of representation.

(a) A complete certificate of representation for a designated representative or an alternate designated representative shall include the following elements in a format prescribed by the Administrator:

(1) Identification of the TR NO$_X$ Ozone Season source, and each TR NO$_X$ Ozone Season unit at the source, for which the certificate of representation is submitted, including source name, source category and NAICS code (or, in the absence of a NAICS code, an equivalent code), State, plant code, county, latitude and longitude, unit identification number and type, identification number and nameplate capacity (in MWe, rounded to the nearest tenth) of each generator served by each such unit, actual or projected date of commencement of commercial operation, and a statement of whether such source is located in Indian Country. If a projected date of commencement of commercial operation is provided, the actual date of commencement of commercial

operation shall be provided when such information becomes available.

(2) The name, address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the designated representative and any alternate designated representative.

(3) A list of the owners and operators of the TR NO$_X$ Ozone Season source and of each TR NO$_X$ Ozone Season unit at the source.

(4) The following certification statements by the designated representative and any alternate designated representative—

(i) "I certify that I was selected as the designated representative or alternate designated representative, as applicable, by an agreement binding on the owners and operators of the source and each TR NO$_X$ Ozone Season unit at the source."

(ii) "I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR NO$_X$ Ozone Season Trading Program on behalf of the owners and operators of the source and of each TR NO$_X$ Ozone Season unit at the source and that each such owner and operator shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the source or unit."

(iii) "Where there are multiple holders of a legal or equitable title to, or a leasehold interest in, a TR NO$_X$ Ozone Season unit, or where a utility or industrial customer purchases power from a TR NO$_X$ Ozone Season unit under a life-of-the-unit, firm power contractual arrangement, I certify that: I have given a written notice of my selection as the 'designated representative' or 'alternate designated representative', as applicable, and of the agreement by which I was selected to each owner and operator of the source and of each TR NO$_X$ Ozone Season unit at the source; and TR NO$_X$ Ozone Season allowances and proceeds of transactions involving TR NO$_X$ Ozone Season allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement, except that, if such multiple holders have expressly provided for a different distribution of TR NO$_X$ Ozone Season allowances by contract, TR NO$_X$ Ozone Season allowances and proceeds of transactions involving TR NO$_X$ Ozone Season allowances will be deemed to be held or distributed in accordance with the contract."

(5) The signature of the designated representative and any alternate designated representative and the dates signed.

(b) Unless otherwise required by the Administrator, documents of agreement referred to in the certificate of representation shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

### § 97.517 Objections concerning designated representative and alternate designated representative.

(a) Once a complete certificate of representation under § 97.516 has been submitted and received, the Administrator will rely on the certificate of representation unless and until a superseding complete certificate of representation under § 97.516 is received by the Administrator.

(b) Except as provided in paragraph (a) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission, of a designated representative or alternate designated representative shall affect any representation, action, inaction, or submission of the designated representative or alternate designated representative or the finality of any decision or order by the Administrator under the TR NO$_X$ Ozone Season Trading Program.

(c) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of any designated representative or alternate designated representative, including private legal disputes concerning the proceeds of TR NO$_X$ Ozone Season allowance transfers.

### § 97.518 Delegation by designated representative and alternate designated representative.

(a) A designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(b) An alternate designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(c) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (a) or (b) of this section, the designated representative or alternate designated representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(1) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such designated representative or alternate designated representative;

(2) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an "agent");

(3) For each such natural person, a list of the type or types of electronic submissions under paragraph (a) or (b) of this section for which authority is delegated to him or her; and

(4) The following certification statements by such designated representative or alternate designated representative:

(i) "I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am a designated representative or alternate designated representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.518(d) shall be deemed to be an electronic submission by me."

(ii) "Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.518(d), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.518 is terminated.".

(d) A notice of delegation submitted under paragraph (c) of this section shall be effective, with regard to the designated representative or alternate designated representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such designated representative or alternate designated representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(e) Any electronic submission covered by the certification in paragraph (c)(4)(i) of this section and made in accordance with a notice of delegation effective under paragraph (d) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

### § 97.519 [Reserved]

### § 97.520 Establishment of compliance accounts, assurance accounts, and general accounts.

(a) *Compliance accounts.* Upon receipt of a complete certificate of representation under § 97.516, the Administrator will establish a compliance account for the TR NO$_X$ Ozone Season source for which the certificate of representation was submitted, unless the source already has a compliance account. The designated representative and any alternate designated representative of the source shall be the authorized account representative and the alternate authorized account representative respectively of the compliance account.

(b) *Assurance accounts.* The Administrator will establish assurance accounts for certain owners and operators and States in accordance with § 97.525(b)(3).

(c) *General accounts.* (1) Application for general account. (i) Any person may apply to open a general account, for the purpose of holding and transferring TR NO$_X$ Ozone Season allowances, by submitting to the Administrator a complete application for a general account. Such application shall designate one and only one authorized account representative and may designate one and only one alternate authorized account representative who may act on behalf of the authorized account representative.

(A) The authorized account representative and alternate authorized account representative shall be selected by an agreement binding on the persons who have an ownership interest with respect to TR NO$_X$ Ozone Season allowances held in the general account.

(B) The agreement by which the alternate authorized account representative is selected shall include a procedure for authorizing the alternate authorized account representative to act in lieu of the authorized account representative.

(ii) A complete application for a general account shall include the following elements in a format prescribed by the Administrator:

(A) Name, mailing address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the authorized account representative and any alternate authorized account representative;

(B) An identifying name for the general account;

(C) A list of all persons subject to a binding agreement for the authorized account representative and any alternate authorized account representative to

represent their ownership interest with respect to the TR NO$_X$ Ozone Season allowances held in the general account;

(D) The following certification statement by the authorized account representative and any alternate authorized account representative: ''I certify that I was selected as the authorized account representative or the alternate authorized account representative, as applicable, by an agreement that is binding on all persons who have an ownership interest with respect to TR NO$_X$ Ozone Season allowances held in the general account. I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR NO$_X$ Ozone Season Trading Program on behalf of such persons and that each such person shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the general account.''

(E) The signature of the authorized account representative and any alternate authorized account representative and the dates signed.

(iii) Unless otherwise required by the Administrator, documents of agreement referred to in the application for a general account shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

(2) Authorization of authorized account representative and alternate authorized account representative. (i) Upon receipt by the Administrator of a complete application for a general account under paragraph (b)(1) of this section, the Administrator will establish a general account for the person or persons for whom the application is submitted, and upon and after such receipt by the Administrator:

(A) The authorized account representative of the general account shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each person who has an ownership interest with respect to TR NO$_X$ Ozone Season allowances held in the general account in all matters pertaining to the TR NO$_X$ Ozone Season Trading Program, notwithstanding any agreement between the authorized account representative and such person.

(B) Any alternate authorized account representative shall be authorized, and any representation, action, inaction, or submission by any alternate authorized account representative shall be deemed to be a representation, action, inaction, or submission by the authorized account representative.

(C) Each person who has an ownership interest with respect to TR NO$_X$ Ozone Season allowances held in the general account shall be bound by any decision or order issued to the authorized account representative or alternate authorized account representative by the Administrator regarding the general account.

(ii) Except as provided in paragraph (c)(5) of this section concerning delegation of authority to make submissions, each submission concerning the general account shall be made, signed, and certified by the authorized account representative or any alternate authorized account representative for the persons having an ownership interest with respect to TR NO$_X$ Ozone Season allowances held in the general account. Each such submission shall include the following certification statement by the authorized account representative or any alternate authorized account representative: ''I am authorized to make this submission on behalf of the persons having an ownership interest with respect to the TR NO$_X$ Ozone Season allowances held in the general account. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(iii) Except in this section, whenever the term ''authorized account representative'' is used in this subpart, the term shall be construed to include the authorized account representative or any alternate authorized account representative.

(3) Changing authorized account representative and alternate authorized account representative; changes in persons with ownership interest. (i) The authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous authorized account representative before the time and date when the Administrator receives the superseding application for a general

account shall be binding on the new authorized account representative and the persons with an ownership interest with respect to the TR NO$_X$ Ozone Season allowances in the general account.

(ii) The alternate authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new alternate authorized account representative, the authorized account representative, and the persons with an ownership interest with respect to the TR NO$_X$ Ozone Season allowances in the general account.

(iii)(A) In the event a person having an ownership interest with respect to TR NO$_X$ Ozone Season allowances in the general account is not included in the list of such persons in the application for a general account, such person shall be deemed to be subject to and bound by the application for a general account, the representation, actions, inactions, and submissions of the authorized account representative and any alternate authorized account representative of the account, and the decisions and orders of the Administrator, as if the person were included in such list.

(B) Within 30 days after any change in the persons having an ownership interest with respect to NO$_X$ Ozone Season allowances in the general account, including the addition or removal of a person, the authorized account representative or any alternate authorized account representative shall submit a revision to the application for a general account amending the list of persons having an ownership interest with respect to the TR NO$_X$ Ozone Season allowances in the general account to include the change.

(4) Objections concerning authorized account representative and alternate authorized account representative. (i) Once a complete application for a general account under paragraph (c)(1) of this section has been submitted and received, the Administrator will rely on the application unless and until a superseding complete application for a general account under paragraph (b)(1) of this section is received by the Administrator.

(ii) Except as provided in paragraph (c)(4)(i) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account shall affect any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative or the finality of any decision or order by the Administrator under the TR NO$_X$ Ozone Season Trading Program.

(iii) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account, including private legal disputes concerning the proceeds of TR NO$_X$ Ozone Season allowance transfers.

(5) Delegation by authorized account representative and alternate authorized account representative. (i) An authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(ii) An alternate authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(iii) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (c)(5)(i) or (ii) of this section, the authorized account representative or alternate authorized account representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(A) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such authorized account representative or alternate authorized account representative;

(B) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an ''agent'');

(C) For each such natural person, a list of the type or types of electronic submissions under paragraph (c)(5)(i) or (ii) of this section for which authority is delegated to him or her;

(D) The following certification statement by such authorized account representative or alternate authorized account representative: ''I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am an authorized account representative or alternate authorized representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.520(c)(5)(iv) shall be deemed to be an electronic submission by me.''; and

(E) The following certification statement by such authorized account representative or alternate authorized account representative: ''Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.520(c)(5)(iv), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.520(c)(5) is terminated.''.

(iv) A notice of delegation submitted under paragraph (c)(5)(iii) of this section shall be effective, with regard to the authorized account representative or alternate authorized account representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such authorized account representative or alternate authorized account representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(v) Any electronic submission covered by the certification in paragraph (c)(5)(iii)(D) of this section and made in accordance with a notice of delegation effective under paragraph (c)(5)(iv) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

(6) Closing a general account. (i) The authorized account representative or alternate authorized account representative of a general account may submit to the Administrator a request to close the account. Such request shall include a correctly submitted TR NO$_X$ Ozone Season allowance transfer under § 97.522 for any TR NO$_X$ Ozone Season allowances in the account to one or more other Allowance Management System accounts.

(ii) If a general account has no TR NO$_X$ Ozone Season allowance transfers to or from the account for a 12-month period or longer and does not contain any TR NO$_X$ Ozone Season allowances, the Administrator may notify the authorized account representative for the account that the account will be closed after 30 days after the notice is sent. The account will be closed after the 30-day period unless, before the end of the 30-day period, the Administrator receives a correctly submitted TR NO$_X$ Ozone Season allowance transfer under § 97.522 to the account or a statement submitted by the authorized account representative or alternate authorized account representative demonstrating to the satisfaction of the Administrator good cause as to why the account should not be closed.

(d) *Account identification.* The Administrator will assign a unique identifying number to each account established under paragraph (a), (b), or (c) of this section.

(e) *Responsibilities of authorized account representative and alternate authorized account representative.* After the establishment of a compliance account or general account, the Administrator will accept or act on a submission pertaining to the account, including, but not limited to, submissions concerning the deduction or transfer of TR NO$_X$ Ozone Season allowances in the account, only if the submission has been made, signed, and certified in accordance with §§ 97.514(a) and 97.518 or paragraphs (c)(2)(ii) and (c)(5) of this section.

**§ 97.521   Recordation of TR NO$_X$ Ozone Season allowance allocations and auction results.**

(a) By November 7, 2011, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source in accordance with § 97.511(a) for the control period in 2012.

(b) By November 7, 2011, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source in accordance with § 97.511(a) for the control period in 2013, unless the State in which the source is located notifies the Administrator in writing by October 17, 2011 of the State's intent to submit to the Administrator a complete SIP revision by April 1, 2012 meeting the

requirements of § 52.38(b)(3)(i) through (iv) of this chapter.

(1) If, by April 1, 2012, the State does not submit to the Administrator such complete SIP revision, the Administrator will record by April 15, 2012 in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source in accordance with § 97.511(a) for the control period in 2013.

(2) If the State submits to the Administrator by April 1, 2012, and the Administrator approves by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source as provided in such approved, complete SIP revision for the control period in 2013.

(3) If the State submits to the Administrator by April 1, 2012, and the Administrator does not approve by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source in accordance with § 97.511(a) for the control period in 2013.

(c) By July 1, 2013, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Ozone Season allowances auctioned to TR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control period in 2014 and 2015.

(d) By July 1, 2014, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Ozone Season allowances auctioned to TR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control period in 2016 and 2017.

(e) By July 1, 2015, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances

allocated to the TR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Ozone Season allowances auctioned to TR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control period in 2018 and 2019.

(f) By July 1, 2016 and July 1 of each year thereafter, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Ozone Season allowances auctioned to TR NO$_X$ Ozone Season units, in accordance with § 97.511(a), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control period in the fourth year after the year of the applicable recordation deadline under this paragraph.

(g) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source, or in each appropriate Allowance Management System account the TR NO$_X$ Ozone Season allowances auctioned to TR NO$_X$ Ozone Season units, in accordance with § 97.512(a)(2) through (8) and (12), or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, for the control period in the year of the applicable recordation deadline under this paragraph.

(h) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source in accordance with § 97.512(b)(2) through (8) and (12) for the control period in the year of the applicable recordation deadline under this paragraph.

(i) By November 15, 2012 and November 15 of each year thereafter, the Administrator will record in each TR NO$_X$ Ozone Season source's compliance account the TR NO$_X$ Ozone Season allowances allocated to the TR NO$_X$ Ozone Season units at the source in accordance with § 97.512(a)(9) through (12), for the control period in the year of the applicable recordation deadline under this paragraph.

(j) By the date on which any allocation or auction results, other than an allocation or auction results

described in paragraphs (a) through (i) of this section, of TR NO$_X$ Ozone Season allowances to a recipient is made by or are submitted to the Administrator in accordance with § 97.511 or § 97.512 or with a SIP revision approved under § 52.38(b)(4) or (5) of this chapter, the Administrator will record such allocation or auction results in the appropriate Allowance Management System account.

(k) When recording the allocation or auction of TR NO$_X$ Ozone Season allowances to a TR NO$_X$ Ozone Season unit or other entity in an Allowance Management System account, the Administrator will assign each TR NO$_X$ Ozone Season allowance a unique identification number that will include digits identifying the year of the control period for which the TR NO$_X$ Ozone Season allowance is allocated or auctioned.

### § 97.522 Submission of TR NO$_X$ Ozone Season allowance transfers.

(a) An authorized account representative seeking recordation of a TR NO$_X$ Ozone Season allowance transfer shall submit the transfer to the Administrator.

(b) A TR NO$_X$ Ozone Season allowance transfer shall be correctly submitted if:

(1) The transfer includes the following elements, in a format prescribed by the Administrator:

(i) The account numbers established by the Administrator for both the transferor and transferee accounts;

(ii) The serial number of each TR NO$_X$ Ozone Season allowance that is in the transferor account and is to be transferred; and

(iii) The name and signature of the authorized account representative of the transferor account and the date signed; and

(2) When the Administrator attempts to record the transfer, the transferor account includes each TR NO$_X$ Ozone Season allowance identified by serial number in the transfer.

### § 97.523 Recordation of TR NO$_X$ Ozone Season allowance transfers.

(a) Within 5 business days (except as provided in paragraph (b) of this section) of receiving a TR NO$_X$ Ozone Season allowance transfer that is correctly submitted under § 97.522, the Administrator will record a TR NO$_X$ Ozone Season allowance transfer by moving each TR NO$_X$ Ozone Season allowance from the transferor account to the transferee account as specified in the transfer.

(b) A TR NO$_X$ Ozone Season allowance transfer to or from a

compliance account that is submitted for recordation after the allowance transfer deadline for a control period and that includes any TR NO$_X$ Ozone Season allowances allocated for any control period before such allowance transfer deadline will not be recorded until after the Administrator completes the deductions from such compliance account under § 97.524 for the control period immediately before such allowance transfer deadline.

(c) Where a TR NO$_X$ Ozone Season allowance transfer is not correctly submitted under § 97.522, the Administrator will not record such transfer.

(d) Within 5 business days of recordation of a TR NO$_X$ Ozone Season allowance transfer under paragraphs (a) and (b) of the section, the Administrator will notify the authorized account representatives of both the transferor and transferee accounts.

(e) Within 10 business days of receipt of a TR NO$_X$ Ozone Season allowance transfer that is not correctly submitted under § 97.522, the Administrator will notify the authorized account representatives of both accounts subject to the transfer of:

(1) A decision not to record the transfer, and

(2) The reasons for such non-recordation.

### § 97.524 Compliance with TR NO$_X$ Ozone Season emissions limitation.

(a) *Availability for deduction for compliance.* TR NO$_X$ Ozone Season allowances are available to be deducted for compliance with a source's TR NO$_X$ Ozone Season emissions limitation for a control period in a given year only if the TR NO$_X$ Ozone Season allowances:

(1) Were allocated for such control period or a control period in a prior year; and

(2) Are held in the source's compliance account as of the allowance transfer deadline for such control period.

(b) *Deductions for compliance.* After the recordation, in accordance with § 97.523, of TR NO$_X$ Ozone Season allowance transfers submitted by the allowance transfer deadline for a control period in a given year, the Administrator will deduct from each source's compliance account TR NO$_X$ Ozone Season allowances available under paragraph (a) of this section in order to determine whether the source meets the TR NO$_X$ Ozone Season emissions limitation for such control period, as follows:

(1) Until the amount of TR NO$_X$ Ozone Season allowances deducted equals the number of tons of total NO$_X$

emissions from all TR NO$_X$ Ozone Season units at the source for such control period; or

(2) If there are insufficient TR NO$_X$ Ozone Season allowances to complete the deductions in paragraph (b)(1) of this section, until no more TR NO$_X$ Ozone Season allowances available under paragraph (a) of this section remain in the compliance account.

(c)(1) *Identification of TR NO$_X$ Ozone Season allowances by serial number.* The authorized account representative for a source's compliance account may request that specific TR NO$_X$ Ozone Season allowances, identified by serial number, in the compliance account be deducted for emissions or excess emissions for a control period in a given year in accordance with paragraph (b) or (d) of this section. In order to be complete, such request shall be submitted to the Administrator by the allowance transfer deadline for such control period and include, in a format prescribed by the Administrator, the identification of the TR NO$_X$ Ozone Season source and the appropriate serial numbers.

(2) *First-in, first-out.* The Administrator will deduct TR NO$_X$ Ozone Season allowances under paragraph (b) or (d) of this section from the source's compliance account in accordance with a complete request under paragraph (c)(1) of this section or, in the absence of such request or in the case of identification of an insufficient amount of TR NO$_X$ Ozone Season allowances in such request, on a first-in, first-out accounting basis in the following order:

(i) Any TR NO$_X$ Ozone Season allowances that were allocated to the units at the source and not transferred out of the compliance account, in the order of recordation; and then

(ii) Any TR NO$_X$ Ozone Season allowances that were allocated to any unit and transferred to and recorded in the compliance account pursuant to this subpart, in the order of recordation.

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the TR NO$_X$ Ozone Season source has excess emissions, the Administrator will deduct from the source's compliance account an amount of TR NO$_X$ Ozone Season allowances, allocated for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, equal to two times the number of tons of the source's excess emissions.

(e) *Recordation of deductions.* The Administrator will record in the

appropriate compliance account all deductions from such account under paragraphs (b) and (d) of this section.

### § 97.525 Compliance with TR NO$_X$ Ozone Season assurance provisions.

(a) *Availability for deduction.* TR NO$_X$ Ozone Season allowances are available to be deducted for compliance with the TR NO$_X$ Ozone Season assurance provisions for a control period in a given year by the owners and operators of a group of one or more TR NO$_X$ Ozone Season sources and units in a State (and Indian country within the borders of such State) only if the TR NO$_X$ Ozone Season allowances:

(1) Were allocated for a control period in a prior year or the control period in the given year or in the immediately following year; and

(2) Are held in the assurance account, established by the Administrator for such owners and operators of such group of TR NO$_X$ Ozone Season sources and units in such State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, as of the deadline established in paragraph (b)(4) of this section.

(b) *Deductions for compliance.* The Administrator will deduct TR NO$_X$ Ozone Season allowances available under paragraph (a) of this section for compliance with the TR NO$_X$ Ozone Season assurance provisions for a State for a control period in a given year in accordance with the following procedures:

(1) By June 1, 2013 and June 1 of each year thereafter, the Administrator will:

(i) Calculate, for each State (and Indian country within the borders of such State), the total NO$_X$ emissions from all TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in the State (and Indian country within the borders of such State) during the control period in the year before the year of this calculation deadline and the amount, if any, by which such total NO$_X$ emissions exceed the State assurance level as described in § 97.506(c)(2)(iii); and

(ii) Promulgate a notice of data availability of the results of the calculations required in paragraph (b)(1)(i) of this section, including separate calculations of the NO$_X$ emissions from each TR NO$_X$ Ozone Season source.

(2) For each notice of data availability required in paragraph (b)(1)(ii) of this section and for any State (and Indian country within the borders of such State) identified in such notice as having TR NO$_X$ Ozone Season units with total NO$_X$ emissions exceeding the State assurance level for a control

period in a given year, as described in § 97.506(c)(2)(iii):

(i) By July 1 immediately after the promulgation of such notice, the designated representative of each TR NO$_X$ Ozone Season source in each such State (and Indian country within the borders of such State) shall submit a statement, in a format prescribed by the Administrator, providing for each TR NO$_X$ Ozone Season unit (if any) at the source that operates during, but is not allocated an amount of TR NO$_X$ Ozone Season allowances for, such control period, the unit's allowable NO$_X$ emission rate for such control period and, if such rate is expressed in lb per mmBtu, the unit's heat rate.

(ii) By August 1 immediately after the promulgation of such notice, the Administrator will calculate, for each such State (and Indian country within the borders of such State) and such control period and each common designated representative for such control period for a group of one or more TR NO$_X$ Ozone Season sources and units in the State (and Indian country within the borders of such State), the common designated representative's share of the total NO$_X$ emissions from all TR NO$_X$ Ozone Season units at TR NO$_X$ Ozone Season sources in the State (and Indian country within the borders of such State), the common designated representative's assurance level, and the amount (if any) of TR NO$_X$ Ozone Season allowances that the owners and operators of such group of sources and units must hold in accordance with the calculation formula in § 97.506(c)(2)(i) and will promulgate a notice of data availability of the results of these calculations.

(iii) The Administrator will provide an opportunity for submission of objections to the calculations referenced by the notice of data availability required in paragraph (b)(2)(ii) of this section and the calculations referenced by the relevant notice of data availability required in paragraph (b)(1)(i) of this section.

(A) Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations referenced in the relevant notice required under paragraph (b)(1)(ii) of this section and referenced in the notice required under paragraph (b)(2)(ii) of this section are in accordance with § 97.506(c)(2)(iii), §§ 97.506(b) and 97.530 through 97.535, the definitions of ''common designated representative'', ''common designated representative's assurance level'', and ''common designated representative's share'' in § 97.502, and the calculation formula in § 97.506(c)(2)(i).

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(iii)(A) of this section. By October 1 immediately after the promulgation of such notice, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iii)(A) of this section.

(3) For any State (and Indian country within the borders of such State) referenced in each notice of data availability required in paragraph (b)(2)(iii)(B) of this section as having TR NO$_X$ Ozone Season units with total NO$_X$ emissions exceeding the State assurance level for a control period in a given year, the Administrator will establish one assurance account for each set of owners and operators referenced, in the notice of data availability required under paragraph (b)(2)(iii)(B) of this section, as all of the owners and operators of a group of TR NO$_X$ Ozone Season sources and units in the State (and Indian country within the borders of such State) having a common designated representative for such control period and as being required to hold TR NO$_X$ Ozone Season allowances.

(4)(i) As of midnight of November 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section, the owners and operators described in paragraph (b)(3) of this section shall hold in the assurance account established for the them and for the appropriate TR NO$_X$ Ozone Season sources, TR NO$_X$ Ozone Season units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section a total amount of TR NO$_X$ Ozone Season allowances, available for deduction under paragraph (a) of this section, equal to the amount such owners and operators are required to hold with regard to such sources, units and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in such notice.

(ii) Notwithstanding the allowance-holding deadline specified in paragraph (b)(4)(i) of this section, if November 1 is not a business day, then such allowance-holding deadline shall be midnight of the first business day thereafter.

(5) After November 1 (or the date described in paragraph (b)(4)(ii) of this section) immediately after the promulgation of each notice of data

availability required in paragraph (b)(2)(iii)(B) of this section and after the recordation, in accordance with § 97.523, of TR NO$_X$ Ozone Season allowance transfers submitted by midnight of such date, the Administrator will determine whether the owners and operators described in paragraph (b)(3) of this section hold, in the assurance account for the appropriate TR NO$_X$ Ozone Season sources, TR NO$_X$ Ozone Season units, and State (and Indian country within the borders of such State) established under paragraph (b)(3) of this section, the amount of TR NO$_X$ Ozone Season allowances available under paragraph (a) of this section that the owners and operators are required to hold with regard to such sources, units, and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in the notice required in paragraph (b)(2)(iii)(B) of this section.

(6) Notwithstanding any other provision of this subpart and any revision, made by or submitted to the Administrator after the promulgation of the notice of data availability required in paragraph (b)(2)(iii)(B) of this section for a control period in a given year, of any data used in making the calculations referenced in such notice, the amounts of TR NO$_X$ Ozone Season allowances that the owners and operators are required to hold in accordance with § 97.506(c)(2)(i) for such control period shall continue to be such amounts as calculated by the Administrator and referenced in such notice required in paragraph (b)(2)(iii)(B) of this section, except as follows:

(i) If any such data are revised by the Administrator as a result of a decision in or settlement of litigation concerning such data on appeal under part 78 of this chapter of such notice, or on appeal under section 307 of the Clean Air Act of a decision rendered under part 78 of this chapter on appeal of such notice, then the Administrator will use the data as so revised to recalculate the amounts of TR NO$_X$ Ozone Season allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.506(c)(2)(i) for such control period with regard to the TR NO$_X$ Ozone Season sources, TR NO$_X$ Ozone Season units, and State (and Indian country within the borders of such State) involved, provided that such litigation under part 78 of this chapter, or the proceeding under part 78 of this chapter that resulted in the decision appealed in such litigation under section 307 of the Clean Air Act, was initiated no later than 30 days after

promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(ii) If any such data are revised by the owners and operators of a TR $NO_X$ Ozone Season source and TR $NO_X$ Ozone Season unit whose designated representative submitted such data under paragraph (b)(2)(i) of this section, as a result of a decision in or settlement of litigation concerning such submission, then the Administrator will use the data as so revised to recalculate the amounts of TR $NO_X$ Ozone Season allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.506(c)(2)(i) for such control period with regard to the TR $NO_X$ Ozone Season sources, TR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) involved, provided that such litigation was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(iii) If the revised data are used to recalculate, in accordance with paragraphs (b)(6)(i) and (ii) of this section, the amount of TR $NO_X$ Ozone Season allowances that the owners and operators are required to hold for such control period with regard to the TR $NO_X$ Ozone Season sources, TR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) involved—

(A) Where the amount of TR $NO_X$ Ozone Season allowances that the owners and operators are required to hold increases as a result of the use of all such revised data, the Administrator will establish a new, reasonable deadline on which the owners and operators shall hold the additional amount of TR $NO_X$ Ozone Season allowances in the assurance account established by the Administrator for the appropriate TR $NO_X$ Ozone Season sources, TR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section. The owners' and operators' failure to hold such additional amount, as required, before the new deadline shall not be a violation of the Clean Air Act. The owners' and operators' failure to hold such additional amount, as required, as of the new deadline shall be a violation of the Clean Air Act. Each TR $NO_X$ Ozone Season allowance that the owners and operators fail to hold as required as of the new deadline, and each day in such control period, shall be a separate violation of the Clean Air Act.

(B) For the owners and operators for which the amount of TR $NO_X$ Ozone Season allowances required to be held decreases as a result of the use of all

such revised data, the Administrator will record, in all accounts from which TR $NO_X$ Ozone Season allowances were transferred by such owners and operators for such control period to the assurance account established by the Administrator for the appropriate at TR $NO_X$ Ozone Season sources, TR $NO_X$ Ozone Season units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, a total amount of the TR $NO_X$ Ozone Season allowances held in such assurance account equal to the amount of the decrease. If TR $NO_X$ Ozone Season allowances were transferred to such assurance account from more than one account, the amount of TR $NO_X$ Ozone Season allowances recorded in each such transferor account will be in proportion to the percentage of the total amount of TR $NO_X$ Ozone Season allowances transferred to such assurance account for such control period from such transferor account.

(C) Each TR $NO_X$ Ozone Season allowance held under paragraph (b)(6)(iii)(A) of this section as a result of recalculation of requirements under the TR $NO_X$ Ozone Season assurance provisions for such control period must be a TR $NO_X$ Ozone Season allowance allocated for a control period in a year before or the year immediately following, or in the same year as, the year of such control period.

## § 97.526    Banking.

(a) A TR $NO_X$ Ozone Season allowance may be banked for future use or transfer in a compliance account or a general account in accordance with paragraph (b) of this section.

(b) Any TR $NO_X$ Ozone Season allowance that is held in a compliance account or a general account will remain in such account unless and until the TR $NO_X$ Ozone Season allowance is deducted or transferred under § 97.511(c), § 97.523, § 97.524, § 97.525, § 97.527, or § 97.528.

## § 97.527    Account error.

The Administrator may, at his or her sole discretion and on his or her own motion, correct any error in any Allowance Management System account. Within 10 business days of making such correction, the Administrator will notify the authorized account representative for the account.

## § 97.528    Administrator's action on submissions.

(a) The Administrator may review and conduct independent audits concerning any submission under the TR $NO_X$ Ozone Season Trading Program and

make appropriate adjustments of the information in the submission.

(b) The Administrator may deduct TR $NO_X$ Ozone Season allowances from or transfer TR $NO_X$ Ozone Season allowances to a compliance account or an assurance account, based on the information in a submission, as adjusted under paragraph (a)(1) of this section, and record such deductions and transfers.

## § 97.529    [Reserved]

## § 97.530    General monitoring, recordkeeping, and reporting requirements.

The owners and operators, and to the extent applicable, the designated representative, of a TR $NO_X$ Ozone Season unit, shall comply with the monitoring, recordkeeping, and reporting requirements as provided in this subpart and subpart H of part 75 of this chapter. For purposes of applying such requirements, the definitions in § 97.502 and in § 72.2 of this chapter shall apply, the terms "affected unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") in part 75 of this chapter shall be deemed to refer to the terms "TR $NO_X$ Ozone Season unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") respectively as defined in § 97.502, and the term "newly affected unit" shall be deemed to mean "newly affected TR $NO_X$ Ozone Season unit". The owner or operator of a unit that is not a TR $NO_X$ Ozone Season unit but that is monitored under § 75.72(b)(2)(ii) of this chapter shall comply with the same monitoring, recordkeeping, and reporting requirements as a TR $NO_X$ Ozone Season unit.

(a) *Requirements for installation, certification, and data accounting.* The owner or operator of each TR $NO_X$ Ozone Season unit shall:

(1) Install all monitoring systems required under this subpart for monitoring $NO_X$ mass emissions and individual unit heat input (including all systems required to monitor $NO_X$ emission rate, $NO_X$ concentration, stack gas moisture content, stack gas flow rate, $CO_2$ or $O_2$ concentration, and fuel flow rate, as applicable, in accordance with §§ 75.71 and 75.72 of this chapter);

(2) Successfully complete all certification tests required under § 97.531 and meet all other requirements of this subpart and part 75 of this chapter applicable to the monitoring systems under paragraph (a)(1) of this section; and

(3) Record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section.

(b) *Compliance deadlines.* Except as provided in paragraph (e) of this section, the owner or operator shall meet the monitoring system certification and other requirements of paragraphs (a)(1) and (2) of this section on or before the following dates and shall record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section on and after the following dates.

(1) For the owner or operator of a TR $NO_X$ Ozone Season unit that commences commercial operation before July 1, 2011, May 1, 2012.

(2) For the owner or operator of a TR $NO_X$ Ozone Season unit that commences commercial operation on or after July 1, 2011 and that reports on an annual basis under § 97.534(d), by the later of the following:

(i) 180 calendar days after the date on which the unit commences commercial operation; or

(ii) May 1, 2012.

(3) For the owner or operator of a TR $NO_X$ Ozone Season unit that commences commercial operation on or after July 1, 2011 and that reports on a control period basis under § 97.534(d)(2)(ii), by the following date:

(i) 180 calendar days after the date on which the unit commences commercial operation; or

(ii) If the compliance date under paragraph (b)(3)(i) of this section is not during a control period, May 1 immediately after the compliance date under paragraph (b)(3)(i) of this section.

(4) The owner or operator of a TR $NO_X$ Ozone Season unit for which construction of a new stack or flue or installation of add-on $NO_X$ emission controls is completed after the applicable deadline under paragraph (b)(1), (2), or (3) of this section shall meet the requirements of §§ 75.4(e)(1) through (e)(4) of this chapter, except that:

(i) Such requirements shall apply to the monitoring systems required under § 97.530 through § 97.535, rather than the monitoring systems required under part 75 of this chapter;

(ii) $NO_X$ emission rate, $NO_X$ concentration, stack gas moisture content, stack gas volumetric flow rate, and $O_2$ or $CO_2$ concentration data shall be determined and reported, rather than the data listed in § 75.4(e)(2) of this chapter; and

(iii) Any petition for another procedure under § 75.4(e)(2) of this chapter shall be submitted under § 97.535, rather than § 75.66.

(c) *Reporting data.* The owner or operator of a TR $NO_X$ Ozone Season unit that does not meet the applicable compliance date set forth in paragraph (b) of this section for any monitoring system under paragraph (a)(1) of this section shall, for each such monitoring system, determine, record, and report maximum potential (or, as appropriate, minimum potential) values for $NO_X$ concentration, $NO_X$ emission rate, stack gas flow rate, stack gas moisture content, fuel flow rate, and any other parameters required to determine $NO_X$ mass emissions and heat input in accordance with § 75.31(b)(2) or (c)(3) of this chapter, section 2.4 of appendix D to part 75 of this chapter, or section 2.5 of appendix E to part 75 of this chapter, as applicable.

(d) *Prohibitions.* (1) No owner or operator of a TR $NO_X$ Ozone Season unit shall use any alternative monitoring system, alternative reference method, or any other alternative to any requirement of this subpart without having obtained prior written approval in accordance with § 97.535.

(2) No owner or operator of a TR $NO_X$ Ozone Season unit shall operate the unit so as to discharge, or allow to be discharged, $NO_X$ to the atmosphere without accounting for all such $NO_X$ in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(3) No owner or operator of a TR $NO_X$ Ozone Season unit shall disrupt the continuous emission monitoring system, any portion thereof, or any other approved emission monitoring method, and thereby avoid monitoring and recording $NO_X$ mass discharged into the atmosphere or heat input, except for periods of recertification or periods when calibration, quality assurance testing, or maintenance is performed in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(4) No owner or operator of a TR $NO_X$ Ozone Season unit shall retire or permanently discontinue use of the continuous emission monitoring system, any component thereof, or any other approved monitoring system under this subpart, except under any one of the following circumstances:

(i) During the period that the unit is covered by an exemption under § 97.505 that is in effect;

(ii) The owner or operator is monitoring emissions from the unit with another certified monitoring system approved, in accordance with the applicable provisions of this subpart and part 75 of this chapter, by the Administrator for use at that unit that provides emission data for the same pollutant or parameter as the retired or discontinued monitoring system; or

(iii) The designated representative submits notification of the date of certification testing of a replacement monitoring system for the retired or discontinued monitoring system in accordance with § 97.531(d)(3)(i).

(e) *Long-term cold storage.* The owner or operator of a TR $NO_X$ Ozone Season unit is subject to the applicable provisions of § 75.4(d) of this chapter concerning units in long-term cold storage.

## § 97.531  Initial monitoring system certification and recertification procedures.

(a) The owner or operator of a TR $NO_X$ Ozone Season unit shall be exempt from the initial certification requirements of this section for a monitoring system under § 97.530(a)(1) if the following conditions are met:

(1) The monitoring system has been previously certified in accordance with part 75 of this chapter; and

(2) The applicable quality-assurance and quality-control requirements of § 75.21 of this chapter and appendices B, D, and E to part 75 of this chapter are fully met for the certified monitoring system described in paragraph (a)(1) of this section.

(b) The recertification provisions of this section shall apply to a monitoring system under § 97.530(a)(1) that is exempt from initial certification requirements under paragraph (a) of this section.

(c) If the Administrator has previously approved a petition under § 75.17(a) or (b) of this chapter for apportioning the $NO_X$ emission rate measured in a common stack or a petition under § 75.66 of this chapter for an alternative to a requirement in § 75.12 or § 75.17 of this chapter, the designated representative shall resubmit the petition to the Administrator under § 97.535 to determine whether the approval applies under the TR $NO_X$ Ozone Season Trading Program.

(d) Except as provided in paragraph (a) of this section, the owner or operator of a TR $NO_X$ Ozone Season unit shall comply with the following initial certification and recertification procedures for a continuous monitoring system (*i.e.,* a continuous emission monitoring system and an excepted monitoring system under appendices D and E to part 75 of this chapter) under § 97.530(a)(1). The owner or operator of a unit that qualifies to use the low mass emissions excepted monitoring methodology under § 75.19 of this chapter or that qualifies to use an alternative monitoring system under subpart E of part 75 of this chapter shall comply with the procedures in paragraph (e) or (f) of this section respectively.

(1) Requirements for initial certification. The owner or operator shall ensure that each continuous monitoring system under § 97.530(a)(1) (including the automated data acquisition and handling system) successfully completes all of the initial certification testing required under § 75.20 of this chapter by the applicable deadline in § 97.530(b). In addition, whenever the owner or operator installs a monitoring system to meet the requirements of this subpart in a location where no such monitoring system was previously installed, initial certification in accordance with § 75.20 of this chapter is required.

(2) Requirements for recertification. Whenever the owner or operator makes a replacement, modification, or change in any certified continuous emission monitoring system under § 97.530(a)(1) that may significantly affect the ability of the system to accurately measure or record $NO_X$ mass emissions or heat input rate or to meet the quality-assurance and quality-control requirements of § 75.21 of this chapter or appendix B to part 75 of this chapter, the owner or operator shall recertify the monitoring system in accordance with § 75.20(b) of this chapter. Furthermore, whenever the owner or operator makes a replacement, modification, or change to the flue gas handling system or the unit's operation that may significantly change the stack flow or concentration profile, the owner or operator shall recertify each continuous emission monitoring system whose accuracy is potentially affected by the change, in accordance with § 75.20(b) of this chapter. Examples of changes to a continuous emission monitoring system that require recertification include: replacement of the analyzer, complete replacement of an existing continuous emission monitoring system, or change in location or orientation of the sampling probe or site. Any fuel flowmeter system, and any excepted $NO_X$ monitoring system under appendix E to part 75 of this chapter, under § 97.530(a)(1) are subject to the recertification requirements in § 75.20(g)(6) of this chapter.

(3) Approval process for initial certification and recertification. For initial certification of a continuous monitoring system under § 97.530(a)(1), paragraphs (d)(3)(i) through (v) of this section apply. For recertifications of such monitoring systems, paragraphs (d)(3)(i) through (iv) of this section and the procedures in §§ 75.20(b)(5) and (g)(7) of this chapter (in lieu of the procedures in paragraph (d)(3)(v) of this section) apply, provided that in applying paragraphs (d)(3)(i) through

(iv) of this section, the words "certification" and "initial certification" are replaced by the word "recertification" and the word "certified" is replaced by with the word "recertified".

(i) Notification of certification. The designated representative shall submit to the appropriate EPA Regional Office and the Administrator written notice of the dates of certification testing, in accordance with § 97.533.

(ii) Certification application. The designated representative shall submit to the Administrator a certification application for each monitoring system. A complete certification application shall include the information specified in § 75.63 of this chapter.

(iii) Provisional certification date. The provisional certification date for a monitoring system shall be determined in accordance with § 75.20(a)(3) of this chapter. A provisionally certified monitoring system may be used under the TR $NO_X$ Ozone Season Trading Program for a period not to exceed 120 days after receipt by the Administrator of the complete certification application for the monitoring system under paragraph (d)(3)(ii) of this section. Data measured and recorded by the provisionally certified monitoring system, in accordance with the requirements of part 75 of this chapter, will be considered valid quality-assured data (retroactive to the date and time of provisional certification), provided that the Administrator does not invalidate the provisional certification by issuing a notice of disapproval within 120 days of the date of receipt of the complete certification application by the Administrator.

(iv) Certification application approval process. The Administrator will issue a written notice of approval or disapproval of the certification application to the owner or operator within 120 days of receipt of the complete certification application under paragraph (d)(3)(ii) of this section. In the event the Administrator does not issue such a notice within such 120-day period, each monitoring system that meets the applicable performance requirements of part 75 of this chapter and is included in the certification application will be deemed certified for use under the TR $NO_X$ Ozone Season Trading Program.

(A) Approval notice. If the certification application is complete and shows that each monitoring system meets the applicable performance requirements of part 75 of this chapter, then the Administrator will issue a written notice of approval of the

certification application within 120 days of receipt.

(B) Incomplete application notice. If the certification application is not complete, then the Administrator will issue a written notice of incompleteness that sets a reasonable date by which the designated representative must submit the additional information required to complete the certification application. If the designated representative does not comply with the notice of incompleteness by the specified date, then the Administrator may issue a notice of disapproval under paragraph (d)(3)(iv)(C) of this section.

(C) Disapproval notice. If the certification application shows that any monitoring system does not meet the performance requirements of part 75 of this chapter or if the certification application is incomplete and the requirement for disapproval under paragraph (d)(3)(iv)(B) of this section is met, then the Administrator will issue a written notice of disapproval of the certification application. Upon issuance of such notice of disapproval, the provisional certification is invalidated by the Administrator and the data measured and recorded by each uncertified monitoring system shall not be considered valid quality-assured data beginning with the date and hour of provisional certification (as defined under § 75.20(a)(3) of this chapter).

(D) Audit decertification. The Administrator may issue a notice of disapproval of the certification status of a monitor in accordance with § 97.532(b).

(v) Procedures for loss of certification. If the Administrator issues a notice of disapproval of a certification application under paragraph (d)(3)(iv)(C) of this section or a notice of disapproval of certification status under paragraph (d)(3)(iv)(D) of this section, then:

(A) The owner or operator shall substitute the following values, for each disapproved monitoring system, for each hour of unit operation during the period of invalid data specified under § 75.20(a)(4)(iii), § 75.20(g)(7), or § 75.21(e) of this chapter and continuing until the applicable date and hour specified under § 75.20(a)(5)(i) or (g)(7) of this chapter:

(1) For a disapproved $NO_X$ emission rate (i.e., $NO_X$-diluent) system, the maximum potential $NO_X$ emission rate, as defined in § 72.2 of this chapter.

(2) For a disapproved $NO_X$ pollutant concentration monitor and disapproved flow monitor, respectively, the maximum potential concentration of $NO_X$ and the maximum potential flow rate, as defined in sections 2.1.2.1 and

2.1.4.1 of appendix A to part 75 of this chapter.

(3) For a disapproved moisture monitoring system and disapproved diluent gas monitoring system, respectively, the minimum potential moisture percentage and either the maximum potential $CO_2$ concentration or the minimum potential $O_2$ concentration (as applicable), as defined in sections 2.1.5, 2.1.3.1, and 2.1.3.2 of appendix A to part 75 of this chapter.

(4) For a disapproved fuel flowmeter system, the maximum potential fuel flow rate, as defined in section 2.4.2.1 of appendix D to part 75 of this chapter.

(5) For a disapproved excepted $NO_X$ monitoring system under appendix E to part 75 of this chapter, the fuel-specific maximum potential $NO_X$ emission rate, as defined in § 72.2 of this chapter.

(B) The designated representative shall submit a notification of certification retest dates and a new certification application in accordance with paragraphs (d)(3)(i) and (ii) of this section.

(C) The owner or operator shall repeat all certification tests or other requirements that were failed by the monitoring system, as indicated in the Administrator's notice of disapproval, no later than 30 unit operating days after the date of issuance of the notice of disapproval.

(e) The owner or operator of a unit qualified to use the low mass emissions (LME) excepted methodology under § 75.19 of this chapter shall meet the applicable certification and recertification requirements in §§ 75.19(a)(2) and 75.20(h) of this chapter. If the owner or operator of such a unit elects to certify a fuel flowmeter system for fuel heat input determination, the owner or operator shall also meet the certification and recertification requirements in § 75.20(g) of this chapter.

(f) The designated representative of each unit for which the owner or operator intends to use an alternative monitoring system approved by the Administrator under subpart E of part 75 of this chapter shall comply with the applicable notification and application procedures of § 75.20(f) of this chapter.

### § 97.532 Monitoring system out-of-control periods.

(a) *General provisions.* Whenever any monitoring system fails to meet the quality-assurance and quality-control requirements or data validation requirements of part 75 of this chapter, data shall be substituted using the applicable missing data procedures in subpart D or subpart H of, or appendix

D or appendix E to, part 75 of this chapter.

(b) *Audit decertification.* Whenever both an audit of a monitoring system and a review of the initial certification or recertification application reveal that any monitoring system should not have been certified or recertified because it did not meet a particular performance specification or other requirement under § 97.531 or the applicable provisions of part 75 of this chapter, both at the time of the initial certification or recertification application submission and at the time of the audit, the Administrator will issue a notice of disapproval of the certification status of such monitoring system. For the purposes of this paragraph, an audit shall be either a field audit or an audit of any information submitted to the Administrator or any State or permitting authority. By issuing the notice of disapproval, the Administrator revokes prospectively the certification status of the monitoring system. The data measured and recorded by the monitoring system shall not be considered valid quality-assured data from the date of issuance of the notification of the revoked certification status until the date and time that the owner or operator completes subsequently approved initial certification or recertification tests for the monitoring system. The owner or operator shall follow the applicable initial certification or recertification procedures in § 97.531 for each disapproved monitoring system.

### § 97.533 Notifications concerning monitoring.

The designated representative of a TR $NO_X$ Ozone Season unit shall submit written notice to the Administrator in accordance with § 75.61 of this chapter.

### § 97.534 Recordkeeping and reporting.

(a) *General provisions.* The designated representative shall comply with all recordkeeping and reporting requirements in paragraphs (b) through (e) of this section, the applicable recordkeeping and reporting requirements under § 75.73 of this chapter, and the requirements of § 97.514(a).

(b) *Monitoring plans.* The owner or operator of a TR $NO_X$ Ozone Season unit shall comply with requirements of § 75.73(c) and (e) of this chapter.

(c) *Certification applications.* The designated representative shall submit an application to the Administrator within 45 days after completing all initial certification or recertification tests required under § 97.531, including

the information required under § 75.63 of this chapter.

(d) *Quarterly reports.* The designated representative shall submit quarterly reports, as follows:

(1) If the TR $NO_X$ Ozone Season unit is subject to the Acid Rain Program or a TR $NO_X$ Annual emissions limitation or if the owner or operator of such unit chooses to report on an annual basis under this subpart, the designated representative shall meet the requirements of subpart H of part 75 of this chapter (concerning monitoring of $NO_X$ mass emissions) for such unit for the entire year and shall report the $NO_X$ mass emissions data and heat input data for such unit, in an electronic quarterly report in a format prescribed by the Administrator, for each calendar quarter beginning with:

(i) For a unit that commences commercial operation before July 1, 2011, the calendar quarter covering May 1, 2012 through June 30, 2012; or

(ii) For a unit that commences commercial operation on or after July 1, 2011, the calendar quarter corresponding to the earlier of the date of provisional certification or the applicable deadline for initial certification under § 97.530(b), unless that quarter is the third or fourth quarter of 2011 or the first quarter of 2012, in which case reporting shall commence in the quarter covering May 1, 2012 through June 30, 2012.

(2) If the TR $NO_X$ Ozone Season unit is not subject to the Acid Rain Program or a TR $NO_X$ Annual emissions limitation, then the designated representative shall either:

(i) Meet the requirements of subpart H of part 75 (concerning monitoring of $NO_X$ mass emissions) for such unit for the entire year and report the $NO_X$ mass emissions data and heat input data for such unit in accordance with paragraph (d)(1) of this section; or

(ii) Meet the requirements of subpart H of part 75 for the control period (including the requirements in § 75.74(c) of this chapter) and report $NO_X$ mass emissions data and heat input data (including the data described in § 75.74(c)(6) of this chapter) for such unit only for the control period of each year and report, in an electronic quarterly report in a format prescribed by the Administrator, for each calendar quarter beginning with:

(A) For a unit that commences commercial operation before July 1, 2011, the calendar quarter covering May 1, 2012 through June 30, 2012; or

(B) For a unit that commences commercial operation on or after July 1, 2011, the calendar quarter corresponding to the earlier of the date

of provisional certification or the applicable deadline for initial certification under § 97.530(b), unless that date is not during a control period, in which case reporting shall commence in the quarter that includes May 1 through June 30 of the first control period after such date.

(3) The designated representative shall submit each quarterly report to the Administrator within 30 days after the end of the calendar quarter covered by the report. Quarterly reports shall be submitted in the manner specified in § 75.73(f) of this chapter.

(4) For TR NO$_X$ Ozone Season units that are also subject to the Acid Rain Program, TR NO$_X$ Annual Trading Program, TR SO$_2$ Group 1 Trading Program, or TR SO$_2$ Group 2 Trading Program, quarterly reports shall include the applicable data and information required by subparts F through H of part 75 of this chapter as applicable, in addition to the NO$_X$ mass emission data, heat input data, and other information required by this subpart.

(5) The Administrator may review and conduct independent audits of any quarterly report in order to determine whether the quarterly report meets the requirements of this subpart and part 75 of this chapter, including the requirement to use substitute data.

(i) The Administrator will notify the designated representative of any determination that the quarterly report fails to meet any such requirements and specify in such notification any corrections that the Administrator believes are necessary to make through resubmission of the quarterly report and a reasonable time period within which the designated representative must respond. Upon request by the designated representative, the Administrator may specify reasonable extensions of such time period. Within the time period (including any such extensions) specified by the Administrator, the designated representative shall resubmit the quarterly report with the corrections specified by the Administrator, except to the extent the designated representative provides information demonstrating that a specified correction is not necessary because the quarterly report already meets the requirements of this subpart and part 75 of this chapter that are relevant to the specified correction.

(6) Any resubmission of a quarterly report shall meet the requirements applicable to the submission of a quarterly report under this subpart and part 75 of this chapter, except for the deadline set forth in paragraph (d)(3) of this section.

(e) *Compliance certification.* The designated representative shall submit to the Administrator a compliance certification (in a format prescribed by the Administrator) in support of each quarterly report based on reasonable inquiry of those persons with primary responsibility for ensuring that all of the unit's emissions are correctly and fully monitored. The certification shall state that:

(1) The monitoring data submitted were recorded in accordance with the applicable requirements of this subpart and part 75 of this chapter, including the quality assurance procedures and specifications;

(2) For a unit with add-on NO$_X$ emission controls and for all hours where NO$_X$ data are substituted in accordance with § 75.34(a)(1) of this chapter, the add-on emission controls were operating within the range of parameters listed in the quality assurance/quality control program under appendix B to part 75 of this chapter and the substitute data values do not systematically underestimate NO$_X$ emissions; and

(3) For a unit that is reporting on a control period basis under paragraph (d)(2)(ii) of this section, the NO$_X$ emission rate and NO$_X$ concentration values substituted for missing data under subpart D of part 75 of this chapter are calculated using only values from a control period and do not systematically underestimate NO$_X$ emissions.

**§ 97.535 Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.**

(a) The designated representative of a TR NO$_X$ Ozone Season unit may submit a petition under § 75.66 of this chapter to the Administrator, requesting approval to apply an alternative to any requirement of §§ 97.530 through 97.534.

(b) A petition submitted under paragraph (a) of this section shall include sufficient information for the evaluation of the petition, including, at a minimum, the following information:

(i) Identification of each unit and source covered by the petition;

(ii) A detailed explanation of why the proposed alternative is being suggested in lieu of the requirement;

(iii) A description and diagram of any equipment and procedures used in the proposed alternative;

(iv) A demonstration that the proposed alternative is consistent with the purposes of the requirement for which the alternative is proposed and with the purposes of this subpart and part 75 of this chapter and that any

adverse effect of approving the alternative will be *de minimis*; and

(v) Any other relevant information that the Administrator may require.

(c) Use of an alternative to any requirement referenced in paragraph (a) of this section is in accordance with this subpart only to the extent that the petition is approved in writing by the Administrator and that such use is in accordance with such approval.

76. Part 97 is amended by adding subpart CCCCC to read as follows:

## Subpart CCCCC—TR SO$_2$ Group 1 Trading Program

Sec.
97.601   Purpose.
97.602   Definitions.
97.603   Measurements, abbreviations, and acronyms.
97.604   Applicability.
97.605   Retired unit exemption.
97.606   Standard requirements.
97.607   Computation of time.
97.608   Administrative appeal procedures.
97.609   [Reserved]
97.610   State SO$_2$ Group 1 trading budgets, new unit set-asides, Indian country new unit set-asides and variability limits.
97.611   Timing requirements for TR SO$_2$ Group 1 allowance allocations.
97.612   TR SO$_2$ Group 1 allowance allocations to new units.
97.613   Authorization of designated representative and alternate designated representative.
97.614   Responsibilities of designated representative and alternate designated representative.
97.615   Changing designated representative and alternate designated representative; changes in owners and operators.
97.616   Certificate of representation.
97.617   Objections concerning designated representative and alternate designated representative.
97.618   Delegation by designated representative and alternate designated representative.
97.619   [Reserved]
97.620   Establishment of compliance accounts and general accounts.
97.621   Recordation of TR SO$_2$ Group 1 allowance allocations.
97.622   Submission of TR SO$_2$ Group 1 allowance transfers.
97.623   Recordation of TR SO$_2$ Group 1 allowance transfers.
97.624   Compliance with TR SO$_2$ Group 1 emissions limitation.
97.625   Compliance with TR SO$_2$ Group 1 assurance provisions.
97.626   Banking.
97.627   Account error.
97.628   Administrator's action on submissions.
97.629   [Reserved]
97.630   General monitoring, recordkeeping, and reporting requirements.
97.631   Initial monitoring system certification and recertification procedures.
97.632   Monitoring system out-of-control periods.

97.633   Notifications concerning monitoring.
97.634   Recordkeeping and reporting.
97.635   Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

## Subpart CCCCC—TR SO$_2$ Group 1 Trading Program

### § 97.601   Purpose.

This subpart sets forth the general, designated representative, allowance, and monitoring provisions for the Transport Rule (TR) SO$_2$ Group 1 Trading Program, under section 110 of the Clean Air Act and § 52.39 of this chapter, as a means of mitigating interstate transport of fine particulates and sulfur dioxide.

### § 97.602   Definitions.

The terms used in this subpart shall have the meanings set forth in this section as follows:

*Acid Rain Program* means a multi-state SO$_2$ and NO$_X$ air pollution control and emission reduction program established by the Administrator under title IV of the Clean Air Act and parts 72 through 78 of this chapter.

*Administrator* means the Administrator of the United States Environmental Protection Agency or the Director of the Clean Air Markets Division (or its successor determined by the Administrator) of the United States Environmental Protection Agency, the Administrator's duly authorized representative under this subpart.

*Allocate* or *allocation* means, with regard to TR SO$_2$ Group 1 allowances, the determination by the Administrator, State, or permitting authority, in accordance with this subpart and any SIP revision submitted by the State and approved by the Administrator under § 52.39(d), (e), or (f) of this chapter, of the amount of such TR SO$_2$ Group 1 allowances to be initially credited, at no cost to the recipient, to:

(1) A TR SO$_2$ Group 1 unit;

(2) A new unit set-aside;

(3) An Indian country new unit set-aside; or

(4) An entity not listed in paragraphs (1) through (3) of this definition;

(5) Provided that, if the Administrator, State, or permitting authority initially credits, to a TR SO$_2$ Group 1 unit qualifying for an initial credit, a credit in the amount of zero TR SO$_2$ Group 1 allowances, the TR SO$_2$ Group 1 unit will be treated as being allocated an amount (*i.e.,* zero) of TR SO$_2$ Group 1 allowances.

*Allowable SO$_2$ emission rate* means, for a unit, the most stringent State or federal SO$_2$ emission rate limit (in lb/MWhr or, if in lb/mmBtu, converted to lb/MWhr by multiplying it by the unit's heat rate in mmBtu/MWhr) that is applicable to the unit and covers the longest averaging period not exceeding one year.

*Allowance Management System* means the system by which the Administrator records allocations, deductions, and transfers of TR SO$_2$ Group 1 allowances under the TR SO$_2$ Group 1 Trading Program. Such allowances are allocated, recorded, held, deducted, or transferred only as whole allowances.

*Allowance Management System account* means an account in the Allowance Management System established by the Administrator for purposes of recording the allocation, holding, transfer, or deduction of TR SO$_2$ Group 1 allowances.

*Allowance transfer deadline* means, for a control period in a given year, midnight of March 1 (if it is a business day), or midnight of the first business day thereafter (if March 1 is not a business day), immediately after such control period and is the deadline by which a TR SO$_2$ Group 1 allowance transfer must be submitted for recordation in a TR SO$_2$ Group 1 source's compliance account in order to be available for use in complying with the source's TR SO$_2$ Group 1 emissions limitation for such control period in accordance with §§ 97.606 and 97.624.

*Alternate designated representative* means, for a TR SO$_2$ Group 1 source and each TR SO$_2$ Group 1 unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to act on behalf of the designated representative in matters pertaining to the TR SO$_2$ Group 1 Trading Program. If the TR SO$_2$ Group 1 source is also subject to the Acid Rain Program, TR NO$_X$ Annual Trading Program, or TR NO$_X$ Ozone Season Trading Program, then this natural person shall be the same natural person as the alternate designated representative, as defined in the respective program.

*Assurance account* means an Allowance Management System account, established by the Administrator under § 97.625(b)(3) for certain owners and operators of a group of one or more TR SO$_2$ Group 1 sources and units in a given State (and Indian country within the borders of such State), in which are held TR SO$_2$ Group 1 allowances available for use for a control period in a given year in complying with the TR SO$_2$ Group 1 assurance provisions in accordance with §§ 97.606 and 97.625.

*Authorized account representative* means, for a general account, the natural person who is authorized, in accordance with this subpart, to transfer and otherwise dispose of TR SO$_2$ Group 1 allowances held in the general account and, for a TR SO$_2$ Group 1 source's compliance account, the designated representative of the source.

*Automated data acquisition and handling system* or *DAHS* means the component of the continuous emission monitoring system, or other emissions monitoring system approved for use under this subpart, designed to interpret and convert individual output signals from pollutant concentration monitors, flow monitors, diluent gas monitors, and other component parts of the monitoring system to produce a continuous record of the measured parameters in the measurement units required by this subpart.

*Biomass* means—

(1) Any organic material grown for the purpose of being converted to energy;

(2) Any organic byproduct of agriculture that can be converted into energy; or

(3) Any material that can be converted into energy and is nonmerchantable for other purposes, that is segregated from other material that is nonmerchantable for other purposes, and that is;

(i) A forest-related organic resource, including mill residues, precommercial thinnings, slash, brush, or byproduct from conversion of trees to merchantable material; or

(ii) A wood material, including pallets, crates, dunnage, manufacturing and construction materials (other than pressure-treated, chemically-treated, or painted wood products), and landscape or right-of-way tree trimmings.

*Boiler* means an enclosed fossil- or other-fuel-fired combustion device used to produce heat and to transfer heat to recirculating water, steam, or other medium.

*Bottoming-cycle unit* means a unit in which the energy input to the unit is first used to produce useful thermal energy, where at least some of the reject heat from the useful thermal energy application or process is then used for electricity production.

*Business day* means a day that does not fall on a weekend or a federal holiday.

*Certifying official* means a natural person who is:

(1) For a corporation, a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function or any other person who performs similar policy- or decision-making functions for the corporation;

(2) For a partnership or sole proprietorship, a general partner or the proprietor respectively; or

(3) For a local government entity or State, federal, or other public agency, a principal executive officer or ranking elected official.

*Clean Air Act* means the Clean Air Act, 42 U.S.C. 7401, *et seq.*

*Coal* means ''coal'' as defined in § 72.2 of this chapter.

*Coal-derived fuel* means any fuel (whether in a solid, liquid, or gaseous state) produced by the mechanical, thermal, or chemical processing of coal.

*Cogeneration system* means an integrated group, at a source, of equipment (including a boiler, or combustion turbine, and a steam turbine generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy.

*Cogeneration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a topping-cycle unit or a bottoming-cycle unit:

(1) Operating as part of a cogeneration system; and

(2) Producing on an annual average basis—

(i) For a topping-cycle unit,

(A) Useful thermal energy not less than 5 percent of total energy output; and

(B) Useful power that, when added to one-half of useful thermal energy produced, is not less than 42.5 percent of total energy input, if useful thermal energy produced is 15 percent or more of total energy output, or not less than 45 percent of total energy input, if useful thermal energy produced is less than 15 percent of total energy output.

(ii) For a bottoming-cycle unit, useful power not less than 45 percent of total energy input;

(3) Provided that the requirements in paragraph (2) of this definition shall not apply to a calendar year referenced in paragraph (2) of this definition during which the unit did not operate at all;

(4) Provided that the total energy input under paragraphs (2)(i)(B) and (2)(ii) of this definition shall equal the unit's total energy input from all fuel, except biomass if the unit is a boiler; and

(5) Provided that, if, throughout its operation during the 12-month period or a calendar year referenced in paragraph (2) of this definition, a unit is operated as part of a cogeneration system and the cogeneration system meets on a system-wide basis the requirement in paragraph (2)(i)(B) or (2)(ii) of this definition, the unit shall be deemed to meet such

requirement during that 12-month period or calendar year.

*Combustion turbine* means an enclosed device comprising:

(1) If the device is simple cycle, a compressor, a combustor, and a turbine and in which the flue gas resulting from the combustion of fuel in the combustor passes through the turbine, rotating the turbine; and

(2) If the device is combined cycle, the equipment described in paragraph (1) of this definition and any associated duct burner, heat recovery steam generator, and steam turbine.

*Commence commercial operation* means, with regard to a unit:

(1) To have begun to produce steam, gas, or other heated medium used to generate electricity for sale or use, including test generation, except as provided in § 97.605.

(i) For a unit that is a TR $SO_2$ Group 1 unit under § 97.604 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that subsequently undergoes a physical change or is moved to a new location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit that is a TR $SO_2$ Group 1 unit under § 97.604 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

(2) Notwithstanding paragraph (1) of this definition and except as provided in § 97.605, for a unit that is not a TR $SO_2$ Group 1 unit under § 97.604 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in introductory text of paragraph (1) of this definition, the unit's date for commencement of commercial operation shall be the date on which the unit becomes a TR $SO_2$ Group 1 unit under § 97.604.

(i) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition and that subsequently undergoes a physical change or is moved to a different location or source, such date

shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

*Common designated representative* means, with regard to a control period in a given year, a designated representative where, as of April 1 immediately after the allowance transfer deadline for such control period, the same natural person is authorized under §§ 97.613(a) and 97.615(a) as the designated representative for a group of one or more TR $SO_2$ Group 1 sources and units located in a State (and Indian country within the borders of such State).

*Common designated representative's assurance level* means, with regard to a specific common designated representative and a State (and Indian country within the borders of such State) and control period in a given year for which the State assurance level is exceeded as described in § 97.606(c)(2)(iii), the common designated representative's share of the State $SO_2$ Group 1 trading budget with the variability limit for the State for such control period.

*Common designated representative's share* means, with regard to a specific common designated representative for a control period in a given year:

(1) With regard to a total amount of $SO_2$ emissions from all TR $SO_2$ Group 1 units in a State (and Indian country within the borders of such State) during such control period, the total tonnage of $SO_2$ emissions during such control period from a group of one or more TR $SO_2$ Group 1 units located in such State (and such Indian country) and having the common designated representative for such control period; and

(2) With regard to a State $SO_2$ Group 1 trading budget with the variability limit for such control period, the amount (rounded to the nearest allowance) equal to the sum of the total amount of TR $SO_2$ Group 1 allowances allocated for such control period to a group of one or more TR $SO_2$ Group 1 units located in the State (and Indian country within the borders of such

State) and having the common designated representative for such control period and of the total amount of TR $SO_2$ Group 1 allowances purchased by an owner or operator of such TR $SO_2$ Group 1 units in an auction for such control period and submitted by the State or the permitting authority to the Administrator for recordation in the compliance accounts for such TR $SO_2$ Group 1 units in accordance with the TR $SO_2$ Group 1 allowance auction provisions in a SIP revision approved by the Administrator under § 52.39(e) or (f) of this chapter, multiplied by the sum of the State $SO_2$ Group 1 trading budget under § 97.610(a) and the State's variability limit under § 97.610(b) for such control period and divided by such State $SO_2$ Group 1 trading budget;

(3) Provided that, in the case of a unit that operates during, but has no amount of TR $SO_2$ Group 1 allowances allocated under §§ 97.611 and 97.612 for, such control period, the unit shall be treated, solely for purposes of this definition, as being allocated an amount (rounded to the nearest allowance) of TR $SO_2$ Group 1 allowances for such control period equal to the unit's allowable $SO_2$ emission rate applicable to such control period, multiplied by a capacity factor of 0.85 (if the unit is a boiler combusting any amount of coal or coal-derived fuel during such control period), 0.24 (if the unit is a simple combustion turbine during such control period), 0.67 (if the unit is a combined cycle turbine during such control period), 0.74 (if the unit is an integrated coal gasification combined cycle unit during such control period), or 0.36 (for any other unit), multiplied by the unit's maximum hourly load as reported in accordance with this subpart and by 8,760 hours/control period, and divided by 2,000 lb/ton.

*Common stack* means a single flue through which emissions from 2 or more units are exhausted.

*Compliance account* means an Allowance Management System account, established by the Administrator for a TR $SO_2$ Group 1 source under this subpart, in which any TR $SO_2$ Group 1 allowance allocations to the TR $SO_2$ Group 1 units at the source are recorded and in which are held any TR $SO_2$ Group 1 allowances available for use for a control period in a given year in complying with the source's TR $SO_2$ Group 1 emissions limitation in accordance with §§ 97.606 and 97.624.

*Continuous emission monitoring system* or *CEMS* means the equipment required under this subpart to sample, analyze, measure, and provide, by means of readings recorded at least once

every 15 minutes and using an automated data acquisition and handling system (DAHS), a permanent record of $SO_2$ emissions, stack gas volumetric flow rate, stack gas moisture content, and $O_2$ or $CO_2$ concentration (as applicable), in a manner consistent with part 75 of this chapter and §§ 97.630 through 97.635. The following systems are the principal types of continuous emission monitoring systems:

(1) A flow monitoring system, consisting of a stack flow rate monitor and an automated data acquisition and handling system and providing a permanent, continuous record of stack gas volumetric flow rate, in standard cubic feet per hour (scfh);

(2) A $SO_2$ monitoring system, consisting of a $SO_2$ pollutant concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of $SO_2$ emissions, in parts per million (ppm);

(3) A moisture monitoring system, as defined in § 75.11(b)(2) of this chapter and providing a permanent, continuous record of the stack gas moisture content, in percent $H_2O$;

(4) A $CO_2$ monitoring system, consisting of a $CO_2$ pollutant concentration monitor (or an $O_2$ monitor plus suitable mathematical equations from which the $CO_2$ concentration is derived) and an automated data acquisition and handling system and providing a permanent, continuous record of $CO_2$ emissions, in percent $CO_2$; and

(5) An $O_2$ monitoring system, consisting of an $O_2$ concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of $O_2$, in percent $O_2$.

*Control period* means the period starting January 1 of a calendar year, except as provided in § 97.606(c)(3), and ending on December 31 of the same year, inclusive.

*Designated representative* means, for a TR $SO_2$ Group 1 source and each TR $SO_2$ Group 1 unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to represent and legally bind each owner and operator in matters pertaining to the TR $SO_2$ Group 1 Trading Program. If the TR $SO_2$ Group 1 source is also subject to the Acid Rain Program, TR $NO_X$ Annual Trading Program, or TR $NO_X$ Ozone Season Trading Program, then this natural person shall be the same natural person as the designated representative, as defined in the respective program.

*Emissions* means air pollutants exhausted from a unit or source into the atmosphere, as measured, recorded, and reported to the Administrator by the designated representative, and as modified by the Administrator:

(1) In accordance with this subpart; and

(2) With regard to a period before the unit or source is required to measure, record, and report such air pollutants in accordance with this subpart, in accordance with part 75 of this chapter.

*Excess emissions* means any ton of emissions from the TR $SO_2$ Group 1 units at a TR $SO_2$ Group 1 source during a control period in a given year that exceeds the TR $SO_2$ Group 1 emissions limitation for the source for such control period.

*Fossil fuel* means—

(1) Natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material; or

(2) For purposes of applying the limitation on "average annual fuel consumption of fossil fuel" in §§ 97.604(b)(2)(i)(B) and (ii), natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material for the purpose of creating useful heat.

*Fossil-fuel-fired* means, with regard to a unit, combusting any amount of fossil fuel in 2005 or any calendar year thereafter.

*General account* means an Allowance Management System account, established under this subpart, that is not a compliance account or an assurance account.

*Generator* means a device that produces electricity.

*Gross electrical output* means, for a unit, electricity made available for use, including any such electricity used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Heat input* means, for a unit for a specified period of time, the product (in mmBtu/time) of the gross calorific value of the fuel (in mmBtu/lb) fed into the unit multiplied by the fuel feed rate (in lb of fuel/time), as measured, recorded, and reported to the Administrator by the designated representative and as modified by the Administrator in accordance with this subpart and excluding the heat derived from preheated combustion air, recirculated flue gases, or exhaust.

*Heat input rate* means, for a unit, the amount of heat input (in mmBtu) divided by unit operating time (in hr) or, for a unit and a specific fuel, the amount of heat input attributed to the

fuel (in mmBtu) divided by the unit operating time (in hr) during which the unit combusts the fuel.

*Heat rate* means, for a unit, the unit's maximum design heat input (in Btu/hr), divided by the product of 1,000,000 Btu/mmBtu and the unit's maximum hourly load.

*Indian country* means "Indian country" as defined in 18 U.S.C. 1151.

*Life-of-the-unit, firm power contractual arrangement* means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of nameplate capacity and associated energy generated by any specified unit and pays its proportional amount of such unit's total costs, pursuant to a contract:

(1) For the life of the unit;

(2) For a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or

(3) For a period no less than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit is built, with option rights to purchase or release some portion of the nameplate capacity and associated energy generated by the unit at the end of the period.

*Maximum design heat input* means, for a unit, the maximum amount of fuel per hour (in Btu/hr) that the unit is capable of combusting on a steady state basis as of the initial installation of the unit as specified by the manufacturer of the unit.

*Monitoring system* means any monitoring system that meets the requirements of this subpart, including a continuous emission monitoring system, an alternative monitoring system, or an excepted monitoring system under part 75 of this chapter.

*Nameplate capacity* means, starting from the initial installation of a generator, the maximum electrical generating output (in MWe, rounded to the nearest tenth) that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings) as of such installation as specified by the manufacturer of the generator or, starting from the completion of any subsequent physical change in the generator resulting in an increase in the maximum electrical generating output that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings), such increased maximum amount (in MWe, rounded to the nearest tenth) as of such completion

as specified by the person conducting the physical change.

*Natural gas* means "natural gas" as defined in § 72.2 of this chapter.

*Newly affected TR $SO_2$ Group 1 unit* means a unit that was not a TR $SO_2$ Group 1 unit when it began operating but that thereafter becomes a TR $SO_2$ Group 1 unit.

*Operate* or *operation* means, with regard to a unit, to combust fuel.

*Operator* means, for a TR $SO_2$ Group 1 source or a TR $SO_2$ Group 1 unit at a source respectively, any person who operates, controls, or supervises a TR $SO_2$ Group 1 unit at the source or the TR $SO_2$ Group 1 unit and shall include, but not be limited to, any holding company, utility system, or plant manager of such source or unit.

*Owner* means, for a TR $SO_2$ Group 1 source or a TR $SO_2$ Group 1 unit at a source respectively, any of the following persons:

(1) Any holder of any portion of the legal or equitable title in a TR $SO_2$ Group 1 unit at the source or the TR $SO_2$ Group 1 unit;

(2) Any holder of a leasehold interest in a TR $SO_2$ Group 1 unit at the source or the TR $SO_2$ Group 1 unit, provided that, unless expressly provided for in a leasehold agreement, "owner" shall not include a passive lessor, or a person who has an equitable interest through such lessor, whose rental payments are not based (either directly or indirectly) on the revenues or income from such TR $SO_2$ Group 1 unit; and

(3) Any purchaser of power from a TR $SO_2$ Group 1 unit at the source or the TR $SO_2$ Group 1 unit under a life-of-the-unit, firm power contractual arrangement.

*Permanently retired* means, with regard to a unit, a unit that is unavailable for service and that the unit's owners and operators do not expect to return to service in the future.

*Permitting authority* means "permitting authority" as defined in §§ 70.2 and 71.2 of this chapter.

*Potential electrical output capacity* means, for a unit, 33 percent of the unit's maximum design heat input, divided by 3,413 Btu/kWh, divided by 1,000 kWh/MWh, and multiplied by 8,760 hr/yr.

*Receive* or *receipt of* means, when referring to the Administrator, to come into possession of a document, information, or correspondence (whether sent in hard copy or by authorized electronic transmission), as indicated in an official log, or by a notation made on the document, information, or correspondence, by the Administrator in the regular course of business.

*Recordation, record,* or *recorded* means, with regard to TR $SO_2$ Group 1 allowances, the moving of TR $SO_2$ Group 1 allowances by the Administrator into, out of, or between Allowance Management System accounts, for purposes of allocation, auction, transfer, or deduction.

*Reference method* means any direct test method of sampling and analyzing for an air pollutant as specified in § 75.22 of this chapter.

*Replacement, replace,* or *replaced* means, with regard to a unit, the demolishing of a unit, or the permanent retirement and permanent disabling of a unit, and the construction of another unit (the replacement unit) to be used instead of the demolished or retired unit (the replaced unit).

*Sequential use of energy* means:

(1) The use of reject heat from electricity production in a useful thermal energy application or process; or

(2) The use of reject heat from useful thermal energy application or process in electricity production.

*Serial number* means, for a TR $SO_2$ Group 1 allowance, the unique identification number assigned to each TR $SO_2$ Group 1 allowance by the Administrator.

*Solid waste incineration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a "solid waste incineration unit" as defined in section 129(g)(1) of the Clean Air Act.

*Source* means all buildings, structures, or installations located in one or more contiguous or adjacent properties under common control of the same person or persons. This definition does not change or otherwise affect the definition of "major source", "stationary source", or "source" as set forth and implemented in a title V operating permit program or any other program under the Clean Air Act.

*State* means one of the States that is subject to the TR $SO_2$ Group 1 Trading Program pursuant to § 52.39(a), (b), (d), (e), and (f) of this chapter.

*Submit* or *serve* means to send or transmit a document, information, or correspondence to the person specified in accordance with the applicable regulation:

(1) In person;

(2) By United States Postal Service; or

(3) By other means of dispatch or transmission and delivery;

(4) Provided that compliance with any "submission" or "service" deadline shall be determined by the date of dispatch, transmission, or mailing and not the date of receipt.

*Topping-cycle unit* means a unit in which the energy input to the unit is first used to produce useful power, including electricity, where at least some of the reject heat from the electricity production is then used to provide useful thermal energy.

*Total energy input* means, for a unit, total energy of all forms supplied to the unit, excluding energy produced by the unit. Each form of energy supplied shall be measured by the lower heating value of that form of energy calculated as follows:

$$LHV = HHV - 10.55(W + 9H)$$

Where:

LHV = lower heating value of the form of energy in Btu/lb,
HHV = higher heating value of the form of energy in Btu/lb,
W = weight % of moisture in the form of energy, and
H = weight % of hydrogen in the form of energy.

*Total energy output* means, for a unit, the sum of useful power and useful thermal energy produced by the unit.

*TR $NO_X$ Annual Trading Program* means a multi-state $NO_X$ air pollution control and emission reduction program established in accordance with subpart AAAAA of this part and § 52.38(a) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(a)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(a)(5) of this chapter), as a means of mitigating interstate transport of fine particulates and $NO_X$.

*TR $NO_X$ Ozone Season Trading Program* means a multi-state $NO_X$ air pollution control and emission reduction program established in accordance with subpart BBBBB of this part and § 52.38(b) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(5) of this chapter), as a means of mitigating interstate transport of ozone and $NO_X$.

*TR $SO_2$ Group 1 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under this subpart, or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.39(d), (e), or (f) of this chapter, to emit one ton of $SO_2$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the TR $SO_2$ Group 1 Trading Program.

*TR $SO_2$ Group 1 allowance deduction* or *deduct TR $SO_2$ Group 1 allowances* means the permanent withdrawal of TR $SO_2$ Group 1 allowances by the Administrator from a compliance account (*e.g.,* in order to account for compliance with the TR $SO_2$ Group 1 emissions limitation) or from an assurance account (*e.g.,* in order to account for compliance with the assurance provisions under §§ 97.606 and 97.625).

*TR $SO_2$ Group 1 allowances held* or *hold TR $SO_2$ Group 1 allowances* means the TR $SO_2$ Group 1 allowances treated as included in an Allowance Management System account as of a specified point in time because at that time they:

(1) Have been recorded by the Administrator in the account or transferred into the account by a correctly submitted, but not yet recorded, TR $SO_2$ Group 1 allowance transfer in accordance with this subpart; and

(2) Have not been transferred out of the account by a correctly submitted, but not yet recorded, TR $SO_2$ Group 1 allowance transfer in accordance with this subpart.

*TR $SO_2$ Group 1 emissions limitation* means, for a TR $SO_2$ Group 1 source, the tonnage of $SO_2$ emissions authorized in a control period by the TR $SO_2$ Group 1 allowances available for deduction for the source under § 97.624(a) for such control period.

*TR $SO_2$ Group 1 source* means a source that includes one or more TR $SO_2$ Group 1 units.

*TR $SO_2$ Group 1 Trading Program* means a multi-state $SO_2$ air pollution control and emission reduction program established in accordance with this subpart and § 52.39(a), (b), (d) through (f), (j), and (k) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(d) or (e) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(f) of this chapter), as a means of mitigating interstate transport of fine particulates and $SO_2$.

*TR $SO_2$ Group 1 unit* means a unit that is subject to the TR $SO_2$ Group 1 Trading Program under § 97.604.

*Unit* means a stationary, fossil-fuel-fired boiler, stationary, fossil-fuel-fired combustion turbine, or other stationary, fossil-fuel-fired combustion device. A unit that undergoes a physical change or is moved to a different location or source shall continue to be treated as the same unit. A unit (the replaced unit) that is replaced by another unit (the replacement unit) at the same or a different source shall continue to be

treated as the same unit, and the replacement unit shall be treated as a separate unit.

*Unit operating day* means, with regard to a unit, a calendar day in which the unit combusts any fuel.

*Unit operating hour or hour of unit operation* means, with regard to a unit, an hour in which the unit combusts any fuel.

*Useful power* means, with regard to a unit, electricity or mechanical energy that the unit makes available for use, excluding any such energy used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Useful thermal energy* means thermal energy that is:

(1) Made available to an industrial or commercial process (not a power production process), excluding any heat contained in condensate return or makeup water;

(2) Used in a heating application (*e.g.,* space heating or domestic hot water heating); or

(3) Used in a space cooling application (*i.e.,* in an absorption chiller).

*Utility power distribution system* means the portion of an electricity grid owned or operated by a utility and dedicated to delivering electricity to customers.

## § 97.603 Measurements, abbreviations, and acronyms.

Measurements, abbreviations, and acronyms used in this subpart are defined as follows:

Btu—British thermal unit
$CO_2$—carbon dioxide
$H_2O$—water
hr—hour
kW—kilowatt electrical
kWh—kilowatt hour
lb—pound
mmBtu—million Btu
MWe—megawatt electrical
MWh—megawatt hour
$NO_X$—nitrogen oxides
$O_2$—oxygen
ppm—parts per million
scfh—standard cubic feet per hour
$SO_2$—sulfur dioxide
yr—year

## § 97.604 Applicability.

(a) Except as provided in paragraph (b) of this section:

(1) The following units in a State (and Indian country within the borders of such State) shall be TR $SO_2$ Group 1 units, and any source that includes one or more such units shall be a TR $SO_2$ Group 1 source, subject to the requirements of this subpart: any stationary, fossil-fuel-fired boiler or

stationary, fossil-fuel-fired combustion turbine serving at any time, on or after January 1, 2005, a generator with nameplate capacity of more than 25 MWe producing electricity for sale.

(2) If a stationary boiler or stationary combustion turbine that, under paragraph (a)(1) of this section, is not a TR SO$_2$ Group 1 unit begins to combust fossil fuel or to serve a generator with nameplate capacity of more than 25 MWe producing electricity for sale, the unit shall become a TR SO$_2$ Group 1 unit as provided in paragraph (a)(1) of this section on the first date on which it both combusts fossil fuel and serves such generator.

(b) Any unit in a State (and Indian country within the borders of such State) that otherwise is a TR SO$_2$ Group 1 unit under paragraph (a) of this section and that meets the requirements set forth in paragraph (b)(1)(i) or (2)(i) of this section shall not be a TR SO$_2$ Group 1 unit:

(1)(i) Any unit:

(A) Qualifying as a cogeneration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a cogeneration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) Not supplying in 2005 or any calendar year thereafter more than one-third of the unit's potential electric output capacity or 219,000 MWh, whichever is greater, to any utility power distribution system for sale.

(ii) If, after qualifying under paragraph (b)(1)(i) of this section as not being a TR SO$_2$ Group 1 unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR SO$_2$ Group 1 unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a cogeneration unit or January 1 after the first calendar year during which the unit no longer meets the requirements of paragraph (b)(1)(i)(B) of this section. The unit shall thereafter continue to be a TR SO$_2$ Group 1 unit.

(2)(i) Any unit:

(A) Qualifying as a solid waste incineration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a solid waste incineration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) With an average annual fuel consumption of fossil fuel for the first 3 consecutive calendar years of operation starting no earlier than 2005 of less than 20 percent (on a Btu basis) and an average annual fuel consumption of fossil fuel for any 3 consecutive calendar years thereafter of less than 20 percent (on a Btu basis).

(ii) If, after qualifying under paragraph (b)(2)(i) of this section as not being a TR SO$_2$ Group 1 unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR SO$_2$ Group 1 unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a solid waste incineration unit or January 1 after the first 3 consecutive calendar years after 2005 for which the unit has an average annual fuel consumption of fossil fuel of 20 percent or more. The unit shall thereafter continue to be a TR SO$_2$ Group 1 unit.

(c) A certifying official of an owner or operator of any unit or other equipment may submit a petition (including any supporting documents) to the Administrator at any time for a determination concerning the applicability, under paragraphs (a) and (b) of this section or a SIP revision approved under § 52.39(e) or (f) of this chapter, of the TR SO$_2$ Group 1 Trading Program to the unit or other equipment.

(1) Petition content. The petition shall be in writing and include the identification of the unit or other equipment and the relevant facts about the unit or other equipment. The petition and any other documents provided to the Administrator in connection with the petition shall include the following certification statement, signed by the certifying official: ''I am authorized to make this submission on behalf of the owners and operators of the unit or other equipment for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(2) Response. The Administrator will issue a written response to the petition and may request supplemental information determined by the Administrator to be relevant to such petition. The Administrator's determination concerning the applicability, under paragraphs (a) and (b) of this section, of the TR SO$_2$ Group 1 Trading Program to the unit or other equipment shall be binding on any State or permitting authority unless the Administrator determines that the petition or other documents or information provided in connection with the petition contained significant, relevant errors or omissions.

## § 97.605 Retired unit exemption.

(a)(1) Any TR SO$_2$ Group 1 unit that is permanently retired shall be exempt from § 97.606(b) and (c)(1), § 97.624, and §§ 97.630 through 97.635.

(2) The exemption under paragraph (a)(1) of this section shall become effective the day on which the TR SO$_2$ Group 1 unit is permanently retired. Within 30 days of the unit's permanent retirement, the designated representative shall submit a statement to the Administrator. The statement shall state, in a format prescribed by the Administrator, that the unit was permanently retired on a specified date and will comply with the requirements of paragraph (b) of this section.

(b) Special provisions. (1) A unit exempt under paragraph (a) of this section shall not emit any SO$_2$, starting on the date that the exemption takes effect.

(2) For a period of 5 years from the date the records are created, the owners and operators of a unit exempt under paragraph (a) of this section shall retain, at the source that includes the unit, records demonstrating that the unit is permanently retired. The 5-year period for keeping records may be extended for cause, at any time before the end of the period, in writing by the Administrator. The owners and operators bear the burden of proof that the unit is permanently retired.

(3) The owners and operators and, to the extent applicable, the designated representative of a unit exempt under paragraph (a) of this section shall comply with the requirements of the TR SO$_2$ Group 1 Trading Program concerning all periods for which the exemption is not in effect, even if such requirements arise, or must be complied with, after the exemption takes effect.

(4) A unit exempt under paragraph (a) of this section shall lose its exemption on the first date on which the unit resumes operation. Such unit shall be treated, for purposes of applying allocation, monitoring, reporting, and recordkeeping requirements under this subpart, as a unit that commences commercial operation on the first date on which the unit resumes operation.

**§ 97.606 Standard requirements.**

(a) *Designated representative requirements.* The owners and operators shall comply with the requirement to have a designated representative, and may have an alternate designated representative, in accordance with §§ 97.613 through 97.618.

(b) *Emissions monitoring, reporting, and recordkeeping requirements.* (1) The owners and operators, and the designated representative, of each TR SO$_2$ Group 1 source and each TR SO$_2$ Group 1 unit at the source shall comply with the monitoring, reporting, and recordkeeping requirements of §§ 97.630 through 97.635.

(2) The emissions data determined in accordance with §§ 97.630 through 97.635 shall be used to calculate allocations of TR SO$_2$ Group 1 allowances under §§ 97.611(a)(2) and (b) and 97.612 and to determine compliance with the TR SO$_2$ Group 1 emissions limitation and assurance provisions under paragraph (c) of this section, provided that, for each monitoring location from which mass emissions are reported, the mass emissions amount used in calculating such allocations and determining such compliance shall be the mass emissions amount for the monitoring location determined in accordance with §§ 97.630 through 97.635 and rounded to the nearest ton, with any fraction of a ton less than 0.50 being deemed to be zero.

(c) *SO$_2$ emissions requirements.* (1) TR SO$_2$ Group 1 emissions limitation. (i) As of the allowance transfer deadline for a control period in a given year, the owners and operators of each TR SO$_2$ Group 1 source and each TR SO$_2$ Group 1 unit at the source shall hold, in the source's compliance account, TR SO$_2$ Group 1 allowances available for deduction for such control period under § 97.624(a) in an amount not less than the tons of total SO$_2$ emissions for such control period from all TR SO$_2$ Group 1 units at the source.

(ii) If total SO$_2$ emissions during a control period in a given year from the TR SO$_2$ Group 1 units at a TR SO$_2$ Group 1 source are in excess of the TR SO$_2$ Group 1 emissions limitation set forth in paragraph (c)(1)(i) of this section, then:

(A) The owners and operators of the source and each TR SO$_2$ Group 1 unit at the source shall hold the TR SO$_2$ Group 1 allowances required for deduction under § 97.624(d); and

(B) The owners and operators of the source and each TR SO$_2$ Group 1 unit at the source shall pay any fine, penalty, or assessment or comply with any other remedy imposed, for the same

violations, under the Clean Air Act, and each ton of such excess emissions and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(2) TR SO$_2$ Group 1 assurance provisions. (i) If total SO$_2$ emissions during a control period in a given year from all TR SO$_2$ Group 1 units at TR SO$_2$ Group 1 sources in a State (and Indian country within the borders of such State) exceed the State assurance level, then the owners and operators of such sources and units in each group of one or more sources and units having a common designated representative for such control period, where the common designated representative's share of such SO$_2$ emissions during such control period exceeds the common designated representative's assurance level for the State and such control period, shall hold (in the assurance account established for the owners and operators of such group) TR SO$_2$ Group 1 allowances available for deduction for such control period under § 97.625(a) in an amount equal to two times the product (rounded to the nearest whole number), as determined by the Administrator in accordance with § 97.625(b), of multiplying—

(A) The quotient of the amount by which the common designated representative's share of such SO$_2$ emissions exceeds the common designated representative's assurance level divided by the sum of the amounts, determined for all common designated representatives for such sources and units within the borders of such State (and Indian country within the borders of such State) for such control period, by which each common designated representative's share of such SO$_2$ emissions exceeds the respective common designated representative's assurance level; and

(B) The amount by which total SO$_2$ emissions from all TR SO$_2$ Group 1 units at TR SO$_2$ Group 1 sources in the State (and Indian country within the borders of such State) for such control period exceed the State assurance level.

(ii) The owners and operators shall hold the TR SO$_2$ Group 1 allowances required under paragraph (c)(2)(i) of this section, as of midnight of November 1 (if it is a business day), or midnight of the first business day thereafter (if November 1 is not a business day), immediately after such control period.

(iii) Total SO$_2$ emissions from all TR SO$_2$ Group 1 units at TR SO$_2$ Group 1 sources in a State (and Indian country within the borders of such State) during a control period in a given year exceed the State assurance level if such total SO$_2$ emissions exceed the sum, for such

control period, of the State SO$_2$ Group 1 trading budget under § 97.610(a) and the State's variability limit under § 97.610(b).

(iv) It shall not be a violation of this subpart or of the Clean Air Act if total SO$_2$ emissions from all TR SO$_2$ Group 1 units at TR SO$_2$ Group 1 sources in a State (and Indian country within the borders of such State) during a control period exceed the State assurance level or if a common designated representative's share of total SO$_2$ emissions from the TR SO$_2$ Group 1 units at TR SO$_2$ Group 1 sources in a State (and Indian country within the borders of such State) during a control period exceeds the common designated representative's assurance level.

(v) To the extent the owners and operators fail to hold TR SO$_2$ Group 1 allowances for a control period in a given year in accordance with paragraphs (c)(2)(i) through (iii) of this section,

(A) The owners and operators shall pay any fine, penalty, or assessment or comply with any other remedy imposed under the Clean Air Act; and

(B) Each TR SO$_2$ Group 1 allowance that the owners and operators fail to hold for such control period in accordance with paragraphs (c)(2)(i) through (iii) of this section and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(3) Compliance periods. A TR SO$_2$ Group 1 unit shall be subject to the requirements under paragraphs (c)(1) and (c)(2) of this section for the control period starting on the later of January 1, 2012 or the deadline for meeting the unit's monitor certification requirements under § 97.630(b) and for each control period thereafter.

(4) Vintage of allowances held for compliance. (i) A TR SO$_2$ Group 1 allowance held for compliance with the requirements under paragraph (c)(1)(i) of this section for a control period in a given year must be a TR SO$_2$ Group 1 allowance that was allocated for such control period or a control period in a prior year.

(ii) A TR SO$_2$ Group 1 allowance held for compliance with the requirements under paragraphs (c)(1)(ii)(A) and (2)(i) through (iii) of this section for a control period in a given year must be a TR SO$_2$ Group 1 allowance that was allocated for a control period in a prior year or the control period in the given year or in the immediately following year.

(5) Allowance Management System requirements. Each TR SO$_2$ Group 1 allowance shall be held in, deducted from, or transferred into, out of, or between Allowance Management

System accounts in accordance with this subpart.

(6) *Limited authorization.* A TR SO$_2$ Group 1 allowance is a limited authorization to emit one ton of SO$_2$ during the control period in one year. Such authorization is limited in its use and duration as follows:

(i) Such authorization shall only be used in accordance with the TR SO$_2$ Group 1 Trading Program; and

(ii) Notwithstanding any other provision of this subpart, the Administrator has the authority to terminate or limit the use and duration of such authorization to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act.

(7) *Property right.* A TR SO$_2$ Group 1 allowance does not constitute a property right.

(d) *Title V permit requirements.* (1) No title V permit revision shall be required for any allocation, holding, deduction, or transfer of TR SO$_2$ Group 1 allowances in accordance with this subpart.

(2) A description of whether a unit is required to monitor and report SO$_2$ emissions using a continuous emission monitoring system (under subpart H of part 75 of this chapter), an excepted monitoring system (under appendices D and E to part 75 of this chapter), a low mass emissions excepted monitoring methodology (under § 75.19 of this chapter), or an alternative monitoring system (under subpart E of part 75 of this chapter) in accordance with §§ 97.630 through 97.635 may be added to, or changed in, a title V permit using minor permit modification procedures in accordance with §§ 70.7(e)(2) and 71.7(e)(1) of this chapter, provided that the requirements applicable to the described monitoring and reporting (as added or changed, respectively) are already incorporated in such permit. This paragraph explicitly provides that the addition of, or change to, a unit's description as described in the prior sentence is eligible for minor permit modification procedures in accordance with §§ 70.7(e)(2)(i)(B) and 71.7(e)(1)(i)(B) of this chapter.

(e) *Additional recordkeeping and reporting requirements.* (1) Unless otherwise provided, the owners and operators of each TR SO$_2$ Group 1 source and each TR SO$_2$ Group 1 unit at the source shall keep on site at the source each of the following documents (in hardcopy or electronic format) for a period of 5 years from the date the document is created. This period may be extended for cause, at any time before the end of 5 years, in writing by the Administrator.

(i) The certificate of representation under § 97.616 for the designated representative for the source and each TR SO$_2$ Group 1 unit at the source and all documents that demonstrate the truth of the statements in the certificate of representation; provided that the certificate and documents shall be retained on site at the source beyond such 5-year period until such certificate of representation and documents are superseded because of the submission of a new certificate of representation under § 97.616 changing the designated representative.

(ii) All emissions monitoring information, in accordance with this subpart.

(iii) Copies of all reports, compliance certifications, and other submissions and all records made or required under, or to demonstrate compliance with the requirements of, the TR SO$_2$ Group 1 Trading Program.

(2) The designated representative of a TR SO$_2$ Group 1 source and each TR SO$_2$ Group 1 unit at the source shall make all submissions required under the TR SO$_2$ Group 1 Trading Program, except as provided in § 97.618. This requirement does not change, create an exemption from, or or otherwise affect the responsible official submission requirements under a title V operating permit program in parts 70 and 71 of this chapter.

(f) *Liability.* (1) Any provision of the TR SO$_2$ Group 1 Trading Program that applies to a TR SO$_2$ Group 1 source or the designated representative of a TR SO$_2$ Group 1 source shall also apply to the owners and operators of such source and of the TR SO$_2$ Group 1 units at the source.

(2) Any provision of the TR SO$_2$ Group 1 Trading Program that applies to a TR SO$_2$ Group 1 unit or the designated representative of a TR SO$_2$ Group 1 unit shall also apply to the owners and operators of such unit.

(g) *Effect on other authorities.* No provision of the TR SO$_2$ Group 1 Trading Program or exemption under § 97.605 shall be construed as exempting or excluding the owners and operators, and the designated representative, of a TR SO$_2$ Group 1 source or TR SO$_2$ Group 1 unit from compliance with any other provision of the applicable, approved State implementation plan, a federally enforceable permit, or the Clean Air Act.

### § 97.607   Computation of time.

(a) Unless otherwise stated, any time period scheduled, under the TR SO$_2$ Group 1 Trading Program, to begin on the occurrence of an act or event shall begin on the day the act or event occurs.

(b) Unless otherwise stated, any time period scheduled, under the TR SO$_2$ Group 1 Trading Program, to begin before the occurrence of an act or event shall be computed so that the period ends the day before the act or event occurs.

(c) Unless otherwise stated, if the final day of any time period, under the TR SO$_2$ Group 1 Trading Program, is not a business day, the time period shall be extended to the next business day.

### § 97.608   Administrative appeal procedures.

The administrative appeal procedures for decisions of the Administrator under the TR SO$_2$ Group 1 Trading Program are set forth in part 78 of this chapter.

### § 97.609   [Reserved]

### § 97.610   State SO$_2$ Group 1 trading budgets, new unit set-asides, Indian country new unit set-aside, and variability limits.

(a) The State SO$_2$ Group 1 trading budgets, new unit set-asides, and Indian country new unit set-asides for allocations of TR SO$_2$ Group 1 allowances for the control periods in 2012 and thereafter are as follows:

| State | SO$_2$ Group 1 trading budget (tons) * for 2012 and 2013 | New unit set-aside (tons) for 2012 and 2013 | Indian country new unit set-aside (tons) for 2012 and 2013 |
|---|---|---|---|
| Illinois | 234,889 | 11,744 | ................................ |
| Indiana | 285,424 | 8,563 | ................................ |
| Iowa | 107,085 | 2,035 | 107 |
| Kentucky | 232,662 | 13,960 | ................................ |
| Maryland | 30,120 | 602 | ................................ |
| Michigan | 229,303 | 4,357 | 229 |
| Missouri | 207,466 | 4,149 | ................................ |
| New Jersey | 5,574 | 111 | ................................ |

| State | SO$_2$ Group 1 trading budget (tons) * for 2012 and 2013 | New unit set-aside (tons) for 2012 and 2013 | Indian country new unit set-aside (tons) for 2012 and 2013 |
|---|---|---|---|
| New York | 27,325 | 520 | 27 |
| North Carolina | 136,881 | 10,813 | 137 |
| Ohio | 310,230 | 6,205 | ............................ |
| Pennsylvania | 278,651 | 5,573 | ............................ |
| Tennessee | 148,150 | 2,963 | ............................ |
| Virginia | 70,820 | 2,833 | ............................ |
| West Virginia | 146,174 | 10,232 | ............................ |
| Wisconsin | 79,480 | 3,894 | 80 |

| State | SO$_2$ Group 1 trading budget (tons) * for 2014 and thereafter | New unit set-aside (tons) for 2014 and thereafter | Indian country new unit set-aside (tons) for 2014 and thereafter |
|---|---|---|---|
| Illinois | 124,123 | 6,206 | ............................ |
| Indiana | 161,111 | 4,833 | ............................ |
| Iowa | 75,184 | 1,429 | 75 |
| Kentucky | 106,284 | 6,377 | ............................ |
| Maryland | 28,203 | 564 | ............................ |
| Michigan | 143,995 | 2,736 | 144 |
| Missouri | 165,941 | 3,319 | ............................ |
| New Jersey | 5,574 | 111 | ............................ |
| New York | 18,585 | 353 | 19 |
| North Carolina | 57,620 | 4,552 | 58 |
| Ohio | 137,077 | 2,742 | ............................ |
| Pennsylvania | 112,021 | 2,240 | ............................ |
| Tennessee | 58,833 | 1,177 | ............................ |
| Virginia | 35,057 | 1,402 | ............................ |
| West Virginia | 75,668 | 5,297 | ............................ |
| Wisconsin | 40,126 | 1,966 | 40 |

*Each trading budget includes the new unit set-aside and, where applicable, the Indian country new unit set-aside and does not include the variability limit.

(b) The States' variability limits for the State SO$_2$ Group 1 trading budgets for the control periods in 2012 and thereafter are as follows:

| State | Variability limits for 2012 and 2013 | Variability limits for 2014 and thereafter |
|---|---|---|
| Illinois | 42,280 | 22,342 |
| Indiana | 51,376 | 29,000 |
| Iowa | 19,275 | 13,533 |
| Kentucky | 41,879 | 19,131 |
| Maryland | 5,422 | 5,077 |
| Michigan | 41,275 | 25,919 |
| Missouri | 37,344 | 29,869 |
| New Jersey | 1,003 | 1,003 |
| New York | 4,919 | 3,345 |
| North Carolina | 24,639 | 10,372 |
| Ohio | 55,841 | 24,674 |
| Pennsylvania | 50,157 | 20,164 |
| Tennessee | 26,667 | 10,590 |
| Virginia | 12,748 | 6,310 |
| West Virginia | 26,311 | 13,620 |
| Wisconsin | 14,306 | 7,223 |

**§ 97.611   Timing requirements for TR SO$_2$ Group 1 allowance allocations.**

(a) *Existing units.* (1) TR SO$_2$ Group 1 allowances are allocated, for the control periods in 2012 and each year thereafter, as provided in a notice of data availability issued by the Administrator. Providing an allocation to a unit in such notice does not constitute a determination that the unit is a TR SO$_2$ Group 1 unit, and not providing an allocation to a unit in such notice does not constitute a determination that the unit is not a TR SO$_2$ Group 1 unit.

(2) Notwithstanding paragraph (a)(1) of this section, if a unit provided an allocation in the notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2011, during the control period in two consecutive years, such unit will not be allocated the TR SO$_2$ Group 1 allowances provided in such notice for the unit for the control periods in the fifth year after the first such year and in each year after that fifth year. All TR SO$_2$ Group 1 allowances that would otherwise have been allocated to such unit will be

allocated to the new unit set-aside for the State where such unit is located and for the respective years involved. If such unit resumes operation, the Administrator will allocate TR SO$_2$ Group 1 allowances to the unit in accordance with paragraph (b) of this section.

(b) *New units.* (1) New unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR SO$_2$ Group 1 allowance allocation to each TR SO$_2$ Group 1 unit in a State, in accordance with § 97.612(a)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR SO$_2$ Group 1 units) are in accordance with § 97.612(a)(2) through (7) and (12) and §§ 97.606(b)(2) and 97.630 through 97.635.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(1)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.612(a)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(ii)(A) of this section.

(iii) If the new unit set-aside for such control period contains any TR SO$_2$ Group 1 allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(1)(ii) of this section, the Administrator will promulgate, by December 15 immediately after such notice, a notice of data availability that identifies any TR SO$_2$ Group 1 units that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR SO$_2$ annual units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(iii) of this section and shall be limited to addressing whether the identification of TR SO$_2$ annual units in such notice is in accordance with paragraph (b)(1)(iii) of this section.

(B) The Administrator will adjust the identification of TR SO$_2$ Group 1 units in each notice of data availability required in paragraph (b)(1)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(1)(iii) of this section and will calculate the TR SO$_2$ Group 1 allowance allocation to each TR SO$_2$ Group 1 unit in accordance with § 97.612(a)(9), (10), and (12) and §§ 97.606(b)(2) and 97.630 through 97.635. By February 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR SO$_2$ Group 1 units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR SO$_2$ Group 1 allowances are added to the new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(1)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR SO$_2$ Group 1 allowances in accordance with § 97.612(a)(10).

(2) Indian country new unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR SO$_2$ Group 1 allowance allocation to each TR SO$_2$ Group 1 unit in Indian country within the borders of a State, in accordance with § 97.612(b)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR SO$_2$ Group 1 units) are in accordance with § 97.612(b)(2) through (7) and (12) and §§ 97.606(b)(2) and 97.630 through 97.635.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.612(b)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(ii)(A) of this section.

(iii) If the Indian country new unit set-aside for such control period contains any TR SO$_2$ Group 1 allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(2)(ii) of this section, the Administrator will promulgate, by December 15 immediately after such notice, a notice of data availability that identifies any TR SO$_2$ Group 1 units that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR SO$_2$ annual units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(iii) of this section and shall be limited to addressing whether the identification of TR SO$_2$ annual units in such notice is in accordance with paragraph (b)(2)(iii) of this section.

(B) The Administrator will adjust the identification of TR SO$_2$ Group 1 units in each notice of data availability required in paragraph (b)(2)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(2)(iii) of this section and will calculate the TR SO$_2$ Group 1 allowance allocation to each TR SO$_2$ Group 1 unit in accordance with § 97.612(b)(9), (10),

and (12) and §§ 97.606(b)(2) and 97.630 through 97.635. By February 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR SO$_2$ Group 1 units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR SO$_2$ Group 1 allowances are added to the Indian country new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(2)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR NO$_X$ Annual allowances in accordance with § 97.612(b)(10).

(c) *Units incorrectly allocated TR SO$_2$ Group 1 allowances.* (1) For each control period in 2012 and thereafter, if the Administrator determines that TR SO$_2$ Group 1 allowances were allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.39(d), (e), or (f) of this chapter, where such control period and the recipient are covered by the provisions of paragraph (c)(1)(i) of this section or were allocated under § 97.612(a)(2) through (7), (9), and (12) and (b)(2) through (7), (9), and (12), or under a provision of a SIP revision approved under § 52.39(e) or (f) of this chapter, where such control period and the recipient are covered by the provisions of paragraph (c)(1)(ii) of this section, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section:

(i)(A) The recipient is not actually a TR SO$_2$ Group 1 unit under § 97.604 as of January 1, 2012 and is allocated TR SO$_2$ Group 1 allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.39(d), (e), or (f) of this chapter, the recipient is not actually a TR SO$_2$ Group 1 unit as of January 1, 2012 and is allocated TR SO$_2$ Group 1 allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR SO$_2$ Group 1 units as of January 1, 2012; or

(B) The recipient is not located as of January 1 of the control period in the State from whose SO$_2$ Group 1 trading budget the TR SO$_2$ Group 1 allowances allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.39(d), (e), or (f) of this chapter, were allocated for such control period.

(ii) The recipient is not actually a TR SO$_2$ Group 1 unit under § 97.604 as of January 1 of such control period and is allocated TR SO$_2$ Group 1 allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.39(d), (e), or (f) of this chapter, the recipient is not actually a TR SO$_2$ Group 1 unit as of January 1 of such control period and is allocated TR SO$_2$ Group 1 allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR SO$_2$ Group 1 units as of January 1 of such control period.

(2) Except as provided in paragraph (c)(3) or (4) of this section, the Administrator will not record such TR SO$_2$ Group 1 allowances under § 97.621.

(3) If the Administrator already recorded such TR SO$_2$ Group 1 allowances under § 97.621 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.624(b) for such control period, then the Administrator will deduct from the account in which such TR SO$_2$ Group 1 allowances were recorded an amount of TR SO$_2$ Group 1 allowances allocated for the same or a prior control period equal to the amount of such already recorded TR SO$_2$ Group 1 allowances. The authorized account representative shall ensure that there are sufficient TR SO$_2$ Group 1 allowances in such account for completion of the deduction.

(4) If the Administrator already recorded such TR SO$_2$ Group 1 allowances under § 97.621 and if the Administrator makes the determination under paragraph (c)(1) of this section after making deductions for the source that includes such recipient under § 97.624(b) for such control period, then the Administrator will not make any deduction to take account of such already recorded TR SO$_2$ Group 1 allowances.

(5)(i) With regard to the TR SO$_2$ Group 1 allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(i) of this section, the Administrator will:

(A) Transfer such TR SO$_2$ Group 1 allowances to the new unit set-aside for such control period for the State from whose SO$_2$ Group 1 trading budget the TR SO$_2$ Group 1 allowances were allocated; or

(B) If the State has a SIP revision approved under § 52.39(e) or (f) covering such control period, include such TR SO$_2$ Group 1 allowances in the portion of the State SO$_2$ Group 1 trading budget that may be allocated for such control period in accordance with such SIP revision.

(ii) With regard to the TR SO$_2$ Group 1 allowances that were not allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will:

(A) Transfer such TR SO$_2$ Group 1 allowances to the new unit set-aside for such control period; or

(B) If the State has a SIP revision approved under § 52.39(e) or (f) covering such control period, include such TR SO$_2$ Group 1 allowances in the portion of the State SO$_2$ Group 1 trading budget that may be allocated for such control period in accordance with such SIP revision.

(iii) With regard to the TR SO$_2$ Group 1 allowances that were allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will transfer such TR SO$_2$ Group 1 allowances to the Indian country new unit set-aside for such control period.

### § 97.612   TR SO$_2$ Group 1 allowance allocations to new units.

(a) For each control period in 2012 and thereafter and for the TR SO$_2$ Group 1 units in each State, the Administrator will allocate TR SO$_2$ Group 1 allowances to the TR SO$_2$ Group 1 units as follows:

(1) The TR SO$_2$ Group 1 allowances will be allocated to the following TR SO$_2$ Group 1 units, except as provided in paragraph (a)(10) of this section:

(i) TR SO$_2$ Group 1 units that are not allocated an amount of TR SO$_2$ Group 1 allowances in the notice of data availability issued under § 97.611(a)(1);

(ii) TR SO$_2$ Group 1 units whose allocation of an amount of TR SO$_2$ Group 1 allowances for such control period in the notice of data availability issued under § 97.611(a)(1) is covered by § 97.611(c)(2) or (3);

(iii) TR SO$_2$ Group 1 units that are allocated an amount of TR SO$_2$ Group 1 allowances for such control period in

the notice of data availability issued under § 97.611(a)(1), which allocation is terminated for such control period pursuant to § 97.611(a)(2), and that operate during the control period immediately preceding such control period; or

(iv) For purposes of paragraph (a)(9) of this section, TR $SO_2$ Group 1 units under § 97.611(c)(1)(ii) whose allocation of an amount of TR $SO_2$ Group 1 allowances for such control period in the notice of data availability issued under § 97.611(b)(1)(ii)(B) is covered by § 97.611(c)(2) or (3).

(2) The Administrator will establish a separate new unit set-aside for the State for each such control period. Each such new unit set-aside will be allocated TR $SO_2$ Group 1 allowances in an amount equal to the applicable amount of tons of $SO_2$ emissions as set forth in § 97.610(a) and will be allocated additional TR $SO_2$ Group 1 allowances (if any) in accordance with §§ 97.611(a)(2) and (c)(5) and paragraph (b)(10) of this section.

(3) The Administrator will determine, for each TR $SO_2$ Group 1 unit described in paragraph (a)(1) of this section, an allocation of TR $SO_2$ Group 1 allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012;

(ii) The first control period after the control period in which the TR $SO_2$ Group 1 unit commences commercial operation;

(iii) For a unit described in paragraph (a)(1)(ii) of this section, the first control period in which the TR $SO_2$ Group 1 unit operates in the State after operating in another jurisdiction and for which the unit is not already allocated one or more TR $SO_2$ Group 1 allowances; and

(iv) For a unit described in paragraph (a)(1)(iii) of this section, the first control period after the control period in which the unit resumes operation.

(4)(i) The allocation to each TR $SO_2$ annual unit described in paragraph (a)(1)(i) through (iii) of this section and for each control period described in paragraph (a)(3) of this section will be an amount equal to the unit's total tons of $SO_2$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (a)(4)(i) in accordance with paragraphs (a)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR $SO_2$ Group 1 allowances determined for all such TR $SO_2$ Group 1 units under paragraph (a)(4)(i) of this section in the State for such control period.

(6) If the amount of TR $SO_2$ Group 1 allowances in the new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (a)(5) of this section, then the Administrator will allocate the amount of TR $SO_2$ Group 1 allowances determined for each such TR $SO_2$ Group 1 unit under paragraph (a)(4)(i) of this section.

(7) If the amount of TR $SO_2$ Group 1 allowances in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(5) of this section, then the Administrator will allocate to each such TR $SO_2$ Group 1 unit the amount of the TR $SO_2$ Group 1 allowances determined under paragraph (a)(4)(i) of this section for the unit, multiplied by the amount of TR $SO_2$ Group 1 allowances in the new unit set-aside for such control period, divided by the sum under paragraph (a)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.611(b)(1)(i) and (ii), of the amount of TR $SO_2$ Group 1 allowances allocated under paragraphs (a)(2) through (7) and (12) of this section for such control period to each TR $SO_2$ Group 1 unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (a)(5) through (8) of this section for such control period, any unallocated TR $SO_2$ Group 1 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate such TR $SO_2$ Group 1 allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (a)(1) of this section that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR $SO_2$ Group 1 allowances referenced in the notice of data availability required under § 97.611(b)(1)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (a)(9)(i) of this section;

(iii) If the amount of unallocated TR $SO_2$ Group 1 allowances remaining in the new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (a)(9)(ii) of this section, then the Administrator will allocate the amount of TR $SO_2$ Group 1 allowances

determined for each such TR $SO_2$ Group 1 unit under paragraph (a)(9)(i) of this section; and

(iv) If the amount of unallocated TR $SO_2$ Group 1 allowances remaining in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(9)(ii) of this section, then the Administrator will allocate to each such TR $SO_2$ Group 1 unit the amount of the TR $SO_2$ Group 1 allowances determined under paragraph (a)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR $SO_2$ Group 1 allowances remaining in the new unit set-aside for such control period, divided by the sum under paragraph (a)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (a)(9) and (12) of this section for such control period, any unallocated TR $SO_2$ Group 1 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each TR $SO_2$ Group 1 unit that is in the State, is allocated an amount of TR $SO_2$ Group 1 allowances in the notice of data availability issued under § 97.611(a)(1), and continues to be allocated TR $SO_2$ Group 1 allowances for such control period in accordance with § 97.611(a)(2), an amount of TR $SO_2$ Group 1 allowances equal to the following: The total amount of such remaining unallocated TR $SO_2$ Group 1 allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.611(a) for such control period, divided by the remainder of the amount of tons in the applicable State $SO_2$ Group 1 trading budget minus the sum of the amounts of tons in such new unit set-aside and the Indian country new unit set-aside for the State for such control period, and rounded to the nearest allowance.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.611(b)(1)(iii), (iv), and (v), of the amount of TR $SO_2$ Group 1 allowances allocated under paragraphs (a)(9), (10), and (12) of this section for such control period to each TR $SO_2$ Group 1 unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (a)(2) through (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraph (a)(7) of this section, paragraphs (a)(6) and (9)(iv) of this section, or paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such new unit set-aside exceeding the total amount of such new unit set-aside, then

the Administrator will adjust the results of the calculations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR SO$_2$ Group 1 units in descending order based on the amount of such units' allocations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, by one TR SO$_2$ Group 1 allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (a)(10) and (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such new unit set-aside less than the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(10) of this section, as follows. The Administrator will list the TR SO$_2$ Group 1 units in descending order based on the amount of such units' allocations under paragraph (a)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's allocation under paragraph (a)(10) of this section by one TR SO$_2$ Group 1 allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(b) For each control period in 2012 and thereafter and for the TR SO$_2$ Group 1 units located in Indian country within the borders of each State, the Administrator will allocate TR SO$_2$ Group 1 allowances to the TR SO$_2$ Group 1 units as follows:

(1) The TR SO$_2$ Group 1 allowances will be allocated to the following TR SO$_2$ Group 1 units, except as provided in paragraph (b)(10) of this section:

(i) TR SO$_2$ Group 1 units that are not allocated an amount of TR SO$_2$ Group 1 allowances in the notice of data availability issued under § 97.611(a)(1); or

(ii) For purposes of paragraph (b)(9) of this section, TR SO$_2$ Group 1 units under § 97.611(c)(1)(ii) whose allocation of an amount of TR SO$_2$ Group 1 allowances for such control period in the notice of data availability issued under § 97.611(b)(2)(ii)(B) is covered by § 97.611(c)(2) or (3).

(2) The Administrator will establish a separate Indian country new unit set-aside for the State for each such control period. Each such Indian country new unit set-aside will be allocated TR SO$_2$ Group 1 allowances in an amount equal to the applicable amount of tons of SO$_2$ emissions as set forth in § 97.610(a) and will be allocated additional TR SO$_2$ Group 1 allowances (if any) in accordance with § 97.611(c)(5).

(3) The Administrator will determine, for each TR SO$_2$ Group 1 unit described in paragraph (b)(1) of this section, an allocation of TR SO$_2$ Group 1 allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012; and

(ii) The first control period after the control period in which the TR SO$_2$ Group 1 unit commences commercial operation.

(4)(i) The allocation to each TR SO$_2$ annual unit described in paragraph (b)(1)(i) of this section and for each control period described in paragraph (b)(3) of this section will be an amount equal to the unit's total tons of SO$_2$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (b)(4)(i) in accordance with paragraphs (b)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR SO$_2$ Group 1 allowances determined for all such TR SO$_2$ Group 1 units under paragraph (b)(4)(i) of this section in Indian country within the borders of the State for such control period.

(6) If the amount of TR SO$_2$ Group 1 allowances in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (b)(5) of this section, then the Administrator will allocate the amount of TR SO$_2$ Group 1 allowances determined for each such TR SO$_2$ Group 1 unit under paragraph (b)(4)(i) of this section.

(7) If the amount of TR SO$_2$ Group 1 allowances in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(5) of this section, then the Administrator will allocate to each such TR SO$_2$ Group 1 unit the amount of the TR SO$_2$ Group 1 allowances determined under paragraph

(b)(4)(i) of this section for the unit, multiplied by the amount of TR SO$_2$ Group 1 allowances in the Indian country new unit set-aside for such control period, divided by the sum under paragraph (b)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.611(b)(2)(i) and (ii), of the amount of TR SO$_2$ Group 1 allowances allocated under paragraphs (b)(2) through (7) and (12) of this section for such control period to each TR SO$_2$ Group 1 unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (b)(5) through (8) of this section for such control period, any unallocated TR SO$_2$ Group 1 allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will allocate such TR SO$_2$ Group 1 allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (b)(1) of this section that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR SO$_2$ Group 1 allowances referenced in the notice of data availability required under § 97.611(b)(2)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (b)(9)(i) of this section;

(iii) If the amount of unallocated TR SO$_2$ Group 1 allowances remaining in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (b)(9)(ii) of this section, then the Administrator will allocate the amount of TR SO$_2$ Group 1 allowances determined for each such TR SO$_2$ Group 1 unit under paragraph (b)(9)(i) of this section; and

(iv) If the amount of unallocated TR SO$_2$ Group 1 allowances remaining in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(9)(ii) of this section, then the Administrator will allocate to each such TR SO$_2$ Group 1 unit the amount of the TR SO$_2$ Group 1 allowances determined under paragraph (b)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR SO$_2$ Group 1 allowances remaining in the Indian country new unit set-aside for such control period, divided by the sum

under paragraph (b)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (b)(9) and (12) for such control period, any unallocated TR $SO_2$ Group 1 allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will:

(i) Transfer such unallocated TR $SO_2$ Group 1 allowances to the new unit set-aside for the State for such control period; or

(ii) If the State has a SIP revision approved under § 52.39(d), (e), or (f) of this chapter covering such control period, include such unallocated TR $SO_2$ Group 1 allowances in the portion of the State $SO_2$ Group 1 trading budget that may be allocated for such control period in accordance with such SIP revision.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.611(b)(2)(iii), (iv), and (v), of the amount of TR $SO_2$ Group 1 allowances allocated under paragraphs (b)(9), (10), and (12) for such control period to each TR $SO_2$ Group 1 unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (b)(2) through (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraph (b)(7) of this section, paragraphs (b)(6) and (9)(iv) of this section, or paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such Indian country new unit set-aside exceeding the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR $SO_2$ Group 1 units in descending order based on the amount of such units' allocations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, by one TR $SO_2$ Group 1 allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (b)(10) and (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such Indian country new unit set-aside less than the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(10) of this section, as follows. The Administrator will list the TR $SO_2$ Group 1 units in descending order based on the amount of such units' allocations under paragraph (b)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's allocation under paragraph (b)(10) of this section by one TR $SO_2$ Group 1 allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

### § 97.613 Authorization of designated representative and alternate designated representative.

(a) Except as provided under § 97.615, each TR $SO_2$ Group 1 source, including all TR $SO_2$ Group 1 units at the source, shall have one and only one designated representative, with regard to all matters under the TR $SO_2$ Group 1 Trading Program.

(1) The designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR $SO_2$ Group 1 units at the source and shall act in accordance with the certification statement in § 97.616(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.616:

(i) The designated representative shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each owner and operator of the source and each TR $SO_2$ Group 1 unit at the source in all matters pertaining to the TR $SO_2$ Group 1 Trading Program, notwithstanding any agreement between the designated representative and such owners and operators; and

(ii) The owners and operators of the source and each TR $SO_2$ Group 1 unit at the source shall be bound by any decision or order issued to the designated representative by the Administrator regarding the source or any such unit.

(b) Except as provided under § 97.615, each TR $SO_2$ Group 1 source may have one and only one alternate designated representative, who may act on behalf of the designated representative. The agreement by which the alternate designated representative is selected shall include a procedure for authorizing the alternate designated representative to act in lieu of the designated representative.

(1) The alternate designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR $SO_2$ Group 1 units at the source and shall act in accordance with the certification statement in § 97.616(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.616,

(i) The alternate designated representative shall be authorized;

(ii) Any representation, action, inaction, or submission by the alternate designated representative shall be deemed to be a representation, action, inaction, or submission by the designated representative; and

(iii) The owners and operators of the source and each TR $SO_2$ Group 1 unit at the source shall be bound by any decision or order issued to the alternate designated representative by the Administrator regarding the source or any such unit.

(c) Except in this section, § 97.602, and §§ 97.614 through 97.618, whenever the term "designated representative" (as distinguished from the term "common designated representative") is used in this subpart, the term shall be construed to include the designated representative or any alternate designated representative.

### § 97.614 Responsibilities of designated representative and alternate designated representative.

(a) Except as provided under § 97.618 concerning delegation of authority to make submissions, each submission under the TR $SO_2$ Group 1 Trading Program shall be made, signed, and certified by the designated representative or alternate designated representative for each TR $SO_2$ Group 1 source and TR $SO_2$ Group 1 unit for which the submission is made. Each such submission shall include the following certification statement by the designated representative or alternate designated representative: "I am authorized to make this submission on behalf of the owners and operators of the source or units for which the submission is made. I certify under

penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(b) The Administrator will accept or act on a submission made for a TR $SO_2$ Group 1 source or a TR $SO_2$ Group 1 unit only if the submission has been made, signed, and certified in accordance with paragraph (a) of this section and § 97.618.

### § 97.615 Changing designated representative and alternate designated representative; changes in owners and operators; changes in units at the source.

(a) *Changing designated representative.* The designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.616. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new designated representative and the owners and operators of the TR $SO_2$ Group 1 source and the TR $SO_2$ Group 1 units at the source.

(b) *Changing alternate designated representative.* The alternate designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.616. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new alternate designated representative, the designated representative, and the owners and operators of the TR $SO_2$ Group 1 source and the TR $SO_2$ Group 1 units at the source.

(c) *Changes in owners and operators.* (1) In the event an owner or operator of a TR $SO_2$ Group 1 source or a TR $SO_2$ Group 1 unit at the source is not included in the list of owners and operators in the certificate of representation under § 97.616, such owner or operator shall be deemed to be subject to and bound by the certificate of representation, the representations, actions, inactions, and submissions of the designated representative and any alternate designated representative of the source or unit, and the decisions and orders of the Administrator, as if the owner or operator were included in such list.

(2) Within 30 days after any change in the owners and operators of a TR $SO_2$ Group 1 source or a TR $SO_2$ Group 1 unit at the source, including the addition or removal of an owner or operator, the designated representative or any alternate designated representative shall submit a revision to the certificate of representation under § 97.616 amending the list of owners and operators to reflect the change.

(d) *Changes in units at the source.* Within 30 days of any change in which units are located at a TR $SO_2$ Group 1 source (including the addition or removal of a unit), the designated representative or any alternate designated representative shall submit a certificate of representation under § 97.616 amending the list of units to reflect the change.

(1) If the change is the addition of a unit that operated (other than for purposes of testing by the manufacturer before initial installation) before being located at the source, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity from whom the unit was purchased or otherwise obtained (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was purchased or otherwise obtained, and the date on which the unit became located at the source.

(2) If the change is the removal of a unit, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity to which the unit was sold or that otherwise obtained the unit (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was sold or otherwise obtained, and the date on which the unit became no longer located at the source.

### § 97.616 Certificate of representation.

(a) A complete certificate of representation for a designated representative or an alternate designated representative shall include the following elements in a format prescribed by the Administrator:

(1) Identification of the TR $SO_2$ Group 1 source, and each TR $SO_2$ Group 1 unit at the source, for which the certificate of representation is submitted, including source name, source category and NAICS code (or, in the absence of a NAICS code, an equivalent code), State, plant code, county, latitude and longitude, unit identification number and type, identification number and nameplate capacity (in MWe, rounded to the nearest tenth) of each generator served by each such unit, actual or projected date of commencement of commercial operation, and a statement of whether such source is located in Indian Country. If a projected date of commencement of commercial operation is provided, the actual date of commencement of commercial operation shall be provided when such information becomes available.

(2) The name, address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the designated representative and any alternate designated representative.

(3) A list of the owners and operators of the TR $SO_2$ Group 1 source and of each TR $SO_2$ Group 1 unit at the source.

(4) The following certification statements by the designated representative and any alternate designated representative—

(i) ''I certify that I was selected as the designated representative or alternate designated representative, as applicable, by an agreement binding on the owners and operators of the source and each TR $SO_2$ Group 1 unit at the source.''

(ii) ''I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR $SO_2$ Group 1 Trading Program on behalf of the owners and operators of the source and of each TR $SO_2$ Group 1 unit at the source and that each such owner and operator shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the source or unit.''

(iii) ''Where there are multiple holders of a legal or equitable title to, or a leasehold interest in, a TR $SO_2$ Group 1 unit, or where a utility or industrial customer purchases power from a TR $SO_2$ Group 1 unit under a life-of-the-unit, firm power contractual arrangement, I certify that: I have given a written notice of my selection as the 'designated representative' or 'alternate designated representative', as applicable, and of the agreement by which I was selected to each owner and operator of the source and of each TR $SO_2$ Group 1 unit at the source; and TR $SO_2$ Group 1 allowances and proceeds of transactions involving TR $SO_2$ Group 1 allowances will be deemed to be held or distributed in proportion to each

holder's legal, equitable, leasehold, or contractual reservation or entitlement, except that, if such multiple holders have expressly provided for a different distribution of TR SO₂ Group 1 allowances by contract, TR SO₂ Group 1 allowances and proceeds of transactions involving TR SO₂ Group 1 allowances will be deemed to be held or distributed in accordance with the contract.''

(5) The signature of the designated representative and any alternate designated representative and the dates signed.

(b) Unless otherwise required by the Administrator, documents of agreement referred to in the certificate of representation shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

### § 97.617 Objections concerning designated representative and alternate designated representative.

(a) Once a complete certificate of representation under § 97.616 has been submitted and received, the Administrator will rely on the certificate of representation unless and until a superseding complete certificate of representation under § 97.616 is received by the Administrator.

(b) Except as provided in paragraph (a) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission, of a designated representative or alternate designated representative shall affect any representation, action, inaction, or submission of the designated representative or alternate designated representative or the finality of any decision or order by the Administrator under the TR SO₂ Group 1 Trading Program.

(c) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of any designated representative or alternate designated representative, including private legal disputes concerning the proceeds of TR SO₂ Group 1 allowance transfers.

### § 97.618 Delegation by designated representative and alternate designated representative.

(a) A designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(b) An alternate designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(c) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (a) or (b) of this section, the designated representative or alternate designated representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(1) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such designated representative or alternate designated representative;

(2) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an ''agent'');

(3) For each such natural person, a list of the type or types of electronic submissions under paragraph (a) or (b) of this section for which authority is delegated to him or her; and

(4) The following certification statements by such designated representative or alternate designated representative:

(i) ''I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am a designated representative or alternate designated representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.618(d) shall be deemed to be an electronic submission by me.''

(ii) ''Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.618(d), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.618 is terminated.''.

(d) A notice of delegation submitted under paragraph (c) of this section shall be effective, with regard to the designated representative or alternate designated representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such designated representative or alternate designated representative, as

appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(e) Any electronic submission covered by the certification in paragraph (c)(4)(i) of this section and made in accordance with a notice of delegation effective under paragraph (d) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

### § 97.619 [Reserved]

### § 97.620 Establishment of compliance accounts, assurance accounts, and general accounts.

(a) *Compliance accounts.* Upon receipt of a complete certificate of representation under § 97.616, the Administrator will establish a compliance account for the TR SO₂ Group 1 source for which the certificate of representation was submitted, unless the source already has a compliance account. The designated representative and any alternate designated representative of the source shall be the authorized account representative and the alternate authorized account representative respectively of the compliance account.

(b) *Assurance accounts.* The Administrator will establish assurance accounts for certain owners and operators and States in accordance with § 97.625(b)(3).

(c) *General accounts.* (1) Application for general account. (i) Any person may apply to open a general account, for the purpose of holding and transferring TR SO₂ Group 1 allowances, by submitting to the Administrator a complete application for a general account. Such application shall designate one and only one authorized account representative and may designate one and only one alternate authorized account representative who may act on behalf of the authorized account representative.

(A) The authorized account representative and alternate authorized account representative shall be selected by an agreement binding on the persons who have an ownership interest with respect to TR SO₂ Group 1 allowances held in the general account.

(B) The agreement by which the alternate authorized account representative is selected shall include a procedure for authorizing the alternate authorized account representative to act in lieu of the authorized account representative.

(ii) A complete application for a general account shall include the

following elements in a format prescribed by the Administrator:

(A) Name, mailing address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the authorized account representative and any alternate authorized account representative;

(B) An identifying name for the general account;

(C) A list of all persons subject to a binding agreement for the authorized account representative and any alternate authorized account representative to represent their ownership interest with respect to the TR SO$_2$ Group 1 allowances held in the general account;

(D) The following certification statement by the authorized account representative and any alternate authorized account representative: ''I certify that I was selected as the authorized account representative or the alternate authorized account representative, as applicable, by an agreement that is binding on all persons who have an ownership interest with respect to TR SO$_2$ Group 1 allowances held in the general account. I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR SO$_2$ Group 1 Trading Program on behalf of such persons and that each such person shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the general account.''

(E) The signature of the authorized account representative and any alternate authorized account representative and the dates signed.

(iii) Unless otherwise required by the Administrator, documents of agreement referred to in the application for a general account shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

(2) Authorization of authorized account representative and alternate authorized account representative. (i) Upon receipt by the Administrator of a complete application for a general account under paragraph (b)(1) of this section, the Administrator will establish a general account for the person or persons for whom the application is submitted, and upon and after such receipt by the Administrator:

(A) The authorized account representative of the general account shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each person who has an ownership interest with respect to TR

SO$_2$ Group 1 allowances held in the general account in all matters pertaining to the TR SO$_2$ Group 1 Trading Program, notwithstanding any agreement between the authorized account representative and such person.

(B) Any alternate authorized account representative shall be authorized, and any representation, action, inaction, or submission by any alternate authorized account representative shall be deemed to be a representation, action, inaction, or submission by the authorized account representative.

(C) Each person who has an ownership interest with respect to TR SO$_2$ Group 1 allowances held in the general account shall be bound by any decision or order issued to the authorized account representative or alternate authorized account representative by the Administrator regarding the general account.

(ii) Except as provided in paragraph (c)(5) of this section concerning delegation of authority to make submissions, each submission concerning the general account shall be made, signed, and certified by the authorized account representative or any alternate authorized account representative for the persons having an ownership interest with respect to TR SO$_2$ Group 1 allowances held in the general account. Each such submission shall include the following certification statement by the authorized account representative or any alternate authorized account representative: ''I am authorized to make this submission on behalf of the persons having an ownership interest with respect to the TR SO$_2$ Group 1 allowances held in the general account. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(iii) Except in this section, whenever the term ''authorized account representative'' is used in this subpart, the term shall be construed to include the authorized account representative or any alternate authorized account representative.

(3) Changing authorized account representative and alternate authorized account representative; changes in

persons with ownership interest. (i) The authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new authorized account representative and the persons with an ownership interest with respect to the TR SO$_2$ Group 1 allowances in the general account.

(ii) The alternate authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new alternate authorized account representative, the authorized account representative, and the persons with an ownership interest with respect to the TR SO$_2$ Group 1 allowances in the general account.

(iii)(A) In the event a person having an ownership interest with respect to TR SO$_2$ Group 1 allowances in the general account is not included in the list of such persons in the application for a general account, such person shall be deemed to be subject to and bound by the application for a general account, the representation, actions, inactions, and submissions of the authorized account representative and any alternate authorized account representative of the account, and the decisions and orders of the Administrator, as if the person were included in such list.

(B) Within 30 days after any change in the persons having an ownership interest with respect to SO$_2$ Group 1 allowances in the general account, including the addition or removal of a person, the authorized account representative or any alternate authorized account representative shall submit a revision to the application for a general account amending the list of persons having an ownership interest with respect to the TR SO$_2$ Group 1 allowances in the general account to include the change.

(4) Objections concerning authorized account representative and alternate

authorized account representative. (i) Once a complete application for a general account under paragraph (c)(1) of this section has been submitted and received, the Administrator will rely on the application unless and until a superseding complete application for a general account under paragraph (b)(1) of this section is received by the Administrator.

(ii) Except as provided in paragraph (c)(4)(i) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account shall affect any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative or the finality of any decision or order by the Administrator under the TR SO$_2$ Group 1 Trading Program.

(iii) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account, including private legal disputes concerning the proceeds of TR SO$_2$ Group 1 allowance transfers.

(5) Delegation by authorized account representative and alternate authorized account representative. (i) An authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(ii) An alternate authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(iii) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (c)(5)(i) or (ii) of this section, the authorized account representative or alternate authorized account representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(A) The name, address, e-mail address, telephone number, and facsimile transmission number (if any)

of such authorized account representative or alternate authorized account representative;

(B) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an ''agent'');

(C) For each such natural person, a list of the type or types of electronic submissions under paragraph (c)(5)(i) or (ii) of this section for which authority is delegated to him or her;

(D) The following certification statement by such authorized account representative or alternate authorized account representative: ''I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am an authorized account representative or alternate authorized account representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.620(c)(5)(iv) shall be deemed to be an electronic submission by me.''; and

(E) The following certification statement by such authorized account representative or alternate authorized account representative: ''Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.620(c)(5)(iv), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.620(c)(5) is terminated.''.

(iv) A notice of delegation submitted under paragraph (c)(5)(iii) of this section shall be effective, with regard to the authorized account representative or alternate authorized account representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such authorized account representative or alternate authorized account representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(v) Any electronic submission covered by the certification in paragraph (c)(5)(iii)(D) of this section and made in accordance with a notice of delegation effective under paragraph (c)(5)(iv) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

(6) Closing a general account. (i) The authorized account representative or alternate authorized account representative of a general account may submit to the Administrator a request to close the account. Such request shall include a correctly submitted TR SO$_2$ Group 1 allowance transfer under § 97.622 for any TR SO$_2$ Group 1 allowances in the account to one or more other Allowance Management System accounts.

(ii) If a general account has no TR SO$_2$ Group 1 allowance transfers to or from the account for a 12-month period or longer and does not contain any TR SO$_2$ Group 1 allowances, the Administrator may notify the authorized account representative for the account that the account will be closed after 30 days after the notice is sent. The account will be closed after the 30-day period unless, before the end of the 30-day period, the Administrator receives a correctly submitted TR SO$_2$ Group 1 allowance transfer under § 97.622 to the account or a statement submitted by the authorized account representative or alternate authorized account representative demonstrating to the satisfaction of the Administrator good cause as to why the account should not be closed.

(d) *Account identification.* The Administrator will assign a unique identifying number to each account established under paragraph (a), (b), or (c) of this section.

(e) *Responsibilities of authorized account representative and alternate authorized account representative.* After the establishment of a compliance account or general account, the Administrator will accept or act on a submission pertaining to the account, including, but not limited to, submissions concerning the deduction or transfer of TR SO$_2$ Group 1 allowances in the account, only if the submission has been made, signed, and certified in accordance with §§ 97.614(a) and 97.618 or paragraphs (c)(2)(ii) and (c)(5) of this section.

### § 97.621  Recordation of TR SO$_2$ Group 1 allowance allocations and auction results.

(a) By November 7, 2011, the Administrator will record in each TR SO$_2$ Group 1 source's compliance account the TR SO$_2$ Group 1 allowances allocated to the TR SO$_2$ Group 1 units at the source in accordance with § 97.611(a) for the control period in 2012.

(b) By November 7, 2011, the Administrator will record in each TR SO$_2$ Group 1 source's compliance account the TR SO$_2$ Group 1 allowances allocated to the TR SO$_2$ Group 1 units at the source in accordance with

§ 97.611(a) for the control period in 2013, unless the State in which the source is located notifies the Administrator in writing by October 17, 2011 of the State's intent to submit to the Administrator a complete SIP revision by April 1, 2012 meeting the requirements of § 52.39(d)(1) through (4) of this chapter.

(1) If, by April 1, 2012, the State does not submit to the Administrator such complete SIP revision, the Administrator will record by April 15, 2012 in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source in accordance with § 97.611(a) for the control period in 2013.

(2) If the State submits to the Administrator by April 1, 2012, and the Administrator approves by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source as provided in such approved, complete SIP revision for the control period in 2013.

(3) If the State submits to the Administrator by April 1, 2012, and the Administrator does not approve by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source in accordance with § 97.611(a) for the control period in 2013.

(c) By July 1, 2013, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 1 allowances auctioned to TR SO₂ Group 1 units, in accordance with § 97.611(a), or with a SIP revision approved under § 52.39(e) or (f) of this chapter, for the control period in 2014 and 2015.

(d) By July 1, 2014, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 1 allowances auctioned to TR SO₂ Group 1 units, in accordance with § 97.611(a), or with a SIP revision approved under § 52.39(e) or (f) of this chapter, for the control period in 2016 and 2017.

(e) By July 1, 2015, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 1 allowances auctioned to TR SO₂ Group 1 units, in accordance with § 97.611(a), or with a SIP revision approved under § 52.39(e) or (f) of this chapter, for the control period in 2018 and 2019.

(f) By July 1, 2016 and July 1 of each year thereafter, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 1 allowances auctioned to TR SO₂ Group 1 units, in accordance with § 97.611(a), or with a SIP revision approved under § 52.39(e) and (f) of this chapter, for the control period in the fourth year after the year of the applicable recordation deadline under this paragraph.

(g) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 1 allowances auctioned to TR SO₂ Group 1 units, in accordance with § 97.612(a)(2) through (8) and (12), or with a SIP revision approved under § 52.39(e) and (f) of this chapter, for the control period in the year of the applicable recordation deadline under this paragraph.

(h) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source in accordance with § 97.612(b)(2) through (8) and (12) for the control period in the year of the applicable recordation deadline under this paragraph.

(i) By February 15, 2013 and February 15 of each year thereafter, the Administrator will record in each TR SO₂ Group 1 source's compliance account the TR SO₂ Group 1 allowances allocated to the TR SO₂ Group 1 units at the source in accordance with § 97.612(a)(9) through (12), for the control period in the year before the year of the applicable recordation deadline under this paragraph.

(j) By the date on which any allocation or auction results, other than an allocation or auction results described in paragraphs (a) through (i) of this section, of the TR SO₂ Group 1 allowances to a recipient is made by or are submitted to the Administrator in accordance with § 97.611 or § 97.612 or with a SIP revision approved under § 52.39(e) or (f) of this chapter, the Administrator will record such allocation or auction results in the appropriate Allowance Management System account.

(k) When recording the allocation or auction of TR SO₂ Group 1 allowances to a TR SO₂ Group 1 unit or other entity in an Allowance Management System account, the Administrator will assign each TR SO₂ Group 1 allowance a unique identification number that will include digits identifying the year of the control period for which the TR SO₂ Group 1 allowance is allocated or auctioned.

**§ 97.622    Submission of TR SO₂ Group 1 allowance transfers.**

(a) An authorized account representative seeking recordation of a TR SO₂ Group 1 allowance transfer shall submit the transfer to the Administrator.

(b) A TR SO₂ Group 1 allowance transfer shall be correctly submitted if:

(1) The transfer includes the following elements, in a format prescribed by the Administrator:

(i) The account numbers established by the Administrator for both the transferor and transferee accounts;

(ii) The serial number of each TR SO₂ Group 1 allowance that is in the transferor account and is to be transferred; and

(iii) The name and signature of the authorized account representative of the transferor account and the date signed; and

(2) When the Administrator attempts to record the transfer, the transferor account includes each TR SO₂ Group 1 allowance identified by serial number in the transfer.

**§ 97.623    Recordation of TR SO₂ Group 1 allowance transfers.**

(a) Within 5 business days (except as provided in paragraph (b) of this section) of receiving a TR SO₂ Group 1 allowance transfer that is correctly submitted under § 97.622, the Administrator will record a TR SO₂ Group 1 allowance transfer by moving each TR SO₂ Group 1 allowance from the transferor account to the transferee account as specified in the transfer.

(b) A TR SO₂ Group 1 allowance transfer to or from a compliance account that is submitted for recordation after the allowance transfer deadline for a control period and that includes any TR SO₂ Group 1 allowances allocated for

any control period before such allowance transfer deadline will not be recorded until after the Administrator completes the deductions from such compliance account under § 97.624 for the control period immediately before such allowance transfer deadline.

(c) Where a TR SO₂ Group 1 allowance transfer is not correctly submitted under § 97.622, the Administrator will not record such transfer.

(d) Within 5 business days of recordation of a TR SO₂ Group 1 allowance transfer under paragraphs (a) and (b) of the section, the Administrator will notify the authorized account representatives of both the transferor and transferee accounts.

(e) Within 10 business days of receipt of a TR SO₂ Group 1 allowance transfer that is not correctly submitted under § 97.622, the Administrator will notify the authorized account representatives of both accounts subject to the transfer of:

(1) A decision not to record the transfer, and

(2) The reasons for such non-recordation.

### § 97.624   Compliance with TR SO₂ Group 1 emissions limitation.

(a) *Availability for deduction for compliance.* TR SO₂ Group 1 allowances are available to be deducted for compliance with a source's TR SO₂ Group 1 emissions limitation for a control period in a given year only if the TR SO₂ Group 1 allowances:

(1) Were allocated for such control period or a control period in a prior year; and

(2) Are held in the source's compliance account as of the allowance transfer deadline for such control period.

(b) *Deductions for compliance.* After the recordation, in accordance with § 97.623, of TR SO₂ Group 1 allowance transfers submitted by the allowance transfer deadline for a control period in a given year, the Administrator will deduct from each source's compliance account TR SO₂ Group 1 allowances available under paragraph (a) of this section in order to determine whether the source meets the TR SO₂ Group 1 emissions limitation for such control period, as follows:

(1) Until the amount of TR SO₂ Group 1 allowances deducted equals the number of tons of total SO₂ emissions from all TR SO₂ Group 1 units at the source for such control period; or

(2) If there are insufficient TR SO₂ Group 1 allowances to complete the deductions in paragraph (b)(1) of this section, until no more TR SO₂ Group 1

allowances available under paragraph (a) of this section remain in the compliance account.

(c)(1) *Identification of TR SO₂ Group 1 allowances by serial number.* The authorized account representative for a source's compliance account may request that specific TR SO₂ Group 1 allowances, identified by serial number, in the compliance account be deducted for emissions or excess emissions for a control period in a given year in accordance with paragraph (b) or (d) of this section. In order to be complete, such request shall be submitted to the Administrator by the allowance transfer deadline for such control period and include, in a format prescribed by the Administrator, the identification of the TR SO₂ Group 1 source and the appropriate serial numbers.

(2) *First-in, first-out.* The Administrator will deduct TR SO₂ Group 1 allowances under paragraph (b) or (d) of this section from the source's compliance account in accordance with a complete request under paragraph (c)(1) of this section or, in the absence of such request or in the case of identification of an insufficient amount of TR SO₂ Group 1 allowances in such request, on a first-in, first-out accounting basis in the following order:

(i) Any TR SO₂ Group 1 allowances that were allocated to the units at the source and not transferred out of the compliance account, in the order of recordation; and then

(ii) Any TR SO₂ Group 1 allowances that were allocated to any unit and transferred to and recorded in the compliance account pursuant to this subpart, in the order of recordation.

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the TR SO₂ Group 1 source has excess emissions, the Administrator will deduct from the source's compliance account an amount of TR SO₂ Group 1 allowances, allocated for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, equal to two times the number of tons of the source's excess emissions.

(e) *Recordation of deductions.* The Administrator will record in the appropriate compliance account all deductions from such account under paragraphs (b) and (d) of this section.

### § 97.625   Compliance with TR SO₂ Group 1 assurance provisions.

(a) *Availability for deduction.* TR SO₂ Group 1 allowances are available to be deducted for compliance with the TR

SO₂ Group 1 assurance provisions for a control period in a given year by the owners and operators of a group of one or more TR SO₂ Group 1 sources and units in a State (and Indian country within the borders of such State) only if the TR SO₂ Group 1 allowances:

(1) Were allocated for a control period in a prior year or the control period in the given year or in the immediately following year; and

(2) Are held in the assurance account, established by the Administrator for such owners and operators of such group of TR SO₂ Group 1 sources and units in such State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, as of the deadline established in paragraph (b)(4) of this section.

(b) *Deductions for compliance.* The Administrator will deduct TR SO₂ Group 1 allowances available under paragraph (a) of this section for compliance with the TR SO₂ Group 1 assurance provisions for a State for a control period in a given year in accordance with the following procedures:

(1) By June 1, 2013, and June 1 of each year thereafter, the Administrator will:

(i) Calculate, for each State (and Indian country within the borders of such State), the total SO₂ emissions from all TR SO₂ Group 1 units at TR SO₂ Group 1 sources in the State (and Indian country within the borders of such State) during the control period in the year before the year of this calculation deadline and the amount, if any, by which such total SO₂ emissions exceed the State assurance level as described in § 97.606(c)(2)(iii); and

(ii) Promulgate a notice of data availability of the results of the calculations required in paragraph (b)(1)(i) of this section, including separate calculations of the SO₂ emissions from each TR SO₂ Group 1 source.

(2) For each notice of data availability required in paragraph (b)(1)(ii) of this section and for any State (and Indian country within the borders of such State) identified in such notice as having TR SO₂ Group 1 units with total SO₂ emissions exceeding the State assurance level for a control period in a given year, as described in § 97.606(c)(2)(iii):

(i) By July 1 immediately after the promulgation of such notice, the designated representative of each TR SO₂ Group 1 source in each such State (and Indian country within the borders of such State) shall submit a statement, in a format prescribed by the Administrator, providing for each TR SO₂ Group 1 unit (if any) at the source

that operates during, but is not allocated an amount of TR SO₂ Group 1 allowances for, such control period, the unit's allowable SO₂ emission rate for such control period and, if such rate is expressed in lb per mmBtu, the unit's heat rate.

(ii) By August 1 immediately after the promulgation of such notice, the Administrator will calculate, for each such State (and Indian country within the borders of such State) and such control period and each common designated representative for such control period for a group of one or more TR SO₂ Group 1 sources and units in the State (and Indian country within the borders of such State), the common designated representative's share of the total SO₂ emissions from all TR SO₂ Group 1 units at TR SO₂ Group 1 sources in the State (and Indian country within the borders of such State), the common designated representative's assurance level, and the amount (if any) of TR SO₂ Group 1 allowances that the owners and operators of such group of sources and units must hold in accordance with the calculation formula in § 97.606(c)(2)(i) and will promulgate a notice of data availability of the results of these calculations.

(iii) The Administrator will provide an opportunity for submission of objections to the calculations referenced by the notice of data availability required in paragraph (b)(2)(ii) of this section and the calculations referenced by the relevant notice of data availability required in paragraph (b)(1)(i) of this section.

(A) Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations referenced in the relevant notice required under paragraph (b)(1)(ii) of this section and referenced in the notice required under paragraph (b)(2)(ii) of this section are in accordance with § 97.606(c)(2)(iii), §§ 97.606(b) and 97.630 through 97.635, the definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share" in § 97.602, and the calculation formula in § 97.606(c)(2)(i).

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(iii)(A) of this section. By October 1 immediately after the promulgation of such notice, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in

accordance with paragraph (b)(2)(iii)(A) of this section.

(3) For any State (and Indian country within the borders of such State) referenced in each notice of data availability required in paragraph (b)(2)(iii)(B) of this section as having TR SO₂ Group 1 units with total SO₂ emissions exceeding the State assurance level for a control period in a given year, the Administrator will establish one assurance account for each set of owners and operators referenced, in the notice of data availability required under paragraph (b)(2)(iii)(B) of this section, as all of the owners and operators of a group of TR SO₂ Group 1 sources and units in the State (and Indian country within the borders of such State) having a common designated representative for such control period and as being required to hold TR SO₂ Group 1 allowances.

(4)(i) As of midnight of November 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section, the owners and operators described in paragraph (b)(3) of this section shall hold in the assurance account established for them and for the appropriate TR SO₂ Group 1 sources, TR SO₂ Group 1 units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section a total amount of TR SO₂ Group 1 allowances, available for deduction under paragraph (a) of this section, equal to the amount such owners and operators are required to hold with regard to such sources, units and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in such notice.

(ii) Notwithstanding the allowance-holding deadline specified in paragraph (b)(4)(i) of this section, if November 1 is not a business day, then such allowance-holding deadline shall be midnight of the first business day thereafter.

(5) After November 1 (or the date described in paragraph (b)(4)(ii) of this section) immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section and after the recordation, in accordance with § 97.623, of TR SO₂ Group 1 allowance transfers submitted by midnight of such date, the Administrator will determine whether the owners and operators described in paragraph (b)(3) of this section hold, in the assurance account for the appropriate TR SO₂ Group 1 sources, TR SO₂ Group 1 units, and State (and Indian country within the borders of such State) established under

paragraph (b)(3) of this section, the amount of TR SO₂ Group 1 allowances available under paragraph (a) of this section that the owners and operators are required to hold with regard to such sources, units, and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in the notice required in paragraph (b)(2)(iii)(B) of this section.

(6) Notwithstanding any other provision of this subpart and any revision, made by or submitted to the Administrator after the promulgation of the notice of data availability required in paragraph (b)(2)(iii)(B) of this section for a control period in a given year, of any data used in making the calculations referenced in such notice, the amounts of TR SO₂ Group 1 allowances that the owners and operators are required to hold in accordance with § 97.606(c)(2)(i) for such control period shall continue to be such amounts as calculated by the Administrator and referenced in such notice required in paragraph (b)(2)(iii)(B) of this section, except as follows:

(i) If any such data are revised by the Administrator as a result of a decision in or settlement of litigation concerning such data on appeal under part 78 of this chapter of such notice, or on appeal under section 307 of the Clean Air Act of a decision rendered under part 78 of this chapter on appeal of such notice, then the Administrator will use the data as so revised to recalculate the amounts of TR SO₂ Group 1 allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.606(c)(2)(i) for such control period with regard to the TR SO₂ Group 1 sources, TR SO₂ Group 1 units, and State (and Indian country within the borders of such State) involved, provided that such litigation under part 78 of this chapter, or the proceeding under part 78 of this chapter that resulted in the decision appealed in such litigation under section 307 of the Clean Air Act, was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(ii) If any such data are revised by the owners and operators of a TR SO₂ Group 1 source and TR SO₂ Group 1 unit whose designated representative submitted such data under paragraph (b)(2)(i) of this section, as a result of a decision in or settlement of litigation concerning such submission, then the Administrator will use the data as so revised to recalculate the amounts of TR SO₂ Group 1 allowances that owners and operators are required to hold in

accordance with the calculation formula in § 97.606(c)(2)(i) for such control period with regard to the TR SO$_2$ Group 1 sources, TR SO$_2$ Group 1 units, and State (and Indian country within the borders of such State) involved, provided that such litigation was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(iii) If the revised data are used to recalculate, in accordance with paragraphs (b)(6)(i) and (ii) of this section, the amount of TR SO$_2$ Group 1 allowances that the owners and operators are required to hold for such control period with regard to the TR SO$_2$ Group 1 sources, TR SO$_2$ Group 1 units, and State (and Indian country within the borders of such State) involved—

(A) Where the amount of TR SO$_2$ Group 1 allowances that the owners and operators are required to hold increases as a result of the use of all such revised data, the Administrator will establish a new, reasonable deadline on which the owners and operators shall hold the additional amount of TR SO$_2$ Group 1 allowances in the assurance account established by the Administrator for the appropriate TR SO$_2$ Group 1 sources, TR SO$_2$ Group 1 units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section. The owners' and operators' failure to hold such additional amount, as required, before the new deadline shall not be a violation of the Clean Air Act. The owners' and operators' failure to hold such additional amount, as required, as of the new deadline shall be a violation of the Clean Air Act. Each TR SO$_2$ Group 1 allowance that the owners and operators fail to hold as required as of the new deadline, and each day in such control period, shall be a separate violation of the Clean Air Act.

(B) For the owners and operators for which the amount of TR SO$_2$ Group 1 allowances required to be held decreases as a result of the use of all such revised data, the Administrator will record, in all accounts from which TR SO$_2$ Group 1 allowances were transferred by such owners and operators for such control period to the assurance account established by the Administrator for the appropriate TR SO$_2$ Group 1 sources, TR SO$_2$ Group 1 units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, a total amount of the TR SO$_2$ Group 1 allowances held in such assurance account equal to the amount of the decrease. If TR SO$_2$ Group 1 allowances were transferred to such assurance account from more than one account, the amount of TR SO$_2$ Group 1

allowances recorded in each such transferor account will be in proportion to the percentage of the total amount of TR SO$_2$ Group 1 allowances transferred to such assurance account for such control period from such transferor account.

(C) Each TR SO$_2$ Group 1 allowance held under paragraph (b)(6)(iii)(A) of this section as a result of recalculation of requirements under the TR SO$_2$ Group 1 assurance provisions for such control period must be a TR SO$_2$ Group 1 allowance allocated for a control period in a year before or the year immediately following, or in the same year as, the year of such control period.

### § 97.626   Banking.

(a) A TR SO$_2$ Group 1 allowance may be banked for future use or transfer in a compliance account or a general account in accordance with paragraph (b) of this section.

(b) Any TR SO$_2$ Group 1 allowance that is held in a compliance account or a general account will remain in such account unless and until the TR SO$_2$ Group 1 allowance is deducted or transferred under § 97.611(c), § 97.623, § 97.624, § 97.625, § 97.627, or § 97.628.

### § 97.627   Account error.

The Administrator may, at his or her sole discretion and on his or her own motion, correct any error in any Allowance Management System account. Within 10 business days of making such correction, the Administrator will notify the authorized account representative for the account.

### § 97.628   Administrator's action on submissions.

(a) The Administrator may review and conduct independent audits concerning any submission under the TR SO$_2$ Group 1 Trading Program and make appropriate adjustments of the information in the submission.

(b) The Administrator may deduct TR SO$_2$ Group 1 allowances from or transfer TR SO$_2$ Group 1 allowances to a compliance account or an assurance account, based on the information in a submission, as adjusted under paragraph (a)(1) of this section, and record such deductions and transfers.

### § 97.629   [Reserved]

### § 97.630   General monitoring, recordkeeping, and reporting requirements.

The owners and operators, and to the extent applicable, the designated representative, of a TR SO$_2$ Group 1 unit, shall comply with the monitoring, recordkeeping, and reporting requirements as provided in this subpart and subparts F and G of part 75 of this

chapter. For purposes of applying such requirements, the definitions in § 97.602 and in § 72.2 of this chapter shall apply, the terms "affected unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") in part 75 of this chapter shall be deemed to refer to the terms "TR SO$_2$ Group 1 unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") respectively as defined in § 97.602, and the term "newly affected unit" shall be deemed to mean "newly affected TR SO$_2$ Group 1 unit". The owner or operator of a unit that is not a TR SO$_2$ Group 1 unit but that is monitored under § 75.16(b)(2) of this chapter shall comply with the same monitoring, recordkeeping, and reporting requirements as a TR SO$_2$ Group 1 unit.

(a) *Requirements for installation, certification, and data accounting.* The owner or operator of each TR SO$_2$ Group 1 unit shall:

(1) Install all monitoring systems required under this subpart for monitoring SO$_2$ mass emissions and individual unit heat input (including all systems required to monitor SO$_2$ concentration, stack gas moisture content, stack gas flow rate, CO$_2$ or O$_2$ concentration, and fuel flow rate, as applicable, in accordance with §§ 75.11 and 75.16 of this chapter);

(2) Successfully complete all certification tests required under § 97.631 and meet all other requirements of this subpart and part 75 of this chapter applicable to the monitoring systems under paragraph (a)(1) of this section; and

(3) Record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section.

(b) *Compliance deadlines.* Except as provided in paragraph (e) of this section, the owner or operator shall meet the monitoring system certification and other requirements of paragraphs (a)(1) and (2) of this section on or before the following dates and shall record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section on and after the following dates.

(1) For the owner or operator of a TR SO$_2$ Group 1 unit that commences commercial operation before July 1, 2011, January 1, 2012.

(2) For the owner or operator of a TR SO$_2$ Group 1 unit that commences commercial operation on or after July 1, 2011, by the later of the following:

(i) January 1, 2012; or

(ii) 180 calendar days after the date on which the unit commences commercial operation.

(3) The owner or operator of a TR SO$_2$ Group 1 unit for which construction of a new stack or flue or installation of add-on SO$_2$ emission controls is completed after the applicable deadline under paragraph (b)(1) or (2) of this section shall meet the requirements of §§ 75.4(e)(1) through (e)(4) of this chapter, except that:

(i) Such requirements shall apply to the monitoring systems required under § 97.630 through § 97.635, rather than the monitoring systems required under part 75 of this chapter;

(ii) SO$_2$ concentration, stack gas moisture content, stack gas volumetric flow rate, and O$_2$ or CO$_2$ concentration data shall be determined and reported, rather than the data listed in § 75.4(e)(2) of this chapter; and

(iii) Any petition for another procedure under § 75.4(e)(2) of this chapter shall be submitted under § 97.635, rather than § 75.66.

(c) *Reporting data.* The owner or operator of a TR SO$_2$ Group 1 unit that does not meet the applicable compliance date set forth in paragraph (b) of this section for any monitoring system under paragraph (a)(1) of this section shall, for each such monitoring system, determine, record, and report maximum potential (or, as appropriate, minimum potential) values for SO$_2$ concentration, stack gas flow rate, stack gas moisture content, fuel flow rate, and any other parameters required to determine SO$_2$ mass emissions and heat input in accordance with § 75.31(b)(2) or (c)(3) of this chapter or section 2.4 of appendix D to part 75 of this chapter, as applicable.

(d) *Prohibitions.* (1) No owner or operator of a TR SO$_2$ Group 1 unit shall use any alternative monitoring system, alternative reference method, or any other alternative to any requirement of this subpart without having obtained prior written approval in accordance with § 97.635.

(2) No owner or operator of a TR SO$_2$ Group 1 unit shall operate the unit so as to discharge, or allow to be discharged, SO$_2$ to the atmosphere without accounting for all such SO$_2$ in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(3) No owner or operator of a TR SO$_2$ Group 1 unit shall disrupt the continuous emission monitoring system, any portion thereof, or any other approved emission monitoring method, and thereby avoid monitoring and recording SO$_2$ mass discharged into the atmosphere or heat input, except for periods of recertification or periods when calibration, quality assurance testing, or maintenance is performed in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(4) No owner or operator of a TR SO$_2$ Group 1 unit shall retire or permanently discontinue use of the continuous emission monitoring system, any component thereof, or any other approved monitoring system under this subpart, except under any one of the following circumstances:

(i) During the period that the unit is covered by an exemption under § 97.605 that is in effect;

(ii) The owner or operator is monitoring emissions from the unit with another certified monitoring system approved, in accordance with the applicable provisions of this subpart and part 75 of this chapter, by the Administrator for use at that unit that provides emission data for the same pollutant or parameter as the retired or discontinued monitoring system; or

(iii) The designated representative submits notification of the date of certification testing of a replacement monitoring system for the retired or discontinued monitoring system in accordance with § 97.631(d)(3)(i).

(e) *Long-term cold storage.* The owner or operator of a TR SO$_2$ Group 1 unit is subject to the applicable provisions of § 75.4(d) of this chapter concerning units in long-term cold storage.

### § 97.631   Initial monitoring system certification and recertification procedures.

(a) The owner or operator of a TR SO$_2$ Group 1 unit shall be exempt from the initial certification requirements of this section for a monitoring system under § 97.630(a)(1) if the following conditions are met:

(1) The monitoring system has been previously certified in accordance with part 75 of this chapter; and

(2) The applicable quality-assurance and quality-control requirements of § 75.21 of this chapter and appendices B and D to part 75 of this chapter are fully met for the certified monitoring system described in paragraph (a)(1) of this section.

(b) The recertification provisions of this section shall apply to a monitoring system under § 97.630(a)(1) that is exempt from initial certification requirements under paragraph (a) of this section.

(c) [Reserved]

(d) Except as provided in paragraph (a) of this section, the owner or operator of a TR SO$_2$ Group 1 unit shall comply with the following initial certification and recertification procedures, for a continuous monitoring system (*i.e.,* a continuous emission monitoring system and an excepted monitoring system under appendix D to part 75 of this chapter) under § 97.630(a)(1). The owner or operator of a unit that qualifies to use the low mass emissions excepted monitoring methodology under § 75.19 of this chapter or that qualifies to use an alternative monitoring system under subpart E of part 75 of this chapter shall comply with the procedures in paragraph (e) or (f) of this section respectively.

(1) Requirements for initial certification. The owner or operator shall ensure that each continuous monitoring system under § 97.630(a)(1) (including the automated data acquisition and handling system) successfully completes all of the initial certification testing required under § 75.20 of this chapter by the applicable deadline in § 97.630(b). In addition, whenever the owner or operator installs a monitoring system to meet the requirements of this subpart in a location where no such monitoring system was previously installed, initial certification in accordance with § 75.20 of this chapter is required.

(2) Requirements for recertification. Whenever the owner or operator makes a replacement, modification, or change in any certified continuous emission monitoring system under § 97.630(a)(1) that may significantly affect the ability of the system to accurately measure or record SO$_2$ mass emissions or heat input rate or to meet the quality-assurance and quality-control requirements of § 75.21 of this chapter or appendix B to part 75 of this chapter, the owner or operator shall recertify the monitoring system in accordance with § 75.20(b) of this chapter. Furthermore, whenever the owner or operator makes a replacement, modification, or change to the flue gas handling system or the unit's operation that may significantly change the stack flow or concentration profile, the owner or operator shall recertify each continuous emission monitoring system whose accuracy is potentially affected by the change, in accordance with § 75.20(b) of this chapter. Examples of changes to a continuous emission monitoring system that require recertification include: Replacement of the analyzer, complete replacement of an existing continuous emission monitoring system, or change in location or orientation of the sampling probe or site. Any fuel flowmeter system under § 97.630(a)(1) is subject to the recertification requirements in § 75.20(g)(6) of this chapter.

(3) Approval process for initial certification and recertification. For initial certification of a continuous monitoring system under § 97.630(a)(1), paragraphs (d)(3)(i) through (v) of this

section apply. For recertifications of such monitoring systems, paragraphs (d)(3)(i) through (iv) of this section and the procedures in §§ 75.20(b)(5) and (g)(7) of this chapter (in lieu of the procedures in paragraph (d)(3)(v) of this section) apply, provided that in applying paragraphs (d)(3)(i) through (iv) of this section, the words "certification" and "initial certification" are replaced by the word "recertification" and the word "certified" is replaced by the word "recertified".

(i) Notification of certification. The designated representative shall submit to the appropriate EPA Regional Office and the Administrator written notice of the dates of certification testing, in accordance with § 97.633.

(ii) Certification application. The designated representative shall submit to the Administrator a certification application for each monitoring system. A complete certification application shall include the information specified in § 75.63 of this chapter.

(iii) Provisional certification date. The provisional certification date for a monitoring system shall be determined in accordance with § 75.20(a)(3) of this chapter. A provisionally certified monitoring system may be used under the TR SO₂ Group 1 Trading Program for a period not to exceed 120 days after receipt by the Administrator of the complete certification application for the monitoring system under paragraph (d)(3)(ii) of this section. Data measured and recorded by the provisionally certified monitoring system, in accordance with the requirements of part 75 of this chapter, will be considered valid quality-assured data (retroactive to the date and time of provisional certification), provided that the Administrator does not invalidate the provisional certification by issuing a notice of disapproval within 120 days of the date of receipt of the complete certification application by the Administrator.

(iv) Certification application approval process. The Administrator will issue a written notice of approval or disapproval of the certification application to the owner or operator within 120 days of receipt of the complete certification application under paragraph (d)(3)(ii) of this section. In the event the Administrator does not issue such a notice within such 120-day period, each monitoring system that meets the applicable performance requirements of part 75 of this chapter and is included in the certification application will be deemed certified for use under the TR SO₂ Group 1 Trading Program.

(A) Approval notice. If the certification application is complete and shows that each monitoring system meets the applicable performance requirements of part 75 of this chapter, then the Administrator will issue a written notice of approval of the certification application within 120 days of receipt.

(B) Incomplete application notice. If the certification application is not complete, then the Administrator will issue a written notice of incompleteness that sets a reasonable date by which the designated representative must submit the additional information required to complete the certification application. If the designated representative does not comply with the notice of incompleteness by the specified date, then the Administrator may issue a notice of disapproval under paragraph (d)(3)(iv)(C) of this section.

(C) Disapproval notice. If the certification application shows that any monitoring system does not meet the performance requirements of part 75 of this chapter or if the certification application is incomplete and the requirement for disapproval under paragraph (d)(3)(iv)(B) of this section is met, then the Administrator will issue a written notice of disapproval of the certification application. Upon issuance of such notice of disapproval, the provisional certification is invalidated by the Administrator and the data measured and recorded by each uncertified monitoring system shall not be considered valid quality-assured data beginning with the date and hour of provisional certification (as defined under § 75.20(a)(3) of this chapter).

(D) Audit decertification. The Administrator may issue a notice of disapproval of the certification status of a monitor in accordance with § 97.632(b).

(v) Procedures for loss of certification. If the Administrator issues a notice of disapproval of a certification application under paragraph (d)(3)(iv)(C) of this section or a notice of disapproval of certification status under paragraph (d)(3)(iv)(D) of this section, then:

(A) The owner or operator shall substitute the following values, for each disapproved monitoring system, for each hour of unit operation during the period of invalid data specified under § 75.20(a)(4)(iii), § 75.20(g)(7), or § 75.21(e) of this chapter and continuing until the applicable date and hour specified under § 75.20(a)(5)(i) or (g)(7) of this chapter:

(1) For a disapproved SO₂ pollutant concentration monitor and disapproved flow monitor, respectively, the maximum potential concentration of SO₂ and the maximum potential flow rate, as defined in sections 2.1.1.1 and 2.1.4.1 of appendix A to part 75 of this chapter.

(2) For a disapproved moisture monitoring system and disapproved diluent gas monitoring system, respectively, the minimum potential moisture percentage and either the maximum potential CO₂ concentration or the minimum potential O₂ concentration (as applicable), as defined in sections 2.1.5, 2.1.3.1, and 2.1.3.2 of appendix A to part 75 of this chapter.

(3) For a disapproved fuel flowmeter system, the maximum potential fuel flow rate, as defined in section 2.4.2.1 of appendix D to part 75 of this chapter.

(B) The designated representative shall submit a notification of certification retest dates and a new certification application in accordance with paragraphs (d)(3)(i) and (ii) of this section.

(C) The owner or operator shall repeat all certification tests or other requirements that were failed by the monitoring system, as indicated in the Administrator's notice of disapproval, no later than 30 unit operating days after the date of issuance of the notice of disapproval.

(e) The owner or operator of a unit qualified to use the low mass emissions (LME) excepted methodology under § 75.19 of this chapter shall meet the applicable certification and recertification requirements in §§ 75.19(a)(2) and 75.20(h) of this chapter. If the owner or operator of such a unit elects to certify a fuel flowmeter system for heat input determination, the owner or operator shall also meet the certification and recertification requirements in § 75.20(g) of this chapter.

(f) The designated representative of each unit for which the owner or operator intends to use an alternative monitoring system approved by the Administrator under subpart E of part 75 of this chapter shall comply with the applicable notification and application procedures of § 75.20(f) of this chapter.

**§ 97.632  Monitoring system out-of-control periods.**

(a) General provisions. Whenever any monitoring system fails to meet the quality-assurance and quality-control requirements or data validation requirements of part 75 of this chapter, data shall be substituted using the applicable missing data procedures in subpart D or appendix D to part 75 of this chapter.

(b) Audit decertification. Whenever both an audit of a monitoring system

and a review of the initial certification or recertification application reveal that any monitoring system should not have been certified or recertified because it did not meet a particular performance specification or other requirement under § 97.631 or the applicable provisions of part 75 of this chapter, both at the time of the initial certification or recertification application submission and at the time of the audit, the Administrator will issue a notice of disapproval of the certification status of such monitoring system. For the purposes of this paragraph, an audit shall be either a field audit or an audit of any information submitted to the Administrator or any State or permitting authority. By issuing the notice of disapproval, the Administrator revokes prospectively the certification status of the monitoring system. The data measured and recorded by the monitoring system shall not be considered valid quality-assured data from the date of issuance of the notification of the revoked certification status until the date and time that the owner or operator completes subsequently approved initial certification or recertification tests for the monitoring system. The owner or operator shall follow the applicable initial certification or recertification procedures in § 97.631 for each disapproved monitoring system.

### § 97.633 Notifications concerning monitoring.

The designated representative of a TR SO$_2$ Group 1 unit shall submit written notice to the Administrator in accordance with § 75.61 of this chapter.

### § 97.634 Recordkeeping and reporting.

(a) *General provisions.* The designated representative shall comply with all recordkeeping and reporting requirements in paragraphs (b) through (e) of this section, the applicable recordkeeping and reporting requirements in subparts F and G of part 75 of this chapter, and the requirements of § 97.614(a).

(b) *Monitoring plans.* The owner or operator of a TR SO$_2$ Group 1 unit shall comply with requirements of § 75.62 of this chapter.

(c) *Certification applications.* The designated representative shall submit an application to the Administrator within 45 days after completing all initial certification or recertification tests required under § 97.631, including the information required under § 75.63 of this chapter.

(d) *Quarterly reports.* The designated representative shall submit quarterly reports, as follows:

(1) The designated representative shall report the SO$_2$ mass emissions data and heat input data for the TR SO$_2$ Group 1 unit, in an electronic quarterly report in a format prescribed by the Administrator, for each calendar quarter beginning with:

(i) For a unit that commences commercial operation before July 1, 2011, the calendar quarter covering January 1, 2012 through March 31, 2012; or

(ii) For a unit that commences commercial operation on or after July 1, 2011, the calendar quarter corresponding to the earlier of the date of provisional certification or the applicable deadline for initial certification under § 97.630(b), unless that quarter is the third or fourth quarter of 2011, in which case reporting shall commence in the quarter covering January 1, 2012 through March 31, 2012.

(2) The designated representative shall submit each quarterly report to the Administrator within 30 days after the end of the calendar quarter covered by the report. Quarterly reports shall be submitted in the manner specified in § 75.64 of this chapter.

(3) For TR SO$_2$ Group 1 units that are also subject to the Acid Rain Program, TR NO$_X$ Annual Trading Program, or TR NO$_X$ Ozone Season Trading Program, quarterly reports shall include the applicable data and information required by subparts F through H of part 75 of this chapter as applicable, in addition to the SO$_2$ mass emission data, heat input data, and other information required by this subpart.

(4) The Administrator may review and conduct independent audits of any quarterly report in order to determine whether the quarterly report meets the requirements of this subpart and part 75 of this chapter, including the requirement to use substitute data.

(i) The Administrator will notify the designated representative of any determination that the quarterly report fails to meet any such requirements and specify in such notification any corrections that the Administrator believes are necessary to make through resubmission of the quarterly report and a reasonable time period within which the designated representative must respond. Upon request by the designated representative, the Administrator may specify reasonable extensions of such time period. Within the time period (including any such extensions) specified by the Administrator, the designated representative shall resubmit the quarterly report with the corrections specified by the Administrator, except to the extent the designated

representative provides information demonstrating that a specified correction is not necessary because the quarterly report already meets the requirements of this subpart and part 75 of this chapter that are relevant to the specified correction.

(ii) Any resubmission of a quarterly report shall meet the requirements applicable to the submission of a quarterly report under this subpart and part 75 of this chapter, except for the deadline set forth in paragraph (d)(2) of this section.

(e) *Compliance certification.* The designated representative shall submit to the Administrator a compliance certification (in a format prescribed by the Administrator) in support of each quarterly report based on reasonable inquiry of those persons with primary responsibility for ensuring that all of the unit's emissions are correctly and fully monitored. The certification shall state that:

(1) The monitoring data submitted were recorded in accordance with the applicable requirements of this subpart and part 75 of this chapter, including the quality assurance procedures and specifications; and

(2) For a unit with add-on SO$_2$ emission controls and for all hours where SO$_2$ data are substituted in accordance with § 75.34(a)(1) of this chapter, the add-on emission controls were operating within the range of parameters listed in the quality assurance/quality control program under appendix B to part 75 of this chapter and the substitute data values do not systematically underestimate SO$_2$ emissions.

### § 97.635 Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

(a) The designated representative of a TR SO$_2$ Group 1 unit may submit a petition under § 75.66 of this chapter to the Administrator, requesting approval to apply an alternative to any requirement of §§ 97.630 through 97.634.

(b) A petition submitted under paragraph (a) of this section shall include sufficient information for the evaluation of the petition, including, at a minimum, the following information:

(i) Identification of each unit and source covered by the petition;

(ii) A detailed explanation of why the proposed alternative is being suggested in lieu of the requirement;

(iii) A description and diagram of any equipment and procedures used in the proposed alternative;

(iv) A demonstration that the proposed alternative is consistent with

the purposes of the requirement for which the alternative is proposed and with the purposes of this subpart and part 75 of this chapter and that any adverse effect of approving the alternative will be *de minimis;* and

(v) Any other relevant information that the Administrator may require.

(c) Use of an alternative to any requirement referenced in paragraph (a) of this section is in accordance with this subpart only to the extent that the petition is approved in writing by the Administrator and that such use is in accordance with such approval.

77. Part 97 is amended by adding subpart DDDDD to read as follows:

## Subpart DDDDD—TR SO₂ Group 2 Trading Program

Sec.
97.701   Purpose.
97.702   Definitions.
97.703   Measurements, abbreviations, and acronyms.
97.704   Applicability.
97.705   Retired unit exemption.
97.706   Standard requirements.
97.707   Computation of time.
97.708   Administrative appeal procedures.
97.709   [Reserved]
97.710   State SO₂ Group 2 trading budgets, new unit set-asides, Indian country new unit set-asides and variability limits.
97.711   Timing requirements for TR SO₂ Group 2 allowance allocations.
97.712   TR SO₂ Group 2 allowance allocations to new units.
97.713   Authorization of designated representative and alternate designated representative.
97.714   Responsibilities of designated representative and alternate designated representative.
97.715   Changing designated representative and alternate designated representative; changes in owners and operators.
97.716   Certificate of representation.
97.717   Objections concerning designated representative and alternate designated representative.
97.718   Delegation by designated representative and alternate designated representative.
97.719   [Reserved]
97.720   Establishment of compliance accounts and general accounts.
97.721   Recordation of TR SO₂ Group 2 allowance allocations.
97.722   Submission of TR SO₂ Group 2 allowance transfers.
97.723   Recordation of TR SO₂ Group 2 allowance transfers.
97.724   Compliance with TR SO₂ Group 2 emissions limitation.
97.725   Compliance with TR SO₂ Group 2 assurance provisions.
97.726   Banking.
97.727   Account error.
97.728   Administrator's action on submissions.
97.729   [Reserved]
97.730   General monitoring, recordkeeping, and reporting requirements.
97.731   Initial monitoring system certification and recertification procedures.
97.732   Monitoring system out-of-control periods.
97.733   Notifications concerning monitoring.
97.734   Recordkeeping and reporting.
97.735   Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

## Subpart DDDDD—TR SO₂ Group 2 Trading Program

### § 97.701   Purpose.

This subpart sets forth the general, designated representative, allowance, and monitoring provisions for the Transport Rule (TR) SO₂ Group 2 Trading Program, under section 110 of the Clean Air Act and § 52.39 of this chapter, as a means of mitigating interstate transport of fine particulates and sulfur dioxide.

### § 97.702   Definitions.

The terms used in this subpart shall have the meanings set forth in this section as follows:

*Acid Rain Program* means a multi-state SO₂ and NOₓ air pollution control and emission reduction program established by the Administrator under title IV of the Clean Air Act and parts 72 through 78 of this chapter.

*Administrator* means the Administrator of the United States Environmental Protection Agency or the Director of the Clean Air Markets Division (or its successor determined by the Administrator) of the United States Environmental Protection Agency, the Administrator's duly authorized representative under this subpart.

*Allocate* or *allocation* means, with regard to TR SO₂ Group 2 allowances, the determination by the Administrator, State, or permitting authority, in accordance with this subpart and any SIP revision submitted by the State and approved by the Administrator under § 52.39(g), (h), or (i) of this chapter, of the amount of such TR SO₂ Group 2 allowances to be initially credited, at no cost to the recipient, to:

(1) A TR SO₂ Group 2 unit;
(2) A new unit set-aside;
(3) An Indian country new unit set-aside; or
(4) An entity not listed in paragraphs (1) through (3) of this definition;
(5) Provided that, if the Administrator, State, or permitting authority initially credits, to a TR SO₂ Group 2 unit qualifying for an initial credit, a credit in the amount of zero TR SO₂ Group 2 allowances, the TR SO₂ Group 2 unit will be treated as being allocated an amount (*i.e.*, zero) of TR SO₂ Group 2 allowances.

*Allowable SO₂* emission rate means, for a unit, the most stringent State or federal SO₂ emission rate limit (in lb/MWhr or, if in lb/mmBtu, converted to lb/MWhr by multiplying it by the unit's heat rate in mmBtu/MWhr) that is applicable to the unit and covers the longest averaging period not exceeding one year.

*Allowance Management System* means the system by which the Administrator records allocations, deductions, and transfers of TR SO₂ Group 2 allowances under the TR SO₂ Group 2 Trading Program. Such allowances are allocated, recorded, held, deducted, or transferred only as whole allowances.

*Allowance Management System account* means an account in the Allowance Management System established by the Administrator for purposes of recording the allocation, holding, transfer, or deduction of TR SO₂ Group 2 allowances.

*Allowance transfer deadline* means, for a control period in a given year, midnight of March 1 (if it is a business day), or midnight of the first business day thereafter (if March 1 is not a business day), immediately after such control period and is the deadline by which a TR SO₂ Group 2 allowance transfer must be submitted for recordation in a TR SO₂ Group 2 source's compliance account in order to be available for use in complying with the source's TR SO₂ Group 2 emissions limitation for such control period in accordance with §§ 97.706 and 97.724.

*Alternate designated representative* means, for a TR SO₂ Group 2 source and each TR SO₂ Group 2 unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to act on behalf of the designated representative in matters pertaining to the TR SO₂ Group 2 Trading Program. If the TR SO₂ Group 2 source is also subject to the Acid Rain Program, TR NOₓ Annual Trading Program, or TR NOₓ Ozone Season Trading Program, then this natural person shall be the same natural person as the alternate designated representative, as defined in the respective program.

*Assurance account* means an Allowance Management System account, established by the Administrator under § 97.725(b)(3) for certain owners and operators of a group of one or more TR SO₂ Group 2 sources and units in a given State (and Indian country within the borders of such State), in which are held TR SO₂ Group 2 allowances available for use for a control period in a given year in

complying with the TR SO₂ Group 2 assurance provisions in accordance with §§ 97.706 and 97.725.

*Authorized account representative* means, for a general account, the natural person who is authorized, in accordance with this subpart, to transfer and otherwise dispose of TR SO₂ Group 2 allowances held in the general account and, for a TR SO₂ Group 2 source's compliance account, the designated representative of the source.

*Automated data acquisition and handling system* or *DAHS* means the component of the continuous emission monitoring system, or other emissions monitoring system approved for use under this subpart, designed to interpret and convert individual output signals from pollutant concentration monitors, flow monitors, diluent gas monitors, and other component parts of the monitoring system to produce a continuous record of the measured parameters in the measurement units required by this subpart.

*Biomass* means—

(1) Any organic material grown for the purpose of being converted to energy;

(2) Any organic byproduct of agriculture that can be converted into energy; or

(3) Any material that can be converted into energy and is nonmerchantable for other purposes, that is segregated from other material that is nonmerchantable for other purposes, and that is;

(i) A forest-related organic resource, including mill residues, precommercial thinnings, slash, brush, or byproduct from conversion of trees to merchantable material; or

(ii) A wood material, including pallets, crates, dunnage, manufacturing and construction materials (other than pressure-treated, chemically-treated, or painted wood products), and landscape or right-of-way tree trimmings.

*Boiler* means an enclosed fossil- or other-fuel-fired combustion device used to produce heat and to transfer heat to recirculating water, steam, or other medium.

*Bottoming-cycle unit* means a unit in which the energy input to the unit is first used to produce useful thermal energy, where at least some of the reject heat from the useful thermal energy application or process is then used for electricity production.

*Business day* means a day that does not fall on a weekend or a federal holiday.

*Certifying official* means a natural person who is:

(1) For a corporation, a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function or any other person who performs similar policy- or decision-making functions for the corporation;

(2) For a partnership or sole proprietorship, a general partner or the proprietor respectively; or

(3) For a local government entity or State, federal, or other public agency, a principal executive officer or ranking elected official.

*Clean Air Act* means the Clean Air Act, 42 U.S.C. 7401, *et seq.*

*Coal* means "coal" as defined in § 72.2 of this chapter.

*Coal-derived fuel* means any fuel (whether in a solid, liquid, or gaseous state) produced by the mechanical, thermal, or chemical processing of coal.

*Cogeneration system* means an integrated group, at a source, of equipment (including a boiler, or combustion turbine, and a steam turbine generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy.

*Cogeneration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a topping-cycle unit or a bottoming-cycle unit:

(1) Operating as part of a cogeneration system; and

(2) Producing on an annual average basis—

(i) For a topping-cycle unit,

(A) Useful thermal energy not less than 5 percent of total energy output; and

(B) Useful power that, when added to one-half of useful thermal energy produced, is not less than 42.5 percent of total energy input, if useful thermal energy produced is 15 percent or more of total energy output, or not less than 45 percent of total energy input, if useful thermal energy produced is less than 15 percent of total energy output.

(ii) For a bottoming-cycle unit, useful power not less than 45 percent of total energy input;

(3) Provided that the requirements in paragraph (2) of this definition shall not apply to a calendar year referenced in paragraph (2) of this definition during which the unit did not operate at all;

(4) Provided that the total energy input under paragraphs (2)(i)(B) and (2)(ii) of this definition shall equal the unit's total energy input from all fuel, except biomass if the unit is a boiler; and

(5) Provided that, if, throughout its operation during the 12-month period or a calendar year referenced in paragraph (2) of this definition, a unit is operated as part of a cogeneration system and the cogeneration system meets on a system-wide basis the requirement in paragraph (2)(i)(B) or (2)(ii) of this definition, the unit shall be deemed to meet such requirement during that 12-month period or calendar year.

*Combustion turbine* means an enclosed device comprising:

(1) If the device is simple cycle, a compressor, a combustor, and a turbine and in which the flue gas resulting from the combustion of fuel in the combustor passes through the turbine, rotating the turbine; and

(2) If the device is combined cycle, the equipment described in paragraph (1) of this definition and any associated duct burner, heat recovery steam generator, and steam turbine.

*Commence commercial operation* means, with regard to a unit:

(1) To have begun to produce steam, gas, or other heated medium used to generate electricity for sale or use, including test generation, except as provided in § 97.705.

(i) For a unit that is a TR SO₂ Group 2 unit under § 97.704 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that subsequently undergoes a physical change or is moved to a new location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit that is a TR SO₂ Group 2 unit under § 97.704 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in the introductory text of paragraph (1) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

(2) Notwithstanding paragraph (1) of this definition and except as provided in § 97.705, for a unit that is not a TR SO₂ Group 2 unit under § 97.704 on the later of January 1, 2005 or the date the unit commences commercial operation as defined in introductory text of paragraph (1) of this definition, the unit's date for commencement of commercial operation shall be the date on which the unit becomes a TR SO₂ Group 2 unit under § 97.704.

(i) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition

and that subsequently undergoes a physical change or is moved to a different location or source, such date shall remain the date of commencement of commercial operation of the unit, which shall continue to be treated as the same unit.

(ii) For a unit with a date for commencement of commercial operation as defined in the introductory text of paragraph (2) of this definition and that is subsequently replaced by a unit at the same or a different source, such date shall remain the replaced unit's date of commencement of commercial operation, and the replacement unit shall be treated as a separate unit with a separate date for commencement of commercial operation as defined in paragraph (1) or (2) of this definition as appropriate.

*Common designated representative* means, with regard to a control period in a given year, a designated representative where, as of April 1 immediately after the allowance transfer deadline for such control period, the same natural person is authorized under §§ 97.713(a) and 97.715(a) as the designated representative for a group of one or more TR SO₂ Group 2 sources and units located in a State (and Indian country within the borders of such State).

*Common designated representative's assurance level* means, with regard to a specific common designated representative and a State (and Indian country within the borders of such State) and control period in a given year for which the State assurance level is exceeded as described in § 97.706(c)(2)(iii), the common designated representative's share of the State SO₂ Group 2 trading budget with the variability limit for the State for such control period.

*Common designated representative's share* means, with regard to a specific common designated representative for a control period in a given year:

(1) With regard to a total amount of SO₂ emissions from all TR SO₂ Group 2 units in a State (and Indian country within the borders of such State) during such control period, the total tonnage of SO₂ emissions during such control period from a group of one or more TR SO₂ Group 2 units located in such State (and such Indian country) and having the common designated representative for such control period;

(2) With regard to a State SO₂ Group 2 trading budget with the variability limit for such control period, the amount (rounded to the nearest allowance) equal to the sum of the total amount of TR SO₂ Group 2 allowances allocated for such control period to a group of one or more TR SO₂ Group 2 units located in the State (and Indian country within the borders of such State) and having the common designated representative for such control period and of the total amount of TR SO₂ Group 2 allowances purchased by an owner or operator of such TR SO₂ Group 2 units in an auction for such control period and submitted by the State or the permitting authority to the Administrator for recordation in the compliance accounts for such TR SO₂ Group 2 units in accordance with the TR SO₂ Group 2 allowance auction provisions in a SIP revision approved by the Administrator under § 52.39(h) or (i) of this chapter, multiplied by the sum of the State SO₂ Group 2 trading budget under § 97.710(a) and the State's variability limit under § 97.710(b) for such control period and divided by such State SO₂ Group 2 trading budget;

(3) Provided that, in the case of a unit that operates during, but has no amount of TR SO₂ Group 2 allowances allocated under §§ 97.711 and 97.712 for, such control period, the unit shall be treated, solely for purposes of this definition, as being allocated an amount (rounded to the nearest allowance) of TR SO₂ Group 2 allowances for such control period equal to the unit's allowable SO₂ emission rate applicable to such control period, multiplied by a capacity factor of 0.85 (if the unit is a boiler combusting any amount of coal or coal-derived fuel during such control period), 0.24 (if the unit is a simple combustion turbine during such control period), 0.67 (if the unit is a combined cycle turbine during such control period), 0.74 (if the unit is an integrated coal gasification combined cycle unit during such control period), or 0.36 (for any other unit), multiplied by the unit's maximum hourly load as reported in accordance with this subpart and by 8,760 hours/control period, and divided by 2,000 lb/ton.

*Common stack* means a single flue through which emissions from 2 or more units are exhausted.

*Compliance account* means an Allowance Management System account, established by the Administrator for a TR SO₂ Group 2 source under this subpart, in which any TR SO₂ Group 2 allowance allocations to the TR SO₂ Group 2 units at the source are recorded and in which are held any TR SO₂ Group 2 allowances available for use for a control period in a given year in complying with the source's TR SO₂ Group 2 emissions limitation in accordance with §§ 97.706 and 97.724.

*Continuous emission monitoring system* or *CEMS* means the equipment required under this subpart to sample, analyze, measure, and provide, by means of readings recorded at least once every 15 minutes and using an automated data acquisition and handling system (DAHS), a permanent record of SO₂ emissions, stack gas volumetric flow rate, stack gas moisture content, and O₂ or CO₂ concentration (as applicable), in a manner consistent with part 75 of this chapter and §§ 97.730 through 97.735. The following systems are the principal types of continuous emission monitoring systems:

(1) A flow monitoring system, consisting of a stack flow rate monitor and an automated data acquisition and handling system and providing a permanent, continuous record of stack gas volumetric flow rate, in standard cubic feet per hour (scfh);

(2) A SO₂ monitoring system, consisting of a SO₂ pollutant concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of SO₂ emissions, in parts per million (ppm);

(3) A moisture monitoring system, as defined in § 75.11(b)(2) of this chapter and providing a permanent, continuous record of the stack gas moisture content, in percent H₂O;

(4) A CO₂ monitoring system, consisting of a CO₂ pollutant concentration monitor (or an O₂ monitor plus suitable mathematical equations from which the CO₂ concentration is derived) and an automated data acquisition and handling system and providing a permanent, continuous record of CO₂ emissions, in percent CO₂; and

(5) An O₂ monitoring system, consisting of an O₂ concentration monitor and an automated data acquisition and handling system and providing a permanent, continuous record of O₂, in percent O₂.

*Control period* means the period starting January 1 of a calendar year, except as provided in § 97.706(c)(3), and ending on December 31 of the same year, inclusive.

*Designated representative* means, for a TR SO₂ Group 2 source and each TR SO₂ Group 2 unit at the source, the natural person who is authorized by the owners and operators of the source and all such units at the source, in accordance with this subpart, to represent and legally bind each owner and operator in matters pertaining to the TR SO₂ Group 2 Trading Program. If the TR SO₂ Group 2 source is also subject to the Acid Rain Program, TR NOₓ Annual Trading Program, or TR NOₓ Ozone Season Trading Program, then this natural person shall be the same

natural person as the designated representative, as defined in the respective program.

*Emissions* means air pollutants exhausted from a unit or source into the atmosphere, as measured, recorded, and reported to the Administrator by the designated representative, and as modified by the Administrator:

(1) In accordance with this subpart; and

(2) With regard to a period before the unit or source is required to measure, record, and report such air pollutants in accordance with this subpart, in accordance with part 75 of this chapter.

*Excess emissions* means any ton of emissions from the TR $SO_2$ Group 2 units at a TR $SO_2$ Group 2 source during a control period in a given year that exceeds the TR $SO_2$ Group 2 emissions limitation for the source for such control period.

*Fossil fuel* means—

(1) Natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material; or

(2) For purposes of applying the limitation on "average annual fuel consumption of fossil fuel" in §§ 97.704(b)(2)(i)(B) and (ii), natural gas, petroleum, coal, or any form of solid, liquid, or gaseous fuel derived from such material for the purpose of creating useful heat.

*Fossil-fuel-fired* means, with regard to a unit, combusting any amount of fossil fuel in 2005 or any calendar year thereafter.

*General account* means an Allowance Management System account, established under this subpart, that is not a compliance account or an assurance account.

*Generator* means a device that produces electricity.

*Gross electrical output* means, for a unit, electricity made available for use, including any such electricity used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Heat input* means, for a unit for a specified period of time, the product (in mmBtu/time) of the gross calorific value of the fuel (in mmBtu/lb) fed into the unit multiplied by the fuel feed rate (in lb of fuel/time), as measured, recorded, and reported to the Administrator by the designated representative and as modified by the Administrator in accordance with this subpart and excluding the heat derived from preheated combustion air, recirculated flue gases, or exhaust.

*Heat input rate* means, for a unit, the amount of heat input (in mmBtu) divided by unit operating time (in hr) or, for a unit and a specific fuel, the amount of heat input attributed to the fuel (in mmBtu) divided by the unit operating time (in hr) during which the unit combusts the fuel.

*Heat rate* means, for a unit, the unit's maximum design heat input (in Btu/hr), divided by the product of 1,000,000 Btu/mmBtu and the unit's maximum hourly load.

*Indian country* means "Indian country" as defined in 18 U.S.C. 1151.

*Life-of-the-unit, firm power contractual arrangement* means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of nameplate capacity and associated energy generated by any specified unit and pays its proportional amount of such unit's total costs, pursuant to a contract:

(1) For the life of the unit;

(2) For a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or

(3) For a period no less than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit is built, with option rights to purchase or release some portion of the nameplate capacity and associated energy generated by the unit at the end of the period.

*Maximum design heat input* means, for a unit, the maximum amount of fuel per hour (in Btu/hr) that the unit is capable of combusting on a steady state basis as of the initial installation of the unit as specified by the manufacturer of the unit.

*Monitoring system* means any monitoring system that meets the requirements of this subpart, including a continuous emission monitoring system, an alternative monitoring system, or an excepted monitoring system under part 75 of this chapter.

*Nameplate capacity* means, starting from the initial installation of a generator, the maximum electrical generating output (in MWe, rounded to the nearest tenth) that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings) as of such installation as specified by the manufacturer of the generator or, starting from the completion of any subsequent physical change in the generator resulting in an increase in the maximum electrical generating output that the generator is capable of producing on a steady state basis and during continuous operation (when not restricted by seasonal or other deratings), such increased maximum amount (in MWe, rounded to the nearest tenth) as of such completion as specified by the person conducting the physical change.

*Natural gas* means "natural gas" as defined in § 72.2 of this chapter.

*Newly affected TR $SO_2$ Group 2 unit* means a unit that was not a TR $SO_2$ Group 2 unit when it began operating but that thereafter becomes a TR $SO_2$ Group 2 unit.

*Operate* or *operation* means, with regard to a unit, to combust fuel.

*Operator* means, for a TR $SO_2$ Group 2 source or a TR $SO_2$ Group 2 unit at a source respectively, any person who operates, controls, or supervises a TR $SO_2$ Group 2 unit at the source or the TR $SO_2$ Group 2 unit and shall include, but not be limited to, any holding company, utility system, or plant manager of such source or unit.

*Owner* means, for a TR $SO_2$ Group 2 source or a TR $SO_2$ Group 2 unit at a source respectively, any of the following persons:

(1) Any holder of any portion of the legal or equitable title in a TR $SO_2$ Group 2 unit at the source or the TR $SO_2$ Group 2 unit;

(2) Any holder of a leasehold interest in a TR $SO_2$ Group 2 unit at the source or the TR $SO_2$ Group 2 unit, provided that, unless expressly provided for in a leasehold agreement, "owner" shall not include a passive lessor, or a person who has an equitable interest through such lessor, whose rental payments are not based (either directly or indirectly) on the revenues or income from such TR $SO_2$ Group 2 unit; and

(3) Any purchaser of power from a TR $SO_2$ Group 2 unit at the source or the TR $SO_2$ Group 2 unit under a life-of-the-unit, firm power contractual arrangement.

*Permanently retired* means, with regard to a unit, a unit that is unavailable for service and that the unit's owners and operators do not expect to return to service in the future.

*Permitting authority* means "permitting authority" as defined in §§ 70.2 and 71.2 of this chapter.

*Potential electrical output capacity* means, for a unit, 33 percent of the unit's maximum design heat input, divided by 3,413 Btu/kWh, divided by 1,000 kWh/MWh, and multiplied by 8,760 hr/yr.

*Receive* or *receipt of* means, when referring to the Administrator, to come into possession of a document, information, or correspondence (whether sent in hard copy or by authorized electronic transmission), as indicated in an official log, or by a notation made on the document,

information, or correspondence, by the Administrator in the regular course of business.

*Recordation, record,* or *recorded* means, with regard to TR $SO_2$ Group 2 allowances, the moving of TR $SO_2$ Group 2 allowances by the Administrator into, out of, or between Allowance Management System accounts, for purposes of allocation, auction, transfer, or deduction.

*Reference method* means any direct test method of sampling and analyzing for an air pollutant as specified in § 75.22 of this chapter.

*Replacement, replace,* or *replaced* means, with regard to a unit, the demolishing of a unit, or the permanent retirement and permanent disabling of a unit, and the construction of another unit (the replacement unit) to be used instead of the demolished or retired unit (the replaced unit).

*Sequential use of energy* means:

(1) The use of reject heat from electricity production in a useful thermal energy application or process; or

(2) The use of reject heat from useful thermal energy application or process in electricity production.

*Serial number* means, for a TR $SO_2$ Group 2 allowance, the unique identification number assigned to each TR $SO_2$ Group 2 allowance by the Administrator.

*Solid waste incineration unit* means a stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine that is a ''solid waste incineration unit'' as defined in section 129(g)(1) of the Clean Air Act.

*Source* means all buildings, structures, or installations located in one or more contiguous or adjacent properties under common control of the same person or persons. This definition does not change or otherwise affect the definition of ''major source'', ''stationary source'', or ''source'' as set forth and implemented in a title V operating permit program or any other program under the Clean Air Act.

*State* means one of the States that is subject to the TR $SO_2$ Group 2 Trading Program pursuant to § 52.39(a), (c), (g), (h), and (i) of this chapter.

*Submit* or *serve* means to send or transmit a document, information, or correspondence to the person specified in accordance with the applicable regulation:

(1) In person;

(2) By United States Postal Service; or

(3) By other means of dispatch or transmission and delivery;

(4) Provided that compliance with any ''submission'' or ''service'' deadline shall be determined by the date of dispatch, transmission, or mailing and not the date of receipt.

*Topping-cycle unit* means a unit in which the energy input to the unit is first used to produce useful power, including electricity, where at least some of the reject heat from the electricity production is then used to provide useful thermal energy.

*Total energy input* means, for a unit, total energy of all forms supplied to the unit, excluding energy produced by the unit. Each form of energy supplied shall be measured by the lower heating value of that form of energy calculated as follows:

$$LHV = HHV - 10.55(W + 9H)$$

Where:

LHV = lower heating value of the form of energy in Btu/lb,

HHV = higher heating value of the form of energy in Btu/lb,

W = weight % of moisture in the form of energy, and

H = weight % of hydrogen in the form of energy.

*Total energy output* means, for a unit, the sum of useful power and useful thermal energy produced by the unit.

*TR $NO_X$ Annual Trading Program* means a multi-state $NO_X$ air pollution control and emission reduction program established in accordance with subpart AAAAA of this part and § 52.38(a) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(a)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(a)(5) of this chapter), as a means of mitigating interstate transport of fine particulates and $NO_X$.

*TR $NO_X$ Ozone Season Trading Program* means a multi-state $NO_X$ air pollution control and emission reduction program established in accordance with subpart BBBBB of this part and § 52.38(b) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(5) of this chapter), as a means of mitigating interstate transport of ozone and $NO_X$.

*TR $SO_2$ Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under this subpart, or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.39(g), (h), or (i) of this chapter, to emit one ton of $SO_2$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the TR $SO_2$ Group 2 Trading Program.

*TR $SO_2$ Group 2 allowance deduction* or *deduct TR $SO_2$ Group 2 allowances* means the permanent withdrawal of TR $SO_2$ Group 2 allowances by the Administrator from a compliance account (*e.g.,* in order to account for compliance with the TR $SO_2$ Group 2 emissions limitation) or from an assurance account (*e.g.,* in order to account for compliance with the assurance provisions under §§ 97.706 and 97.725).

*TR $SO_2$ Group 2 allowances held* or *hold TR $SO_2$ Group 2 allowances* means the TR $SO_2$ Group 2 allowances treated as included in an Allowance Management System account as of a specified point in time because at that time they:

(1) Have been recorded by the Administrator in the account or transferred into the account by a correctly submitted, but not yet recorded, TR $SO_2$ Group 2 allowance transfer in accordance with this subpart; and

(2) Have not been transferred out of the account by a correctly submitted, but not yet recorded, TR $SO_2$ Group 2 allowance transfer in accordance with this subpart.

*TR $SO_2$ Group 2 emissions limitation* means, for a TR $SO_2$ Group 2 source, the tonnage of $SO_2$ emissions authorized in a control period by the TR $SO_2$ Group 2 allowances available for deduction for the source under § 97.724(a) for such control period.

*TR $SO_2$ Group 2 source* means a source that includes one or more TR $SO_2$ Group 2 units.

*TR $SO_2$ Group 2 Trading Program* means a multi-state $SO_2$ air pollution control and emission reduction program established in accordance with this subpart and § 52.39(a), (c), and (g) through (k) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(g) or (h) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(i) of this chapter), as a means of mitigating interstate transport of fine particulates and $SO_2$.

*TR $SO_2$ Group 2 unit* means a unit that is subject to the TR $SO_2$ Group 2 Trading Program under § 97.704.

*Unit* means a stationary, fossil-fuel-fired boiler, stationary, fossil-fuel-fired combustion turbine, or other stationary, fossil-fuel-fired combustion device. A unit that undergoes a physical change or is moved to a different location or source shall continue to be treated as the same unit. A unit (the replaced unit) that is replaced by another unit (the

replacement unit) at the same or a different source shall continue to be treated as the same unit, and the replacement unit shall be treated as a separate unit.

*Unit operating day* means, with regard to a unit, a calendar day in which the unit combusts any fuel.

*Unit operating hour or hour of unit operation* means, with regard to a unit, an hour in which the unit combusts any fuel.

*Useful power* means, with regard to a unit, electricity or mechanical energy that the unit makes available for use, excluding any such energy used in the power production process (which process includes, but is not limited to, any on-site processing or treatment of fuel combusted at the unit and any on-site emission controls).

*Useful thermal energy* means thermal energy that is:

(1) Made available to an industrial or commercial process (not a power production process), excluding any heat contained in condensate return or makeup water;

(2) Used in a heating application (*e.g.,* space heating or domestic hot water heating); or

(3) Used in a space cooling application (*i.e.,* in an absorption chiller).

*Utility power distribution system* means the portion of an electricity grid owned or operated by a utility and dedicated to delivering electricity to customers.

## § 97.703 Measurements, abbreviations, and acronyms.

Measurements, abbreviations, and acronyms used in this subpart are defined as follows:

Btu—British thermal unit
$CO_2$—carbon dioxide
$H_2O$—water
hr—hour
kW—kilowatt electrical
kWh—kilowatt hour
lb—pound
mmBtu—million Btu
MWe—megawatt electrical
MWh—megawatt hour
$NO_X$—nitrogen oxides
$O_2$—oxygen
ppm—parts per million
scfh—standard cubic feet per hour
$SO_2$—sulfur dioxide
yr—year

## § 97.704 Applicability.

(a) Except as provided in paragraph (b) of this section:

(1) The following units in a State (and Indian country within the borders of such State) shall be TR $SO_2$ Group 2 units, and any source that includes one or more such units shall be a TR $SO_2$

Group 2 source, subject to the requirements of this subpart: Any stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine serving at any time, on or after January 1, 2005, a generator with nameplate capacity of more than 25 MWe producing electricity for sale.

(2) If a stationary boiler or stationary combustion turbine that, under paragraph (a)(1) of this section, is not a TR $SO_2$ Group 2 unit begins to combust fossil fuel or to serve a generator with nameplate capacity of more than 25 MWe producing electricity for sale, the unit shall become a TR $SO_2$ Group 2 unit as provided in paragraph (a)(1) of this section on the first date on which it both combusts fossil fuel and serves such generator.

(b) Any unit in a State (and Indian country within the borders of such State) that otherwise is a TR $SO_2$ Group 2 unit under paragraph (a) of this section and that meets the requirements set forth in paragraph (b)(1)(i) or (2)(i) of this section shall not be a TR $SO_2$ Group 2 unit:

(1)(i) Any unit:

(A) Qualifying as a cogeneration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a cogeneration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) Not supplying in 2005 or any calendar year thereafter more than one-third of the unit's potential electric output capacity or 219,000 MWh, whichever is greater, to any utility power distribution system for sale.

(ii) If, after qualifying under paragraph (b)(1)(i) of this section as not being a TR $SO_2$ Group 2 unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR $SO_2$ Group 2 unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a cogeneration unit or January 1 after the first calendar year during which the unit no longer meets the requirements of paragraph (b)(1)(i)(B) of this section. The unit shall thereafter continue to be a TR $SO_2$ Group 2 unit.

(2)(i) Any unit:

(A) Qualifying as a solid waste incineration unit throughout the later of 2005 or the 12-month period starting on the date the unit first produces electricity and continuing to qualify as a solid waste incineration unit throughout each calendar year ending after the later of 2005 or such 12-month period; and

(B) With an average annual fuel consumption of fossil fuel for the first 3 consecutive calendar years of operation starting no earlier than 2005 of less than 20 percent (on a Btu basis) and an average annual fuel consumption of fossil fuel for any 3 consecutive calendar years thereafter of less than 20 percent (on a Btu basis).

(ii) If, after qualifying under paragraph (b)(2)(i) of this section as not being a TR $SO_2$ Group 2 unit, a unit subsequently no longer meets all the requirements of paragraph (b)(1)(i) of this section, the unit shall become a TR $SO_2$ Group 2 unit starting on the earlier of January 1 after the first calendar year during which the unit first no longer qualifies as a solid waste incineration unit or January 1 after the first 3 consecutive calendar years after 2005 for which the unit has an average annual fuel consumption of fossil fuel of 20 percent or more. The unit shall thereafter continue to be a TR $SO_2$ Group 2 unit.

(c) A certifying official of an owner or operator of any unit or other equipment may submit a petition (including any supporting documents) to the Administrator at any time for a determination concerning the applicability, under paragraphs (a) and (b) of this section or a SIP revision approved under § 52.39(h) or (i) of this chapter, of the TR $SO_2$ Group 2 Trading Program to the unit or other equipment.

(1) *Petition content.* The petition shall be in writing and include the identification of the unit or other equipment and the relevant facts about the unit or other equipment. The petition and any other documents provided to the Administrator in connection with the petition shall include the following certification statement, signed by the certifying official: "I am authorized to make this submission on behalf of the owners and operators of the unit or other equipment for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment."

(2) *Response.* The Administrator will issue a written response to the petition

and may request supplemental information determined by the Administrator to be relevant to such petition. The Administrator's determination concerning the applicability, under paragraphs (a) and (b) of this section, of the TR SO₂ Group 2 Trading Program to the unit or other equipment shall be binding on any State or permitting authority unless the Administrator determines that the petition or other documents or information provided in connection with the petition contained significant, relevant errors or omissions.

### § 97.705    Retired unit exemption.

(a)(1) Any TR SO₂ Group 2 unit that is permanently retired shall be exempt from § 97.706(b) and (c)(1), § 97.724, and §§ 97.730 through 97.735.

(2) The exemption under paragraph (a)(1) of this section shall become effective the day on which the TR SO₂ Group 2 unit is permanently retired. Within 30 days of the unit's permanent retirement, the designated representative shall submit a statement to the Administrator. The statement shall state, in a format prescribed by the Administrator, that the unit was permanently retired on a specified date and will comply with the requirements of paragraph (b) of this section.

(b) Special provisions. (1) A unit exempt under paragraph (a) of this section shall not emit any SO₂, starting on the date that the exemption takes effect.

(2) For a period of 5 years from the date the records are created, the owners and operators of a unit exempt under paragraph (a) of this section shall retain, at the source that includes the unit, records demonstrating that the unit is permanently retired. The 5-year period for keeping records may be extended for cause, at any time before the end of the period, in writing by the Administrator. The owners and operators bear the burden of proof that the unit is permanently retired.

(3) The owners and operators and, to the extent applicable, the designated representative of a unit exempt under paragraph (a) of this section shall comply with the requirements of the TR SO₂ Group 2 Trading Program concerning all periods for which the exemption is not in effect, even if such requirements arise, or must be complied with, after the exemption takes effect.

(4) A unit exempt under paragraph (a) of this section shall lose its exemption on the first date on which the unit resumes operation. Such unit shall be treated, for purposes of applying allocation, monitoring, reporting, and recordkeeping requirements under this subpart, as a unit that commences commercial operation on the first date on which the unit resumes operation.

### § 97.706    Standard requirements.

(a) *Designated representative requirements.* The owners and operators shall comply with the requirement to have a designated representative, and may have an alternate designated representative, in accordance with §§ 97.713 through 97.718.

(b) *Emissions monitoring, reporting, and recordkeeping requirements.* (1) The owners and operators, and the designated representative, of each TR SO₂ Group 2 source and each TR SO₂ Group 2 unit at the source shall comply with the monitoring, reporting, and recordkeeping requirements of §§ 97.730 through 97.735.

(2) The emissions data determined in accordance with §§ 97.730 through 97.735 shall be used to calculate allocations of TR SO₂ Group 2 allowances under §§ 97.711(a)(2) and (b) and 97.712 and to determine compliance with the TR SO₂ Group 2 emissions limitation and assurance provisions under paragraph (c) of this section, provided that, for each monitoring location from which mass emissions are reported, the mass emissions amount used in calculating such allocations and determining such compliance shall be the mass emissions amount for the monitoring location determined in accordance with §§ 97.730 through 97.735 and rounded to the nearest ton, with any fraction of a ton less than 0.50 being deemed to be zero.

(c) *SO₂ emissions requirements.* (1) TR SO₂ Group 2 emissions limitation. (i) As of the allowance transfer deadline for a control period in a given year, the owners and operators of each TR SO₂ Group 2 source and each TR SO₂ Group 2 unit at the source shall hold, in the source's compliance account, TR SO₂ Group 2 allowances available for deduction for such control period under § 97.724(a) in an amount not less than the tons of total SO₂ emissions for such control period from all TR SO₂ Group 2 units at the source.

(ii) If total SO₂ emissions during a control period in a given year from the TR SO₂ Group 2 units at a TR SO₂ Group 2 source are in excess of the TR SO₂ Group 2 emissions limitation set forth in paragraph (c)(1)(i) of this section, then:

(A) The owners and operators of the source and each TR SO₂ Group 2 unit at the source shall hold the TR SO₂ Group 2 allowances required for deduction under § 97.724(d); and

(B) The owners and operators of the source and each TR SO₂ Group 2 unit at the source shall pay any fine, penalty, or assessment or comply with any other remedy imposed, for the same violations, under the Clean Air Act, and each ton of such excess emissions and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(2) TR SO₂ Group 2 assurance provisions. (i) If total SO₂ emissions during a control period in a given year from all TR SO₂ Group 2 units at TR SO₂ Group 2 sources in a State (and Indian country within the borders of such State) exceed the State assurance level, then the owners and operators of such sources and units in each group of one or more sources and units having a common designated representative for such control period, where the common designated representative's share of such SO₂ emissions during such control period exceeds the common designated representative's assurance level for the State and such control period, shall hold (in the assurance account established for the owners and operators of such group) TR SO₂ Group 2 allowances available for deduction for such control period under § 97.725(a) in an amount equal to two times the product (rounded to the nearest whole number), as determined by the Administrator in accordance with § 97.725(b), of multiplying—

(A) The quotient of the amount by which the common designated representative's share of such SO₂ emissions exceeds the common designated representative's assurance level divided by the sum of the amounts, determined for all common designated representatives for such sources and units in the State (and Indian country within the borders of such State) for such control period, by which each common designated representative's share of such SO₂ emissions exceeds the respective common designated representative's assurance level; and

(B) The amount by which total SO₂ emissions from all TR SO₂ Group 2 units at TR SO₂ Group 2 sources in the State (and Indian country within the borders of such State) for such control period exceed the State assurance level.

(ii) The owners and operators shall hold the TR SO₂ Group 2 allowances required under paragraph (c)(2)(i) of this section, as of midnight of November 1 (if it is a business day), or midnight of the first business day thereafter (if November 1 is not a business day), immediately after such control period.

(iii) Total SO₂ emissions from all TR SO₂ Group 2 units at TR SO₂ Group 2

sources in a State (and Indian country within the borders of such State) during a control period in a given year exceed the State assurance level if such total $SO_2$ emissions exceed the sum, for such control period, of the State $SO_2$ Group 2 trading budget under § 97.710(a) and the State's variability limit under § 97.710(b).

(iv) It shall not be a violation of this subpart or of the Clean Air Act if total $SO_2$ emissions from all TR $SO_2$ Group 2 units at TR $SO_2$ Group 2 sources in a State (and Indian country within the borders of such State) during a control period exceed the State assurance level or if a common designated representative's share of total $SO_2$ emissions from the TR $SO_2$ Group 2 units at TR $SO_2$ Group 2 sources in a State (and Indian country within the borders of such State) during a control period exceeds the common designated representative's assurance level.

(v) To the extent the owners and operators fail to hold TR $SO_2$ Group 2 allowances for a control period in a given year in accordance with paragraphs (c)(2)(i) through (iii) of this section,

(A) The owners and operators shall pay any fine, penalty, or assessment or comply with any other remedy imposed under the Clean Air Act; and

(B) Each TR $SO_2$ Group 2 allowance that the owners and operators fail to hold for such control period in accordance with paragraphs (c)(2)(i) through (iii) of this section and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(3) Compliance periods. A TR $SO_2$ Group 2 unit shall be subject to the requirements under paragraphs (c)(1) and (c)(2) of this section for the control period starting on the later of January 1, 2012 or the deadline for meeting the unit's monitor certification requirements under § 97.730(b) and for each control period thereafter.

(4) Vintage of allowances held for compliance. (i) A TR $SO_2$ Group 2 allowance held for compliance with the requirements under paragraph (c)(1)(i) of this section for a control period in a given year must be a TR $SO_2$ Group 2 allowance that was allocated for such control period or a control period in a prior year.

(ii) A TR $SO_2$ Group 2 allowance held for compliance with the requirements under paragraphs (c)(1)(ii)(A) and (2)(i) through (iii) of this section for a control period in a given year must be a TR $SO_2$ Group 2 allowance that was allocated for a control period in a prior year or the control period in the given year or in the immediately following year.

(5) Allowance Management System requirements. Each TR $SO_2$ Group 2 allowance shall be held in, deducted from, or transferred into, out of, or between Allowance Management System accounts in accordance with this subpart.

(6) Limited authorization. A TR $SO_2$ Group 2 allowance is a limited authorization to emit one ton of $SO_2$ during the control period in one year. Such authorization is limited in its use and duration as follows:

(i) Such authorization shall only be used in accordance with the TR $SO_2$ Group 2 Trading Program; and

(ii) Notwithstanding any other provision of this subpart, the Administrator has the authority to terminate or limit the use and duration of such authorization to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act.

(7) Property right. A TR $SO_2$ Group 2 allowance does not constitute a property right.

(d) *Title V permit requirements.* (1) No title V permit revision shall be required for any allocation, holding, deduction, or transfer of TR $SO_2$ Group 2 allowances in accordance with this subpart.

(2) A description of whether a unit is required to monitor and report $SO_2$ emissions using a continuous emission monitoring system (under subpart H of part 75 of this chapter), an excepted monitoring system (under appendices D and E to part 75 of this chapter), a low mass emissions excepted monitoring methodology (under § 75.19 of this chapter), or an alternative monitoring system (under subpart E of part 75 of this chapter) in accordance with §§ 97.730 through 97.735 may be added to, or changed in, a title V permit using minor permit modification procedures in accordance with §§ 70.7(e)(2) and 71.7(e)(1) of this chapter, provided that the requirements applicable to the described monitoring and reporting (as added or changed, respectively) are already incorporated in such permit. This paragraph explicitly provides that the addition of, or change to, a unit's description as described in the prior sentence is eligible for minor permit modification procedures in accordance with §§ 70.7(e)(2)(i)(B) and 71.7(e)(1)(i)(B) of this chapter.

(e) *Additional recordkeeping and reporting requirements.* (1) Unless otherwise provided, the owners and operators of each TR $SO_2$ Group 2 source and each TR $SO_2$ Group 2 unit at the source shall keep on site at the source each of the following documents (in hardcopy or electronic format) for a period of 5 years from the date the document is created. This period may be extended for cause, at any time before the end of 5 years, in writing by the Administrator.

(i) The certificate of representation under § 97.716 for the designated representative for the source and each TR $SO_2$ Group 2 unit at the source and all documents that demonstrate the truth of the statements in the certificate of representation; provided that the certificate and documents shall be retained on site at the source beyond such 5-year period until such certificate of representation and documents are superseded because of the submission of a new certificate of representation under § 97.716 changing the designated representative.

(ii) All emissions monitoring information, in accordance with this subpart.

(iii) Copies of all reports, compliance certifications, and other submissions and all records made or required under, or to demonstrate compliance with the requirements of, the TR $SO_2$ Group 2 Trading Program.

(2) The designated representative of a TR $SO_2$ Group 2 source and each TR $SO_2$ Group 2 unit at the source shall make all submissions required under the TR $SO_2$ Group 2 Trading Program, except as provided in § 97.718. This requirement does not change, create an exemption from, or or otherwise affect the responsible official submission requirements under a title V operating permit program in parts 70 and 71 of this chapter.

(f) *Liability.* (1) Any provision of the TR $SO_2$ Group 2 Trading Program that applies to a TR $SO_2$ Group 2 source or the designated representative of a TR $SO_2$ Group 2 source shall also apply to the owners and operators of such source and of the TR $SO_2$ Group 2 units at the source.

(2) Any provision of the TR $SO_2$ Group 2 Trading Program that applies to a TR $SO_2$ Group 2 unit or the designated representative of a TR $SO_2$ Group 2 unit shall also apply to the owners and operators of such unit.

(g) *Effect on other authorities.* No provision of the TR $SO_2$ Group 2 Trading Program or exemption under § 97.705 shall be construed as exempting or excluding the owners and operators, and the designated representative, of a TR $SO_2$ Group 2 source or TR $SO_2$ Group 2 unit from compliance with any other provision of the applicable, approved State implementation plan, a federally enforceable permit, or the Clean Air Act.

**§ 97.707   Computation of time.**

(a) Unless otherwise stated, any time period scheduled, under the TR $SO_2$ Group 2 Trading Program, to begin on the occurrence of an act or event shall begin on the day the act or event occurs.

(b) Unless otherwise stated, any time period scheduled, under the TR $SO_2$ Group 2 Trading Program, to begin before the occurrence of an act or event shall be computed so that the period ends the day before the act or event occurs.

(c) Unless otherwise stated, if the final day of any time period, under the TR $SO_2$ Group 2 Trading Program, is not a business day, the time period shall be extended to the next business day.

**§ 97.708   Administrative appeal procedures.**

The administrative appeal procedures for decisions of the Administrator under the TR $SO_2$ Group 2 Trading Program are set forth in part 78 of this chapter.

**§ 97.709   [Reserved]**

**§ 97.710   State $SO_2$ Group 2 trading budgets, new unit set-asides, Indian country new unit set-aside, and variability limits.**

(a) The State $SO_2$ Group 2 trading budgets, new unit set-asides, and Indian country new unit set-asides for allocations of TR $SO_2$ Group 2 allowances for the control periods in 2012 and thereafter are as follows:

| State | $SO_2$ Group 2 trading budget (tons) * for 2012 and 2013 | New unit set-aside (tons) for 2012 and 2013 | Indian country new unit set-aside (tons) for 2012 and 2013 |
| --- | ---: | ---: | ---: |
| Alabama | 216,033 | 4,321 | |
| Georgia | 158,527 | 3,171 | |
| Kansas | 41,528 | 789 | 42 |
| Minnesota | 41,981 | 798 | 42 |
| Nebraska | 65,052 | 2,537 | 65 |
| South Carolina | 88,620 | 1,683 | 89 |
| Texas | 243,954 | 11,954 | 244 |

| State | $SO_2$ Group 2 trading budget (tons) * for 2014 and thereafter | New unit set-aside (tons) for 2014 and thereafter | Indian country new unit set-aside (tons) for 2014 and thereafter |
| --- | ---: | ---: | ---: |
| Alabama | 213,258 | 4,265 | |
| Georgia | 95,231 | 1,905 | |
| Kansas | 41,528 | 789 | 42 |
| Minnesota | 41,981 | 798 | 42 |
| Nebraska | 65,052 | 2,537 | 65 |
| South Carolina | 88,620 | 1,683 | 89 |
| Texas | 243,954 | 11,954 | 244 |

\* Each trading budget includes the new unit set-aside and, where applicable, the Indian country new unit set-aside and does not include the variability limit.

(b) The States' variability limits for the State $SO_2$ Group 2 trading budgets for the control periods in 2012 and thereafter are as follows:

| State | Variability limits for 2012 and 2013 | Variability limits for 2014 and thereafter |
| --- | ---: | ---: |
| Alabama | 38,886 | 38,386 |
| Georgia | 28,535 | 17,142 |
| Kansas | 7,475 | 7,475 |
| Minnesota | 7,557 | 7,557 |
| Nebraska | 11,709 | 11,709 |
| South Carolina | 15,952 | 15,952 |
| Texas | 43,912 | 43,912 |

**§ 97.711   Timing requirements for TR $SO_2$ Group 2 allowance allocations.**

(a) *Existing units.* (1) TR $SO_2$ Group 2 allowances are allocated, for the control periods in 2012 and each year thereafter, as provided in a notice of data availability issued by the Administrator. Providing an allocation to a unit in such notice does not constitute a determination that the unit is a TR $SO_2$ Group 2 unit, and not providing an allocation to a unit in such notice does not constitute a determination that the unit is not a TR $SO_2$ Group 2 unit.

(2) Notwithstanding paragraph (a)(1) of this section, if a unit provided an allocation in the notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2011, during the control period in two consecutive years, such unit will not be allocated the TR $SO_2$ Group 2 allowances provided in such notice for the unit for the control periods in the fifth year after the first such year and in each year after that fifth year. All TR $SO_2$ Group 2 allowances that would otherwise have been allocated to such unit will be allocated to the new unit set-aside for the State where such unit is located and for the respective years involved. If such unit resumes operation, the Administrator will allocate TR $SO_2$ Group 2 allowances to the unit in accordance with paragraph (b) of this section.

(b) *New units.* (1) New unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR SO$_2$ Group 2 allowance allocation to each TR SO$_2$ Group 2 unit in a State, in accordance with § 97.712(a)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR SO$_2$ Group 2 units) are in accordance with § 97.712(a)(2) through (7) and (12) and §§ 97.706(b)(2) and 97.730 through 97.735.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(1)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(i) of this section, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.712(a)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(ii)(A) of this section.

(iii) If the new unit set-aside for such control period contains any TR SO$_2$ Group 2 allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(1)(ii) of this section, the Administrator will promulgate, by December 15 immediately after such notice, a notice of data availability that identifies any TR SO$_2$ Group 2 units that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR SO$_2$ annual units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(1)(iii) of this section and shall be limited to addressing whether the identification of TR SO$_2$ annual units in such notice is in accordance with paragraph (b)(1)(iii) of this section.

(B) The Administrator will adjust the identification of TR SO$_2$ Group 2 units in the each notice of data availability required in paragraph (b)(1)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(1)(iii) of this section and will calculate the TR SO$_2$ Group 2 allowance allocation to each TR SO$_2$ Group 2 unit in accordance with § 97.712(a)(9), (10), and (12) and §§ 97.706(b)(2) and 97.730 through 97.735. By February 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(1)(iii) of this section, the Administrator will promulgate a notice of data availability of any adjustments of the identification of TR SO$_2$ Group 2 units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(1)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR SO$_2$ Group 2 allowances are added to the new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(1)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR SO$_2$ Group 2 allowances in accordance with § 97.712(a)(10).

(2) Indian country new unit set-asides. (i) By June 1, 2012 and June 1 of each year thereafter, the Administrator will calculate the TR SO$_2$ Group 2 allowance allocation to each TR SO$_2$ Group 2 unit in Indian country within the borders of a State, in accordance with § 97.712(b)(2) through (7) and (12), for the control period in the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(i) of this section and shall be limited to addressing whether the calculations (including the identification of the TR SO$_2$ Group 2

units) are in accordance with § 97.712(b)(2) through (7) and (12) and §§ 97.706(b)(2) and 97.730 through 97.735.

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(ii)(A) of this section. By August 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(i) of this section, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary with regard to allocations under § 97.712(b)(2) through (7) and (12) and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(ii)(A) of this section.

(iii) If the Indian country new unit set-aside for such control period contains any TR SO$_2$ Group 2 allowances that have not been allocated in the applicable notice of data availability required in paragraph (b)(2)(ii) of this section, the Administrator will promulgate, by December 15 immediately after such notice, a notice of data availability that identifies any TR SO$_2$ Group 2 units that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period.

(iv) For each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will provide an opportunity for submission of objections to the identification of TR SO$_2$ annual units in such notice.

(A) Objections shall be submitted by the deadline specified in each notice of data availability required in paragraph (b)(2)(iii) of this section and shall be limited to addressing whether the identification of TR SO$_2$ annual units in such notice is in accordance with paragraph (b)(2)(iii) of this section.

(B) The Administrator will adjust the identification of TR SO$_2$ Group 2 units in the each notice of data availability required in paragraph (b)(2)(iii) of this section to the extent necessary to ensure that it is in accordance with paragraph (b)(2)(iii) of this section and will calculate the TR SO$_2$ Group 2 allowance allocation to each TR SO$_2$ Group 2 unit in accordance with § 97.712(b)(9), (10), and (12) and §§ 97.706(b)(2) and 97.730 through 97.735. By February 15 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii) of this section, the Administrator will promulgate a notice of data availability of any

adjustments of the identification of TR $SO_2$ Group 2 units that the Administrator determines to be necessary, the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iv)(A) of this section, and the results of such calculations.

(v) To the extent any TR $SO_2$ Group 2 allowances are added to the Indian country new unit set-aside after promulgation of each notice of data availability required in paragraph (b)(2)(iv) of this section, the Administrator will promulgate additional notices of data availability, as deemed appropriate, of the allocation of such TR $SO_2$ Group 2 allowances in accordance with § 97.712(b)(10).

(c) *Units incorrectly allocated TR $SO_2$ Group 2 allowances.* (1) For each control period in 2012 and thereafter, if the Administrator determines that TR $SO_2$ Group 2 allowances were allocated under paragraph (a) of this section, or under a provision of a SIP revision approved § 52.39(g), (h), or (i) of this chapter, where such control period and the recipient are covered by the provisions of paragraph (c)(1)(i) of this section or were allocated under § 97.712(a)(2) through (7), (9), and (12) and (b)(2) through (7), (9), and (12), or under a provision of a SIP revision approved § 52.39(h) or (i) of this chapter, where such control period and the recipient are covered by the provisions of paragraph (c)(1)(ii) of this section, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section:

(i)(A) The recipient is not actually a TR $SO_2$ Group 2 unit under § 97.704 as of January 1, 2012 and is allocated TR $SO_2$ Group 2 allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved § 52.39(g), (h), or (i) of this chapter, the recipient is not actually a TR $SO_2$ Group 2 unit as of January 1, 2012, and is allocated TR $SO_2$ Group 2 allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR $SO_2$ Group 2 units as of January 1, 2012; or

(B) The recipient is not located at an ERC on January 1 of the control period in the State from whose $SO_2$ Group 2 trading budget the TR $SO_2$ Group 2 allowances allocated under paragraph (a) of this section, or under a provision of a SIP revision approved under § 52.39(g), (h), or (i) of this chapter, were allocated for such control period.

(ii) The recipient is not actually a TR $SO_2$ Group 2 unit under § 97.704 as of January 1 of such control period and is allocated TR $SO_2$ Group 2 allowances for such control period or, in the case of an allocation under a provision of a SIP revision approved under § 52.39(g), (h), or (i) of this chapter, the recipient is not actually a TR $SO_2$ Group 2 unit as of January 1 of such control period and is allocated TR $SO_2$ Group 2 allowances for such control period that the SIP revision provides should be allocated only to recipients that are TR $SO_2$ Group 2 units as of January 1 of such control period.

(2) Except as provided in paragraph (c)(3) or (4) of this section, the Administrator will not record such TR $SO_2$ Group 2 allowances under § 97.721.

(3) If the Administrator already recorded such TR $SO_2$ Group 2 allowances under § 97.721 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.724(b) for such control period, then the Administrator will deduct from the account in which such TR $SO_2$ Group 2 allowances were recorded an amount of TR $SO_2$ Group 2 allowances allocated for the same or a prior control period equal to the amount of such already recorded TR $SO_2$ Group 2 allowances. The authorized account representative shall ensure that there are sufficient TR $SO_2$ Group 2 allowances in such account for completion of the deduction.

(4) If the Administrator already recorded such TR $SO_2$ Group 2 allowances under § 97.721 and if the Administrator makes the determination under paragraph (c)(1) of this section after making deductions for the source that includes such recipient under § 97.724(b) for such control period, then the Administrator will not make any deduction to take account of such already recorded TR $SO_2$ Group 2 allowances.

(5)(i) With regard to the TR $SO_2$ Group 2 allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(i) of this section, the Administrator will:

(A) Transfer such TR $SO_2$ Group 2 allowances to the new unit set-aside for such control period for the State from whose $SO_2$ Group 2 trading budget the TR $SO_2$ Group 2 allowances were allocated; or

(B) If the State has a SIP revision approved under § 52.39(h) or (i) covering such control period, include such TR $SO_2$ Group 2 allowances in the

portion of the State $SO_2$ Group 2 trading budget that may be allocated for such control period in accordance with such SIP revision.

(ii) With regard to the TR $SO_2$ Group 2 allowances that were not allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will:

(A) Transfer such TR $SO_2$ Group 2 allowances to the new unit set-aside for such control period; or

(B) If the State has a SIP revision approved under § 52.39(h) or (i) covering such control period, include such TR $SO_2$ Group 2 allowances in the portion of the State $SO_2$ Group 2 trading budget that may be allocated for such control period in accordance with such SIP revision.

(iii) With regard to the TR $SO_2$ Group 2 allowances that were allocated from the Indian country new unit set-aside for such control period and that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section for a recipient under paragraph (c)(1)(ii) of this paragraph, the Administrator will transfer such TR $SO_2$ Group 2 allowances to the Indian country new unit set-aside for such control period.

### § 97.712  TR $SO_2$ Group 2 allowance allocations to new units.

(a) For each control period in 2012 and thereafter and for the TR $SO_2$ Group 2 units in each State, the Administrator will allocate TR $SO_2$ Group 2 allowances to the TR $SO_2$ Group 2 units as follows:

(1) The TR $SO_2$ Group 2 allowances will be allocated to the following TR $SO_2$ Group 2 units, except as provided in paragraph (a)(10) of this section:

(i) TR $SO_2$ Group 2 units that are not allocated an amount of TR $SO_2$ Group 2 allowances in the notice of data availability issued under § 97.711(a)(1);

(ii) TR $SO_2$ Group 2 units whose allocation of an amount of TR $SO_2$ Group 2 allowances for such control period in the notice of data availability issued under § 97.711(a)(1) is covered by § 97.711(c)(2) or (3);

(iii) TR $SO_2$ Group 2 units that are allocated an amount of TR $SO_2$ Group 2 allowances for such control period in the notice of data availability issued under § 97.711(a)(1), which allocation is terminated for such control period pursuant to § 97.711(a)(2), and that operate during the control period

immediately preceding such control period; or

(iv) For purposes of paragraph (a)(9) of this section, TR SO$_2$ Group 2 units under § 97.711(c)(1)(ii) whose allocation of an amount of TR SO$_2$ Group 2 allowances for such control period in the notice of data availability issued under § 97.711(b)(1)(ii)(B) is covered by § 97.711(c)(2) or (3).

(2) The Administrator will establish a separate new unit set-aside for the State for each such control period. Each such new unit set-aside will be allocated TR SO$_2$ Group 2 allowances in an amount equal to the applicable amount of tons of SO$_2$ emissions as set forth in § 97.710(a) and will be allocated additional TR SO$_2$ Group 2 allowances (if any) in accordance with §§ 97.711(a)(2) and (c)(5) and paragraph (b)(10) of this section.

(3) The Administrator will determine, for each TR SO$_2$ Group 2 unit described in paragraph (a)(1) of this section, an allocation of TR SO$_2$ Group 2 allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012;

(ii) The first control period after the control period in which the TR SO$_2$ Group 2 unit commences commercial operation;

(iii) For a unit described in paragraph (a)(1)(ii) of this section, the first control period in which the TR SO$_2$ Group 2 unit operates in the State after operating in another jurisdiction and for which the unit is not already allocated one or more TR SO$_2$ Group 2 allowances; and

(iv) For a unit described in paragraph (a)(1)(iii) of this section, the first control period after the control period in which the unit resumes operation.

(4)(i) The allocation to each TR SO$_2$ annual unit described in paragraph (a)(1)(i) through (iii) of this section and for each control period described in paragraph (a)(3) of this section will be an amount equal to the unit's total tons of SO$_2$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (a)(4)(i) in accordance with paragraphs (a)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR SO$_2$ Group 2 allowances determined for all such TR SO$_2$ Group 2 units under paragraph (a)(4)(i) of this section in the State for such control period.

(6) If the amount of TR SO$_2$ Group 2 allowances in the new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (a)(5) of this section, then the Administrator will allocate the amount

of TR SO$_2$ Group 2 allowances determined for each such TR SO$_2$ Group 2 unit under paragraph (a)(4)(i) of this section.

(7) If the amount of TR SO$_2$ Group 2 allowances in the new unit set-aside for the State for such control period is less than the sum under paragraph (a)(5) of this section, then the Administrator will allocate to each such TR SO$_2$ Group 2 unit the amount of the TR SO$_2$ Group 2 allowances determined under paragraph (a)(4)(i) of this section for the unit, multiplied by the amount of TR SO$_2$ Group 2 allowances in the new unit set-aside for such control period, divided by the sum under paragraph (a)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.711(b)(1)(i) and (ii), of the amount of TR SO$_2$ Group 2 allowances allocated under paragraphs (a)(2) through (7) and (12) of this section for such control period to each TR SO$_2$ Group 2 unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (a)(5) through (8) of this section for such control period, any unallocated TR SO$_2$ Group 2 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate such TR SO$_2$ Group 2 allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (a)(1) of this section that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR SO$_2$ Group 2 allowances referenced in the notice of data availability required under § 97.711(b)(1)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (a)(9)(i) of this section;

(iii) If the amount of unallocated TR SO$_2$ Group 2 allowances remaining in the new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (a)(9)(ii) of this section, then the Administrator will allocate the amount of TR SO$_2$ Group 2 allowances determined for each such TR SO$_2$ Group 2 unit under paragraph (a)(9)(i) of this section; and

(iv) If the amount of unallocated TR SO$_2$ Group 2 allowances remaining in the new unit set-aside for the State for

such control period is less than the sum under paragraph (a)(9)(ii) of this section, then the Administrator will allocate to each such TR SO$_2$ Group 2 unit the amount of the TR SO$_2$ Group 2 allowances determined under paragraph (a)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR SO$_2$ Group 2 allowances remaining in the new unit set-aside for such control period, divided by the sum under paragraph (a)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (a)(9) and (12) of this section for such control period, any unallocated TR SO$_2$ Group 2 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each TR SO$_2$ Group 2 unit that is in the State, is allocated an amount of TR SO$_2$ Group 2 allowances in the notice of data availability issued under § 97.711(a)(1), and continues to be allocated TR SO$_2$ Group 2 allowances for such control period in accordance with § 97.711(a)(2), an amount of TR SO$_2$ Group 2 allowances equal to the following: The total amount of such remaining unallocated TR SO$_2$ Group 2 allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.711(a) for such control period, divided by the remainder of the amount of tons in the applicable State SO$_2$ Group 2 trading budget minus the sum of the amounts of tons in such new unit set-aside and the Indian country new unit set-aside for the State for such control period, and rounded to the nearest allowance.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.711(b)(1)(iii), (iv), and (v), of the amount of TR SO$_2$ Group 2 allowances allocated under paragraphs (a)(9), (10), and (12) of this section for such control period to each TR SO$_2$ Group 2 unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (a)(2) through (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraph (a)(7) of this section, paragraphs (a)(6) and (9)(iv) of this section, or paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such new unit set-aside exceeding the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR SO$_2$ Group 2 units in descending order based

on the amount of such units' allocations under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (a)(7), (9)(iv), or (10) of this section, as applicable, by one TR SO$_2$ Group 2 allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (a)(10) and (11) of this section, if the calculations of allocations of a new unit set-aside for a control period in a given year under paragraphs (a)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such new unit set-aside less than the total amount of such new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (a)(10) of this section, as follows. The Administrator will list the TR SO$_2$ Group 2 units in descending order based on the amount of such units' allocations under paragraph (a)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's allocation under paragraph (a)(10) of this section by one TR SO$_2$ Group 2 allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such new unit set-aside equal the total amount of such new unit set-aside.

(b) For each control period in 2012 and thereafter and for the TR SO$_2$ Group 2 units located in Indian country within the borders of each State, the Administrator will allocate TR SO$_2$ Group 2 allowances to the TR SO$_2$ Group 2 units as follows:

(1) The TR SO$_2$ Group 2 allowances will be allocated to the following TR SO$_2$ Group 2 units, except as provided in paragraph (b)(10) of this section:

(i) TR SO$_2$ Group 2 units that are not allocated an amount of TR SO$_2$ Group 2 allowances in the notice of data availability issued under § 97.711(a)(1); or

(ii) For purposes of paragraph (b)(9) of this section, TR SO$_2$ Group 2 units under § 97.711(c)(1)(ii) whose allocation of an amount of TR SO$_2$ Group 2 allowances for such control period in the notice of data availability issued

under § 97.711(b)(2)(ii)(B) is covered by § 97.711(c)(2) or (3).

(2) The Administrator will establish a separate Indian country new unit set-aside for the State for each such control period. Each such Indian country new unit set-aside will be allocated TR SO$_2$ Group 2 allowances in an amount equal to the applicable amount of tons of SO$_2$ emissions as set forth in § 97.710(a) and will be allocated additional TR SO$_2$ Group 2 allowances (if any) in accordance with § 97.711(c)(5).

(3) The Administrator will determine, for each TR SO$_2$ Group 2 unit described in paragraph (b)(1) of this section, an allocation of TR SO$_2$ Group 2 allowances for the later of the following control periods and for each subsequent control period:

(i) The control period in 2012; and

(ii) The first control period after the control period in which the TR SO$_2$ Group 2 unit commences commercial operation.

(4)(i) The allocation to each TR SO$_2$ annual unit described in paragraph (b)(1)(i) of this section and for each control period described in paragraph (b)(3) of this section will be an amount equal to the unit's total tons of SO$_2$ emissions during the immediately preceding control period.

(ii) The Administrator will adjust the allocation amount in paragraph (b)(4)(i) in accordance with paragraphs (b)(5) through (7) and (12) of this section.

(5) The Administrator will calculate the sum of the TR SO$_2$ Group 2 allowances determined for all such TR SO$_2$ Group 2 units under paragraph (b)(4)(i) of this section in Indian country within the borders of the State for such control period.

(6) If the amount of TR SO$_2$ Group 2 allowances in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum under paragraph (b)(5) of this section, then the Administrator will allocate the amount of TR SO$_2$ Group 2 allowances determined for each such TR SO$_2$ Group 2 unit under paragraph (b)(4)(i) of this section.

(7) If the amount of TR SO$_2$ Group 2 allowances in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(5) of this section, then the Administrator will allocate to each such TR SO$_2$ Group 2 unit the amount of the TR SO$_2$ Group 2 allowances determined under paragraph (b)(4)(i) of this section for the unit, multiplied by the amount of TR SO$_2$ Group 2 allowances in the Indian country new unit set-aside for such control period, divided by the sum

under paragraph (b)(5) of this section, and rounded to the nearest allowance.

(8) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.711(b)(2)(i) and (ii), of the amount of TR SO$_2$ Group 2 allowances allocated under paragraphs (b)(2) through (7) and (12) of this section for such control period to each TR SO$_2$ Group 2 unit eligible for such allocation.

(9) If, after completion of the procedures under paragraphs (b)(5) through (8) of this section for such control period, any unallocated TR SO$_2$ Group 2 allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will allocate such TR SO$_2$ Group 2 allowances as follows—

(i) The Administrator will determine, for each unit described in paragraph (b)(1) of this section that commenced commercial operation during the period starting January 1 of the year before the year of such control period and ending November 30 of year of such control period, the positive difference (if any) between the unit's emissions during such control period and the amount of TR SO$_2$ Group 2 allowances referenced in the notice of data availability required under § 97.711(b)(2)(ii) for the unit for such control period;

(ii) The Administrator will determine the sum of the positive differences determined under paragraph (b)(9)(i) of this section;

(iii) If the amount of unallocated TR SO$_2$ Group 2 allowances remaining in the Indian country new unit set-aside for the State for such control period is greater than or equal to the sum determined under paragraph (b)(9)(ii) of this section, then the Administrator will allocate the amount of TR SO$_2$ Group 2 allowances determined for each such TR SO$_2$ Group 2 unit under paragraph (b)(9)(i) of this section; and

(iv) If the amount of unallocated TR SO$_2$ Group 2 allowances remaining in the Indian country new unit set-aside for the State for such control period is less than the sum under paragraph (b)(9)(ii) of this section, then the Administrator will allocate to each such TR SO$_2$ Group 2 unit the amount of the TR SO$_2$ Group 2 allowances determined under paragraph (b)(9)(i) of this section for the unit, multiplied by the amount of unallocated TR SO$_2$ Group 2 allowances remaining in the Indian country new unit set-aside for such control period, divided by the sum under paragraph (b)(9)(ii) of this section, and rounded to the nearest allowance.

(10) If, after completion of the procedures under paragraphs (b)(9) and (12) of this section for such control

period, any unallocated TR $SO_2$ Group 2 allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will:

(i) Transfer such unallocated TR $SO_2$ Group 2 allowances to the new unit set-aside for the State for such control period; or

(ii) If the State has a SIP revision approved under § 52.39(g), (h), or (i) of this chapter covering such control period, include such unallocated TR $SO_2$ Group 2 allowances in the portion of the State $SO_2$ Group 2 trading budget that may be allocated for such control period in accordance with such SIP revision.

(11) The Administrator will notify the public, through the promulgation of the notices of data availability described in § 97.711(b)(2)(iii), (iv), and (v), of the amount of TR $SO_2$ Group 2 allowances allocated under paragraphs (b)(9), (10), and (12) of this section for such control period to each TR $SO_2$ Group 2 unit eligible for such allocation.

(12)(i) Notwithstanding the requirements of paragraphs (b)(2) through (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year under paragraph (b)(7) of this section, paragraphs (b)(6) and (9)(iv) of this section, or paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in total allocations of such Indian country new unit set-aside exceeding the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, as follows. The Administrator will list the TR $SO_2$ Group 2 units in descending order based on the amount of such units' allocations under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will reduce each unit's allocation under paragraph (b)(7), (9)(iv), or (10) of this section, as applicable, by one TR $SO_2$ Group 2 allowance (but not below zero) in the order in which the units are listed and will repeat this reduction process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

(ii) Notwithstanding the requirements of paragraphs (b)(10) and (11) of this section, if the calculations of allocations of an Indian country new unit set-aside for a control period in a given year

under paragraphs (b)(6), (9)(iii), and (10) of this section would otherwise result in a total allocations of such Indian country new unit set-aside less than the total amount of such Indian country new unit set-aside, then the Administrator will adjust the results of the calculations under paragraph (b)(10) of this section, as follows. The Administrator will list the TR $SO_2$ Group 2 units in descending order based on the amount of such units' allocations under paragraph (b)(10) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant source's name and numerical order of the relevant unit's identification number, and will increase each unit's allocation under paragraph (b)(10) of this section by one TR $SO_2$ Group 2 allowance in the order in which the units are listed and will repeat this increase process as necessary, until the total allocations of such Indian country new unit set-aside equal the total amount of such Indian country new unit set-aside.

### § 97.713 Authorization of designated representative and alternate designated representative.

(a) Except as provided under § 97.715, each TR $SO_2$ Group 2 source, including all TR $SO_2$ Group 2 units at the source, shall have one and only one designated representative, with regard to all matters under the TR $SO_2$ Group 2 Trading Program.

(1) The designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR $SO_2$ Group 2 units at the source and shall act in accordance with the certification statement in § 97.716(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.716:

(i) The designated representative shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each owner and operator of the source and each TR $SO_2$ Group 2 unit at the source in all matters pertaining to the TR $SO_2$ Group 2 Trading Program, notwithstanding any agreement between the designated representative and such owners and operators; and

(ii) The owners and operators of the source and each TR $SO_2$ Group 2 unit at the source shall be bound by any decision or order issued to the designated representative by the Administrator regarding the source or any such unit.

(b) Except as provided under § 97.715, each TR $SO_2$ Group 2 source may have one and only one alternate designated

representative, who may act on behalf of the designated representative. The agreement by which the alternate designated representative is selected shall include a procedure for authorizing the alternate designated representative to act in lieu of the designated representative.

(1) The alternate designated representative shall be selected by an agreement binding on the owners and operators of the source and all TR $SO_2$ Group 2 units at the source and shall act in accordance with the certification statement in § 97.716(a)(4)(iii).

(2) Upon and after receipt by the Administrator of a complete certificate of representation under § 97.716,

(i) The alternate designated representative shall be authorized;

(ii) Any representation, action, inaction, or submission by the alternate designated representative shall be deemed to be a representation, action, inaction, or submission by the designated representative; and

(iii) The owners and operators of the source and each TR $SO_2$ Group 2 unit at the source shall be bound by any decision or order issued to the alternate designated representative by the Administrator regarding the source or any such unit.

(c) Except in this section, § 97.702, and §§ 97.714 through 97.718, whenever the term "designated representative" (as distinguished from the term "common designated representative") is used in this subpart, the term shall be construed to include the designated representative or any alternate designated representative.

### § 97.714 Responsibilities of designated representative and alternate designated representative.

(a) Except as provided under § 97.718 concerning delegation of authority to make submissions, each submission under the TR $SO_2$ Group 2 Trading Program shall be made, signed, and certified by the designated representative or alternate designated representative for each TR $SO_2$ Group 2 source and TR $SO_2$ Group 2 unit for which the submission is made. Each such submission shall include the following certification statement by the designated representative or alternate designated representative: "I am authorized to make this submission on behalf of the owners and operators of the source or units for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of

those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(b) The Administrator will accept or act on a submission made for a TR SO$_2$ Group 2 source or a TR SO$_2$ Group 2 unit only if the submission has been made, signed, and certified in accordance with paragraph (a) of this section and § 97.718.

### § 97.715   Changing designated representative and alternate designated representative; changes in owners and operators; changes in units at the source.

(a) *Changing designated representative.* The designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.716. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new designated representative and the owners and operators of the TR SO$_2$ Group 2 source and the TR SO$_2$ Group 2 units at the source.

(b) *Changing alternate designated representative.* The alternate designated representative may be changed at any time upon receipt by the Administrator of a superseding complete certificate of representation under § 97.716. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate designated representative before the time and date when the Administrator receives the superseding certificate of representation shall be binding on the new alternate designated representative, the designated representative, and the owners and operators of the TR SO$_2$ Group 2 source and the TR SO$_2$ Group 2 units at the source.

(c) *Changes in owners and operators.* (1) In the event an owner or operator of a TR SO$_2$ Group 2 source or a TR SO$_2$ Group 2 unit at the source is not included in the list of owners and operators in the certificate of representation under § 97.716, such owner or operator shall be deemed to be subject to and bound by the certificate of representation, the representations, actions, inactions, and submissions of

the designated representative and any alternate designated representative of the source or unit, and the decisions and orders of the Administrator, as if the owner or operator were included in such list.

(2) Within 30 days after any change in the owners and operators of a TR SO$_2$ Group 2 source or a TR SO$_2$ Group 2 unit at the source, including the addition or removal of an owner or operator, the designated representative or any alternate designated representative shall submit a revision to the certificate of representation under § 97.716 amending the list of owners and operators to reflect the change.

(d) *Changes in units at the source.* Within 30 days of any change in which units are located at a TR SO$_2$ Group 2 source (including the addition or removal of a unit), the designated representative or any alternate designated representative shall submit a certificate of representation under § 97.716 amending the list of units to reflect the change.

(1) If the change is the addition of a unit that operated (other than for purposes of testing by the manufacturer before initial installation) before being located at the source, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity from whom the unit was purchased or otherwise obtained (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was purchased or otherwise obtained, and the date on which the unit became located at the source.

(2) If the change is the removal of a unit, then the certificate of representation shall identify, in a format prescribed by the Administrator, the entity to which the unit was sold or that otherwise obtained the unit (including name, address, telephone number, and facsimile number (if any)), the date on which the unit was sold or otherwise obtained, and the date on which the unit became no longer located at the source.

### § 97.716   Certificate of representation.

(a) A complete certificate of representation for a designated representative or an alternate designated representative shall include the following elements in a format prescribed by the Administrator:

(1) Identification of the TR SO$_2$ Group 2 source, and each TR SO$_2$ Group 2 unit at the source, for which the certificate of representation is submitted, including source name, source category and NAICS code (or, in the absence of a NAICS code, an equivalent code),

State, plant code, county, latitude and longitude, unit identification number and type, identification number and nameplate capacity (in MWe, rounded to the nearest tenth) of each generator served by each such unit, actual or projected date of commencement of commercial operation, and a statement of whether such source is located in Indian Country. If a projected date of commencement of commercial operation is provided, the actual date of commencement of commercial operation shall be provided when such information becomes available.

(2) The name, address, e-mail address (if any), telephone number, and facsimile transmission number (if any) of the designated representative and any alternate designated representative.

(3) A list of the owners and operators of the TR SO$_2$ Group 2 source and of each TR SO$_2$ Group 2 unit at the source.

(4) The following certification statements by the designated representative and any alternate designated representative—

(i) I certify that I was selected as the designated representative or alternate designated representative, as applicable, by an agreement binding on the owners and operators of the source and each TR SO$_2$ Group 2 unit at the source.''

(ii) "I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR SO$_2$ Group 2 Trading Program on behalf of the owners and operators of the source and of each TR SO$_2$ Group 2 unit at the source and that each such owner and operator shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the source or unit.''

(iii) "Where there are multiple holders of a legal or equitable title to, or a leasehold interest in, a TR SO$_2$ Group 2 unit, or where a utility or industrial customer purchases power from a TR SO$_2$ Group 2 unit under a life-of-the-unit, firm power contractual arrangement, I certify that: I have given a written notice of my selection as the 'designated representative' or 'alternate designated representative', as applicable, and of the agreement by which I was selected to each owner and operator of the source and of each TR SO$_2$ Group 2 unit at the source; and TR SO$_2$ Group 2 allowances and proceeds of transactions involving TR SO$_2$ Group 2 allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement, except that, if such multiple holders have expressly provided for a different distribution of TR SO$_2$ Group 2

allowances by contract, TR SO₂ Group 2 allowances and proceeds of transactions involving TR SO₂ Group 2 allowances will be deemed to be held or distributed in accordance with the contract.''

(5) The signature of the designated representative and any alternate designated representative and the dates signed.

(b) Unless otherwise required by the Administrator, documents of agreement referred to in the certificate of representation shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

### § 97.717   Objections concerning designated representative and alternate designated representative.

(a) Once a complete certificate of representation under § 97.716 has been submitted and received, the Administrator will rely on the certificate of representation unless and until a superseding complete certificate of representation under § 97.716 is received by the Administrator.

(b) Except as provided in paragraph (a) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission, of a designated representative or alternate designated representative shall affect any representation, action, inaction, or submission of the designated representative or alternate designated representative or the finality of any decision or order by the Administrator under the TR SO₂ Group 2 Trading Program.

(c) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of any designated representative or alternate designated representative, including private legal disputes concerning the proceeds of TR SO₂ Group 2 allowance transfers.

### § 97.718   Delegation by designated representative and alternate designated representative.

(a) A designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(b) An alternate designated representative may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator

provided for or required under this subpart.

(c) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (a) or (b) of this section, the designated representative or alternate designated representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(1) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such designated representative or alternate designated representative;

(2) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an ''agent'');

(3) For each such natural person, a list of the type or types of electronic submissions under paragraph (a) or (b) of this section for which authority is delegated to him or her; and

(4) The following certification statements by such designated representative or alternate designated representative:

(i) ''I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am a designated representative or alternate designated representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.718(d) shall be deemed to be an electronic submission by me.''

(ii) ''Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.718(d), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.718 is terminated.''.

(d) A notice of delegation submitted under paragraph (c) of this section shall be effective, with regard to the designated representative or alternate designated representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such designated representative or alternate designated representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(e) Any electronic submission covered by the certification in paragraph (c)(4)(i) of this section and made in accordance with a notice of delegation effective under paragraph (d) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

### § 97.719   [Reserved]

### § 97.720   Establishment of compliance accounts, assurance accounts, and general accounts.

(a) *Compliance accounts.* Upon receipt of a complete certificate of representation under § 97.716, the Administrator will establish a compliance account for the TR SO₂ Group 2 source for which the certificate of representation was submitted, unless the source already has a compliance account. The designated representative and any alternate designated representative of the source shall be the authorized account representative and the alternate authorized account representative respectively of the compliance account.

(b) *Assurance accounts.* The Administrator will establish assurance accounts for certain owners and operators and States in accordance with § 97.725(b)(3).

(c) *General accounts.* (1) Application for general account. (i) Any person may apply to open a general account, for the purpose of holding and transferring TR SO₂ Group 2 allowances, by submitting to the Administrator a complete application for a general account. Such application shall designate one and only one authorized account representative and may designate one and only one alternate authorized account representative who may act on behalf of the authorized account representative.

(A) The authorized account representative and alternate authorized account representative shall be selected by an agreement binding on the persons who have an ownership interest with respect to TR SO₂ Group 2 allowances held in the general account.

(B) The agreement by which the alternate authorized account representative is selected shall include a procedure for authorizing the alternate authorized account representative to act in lieu of the authorized account representative.

(ii) A complete application for a general account shall include the following elements in a format prescribed by the Administrator:

(A) Name, mailing address, e-mail address (if any), telephone number, and

facsimile transmission number (if any) of the authorized account representative and any alternate authorized account representative;

(B) An identifying name for the general account;

(C) A list of all persons subject to a binding agreement for the authorized account representative and any alternate authorized account representative to represent their ownership interest with respect to the TR SO$_2$ Group 2 allowances held in the general account;

(D) The following certification statement by the authorized account representative and any alternate authorized account representative: ''I certify that I was selected as the authorized account representative or the alternate authorized account representative, as applicable, by an agreement that is binding on all persons who have an ownership interest with respect to TR SO$_2$ Group 2 allowances held in the general account. I certify that I have all the necessary authority to carry out my duties and responsibilities under the TR SO$_2$ Group 2 Trading Program on behalf of such persons and that each such person shall be fully bound by my representations, actions, inactions, or submissions and by any decision or order issued to me by the Administrator regarding the general account.''

(E) The signature of the authorized account representative and any alternate authorized account representative and the dates signed.

(iii) Unless otherwise required by the Administrator, documents of agreement referred to in the application for a general account shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

(2) Authorization of authorized account representative and alternate authorized account representative. (i) Upon receipt by the Administrator of a complete application for a general account under paragraph (b)(1) of this section, the Administrator will establish a general account for the person or persons for whom the application is submitted, and upon and after such receipt by the Administrator:

(A) The authorized account representative of the general account shall be authorized and shall represent and, by his or her representations, actions, inactions, or submissions, legally bind each person who has an ownership interest with respect to TR SO$_2$ Group 2 allowances held in the general account in all matters pertaining to the TR SO$_2$ Group 2 Trading Program, notwithstanding any agreement between

the authorized account representative and such person.

(B) Any alternate authorized account representative shall be authorized, and any representation, action, inaction, or submission by any alternate authorized account representative shall be deemed to be a representation, action, inaction, or submission by the authorized account representative.

(C) Each person who has an ownership interest with respect to TR SO$_2$ Group 2 allowances held in the general account shall be bound by any decision or order issued to the authorized account representative or alternate authorized account representative by the Administrator regarding the general account.

(ii) Except as provided in paragraph (c)(5) of this section concerning delegation of authority to make submissions, each submission concerning the general account shall be made, signed, and certified by the authorized account representative or any alternate authorized account representative for the persons having an ownership interest with respect to TR SO$_2$ Group 2 allowances held in the general account. Each such submission shall include the following certification statement by the authorized account representative or any alternate authorized account representative: ''I am authorized to make this submission on behalf of the persons having an ownership interest with respect to the TR SO$_2$ Group 2 allowances held in the general account. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(iii) Except in this section, whenever the term ''authorized account representative'' is used in this subpart, the term shall be construed to include the authorized account representative or any alternate authorized account representative.

(3) Changing authorized account representative and alternate authorized account representative; changes in persons with ownership interest. (i) The authorized account representative of a general account may be changed at any time upon receipt by the Administrator

of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new authorized account representative and the persons with an ownership interest with respect to the TR SO$_2$ Group 2 allowances in the general account.

(ii) The alternate authorized account representative of a general account may be changed at any time upon receipt by the Administrator of a superseding complete application for a general account under paragraph (c)(1) of this section. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous alternate authorized account representative before the time and date when the Administrator receives the superseding application for a general account shall be binding on the new alternate authorized account representative, the authorized account representative, and the persons with an ownership interest with respect to the TR SO$_2$ Group 2 allowances in the general account.

(iii)(A) In the event a person having an ownership interest with respect to TR SO$_2$ Group 2 allowances in the general account is not included in the list of such persons in the application for a general account, such person shall be deemed to be subject to and bound by the application for a general account, the representation, actions, inactions, and submissions of the authorized account representative and any alternate authorized account representative of the account, and the decisions and orders of the Administrator, as if the person were included in such list.

(B) Within 30 days after any change in the persons having an ownership interest with respect to SO$_2$ Group 2 allowances in the general account, including the addition or removal of a person, the authorized account representative or any alternate authorized account representative shall submit a revision to the application for a general account amending the list of persons having an ownership interest with respect to the TR SO$_2$ Group 2 allowances in the general account to include the change.

(4) Objections concerning authorized account representative and alternate authorized account representative. (i) Once a complete application for a general account under paragraph (c)(1) of this section has been submitted and

received, the Administrator will rely on the application unless and until a superseding complete application for a general account under paragraph (b)(1) of this section is received by the Administrator.

(ii) Except as provided in paragraph (c)(4)(i) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account shall affect any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative or the finality of any decision or order by the Administrator under the TR SO$_2$ Group 2 Trading Program.

(iii) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of the authorized account representative or any alternate authorized account representative of a general account, including private legal disputes concerning the proceeds of TR SO$_2$ Group 2 allowance transfers.

(5) Delegation by authorized account representative and alternate authorized account representative. (i) An authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(ii) An alternate authorized account representative of a general account may delegate, to one or more natural persons, his or her authority to make an electronic submission to the Administrator provided for or required under this subpart.

(iii) In order to delegate authority to a natural person to make an electronic submission to the Administrator in accordance with paragraph (c)(5)(i) or (ii) of this section, the authorized account representative or alternate authorized account representative, as appropriate, must submit to the Administrator a notice of delegation, in a format prescribed by the Administrator, that includes the following elements:

(A) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of such authorized account representative or alternate authorized account representative;

(B) The name, address, e-mail address, telephone number, and facsimile transmission number (if any) of each such natural person (referred to in this section as an ''agent'');

(C) For each such natural person, a list of the type or types of electronic submissions under paragraph (c)(5)(i) or (ii) of this section for which authority is delegated to him or her;

(D) The following certification statement by such authorized account representative or alternate authorized account representative: ''I agree that any electronic submission to the Administrator that is made by an agent identified in this notice of delegation and of a type listed for such agent in this notice of delegation and that is made when I am an authorized account representative or alternate authorized representative, as appropriate, and before this notice of delegation is superseded by another notice of delegation under 40 CFR 97.720(c)(5)(iv) shall be deemed to be an electronic submission by me.''; and

(E) The following certification statement by such authorized account representative or alternate authorized account representative: ''Until this notice of delegation is superseded by another notice of delegation under 40 CFR 97.720(c)(5)(iv), I agree to maintain an e-mail account and to notify the Administrator immediately of any change in my e-mail address unless all delegation of authority by me under 40 CFR 97.720(c)(5) is terminated.''.

(iv) A notice of delegation submitted under paragraph (c)(5)(iii) of this section shall be effective, with regard to the authorized account representative or alternate authorized account representative identified in such notice, upon receipt of such notice by the Administrator and until receipt by the Administrator of a superseding notice of delegation submitted by such authorized account representative or alternate authorized account representative, as appropriate. The superseding notice of delegation may replace any previously identified agent, add a new agent, or eliminate entirely any delegation of authority.

(v) Any electronic submission covered by the certification in paragraph (c)(5)(iii)(D) of this section and made in accordance with a notice of delegation effective under paragraph (c)(5)(iv) of this section shall be deemed to be an electronic submission by the designated representative or alternate designated representative submitting such notice of delegation.

(6) Closing a general account. (i) The authorized account representative or alternate authorized account

representative of a general account may submit to the Administrator a request to close the account. Such request shall include a correctly submitted TR SO$_2$ Group 2 allowance transfer under § 97.722 for any TR SO$_2$ Group 2 allowances in the account to one or more other Allowance Management System accounts.

(ii) If a general account has no TR SO$_2$ Group 2 allowance transfers to or from the account for a 12-month period or longer and does not contain any TR SO$_2$ Group 2 allowances, the Administrator may notify the authorized account representative for the account that the account will be closed after 30 days after the notice is sent. The account will be closed after the 30-day period unless, before the end of the 30-day period, the Administrator receives a correctly submitted TR SO$_2$ Group 2 allowance transfer under § 97.722 to the account or a statement submitted by the authorized account representative or alternate authorized account representative demonstrating to the satisfaction of the Administrator good cause as to why the account should not be closed.

(d) *Account identification.* The Administrator will assign a unique identifying number to each account established under paragraph (a), (b), or (c) of this section.

(e) *Responsibilities of authorized account representative and alternate authorized account representative.* After the establishment of a compliance account or general account, the Administrator will accept or act on a submission pertaining to the account, including, but not limited to, submissions concerning the deduction or transfer of TR SO$_2$ Group 2 allowances in the account, only if the submission has been made, signed, and certified in accordance with §§ 97.714(a) and 97.718 or paragraphs (c)(2)(ii) and (c)(5) of this section.

**§ 97.721 Recordation of TR SO$_2$ Group 2 allowance allocations and auction results.**

(a) By November 7, 2011, the Administrator will record in each TR SO$_2$ Group 2 source's compliance account the TR SO$_2$ Group 2 allowances allocated to the TR SO$_2$ Group 2 units at the source in accordance with § 97.711(a) for the control period in 2012.

(b) By November 7, 2011, the Administrator will record in each TR SO$_2$ Group 2 source's compliance account the TR SO$_2$ Group 2 allowances allocated to the TR SO$_2$ Group 2 units at the source in accordance with § 97.711(a) for the control period in 2013, unless the State in which the source is located notifies the

Administrator in writing by October 17, 2011 of the State's intent to submit to the Administrator a complete SIP revision by April 1, 2012 meeting the requirements of § 52.39(g)(1) through (4) of this chapter.

(1) If, by April 1, 2012, the State does not submit to the Administrator such complete SIP revision, the Administrator will record by April 15, 2012 in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source in accordance with § 97.711(a) for the control period in 2013.

(2) If the State submits to the Administrator by April 1, 2012, and the Administrator approves by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source as provided in such approved, complete SIP revision for the control period in 2013.

(3) If the State submits to the Administrator by April 1, 2012, and the Administrator does not approve by October 1, 2012, such complete SIP revision, the Administrator will record by October 1, 2012 in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source in accordance with § 97.711(a) for the control period in 2013.

(c) By July 1, 2013, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 2 allowances auctioned to TR SO₂ Group 2 units, in accordance with § 97.711(a), or with a SIP revision approved under § 52.39(h) or (i) of this chapter, for the control period in 2014 and 2015.

(d) By July 1, 2014, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 2 allowances auctioned to TR SO₂ Group 2 units, in accordance with § 97.711(a), or with a SIP revision approved under § 52.39(h) or (i) of this chapter, for the control period in 2016 and 2017.

(e) By July 1, 2015, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR

SO₂ Group 2 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 2 allowances auctioned to TR SO₂ Group 2 units, in accordance with § 97.711(a), or with a SIP revision approved under § 52.39(h) or (i) of this chapter, for the control period in 2018 and 2019.

(f) By July 1, 2016 and July 1 of each year thereafter, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 2 allowances auctioned to TR SO₂ Group 2 units, in accordance with § 97.711(a), or with a SIP revision approved under § 52.39(h) and (i) of this chapter, for the control period in the fourth year after the year of the applicable recordation deadline under this paragraph.

(g) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source, or in each appropriate Allowance Management System account the TR SO₂ Group 2 allowances auctioned to TR SO₂ Group 2 units, in accordance with § 97.712(a)(2) through (8) and (12), or with a SIP revision approved under § 52.39(h) and (i) of this chapter, for the control period in the year of the applicable recordation deadline under this paragraph.

(h) By August 1, 2012 and August 1 of each year thereafter, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source in accordance with § 97.711(b)(2) through (8) and (12) for the control period in the year of the applicable recordation deadline under this paragraph.

(i) By February 15, 2013 and February 15 of each year thereafter, the Administrator will record in each TR SO₂ Group 2 source's compliance account the TR SO₂ Group 2 allowances allocated to the TR SO₂ Group 2 units at the source in accordance with § 97.712(a)(9) through (12), for the control period in the year before the year of the applicable recordation deadline under this paragraph.

(j) By the date on which any allocation or auction results, other than an allocation or auction results, described in paragraphs (a) through (i) of this section, of TR SO₂ Group 2 allowances to a recipient is made by or are submitted to the Administrator in

accordance with § 97.711 or § 97.712 or with a SIP revision approved under § 52.39(h) or (i) of this chapter, the Administrator will record such allocation or auction results in the appropriate Allowance Management System account.

(k) When recording the allocation or auction of TR SO₂ Group 2 allowances to a TR SO₂ Group 2 unit or other entity in an Allowance Management System account, the Administrator will assign each TR SO₂ Group 2 allowance a unique identification number that will include digits identifying the year of the control period for which the TR SO₂ Group 2 allowance is allocated or auctioned.

**§ 97.722    Submission of TR SO₂ Group 2 allowance transfers.**

(a) An authorized account representative seeking recordation of a TR SO₂ Group 2 allowance transfer shall submit the transfer to the Administrator.

(b) A TR SO₂ Group 2 allowance transfer shall be correctly submitted if:

(1) The transfer includes the following elements, in a format prescribed by the Administrator:

(i) The account numbers established by the Administrator for both the transferor and transferee accounts;

(ii) The serial number of each TR SO₂ Group 2 allowance that is in the transferor account and is to be transferred; and

(iii) The name and signature of the authorized account representative of the transferor account and the date signed; and

(2) When the Administrator attempts to record the transfer, the transferor account includes each TR SO₂ Group 2 allowance identified by serial number in the transfer.

**§ 97.723    Recordation of TR SO₂ Group 2 allowance transfers.**

(a) Within 5 business days (except as provided in paragraph (b) of this section) of receiving a TR SO₂ Group 2 allowance transfer that is correctly submitted under § 97.722, the Administrator will record a TR SO₂ Group 2 allowance transfer by moving each TR SO₂ Group 2 allowance from the transferor account to the transferee account as specified in the transfer.

(b) A TR SO₂ Group 2 allowance transfer to or from a compliance account that is submitted for recordation after the allowance transfer deadline for a control period and that includes any TR SO₂ Group 2 allowances allocated for any control period before such allowance transfer deadline will not be recorded until after the Administrator completes the deductions from such

compliance account under § 97.724 for the control period immediately before such allowance transfer deadline.

(c) Where a TR SO$_2$ Group 2 allowance transfer is not correctly submitted under § 97.722, the Administrator will not record such transfer.

(d) Within 5 business days of recordation of a TR SO$_2$ Group 2 allowance transfer under paragraphs (a) and (b) of the section, the Administrator will notify the authorized account representatives of both the transferor and transferee accounts.

(e) Within 10 business days of receipt of a TR SO$_2$ Group 2 allowance transfer that is not correctly submitted under § 97.722, the Administrator will notify the authorized account representatives of both accounts subject to the transfer of:

(1) A decision not to record the transfer, and

(2) The reasons for such non-recordation.

### § 97.724 Compliance with TR SO$_2$ Group 2 emissions limitation.

(a) *Availability for deduction for compliance.* TR SO$_2$ Group 2 allowances are available to be deducted for compliance with a source's TR SO$_2$ Group 2 emissions limitation for a control period in a given year only if the TR SO$_2$ Group 2 allowances:

(1) Were allocated for such control period or a control period in a prior year; and

(2) Are held in the source's compliance account as of the allowance transfer deadline for such control period.

(b) *Deductions for compliance.* After the recordation, in accordance with § 97.723, of TR SO$_2$ Group 2 allowance transfers submitted by the allowance transfer deadline for a control period in a given year, the Administrator will deduct from each source's compliance account TR SO$_2$ Group 2 allowances available under paragraph (a) of this section in order to determine whether the source meets the TR SO$_2$ Group 2 emissions limitation for such control period, as follows:

(1) Until the amount of TR SO$_2$ Group 2 allowances deducted equals the number of tons of total SO$_2$ emissions from all TR SO$_2$ Group 2 units at the source for such control period; or

(2) If there are insufficient TR SO$_2$ Group 2 allowances to complete the deductions in paragraph (b)(1) of this section, until no more TR SO$_2$ Group 2 allowances available under paragraph (a) of this section remain in the compliance account.

(c)(1) *Identification of TR SO$_2$ Group 2 allowances by serial number.* The authorized account representative for a source's compliance account may request that specific TR SO$_2$ Group 2 allowances, identified by serial number, in the compliance account be deducted for emissions or excess emissions for a control period in a given year in accordance with paragraph (b) or (d) of this section. In order to be complete, such request shall be submitted to the Administrator by the allowance transfer deadline for such control period and include, in a format prescribed by the Administrator, the identification of the TR SO$_2$ Group 2 source and the appropriate serial numbers.

(2) *First-in, first-out.* The Administrator will deduct TR SO$_2$ Group 2 allowances under paragraph (b) or (d) of this section from the source's compliance account in accordance with a complete request under paragraph (c)(1) of this section or, in the absence of such request or in the case of identification of an insufficient amount of TR SO$_2$ Group 2 allowances in such request, on a first-in, first-out accounting basis in the following order:

(i) Any TR SO$_2$ Group 2 allowances that were allocated to the units at the source and not transferred out of the compliance account, in the order of recordation; and then

(ii) Any TR SO$_2$ Group 2 allowances that were allocated to any unit and transferred to and recorded in the compliance account pursuant to this subpart, in the order of recordation.

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the TR SO$_2$ Group 2 source has excess emissions, the Administrator will deduct from the source's compliance account an amount of TR SO$_2$ Group 2 allowances, allocated for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, equal to two times the number of tons of the source's excess emissions.

(e) *Recordation of deductions.* The Administrator will record in the appropriate compliance account all deductions from such an account under paragraphs (b) and (d) of this section.

### § 97.725 Compliance with TR SO$_2$ Group 2 assurance provisions.

(a) *Availability for deduction.* TR SO$_2$ Group 2 allowances are available to be deducted for compliance with the TR SO$_2$ Group 2 assurance provisions for a control period in a given year by the owners and operators of a group of one or more TR SO$_2$ Group 2 sources and units in a State (and Indian country within the borders of such State) only if the TR SO$_2$ Group 2 allowances:

(1) Were allocated for a control period in a prior year or the control period in the given year or in the immediately following year; and

(2) Are held in the assurance account, established by the Administrator for such owners and operators of such group of TR SO$_2$ Group 2 sources and units in such State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, as of the deadline established in paragraph (b)(4) of this section.

(b) *Deductions for compliance.* The Administrator will deduct TR SO$_2$ Group 2 allowances available under paragraph (a) of this section for compliance with the TR SO$_2$ Group 2 assurance provisions for a State for a control period in a given year in accordance with the following procedures:

(1) By June 1, 2013 and June 1 of each year thereafter, the Administrator will:

(i) Calculate, for each State (and Indian country within the borders of such State), the total SO$_2$ emissions from all TR SO$_2$ Group 2 units at TR SO$_2$ Group 2 sources in the State (and Indian country within the borders of such State) during the control period in the year before the year of this calculation deadline and the amount, if any, by which such total SO$_2$ emissions exceed the State assurance level as described in § 97.706(c)(2)(iii); and

(ii) Promulgate a notice of data availability of the results of the calculations required in paragraph (b)(1)(i) of this section, including separate calculations of the SO$_2$ emissions from each TR SO$_2$ Group 2 source.

(2) For each notice of data availability required in paragraph (b)(1)(ii) of this section and for any State (and Indian country within the borders of such State) identified in such notice as having TR SO$_2$ Group 2 units with total SO$_2$ emissions exceeding the State assurance level for a control period in a given year, as described in § 97.706(c)(2)(iii):

(i) By July 1 immediately after the promulgation of such notice, the designated representative of each TR SO$_2$ Group 2 source in each such State (and Indian country within the borders of such State) shall submit a statement, in a format prescribed by the Administrator, providing for each TR SO$_2$ Group 2 unit (if any) at the source that operates during, but is not allocated an amount of TR SO$_2$ Group 2 allowances for, such control period, the unit's allowable SO$_2$ emission rate for such control period and, if such rate is

expressed in lb per mmBtu, the unit's heat rate.

(ii) By August 1 immediately after the promulgation of such notice, the Administrator will calculate, for each such State (and Indian country within the borders of such State) and such control period and each common designated representative for such control period for a group of one or more TR $SO_2$ Group 2 sources and units in the State (and Indian country within the borders of such State), the common designated representative's share of the total $SO_2$ emissions from all TR $SO_2$ Group 2 units at TR $SO_2$ Group 2 sources in the State (and Indian country within the borders of such State), the common designated representative's assurance level, and the amount (if any) of TR $SO_2$ Group 2 allowances that the owners and operators of such group of sources and units must hold in accordance with the calculation formula in § 97.706(c)(2)(i) and will promulgate a notice of data availability of the results of these calculations.

(iii) The Administrator will provide an opportunity for submission of objections to the calculations referenced by the notice of data availability required in paragraph (b)(2)(ii) of this section and the calculations referenced by the relevant notice of data availability required in paragraph (b)(1)(i) of this section.

(A) Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations referenced in the relevant notice required under paragraph (b)(1)(ii) of this section and referenced in the notice required under paragraph (b)(2)(ii) of this section are in accordance with § 97.706(c)(2)(iii), §§ 97.706(b) and 97.730 through 97.735, the definitions of ''common designated representative'', ''common designated representative's assurance level'', and ''common designated representative's share'' in § 97.702, and the calculation formula in § 97.706(c)(2)(i).

(B) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(2)(iii)(A) of this section. By October 1 immediately after the promulgation of such notice, the Administrator will promulgate a notice of data availability of any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(2)(iii)(A) of this section.

(3) For any State (and Indian country within the borders of such State) referenced in each notice of data availability required in paragraph

(b)(2)(iii)(B) of this section as having TR $SO_2$ Group 2 units with total $SO_2$ emissions exceeding the State assurance level for a control period in a given year, the Administrator will establish one assurance account for each set of owners and operators referenced, in the notice of data availability required under paragraph (b)(2)(iii)(B) of this section, as all of the owners and operators of a group of TR $SO_2$ Group 2 sources and units in the State (and Indian country within the borders of such State) having a common designated representative for such control period and as being required to hold TR $SO_2$ Group 2 allowances.

(4)(i) As of midnight of November 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section, the owners and operators described in paragraph (b)(3) of this section shall hold in the assurance account established for them and for the appropriate TR $SO_2$ Group 2 sources, TR $SO_2$ Group 2 units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section a total amount of TR $SO_2$ Group 2 allowances, available for deduction under paragraph (a) of this section, equal to the amount such owners and operators are required to hold with regard to such sources, units and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in such notice.

(ii) Notwithstanding the allowance-holding deadline specified in paragraph (b)(4)(i) of this section, if November 1 is not a business day, then such allowance-holding deadline shall be midnight of the first business day thereafter.

(5) After November 1 (or the date described in paragraph (b)(4)(ii) of this section) immediately after the promulgation of each notice of data availability required in paragraph (b)(2)(iii)(B) of this section and after the recordation, in accordance with § 97.723, of TR $SO_2$ Group 2 allowance transfers submitted by midnight of such date, the Administrator will determine whether the owners and operators described in paragraph (b)(3) of this section hold, in the assurance account for the appropriate TR $SO_2$ Group 2 sources, TR $SO_2$ Group 2 units, and State (and Indian country within the borders of such State) established under paragraph (b)(3) of this section, the amount of TR $SO_2$ Group 2 allowances available under paragraph (a) of this section that the owners and operators are required to hold with regard to such

sources, units, and State (and Indian country within the borders of such State) as calculated by the Administrator and referenced in the notice required in paragraph (b)(2)(iii)(B) of this section.

(6) Notwithstanding any other provision of this subpart and any revision, made by or submitted to the Administrator after the promulgation of the notice of data availability required in paragraph (b)(2)(iii)(B) of this section for a control period in a given year, of any data used in making the calculations referenced in such notice, the amounts of TR $SO_2$ Group 2 allowances that the owners and operators are required to hold in accordance with § 97.706(c)(2)(i) for such control period shall continue to be such amounts as calculated by the Administrator and referenced in such notice required in paragraph (b)(2)(iii)(B) of this section, except as follows:

(i) If any such data are revised by the Administrator as a result of a decision in or settlement of litigation concerning such data on appeal under part 78 of this chapter of such notice, or on appeal under section 307 of the Clean Air Act of a decision rendered under part 78 of this chapter on appeal of such notice, then the Administrator will use the data as so revised to recalculate the amounts of TR $SO_2$ Group 2 allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.706(c)(2)(i) for such control period with regard to the TR $SO_2$ Group 2 sources, TR $SO_2$ Group 2 units, and State (and Indian country within the borders of such State) involved, provided that such litigation under part 78 of this chapter, or the proceeding under part 78 of this chapter that resulted in the decision appealed in such litigation under section 307 of the Clean Air Act, was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(ii) If any such data are revised by the owners and operators of a TR $SO_2$ Group 2 source and TR $SO_2$ Group 2 unit whose designated representative submitted such data under paragraph (b)(2)(i) of this section, as a result of a decision in or settlement of litigation concerning such submission, then the Administrator will use the data as so revised to recalculate the amounts of TR $SO_2$ Group 2 allowances that owners and operators are required to hold in accordance with the calculation formula in § 97.706(c)(2)(i) for such control period with regard to the TR $SO_2$ Group 2 sources, TR $SO_2$ Group 2 units, and State (and Indian country within the

borders of such State) involved, provided that such litigation was initiated no later than 30 days after promulgation of such notice required in paragraph (b)(2)(iii)(B) of this section.

(iii) If the revised data are used to recalculate, in accordance with paragraphs (b)(6)(i) and (ii) of this section, the amount of TR SO$_2$ Group 2 allowances that the owners and operators are required to hold for such control period with regard to the TR SO$_2$ Group 2 sources, TR SO$_2$ Group 2 units, and State (and Indian country within the borders of such State) involved—

(A) Where the amount of TR SO$_2$ Group 2 allowances that the owners and operators are required to hold increases as a result of the use of all such revised data, the Administrator will establish a new, reasonable deadline on which the owners and operators shall hold the additional amount of TR SO$_2$ Group 2 allowances in the assurance account established by the Administrator for the appropriate TR SO$_2$ Group 2 sources, TR SO$_2$ Group 2 units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section. The owners' and operators' failure to hold such additional amount, as required, before the new deadline shall not be a violation of the Clean Air Act. The owners' and operators' failure to hold such additional amount, as required, as of the new deadline shall be a violation of the Clean Air Act. Each TR SO$_2$ Group 2 allowance that the owners and operators fail to hold as required as of the new deadline, and each day in such control period, shall be a separate violation of the Clean Air Act.

(B) For the owners and operators for which the amount of TR SO$_2$ Group 2 allowances required to be held decreases as a result of the use of all such revised data, the Administrator will record, in all accounts from which TR SO$_2$ Group 2 allowances were transferred by such owners and operators for such control period to the assurance account established by the Administrator for the appropriate at TR SO$_2$ Group 2 sources, TR SO$_2$ Group 2 units, and State (and Indian country within the borders of such State) under paragraph (b)(3) of this section, a total amount of the TR SO$_2$ Group 2 allowances held in such assurance account equal to the amount of the decrease. If TR SO$_2$ Group 2 allowances were transferred to such assurance account from more than one account, the amount of TR SO$_2$ Group 2 allowances recorded in each such transferor account will be in proportion to the percentage of the total amount of TR SO$_2$ Group 2 allowances transferred to such assurance account for such

control period from such transferor account.

(C) Each TR SO$_2$ Group 2 allowance held under paragraph (b)(6)(iii)(A) of this section as a result of recalculation of requirements under the TR SO$_2$ Group 2 assurance provisions for such control period must be a TR SO$_2$ Group 2 allowance allocated for a control period in a year before or the year immediately following, or in the same year as, the year of such control period.

### § 97.726   Banking.

(a) A TR SO$_2$ Group 2 allowance may be banked for future use or transfer in a compliance account or a general account in accordance with paragraph (b) of this section.

(b) Any TR SO$_2$ Group 2 allowance that is held in a compliance account or a general account will remain in such account unless and until the TR SO$_2$ Group 2 allowance is deducted or transferred under § 97.711(c), § 97.723, § 97.724, § 97.725, § 97.727, or § 97.728.

### § 97.727   Account error.

The Administrator may, at his or her sole discretion and on his or her own motion, correct any error in any Allowance Management System account. Within 10 business days of making such correction, the Administrator will notify the authorized account representative for the account.

### § 97.728   Administrator's action on submissions.

(a) The Administrator may review and conduct independent audits concerning any submission under the TR SO$_2$ Group 2 Trading Program and make appropriate adjustments of the information in the submission.

(b) The Administrator may deduct TR SO$_2$ Group 2 allowances from or transfer TR SO$_2$ Group 2 allowances to a compliance account or an assurance account, based on the information in a submission, as adjusted under paragraph (a)(1) of this section, and record such deductions and transfers.

### § 97.729   [Reserved]

### § 97.730   General monitoring, recordkeeping, and reporting requirements.

The owners and operators, and to the extent applicable, the designated representative, of a TR SO$_2$ Group 2 unit, shall comply with the monitoring, recordkeeping, and reporting requirements as provided in this subpart and subparts F and G of part 75 of this chapter. For purposes of applying such requirements, the definitions in § 97.702 and in § 72.2 of this chapter shall apply, the terms "affected unit," "designated representative," and "continuous

emission monitoring system" (or "CEMS") in part 75 of this chapter shall be deemed to refer to the terms "TR SO$_2$ Group 2 unit," "designated representative," and "continuous emission monitoring system" (or "CEMS") respectively as defined in § 97.702, and the term "newly affected unit" shall be deemed to mean "newly affected TR SO$_2$ Group 2 unit". The owner or operator of a unit that is not a TR SO$_2$ Group 2 unit but that is monitored under § 75.16(b)(2) of this chapter shall comply with the same monitoring, recordkeeping, and reporting requirements as a TR SO$_2$ Group 2 unit.

(a) Requirements for installation, certification, and data accounting. The owner or operator of each TR SO$_2$ Group 2 unit shall:

(1) Install all monitoring systems required under this subpart for monitoring SO$_2$ mass emissions and individual unit heat input (including all systems required to monitor SO$_2$ concentration, stack gas moisture content, stack gas flow rate, CO$_2$ or O$_2$ concentration, and fuel flow rate, as applicable, in accordance with §§ 75.11 and 75.16 of this chapter);

(2) Successfully complete all certification tests required under § 97.731 and meet all other requirements of this subpart and part 75 of this chapter applicable to the monitoring systems under paragraph (a)(1) of this section; and

(3) Record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section.

(b) *Compliance deadlines.* Except as provided in paragraph (e) of this section, the owner or operator shall meet the monitoring system certification and other requirements of paragraphs (a)(1) and (2) of this section on or before the following dates and shall record, report, and quality-assure the data from the monitoring systems under paragraph (a)(1) of this section on and after the following dates.

(1) For the owner or operator of a TR SO$_2$ Group 2 unit that commences commercial operation before July 1, 2011, January 1, 2012.

(2) For the owner or operator of a TR SO$_2$ Group 2 unit that commences commercial operation on or after July 1, 2011, by the later of the following:

(i) January 1, 2012; or

(ii) 180 calendar days after the date on which the unit commences commercial operation.

(3) The owner or operator of a TR SO$_2$ Group 2 unit for which construction of a new stack or flue or installation of add-on SO$_2$ emission controls is completed after the applicable deadline

under paragraph (b)(1) or (2) of this section shall meet the requirements of §§ 75.4(e)(1) through (e)(4) of this chapter, except that:

(i) Such requirements shall apply to the monitoring systems required under § 97.730 through § 97.735, rather than the monitoring systems required under part 75 of this chapter;

(ii) SO₂ concentration, stack gas moisture content, stack gas volumetric flow rate, and O₂ or CO₂ concentration data shall be determined and reported, rather than the data listed in § 75.4(e)(2) of this chapter; and

(iii) Any petition for another procedure under § 75.4(e)(2) of this chapter shall be submitted under § 97.735, rather than § 75.66.

(c) *Reporting data.* The owner or operator of a TR SO₂ Group 2 unit that does not meet the applicable compliance date set forth in paragraph (b) of this section for any monitoring system under paragraph (a)(1) of this section shall, for each such monitoring system, determine, record, and report maximum potential (or, as appropriate, minimum potential) values for SO₂ concentration, stack gas flow rate, stack gas moisture content, fuel flow rate, and any other parameters required to determine SO₂ mass emissions and heat input in accordance with § 75.31(b)(2) or (c)(3) of this chapter or section 2.4 of appendix D to part 75 of this chapter, as applicable.

(d) *Prohibitions.* (1) No owner or operator of a TR SO₂ Group 2 unit shall use any alternative monitoring system, alternative reference method, or any other alternative to any requirement of this subpart without having obtained prior written approval in accordance with § 97.735.

(2) No owner or operator of a TR SO₂ Group 2 unit shall operate the unit so as to discharge, or allow to be discharged, SO₂ to the atmosphere without accounting for all such SO₂ in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(3) No owner or operator of a TR SO₂ Group 2 unit shall disrupt the continuous emission monitoring system, any portion thereof, or any other approved emission monitoring method, and thereby avoid monitoring and recording SO₂ mass discharged into the atmosphere or heat input, except for periods of recertification or periods when calibration, quality assurance testing, or maintenance is performed in accordance with the applicable provisions of this subpart and part 75 of this chapter.

(4) No owner or operator of a TR SO₂ Group 2 unit shall retire or permanently discontinue use of the continuous emission monitoring system, any component thereof, or any other approved monitoring system under this subpart, except under any one of the following circumstances:

(i) During the period that the unit is covered by an exemption under § 97.705 that is in effect;

(ii) The owner or operator is monitoring emissions from the unit with another certified monitoring system approved, in accordance with the applicable provisions of this subpart and part 75 of this chapter, by the Administrator for use at that unit that provides emission data for the same pollutant or parameter as the retired or discontinued monitoring system; or

(iii) The designated representative submits notification of the date of certification testing of a replacement monitoring system for the retired or discontinued monitoring system in accordance with § 97.731(d)(3)(i).

(e) *Long-term cold storage.* The owner or operator of a TR SO₂ Group 2 unit is subject to the applicable provisions of § 75.4(d) of this chapter concerning units in long-term cold storage.

**§ 97.731 Initial monitoring system certification and recertification procedures.**

(a) The owner or operator of a TR SO₂ Group 2 unit shall be exempt from the initial certification requirements of this section for a monitoring system under § 97.730(a)(1) if the following conditions are met:

(1) The monitoring system has been previously certified in accordance with part 75 of this chapter; and

(2) The applicable quality-assurance and quality-control requirements of § 75.21 of this chapter and appendices B and D to part 75 of this chapter are fully met for the certified monitoring system described in paragraph (a)(1) of this section.

(b) The recertification provisions of this section shall apply to a monitoring system under § 97.730(a)(1) that is exempt from initial certification requirements under paragraph (a) of this section.

(c) [Reserved]

(d) Except as provided in paragraph (a) of this section, the owner or operator of a TR SO₂ Group 2 unit shall comply with the following initial certification and recertification procedures, for a continuous monitoring system (*i.e.,* a continuous emission monitoring system and an excepted monitoring system under appendix D to part 75 of this chapter) under § 97.730(a)(1). The owner or operator of a unit that qualifies to use the low mass emissions excepted monitoring methodology under § 75.19

of this chapter or that qualifies to use an alternative monitoring system under subpart E of part 75 of this chapter shall comply with the procedures in paragraph (e) or (f) of this section respectively.

(1) Requirements for initial certification. The owner or operator shall ensure that each continuous monitoring system under § 97.730(a)(1) (including the automated data acquisition and handling system) successfully completes all of the initial certification testing required under § 75.20 of this chapter by the applicable deadline in § 97.730(b). In addition, whenever the owner or operator installs a monitoring system to meet the requirements of this subpart in a location where no such monitoring system was previously installed, initial certification in accordance with § 75.20 of this chapter is required.

(2) Requirements for recertification. Whenever the owner or operator makes a replacement, modification, or change in any certified continuous emission monitoring system under § 97.730(a)(1) that may significantly affect the ability of the system to accurately measure or record SO₂ mass emissions or heat input rate or to meet the quality-assurance and quality-control requirements of § 75.21 of this chapter or appendix B to part 75 of this chapter, the owner or operator shall recertify the monitoring system in accordance with § 75.20(b) of this chapter. Furthermore, whenever the owner or operator makes a replacement, modification, or change to the flue gas handling system or the unit's operation that may significantly change the stack flow or concentration profile, the owner or operator shall recertify each continuous emission monitoring system whose accuracy is potentially affected by the change, in accordance with § 75.20(b) of this chapter. Examples of changes to a continuous emission monitoring system that require recertification include: Replacement of the analyzer, complete replacement of an existing continuous emission monitoring system, or change in location or orientation of the sampling probe or site. Any fuel flowmeter system under § 97.730(a)(1) is subject to the recertification requirements in § 75.20(g)(6) of this chapter.

(3) Approval process for initial certification and recertification. For initial certification of a continuous monitoring system under § 97.730(a)(1), paragraphs (d)(3)(i) through (v) of this section apply. For recertifications of such monitoring systems, paragraphs (d)(3)(i) through (iv) of this section and the procedures in §§ 75.20(b)(5) and (g)(7) of this chapter (in lieu of the

procedures in paragraph (d)(3)(v) of this section) apply, provided that in applying paragraphs (d)(3)(i) through (iv) of this section, the words "certification" and "initial certification" are replaced by the word "recertification" and the word "certified" is replaced by with the word "recertified".

(i) *Notification of certification.* The designated representative shall submit to the appropriate EPA Regional Office and the Administrator written notice of the dates of certification testing, in accordance with § 97.733.

(ii) *Certification application.* The designated representative shall submit to the Administrator a certification application for each monitoring system. A complete certification application shall include the information specified in § 75.63 of this chapter.

(iii) *Provisional certification date.* The provisional certification date for a monitoring system shall be determined in accordance with § 75.20(a)(3) of this chapter. A provisionally certified monitoring system may be used under the TR $SO_2$ Group 2 Trading Program for a period not to exceed 120 days after receipt by the Administrator of the complete certification application for the monitoring system under paragraph (d)(3)(ii) of this section. Data measured and recorded by the provisionally certified monitoring system, in accordance with the requirements of part 75 of this chapter, will be considered valid quality-assured data (retroactive to the date and time of provisional certification), provided that the Administrator does not invalidate the provisional certification by issuing a notice of disapproval within 120 days of the date of receipt of the complete certification application by the Administrator.

(iv) *Certification application approval process.* The Administrator will issue a written notice of approval or disapproval of the certification application to the owner or operator within 120 days of receipt of the complete certification application under paragraph (d)(3)(ii) of this section. In the event the Administrator does not issue such a notice within such 120-day period, each monitoring system that meets the applicable performance requirements of part 75 of this chapter and is included in the certification application will be deemed certified for use under the TR $SO_2$ Group 2 Trading Program.

(A) *Approval notice.* If the certification application is complete and shows that each monitoring system meets the applicable performance requirements of part 75 of this chapter,

then the Administrator will issue a written notice of approval of the certification application within 120 days of receipt.

(B) *Incomplete application notice.* If the certification application is not complete, then the Administrator will issue a written notice of incompleteness that sets a reasonable date by which the designated representative must submit the additional information required to complete the certification application. If the designated representative does not comply with the notice of incompleteness by the specified date, then the Administrator may issue a notice of disapproval under paragraph (d)(3)(iv)(C) of this section.

(C) *Disapproval notice.* If the certification application shows that any monitoring system does not meet the performance requirements of part 75 of this chapter or if the certification application is incomplete and the requirement for disapproval under paragraph (d)(3)(iv)(B) of this section is met, then the Administrator will issue a written notice of disapproval of the certification application. Upon issuance of such notice of disapproval, the provisional certification is invalidated by the Administrator and the data measured and recorded by each uncertified monitoring system shall not be considered valid quality-assured data beginning with the date and hour of provisional certification (as defined under § 75.20(a)(3) of this chapter).

(D) *Audit decertification.* The Administrator may issue a notice of disapproval of the certification status of a monitor in accordance with § 97.732(b).

(v) *Procedures for loss of certification.* If the Administrator issues a notice of disapproval of a certification application under paragraph (d)(3)(iv)(C) of this section or a notice of disapproval of certification status under paragraph (d)(3)(iv)(D) of this section, then:

(A) The owner or operator shall substitute the following values, for each disapproved monitoring system, for each hour of unit operation during the period of invalid data specified under § 75.20(a)(4)(iii), § 75.20(g)(7), or § 75.21(e) of this chapter and continuing until the applicable date and hour specified under § 75.20(a)(5)(i) or (g)(7) of this chapter:

(1) For a disapproved $SO_2$ pollutant concentration monitor and disapproved flow monitor, respectively, the maximum potential concentration of $SO_2$ and the maximum potential flow rate, as defined in sections 2.1.1.1 and 2.1.4.1 of appendix A to part 75 of this chapter.

(2) For a disapproved moisture monitoring system and disapproved diluent gas monitoring system, respectively, the minimum potential moisture percentage and either the maximum potential $CO_2$ concentration or the minimum potential $O_2$ concentration (as applicable), as defined in sections 2.1.5, 2.1.3.1, and 2.1.3.2 of appendix A to part 75 of this chapter.

(3) For a disapproved fuel flowmeter system, the maximum potential fuel flow rate, as defined in section 2.4.2.1 of appendix D to part 75 of this chapter.

(B) The designated representative shall submit a notification of certification retest dates and a new certification application in accordance with paragraphs (d)(3)(i) and (ii) of this section.

(C) The owner or operator shall repeat all certification tests or other requirements that were failed by the monitoring system, as indicated in the Administrator's notice of disapproval, no later than 30 unit operating days after the date of issuance of the notice of disapproval.

(e) The owner or operator of a unit qualified to use the low mass emissions (LME) excepted methodology under § 75.19 of this chapter shall meet the applicable certification and recertification requirements in §§ 75.19(a)(2) and 75.20(h) of this chapter. If the owner or operator of such a unit elects to certify a fuel flowmeter system for heat input determination, the owner or operator shall also meet the certification and recertification requirements in § 75.20(g) of this chapter.

(f) The designated representative of each unit for which the owner or operator intends to use an alternative monitoring system approved by the Administrator under subpart E of part 75 of this chapter shall comply with the applicable notification and application procedures of § 75.20(f) of this chapter.

**§ 97.732  Monitoring system out-of-control periods.**

(a) *General provisions.* Whenever any monitoring system fails to meet the quality-assurance and quality-control requirements or data validation requirements of part 75 of this chapter, data shall be substituted using the applicable missing data procedures in subpart D or appendix D to part 75 of this chapter.

(b) *Audit decertification.* Whenever both an audit of a monitoring system and a review of the initial certification or recertification application reveal that any monitoring system should not have been certified or recertified because it did not meet a particular performance

specification or other requirement under § 97.731 or the applicable provisions of part 75 of this chapter, both at the time of the initial certification or recertification application submission and at the time of the audit, the Administrator will issue a notice of disapproval of the certification status of such monitoring system. For the purposes of this paragraph, an audit shall be either a field audit or an audit of any information submitted to the Administrator or any State or permitting authority. By issuing the notice of disapproval, the Administrator revokes prospectively the certification status of the monitoring system. The data measured and recorded by the monitoring system shall not be considered valid quality-assured data from the date of issuance of the notification of the revoked certification status until the date and time that the owner or operator completes subsequently approved initial certification or recertification tests for the monitoring system. The owner or operator shall follow the applicable initial certification or recertification procedures in § 97.731 for each disapproved monitoring system.

### § 97.733 Notifications concerning monitoring.

The designated representative of a TR SO$_2$ Group 2 unit shall submit written notice to the Administrator in accordance with § 75.61 of this chapter.

### § 97.734 Recordkeeping and reporting.

(a) *General provisions.* The designated representative shall comply with all recordkeeping and reporting requirements in paragraphs (b) through (e) of this section, the applicable recordkeeping and reporting requirements in subparts F and G of part 75 of this chapter, and the requirements of § 97.714(a).

(b) *Monitoring plans.* The owner or operator of a TR SO$_2$ Group 2 unit shall comply with requirements of § 75.62 of this chapter.

(c) *Certification applications.* The designated representative shall submit an application to the Administrator within 45 days after completing all initial certification or recertification tests required under § 97.731, including the information required under § 75.63 of this chapter.

(d) *Quarterly reports.* The designated representative shall submit quarterly reports, as follows:

(1) The designated representative shall report the SO$_2$ mass emissions data and heat input data for the TR SO$_2$ Group 2 unit, in an electronic quarterly report in a format prescribed by the Administrator, for each calendar quarter beginning with:

(i) For a unit that commences commercial operation before July 1, 2011, the calendar quarter covering January 1, 2012 through March 31, 2012; or

(ii) For a unit that commences commercial operation on or after July 1, 2011, the calendar quarter corresponding to the earlier of the date of provisional certification or the applicable deadline for initial certification under § 97.730(b), unless that quarter is the third or fourth quarter of 2011, in which case reporting shall commence in the quarter covering January 1, 2012 through March 31, 2012.

(2) The designated representative shall submit each quarterly report to the Administrator within 30 days after the end of the calendar quarter covered by the report. Quarterly reports shall be submitted in the manner specified in § 75.64 of this chapter.

(3) For TR SO$_2$ Group 2 units that are also subject to the Acid Rain Program, TR NO$_X$ Annual Trading Program, or TR NO$_X$ Ozone Season Trading Program, quarterly reports shall include the applicable data and information required by subparts F through H of part 75 of this chapter as applicable, in addition to the SO$_2$ mass emission data, heat input data, and other information required by this subpart.

(4) The Administrator may review and conduct independent audits of any quarterly report in order to determine whether the quarterly report meets the requirements of this subpart and part 75 of this chapter, including the requirement to use substitute data.

(i) The Administrator will notify the designated representative of any determination that the quarterly report fails to meet any such requirements and specify in such notification any corrections that the Administrator believes are necessary to make through resubmission of the quarterly report and a reasonable time period within which the designated representative must respond. Upon request by the designated representative, the Administrator may specify reasonable extensions of such time period. Within the time period (including any such extensions) specified by the Administrator, the designated representative shall resubmit the quarterly report with the corrections specified by the Administrator, except to the extent the designated representative provides information demonstrating that a specified correction is not necessary because the quarterly report already meets the requirements of this subpart and part 75 of this chapter that are relevant to the specified correction.

(ii) Any resubmission of a quarterly report shall meet the requirements applicable to the submission of a quarterly report under this subpart and part 75 of this chapter, except for the deadline set forth in paragraph (d)(2) of this section.

(e) *Compliance certification.* The designated representative shall submit to the Administrator a compliance certification (in a format prescribed by the Administrator) in support of each quarterly report based on reasonable inquiry of those persons with primary responsibility for ensuring that all of the unit's emissions are correctly and fully monitored. The certification shall state that:

(1) The monitoring data submitted were recorded in accordance with the applicable requirements of this subpart and part 75 of this chapter, including the quality assurance procedures and specifications; and

(2) For a unit with add-on SO$_2$ emission controls and for all hours where SO$_2$ data are substituted in accordance with § 75.34(a)(1) of this chapter, the add-on emission controls were operating within the range of parameters listed in the quality assurance/quality control program under appendix B to part 75 of this chapter and the substitute data values do not systematically underestimate SO$_2$ emissions.

### § 97.735 Petitions for alternatives to monitoring, recordkeeping, or reporting requirements.

(a) The designated representative of a TR SO$_2$ Group 2 unit may submit a petition under § 75.66 of this chapter to the Administrator, requesting approval to apply an alternative to any requirement of §§ 97.730 through 97.734.

(b) A petition submitted under paragraph (a) of this section shall include sufficient information for the evaluation of the petition, including, at a minimum, the following information:

(i) Identification of each unit and source covered by the petition;

(ii) A detailed explanation of why the proposed alternative is being suggested in lieu of the requirement;

(iii) A description and diagram of any equipment and procedures used in the proposed alternative;

(iv) A demonstration that the proposed alternative is consistent with the purposes of the requirement for which the alternative is proposed and with the purposes of this subpart and part 75 of this chapter and that any

adverse effect of approving the alternative will be *de minimis;* and

(v) Any other relevant information that the Administrator may require.

(c) Use of an alternative to any requirement referenced in paragraph (a) of this section is in accordance with this subpart only to the extent that the petition is approved in writing by the Administrator and that such use is in accordance with such approval.

[FR Doc. 2011–17600 Filed 8–5–11; 8:45 am]

**BILLING CODE 6560–50–P**

# Tab 15

Memorandum from Janet G. McCabe, Acting Assistant Administrator for the Office of Air and Radiation to Regional Administrators, Regions 1-10, "Implementing the 2015 Ozone National Ambient Air Quality Standards"



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OCT 1 2015

OFFICE OF
AIR AND RADIATION

## MEMORANDUM

**SUBJECT:**   Implementing the 2015 Ozone National Ambient Air Quality Standards

**FROM:**   Janet G. McCabe, Acting Assistant Administrator
Office of Air and Radiation

**TO:**   Regional Administrators, Regions 1-10

Following the directives of the Clean Air Act (CAA), on October 1, 2015, Administrator McCarthy signed a rulemaking action that revises the current national ambient air quality standards (NAAQS) for ozone to a new, more protective level of 0.070 parts per million (70 parts per billion). These revised standards will improve the health and well-being of millions of Americans in the coming years. They are built on a foundation of sound health and ecosystem science.

I am writing to you today to let you know about the process going forward for delivering the protections afforded by the revised standards. In doing so, I want to emphasize that we will work with our state, local, federal and tribal partners to carry out the duties of ozone air quality management in a manner that maximizes common sense, flexibility and cost-effectiveness while achieving improved public health expeditiously and abiding by the legal requirements of the CAA. The goal is achieving cleaner air, while recognizing the many other activities underway and the resource constraints that we and our co-regulators face. This has proved a successful partnership in the past, and I am confident it will continue to be so in the future. In particular, I note that a number of the other clean air programs currently underway will work to lower ozone levels nationally, such as Tier 3 vehicle standards, Mercury and Air Toxics Standards, measures to address the 2010 sulfur dioxide NAAQS, the Clean Power Plan and others.

The attached document highlights many of the issues related to implementing the revised national ozone standards, including policy and technical aspects of implementation that we anticipate facing in the coming years. It outlines actions that the EPA will take and our expectations of our air agency partners. Please share this memo with our state, local and tribal partners within your regions.

Attachment

**ATTACHMENT**

**How Air Agencies and the EPA Will Move Forward to Implement the 2015 Ozone Standards**

This document provides an outline of how the EPA will work with state, federal and tribal air agencies to carry out the duties of air quality management (AQM) for the revised ozone standards in a manner that maximizes common sense, flexibility and cost-effectiveness while abiding by the legal requirements of the Clean Air Act (CAA). It highlights many of the key issues and activities related to implementing the revised national ozone standards, including policy and technical aspects of implementation that we anticipate facing together in the coming years. It outlines commitments that the EPA will endeavor to meet, and our expectations of our air agency partners with regard to some of these issues. It is not intended to be a comprehensive communication on implementing the revised ozone standards, nor does it constitute new guidance.

*A. Plan for Ensuring Air Agencies and Emissions Sources Have Timely Guidance and Clear Rules to Follow*

The CAA places important obligations for implementing the ozone National Ambient Air Quality Standards (NAAQS) on various parties, but primary responsibility for administering the CAA to assure attainment of the NAAQS falls to the state and federal governments.[1] There is now a long history of managing ozone air quality under the CAA, underpinned by a wealth of previously-issued EPA rules and guidance. While portions of some existing rules and guidance need to be updated when the ozone NAAQS are revised, much of it remains applicable to the revised standards (e.g., the rule that applies to nonattainment areas for implementing the 2008 NAAQS). The EPA is committed to ensuring that air agencies have adequate guidance, and new rules where necessary, to carry out CAA directives through the state implementation plan (SIP) process. We have identified existing rules and guidance documents, and we are developing schedules for proposing and finalizing several new guidance documents and rulemakings to provide timely support for implementing the revised ozone standards. We will share more specific information regarding these actions and documents, including the timing, in the coming months.

To implement the revised ozone NAAQS, all states will need to review their existing air quality management (AQM) infrastructure State Implementation Plan (SIP) for ozone to ensure it is appropriate and adequate. The EPA's 2013 guidance on infrastructure SIPs titled, "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)," should be a helpful guide for conducting a comprehensive review of the state's AQM infrastructure. States were last required to review their AQM infrastructure SIP for ozone following the 2008 revision to the ozone standards. Accordingly, we expect most states will not have to make significant changes to existing infrastructure SIPs, and will simply need to submit a certification that their existing SIP is sufficient to meet applicable CAA AQM requirements for the revised ozone standards.[2]

---

[1] States also have primary regulatory jurisdiction in non-reservation areas of Indian country (i.e., Indian allotments located outside of reservations and dependent Indian communities) within its geographic boundaries unless the EPA or a tribe has demonstrated that a tribe has jurisdiction over a particular area of non-reservation Indian country within the state. *See Oklahoma Department of Environmental Quality v. EPA*, 740 F.3d 185 (D.C. Cir. 2014). For tribal areas of Indian country (i.e., reservations), tribes are generally not required to submit tribal implementation plans (TIPs), but are encouraged to reference the EPA's current 2008 Ozone NAAQS SIP Requirements Rule (2008 ozone NAAQS SRR) (80 FR 12264, March 6, 2015) and guidance should they choose to develop a TIP.

[2] Certifications are SIP submissions that must meet the requirements of 40 CFR part 50 appendix V and undergo the SIP review process required under CAA section 110(k).

For states with areas that are designated nonattainment, there are additional planning and control obligations that will apply. The final 2008 Ozone NAAQS SIP Requirements Rule (2008 ozone NAAQS SRR) contains the EPA's latest rules and guidance for implementing the ozone standards under the statutory provisions of CAA part D, subpart 2. The EPA believes that the overall framework and policy approach reflected in this rule provide an effective and appropriate template for the general approach states would follow in planning for attainment of the revised ozone standards. However, to assist with the implementation of the revised ozone standards, the EPA intends to develop and propose an additional ozone NAAQS implementation rule that will address certain subjects. We also recognize the rules and guidance cannot anticipate every possible situation or innovation, and we continue to be committed to working one-on-one with air agencies to explore case-specific innovative or untested approaches that have promise to fulfill CAA requirements and achieve clean air faster and more cost-effectively. In particular for areas where states are still actively working toward attaining the 2008 ozone NAAQS, we encourage air agencies to look for and take advantage of potential planning and emissions control efficiencies that may occur within the horizon for attaining the 2015 standards. Formal attainment plans for the 2015 standards are not anticipated to be due until 2020 or 2021, but this timeframe would roughly coincide with the next planning cycle for any current Moderate areas that fail to attain by the 2018 deadline for the 2008 ozone NAAQS.

The EPA has made significant efforts in recent years to update guidance and rules that relate to NAAQS implementation, so as not to have to update every document each time a NAAQS is revised. Below is a list of guidance and rules that are current and applicable to the 2015 ozone NAAQS, followed by a list of updates to guidance and rules that the EPA expects to complete for states' use in 2015 ozone NAAQS planning.

Guidance and Rules That Remain Current and Applicable to the Revised NAAQS

- Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2) – September 13, 2013 (*http://www.epa.gov/airquality/urbanair/sipstatus/infrastructure.html*)
- Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze – December 2014 and Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze – April 2007 (*http://www.epa.gov/scram001/guidance_sip.htm*)
- Draft Emissions Inventory Guidance for Implementation of Ozone [Particulate Matter] National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations – April 2014 (*http://www3.epa.gov/ttn/chief/eidocs/eiguid/index.html*)
- Revisions to the General Conformity Regulations (75 FR 17254, April 5, 2010) and guidance (40 CFR part 93, subpart B and 40 CFR part 51, subpart W) (*http://www3.epa.gov/airquality/genconform/regs.html*)
- Transportation Conformity Rule (77 FR 14979, March 14, 2012) and Guidance for Transportation Conformity Implementation in Multi-Jurisdictional Nonattainment and Maintenance Areas – February 2012 (40 CFR part 93, subpart A and 40 CFR part 51, subpart T) (*http://www3.epa.gov/otaq/stateresources/transconf/index.htm*)

Expected Updates to Implementation-Related Guidance and Rules and other Actions

- Rulemaking to establish nonattainment classification thresholds, incorporate SIP due dates into the EPA regulations, and update (as necessary) policy interpretations of CAA SIP requirements (expected to closely follow the 2008 Ozone NAAQS SRR) (*see section A*)

- Rulemaking to revoke 2008 ozone NAAQS effective 1 year after initial area designations and plan for transitioning from 2008 to 2015 standards (expected to closely follow the 2008 Ozone NAAQS SRR)
- Analysis of interstate ozone transport contributions for the 2015 NAAQS (expected to include an analysis similar to the Notice of Data Availability (NODA) for transport contributions for the 2008 NAAQS) (*see section E*)
- Guidance on meeting transportation conformity requirements for nonattainment areas under the revised ozone NAAQS (expected to closely follow the transportation conformity guidance for the 2008 ozone NAAQS) (*see section H*)
- Exceptional Events Rule revisions and guidance on exceptional events demonstrations for wildfire events that may influence ozone concentrations (*see section D*)
- Guidance or rulemaking on the use of PSD permit screening tools and offsets in attainment areas (*see section B*)
- White paper on background ozone and stakeholder workshop (*see section D*)

Based on the EPA's recent work with states to identify the types of guidance and rules that would facilitate NAAQS implementation and the schedule on which those materials are needed to assist states in meeting required submittal dates, the EPA is developing schedules for these materials. The EPA will continue to prioritize development of these materials with input from co-regulators and other stakeholders.

*B. Plan for Ensuring Major Source Permitting is Effective and Efficient*

Starting on the effective date of the revised ozone NAAQS, the CAA requires permit authorities to consider the revised ozone standards when issuing preconstruction permits to new or modified major emissions sources. Generally, this means that a proposed source obtaining a prevention of significant deterioration (PSD) permit for construction in an ozone attainment area must show that its emissions of ozone precursors will not cause or contribute to a violation of the revised standards. However, in the final 2015 ozone NAAQS rule the EPA finalized a grandfathering provision that allows some sources with PSD permit applications pending to apply the ozone standards that were in effect when certain milestones in the application process were reached to satisfy certain PSD requirements. Specifically, this provision would apply to applications for which the reviewing authority has either formally determined that the application is complete on or before the signature date of the 2015 ozone NAAQS or has published a public notice of a draft permit or preliminary determination before the effective date of the 2015 ozone NAAQS. Although some sources may continue to focus on compliance with the prior ozone standards under the grandfathering provision, all existing EPA-issued, permitting-related rules and modeling guidelines applicable to ozone remain in effect until they are formally revised. In addition, the EPA continues to recommend following its existing permitting guidance pending additional guidance specific to ozone and the revised standards.

We recognize that the owners and operators of emissions sources need clarity and certainty about regulatory requirements, especially when there are changes in air quality standards that may affect their construction and operations. In an effort to add clarity and certainty for preconstruction permitting generally, the EPA is planning some enhancements to existing rules and guidance and providing additional guidance to assist with applying PSD requirements to ozone generally, and with implementing specific aspects of the 2015 ozone NAAQS. For example, the EPA recently proposed a comprehensive update to the PSD permit modeling guidelines in Appendix W of 40 CFR part 51 (80 FR 45340, July 29, 2015). We intend to finalize the proposed action in 2016. In this proposed action, we

took comment on incorporating new recommendations for evaluating single-source ozone contributions, including the appropriate use of single-source modeling tools. I want to emphasize, however, that until final changes are made to Appendix W, the existing guidelines in Appendix W remain applicable to ozone. Even if changes are made, we intend to provide a transition period before any new guidelines become effective.

There are a number of existing program tools that can be used to help facilitate the permitting process, and the EPA continues to work with stakeholders on others that will improve the permitting process while assuring attainment and protection of the ozone standards. These include the use of emission offset programs and significant impact levels (SILs) for ozone for PSD permitting. The existing "PSD offsets" tool continues to be available for permit applicants and reviewing authorities to address ozone impacts from a proposed source or modification, including in an area that is not designated nonattainment but where ambient monitoring data shows ozone concentrations that exceed the revised NAAQS. We believe that SILs and related "screening tools"[3] are useful in determining the extent to which an ambient impact analysis must be completed to make the required demonstration for the applicable pollutant. We intend to provide additional guidance on these screening tools in the near future.

Finally, in areas that are likely to be designated nonattainment for the 2015 ozone NAAQS, state and local permit authorities can help facilitate efficient nonattainment NSR permitting by establishing emissions offset banks and registries.

## C. Plan for Ensuring All Areas Are Appropriately Designated

One of the most important near-term implementation efforts is completing the process for initially designating all areas as to whether each area is meeting or not meeting the 2015 ozone NAAQS. Because designating areas is typically a 2-year process (and may even, in some cases, be extended another year), the final designations will be based in part on future air quality data (i.e., 2014-2016 data). Current air quality data may not be a reliable indicator of likely nonattainment areas. Nevertheless, 2012-2014 data indicate that many counties with design values above the 2015 ozone standards have previously been designated nonattainment for ozone, which suggests that there is already widespread experience with ozone nonattainment planning.

In early 2016, the EPA will issue new guidance to facilitate the designations process. We expect this guidance will be similar in concept and scope to the designations guidance issued for the 2012 $PM_{2.5}$ NAAQS (see "Initial Area Designations for the 2012 Revised Primary Annual Fine Particle National Ambient Air Quality Standard," April 16, 2013). It will include a discussion of the factors that the EPA plans to consider in evaluating designation recommendations from states and tribes and in determining nonattainment area boundaries. It will also include information on establishing Rural Transport Areas under CAA section 182(h) where it is appropriate to do so. Using this guidance approach, the EPA has established a good track record of finalizing designations that are based on sound technical assessment and policy judgment, and that have withstood a variety of legal challenges.

---

[3] For example, in the July 2015 proposed update to Appendix W, we introduced a new demonstration tool for ozone precursors referred to as Model Emissions Rates for Precursors (MERPs). A MERP would represent a level of emissions of precursors that is not expected to contribute significantly to concentrations of ozone.

The statutory deadline for the EPA to finalize area designations is October 1, 2017. State recommendations on area designations are due October 1, 2016. Designations completed by October 1, 2017, would, as noted above, involve ozone air quality data collected during the most recent 3-year period (i.e., 2014-2016). In some locations, these data may have been impacted by events that could be determined to be exceptional events. We recognize the importance of timely review and approval of any data exclusions requested under the Exceptional Events Rule, and will work with states to prioritize review of any exceptional events demonstrations that would materially impact an attainment determination or nonattainment area classification. The final ozone NAAQS rule establishes October 1, 2016, as the deadline for states to submit exceptional event demonstrations for events that occurred in 2014 and 2015, and May 31, 2017, as the deadline for events that occur in 2016.

*D. Issues Related to Background Ozone*

Background ozone is ozone arising from natural events (e.g., stratospheric intrusions and wildfires) or non-United States (U.S.) anthropogenic sources (e.g., ozone and ozone precursor emissions from Mexico, Canada or other international locations). A number of stakeholders have expressed a concern that some locations in the U.S. may violate the ozone standards due to background ozone concentrations. We anticipate that there are only a few locations in the western U.S. where levels in excess of 70 ppb could be due to the overwhelming influence of background ozone. These are generally high elevation sites in the western U.S. that are impacted by stratospheric intrusions, sites impacted by large-scale wildfires, or locations along the U.S.-Mexican border influenced by Mexican emissions.

Under the CAA, states are not responsible for reducing emissions from background sources. We intend to work directly with responsible air management agencies in these areas to ensure that all CAA provisions that would provide regulatory relief associated with background ozone are recognized. However, even if elevated levels of ozone are influenced by natural events or are caused by human activities outside the U.S., it is critically important that the public is informed about whether the air is healthy to breathe.

The CAA provides for the exclusion of emissions data showing exceedances of the ozone standards when such exceedances are caused by certain natural events like stratospheric ozone intrusions and wildfires. We acknowledge that the CAA requires that there be demonstrated evidence of these exceptional events and a public review process in order to use the exclusion; these requirements are provided in the Exceptional Events Rule (72 FR 12560, March 22, 2007). We fully expect to work with states to ensure they are able to exclude such data in locations where they are warranted. Any exceedances of the standards that result from stratospheric ozone intrusion events or wildfire impacts could be evaluated for exclusion of ambient concentration data under the Exceptional Events Rule. We already work closely with states to review exceptional events submissions, and we are currently developing revisions to the Exceptional Events Rule to simplify and expedite the process for states developing technical demonstrations and for the EPA to approve exclusions for these types of events. This proposal, which we expect to issue this fall, has been well informed by our discussions with states and other stakeholders and by our experience with past exceptional events submittals. We are also developing additional guidance for preparing exceptional events demonstrations for wildfire events that may influence ozone concentrations. It is our intent to finalize the rulemaking and wildfire event guidance before states must submit recommendations on area designations and we stand ready to work with states, as needed, in addressing potential exceptional event demonstrations prior to that final rulemaking.

For areas impacted by international sources, the CAA contains provisions in section 179B that ensure states only need to address man-made sources within their jurisdiction, and only need to impose emissions controls on local sources to the extent they are reasonably available. We intend to ensure that states that may be impacted by international sources, such as California, Arizona, New Mexico and Texas, are able to employ these provisions, where applicable, and we will offer whatever technical assistance we can feasibly provide to these states and impacted communities.

During this latest review of the ozone NAAQS there has been a good deal of discussion about background ozone. To further ensure that all interested stakeholders have a common understanding of the nature of background ozone and how it could be accounted for in implementing the ozone standards, we are developing a white paper on background ozone that we will make available soon for stakeholder review. We intend to hold a workshop in the next few months to discuss the information in the white paper and to further advance our collective understanding of the technical and policy issues that may be involved with background ozone. We will evaluate the need for further guidance or regulatory tools to address background ozone after receiving stakeholder input and after conducting the workshop. We emphasize again that the EPA headquarters and regional offices will work with states to ensure they can successfully invoke all of the CAA provisions that are legally and technically warranted for ensuring background ozone does not result in ineffective air quality management actions.

In addition, the EPA continues to work with other federal agencies, our counterparts in other countries, and the international community to improve our understanding of the sources and impacts of background ozone and to enable and motivate control of pollution sources in other countries that affect the U.S. Working with the European Commission in the context of the Convention on Long-Range Transboundary Air Pollution, we are leading an international scientific effort to improve the databases and modeling tools that enable us to characterize the intercontinental transport of ozone and assess potential control strategies.[4] We are working with Mexico through the Border 2020 Program,[5] with Canada under the US-Canada Air Quality Agreement,[6] and with China through agreements on cooperation with their environment and science ministries[7] to improve air quality management and address key sources in these countries. And we are working through multilateral efforts, such as the Global Methane Initiative[8] and the Climate and Clean Air Coalition to Reduce Short Lived Climate Pollutants[9] to engage both governments and the private sector to achieve decreases in methane emissions which contribute to background ozone. Ultimately, these efforts will benefit air quality in the United States by decreasing international contributions to background air pollution.

*E. Plan for Addressing Interstate Ozone Transport*

The "Good Neighbor" provision of the CAA, section 110(a)(2)(D)(i)(I), requires upwind states to develop SIPs that prohibit emissions of pollutants in amounts that will contribute significantly to nonattainment, or interfere with maintenance of, a NAAQS in another state. These Good Neighbor SIPs are due within 3 years of promulgation of a new or revised NAAQS, meaning that transport SIPs for the 2015 ozone NAAQS will be due by October 2018. If the EPA finds that states have not timely submitted SIPs or the EPA disapproves such a SIP, then the EPA must promulgate Federal Implementation Plans

---

[4] http://www.htap.org/
[5] http://www2.epa.gov/border2020
[6] http://www.epa.gov/airmarkets/programs/us-canada.html
[7] http://www2.epa.gov/international-cooperation/epa-collaboration-china
[8] https://www.globalmethane.org/
[9] http://www.ccacoalition.org/

(FIPs) that eliminate the emissions that significantly contribute to nonattainment and interfere with maintenance of the standards in downwind states.

We believe that the Good Neighbor provision for the 2015 NAAQS can be addressed in a timely fashion using the framework of the Cross-State Air Pollution Rule (CSAPR), especially given the recent court decisions upholding the rule. The CSAPR framework involves a 4-step process to address the requirements of the good neighbor provision: (1) identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (i.e., NAAQS); (2) determining which upwind states contribute to these problems in amounts sufficient to "link" them to the downwind air quality problems; (3) for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance by quantifying upwind reductions in ozone precursor emissions and apportioning upwind responsibility; and (4) for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, adopting SIPs or FIPs that eliminate such emissions.

As a first step in facilitating the implementation of the Good Neighbor provision for the 2015 NAAQS, the EPA intends to provide timely information regarding steps 1 and 2 of the CSAPR framework. We expect to conduct modeling necessary to identify projected nonattainment and maintenance receptors and identify the upwind states that contribute significantly to these receptors. We would make such information available in fall 2016 through a NODA process (similar to the one the EPA recently used in developing the transport modeling for the 2008 ozone NAAQS) so that air agencies and others can help assure that the EPA is using the best available information.

Finally, in light of our shared responsibility to address interstate transport, we intend to continue on-going discussions with eastern states and to undertake discussions with western states. These discussions are necessary to make sure we have a common understanding of the nature of inter-state ozone transport in each part of the country and that we are working together on appropriate solutions.

*F. Addressing the Challenges in California*

California has unique challenges among the states in addressing ozone pollution. Air basins surrounded by mountains and a generally warm climate combine to make many areas of the state conducive to ozone formation. In particular, the South Coast air basin in the Los Angeles area and the San Joaquin Valley in the central part of the state are the only two areas in the U.S. classified as "Extreme" nonattainment areas for the 1979, 1997 and 2008 ozone standards. Although ozone levels have decreased by 30 percent in South Coast and nearly 20 percent in the San Joaquin Valley since 2000, South Coast still has the highest 2012-2014 8-hour ozone design value in the nation at 102 ppb, and San Joaquin has the second highest at 95 ppb. Through September 29, 2015, South Coast had exceeded the 2008 ozone standards on 81 days this year, the San Joaquin Valley on 73 days. More than 25 million people in California breathe air that does not meet the 2008 ozone standards.

Air pollution from mobile sources dominates the ozone precursor emissions in California. With ports that bring in forty percent of the nation's goods and agricultural areas that produce nearly half of the nation's produce, as well as a population of over 38 million, the state is challenged by high levels of NOx emissions from freight movement and from transportation generally. Under section 209 of the CAA, California has the authority to regulate mobile sources. Beginning in the 1970s, the state has used this authority to set stringent emissions standards. In 2008, California began regulating in-use trucks and buses to reduce emissions from the legacy fleet, the only such mandatory program in the country. More

recently, it adopted a voluntary low-NOx emissions standards for heavy-duty engines to help engine technology move toward even cleaner levels. In addition, the state has funded incentive programs to further reduce emissions from the legacy fleet and has pursued numerous advanced mobile source technologies. Since 2008, California has spent nearly $3 billion in funding the demonstration and deployment of innovative technologies such as zero-emission trucks and buses, hybrid-electric medium- and heavy-duty vehicles, and zero-emission freight equipment. The federal government has provided more than $200 million, largely through Diesel Emissions Reduction Act grants and the Department of Agriculture's Environmental Quality Incentives Program funds.

Even with these aggressive regulatory and non-regulatory programs to control mobile-source emissions, and with the most stringent stationary source emission standards in the U.S., most of central and southern California is likely to be designated nonattainment for the 2015 ozone standards. The South Coast Air Quality Management District estimates that it will need a reduction of at least 85 percent in NOx emissions from 2012 levels to attain a standard of 70 ppb by 2037.[10]

With the implementation of all the measures currently adopted and planned by 2032[11], the sources contributing the most NOx emissions in California's nonattainment areas will be heavy-duty diesel trucks, ships and commercial boats, off-road equipment, locomotives, aircraft, agricultural engines, and passenger cars. For California's ozone nonattainment areas to attain the 2015 ozone standards, the state and the EPA have recognized that transformational change is likely needed. For example, recent discussions have focused on a transition to largely zero and near-zero emissions vehicle technologies as well as significant turnover of the legacy fleet of vehicles. Additionally, California is undertaking a comprehensive review of its goods movement system with the goal to release a sustainable freight plan in July 2016. The state is also developing attainment plans for the 2008 ozone NAAQS, to be submitted to the EPA in 2016. For these and other related efforts, the EPA will work closely with California, local air quality officials, nongovernmental organizations, other federal agencies, and interested commercial representatives to identify both regulatory and non-regulatory emission control solutions best designed to achieve reductions in the transportation sector.

## G.  Managing Ozone Monitoring Networks

A sound ambient pollution monitoring program is one of the foundations of delivering environmental protection. The public counts on states and other air agencies to establish and operate air quality monitoring networks, and provide reliable, high quality air quality measurement data. We encourage air agencies to ensure their ozone networks are efficient and effective at determining public exposure to ozone, and in full compliance with existing air monitoring regulations. In rules accompanying the 2015 revision to the ozone NAAQS, we took three actions related to air monitoring. First, the monitoring season period for ozone monitors was extended in 32 states and the District of Columbia starting in 2017. All previously approved ozone monitoring site waivers are now revoked, however we encourage air management agencies to work with their respective EPA regional office in cases where they believe new waivers should be granted. We have not changed the process or reasons for granting seasonal exemptions for collecting monitoring data in cases where access or operations of the monitor are affected by inclement weather conditions. As a reminder, we expect that the CASTNET monitors will

---

[10] South Coast Air Quality Management District documents:
*http://www4.aqmd.gov/enewsletterpro/uploadedimages/000001/Celia/FactSheet-2016%20AQMP-v9.pdf*;
*http://www.aqmd.gov/docs/default-source/Agendas/aqmp/advisory4-item3.pdf?sfvrsn=2.*
[11] The year 2032 is the attainment deadline under the 2008 ozone NAAQS for California nonattainment areas that are classified Extreme for that standard.

continue to provide ozone air quality information that is comparable to the ozone NAAQS. The revised ozone monitoring seasons become effective at state and local air monitoring stations or SLAMS (including NCore stations) on January 1, 2017.

Second, to improve implementation of the CAA's requirement for "enhanced" ozone monitoring, we modified the network requirements for Photochemical Assessment Monitoring Stations (PAMS) to modernize and streamline the network. These revisions were based on a 2011 evaluation of the network, along with consultation with the EPA's independent science advisers (the Clean Air Scientific Advisory Committee) and an organization of state air agencies. PAMS will now be required at existing NCore sites in large urban areas with a population of 1,000,000 or more. This change will improve the geographic distribution of PAMS sites, while reducing redundancy in the existing network. In addition, monitoring agencies with Moderate (and above) nonattainment areas and states in the Ozone Transport Region will now be required to establish Enhanced Monitoring Plans (EMPs). This process gives states the flexibility to determine and collect the additional data they need to better understand the ozone problems unique to their area. States will need to comply with the new PAMS monitoring at NCore sites by June 1, 2019. States will need to submit EMPs within 2 years of designations or by October 1, 2019, whichever is later. The EPA intends to redistribute available PAMS funding to support the new requirements.

Third, we established a new procedure for determining daily maximum, 8-hour average ozone concentrations to avoid "double counting" overlapping daily maximum 8-hour averages. This procedure prevents the situation in which we count two exceedances of the NAAQS on 2 consecutive days based on overlapping 8-hour periods with up to 7 hours in common. The criteria for determining whether a daily maximum 8-hour average is valid for the purpose of calculating a design value has been changed accordingly, so that 13 of 17 possible 8-hour averages are now required instead of 18 of 24. In addition, we have retained the requirement that daily maximum 8-hour average values greater than the level of the NAAQS will be considered valid regardless of data completeness.

*II. Other Implementation Issues*

**Community Involvement.** We believe it is vitally important for state and local air agencies to engage with their communities as they plan to address attainment and/or maintenance of the 2015 ozone standards. Communities experiencing disproportionate impacts of air pollution may reasonably expect more stringent ozone standards to lead to improved air quality that meets the EPA's standards as soon as possible. To fully benefit from the opportunities the revised standards present, these communities' voices must be heard by the air agencies responsible for meeting the standards. The EPA recommends that state and local air agencies take steps to ensure that minority populations, low-income communities, tribes and indigenous populations are involved meaningfully in the development and implementation of regulations and programs to meet the 2015 ozone standards.

The EPA has developed a guidance document titled, "Guidance on Considering Environmental Justice during Development of Regulatory Actions," to assist its own staff in considering and addressing environmental justice issues as it develops rules. We recommend that state and local air agencies consider the approaches described in this document as they undertake their planning activities around the 2015 ozone standards. For example, the guidance includes specific steps to make public involvement meaningful and effective, ideas for using web-based tools for communicating with a variety of communities, and best practices for engaging environmental justice communities in developing and implementing environmental regulations. All communities deserve to breathe air that meets federal

standards. We are committed to working with states as they engage their most vulnerable communities toward achieving this goal.

***Opportunity for Multi-pollutant Planning.*** Ozone pollution does not need to be addressed independently from other air pollution concerns. Emissions affecting compliance with other criteria pollutant NAAQS and contributing to greenhouse gases may have similar sources. We encourage air agencies to consider multi-pollutant planning, as a means to ensure environmental protection and at the same time take advantage of potential efficiencies, synergies, and provide more certainty to the regulated community. It is possible to work within the statutory requirements to plan and implement in a multi-pollutant fashion. Most recently, in the preamble for the final Clean Power Plan, the EPA noted "… the Clean Power Plan provides an opportunity for states to consider strategies for meeting future CAA planning obligations as they develop their plans under this rulemaking. Multi-pollutant strategies that incorporate criteria pollutant reductions over the planning horizons specific to particular states, jointly with strategies for reducing $CO_2$ emissions from affected EGUs needed to meet Clean Power Plan requirements over the time horizon of this rule, may accomplish greater environmental results with lower long-term costs." We believe that the coincident planning periods for the Clean Power Plan and the NAAQS for ozone, $PM_{2.5}$ and $SO_2$, and for the Regional Haze program, should encourage states to take a multi-pollutant approach in addressing these regulatory requirements.

***Emissions from Wildland Fires.*** We understand that fire is an unavoidable occurrence on many types of wildland, and that changing climate conditions will increase the occurrence of damaging wildfires unless fuel loads are managed by other means including science-based use of prescribed fire.[12,13,14] Emissions from fires on wildland, particularly large wildfires, can impact concentrations of ozone and other harmful pollutants, such as $PM_{2.5}$, both in the locations with fire and downwind. In areas where wild fires have been prevalent or are likely, we encourage air agencies to work with state, federal and private land managers on promoting prescribed fire and other strategies that may reduce wildfire emissions and their effects on ozone exceedances; we appreciate that such strategies may have other public safety, ecological, and property protection benefits as well. Recognizing the importance of various fire management strategies, in the proposed revisions to the Exceptional Events Rule we intend to encourage air agencies to rely on burn managers' use of basic smoke management practices[15] by identifying a set of generally applicable practices that would be employed during prescribed fires. The EPA and the federal land management agencies will support state efforts to educate the public on the ecological role of fire, and wildfire and prescribed fire concepts. Where a prescribed fire program has been developed and is being implemented in and/or upwind of a nonattainment area, the EPA recommends that air agencies account for the expected prescribed fire emissions in the attainment and maintenance planning process. In those areas where prescribed fires are known to be capable of causing occasional ozone exceedances, the EPA will continue to work with air agencies and stakeholders to improve the long-term effectiveness of the existing basic smoke management practices and smoke management programs.

---

[12] The Administrator's finding on the adverse effects of greenhouse gases included the observation that wildfires have increased, and that there are potential serious adverse impacts from further wildfire occurrence. (74 FR 66530, December 15, 2009.

[13] *Climate Change in the United States: Benefits of Global Action*, U.S. EPA, EPA-430-R-15-001, June 2015. Available at *http://www2.epa.gov/cira.*

[14] The National Strategy: The Final Phase in the Development of the National Cohesive Wildland Fire Management Strategy, Report to Congress developed by the U.S. Department of Agriculture and the U.S. Department of the Interior, April 2014. Available at *http://www.forestsandrangelands.gov/strategy/thestrategy.shtml.*

[15] Basic Smoke Management Practices, October 2011, U.S. Forest Service and Natural Resources Conservation Service, *http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1046311.pdf.*

***Transportation Planning.*** The CAA requires that transportation plans, transportation improvement programs (TIPs) and projects must be consistent with, or "conform" to, attainment and maintenance of the ozone NAAQS. The EPA intends to issue an update to existing guidance for purposes of addressing issues that are expected to arise in implementing the 2015 NAAQS in future nonattainment areas. The EPA issued a similar guidance update for the 2008 NAAQS. The guidance for the 2015 ozone NAAQS will address transportation conformity requirements that apply in ozone nonattainment areas including:

- When will conformity apply for the 2015 ozone NAAQS;
- Requirements for completing transportation plans and TIP conformity determinations in metropolitan areas; and
- Requirements for completing conformity determinations in rural areas.

For more details on topics that will be addressed in transportation conformity guidance for the 2015 ozone NAAQS please refer to the current guidance for the 2008 ozone NAAQS, which is available at: *http://www.epa.gov/otaq/stateresources/transconf/2008naaqs.htm.* With the exception of issues unique to the 2015 ozone NAAQS (such as implementation dates), we expect the new guidance to be very similar to the guidance for the 2008 NAAQS.

The CAA also requires certain areas to implement vehicle inspection and maintenance (I/M) programs. These areas are limited to ozone nonattainment areas that have been classified as Moderate or worse and meet CAA-specified population thresholds (200,000 based upon the 1990 U.S. Census for Moderate nonattainment areas, and 200,000 based upon the 1980 U.S. Census for Serious or worse nonattainment areas). In addition, any Metropolitan Statistical Area within the Ozone Transport Region with a 1990 population of 100,000 or more is also required to implement I/M, regardless of attainment status.

While it is too soon to know, we expect few if any areas not already implementing vehicle I/M programs will need to do so as a result of being initially designated and classified nonattainment for the 2015 ozone standards. For those areas that may eventually be required to implement I/M as a result of missing their initial attainment deadline under the 2015 standards, a great deal of flexibility and many implementation options exist that were not available during the last period during which new I/M programs were required. This implementation flexibility is the result of numerous revisions to the original I/M rule as well as technological advances such as the use of onboard diagnostics on most in-use vehicles.

***Ozone Advance Program.*** Finally, we also want to remind states, tribes, and communities about the EPA's Ozone Advance program, which encourages expeditious emission reductions in ozone attainment areas to help these areas continue to meet the ozone NAAQS. While the program to date has focused on helping attainment areas continue to meet the 2008 NAAQS, we now plan to re-focus the program toward continued attainment of the 2015 NAAQS. Early reductions of the pollutants that form ozone can be achieved by any area without participating in Ozone Advance, however the program may be of interest to areas that would like to work more collaboratively with the EPA when planning and implementing measures to reduce ozone. Areas with air quality that currently does not meet the 2015 NAAQS can participate in Advance until final nonattainment area designations (expected in fall 2017), and for as long as the area is classified as Marginal (and therefore is not subject to planning requirements).

Ozone Advance participants have voluntarily opted to undertake a variety of emission reducing measures, including diesel reductions, congestion mitigation, fleet management, alternative fuels, point

and area source reductions, and energy efficiency improvements. They are also taking steps to build public awareness about the connections between air quality and health and actions individuals can take to improve air quality locally. Further information is available at *http://www.epa.gov/ozoneadvance/participants.html*.

# Tab 16

Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards to Regional Air Division Directors, Regions 1-10, "Information on the Interstate Transport "Good Neighbor" Provision for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) under Clean Air Act (CAA) Section 110(a)(2)(D)(i)(I)"



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

JAN 22 2015

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:**   Information on the Interstate Transport "Good Neighbor" Provision for the 2008 Ozone
National Ambient Air Quality Standards (NAAQS) under Clean Air Act (CAA)
Section 110(a)(2)(D)(i)(I)

**FROM:**   Stephen D. Page
Director

**TO:**   Regional Air Division Directors, Regions 1 – 10

The purpose of this memorandum is to provide information to states regarding state implementation
plans (SIPs) to address the interstate transport "Good Neighbor" Provision of the Clean Air Act (CAA)
as it pertains to the 2008 ozone National Ambient Air Quality Standards (NAAQS). This information
consists of:

- Discussion of elements that have been used previously to address interstate transport, and
- The EPA's preliminary air quality modeling data for ozone for the year 2018.

The EPA anticipates that this information, together with additional steps described below, will be
helpful to states developing "Good Neighbor" SIPs for the 2008 ozone NAAQS. The EPA and states are
behind schedule in addressing the "Good Neighbor" Provision for the 2008 ozone standards, due to
factors such as the EPA's reconsideration of the standards and protracted litigation related to previous
actions [most recently the Cross-State Air Pollution Rule (CSAPR)] under the "Good Neighbor"
Provision. This document is part of the process of working with states to offer support and information
to enable the EPA and states to move forward to address the requirements of the "Good Neighbor"
Provision for this NAAQS as soon as possible.

In addition to the information being shared today, the EPA will hold a webinar in early February and a
workshop in the spring of 2015. The webinar will focus on the content of this memo and the attached
preliminary air quality modeling data. For the workshop, the EPA plans to facilitate discussions with
states on: (1) available emission controls; (2) potential state-by-state electric generating unit (EGU)
nitrogen oxides ($NO_X$) reductions based on those controls; and (3) potential EGU emissions budgets
informed by those reductions. More information on the webinar and workshop will be forthcoming.

The EPA's goal is to provide information and to initiate discussions that will inform state development
and EPA review of "Good Neighbor" SIPs, and, where appropriate, to facilitate state efforts to
supplement or resubmit their "Good Neighbor" SIPs. At this time, there are a number of states that may
not have submitted "Good Neighbor" SIPs for the 2008 ozone NAAQS. In addition, there are a number

of pending "Good Neighbor" SIPs for the 2008 ozone NAAQS that the EPA will review and take action on. While our goal is to facilitate SIP development, the EPA also recognizes its backstop role in the SIP development process—that is, our obligation to develop and promulgate federal implementation plans, as appropriate. We plan to take this action, if necessary. It is our intention that any federal rule developed to satisfy this obligation would provide ample opportunity for states to pursue alternatives.

## The "Good Neighbor" Provision

Under CAA sections 110(a)(1) and 110(a)(2), each state[1] is required to submit a SIP[2] that provides for the implementation, maintenance and enforcement of each primary or secondary NAAQS. Moreover, section 110(a)(1) requires each state to make this new SIP submission within 3 years after promulgation of a new or revised NAAQS.[3] This type of SIP submission is commonly referred to as an "infrastructure SIP." The conceptual purpose of an infrastructure SIP submission is to assure that the state's SIP contains the necessary structural requirements for the implementation of the new or revised NAAQS, whether by establishing that the SIP already contains or sufficiently addresses the necessary provisions, or by making a substantive SIP revision to update the SIP.

CAA section 110(a)(2)(D)(i)(I) requires each state in its SIP to prohibit emissions that will significantly contribute to nonattainment of a NAAQS, or interfere with maintenance of a NAAQS, in a downwind state. Under section 110(a)(2)(D)(i)(I), each state is required to submit to the EPA new or revised SIPs that "contain adequate provisions – prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the state from emitting any air pollutant in amounts which will … contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard." For purposes of this document, we refer to section 110(a)(2)(D)(i)(I) as the "Good Neighbor Provision" and to SIP revisions addressing this requirement as "Good Neighbor SIPs."

## Elements That Have Been Used Previously to Address the "Good Neighbor" Provision

The EPA notes that a consistent framework for addressing transport for certain NAAQS, involving a number of basic steps, has been developed in several previous federal rulemakings.[4] These basic steps include: (1) identifying downwind air quality problems, (2) identifying upwind states that contribute enough to those downwind air quality problems to warrant further review and analysis, (3) identifying

---

[1] The term "state" as used in this memorandum has the same meaning as provided in CAA section 302(d). These CAA sections and this information may also apply, as appropriate under the Tribal Authority Rule (TAR) in 40 CFR part 49, to an Indian tribe that receives a determination of eligibility for treatment in a similar manner as a state for purposes of administering a tribal air quality management program under section 110(a) of the CAA. Tribes should look to the TAR and engage their respective EPA regional offices in discussing how this information may impact the development and approvability of their tribal implementation plans (TIPs). We encourage states to provide outreach and engage in discussions with tribes about their SIPs as they are being developed.

[2] In the CAA and in this memorandum, "plan," "SIP" and "TIP" may, depending on context, refer either to (i) all or part of the existing state (or tribal) implementation plan (*i.e.*, the collection of all submissions previously approved by the EPA as meeting CAA requirements) or (ii) a submission that adds to or modifies the existing plan as directed by section 110(a)(l).

[3] The Administrator may specify a shorter period.

[4] *See* for example, Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone. 63 FR 57356 (October 27, 1998); Clean Air Interstate Rule (CAIR) Final Rule. 70 FR 25162 (May 12, 2005); CSAPR Final Rule. 76 FR 48208 (August 8, 2011).

the emissions reductions necessary to prevent an identified upwind state from contributing significantly to those downwind air quality problems and (4) adoption of permanent and enforceable measures needed to achieve those emissions reductions.

Efforts to address ozone transport by the EPA and states under the "Good Neighbor" Provision have focused on reductions of $NO_X$ as the precursor pollutant for which emissions in upwind states have the greatest impacts on transported ozone.[5]

In CSAPR, downwind air quality problems were assessed based on modeled future air quality concentrations for a year aligned with attainment deadlines for a particular NAAQS. The assessment of future air quality conditions generally accounted for on-the-books emissions reductions[6] and the most up-to-date forecast of future baseline emissions. The locations of downwind air quality problems were identified as those receptors that were projected to be unable to attain or maintain the standard. More detail on the methods for identifying problem receptors in CSAPR is contained in the attachment.

CSAPR used a screening threshold (1 percent of the NAAQS) to identify contributing upwind states warranting further review and analysis. States whose air quality impact[7] to at least one downwind problem receptor was greater than or equal to the threshold were identified as needing further evaluation for actions to address transport. States whose air quality impacts to all downwind problem receptors were below this threshold were identified as states not requiring further evaluation for actions to address transport—that is, these states had no emissions reduction obligation under the "Good Neighbor" Provision.

In order to quantify emissions reductions needed to eliminate significant contributions to a downwind air quality problem, CSAPR's apportionment of responsibility evaluated air quality and included consideration of cost, an approach that was recently upheld by the U.S. Supreme Court.[8] The selection of cost criteria was informed by air quality considerations. For example, the approach in CSAPR for sulfur dioxide contributions to fine particulate matter ($PM_{2.5}$) placed states into two groups based on differing air quality considerations at downwind receptors. For states within each group, however, a uniform cost level was used to determine needed emissions reductions.

The EPA's preliminary air quality modeling analysis (*see* attachment and the Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Transport Assessment located at *www.epa.gov/airtransport*) applies the CSAPR approach to the 2008 ozone NAAQS, including the approach for identifying nonattainment and maintenance receptors and for identifying upwind states that contribute to these receptors based on the 1 percent screening threshold. Following the CSAPR approach, a state could either demonstrate that its contribution is below the screening threshold, or it could evaluate the scope of its transport obligation and identify measures to achieve any needed emissions reductions. The discussions at the spring 2015 workshop are intended to help states with their evaluation of such emissions reductions.

---

[5] *See* discussion in preamble to the CSAPR Final Rule. 76 FR 48222 (August 8, 2011).

[6] The exception being CAIR, which CSAPR was designed to replace and therefore was not considered on-the-books.

[7] For ozone the impacts would include those from volatile organic compounds (VOC) and $NO_X$, and from all sectors.

[8] *EPA v. EME Homer City Generation, L.P.,* 134 S. Ct. 1584, 1606-07 (2014).

CSAPR and its predecessor transport rules, the NO$_X$ SIP Call and CAIR, were designed to address the collective contributions from the 37 states in the Eastern U.S. and were not formally evaluated for applicability to the 11 states in the Western U.S.[9] The EPA's preliminary modeling indicates that most western states contribute less than 1 percent to downwind nonattainment or maintenance receptors, a level the EPA considered to not need further evaluation for actions to address transport in CSAPR. There are a few receptors in the West where 1 to 3 western states may contribute amounts potentially exceeding the 1 percent threshold (*See* Technical Support Document). Due to the possibility that additional considerations may impact the EPA's and state's evaluation of transport from these potentially linked states in the Western U.S., we expect that the EPA and states will continue to evaluate these western transport linkages (not included in the attachment) on a case-by-case basis. We recommend that states consult with their EPA regional offices regarding these specific situations.

## **For Further Information**

If you have any questions concerning this information, please contact Tim Smith, at (919) 541-4718, *smith.tim@epa.gov*, or Gobeail McKinley, at (919) 541-5246, *mckinley.gobeail@epa.gov*.

Attachment

---

[9] For the purposes of this information document, we include the 37 states and the District of Columbia in the region from Texas northward to North Dakota and eastward to the East Coast as comprising the Eastern U.S. The Western U.S. refers to the 11 states in the contiguous U.S. west of those states (AZ, CA, CO, ID, MT, NM, NV, OR, UT, WA and WY).

**Attachment**

**Air Quality Modeling Results**

*A.    Background*

The EPA performed photochemical air quality modeling to project ozone concentrations at air quality monitoring sites to 2018, the moderate area attainment date for the 2008 ozone National Ambient Air Quality Standards (NAAQS), and to estimate state-by-state contributions to those 2018 concentrations. We then used the air quality modeling results, and the methods we used for Cross-State Air Pollution Rule (CSAPR), to identify ozone monitoring sites expected to be nonattainment or maintenance receptors for the 2008 ozone NAAQS in 2018. We used the contribution information to quantify projected interstate contributions from emissions in each upwind state to ozone concentrations at each identified 2018 nonattainment and maintenance receptor in downwind states. The EPA's air quality modeling used the 2011-based air quality modeling platform. This platform includes emissions for a 2011 base year and a 2018 future base case as well as meteorology for 2011. The 2011 meteorology was used in air quality model simulations for both 2011 and 2018. We selected 2011 as the base year because it reflected the most current National Emissions Inventory (NEI) available. Details on the construct and evaluation of the 2011-based air quality modeling platform are provided in the Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Transport Assessment (AQMTSD).

The 2011 base year emissions in the 2011-based air quality modeling platform were derived from the 2011 NEI, as described in the Technical Support Document: Preparation of Emissions Inventories for the Version 6.0, 2011 Emissions Modeling Platform.[10] This document also describes the control and growth assumptions by source type that were used to create the 2018 base case emissions inventory.[11] The EPA released the 2011 and 2018 emissions inventory for public review on

---

[10] Available on the EPA's website at: *http://www.epa.gov/ttnchie1/emch.*

[11] For electric generating units (EGUs), the 2018 base case emissions were obtained from the Integrated Planning Model (IPM version 5.13, *http://www.epa.gov/powersectormodeling/BaseCasev513.html*). The 2018 base case EGU projections include the Acid Rain Program, Clean Air Interstate Rule (CAIR), and Mercury and Air Toxics Standards. The base case does not include CSAPR, the proposed Clean Power Plan or the proposed 2015 ozone NAAQS, because of the time the projections were developed.

November 27, 2013 (78 FR 70935), and January 14, 2014 (79 FR 2437), respectively. The air quality modeling presented in this transport information document pre-dated, and therefore does not reflect, comments received from this public review process of the 2011 and 2018 emissions inventories. We note that the EPA plans to re-model 2011 and 2018 to provide updated projections of 2018 design values and contributions, using revised inventories created in response to comments on this public review process and other emissions updates.

The EPA used the Comprehensive Air Quality Model with Extensions (CAMx version 6.10)[12] for modeling the 2011 base year and 2018 base case emissions scenarios to identify sites with projected nonattainment and maintenance problems in 2018. As shown in Figure 1, the air quality model runs were performed for a modeling domain that covers the 48 states in the contiguous U.S. along with adjacent portions of Canada and Mexico. The spatial resolution (i.e., grid size) for this modeling domain is 12 km x 12 km. The 2011 and 2018 scenarios were also both modeled for the full year with 2011 meteorology.

---

[12] Environ, April 4, 2014 (*http://www.camx.com*).



**Figure 1. Air quality modeling domain (area within the purple lines).**

*B.     Identification of Future Nonattainment and Maintenance Receptor Sites*

The ozone predictions from the 2011 and 2018 CAMx model runs were used to project ambient (i.e., measured) ozone design values to 2018 following the approach described in the EPA's draft information for attainment demonstration modeling.[13] We selected 2011 as the base year to reflect the most recent NEI, and we selected 2018 to coincide with the attainment date for moderate areas under the 2008 ozone NAAQS. The draft modeling information recommends using 5-year weighted average

---

[13] The December 3, 2014, draft ozone, fine particulate matter and regional haze SIP modeling guidance is available at *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf.*

3

ambient design values[14] centered on the base year as the starting point for projecting design values to the future. Because 2011 is the base year of emissions, we started with the average ambient 8-hour ozone design values for the period 2009 through 2013 (i.e., the average of design values for 2009-2011, 2010-2012 and 2011-2013). The 5-year weighted average ambient design value at each site was projected to 2018 using model-predicted Relative Response Factors (RRFs)[15] which were calculated based on procedures described in the draft modeling information. The 2018 projected average ozone design values were evaluated to identify those sites with design values that exceed the 2008 ozone NAAQS.[16] Those sites with 2018 average design values that exceed the NAAQS are projected to be nonattainment in 2018.

We followed the CSAPR approach to identify sites with projected maintenance problems in 2018 (76 FR 48208). As part of the approach for identifying sites with projected future maintenance problems, the highest (i.e., maximum) ambient design value from the 2011-centered 5-year period (i.e., the maximum of design values from 2009-2011, 2010-2012 and 2011-2013) was projected to 2018 for each site using the site-specific RRFs. Monitoring sites with a 2018 maximum design value that exceeds the NAAQS are projected by the CSAPR approach to have a maintenance problem in 2018.

The base year ambient and projected 2018 average and maximum design values at all monitoring sites are provided in the AQMTSD. In 2018 there are 11 projected nonattainment sites and 18 projected maintenance sites in the East (*See* Table 1). These are the sites that are indicated from the EPA's preliminary modeling as warranting the evaluation of contributions from upwind states. The projected 2018 nonattainment sites in the East are located in four nonattainment areas: Baltimore, MD; New York City, NY (sites in both NY and CT); Dallas, TX; and Houston, TX. Note that several of these nonattainment areas also contain additional sites that are projected as maintenance receptors. Also, there are several projected maintenance-only areas in the East: Holland, MI; Louisville, KY; Philadelphia, PA (including sites in both NJ and PA); St. Louis, MO; and Sheboygan, WI (*See* Table 2).

---

[14] The air quality design value for a site is the 3-year average annual fourth-highest daily maximum 8-hour average ozone concentration.

[15] In brief, the RRF for a particular location is the ratio of the 2018 ozone model prediction to the 2011 ozone model prediction. The RRFs were calculated using model outputs for the May through September period.

[16] In determining compliance with the NAAQS, ozone design values are truncated to integer values. For example, a design value of 75.9 ppb is truncated to 75 ppb which is attainment. In this manner, design values at or above 76.0 ppb are considered nonattainment.

**Table 1. Ambient and 2018 projected average and maximum 8-hour ozone design values (DVs) at 2018 nonattainment receptors in the East (nonattainment receptors have a 2018 average design value of ≥ 76.0 ppb). Units are ppb.**

| State | County | Site ID | 2009 - 2013 Avg DVs | 2009 - 2013 Max DVs | 2018 Avg DVs | 2018 Max DVs |
|-------|--------|---------|------|------|------|------|
| Connecticut | Fairfield | 90013007 | 84.3 | 89.0 | 76.7 | 81.0 |
| Connecticut | Fairfield | 90019003 | 83.7 | 87.0 | 77.5 | 80.6 |
| Maryland | Harford | 240251001 | 90.0 | 93.0 | 79.4 | 82.1 |
| New York | Suffolk | 361030002 | 83.3 | 85.0 | 78.2 | 79.8 |
| Texas | Brazoria | 480391004 | 88.0 | 89.0 | 80.5 | 81.4 |
| Texas | Denton | 481210034 | 84.3 | 87.0 | 77.0 | 79.5 |
| Texas | Harris | 482010024 | 80.3 | 83.0 | 76.4 | 79.0 |
| Texas | Harris | 482011034 | 81.0 | 82.0 | 76.6 | 77.6 |
| Texas | Harris | 482011039 | 82.0 | 84.0 | 77.7 | 79.6 |
| Texas | Tarrant | 484392003 | 87.3 | 90.0 | 79.7 | 82.2 |
| Texas | Tarrant | 484393009 | 86.0 | 86.0 | 78.3 | 78.3 |

**Table 2. Ambient and 2018 projected average and maximum 8-hour ozone design values (DVs) at 2018 maintenance receptors in the East (maintenance receptors have a 2018 maximum design value of ≥ 76.0 ppb). Units are ppb.**

| State | County | Site ID | 2009 - 2013 Avg DVs | 2009 - 2013 Max DVs | 2018 Avg DVs | 2018 Max DVs |
|-------|--------|---------|------|------|------|------|
| Connecticut | Fairfield | 90010017 | 80.3 | 83.0 | 74.1 | 76.6 |
| Connecticut | New Haven | 90099002 | 85.7 | 89.0 | 75.8 | 78.8 |
| Kentucky | Jefferson | 211110067 | 82.0 | 85.0 | 73.7 | 76.4 |
| Michigan | Allegan | 260050003 | 82.7 | 86.0 | 74.5 | 77.5 |
| Missouri | Saint Charles | 291831002 | 82.3 | 86.0 | 74.1 | 77.4 |
| New Jersey | Camden | 340071001 | 82.7 | 87.0 | 72.3 | 76.0 |
| New Jersey | Gloucester | 340150002 | 84.3 | 87.0 | 74.0 | 76.3 |
| New York | Richmond | 360850067 | 81.3 | 83.0 | 74.6 | 76.2 |
| Pennsylvania | Philadelphia | 421010024 | 83.3 | 87.0 | 74.7 | 78.0 |
| Texas | Collin | 480850005 | 82.7 | 84.0 | 75.0 | 76.2 |
| Texas | Dallas | 481130069 | 79.7 | 84.0 | 73.7 | 77.7 |
| Texas | Dallas | 481130075 | 82.0 | 83.0 | 75.2 | 76.1 |
| Texas | Denton | 481211032 | 82.7 | 84.0 | 75.1 | 76.3 |

| State | County | Site ID | 2009 - 2013 Avg DVs | 2009 - 2013 Max DVs | 2018 Avg DVs | 2018 Max DVs |
|-------|--------|---------|---------------------|---------------------|--------------|--------------|
| Texas | Harris | 482010029 | 83.0 | 84.0 | 75.4 | 76.3 |
| Texas | Harris | 482010055 | 81.3 | 83.0 | 75.0 | 76.6 |
| Texas | Tarrant | 484390075 | 82.0 | 83.0 | 75.5 | 76.4 |
| Texas | Tarrant | 484393011 | 80.7 | 83.0 | 74.2 | 76.3 |
| Wisconsin | Sheboygan | 551170006 | 84.3 | 87.0 | 75.4 | 77.8 |

## C.    Quantification of Interstate Ozone Contributions

The EPA performed nationwide,[17] state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[18] to quantify the contribution of 2018 base case nitrogen oxides ($NO_X$) and volatile organic compound (VOC) emissions from all sources in each state to projected 2018 ozone concentrations at air quality monitoring sites. In the source apportionment model run, we tracked the ozone formed from each of the following contribution categories (i.e., "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each state tracked individually (emissions from all anthropogenic sectors in a given state were combined),
- Biogenics – biogenic $NO_X$ and VOC emissions domainwide (i.e., not by state),
- Boundary Concentrations – concentrations transported into the nationwide modeling domain,
- Tribes – the aggregate of emissions from those tribal lands for which we have point source inventory data in the 2011 NEI (i.e., we did not model the contributions from individual tribes), and
- Other – combined emissions from wild and prescribed fires, offshore emissions from marine vessels, offshore drilling platforms and anthropogenic emissions from the portions of Canada and Mexico within the modeling domain.

---

[17] As shown in Figure 1, the EPA's nationwide modeling includes the 48 contiguous states.

[18] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_x$ with anthropogenic $NO_x$ and VOC are assigned to the anthropogenic emissions.

The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected 2018 base case emissions and 2011 meteorology for this time period. The hourly contributions[19] from each tag were processed to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2018 model simulation. This step was performed for those model grid cells containing monitoring sites in order to obtain 8-hour average contributions for each day at the location of each site. The model-predicted contributions were then applied in a relative sense to quantify the contributions to the 2018 average design value at each site. First, the daily 8-hour contributions were averaged across the subset of days with 2018 model predictions exceeding the 2008 ozone NAAQS (i.e., 8-hr daily maximum $\geq$ 76 ppb). For those sites with fewer than 5 predicted exceedance days in 2018, we averaged the contributions for the top five concentrations days.[20] For each site, the multi-day average contribution from each tag was normalized by the sum of the contribution from all tags, combined. The resulting fractional contributions at each site were then applied to the 2018 average design value to quantify (i.e., "apportion") the design value into contributions from each tag. This process was performed for each monitoring site with a projected 2018 design value. Additional details on the source apportionment modeling and the calculation of contributions can be found in the AQMTSD. The resulting 2018 contributions from each tag to each monitoring site are provided in the AQMTSD. The largest contributions from each state to 2018 downwind nonattainment receptors and to downwind maintenance receptors are provided in Table 3.

---

[19] Contributions from anthropogenic emissions under "NO$_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from NO$_X$ and VOC anthropogenic emissions in each state.

[20] If a site did not have at least 5 days with a modeled 2018 8-hour daily maximum concentration $\geq$ 60 ppb, then contributions were not calculated at the monitor.

**Table 3. Largest ozone contributions from each state to downwind 2018 projected nonattainment and to 2018 projected maintenance receptors. Units are ppb.**

| Upwind State | Largest Contribution to a 2018 Nonattainment Site in Downwind States | Largest Contribution to a 2018 Maintenance Site in Downwind States |
|---|---|---|
| Alabama | 1.06 | 1.39 |
| Arizona | 1.47[a] | 0.44 |
| Arkansas | 1.25 | 2.19 |
| California | 0.23 | 1.16[a] |
| Colorado | 0.35 | 0.33 |
| Connecticut | 0.41 | 0.08 |
| Delaware | 0.63 | 2.46 |
| District of Columbia | 0.69 | 0.29 |
| Florida | 0.87 | 1.05 |
| Georgia | 0.71 | 0.73 |
| Idaho | 0.09 | 0.22 |
| Illinois | 0.87 | 22.29 |
| Indiana | 1.93 | 11.41 |
| Iowa | 0.62 | 0.89 |
| Kansas | 0.70 | 1.15 |
| Kentucky | 1.94 | 2.40 |
| Louisiana | 3.38 | 4.37 |
| Maine | 0.01 | 0.00 |
| Maryland | 2.59 | 6.96 |
| Massachusetts | 0.21 | 0.12 |
| Michigan | 1.48 | 3.63 |
| Minnesota | 0.43 | 0.34 |
| Mississippi | 0.83 | 1.52 |
| Missouri | 1.53 | 4.12 |
| Montana | 0.14 | 0.17 |
| Nebraska | 0.36 | 0.56 |
| Nevada | 0.70 | 0.44 |
| New Hampshire | 0.03 | 0.02 |
| New Jersey | 9.21 | 9.95 |
| New Mexico | 0.26 | 0.20 |
| New York | 16.05 | 16.14 |
| North Carolina | 0.57 | 0.55 |
| North Dakota | 0.13 | 0.19 |
| Ohio | 4.06 | 4.41 |
| Oklahoma | 1.50 | 2.59 |
| Oregon | 0.69 | 0.73 |
| Pennsylvania | 9.85 | 18.76 |
| Rhode Island | 0.04 | 0.03 |

| Upwind State | Largest Contribution to a 2018 Nonattainment Site in Downwind States | Largest Contribution to a 2018 Maintenance Site in Downwind States |
|---|---|---|
| South Carolina | 0.36 | 0.35 |
| South Dakota | 0.09 | 0.12 |
| Tennessee | 0.69 | 0.99 |
| Texas | 0.92 | 2.74 |
| Utah | 0.29 | 1.43[a] |
| Vermont | 0.02 | 0.02 |
| Virginia | 4.42 | 3.27 |
| Washington | 0.21 | 0.13 |
| West Virginia | 2.79 | 2.88 |
| Wisconsin | 0.34 | 2.49 |
| Wyoming | 0.37 | 1.29[a] |

[a] These four western states (i.e., AZ, CA, UT, and WY) contribute above the 1 percent threshold to projected 2018 nonattainment or maintenance sites in the West, as identified in the AQMTSD.

Table 4 indicates the projected state "linkages" to downwind 2018 nonattainment receptors in the Eastern U.S.[21] identified in the air quality modeling using a threshold of 1 percent of the 2008 ozone NAAQS (0.76 ppb), consistent with CSAPR. Table 5 provides the same information for states that contribute at or above the 1 percent threshold to identified 2018 maintenance receptors in the Eastern U.S. (States in the Eastern U.S. that are not listed in these tables contribute below 1 percent at all receptors).

[21] For the purposes of this information document, we include the 37 states and the District of Columbia in the region from Texas northward to North Dakota and eastward to the East Coast as comprising the Eastern U.S. The Western U.S. refers to the 11 states in the contiguous U.S. west of those states (AZ, CA, CO, ID, MT, NM, NV, OR, UT, WA and WY).

9

**Table 4. Ozone contributions at or above a 1 percent threshold from upwind states to 2018 nonattainment receptors in the Eastern U.S. Units are ppb.**

| 2018 Nonattainment Receptors | | Upwind States – Part 1 (AL through MS) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| County | Site ID | AL | AR | FL | IL | IN | KY | LA | MD | MI | MS |
| Fairfield, CT | 90013007 | | | | | | | | 2.11 | 0.93 | |
| Fairfield, CT | 90019003 | | | | | | | | 2.60 | | |
| Harford, MD | 240251001 | | | | | 1.93 | 1.95 | | | 0.86 | |
| Suffolk, NY | 361030002 | | | | 0.79 | 1.02 | | | 1.50 | 1.49 | |
| Brazoria, TX | 480391004 | | 1.00 | | 0.88 | | | 3.25 | | | 0.81 |
| Denton, TX | 481210034 | 1.06 | 0.95 | | | | | 3.13 | | | |
| Harris, TX | 482010024 | | | 0.87 | | | | 2.24 | | | |
| Harris, TX | 482011034 | | 1.06 | | 0.81 | | | 3.39 | | | |
| Harris, TX | 482011039 | | 1.25 | | | | | 2.93 | | | 0.84 |
| Tarrant, TX | 484392003 | 0.82 | 0.97 | | | | | 2.94 | | | |
| Tarrant, TX | 484393009 | | 1.19 | | | | | 2.29 | | | |
| | | | | | | | | | | | |
| Number of Linkages => | | 2 | 6 | 1 | 3 | 2 | 1 | 7 | 3 | 3 | 2 |

| 2018 Nonattainment Receptors | | Upwind States – Part 2 (MO through WV) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| County | Site ID | MO | NJ | NY | OH | OK | PA | TX | VA | WV |
| Fairfield, CT | 90013007 | | 6.72 | 15.58 | 1.92 | | 9.86 | | 1.92 | 0.97 |
| Fairfield, CT | 90019003 | | 8.17 | 16.06 | 1.50 | | 9.30 | | 2.17 | 0.89 |
| Harford, MD | 240251001 | | | | 4.07 | | 6.93 | 0.92 | 4.43 | 2.80 |
| Suffolk, NY | 361030002 | | 9.21 | | 2.52 | | 9.79 | 0.80 | 1.72 | 0.99 |
| Brazoria, TX | 480391004 | 1.20 | | | | 0.77 | | | | |
| Denton, TX | 481210034 | | | | | 1.12 | | | | |
| Harris, TX | 482010024 | | | | | | | | | |
| Harris, TX | 482011034 | 1.53 | | | | 1.51 | | | | |
| Harris, TX | 482011039 | 1.06 | | | | 0.99 | | | | |
| Tarrant, TX | 484392003 | | | | | 1.22 | | | | |
| Tarrant, TX | 484393009 | | | | | 1.25 | | | | |
| | | | | | | | | | | |
| Number of Linkages => | | 3 | 3 | 2 | 4 | 6 | 4 | 2 | 4 | 4 |

**Table 5. Ozone contributions at or above a 1 percent threshold from upwind states to 2018 maintenance receptors in the Eastern U.S. Units are ppb.**

| 2018 Maintenance Receptors | | Upwind States – Part 1 (AL through LA) | | | | | | | | | |
| County | Site ID | AL | AR | DE | FL | IL | IN | IA | KS | KY | LA |
| Fairfield, CT | 90010017 | | | | | 0.79 | 1.04 | | | | |
| New Haven, CT | 90099002 | | | | | | 0.81 | | | | |
| Jefferson, KY | 211110067 | | | | | 1.09 | 11.42 | | | | |
| Allegan, MI | 260050003 | | 2.19 | | | 22.30 | 8.17 | 0.89 | 1.15 | | |
| Saint Charles, MO | 291831002 | 0.87 | 1.53 | | | 7.07 | | | | | 0.78 |
| Camden, NJ | 340071001 | | | 1.85 | | 1.33 | 1.66 | | | 0.87 | |
| Gloucester, NJ | 340150002 | | | 2.47 | | 0.86 | 1.01 | | | 1.22 | |
| Richmond, NY | 360850067 | | | 1.14 | | | 0.90 | | | 1.21 | |
| Philadelphia, PA | 421010024 | | | 1.36 | | 0.78 | 2.01 | | | 2.41 | |
| Collin, TX | 480850005 | | 1.06 | | | | | | | | 1.91 |
| Dallas, TX | 481130069 | | 1.07 | | | | | | | | 1.55 |
| Dallas, TX | 481130075 | | 1.13 | | | | | | | | 1.55 |
| Denton, TX | 481211032 | | 1.40 | | | | | | | | 3.05 |
| Harris, TX | 482010029 | 0.77 | | | 1.05 | | | | | | 4.32 |
| Harris, TX | 482010055 | 1.40 | 0.82 | | | | | | | | 4.37 |
| Tarrant, TX | 484390075 | | 0.94 | | | | | | 1.03 | | 2.33 |
| Tarrant, TX | 484393011 | | 1.87 | | | | | | 0.99 | | 2.55 |
| Sheboygan, WI | 551170006 | | | | | 15.87 | 7.92 | | 0.88 | | 1.12 |
| | | | | | | | | | | | |
| Number of Linkages => | | 3 | 9 | 4 | 1 | 8 | 9 | 1 | 4 | 4 | 10 |

| 2018 Maintenance Receptors | | Upwind States -- Part 2 (MD through TN) | | | | | | | | | |
| County | Site ID | MD | MI | MS | MO | NJ | NY | OH | OK | PA | TN |
| Fairfield, CT | 90010017 | 2.01 | | | | 7.64 | 15.49 | 1.93 | | 9.28 | |
| New Haven, CT | 90099002 | 1.74 | | | | 5.58 | 16.15 | 1.86 | | 8.70 | |
| Jefferson, KY | 211110067 | | 1.23 | | | | | 3.93 | | | |
| Allegan, MI | 260050003 | | | | 4.13 | | | | 1.70 | | |
| Saint Charles, MO | 291831002 | | | | | | | | 0.89 | | 0.77 |
| Camden, NJ | 340071001 | | 1.58 | | 0.95 | | 1.54 | 4.42 | | 18.76 | |
| Gloucester, NJ | 340150002 | 6.97 | 1.03 | | | | 1.34 | 3.71 | | 16.20 | |
| Richmond, NY | 360850067 | 3.59 | | | | 9.95 | | 2.10 | | 16.19 | |
| Philadelphia, PA | 421010024 | 5.14 | | | | 1.38 | | 3.84 | | | 1.00 |
| Collin, TX | 480850005 | | | | | | | | 0.91 | | |
| Dallas, TX | 481130069 | | | | | | | | 1.06 | | |
| Dallas, TX | 481130075 | | | | | | | | 1.07 | | |

| 2018 Maintenance Receptors | | Upwind States – Part 2 (MD through TN) | | | | | | | | | |
| County | Site ID | MD | MI | MS | MO | NJ | NY | OH | OK | PA | TN |
| Denton, TX | 481211032 | | | | | | | | 1.22 | | |
| Harris, TX | 482010029 | | 0.79 | | | | | | | | |
| Harris, TX | 482010055 | | | 1.52 | 0.95 | | | | | | |
| Tarrant, TX | 484390075 | | | | | | | | 2.59 | | |
| Tarrant, TX | 484393011 | | | | 0.81 | | | | 2.55 | | |
| Sheboygan, WI | 551170006 | | 3.64 | | 1.81 | | | | 1.64 | | |
| | | | | | | | | | | | |
| Number of Linkages => | | 5 | 4 | 2 | 5 | 4 | 4 | 7 | 9 | 5 | 2 |

| 2018 Maintenance Receptors | | Upwind States – Part 3 TX through WI | | | |
| County | Site ID | TX | VA | WV | WI |
| Fairfield, CT | 90010017 | | 1.88 | 0.87 | |
| New Haven, CT | 90099002 | | 1.39 | 0.83 | |
| Jefferson, KY | 211110067 | | | | |
| Allegan, MI | 260050003 | 2.75 | | | 2.49 |
| Saint Charles, MO | 291831002 | 2.38 | | | |
| Camden, NJ | 340071001 | 1.45 | | 1.17 | |
| Gloucester, NJ | 340150002 | 0.97 | 2.95 | 2.23 | |
| Richmond, NY | 360850067 | | 3.28 | 2.03 | |
| Philadelphia, PA | 421010024 | 1.01 | 2.39 | 2.88 | |
| Collin, TX | 480850005 | | | | |
| Dallas, TX | 481130069 | | | | |
| Dallas, TX | 481130075 | | | | |
| Denton, TX | 481211032 | | | | |
| Harris, TX | 482010029 | | | | |
| Harris, TX | 482010055 | | | | |
| Tarrant, TX | 484390075 | | | | |
| Tarrant, TX | 484393011 | | | | |
| Sheboygan, WI | 551170006 | 2.26 | | | |
| | | | | | |
| Number of Linkages => | | 6 | 5 | 6 | 1 |

# Tab 23

EPA letter of December 20, 2012 pertaining to administrative completeness of the Texas SIP revision "Infrastructure Demonstration and Transport Plan for Ozone"



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS, TX 75202-2733

DEC 2 0 2012

Mr. Zak Covar
Executive Director
Texas Commission on Environmental Quality
Post Office Box 13087
Austin, Texas 78711-3087

Dear Mr. Covar:

Thank you for your agency's letter of December 13, 2012 to the U.S. Environmental Protection Agency providing revisions to the Texas State Implementation Plan. We have determined that the submittal concerning "Infrastructure Demonstration and Transport Plan for Ozone" is administratively and technically complete. We appreciate your efforts to address this Clean Air Act requirement.

If you have any questions, please contact me at (214) 665-7100 or Carl Young of my staff at (214) 665-6645.

Sincerely,

David F. Garcia
Acting Director
Multimedia Planning and
Permitting Division

cc: Chairman Bryan Shaw
Texas Commission on Environmental Quality

Susana Hildebrand, P.E.
Texas Commission on Environmental Quality

Steve Hagle, P.E.
Texas Commission on Environmental Quality

David Brymer
Texas Commission on Environmental Quality

**Recycled/Recyclable** • *Printed with Vegetable Oil Based Inks on 100% Recycled Paper (40% Postconsumer)*